**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES NACE and APRIL NACE, as Guardians of E.N., a Minor, | : | CIVIL ACTION NO.: 15-00333-WB |
| | : | |
| v. | : | |
| | : | |
| FAITH CHRISTIAN ACADEMY, et al. | : | **JURY TRIAL DEMANDED** |

## <u>ORDER</u>

AND NOW, on this                day of                , 2016, upon consideration of Defendant, Faith Christian Academy's Motion for Summary Judgment, and any response thereto, it is hereby **ORDERED** and **DECREED** that Defendant's Motion is **GRANTED** and all claims averred against Faith Christian Academy are hereby **DISMISSED WITH PREJUDICE.**


By:


_____
Honorable Wendy Beetlestone, U.S.D.J.

**JOSEPH J. SANTARONE, JR., ESQUIRE**
**DAVID SALAZAR, ESQUIRE**
PA Attorney ID No.: 45723; 316879
2000 Market Street, Suite 2300                    Attorneys for Defendant
Philadelphia, PA 19103                            Faith Christian Academy
P: (215) 575-2626 / F: (215) 575-0856
jjsantarone@mdwcg.com
ddsalazar@mdwcg.com

---

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES NACE and APRIL NACE, as Guardians of E.N., a Minor, | : | CIVIL ACTION NO.: 15-00333-WB |
| | : | |
| v. | : | |
| | : | |
| FAITH CHRISTIAN ACADEMY, et al. | : | **JURY TRIAL DEMANDED** |

### DEFENDANT, FAITH CHRISTIAN ACADEMY'S
### MOTION FOR SUMMARY JUDGMENT

Defendant, Faith Christian Academy ("Faith Christian"), by and through its undersigned counsel, respectfully moves for summary judgment on the grounds that there is no genuine dispute of material fact and Faith Christian is entitled to judgment as a matter of law.  In support of its Motion, Faith Christian submits herewith its Memorandum of Law, which is incorporated herein by reference.

**MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**

s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
DAVID SALAZAR, ESQUIRE
Attorneys for Defendant,
Faith Christian Academy

DATE: January 27, 2016

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES NACE and APRIL NACE, as Guardians of E.N., a Minor, | : |
| | : CIVIL ACTION NO.: 15-00333-WB |
| | : |
| v. | : |
| | : |
| FAITH CHRISTIAN ACADEMY, et al. | : **JURY TRIAL DEMANDED** |

## DEFENDANT, FAITH CHRISTIAN ACADEMY'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Faith Christian Academy ("Faith Christian"), by and through its attorneys, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.

**Respectfully Submitted,**

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
DAVID SALAZAR, ESQUIRE
Attorneys for Defendant,
Faith Christian Academy

**CASSIDY CONNOR & PITCHFORD, P.C.**

s/ *Carla Connor*
CARLA CONNOR, ESQUIRE
Attorney for Defendants,
Faith Christian Academy, Ryan Clymer, and
Russell Hollenbach

**DRAKE, HILEMAN & DAVIS**

s/ *Jonathan Russell*
JONATHAN RUSSELL, ESQUIRE
Attorney for Defendants,
Faith Christian Academy, Ryan Clymer, and
Russell Hollenbach

DATE: January 27, 2016

## *TABLE OF CONTENTS*

I.     INTRODUCTION..............................................................................1

II.    FACTUAL BACKGROUND............ .......................................................3

    A.  Nace's Incident at Pennridge High School.............................................3

    B.  Circumstances Surrounding Mayer's incident at Faith Christian...............6

    C.  Romig's Hiring at Pennridge...............................................................14

    D.  Bucks County Detectives' Investigation of Mayer's Allegations...............16

III.   STANDARD OF REVIEW...................................................................16

IV.    ARGUMENT.................................................................................... 17

    A.  Faith Christian is Entitled to Dismissal of Plaintiffs' Claims Because Faith
        Christian Owed No Duty to Plaintiffs..............................................17

        1.   No special relationship existed between Faith Christian and Plaintiff
             to support liability based on Romig's intentional and criminal
             conduct................................................................................22

        2.   The relationship between the parties was too attenuated to support a
             duty on the part of Faith
             Christian...............................................................................24

        3.   Plaintiffs' claim of negligence *per se* must be dismissed because
             Plaintiff never came before a Faith Christian employee  acting in his
             official or professional capacity...............................................25

    B.  Plaintiffs' Claim of Negligence *Per* Se Must Be Dismissed Because Plaintiff
        Never Came Before A Faith Christian Employee Acting in His Official or
        Professional Capacity....................................................................26

    C.  The Claims Against Faith Christian Must Be Dismissed Because There Is No
        Evidence of Willful Failure to Report................................................27

V.     CONLUSION..................................................................................29

## ***TABLE OF AUTHORITIES***

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). .................................................. 17
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................................... 17
*Doe v. Liberatore*, 478 F. Supp. 2d 742 (M.D.Pa. 2007) ............................................... 21
*Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3d. Cir. 1991) ................................... 16
*Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1085 (3d. Cir. 1992) ......................... 17
*Groman v. Township of Manalapan*, 47 F.3d 626 (3d. Cir. 1995) ................................ 16
*M.S. v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412 (M.D.Pa. 2014) .......... 21, 27
*Picarella v. Terrizzi*, 893 F. Supp. 1292 (M.D.Pa. 1995)............................................... 28
*United States v. 107.9 Acre Parcel of Land in Warren Township*, 898 F.2d 396, 398 (3d. Cir.
   1990) ........................................................................................................................ 17

**State Cases**

*Cechman v. Travis*, 202 Ga. App. 255 (Ga. Ct. App. 1991)........................................... 27
*Horn v. Kumar*, 2014 Pa. Dist. & Cnty. Dec. LEXIS 417 (Com. Pl. Ct. of Lancaster Cnty. 2014)
   ................................................................................................................ 21, 27, 28
*J.E.J. v. Tri-County Big Brothers/Big Sisters*, 692 A.2d 582 (Pa. Super. 1997) ................. *passim*
*R.A. by & through N.A. v. First Church of Christ*, 2000 Pa. Super. 58, 748 A.2d 692 (2000) .... 21
*T.A. v. Allen (Appeal of Allen)*, 669 A.2d 360, 362 (Pa. Super. Ct. 1995) ........................... 22, 23

**Federal Rules of Civil Procedure**

*Fed. R. Civ. P. 56(c)* ....................................................................................................... 16

**Pennsylvania Statutes**

23 Pa.C.S. §6311 (2009)................................................................................................... 21
23 Pa. C.S. §6352 (2009)................................................................................... 18, 19, 25, 27

**Other Authorities**

Restatement (Second) of Torts, § 314A.............................................................................23
Restatement (Second) of Torts, § 314B.............................................................................23
Restatement (Second) Torts, § 315 ................................................................................... 23

## I.    **INTRODUCTION**

During the course of approximately three months in 2013, Eric Romig had sexual intercourse with Plaintiff, Elizabeth Nace[1]—then a minor —between eight and ten times. Nace and Romig had first become acquainted while Romig was the Pennridge High School ("Pennridge") girls' junior varsity softball coach and Nace was a member of the team.  After the Pennridge girls' softball season was over and after Romig's contract with Pennridge for the academic year had ended, the relationship between Romig and Nace became sexual in nature. Romig and Nace exchanged thousands of text messages, many of which are described as sexually explicit.  Some of the text messages contained sexually explicit photographs and videos.

On October 1, 2013, Romig was arrested and charged with several felonies for his actions relating to Nace, including: corruption of minors; photographing, videotaping, depicting on computer or filming sexual acts with a minor; viewing or possessing child pornography; and, unlawful contact with a minor.  Romig pled guilty to all the charges and is currently incarcerated.

Plaintiffs' claims against Faith Christian hinge on an unrelated incident that occurred at Faith Christian three years before Nace's incident.  The incident involved allegations that Romig, at the time the girls' basketball coach at Faith Christian, sent inappropriate text messages to Emily Mayer, a 17-year-old co-captain of the team.  Critically, Mayer and Romig had deleted all the messages they exchanged by the time the allegations surfaced.  To this day, no one has produced the *actual* content of those messages.  Further, at no time did Mayer report sexual contact to Faith Christian, and, in fact, Mayer denies that she and Romig ever engaged in sexual intercourse.  Moreover, Faith Christian engaged in an investigation of the matter that encompassed the interview of prior students, coaches, and included input from a police chief and

---

[1] Out of concern for the identities of certain parties and witnesses, undersigned counsel proposed using initials to identify any parties or witnesses who were minors at the relevant times.  Plaintiffs' counsel was not amenable to that proposal, and, therefore, full names are being used.

1

Faith Christian's counsel.   Ultimately, the headmaster at Faith Christian, Ryan Clymer, concluded that he did not have proof of the allegations being made against Romig, but nonetheless determined that the amount of texts merited Romig's resignation.   Romig resigned from Faith Christian more than three years before Nace's incident.

Plaintiffs' claims of negligence and negligence *per se* directed at Faith Christian are rooted in Faith Christian's obligations under the Child Protective Services Law ("CPSL").   Both claims aver that Faith Christian was negligent because it failed to report Romig's conduct pursuant to that statute.   Clearly, the pleadings are a concession that Faith Christian's duty, if any, is statutorily based; there is no common law duty to report.   Thus, Faith Christian's liability must necessarily stem from a violation of the statute.   Stated differently, a necessary, though certainly not sufficient, condition for the imposition of liability is a finding that Faith Christian violated the CPSL.

While some witnesses and parties may have forgotten details, or even recounted competing versions of events, the germane facts that control the outcome of this Motion are beyond dispute, and when viewed in the light most favorable to Plaintiffs, they require dismissal. Initially, because Nace was never a student at, or in any way associated with, Faith Christian, she is not within the specific class of people protected by the state, requiring dismissal of Plaintiff's negligence *per se* claim.

Further, Plaintiffs' general negligence claim—which is rooted in a purported violation of the CPSL—must be dismissed because there is no liability to a party for the intentional and criminal conduct of a third party, absent a special relationship.   To be clear, this is not a case where Faith Christian's own affirmative conduct caused Plaintiffs' alleged damages; rather, the issue here is Faith Christian's purported failure to act.   As discussed below, there was no special

2

relationship between Faith Christian and Plaintiff, or Faith Christian and Romig at t the time of

Romig's relationship with Nace, requiring Faith Christian to act as it relates to Nace.

Moreover, the causation element of Plaintiffs' claim is, as a matter of law, too attenuated

to support a finding of liability.  For Plaintiffs' claim to survive dismissal, Plaintiffs must point to

evidence to show that had Faith Christian reported Mayer's allegations, the local district

attorney's office or law enforcement would have pressed charges and Romig would have been

found guilty beyond reasonable doubt.  The undisputed facts will show that when the Nace

matter came to light, the detectives investigating that case interviewed several of the individuals

involved in the Mayer matter, including Mayer.  Ultimately, the detectives did not press charges

against Romig for Mayer's allegations.  The detectives' unwillingness to press charges against

Romig for the Mayer matter is dispositive of the causation issue and supports dismissal of

Plaintiffs' claims.

Lastly, under the express language of the CPSL, and case law interpreting it, a violation

of the CPSL requires that a party <u>willfully</u> fail to report.  In the present matter, there can be no

dispute that there is no evidence of willful failure to report; rather, based upon his understanding

of the facts and the evidence adduced during his investigation, Clymer did not believe he had

sufficient proof to report.  Under the law, Clymer is afforded discretion in weighing the

evidence, and Plaintiff can point to no case imposing liability on someone for exercising that

discretion in good faith.  Thus, because the alleged failure to report was not willful, there can be

no finding that Faith Christian violated the CPSL, and Plaintiff's claims must be dismissed.

## II.  **FACTUAL BACKGROUND**

### A.  **Nace's Incident at Pennridge High School**

During the relevant time frame, Nace was a minor attending Pennridge High School. *See*

Complaint, ECF Doc. No. 1 at ¶7.  During her freshman and sophomore years, Nace was a

3

member of the girls junior varsity softball team coached by Romig.  *See* Joint Appendix ("JA")

0024-26 at 24:15-26:2.  Nace never attended school at Faith Christian.  *See* JA 0009-11 at 9:18-

11:21.  In fact, Nace denied that she knew anything about Faith Christian.  *See* JA 0079 at 79:1-

79:9.  She also denied that she knew Faith Christian's headmaster and principal, Ryan Clymer, or

Faith Christian's former athletic director, Russell Hollenbach.  *See id.*  Further, Nace is not a

member of the church that was affiliated with Faith Christian at the time of Romig's

employment. *See* JA 0143, at 143:10-143:16.

Nace first met Romig her freshman year at Pennridge.  *See* JA  0024-26 at 24:15-26:2

She testified that there was nothing remarkable about her relationship with him during her

freshman year. *See id.*  Towards the end of her sophomore year, her relationship with Romig

changed when he started texting her.  *See* JA 0026, at 26:8-26:24  Nace explained that she gave

Romig her phone number to get information regarding practices and things of that nature.  *See id.*

Nace testified that there was nothing sexual about Romig's communications with her at

the end of her sophomore year.  *See* JA 0028, at 28:6-28:9.  She did note that in his texts, Romig

would try to get to know her.  *See* JA 0027, at 27:4-27:8.  Romig's texts began to turn sexual in

nature sometime in June of 2013.  *See* JA 0029, 29:10-29:15.  Nace testified that the junior

varsity season was over by the time the texts became sexual in nature.  *See* JA 0158-59, at

158:21-159:22.

Nace testified that Romig would send her approximately 50 texts per day during the first

month they texted.  *See* JA 0033, at 33:12-33:22.  The frequency of his texting increased a

couple of weeks before the end of the school year, going from 50 texts to 200 texts per day.  *See*

JA 0034-35, at 34:6-35:1; JA 0038, 38:7-38:14.  She responded to most of his texts.  *See* JA.

Sometime in late June, Romig began texting her about having sexual relations with her. *See* JA 0036-37, at 36:14-37:6. For about a week, she did not respond to his request. *See id.* When she did respond, she remained hesitant because she was not sure that she wanted to have sexual relations. *See id.* When she would tell Romig that she did not want to have sexual relations, however, Romig would get upset and stop texting her. *See* JA 0037-38, at 37:15-38:6.

During that summer, Nace saw Romig overnight on eight to twelve occasions. *See* JA 0046-47, 46:15-47:3. All the overnight meetings occurred at Romig's home. *See id.* She testified that she and Romig had eight to ten sexual encounters during the course of that summer. *See* JA 0049, 49:3-49:21. She denies that during those encounters Romig ever asked her to do anything she did not want to do. *See id.* She also denies that, once the physical relationship started, she ever told Romig that she did not want to continue to have intercourse with him. *See id.*

Sometime in late September of 2013, Nace 's parents found out that she was having a sexual relationship with Romig. *See* JA 0052-54, at 52:3-55:18. Her parents discovered the relationship when they realized the amount of texts exchanged between her and Romig. *See id.* When Nace's mother asked her about her relationship, Nace denied everything because she did not want her mother to find out. *See id.* After a couple of minutes, she admitted that she was having a sexual relationship with Romig. *See id.* At some point thereafter, Nace's parents contacted the police. *See id.*

Romig was arrested on October 1, 2013. *See* JA 0854. He was charged with several crimes as a result of his actions towards Nace, including: corruption of minors; photographing, videotaping, depicting on computer or filming sexual acts with a minor; viewing or possessing child pornography; and, unlawful contact with a minor. *See* JA 0855-57. Romig pled guilty to

5

all the charges and is currently incarcerated. *See id.* At his deposition, Romig testified that he pled guilty immediately after the incident because "[he] did something wrong, and [he] didn't want to follow it up by causing more heartache and pain to the family." *See* JA 0282, at 232:3-232:11.

Nace testified that, despite Romig's arrest that summer, she was able to join the National Honor Society during her junior year at Pennridge, and was able to remain a member through the end of her studies at Pennridge. *See* JA 0101-02, at 101:24-102:13. She indicated that after Romig was arrested, for about a month or so, her grades slipped a little, but she was able to bring them back up. *See* JA 0016, at 16:2-16:12. Moreover, she reported that she had trouble sleeping and lost about 10 pounds—going from 105 pounds to less than 100 pounds. *See* JA 0017-18, at 17:24-18:15. She was able to regain the lost weight by the end of the school year. *See id.* She also testified that when the news broke, she had to take a few days off. *See* JA 0021, at 21:10-21:23. After that, however, everything was fairly normal for her; she had no behavior or attendance issues. *See id.*

### B.    Circumstances Surrounding Mayer's Incident at Faith Christian

Prior to his hire at Pennridge, and more than *three years* before Nace's incident, Romig was the girls' basketball coach at Faith Christian. He served as the girls' basketball coach at Faith Christian from 2005 to 2010. *See* JA 0229-30, at 20:21-21:8.

By way of background, Romig is a graduate of Faith Christian, where he attended school with Ryan Clymer, the headmaster and principal at Faith Christian. *See* JA 0227, at 11:6-11:13 Though Plaintiff will make much of Clymer and Romig's purported friendship, Clymer did explain that there were only eight boys in his class at Faith Christian, so choices were limited. *See* JA 0296-97, at 46:18-49:9. Moreover, Clymer *did not hire* Romig; Romig was already the coach by the time Clymer was hired at Faith Christian. *See id.*

6

Critically, Romig was not a full-time educator or coach; his full-time job was as a manager at R&R, a gasoline, oil and auto mechanic business. *See* JA 0229, at 18:15-20:17. R&R was Romig's only full-time job. *See id.* Romig has never worked as a school teacher. *See id.* Furthermore, no evidence has been adduced to suggest that Romig had ever been accused of sexual misconduct or any other inappropriate behavior by any female employee at R&R. *See id.*

Romig resigned from his position as the basketball coach at Faith Christian on January 5, 2010 citing health reasons. *See* JA 0845. Prior to his resignation, Emily Mayer, then seventeen years old, reported that Romig had sent her inappropriate texts. *See* JA 0181, at 46:10-46:22.[2]

There is some dispute as to how the texting relationship between Romig and Mayer came to light. Mayer testified that Cheryl Alderfer, a lunch aide at Faith Christian, took her to the principal's office so that she could tell Ryan Clymer, the headmaster at Faith Christian, about the texts. *See* JA 0180, at 44:3-45:21. Mayer's version is corroborated by Alderfer. *See* JA 0825, at 42:23-46:18. Clymer believes that Mayer's then-boyfriend, Chase Brunner, came to his office and told him that Mayer had been receiving texts from Romig telling her that she should end her relationship with Brunner. *See* JA 0297-98, at 49:10-53:5.

Ultimately, this difference of recollection is immaterial as it is beyond dispute that Mayer met with Clymer at some point in December of 2009, just a few days before the winter break, and disclosed that she had been receiving "inappropriate" texts from Romig. *See* JA 0298, at 53:6-55:15. During the meeting, Mayer told Clymer that she had received inappropriate text messages from Romig. *See* JA 0181, 46:10-46:22. Mayer does not recall telling Clymer that the text messages were sexually inappropriate. *See* JA 0181, at 46:10-46:22.

---

[2] It should be noted that Plaintiff's counsel met with Mayer and her parents prior to her deposition. During one of his meetings with Mayer, counsel advised Mayer, in so many words, **that he believed that her incident with Romig had been mishandled.** Counsel then met with Ms. Mayer a second time to prepare her for her deposition.

Further, there is no dispute that by the time she disclosed that she was receiving inappropriate text messages from Romig, she had already deleted all the messages from her phone. *See* 0178, at 34:19-36:15.   Notably, prior to her meeting with Mr. Clymer, Mayer had not disclosed the nature of Romig's texts to any of the staff at Faith Christian. *See* 0177, at 33:4-33:13.   Mayer also admitted that when she started receiving the texts, she did not tell her parents, friends or boyfriend. *See id.*   In fact, when her boyfriend eventually found out about the texts, he became upset and wanted to confront Romig, but Mayer told him not to say anything because Romig's adopted daughter, Chelsea Romig, was Mayer's friend.  JA 0177-78, at 33:14-36:11

After meeting with Mayer, Clymer sent Mayer home for her own safety and told her to tell her parents what she had disclosed to him. *See* JA 0181-82, 49:20-51:6.   He also asked Mayer to stay away from basketball activities.   *See* JA 0182, at 52:16-52:21.   The next day, Clymer asked Romig to step aside from his coaching duties while he investigated Mayer's allegations.   *See* JA 0246, 88:1-88:20.

During his investigation, Clymer spoke to Annette and Kevin Smith, Mayer's mother and stepfather, via telephone on at least two undisputed occasions. *See* JA 0623, at 70:10-72:8.  During the initial communication, Clymer advised the Smiths that he would be investigating the matter.   *See* JA 0622, 66:17-69:8.   During one of the calls between the Smiths and Clymer, Clymer highlighted the importance of obtaining the deleted texts messages. *See* JA 0623-24, at 73:19-75:24.  Mr. Smith admitted that he told Clymer that he would attempt to get the contents of those deleted messages.  *See id.*

By way of background, Mr. Smith is a former investigator with the Montgomery County District Attorney's Office, Office of County Detectives.   *See* JA 0608, at 12:16-13:24.  Mr. Smith's educational background includes a graduate degree in information management—an IT-

related degree. *See id.* As part of his job, Mr. Smith is required to retrieve data from hardware, though he denies that in 2009 he had the skill or tools to do so. *See* JA 0631, at 103:11-103:24. Significantly, Mr. Smith indicated that he considered going to the Bucks County Detectives, but Emily asked him not do. *See* JA 0627, 86:4-86:17.

In his efforts to obtain the texts, Mr. Smith reached out to his carrier, Verizon, but they told him that they were not permitted to send him that information. *See* JA 0624, 75:21-77:16. Mr. Smith admitted that Henry Thompson, Faith Christian's business manager, provided Mr. Smith with a telephone number for an attorney who might be able to help him obtain the texts. *See id.* Mr. Smith was unable to reach that attorney. *See id.* Thereafter, he contacted his divorce attorney to see if she could get the texts, but the attorney was unable to get them. *See id.* In sum, the content of those texts was never obtained. *See id.* To this day, no one knows what is contained in those text messages.

There is no dispute that Clymer investigated this matter. Mr. Clymer spoke to Mark Toomey, then-Chief of the Hatfield Township Police Department, who advised Mr. Clymer to speak to his attorney and follow up on Mayer's assertion that a prior student, Lauren Fretz, had an inappropriate relationship with Romig so that he might ascertain the veracity of Mayer's story. *See* JA 0304-05, at 80:4-81:20. Clymer explained that he contacted Chief Toomey because he trusted Chief Toomey. *See* JA 0305, 81:23-82:24. Though Chief Toomey did have a child who attended Faith Christian, nothing in the record suggests that this would influence his judgment concerning the Mayer incident. *See id.*

Following Chief Toomey's advice, Clymer contacted Lauren Fretz, who denied that she and Romig had an inappropriate relationship. *See* JA 0305-06, at 84:11-86:6. Lauren did

9

advice Mr. Clymer to contact Kristen Kennedy, another Faith Christian alum, as she may have information relevant to his investigation. *See id.*

Notably, Tracy Fretz, Lauren's mother, was deposed in this matter and she testified that even after Nace's incident came to light, she asked Lauren whether anything inappropriate had taken place between her and Romig, which Lauren denied. *See* JA 0451, 48:17-48:23. Tracy also testified that Romig would text Lauren frequently when she played on the basketball team. *See* JA 0444-46 , 41:8-43:12. Tracy admitted that she was bothered by the texts, but that Lauren explained to her that the texts were about basketball, and Tracy had no reason to suspect that her daughter was having an inappropriate relationship with Romig. *See* JA 0447-48, 44:13-46:21. She also noted that she spoke to Romig about the texting and asked him to stop. *See* JA 0447, 42:10-42:22. After the Nace incident came to light, Lauren admitted to Tracy that some of Romig's texts were inappropriate, but not sexual. *See* 0477-79, at 74:9-76:3. Critically, no evidence has been adduced to show that Clymer was aware of Lauren and Romig's texting. *See* JA 0305-06, at 84:11-86:6.

Following his conversation with Lauren, Clymer asked Lauren to have Kennedy contact him. *See* 0306, at 85:15-88:17. Kennedy denied having an inappropriate, physical relationship with Romig. *See id.* Kennedy did tell Clymer that Romig sent her an email after she graduated from Faith Christian where he told her that he was attracted to her. *See id.* According to Clymer, Kennedy told him that her father learned of the message and confronted Romig, asking him not to contact Kennedy any more. *See id.*

At her deposition, Kennedy testified that, while attending Faith Christian, Romig would send her Facebook messages asking her about her relationship with her boyfriend, including questions regarding their intimacy. *See* JA 0506-07, at 21:2-22:18. She explained that she

10

looked to Romig as a mentor, and, as such, their conversations dealt with issues of temptation and sin. *See id.* She denies that her relationship with Romig ever involved inappropriate physical contact, or that Romig ever suggested to her that he wanted to be intimate with her. *See* JA 0509, at 33:18-35:18; JA 0520, at 76:7-76:10. She also denied that she ever disclosed her communications with Romig to anyone at Faith Christian while they were ongoing. *See* JA 0508, at 26:24-27:18. Kennedy stated that she told Clymer about the messages when he contacted her regarding Mayer's incident, and that she told him that they were nothing to be "super alarmed by." *See* JA 0523, at 86:10-88:4.

Clymer also approached Robin Landis, the assistant coach of the girls basketball team, and asked her whether she had noticed anything out of the ordinary between Mayer and Romig. *See* JA 0308, 94:21-96:13. Ms. Landis told Mr. Clymer that Romig had recently relieved Mayer of her co-captaincy of the team. *See id.* Otherwise, Ms. Landis denied that she noticed anything of concern in Romig and Mayer's interaction. *See id.*

There were two significant communications that Clymer received from the Smiths during his investigation. On New Year's Eve 2009, Mrs. Smith sent an email to Mr. Clymer attaching Mayer's purported statement.[3] *See* JA 0959-60. The "statement" attached was a ten item list of messages Mayer claimed to have received from Romig. *See id.* One of the messages stated, "I want to be in you." *See id.* At his deposition, Mr. Clymer explained that when he saw the message, he thought it was a mistake given that when he first met with Mayer, she told him that Romig told her that he wanted to be *with* her. *See* JA 0329, at 180:4-180:22.

The second communication came from Mr. Smith, enclosing logs he had obtained from Verizon evidencing that Romig texted Mayer 2,140 times and Mayer texted Romig 1,886 times

---

[3] Though this "statement" was prepared on December 21, 2009, the Smiths waited ten days to forward it to Mr. Clymer. *See* JA 0959-60.

during the month of December. *See* JA 0864-958. The email from Mr. Smith notes that Mayer's phone received one text message after Clymer's meeting with Romig stating, "[t]his presentation is going to be rough. Ewing Oil contracts are difficult to negotiate[.]" *See id.* At his deposition, Romig could not recall sending that message, but noted that if he did send that message to Mayer, it was not intended for her. *See* JA 0264, 159:19-160:5.

In his investigation, Clymer also discussed the matter with the school's counsel, Jeff Drake.[4] *See* JA 0385-86, at 32:9-33-35:19. Drake testified in this matter as the school waived its privilege with regard to the communications between Clymer and Drake during the investigation. *See* JA 0379, at 5:1-6:18. During the initial conversation on December 23, 2009, Clymer told Drake that Mayer came to him and told him that she had been receiving inappropriate texts from a coach. *See* JA 0385-86, 32:9-36:3. Drake testified that Clymer identified four texts during that conversation: (1) I love you; (2) I'm going to be leaving my wife; (3) I'll wait for you if you want to marry me; (4) I want to get *with* you. *See id.*; *see also*, JA 0846-0851 (Jeff Drake's notes). Clymer also told Drake that Romig denied the allegations. *See* JA 0387, at 37:24-39:16.

Additionally, Clymer told Drake that he did not have the content of the text messages, but that Mr. Smith indicated that he could get it. *See id.* Drake was aware that over a thousand texts were exchanged between the period of October 4th and November 30th. *See id.* Moreover, Drake was also aware that Lauren Fretz had been identified as someone with whom Romig had an inappropriate relationship. *See id.*

Drake testified that during a second conversation with Clymer, Clymer disclosed to him that he believed that he had caught Romig in a lie. *See* JA 0394-95, 68:11-71:22. Specifically, Clymer believed that Romig lied to him when he asked whether he had the phone during the day

---

[4] Drake testified that in 2009, he was familiar with the Pennsylvania Child Protective Services Law. *See* JA 0383, 21:3-23:2. He regularly represents schools, and questions concerning the law arise in his practice. *See id.* In fact, he testified that he taught a class at Cairn University that dealt with the CPSL. *See id.*

when Mayer claimed to have received the "I want to be in you" text. *See id.* Drake believes that when Clymer verified that Romig may have lied to him, he told Romig that he was going to terminate him based on the number of texts. *See id.*

Significantly, Drake denied that he reviewed Mrs. Smith's December 31st email with Mayer's statement. *See* JA, 0397, 77:3-80:4. He also denied that he was aware that Kennedy told Clymer that Romig and her had conversations regarding her intimacy with her boyfriend. *See* JA 0398, at 82:12-83:9. However, based on what he did know, Drake admitted that he did not advise Clymer to contact the authorities. *See* JA 0399, 86:9-86:17.

Because he did not have the ultimate source of the truth—the text messages between Romig and Mayer— Clymer believed was dealing with allegations. *See* JA, 0320-21, at 144:5-145:24. Clymer stated that he could not verify Mayer's allegations, nor could he disprove Romig's denial. *See id.* Nonetheless, he still believed that too many texts were exchanged. *See id.*

On the morning of January 7, 2010, Drake became aware of a conflict and had to step away from the investigation, so he recommended that Faith Christian retain Brett Mandes, an employment lawyer to advise Faith Christian regarding the Romig matter. *See* JA 0384-85, at 28:21-30:8. Clymer had a conversation with Mandes regarding his investigation, including the statement supplied by Mrs. Smith with her December 31, 2009 email. *See* JA 0293-94, at 34:16-39:18. Mandes advised Clymer that he had to ask Romig to resign. *See* JA 0292, at 30:10-31:5. Notably, Drake testified that during one of his conversations with Clymer, he also advised Clymer that if Ryan was headed in the direction of terminating Romig, it would be better if Romig resigned rather than firing him. *See* JA 0392, at 58:24-60:2.

13

As noted above, Romig resigned on January 5th, 2010. *See* JA 0845. Clymer explained that he was aware that Romig was having health problems. *See* JA 0321, at 146:1-148:24. Thus, he was not surprised that Romig listed health issues as the reason for his resignation. *See id.* Clymer also noted that Mr. Mandes told him that he could not tell Romig what to put down as the reason for his resignation. *See* JA 0320, at 143:4-144:4.

Critically, when asked, implicitly, whether his investigation was affected by his relationship with Romig and his desire not to see something bad happen to Romig, Clymer testified that he "wouldn't want anything bad to happen to him . . . not because of [his] long-standing relationship," but, rather, because Romig is a human being. *See* JA 0308, at 93:8-93:19. Clymer added that he absolutely would have handled this investigation the same way even if it was somebody with whom he had no prior relationship. *See id.*

Significantly, Mayer denied that she and Romig ever engaged in sexual intercourse. *See* JA 0195-96, at 104:21-106:3. Mayer also denied that Romig ever sent her explicit pictures of himself. *See* JA 0186, at 67:12-67:20. While Mayer would later claim that Romig had touched her inappropriately on one occasion, she admitted that she never told anyone at Faith Christian about it. *See* JA 0208, at 154:10-154:13. Mayer could not recall whether she ever asked Romig to stop texting her. *See* JA 0187, at 72:6-72:8.

Prior to the Mayer matter, Faith Christian had never received complaints regarding his coaching activities. *See* JA 0349, 69:10-69:13. Further, Romig's background was devoid of any criminal activity prior to his arrest for his involvement with Nace. *See* JA 1624-29.

### C.   Romig's Hiring at Pennridge

David Babb, athletic director at Pennridge, testified that he had previously worked with Romig when Babb worked as the athletic director at Quakertown High School. *See* JA 0532, 12:16-14:20. While at Quakertown, Babb believed Romig did a great job as a coach. *See id.*

14

Babb testified that he reached out to Romig regarding an open position at Pennridge for the 2011-2012 season. *See* JA 0534, at 17:18-20:4. At first Romig was not interested, but he told Babb that he would get back to him. *See id.*

Eventually Romig came around and accepted the position. *See* JA 0852-53. Babb denied that they discussed whether Romig had coached anywhere else other than Quakertown. *See* JA 0535, at 22:1-22:24. Further, Babb specifically denied that Romig's coaching at Faith Christian was discussed prior to his hiring at Pennridge as the softball coach. *See id.* In fact, at his deposition, Babb was unsure whether he even knew that Romig had coached at Faith Christian before he hired him at Pennridge. *See* JA 0539, at 38:1-39:3.

Furthermore, while Romig did list Hollenbach as a reference, Babb denied that he contacted Hollenbach. *See id.* at 39:4-39:22. Babb did testify that he ran into Hollenbach at a PIAA meeting sometime in the Spring of 2012—after Romig had been hired at Pennridge— and that during a brief conversation, Hollenbach told Babb that Romig had been let go because of texting. *See* JA 0544, at 60:18-61:23, 69:10-72:1. Babb denied that he asked any additional questions regarding the texts. *See id.* Hollenbach has no recollection of this conversation. *See* JA 0351, at 79:8-79:10.

Significantly, Romig was hired pursuant to an Extra Duty, Extra Pay contract. *See* JA 0852-53. Pursuant to this contract, Romig was employed from the start of the junior varsity softball season through the conclusion of that season. *See* JA 0537, 31:15-32:22. Though Romig can continue sitting in the dugout for the varsity team if that team's season extends beyond the junior varsity season, he is not required to do so. *See id.* Romig was paid at the conclusion of the junior varsity season. *See id.* In 2012, the junior varsity season ended in mid-

May. *See id.* Thus, the sexual nature of Romig's relationship with Nace occurred after Romig's

Extra Duty, Extra Pay contract had ended for the 2012-2013 season.

### D.   Bucks County Detectives' Investigation of Mayer's Allegations

The Bucks County detectives investigating the Nace matter also investigated Mayer's

allegations. Romig explained that although the detectives did not ask him about the Mayer

matter, he disclosed it to them. *See* JA 0278, at 213:4- 213:13. It is beyond dispute that several

of the critical participants in the 2009 investigation were interviewed by the Bucks County

detectives. The detectives interviewed Mayer, Kevin Smith, and Annette Smith. *See* JA 0192, at

90:6-91:2; JA 0643, at 150:5-150:13; JA 0643, at 150:5-150:13. The detectives met and

interviewed Kennedy. *See* JA 0520, at 74:6-76:15. The detectives also met and interviewed

Clymer. *See* JA 0374, at 169:9-169:23. In fact, the detectives went as far as traveling to

California in order to interview Lauren Fretz. *See* JA 0479-80, at 76:24-77:21. In the end, the

detectives and the district attorney told Romig's attorney that after conducting a full

investigation, they would not pursue any charges against him related to Faith Christian. *See* JA

0282, at 231:3-231:9.

### III.   **STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, "show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fed. R. Civ. P. 56(c)*; *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 *(3d. Cir. 1991)*.

In reviewing a motion for summary judgment, the court must view the facts and all inferences

drawn therefrom in the light most favorable to the non-moving party. *Groman v. Township of*

*Manalapan*, 47 F.3d 626 (3d. Cir. 1995*)*. The role of the court is not to weigh the evidence and

determine the truth of the matter, but to determine whether, construing the facts and inferences

therefrom in the light most favorable to the non-moving party, there is a genuine issue for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes a showing, then the burden shifts to the non-moving party to demonstrate that a genuine issue of material fact exists by presenting sufficient evidence from which a reasonable jury could return a verdict for the non-moving party. *United States v. 107.9 Acre Parcel of Land in Warren Township*, 898 F.2d 396, 398 (3d. Cir. 1990).

In opposing the Faith Christian's present Motion for Summary Judgment, Plaintiff bears the burden of presenting facts which evidence that a genuine issue for trial as to the essential elements of her claims exists. *Celotex Corp.*, 477 U.S. at 324. To meet this burden, Plaintiff cannot rely on the allegations in the pleadings, or on conclusory assertions unsupported by evidence, that a factual dispute exists. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1085 (3d. Cir. 1992). Further, mere speculation, suspicion, metaphysical doubt or evidence that is not sufficiently probative will not defeat summary judgment. *Id.*

Here, no genuine issue of material fact exists; therefore, Faith Christian is entitled to judgment as a matter of law.

IV.     **ARGUMENT**

      **A.     Faith Christian is Entitled to Dismissal of Plaintiffs' Claims Because Faith   Christian Owed No Duty to Plaintiffs.**

Plaintiffs' claims must be dismissed because Nace never was, nor has ever been, a member of Faith Christian, and, therefore, she is owed no duty. It is well settled that the elements of a negligence claim require proof of "a duty, a breach of that duty, a causal

relationship between the breach and the resulting injury, and actual loss." *J.E.J. v. Tri-County Big Brothers/Big Sisters*, 692 A.2d 582, 584 (Pa. Super. 1997) (citing, *Burman v. Golay & Co.*, 420 Pa. Super. 209, 616 A.2d 657 (1992); *Casey v. Geiger*, 346 Pa. Super. 279, 499 A.2d 606 (1985)).   In determining whether a duty exists, it is necessary to determine "whether a defendant is under any obligation for the benefit of the particular plaintiff . . . and, unless there is a duty upon the defendant in favor of the plaintiff which has been breached, there can be no cause of action based upon negligence." *See id.* (quoting, *Hoffman v. Sun Pipe Line Co.*, 394 Pa. Super. 109, 575 A.2d 122, 125 (1990)).

A claim of negligence *per se* "establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm[.]" *J.E.J.*, 692 A.2d at 585 (quoting, *Braxton v. Commonwealth Dept. of Transp.*, 160 Pa. Commw. 32, 634 A.2d 1150, 1157 (1993)).   A court analyzing a claim based on negligence *per se* must show that "the purpose of the statute [is] to protect the interest of a group of individuals, as opposed to the general public, and the statute must clearly apply to the conduct of the defendant." *Id.* (citations omitted).

Section 6352(a)(1) of the CPSL provides that "a school employee who has ***reasonable cause*** to suspect, on the basis of profession or other training and experience, that a student ***coming before the school employee in the employee's professional or official capacity*** is a victim of serious bodily injury or sexual abuse or sexual exploitation by a school employee shall immediately contact the administrator." 23 Pa.C.S. §6352(a)(1) (2009) (provision repealed

effective December 31, 2014) (emphasis added).[5]   Section 6352(c) sets out the manner in which §6352(a) is violated, providing as follows:

> a.   A school employee who willfully violates subsection (a) Commits a summary offense.
>
> b.   A school employee who, after being sentenced under paragraph (1), violates subsection (a) commits a misdemeanor of the third degree.

23 Pa. C.S. §6352(c) (emphasis added).

*J.E.J., supra*, is the case most factually analogous to the present matter.   In *J.E.J.*, the Pennsylvania Superior Court affirmed the dismissal of claims brought by the parents of J.J., a child who had been molested by Randall Cassel.    *J.E.J.*, 692 A.2d  at 583.   Cassel had previously served as a volunteer at the Tri-County Big Brothers/Big Sisters. *Id.*  Though J.J. had never been a member of Tri-County, the parents learned that, prior to his abuse of J.J., Cassel had been investigated by Tri-County as a result of allegations that he had sexually abused a boy designated as his "Little Brother." *Id.*

During its investigation, Tri-County suspended the Cassel from participation in the Big Brother program, but did not report the allegations to any law enforcement or protective agency. *Id.*    Tri-County later determined that the allegations against Cassel were groundless, and reinstated him as a Big Brother.   *Id.*   Eventually, Cassel would be arrested, charged, and convicted for his conduct against J.J. *Id.* at n. 2.   Cassel, however, was not charged or convicted for his conduct against the Little Brother. *Id.*

---

[5] The CPSL underwent various amendments in 2015.   Faith Christian's position is that their conduct must be analyzed under the framework existing at the time Mayer came before Clymer—to wit, the statutory framework of the CPSL in 2009.

Based on these allegations, the plaintiffs in *J.E.J.* brought, *inter alia*, claims of negligence and negligence *per se* against Tri-County and the national Big Brother/Big Sister organization based on their purported failure to report Cassel's conduct under the CPSL. *Id.*

In dismissing the claims, the court held that neither Tri-County nor the national organization owed the plaintiffs a duty. *Id.* at 585. The court reasoned that Tri-County and the National Organization did not owe the plaintiffs a duty because there were no allegations that J.J. had "in any way participated in the Big Brother program." *Id.* Thus, the court noted, "no relationship existed between the parties at the time of the abuse or at any time thereafter." *Id.* (citing, *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984); *Schmoyer by Schmoyer v. Mexico Forge, Inc.*, 437 Pa. Super. 159, 649 A.2d 705 (1994); *Hoffman, supra*).

The court added that because no relationship existed between the J.J. and Tri-County/National Organization, the latter only owed the plaintiffs "a general duty imposed on all persons not to place others at risk of harm; such risks, however, must be reasonably foreseeable." *Id.* While the court was admittedly disturbed by the facts before it, it was nonetheless unwilling to "extend the scope of such a duty to require Tri-County/National Organization to warn or protect **all** parents and children from persons like Cassel[,]" particularly in light of the "tenuous connection between the parties and events" of the case. *Id.*

The court also dismissed the negligence *per se* claim, holding that the plaintiffs fell outside the group of individuals covered by Section 6311 of the CPSL. *Id.* at 586. The court reasoned that while the statute was clearly promulgated for the protection of children, "it appears that the children the statute aims to protect must be in some way connected to the persons who, in the course of their employment, come into contact with abused children." *Id.* (citing, 23

20

Pa.C.S. §6311(a)).  Consequently, because plaintiff-child was not affiliated with Tri-County, he was never a member of that organization.  *Id.*

It should be noted that *J.E.J.* is not the only case where a court has refused to allow a case premised on a violation of the CPSL to survive dispositive motions; to the contrary, courts have overwhelmingly dismissed cases premised on the CPSL.  *See, e.g.*, *Horn v. Kumar*, 2014 Pa. Dist. & Cnty. Dec. LEXIS 417 (Com. Pl. Ct. of Lancaster Cnty. 2014) (finding, *inter alia*, that defendant doctors were not liable for their failure to report because it was not willful and because there is no common law duty to report child abuse); *R.A. by & through N.A. v. First Church of Christ*, 2000 Pa. Super. 58, 748 A.2d 692 (2000) (finding that mandatory reported lacked reasonable cause to report and that the failure to report was not the proximate cause of the plaintiff's injuries); *M.S. v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412 (M.D.Pa. 2014) (finding that violation of CPSL requires willful failure to report and that plaintiffs failed to establish proximate cause).

By contrast, in the very limited cases where a court has allowed a claim rooted in the violation of the CPSL to survive dispositive motions, the defendant organization tasked with reporting takes *an affirmative act* to place the perpetrator of the abuse *directly* on the path to abuse the plaintiff; the plaintiff is a member of the reporting organization; the perpetrator of the act is still within the control of the organization at the time when he carries out the abuse *on the plaintiff*; and, most importantly, the organization is aware of the perpetrator's abuse *as it is ongoing*, and does nothing to stop it.  *See Doe v. Liberatore*, 478 F. Supp. 2d 742 (M.D.Pa. 2007).

1.      **No special relationship existed between Faith Christian and Plaintiff to support liability based on Romig's intentional and criminal conduct.**

"As a general rule, a person is not liable for the criminal conduct of another in the absence of a special relationship imposing a pre-existing duty." *T.A. v. Allen (Appeal of Allen)*, 669 A.2d 360, 362 (Pa. Super. Ct. 1995) (*quoting, Elbasher v. Simco-Sales Services of Pennsylvania*, 441 Pa. Super. 397, 657 A.2d 983, 984 (1995)).

*Appeal of Allen* is particularly instructive on how Pennsylvania courts treat a defendant's duty when the conduct anchoring liability is a third-party's criminal acts. In *Appeal of Allen*, Eugene Allen was convicted of offenses involving the sexual abuse of his three grandchildren. *Id.* The offenses were all committed in homes owned by Allen and his second wife, Elizabeth. *Id.*

The plaintiffs, Allen's grandchildren, sued Allen and Elizabeth. *Id.* at 360-61. The plaintiffs' claim against Elizabeth was premised on her failure to exercise due care to protect the children against the misconduct of her husband. *Id.* at 361. Notably, the children were Allen's grandchildren from his prior marriage. *Id.* at 360.

In reversing the jury's judgment and entering judgment n.o.v. for Elizabeth, the court found that no special relationship existed between Elizabeth and the grandchildren that would impose a duty upon her to protect the children from criminal abuse. *Id.* at 363.

The court opened its analysis by noting that Elizabeth "did not cause injury to the grandchildren by her own affirmative conduct," but, rather, her liability hinged on the allegation "that she failed to protect her husband's grandchildren from pedophilic tendencies of her husband of which she knew or should have known." *Id.* at 362. The court noted that the applicable rule under the circumstances was set by Section 315 of the Restatement (Second) of Torts, which states:

§ 315. General Principle

There is no duty so to control the conduct of a third person as to
prevent him from causing physical harm to another unless

    i.    a special relation exists between the actor and the third person
        which imposes a duty upon the actor to control the third person's
        conduct, or

    ii.     a special relation exists between the actor and the other which
        gives to the other a right to protection.

*Id.* (quoting, Restatement (Second) Torts, § 315).

The court added that special relations "which give rise to a duty to act affirmatively to
protect another" are set by Section 314A of the Restatement, which establishes special duties for
common carriers in connection with their passenger; for innkeepers with their guests; for
possessors of land who open the land to the public; and for "[o]ne who is required by law to take
or who voluntarily takes custody of another under circumstances such as to deprive the other of
his normal opportunities for protection." *Id.* at 362-63. (quoting, Restatement (Second) of Torts,
§ 314A).[6]

Based on its review of the record, the court found that there was no special relationship
between Elizabeth and the children that would impose a duty upon her a duty to protect the
children from the criminal abuse by their own grandfather. *Id.* at 363. The court also rejected the
proposition that Elizabeth owed the grandchildren the same duty a possessor of land owes an
entrant. *Id.*

One critical similarity between *Appeal of Allen* and the instant case is that Faith
Christian's liability is not premised on Faith Christian's affirmative action; rather, Plaintiffs argue
that Faith Christian is liability for its failure to act in a manner that would have, allegedly,

---

[6] While the court's opinion does not discuss Section 314B of the Restatement, it is worthwhile mentioning that said
provision stands for the proposition that there is a special relationship between an employer and employee.
Restatement (Second) of Torts, §314B. The duty set out by that duty is circumscribed to situations where an
employee is injured or in peril. *Id.*

prevented Romig from coming into contact with Nace.  The evidence shows, however, that in the instant case, there was no special relationship between Nace and Faith Christian at the time Romig engaged in his criminal conduct.  Moreover, there was no special relationship between Faith Christian and Romig once Romig was no longer employed by Faith Christian.

### 2. The relationship between the parties was too attenuated to support a duty on the part of Faith Christian.

Duty is predicated upon the relationship between the parties existing at the relevant time frame.  *J.E.J.*, 692 A.2d at 584 (citing, *Hoffman*, 575 A.2d at 125).  In a situation where parties are strangers to each other, the duty owed by one party to another is the "general duty imposed on all persons not to place others at risk of harm through their ***actions***."  *Id.* (emphasis added) "The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case."  *Id.*  "Only when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff."  *Id.*

There are many parallels between the instant matter and the facts underlying *J.E.J*, *supra*.  Initially, Plaintiffs' claims are not premised on Faith Christian's actions; rather, they are premised on *inactions*.  Further, Nace was never a member of Faith Christian or the church affiliated with Faith Christian at the time she encountered Romig.  Indeed, there is no connection between Faith Christian and Plaintiffs.  Furthermore, like in *J.E.J.*, Plaintiffs' claims against Faith Christian are premised entirely on Faith Christian's purported failure to report an incident that did not involve Plaintiffs.  Stated differently, Plaintiffs' incident is completely unrelated to Mayer's allegations.

In this particular case, the relationship between Plaintiffs and Faith Christian is further attenuated by the fact that Faith Christian played no role in Romig's hiring at Pennridge *two years* after he resigned from Faith Christian.  Indeed, as Mr. Babb indicated, he is not even sure

24

he knew that Romig had coached at Faith Christian.  Instead, Babb relied on his familiarity with Romig from Babb's time at Quakertown High School.  Based on his knowledge of Romig, Babb reached out to Romig and offered him the job; nothing in the record suggests that Romig was looking for a coaching job when Babb reached out to him.  To the contrary, he already had a full-time job at R&R, and even rejected Babb's job offer the first time he was presented with it.

Furthermore, by the time Romig began his advances towards Nace, he was no longer acting in his official capacity as coach of the junior varsity softball team at Pennridge.  His contract, which lasted from the start of the junior varsity season through the end, had ended by June when he began sending Nace inappropriate texts.  More importantly, by the time he began his sexual advances towards Nace, Romig was no longer employed by Faith Christian.

In sum, the relationship between the Nace and Faith Christian, and what happened to Nace at the hands of Romig, is far too attenuated to support a finding of duty.  For that reason, the claims against Faith Christian must be dismissed.

### 3. Plaintiffs' claim of negligence *per se* must be dismissed because Plaintiff never came before a Faith Christian employee acting in his official or professional capacity.

Plaintiffs' negligence *per se* claim must be dismissed because Plaintiff never came before a Faith Christian school employee in that employee's professional or official capacity at any point in time.  Like Section 6311, Section 6352 cabins the definition of the "children the statute aims to protect . . . ." *J.E.J.*, 692 A.2d at 585-86.  Section 6352 expressly applies to students "coming before the school employee in the employee's professional or official capacity."  23 Pa.C.S. §6352 (2009).

In the present matter, there can be no dispute that Nace never came before any Faith Christian employee at the time Romig engaged in the criminal misconduct that led to his

25

imprisonment. As noted above, she denied that she knew Clymer, Hollenbach, or that she was familiar with Faith Christian. As such, she is not within the specific class of children protected by § 6352.

To the extent Plaintiffs argue that Section 6311 applies to Faith Christian, the reasoning in *J.E.J.* applies with equal force. As noted in *J.E.J.*, the children that Section 6311 aims to protect "must be in some way connected to the persons who, in the course of their employment come into contact with abused children." *J.E.J.*, 692 A.2d at 585-86. Again, Nace was never a member of Faith Christian, and, therefore, Plaintiffs' negligence *per se* claim must be dismissed.

### B. Plaintiffs' Claims Merit Dismissal Because Causation in this Matter is Purely Speculative and Attenuated.

Plaintiffs' claim that Faith Christian caused their damages by allegedly failing to report is purely speculative and attenuated. For purposes of efficiency, Faith Christian incorporates by reference its *Daubert* Motion to preclude the opinions of Plaintiff's expert, Brad Jackman, Esquire. As is noted therein, Mr. Jackman's opinion is purely speculative and unreliable. Without Jackman's opinion, Plaintiffs cannot prove causation because they cannot establish that a founded or indicated report would have prevented Romig from working at Pennridge.

Causation in this matter is further undermined by the undisputed fact that the Bucks County Detectives investigated the Mayer matter thoroughly. Indeed, the detectives interviewed Mayer, her parents, Clymer, Kennedy, and even traveled to California to interview Lauren Fretz. Despite their comprehensive investigation, the detectives and the district attorney's office did not charge Romig for the Mayer allegations.

To suggest that a different outcome would have occurred in 2009 is nothing more than speculation. This Court need not engage in speculation when the facts are clear: the detectives had arguably more evidence than Clymer had at the time Mayer came forward with her

26

allegations (given that Mayer told the detectives that Romig inappropriately touched her backside), and they chose not charge Romig for those allegations.

### C. The Claims Against Faith Christian Must Be Dismissed Because There is No Evidence of Willful Failure to Report.

Plaintiffs' claims must be dismissed because the record does not support a finding that Faith Christian willfully failed to report, and, therefore, there can be no finding that Faith Christian violated the CPSL.  It should be noted from the outset that this case does not involve the argument that the CPSL contains a private right of action; indeed no case law has ever determined the CPSL to contain such right.  On its face, the CPSL expressly outlines the manner by which a mandatory report violates the statute, providing as follows:

> (1) A school employee who *willfully* violates subsection (a) commits a summary offense.
>
> (2) A school employee who, after being sentenced under paragraph (1), violates subsection (a) commits a misdemeanor of the third degree.

23 Pa. C.S. §6352(c) (emphasis added).

A violation of the CPSL requires evidence of willful failure to report—that is, the plaintiff must show that the defendant had cause to believe that the plaintiff was a victim of sexual misconduct *while it was ongoing* and *intentionally* failed to report.  *See M.S.*, 43 F. Supp. 3d at 431-32 (finding that a violation of the CPSL requires that the plaintiff show that the failure to report was willful by showing that the defendants had cause to believe that the plaintiff was a victim of sexual misconduct while it was ongoing and intentionally failed to report it); *Cechman v. Travis*, 202 Ga. App. 255, 256 (Ga. Ct. App. 1991) (finding that analogous Georgia reporting statute penalizes only individuals who knowingly and willfully fail to report, not individuals who should have reasonable cause to report, but fail to do so); *Cf. Horn*, 2014 Pa. Dist. & Cnty. Dec.

LEXIS 417 at 30 (finding that the CPSL does not impose a duty upon physicians who merely fail to discover and report suspected child abuse).

The principle that willful failure to report is necessary for a finding that a defendant violated the CPSL harmonizes with the fact that persons making a determination as to whether to report under the CPSL must exercise discretion. *Picarella v. Terrizzi*, 893 F. Supp. 1292, 1300, n.7 (M.D.Pa. 1995) (holding that a mandatory reporter under the CPSL is making a discretionary judgment when deciding whether to report) (citing, *Good v. Dauphin County Social Services*, 891 F.2d 1087, 1091 (3d Cir. 1989)).

In fact, on its face, the statute provides that the reasonable cause develops "on the basis of professional or other training and experience." 23 Pa.C.S. §6352 (2009). By imposing liability only when the failure to report is willful, the legislature is recognizing that there is room for error in the exercise of discretion, and that liability will only follow if the mandatory report misuses that discretion.

In present matter, there are no genuine facts to dispute Clymer's good faith effort to investigate this matter. Indeed, he interviewed the same people that the Bucks County Detectives later interviewed when investigating the Nace matter. Further, his decision was informed by his conversations with Mr. Drake, who is knowledgeable regarding the CPSL. Even more significant, Clymer even involved a member of law enforcement in an effort to find out what he should do. In the end, Clymer explained that, *in his opinion*, he was unable to adduce the proof necessary to report because he was never able to see the content of those text messages. By no means does his conduct rise to the level of *willful* failure to report; rather, this is a reflection of someone who has weighed the facts before him and decided there was not enough to report.

Further, it should not be lost on this Honorable Court that law enforcement, by not charging Romig with Mayer's allegations, validates Clymer's decision.  Also not to be forgotten is the fact that, even now, Plaintiff cannot show this Court the *actual* content of the text messages—Plaintiff continues to rely on the assumption that the messages contain what Mayer claims they do, and, respectfully, that is not enough.

**V.      CONCLUSION**

For the reasons set forth above, Faith Christian respectfully asks that this Honorable Court dismiss the claims against it on the basis that it does not owe a duty to Plaintiffs, and that even if it did, Plaintiffs' causation argument is highly attenuated.  Further, because liability against Faith Christian necessarily requires a finding that it violated the CPSL, Faith Christian asks that this Honorable Court find that it did not violate the CPSL because its actions were not willful, as required by that statute.

Respectfully Submitted,

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
DAVID SALAZAR, ESQUIRE
Attorneys for Defendant,
Faith Christian Academy

DATE:  January 27, 2016

## CERTIFICATE OF SERVICE

I, David Salazar, Esquire, do hereby certify that a true and correct copy of Defendant, Faith Christian Academy's Motion for Summary Judgment and Brief in Support of its Motion, was electronically filed with the Court this date and is available for viewing and downloading from the ECF System to parties of record with ECF accessibility, and via Federal Express as follows:

Eric Romig - LN3630
SCI-Retreat
660 State Route 11
Hunlock Creek, PA 18621-3136

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
DAVID SALAZAR, ESQUIRE
Attorneys for Defendant,
Faith Christian Academy

DATE: January 27, 2016