ELIZABETH A. NACE

1    Q.      Did you ever use the Sellersville Belles as

2    an opportunity to get together after a practice or

3    after a game with Mr. Romig?

4    A.      No.

5    Q.      And the Sellersville Belles, that continued

6    up until the time of his arrest, his coaching,

7    correct?

8    A.      Yes.

9    Q.      Do you know how many times you had sex

10   while he was coaching the Sellersville Belles?

11   A.      From what I remember, it was only a couple

12   of times, like two or --

13   Q.      The other times would have occurred before

14   then?

15   A.      Yes.

16   Q.      And all those times were at his home?

17   A.      Most of them.

18   Q.      Where were the other ones?

19   A.      There were some at my house.

20   Q.      I think you stated that you self-diagnosed

21   concerning the anorexia, correct?

22   A.      Yes.

23   Q.      Never received any treatment before this

24   sexual encounter with Mr. Romig, never received any

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

142

1    treatment after it, correct?

2    A.       No.  Yes, that's correct.

3    Q.       My understanding is that you indicated that

4    you were a member of the National Honor Society

5    both your junior and senior year, right?

6    A.       Yes.

7    Q.       As part of the National Honor Society, you

8    had to complete a student activity information form

9    and submit that to Pennridge?

10   A.       Yes.

11   Q.       What were some of the activities you recall

12   submitting on that form that would have been

13   submitted when you were a sophomore I suppose,

14   right?

15   A.       Yes.

16   Q.       What were some of the activities you

17   submitted on that form?

18   A.       From what I remember, I think I put

19   softball down as one of them on my travel team and

20   then --

21   Q.       That was the Deep Run team?

22   A.       Yes.

23   Q.       Is that the Deep Run team that was coached

24   by Mr. Geary?

ELIZABETH A. NACE

143

1    A.        Yes, he was one of the coaches.

2    Q.        How long did Mr. Geary coach you?

3    A.        I believe it was only like two years.

4    Q.        But that would have been say ninth and

5    tenth grade?

6    A.        Yes.

7    Q.        So you put down softball.  What other

8    activities did you put down?

9    A.        I think I put down Girl Scouts and church.

10   Q.        What church are you a member of?  Are you a

11   member of a church?

12   A.        Yes.

13   Q.        What is the name of that?

14   A.        St. Michael's Lutheran.

15   Q.        In Perkasie?

16   A.        In Sellersville.

17   Q.        And are you member of their youth group?

18   A.        Yes.

19   Q.        I think it came up about counseling, and I

20   may bounce around here a little bit.  I apologize.

21   My understanding is you never went to -- didn't

22   take up the offer of Ms. Moffet at Pennridge to go

23   to counseling at the high school, correct?

24   A.        Yes.

ELIZABETH A. NACE

1   Q.      Did you get any counseling through your

2   church?

3   A.      No.

4   Q.      Was counseling available through your

5   church?

6   A.      Yes.

7   Q.      Why didn't you get counseling through Ms.

8   Moffet at Pennridge?

9   A.      I didn't really want to.  Like when it

10  first started, I didn't want to talk about it, and

11  I never wanted to go to a counselor.  My parents

12  were the ones who wanted me to.

13  Q.      And how about no counseling through your

14  church, why not?

15  A.      Again, I didn't really want to talk about

16  it.

17  Q.      At your church, do they have a teen pastor

18  there?

19  A.      No.  It's just a pastor who is the pastor.

20  Q.      Just one pastor?

21  A.      Yes.

22  Q.      Did you also go to the First Baptist Church

23  in Perkasie?

24  A.      I attended there with my friends a little

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1    bit.

2    Q.      Was that in their youth group?

3    A.      Yes.

4    Q.      Did they have a youth pastor there as well?

5    A.      Yes.

6    Q.      Did you seek out any counseling with that

7    youth pastor?

8    A.      No.

9    Q.      Did Eric Romig ever state to you that he

10   had a sexual relationship with any other student?

11   A.      No.

12   Q.      He never indicated that to you?

13   A.      No.

14   Q.      Yes, he never indicated that?

15   A.      Yes.

16   Q.      Just as I'm looking at this, would it be

17   fair to characterize that the majority of the

18   sexting that -- the texting and the sexting that

19   occurred, that occurred during the summer between

20   your sophomore and junior year?

21   A.      Yes.

22   Q.      How would you describe your relationship

23   between you and your mom during the 2012/2013

24   summer?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

146

```
 1    A.        It was good.

 2    Q.        2014 summer?

 3    A.        It was good.

 4    Q.        How about your dad?

 5    A.        It was good.

 6    Q.        Has your relationship with your mom gotten

 7    better or worse since this incident came to light?

 8    A.        Better.

 9    Q.        How about your dad?  Has that gotten better

10    or worse?

11    A.        Better.

12    Q.        It's my understanding that you had -- and

13    you've indicated that you had to lie to your

14    parents in order to continue to have a sexual

15    relationship with Eric Romig, is that right?

16    A.        Yes.

17    Q.        And did you also have to lie to your

18    friends?

19    A.        Not really, no.

20    Q.        Just your parents?

21    A.        Yes.

22    Q.        Do you still lie about anything now

23    relative to the relationship if you're asked about

24    it?  You talked about being embarrassed perhaps.
```

ELIZABETH A. NACE

1   Do you still lie about it now if somebody asks or

2   you will just tell them?

3   A.      No one besides my parents really ask me

4   about it.

5   Q.      The one thing is, when this lawsuit was

6   filed, it did make some press and your parents'

7   names were indicated in the paperwork that was

8   filed.  Obviously, your initials were indicated.

9   Somebody can put two and two together.  You

10  indicated there was some press associated with this

11  lawsuit, is that correct?

12  A.      A little, yes.

13  Q.      Is that -- isn't it true that, when your

14  father would go watch your games, the reason he

15  would sit apart was because of the tension that

16  developed as a result of the filing of this lawsuit

17  on the team?

18  A.      I do not know.

19  Q.      Now, your Complaint alleges certain

20  elements that you've suffered as a result of this

21  inappropriate sexual relationship.  Talks about

22  severe and ongoing physical damage.  What severe

23  and ongoing physical damage have you sustained?

24  A.      Again, like the sleepless nights.  Like I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1    still sometimes have the times when I have to think

2    about it, and sometimes when I don't want to do

3    anything or just want to stay at home and just the

4    nightmares that occurred like right after for a

5    couple of months.

6    Q.    And I understand there was a couple months'

7    period where that was more intense than it is now,

8    is that right?

9    A.    Yes.

10   Q.    Did you ever receive any medications to

11   help you with your sleeplessness?

12   A.    No.

13   Q.    Did you ever receive any medication to help

14   you with your lethargy?

15   A.    No.

16   Q.    Any medication for your dermatological

17   condition?

18   A.    No.

19   Q.    Did you treat with a dermatologist before

20   this sexual relationship with Mr. Romig?

21   A.    No.

22   Q.    Did you treat with a dermatologist after

23   the sexual relationship with Mr. Romig?

24   A.    No.

ELIZABETH A. NACE

1   Q.     Did you ever treat with a medical doctor as

2   a result of any harm that you sustained or you're

3   alleging that you sustained in this inappropriate

4   sexual relationship?

5   A.     No.

6   Q.     You also allege severe and ongoing

7   psychological damage.  To my understanding in

8   looking through the records that we've been

9   provided by your counsel, you treated twelve times

10   with Nova and two times with Insight, is that

11   right?

12   A.     Yes.

13   Q.     So fourteen times total?

14   A.     Yes.

15   Q.     Have you received any other treatment other

16   than those fourteen times?

17   A.     No.

18   Q.     In your treatment that you went through

19   with Insight, and this was on the first visit, they

20   do kind of an evaluation of your circumstances.

21   And they said that you were well-groomed, that your

22   speech was normal, motor skills were normal, your

23   mood was good.  Would you agree with that

24   assessment at that time?  Is that an accurate

1  assessment?

2  A.    Yes.

3  Q.    It also said your thought processes were

4  goal oriented, your affect was appropriate, that

5  you had no hallucinations, no delusions?

6  A.    Yes.

7  Q.    Also indicated that you were not suicidal

8  and you had no homicidal ideation?

9  A.    Yes.

10  Q.    And in the evaluation it also said that you

11  had no insomnia and no anxiety at this time.  This

12  was done on -- this evaluation was completed on

13  5/22/14.  So at this time you were not suffering

14  from any insomnia or any anxiety, would that be

15  accurate?

16  A.    Yes.

17  Q.    In your -- the initial disclosure filed by

18  your attorney with the court, it says that you lost

19  life's pleasures.  Do you know what part of life's

20  pleasures that you've lost as a result of this

21  inappropriate relationship with Eric Romig?

22  A.    Well, in the beginning for a couple of

23  months, like, I didn't want to go back to the

24  normal things and like my normal life basically,

ELIZABETH A. NACE

1    and I didn't want to do those things anymore for a

2    while.

3    Q.    Was that just for that first couple of

4    months after the arrest occurred?

5    A.    Yes.

6    Q.    Also says you were suffering from

7    depression.  Have you treated with anyone for

8    depression?

9    A.    No.

10   Q.    Did you ever treat with anyone before the

11   sexual relationship with Mr. Romig for depression?

12   A.    No.

13   Q.    Ever treat with anyone after the sexual

14   relationship with Mr. Romig?

15   A.    No.

16   Q.    Also mentioned anxiety and fear.  Did you

17   treat with anyone regarding anxiety and fear other

18   than those fourteen visits with the therapists?

19   A.    No.

20   Q.    Also mentioned in the filing that you

21   experienced loss of self-worth and esteem.  Have

22   you sensed a loss of self-worth and self-esteem?

23   A.    Like, yes, until the end of my junior year.

24   Q.    Also mentioned that you've suffered

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

152

1    embarrassment.  Can you explain that?

2    A.       Again, walking through the school hallways

3    it was hard for me because I thought other people

4    were looking at me differently or judging me.

5    Q.       Since the filing of this lawsuit, which

6    occurred in January of this year, has your anxiety

7    increased at all?

8    A.       No.

9    Q.       Has your embarrassment increased at all?

10   A.       No.

11   Q.       Has your insomnia increased at all?

12   A.       No.

13   Q.       Because this claim involves emotional

14   distress, and I have to ask some of these

15   questions, and I apologize if they seem out of

16   balance as they would be in any other context, but

17   were you affected at all from an anxiety standpoint

18   or an emotional standpoint when you learned that

19   your attorney, Louis Hornstine, is also

20   representing a Bucks County teacher who's accused

21   of similar incident involving a student?

22   A.       No.

23            MR. GROTH:  Object to the form of

24        the question.  You can answer.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1                    THE WITNESS:  No.

2    BY MR. RUSSELL:

3    Q.      Do you have any fears or anxieties that the

4    information that is being gained in your case will

5    be used to help a Bucks County teacher in another

6    case?

7    A.      No.

8    Q.      I think you indicated that this incident

9    didn't affect in any way your college selection?

10   A.      Yes.

11   Q.      You also got two scholarships, correct?

12   A.      Yes.

13   Q.      You finished your school year on the

14   distinguished honor roll?

15   A.      Yes.

16   Q.      Or your school career, I should say,

17   correct?

18   A.      Yes.

19   Q.      Sports, you had mentioned that your

20   softball team didn't do as well the next year, I

21   think, or something like that.  That personally you

22   did get better every year you played, correct?

23   A.      Yes.

24   Q.      So this involvement with Mr. Romig had no

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

154

1    adverse effect on your ability to continue to

2    improve playing softball?

3    A.      No.

4    Q.      It did not have any effect?

5    A.      Yes.

6            MR. RUSSELL:  No further questions

7         at this time.  Thank you.

8            MR. KEMETHER:  One real quick.

9            MR. GROTH:  Let me ask a couple.

10           MR. KEMETHER:  Sorry about that.

11           MR. GROTH:  That's okay.

12   BY MR. GROTH:

13   Q.      Miss Nace, Mr. Russell read to you off a

14   checklist of items from Ms. Trishelle's counseling

15   notes of you.  He said there were checkmarks for

16   insomnia, marked diminished interest in pleasure in

17   all or most of daily activities, but he omitted a

18   couple of things that were checked off by Ms.

19   Trishelle.  First of all, have you ever seen this

20   document before?  It's attached to my -- to

21   Plaintiff's initial disclosures, and it's the

22   Insight counseling records?

23   A.      Yes.

24   Q.      Okay.  And there is a category which Mr.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1    Russell did not mention that says feeling of

2    worthlessness or excessive or inappropriate guilt

3    nearly every day, not nearly self-reproach or guilt

4    about being sick.  What's the checkmark for that?

5    Yes or no?

6    A.    Yes.

7    Q.    Did you have discussions about that with

8    Ms. Trishelle?

9    A.    Yes.

10   Q.    Did you tell her that you had feelings of

11   worthlessness or excessive or inappropriate guilt

12   about the Romig relationship situation?

13   A.    Yes.

14   Q.    Okay.  There's another category right under

15   that that says diminished ability to think or

16   concentrate or indecisiveness nearly every day,

17   which Mr. Russell omitted to refer to you.  What's

18   the box checked there?  Yes or no?

19   A.    Yes.

20   Q.    What did you discuss with Ms. Trishelle

21   about your diminished ability to think or

22   concentrate or indecisiveness nearly every day?

23   A.    We discussed how hard it was for me to

24   focus.  I was not able to concentrate more in

ELIZABETH A. NACE

1    school and more on problems that I would have that

2    would arise.

3                    MR. GROTH:   Thanks.   No other

4              questions.

5    BY MR. KEMETHER:

6    Q.      That treatment was six months to a year

7    after the arrest happened?

8    A.      Yes.

9    Q.      Had those issues largely resolved by then?

10                   MR. GROTH:   I'll object to the form

11             of the question only insofar as it may

12             delve into expert testimony, but go ahead

13             and answer.

14   BY MR. KEMETHER:

15   Q.      Had the issues you were complaining of

16   largely resolved by then, the concentration and so

17   forth?

18   A.      The concentration, it was still hard for me

19   to focus sometimes, like some days were worse than

20   others, but for the most part, I was getting back

21   to normal, but I was not fully my normal self.

22   Q.      Okay.   And I think you mentioned that you

23   went there because your parents asked you to?

24   A.      Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1   Q.      You understand that you are a plaintiff in

2   this lawsuit?

3   A.      Yes.

4   Q.      You understand that what you are doing is

5   you're seeking money compensation from the

6   defendants here?

7   A.      Yes.

8   Q.      Did your parents ask your permission to

9   pursue this lawsuit?

10   A.      Yes.

11   Q.      Did you give it?

12   A.      Yes.

13           MR. KEMETHER:  Thank you.  No

14       further questions.

15   BY MR. SANTARONE?

16   Q.      Just a couple.  Trishelle, why did you stop

17   going to see her after only two visits?

18   A.      She basically discharged me.  She said I

19   was getting better, and there was no really other

20   reason to go back.

21   Q.      And did she tell you that at the time of

22   the second visit then?

23   A.      Yes.

24   Q.      Alli Wedman, when you told her about that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1    you are the person, had she come to you?  Did she

2    have any suspicion that you were the person?

3    A.     No.

4    Q.     She didn't say, hey, you are acting

5    different or there's something going on?

6    A.     No.

7    Q.     The counseling sessions that you had in

8    either the twelve or the two, were any of them

9    family counseling sessions?

10   A.     No.

11   Q.     Have you ever had any family counseling

12   sessions?

13   A.     No.

14   Q.     Have you discussed what happened with your

15   older sister?

16   A.     No.

17             MR. SANTARONE:  That's all have.

18        Thank you.

19             MS. CONNOR:  No questions.

20   BY MR. COX:

21   Q.     Just a couple more.  When you testified in

22   response to a question from Mr. Russell that you

23   believed the texts from Mr. Romig became sexual

24   sometime in June of 2013, do you recall whether you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1   were still playing JV softball at the time they

2   became sexual in nature in June of 2013?

3   A.       No, I don't believe so.

4   Q.       Okay.  There was a banquet at the end of

5   that softball season.  You told me about the one in

6   the spring of 2012.  Was there a banquet in the

7   spring of 2013?

8   A.       Yes.

9   Q.       Did Mr. Romig attend that banquet?

10  A.       Yes.

11  Q.       Did your folks go with you to that banquet?

12  A.       Yes.

13  Q.       Do you remember when that was in 2013, the

14  banquet?

15  A.       I believe, it was in June.

16  Q.       And at the time that you went to that

17  banquet, had your relationship with Mr. Romig

18  become sexual in nature?

19  A.       No.

20  Q.       Had the texts become sexual in nature at

21  that time?

22  A.       I don't remember.

23  Q.       Do you remember your parents having any

24  interaction with Mr. Romig at this banquet?

ELIZABETH A. NACE

1   A.      I do not know.

2                  MR. COX:  That's all I have.

3           Thank you.

4                  MR. RUSSELL:  Nothing further.

5   BY MR. GROTH:

6   Q.      Couple more questions about the issue about

7   the texts from Mr. Romig becoming personal in

8   nature to you, not having anything to do with

9   softball, I think, your testimony was that happened

10  sometime in late April or May, correct?

11  A.      Yes.

12  Q.      During the softball season, correct?

13  A.      Yes.

14  Q.      During that time, when those texts

15  according to your testimony you think were being

16  used to gain your trust of him and you are talking

17  about things outside of softball, was he making

18  comments in the texts or writing anything in the

19  text about your body?

20  A.      Yes, he would comment on my body and how I

21  looked.

22  Q.      Did he comment about your attractiveness?

23  A.      Yes.

24  Q.      Did he say in the texts that he found you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

1   attractive?

2   A.     Yes.

3   Q.     And this is before the end of the school

4   year?

5   A.     Yes.

6   Q.     And was this also at a time when he was

7   coaching you?

8   A.     I believe so, yes.

9   Q.     Did he also tell you in these texts before

10  the end of the school year while he was coaching

11  you that he realized you might have some kind of

12  eating disorder, that he would be able to help you

13  with that?

14  A.     Yes.

15  Q.     Did any of those topics have anything to do

16  with softball?

17  A.     No.

18           MR. GROTH:  No other questions.

19       Thank you.

20           MR. KEMETHER:  Nothing further.

21           (Witness excused.)

22           (Deposition concluded at 1:30 p.m.)

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

162

1                   C E R T I F I C A T I O N

2

3              I, LISA PETITTA, Certified

4    Shorthand Reporter and Registered Professional

5    Reporter, do hereby certify that the foregoing is a

6    true and accurate transcript of the stenographic

7    notes taken by me in the aforementioned matter.

8

9

10

11

12

13

14

15

16

17

18

19

20

21   DATE:

22   JUL 22 2015              Lisa Petitta, CSR, RPR

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

163

```
1                 INSTRUCTIONS TO WITNESS

2

3                 Please read your deposition

4      over carefully and make any necessary

5      corrections.  You should state the reason

6      in the appropriate space on the errata

7      sheet for any corrections that are made.

8                 After doing so, please sign the

9      errata sheet and date it.

10                You are signing same subject to

11     the changes you have noted on the errata

12     sheet, which will be attached to your

13     deposition.

14                It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of

17     receipt of the deposition transcript by

18     you.  If you fail to do so, the deposition

19     transcript may be deemed to be accurate

20     and may be used in court.

21

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

164

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 1 | | | |
| 2 | | E R R A T A | |
| 3 | | | |
| 4 | PAGE | LINE | CHANGE |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ELIZABETH A. NACE

165

1          ACKNOWLEDGMENT OF DEPONENT

2

3              I, _ _ _ _ _ _ _ _ _ _ _, do

4      hereby certify that I have read the

5      foregoing pages, and that the same is a

6      correct transcription of the answers given

7      by me to the questions therein propounded,

8      except for the corrections or changes in

9      form or substance, if any, noted in the

10     attached Errata Sheet.

11

12

13     _ _ _ _ _            _ _ _ _ _ _ _ _ _

14     DATE                 SIGNATURE

15

16     Subscribed and sworn to before me.

17     My commission expires _____

18

19                          _____

20                          Notary Public

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

CIVIL TRIAL DIVISION

3      JAMES NACE, et al                CIVIL ACTION

4

5              vs.

6

7      PENNRIDGE SCHOOL DISTRICT,
       et al.                          NO. 15-333

8

9                     Friday, August 28, 2015

10

11             Oral deposition of EMILY MAYER, held at the

12     offices of HORNSTINE PELLONI & HORNSTINE, 1500 Walnut

13     Street, Suite 300, Philadelphia, Pennsylvania,

14     beginning at 10:00 a.m., on the above date, before

15     LANCE A. BRUSILOW, Registered Professional Reporter,

16     Approved Reporter for the United States District Court,

17     and Notary Public, there being present.

18

19

20

21

22

23

24

Page: 2 (2)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

```
 1      APPEARANCES

 2      HORNSTINE PELLONI & HORNSTINE

 3      BY:  DAVID GROTH, ESQUIRE

 4      1500 Walnut Street

 5      Suite 300

 6      Philadelphia, PA 19102

 7      ph: 215.568.4968

 8      (david@hornstine.com)

 9        Counsel for Plaintiffs

10

11

12      MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

13      BY:   JOSEPH J. SANTARONE, ESQUIRE

14      2000 Market Street

15      Suite 2300

16      Philadelphia, PA 19103

17      ph: 215.575.2626

18      (jjsantarone@mdwcg.com)

19        Counsel for Faith Christian Academy

20

21

22

23

24
```

```
 1    APPEARANCES CONTINUED:

 2    EASTBURN & GRAY, P.C.

 3    BY:  ERIN N. KERNAN, ESQUIRE

 4    60 East Court Street

 5    Doylestown, PA  18901

 6    ph: 215.345.7000

 7    (ekernan@eastburngray.com)

 8      Counsel for Pennridge School District

 9      and individual Pennridge defendants

10

11

12    CASSIDY CONNOR PITCHFORD

13    BY:  CARLA E. CONNOR, ESQUIRE

14    295 East Swedesford Road

15    Suite #346

16    Wayne, PA  19087

17    ph: 610.783.3513

18    (cconnor@ccplegal.com)

19      Counsel for FCA, Ryan Clymer and

20      Russell Hollenbach

21

22

23

24
```

```
 1      APPEARANCES CONTINUED:

 2      KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

 3      BY:  SEAN V. KEMETHER, ESQUIRE

 4      30 East Second Street

 5      Media, PA  19063

 6      ph: 610.585.0600

 7      (skemether@kgpv.com)

 8         Counsel for Ryan Clymer and Russell

 9         Hollenbach

10

11

12      DRAKE, HILEMAN & DAVIS

13      BY:  JONATHAN J. RUSSELL, ESQUIRE

14      252 W. Swamp Road, #15

15      Doylestown, PA  18901

16      ph:  215.348.2088

17      (jrussell@dhdlaw.com)

18         Counsel for Faith Christian Defendants

19

20

21      ALSO PRESENT:

22         Henry Thompson

23

24
```

Page: 5 (5)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

```
 1        EXAMINATION INDEX

 2    WITNESS:  EMILY MAYER

 3        By Mr. Groth (page-6)

 4        By Mr. Kemether (page-105, 214)

 5        By Mr. Santarone (page-146)

 6        By Ms. Connor (page-162)

 7        By Mr. Russell (page-166)

 8

 9

10

11        EXHIBIT INDEX

12    Exhibit-1 Letter dated April 10, 2015

13    from D. Groth to E. Mayer (page-19)

14

15    Exhibit-2 ***Not Marked***

16

17    Exhibit-3 Email dated January 16, 2010

18    from A. Smith to R. Clymer (page-201)

19

20    Exhibit-4 Complaint (page-204)

21

22

23

24
```

Page: 6 (6 - 9)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 6

1  (It is hereby agreed by and
2  among counsel that sealing, certification
3  and filing are waived; and that all
4  objections, except as to the form of the
5  question, are reserved until the time of
6  trial)
7  EMILY MAYER, having been first
8  duly sworn, was examined and testified as
9  follows:
10  EXAMINATION
11  BY MR. GROTH:
12  Q.   Good morning. Would you state
13  your full name for the record, please?
14  A.   Emily Mayer.
15  Q.   Would you keep your voice up,
16  please, so all the attorneys can hear
17  you? I know this is a small room, but
18  you have to speak loudly enough so that
19  everybody hears what you have to say.
20  My name is David Groth, and I
21  represent the plaintiff in a lawsuit
22  that's currently pending in the Federal
23  District Court for the Eastern District of
24  Pennsylvania, and I've asked you here

Page 7

1  today to testify about facts and issues
2  that I think are important to my client's
3  case. I'm going to ask you a series of
4  questions regarding events that go back as
5  far back as 2008/2009.
6  Have you ever given a
7  deposition before?
8  A.   No, I have not.
9  Q.   Let me just give you some
10  instructions which will help us get
11  through more quickly and more efficiently
12  in terms of the handling of the
13  deposition.
14  First of all, listen to my
15  questions carefully and make sure that you
16  understand the question before you begin
17  an answer.
18  If the question is not clear
19  to you, my question or any of the other
20  attorneys' questions, ask me to restate
21  it or rephrase it or clarify the question
22  and I'll be happy to do that.
23  If you answer a question, I
24  will assume that you understood the

Page 8

1  question and that the information you're
2  giving me going back to 2008 or so is
3  true and correct to the best of your
4  recollection.
5  Let me complete the question
6  before you give an answer, for two
7  reasons: Number one, so that you know
8  exactly what it is I'm asking you before
9  you start your answer; and number two, so
10  that the court reporter only has to take
11  down one of us speaking at a time. It's
12  hard to take notes of exactly what's
13  being said if the witness and the
14  attorney are speaking over each other.
15  You have to give a verbal
16  response to all questions -- a yes, no,
17  or some narrative explanation -- as
18  opposed to head-shake yes or a head-shake
19  no because the court reporter can only
20  make a transcript of what's said. So,
21  you have to verbalize all of your
22  answers.
23  You're required to answer all
24  the questions that you are asked fully

Page 9

1  and to the best of your ability.
2  There may be objections to
3  questions that I ask you by the other
4  attorneys or I may object to a question
5  that one of the other attorneys asks.
6  If that happens, if somebody
7  objects to a question, you're to allow
8  the objection to be stated for the record
9  and then you're going to proceed to
10  answer the question, anyway. That has to
11  do with some legal issues that you don't
12  have to be concerned about.
13  I'm going to ask you for facts
14  and information that you know personally
15  or may have heard or learned from others
16  or gotten through other sources.
17  So, it's not just what you
18  personally did or said or your interaction
19  with another person. If somebody told
20  you something about facts or information
21  that I'm asking you about, you're allowed
22  to tell us that. In another setting --
23  at trial -- that would be hearsay and you
24  couldn't say what somebody else said to

Appendix 0171

Page 10

1  you, but that doesn't apply in this
2  situation, in an oral deposition before
3  trial.
4      If you do not know the answer
5  to a question or do not recall the facts
6  or information I'm asking you about, tell
7  me that.  That's a sufficient answer.
8      I know that, again, some of
9  these events that we'll be talking about
10 go back six years or so and you may have
11 simply forgotten some of the information
12 you knew back then.  And if that's the
13 case, just tell us that.
14     I don't want you to guess or
15 speculate or assume anything in response
16 to a question.  Don't think that just
17 because somebody asks you a question, that
18 you're expected to know the answer.  If
19 you don't know the answer, you'll tell us
20 that.
21     There may be information that
22 you knew at one time that you simply
23 can't recall now, and if that's the case,
24 you'll tell us that.

Page 11

1      There may be information that
2  we ask you about that you never had, that
3  you never knew, and if that's the case,
4  it's not a question of recollection; it's
5  an issue of "I never had that information
6  in the first place" and you can tell us
7  that.
8      Are you feeling okay today?  Is
9  there any medical reason why you would
10 not be able to testify?
11 A.   No.
12 Q.   If you need a break for any
13 reason, bathroom break or any other
14 break -- you just want to get up and
15 walk around a little bit -- you're
16 certainly free to do that, and just ask
17 us for that and we'll be happy to give
18 you a break whenever you need it.
19     Do you understand that you're
20 required to answer all of the questions
21 that you're asked truthfully and that
22 you've taken an oath and sworn to do so?
23 A.   Yes.
24 Q.   And do you understand that your

Page 12

1  testimony under oath today is just the
2  same as if you were testifying under oath
3  at trial in front of a judge or jury?
4  A.   Yes.
5  Q.   Let me first have your current
6  residence address, please.
7  A.   ████████████████████████
8  ████████████████
9  Q.   And do you live there with
10 somebody?
11 A.   Yes, my husband.
12 Q.   And what's his name?
13 A.   Chase Brunner.
14 Q.   And when were you married?
15 A.   May 17th, 2015.
16 Q.   Is this the same Chase Brunner
17 who you were dating in high school at
18 Faith Christian Academy back in 2009?
19 A.   Yes.
20 Q.   Who were you living with in
21 2009?
22 A.   My parents.
23 Q.   Can I have their names, please?
24 A.   Kevin and Annette Smith.

Page 13

1  Q.   And where were you living at
2  that time?
3  A.   With my parents.
4  Q.   I mean the address.
5  A.   Oh, sorry.
6  Q.   That's okay.
7  A.   ████████████████████████
8  ████████████████
9  Q.   And in the fall of 2009 how
10 old were you?
11 A.   Seventeen.
12 Q.   And where were you going to
13 school?
14 A.   Faith Christian Academy.
15 Q.   I might refer to them on
16 occasion as FCA instead of Faith Christian
17 Academy.
18 A.   Okay.
19 Q.   What grades did you attend at
20 FCA?
21 A.   Eleventh and twelfth.
22 Q.   Where did you go to school
23 prior to going to school at FCA?
24 A.   Upper Pekriomen.

Page 14

1  Q.    And how long did you attend
2  there?
3  A.    One year.
4  Q.    Was that tenth grade?
5  A.    Correct.
6  Q.    Why did you leave Upper
7  Pekriomen?
8  A.    Wasn't able play sports there.
9  Wasn't really choosing the right friends,
10 so...
11 Q.    How did you end up going to
12 FCA?
13 A.    My parents heard about it
14 through friends, so...
15 Q.    Had you played sports before
16 going to Upper Pekriomen?
17 A.    Yes.
18 Q.    Where was that?
19 A.    Calvary Baptist in Lansdale.
20 Q.    And what grades did you go to
21 at Calvary Baptist?
22 A.    Fourth to ninth.
23 Q.    What sports did you play?
24 A.    Volleyball, basketball and

Page 15

1  soccer.
2  Q.    Why did you end up leaving
3  Faith Baptist to go to Upper Pekriomen?
4  A.    I just was not -- I was kind
5  of an outsider and I didn't get along
6  with a lot of kids there, very cliquey,
7  so I asked my parents if I could leave
8  and they granted that.
9  Q.    Where did you go to school
10 before Calvary Baptist?
11 A.    Bridle Path.
12 Q.    What is that?
13 A.    Elementary school.
14 Q.    Where is that located?
15 A.    Montgomeryville.
16 Q.    Did you go to college after
17 high school?
18 A.    I did.
19 Q.    What year did you graduate high
20 school?
21 A.    2010.
22 Q.    From FCA?
23 A.    Correct.
24 Q.    And where did you go to

Page 16

1  college?
2  A.    My first year I went to Montco,
3  and after that I went to Cairn University
4  and graduated there.
5  Q.    Did you play sports there?
6  A.    I did: I played volleyball.
7  Q.    Not basketball?
8  A.    No.
9  Q.    And Montgomery County Community
10 College, you went there for one year?
11 A.    I did.
12 Q.    Did you get a degree at Cairn?
13 A.    I did: I graduated with a
14 business administration degree.
15 Q.    That's a four-year degree?
16 A.    Correct.
17 Q.    Do you have any other formal
18 education besides what we've already gone
19 over?
20 A.    No.
21 Q.    Let's talk about your employment
22 history starting in high school. Were
23 you employed in high school or during
24 high school, summer or part time,

Page 17

1  whatever?
2  A.    Yes.
3  Q.    Doing what?
4  A.    I was a waitress at a small
5  cafe in Pennsburg, and I also worked at a
6  vet's office.
7  Q.    Anyplace else in high school?
8  A.    No.
9  Q.    What about during your college
10 years? Did you work part time at all?
11 A.    I did. I worked at Chantilly
12 Floral Boutique in Lansdale.
13 Q.    Doing what?
14 A.    I was a sales associate.
15 Q.    Anywhere else?
16 A.    I worked at American Eagle for
17 a short time my second year of college, I
18 believe.
19 Q.    Anything else?
20 A.    I had work-study at the
21 university, but...
22 Q.    What about after you graduated?
23 Where did you work?
24 A.    I remained at the university

Appendix  0173

Page 18

1 doing a presidential internship in the
2 campus store, managing it, and in July
3 they hired me full time to continue to
4 manage the store.
5    Q.    Is this like the bookstore
6 or...
7    A.    Yes.
8    Q.    And what year did you graduate
9 from Cairn?
10   A.    2014.
11   Q.    Is your husband employed?
12   A.    Yes.
13   Q.    Where does he work?
14   A.    Modern Male Barber Shop in
15 Sellersville.
16   Q.    What sports did you play while
17 you were at FCA?
18   A.    My eleventh-grade year I played
19 volleyball, basketball and soccer, and my
20 senior year I only played volleyball and
21 basketball.
22   Q.    Who was your basketball coach
23 during your junior and senior years at
24 FCA?

Page 19

1    A.    Eric Romig.
2    Q.    Did you know him before he
3 became your basketball coach?
4    A.    No.
5         (Exhibit Mayer-1 was marked for
6 identification)
7 BY MR. GROTH:
8    Q.    Ms. Mayer, I'm going to show
9 you a document which is marked Mayer
10 exhibit one and ask you if you've ever
11 seen that document before.
12   A.    Yes.
13   Q.    That's a letter from me to you
14 dated April 10th, 2015. Is that correct?
15   A.    Yes.
16   MR. GROTH:  And for the rest
17 of the attorneys, this is pretty much the
18 same letter that Mr. Russell attached to
19 his letter to the court after our first
20 meeting, the same letter I sent to other
21 independent witnesses, like Ms.
22 Alderfer.
23 BY MR. GROTH:
24   Q.    Did you receive this letter

Page 20

1 shortly after April 10th, 2015?
2    A.    Yes.
3    Q.    And after receiving this letter,
4 did you and your parents agree to meet
5 with me and talk about the issues that I
6 raised in that letter?
7    A.    Yes.
8    Q.    And did I come to your home
9 and meet with you and your father and
10 your mother and sit down and talk about
11 basically your time at FCA during your
12 junior and senior year there?
13   A.    Yes.
14   Q.    Okay. Let me ask you about
15 your junior year first. That was the
16 first year that Mr. Romig coached you at
17 FCA, correct?
18   A.    Yes.
19   Q.    During that year, during that
20 season -- when does the basketball season
21 run, or when did it run back then?
22   A.    I believe pre-season started
23 November and went to March.
24   Q.    That would have been November

Page 21

1 of 2008 to March of 2009?
2    A.    Correct.
3    Q.    During that basketball season
4 did you ever receive any texts from Eric
5 Romig?
6    A.    Yes.
7    Q.    What was the subject matter of
8 the texts?
9    A.    Mainly that year it was just
10 mass texts will go out to the whole team.
11   Q.    About what? What types of
12 issues?
13   A.    Practices, games.
14   Q.    That year did you receive any
15 texts from Mr. Romig of a personal
16 nature? And when I use that term,
17 "personal nature," I'm talking about
18 anything that wasn't related to basketball
19 activities.
20   A.    I do not believe so.
21   Q.    Did you have any particular
22 problems with Mr. Romig acting as your
23 basketball coach for that junior-year
24 season?

Appendix  0174

Page 22

1   A.    No.
2   Q.    Did you get along with him
3 okay?
4   A.    Yes.
5   Q.    During your junior season was
6 Chelsea Romig on the basketball team?
7   A.    Yes.
8   Q.    That's his, I believe, adopted
9 daughter, Mr. Romig's adopted daughter?
10   A.    Yes.
11   Q.    Did you become friendly with
12 her?
13   A.    Yes.
14   Q.    How would you characterize your
15 friendship?
16   A.    Very close friends.
17   Q.    Was she your best friend or one
18 of your best friends or --
19   A.    Yes, best friend.
20   Q.    Did you do things out of school
21 together?
22   A.    Yes.
23   Q.    What types of things?
24   A.    Just hang out, shop, go to each

Page 23

1 other's houses.
2   Q.    Did you ever sleep overnight at
3 Chelsea Romig's house?
4   A.    Yes.
5   Q.    On how many occasions,
6 approximately?
7   A.    About two or three, maybe.
8   Q.    When you did that, was that you
9 along with other girls and Chelsea Romig,
10 or just you and she?
11   A.    There were other girls.
12   Q.    Do you remember who they were?
13   A.    Heather Demar, Rachel Mauer.
14   Q.    Let's go slow on that:
15 D-e-m-a-r?
16   A.    Correct.
17   Q.    Rachel who?
18   A.    Mauer.
19   Q.    Anybody else?
20   A.    I don't believe so.
21   Q.    Were both of them on the
22 basketball team?
23   A.    Yes.
24   Q.    And did that friendship with

Page 24

1 Chelsea Romig start when you started
2 playing basketball at FCA in November of
3 2008?
4   A.    It was before.
5   Q.    You knew her before basketball,
6 even?
7   A.    Just from attending the school
8 in the beginning of that year.
9   Q.    She was in your classes?
10   A.    She was a year younger.
11   Q.    How did you know her before
12 basketball?
13   A.    Hallways.  She may have played
14 volleyball, but to be honest, I don't
15 remember.
16   Q.    When is the volleyball season?
17   A.    August or September to the
18 beginning of November.
19   Q.    Beginning of basketball.
20   A.    Uh-huh.
21   Q.    Okay.  Did Chelsea Romig ever
22 tell you that she was sexually abused as
23 a child?
24   A.    Yes.

Page 25

1   Q.    How did she tell you that?
2   A.    Through a text message.
3   Q.    Did she say by whom?
4   A.    No.
5   Q.    Did she say how old?
6   A.    I don't believe so.
7   Q.    Do you recall any details of
8 what she put in the text messages to you
9 about that?
10   A.    No.
11   Q.    Did you ever have a discussion
12 with her about that in person as opposed
13 to through text messages or some
14 electronic means?
15   A.    No.
16   Q.    Did she ever say in the texts
17 why she was telling you that?
18   A.    No.
19   Q.    Do you know if she told anybody
20 else that?
21   A.    I don't know.
22   Q.    Let's talk about your senior
23 year playing basketball.  Was Eric Romig
24 still the coach?

ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 26

1    A.    Yes.
2    Q.    And the practices and whatever,
3  did they begin in November of 2009?
4    A.    Yes.
5    Q.    Is it early November, late
6  November? Do you remember?
7    A.    Early to mid.
8    Q.    Did you start dating Chase
9  Brunner that year?
10   A.    Yes.
11   Q.    Do you recall when,
12 approximately, you started dating him?
13   A.    November 20th.
14   Q.    You recall specifically when you
15 started dating him.
16   A.    Yes.
17   Q.    Starting with that basketball
18 season, November of 2009, did Eric Romig
19 send you any test messages that were not
20 basketball related?
21   A.    Yes.
22   Q.    When did he start sending them
23 to you?
24   A.    Right when we started the

Page 27

1  season.
2    Q.    And what topics or subjects was
3  Mr. Romig texting you about at the
4  beginning of the season? What type of
5  text messages was he sending you that
6  were not basketball related?
7    A.    Just about my physical features,
8  that he liked me.
9    Q.    Anything else you can remember
10 specifically?
11   A.    Specific text messages?
12   Q.    Yes, early in the season.
13 We'll get to December in a second.
14   A.    Nothing I can recall early in
15 the season.
16   Q.    At the start of that season
17 were you acquainted with somebody named
18 Laura Fretz?
19   A.    Lauren Fretz.
20   Q.    I'm sorry.
21   A.    Sorry.
22   Q.    That's okay.  Fretz.
23   A.    I was not friends with her.
24 She was not -- she had already graduated.

Page 28

1    Q.    She graduated a year before
2  or...
3    A.    The year before anybody.
4    Q.    Was she on the basketball team?
5    A.    Yes.
6    Q.    In your junior year.
7    A.    No.
8    Q.    So, she had already graduated
9  by then?
10   A.    Yes.
11   Q.    So, she was never attending the
12 school while you were attending the
13 school.
14   A.    No.
15   Q.    How did you know her?
16   A.    I had played against her when I
17 went to Calvary.
18   Q.    In your senior year or in your
19 junior year, while you were practicing for
20 games at FCA, did she ever come to the
21 gym?
22   A.    Yes.
23   Q.    On how many occasions?
24   A.    A handful.

Page 29

1    Q.    What did she say when she got
2  there?
3    A.    She just would scrimmage against
4  us.
5    Q.    Did you know another student by
6  the name of Kristen Kennedy?
7    A.    Yes.
8    Q.    How did you know her?
9    A.    I also played against her when
10 I was at Calvary.
11   Q.    She was at FCA?
12   A.    Yes.
13   Q.    Did she graduate the same year
14 as Lauren Fretz?
15   A.    Yes.
16   Q.    Did she also come to practices
17 during your junior or senior years at
18 FCA?
19   A.    Yes.
20   Q.    What did she do at practices?
21   A.    Same as Lauren:  She would
22 scrimmage against us.
23   Q.    Did any other players or any
24 other people ever come to these practices

Page 30

1 your junior or senior year to scrimmage
2 with you other than those two? People
3 that had graduated.
4 A.   Yes; I don't remember her name.
5 Q.   One other person?
6 A.   Yes.
7 Q.   Do you know if these two
8 people, Lauren Fretz and Kristen Kennedy,
9 came to practices with Eric Romig -- in
10 other words, that he would drive them
11 there -- or did they come there on their
12 own?
13 A.   I believe they came on their
14 own.
15 Q.   Did Eric Romig ever text you
16 personal texts prior to the beginning of
17 basketball season in November of 2009?
18 A.   No.
19 Q.   How about in September or
20 October of that year?
21 A.   I don't remember.
22 Q.   You do remember him doing it
23 starting in November as soon as basketball
24 started, but you don't recall if he did

Page 31

1 it before then.
2 A.   Correct.
3 Q.   Did he ever text you in
4 November or in any month prior to
5 December of 2009 texts about your family
6 or texts about your boyfriend?
7 A.   Not about my family, but he
8 would mention that he didn't like my
9 boyfriend.
10 Q.   In the texts he would say that.
11 A.   Yes.
12 Q.   What type of things would he
13 say?
14 A.   He just said "I don't like you
15 with him."
16 Q.   Did he say why?
17 A.   Because he wanted me to be with
18 him.
19 Q.   Did you ever text him about any
20 issues you were having with your parents?
21 A.   No.
22 Q.   Did you ever text him about any
23 issues you were having with your
24 boyfriend?

Page 32

1 A.   No.
2 Q.   Did you ever text him about any
3 issues you were having with your
4 biological father?
5 A.   No.
6 Q.   Kevin Smith is your stepfather,
7 correct?
8 A.   Yes.
9 Q.   Did you ever send him a text
10 and indicate to him that you were wanting
11 to leave where you were living and go
12 live with your biological father?
13 A.   No.
14 Q.   Did you at some point live with
15 your biological father and then move in
16 with your stepfather and your mother?
17 Was there a period of time where you
18 lived with your biological father?
19 A.   Not fully. I saw him on
20 weekends.
21 Q.   The texts that you do recall
22 that Mr. Romig sent you in November or
23 any time prior to December of 2009, were
24 they generally personal in nature, having

Page 33

1 something to do with you and he getting
2 together somehow?
3 A.   Yes.
4 Q.   When those texts started
5 happening, did you notify or report those
6 texts to anybody at first?
7 A.   No.
8 Q.   Did you tell your parents?
9 A.   No.
10 Q.   Any of your friends?
11 A.   No.
12 Q.   Your boyfriend?
13 A.   No.
14 Q.   Chase? I'm talking about in
15 November.
16 A.   Oh, yes. He became aware of
17 it.
18 Q.   How did he become aware?
19 A.   One evening we were together
20 and I had told him about it because Mr.
21 Romig was texting me.
22 Q.   Do you remember where you were
23 you told Chase Brunner about the texts?
24 A.   I believe we were in a car on

ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 34

1  our way home.
2  Q.    And did you get a text from
3  Mr. Romig while you were in the car going
4  home?
5  A.    Yes.
6  Q.    What did you tell Chase at that
7  time? What did you tell him had been
8  going on?
9  A.    I told him that Mr. Romig had
10  been texting me more than just basketball
11  and it was inappropriate. I had asked
12  him not to say anything because his
13  daughter was my best friend.
14  Q.    You're talking about Chelsea.
15  A.    Yes.
16  Q.    So, you asked Chase not to say
17  anything to anybody else.
18  A.    Yes.
19  Q.    Did you tell Chase Brunner what
20  type of texts you were receiving from Mr.
21  Romig?
22  A.    Yes.
23  Q.    What did you tell him?
24  A.    I just told him that they were

Page 35

1  inappropriate.
2  Q.    Did you tell him in what way
3  they were inappropriate?
4  A.    Yes.
5  Q.    What did you tell him?
6  A.    They were sexual texts. They
7  were inappropriate.
8  Q.    Did he ask to see them?
9  A.    I normally deleted them before,
10  but he had seen a few. I don't remember
11  which he had seen.
12  Q.    What was his reaction when he
13  saw the texts and you told him about the
14  texts?
15  A.    He was angry.
16  Q.    What did he want to do?
17  A.    He wanted to let Mr. Romig know
18  that he knew what was going on.
19  Q.    Did you have a discussion about
20  that?
21  A.    Yes.
22  Q.    What was the discussion?
23  A.    I just continued to ask him not
24  to say anything because of my friendship

Page 36

1  with Chelsea.
2  Q.    Did you ever tell Chelsea about
3  it?
4  A.    No.
5  Q.    Up to this point was Chase
6  Brunner the first one who knew about
7  these texts?
8  A.    Yes.
9  Q.    Was he the only person who had
10  seen some of them other than yourself?
11  A.    Yes.
12  Q.    Did you continue to delete the
13  texts from Mr. Romig after you received
14  them?
15  A.    Yes.
16  Q.    At some point did you tell any
17  of your other friends in high school or
18  outside of high school about the texts
19  that you were receiving from Mr. Romig?
20  A.    Yes.
21  Q.    Who did you talk to?
22  A.    Alli Alderfer.
23  Q.    Okay.
24  A.    And Fateem Diabetes.

Page 37

1  Q.    Were they basketball players?
2  A.    No.
3  Q.    Were they classmates of yours?
4  A.    Yes.
5  Q.    Did you tell them together or
6  separately?
7  A.    Together.
8  Q.    Do you remember where you were
9  when you told them?
10  A.    Standing outside the gym.
11  Q.    Do you recall approximately when
12  you told them, what month? Was this
13  November or December?
14  A.    I believe November, very late
15  November.
16  Q.    And as specifically as you can
17  recall, what did you tell them?
18  A.    I just told them that my
19  basketball coach had been texting me
20  inappropriately.
21  Q.    Did you tell them what the
22  subject of the texts was?
23  A.    No.
24  Q.    Did you tell them that some of

Appendix  0178

**Page 38**

1 the texts were sexual-based texts?
2   A.   Yes.
3   Q.   But you didn't give any
4 specific details about the type of texts
5 he was sending you.
6   A.   No.
7   Q.   What was their reaction?
8   A.   They were shocked.
9   Q.   Did they advise you to do
10 anything?
11   A.   Yes.
12   Q.   What?
13   A.   They told me that I should tell
14 the principal.
15   Q.   Did you do that?
16   A.   No.
17   Q.   For the same reason that you
18 told Chase not to tell anyone?
19   A.   Correct.
20   Q.   Did you tell them not to tell
21 anybody?
22   A.   Correct.
23   Q.   Do you know if they told
24 anybody else?

**Page 39**

1   A.   I don't believe so.
2   Q.   When I'm ask asking that
3 question, I'm referring to any other
4 students.
5   A.   I don't think so.
6   Q.   It never came back to you? You
7 never heard through any source that they
8 had mentioned it to somebody else?
9   A.   No.
10   Q.   What's Alli's mother's name?
11   A.   Cheryl.
12   Q.   Did you know her?
13   A.   I did.
14   Q.   Was she something other than
15 Alli's mother? Was she something at the
16 school?
17   A.   She was my homeroom teacher's
18 assistant.
19   Q.   Was Fateem Diabetes living with
20 the Alderfer family?
21   A.   No.
22   Q.   Was she an exchange student, or
23 was she living with a host family, or was
24 she from the area?

**Page 40**

1   A.   I believe she lived with her
2 grandmother in Sellersville.
3   Q.   Who was your homeroom teacher
4 back in 2009?
5   A.   Kathy Tatarro.
6   Q.   And when you came into your
7 homeroom in the morning at the start of
8 school, was Cheryl Alderfer usually in the
9 homeroom, also?
10   A.   Yes.
11   Q.   What kind of function did she
12 perform?
13   A.   I'm not sure. I think she
14 just kind of was helping with grading
15 papers and -- I know she helped out in
16 the lunchroom.
17   Q.   How did she help out in the
18 lunchroom?
19   A.   Preparing the food.
20   Q.   Did you know her outside of
21 school, Cheryl Alderfer, by going over to
22 Alli's house on occasion?
23   A.   I had been there for a few
24 things that we did as a class, but

**Page 41**

1 nothing outside of that.
2   Q.   At the Alderfer house?
3   A.   Correct.
4   Q.   What type of class things?
5   A.   Dinners, those sorts of things.
6   Q.   When you're talking about class,
7 you're talking about your grade class?
8   A.   Yes.
9   Q.   How many kids were in that
10 class, approximately?
11   A.   Thirty.
12   Q.   Thirty? Okay. Did you find out
13 at some point that Cheryl Alderfer had
14 gotten some information about this texting
15 issue between you and Eric Romig?
16   A.   Yes.
17   Q.   Do you recall when that was?
18   A.   Sometime in December.
19   Q.   Of 2009?
20   A.   Correct.
21   Q.   Do you know how she found out?
22   A.   She overheard her daughter Alli
23 and Fateem talking about it at their
24 house.

Page: 15 (42 - 45)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 42

1  Q.   Did she tell you that? Did
2  Cheryl Alderfer tell that you?
3  A.   Yes.
4  Q.   Where did she tell you that?
5  A.   Right outside of homeroom.
6  Q.   What time of day was this?
7  A.   In the morning.
8  Q.   When you first arrived at
9  school?
10  A.   Shortly after.
11  Q.   And what exactly did she tell
12  you she had overheard?
13  A.   She said "I know what's going
14  on between you and Mr. Romig.  I
15  overheard Alli and Fateem talking about
16  it" and brought me to Mr. Clymer's
17  office.
18  Q.   When you say she brought you to
19  Mr. Clymer's office, did she physically
20  walk with you to Ryan Clymer's office?
21  A.   Yes.
22  Q.   Did she give you a choice?
23  A.   No.
24  Q.   Did she ask you to bring your

Page 43

1  cell phone with you?
2  A.   I don't believe so.
3  Q.   Did you have your cell phone
4  with you?
5  A.   I don't remember.
6  Q.   Did you usually take it to
7  school?
8  A.   I kept it in my locker because
9  of the amount of texts that he would send
10  me.
11  Q.   During a school day?
12  A.   Yes.
13  Q.   "He" being Mr. Romig.
14  A.   Yes.
15  Q.   Did you return his texts?
16  A.   Yes.
17  Q.   Did you return every text?
18  A.   No.
19  Q.   What types of things would you
20  text him back when he was texting you
21  these inappropriate emails?
22  A.   I would not answer him mostly
23  if it was inappropriate.
24  Q.   Okay.

Page 44

1  A.   I don't recall a lot of what I
2  sent back to him.
3  Q.   Aside from the sexually-based
4  inappropriate emails, do you recall in
5  December of 2009 texting back and forth
6  with Mr. Romig regarding, again, issues
7  you may be having at school, issues you
8  might be having with your parents, or
9  issues you might be having with your
10  boyfriend?
11  A.   No.
12  Q.   Or just facts having nothing to
13  do with school or basketball?
14  A.   No.
15  Q.   Before Mrs. Alderfer took you
16  to Ryan Clymer's office, did she ask you
17  for any details about what was going on?
18       In other words, I'm asking you,
19  after she told you she overheard a
20  discussion between her daughter and Fateem
21  Diabetes about the issue, did she ask you
22  for any more details herself?
23  A.   No.
24  Q.   Did you give her any more

Page 45

1  details yourself?
2  A.   No.
3  Q.   Did you try to dissuade her
4  from taking you to the headmaster's office
5  to discuss it?
6  A.   No.
7  Q.   When she took you to Mr.
8  Clymer's office, was he in the office?
9  A.   Yes.
10  Q.   Was anybody else in the office
11  with him?
12  A.   No.
13  Q.   Did Cheryl Alderfer accompany
14  you into the office with him?
15  A.   Yes.
16  Q.   And did you have a meeting with
17  Mr. Clymer at that point?
18  A.   Yes.
19  Q.   Was it just you, Mr. Clymer and
20  Cheryl Alderfer?
21  A.   Yes.
22  Q.   And did Cheryl Alderfer stay at
23  the meeting throughout the entire course
24  of the meeting?

Page 46

1   A.   Yes.
2   Q.   From beginning to end?
3   A.   Yes.
4   Q.   When you got into the office
5   with Mr. Clymer, what did Ms. Alderfer
6   say, if anything?
7   A.   I believe she just said "Emily
8   needs to make you aware of something
9   that's going on."
10  Q.   And what did you tell Mr.
11  Clymer, to the best of your recollection?
12  A.   From what I recall, I told him
13  that my basketball coach, Mr. Romig, had
14  been texting me inappropriately for a
15  number of weeks now.
16  Q.   Did you tell him the type of
17  texts?
18  A.   I believe I told him that they
19  were inappropriate texts.
20  Q.   Did you say they were sexually
21  inappropriate texts?
22  A.   I don't recall.
23  Q.   When you started telling Mr.
24  Clymer about these texts and whatever,

Page 47

1   were you embarrassed?
2   A.   Yes.
3   Q.   Were you nervous?
4   A.   Yes.
5   Q.   Did you believe that something
6   might happen to you?
7   A.   Yes.
8   Q.   Were you concerned that people
9   might not believe you?
10  A.   Yes.
11  Q.   At that point did you have any
12  undeleted texts on your phone that you
13  know of?
14  A.   I don't recall.
15  Q.   During the course of the
16  meeting did Mr. Clymer ask you to get
17  your phone and bring it to him to look
18  at?
19  A.   No.
20  Q.   Did anybody ever ask you to
21  look at your phone?
22  A.   No.
23  Q.   Did Mr. Clymer ask you any
24  questions about the inappropriate nature

Page 48

1   of the texts that Mr. Romig was sending
2   to you?
3   A.   No.
4   Q.   Did he ask you whether or not
5   you had shared this information about the
6   texting with anybody other than Alli
7   Alderfer or Fateem Diabetes?
8   A.   I don't believe so.
9   Q.   Did he know that you were
10  dating Chase Brunner at the time?
11  A.   Yes.
12  Q.   Did he ask you whether or not
13  Chase Brunner knew of or had seen any of
14  these inappropriate sexually-based texts?
15  A.   No, not during that meeting.
16  Q.   Did you have any other meeting
17  with Mr. Clymer?
18  A.   No.
19  Q.   At any time after this first
20  meeting with him -- and by the way, do
21  you remember the date of that meeting?
22  A.   I only remember that it was
23  right before being dismissed for Christmas
24  break because I wasn't allowed back.

Page 49

1   Q.   We'll get to that in second,
2   but you think it was sometime within a
3   week --
4   A.   About the 20th?
5   Q.   Yes, the week before the
6   Christmas break.
7   A.   Correct.
8   Q.   Did Ryan Clymer ask you if your
9   parents knew about this?
10  A.   No.
11  Q.   Do you recall him asking you
12  any questions at all?
13  A.   No.
14  Q.   How long did the meeting last?
15  A.   Less than ten minutes.
16  Q.   During the meeting did Cheryl
17  Alderfer say anything other than what you
18  stated she said to open up the meeting?
19  A.   No.
20  Q.   What did Mr. Clymer say to you?
21  A.   He asked me to leave the school
22  immediately.
23  Q.   Did he tell you why?
24  A.   Just for my safety.

**Page 50**

1     Q.    Did he state to you why he
2 thought you might not be safe if you
3 stayed?
4     A.    No.
5     Q.    Did you argue with him about
6 that?
7     A.    No.
8     Q.    Did you ask him when you would
9 be allowed back in school?
10     A.    No.
11     Q.    Did he tell you when you would
12 be allowed back in school?
13     A.    No.
14     Q.    Did he tell you whether or not
15 he was going to do anything about the
16 information you gave him about the texting
17 from Mr. Romig?
18     A.    I believe he said he would
19 handle it.
20     Q.    Did he say any specifics about
21 how he would handle it?
22     A.    No.
23     Q.    When Ryan Clymer told you to
24 leave school immediately for your own

**Page 51**

1 safety, did he tell you what he wanted
2 you to do when you left school? Did he
3 give you some instruction about what to
4 do or not to do?
5     A.    He told me to go home and tell
6 my parents what was going on.
7     Q.    And as of that time your
8 parents didn't know what was going on.
9     A.    No.
10     Q.    Did you tell him that your
11 parents didn't know what was going on?
12     A.    Yes.
13     Q.    Did he give you any -- did
14 Ryan Clymer give you any other
15 instructions or directions about what you
16 were to do while he was handling this?
17     A.    No.
18     Q.    Did he tell you not to have
19 any contact with Eric Romig?
20     A.    No.
21     Q.    Did he tell what to do if you
22 received any additional inappropriate texts
23 from Eric Romig?
24     A.    No.

**Page 52**

1     Q.    Did he tell you that he would
2 instruct Mr. Romig not to have any
3 contact with you?
4     A.    No.
5     Q.    Do you know if there were any
6 more practices or games scheduled for the
7 basketball team prior to the Christmas
8 break?
9     A.    There were.
10     Q.    Was there a game or a practice
11 that same day that you went in to talk
12 to Ryan Clymer?
13     A.    There was a practice.
14     Q.    Did you go to that practice?
15     A.    No.
16     Q.    Did Ryan Clymer tell you
17 whether or not you were allowed to
18 participate in any basketball activities?
19     A.    He told me I was not allowed.
20     Q.    To do what?
21     A.    To participate in basketball.
22     Q.    When he told you that or when
23 he told you to go home and tell your
24 parents, did you argue with him at all?

**Page 53**

1     A.    No.
2     Q.    About anything.
3     A.    No.
4     Q.    Do you know if there was a
5 basketball game before the Christmas
6 break?
7     A.    There was.
8     Q.    Do you know what team you were
9 playing?
10     A.    No.
11     Q.    Did you attempt to go to the
12 practice or play in that game?
13     A.    No.
14     Q.    Between the day that you met
15 with Mr. Clymer and the day that you
16 eventually came back to school, did you
17 have any contact with Eric Romig at all?
18     A.    No.
19     Q.    Did he just stop texting you
20 all of a sudden?
21     A.    He had sent me one text message
22 that was very random. My parents had my
23 phone at that time, so they kind of
24 handled it.

Page 54

1  Q. Do you know what that message
2  said?
3  A. I don't recall. I know my
4  parents have it documented.
5  Q. That was the only text message
6  you got from him?
7  A. Yes.
8  Q. Do you remember what day you
9  went back to school?
10  A. It was after the Christmas
11  break, so...
12  Q. Sometime in January 2010?
13  A. Yes.
14  Q. Do you know if you went back
15  to school on the first school day after
16  the Christmas break?
17  A. Yes.
18  Q. Do you recall how you were
19  notified that you were allowed or
20  permitted to come back to school?
21  A. I don't recall.
22  Q. Do you recall yourself getting
23  any message from Ryan Clymer or any of
24  the administration at FCA, or your parents

Page 55

1  getting any information or message from
2  FCA?
3  A. No.
4  Q. What did you do after the
5  meeting with Mr. Clymer?
6  A. Drove home and told my parents
7  what was going on.
8  Q. Did you go to your locker
9  first?
10  A. I don't recall.
11  Q. Did you get your cell phone?
12  A. Probably.
13  Q. You don't have a recollection
14  of doing it, but when you got home did
15  you have your cell phone?
16  A. Yes.
17  Q. Where were your parents when
18  you got home?
19  A. They were both working from
20  home, so they had been there.
21  Q. And tell me how that
22  conversation went with your parents what
23  did you tell them. What did you tell
24  them about why you were home and about

Page 56

1  the discussion you had with Mr. Clymer?
2  A. I told them that my basketball
3  coach was texting me inappropriately, and
4  I was contacted by Cheryl Alderfer to go
5  and tell Mr. Clymer about this.
6  Q. Did you tell them anything
7  about the type of texts you were getting
8  from Mr. Romig?
9  A. Yes.
10  Q. What did you tell them?
11  A. I told them they were sexual,
12  inappropriate.
13  Q. Did you give them any idea
14  about the quantity of texts that you were
15  receiving from Mr. Romig?
16  A. I don't recall.
17  Q. Did you tell them how long this
18  had been going on?
19  A. Yes.
20  Q. Do you remember what you told
21  them, for how many weeks or months or
22  whatever?
23  A. I told them I believe about two
24  months.

Page 57

1  Q. Did your parents ask you any
2  questions?
3  A. They just instructed me to sit
4  down with them and type out everything I
5  could remember.
6  Q. About what?
7  A. About what he was sending me.
8  Q. About the texts that Mr. Romig
9  was sending you.
10  A. Yes.
11  Q. The inappropriate texts that he
12  was sending you.
13  A. Yes.
14  Q. And who gave you that
15  instruction?
16  A. I believe my father, Kevin.
17  Q. And did you sit down and type
18  something out regarding your recollection
19  of the type of inappropriate sexual texts
20  you were receiving from Mr. Romig?
21  A. Yes.
22  Q. I'm going to show you what's
23  previously been marked as Romig exhibit
24  six at his deposition. It's two pages:

Page 58

1  The first page is an email from your
2  mother to Ryan Clymer dated December 31st,
3  2009, at 11:27 a.m.; the second page is a
4  typed document that has at the top "Emily
5  Mayer Statements."
6      I'll ask you to take a look at
7  that and then tell me whether or not
8  that's the document that you were just
9  referring to in your testimony that you
10  prepared at your parents' direction.
11      A.    Yes, this is the document.
12      Q.    Did your parents ask to see
13  your phone?
14      A.    Yes.
15      Q.    At that time?
16      A.    Yes.
17      Q.    Did you give it to them?
18      A.    Yes.
19      Q.    At that time, other than that
20  one email that you had mentioned was on
21  there, were there any other -- strike
22  that.
23      Other than the one text that
24  you had mentioned from Eric Romig, were

Page 59

1  there any other texts from him that had
2  not been deleted from the phone?
3      A.    I don't believe there were any
4  texts from him.
5      Q.    So, when you prepared the
6  statements that are attached to Romig
7  exhibit six, this was all done from your
8  memory of texts that you had received
9  from Eric Romig over the last month or
10  two. Is that correct?
11      A.    Yes.
12      Q.    I'm going to ask you about some
13  of these texts that are in here, in your
14  statement. The first notation here is --
15  sorry, quoting, "Beginning in November he
16  started telling me how he and Lauren did
17  sexual things and was hinting at me to be
18  this way."
19      When you put down Lauren's name
20  here, were you referring to Lauren Fretz?
21      A.    Yes.
22      Q.    Did you ever have any direct
23  conversations with Mr. Romig about any of
24  the statements that you have down on this

Page 60

1  page?
2      In other words, at a game,
3  after a game, walking through the hallways
4  at school or walking to a practice field
5  or anything like that, did you ever talk
6  about any of this stuff in person with
7  him?
8      A.    Never face-to-face.
9      Q.    Not once.
10      A.    No.
11      Q.    So, the only information that
12  you got from him was through texting.
13      A.    Yes.
14      Q.    Let me correct that. I think
15  there was something -- strike that.
16      In the text messages relating
17  to this first entry on your statement
18  page here, what types of things was he
19  telling you that he and Lauren were doing
20  or had done?
21      A.    That they were having or had
22  sex.
23      Q.    Physical contact.
24      A.    Yes.

Page 61

1      Q.    Prior to receiving that text
2  from Mr. Romig, did you have any
3  knowledge of or suspicion of or had you
4  heard anything from any source that there
5  was some type of relationship between
6  Lauren Fretz and Eric Romig?
7      A.    No.
8      Q.    Nothing in the hallways or no
9  suspicion you had when Lauren Fretz showed
10  up for practice?
11      A.    No.
12      Q.    Nothing at all.
13      A.    No.
14      Q.    The fourth statement from the
15  bottom you state, "He would forward text
16  messages he said were between he and
17  Lauren Fretz and asked if I was jealous."
18      When you wrote here that he
19  would forward text messages, did he
20  forward you the actual text message that
21  he had sent to Lauren Fretz or she had
22  sent to him?
23      MR. KEMETHER:  Objection to the
24  form.

Page: 20 (62 - 65)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 62

1  A.    I don't recall. I know he
2  would forward text messages to me that
3  she had sent me, but I --
4  Q.    That she had sent who?
5  A.    That she had sent him, I'm
6  sorry, but I don't recall what they said.
7  Q.    Okay. But do you have a
8  recollection of seeing on your phone some
9  text message that was actually authored by
10 Lauren Fretz?
11 A.    No.
12 Q.    So, he would be telling you
13 about texts that he had had or received
14 from Lauren Fretz?
15 A.    Yes.
16 Q.    The second entry is "December
17 5th - Desales game he texted me and said
18 'I want to be in you.'"
19     Again, you're writing this at
20 the end or toward the end of December.
21 How did you know that that text was
22 specifically sent on that date?
23 A.    I believe I probably just
24 remembered that from having that on our

Page 63

1  calendar because that's when we went to
2  the game.
3  Q.    I think in Mr. Romig's
4  deposition he said that you had never
5  gone to a DeSales game, that you had gone
6  to a Drexel game.
7      Does that change your
8  recollection at all, whether it was
9  DeSales, Drexel or some other game?
10 A.    I knew it was a school. As
11 far as the date, I don't recall.
12 Q.    Do you know whether or not
13 Chase Brunner ever saw that text?
14 A.    No. That was -- that text was
15 sent to me while we were on our way to
16 the game.
17 Q.    Why don't you describe that for
18 us? What were the circumstance surrounding
19 the sending of that text?
20 A.    We were on our way to the game
21 and he was sitting next to me, and he
22 had texted me that.
23 Q.    What type of vehicle were you
24 going in?

Page 64

1  A.    A van.
2  Q.    A van. And how many people went
3  to the game?
4  A.    Our whole team.
5  Q.    Were they all in one van, or
6  was there more than one vehicle?
7  A.    I don't recall.
8  Q.    What was your response, if any,
9  when Mr. Romig sent you that text?
10 A.    I did not respond. I deleted
11 it.
12 Q.    Right then and there?
13 A.    Yes.
14 Q.    Did you move your seat?
15 A.    No. The car was moving.
16 Q.    And that day while you were at
17 the game, you went to this game, whatever
18 team you saw playing -- it was a college
19 game, correct?
20 A.    Correct.
21 Q.    (Continuing) -- did he mention
22 anything to you in person about the text
23 that he had sent you, about that specific
24 text?

Page 65

1  A.    No.
2  Q.    The next entry is "This month
3  he would just tell me every day that he
4  was in love with me." By "this month,"
5  the reference in that sentence, is that
6  to the month of December?
7  A.    I believe so.
8  Q.    The next statement: "He would
9  tell me he could give me everything that
10 I need and has so much to offer me and
11 wants to marry me."
12     Did he text you words or
13 statements to that effect on more than
14 one occasion?
15 A.    Yes.
16 Q.    Do you know how many?
17 A.    No.
18 Q.    Did you know whether or not he
19 was married at the time?
20 A.    I did know that he was married
21 at the time.
22 Q.    Did you ever meet his wife?
23 A.    Yes.
24 Q.    On what occasions?

Appendix 0185

**Page 66**

1    A.    Games, when I was at his house.
2    Q.    Oh, that's right, when you
3 stayed over with Chelsea, correct?
4    A.    Yes.
5    Q.    Did Mr. Romig ever text you
6 that he was having any problems with his
7 wife?
8    A.    No.
9    Q.    Did he ever text you that he
10 intended to divorce his wife?
11    A.    No.
12    Q.    The next statement states, "He
13 wanted me to pick between him and Chase,
14 said he hated my picture on my cell phone
15 and told me to delete it."
16        Do you know whether or not
17 Chase Brunner ever saw that text?
18    A.    I don't recall.
19    Q.    Did you tell Chase at some
20 point that you were getting that type of
21 text from Mr. Romig?
22    A.    Yes.
23    Q.    And is that what made Chase
24 upset?

**Page 67**

1    A.    Yes.
2    Q.    Do you know what he meant by
3 stating "Said he hated my picture on my
4 cell phone and told me to delete it"?
5    A.    It was a picture of Chase and
6 I.
7    Q.    On your cell phone.
8    A.    Yes.
9    Q.    And how would he have seen
10 that?
11    A.    I don't know.
12    Q.    Did Mr. Romig ever send you any
13 pictures?
14    A.    Yes.
15    Q.    How many?
16    A.    One.
17    Q.    What was the image of?
18    A.    Him in his new jeans.
19    Q.    Was there a text with it?
20    A.    I don't recall.
21    Q.    You don't recall if there was
22 any text along with it?
23    A.    No.
24    Q.    How did you know they were new

**Page 68**

1 jeans?
2    A.    He may have said that after he
3 sent me the picture. When he initially
4 sent me the picture there was nothing
5 with it.
6    Q.    The next statement is "He told
7 me he would leave the house just to text
8 me because he had to hide it." How many
9 times did he send you a text of that
10 nature?
11    A.    Very frequently.
12    Q.    And the same type of statement,
13 the next statement: "Coach said he
14 stayed in his bathroom for long periods
15 of time to text me."
16        Was it your understanding or
17 impression from the texts that you were
18 getting Mr. Mr. Romig that he was hiding
19 this from his wife?
20    A.    Yes.
21    Q.    Would you say that throughout
22 this texting, the personal texting that
23 Mr. Romig was sending you, that he was at
24 some point, in some way, aside from the

**Page 69**

1 sexually-based texting, trying to act as
2 some kind of mentor to you?
3    A.    No.
4    Q.    Did you ever seek him out to
5 be or to act as a mentor to you for
6 personal issues or school issues, that
7 type of thing?
8    A.    No.
9    Q.    Do you know if he did that for
10 other players on his team?
11    A.    No.
12        MR. SANTARONE: I'm sorry, no,
13 you don't know; or no, he didn't?
14        THE WITNESS: No, I don't
15 recall if he had done that for anybody
16 else.
17 BY MR. GROTH:
18    Q.    No other player on the team had
19 told you that he had been acting as her
20 mentor in some way.
21    A.    No.
22    Q.    The next statement is "December
23 17th - Coach texted me after the game,
24 Just so you know next Tuesday I'm going

Page 70

1  to tell them that I resign. I said why
2  and he said that he can't be friends with
3  me and has to quit because it kills him
4  to see me."
5      How do you know that that text
6  was on December 17th?
7      A.   I don't recall.
8      Q.   Is there something about that
9  particular text that made the date stand
10 out in your memory for some reason?
11     A.   It could have been that we had
12 a game that day and I remember the date
13 from our game.
14     Q.   Do you remember what game you
15 were referring to, what team?
16     A.   No.
17     Q.   Did the team ever go to away
18 games on a bus, school bus?
19     A.   Yes.
20     Q.   Was there any time when girls
21 on the team would change their clothes
22 from their school clothes to their
23 basketball uniforms or back on the bus?
24     A.   No.

Page 71

1      Q.   The next statement says "Coach
2  told me he liked being on the Quakertown
3  school bus with his team because they
4  would change in front of him," and then
5  it says in parenthesis "(text message was
6  more recent)."
7      What did you mean by "text
8  message was more recent"?
9      A.   That he had sent that text
10 message to me more recently from when I
11 was writing this.
12     Q.   That would be toward the end of
13 December.
14     A.   Yes.
15     Q.   The next statement is "Late
16 night text messages unreturned by me
17 because I feel asleep" -- probably meant
18 "fell asleep." "He would respond with a
19 text full of" question marks.
20     How often would you get
21 late-night text messages from Mr. Romig?
22     A.   Every night.
23     Q.   And were those late-night text
24 messages usually of a sexual nature?

Page 72

1      A.   If by "sexual" you mean like he
2  would just tell me that he wanted to be
3  with me.
4      Q.   Yes.
5      A.   Yes.
6      Q.   Did you ever text him, telling
7  him to stop texting you?
8      A.   I don't recall.
9      Q.   Were you concerned at all that,
10 if you didn't accept his texts or tell
11 him to stop texting you or whatever, that
12 it might affect your ability to play on
13 the basketball team?
14     A.   Yes.
15     Q.   How did you rate yourself as a
16 player on the basketball team your senior
17 year? Were you one of the better
18 players, the best player, a substitution
19 player? Who?
20     A.   I started.  I don't think I
21 was the best player, but...
22     Q.   Okay. Were you a captain or
23 co-captain of the team?
24     A.   Yes.

Page 73

1      Q.   Along with whom?
2      A.   Chelsea Romig and Heather Demar.
3      Q.   So, the three co-captains.
4      A.   Yes.
5      Q.   At any time before you had your
6  meeting with Ryan Clymer, did Eric Romig
7  demote the three of you or some of you
8  as co-captains from the team?
9      A.   No.
10     Q.   Was there ever a problem with
11 you having issues with other members of
12 the team where you were bad-mouthing them
13 or snapping at them or having fights with
14 them, anything of that nature at all?
15     A.   No.
16     Q.   Do you know how many games you
17 actually had played before Ryan Clymer
18 told you at that meeting to go home and
19 discontinue your basketball activities?
20     A.   I don't recall.
21     Q.   The season starts sometime in
22 November?
23     A.   Yes.
24     Q.   And did you usually have a game

Appendix  0187

Page: 23 (74 - 77)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 74

1  every week?
2  A.   Yes.
3  Q.   Does the actual season start
4  later in November?
5  A.   I believe so.
6  Q.   You state that you did not have
7  any further conversations with Ryan Clymer
8  about the Eric Romig texting allegations,
9  correct?
10  A.   Correct.
11  Q.   Did you have any conversations
12  at any time with any other administrators
13  at FCA?
14  A.   No.
15  Q.   Did you ever have any
16  conversations with any of the pastors
17  there at the church?
18  A.   No.
19  Q.   Did you have any conversations
20  with Mr. Hollenbach, the athletic
21  director?
22  A.   No.
23  Q.   He never asked you any
24  questions about anything.

Page 75

1  A.   No.
2  Q.   Did you have any more
3  discussions with Cheryl Alderfer?
4  A.   No.
5  Q.   After you went home and told
6  your parents and wrote up this statement
7  of inappropriate texts that you were
8  receiving from Mr. Romig, would it be
9  fair to say that your parents basically
10  handled the situation from there on out?
11  A.   No.
12  Q.   Handled it in terms of dealing
13  with the school, dealing with Ryan Clymer
14  and...
15  A.   Yes, the best that they could.
16  Q.   Did you ever hear any
17  conversations between Ryan Clymer, Mr.
18  Hollenbach and Mr. Romig?
19  A.   Yes.
20  Q.   Tell me about that.
21  A.   I was going to meet with Pastor
22  Ron --
23  Q.   What's his full name?
24  A.   I'm not...

Page 76

1  Q.   Is it Jones?
2  A.   Yes.
3  Q.   Ron Jones?
4  A.   Yes.
5  Q.   You were going to meet with him
6  where?
7  A.   In his office.
8  Q.   Is that at the school?
9  A.   It's at the school.
10  Q.   Okay.
11  A.   And I don't know if I got the
12  time wrong or he was just not there. I
13  happened to be sitting outside, and Mr.
14  Hollenbach and Mr. Clymer were on the
15  phone with Mr. Romig.
16  Q.   You were sitting outside where?
17  A.   Of Ron Jones' office.
18  Q.   Was the door to the office open
19  or closed?
20  A.   Closed.
21  Q.   Was there anybody else outside
22  the office with you?
23  A.   No.
24  Q.   What time of day was this?

Page 77

1  A.   Around lunchtime.
2  Q.   Is there a glass window or
3  window pane or whatever into the office
4  where you could see who was in the
5  office?
6  A.   There is a small window, I
7  believe, on the door.
8  Q.   On the door? Okay. When you
9  got to the office, did you look inside to
10  see who was inside?
11  A.   No.
12  Q.   But you could hear voices from
13  outside?
14  A.   Yes.
15  Q.   This was after you came back to
16  school, correct?
17  A.   Yes.
18  Q.   So, it would have been after
19  the Christmas break.
20  A.   Yes.
21  Q.   And could you hear the voices
22  talking in the room?
23  A.   Yes.
24  Q.   Did you recognize all of the

**Page 78**

1  voices?
2  A.   Yes.
3  Q.   You recognized Mr. Clymer's and
4  Mr. Hollenbach's and Mr. Romig's voice?
5  A.   Yes.
6  Q.   Was Mr. Romig on the phone?
7  A.   Yes.
8  Q.   Was it a speakerphone setup?
9  A.   Yes.
10 Q.   And what did you hear them say
11 or talk about?
12 A.   I don't recall most of the
13 conversation. They were just kind of going
14 back and forth, and that's really all I
15 remember.
16 Q.   Do you recall them talking at
17 all about the allegations that you made
18 about the texting and the inappropriate
19 texts that you claim that he was sending
20 you?
21 A.   I don't recall.
22 Q.   Were the voices loud? Did it
23 sound like somebody was angry or upset?
24 A.   Yes.

**Page 79**

1  Q.   Who was angry or upset?  Whose
2  voice could you hear that sounded angry
3  or upset?
4  A.   Mr. Romig.
5  Q.   Did you wait outside the office
6  door until that telephone conversation was
7  over?
8  A.   Yes.
9  Q.   Did Mr. Hollenbach and Mr.
10 Clymer then come out the door, leave the
11 office?
12 A.   Yes.
13 Q.   Did they see you?
14 A.   Yes.
15 Q.   Did they talk to you at all?
16 A.   No.
17 Q.   Did they ask you what you were
18 doing there?
19 A.   No.
20 Q.   Did they ask you if you had
21 heard any of the conversation?
22 A.   No.
23 Q.   Did Pastor Jones ever show up?
24 A.   No.

**Page 80**

1  Q.   So, you just left after a
2  period of time?
3  A.   Yes.
4  Q.   And again, there was nobody
5  else sitting out at the outer-office area
6  but you?
7  A.   No.
8  Q.   When you came back to school
9  after the Christmas break, did you
10 immediately resume your basketball
11 activities?
12 A.   Yes.
13 Q.   Do you recall how you were
14 informed that you could do so?
15 A.   No.
16 Q.   Was Eric Romig still coaching
17 the team then?
18 A.   No.
19 Q.   Did you know what happened to
20 him?
21 A.   No.
22 Q.   From any source: From your
23 parents or from the school or anything at
24 all.  Did somebody tell you that he was

**Page 81**

1  not going to be the coach any more?
2  A.   I knew that he was not going
3  to be there.  I don't recall how.
4  Q.   You don't recall if it was your
5  parents or somebody else told you that?
6  A.   No.
7  Q.   Who took over coaching the
8  team?
9  A.   Mr. Forker.
10 Q.   Was he another coach of another
11 team at the school?
12 A.   The mens.
13 Q.   Did he coach Chase Brunner?
14 A.   Yes.
15 Q.   When you got back to the team
16 and started playing again, did any of
17 your teammates ask you any questions about
18 what was going on and why Mr. Romig was
19 not coaching the team any more?
20 A.   No one really talked to me.
21 Q.   Did you get an impression from
22 anything anybody said or did that they
23 knew that there was some issue between
24 you and Mr. Romig?

Page: 25 (82 - 85)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 82

1   A.   Yes.
2        MR. KEMETHER: Objection to the
3   form.
4   Q.   Did you ever speak to Chelsea
5   Romig about the allegations about improper
6   sexual texting by her father?
7   A.   Yes.
8   Q.   Tell me about that.
9   A.   One of our assistant coaches
10  had asked Chelsea and I to sit down
11  together in a classroom and try to work
12  through things, but neither of us really
13  talked.
14  Q.   And who was that coach?
15  A.   I believe it was Mrs. Landis.
16  Q.   That's Robin Landis?
17  A.   Yes.
18  Q.   Did Chelsea Romig ever call you
19  after your meeting with Ryan Clymer?
20  A.   Yes.
21  Q.   On your cell phone?
22  A.   Yes.
23  Q.   Did you take the call?
24  A.   I did.

Page 83

1   Q.   And what was said?
2   A.   I had answered the call and she
3   asked what was going on between me and
4   her father, and I hung up.
5   Q.   Why did you hang up?
6   A.   Because I didn't know what to
7   say to her.
8   Q.   Did she ever call you back?
9   A.   No.
10  Q.   Did you ever have any phone
11  conversation with her about the texts from
12  her father to you?
13  A.   No.
14  Q.   You said Robin Landis put you
15  in a room with her when you came back to
16  rejoin the basketball team after the
17  Christmas break.
18       Did you have any discussion
19  with her at all in the room, or did you
20  just pretty much sit and stare at each
21  other?
22  A.   I think it was more of me
23  apologizing.
24  Q.   Saying what?

Page 84

1   A.   That I was sorry for what had
2   happened. I don't recall much other
3   than...
4   Q.   Do you recall anything that she
5   said?
6   A.   No.
7   Q.   Do you recall whether or not
8   she said that she believed your
9   accusations about her father?
10  A.   No.
11  Q.   She didn't say one way or the
12  other, whether she believed or did not
13  believe them.
14  A.   No.
15  Q.   How did the rest of the
16  basketball season go once you rejoined the
17  team?
18  A.   Not good.
19  Q.   In what way?
20  A.   Didn't pass me the ball,
21  unkind.
22  Q.   The other girls?
23  A.   Yes.
24  Q.   Did any of them say anything to

Page 85

1   you at all about the issue between you
2   and Mr. Romig?
3   A.   No.
4   Q.   Did you finish out the
5   basketball season?
6   A.   Yes.
7   Q.   When you started up playing
8   basketball again after the Christmas break
9   in January of 2010, was Mr. Romig allowed
10  to watch the games?
11  A.   Yes.
12  Q.   Did he sit with the team?
13  A.   Yes.
14  Q.   This is for home games, right?
15  A.   Yes.
16  Q.   Did the team sit on separate
17  benches or separate rows or separate
18  chairs on the basketball floor?
19  A.   Chairs.
20  Q.   On individual chairs lined up?
21  A.   Yes.
22  Q.   Were other spectators allowed to
23  sit in those chairs other than people on
24  the team?