Page 86

1     A.    No.
2     Q.    And when you came back to play
3 basketball, where was Mr. Romig sitting?
4     A.    On the end of the bench, the
5 chairs.
6     Q.    And how close would that be to
7 you when you were on the bench?
8     A.    Twenty feet, thirty feet.
9     Q.    Did he ever talk to you?
10     A.    No.
11     Q.    Was he doing anything there
12 rather than watching the game?
13     A.    No.
14     Q.    He never tried to coach or
15 anything.
16     A.    No.
17     Q.    Did you have a stat-keeper,
18 somebody who would keep score or do stats
19 for the team, that type of thing?
20     A.    I don't recall.
21     Q.    When you came back to the team,
22 was there any explanation given to the
23 team as to why Mr. Romig was no longer
24 the coach?

Page 87

1     A.    No.
2     Q.    I mean, he just basically left
3 and there was no discussion about why he
4 was no longer the coach for the team?
5     A.    There was no conversation while
6 I was there that I recall.
7     Q.    Were you told by anybody that
8 Mr. Romig had resigned as coach?
9     A.    I don't believe so.
10     Q.    Was it your understanding or
11 impression at the time that his no longer
12 coaching the team was as a result of your
13 allegations against him?
14     A.    Yes.
15     Q.    You didn't know of any other
16 reason why he might not be coaching.  Is
17 that correct?
18     A.    Correct.
19     Q.    Did Romig ever send you
20 messages by Facebook?
21     A.    Yes.
22     Q.    On how many occasions?
23     A.    A lot.  I can't remember a
24 number, but...

Page 88

1     Q.    Did you have your own Facebook
2 account?
3     A.    I did.
4     Q.    It was your own account, not
5 your parents' or your family's account?
6     A.    No.
7     Q.    Just yours.
8     A.    Yes.
9     Q.    Would he send inappropriate
10 messages over Facebook?
11     A.    Not extremely inappropriate
12 because he would message me on his wife's
13 Facebook.
14     Q.    What kind of messages would he
15 send on Facebook?
16     A.    He would just ask me to come
17 over, see if Chelsea wanted to hang out
18 so that I could come over.
19     Q.    So, he would invite you over to
20 his house to hang out with Chelsea and he
21 would be there?
22     A.    Yes.
23     Q.    Do you have any facts or
24 information about what it is that Ryan

Page 89

1 Clymer did to investigate your allegations
2 against Mr. Romig?
3     A.    No.
4     Q.    When you came back to the team
5 after the Christmas break and were playing
6 games where Mr. Romig was sitting on the
7 team's chairs, did you complain about that
8 to somebody?
9     A.    My parents.  I believe they
10 contacted Ryan Clymer.
11     Q.    Were your parents at that game?
12     A.    Yes.
13     Q.    So, they saw it, too?
14     A.    Yes.
15     Q.    And you believe they contacted
16 Ryan Clymer?
17     A.    I believe my mom did, yes.
18     Q.    Was Romig sitting on the team
19 chairs any time after that?
20     A.    He sat in a little cove that
21 was two feet away from there.
22     Q.    Did you ever have any other
23 contact with Eric Romig from January 1st,
24 2010 until October of 2013? That was

Appendix  0191

Page: 27 (90 - 93)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 90

1   after Mr. Romig was arrested for acts he
2   engaged in with my client.
3       A.   No.
4       Q.   Did you ever see him anywhere?
5       A.   No.
6       Q.   At some point were you
7   contacted by detectives, Bucks County
8   detectives, to ask you questions about the
9   allegations that you made while at FCA
10  about the inappropriate sexual texting by
11  Mr. Romig?
12      A.   Yes.
13      Q.   Do you remember who the
14  detective was?
15      A.   No.
16      Q.   Do you recall where you spoke
17  to the detective?
18      A.   Are you asking what city I was
19  in?
20      Q.   Yes, what location.  Were you
21  at your house?  Were you at the police
22  office?
23      A.   I was at their office, near
24  Langhorne.

Page 91

1       Q.   Near Langhorne?
2       A.   Yes.
3       Q.   Let me digress for one second:
4   When you came back to the team, was Robin
5   Landis still the assistant coach?
6       A.   Yes.
7       Q.   Did she ever say anything to
8   you or make any statements to you about
9   the situation between you and Mr. Romig
10  after you returned to the team?
11      A.   She eventually told me that she
12  believed me and she apologized.
13      Q.   Do you remember exactly what
14  she said?
15      A.   No, not word-for-word.
16      Q.   Do you know whether or not,
17  while you were no longer with the team,
18  Robin Landis or Marc Hoover talked to the
19  girls about the allegations that had been
20  made about Coach Romig?  Did you ever
21  hear that from anybody?
22      A.   No.
23      Q.   Did you ever hear that Robin
24  Landis had talked to the girls on the

Page 92

1   team, asking them what they had heard, if
2   anything, about the allegations?
3       A.   No.
4       Q.   While you were sitting outside
5   of Pastor Jones' office and overhearing
6   this telephone conversation between Mr.
7   Clymer, Hollenbach and Mr. Romig, did you
8   ever hear Eric Romig deny sending text
9   messages to you?
10      A.   Yes.
11      Q.   Do you recall if they were
12  talking about the actual nature of the
13  text messages being inappropriate during
14  the telephone conversation?
15      A.   I don't recall.
16      Q.   Getting back to the detectives,
17  do you remember anything about the
18  conversation you had with the Bucks County
19  detectives regarding the situation between
20  you and Eric Romig at FCA?
21      A.   I believe I did something
22  similar to this:  I typed up what I
23  could remember, and I sat down and I went
24  over it with them.

Page 93

1       Q.   When you say typed something
2   up, something other than what we went
3   over with Romig exhibit six, some
4   different document?
5       A.   Correct, it was not this.
6       Q.   Did you keep a copy of it?
7       A.   I don't know if my parents have
8   it on a computer or not.  I don't
9   personally, no.
10      Q.   Did they ask you the same types
11  of questions that I've been asking you
12  today?
13      A.   Similar.
14      Q.   Do you know how long the
15  meeting lasted?
16      A.   Forty-five minutes.
17      Q.   I'm going to show you the first
18  page of Romig exhibit six.  It's an email
19  from your mother to Ryan Clymer.
20          I'll first ask you to read that
21  to yourself for a second -- oh, you have
22  it in front of you.  Just read that to
23  yourself for a second and I'll ask you
24  some questions about that.

Page: 28 (94 - 97)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 94

1   (Pause)
2   Q.   Have you had a chance to read
3   that?
4   A.   Yes.
5   Q.   Does this refresh your
6   recollection at all regarding a prior
7   question I asked you about Robin Landis
8   talking to the girls on the team and
9   asking them what they knew or heard about
10  your texting situation with Mr. Romig?
11  A.   No.
12  Q.   You don't recall your mom's
13  writing on this email?
14  A.   No.
15  Q.   You don't recall Ashley Makowski
16  telling you that on the 30th of December
17  "Robin had been talking to the girls and
18  questioning whether they believed Emily"?
19  A.   I don't recall.
20  Q.   Okay.  At any point in the
21  fall of 2009 did Mr. Romig ever touch
22  you?
23  A.   Yes.
24  Q.   When did that occur?

Page 95

1   A.   During a practice.  I had had
2   a concussion, so I was not practicing
3   with the other girls.
4   Q.   You had a concussion before the
5   practice?
6   A.   Yes.
7   Q.   And what happened?
8   A.   We were standing on the
9   sidelines and he touched my butt.
10  Q.   Was it your impression that
11  when he touched you it was intentional as
12  opposed to accidental?
13  A.   I believe it was intentional.
14  Q.   Was it the type of touching of
15  the butt that players and athletes
16  sometimes do when they are patting each
17  other after a play or something like
18  that, or was it something else?
19  A.   It was something else.
20  Q.   What did you do when he did
21  that?
22  A.   I just moved away and my
23  assistant coach was standing right there,
24  so I didn't know what to do.

Page 96

1   Q.   Which assistant coach?
2   A.   Robin Landis.
3   Q.   Do you know whether or not she
4   saw him touch your butt?
5   A.   I would think she did not,
6   considering she didn't say anything.
7   Q.   Were you only contacted by the
8   detectives on one occasion?
9   A.   Yes.
10  Q.   Did they provide you with any
11  information that they had uncovered in
12  their investigation of Mr. Romig that you
13  can recall?
14  A.   I don't recall.
15  Q.   Did they show you any
16  documents?
17  A.   No.
18  Q.   Were you in contact with any
19  employees of FCA after you graduated in
20  May or June of 2010?
21  A.   No.
22  Q.   Did Henry Thompson ever coach
23  Chase?
24  A.   Yes.

Page 97

1   Q.   In what sport?
2   A.   Basketball.
3   Q.   For how many years?
4   A.   One.
5   Q.   Did you know Henry Thompson
6   while you were at FCA?  Did you know
7   him?
8   A.   I knew of him.  I didn't know
9   him personally.
10  Q.   Do you know if he knew your
11  name?
12  A.   I would think so.
13  Q.   Were you ever contacted by
14  Henry Thompson about this case?
15  A.   Previously...
16  Q.   At any time prior to today.
17  A.   He had contacted Chase recently.
18  Q.   Did you speak to Mr. Thompson
19  at all yourself?
20  A.   No.
21  Q.   Did Chase speak to him?
22  A.   About this situation, no.
23  Q.   About this situation with Mr.
24  Romig at FCA.

Page 98

1    A.    He did not speak with him about
2    it.
3    Q.    About that.  Do you know if
4    Chase talked to Mr. Thompson about the
5    situation involving this lawsuit against
6    FCA?
7    A.    No.
8    Q.    Do you know what they talked
9    about at all? Did Chase say anything to
10   you about why Mr. Thompson was contacting
11   him?
12   A.    He just said that he had
13   reached out to him and wanted to talk.
14   Q.    He didn't say what about?
15   A.    I believe he wanted to talk
16   about the deposition, because from what
17   Chase told me, he didn't want me to have
18   to sit here and go through what the
19   victim went through.
20   Q.    Is that all Chase told you
21   about the conversation?
22   A.    Yes.
23   Q.    Do you know whether or not
24   Chase had any further conversation with

Page 99

1    Mr. Thompson after that?
2    A.    He did not.
3    Q.    Did Eric Romig ever gave you
4    any gifts while he was texting you
5    inappropriately?
6    A.    No.
7    Q.    Did you ever tell Eric Romig,
8    in a text message or otherwise, that you
9    ran away from home at some point in the
10   past with somebody that you were dating?
11   A.    No.
12   Q.    Had you ever done that?
13   A.    No.
14   Q.    Had you ever threatened to do
15   that?
16   A.    No.
17   Q.    Did you ever tell Mr. Romig,
18   either by text message or in person or
19   any other form of communication, that you
20   were considering running away with Chase
21   Brunner while you were at FCA?
22   A.    No.
23   Q.    Did you ever tell Eric Romig,
24   in a text message or otherwise, that you

Page 100

1    wanted to live with your biological father
2    as opposed to living with your stepfather
3    and your mother?
4    A.    No.
5    Q.    After your meeting with Ryan
6    Clymer and you started back in school
7    after the Christmas break, did you ever
8    have occasion to talk to him about
9    anything?
10        Not necessarily this issue with
11   Mr. Romig, but anything at all until the
12   time you graduated.
13   A.    No.  He never spoke to me.
14   Q.    In your meeting with Ryan
15   Clymer did you give him the names of
16   Lauren Fretz and Kristen Kennedy -- or
17   Kristen Kennedy as somebody that Mr. Romig
18   may have had some inappropriate
19   relationship with?
20   A.    No.
21   Q.    When Eric Romig came to the
22   games after the Christmas break, did his
23   wife also come?
24   A.    I don't believe so.

Page 101

1    Q.    When you were sitting in that
2    room with Chelsea after Coach Landis told
3    you to meet with her and try to work out
4    your differences, did Chelsea say anything
5    about knowing about the allegations that
6    you had made about her father?
7    A.    No.
8    Q.    Do you know an individual named
9    Mikaela Vermonica?
10   A.    No.
11   Q.    You never heard the name?
12   A.    No.
13   Q.    I want to show you what's been
14   previously marked as Romig exhibit nine.
15   This is an email originally from Stephanie
16   Romig to Mr. Hollenbach, and it was sent
17   to Mr. Hollenbach from Mr. Clymer.  Just
18   read the body of that and I'll ask you
19   questions about that.
20        MR. RUSSELL:  What's the date
21   of that?
22        THE WITNESS:  January 7th.
23        MR. RUSSELL:  Thank you.
24   BY MR. GROTH:

Appendix  0194

Page 102

1  Q.   You've never seen that document
2  before, have you?
3  A.   No.
4  Q.   This document talks about
5  Chelsea providing some information to her
6  mother, Stephanie Romig, about things
7  other girls had said about you; and
8  basically that you had told Eric Romig
9  last year that you liked him, that you
10 would stand close to him all the time,
11 unlike the rest of the girls on the team;
12 you always snuggled next to Eric when
13 they took team pictures and multiple
14 people have noticed this.
15        Is any of that true?
16 A.   No.
17 Q.   Had any of the girls on the
18 team ever said anything of that sort to
19 you directly?
20 A.   No.
21 Q.   Did you ever make any comments
22 to any of the girls on the team that you
23 were attributing to Mr. Romig in any way?
24 A.   No.

Page 103

1  Q.   This mentions Mikaela College.
2  Do you know that person?
3  A.   I think the last name might be
4  different, so I think I know who we're
5  referring to, yes.
6  Q.   And the other name -- I guess
7  I had that wrong. Vermonica Fehr: Did
8  you know her?
9  A.   Yes.
10 Q.   Did either of those girls ever
11 talk to you about Eric Romig?
12 A.   No; they were younger than me.
13 Q.   Did you ever talk to them about
14 Eric Romig?
15 A.   No.
16 Q.   This also mentions -- this is
17 Stephanie Romig saying that Chelsea told
18 her that you were outside the gym doors
19 watching the entire practice during the
20 time that you were supposedly off the
21 team, and Stephanie Romig saying "If she
22 is not allowed to be on the team at
23 practice or at games, even she needs to
24 stay away." Again, that was dated January

Page 104

1  6th, that email from her to Mr.
2  Hollenbach.
3        Stephanie Romig says, "I think
4  that it is pure intimidation she is
5  trying to pull and I don't think it's
6  right."
7        Do you recall ever standing at
8  the gym door watching the practice during
9  the time that you were told by Mr. Clymer
10 you could no longer participate on the
11 basketball team?
12 A.   No.
13       MR. GROTH:  All right.  I have
14 no other questions.  Thank you.
15       MR. RUSSELL: Let's go off the
16 record for a second.
17       (There was a discussion held
18 off the record)
19 EXAMINATION
20 BY MR. KEMETHER:
21 Q.   I'm Sean Kemether.  I have some
22 questions for you.  Did Eric Romig ever
23 put his lips onto yours?
24 A.   No.

Page 105

1  Q.   Did Eric Romig ever put his
2  lips onto your breasts?
3  A.   No.
4  Q.   Did Eric Romig ever put his
5  lips onto your vulva?
6  A.   No.
7  Q.   Did Eric Romig ever put his
8  lips onto your anus?
9  A.   No.
10 Q.   Did he ever put his hands onto
11 your breasts?
12 A.   No.
13 Q.   Did he ever put his hands onto
14 your vulva?
15 A.   No.
16 Q.   Did he ever put his hands onto
17 your anus?
18 A.   No.
19 Q.   Did he ever put his penis into
20 your mouth?
21 A.   No.
22 Q.   Did he ever his penis into your
23 vulva?
24 A.   No.

**Page 106**

1  Q.   Did he ever put his penis into
2  your anus?
3  A.   No.
4  Q.   Okay.  When was the first time
5  you had any conversations of any kind
6  with Mr. Groth or anybody from his firm?
7  A.   April.
8  Q.   Of this year.
9  A.   Yes.
10 Q.   And how many times?
11 A.   Twice.
12 Q.   What period of time separated
13 the two?
14 A.   Four months.
15 Q.   Four months, okay.  The first
16 one you mentioned, I believe, was at your
17 parents' house?
18 A.   Yes.
19 Q.   And who was there?
20 A.   My mother and my father.
21 Q.   And...
22 A.   Mr. Groth.
23 Q.   And you.
24 A.   And myself.

**Page 107**

1  Q.   Anyone else?
2  A.   No.
3  Q.   Was your husband?
4  A.   No.
5  Q.   What was discussed?
6  A.   Just basically the information
7  that we are seeing here today, what was
8  going on with the case and how Faith had
9  not handled it correctly.
10 Q.   Who told you that Faith hadn't
11 handled it correctly?
12 A.   That's what I'm saying, but...
13 Q.   Did someone else tell you that?
14 A.   My parents.
15 Q.   Anyone else?
16 A.   No.
17 Q.   Did Mr. Groth?
18 A.   Not in those words.
19 Q.   And the situation we're talking
20 about involving Eric Romig and you.
21 A.   Yes.
22 Q.   As opposed to Eric Romig and
23 Elizabeth Nace.
24 A.   Yes.

**Page 108**

1  Q.   Did you ever tell anyone that
2  FCA did not handle what you're calling
3  "the situation" between you and Mr. Romig
4  properly?
5  A.   No.
6  Q.   What specifically did Mr. Groth
7  tell you during that initial meeting?
8  A.   He just had mentioned what was
9  going on.
10 Q.   What did he mention?
11 A.   All this information that we're
12 talking about today.
13 Q.   Well, all of that information
14 already happened, so I'm not sure --
15 could you be more detailed as to what he
16 said?
17 A.   He just asked us questions
18 about how things happened in my case with
19 Mr. Romig and how Mr. Clymer handled it,
20 both myself and my family.
21 Q.   He asked questions about that?
22 A.   Yes.
23 Q.   And you responded?
24 A.   Yes.

**Page 109**

1  Q.   Who else was talking?
2  A.   My mother and my father.
3  Q.   Was there any discussion about
4  Mr. Groth representing you as an attorney
5  for any reason?
6  A.   No.
7  Q.   How long was this meeting?
8  A.   An hour, an hour and a half.
9  Q.   Is there anything that you
10 talked to Mr. Groth about during this
11 meeting that we have not discussed today?
12 A.   No.
13 Q.   Okay. You mentioned there was a
14 second meeting.
15 A.   Yes.
16 Q.   Was that the only other time
17 you've spoken to either Mr. Groth or
18 someone from his firm?
19 A.   Yes.
20 Q.   When was the second meeting?
21 A.   August 7th. I believe that was
22 the day that we spoke.
23 Q.   And where was that?
24 A.   Again, my parents' house.

Page 110

1    Q.    How long was that meeting?
2    A.    Same length: Hour, hour and a
3  half.
4    Q.    Who was present at that
5  meeting?
6    A.    That was just myself and my
7  dad.  My mom was not there.
8    Q.    And?
9    A.    Mr. Groth.
10   Q.    So, there were three people
11 there?
12   A.    Yes.
13   Q.    What was discussed during that
14 meeting?
15   A.    Just reviewing what he had sent
16 to us.
17   Q.    Reviewing what who had sent to
18 you?
19   A.    Mr. Groth.
20   Q.    What did he send to you?
21   A.    This subpoena and the other
22 paperwork.
23   Q.    What email are you talking
24 about?

Page 111

1    A.    This.
2          MR. RUSSELL:  She said
3  subpoena, for the record, but...
4          MR. KEMETHER:  Subpoena? Okay.
5    A.    I don't know the difference...
6    Q.    That's fine.
7    A.    ...about it.
8    Q.    I'm just trying to clarify what
9  it is that you were given.  So, you were
10 given Mayer-1.  Was that not mailed to
11 you?
12   A.    That was mailed to me.  He gave
13 us another copy just to have and he also
14 gave us -- I don't know what it was, the
15 other paper.  I don't know if you're
16 allowed to --
17         MR. GROTH:  They were subpoenas
18 from the deposition.
19   Q.    During the second meeting he
20 gave you a copy of Mayer-1 and the
21 subpoena.  Is that what I'm understanding?
22   A.    Yes.
23   Q.    Did he give you anything else?
24   A.    A check.

Page 112

1    Q.    Okay.
2          MR. GROTH:  Witness fee.
3          MR. KEMETHER:  I understand.
4  BY MR. KEMETHER:
5    Q.    Anything else?
6    A.    No.
7    Q.    No.  You spent an hour and a
8  half with him discussing what?
9    A.    Just reviewing this information
10 and how this meeting would work.
11   Q.    What meeting?
12   A.    This deposition.
13   Q.    So, what specifically did you
14 review during the second meeting with Mr.
15 Groth in August of 2015?
16   A.    We went over what I had
17 previously told him in our first meeting.
18   Q.    Did you have notes?
19   A.    Did I have notes?
20   Q.    Yes.
21   A.    No.
22   Q.    Did he have notes?
23   A.    Yes.
24   Q.    Did your parents have notes?

Page 113

1    A.    No.
2    Q.    The two documents you've
3  referred to creating, one during 2009/2010
4  and one following the interview with the
5  police in 2013, did you have them?
6    A.    No.
7    Q.    What did Mr. Groth say to you
8  during the second meeting?
9    A.    He reviewed with us how this
10 the deposition would work, that we were
11 under oath.  That was about it.
12   Q.    During the second meeting did
13 he discuss representing you in any sort
14 of causative case against Faith Christian
15 or Mr. Romig or anybody else?
16   A.    No.
17   Q.    Has there ever been a
18 discussion about that?
19   A.    No.
20   Q.    What did you discuss with Mr.
21 Groth during that second meeting?
22   A.    I just reviewed what I had
23 previously told him about the situation in
24 2009 with Mr. Romig.

Page 114

1  Q.    What documents have you reviewed
2  before today pertaining to anything having
3  to do with this lawsuit or your dispute
4  with Faith Christian involving Mr. Romig?
5  A.    Nothing.
6  Q.    If I'm understanding correctly,
7  the history of texts from Mr. Romig to
8  you that you have called inappropriate
9  lasted approximately two months.
10  A.    Correct.
11  Q.    At least from the end of
12  October or the beginning of November of
13  2009 until shortly before Christmas of
14  2009, correct?
15  A.    Yes.
16  Q.    If I'm understanding you
17  correctly, Mr. Romig did not send any
18  further texts to you after your
19  conversation with Mr. Clymer, except for
20  one.
21  A.    Correct.
22  Q.    Which your parents got.
23  A.    Yes.
24  Q.    Am I understanding correctly

Page 115

1  that every single one of those texts over
2  the roughly two-month period that Mr.
3  Romig sent to you you destroyed?
4  A.    Correct.
5  Q.    And if I'm understanding
6  correctly, whatever texts you sent to him
7  during that same time period you also
8  destroyed?
9        MR. GROTH:  Objection to the
10  form. You can answer.
11  Q.    Do you understand my question?
12  A.    Yes.
13  Q.    So, however many texts you sent
14  to him you destroyed?
15  A.    Yes.
16  Q.    How many texts do you think you
17  sent him during that roughly two-month
18  period?
19  A.    I don't know.
20  Q.    More than ten?
21  A.    Yes.
22  Q.    More than a hundred?
23  A.    I don't know.
24  Q.    More than a thousand?

Page 116

1  A.    No.
2  Q.    You mentioned something about
3  Mr. Romig also communicating with you via
4  Facebook, I take it, during this same
5  two-month period?
6  A.    Yes.
7  Q.    And what was your Facebook
8  account during that time?
9  A.    What was it like?
10  Q.    What was the name.
11  A.    Emily Mayer.
12  Q.    And what was the password?
13  A.    God, I don't know.  I can tell
14  you that that's not the same account I
15  have today.
16  Q.    What happened to the account?
17  A.    Well, it's still up. I just
18  don't remember -- I didn't remember the
19  password.
20  Q.    And is there anything you can
21  do to get the password -- or is it
22  changed? -- so it could be accessed?
23  A.    No.
24  Q.    No? Why not?

Page 117

1  A.    Because I don't have the email
2  or the password.
3  Q.    You mentioned that it's still
4  up?
5  A.    I've never searched for it.
6  Q.    Would you do that?
7  A.    If it needs to be done.
8  Q.    I'm asking you would you do
9  that, please?
10  A.    Yes.
11  Q.    You can report to Mr. Groth
12  about it, but I want you to find out if
13  it's still active; if so, what's the
14  email and what's the password.  Okay?
15  A.    Yes.
16  Q.    If I understand correctly, you
17  first attended Faith Christian as a
18  sophomore in high school?
19  A.    Junior.
20  Q.    Junior high school.  I
21  apologize. The first two years of high
22  school you spent at one other high
23  school?
24  A.    I was at two other high

Appendix  0198

Page 118

1  schools.
2  Q.    Two other high schools.  The
3  first one was what?
4  A.    Calvary Baptist in Lansdowne,
5  and the second was Upper Pekriomen.
6  Q.    For the first one, did you
7  leave that of your own accord?
8  A.    I did.
9  Q.    Why did you leave?
10  A.    I was not getting along with
11  many of the girls there.  It was very
12  cliquey.
13  Q.    Was it just a girls-only
14  school?
15  A.    No.
16  Q.    Boys and girls, but you were
17  having trouble with girls?
18  A.    Yes.
19  Q.    What were the troubles you were
20  having with girls?
21  A.    They were just judgmental.
22  Q.    Judgmental about what?
23  A.    My parents were divorced.  It's
24  just...

Page 119

1  Q.    Do you want to take a break?
2  A.    (No response)
3  Q.    Do you want to take a break?
4  (There was a discussion held
5  off the record)
6  MR. KEMETHER:  We're back on
7  the record.
8  BY MR. KEMETHER:
9  Q.    I had asked you about what the
10  girls at Calvary High School were
11  judgmental about with you.
12  A.    Just judgmental. I came from a
13  divorced home. They were very Christian
14  people, so I was just always kind of an
15  outcast.
16  Q.    Was there anything other than
17  the fact that your parents were divorced
18  that they were judgmental about with you?
19  A.    No.
20  Q.    And how long were you there?
21  A.    Fourth grade to ninth grade.
22  Q.    Fourth grade to...
23  A.    Ninth grade.
24  Q.    So, that would have been

Page 120

1  freshman your year in high school?
2  A.    Yes.
3  Q.    After your freshman year, you
4  then went to Upper Pekriomen for your
5  sophomore year?
6  A.    Yes.
7  Q.    Why did you leave there?
8  A.    I was just not making good
9  friends, good choices.
10  Q.    What does that mean?
11  A.    I just wasn't choosing the
12  right group of friends.  That's what that
13  means.
14  Q.    What about the friends you were
15  choosing was bad?
16  A.    Just weren't doing things that
17  I should have been doing at my age.
18  Q.    Such as?
19  A.    I don't feel comfortable
20  answering that.  I don't feel I need to
21  answer that.
22  Q.    I can take that up with the
23  judge and ask you to come back and force
24  you to do it.

Page 121

1  A.    Sure.
2  Q.    Were you asked to leave Upper
3  Pekriomen, or did you leave of your own
4  accord?
5  A.    I left of my own accord.
6  Q.    And starting your junior year,
7  you went to Faith Christian. So, you were
8  at Faith Christian for approximately a
9  year and change before you had any
10  problems with Mr. Romig.  Is that fair to
11  say?
12  A.    Yes.
13  Q.    And during that roughly year
14  and change, you became best friends with
15  his stepdaughter Chelsea Romig.
16  A.    I mean, I was best friends with
17  her since the first day I started there.
18  I mean, it wasn't -- it didn't take us a
19  year to become friends.
20  Q.    You didn't know her before you
21  got there. Is that fair to say?
22  A.    That's correct.
23  Q.    You became friends very quickly
24  with her.  You spent time at their house?

Page 122

1    A.    Minimally, yes.
2    Q.    You stayed overnight a couple
3    times, at least?
4    A.    Yes.
5    Q.    During the junior year or the
6    summer of your junior year, between your
7    junior and senior year, the times that
8    you spent at the Romig house, did you
9    have any problems with Mr. Romig?
10   A.    No.
11   Q.    During your junior year of high
12   school, did you have any behavioral issues
13   that you were addressed about by the
14   school?
15   A.    No.
16   Q.    Did you attend in June of 2009
17   something called a junior/senior banquet?
18   A.    Yes.
19   Q.    Was that during your junior
20   year?
21   A.    Yes.
22   Q.    School was still in session at
23   that point?
24   A.    I'm sorry, did you say it was

Page 124

1    A.    I was asked to leave the
2    school, but they offered for me to do
3    counseling for $100 per session with Ron
4    Jones.
5    Q.    And did you choose to stay at
6    school?
7    A.    I did.
8    Q.    Were you happy with that
9    decision?
10   A.    No, but I didn't think I had
11   any choice at the time.
12   Q.    Did you tell your parents you
13   were unhappy with that decision?
14   A.    No.
15   Q.    And did you have to do certain
16   things before you were actually going to
17   be readmitted to the school?
18   A.    From what I recall, I just had
19   to do the counseling.
20   Q.    Just the counseling sessions?
21   A.    Yes.
22   Q.    And did you do them?
23   A.    Yes.
24   Q.    Is it your understanding the

Page 123

1    in June?
2    Q.    In June of 2009 was there
3    something you attended called a
4    junior/senior banquet?
5    A.    Yes.  I don't believe it was
6    that late in the school year, but I did
7    attend the banquet.
8    Q.    Was the banquet during your
9    junior year of school?
10   A.    Yes.
11   Q.    Did something happen following
12   that banquet that night that you got in
13   trouble for?
14   A.    Yes.
15   Q.    What happened?
16   A.    I was drinking with friends.
17   Q.    Anything else?
18   A.    No.
19   Q.    Were you caught giving oral sex
20   to a boy in public following that
21   banquet?
22   A.    No.
23   Q.    Were you asked to leave the
24   school following that banquet?

Page 125

1    reason you were asked to leave the school
2    was simply because you were caught
3    drinking following this banquet?
4    A.    Yes.
5    Q.    Nothing else?
6    A.    Yes.
7    Q.    I'm correct?
8    A.    Yes.
9    Q.    Did you have any other
10   behavioral issues while you were at the
11   school before the problems with Mr. Romig
12   started?
13   A.    No.
14   Q.    Now, you were asked a little
15   earlier about your being a co-captain of
16   the basketball team your senior year?
17   A.    Yes.
18   Q.    And I understood you said you
19   had no problems with that.
20   A.    No.
21   Q.    You were never asked to step
22   down as a co-captain.
23   A.    No.
24   Q.    So, if people testified that

Appendix 0200

Page 126

1  you in fact were, they would not be
2  telling the truth?
3      A.    Correct.
4      Q.    The meeting you had with Ryan
5  Clymer, do you know how many days before
6  December 25th, 2009 it was?
7      A.    I don't recall.
8      Q.    Do you know how many school
9  days before December 25th, 2009 it was?
10     A.    I don't recall.
11     Q.    Is it possible that it was the
12 last school day before the holiday
13 started?
14     A.    It was possible, yes, but I
15 don't remember.
16     Q.    I just want to make sure I'm
17 understanding what happened during that
18 meeting.  You told us that it lasted less
19 than ten minutes.
20     A.    Correct.
21     Q.    I want to know, to the best of
22 your memory, everything you said during
23 that meeting.
24     A.    I went in with Cheryl Alderfer.

Page 127

1  I told Mr. Clymer that my basketball
2  coach, Mr. Romig, had been texting me
3  inappropriately, and that's really all I
4  remember other than him asking me to
5  leave the campus.
6      Q.    So, during that
7  less-than-ten-minute period, that's the
8  only thing you remember saying to Mr.
9  Romig?
10     A.    Yes.
11     Q.    During that less-than-ten-minute
12 period what did Mr. Romig say to you or
13 to Mr. Alderfer?
14         MR. GROTH:  Mr. Clymer.
15     Q.    I'm sorry, Mr. Clymer say to
16 you or Ms. Alderfer.
17     A.    All I remember is him asking me
18 to leave.  There weren't many questions
19 that were asked.
20     Q.    The only thing that I recall
21 Mr. Clymer saying during that meeting was
22 asking you to leave.
23     A.    Yes.
24     Q.    That's all I remember.

Page 128

1      A.    Yes.
2      Q.    And did he say to leave the
3  school and not come back?
4      A.    Yes, until I was otherwise
5  told.
6      Q.    Did he say to leave the team,
7  leave the school?  Either?  Neither?
8  Both?
9      A.    Both.
10     Q.    He said leave the school and
11 leave the team.
12     A.    Correct.
13     Q.    And that is the last time you
14 can recall discussing with Ryan Clymer
15 anything having to do with Eric Romig?
16     A.    Correct.
17     Q.    Are you aware of what steps
18 your parents took during the Christmas
19 break, following the Christmas break in
20 terms of your allegations against Mr.
21 Romig?
22     A.    I believe that they were trying
23 to contact Ryan Clymer.
24     Q.    What I want to know is, do you

Page 129

1  know anything about the specifics of that?
2      A.    No.
3      Q.    Your parents wouldn't have
4  shared that with you at the time?
5      A.    I don't remember.
6      Q.    Did you tell anybody that Faith
7  Christian did nothing about your
8  allegations?
9      A.    No.
10     Q.    Never said that to anybody?
11     A.    No.
12     Q.    Did you tell anybody that Faith
13 Christian didn't believe your allegations?
14     A.    No.
15     Q.    Never told that to anybody?
16     A.    No.
17     Q.    When the Christmas break was
18 over -- first of all, I'll stop there.
19 Were there any basketball games over
20 Christmas break?
21     A.    No, I don't believe so.
22     Q.    Christmas break would have been
23 roughly the two-week period?
24     A.    Yes.

Appendix 0201

ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 130

1  Q.    Were there any practices
2  scheduled over the Christmas break?
3  A.    I don't believe so, but it's
4  possible.
5  Q.    By the time Christmas break
6  ended, I understand from your testimony
7  that you were back on the team, correct?
8  A.    Yes.
9  Q.    In school?
10  A.    Yes.
11  Q.    And that Mr. Romig was no
12  longer coaching the team.
13  A.    Correct.
14  Q.    Were you happy with that?
15  A.    Yes.
16  Q.    Did you tell anyone in January
17  of 2010 that you were unhappy with the
18  way the school had handled the Eric Romig
19  situation?
20  A.    I don't recall ever saying that
21  to anyone, no.
22  Q.    Until today have you ever told
23  anyone that?
24  A.    Probably.

Page 131

1  Q.    Who did you tell?
2  A.    Probably my husband.
3  Q.    When --
4  A.    My parents.
5  Q.    When?
6  A.    I don't know.
7  Q.    Is it fair to say that you
8  never reported that conduct to any
9  government agency in 2009?
10  A.    I did not, no.
11  Q.    2010?
12  A.    No.
13  Q.    2011?
14  A.    No.
15  Q.    2012?
16  A.    No.
17  Q.    2013?
18  A.    That's when the detectives had
19  contacted me, but I did not do that on
20  my own.
21  Q.    Correct, they came to you.
22  A.    Yes.
23  Q.    Even at that point did you then
24  report your own problems with Mr. Romig

Page 132

1  to anyone?
2  A.    No.
3  Q.    2014?
4  A.    No.
5  Q.    Today, 2015?
6  A.    No.
7  Q.    Do you know of your parents
8  reporting any of these issues with Mr.
9  Romig to any government agency?
10  A.    I don't believe so, because
11  they were told that Mr. Clymer was going
12  to handle it.
13  Q.    And who said that?
14  A.    Mr. Clymer said that he was
15  going to handle it.
16  Q.    And who did he say that to?
17  A.    To my parents.
18  Q.    And how do you know this?
19  A.    My parents told me.
20  Q.    When did they tell you that?
21  A.    In 2009, when this was
22  happening.
23  Q.    What does your father do for a
24  living, your step-father?

Page 133

1  A.    He works for Merck.
2  Q.    He had a different job in the
3  past?
4  A.    Not since I've known him.
5  Q.    Your stepfather?
6  A.    Yes.
7  Q.    Has he ever worked as a
8  detective, ever worked in law-enforcement?
9  A.    Yes.
10  Q.    Do you know when he did that?
11  A.    This is previous to my knowing
12  of him, so I don't know.
13  Q.    Do you know anything about what
14  he did in law-enforcement?
15  A.    No.
16  Q.    Were you dissatisfied with the
17  conduct of Ryan Clymer in handling
18  whatever issues you had with Eric Romig?
19  A.    Yes.
20  Q.    Did you ever tell anyone about
21  that?
22  A.    I don't believe at the time I
23  did.
24  Q.    How about up until today?

Appendix 0202

Page 134

1   A.   I'm sure I did today, like I
2 said, to my parents, to my husband. I'm
3 sure I spoke with them.
4   Q.   To anyone at Faith Christian?
5   A.   I don't speak to anybody there.
6   Q.   You were there for school for
7 another six months after all of this
8 happened. Did you report that you were
9 unhappy with Mr. Clymer any time during
10 those six months?
11   A.   No.
12   Q.   And if I understand correctly,
13 the texts that you got where you claim
14 that Eric Romig told you that he wanted
15 to be "inside you," you received that in
16 early November of 2009?
17   A.   December, I believe.
18   Q.   It was December, you say, you
19 received it?
20   A.   Yes.
21   Q.   Early December?
22   A.   Yes.
23   Q.   And your conversation with Mr.
24 Clymer was at least in the 20s -- you

Page 135

1 know, the 21st, 22nd, 23rd, 24th -- so
2 for a couple of weeks you said nothing
3 about that?
4   A.   No.
5   Q.   You didn't say it to your
6 parents, either?
7   A.   No.
8   Q.   You mentioned that when you
9 spoke to Mr. Clymer, that you didn't
10 think he would believe you. Do you
11 remember testifying to that?
12   A.   Yes.
13   Q.   Why did you have that feeling?
14   A.   Because, first of all, I had
15 deleted everything and I was just
16 embarrassed by what was happening.
17   Q.   So, if I'm understanding you
18 correctly, you didn't think he would
19 believe you because you were embarrassed?
20   A.   I had no proof of anything.
21   Q.   Do you want to take a break?
22   A.   No.
23   Q.   You mentioned that you were
24 best friends with Chelsea Romig. Did

Page 136

1 that change at some point in time?
2   A.   After.
3   Q.   After what?
4   A.   I had spoken to Ryan Clymer
5 about the situation.
6   Q.   How quickly after that meeting
7 with Mr. Clymer?
8   A.   That day.
9   Q.   That day?
10   A.   Uh-huh.
11   Q.   How did you learn that it
12 changed?
13   A.   Because she didn't speak to me
14 any more.
15   Q.   Did you ever try to speak to
16 her again?
17   A.   Yes.
18   Q.   Tell me about when you did
19 that. When after that meeting did you
20 first try to speak to her?
21   A.   I don't remember the first time
22 I tried to reach out to her, but probably
23 in school. I may have texted her. I
24 don't recall.

Page 137

1   Q.   Would you have generally spoken
2 to her every day?
3   A.   Yes.
4   Q.   In any way, shape or form,
5 whether by text or talking on the phone
6 or in person?
7   A.   Yes.
8   Q.   And do you think over the
9 Christmas break you tried to reach out to
10 her?
11   A.   I don't recall.
12   Q.   Do you have a memory of ever
13 trying to reach out to her again after
14 your meeting with Mr. Clymer?
15   A.   I think I did. I don't know.
16 I don't recall if I did or when I did.
17   Q.   You're saying that she never
18 spoke to you again.
19   A.   Correct.
20   Q.   Fair to say that you never
21 spoke to her again, either?
22   A.   I don't recall.
23   Q.   This meeting that Coach Landis
24 arranged with you and Chelsea Romig, was

Page 138

1   that in relation to the beginning of the
2   school following the Christmas break?
3      A.   Maybe the first practice back.
4      Q.   So, school was back in session.
5      A.   Yes.
6      Q.   And at the first practice the
7   coach sat you down, sat Chelsea Romig
8   down.  What did the coach say?
9      A.   I don't recall what she said.  I
10  just remember that it was kind of a
11  meeting to get us to talk and work out
12  the situation.
13     Q.   So, is it fair to say you have
14  a memory that she at least asked the two
15  of you to talk to each other?
16     A.   Yes.
17     Q.   Did the two of you talk to
18  each other?
19     A.   I don't believe she talked to
20  me.
21     Q.   "She "being Chelsea Romig.
22     A.   Yes.
23     Q.   Did you talk to her?
24     A.   Yes.

Page 139

1      Q.   What did you say to her?
2      A.   I don't remember much of the
3   conversation other than "I'm sorry."
4      Q.   So, your memory is that you
5   said you're sorry to Chelsea Romig and
6   Chelsea Romig said, to the best of your
7   memory, nothing.
8      A.   No, sir.
9      Q.   How long did the meeting last?
10     A.   Maybe ten minutes.
11     Q.   Anything else happen in those
12  ten minutes that we haven't talked about?
13     A.   No.
14     Q.   Did Coach Landis say anything
15  else?
16     A.   Not that I recall.
17     Q.   Did you ever tell Eric Romig to
18  stop doing what he was doing?
19     A.   I don't recall.
20     Q.   What's your biological father's
21  name?
22     A.   Phil Mayer.
23     Q.   Do you know where he lives?
24     A.   Georgia.

Page 140

1      Q.   Do you know where in Georgia?
2      A.   No.
3      Q.   Do you speak with him?
4      A.   I haven't spoken to him since I
5   got married. Maybe every four months.
6      Q.   Do you know what town he lives
7   in?
8      A.   No, I don't.
9      Q.   Do you know his phone number?
10     A.   I could probably get it for
11  you.
12     Q.   Would you do that? Do you
13  recall at the beginning --
14         MR. GROTH:  Hold on a second.
15         MR. KEMETHER: I'm sorry. I
16  didn't know she was doing that right now.
17         THE WITNESS: Do you want me to
18  wait?
19         MR. KEMETHER:  No. If you have
20  it, I'll take it.  That's great.
21         THE WITNESS: 215-390-8600.
22         MR. KEMETHER:  Thank you.  Is
23  that a work number?
24         THE WITNESS: I believe that's

Page 141

1   his cell phone.
2         MR. KEMETHER: Thank you.
3   BY MR. KEMETHER:
4      Q.   Do you recall at the beginning
5   of both your junior and senior year being
6   given a student handbook at Faith
7   Christian?
8      A.   No.
9      Q.   Do you recall being given any
10  instructions about what you were to do in
11  the event that somebody was sexually
12  harassing you?
13     A.   No.
14     Q.   What was your attendance history
15  like in your junior year in high school?
16     A.   Good, I think.
17     Q.   Good? How about in your senior
18  year?
19     A.   My senior year I had mono, so
20  I know I missed a couple of weeks.
21     Q.   For what period of time did you
22  have mono?
23     A.   I don't know.
24     Q.   Was it in the fall, the winter,

Appendix 0204

Page: 40 (142 - 145)
ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

**Page 142**

1  the spring?
2  A.    I don't know.
3  Q.    I'm sorry?
4  A.    I don't know.  Sorry.
5  Q.    Are you aware if your parents
6  ever thanked Mr. Clymer for the way he
7  handled the situation with you and Mr.
8  Romig?
9  A.    I'm sorry, thanked him?
10  Q.    Are you aware if your parents
11  ever thanked Mr. Clymer for the way he
12  handled the situation between you and Mr.
13  Romig?
14  A.    I don't know.
15  Q.    Would you be surprised if that
16  were true?
17  A.    Yes.
18  Q.    If I'm understanding correctly,
19  Mr. Romig's improper behavior towards you
20  was entirely via text except for the one
21  time where he touched your butt.
22  A.    Correct.
23  Q.    And he touched your butt with
24  his hands?

**Page 143**

1  A.    Correct.
2  Q.    Never did anything inappropriate
3  with you in person?
4  A.    No.
5  Q.    Aside from touching your butt.
6  A.    No.
7  Q.    Never did anything inappropriate
8  with you on the phone.
9  A.    No.
10  Q.    You mentioned that the girls on
11  the team after Christmas break, after
12  Coach Romig was no longer coaching the
13  team, were not treating you the same way.
14  A.    That's correct.
15  Q.    Did you remain as a co-captain
16  of the team?
17  A.    Yes.
18  Q.    And did I hear you say they
19  basically stopped talking to you?
20  A.    For a while, yes.
21  Q.    For a while.  For how long a
22  period?
23  A.    A couple of weeks.
24  Q.    And did someone ever explain to

**Page 144**

1  you why that was the case?
2  A.    No.
3  Q.    And it stopped after a couple
4  weeks?
5  A.    Yes.
6  Q.    They started talking to you
7  again?
8  A.    Yes.
9  Q.    Did anyone explain to you why
10  the people started talking to you again?
11  A.    No.
12  Q.    You mentioned something about
13  the girls in the games not passing the
14  ball to you?
15  A.    Correct.
16  Q.    Was that an issue with the
17  coach, whoever was coaching the team at
18  that point?
19  A.    I don't believe so.
20  Q.    Did you ever say anything to
21  the coach about that?
22  A.    I don't think so.
23  Q.    Did the coach ever saying
24  anything to you about that?

**Page 145**

1  A.    No.
2  Q.    Did the coach ever say anything
3  to the team about that?
4  A.    I don't believe so.
5  Q.    When is the last time you
6  communicated with Robin Landis?
7  A.    She was at my wedding in May.
8        MR. RUSSELL:  Did you say "in"
9  or "at"?
10       THE WITNESS:  She was at my
11  wedding.
12  BY MR. KEMETHER:
13  Q.    Was she in your wedding party?
14  A.    No.
15  Q.    What would you describe your
16  relationship with her to be now?
17  A.    I don't talk to her very often.
18  I mean, I'm friends with her daughter,
19  so...
20  Q.    Did you invite her to the
21  wedding?
22  A.    Yes.
23  Q.    Is she your friend?
24  A.    Yes.

Appendix 0205

Page 146

1    Q.    Weddings, sometimes the groom
2  invites people, sometimes the bride does.
3  Did you invite her?
4    A.    Yes.
5        MR. KEMETHER:  Those are all
6  the questions I have for now, but I'm
7  sure there will be some others.  Thanks
8  for your time.
9        MR. SANTARONE:  Ms. Mayer, I
10  just have some follow-up questions.
11    EXAMINATION
12  BY MR. SANTARONE:
13    Q.    When you left Upper
14  Pekriomen -- and I understand you don't
15  want to talk about some of the issues
16  that arose at Upper Pekriomen -- was
17  there any interview process at Faith
18  Christian Academy before you went there?
19    A.    No.
20    Q.    Do you know what, if anything,
21  Faith Christian Academy knew about
22  whatever issues there were at Upper
23  Pekriomen?
24    A.    No.  And to clarify, they

Page 147

1  weren't really issues.  They were just,
2  for me, decisions I didn't find were
3  right.
4    Q.    Did any of these decisions that
5  you were making that weren't right, did
6  any of those decisions, was that known to
7  Upper Pekriomen, the school?
8    A.    No.
9    Q.    Did it involve any police
10  involvement?
11    A.    No.
12    Q.    When you were the co-captain of
13  the team -- do the players vote for the
14  co-captains?
15    A.    I believe so.
16    Q.    So, when you came back -- in
17  your senior year you were voted as
18  co-captain.
19    A.    Yes.
20    Q.    Was it something where all
21  seniors were co-captains, or were there
22  people that weren't?
23    A.    No, I was the only senior.
24    Q.    Okay. You talked about learning

Page 148

1  through text messages that Chelsea Romig
2  told you she had been sexually abused as
3  a child?
4    A.    That's correct.
5    Q.    How did that conversation come
6  up with Mr. Groth when you met with him?
7    A.    To be honest, I don't remember.
8    Q.    Do you remember discussing it
9  with him, though?
10    A.    Yes.
11    Q.    And in what context? Did he ask
12  you everything you knew about Chelsea?  I
13  mean, how did it come up?
14    A.    I don't remember.
15    Q.    And how many text messages did
16  you exchange with Chelsea on this topic?
17    A.    Very few.  It was not talked
18  about very much.
19    Q.    And what led to it coming up
20  at all? Did something happen or did some
21  event happen that --
22    A.    I don't remember.
23    Q.    You talked about, when you were
24  at Calvary Baptist, you went there from

Page 149

1  fourth to ninth grade?
2    A.    Correct.
3    Q.    And you felt like you were an
4  outsider.  Did your parents get divorced
5  while you were at that school, or had
6  they been divorced before that?
7    A.    They had been divorced before
8  that.
9    Q.    So, ever since you started at
10  Calvary Baptist your stepfather was with
11  you, Kevin Smith.
12    A.    Yes.
13    Q.    Did you ever see any list of
14  the number of text messages that were
15  exchanged between you and Mr. Romig?
16    A.    I know that my parents have
17  documentation of that, but I've never sat
18  down and looked at it.
19    Q.    Okay.  Do you know whether or
20  not, looking at that, you would be able
21  to see how many text messages he sent to
22  you as opposed to how many text messages
23  you sent to him?
24    A.    If I look at it? Potentially.

Appendix  0206

Page 150

1  I don't recall a lot of that.
2      Q.    Generally, were the text
3  messages reciprocal -- that is, he would
4  send you messages and you would respond
5  back -- or did he text-message you much
6  more than you text-messaged him?
7      A.    He texted me a lot more than I
8  texted him.
9      Q.    Are you able to give a
10  percentage? You know, say an average of
11  one hundred text messages, how many you
12  sent and how many he sent?
13      A.    Maybe for every three or four I
14  would send one. I don't know if that
15  helps you.
16      Q.    That helps. In the meeting
17  that you had with Mr. Clymer, you said
18  that he didn't ask to see the phone?
19      A.    No.
20      Q.    Had you told him you had
21  deleted all the messages off the phone?
22      A.    I don't recall.
23      Q.    Between the time that you left
24  Mr. Clymer's office to when you arrived

Page 151

1  home and told your parents, had you
2  deleted any messages during that time
3  frame?
4      A.    I don't believe so, no -- I
5  don't know if I had even received a text
6  from him.
7      Q.    Okay. So, if Mr. Clymer had
8  looked at your phone on that day, it
9  wouldn't have been anything different than
10  what your parents saw on the phone,
11  correct?
12      A.    Correct.
13      Q.    You were asked some questions
14  about the meeting that you had with Mr.
15  Clymer and that it could have been the
16  last day of school before the Christmas
17  break?
18      A.    It can have been, yes.
19      Q.    Did class let out early on that
20  last day before the Christmas break?
21      A.    I don't know.
22      Q.    And your meeting would
23  have been first thing in the morning
24  because -- was it after homeroom?

Page 152

1      A.    Yes.
2      Q.    But you don't know whether
3  there was a 12:00 dismissal that day?
4      A.    I don't believe there was just
5  because I remember there was a practice
6  that day.
7      Q.    Okay. And Mr. Clymer said that
8  he thought you should leave the school
9  for your safety. That's what you
10  testified to, correct?
11      A.    Correct.
12      Q.    And Mr. Clymer told you to go
13  home and tell your parents.
14      A.    Yes.
15      Q.    And you did that.
16      A.    Yes.
17      Q.    And after that meeting that you
18  had with Mr. Clymer that day, you got no
19  more text messages from Mr. Romig other
20  than the one that your parents have a
21  copy of, correct?
22      A.    Correct.
23      Q.    And have you ever seen that
24  text message?

Page 153

1      A.    I saw it, yes. I don't
2  remember -- it was very random, something
3  about --
4      Q.    It doesn't seem like it's
5  addressed to you, does it? It doesn't
6  make sense.
7      A.    Correct.
8      Q.    So, the inappropriate text
9  messages, they stopped -- you never got
10  any after you met with Mr. Clymer.
11      A.    Correct.
12      Q.    When you sat down and you typed
13  this out -- you said that you came home,
14  you talked to your parents, your dad said
15  to sit down and type this out?
16      A.    Yes.
17          MR. RUSSELL: Just for the
18  record, we're talking about exhibit six?
19          MR. GROTH: Yes, second page,
20  Romig exhibit six.
21  BY MR. SANTARONE:
22      Q.    You don't have in here anywhere
23  at all that Mr. Romig ever touched you.
24      A.    I don't, no. But I mean, at

ORAL DEPOSITION OF EMILY MAYER, 8/28/2015

Page 154

1  that time there was so much that I was
2  processing through.
3      Q.   Sure.  But before you met with
4  the detectives in 2013, up until then you
5  had never told your parents that Mr.
6  Romig had touched you, did you?
7      A.   I think I did.  I don't know.
8      Q.   Do you remember when you did?
9      A.   No.
10     Q.   You never told the school --
11 you never told Mr. Clymer that Mr. Romig
12 had ever touched you.
13     A.   I don't believe so.
14     Q.   Okay.  You talk about you had
15 a concussion and you weren't practicing.
16 Do you remember what year it was that you
17 had the concussion?  Was it your junior
18 year or senior year?
19     A.   It was my senior year.
20     Q.   Do you remember, was it before
21 the season started or after the season
22 started?
23     A.   After the season started.
24     Q.   So, the season starts in

Page 155

1  November, is when practice starts, right?
2      A.   Correct.
3      Q.   And therefore your first game
4  is maybe late November?
5      A.   Yes.
6      Q.   And you had a concussion where
7  you missed some games during that period?
8      A.   I believe one or two games,
9  yes.
10     Q.   Did you go to a doctor for the
11 concussion?
12     A.   Yes.
13     Q.   Who did you go to?
14     A.   I think Grandview Hospital.
15     Q.   Did they have like a concussion
16 protocol you had to go through where they
17 check you again?
18     A.   Did I go again after the
19 initial visit?
20     Q.   Yes.
21     A.   I don't believe so.
22     Q.   But instead of going to a
23 family doctor, you went to Grandview
24 Hospital?

Page 156

1      A.   Yes.
2      Q.   Did you go to the emergency
3  room?
4      A.   Yes.
5      Q.   And how was it you got the
6  concussion?
7      A.   I was going for a ball, so
8  with another player we hit heads.
9      Q.   In a practice?
10     A.   In a game.
11     Q.   You mentioned in the document
12 we looked at before --
13         MR. SANTARONE:  What was it
14 marked, Romig-6?
15         MR. GROTH:  Yes.
16     BY MR. SANTARONE:
17     Q.   (Continuing) -- about Mr. Romig
18 not liking pictures on your cell phone.
19 Do you know when he would have seen your
20 cell phone?
21     A.   No.
22     Q.   Did you ever forward him any
23 pictures at all?
24     A.   No.

Page 157

1      Q.   He never asked you to forward
2  any pictures, did he?
3      A.   No.
4      Q.   During that time after the
5  Christmas break, did you have any sense
6  as to how often or if at all your
7  parents were talking to Mr. Clymer?
8      A.   I know my mom had reached out
9  to him once and I believe got his
10 voice-mail.  It was very difficult for
11 them to get ahold of him.
12     Q.   Do you know whether it was
13 because he was out of the country,
14 because he was away -- or out of the
15 state, rather?
16     A.   I don't know.
17     Q.   Did you ever have any
18 discussion at all with your parents about
19 notifying the police?
20     A.   They had wanted to, yes, but I
21 think at the same time they were
22 depending on the school to handle this
23 and I -- I just wanted to play
24 basketball, so...

Appendix 0208

Page 158

1    Q.   Right. Do you know if they
2 ever, once they learned that the police
3 had been contacted, whether they talked
4 about contacting the police on their own?
5    A.   I don't know.
6    Q.   If there came a time between
7 November/December of 2009 and the time you
8 talked to the detectives, if your parents
9 had learned that you said that Mr. Romig
10 had touched you, do you remember any
11 discussion then "Maybe we should call the
12 police"?
13    A.   No.
14    Q.   This issue about the banquet or
15 some event where you were caught drinking,
16 were there any other students that were
17 caught drinking with you?
18    A.   Yes.
19    Q.   What happened to those students?
20 Were any of them asked to leave the
21 school?
22    A.   They kind of got the same deal
23 I did. I think two of them left and I
24 believe the one other stayed.

Page 159

1    Q.   Did the one that stayed have to
2 go to the counseling sessions?
3    A.   Yes.
4    Q.   Do you know who that was?
5    A.   Devin Brenner.
6    Q.   And how many of these
7 counseling sessions with Ron Jones did you
8 have to go to? Do you remember?
9    A.   Five?
10    Q.   The phone conversation that you
11 said you overheard while you were waiting
12 to see Ron Jones, you said, when asked
13 about it a second time, that Romig denied
14 sending you the text messages?
15    A.   Correct.
16    Q.   So, of this whole conversation
17 you don't recall anything, what you could
18 hear, but you remember hearing that?
19    A.   Yes.
20    Q.   Do you know if that was in
21 response to a question?
22    A.   I don't remember.
23    Q.   So, you don't know what led to
24 that.

Page 160

1    A.   No.
2    Q.   Do you remember verbatim what
3 he said?
4    A.   No.
5    Q.   Do you know whether he was
6 talking about he didn't send any text
7 messages or that he didn't send any
8 inappropriate text messages?
9    A.   I don't remember.
10    Q.   It could have been either one.
11    A.   Correct.
12    Q.   You talked about there was a
13 game where Mr. Romig was sitting on the
14 chairs and he was about twenty or thirty
15 feet away from you, a complaint was made
16 and then that didn't happen any more,
17 correct?
18    A.   Correct.
19    Q.   And you said he was sitting in
20 a cubby or --
21    A.   It's just kind of like a cove
22 in the wall that's right next to the
23 bench or chairs.
24    Q.   Is it where a spectator could

Page 161

1 sit?
2    A.   Yes.
3    Q.   And his daughter's playing in
4 the game, correct?
5    A.   Yes.
6    Q.   He's not sitting at any game
7 that his daughter's not playing in,
8 correct?
9    A.   Correct.
10    Q.   And Coach Forker, is it?
11    A.   Yes.
12    Q.   He had never raised an issue
13 with the team about, hey, you're not
14 passing the ball to Emily?
15    A.   No.
16    Q.   Was he a good coach?
17    A.   Yes.
18    Q.   And in your meetings with Mr.
19 Groth, other than the letter and the
20 subpoena, did he ever show you any other
21 documents?
22    A.   No.
23    Q.   You've never seen the complaint
24 that was filed in this case?

Appendix  0209

Page 162

1    A.    I don't believe so.
2    Q.    Have you seen any detective
3  records or police records of anything the
4  police did?
5    A.    No.
6    Q.    Even after you graduated --
7  well, leading up to your graduation the
8  rest of that school year and after that,
9  do you know if your parents ever told
10  Faith Christian Academy that they thought
11  they didn't handle the situation right?
12    A.    I don't believe so.
13        MR. SANTARONE:  That's all I
14  have.
15        Thank you.
16        MS. CONNOR:  I have a few
17  questions.
18  EXAMINATION
19  BY MS. CONNOR:
20    Q.    Emily, I've already introduced
21  myself. I just have a few questions for
22  you.
23        With regard to texting,
24  typically one person starts texting and

Page 163

1  the other person responds. Were there
2  times in November and December when you
3  initiated a texting chain with Mr. Romig?
4    A.    No.
5    Q.    So, you're saying that you
6  would never have initiated texting.
7    A.    No.
8    Q.    You would always receive a text
9  from him and then respond.
10    A.    Correct.
11    Q.    Okay.  What is your date of
12  birth?
13    A.    12/29/91.
14    Q.    Were you ever suspended from
15  Upper Pekriomen?
16    A.    No.
17    Q.    Did you ever talk to Lauren
18  Fretz or Kristen Kennedy about the
19  situation with Eric Romig?
20    A.    No.
21    Q.    On the day that you had your
22  meeting with Ryan Clymer, how did you get
23  home from school that day?
24    A.    I drove.

Page 164

1    Q.    When you left Ryan Clymer's
2  office, did you speak with Cheryl
3  Alderfer?
4    A.    No.
5    Q.    So, where did she go after the
6  meeting?
7    A.    I believe when I left she was
8  still in the office.  I don't recall.
9    Q.    Oh, she stayed in the office.
10    A.    I don't recall.
11    Q.    Now, you mentioned that Robin
12  Landis at some point apologized to you.
13    A.    Yes.
14    Q.    Do you know when that occurred?
15    A.    It was the end of the season.
16  I mean, it was still -- I was still in
17  school when it happened.
18    Q.    So, the end of the 2010 school
19  year, like the 2009/2010 school year,
20  sometime at the end.
21    A.    Yes.
22    Q.    And what did she apologize for?
23    A.    For not believing me.
24    Q.    Did she tell you why she now

Page 165

1  believed you?
2    A.    No.
3    Q.    Now, the records that your
4  step-dad provided to Faith Christian
5  Academy, the phone records appear to
6  indicate that there was a text message
7  from Eric Romig's phone at 3:33 on
8  December 21st, 3:33 in the afternoon.
9        Do you recall receiving a text
10  message after you left Mr. Clymer's office
11  from Eric Romig?
12    A.    Yes.  That was the one weird
13  text message that I had received.
14    Q.    Well, actually that weird text
15  message was on December 22nd, wasn't it?
16  It was the next morning.
17    A.    I don't know.
18    Q.    So, you don't recall receiving
19  a text message from Eric Romig after you
20  left Ryan Clymer's office.
21    A.    No.
22    Q.    Okay.  Do you know if you
23  would have saved that message?
24    A.    No.

Page 166

1       MR. KEMETHER: No, you don't
2 know if you would have, or you did not?
3       THE WITNESS: I would not have
4 saved it, no.
5       BY MS. CONNOR:
6   Q.   Is there any particular reason
7 why you would have deleted that message?
8   A.   The message on my way home?
9   Q.   Right.
10   A.   No.  I don't recall receiving
11 one.  I don't...
12   Q.   But you think you deleted it if
13 you did receive it.
14   A.   Definitely, yes.
15   Q.   And you don't know why you
16 would have deleted that.
17   A.   I didn't save any test messages
18 from him.
19   Q.   Thank you.
20       MS. CONNOR:  I don't have any
21 other questions.
22       EXAMINATION
23       BY MR. RUSSELL:
24   Q.   I apologize if it sounds like

Page 167

1 we're covering some of the same rounds.
2 I don't want to, but there are some
3 subtle nuances that I want to go through.
4       I introduced myself. I'm
5 Jonathan Russell. I represent Faith as
6 well as Ryan Clymer as well as Russ
7 Hollenbach. And the reason why we're here
8 is because we're trying to look back and
9 see what happened at that time based upon
10 the lawsuit that's been brought against
11 Faith by Attorney Groth and his client.
12       So, it's a little bit
13 difficult. We know what we now know, but
14 we're going to go back and try and figure
15 out what did we know then, and that's why
16 we're asking you some of these questions.
17 Nobody wants to send you through the
18 ringer on this, but I understand that
19 some may be difficult to work through.
20       Back in 2009/2010, Ms. Mayer,
21 how would you describe your relationship
22 with your mother and your step-father?
23   A.   A normal teenager/parent
24 relationship.

Page 168

1   Q.   You thought you could speak
2 with them if something was going on,
3 though?  Were they approachable or
4 unapproachable?
5   A.   They were approachable, but I
6 didn't feel I could share it with anyone.
7   Q.   How about now? Is it better or
8 worse now?
9   A.   Better.
10   Q.   Better now, okay. And how
11 would you describe, in your own words,
12 how FCA and Ryan Clymer handled the
13 investigation into the texting issue
14 between you and Mr. Romig?  What words
15 would you use to describe it?
16   A.   I wish they would have handled
17 it differently.
18   Q.   How so?
19   A.   I wish that they would have
20 followed through with actually contacting
21 the authorities.
22   Q.   So, you wish they would have
23 contacted the police or Children & Youth?
24   A.   Correct.

Page 169

1   Q.   Do you know why your parents
2 didn't contact the police?
3   A.   Because they were told by Ryan
4 Clymer that he was going to be doing
5 that.
6   Q.   When nothing happened, when they
7 didn't hear from anybody, did they inquire
8 further as to whether he contacted the
9 police or Children & Youth?
10   A.   Not to my knowledge.  And
11 again, as I mentioned, I just wanted to
12 play basketball.  I didn't feel like
13 having to deal with this, so...
14   Q.   Do you know whether your
15 parents felt that they believed you? Did
16 they communicate that they believed you?
17   A.   Yes.
18   Q.   Did they say they believed you
19 about the sexual content of these
20 messages?
21   A.   Yes, ma'am.
22   Q.   One concern was, we were able
23 to -- they were able to establish the
24 volume of messages, right?

Page 170

1    A.    Yes.
2    Q.    They just couldn't ascertain the
3  content of those messages, correct?
4    A.    Correct.
5    Q.    And you talked about -- you
6  were concerned that no one would believe
7  you, right?
8    A.    Yes.
9    Q.    And that's why I didn't really
10  understand, how come you deleted the
11  messages as opposed to hanging onto them?
12  Because then they would really believe
13  you, if you had them. Why did you
14  delete the messages?
15    A.    Well, I think I was -- I was
16  in shock, kind of, when it first started
17  happening. I didn't know what to do. And
18  then again, Chelsea is his daughter, so I
19  think I was just kind of in denial for a
20  while.
21    Q.    Did you ever tell your parents
22  not to contact the police because you
23  just wanted to play basketball?
24    A.    I did.

Page 171

1    Q.    Do you know if your parents
2  felt that Ryan was responsive to their
3  comments? Did he ever tell you that one
4  way or the other?
5    A.    He was not responsive to them.
6    Q.    And did they tell you that, or
7  that was your impression?
8    A.    That was my impression.
9    Q.    Did they ever talk to you
10  about -- once they got involved, did they
11  ever communicate to you about what the
12  investigation revealed?
13    A.    No.
14    Q.    For instance, did your parents
15  ever share with you that Ryan spoke
16  directly with Lauren Fretz?
17    A.    I don't believe my parents
18  mentioned that to me.
19    Q.    Did you ever find out at any
20  time that Ryan had contacted Lauren Fretz?
21    A.    I don't believe so.
22    Q.    Did you ever learn that Lauren
23  Fretz denied ever having a sexual
24  relationship with Eric Romig?

Page 172

1    A.    I believe I learned that
2  through my conversations Mr. Groth.
3    Q.    Did you ever tell Ryan Clymer
4  that you believed Lauren Fretz was coming
5  home on a particular weekend to have sex
6  with Eric Romig?
7    A.    I don't recall.
8    Q.    Does that refresh your
9  recollection at all, that comment, or hear
10  something like that?
11    A.    Could you repeat it, please?
12    Q.    Did you ever tell Ryan Clymer
13  that you believe Lauren Fretz was coming
14  home from college on a particular weekend
15  to have sex with Eric Romig?
16    A.    I don't recall ever telling
17  that to Ryan Clymer, but I remember Mr.
18  Romig saying that to me.
19    Q.    Did you know that Ms. Fretz was
20  also contacted by the police as part of
21  that investigation as well?
22    A.    Yes.
23    Q.    And did you learn that she told
24  the same thing to the detectives, the

Page 173

1  police investigating this matter involving
2  Ms. Nace, as she told to Ryan Clymer?
3  Did you ever hear that?
4    A.    No.
5    Q.    Did Ryan Clymer or your parents
6  ever tell you that Mr. Clymer contacted
7  Kristen Kennedy as part of his
8  investigation?
9    A.    No.
10    Q.    So, you never knew that until I
11  just told that you?
12    A.    No.
13    Q.    Did you ever learn through your
14  parents or through Mr. Clymer that he
15  contacted a police officer?
16    A.    Can you repeat that?
17    Q.    Sure: Did you ever learn
18  through your parents or through Ryan
19  Clymer that as part of his investigation
20  he contacted a police officer?
21    A.    He said he would, but he never
22  did.
23    Q.    He never told you or he never
24  contacted --

Appendix 0212

Page 174

1  A.   He never told me that, no.
2  Q.   Do you know whether he told
3  your parents that?
4  A.   I don't know.
5  Q.   Did you learn through your
6  parents, through Mr. Clymer or even
7  through Attorney Groth that he contacted
8  former players and the assistant coach,
9  Robin Landis, as part of his investigation
10  into this matter?
11  A.   I don't.
12  Q.   You don't recall?
13  A.   No.
14  Q.   Or he didn't.
15  A.   I don't recall.
16  Q.   Did you ever learn through
17  anyone, whether it be through Ryan Clymer,
18  whether it be through your parents,
19  whether it be through Attorney Groth when
20  he met with you on those two days, that
21  as part of his investigations Ryan Clymer
22  spoke with Eric Romig's wife about these
23  texts in particular?
24  A.   That he said face-to-face --

Page 175

1  Q.   Either on the phone or
2  face-to-face.
3  A.   I don't know.
4  Q.   Did you ever hear any
5  information that Eric Romig's wife
6  indicated to Mr. Clymer that some of
7  these texts were for her?
8  A.   Sorry, but can you repeat that?
9  Q.   Sure: Did you ever hear from
10  anyone, whether it be Ryan Clymer, whether
11  it be through your parents, whether it be
12  through detectives, whether it be through
13  Attorney Groth, that Mrs. Romig at the
14  time, Eric Romig's wife, indicated that
15  some of the texts that were identified as
16  being inappropriate she said were intended
17  for her?
18  A.   I just learned that through the
19  email I read.
20  Q.   But prior to today you never
21  heard that.
22  A.   No.
23  Q.   Was there anyone else that you
24  believe Ryan Clymer should have spoken to

Page 176

1  as part of his investigation?
2  A.   Sorry.
3  Q.   That's all right.
4       MR. GROTH:  Do you want to
5  take a couple minutes and go out to the
6  ladies room, get some air?
7       THE WITNESS:  Yes.
8       (A brief recess was taken)
9       MR. RUSSELL:  We're back on the
10  record.
11       (The record was read by the
12  court reporter as requested)
13  BY MR. RUSSELL:
14  Q.   Is there anyone else that you
15  believe that Ryan Clymer should have gone
16  to as part of his investigation?
17  A.   I don't think so.
18  Q.   And you talked during your
19  deposition about feeling like you weren't
20  believed, and I just want to look into
21  that a little bit or explore it a little
22  bit further.
23       They believe the number the
24  texts that were sent between you were

Page 177

1  inappropriate, right?
2  A.   Yes.
3  Q.   And you were brought back on
4  the team and you were co-captain.
5  A.   Yes.
6  Q.   And Mr. Romig was no longer
7  coaching the team.
8  A.   Right.
9  Q.   Doesn't that indicate that they
10  believed you?
11  A.   Yes.
12       MR. GROTH:  Just note my
13  objection to the form of that question,
14  please.
15  BY MR. RUSSELL:
16  Q.   I think you said you don't
17  recall ever telling Mr. Romig to stop
18  texting you, right?
19  A.   Correct.
20  Q.   In the texts that you sent back
21  to Mr. Romig, did they contain things
22  other than discussions about basketball?
23  A.   Yes.  Occasionally I would text
24  him back.  I mean, there is an example in

Page 178

1  here. He would say something to me and
2  I would say why or okay.
3      I don't recall ever texting him
4  back where it was like I wanted to have
5  this conversation with you.
6    Q.   Like asking him a question.
7    A.   Correct.
8    Q.   Okay.
9    A.   Well, this is a question in
10  there, so...
11    Q.   You talked about why?
12    A.   Yes.
13    Q.   And by "there," just for the
14  record, we're referring to the list that
15  was generated as part of Romig six
16  attached to page two.
17      Do you know if Chase ever met
18  separately with Mr. Clymer?
19    A.   I don't believe he did until
20  after.
21    Q.   Let me back up. When I say
22  "met with him," I mean met with him about
23  this situation, the texting situation. You
24  don't believe he met until after what?

Page 179

1    A.   After I had gone to...
2    Q.   To meet with Mr. Clymer.
3    A.   Yes.
4    Q.   But it was within that same
5  time period before Mr. Romig didn't return
6  to the team?
7    A.   I believe so.
8    Q.   Did you ever meet together with
9  Chase and Mr. Clymer?
10    A.   No.
11    Q.   Do you know if your mom or
12  your dad ever told Mr. Clymer that they
13  were going to try to obtain the actual
14  content of the texts?
15    A.   They did.
16    Q.   They told him that?
17    A.   Yes.
18    Q.   And did they take any steps to
19  try to do that?
20    A.   I believe so.
21    Q.   What was your understanding of
22  what happened?
23    A.   I don't know. I wasn't really
24  involved. Again, I didn't care to even

Page 180

1  deal with it then.
2    Q.   So, your mom or your dad would
3  know what happened with that. You don't
4  have any knowledge.
5    A.   Correct.
6    Q.   But you do remember them saying
7  that they were going to try to get the
8  actual content, and then were they going
9  to go back and disclose that to Ryan?
10    A.   Yes. And when they couldn't,
11  that's when they made up that document of
12  text messages, how many he sent and how
13  many I sent.
14    Q.   They were able to get the
15  volume.
16    A.   Yes.
17    Q.   Do you believe that Ryan Clymer
18  or Faith Christian Academy should have
19  done something more than what they did as
20  a result of their investigation?
21    A.   Yes.
22    Q.   What do you believe that they
23  should have done?
24    A.   I believe they should have

Page 181

1  actually gone to the authorities.
2    Q.   And you said your parents
3  didn't because you told them not to.
4    A.   Correct.
5    Q.   Did you ever tell Ryan not to?
6    A.   No.
7    Q.   The reason that you told your
8  parents not to, would that have been the
9  same reason, though, that you wouldn't
10  want Ryan not to go to the police?
11    A.   Yes, it would have been the
12  same reason, but I would not have stopped
13  him in this case.
14    Q.   After this incident occurred,
15  you continued to attend Faith Christian
16  Academy.
17    A.   Yes.
18    Q.   Was there anything that
19  prevented you from going to a different
20  school?
21    A.   No.
22    Q.   Was there anything that
23  prevented from you being home-schooled?
24    A.   No.

Page 182

1  Q.    Anything that prevented you from
2  being a part of a cyber-school?
3  A.    No.
4  Q.    In 2009 and 2010, during the
5  period of this investigation, did you ever
6  tell your parents or Ryan Clymer that you
7  were touched inappropriately by Mr. Romig?
8  A.    I believe I told my parents.
9  Q.    Did you ever tell Mr. Clymer?
10  A.    No.
11  Q.    Why was that?
12  A.    He never asked me any questions
13  about what even happened.
14  Q.    And the only time that you're
15  saying that you believe you were touched
16  inappropriately was at that practice where
17  you had the concussion and he touched
18  your backside?
19  A.    That is the only time, yes.
20  Q.    You had mentioned that you
21  believed it was intentional and not
22  inadvertent. What was the thought that
23  gave you that impression?
24  A.    Well, it wasn't like I just ran

Page 183

1  into him or he ran into me. He came over
2  and intentionally touched me.
3  Q.    Did he like smack your backside
4  or pinch you or...
5  A.    More like a grab.
6  Q.    When that happened, what did
7  you do?
8  A.    I just stepped away. I didn't
9  know what to do because my assistant
10  coach was right there and it was very
11  awkward.
12  Q.    But you didn't say "hey, watch
13  it" or "what was that" or no comment?
14  A.    No.
15  Q.    And he made no comment at the
16  same time? He didn't say "excuse me" or
17  anything like that?
18  A.    No.
19  Q.    At any time in 2009 or 2010,
20  did you believe you were the victim of
21  serious bodily injury?
22  A.    No.
23  Q.    At any time in 2009 or 2010
24  did you believe that you were the victim

Page 184

1  of sexual exploitation?
2  A.    No.
3  Q.    At any time in 2009 or 2010
4  did you believe that Mr. Romig was
5  attempting to persuade you, induce you,
6  entice you or coerce you to engage in
7  sexually explicit conduct?
8  A.    Yes.
9  Q.    What did he do that gave you
10  that impression?
11  A.    The way he would send me text
12  messages; the way he would say things he
13  did with Lauren; and, you know, trying to
14  get me to do the same things that she
15  was doing with him.
16  Q.    And with regard to Lauren, you
17  don't know whether that actually ever
18  happened.
19  A.    I don't know.
20  Q.    Did you ever tell that to Mr.
21  Clymer?
22  A.    No.
23  Q.    You never told him that you
24  thought that Mr. Romig was attempting to

Page 185

1  persuade you, induce you, entice you or
2  coerce you to engage in some sort of
3  sexual activity?
4  A.    I was never asked.
5  Q.    But let me back up a little
6  bit. I think you testified in your
7  deposition that don't recall telling him
8  that the texts were sexual in nature.
9  You recall telling him that they were
10  inappropriate.
11  A.    Correct.
12  Q.    Is that accurate?
13  A.    Yes.
14  Q.    But you have no recollection of
15  telling him anything about the sexual
16  aspect of these texts.
17  A.    No.
18  Q.    No, you don't.
19  A.    No, I don't.
20  Q.    Was there anything else that
21  you wanted your parents to do that they
22  didn't do?
23  A.    No.
24  Q.    And you do believe that the

Page 186

1  school believed you regarding the volume
2  of texts that were exchanged between you
3  and Mr. Romig, correct?
4      A.   Correct.
5      Q.   Do you believe that your
6  parents believed you about the content of
7  those texts?
8      A.   Yes.
9      Q.   Did your mom or step-dad have
10 any kind words to say to Ryan at your
11 graduation? Do you recall that?
12     A.   I don't believe they spoke.
13     Q.   Since graduating, have you
14 spoken to anyone else about this texting
15 situation other than Mr. Groth and the
16 detectives?
17     A.   No.
18     Q.   When you went to see the
19 detectives in 2013, do you recall telling
20 them anything that was different than what
21 you had told Mr. Clymer or what you had
22 told your parents as evidenced in Romig-6?
23     A.   No.
24     Q.   The one thing -- and I think

Page 187

1  it's been addressed -- there's no
2  indication in Romig-6, that document, that
3  there was any physical touching between
4  you and Mr. Romig, correct?
5      A.   Correct.
6      Q.   So, if you did tell the police
7  officers at that time that he had touched
8  your backside, that would be different,
9  right?
10     A.   Correct.
11     Q.   Is there a reason why you
12 didn't put that in Romig-6, that list of
13 things?
14     A.   No.
15     Q.   Is there a reason why you
16 didn't tell Mr. Clymer that he had
17 inappropriately touched your backside?
18     A.   Again, he never questioned me
19 on anything.
20     Q.   How about your parents? Is
21 there a reason why you didn't tell your
22 parents that?
23     A.   I think I did tell my parents.
24     Q.   If you had told your parents

Page 188

1  that, would it have been your hope that
2  they would have told Mr. Clymer that?
3      A.   Yes.
4      Q.   Did you ever tell the police
5  officers that Mr. Romig had texted
6  comments about your backside in general?
7      A.   Yes.
8      Q.   Was that ever on Romig-6?
9      A.   No.
10     Q.   The second document that's
11 attached to that.
12     A.   No.
13     Q.   No? Is there a reason why you
14 didn't put texts about your physical
15 appearance of your backside in that
16 document?
17     A.   No.
18     Q.   Did you ever tell your parents
19 before you met with the detectives about
20 Mr. Romig sending you texts about the
21 character of your backside?
22     A.   No.
23     Q.   Also, there was an issue about
24 him wearing jeans. He texted you an

Page 189

1  image. Was that the only image that was
2  ever texted?
3      A.   Yes.
4      Q.   And that wasn't on Romig-6 -- I
5  think it's six. I keep referring to it.
6  But Romig-6, the document that you
7  prepared attached to that email, there was
8  no mention of him sending an image of him
9  in his jeans. Is that correct?
10     A.   Correct.
11     Q.   Do you know why you didn't put
12 that on that document?
13     A.   No.
14     Q.   Did you tell your parents that
15 he had sent you an image of his jeans?
16     A.   Yes.
17     Q.   Was it just from the waist
18 down?
19     A.   It was like a mirror picture.
20     Q.   So, it was a whole body?
21     A.   Yes.
22     Q.   Did you ever tell Ryan Clymer
23 or your parents that Mr. Romig told you
24 that he would like it if you changed on

Page 190

1  the bus like the other girls did?
2  A.    No.
3  Q.    You never told him that?
4  A.    It's written here, but I never
5  verbally said that.  I may have verbally
6  said to my parents through this, but...
7  Q.    But I think on Romig-6 you
8  talked about the Quakertown bus, right?
9  A.    Yes.
10  Q.    But did Mr. Romig ever say to
11  you that he wanted you to change on the
12  bus with the basketball team?
13  A.    Yes, he did reference that via
14  text with me.
15  Q.    Why was that not on Romig-6?
16  A.    Because I said it here.  It
17  was kind of the same -- thinking back, it
18  was kind of the same conversation.
19         He was telling me that -- I
20  believe that he was saying it was okay
21  for me or all the other players to be
22  doing that.
23  Q.    And were they doing that? Were
24  they getting changed on the bus?

Page 191

1  A.    They weren't allowed to.
2  Q.    So, nobody ever got changed on
3  the bus at Faith Christian Academy?
4  A.    No.
5  Q.    That was something that he said
6  was done at Quakertown.
7  A.    Correct.
8  Q.    Did you ever tell Ryan Clymer
9  that he said to you he would like to see
10  you get changed on the bus?
11  A.    No.  And again, Ryan Clymer
12  never asked me any questions.
13  Q.    You mentioned that you had two
14  meetings with Attorney Groth before today.
15  Did he also meet with you today a little
16  bit before our deposition?
17  A.    Yes.
18  Q.    And what did you discuss at
19  that meeting?
20  A.    Things similar to our second
21  meeting, just how this was going to work,
22  the kind of setting, under oath.
23  Q.    What time did you get here
24  today?

Page 192

1  A.    About 9:30.
2  Q.    And the depositions were to
3  begin at 10:00?
4  A.    Correct.
5  Q.    And you believe he took notes
6  of that deposition you had the first
7  time?
8  A.    Yes.
9  Q.    And did he take notes the
10  second time when he met with you?
11  A.    I believe so.
12  Q.    And that second time, that was
13  to hand you the subpoena, to essentially
14  serve you with the subpoena to appear
15  today at the deposition?
16  A.    Yes, if that's what that paper
17  was.
18  Q.    Did you go to Eric Romig's
19  sentencing hearing?
20  A.    No.
21  Q.    Why was that?
22  A.    Because I never want to see him
23  again.
24  Q.    At any of the meetings that you

Page 193

1  had with Mr. Groth, did he ever tell you
2  that he knew of other girls at Faith
3  Christian Academy who had some sort of
4  alleged sexual relationship with Mr.
5  Romig?
6  A.    We referenced two, what I had
7  told him, about Lauren and Kristen.
8  Q.    How did you know something
9  about Lauren and Kristen, though?
10  A.    Because Eric Romig had told me
11  that.
12  Q.    What did he say about Kristen?
13  A.    That he would be sexual with
14  her, same things as he did with Lauren.
15  Q.    So, this was all coming to you
16  from Mr. Romig.
17  A.    Correct.
18  Q.    Did Mr. Groth ever tell you
19  that he had information about other girls?
20  A.    No.
21  Q.    Did he ever tell you, Mr.
22  Groth, that he believed that FCA was
23  covering something up?
24  A.    No.

Appendix 0217

Page 194

1  Q.    Do you have any information
2  that you believe FCA was covering
3  something up?
4  A.    I mean, I know of past things,
5  but I don't know if that's what they're
6  covering up.
7  Q.    What are the past things?
8  A.    Situations that had happened
9  with Eric Romig's sister. I don't know
10  how many years ago that was.
11  Q.    And how did you know that?
12  A.    I've known about it since
13  before he had contacted me, but I don't
14  remember how I heard of it.
15  Q.    But what did you think Faith
16  was covering up about that?
17  A.    Well, I don't know. Just what I
18  know is, it wasn't handled maybe the
19  right way.
20  Q.    What is your impression or
21  understanding of how it was handled?
22  A.    I don't have much knowledge of
23  that.
24  Q.    It's just kind of an impression

Page 195

1  that you have?
2  A.    Yes.
3  Q.    Do you know Elizabeth Nace?
4  A.    No.
5  Q.    Have you ever met her or her
6  parents?
7  A.    No.
8  Q.    In the letters that was sent to
9  you on April 10th, which has been marked
10  as Mayer number one, when you got that
11  letter what did do you?
12  A.    My parents had sent it to me.
13  I was living in Langhorne at the time, so
14  my mom scanned it, emailed it to me, and
15  said we're doing this because it's the
16  right thing to do, basically.
17  Q.    "Doing this" meaning contacting
18  Mr. Groth?
19  A.    Yes; we would agree to meet
20  with him to go over...
21  Q.    It says in the second paragraph
22  on this letter "I can explain to you to
23  you in more detail why I need your
24  facts" -- the first paragraph on page

Page 196

1  two, I'm sorry, and it begins with
2  "Consequently."
3      It says, "Consequently, I would
4  ask that you call me as soon as possible
5  on my cell phone at 267-231-2170, day or
6  evening, so that I can explain to you in
7  more detail why I need your facts and
8  information."
9      Did he explain to you to you
10  why he needed your facts and information?
11  A.    Yes.
12  Q.    What did he say?
13  A.    So that he could figure out
14  how -- like what they did in my situation
15  at the time.
16  Q.    Did he say that your parents at
17  any time should have done something
18  different than what they did?
19  A.    Mr. Groth?
20  Q.    Yes.
21  A.    No, he didn't.
22  Q.    And then at the last sentence
23  in that paragraph it says "If I get
24  the" -- and this is the last full

Page 197

1  paragraph before the salutation there, but
2  "If I get the impression from our
3  telephone conversation that you are not,"
4  meaning truthful and forthcoming, I guess,
5  "I will have no alternative but to
6  immediately issue a subpoena to complete
7  your deposition testimony under oath on a
8  date of my choosing."
9      Did Mr. Groth notice your
10  deposition today?
11  A.    Sorry?
12  Q.    He's the one who gave you the
13  deposition notice today.
14  A.    Yes.
15  Q.    Did he ever tell you that he
16  got the impression that you were not
17  being truthful at all?
18  A.    No.
19  Q.    Did he tell you that he would
20  not depose you if you were truthful with
21  him during that private interview that you
22  gave him?
23  A.    No.
24  Q.    What's been marked as Romig-6,

Page 198

1   in there it has a paragraph, and it's the
2   second paragraph, and it says -- let me
3   read the first one: "Ryan: Hope your
4   holidays were good. I wanted to follow up
5   on the Voicemail I sent you and include
6   the document which I told you we had
7   Emily write out some of the information
8   she indicated verbally.
9   "This document was written on
10  Monday," December 22nd, "when Emily came
11  home early from school after having talked
12  to you."
13       So, does that refresh your
14  recollection that you were sent home early
15  from school after speaking with Ryan, and
16  then you spoke with your parents and then
17  they asked you to write this document up?
18      A.   That's correct.
19      Q.   It was your stepfather that
20  asked you to sit down and document some
21  of the content of the text messages and
22  some of the key texts that you could
23  remember that were fresh in your mind?
24      A.   Yes.

Page 199

1       Q.   Do you recall ever personally
2   telling Ryan that Mr. Romig had said he
3   had texted you that he wanted to be in
4   you?
5       A.   No, Ryan never questioned me.
6       Q.   Did you ever tell Ryan, when
7   you told him that the texts were
8   inappropriate, that he was telling you
9   that he wanted to be with you?
10      A.   Did I ever say that to Ryan?
11      Q.   Yes.
12      A.   No.
13      Q.   The email that we've referred
14  to that was kind of odd, I believe that
15  the text of that -- not the email; the
16  test message, rather, states "This
17  presentation is going to be rough.  Ewing
18  Oil contracts are difficult to negotiate."
19       Does that refresh your
20  recollection about the email that was
21  after your meeting --
22      A.   That was the last thing he
23  texted me.
24      Q.   Is that like code for

Page 200

1   something, or what is that?
2       A.   No. I have no clue what that
3   means to this day.
4       Q.   It's my understanding that Mr.
5   Romig was working at a gas station at the
6   time.  Were you aware of that at all?
7       A.   No.
8       Q.   Did he ever talk to you about
9   negotiating gas contracts or something at
10  that station?
11      A.   No.
12      Q.   Did you even know that he
13  worked at a gas station?
14      A.   No.
15      Q.   Just for the record, it looks
16  like, at least according to the email
17  that's Romig-6, you went home on the
18  21st, and then on another email that was
19  September it says the gas -- the Ewing
20  Oil one was actually on the 22nd at 9:53
21  a.m., so that would be the day after you
22  spoke with Ryan.
23       Does that refresh your
24  recollection at all or does it...

Page 201

1       A.   I mean, yes.
2           MR. RUSSELL:  Why don't we take
3   this -- are we up to Mayer-2 or 3? What
4   are we up to?
5           MR. GROTH:  Three, I believe.
6           (Exhibit Mayer-3 was marked for
7   identification)
8   BY MR. RUSSELL:
9       Q.   I'm showing you an email that
10  purports to be from your mother.  Her
11  name is Annette Smith, right?
12      A.   Yes.
13      Q.   And this is dated January 16th,
14  2010.  And do you see the last sentence
15  of that email says "Ryan, thank you again
16  for the support you have given us and
17  Emily"?
18      A.   Yes.
19      Q.   Did your mom ever tell you that
20  she was appreciative of the support that
21  Ryan had given you and your parents?
22      A.   She never mentioned that to me,
23  but...
24      Q.   Do you know any reason why she

Page 202

1  would write that if she didn't feel that
2  way?
3          MR. GROTH: Objection to the
4  form. You can answer.
5      A.   My parents aren't awful people.
6  I'm sure that, if he was answering them
7  at all, they were appreciative of that.
8  My parents aren't monsters.
9      Q.   Nobody's trying to stay they're
10 monsters or you're a monster. Nobody's
11 even trying to allude to that. I'm just
12 wondering, if she didn't feel that, do
13 you know why she would say that?
14         MR. GROTH: Objection.
15     A.   I don't know what my mom felt.
16     Q.   But you didn't feel you were
17 given the support from Ryan. Would that
18 would be accurate?
19     A.   Correct.
20     Q.   And were your parents
21 communicating to you what the
22 investigation was being revealed to them
23 through Ryan?
24     A.   Can you repeat that?

Page 203

1      Q.   Sure. Do you have any
2  knowledge or recollection of your parents
3  communicating to you about what they
4  learned through Ryan's investigation?
5      A.   No.
6      Q.   So, whatever Ryan discovered,
7  you don't know because it wasn't
8  communicated either by Ryan or by your
9  parents to you.
10     A.   Correct. I never spoke with
11 Ryan. He never questioned me --
12     Q.   After that first interview.
13     A.   Correct, and he never asked me
14 any questions, just told me to leave.
15 And it was difficult for my parents to
16 get in contact with him.
17     Q.   What gives you that impression?
18     A.   I mean, you can see my mom in
19 these emails is leaving voice-mails.
20 Therefore, he's not as answering, so...
21     Q.   Did you know that Ryan wasn't
22 able to access his emails if he was out
23 of state during the Christmas break?
24     A.   I don't know that.

Page 204

1      Q.   I'm going to show you what
2  we'll mark as Mayer exhibit four.
3          (Exhibit Mayer-4 was marked for
4  identification)
5  BY MR. RUSSELL:
6      Q.   I'm showing you what's been
7  marked as Mayer-4. This is the copy of
8  complaint that was filed in this matter.
9          I'd like to you ask you some
10 questions about this here because there is
11 some mention of you in here. On page
12 eight of the complaint, paragraph
13 thirty-four, it says "In or about October
14 of 2009" -- do you see that?
15     A.   Yes.
16     Q.   (Continuing) -- "Defendant Romig
17 began to excessively text student EM, who
18 was being coached by Defendant Romig.
19 Specifically, these text messages commented
20 on EM's appearance and stated sexual
21 activities that Defendant Romig wanted to
22 engage in with EM."
23         Was there anything on document
24 Romig-6 that talked about comments that

Page 205

1  you made about Romig saying about your
2  appearance or activities?
3      A.   No.
4      Q.   I'm sorry, was that appearance?
5      A.   No.
6      Q.   Was there anything that you
7  prepared on Romig-6 that talked about
8  Romig wanting to engage in specific
9  activities with you?
10     A.   Second thing right here.
11     Q.   He said "I want to be in you."
12     A.   Yes.
13     Q.   And you interpreted that to
14 mean what?
15     A.   That he wanted to have sex.
16     Q.   And then the next paragraph
17 says "During the course of Defendant
18 Romig's contact with EM, he admitted to
19 EM that he had a prior sexual
20 relationship with another student, CC."
21         Do you know who CC is?
22     A.   It could be Kristen Kennedy --
23 I think that would be a KK, so I don't
24 know if --

Appendix  0220

Page 206

1  Q.    Yes, KK is mentioned further in
2  the complaint, but --
3  A.    I don't know.
4  Q.    Did you ever have any knowledge
5  of a prior sexual relationship with a
6  student with the initials CC?
7  A.    No.
8  Q.    So, however that information was
9  gained by the plaintiff, it's not
10 something that came through you.
11 A.    No.
12 Q.    And then paragraph thirty-six
13 says, "EM" -- again, I'm assuming this is
14 you -- "had previously observed the
15 relationship between Defendant Romig and
16 LF." That would be Lauren Fretz?
17 A.    Yes.
18 MR. GROTH: Objection.
19 Q.    And you believe that they were
20 too close for a student/coach
21 relationship. Did you actually observe
22 the relationship or interaction between
23 Eric Romig and Lauren Fretz?
24 A.    When she would come to

Page 207

1  practices, they were just very friendly
2  with each other. I mean, she of course
3  had graduated by then. But still, very
4  odd.
5  Q.    What was it about that
6  friendship that you thought was too close
7  for a student/coach relationship?
8  A.    Just everything about how they
9  interacted with each other.
10 Q.    Give me some descriptive terms
11 or an example. Did they kiss or
12 something? Did they hug?
13 A.    Hug, yes. The conversations --
14 and I don't recall any of the
15 conversations that they had during those
16 practices, but it was just -- you
17 wouldn't kind of see that from somebody
18 that was your player to your coach.
19 Q.    From your perspective.
20 A.    Correct.
21 Q.    Did anybody else ever comment
22 to you that they thought that the
23 relationship was inappropriate or too
24 close for a student/coach?

Page 208

1  A.    No, not at the time.
2  Q.    How about after -- at any time?
3  A.    I don't recall how I heard
4  this, but it was said that people were --
5  I don't know if "aware" is the right
6  word, but they had sensed something
7  between the two of them.
8  Q.    But nothing was ever confirmed.
9  A.    No.
10 Q.    So, it was just innuendo or
11 rumor?
12 A.    Yes.
13 Q.    And then the next paragraph
14 says "EM's boyfriend" -- that would be
15 Chase?
16 A.    Correct.
17 Q.    (Continuing) -- "and /or family
18 members reported Romig's inappropriate
19 sexual misconduct to Defendant Clymer."
20 That would be Ryan Clymer.
21 Do you know whether Chase ever
22 told Ryan Clymer that Mr. Romig had
23 sexual misconduct?
24 A.    No.

Page 209

1  Q.    You don't know or he did not?
2  A.    He did not. He never had a
3  conversation with Mr. Clymer until after I
4  had said something to him.
5  Q.    And did Chase ever know that
6  the content of the text messages were, in
7  your opinion, sexually inappropriate?
8  A.    Yes.
9  Q.    And when did he learn that?
10 A.    Well, when he first had seen
11 him texting me, Mr. Romig texting me.
12 Q.    Do you recall what that first
13 text was?
14 A.    No.
15 Q.    And then it says in the next
16 paragraph "Defendant Clymer suspended EM,"
17 which is you again, "during the course of
18 the investigation and prevented her from
19 playing basketball."
20 Were you ever suspended?
21 A.    Not officially. I mean, they
22 just asked me to leave.
23 Q.    Just like they separated Mr.
24 Romig as well until they could sort this

Page 210

1  out?
2      MR. GROTH: Object to the form.
3  Q.    You can answer.
4  A.    Yes.
5  Q.    And when they sorted it out,
6  you were brought back on the team and Mr.
7  Romig was no longer part of the team.
8  A.    Correct.
9  Q.    And then it says in paragraph
10  thirty-nine, "Further, Defendant Romig
11  engaged in inappropriate sexual conduct
12  with another female student, KK," which I
13  think is Kristen Kennedy, "through
14  Facebook and/or in person."
15      Do you have any knowledge of
16  that?
17  A.    No.
18  Q.    The next paragraph says,
19  "Defendant Romig questioned KK about her
20  sexual activities with KK's boyfriend."
21      Do you have any knowledge of
22  that?
23  A.    No.
24  Q.    "Additionally, LF," which I

Page 211

1  suppose is Lauren Fretz, "again had
2  reported to Defendant Clymer that she
3  believed that Defendant and KK were
4  personally involved. "
5      Do you have any knowledge of
6  that?
7  A.    No.
8  Q.    Technically, were you on
9  probation your senior year?
10  A.    I was never verbally told that,
11  no.
12  Q.    You weren't sent a letter or
13  anything saying you were able to come
14  back, but it's on probation?  You have to
15  meet with Pastor Ron, and you can't have
16  any lates through January or anything like
17  that?
18  A.    I don't recall.
19  Q.    Did you ever sign an agreement
20  indicating that you had to abide by
21  certain terms?
22  A.    I don't recall if I had to
23  sign anything through those counseling
24  sessions or before the school year ended.

Page 212

1  Q.    And the reason we asked you
2  about the co-captain issue -- it came up
3  in some other setting, and I'm not sure
4  where -- that both you and Chelsea were
5  removed as co-captains of the team for a
6  brief period of time about a week before
7  this revelation came about with respect to
8  the excessive texting.
9      Does that refresh your
10  recollection at all?
11  A.    Never happened.
12  Q.    Before this situation came to
13  light involving this excessive texting and
14  the inappropriate number of texts, had you
15  ever been disciplined while at Faith
16  Christian Academy for issues involving
17  truthfulness or dishonesty such as
18  cheating on a test?
19  A.    No.
20  Q.    Never?
21  A.    No, not that I recall.
22  Q.    As you sit here today, is there
23  any additional information that you would
24  think would be helpful in getting us to

Page 213

1  put the pieces together so that we can
2  have a fuller and more accurate picture
3  whether FCA acted appropriately in
4  conducting its investigations?
5      MR. GROTH: Object to the form.
6  Q.    You can answer.
7  A.    I don't know.
8  Q.    Anyone else that you think
9  needs to be contacted in order to
10  determine whether Faith Christian Academy
11  acted appropriately in conducting its
12  investigation?
13  A.    Not that I'm aware of.
14      MR. RUSSELL: I have no further
15  questions.
16      MR. GROTH: Let me just put
17  one comment on the record while I'm
18  thinking of it.
19      I think that CC in the
20  complaint was probably a leftover from the
21  time when we were in a draft identifying
22  the people from FCA as AA, BB, CC and DD
23  instead of by their actual initials to
24  try to keep the other individuals

Appendix 0222

Page 214

1  anonymous, and I think that's why that
2  was left in there. That's my
3  professional recollection. I'm sorry, go
4  ahead.
5      MS. KERNAN: We have no
6  questions.
7      MR. KEMETHER: I have one or
8  two follow-ups, if that's all right.
9  EXAMINATION
10 BY MR. KEMETHER:
11     Q.    I think you said a little while
12 ago that when you got the subpoena, your
13 mother said "We're going to do this
14 because it's the right thing to do."
15     What does that mean?
16     A.    Well, I think my parents were
17 aware of, you know, obviously how Faith
18 handled my situation. And what had
19 happened to the victim, I think they
20 thought that it would be best for us to
21 tell them what we knew and how they
22 handled...
23     Q.    Did you feel the same way?
24     A.    Feel the same way as...

Page 215

1      Q.    Your mother, who made this
2  statement.
3      A.    I did, but this isn't something
4  I wanted to be doing.
5      Q.    And one last thing: If I
6  remember correctly, Cheryl Alderfer is the
7  one who took you down to the meeting with
8  Mr. Clymer?
9      A.    Yes.
10     Q.    And she sat through the whole
11 meeting?
12     A.    Yes.
13     Q.    And she actually started the
14 meeting by saying to Mr. Clymer that you
15 have some things to tell him. Am I
16 correct?
17     A.    Yes.
18     Q.    You said several times during
19 the deposition that Mr. Clymer asked you
20 nothing. Do I understand the purpose of
21 the meeting was for you to tell him some
22 things?
23     A.    Yes.
24     Q.    And you've already related to

Page 216

1  us the extent of what you told him.
2      A.    Yes.
3      Q.    That Mr. Romig had been sending
4  you inappropriate texts.
5      A.    Yes.
6      Q.    And you said nothing about
7  whether they contained sexual content or
8  not.
9      A.    I felt "inappropriate" explained
10 that.
11     MR. KEMETHER: Thank you.
12     MR. GROTH: No other questions.
13 Thank you very much.
14     THE WITNESS: Thank you.
15     (The deposition was concluded
16 at 1:20 p.m.)

Page 217

1      WITNESS CERTIFICATION
2
3
4      I hereby certify that I have
5  read the foregoing transcript of my
6  deposition testimony, and that my answers
7  to the questions propounded, with the
8  attached corrections or changes, if any,
9  are true and correct.
10
11
12
13  _____   _____
14  DATE        EMILY MAYER
15
16
17  _____
18  PRINTED NAME
19
20  FILE 11780
21  NACE
22  vs.
23  PENNRIDGE SCHOOL DISTRICT
24

Appendix 0223

```
 1                    CERTIFICATION

 2

 3

 4           I hereby certify that the

 5    testimony and the proceedings in the

 6    aforegoing matter are contained fully and

 7    accurately in the stenographic notes taken

 8    by me and that the copy is a true and

 9    correct transcript of the same.

10

11

12

13

14           _____

15           Lance A. Brusilow

16           Registered Professional Reporter

17           Certified Realtime Reporter

18

19           The foregoing certification

20    does not apply to any reproduction of

21    the same by any means unless under the

22    direct control and/or supervision of the

23    certifying shorthand reporter.

24
```

Appendix  0224

Eric Romig                                Nace vs. Pennridge School District
                          May 4, 2015

**Page 1**

IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

JAMES NACE, et al        : CIVIL ACTION
    vs.
PENNRIDGE SCHOOL DISTRICT,  :
et al.           : NO. 15-333

Monday, May 4, 2015

Oral deposition of ERIC ROMIG, held at

STATE CORRECTIONAL INSTITUTE - RETREAT, 600 State Route

11, Hunlock, Pennsylvania, beginning at 10:00 a.m.,

on the above date, before LANCE A. BRUSILOW, Registered

Professional Reporter, Notary Public, and Approved

Reporter for the United States District Court.

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

**Page 2**

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY: DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY: JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY: JOANNE D. SOMMER, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, PA 18901
ph: 215.345.7000
(jsommer@eastburngray.com)
Counsel for Pennridge School District and individual
Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY: CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA 19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell Hollenbach

**Page 3**

(APPEARARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY: SEAN V. KEMETHER, ESQUIRE
30 East Second Street
Media, PA 19063
ph: 610.585.0600
(skemether@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

ALSO PRESENT:
FAITH CHRISTIAN ACADEMY
BY: HENRY THOMPSON
700 N. Main Street
Sellersville, PA 18960

**Page 4**

```
 1           (It is hereby agreed by and among
 2      counsel that sealing, certification and filing are
 3      waived; and that all objections, except as to the
 4      form of the question, are reserved until the time
 5      of trial)
 6           ERIC ROMIG, having been first duly
 7      sworn, was examined and testified as follows:
 8           (EXAMINATION)
 9   BY MR. GROTH:
10      Q.  Good morning, Mr. Romig.  My name is David
11      Groth, and I represent James and April Nace and their
12      daughter Elizabeth Nace in a lawsuit that's currently
13      pending in Federal District Court for the Eastern
14      District of Pennsylvania against Pennridge School
15      District, Faith Christian Academy and some employees of
16      those schools:  Mr. Hollenbach and Mr. Clymer at Faith
17      Christian, and Mr. Creeden and Mr. Babb at Pennridge.
18           We're here today to take your deposition in
19      the case, to talk about the subject matter of this
20      litigation.  Have you ever given a deposition before, a
21      civil deposition?
22      A.  No.
23      Q.  I'll explain to you a little bit about the
24      process so we can get through it a little bit more
```

1 (Pages 1 to 4)

Appendix 0225

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

| Page 5 |
| --- |

1  easily, but let me just tell you that we're going to go
2  over issues and facts that I think are important to the
3  case. I'm going to question you first. I'll ask as
4  many questions as I want or as I need in order to get
5  the information that I need, then in turn we'll go
6  around the room to the other attorneys and they'll have
7  a chance to follow up on the questions that I've asked
8  you or maybe ask you completely different questions
9  about facts and information that they want to get from
10 you as well. We'll keep doing that until none of the
11 attorneys have any more questions, and we'll conclude
12 the deposition at that time.
13         MR. GROTH: This deposition, I'll just
14 note for the record, was court-ordered by Judge
15 Beetlestone to be held on this date.
16         Let the record reflect we're taking
17 this deposition at the Correctional Facility at
18 SCI Retreat in Hunlock Creek, Pennsylvania, and
19 that the deposition is taken pursuant to the
20 judge's order and the deposition notice that our
21 office issued on April 22nd, 2015, which I've
22 marked as Romig Exhibit 1.
23         (Exhibit Romig-1 was marked for
24 identification)

| Page 6 |
| --- |

1  BY MR. GROTH:
2         You can take a look at that. I think you
3  probably got a copy of that in the mail as well. Is
4  that correct?
5   A.  Yes, sir.
6   Q.  As I said, we're going to be asking you
7  questions that we think are important and looking for
8  facts and information that are relevant to the claims
9  in this case and to the defenses in this case, and let
10 me give you some instructions that will make this more
11 efficient for us to go through, especially since you
12 have not done it before.
13         As I understand it, you're representing
14 yourself in this litigation, correct?
15  A.  Yes, sir.
16  Q.  You are not represented by counsel?
17  A.  No, sir.
18  Q.  Let me give you some quick directions. First,
19 listen to the question to make sure you understand the
20 question, and if you don't understand the question --
21 if it's vague or you just don't understand it -- ask me
22 to restate or rephrase or clarify the question for you,
23 and I'll be happy to do that so that when you do give
24 me an answer to a question, you will have understood

| Page 7 |
| --- |

1  the question and know what you're responding to.
2         Let me complete the question before you begin
3  your answer. The court reporter here is going to make
4  a transcript of everything that's said, both the
5  questions and the answers, and he cannot take down two
6  people talking over each other at the same time.
7         So, if you agree to let me finish my question
8  before you begin answering -- and sometimes witnesses
9  want to jump in and provide the information that they
10 think the attorney's looking for, but they don't want
11 wait to hear the end of the question. So. Let me get
12 the opportunity to finish the question and I'll give
13 you the opportunity to complete your answer before I
14 start the next question.
15         If you answer a question, I'll assume that you
16 understood the question and that the information and
17 facts that you're giving me are your best recollection
18 of facts and events that took place maybe going back as
19 far as the early 2000s, 2003, 2004.
20         You have to give a verbal answer to all
21 questions; that is, you have to speak. No hand
22 gestures, no head-nods, no head-shakes, no uh-huh or
23 the like, whatever. We need a yes or no or some type
24 of narrative answer.

| Page 8 |
| --- |

1         You must answer every question I ask you fully
2  and to the best of your ability. There may be other
3  objections to a question I ask you from the other
4  attorneys here.
5         They may object to a question for some legal
6  reason that you don't have to be concerned about. If
7  there is an objection to a question, simply allow the
8  objection to be stated by the other attorney and then
9  proceed to answer the question.
10  A.  Yes, sir.
11  Q.  All right? I'm going to ask you questions
12 looking for facts and information that you know
13 personally or for facts and information that you may
14 have gathered or heard from other people, something
15 somebody told you: A conversation you had with other
16 people and they may have provided you with some
17 information and you can provide that information to me.
18  A.  Yes, sir.
19  Q.  Hearsay is not an issue in a deposition like
20 it would be at trial, so the fact that somebody else
21 told you something doesn't mean you can't testify to it
22 here.
23         If you don't know the answer to a question I
24 ask you or you don't recall the information that I'm

Eric Romig                                    Nace vs. Pennridge School District
                              May 4, 2015

---

Page 9

1   looking for, meaning that you knew it at one time but
2   so many years have passed that you don't recall the
3   information any more, tell me that and that will be a
4   sufficient answer.
5            You're not here to guess or speculate or
6   assume anything in response to a question, so don't
7   think that you have to answer a question because you
8   don't have any facts or knowledge or information that
9   is responsive to that question.
10           Is there any medical reason today why you're
11  not able to fully participate in the deposition and
12  answer the questions that the attorneys have for you?
13      A.  No, sir.
14      Q.  Are you taking any medications or drugs that
15  would affect your memory or ability to participate in
16  the deposition?
17      A.  No, sir.
18      Q.  Are you under the influence of any drug or
19  alcohol or any other substance?
20      A.  No, sir.
21      Q.  Do you understand that you are obligated to
22  answer all my questions truthfully and that you have
23  taken an oath and sworn to do so today?
24      A.  Yes, sir.

---

Page 10

1       Q.  Just as if you were testifying at trial before
2   a judge and jury.
3       A.  Yes, sir.
4       Q.  And you understand that, if you don't answer
5   these questions truthfully, and that's proven to be the
6   case at some point, that there would be consequences
7   for your lying under oath?
8       A.  Yes, sir.
9       Q.  Are you familiar with the term perjury?
10      A.  Yes, sir.
11      Q.  Do you know that under Pennsylvania statute, a
12  person is guilty of perjury, which is a felony of the
13  third degree, if he makes a false statement under oath
14  or swears or affirms the truth of a statement
15  previously made when the statement is material and he
16  does not believe it to be true?
17           Do you understand that?
18      A.  Yes, sir.
19      Q.  So, there would be consequences if you don't
20  know the truth in this deposition.
21      A.  Yes, sir.
22      Q.  If you need to take a break for any reason
23  during the deposition, just ask us. I'm not sure what
24  the procedure is if you have to take a bathroom break

---

Page 11

1   or whatever, but we can call out and you will be
2   allowed to do that.
3       A.  Okay.
4       Q.  Do you understand those instructions?
5       A.  Yes, sir.
6       Q.  Let me get some background information about
7   you first. Let's talk about your educational
8   background. Can you just run through that
9   chronologically for me, please, starting with high
10  school graduation?
11      A.  I graduated from Faith Christian Academy in
12  1995 and graduated from Clearwater Christian College in
13  2003.
14      Q.  Where is that?
15      A.  In Clearwater, Florida.
16      Q.  And what did you major in in college?
17      A.  General studies education.
18      Q.  You got a BA degree?
19      A.  Yes, sir.
20      Q.  Do you play baseball in college?
21      A.  Yes, sir.
22      Q.  Four years?
23      A.  Three years.
24      Q.  You had some kind of leg injury or something

---

Page 12

1   that prevented you from playing the fourth year?
2       A.  I had a knee injury that did not completely
3   prevent me from playing, but I just decided it was
4   better not to.
5       Q.  What year was that, your third year or fourth
6   year? The injury.
7       A.  I played my freshman, sophomore and junior
8   year, not my senior year.
9       Q.  Do you have any other formal education or
10  vocational training of any type?
11      A.  No, sir.
12      Q.  Construction trades, anything like that?
13      A.  No, sir.
14      Q.  When you were growing up, were you a victim of
15  sexual abuse other harassment or exploitation?
16      A.  No, sir.
17      Q.  Has any family member been a victim of sexual
18  harassment, abuse or exploitation?
19      A.  Yes, sir.
20      Q.  Who was that?
21      A.  My sister.
22      Q.  Your sister Kelly?
23      A.  Yes, sir.
24      Q.  Did that take place at -- I'm going to call

---

3 (Pages 9 to 12)

Appendix 0227

Eric Romig                          Nace vs. Pennridge School District
                        May 4, 2015

---

**Page 13**

1   Faith Christian Academy FCA, just to shorten it a
2   little bit.
3       A.   Yes, sir.
4       Q.   (Continuing) -- did that happen while was a
5   student at Faith Christian Academy?
6       A.   Yes, sir.
7       Q.   What grade was she?
8       A.   I do not know all the details of when it
9   occurred or when it did not occur. I just know that it
10  occurred while she was a student at FCA.
11      Q.   You were born in what year?
12      A.   1977.
13      Q.   What year was she born?
14      A.   1978.
15      Q.   So, she was a year younger than you.
16      A.   Yes, sir.
17      Q.   So, you were at Faith Christian Academy with
18  her at the time that this occurred.
19      A.   I do not know when it occurred. I don't know
20  what year, if it occurred over a short period of time,
21  a long period of time. I've never been given the
22  details. I don't know.
23      Q.   Was it something, to your understanding, that
24  was not reported by her immediately after it happened?

---

**Page 14**

1       A.   I don't know that as well.
2       Q.   And what was the nature of the sexual abuse or
3   harassment or exploitation that she was subjected to?
4       A.   I do not know.
5       Q.   Who was the perpetrator?
6       A.   John Longacre.
7       Q.   Jr.? Do you know if he's a junior?
8       A.   I do not know.
9       Q.   And at the time when the sexual abuse or
10  whatever it was took place, was he a teacher at FCA?
11      A.   Yes, sir.
12      Q.   What did he teach?
13      A.   I believe he taught some -- what I would term
14  odds-and-ends classes. I believe maybe accounting; I
15  believe a basic computer class.
16      Q.   Did you ever have him as a teacher?
17      A.   Yes, sir.
18      Q.   What did he teach you?
19      A.   Accounting and basic -- the computer class.
20      Q.   Was he charged with some kind of crime in
21  connection with behavior with your sister?
22      A.   Yes, sir.
23      Q.   What was the result of that?
24      A.   I believe he got -- I know he got jail time,

---

**Page 15**

1   but it was a county sentence.
2       Q.   Meaning he was at county prison, not state
3   prison?
4       A.   Yes, he never went to state prison.
5       Q.   Do you know how long the sentence was?
6       A.   If I remember correctly, it was eleven and
7   half to twenty-three months.
8       Q.   And do you know what he was charged with?
9       A.   I do not.
10      Q.   Do you know if he was charged with rape?
11      A.   I would assume not, by his sentence.
12      Q.   Did you go to the trial at all?
13      A.   I went to sentencing. For all the other
14  things, I was in college at that time in Florida.
15      Q.   Do you know whether or not there was an actual
16  jury trial?
17      A.   I don't believe so.
18      Q.   Did he plead guilty to something?
19      A.   I believe so.
20      Q.   Was your sister at sentencing?
21      A.   Yes, sir.
22      Q.   Your parents were there?
23      A.   Yes, sir.
24      Q.   What was the impact on you, if any, of your

---

**Page 16**

1   sister being subjected to this crime by Mr. Longacre?
2   How did it impact you?
3       A.   Being I was in college at the time, I wasn't
4   home to see what the impact was. Are you talking about
5   just me personally?
6       Q.   Yes, just you personally.
7       A.   I was disappointed, surprised.
8       Q.   Disappointed and surprised at Mr. Longacre.
9       A.   Yes.
10      Q.   Let me go back to my question. Maybe I was
11  unclear with it: What was the impact on you
12  personally, if any? How did you take what happened to
13  your sister? How did it affect you emotionally or
14  physically or whatever, if at all?
15      A.   I just wanted to support my sister.
16      Q.   Did she ever talk about it with you?
17      A.   No, sir.
18      Q.   Do you know if what happened with her and Mr.
19  Longacre while he was an employee of FCA occurred while
20  on school property?
21      A.   I do not.
22      Q.   Do you know if whatever contact, physical
23  contact, they had on more than one occasion or just
24  one occasion?

---

brusilow.com          brusilow + associates          215.772.1717

Appendix 0228

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

Page 17

1      A.  I do not.
2      Q.  To this day you have not talked to your
3   sister --
4      A.  I was never told any details, nor did they
5   want to talk about it.
6      Q.  Have you ever had any contact with Mr.
7   Longacre after the sentencing hearing?
8      A.  No, sir.
9      Q.  Did you speak at the sentencing hearing?
10     A.  No, sir.
11     Q.  Do you remember how old you were,
12  approximately?
13     A.  Approximately?
14     Q.  Yes.
15     A.  Twenty.
16     Q.  What county was that?
17     A.  Bucks.
18     Q.  In the sentencing hearing did it come out in
19  court, either from the DA or from the judge or
20  whatever, that Mr. Longacre had engaged in any other
21  sexual misconduct anywhere else or at any other time?
22     A.  Not that I'm aware of.
23     Q.  Other than your sister's victimization by Mr.
24  Longacre, was any other member of your family ever

Page 18

1   subjected to any type of sexual abuse or harassment or
2   exploitation?
3      A.  No, sir.
4      Q.  Your sister was at your sentencing, too,
5   wasn't she?
6      A.  Yes, sir.
7      Q.  Did you ever give her any details of your
8   behavior or contact with Elizabeth Nace?
9      A.  No, sir.
10     Q.  You never spoke to her with any details at
11  all?
12     A.  No, sir.
13     Q.  She never asked you any questions?
14     A.  No, sir.
15     Q.  Let's talk a little bit about your employment
16  history.  Again, can you take us through your
17  employment history starting with your graduation from
18  college?  You were twenty-one when you graduated from
19  college?
20     A.  From college?
21     Q.  Yes.
22     A.  I was twenty-one, yes, sir.
23     Q.  Up until the time that you were employed by
24  Pennridge as a coach, if you can just remember the

Page 19

1   types of jobs you had, the number of years you spent
2   there and what kind of work you did, including, by the
3   way, coaching positions.
4      A.  Okay.  Outside of coaching I worked for R&R
5   Service Group in Doylestown.
6      Q.  What years?  Do you know?
7      A.  From 2003 to 200 -- until my arrest.
8      Q.  That would be October 1st, 2013?
9      A.  2013, yes.
10     Q.  And what did you do for them?
11     A.  I was a manager.
12     Q.  What kind of business is that?
13     A.  Gasoline, oil, as well as auto mechanic.
14     Q.  Is that business owned by some family member
15  or relative or something like that?
16     A.  No, sir.
17     Q.  Where was that located?
18     A.  At 290 West State Street in Doylestown.
19     Q.  Did you ever hear of a company called Ewing
20  Oil?
21     A.  Yes, sir.
22     Q.  What's Ewing Oil?
23     A.  Ewing Oil was the provider of gasoline for the
24  R&R Service Group.

Page 20

1      Q.  Any other regular or full-time employment --
2   let's just say other than the coaching positions --
3   other than R&R Service Group?
4      A.  No, sir.
5      Q.  Did you ever have any problems on that job
6   with regard to your conduct or behavior toward any
7   female employees?
8      A.  No, sir.
9      Q.  No complaints, no accusations, no allegations
10  about any sexual misconduct or any other inappropriate
11  behavior or activity by you toward a woman employee?
12     A.  No, sir.
13     Q.  Were there any woman employees there?
14     A.  Yes, sir.
15     Q.  Did you ever hold a position anywhere as a
16  teacher?
17     A.  No, sir.
18     Q.  Never taught a course, either voluntarily or
19  for compensation?
20     A.  No, sir.
21     Q.  Let's talk about your coaching career, as it
22  were.
23         When did you begin coaching?  Any type of
24  coaching, at any level, for any type of educational

                                    5 (Pages 17 to 20)

Eric Romig                          Nace vs. Pennridge School District
                          May 4, 2015

<table>
<tr><td colspan="2">

**Page 21**

1  institution or religious institution or what have you.
2      A.  2005 to -- I'm sorry.
3      Q.  Go ahead.
4      A.  2009 or '10, I believe, at FCA.
5      Q.  Coaching what?
6      A.  High school girls basketball.
7      Q.  That was continuous?
8      A.  Yes, sir.
9      Q.  And when was that season?  What's the length
10  of the season, from what month to what month?
11      A.  November to February.
12      Q.  In the school year 2008/2009, 2009/2010, were
13  there assistant coaches for that team?
14      A.  Yes, sir.
15      Q.  Was one of them Robin Landis?
16      A.  Yes, sir: Robin Landis.
17              MS SOMMER:  Who was it?
18              MR. GROTH:  Robin Landis, L-a-n-d-i-s.
19  BY MR. GROTH:
20      Q.  You had another assistant coach, Marc Hoover?
21      A.  Yes.
22      Q.  Were they both teachers at FCA, or were they
23  just coaches?
24      A.  Just coaches.

</td></tr>
</table>

**Page 23**

1  coaching at Quakertown?
2      A.  No, sir.
3      Q.  When you were coaching at Quakertown, did you
4  know a female student named Alicia Hughes?
5      A.  Yes.
6      Q.  How did you know her?
7      A.  She was a player of mine for, I believe, one
8  or two years.
9      Q.  Was she one of the best players on the team?
10      A.  One of the.
11      Q.  How would you characterize your relationship
12  with her during those one or two years that she was a
13  player under your coaching?
14      A.  Just like any other player.
15      Q.  Other coaching positions, male or female.
16      A.  I was at Faith Christian Academy High School,
17  boys baseball coach.
18      Q.  What years?
19      A.  Oh, boy.  2003/20004, I believe.
20      Q.  Any other coaching experience other than
21  Pennridge.
22      A.  Other than Pennridge? No, sir.
23      Q.  Is there a reason why you only coached boys
24  baseball for 2003/2004 at FCA?

**Page 22**

1      Q.  Any other assistant coaches during that period
2  of time, 2008 through the end of 2009?
3      A.  I don't believe so.
4      Q.  Other coaching positions.
5      A.  Outside of Faith Christian Academy?
6      Q.  I want all of them, wherever you were made a
7  coach.
8      A.  Quakertown High School, I believe 2008 and
9  2009.
10      Q.  Coaching what?
11      A.  High school girls softball.
12      Q.  Have you ever coached anything other than
13  basketball and softball?
14      A.  No, sir.
15      Q.  Anything other than girls teams?
16      A.  Yes, sir. I coached --
17      Q.  Do you know what? Hold on with that for one
18  second.  Let's finish Quakertown and we'll get to that.
19      A.  Okay.
20      Q.  Was it at Quakertown where you did boys
21  coaching?
22      A.  No, sir.
23      Q.  Let's finish with Quakertown.  You were there
24  in 2008/2009, coaching girls softball.  Any other

**Page 24**

1      A.  The reason I left as a boys baseball coach, I
2  was assistant coach at first with the gentleman who was
3  the head coach, and that was the reason I took the job,
4  to coach with him.  And then when he left or retired
5  from that position, I stayed on one more year at the
6  request of the players.
7      Q.  Who was the head coach?
8      A.  The first year I was there?
9      Q.  Yes.
10      A.  Tim Kuhn.
11      Q.  Over the years have you applied for coaching
12  positions at other schools, positions that you didn't
13  get or there weren't openings or whatever?
14      A.  I believe I put a request in in 2013 to
15  Souderton High School.
16      Q.  When you say put a request in, is that making
17  an application or a feeler, like an email --
18      A.  Like a feeler.  I believe it was an email to
19  the athletic director.
20      Q.  For what position?
21      A.  The softball coach.
22      Q.  Girls softball.
23      A.  Yes, sir.
24      Q.  And what happened to that?

6  (Pages 21 to 24)

Eric Romig                          Nace vs. Pennridge School District
                          May 4, 2015

| Page 25 | Page 27 |
|---|---|

**Page 25**

1    A.  I never heard back from them.  It was
2  literally within the month of my arrest.
3    Q.  You say within a month of your arrest.  You're
4  talking about sometime in September of 2013?
5    A.  September of 2013.
6    Q.  At that time you were coaching the woman's
7  softball team -- girls softball team at Pennridge,
8  correct?
9    A.  I was technically still with them, yes.
10    Q.  What do you mean by "technically"?
11    A.  At the end of every year I was free to decide
12  whether I would return or not or to pursue another
13  interest.
14    Q.  Was it your intention to return to Pennridge
15  in September of 2013?
16    A.  I was unsure.
17    Q.  Why was that?
18    A.  Just looking for something better because I
19  was only a junior varsity coach.
20    Q.  Let's talk about Pennridge.
21    A.  Yes, sir.
22    Q.  When did you apply for a position with
23  Pennridge?
24    A.  I did not apply.  They contacted me.

**Page 26**

1    Q.  Who contacted you?
2    A.  David Babb.
3    Q.  Did you know David Babb before he contacted
4  you?
5    A.  Yes.
6    Q.  How did you know him?
7    A.  He was the athletic director at Quakertown at
8  the time I was a coach at Quakertown.
9    Q.  Did he hire you at Quakertown?
10    A.  Yes, sir.
11    Q.  While you were at Quakertown -- and you were
12  only there for two seasons?
13    A.  Yes, sir.
14    Q.  (Continuing) -- was there an athletic director
15  there named Sylvia Kalazs?
16    A.  Yes, sir.
17    Q.  Was she after Babb or before Babb, or what?
18    A.  After.
19    Q.  And where did Babb go after -- I'm sorry.  Did
20  Babb leave before Kalazs was hired as athletic
21  director?
22    A.  Yes, sir.
23    Q.  And what position did he leave to go to?
24    A.  The athletic director at Pennridge.

**Page 27**

1    Q.  So, for a period of time you were also a coach
2  under Sylvia Kalazs?
3    A.  No, sir.
4    Q.  That was after you finished coaching?
5    A.  Yes, sir.  The year that David Babb left I
6  stepped down as softball coach.  I only met Sylvia
7  Kalazs one time.
8    Q.  So, you were never a coach while she was
9  athletic director?
10    A.  No, sir.
11    Q.  Was she at Quakertown while Babb was at
12  Quakertown in some other capacity, teacher or something
13  else?
14    A.  I don't believe so.  I believe she was retired.
15  She came out of retirement to take the position.
16    Q.  All right.  You said you knew David Babb from
17  his time as athletic director at Quakertown.  How well
18  did you know him?  Did you know him as anything other
19  than as a coach who was hired by him and played for
20  him?
21    A.  No, sir.
22    Q.  Did you know him socially?
23    A.  No, sir.
24    Q.  Go to your church?

**Page 28**

1    A.  No, sir.
2    Q.  Did you ever meet him at any conferences, any
3  PIAA events or anything like that?
4    A.  No, sir.
5    Q.  You never met him before he hired you for
6  Quakertown.
7    A.  No, sir.
8    Q.  When did you first get contacted by David Babb
9  as athletic director of Pennridge to ask you about
10  coaching for Pennridge?
11    A.  I believe it was the summer of 2011.
12    Q.  And what were you doing at that time?  Were you
13  coaching at all somewhere?
14    A.  No, sir.
15    Q.  How did he contact you?
16    A.  Through email.
17    Q.  What did he tell you?
18    A.  That there was a position open at Pennridge
19  that he thought I would be interested in, that the
20  school could really use me to fill that position.
21    Q.  That would be the girls JV softball team?
22    A.  Yes, sir.
23    Q.  Did you eventually meet with him about the
24  position?

Appendix 0231

Eric Romig                                    Nace vs. Pennridge School District
                          May 4, 2015

Page 29

1        A.   He had not -- he contacted me a couple of
2    times and had the varsity coach from Pennridge contact
3    me a couple times through phone and email to take the
4    position.
5        I told him that I would show up at the school
6    to meet with the other coaches and then I needed some
7    time to decide whether I wanted to take the position or
8    not, so I never met with David Babb himself, no.
9        Q.   And was this position for the fall of 2011?
10   This would be the 2011/2012 academic year?
11       A.   Yes, sir.
12       Q.   You did talk to David Babb by telephone?
13       A.   Yes, sir.
14       Q.   And you communicated by email, also?
15       A.   Yes, sir.
16       Q.   Did he ask you anything about your coaching
17   experience after leaving Quakertown?
18       A.   No, sir.
19       Q.   At Quakertown you were coaching basketball,
20   right?
21       A.   Quakertown?
22       Q.   Yes.
23       A.   Softball.
24       Q.   I'm sorry, softball.  And you only worked for

Page 30

1    him for a year or so at Quakertown, correct?
2        A.   Two years.
3        Q.   Okay.
4        A.   Two summers.
5        Q.   Two summers?
6        A.   Well, the spring of '08 and spring of '09.  I
7    was hired the very beginning of 2008, right before the
8    season started.
9        Q.   And the season lasted January through May?
10       A.   No, sir.  It was March through May.
11       Q.   March through May.
12       A.   Yes, sir.
13       Q.   There is no training or indoor drills or
14   anything in the winter?
15       A.   No, because I was coaching at Faith
16   Christian Academy at the same time, so I didn't have
17   the time or the ability to do both.
18       Q.   Did you fill out an employment application for
19   the job at Pennridge?
20       A.   I don't believe so.
21       Q.   Do you know if they did any background checks
22   on you?
23       A.   Yes, sir.
24       Q.   What did they do?

Page 31

1        A.   There were two background checks they ran.
2    I'm not quite sure what the name of them are, but one
3    was basically a criminal history and one was, I
4    believe, something to do with child-abuse history maybe
5    or something.
6        Q.   I think I asked you this a little earlier.
7    When you talked to David Babb about your potentially
8    taking this position at Pennridge, did you talk to him
9    about your coaching experience at FCA?
10       A.   I do not know.
11       Q.   Do you know if he knew that you were coaching
12   at FCA?
13       A.   I do not know that.
14       Q.   You were coaching at the same time at FCA as
15   you were coaching at Quakertown, correct?
16       A.   Yes, sir.
17       Q.   He didn't know that when he was athletic
18   director at Quakertown?
19       A.   I don't believe so.
20       Q.   Did Mr. Babb or the varsity coach, who was --
21   who? What's the name of the varsity coach?
22       A.   At Pennridge?
23       Q.   Yes.
24       A.   Paul Koehler.

Page 32

1        Q.   Is he still the varsity coach there?
2        A.   I do not know.
3        Q.   Do you know whether or not, from talking to
4    Mr. Babb or Mr. Koehler, they intended to speak to
5    anybody at your former coaching positions or
6    institutions to talk about your employment history at
7    those places?  Did they say they were going to do that?
8        A.   Well, the only one in question would be FCA
9    because David Babb was at Quakertown at that time, so
10   he was there.  So, I do not know if they had any
11   contacts with FCA or not.
12       Q.   Did you tell him to contact FCA about your
13   coaching experience at FCA?
14       A.   No, sir.
15       Q.   Did you tell Babb or Koehler to check with
16   them?
17       A.   No, sir.
18       Q.   Did you eventually take the position with the
19   JV girls softball team starting in the fall of 2011?
20       A.   I took the position in the winter of 2012.
21       Q.   What month?
22       A.   February.
23       Q.   Again, was there a formal application that you
24   made or a written application?

brusilow.com              brusilow + associates              215.772.1717

Appendix 0232

Eric Romig

Nace vs. Pennridge School District
May 4, 2015

Page 33

1    A. I don't know.
2    Q. You had done applications before in other
3 coaching positions, right?
4    A. Yes, sir.
5    Q. You did it in Quakertown?
6    A. And FCA.
7    Q. So, you're familiar with the process.
8    A. Absolutely.
9    Q. Pennridge didn't submit one to you to fill
10 out?
11    A. I believe the only paperwork I had to fill out
12 was to do the background checks.
13    Q. To authorize background checks.
14    A. Yes, sir.
15    Q. Do you know whether or not at that time, in
16 February of 2012, it was Pennridge's policy -- written
17 policy, school policy -- to check with former employers
18 of their potential employees to get information about
19 their employment history and background?
20    A. I do not.
21    Q. You had mentioned these criminal checks and
22 the child-abuse checks. Have you ever been charged
23 with a crime other than what we're talking about today?
24    A. No, sir.

Page 34

1    Q. With Elizabeth Nace.
2    A. No, sir.
3    Q. Never been charged with a crime?
4    A. No, sir.
5    Q. Ever been arrested?
6    A. No, sir.
7    Q. Did you sign a contract with Pennridge in
8 February of 2012?
9    A. Yes, sir.
10    Q. A written contract.
11    A. Yes, sir.
12    Q. Do you have a copy of it?
13    A. No, sir.
14    Q. I don't mean on you right now, but did you
15 keep a copy of it yourself?
16    A. No, sir, I never was given one.
17    Q. What was the term of the contract? Was there a
18 term on the contract, starting at a certain date and
19 ending on a certain date?
20    A. The agreement was the start of the season,
21 which was always in or around March 1st, to the last
22 day that my season ended. That was the agreement of me
23 taking the job because I did not want to do it all year
24 round.

Page 35

1    Q. Why not?
2    A. Because I didn't want the time commitment that
3 I had at previous coaching positions. I was reluctant
4 to take the job in the first place.
5    Q. Now, your season could run through the end of
6 May, the playoffs?
7    A. There are no playoffs in JV.
8    Q. There are playoffs with the varsity team,
9 correct?
10    A. Yes.
11    Q. At some point in the season Elizabeth Nace was
12 moved up to the varsity team to play in the playoffs,
13 correct?
14    A. In 2013, yes.
15    Q. Not 2012.
16    A. No, sir.
17    Q. Okay. But with the playoffs with the varsity
18 team -- you were the JV coach. Did you coach the
19 varsity team, or you were the assistant coach of the
20 varsity team?
21    A. No, sir.
22    Q. In 2012?
23    A. No, sir.
24    Q. What about 2013?

Page 36

1    A. No.
2    Q. Do you know if Elizabeth Nace was moved up to
3 play with the varsity team in the playoffs in 2013?
4    A. Yes, sir.
5    Q. So, she would have been playing for Coach
6 Koehler.
7    A. Yes, sir, after our season ended.
8    Q. Did you participate in those playoffs at all
9 in any way?
10    A. At the games, yes.
11    Q. What did you do?
12    A. I was just on the bench.
13    Q. You weren't up in the stands. You were
14 sitting on the bench with the team?
15    A. Yes, sir.
16    Q. Is there a dugout or just a bench?
17    A. The dugout.
18    Q. So, if Liz Nace was playing on the varsity
19 team in 2013 and that team went to the playoffs, that
20 could stretch out the season until the end of May?
21    A. Possibly.
22    Q. Did you sign another contract with Pennridge
23 after the one that started on March 1, 2013?
24    A. I never -- the contract for the season 2013, I

9 (Pages 33 to 36)

Appendix 0233

Eric Romig                          Nace vs. Pennridge School District
                        May 4, 2015

Page 37

1   never signed the contract itself. I had the varsity
2   coach, Paul Koehler, sign it for me because of my work
3   commitment.
4       Q.   You mean he signed your name to it?
5       A.   Yes, sir.
6       Q.   You authorized him to sign your name to it?
7       A.   Yes, sir.
8       Q.   Okay.
9       A.   Because I couldn't make it to the school.
10      Q.   Why is that?
11      A.   They needed it by a certain deadline, and I
12  was working so much overtime during my regular job that
13  I could never make it during my school hours.
14      Q.   Same contract otherwise?
15      A.   I believe so.
16      Q.   Were there any terms that were any different?
17      A.   I never saw the contract.
18      Q.   Never had a copy of it after he signed your
19  name to it?
20      A.   Never had a copy of it, either year.
21      Q.   When you signed your first contract with
22  Pennridge in November of 2012, starting as of March
23  1st, 2012, did you receive any other documents from
24  Pennridge other than a written contract to sign?

Page 38

1       A.   I signed the contract at the school itself. I
2   never received any paperwork.
3       Q.   And I'm not talking about the contract itself.
4   We just talked about the contract. I'm talking about any
5   documents, like handbooks, coaching guidelines, rules
6   and regulations for coaches, rules and regulations for
7   students, sexual-harassment policy, drug-free policy,
8   anything like that at all.
9       A.   I don't believe so.
10      Q.   You had gotten those types of documents at
11  other places you worked, correct?
12      A.   Yes, sir.
13      Q.   Where did you get them?
14      A.   Quakertown and Faith Christian Academy.
15      Q.   And did they give you those documents upon
16  your start of employment for them as coach?
17      A.   Yes.
18      Q.   Did you have to sign some kind of form to
19  acknowledge that you received these documents from
20  them?
21      A.   I believe there were other documents I had to
22  sign.
23      Q.   And at Quakertown it included both a drug-free
24  policy and a sexual harassment or abuse policy?

Page 39

1       A.   I believe so.
2       Q.   What about FCA?
3       A.   I believe I received the same paperwork.
4       Q.   Similar subject matter, that type of thing?
5       A.   Similar subject matter.
6       Q.   On sexual harassment or abuse and drug-free,
7   that type of thing?
8       A.   Yes, sir, and what was required of the coach.
9       Q.   What was the title of that document at FCA,
10  the one that tells you what you're supposed to be doing
11  or not doing as a coach? Did it have a heading or name
12  or title?
13      A.   I do not recall. It was a long time ago.
14      Q.   Was it just for coaching as opposed to
15  teachers or staff employees or administrators?
16      A.   I do not know.
17      Q.   Would it be more like an employee handbook, an
18  employee of FCA, rather than just specifically
19  something to a coach?
20      A.   I don't believe so. I believe it was
21  individual papers. They may have been coach-specific,
22  but I cannot say for sure.
23      Q.   Did you keep them?
24      A.   Currently?

Page 40

1       Q.   Yes. Did you keep them after you received
2   them from FCA? Did you throw them in the trash? Did you
3   keep them at your house?
4       A.   I kept them until I was done coaching there.
5       Q.   Did you read them?
6       A.   Yes.
7       Q.   What did it say about their policy, FCA's
8   policy, on sexual harassment or discrimination or
9   abuse?
10      A.   I do not recall the specifics.
11      Q.   What about with regard to any drug policy that
12  FCA had? Do you recall any specifics on that?
13      A.   Just that there was a zero tolerance for any
14  drug use or anything like that.
15      Q.   What about in the coach's handout and
16  whatever? Do you remember any of the details specific
17  to those written handouts?
18      A.   I do not. The only one I remember is what
19  their requirements were, which is basically that you
20  had the experience or the knowledge of sport and
21  basically were qualified for the job.
22      Q.   At either Pennridge or FCA, aside from
23  whatever documents you got at FCA about sexual
24  harassment or drug policy or coach handbook or whatever

                                10 (Pages 37 to 40)

                                            Appendix 0234

Eric Romig                                    Nace vs. Pennridge School District
                                        May 4, 2015

Page 41

1  you want to call it, did you ever receive any type of
2  training -- I mean actually sitting in a room with
3  somebody and having them explain to you policies about
4  sexual harassment or abuse?
5      A.  No, sir.  The paperwork that was given was
6  pretty self-explanatory, what's right and what's wrong.
7      Q.  But you can't remember any of the details of
8  that.
9      A.  I don't remember the exact word-for-word
10 details, but it was laid out specifically what you
11 should and shouldn't do.
12     Q.  What did that include, what you should or
13 shouldn't do?
14     A.  No physical contact and just, you know,
15 maintain a proper standing with the parents and the
16 players.
17     Q.  Was there anything in FCA's rules or policies
18 regarding texting of students or players?
19     A.  No, sir.
20     Q.  Again, you never remember getting any such
21 rules or regulations or policies from Pennridge at all,
22 correct?  So, I can't ask you anything about what might
23 have been in their policies?
24     A.  Not that I recall.  I'm not saying they did or

Page 42

1  they didn't.  I just do not recall.
2      Q.  Do you recall signing any authorization with
3  Pennridge acknowledging receipt of any policies or
4  procedures or rules regarding sexual harassment or
5  abuse?
6      A.  I know for a fact I did not in 2013.  I can't
7  say for 2012.  Maybe there was a carryover from year to
8  year.  I don't know what the policy is.
9      Q.  But you have no recollection of receiving it
10 in 2012, either, correct?
11     A.  No, sir.
12     Q.  Let's talk about training on sexual-harassment
13 policies and practices at Pennridge.
14         Did you ever receive any training from any
15 administrator, faculty member, outside consultant that
16 they brought in to tell you this is what you're allowed
17 to do, this is what you're not allowed to do?
18     A.  No, sir.
19     Q.  Did you ever receive any training at Pennridge
20 or FCA regarding your obligation, legal or otherwise,
21 to report any instances of child sexual abuse or
22 harassment or misconduct that you personally suspected
23 or observed?
24         Do you understand the question?

Page 43

1      A.  No, sir.
2      Q.  Did you have any understanding when you were
3  working either at FCA or Pennridge that you had any
4  obligation, legal or otherwise, to report any suspected
5  incidents or events of sexual harassment or abuse that
6  you yourself observed or suspected?
7      A.  Yes, sir.
8      Q.  How did you get that training, and where?
9      A.  At FCA I believe it was in the paperwork.
10     Q.  Okay.
11     A.  The paper that I read.  I can't say for sure
12 at Pennridge.  I received the same thing, but with my
13 coaching history, I assume that it carries from school
14 to school.
15     Q.  You said you received the same thing.
16     A.  The paperwork?
17     Q.  At Pennridge.
18     A.  The paperwork?
19     Q.  Yes.  I thought you just said earlier that you
20 didn't recall getting any paperwork.
21     A.  I don't recall getting any paperwork at
22 Pennridge, but I believe the paperwork I got from FCA,
23 which I figure carried through. . .
24     Q.  So, you think at FCA -- and I should probably

Page 44

1  do this one at a time, but you think at FCA they
2  actually did provide some written explanation of your
3  obligations to report suspected child abuse or sexual
4  abuse, or whatever, as part of their policies and
5  practices and rules and regulations, correct?
6      A.  Yes, sir, but you had to sign and date them at
7  the bottom as well.
8      Q.  But you don't have any recollection of
9  receiving that type material, written material, or
10 signing any acknowledgment for those materials at
11 Pennridge, correct?
12     A.  I cannot say yes or no.
13     Q.  Okay.
14     A.  And then I went into actual personal training
15 on the issue.
16     Q.  At FCA was there any personal training of you
17 by an administrator or faculty member or a consultant
18 about a sexual-harassment policy or sexual-abuse
19 policy?
20     A.  I never received that at any schools.
21     Q.  At any school, including Pennridge.
22     A.  All of them.
23     Q.  Was it your understanding while you were a
24 coach at FCA and a coach at Pennridge that you had a

11  (Pages 41 to 44)

Appendix 0235

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

<table>
<tr><td>

**Page 45**

1  legal obligation -- and by legal, by law -- that there
2  was a law that said that you, as an employee of the
3  school, had a legal obligation to report suspected
4  child abuse or sexual exploitation to some
5  administrator at the school?
6      A.  If I witnessed any, yes.
7      Q.  If you witnessed or suspected it.  Whether you
8  witnessed it or not, even if you suspected it.
9      A.  I don't know.  I can't say for sure.
10     Q.  You can't say whether that was your
11  understanding about -- I'm not asking you if that's
12  true or false.
13         I'm asking you was it your understanding back
14  at FCA as a coach and at Pennridge as a coach that you
15  had some legal obligation to report such behavior if
16  you suspected it was taking place.
17     A.  Legally, no, but if there was, you know, I
18  would.
19     Q.  Let me just make sure I understand that.  Is
20  it your testimony that you did not understand when you
21  worked for FCA and Pennridge as the coach that you had
22  a legal obligation to report any suspected child abuse
23  to a school administrator?
24     A.  No.

</td><td>

**Page 47**

1  she was, I believe, a freshman at the time, in the
2  spring of 2012.
3      Q.  Did you meet her in the spring of 2012?
4      A.  Yes, sir.
5      Q.  How did you meet her?
6      A.  Through the tryouts for that particular
7  season, for the 2012 season.
8      Q.  I'm sorry, did you say spring 2012?
9      A.  Yes, sir.
10     Q.  You didn't know her before that, correct?
11     A.  No, sir.
12     Q.  So, the first contact you had with Elizabeth
13  Nace is when she tried out for the Pennridge girls JV
14  softball team that Pennridge made you the head coach
15  of.
16     A.  My first contact was the first day of tryouts
17  in 2012, yes, sir.
18     Q.  And you were the head coach at that time of
19  Pennridge.
20     A.  Of the junior varsity, yes, sir.
21     Q.  And you didn't have any contact with Elizabeth
22  Nace as coach or assistant coach -- you were assistant
23  coach of the Sellersville Belles.
24     A.  I was the head coach.

</td></tr>
<tr><td>

**Page 46**

1      Q.  Have you given me all of your coaching
2  positions?
3      A.  Yes.
4      Q.  What about the Sellersville Belles?
5      A.  Are you asking for the educational-institution
6  coaching jobs?  Sellersville Belles was recreation.
7      Q.  You term that as recreational?
8      A.  Yes, sir.
9      Q.  When did you coach the Sellersville Belles?
10     A.  August and September of 2013.
11     Q.  And then you were arrested October 1st, so
12  that ended that.
13     A.  Yes.
14     Q.  And Elizabeth Nace was on that team?
15     A.  Yes, sir.
16     Q.  And had been on that team for some time?
17     A.  For two months.
18     Q.  Had she just started on the team?
19     A.  Yes.
20     Q.  Would it be correct to say that the first
21  contact that you had with Elizabeth Nace was as an
22  employee of the Pennridge School District, coaching her
23  while she was on the JV girls softball team?
24     A.  She was not on any team at the time because

</td><td>

**Page 48**

1      Q.  You were the head coach of the Sellersville
2  Belles.
3      A.  Yes.
4      Q.  For those two months?
5      A.  Yes, sir.
6      Q.  You didn't have any contact with her in
7  connection with your capacity as head coach of the
8  Sellersville Belles until over a year later, after you
9  met her for tryouts for the spring of 2012 season at
10  Pennridge, correct?
11     A.  I don't understand the question.
12     Q.  Okay.  Whatever contact you had with Elizabeth
13  Nace as head coach of the Sellersville Belles didn't
14  take place until over a year after you were already the
15  head coach of the JV team at Pennridge, correct?
16     A.  Yes, sir.
17     Q.  Who did you replace as the head coach of the
18  Belles?
19     A.  There was none.  There was the second team,
20  and they only had one team the previous year.
21     Q.  There were two teams?
22     A.  Yes, sir.
23     Q.  And when they formulated the second team, you
24  became the head coach of the second team?

</td></tr>
</table>

12  (Pages 45 to 48)

Eric Romig                                Nace vs. Pennridge School District
                          May 4, 2015

Page 49

1    A.   Yes, sir.
2    Q.   Who was the head coach of the first time?
3    A.   Paul Koehler.
4    Q.   Same as the high school varsity head coach.
5    A.   Yes, sir.
6    Q.   Who hired you for the Belles position?
7    A.   Paul Koehler.
8    Q.   Was there any application?
9    A.   No, sir.
10   Q.   Was there any type of contract, oral or
11   otherwise, written?
12   A.   No, sir.
13   Q.   Was there any type of compensation?
14   A.   No, sir.
15   Q.   Strictly voluntary?
16   A.   Yes, sir.
17   Q.   Did you have to be approved by a board or
18   something like that, or did Koehler make the decision
19   himself.
20   A.   He is the board.
21   Q.   He is the board?
22   A.   As far as I know.
23   Q.   Now, other than this recreational team, did
24   you coach at any other recreational teams?

Page 50

1    A.   Back in 2004 I coached a year at the RASA, the
2    Quakertown travel team.
3    Q.   Coached what?
4    A.   Girls softball.
5    Q.   Head coach?
6    A.   Yes, sir.
7    Q.   Only for one year?
8    A.   One year.
9    Q.   Was that voluntary?
10   A.   Yes, sir.
11   Q.   And who hired you for that, David Babb?
12   A.   No, he had nothing to do with RASA.  I believe
13   it was a man named Paul Hetrick.
14   Q.   Any other recreational teams?
15   A.   No, sir.
16   Q.   I saw in some documents a reference to -- I
17   don't know if it was a league or a team, but I think it
18   was shorthand for something and I didn't understand it:
19   Strat, S-t-r-a-t?
20   A.   That's a fantasy baseball league.
21   Q.   How long have you been doing that?
22   A.   Up to my arrest.  Five years, maybe.
23   Q.   And what does Strat stand for?
24   A.   It's Strat-O-Matic.  It's a board game you

Page 51

1    play.
2    Q.   How many members are in this league?
3    A.   Including me?  Ten.
4    Q.   Were most of those members friends of yours?
5    A.   Yes, sir.
6    Q.   Were any of those members employees at FCA?
7    A.   Yes, sir.
8    Q.   Who?
9    A.   Russell Hollenbach, Marc Hoover and Dale Moe.
10   Q.   Who was he?
11   A.   He was a teacher at FCA.
12   Q.   Okay.
13   A.   Tim Weaver.
14   Q.   Who is he?
15   A.   He was a teacher at the time.
16   Q.   At FCA?
17   A.   Yes, sir.  I believe that's it.
18   Q.   Those are the only people from FCA?
19   A.   The school, yes, sir.
20   Q.   The other five or so members, are they from
21   other places other than FCA?
22   A.   Yes, sir -- not schools.
23   Q.   Not schools?
24   A.   Yes, sir.

Page 52

1    Q.   Just Pennridge friends of yours?
2    A.   Just friends, yes, sir.
3    Q.   Back in 2013 where did you live?
4    A.   Quakertown.
5    Q.   Address?
6    A.   1247 Fieldstone Court.
7    Q.   Who did you live there with in 2013?
8    A.   My wife and kids.
9    Q.   Stephanie?
10   A.   Yes, sir.
11   Q.   Chelsea?
12   A.   She was living in Colorado at the time.  She
13   was in veterinary school.
14   Q.   How many other kids?
15   A.   Three.
16   Q.   What are their names?
17   A.   Abbe, Chase, and Carson.
18   Q.   We had mentioned your leg issue that ended --
19   sort of ended your college baseball career.  Did you
20   have any other out-of-the-ordinary health issues any
21   time prior to October 1st, 2013?
22   A.   Yes, sir.
23   Q.   What was that?
24   A.   I had a heart ablation done in, I believe,

13 (Pages 49 to 52)

Eric Romig                              Nace vs. Pennridge School District
                              May 4, 2015

---

Page 53

1    September of 2009.
2        Q.  September 2009.
3        A.  I believe so.
4        Q.  Where was that done?
5        A.  Doylestown Hospital.
6        Q.  Did they use catheters to correct the
7    structural heart problem that you had that was causing
8    some kind of arrhythmia or something?
9        A.  Yes, sir.
10       Q.  Afterwards were you taking any type of
11   anticoagulants, coumadin of warfarin or anything like
12   that?
13       A.  No, sir.
14       Q.  Do you remember the exact date of your
15   procedure?
16       A.  I don't, no, sir.
17       Q.  Who was the doctor?
18       A.  Dr. Singh Sandraglo.
19       Q.  Can you spell it phonetically?
20       A.  S-a-n-d-r-a-g-l-o.
21       Q.  Do you know how long you had the heart
22   condition that led to that procedure?
23       A.  At least a few years.
24       Q.  Did that heart condition that you had before

Page 54

1    the procedure prevent you or restrict you or limit you
2    in any way from any of your work activities or your
3    coaching activities?
4        A.  No, sir, just caused me pain.
5        Q.  On a regular basis or intermittent basis?
6        A.  On a regular basis.
7        Q.  What kind of pain?
8        A.  Shortness of breath. My heart would beat real
9    fast and cause like temporary blackouts.
10       Q.  When you say "temporary," how temporary?
11       A.  Seconds.
12       Q.  Ever happen while you were at FCA?
13       A.  Yes, sir.
14       Q.  Where people saw it happen?
15       A.  They saw that I was having a problem, yes.
16       Q.  Who saw that you were having a problem?
17       A.  My assistant coaches.
18       Q.  Happened during softball practice or a game?
19       A.  Basketball at FCA.
20       Q.  And who were the coaches?
21       A.  Robin Landis and Marc Hoover.
22       Q.  When these events would occur, what would you
23   do?
24       A.  Just go off to the side. I had major

Page 55

1    headaches, shortness of breath, and just needed a few
2    seconds to gather myself.
3        Q.  Did you have any difficulty with your recovery
4    after this procedure in September of 2009?
5        A.  Yes.  There were times I still have the
6    irregular heartbeat and still experience headaches, and
7    at times shortness of breath.  It was triggered by the
8    stress.
9        Q.  What kind of stress?
10       A.  Could be physical from the job or. . .
11       Q.  Family?
12       A.  No, sir.
13       Q.  Money?
14       A.  Yes, sir.
15       Q.  Your relationship with players?
16       A.  No, sir.
17       Q.  Relationship with her parents?
18       A.  With my parents?
19       Q.  No, with the players' parents.
20       A.  No, sir.
21       Q.  Did Coach Landis and Coach Hoover know about
22   this condition that you had?
23       A.  No.
24       Q.  Did you tell them about your heart condition

Page 56

1    and the surgical procedure that you had?
2        A.  Not until I was diagnosed shortly before
3    surgery.
4        Q.  They knew about the surgery, though?
5        A.  Yes, sir.
6        Q.  In terms of your recovery, did you have to
7    take any medications or do anything special to promote
8    your recovery?
9        A.  Just rest.
10       Q.  Were you still able to work full time at R&R?
11       A.  Yes, sir.
12       Q.  Still able to carry out all of your coaching
13   obligations in 2009, both at Quakertown and FCA?
14       A.  After the heart -- after I had the heart
15   ablation done in 2009, I was no longer a coach at
16   Quakertown, only at FCA for a couple months.
17       Q.  And were you able to carry out all those
18   duties and responsibilities as coach for those few
19   months at FCA?
20       A.  Not as well as I would have liked, no.
21       Q.  But you didn't --
22       A.  I took breaks. We didn't practice as often as
23   we did in the previous years.
24       Q.  But you didn't miss any practices or games or

14  (Pages 53 to 56)

Appendix 0238

Eric Romig                              Nace vs. Pennridge School District
                        May 4, 2015

| | Page 57 |
|---|---|
| 1 | anything like that? |
| 2 | A. No, sir. Just kind of shortened up the work |
| 3 | load compared to previous years. |
| 4 | Q. You graduated from FCA, you said, in 1995. |
| 5 | Did you go to FCA from kindergarten through twelfth |
| 6 | grade? |
| 7 | A. Eleventh through twelfth grade. |
| 8 | Q. Was Ryan Clymer a classmate of yours? |
| 9 | A. Yes, sir. |
| 10 | Q. Was he in the same grade? |
| 11 | A. Yes, sir. |
| 12 | Q. He went with you the whole way, from first |
| 13 | through twelfth grade? |
| 14 | A. Yes, sir. |
| 15 | Q. Was he a personal friend of yours? |
| 16 | A. Yes. |
| 17 | Q. How good a friend? I mean, in terms of your |
| 18 | sphere of friends, was he your best friend or regular |
| 19 | friend or just an acquaintance, or what? |
| 20 | A. A friend, not a best friend. |
| 21 | Q. Do you know his family? |
| 22 | A. Yes, sir. |
| 23 | Q. Do you know his father? |
| 24 | A. Yes, sir. |

| | Page 58 |
|---|---|
| 1 | Q. Who was his father? |
| 2 | A. Bob Clymer. |
| 3 | Q. Is he connected with FCA in any way? |
| 4 | A. Currently? |
| 5 | Q. Yes, currently. Let's start with currently. |
| 6 | A. I don't know. |
| 7 | Q. What about back in the years where you were |
| 8 | going there as a student up through high school? |
| 9 | A. No, sir. |
| 10 | Q. Do you know if he founded the school? |
| 11 | A. No, sir. |
| 12 | Q. You don't know, or he didn't? |
| 13 | A. He did not. |
| 14 | Q. He did not. When your sister was a victim of |
| 15 | sexual abuse while at FCA, he would have been in his |
| 16 | college years as well, correct? |
| 17 | A. Yes, sir. |
| 18 | Q. Do you know if he went to college? |
| 19 | A. Yes. |
| 20 | Q. Where did he go? |
| 21 | A. Tennessee Temple University. |
| 22 | Q. Where is that? I know it's in Tennessee, but |
| 23 | where? |
| 24 | A. I don't know. |

| | Page 59 |
|---|---|
| 1 | Q. Is FCA related to some -- FCA, the school, |
| 2 | related to some church, affiliated with a church? |
| 3 | A. Currently? |
| 4 | Q. No, back when you were a student there. |
| 5 | A. Yes, sir. |
| 6 | Q. What was the church name? |
| 7 | A. Faith Baptist Church. |
| 8 | Q. Is it in the same location, same property? |
| 9 | A. Yes, sir. |
| 10 | Q. Were you a member of the church also? |
| 11 | A. Yes, sir. |
| 12 | Q. Ryan Clymer was a member of the church? |
| 13 | A. That I don't know. |
| 14 | Q. How about Russell Hollenbach? |
| 15 | A. Yes, sir. |
| 16 | Q. What about Robin Landis? |
| 17 | A. I believe she was. |
| 18 | Q. What about Marc Hoover? |
| 19 | A. No, sir. |
| 20 | Q. Have you ever been treated for a drinking or |
| 21 | drug problem? |
| 22 | A. No, sir. |
| 23 | Q. Have you ever had what you consider to be, |
| 24 | whether you were treated or not, a drinking or a drug |

| | Page 60 |
|---|---|
| 1 | problem? |
| 2 | A. No, sir. |
| 3 | Q. Why did you stop coaching at Quakertown? |
| 4 | A. Because of the physical issues I was having, |
| 5 | the same reason I stepped down from Quakertown and FCA |
| 6 | at the same time. |
| 7 | Q. All right. You submitted letters or emails or |
| 8 | whatever, a resignation, on the same day, correct? |
| 9 | A. Email. |
| 10 | Q. January 5th, 20. . . |
| 11 | A. '10, maybe? |
| 12 | Q. '10, okay. Was that the only reason you |
| 13 | stepped down from both places? |
| 14 | A. That was the reason that I stepped down from |
| 15 | Quakertown. |
| 16 | Q. And why did you step down from FCA? |
| 17 | A. Well, after the allegations that were in the |
| 18 | complaint were out and I had a meeting with Ryan Clymer |
| 19 | and Russ Hollenbach, they told me to -- after |
| 20 | discussing it with the one person mentioned in the |
| 21 | complaint and her parents and whatnot, they were trying |
| 22 | to figure out a solution to the problem because they |
| 23 | did an investigation for, I'd say, approximately two to |
| 24 | three weeks after they asked me if I would step aside |

                                    15 (Pages 57 to 60)

Eric Romig                                Nace vs. Pennridge School District
                                                      May 4, 2015

Page 61

1   for the rest of the season, and it was suggested to me
2   to come back the following season, which I declined
3   because it was just too much stress, caused me physical
4   problems.
5       Q.  Okay, we're going to break that down.  I asked
6   you both Quakertown and about resigning at Quakertown
7   and leaving FCA, but let's start with Quakertown first.
8       You said there was no other issue at
9   Quakertown other than your health considerations.  Is
10  that correct?
11      A.  No, sir.
12      Q.  Were there any problems that you had with
13  parents or students or players at Quakertown,
14  especially female players?
15      A.  No, sir.
16      Q.  No allegations or accusations or suspicions
17  about some inappropriate behavior between you and any
18  of the students at Quakertown?
19      A.  Not at all.  Any and all contact went through
20  my assistant coaches, who were female.
21      Q.  When you were at Quakertown, did you text or
22  email your players?
23      A.  Not at all.
24      Q.  Why not?

Page 62

1       A.  Because I set a policy in place that any and
2   all communication would go through the coaches.
3       Q.  Why did you do that?
4       A.  Because when I first got hired at the job they
5   already had one female assistant in place, and I
6   brought on another one who was a mother of one of the
7   girls on the team, and at our first coaches meeting we
8   decided that was best.
9       Q.  Did Quakertown have any written policy or
10  procedure or practice prohibiting texting or emailing
11  between coaches and players?
12      A.  Texting?
13      Q.  Texting or email.
14      A.  No.
15          MR. GROTH:  I'm going to mark a letter
16      dated April 1st, 2015 and a number of attached
17      documents as Romig Exhibit 2.
18          The letter, just for identification
19      purposes, is from Jeffrey Garton, an attorney for
20      the Quakertown Community School District, who was
21      responding to a subpoena that I issued to
22      Quakertown asking for the employment records and
23      personnel records for Eric Romig.
24          I've marked the whole packet of

Page 63

1   documents, which I think he sent to everyone --
2   Carla, you got those, right?
3           MS. CONNOR:  I did.
4           MR. GROTH:  I'm sorry.  He sent them to
5       me; I sent them to all counsel.  So, all counsel
6       had these documents already.
7           He responded to the subpoena by sending
8       me these documents, and I'm marking the entire
9       packet of documents that he sent to me.  I want to
10      go over a couple of documents with you.
11          THE WITNESS:  Sure.
12          (Exhibit Romig-2 was marked for
13      identification)
14  BY MR. GROTH:
15      Q.  Some of these I think you may have seen
16  because they were addressed to you.  I'm looking at a
17  letter from Nancianne Edwards, Director of Human
18  Resources, to Eric Romig dated November 12, 2009,
19  appointing Mr. Romig as head girls softball coach for
20  the senior high school for the 2009/2010 school year.
21  The rate of pay for this activity will be $3,198.01.
22      Do you recall seeing that letter?
23      A.  I believe so, yes.
24      Q.  Now, that is the year that you did not finish

Page 64

1   out, correct?
2       A.  Yes, sir.  I resigned from there, I believe,
3   two months later, approximately.
4       Q.  Two months after November 12th, 2009.
5       A.  Yes, sir.
6       Q.  And you resigned with an email to Sylvia
7   Kalazs dated January 5th, 2010, which is one of the
8   documents in Romig Exhibit 2.  Is that correct?  Is that
9   your email?
10      A.  Yes, sir.
11      Q.  So, at the time that you resigned, Ms. Kalazs
12  was the athletic director at Quakertown, correct?
13      A.  Yes, sir.
14      Q.  In this email you refer to this heart ablation
15  that you had done "a couple months ago" and that you
16  were going to go away from coaching for a while.  Is
17  that correct?
18      A.  Yes, sir.
19      Q.  You actually started there as head softball
20  coach at the senior high school for the 2007/2008
21  school year.  Is that correct?  As evidenced by a
22  letter to you from Nancianne Edwards dated March 28th,
23  2008.
24      A.  Yes, sir, signed in April 2008.

16  (Pages 61 to 64)

Appendix 0240