Eric Romig                                    Nace vs. Pennridge School District
                          May 4, 2015

**Page 65**

1    Q.  We had talked earlier about documents that you
2   may have received from Quakertown when you became a
3   coach there about a sexual-harassment policy or abuse
4   policy and drug-free policy or whatever.
5       There is a letter from Nancianne Edwards to
6   you dated March 28, 2008, in which she refers to "The
7   attached board policies and regulations distributed to
8   all employees." It says, "Please read this information.
9   Keep it in your file," and then behind that there are
10  two authorizations: One for the unlawful-harassment
11  policy, acknowledging receipt of that; and the other
12  one was for a drug-free-workplace policy, and there is
13  an acknowledgment of that.
14      Are those documents -- and I'll show you the
15  letter and the two documents. You can take a look at
16  those, if you like.
17      My question to you: Are those the documents
18  that you referred to earlier as the written documents
19  distributed to you by Quakertown when you became
20  employed there as a coach?
21      A.  Yes, sir.
22      Q.  And again, you don't recall receiving any
23  similar documents or policies or signing any similar
24  acknowledgements for your employment at Pennridge. Is

**Page 66**

1   that correct?
2       A.  I can't say.
3       Q.  Can't say either way?
4       A.  Either way.
5       Q.  Do you have even a general recollection of
6   getting similar documents from Pennridge and signing an
7   authorization for them?
8       A.  I don't.
9       Q.  When you left Quakertown on January 5th of
10  2010, did you tell your teammates why you were leaving?
11      A.  When I left Quakertown?
12      Q.  Yes.
13      A.  No, I don't believe so.
14      Q.  Did you give any farewell speech or tell them
15  you had a physical condition that was going to prevent
16  from you coaching?
17      A.  No.  As a matter of fact, one of my assistant
18  coaches believed that they just thought I didn't want
19  to coach at the school any more.
20      Q.  Is there some reason you didn't tell them?
21      A.  No.
22      Q.  I mean, your coaches knew about your health
23  condition, right?
24      A.  Yes, sir.

**Page 67**

1       Q.  And did you tell your coaches that you were
2   leaving as of January 5th, 2010 because of your health
3   condition?
4       A.  I believe I asked the one coach that was still
5   there to tell her I was not returning.
6       Q.  Who was?
7       A.  Beth Rice.
8       Q.  Rice?
9       A.  Yes, sir.
10      Q.  She still there?
11      A.  I do not know.
12      Q.  Was there some kind of season-ending banquet
13  or awards dinner or something for the softball team at
14  Quakertown, girls softball team?
15      A.  I don't believe.
16      Q.  When was the season? What was the duration of
17  the season at Quakertown?
18      A.  March to May.
19      Q.  So, you had not yet begun coaching that
20  season.
21      A.  What season?
22      Q.  The 2010 season, I guess.
23      A.  No, sir.
24      Q.  You had finished the 2009 season.

**Page 68**

1       A.  Yes, sir, in the spring of 2009.
2       Q.  Do you recall if there was an awards dinner or
3   banquet at the end of the 2009 season?
4       A.  I do not.
5       Q.  All right.  We just finished up with why you
6   left Quakertown and when you left Quakertown.  We
7   started talking about FCA and what happened when you
8   left FCA. Let's talk about your beginning at FCA
9   first.
10      You said that Ryan Clymer and Russ Hollenbach
11  hired you?
12      A.  No, sir.
13      Q.  Who hired you?
14      A.  I believe it was Bob Clymer and Russ
15  Hollenbach.
16      Q.  Maybe I misunderstood.  What position or
17  function did Bob Clymer play in the school at that
18  time?
19      A.  He was the principal, I believe, at the time I
20  was hired.
21      Q.  And that would have been 2005?
22      A.  I believe.
23      Q.  Was Russ Hollenbach there then?
24      A.  Yes.

17 (Pages 65 to 68)

Eric Romig                          Nace vs. Pennridge School District
                        May 4, 2015

Page 69

1    Q. Was he athletic director?
2    A. He was the athletic director, yes, sir.
3    Q. And you were hired as the basketball coach?
4    A. Yes, sir.
5    Q. Girls basketball coach.
6    A. Yes, sir.
7    Q. For what years did your stepdaughter, Chelsea,
8  attend FCA?
9    A. She's my daughter through adoption --
10   Q. I'm sorry --
11   A. -- and she attended FCA from sixth to twelfth
12 grade. The years I'd have to guess.
13   Q. She's in the same grade as Elizabeth Nace?
14   A. No, sir.
15   Q. Who is older?
16   A. Chelsea.
17   Q. How many years?
18   A. Approximately three.
19   Q. Three years older than Elizabeth?
20   A. Yes, sir.
21   Q. Were there occasions when Elizabeth Nace had
22 sleep-overs at your house?
23   A. Yes, sir.
24   Q. Approximately how many before you resigned

Page 70

1  from FCA on January 5th, 2010?
2    A. None.
3    Q. I'm sorry. Emily Mayer: Was Emily Mayer a
4  friend of your daughter's?
5    A. For a time, short time.
6    Q. Were they in the same grade?
7    A. No.
8    Q. Who was older?
9    A. Emily.
10   Q. By how much?
11   A. I believe a year.
12   Q. Did Emily Mayer come to your house for a
13 sleep-over?
14   A. No.
15   Q. Never?
16   A. Not that I recall.
17   Q. Was there a period of time where you believed
18 that Emily Mayer and Chelsea were best friends?
19   A. No.
20   Q. Who was Chelsea's best friend back then?
21   A. Rachel Maurer.
22   Q. Did you ever invite or suggest to Emily Mayer
23 that she come over for a sleep-over at your house?
24   A. No.

Page 71

1    Q. Did Chelsea ever have anybody sleep over at
2  the house?
3    A. I don't recall.
4    Q. Not Rachel Maurer or anybody else that you can
5  think of?
6    A. She may have Rachel Maurer...I don't recall
7  specifically, though.
8    Q. Now, Chelsea was on the basketball team,
9  correct?
10   A. Yes, sir.
11   Q. Was there a player on the basketball team at
12 FCA who may have been there just before Emily Mayer was
13 there named Lauren Fretz?
14   A. Yes.
15   Q. Was she a basketball player?
16   A. Yes.
17   Q. Did you coach her?
18   A. Yes.
19   Q. How many years?
20   A. Three or four.
21   Q. Was she there at any time that Emily Mayer was
22 at FCA?
23   A. No.
24   Q. Emily Mayer was there for what years, her

Page 72

1  years? Like eleventh grade, twelfth grade?
2    A. I believe eleventh and twelfth.
3    Q. And Fretz graduated sometime before that.
4    A. Yes. If I recall correctly, Lauren graduated
5  and the following year Emily came to the school.
6    Q. So, to your knowledge, did they know each
7  other, Lauren Fretz and Emily Mayer?
8    A. Not that I know of, not until Emily came to
9  the school. Unless there was tough competition, then
10 we went to another private school and participated
11 against her. Maybe as an opponent, but I don't know if
12 personally.
13   Q. Where else did Emily play before FCA?
14   A. What schools did she attend or just played?
15   Q. She played basketball. You said she may have
16 played at another school.
17   A. At Calvary Baptist.
18   Q. Is that a rival of FCA?
19   A. At that time. It was one of a few.
20   Q. How was your relationship with Lauren Fretz as
21 a coach and player?
22   A. It was good.
23   Q. Did you ever engage in any inappropriate
24 sexual behavior with Lauren Fretz? And by that I mean

18 (Pages 69 to 72)

Appendix 0242

Eric Romig                              Nace vs. Pennridge School District
                          May 4, 2015

---

### Page 73

1 anything from texting to photos to videos to physical
2 contact, anything at all.
3    A. No.
4    Q. Did anybody ever accuse you of engaging in
5 that type of conduct with Lauren Fretz?
6    A. No.
7    Q. Did you ever hear any scuttlebutt in the
8 hallways or teachers talking or whatever where people
9 were questioning your relationship with Lauren Fretz?
10    A. Not at all.
11    Q. For away games when you were coaching at FCA,
12 did the girls go on a bus?
13    A. Yes.
14    Q. Did the girls ever change clothes on the bus,
15 either into their uniforms or out of their uniforms on
16 the bus going to or from FCA?
17    A. No.
18    Q. Did the girls ever change on the bus going to
19 or from Quakertown when you coached there?
20    A. Not that I recall because I wasn't always on
21 the bus.
22    Q. Just the times that you were on the bus.
23    A. Okay. Not that I recall, no.
24    Q. Let's talk about your relationship with Emily

---

### Page 74

1 Mayer.
2    A. Okay.
3    Q. She transferred to FCA from Calvary Baptist.
4 Is that correct?
5    A. I believe it was either Calvary Baptist or
6 public school. She was dismissed from two schools in
7 the previous, I believe, twelve to eighteen months. I
8 don't know if she came from Calvary or if she came from
9 some public school she was dismissed from.
10    Q. For what reason?
11    A. For what reason was she dismissed?
12    Q. Yes.
13    A. I do not know.
14    Q. How do you know she was dismissed?
15    A. She told me.
16    Q. But you don't recall what she told you about
17 why she was dismissed?
18    A. No, sir.
19    Q. I mean, was it something criminal?
20    A. Apparently not, if she wasn't charged. I
21 don't know, though.
22    Q. Was it for some kind of misconduct: Fighting,
23 stealing?
24    A. Some sort of misconduct, but I didn't get into

---

### Page 75

1 specifics.
2    Q. Well, you talked to Emily a lot, right?
3    A. Her senior year I believe I did, yes.
4    Q. And you texted her frequently, correct?
5    A. Yes.
6    Q. And you said that FCA didn't have any policy
7 against texting.
8    A. No.
9    Q. Between coach and players, correct?
10    A. No.
11    Q. In the fall into the winter of 2009, were you
12 coaching her?
13    A. Yes.
14    Q. And in what capacity? What season?
15    A. Basketball.
16    Q. And during that time, from September to the
17 end of 2009, did you ever have occasion to text her?
18    A. Yes.
19    Q. How many occasions?
20    A. I don't recall.
21    Q. More than ten?
22    A. Yes.
23    Q. More than a hundred?
24    A. Yes.

---

### Page 76

1    Q. More than a thousand?
2    A. I don't know.
3    Q. You don't know if it was more than a thousand?
4    A. I don't.
5    Q. On any given day what would be the maximum
6 number of texts that you would send to Emily Mayer?
7    A. I don't recall.
8    Q. More than a hundred?
9    A. I don't recall.
10    Q. When you say you don't recall, I'm not asking
11 you what you ate for lunch on a certain day in 2009.
12       I'm asking you if in the month of December
13 2009 you have any -- this is just before you resigned
14 or were sending a letter of resignation from FCA: Do
15 you recall how many texts -- ballpark it, estimate it,
16 approximate it. I don't want you to guess, but I want
17 you to approximate how many emails you sent to her that
18 month in December.
19    A. Emails or texts.
20    Q. I'm sorry, texts.
21    A. In September?
22    Q. December.
23    A. December. If I had to approximate, fifty.
24    Q. And for what purpose or for what reason were

---

brusilow.com           brusilow + associates          215.772.1717

Eric Romig                              Nace vs. Pennridge School District
                                        May 4, 2015

Page 77

1  you sending her approximately fifty emails in December
2  of 2009?
3      A.   There were many.  She spent a good bit of time
4  on the fact that she had a stepdad herself, discussing
5  their relationship and the issues she had with their
6  family.
7          We discussed an issue that she was having with
8  something that was said to her boyfriend at the time in
9  regards to him and her.
10     Q.   What was said?
11     A.   Someone at the time must have said something
12 to him about why he was dating someone like her and it
13 caused a rift at the time.
14     Q.   When you say "someone like her," what did that
15 mean to you at the time?  What was your understanding of
16 why somebody would make a comment about her as "someone
17 like her"?
18     A.   Maybe because of the history that she had of
19 being kicked out of schools and whatever else went on
20 in her past.
21     Q.   What else did you discuss and text to Emily
22 Mayer at any time during September, October, November
23 and December 2009?
24     A.   Things regarding basketball, the school, her

Page 78

1  college options.  But the bulk of it was spent on her
2  family, her relationship with her father, relationship
3  with her sister, and what was going on with him at the
4  time.
5      Q.   Did you have these discussions with her in
6  person as well?
7      A.   No, sir.
8      Q.   Only by texts?
9      A.   Yes.
10     Q.   Did you ever email her?
11     A.   No.
12     Q.   Did you ever send her any photos?
13     A.   No.
14     Q.   Any videos?
15     A.   No.
16     Q.   When I say photos or videos, I mean whether
17 they're appropriate or inappropriate or whatever.  Any
18 at all.
19     A.   Not that I'm aware of.
20     Q.   Did you have similar texting -- I'll call them
21 texting conversations with other players on the
22 Quakertown team?
23     A.   Quakertown?
24     Q.   I'm sorry, strike that.  Other players on

Page 79

1  FCA's team.
2      A.   Not that I'm aware of, no.
3      Q.   Did you ever have any reason to text any of
4  the other girls on FCA's team in 2009?
5      A.   Unless it was a bulk email about a change in
6  practice and so on and so forth, but that would have
7  been sent to all of them.
8      Q.   A cancellation or change in practice, right?
9  That would be a bulk email where you would send out one
10 text to everyone.
11     A.   Yes, they showed me how to attach all at once.
12     Q.   But with Emily Mayer we're not talking about
13 bulk texts.  We're talking about texts between you and
14 her, correct?
15     A.   Yes.
16     Q.   What was your cell phone number back then?
17     A.   I believe it was the same as it was at the
18 end: 267-218-5232, I believe.
19     Q.   That was your cell phone, only your cell
20 phone?
21     A.   Yes.
22     Q.   And you had that up until the time that you
23 were arrested in October of 2013?
24     A.   I had that telephone number, yes.

Page 80

1      Q.   Did you have a passcode or a password or
2  something in order to get on that phone?
3      A.   In 2009?
4      Q.   Yes.
5      A.   Not that I recall.
6      Q.   How about in 2013?
7      A.   Yes.
8      Q.   What was the passcode or code number or word
9  or whatever?
10     A.   I believe it was 0519.
11     Q.   What is Elizabeth Nace's birthday?
12     A.   May 19th.
13     Q.   Is that why that was your passcode?
14     A.   Yes.
15     Q.   Why would you put your passcode as her
16 birthday?
17     A.   I don't know.  Why would I have done anything
18 I did back then?
19     Q.   That's what I'm going to ask you about.  What
20 was your passcode for the phone before you met
21 Elizabeth Nace or before it was 0519?
22     A.   I don't believe I ever had one.
23     Q.   You just put one on after you met Elizabeth
24 Nace?

Appendix 0244

Eric Romig

Nace vs. Pennridge School District
May 4, 2015

Page 81

```
 1     A.  Yes.
 2     Q.  How do you know what her birthday is?
 3     A.  She told me.
 4     Q.  And I'll ask you the question again:  Can you
 5   give me any reasons that are not good why you made the
 6   passcode your personal cell phone one of your player's
 7   birth dates?
 8     A.  Probably so no one else could get in to see
 9   the text messages.
10     Q.  You could have picked 1234, but why did you
11   pick that date?
12     A.  I don't know.
13     Q.  Was that date important to you at the time you
14   chose that for your passcode?
15     A.  At the time, yes.
16     Q.  Why was it important to you?
17     A.  Because it was her birthday.
18     Q.  And in 2013, when May 19th came around, how
19   old did Elizabeth Nace become?
20     A.  In 2013?
21     Q.  Yes.
22     A.  Sixteen, I believe.
23     Q.  Was that important to you?
24     A.  No.
```

Page 82

```
 1     Q.  Meant nothing, whether it was her sixteenth or
 2   fifteenth or seventeenth birthday?
 3     A.  No.
 4     Q.  We're getting away from Emily Mayer.  Sorry
 5   about that, but we'll get back to Elizabeth obviously
 6   in the future.
 7           So, back in 2009 you were not texting any
 8   other players or students at FCA with the type of
 9   personal texts that were going back and forth between
10   you and Emily Mayer, correct?
11     A.  Not that I recall.
12     Q.  And you said that was approximately -- in
13   December of that month it was approximately fifty
14   emails from you to her, correct?
15     A.  If I had to put a number on it, it would be
16   approximately fifty.
17     Q.  And I'm not holding you to that number
18   specifically.
19     A.  Okay.
20     Q.  It could be more, it could be less.
21     A.  Okay.
22     Q.  Could it be more than a hundred?
23     A.  Maybe.
24     Q.  More than 500?
```

Page 83

```
 1     A.  I don't believe so.
 2     Q.  Was the subject matter or content of any of
 3   those texts from you to her any inappropriate words
 4   regarding sexual issues, sexual behavior, sexual
 5   issues, her sex life, your sex life, a sex life you
 6   would like to have with her, something you would like
 7   to do to her?
 8     A.  No.
 9     Q.  Not one of them.
10     A.  No.
11     Q.  They were all just about her personal life,
12   her stepfather, something about her boyfriend, school,
13   college, those things, correct?
14     A.  And related to her past.
15     Q.  The past that you really can't give me details
16   about.
17     A.  Her past?
18     Q.  Yes.
19     A.  I can give you details, but not as to why she
20   was dismissed from the school.
21     Q.  What other past are you talking about?
22     A.  While she was at Calvary there was someone
23   that she dated that she actually ran away from her home
24   for; and because of the issues that she was having with
```

Page 84

```
 1   her parents, she mentioned doing that again.
 2     Q.  Doing it again when?
 3     A.  At that time.  Not with the same guy.
 4     Q.  While she was at Calvary, not while she was at
 5   FCA?
 6     A.  When she ran away from the guy I just told you
 7   about?
 8     Q.  Yes.
 9     A.  That was while she was at Calvary.
10     Q.  But you said she was talking about doing it
11   again.
12     A.  Because of the issue she was having with her
13   parents at the time while attending at FCA.
14     Q.  And who was she going to run away with that
15   time?
16     A.  She had a boyfriend at the time that she
17   mentioned, and also her biological father.
18     Q.  Was her boyfriend Chase Brunner?
19     A.  Yes.
20     Q.  What did she say about her biological father?
21     A.  It was not what she said about her biological
22   father.  It was what she said about her stepfather:
23   That they were paying more attention to her older
24   sister, who at the time I believe just had a baby; and
```

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

Page 85

1  that they weren't showing up for her games and so on
2  and so forth; and that he was not being a father to her
3  at all, and that it was her desire at the time to go
4  back with her regular father.
5      Q.  Who was where?
6      A.  That I don't know.  He was in the area
7  somewhere.  I know that because he would show up
8  occasionally.
9      Q.  Did you give her advice?
10     A.  Yes.
11     Q.  What advice did you give her?
12     A.  My advice was that she talk with her parents
13 because it was obviously causing a rift, which was
14 noticeable at the games and from the words that she was
15 saying.  It was causing a rift between her siblings,
16 step or otherwise.
17     Q.  When you texted Emily Mayer, did she usually
18 return your texts?
19     A.  Usually.
20     Q.  Not always?
21     A.  As far as I recall, she did.
22     Q.  If she didn't return a text, would you bug her
23 about it?  Would you send her more frequent texts?
24     A.  No, but there were times where I would state

Page 86

1  something and then maybe add to it.
2      Q.  Add to it.  Did you ever do a text with a lot
3  of question marks?
4      A.  I don't recall.
5      Q.  All right.  You coached, at FCA, the girls
6  basketball team until sometime in December of 2009,
7  correct?
8      A.  Until January 5th of 2010.
9      Q.  You sent in a letter of resignation on that
10 day, correct?
11     A.  Yes.
12     Q.  But there was a Christmas break and whatever,
13 so was there anything going on between December 25th
14 and January 5th with the team?
15     A.  With the team?  No.  That's when the
16 investigation was going on.
17     Q.  That's what I'm saying.  So, it was sometime
18 in December that you stopped coaching the team.  I mean
19 having physical contact with the team.
20     A.  Yes.
21     Q.  Is that correct?
22     A.  Yes.
23     Q.  What happened in December regarding an
24 investigation into your behavior and relationship with

Page 87

1  Emily Mayer?
2      A.  There was approximately maybe a two- to
3  three-week period where Ryan Clymer asked me to just
4  wait to hear from him while he talked with different
5  parties involved.
6         We met, I believe, sometime maybe in very
7  very late December or maybe right after the new year --
8  I can't recall -- and basically what was said was that
9  she mentioned about inappropriate texts, which I argued
10 about.  I didn't argue the quantity.  I argued the
11 content.
12        They discussed with me at the time that the
13 only request that the parents had at that time was that
14 she be reinstated to the team, because she was asked to
15 step aside as well while everything was being looked
16 upon.
17        Being that the season was close to the end, it
18 was suggested by the athletic director in that meeting
19 to step aside and possibly come back the following
20 year, which I declined.
21     Q.  You declined to come back.
22     A.  Yes.
23     Q.  That would be Russ Hollenbach.
24     A.  Yes.

Page 88

1      Q.  Let me break that down a little bit.
2         The first information you got that Emily Mayer
3  had complained about something you were doing
4  specifically relating to these texting -- and I think
5  you used the phrase "inappropriate texts," right?
6      A.  That's what she said, yes.
7      Q.  When were you first made aware of that -- and
8  how?  Was it by phone, by personal meeting, or what?
9      A.  I don't recall who told me that something was
10 said, but then I called the principal at the time on
11 the telephone.
12     Q.  Ryan Clymer.
13     A.  Ryan Clymer, yes.
14     Q.  And?
15     A.  And asked him what was going on, and he told
16 me about the allegations.  And I believe I continued on
17 for maybe another day or two, and that's when I believe
18 we had another game maybe the following day, and then
19 it was right after that game that I stepped aside for
20 the investigation.
21     Q.  So, you heard it first from someone else
22 besides Clymer that there had been a complaint about
23 you?
24     A.  Yes.

22  (Pages 85 to 88)

Eric Romig                                    Nace vs. Pennridge School District
                              May 4, 2015

Page 89

1       Q.  Who did you hear it from?
2       A.  I don't know if it was an assistant coach or
3   someone within the school, but basically what was said
4   to me was that she said something to the administration
5   which triggered my phone call to Ryan, but I don't
6   recall who told me that for sure.
7       Q.  So, you actually called him to find out what
8   was going on?
9       A.  Yes.
10      Q.  He didn't call you first?
11      A.  No.  I used the cell phone in the -- the
12  telephone in the athletic director's office to contact
13  him on his cell phone and ask him what was going on.
14      Q.  What did he tell you?
15      A.  He said that she made an allegation of an
16  inappropriate text and that they were going to look
17  into it, and we discussed it for a few minutes and I
18  went back to practice, then we talked maybe two days
19  later and that's when he said, you know, let all
20  parties sit down for a while before we decide what's
21  going to happen.
22      Q.  Now, when he used the term "inappropriate
23  texts," did he say to you specifically that it was
24  sexual in nature, the text?

Page 90

1       A.  "Inappropriate" only.
2       Q.  He didn't say having to do with some sexual
3   content of the email or emails -- sorry, of the text or
4   texts?
5       A.  Not that I recall.
6       Q.  Inappropriate.  You did not ask him what he
7   meant by the term "inappropriate"?
8       A.  Just that there was an inappropriate text
9   sent, which I refuted, and he said he would contact me,
10  you know, in the next couple days and decide what's
11  going to be going on here.
12      Q.  All right.  Was it your understanding that at
13  the time that you had that conversation, that first
14  conversation, telephone conversation, with Mr. Clymer,
15  that he had already dismissed Emily Mayer from the
16  school and told her to go home and not come to school?
17      A.  No.
18      Q.  Did she show up for practice that night?
19      A.  No, I don't believe so.
20      Q.  In the day or two that you remained coaching
21  the team, did you see her at practice or at a game?
22      A.  No.
23          MR. SANTARONE:  Objection to the form
24      of the question.

Page 91

1   BY MR. GROTH:
2       Q.  Did you ask anybody why she wasn't there?
3       A.  After I had the conversation with Ryan, they
4   didn't want her there.
5       Q.  That wasn't my question.  Did you ask anybody
6   why she was not at practice?
7       A.  No.
8       Q.  You said that Clymer didn't tell you that he
9   had dismissed her and told her to leave school.
10      A.  No.
11      Q.  Did Clymer tell you that he told her she
12  couldn't participate in any basketball activities while
13  this was being investigated?
14      A.  No.
15      Q.  Did Ryan Clymer tell you that you could not
16  participate in any basketball activities while he was
17  doing the investigation?
18      A.  I believe it was two days later after that
19  phone call that we met.  And being that it was
20  Christmas break and there was nothing going on anyways,
21  that's when I knew that all parties were going to sit
22  aside and wait until this investigation took place and
23  that he would get back to me.
24      Q.  That meeting with Clymer two days later, where

Page 92

1   was that meeting?
2       A.  I believe that was at the school.
3       Q.  At his office?
4       A.  Possible.  I can't say if it was in his office
5   or if it was by telephone, but I know it was two days
6   later.
7       Q.  Well, if it was in person, there could have
8   been other people at the meeting; if it was by
9   telephone --
10      A.  There was no other person present.
11      Q.  Hollenbach wasn't involved in this?
12      A.  No.
13      Q.  Did you ever call Russ Hollenbach -- who was a
14  good personal friend of yours, right?
15      A.  Yes.
16      Q.  (Continuing) -- did you ever call him and ask
17  him what was going on?
18      A.  I believe so, yes.
19      Q.  Did you do it the first day that Mr. Clymer
20  told you about the complaint by Emily Mayer and that
21  there was going to be an investigation?  Did you call
22  Hollenbach right away?
23      A.  I don't believe it was right away.  I believe
24  it was over Christmas.

23  (Pages 89 to 92)

Appendix 0247

Eric Romig                          Nace vs. Pennridge School District
                          May 4, 2015

| Page 93 | Page 95 |
|---|---|

**Page 93**

1    Q.  What did you discuss with him?
2    A.  I just asked him if he had any other
3  information, and at that time there was no
4  investigation done.  That still needed to take place.
5  He basically told me the same thing that Mr. Clymer
6  did.
7    Q.  Did he say the content of the email or --
8  strike that.  Did he say the content of the texts or
9  the multiple texts that were inappropriate was because
10  it was sexual in nature?
11    A.  No.
12    Q.  Did he say whether or not he had spoken to
13  Emily Mayer himself?
14    A.  No.
15    Q.  Did you ask them what they were going to do to
16  investigate this?
17    A.  I asked him what kind of time frame we were
18  looking at.  I asked him if I was going to be brought
19  in for questioning.  And basically what she said was
20  "we need time."
21        There were times I tried to contact them
22  throughout that couple of weeks, and my phone calls
23  were not returned because he wanted to wait until the
24  investigation was completed.

**Page 94**

1    Q.  But you had no idea what the investigation
2  consisted of.
3    A.  No.
4    Q.  Were you he ever told whether or not FCA hired
5  an attorney to assist with the investigations or give
6  them advice about the investigation?
7    A.  I believe in the last meeting that we had in
8  Mr. Clymer's office, I believe he said that he had had
9  a discussion with his attorney.  I do not recall who the
10  attorney was or what the nature of that conversation
11  was.
12    Q.  Did Ryan Clymer ever tell you that he
13  consulted with or retained or sought advice from a
14  police official or a former detective or private
15  detective regarding investigating these allegations?
16    A.  That I don't know.  I don't even know what the
17  details of the full investigation was.
18    Q.  So, you had an initial phone call with Clymer,
19  then a couple days later you had another phone call
20  with Clymer and a telephone conversation with
21  Hollenbach, correct?
22    A.  Yes.
23    Q.  During either telephone call did either one of
24  them tell you what the investigation was going to

**Page 95**

1  consist of and what they wanted from you?
2    A.  No.  All they asked of me was just to wait and
3  then they would bring me in to talk to me, and outside
4  of that I still to this day have no idea what took
5  place.
6    Q.  Did you attempt to contact Emily Mayer at all?
7    A.  No.
8    Q.  Did you eventually have a face-to-face meeting
9  with Clymer and/or Hollenbach?
10    A.  Yes.
11    Q.  When? January or December?
12    A.  I believe it was January.
13    Q.  Now, before that January face-to-face -- and
14  obviously that was sometime on or before January 5th,
15  when you sent in your resignation letter?
16    A.  I believe it was right before.
17    Q.  Same day?
18    A.  No, I don't believe so.
19    Q.  Okay.
20    A.  If I had to guess, I would say it was January
21  3rd or 4th.  It was right before.
22    Q.  And you met with Clymer and Hollenbach?
23    A.  Yes.
24    Q.  Before we get to that meeting, were there any

**Page 96**

1  other telephone calls in between there, from the end
2  around Christmas of December until that face-to-face
3  meeting in January, either the 3rd or the 4th?
4    A.  I attempted to contact Mr. Clymer, but I did
5  not get ahold of him.
6    Q.  During this time were you experiencing any
7  health problems relating to your heart?
8    A.  Yes.
9    Q.  What were the problems?
10    A.  I was having palpitations again and found
11  myself to be tired a lot and just not feeling good
12  overall.
13    Q.  Did this situation with Emily Mayer put you
14  under a lot of stress?
15    A.  Yes.
16    Q.  Were you worried about what they were going to
17  find out in their investigation?
18    A.  No.
19    Q.  Why?
20    A.  Because from the beginning I told them that I
21  knew and I believed, when the investigation was
22  completed, that -- you know, not knowing what was going
23  to be investigated, that my name would be cleared and I
24  suspected the whole time that I would be back.

Eric Romig                                    Nace vs. Pennridge School District
                                  May 4, 2015

---

Page 97

1      Q.   Well, as of January 3rd or 4th, when you met
2   with Clymer and Hollenbach, did they tell you their
3   investigation was completed?
4      A.   No, they contacted me -- before the meeting?
5      Q.   No, at the meeting.
6      A.   At the meeting they told me that they
7   conducted an investigation. The only thing about the
8   investigation that I was told is that they talked to
9   her, they talked to her parents, and I believe in that
10  meeting as well, as I told you before, that I believe
11  they had maybe one phone conversation with their
12  attorney --
13     Q.   He wasn't at the meeting.
14     A.   No.
15     Q.   Okay. And?
16     A.   And the best solution would be for me to step
17  aside for the remainder of the year, because basically
18  what her parents wanted was her to be returned to the
19  team and nothing else, which I already knew about.
20     Q.   So, based on that meeting with Clymer and
21  Hollenbach on January 3rd or 4th, as far as you know,
22  the investigation of FCA consisted of talking to Emily
23  and her parents, correct?
24     A.   Yes.

---

Page 98

1      Q.   And nothing else.
2      A.   I believe they may have talked to the
3   assistant coaches and I believe they talked to Lauren
4   Fretz as well.
5      Q.   What did they tell you they talked to Lauren
6   about?
7      A.   They told me that they asked her mother
8   because Emily Mayer said that I sent text messages to
9   Lauren that were inappropriate and that there was a
10  phone conversation between Ryan and Lauren about what
11  was alleged by Emily Mayer. And Ryan told me that
12  Lauren's response was "Oh, he's coach. He's always
13  coach."
14         And her mother confiscated Lauren's phone and
15  saw text messages on her phone from me, which were
16  nothing but had to do with her helping out with
17  practice and were strictly basketball related.
18     Q.   Did Clymer or Hollenbach tell you that there
19  were suspicions on their part based on information they
20  got that you actually had a sexual physical
21  relationship with Lauren Fretz?
22     A.   No.
23     Q.   Did you?
24     A.   No.

---

Page 99

1      Q.   Did you try to?
2      A.   No.
3      Q.   Did Clymer and Hollenbach at the meeting on
4   January 3rd or 4th tell you that they talked to any
5   other students?
6      A.   Outside of Lauren.
7      Q.   Yes.
8      A.   I believe that Emily Mayer mentioned
9   someone -- I believe it was Kristen Kennedy who was
10  mentioned in the complaint.  But outside of what's in
11  the complaint, I don't know what the whole story of
12  what that involved.
13     Q.   They didn't tell you what they asked her about
14  and what she told them?
15     A.   That I sent a message to her, which I denied.
16  I had no contact with Kristen Kennedy at all.
17     Q.   They told you that she said that you sent
18  heard a text message, a single text message?
19     A.   That was what was alleged. I don't know if it
20  was a text message or email, whatever.  I can't recall
21  exactly what it was.
22     Q.   Did you ever have conversations, either in
23  person or through texting or email, with Kristen
24  Kennedy about sexual issues, including her own sex

---

Page 100

1   life, her sex life with her boyfriend, what kind of sex
2   life she had, what type of things she did, anything of
3   that nature?
4      A.   Absolutely not. I don't even know who she
5   even ever dated.
6      Q.   Were you ever contacted by Kristen Kennedy's
7   father and told to stay away from her?
8      A.   No. As a matter of fact, the following year I
9   saw him at a Christopher Dock game and said hello.
10     Q.   Is Kristen a basketball player?
11     A.   She was.  She was at the school for one year.
12     Q.   Had she been dismissed from other schools as
13  well?
14     A.   I don't know.
15     Q.   Did she ever tell you anything about her
16  background?
17     A.   No.
18     Q.   How often did you text her?
19     A.   Never.
20     Q.   Not once.
21     A.   Not once.
22     Q.   Email?
23     A.   Never.
24     Q.   Did Clymer and Hollenbach tell you that she

---

                                    25  (Pages 97 to 100)

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

| Page 101 | Page 103 |

**Page 101**

1  did any other investigation other than what you've
2  already talked about?  Talking to Emily and her
3  parents, assistant coaches, Kristen Kennedy, Lauren
4  Fretz.
5      A.  No.
6      Q.  And my question to you is, when did they talk
7  to you?  When did they ask you about what they had been
8  told by other people?
9          Because at your meeting, as I understand it,
10  on the 3rd or the 4th, they were calling you in to tell
11  you it would be best if you stepped aside from the
12  school for the rest of the basketball season.
13      A.  Everything I just told you, including some of
14  the questions you asked me, they asked at that meeting.
15      Q.  Okay.
16      A.  At that same meeting -- at the conclusion of
17  the that meeting was when the solution was, you know,
18  presented to me to step down, whether Mr. Hollenbach
19  said at the time about stepping down for the rest of
20  the year and coming back the following year, which I
21  declined, and Mr. Hollenbach and I left the meeting
22  because I was very mad.
23      Q.  Isn't it true that it wasn't suggested that
24  you step down; that you were told by Clymer and

**Page 102**

1  Hollenbach that if you did not resign voluntarily, you
2  were going to be terminated?
3      A.  No.
4      Q.  That never happened?
5      A.  Not that I recall.
6      Q.  Never had that discussion?
7      A.  Not that I recall, because then why would Mr.
8  Hollenbach offer me to come back the following year if
9  that was the case?
10      Q.  When Clymer and Hollenbach told you about
11  their investigation, did it ever come up that some of
12  these texts that you were sending to Emily Mayer as
13  reported by her were sexual in nature?
14      A.  No.  It was brought up that they were
15  excessive in quantity, which Mr. Hollenbach said to me
16  "I should have said something to you because this is
17  how kids communicate with their friends, their
18  coaches," so on and so forth.
19      Q.  So, you had discussed with Clymer and
20  Hollenbach the quantity, but not the content of the
21  texts?
22      A.  No -- yes, the quantity.  They asked me what
23  the content was.
24      Q.  Right, and you told them what you told me.

**Page 103**

1      A.  Yes.
2      Q.  When they talked about quantity, did they tell
3  you they knew what the quantity was?
4      A.  No, they showed me -- I believe they pulled it
5  up on a screen, something that may have been sent by
6  the father.
7      Q.  Emily's father.
8      A.  I believe so, yes. It had dates and times and
9  so on and so forth that text messages were sent.  They
10  showed me one page of it on -- or a page or two of it
11  on the computer screen.
12      Q.  Okay.
13      A.  And that was the extent of it.
14      Q.  What was the quantity that was shown on that
15  computer screen?
16      A.  I don't know.  Whatever consists of one page
17  of texts.
18      Q.  One page of texts.  That's what they showed
19  you.
20      A.  No, they showed me one or two pages of texts.
21  He scrolled down to show me another page.
22      Q.  Were those texts for one day or more than one
23  day?
24      A.  I don't recall. It was in the month of either

**Page 104**

1  September or October, I believe, what they showed me.
2      Q.  The texts that the document had put up on the
3  screen and showed you, it showed a date, the time, and
4  the length of the text, or just the date and the time?
5      A.  No, it shows the date, the time, and I believe
6  the number.  I believe it has sent or received or who
7  send it or who received it.
8      Q.  Okay.
9      A.  But not the length or anything like that.
10      Q.  And were some of these texts at night?
11      A.  Yes.
12      Q.  Were these late at night?
13      A.  Yes.
14      Q.  Like 11:00 at night?
15      A.  Yes.
16      Q.  12:00 at night?
17      A.  Yes.
18      Q.  Did you tell your wife you were texting this
19  student 12:00 at night?
20      A.  I don't believe so.
21      Q.  Did you ever tell your wife you were texting
22  this student dozens of times?
23      A.  She knew I texted my players.
24      Q.  I'm not talking about your players.  I'm not

Eric Romig                                    Nace vs. Pennridge School District
                          May 4, 2015

| Page 105 | Page 107 |
|---|---|

**Page 105**

1   talking about the basketball-relates texts. I'm talking
2   about the personal ones where you were discussing
3   personal issues with one of your players. Did you tell
4   her that you were doing that on a regular basis?
5       A.   No.
6       Q.   Why not?
7       A.   Didn't think there was any need to.
8       Q.   Did you ever text Emily Mayer in front of your
9   wife?
10      A.   Yes.
11      Q.   Did you tell her who you were texting and why?
12      A.   Yes.
13      Q.   Did you ever discuss Emily Mayer's problems
14  with your wife?
15      A.   Yes.
16      Q.   How many times?
17      A.   Many, as well as my assistant coaches and
18  everyone else.
19      Q.   What did you tell your wife about Emily Mayer?
20      A.   The issues that she was having with her
21  stepdad and issues that she was having with her family,
22  so on and so forth.
23          I also told her that previously, about a week
24  before the allegations were made, that I removed her as

**Page 106**

1   captain of the team because of conduct on and off the
2   court at that time.
3       Q.   Which was what, what conduct?
4       A.   Mistreating teammates.  We had like a policy
5   for our own team, you know, what I expected of them on
6   and off the court, staying out of trouble.
7       Q.   And what did she do?
8       A.   Just bad-mouthing friends, teammates, just not
9   what would be expected of the captain of a basketball
10  team.
11      Q.   Bad-mouthing them to who?
12      A.   To her own friends who were not teammates or
13  were not a part of the team.
14      Q.   How did you find out about that?
15      A.   I was told by players on our team, which I
16  confronted her about.
17      Q.   Was Chelsea a captain of the team, also?
18      A.   Yes.
19      Q.   Was she demoted?
20      A.   Yes.
21      Q.   For what?
22      A.   Because her and Emily at that time were having
23  issues, and I sat both of the them aside as well as one
24  other player on the team and told them, "Until you guys

**Page 107**

1   figure this out, you guys are both stepping down as
2   captain."
3       Q.   Did they figure it out before all this stuff
4   hit the fan in December?
5       A.   No.
6       Q.   Did you ever ask or did Mr. Clymer or Mr.
7   Hollenbach ever tell you that they actually saw any of
8   these emails?
9       A.   No, nobody saw them.
10      Q.   Did you ask to see them?
11      A.   Yes.
12      Q.   Who did you ask?
13      A.   I asked to see them at that meeting that took
14  place on January 3rd or 4th.
15      Q.   And what were you have told?
16      A.   That they were not permitted to see them.
17      Q.   What do you mean?
18      A.   I do not know.  They were not permitted to see
19  them. By who, for who, whatever the case may be, I
20  assumed that it was her parents. I do not know, but no
21  one was permitted to see the contents of the messages.
22      Q.   Did anybody ever tell you, Mr. Clymer or Mr.
23  Hollenbach or anybody else, that Emily Mayer was
24  deleting the texts as she got them?

**Page 108**

1       A.   I asked them at that meeting.  I said, "Do you
2   have her phone?"  And they said, "We can get her phone,
3   but she does not have the messages on the phone."
4           I said "Why is that?" And they said "We don't
5   know."  And I asked them, "As a parent, if your
6   daughter came up to you and made these allegations and
7   your only response was to have her back on the team,
8   what message does that send?"
9       Q.   Well, you didn't hear that from the Smiths,
10  did you, that all she wanted was to get back on the
11  team?  You never talked to the Smiths directly, did
12  you?
13      A.   It was clearly obvious:  When she was put back
14  on the team, she sat right next to me and my wife
15  within a week of the meeting.
16      Q.   You were still coaching?
17      A.   No.  On my own, as it said there in the paper,
18  I stepped aside.
19      Q.   Did you ever make any effort yourself to
20  demand or obtain the actual content of the emails that
21  you sent to Emily Mayer?
22      A.   I didn't even know that was possible at the
23  time.
24      Q.   So, the answer is no, you did not.

27  (Pages 105 to 108)

Page 109

1      A.   No.
2      Q.   Did Ryan Clymer or Russ Hollenbach ever tell
3   you in this meeting on January 3rd or 4th that they
4   were obligated, either by law or morally or in some
5   fashion, to report this allegation that was made by
6   Emily Mayer to state agencies or to local
7   law-enforcement officials?
8      A.   No.
9      Q.   Did that topic ever come up at all during your
10   conversations with Mr. Clymer or Mr. Hollenbach?
11      A.   No, because they all believed that there was
12   no reason for it.
13      Q.   Did Mr. Clymer or Mr. Hollenbach ever tell you
14   that they actually received from Mr. or Mrs. Smith or
15   Emily Mayer a document that was prepared by her that
16   was actually listing her recollection of the content of
17   what she thought were sexually inappropriate texts?
18      A.   Not that I recall, no.
19      Q.   They didn't show you any document?
20      A.   No.
21      Q.   Would it be correct to say that it was not
22   your intention at that meeting to voluntarily resign
23   your position as coach?
24      A.   I would say that I did not expect to be in

Page 110

1   that position, and as a result of the meeting and
2   whatnot, as well as the physical problems I was having
3   the previous weeks, there was just no way, even if I
4   was allowed to, that I could have.
5      Q.   Did you coach at all after the Christmas
6   break?
7      A.   No.
8      Q.   You went to the games, though, correct?
9      A.   Yes.
10      Q.   Was there any discussion between you and Mr.
11   Clymer and Mr. Hollenbach that perhaps you should stay
12   off the campus as well as step down as coach of the
13   girls basketball team?
14      A.   No.
15      Q.   Were you allowed on campus to go to your
16   daughter's basketball games until the end of the
17   season?
18      A.   Yes.
19      Q.   And you did that?
20      A.   Yes.
21      Q.   And did Emily Mayer rejoin the team
22   eventually?
23      A.   Yes.
24      Q.   When was that?

Page 111

1      A.   Right away.
2      Q.   Right away after the Christmas break?
3      A.   Right after the meeting.
4      Q.   After the meeting?
5      A.   Right.
6      Q.   And Chelsea was still on the team, right?
7      A.   Yes.
8      Q.   Did Chelsea ever have a conversation with
9   Emily Mayer regarding the accusations that she made
10   about you?
11      A.   Not that I recall.  Chelsea never mentioned
12   anything about it.
13      Q.   Do you know whether or not the -- who took
14   over for you as coach?
15      A.   Dave Forker.
16      Q.   Dave Forker.
17      A.   Yes.
18      Q.   And the assistant coaches were still Robin
19   Landis and Marc Hoover?
20      A.   I believe so, but I know there were others,
21   too.  I don't know what capacity they had.  I don't
22   recall.
23      Q.   Do you know if those coaches ever did anything
24   to get Chelsea and Emily to bury the hatchet and be

Page 112

1   able to co-exist on the same basketball team?
2      A.   I don't recall, no.
3      Q.   Do you recall if they ever asked Chelsea and
4   Emily Mayer to like go into a room together by
5   themselves and try to work things out together?
6      A.   The only thing I recall them mentioning was
7   that they were asked to co-exist for rest of the
8   season.  That was by coaches, not administrators.
9      Q.   Around that same period of time were you
10   undergoing any marital counseling of any type?
11      A.   No.
12      Q.   Any discussions with your pastor or anything
13   like that about any problems within the marriage?
14      A.   No problems within the marriage.  There were
15   meetings with our pastor in relation to the school, on
16   how things were handled and my thoughts and attitudes
17   towards it.
18           I went and told my pastor that I wanted
19   nothing to do with the school, wanted nothing to do
20   with the church, and any meetings I had were not
21   related to my marriage.  It was related to how
22   everything was handled.
23      Q.   Did either Clymer or Hollenbach ever tell you
24   that they wanted you to undergo some type of

28  (Pages 109 to 112)

Eric Romig                                    Nace vs. Pennridge School District
                    May 4, 2015

Page 113

1  counseling, religious counseling or whatever, marital
2  counseling, as a result of the information they got
3  during the Emily Mayer investigation?
4      A.  No.
5      Q.  Did you ever have any discussion about the
6  Emily Mayer allegations and accusations with any of the
7  board members at FCA?
8      A.  No.  I didn't even know who they were.
9      Q.  Other than the situation with your sister,
10  when she was a victim of sexual misconduct or criminal
11  activity when she was a student at FCA, are you aware
12  of any other instance of suspected sexual abuse or
13  exploitation of students at FCA over your many years
14  there, either as a student or as a coach?
15      A.  No.
16      Q.  Never once an allegation, a suspicion, a
17  complaint by a parent, nothing like that?
18      A.  Not that I'm aware of.
19          THE WITNESS:  Can I take a restroom
20  break.
21          MR. GROTH:  Sure.
22          (A brief recess was taken)
23          MR. GROTH:  Let's go back on the
24  record.

Page 114

1  BY MR. GROTH:
2      Q.  Getting back to the Emily Mayer situation at
3  FCA, during the investigation of her allegations and
4  accusations against you, did you ever lie to Ryan
5  Clymer or Russ Hollenbach about anything?
6      A.  I told them there was -- they asked me about a
7  specific weekend, about having my phone or not having
8  my phone, and I told them that I believed at that time
9  I did not have my phone that weekend.
10          As it ended up, it wasn't that exact weekend,
11  but -- and it wasn't until a couple years later when I
12  asked Mr. Hollenbach what was so important about that
13  weekend that he told me that that is the weekend that
14  she alleged that these supposed text messages came to
15  her, and I did not know.
16      Q.  And that was in December of 2009, towards the
17  end.
18      A.  When she claimed that that was --
19      Q.  The text messages that she was complaining
20  about.
21      A.  Yes.
22      Q.  Not the end, but sometime in December as
23  opposed to September.
24      A.  Sometime in December, yes.

Page 115

1      Q.  Did you lie to them about anything else?
2      A.  No, and I did not lie to them.  It was one of
3  the weekends that I left my phone there.  I recovered
4  it the next day at church.
5      Q.  And you actually accused somebody of taking
6  your phone and using it to do all these many texts to
7  Emily Mayer over that time, correct?
8      A.  No.  I told them that the girls would use my
9  phone for different things.  I mean, those are the ones
10  who program different things in my phone, so on and so
11  forth.
12          I didn't say they were texting specific
13  people, but that there were others that used my phone
14  on bus trips and so on and so forth.
15      Q.  You're talking about players used your phone.
16      A.  Yes.
17      Q.  I thought you meant your family members or
18  something used your phone.
19      A.  No.
20      Q.  Did you ever apologize to Ryan Clymer or Russ
21  Hollenbach about lying to them during the
22  investigation?
23      A.  I did not lie to them because I thought that
24  was the weekend that was, you know, when I left the

Page 116

1  phone.  And it ended up that it was not, because an
2  assistant coach of mine stated that she believed that
3  weekend or saw that weekend that I had my phone.
4      Q.  That incident notwithstanding, did you lie to
5  them about anything else?
6      A.  No.
7      Q.  Did you apologize to them for actually lying
8  about something?  You said this thing about the phone
9  was a misunderstanding on your part, with the dates and
10  whatever.
11      A.  Yes.
12      Q.  But did you ever apologize to them and tell
13  them "I'm sorry I lied to you about some of this
14  stuff"?
15      A.  Not that I recall.
16      Q.  Did Ryan Clymer tell you who the first person
17  was who reported the accusations about Emily Mayer to
18  him?
19      A.  No.
20      Q.  Did you ask?
21      A.  No.  I figured it was her.
22      Q.  You assumed it was her, you speculated that it
23  was her, but you didn't know for sure?
24      A.  No, not for sure.

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

Page 117

1      Q.   Were you ever told that there was another
2   individual, a mother of one of Emily Mayer's friends,
3   that actually took Emily Mayer in to see Ryan Clymer
4   and forced her to tell him about what she was getting
5   from you in texts?
6      A.   No.  The paperwork that I received with that
7   email here in the mail, that's the first time I knew
8   that those people were mentioned in the investigation.
9      Q.   What people are you referring to?
10     A.   The Alderfers.
11     Q.   Do you know Sharon Alderfer?
12     A.   I know of her, yes.
13     Q.   Did you know her at the time?
14     A.   Just by name, not personally.
15     Q.   Did you know her daughter?
16     A.   No.
17     Q.   She wasn't a basketball player?
18     A.   No.
19     Q.   Do you know her name?
20     A.   From the paperwork, yes:  Allison.
21     Q.   Okay.  But Mr. Clymer never told you that?
22     A.   No.
23     Q.   To this date you maintain that none of the
24   texts that you sent to Emily Mayer were inappropriate

Page 118

1   in terms of sexual content?
2      A.   Yes.
3      Q.   So, if we were to subpoena and able to
4   subpoena those text messages as part of this
5   litigation, you would have nothing to worry about in
6   terms of seeing the content, correct?
7      A.   I would like to see them.
8      Q.   You would have nothing to worry about in terms
9   of seeing the content, right?
10     A.   No.  I believe they tried to do that in the
11   criminal investigation.
12     Q.   Why do you believe that?
13     A.   Because I --
14     Q.   Oh, you're talking about in the criminal
15   investigation with Elizabeth Nace.
16     A.   Yes.
17     Q.   Okay.
18     A.   Because they all investigated as well during
19   the criminal case.
20     Q.   Do you know whether or not they tried to get
21   those records?
22     A.   I don't know for sure, but I believe so from
23   what my attorney told me.
24     Q.   You know they got Elizabeth Nace's records,

Page 119

1   right?
2      A.   Yes.
3      Q.   And they saw all of the inappropriate texts,
4   correct?
5      A.   Yes.
6      Q.   The same type of texts that Emily Mayer was
7   supposedly accusing you of sending to her, correct?
8      A.   I still don't know what Emily Mayer said --
9   what I said to her or what she is alleging I said to
10   her.
11     Q.   Mr. Clymer or Mr. Hollenbach never told you
12   what Emily Mayer said you texted to her?
13     A.   Not specifically.
14     Q.   But you asked to see them, right?
15     A.   Yes.
16     Q.   And you wanted to know, right?
17     A.   Yes.
18     Q.   You wanted to see the texts.
19     A.   Yes.
20     Q.   And if you couldn't see the texts, at least
21   you should be told what she said was in the texts,
22   right?
23     A.   Yes, but I was --
24           MR. SANTARONE:  Objection to the

Page 120

1   question.  You're asking him about what other
2   people should know or not know.
3           MR. GROTH:  I'm not asking him that at
4   all, but the objection is noted.
5   BY MR. GROTH:
6      Q.   You weren't able to see the texts themselves,
7   right?
8      A.   No.
9           MR. SANTARONE:  Objection to the form
10   of the question.  That assumes they existed.
11           MR. GROTH:  I didn't assume anything.
12   BY MR. GROTH:
13     Q.   You weren't able to see the texts themselves,
14   correct?
15     A.   The content, no.
16     Q.   Yes.  And you were never told exactly what the
17   content was by Mr. Clymer or Mr. Hollenbach that Emily
18   Mayer was complaining about.
19     A.   No, just that -- the only thing they showed me
20   was the quantity on those two pages at that time.
21     Q.   So, for you this investigation was all about
22   quantity of texts and nothing else.
23     A.   Yes.
24     Q.   That was your understanding --

                        30  (Pages 117 to 120)

Appendix 0254

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

---

Page 121

1      A.  Quantity?
2      Q.  Quantity.
3      A.  No, content.
4      Q.  Content was the issue, not the quantity.
5      A.  Yes.
6      Q.  Did you have any conversation with Mr. Clymer
7   or Mr. Hollenbach regarding what they considered to be,
8   if they considered it to be, an excessive quantity of
9   texts to her over a period of time?
10     A.  Yes, that is when they said that they thought
11  that it was excessive, and that is when Mr. Hollenbach
12  told me that he should have said something or put
13  something there about texting and whatnot, because like
14  he said to me, this is how kids communicate.
15         Every place I've ever coached at in all three
16  institutions, the players text all their coaches.
17     Q.  So, was it your belief that Mr. Hollenbach
18  should have put something in writing regarding the
19  quantity of texts that a coach is able to send to a
20  player?
21     A.  No, because it was brand-new at the time.
22  This is not something that has gone on in the previous
23  ten years.  This is something that just happened.  It
24  was new to the school.

Page 122

1         My case represented to them something that
2   needed to take place for the future.  It's not
3   something that was very well known for the years
4   previous.
5      Q.  Was there a number or a ballpark number of
6   texts that a coach could sent a student back in 2009
7   that you would have personally considered to be
8   inappropriate or excessive?
9      A.  No.  It was all new at the time.
10     Q.  So, whether you sent 50 or 500 or 5,000, it's
11  all the same.
12     A.  At that time, yes.
13     Q.  To you.  That was your opinion.
14     A.  At that time.
15     Q.  What about now? Do you change your opinion?
16     A.  Yes.
17     Q.  What's your opinion now?
18     A.  That the contact through texts should be
19  minimal to none.
20     Q.  We touched on this a little bit, but did Ryan
21  Clymer or Russell Hollenbach tell you at your meeting
22  in January 3rd or 4th that they were going to allow you
23  to resign for health reasons, but that you were
24  actually being let go or terminated due to the

Page 123

1   excessive texting?
2      A.  What was determined as a solution to that
3   problem was, they wanted me to step down because of the
4   allegations that were made and that her parents wanted
5   her back on the team.
6         I refused to step aside for any reason other
7   than health reasons, which were legitimate at that
8   time, and it was also offered me from Mr. Hollenbach to
9   come back the next season.  Nothing set in stone, no
10  contract, nothing like that, but it was presented in
11  that meeting as a possibility.
12     Q.  I think that partially answers my question,
13  but I think my question was a little bit more direct:
14  Did Mr. Clymer or Mr. Hollenbach tell you that they
15  were allowing you to resign for health reasons, but at
16  the same time telling you that you were being dismissed
17  or terminated or let go for the excessive texting?
18     A.  We discussed at the meeting as far as how the
19  resignation would go, what it would look like, so on
20  and so forth.  I refused to put anything other than
21  health reasons because that was the truth.
22     Q.  Did they tell you if you didn't resign,
23  whether for health reasons or any other reason, that
24  you would be terminated?

Page 124

1      A.  The only thing I was told is that for the rest
2   of that calendar year, for the rest of that season,
3   which was maybe a month, that I could not coach at that
4   time.  That's what I was told.
5      Q.  And again, I'm not sure that answers my
6   question. My question is, did they tell that if you
7   didn't resign, that you would be terminated?
8      A.  I don't know --
9      Q.  For that season, for that contract year.
10     A.  I don't recall being terminated.  I do recall
11  them saying that coming back that season was not an
12  option.
13     Q.  Well, did you ever discuss the term and
14  suspension?
15     A.  Yes, that was a part of the whole coming back
16  the following season.  I believe it was put as a
17  temporary suspension or a stepping aside for a short
18  period of time.
19     Q.  None of that was ever put in writing.
20     A.  Nothing was put in writing except for the
21  termination -- or the resignation letter that you have.
22     Q.  Did they make any promise to you that if you
23  did resign for health reasons, that you would be
24  allowed to re-apply for the job the following season?

31 (Pages 121 to 124)

Appendix 0255

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

| Page 125 | Page 127 |
|---|---|

**Page 125**

1  A. No, because I was not interested. I had no
2  interest in coming back.
3  Q. That wasn't my question. Listen to the
4  question: Did they tell you that if you resigned for
5  the rest of that season, that you could re-apply for
6  the following season if you wanted to?
7  A. Yes, Mr. Hollenbach did.
8  Q. But even at that point, on January 3rd or 4th,
9  you knew you didn't want to come back, correct?
10  A. Yes.
11  Q. Did you ever hear from Mr. Hollenbach or Mr.
12  Clymer that they were consulting with an attorney named
13  Jeff Drake regarding the Emily Mayer investigation
14  incident?
15  A. I know they contacted or they spoke with their
16  attorney, but I did not know who their attorney was at
17  that time.
18  Q. That name doesn't ring any bells for you?
19  A. No, only through this matter.
20  Q. You were interviewed by the Bucks County
21  detectives as part of the investigation of the
22  Elizabeth Nace criminal investigation, correct?
23  A. Yes.
24  Q. And you voluntarily gave them information and

**Page 126**

1  made statements to them about your history with
2  Elizabeth Nace, as well as things that had occurred
3  prior to the Elizabeth Nace's situation as far back as
4  when you were at FCA or Quakertown, correct?
5  A. They asked me about my Pennridge situation.
6  They asked me if I ever had any other allegations made
7  against me and I told them about the situation at FCA
8  with Emily Mayer, that nothing came of that and nothing
9  was true, which is what brought them to Faith Christian
10  Academy. I told them the truth from day one.
11  Q. Did you ever tell the detectives that were
12  investigating -- and I think their names were Kemmerer
13  and Slattery.
14  A. Yes.
15  Q. (Continuing) -- did you ever tell them that
16  you actually had sent inappropriate sexual texts or
17  messages to other girls but never had any physical
18  contact with any other girls other than Elizabeth Nace?
19  A. No.
20  Q. Did you tell them that you had ever sent any
21  photos or videos of an inappropriate sexual nature to
22  other female students, but not had any physical contact
23  with them?
24  A. No.

**Page 127**

1  Q. You did send inappropriate sexual texts and
2  videos and photographs to Elizabeth Nace, correct?
3  A. Yes.
4  Q. Did you tell the Bucks County detectives that
5  any of the text messages you sent to Emily Mayer were
6  inappropriate?
7  A. No.
8  Q. In what month did you start texting with Emily
9  Mayer?
10  A. I don't recall. It was six years ago.
11  Q. Well, everything went south in December, the
12  end of December 2009. Was it that fall, sometime that
13  fall: September, October, November?
14      MR. SANTARONE: Objection to the
15  characterization of "went south."
16      MR. GROTH: You can answer.
17      THE WITNESS: Can I still answer the
18  question?
19      MR. KEMETHER: If you're able to do so.
20  If you understand the question and you're able to
21  answer it, then you're allowed to answer it.
22      THE WITNESS: You're asking when the
23  text messages started?
24      MR. GROTH: Yes, I am.

**Page 128**

1      THE WITNESS: Sometime after the school
2  year started, either September or October of 2009,
3  I believe.
4  BY MR. GROTH:
5  Q. Did you ever physically touch Emily Mayer in
6  any way?
7  A. Never.
8  Q. Did you ever touch her butt in any way?
9  A. Never.
10  Q. Did you ever tell Emily Mayer that you used to
11  do sexual things, have sexual contact with Lauren Fretz
12  and that nobody ever found out about it?
13  A. Never.
14  Q. I'm going to show you some documents that we
15  got from FCA's counsel, Carla Connor, and review some
16  of these documents with you. I've broken the set of
17  documents into certain subsections, and we'll just go
18  through them briefly.
19      (Exhibit Romig-3 was marked for
20  identification)
21  BY MR. GROTH:
22      I've marked as Romig Exhibit 3 Ms. Connor's
23  cover letter to me dated April 28, 2015, indicating she
24  was forwarding her supplemental initial disclosures as

Eric Romig                          Nace vs. Pennridge School District
                  May 4, 2015

Page 129

1  attachments to her letter.
2      Also, she sent the supplemental initial
3  disclosures, under Rule 26A1A, of Faith Christian
4  Academy, Ryan Clymer and Ross Hollenbach, in which she
5  names some supplemental witnesses and lists the
6  documents that we're about to go over.
7      You were sent a copy of this. Your name is
8  copied on it. Do you recall seeing that?
9  A.  I never received this, no.
10  Q.  That list that you're looking at right there,
11  on the third page, is a list of documents that she
12  provided from FCA's personnel files and other files
13  regarding your situation. Okay?
14  A.  Okay.
15  Q.  We'll go over some of them. I don't expect
16  you to know them just from a description on a page.
17      The first set of documents that I grouped are
18  the employment records: The application for
19  employment, withholding form, W4 Form, employee record,
20  written contracts that you signed with Faith Christian
21  Academy, criminal record check, and two letters that
22  were sent from Daniel Schmidt on behalf of the FCA
23  school board to the, I guess, parents of students at
24  FCA as a result of the Elizabeth Nace situation with

Page 130

1  you. One is dated October 10th, 2013; the other is
2  dated January 31, 2014.
3      MR. GROTH: Off the record for a
4  second.
5      (There was a discussion held off the
6  record)
7      MR. GROTH: We're back on the record.
8  BY MR. GROTH:
9  Q.  In a contract document that you signed for the
10  2009/2010 school year at Faith Christian -- and I take
11  it that's your signature on this document?
12  A.  Yes.
13  Q.  (Continuing) -- there's a requirement that you
14  attend the PIAA rules interpretation meeting every year
15  or face a $100 fine from the PIAA. Did you do that?
16  A.  Yes.
17  Q.  Who would attend these meetings, coaches?
18  A.  From all the schools?
19  Q.  Yes.
20  A.  Either coaches or athletic directors. It had
21  to be a representative from the school.
22  Q.  Would Mr. Babb attend those meetings as well?
23  A.  I have no idea.
24  Q.  When you went to work for Pennridge, do you

Page 131

1  know if he went to those meetings?
2  A.  No, I believe Paul Koehler did.
3  Q.  What about Mr. Hollenbach? Do you know if Mr.
4  Hollenbach went to those meetings?
5      MR. KEMETHER: Just give us the time
6  frame you're talking about.
7      MR. GROTH: When he was at FCA, while
8  Hollenbach was at FCA.
9      THE WITNESS: Has he ever been to a
10  meeting?
11      MR. GROTH: Yes.
12  BY MR. GROTH:
13  Q.  Did you ever go to a meeting with him?
14  A.  I never went with him, but I know he's
15  attended meetings.
16  Q.  There is an administrator who signed in as
17  well. Is that Ryan Clymer's signature?
18  A.  Yes, sir.
19  Q.  I'm showing you another document in the same
20  exhibit, from exhibit four, a letter, typed letter,
21  dated January 5th, 2010 to Ryan Clymer and Russ
22  Hollenbach from you regarding your resignation as high
23  school girls basketball coach due to health concerns,
24  effective immediately.

Page 132

1      Is that the letter you sent to Mr. Clymer and
2  Mr. Hollenbach?
3  A.  Yes, sir.
4  Q.  When you met with them on January 3rd or 4th,
5  was the wording of this letter actually discussed: If
6  you were going to resign, what you would put in the
7  letter of resignation?
8  A.  I don't recall the exact details of that other
9  than the fact that I told them I will not put in a
10  letter of resignation with anything other than health
11  issues.
12  Q.  You didn't want to admit to any wrongdoing
13  or --
14  A.  Because there was none.
15  Q.  There is a letter dated October 10th, 2013
16  from a Dan Schmidt, school board chairman. Do you know
17  Mr. Schmidt at all?
18  A.  I know the name.
19  Q.  Did you ever meet him?
20  A.  I don't believe so.
21  Q.  Do you know if he was involved in any
22  investigation of the Emily Mayer situation?
23  A.  I don't know.
24  Q.  When the Emily Mayer situation arose and you

                          33  (Pages 129 to 132)

Appendix 0257

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

|  | Page 133 |
|---|---|

1 were talking to Mr. Clymer and Mr. Hollenbach, did you
2 ever threaten to go to the police to bring some kind of
3 criminal charge against the Smiths or Emily Mayer?
4     A. No. I mentioned a lawsuit, a civil suit,
5 against the school.
6     Q. Against the school.
7     A. Yes.
8     Q. What was the lawsuit against the school going
9 to be based on?
10    A. Just for the whole -- the way the whole thing
11 was handled, because I didn't see any reason why I
12 would have to step aside for the rest of the year,
13 which we discussed.
14    Q. Did you ever see this letter, which again
15 doesn't have a date on it but from Ms. Connor's
16 description I think is dated January 31st, 2014? That
17 was after you pled guilty to a number of felony charges
18 against Elizabeth Nace.
19    A. No, I did not.
20    Q. Did you ever see this letter? And you can
21 take an opportunity to read through that, if you would,
22 and I'll ask you first if you ever saw it and then I'm
23 going to ask you about some of the contents in it.
24         (Pause)

|  | Page 135 |
|---|---|

1     Q. It goes on to say, "Regardless of the content,
2 FCA believed the amount of text-message communication
3 between a student and school employee to be
4 inappropriate, and concluded that FCA's association
5 with Mr. Romig could no longer continue." These are
6 Mr. Schmidt's words, not mine, obviously.
7         Now, from this, the way I look at this may be
8 different from the way you read it, but it sounds to
9 me, when they say that FCA concluded that FCA's
10 association with Mr. Romig could no longer continue,
11 that it was FCA's decision that it was no longer going
12 to continue, not your decision. Is that what happened?
13    A. For the rest of that season, yes.
14    Q. It was FCA's decision?
15    A. I could not coach the rest of that season,
16 yes.
17    Q. The doesn't say here for the rest of that
18 season, does it?
19    A. No.
20    Q. I didn't read that incorrectly.
21    A. No.
22         (Exhibit Romig-5 was marked for
23         identification)
24

|  | Page 134 |
|---|---|

1     A. I've never seen that before today.
2     Q. Among other things, it says in this letter
3 that "Prior to Mr. Romig's resignation from FCA on
4 January 5, 2010, it was reported that FCA had a student
5 on the girls varsity basketball team that received text
6 messages from Mr. Romig, some of which he believed to
7 be inappropriate."
8         It says also, and I'm quoting, "Unfortunately,
9 FCA was unable to review the content of any of the text
10 messages between Mr. Romig and the student since all
11 the messages had been previously deleted."
12        It also says, "Further, FCA was not able to
13 retrieve copies of the actual text messages from the
14 phone company."
15        My question to you is, did Ryan Clymer or Mr.
16 Hollenbach ever tell you any of any effort they made to
17 try to get the actual text messages, with their
18 contents, from the phone company?
19    A. No.
20    Q. Did Ryan Clymer or Mr. Hollenbach ever tell
21 you that they even considered contacting the local
22 police department or the district attorney in order to
23 get a subpoena to get those records?
24    A. No.

|  | Page 136 |
|---|---|

1 BY MR. GROTH:
2     Q. I have another group of documents which I've
3 marked Romig Exhibit 5. It consists of a --
4     MR. GROTH: Just so counsel are not
5     confused, I was sent a copy of the documents off
6     the disk that Ms. Connor provided by my office.
7     And the secretary's name is Linda McGuire, whose
8     name appears at the top, in case people were
9     wondering who that is.
10        MS. CONNOR: That is how they printed
11        out.
12 BY MR. GROTH:
13    Q. It is an email from Kevin Smith to Ryan Clymer
14 dated December 23rd, 2009, at 9:30.
15        Attached as part of the emails are logs of
16 text messages that you sent to Emily Mayer and that she
17 sent back to you for the period of September, October
18 and November of 2009.
19        MR. GROTH: Can we go off the record
20        again, please?
21        (There was a discussion held off the
22        record)
23        MR. GROTH: We're back on the report.
24

                                    34  (Pages 133 to 136)

Eric Romig                                    Nace vs. Pennridge School District
                    May 4, 2015

| Page 137 | Page 139 |
|---|---|

**Page 137**

BY MR. GROTH:
1  BY MR. GROTH:
2      Q.   Mr. Smith's email on Romig Exhibit 5 says that
3   these sheets contain the texts between you and Emily
4   Mayer for September, October and November received from
5   267-218-5232.  That's your phone, right?
6      A.   Yes.
7      Q.   And it shows for those months a total of 1,077
8   emails for three months.
9      A.   How many --
10          MR. GROTH: Off the record.
11          (There was a discussion held off the
12     record)
13          MR. GROTH: We're back on the record.
14  BY MR. GROTH:
15      Q.   To correct myself, it's 1,077 texts over this
16   three-month period.  And I have a couple of questions.
17   I'm going to let you take a look at this.
18          It also says he will get the details of
19   December 2009 texts sometime around January 4th, but
20   this is a document that he sent to Ryan Clymer on
21   December 23rd, 2009.
22      A.   What's "domestic text" mean?
23      Q.   I can't interpret the document for you.
24      A.   All right.

**Page 138**

1      Q.   You've never seen these documents before?
2      A.   No.
3      Q.   Mr. Clymer never showed them to you?
4      A.   Just what was on the screen there.
5      Q.   But he only showed you a page or two.
6      A.   Yes.
7      Q.   It was a page or two of the documents that had
8   the date and day of the week and the date and time?
9      A.   No, it was probably that what was on the
10   computer screen, but I never saw the. . .
11      Q.   When I asked you before how many times you
12   texted Emily Mayer, I had think you said around fifty
13   times, approximately, in December of 2009, and you
14   weren't sure how many times in September, October and
15   November.
16          Do you recall that testimony?
17      A.   I recall saying approximately fifty times.
18      Q.   Having seen these logs and this email from Mr.
19   Smith to Ryan Clymer, does that refresh your
20   recollection about how many times you were texting
21   Emily Mayer that fall?
22      A.   Yes.
23      Q.   And if he concludes it was, by counting, 1,077
24   times in three months, would you have any basis to

**Page 139**

1   dispute that?
2      A.   Not that I know of, no.
3      Q.   And if you look at the times on these calls,
4   almost any time of night or the day, they go from
5   morning to night, to 11:00 at night, whatever, right?
6          So, there was never any time of the day where
7   you night not text her unless she was playing on the
8   team or something at that time.
9      A.   At that time when she was playing on the team,
10   she was on the basketball team.
11      Q.   Right, so you had wouldn't text her then.
12      A.   Right.
13      Q.   But any other times, in the morning or at
14   night or whatever, you would text her whenever the urge
15   struck you, correct?
16      A.   I wouldn't say when the urge struck me.  It's
17   when. . .
18      Q.   Well, we're talking about an average of
19   300-plus emails a month for a three-month period.
20          MR. SANTARONE:  Objection to the form.
21      Q.   Which, if you break it down by day, it's at
22   least ten a day.  And if you miss a day, it's like
23   twenty the next day.
24          Is that what your recollection is of how many

**Page 140**

1   times you were emailing her during that period of time?
2          MR. KEMETHER:  Objection.
3          THE WITNESS:  Yes.
4          MS. SOMMER:  Texts.
5          MR. GROTH:  Texts, thank you.
6          MR. SANTARONE: For clarification, they
7   just focused on from him or both?
8          MR. GROTH:  I think it's both.
9          MS. SOMMER:  I think it's both, too.
10          MR. GROTH:  The email that Mr. Smith
11   sent said he's talking about text messages to her
12   from him, 1,077.
13          THE WITNESS:  So, in that 1,077, that
14   does not include hers to me?
15          MR. GROTH:  I don't believe so.  That's
16   not what it says.
17          MS. CONNOR: I'm not sure.  I think it's
18   actually both.
19          MR. GROTH:  Let's go off the record.
20          (There was a discussion held off the
21   record)
22          MR. GROTH:  We're back on the record.
23  BY MR. GROTH:
24      Q.   Did Mr. Clymer or Mr. Hollenbach ever tell you

                                    35  (Pages 137 to 140)

Eric Romig                              Nace vs. Pennridge School District
                    May 4, 2015

Page 141

1   if they had received emails from Kevin Smith, Emily
2   Mayer's father, which basically gave them the quantity
3   of emails that Emily was talking about receiving from
4   you?
5       A.   They told me that he sent them what I saw on
6   the screen, yes.
7       Q.   Yes, but that was just two pages, right?
8       A.   There may have been more.  That's what I saw.
9       Q.   Okay.
10      A.   I mean, it was self-explanatory what they were
11  trying to say.
12      Q.   Well, did they tell you that, by Mr. Smith's
13  count, we're taking about a thousand-plus emails for
14  those three months?
15      A.   I don't recall the number, but it was too
16  many.
17      Q.   And your testimony today is that all of those
18  texts and messages between you and Emily Mayer had
19  nothing to do with anything sexual.  It was all her
20  personal issues and all of those things you were trying
21  to help her out with.
22      A.   Yes.
23      Q.   How many texts did you send to Elizabeth Nace
24  from the spring of 2013 until you were arrested on

Page 142

1   October 1st, 2013?
2       A.   From the end of May until the end of
3   September?
4       Q.   Yes.
5       A.   Thousands.
6       Q.   Thousands.
7       A.   Yes.
8       Q.   Were some of those sexually inappropriate?
9       A.   Many.
10      Q.   But not a single one to Emily Mayer was
11  inappropriate.
12      A.   No.
13      Q.   And the detectives let you know that they had
14  the cell phone and they had the text messages with
15  regard to Elizabeth Nace, so they knew what the content
16  was, right?
17      A.   They never showed me or -- they said they
18  could get them.  I didn't know that they had them at
19  the time.  They asked me and I told them.
20      Q.   So, there is no way you could deny that these
21  were inappropriate, correct?
22      A.   I never denied anything related to the
23  Pennridge case from the beginning.
24

Page 143

1           (Exhibit Romig-6 was marked for
2   identification.)
3   BY MR. GROTH:
4       Q.   This is an email from Annette Smith to Ryan
5   Clymer dated December 31st, 2009, which I've marked as
6   Romig Exhibit 6.  That email contains an attachment of
7   a document, a typed document, that Emily Mayer prepared
8   to try to record, as best she could, her recollection
9   of the texts from you that she found to be
10  inappropriate.
11          Let me show you this first to first find out
12  if you had seen the email itself or the attachment
13  purportedly prepared by Emily Mayer concerning what was
14  going on between the two of you.  Take a minute to read
15  through that, both pages.
16          (Pause)
17      A.   Okay.
18      Q.   The first question is, have you ever seen
19  either of these two documents before?
20      A.   No.
21      Q.   This was sent to Ryan Clymer on December 31st,
22  2009 by an Ed Smith, so that would be a number of days
23  before he, Ryan Clymer, and Russ Hollenbach met with
24  you in person to discuss their investigation, correct?

Page 144

1       A.   Yes.
2       Q.   And even though they met with you in person to
3   tell you what they had done to investigate, including
4   interviewing assistant coaches, students, everyone that
5   you mentioned in your prior testimony that they talked
6   to in order to try to find out what was going on,
7   neither Mr. Clymer nor Mr. Hollenbach ever told you
8   that they had this email from Annette Smith and this
9   list of allegations and recollections of Emily Mayer?
10      A.   No.
11      Q.   Who is Ashley Makowski?
12      A.   Another student at the school at that time.
13      Q.   Was she a basketball player?
14      A.   I believe she was for one year.
15      Q.   How about this year, in 2009?
16      A.   I don't recall if it was that year or not.
17      Q.   Did you ever ask Robin Landis to talk to your
18  players about these allegations that Emily Mayer was
19  making against you?
20      A.   I don't recall ever asking her that, no.
21      Q.   Did anybody ever tell you that Robin had been
22  talking to the players on the team and questioning
23  whether they believed Emily?
24      A.   I know she was talking with them.  I don't

                              36 (Pages 141 to 144)

| Page 145 |
|---|

1  know the exact details of that discussion or what.
2     Q.  How long have you known Robin Landis?
3     A.  Probably for thirty years.
4     Q.  Went to school with her?
5     A.  No, not that -- she's much older than me, so
6  when I was in elementary school I don't know if she was
7  in high school or not, but. . .
8     Q.  How did you know her for thirty years, then?
9     A.  Her brother was one of my good friends in high
10  school.  I know the family.
11     Q.  Did you ever see that family socially?
12     A.  Yes.
13     Q.  Picnics, outings, that type of thing?
14     A.  Yes.
15     Q.  So, she knows you very well, right?
16     A.  Yes.
17     Q.  Did you ever receive any information from
18  anybody that Emily was challenging the girls on the
19  team as to why they may have believed Emily Mayer's
20  accusations and that she told them -- Robin Landis told
21  the players that they don't know the character of the
22  coach?
23     A.  No, I never heard that.
24     Q.  Now, in Emily Mayer's typed remarks about the

| Page 146 |
|---|

1  recollection of the content of the emails and her
2  discussion with you, it says, "Beginning in November
3  he," meaning you, "started telling me how he and
4  Lauren," meaning Lauren Fretz, "did sexual things and
5  was hinting at me to be this way."
6        Is she telling the truth?
7     A.  No.
8     Q.  She says "On December 5th of 2009, either
9  going to or coming back from the DeSales game, he,"
10  meaning you, "texted her and said 'I want to be in
11  you.'"
12        Did that happen?
13     A.  I never texted her that.  We never went to a
14  DeSales game.  It was a Drexel game.
15     Q.  Did you play DeSales?
16     A.  That's a college.
17     Q.  Is there a high school or an elementary school
18  or anything like that, senior high school?
19     A.  Not that I recall.
20     Q.  Did you ever go a DeSales game?
21     A.  No.
22     Q.  You went to Drexel and Villanova?
23     A.  We went to Drexel.
24     Q.  As a team?

| Page 147 |
|---|

1     A.  Yes, as a team.
2     Q.  In a bus?
3     A.  I believe we went in vans.
4     Q.  Did you go in her van?
5     A.  Whose?
6     Q.  The van that Emily Mayer was in.
7     A.  I don't recall.  I may have.
8     Q.  Did you sit next to her in the van?
9     A.  I don't recall.
10     Q.  In either direction?
11     A.  I know I was in the front seat in one of the
12  directions, because I wasn't feeling good.
13     Q.  Emily Mayer says here, "He would tell me he
14  could give me everything that I need and he has so much
15  to offer me and wants to marry me."
16        Did you ever tell her that?
17     A.  No.
18     Q.  Did you ever tell that to Elizabeth Nace?
19     A.  Yes.
20     Q.  Multiple occasions?
21     A.  Many.
22     Q.  Emily Mayer says, "And he wanted me to pick
23  between him and Chase," meaning Chase Brunner, her
24  boyfriend.

| Page 148 |
|---|

1     A.  Okay.
2     Q.  "Said he hated my picture on my telephone."
3  Do you see that?  Did you ever have that conversation
4  with her or text her about that?
5     A.  Never.  I've never seen any picture on her
6  cell phone.
7     Q.  Emily Mayer says, "He told me he would leave
8  the house just to text me because he had to hide it."
9  Did you ever tell her that?
10     A.  No.
11     Q.  Did you ever have to leave the house to text
12  Elizabeth Nace because you had to hide it?
13     A.  No.
14     Q.  Was your wife ever interviewed by the Bucks
15  County detectives about the Elizabeth Nace situation?
16     A.  I don't know for sure.  I know she showed up
17  at the house.  I don't know what they discussed with
18  her or how in-depth the conversation was or any of
19  that.
20     Q.  She never told you they talked to her about
21  certain things, like going away to Colorado for six
22  weeks and coming home and finding photographs in the
23  household put away?
24     A.  Things related to the Pennridge case, yes.

Page 149

1    Q.  Yes, that's what I'm talking about.
2    A.  Yes.
3    Q.  Okay. Do you know if your wife told the
4  investigators that occasionally you would leave the
5  house at night and go out in the field or in the yard
6  some place and be on the phone in the dark?
7        Do you know if your wife ever told the
8  detectives that?
9    A.  I don't know that.
10   Q.  Did she tell you, ever, that she told the
11  detectives that?
12   A.  No.
13   Q.  She says on December 17th -- again, this is
14  2009 -- "Coach texted me after the game 'just so you
15  know, next Tuesday I am going to tell them that I
16  resign.' I said why and he said that he can't be
17  friends with me and has to quit because it kills him to
18  see me."
19       Did you ever text her that?
20   A.  No.
21   Q.  Did you ever text her or tell Emily Mayer
22  anything in order to make her jealous in order to get
23  her to have some physical relationship with you?
24   A.  No. If I would, why would I remove her as

Page 150

1  captain of the team at the same time?
2    Q.  I can't answer your questions. Did you ever
3  tell Elizabeth Nace that you had physical relationships
4  with other players, not only that team but other teams,
5  in order to make her jealous to enter into a physical
6  relationship with you?
7    A.  I told her -- I never told her I had a
8  physical relationship with anyone, that I recall. I
9  told her that I spoke with others.
10   Q.  Texted others.
11   A.  And it was not to make her jealous. It was
12  because she had a clear dislike for the people that I
13  mentioned.
14   Q.  Then why would you tell her that?
15   A.  Because I knew she disliked the person that I
16  was talking about.
17   Q.  Were you trying to upset her?
18   A.  No, just -- not trying to upset her at all. I
19  don't know how I would describe it.
20   Q.  Do you know a girl, or a woman now, named
21  Madeleine Wright?
22   A.  I don't know her personally, but she was one
23  person I mentioned in those text messages.
24   Q.  To Elizabeth Nace.

Page 151

1    A.  Yes.
2    Q.  Why did you mention her to Elizabeth Nace?
3    A.  Because she didn't like her.
4    Q.  I don't understand. Why would you tell
5  Elizabeth Nace that you were having some
6  communications, in text or otherwise, with someone that
7  Elizabeth didn't like?
8    A.  To get a reaction.
9    Q.  What kind of reaction?
10   A.  None specifically.
11   Q.  Did you tell her why you were in communication
12  with that person?
13   A.  I don't recall.
14   Q.  But it wasn't to make Elizabeth Nace jealous
15  or worrying about you paying attention to some other
16  girl.
17   A.  I don't recall what my intentions were at the
18  time other than to get her, you know -- a reaction.
19   Q.  Emily Mayer says again on this Romig Exhibit
20  6, "He," meaning you, "would forward text messages he
21  said were between he and Lauren Fretz and ask if I was
22  jealous."
23       Did you ever do that?
24   A.  No.

Page 152

1    Q.  Did you text Lauren Fretz when she was a
2  player?
3    A.  No.
4    Q.  Never?
5    A.  Not that I recall. I don't even know if I had
6  a cell phone at the time.
7    Q.  That would have been around 2008, right?
8    A.  2007, 2008, somewhere around that time.
9    Q.  Emil Mayer says in her statement or typed
10  remarks "Coach told me he liked being on the Quakertown
11  school bus with his team because they would change in
12  front of him."
13   A.  Never.
14   Q.  Did you ever tell her that in a text?
15   A.  No, sir.
16   Q.  Emily Mayer says in her recollected statement
17  here, "Late-night text messages unreturned by me
18  because I fell asleep and he would respond with a text
19  full of question marks, multiple question marks, one
20  after the other."
21       Did you ever do that to her?
22   A.  Not that I recall.
23   Q.  After you were told by Clymer about the
24  accusations that Emily Mayer was making about texting,

38  (Pages 149 to 152)

Eric Romig                                    Nace vs. Pennridge School District
                      May 4, 2015

<table>
<tr><td>

**Page 153**

1  inappropriate texting from you, did you ever send her
2  an email about Ewing Oil?
3      A.  Who?
4      Q.  Ewing Oil.
5      A.  An email to who?
6      Q.  To Emily Mayer.
7      A.  Not that I recall.
8      Q.  I'm asking you.
9      A.  Not that I recall.
10     Q.  Was Chelsea ever sexually abused as child?
11     A.  No.
12     Q.  Did she ever tell you that she was?
13     A.  No.
14     Q.  In any of your emails to Emily Mayer, did you
15  ever compliment her on her looks, tell her she was
16  pretty, tell her you liked the way her body looked,
17  anything like that?
18     A.  No.
19     Q.  To Emily Mayer.
20     A.  To Emily Mayer?  No.
21     Q.  Did you do it with Elizabeth Nace?
22     A.  Yes.
23     Q.  Did you ever try to communicate with players
24  on your teams through your wife's Facebook account?

</td><td>

**Page 155**

1      A.  Yes.
2      Q.  Do you know whether or not Ryan Clymer and
3  Russ Hollenbach ever met with Emily Mayer's parents in
4  person?
5      A.  I have no idea what -- anything that happened
6  in the investigation other than what happened with me.
7      Q.  And we've seen emails between the Smiths and
8  Ryan Clymer back and forth, but you don't have any
9  knowledge that he actually met them face-to-face to
10  review this stuff?
11     A.  I have no knowledge, no.
12     Q.  Did Ryan Clymer or Russ Hollenbach ever
13  discuss with you the issue of whether or not they
14  should report these allegations of inappropriate
15  conduct between you and Emily Mayer to the police
16  department or the DA or the state public agencies?
17     A.  No.
18     Q.  Did you tell Chelsea of the accusations that
19  Emily Mayer was making against you?
20     A.  She was well aware of it.
21     Q.  How did she become aware of it?
22     A.  The whole team knew.
23     Q.  How did they know?
24     A.  I don't know.

</td></tr>
<tr><td>

**Page 154**

1      A.  No.
2      Q.  Did you ever Facebook Emily Mayer on your
3  wife's Facebook account?
4      A.  No.
5      Q.  Did Ryan Clymer or Russ Hollenbach ever tell
6  you that they tried to talk to Chase Brunner about the
7  texting situation between you and Emily Mayer?
8      A.  I don't recall if there was a conversation or
9  what the content of that conversation was.
10     Q.  Did they ever tell you whether or not Emily
11  Mayer actually showed some of the inappropriate texts
12  to Chase Brunner?
13     A.  No.
14     Q.  Did anybody ever tell you whether or not Emily
15  Mayer showed any of the inappropriate texts to Alli
16  Alderfer?
17     A.  No.
18     Q.  Did you ever tell Emily Mayer not to tell or
19  discuss with other people all the texting that you were
20  doing back and forth with her?
21     A.  No.
22     Q.  Did you tell that to Elizabeth Nace, about all
23  the testing you were doing back and forth with her, not
24  to tell other people?

</td><td>

**Page 156**

1      Q.  I'm asking you:  Did you tell Chelsea about
2  it?
3      A.  No.
4      Q.  Do you know who did tell Chelsea about it?
5      A.  I'm assuming it was through the school, but I
6  don't know specifically who, whether it was an
7  individual or group of people.
8      Q.  Do you know if Chelsea tried to contact Emily
9  Mayer after she found out about the accusations to talk
10  to Emily about it?
11     A.  I don't.  I don't believe they were talking at
12  all at that time, anyways.
13     Q.  Did you ever get on a conference call with Mr.
14  Clymer and Russ Hollenbach, a telephone call,
15  conference call, where they were in a room somewhere at
16  the school and you were somewhere out away from the
17  school?
18     A.  No.
19     Q.  About the Emily Mayer situation?
20     A.  No.
21         (Exhibit Romig-7 was marked for
22     identification)
23  BY MR. GROTH:
24     Q.  We have another exhibit, Romig Exhibit 7, from

</td></tr>
</table>

                                        39  (Pages 153 to 156)

                                              Appendix 0263

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

Page 157

1    Kevin Smith to Ryan Clymer, dated January 5th, 2010.
2    This email with attachments -- more phone logs, text
3    logs, between you and Emily Mayer --is dated the same
4    date as you turning in your resignation to Ryan Clymer
5    and Russ Hollenbach.
6         First of all, this is what Mr. Smith attaches
7    as logs of the text messages between you and Emily
8    Mayer for the month of December 2009, only for the
9    month of December 2009. We looked at the other logs
10   for September, October and November.
11        A. Okay.
12        Q. Let me ask you -- and you're free to look at
13   the logs if you want. They're the same as the other
14   logs, the same kind of information. They go from
15   December 4th, 2009 at 5:47 a.m. until Tuesday, December
16   22nd at 9:53 a.m., with numerous emails after 10:00 at
17   night, 11:00 at night, what have you.
18        You can go through them if you want, but first
19   I want to take a look at the email from Kevin Smith
20   to Ryan Clymer and let me know if you were ever shown
21   that email by anybody before.
22        (Pause)
23        A. Okay.
24        Q. Did you ever see that document before?

Page 158

1        A. No.
2        Q. Mr. Clymer didn't show it to you?
3        A. No.
4        Q. What time was your meeting with Mr. Clymer and
5    Mr. Hollenbach on -- strike that.
6        This says, according to Mr. Smith's count of texts
7    that during the month of December the number of texts
8    between you and Emily was 2,140 texts; and texts from
9    Emily back to you, 1,886.
10       Why were there so many texts between you and
11   Emily in December of 2009?
12       A. Because the issues that she was having with
13   Chelsea and the other members of the team and what was
14   going on at the time, just letting her -- I asked her
15   to step down as the captain.
16       Q. And it took 2,140 text messages from you to
17   discuss that issue?
18       A. You asked what increased the amount from the
19   previous month, and that's what increased it for me.
20       Q. And that's what I'm asking you now. Now that
21   you're telling me it's about them being demoted as
22   captains and having problems, that that took 2,140
23   messages from you to Emily in December?
24       A. That is what the nature of those conversations

Page 159

1    were in December.
2        Q. It also says that on December 5th, 2009,
3    beginning at 9:38 a.m. and continuing all day until one
4    minute after midnight on December 6th, you texted Emily
5    175 times in one day.
6        A. Okay.
7        Q. Does that refresh your recollection at all
8    about that particular date?
9        A. I don't recall.
10       Q. Do you have any reason to dispute Mr. Smith's
11   conclusion that you texted his daughter 175 times in
12   one day in December?
13       A. Do I have any reason to dispute that?
14       Q. Yes, do you have any reason to dispute it? Can
15   you tell me it's not true, and tell me why it's not
16   true if it's not true?
17       A. I have no factual reason to believe it's not
18   true.
19       Q. Did you see the reference in Mr. Smith's email
20   to Mr. Clymer that says "You will notice a message sent
21   December 22nd at 9:23 a.m., the day after Emily spoke
22   to you," meaning Mr. Clymer, "and the last text message
23   containing the message 'This presentation is going to
24   be rough. Ewing Oil contracts are difficult to

Page 160

1    negotiate'"?
2        Do you read that at the bottom?
3        A. I read that, yes.
4        Q. Did you send her that text message?
5        A. I have no idea why I would.
6        Q. But you can't deny that you did.
7        A. If I did, it was not meant for her.
8        Q. Were any of the text messages that you ever
9    sent Emily Mayer intended for your wife? In other
10   words, did you text something to Emily Mayer that you
11   actually had intended to send to your wife?
12       A. I don't recall. I have mistexted people in my
13   life, yes.
14       (Exhibit Romig-8 was marked for
15   identification.)
16   BY MR. GROTH:
17       Q. I've marked as Romig Exhibit 8 an email from
18   Russ Hollenbach to Ryan Clymer, Ron Jones and Paul
19   Auckland. Who is Ron Jones?
20       A. He was an assistant pastor at the church at
21   that time.
22       Q. And who is Paul Auckland?
23       A. The head pastor of the church at that time.
24       MR. GROTH: I'm not sure if I gave the

40 (Pages 157 to 160)

Appendix 0264

Eric Romig                                    Nace vs. Pennridge School District
                        May 4, 2015

| Page 161 | Page 163 |
|---|---|

**Page 161**

1     date identifying it: It's January 5th, 2010 also.
2 BY MR. GROTH:
3     Q.  Mr. Hollenbach is forwarding this email that
4 was sent to him by your wife, Stephanie Romig.
5       Were you aware back at the time, 2009/2010,
6 that your wife was emailing either Mr. Hollenbach or
7 Mr. Clymer about the situation with Emily Mayer?
8     A.  I knew she was in contact with him. I don't
9 know the specifics of what was said.
10     Q.  Did you ever tell your wife that you thought
11 that somebody sent these texts, 175 texts on December
12 5th, when you left your phone someplace overnight? Did
13 you ever tell her that?
14     A.  When I thought that was the weekend that my
15 phone was misplaced, I believe it had to be the case
16 because I didn't have my phone at the time.
17     Q.  Let me have you take look at that, read
18 through it if you want, and tell me if you've ever seen
19 it before.
20       (Pause)
21     A.  Thank you.
22     Q.  First question: Did you ever see this email
23 before?
24     A.  I have not.

**Page 162**

1     Q.  Your wife didn't get your okay or clearance to
2 send this to Russ Hollenbach on January 5th, the day
3 you resigned?
4     A.  No, nor would she need it.
5       MS. SOMMER: Mr. Groth, can we just go
6 off the record for a minute?
7       MR. GROTH: Sure.
8       (There was a discussion held off the
9 record)
10       MR. GROTH: We're back on the record.
11 BY MR. GROTH:
12     Q.  There is a comment on the second page of this
13 email from your wife that says ""We pay for our
14 children to go to a Christian school so that they don't
15 have to endure this kind of thing in public school. I
16 know kids are kids and we will see bad ones. However,
17 lesbians, drinkers, and ones having sex shouldn't be
18 allowed in Faith."
19       Do you know who she's referring to there as
20 "lesbians, drinkers, and ones having sex shouldn't be
21 allowed in Faith"?
22     A.  I don't know who specifically, but I know at
23 that time there were people within the school that fell
24 into those categories.

**Page 163**

1     Q.  Women people? Girls, females?
2     A.  Lesbians, yes.
3     Q.  Well, was she referring to any boys or just
4 girls?
5     A.  I don't know.
6     Q.  If you know.
7     A.  I don't know.
8     Q.  She also refers to your sister's situation and
9 she says in her email, "He is so hurt. His sister went
10 through this and it crushed him. He would never do this
11 to his family. He tried to be there for his team and
12 never thought it would turn on him."
13       I asked you before how you felt about your
14 sister's situation, and you said that you were there to
15 support her when she needed support, although you
16 didn't give me any details about what happened to her.
17       Is your wife here correct when she wrote that
18 whatever happened to your sister crushed you?
19     A.  I was very disappointed, yes.
20     Q.  Disappointed in the. . .
21     A.  In what happened.
22     Q.  . . .in the teacher.
23     A.  Yes.
24

**Page 164**

1       (Exhibit Romig-9 was marked for
2 identification)
3 BY MR. GROTH:
4     Q.  There is another email from Hollenbach to Ryan
5 Clymer -- I'm sorry. It's forwarding the email through
6 him, to Hollenbach, which you sent to him on January
7 6th. Hollenbach is forwarding it to Clymer on January
8 7th.
9       Would you take a look at that? It's marked as
10 Romig exhibit nine.
11     A.  Thank you.
12       MR. GROTH: Off the record for a
13 second.
14       (There was a discussion held off the
15 record)
16       THE WITNESS: Okay.
17 BY MR. GROTH:
18     Q.  That is your email to Mr. Hollenbach. Do you
19 recall sending that email?
20     A.  I did not send it; my wife did.
21     Q.  It says from Eric Romig to Hollenbach.
22     A.  We had a shared account.
23     Q.  Oh, okay. Stephanie's name is at the bottom.
24     A.  Correct.

41 (Pages 161 to 164)

Appendix 0265

Eric Romig                                Nace vs. Pennridge School District
                    May 4, 2015

---

Page 165

1    Q.  She says that she wants the texts subpoenaed
2  between Emily and Chase Brunner to try to help you out.
3  Did she ever discuss that with you?
4    A.  No.
5    Q.  Did she ever tell you why she thought getting
6  text messages between Emily and Chase Brunner would be
7  of some help to you?
8    A.  I don't recall, no.
9    Q.  Who is Mikeala Vermonica?
10   A.  Vermonica, I believe, was a -- she was a
11  player of mine.  Mikeala, I think, was a student at the
12  school, if I recall correctly.
13   Q.  Was she a player?
14   A.  No.
15   Q.  When I asked you before about going to Drexel
16  and Villanova, this also references going to Villanova,
17  does it not?
18   A.  I don't recall going to Villanova unless it
19  was for a district game or a championship game.
20   Q.  Did your wife ever tell you about this Mikeala
21  Vermonica supposedly telling somebody that Emily Mayer
22  said that she was attracted to you?
23   A.  If I recall correctly, they told Chelsea this
24  information.

---

Page 166

1    Q.  Did you ever try to verify that?
2    A.  There was no way to verify that.
3    Q.  You didn't do any investigation yourself,
4  correct?
5    A.  No.
6    Q.  Of Emily Mayer's allegations?  You didn't talk
7  to any students?  You didn't take to new players?  You
8  didn't talk to any assistant coaches or anything like
9  that?
10   A.  I would never put any of the other students in
11  the middle of that.
12   Q.  She also references here seeing Emily standing
13  by the gym door watching the basketball team practice.
14      Was this during the period of time where she
15  was suspended and out of school and off the team?
16   A.  I assume so.  I don't even recall that that
17  even took place.
18      (Exhibit Romig-10 was marked for
19      identification)
20  BY MR. GROTH:
21   Q.  I've marked as Exhibit Romig-10 an email from
22  you to Ryan Clymer dated January 7th, 2010.  This is
23  two days after you sent in your letter of resignation.
24  Would you take a look at this, please?

---

Page 167

1    A.  Yes, sir.
2       (Pause)
3    A.  Okay, thank you.
4    Q.  Now, this is about somebody supposedly using
5  your cell phone to text Emily on that day, of 175 texts
6  on 12/5.
7    A.  When we were talking about the weekend in
8  question, one of the weekends in December there, that's
9  what that was pertaining to.
10   Q.  So, when you say in this email "I hope this
11  helps and shows that someone was using my phone," you
12  later found that not to be the case.
13   A.  There were telephone numbers on that list.
14  Those telephone numbers I didn't recognize nor who they
15  pertained to.
16   Q.  But do you have any factual information that
17  somebody else texted on your phone?
18   A.  I don't have any proof or anyone on a camera
19  that they did it, but I don't know what the numbers
20  were on that call log.  Some of them --
21   Q.  You say you gave your phone occasionally to
22  members of the team to do texting and whatever?
23   A.  Or whatever they were doing.
24   Q.  Okay.

---

Page 168

1    A.  They would program numbers in my phone, you
2  know, things like that.
3    Q.  Somebody on your team that you gave the phone
4  to could have texted somebody else, correct?
5    A.  At specific times, but maybe not. . .
6       (Exhibit Romig-11 was marked for
7       identification)
8  BY MR. GROTH:
9    Q.  Romig Exhibit 11 is an email from Annette
10  Smith to Ryan Clymer dated January 16th.  This is
11  eleven days after you submitted your resignation.
12      Did you ever see this document before?
13      (Pause)
14   A.  I've never seen that, no.
15   Q.  Okay.  You testified earlier that as far as
16  you understood at the time, that Emily Mayer wasn't
17  really that upset about anything and just wanted to be
18  back on the basketball team.  Is that correct?
19   A.  Yes, her and her parents.
20   Q.  And this indicates that at some time after you
21  resigned you were actually sitting with the team during
22  a game?
23   A.  I don't ever recall sitting with the team
24  during the game.

---

42  (Pages 165 to 168)

Appendix  0266

Eric Romig
Nace vs. Pennridge School District
May 4, 2015

Page 169

1    Q.  The email here says "In my discussions with
2  Emily, she informed me that initially Mr. Romig was
3  sitting on the chairs with the girls."
4        Do you recall doing that?
5    A.  There was no way that ever would have
6  happened.  I may have been behind the bench a few rows
7  or somewhere in the vicinity, but never on the bench
8  with the team.
9    Q.  Do you recall having a conversation with Coach
10  Forker where he asked you to move because Emily Mayer
11  was uncomfortable with you sitting where you were
12  sitting?
13    A.  I do not recall a conversation like that.
14        (Exhibit Romig-12 was marked for
15  identification)
16  BY MR. GROTH:
17    Q.  I'm going to show you Romig Exhibit 12.  It's
18  dated March 31st, 2010.  It looks like notes of a meeting
19  between you and a number of people.  I'll ask you to
20  take a look at that and tell me if you've ever seen it
21  before.
22        (Pause)
23    A.  Thank you.
24    Q.  Have you ever seen that document before, Mr.

Page 170

1  Romig?
2    A.  No.
3    Q.  What was the purpose of this meeting that is
4  being documented here on March 31st, 2010?
5    A.  After having multiple meetings with the
6  pastors and talking the whole situation through, they
7  felt it would be good to bring everyone in to talk, to
8  try and come up with a resolution moving forward as far
9  as relationships and as far as how to handle things
10  properly.
11    Q.  They talk about a lot of the issues that came
12  up as part of the Mayer investigation, correct?
13    A.  Yes.
14    Q.  At this time, in March of 2010, did you want
15  to try to return to coaching at FCA?
16    A.  March of 2010.  I don't believe so, no.  I had
17  no interest in returning as coach.
18    Q.  It says here in paragraph three, "Eric
19  speaking," referring to you, and then it says in
20  Subsection A, "Eric used the term 'neglect' on -- I'm
21  not sure what the last two words are.  Right here:  Do
22  you know what that is referring to?
23    A.  I don't know.
24        MR. SANTARONE:  What is it?

Page 171

1        THE WITNESS:  This right here.  It says
2  "Eric has used the term 'neglect. . .'"  I don't
3  know what that says, though.
4        MR. KEMETHER.  ". . .on her part."
5        MR. GROTH:  You can't read it?
6        THE WITNESS:  No.
7        MR. SANTARONE:  The last word is
8  "part."
9        MR. GROTH:  Yes.
10        THE WITNESS:  If there was -- what
11  you're talking about at the time is also stated, I
12  believe, in maybe an email I sent to Ryan about
13  how I was bad-mouthing him and everyone involved
14  at that time, which I even sent them a letter
15  recently stating the same thing because it
16  continued long after that even took place.
17  BY MR. GROTH:
18    Q.  Subsection 4.2 says, "Ryan brought up some
19  specifics regarding untruths that surfaced in the whole
20  situation."
21        Do you recall what was being talked about at
22  the meeting between you and these gentlemen about
23  untruths that surfaced during the whole situation?
24    A.  The only thing it could have been was the

Page 172

1  confusion on the weekend of the text messages, which
2  again at that time I didn't know what was so important
3  about this specific weekend that they were talking
4  about.
5    Q.  The next section, 4.3:  "Ryan shared that Eric
6  lied to him.  Eric shared some reasons and excuses."
7  You think that's what that was referring to?
8    A.  Yes, had to be.
9    Q.  No other lies?  No other excuses?
10    A.  No.
11    Q.  It says in 5.3 "Claims marriage is great and
12  Steph is aware of texting."  Do you recall discussing
13  that at this meeting?
14    A.  Yes.
15    Q.  Was your marriage great in the spring and fall
16  of 2013 when you started a physical relationship with
17  Elizabeth Nace?
18    A.  No.
19    Q.  What had happened between 2010 and 2013 with
20  your marriage?
21    A.  It wasn't 2010 and 2013.  It was the year
22  2013.  It just seemed to be a disconnect.  We had many
23  conversations about our marriage, and to me it just
24  seemed that there was a change in maybe her feelings or

43 (Pages 169 to 172)

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

---

Page 173

1   what was going on in her mind at the time.
2       Q.   Did you ever get any marital counseling?
3       A.   No.
4       Q.   Under paragraph six of this handwritten
5   report, under Subsection 6.5 it says "Can you coach
6   again?". Then it says "Yes, in time and under probation
7   contract."
8           Did you discuss at this meeting coaching again
9   at FCA?
10      A.   I don't ever recall the probation part of it,
11  but at that meeting I told you I discussed with Russ
12  possibly returning next season as girls coach, and I
13  believe it was maybe a year later about me coming back
14  or applying for the boys coach at the time.
15      Q.   And did you ever do that, apply for any of
16  those positions afterwards?
17      A.   Ryan and I had dinner at a diner in
18  Sellersville to discuss the matter.
19      Q.   When?
20      A.   It was quite some time between this incident
21  and. . .
22      Q.   Sometime after March 31st, 2010, sometime
23  later.
24      A.   No doubt.

---

Page 174

1       Q.   Later in 2010 or 2011?
2       A.   I don't recall the exact time, but it was at
3   least a year after this incident.
4       Q.   And when the note here is "Yes, in time and
5   under probation contract," do you know who is saying
6   that or who said it at the meeting, that you could come
7   back under a probation contract?
8       A.   No.
9       Q.   Under the conclusion paragraph, paragraph
10  nine, 9.1, it says "Because of legal counsel, coaching
11  next year is not possible."
12      A.   I have no idea what that's -- legal counsel or
13  anything to do with that.
14          (Exhibit Romig-13 was marked for
15              identification)
16  BY MR. GROTH:
17      Q.   The next exhibit is thirteen, Romig-13, an
18  email from you dated May 7th, 2010, to Russ Hollenbach
19  with a copy to Clymer.
20          There is a series of actual emails back and
21  forth between you folks that are attached to that.
22  Would you take a look at that quickly, please?
23      A.   Sure.
24          (Pause)

---

Page 175

1       Q.   I just have a couple of questions about this.
2   Just for the conversations, it seems to be about your
3   going to an awards banquet or basketball banquet at the
4   end of the season. Is that correct?
5       A.   Yes.
6       Q.   Did you ask permission to attend the banquet
7   after the Emily Mayer situation arose? Did you ask
8   anyone for permission, Ryan Clymer or Russ Hollenbach
9   or anybody else?
10      A.   No.
11      Q.   Did Mr. Clymer or Mr. Hollenbach try to
12  dissuade you from attending the banquet?
13      A.   Absolutely not.
14      Q.   What was the reason, then, for the email about
15  going to the banquet or having the girls say something
16  to you or not say something to you?
17      A.   To do what's best for everybody involved, not
18  to take attention off the students, because the night
19  is about them. It's not about me. It's not about what
20  happened. It's not about what's been said.
21          The night's about them, so I didn't want to
22  take focus off where it should have been, and that's on
23  the students.
24      Q.   Well, was there a discussion about somebody

---

Page 176

1   telling the players on the team not to ask you any
2   questions or talk about the Emily Mayer situation? Did
3   somebody raise that issue with you?
4       A.   Not that I recall. I know in that email we
5   discussed, you know -- because I believe Chelsea wanted
6   to have the right to do that, if she deemed necessary.
7       Q.   To do what?
8       A.   To bring me up and thank me for my time there,
9   but not to bring up the situation itself. That would
10  be uncomfortable for the students.
11      Q.   There is also a passage in this email that you
12  sent that says "There is nothing written in the coach's
13  handbook at FCA or anywhere at Faith that let the
14  coaches know this or that it was a rule," talking about
15  not texting players.
16      A.   Right.
17      Q.   And you say "Quantity means nothing when there
18  is no rule in writing preventing coaches from texting
19  their players."
20          Are you trying to tell Mr. Hollenbach here and
21  Ryan Clymer that this all occurred with Emily Mayer
22  because there was no written rule at FCA that you
23  couldn't text players?
24      A.   Ask that again, please.

---

44 (Pages 173 to 176)

Appendix 0268

Eric Romig                          Nace vs. Pennridge School District
                          May 4, 2015

Page 177

1    Q.  Yes.  Were you trying to convince Mr. Clymer
2  and Mr. Hollenbach that none of this texting issue with
3  Emily Mayer would have taken place if FCA had had in
4  place a written policy regarding texting between
5  coaches and players?
6    A.  If it was set in stone, it would not have
7  taken place.  But it was new to all of us at that time.
8  It's not like this existed for years and years, where,
9  you know, this is the first time something ever came up
10  related to that.  So, it was new to the school as well
11  as me.
12    Q.  Well, when you put in this email -- and I
13  quote -- "Quantity means nothing when there is no rule
14  in writing preventing coaches from texting their
15  players," were you meaning to impart to Mr. Clymer and
16  Mr. Hollenbach that a coach texting one of his players
17  over 2,100 times in December and a total of over 3,000
18  times in three months should not have any consequences,
19  that it didn't mean anything if there is no rule
20  against it?
21    A.  At that time I didn't see what the problem
22  was.
23    Q.  Also in the email, you reference a statement
24  saying Mayer faces a defamation lawsuit from you for

Page 178

1  the accusations that she made against you.
2    A.  I must have said that out of anger because. .
3  .
4    Q.  My question is, did you ever do anything about
5  that?
6    A.  No.
7    Q.  Did you ever talk to an attorney about it,
8  about pursuing it?
9    A.  No.
10    Q.  Did you ever talk to the Mayers or Smiths
11  about it?
12    A.  No.
13    Q.  Did you ever make a threat against them?
14    A.  No, I had no contact with them once the
15  allegation came out.
16    Q.  It says in here that you were intending to
17  confront the Smiths at the school about the accusations
18  of their daughter against you, and Hollenbach actually
19  tells you here in his email to go and confront the
20  Smiths.
21    A.  Right.
22    Q.  Do you recall reading that?
23    A.  Yes.
24    Q.  Did you ever do it?

Page 179

1    A.  No.
2    Q.  Why not?
3    A.  Well, when I discussed it -- when I sought
4  advice from my pastor and whatnot about the proper
5  thing to do, we do believe that Christians shouldn't
6  sue other Christians.  And I believe that on my own,
7  still believe that to day, so I just kind of move
8  forward with that.
9    Q.  You believe that Christians shouldn't sue
10  other Christians even if they do very hurtful things to
11  other Christians.
12    A.  No.
13    Q.  They should not.
14    A.  No.
15    Q.  How should it be handled?
16    A.  The person that commits the offense should go
17  to the people and seek their forgiveness.
18    Q.  And that should be the only consequence.
19    A.  Yes.
20    Q.  And it was also your belief that as a
21  Christian you should forgive the person who committed
22  an offense against you, correct?
23    A.  Yes.
24    Q.  So, as far as you were concerned, if you did

Page 180

1  anything wrong, you should ask for forgiveness from the
2  Smiths and they should forgive you, end of story,
3  right?
4    A.  No.
5    Q.  What about your situation with Elizabeth Nace?
6  Same thing?  You believe that as a Christian -- and she
7  was a Christian -- that all you should have done was
8  seek her forgiveness and get it from her, and that
9  would have been the end of the story?
10    A.  Absolutely not.  I belong where I -- I belong
11  doing the time I'm doing because I did something wrong.
12    Q.  As a Christian, you regard it as a sin to lie
13  about things you've done, acts that you've committed in
14  the past?
15    A.  Yes.
16        (Exhibits Romig-14 and Romig-15 were
17      marked for identification)
18  BY MR. GROTH:
19    Q.  Last two things from the FCA, two letters that
20  you wrote to Russell Hollenbach, one dated 8/27/14 and
21  one dated 11/12/14.  I don't know if you need to read
22  through all of them here.
23    A.  No, thank you.
24    Q.  They're more recent, whatever.  I have just a

45 (Pages 177 to 180)

Eric Romig                                    Nace vs. Pennridge School District
                              May 4, 2015

Page 181

1  couple of questions.  In the August 27th letter which
2  is marked Romig Exhibit 14, you say you were not under
3  contract after May 2013 at Pennridge.  Do you recall
4  writing that?
5     A.  Yes.
6     Q.  But in 2013 you started coaching Elizabeth
7  Nace when?
8     A.  Repeat the question, please?
9     Q.  Yes.  The season ended at Pennridge in May of
10 2013, the JV season, right?
11    A.  Yes.
12    Q.  And you coached her for what period of time
13 during 2013?
14    A.  From March to May.
15    Q.  So, you had March, April and to the end of May
16 where you were in contact with Elizabeth Nace by virtue
17 of Pennridge putting you in position as JV coach of the
18 girls softball team, correct?
19    A.  Correct.
20    Q.  You had no other reason to be in contact with
21 her, correct?
22    A.  Correct.
23    Q.  You were not a teacher?
24    A.  Correct.

Page 182

1     Q.  You had nothing else to do, no other function
2  or part to play at the school, correct?
3     A.  No.
4     Q.  You didn't know her before that, correct?
5     A.  Yes, I coached her the previous year.
6     Q.  Except for coaching her the previous year, you
7  had no contact with her or knew her before that year.
8     A.  No.
9     Q.  Okay.  And do you have any reason to believe
10 that Elizabeth Nace knew, personally knew, Emily Mayer
11 at any time before you became her coach at Pennridge?
12    A.  Not that I'm aware of.
13    Q.  In this Romig-14 exhibit, the handwritten
14 letter from you to Russ Hollenbach dated 8/27/14, you
15 indicated something about meeting a guy in prison and
16 about him getting some Facebook messages from -- it
17 says "her to meet for sex."
18    Do you recall saying that in the letter?
19    A.  Yes.
20    Q.  Tell me what that's all about.
21    A.  I met a guy in county prison who --
22    Q.  In Doylestown?
23    A.  In Doylestown, at Bucks County Prison, who
24 actually told me during that summer that he knew the

Page 183

1  person in my case.  He knew --
2     Q.  What person in your case?
3     A.  Elizabeth Nace.
4     Q.  Okay.
5     A.  And that they -- the same time that we were --
6  in the summer of 2013, when we were doing our thing,
7  that he had Facebook conversations with her; that she
8  invited him over, discussing when her parents would not
9  be home, and also stated what her name was and where
10 she lived.
11    Q.  And he was in county jail for what?
12    A.  Arson.
13    Q.  Do you know what happened to him eventually?
14 Was he convicted, plead guilty, what?
15    A.  Yes.
16    Q.  And how did it come up that he started
17 discussing Elizabeth Nace with you in county prison?
18    A.  He told me that he knew the person involved in
19 that case.
20    Q.  How did he know what your case was about?
21    A.  It was pretty well publicized.
22    Q.  Did he tell you he read it in the newspaper,
23 or what?
24    A.  Saw it on TV, read it in the newspaper.

Page 184

1     Q.  While he was in jail?
2     A.  Yes.
3     Q.  And he told you, out of the blue, that
4  Elizabeth Nace had contacted him by Facebook in a chat
5  room or something to talk to him about meeting up for
6  sex?
7     A.  I don't know exactly if it was a chat room --
8  I don't know all the details of that, but he said they
9  were friends on Facebook because they were both
10 associated with Pennridge and that the conversation
11 took place in the summer of 2013.
12    Q.  Was that important to you for any reason?
13    A.  Yes.
14    Q.  Why?
15    A.  Because it shows a pattern on her part.
16    Q.  Pattern of what?
17    A.  That this is not the only time that this
18 happened with an adult.
19    Q.  Only time what happened with an adult?
20    A.  Discussing inappropriate things or actually
21 being involved with inappropriate things.
22    Q.  Well, whose idea was it for Elizabeth Nace to
23 get involved with you in the first place?  Whose idea
24 was it?

Appendix 0270

Eric Romig                          Nace vs. Pennridge School District
                    May 4, 2015

Page 185

1       A.  Both of ours.
2       Q.  So, you're saying she pursued you.
3       A.  I wouldn't say she pursued me, no, but she
4   told me what her intentions were and how she felt about
5   me long before I even knew.
6       Q.  When did she tell you that?
7       A.  In the summer of 2013.
8       Q.  When in the summer of 2013?
9       A.  Possibly June or July.
10      Q.  You didn't text her at all the first year you
11  coached her, did you?
12      A.  No.
13      Q.  But you started coaching her in the second
14  year -- you started texting her in the second year.
15      A.  At the end of the season, yes.
16      Q.  In May?
17      A.  Yes.
18      Q.  Before the season ended.
19      A.  I don't recall if it was when our season
20  ended.  Our season ended the beginning or middle of
21  May.
22      Q.  And were any of those texts inappropriate in
23  terms of talking about personal matters with her that
24  had nothing to do with the softball season?

Page 186

1       A.  I don't know the exact time where the text
2   messages turned inappropriate.
3       Q.  If she says that that occurred during the
4   season at Pennridge before the season ended at the end
5   May, you can't dispute that, can you?
6           MR. SANTARONE:  I'm sorry, are you
7       talking about 2013?
8           MR. GROTH:  Yes.
9           MR. SANTARONE:  Season, okay.
10          THE WITNESS:  I don't know what -- I
11      mean, I'm sure you have the documentation of what
12      was in the text messages between her and I, so. .
13
14  BY MR. GROTH:
15      Q.  Well, I want to know your recollection.  To
16  your recollection, you were texting her inappropriate
17  things before the season ended at Pennridge in 2013?
18      A.  I don't believe our conversations were during
19  our season, no.  Maybe after our season ended and maybe
20  she went and played for the varsity, but I do not even
21  recall that.
22      Q.  What types of inappropriate things did you
23  text to her when you started texting her inappropriate
24  things?

Page 187

1       A.  I don't recall.
2       Q.  You don't recall?
3       A.  No, not at the beginning.  I obviously know
4   what was said June, July and August.
5       Q.  Were you complimenting her on her looks?
6       A.  I know at some point in the summer of 2013 I
7   did, yes.
8       Q.  You keep saying in the summer.  What time do
9   you mean by "the summer""?
10      A.  June, July and August.
11      Q.  Were you telling her that you could help her
12  out with her problems?
13      A.  Yes.
14      Q.  What problems did she have?
15      A.  She was having issues as far as her parents
16  and how they were treating her in reference to she
17  mentioned something about her father was only
18  interested in her life when it came to softball, and I
19  believe that's how that started.
20      Q.  Sort of the same type of personal problems you
21  texted and discussed with Emily Mayer.
22      A.  Completely different.
23      Q.  Did Elizabeth Nace ever tell you that she had
24  an eating disorder?

Page 188

1       A.  Yes.
2       Q.  And what did she tell you?
3       A.  That she has had -- that she suffered from an
4   eating disorder over the last couple to few years of
5   her life.
6       Q.  What was her height and weight, to the best of
7   your approximation, back in 2013 when she just turned
8   sixteen, May of 2013?
9       A.  Approximately five foot three and somewhere
10  around 100, 105 pounds.
11      Q.  Could it be a little less than that? Could she
12  be a little shorter than that, less weight than that?
13      A.  I don't know.
14      Q.  Did she have braces on her teeth back then?
15      A.  Yes.
16      Q.  Did she look like she was sixteen or did she
17  look younger?
18      A.  Yes.
19      Q.  Yes what?
20      A.  She looked like she was sixteen.
21      Q.  You don't know exactly the date, but you say
22  it's in the summer of 2013, when you began
23  inappropriate texts with her.  Is that correct?
24      A.  I believe it was June of 2013, yes.

47 (Pages 185 to 188)

Appendix 0271

Eric Romig                                    Nace vs. Pennridge School District
                                May 4, 2015

Page 189

1    Q.  June of 2013.  You're not sure of that.
2    A.  Not one hundred percent, but pretty sure.
3    Q.  Who was the first person between the two of
4  you to make any suggestion that there should be some
5  physical sexual contact between the two of you?
6    A.  I believe we discussed that in person the
7  first time.
8    Q.  Who brought it up?
9    A.  I don't recall.
10   Q.  She might have brought it up?
11   A.  May have, but may not have as well.
12   Q.  Do you recall whether or not you ever asked
13  her if she was a virgin?
14   A.  Yes.
15   Q.  Did you ask her?
16   A.  Yes.
17   Q.  Do you think that was an appropriate question?
18   A.  None of it was appropriate.
19   Q.  What did she tell you?
20   A.  She said yes, and then later recanted that she
21  was not.
22   Q.  When did she recant it?
23   A.  I believe it was July of 2013.
24   Q.  What did she tell you?

Page 190

1    A.  That she was with some -- I knew of at least
2  one other person that she confessed to me about.
3    Q.  Who?
4    A.  A guy named Kyle.
5    Q.  Kyle what?
6    A.  I don't know.
7    Q.  A student at school?
8    A.  I believe so.  It was somebody that she dated.
9  I don't know if it was someone at Pennridge or someone
10  outside of Pennridge.
11   Q.  Did she say that was her only time of physical
12  sexual contact?
13   A.  In June of 2013, I believe if you review the
14  text messages, she discussed a coach that she was
15  coached by previous to the -- he was on the travel team
16  that she participated in.
17      She mentioned about a close relationship she
18  had with that coach, but would not admit whether it was
19  physical or not.  But you will be able to review that
20  in the text messages.
21   Q.  Do you know who the coach was?
22   A.  Mark Gery.
23   Q.  Where did he work or coach or whatever?
24   A.  The Deep Run.

Page 191

1    Q.  Deep Run what?
2    A.  Athletic Association, I believe.
3    Q.  Did she actually show you emails or text
4  messages or something that confirms this information?
5    A.  No.  She just discussed with me what their
6  relationship was.  And when she left The Deep Run team
7  to pursue other interests with another team, she told
8  me that he said that, if she left the team, that he
9  would be extremely upset, that he wouldn't know what he
10  would do, and other comments that make it seem like
11  there was a lot more than just a coach-player
12  relationship.
13   Q.  Did she say there was actually anything
14  physical between the two of them?
15   A.  She would not admit it, but she would . . .
16   Q.  She would what?
17   A.  Talk about him quite often and infer as if
18  there was, falling short of actually stating that it
19  actually did happen.
20   Q.  Is this before or after you were having a
21  physical sexual relationship with her?
22   A.  Before.
23   Q.  Did you tell Elizabeth Nace that you and your
24  wife were having marital problems?

Page 192

1    A.  I believe I did, yes.
2    Q.  Did you tell her that you were getting a
3  divorce?
4    A.  I believe I did, yes.
5    Q.  Did you tell her that you were separated from
6  your wife?
7    A.  I don't recall whether I did or not.  I may or
8  may not have.
9    Q.  Well, if you told her you were getting a
10  divorce or that you were separated, that was all lies,
11  right?
12   A.  I wasn't sure what my intention was at that
13  time.
14   Q.  Well, you weren't divorced and you weren't
15  separated at that time, correct?
16   A.  There were obvious problems in our marriage.
17  We weren't legally separated or legally divorced.
18   Q.  But you told Elizabeth Nace that you were
19  either separated or getting a divorce, correct?
20   A.  I told her that that was my intention.
21   Q.  And you told her it was your intention to
22  marry her and take care of her, Elizabeth Nace,
23  correct?
24   A.  Yes.

brusilow.com          brusilow + associates          215.772.1717

Appendix 0272

Page 193

1    Q.   That was a lie, too, right?
2    A.   No.
3    Q.   You had the intention of marrying a
4  just-turned-sixteen-year-old girl when you were
5  thirty-six.  Is that correct?
6    A.   No, I wasn't going to marry her when she was
7  sixteen years old.
8    Q.   You were going to marry her eventually.
9    A.   At that time I thought that was a possibility.
10   Q.   You invited Elizabeth Nace over to your family
11 house on a number of occasions to sleep over.  Is that
12 correct?
13   A.   Yes.
14   Q.   And she lied to her parents and said that she
15 was at a girlfriend's house and she spent the night
16 with you at your place, right?
17   A.   I believe she did.
18   Q.   And you had sexual contact with her at your
19 place?
20   A.   Yes.
21   Q.   How many times?
22   A.   I believe on two separate occasions.
23   Q.   Just two.
24   A.   I believe so, yes.

Page 194

1    Q.   And on those occasions did you tell her, since
2  nobody was there -- the family was not there,
3  whatever -- did you tell her that they were not there
4  because you were separated from your wife?
5    A.   I told her that my wife was at her parents'
6  house.
7    Q.   Did you try to give her the impression that
8  you were separated?
9    A.   I don't remember exactly what I told her.
10   Q.   At some point before your wife and kids came
11 back from Colorado, did you take the family pictures
12 off of the dressers, walls, cabinets, wherever you had
13 them, and put them away somewhere?
14   A.   Yes.
15   Q.   Why did you do that?
16   A.   Well, as soon as my family left and whatnot, I
17 was cleaning the home and whatnot, and I put some of
18 them back and some of them I did not.
19   Q.   Why did you not put back some of them?
20   A.   Because I didn't know exactly where they went.
21 But there were pictures of our family up in the house
22 at that time.
23   Q.   In your letters to Mr. Hollenbach dated
24 11/12/14, Romig Exhibit 15n, you talk about getting

Page 195

1  divorced from Stephanie and having her call you or try
2  to get you ruled to be an unfit father, and you raised
3  a question of whether you should bring up her past and
4  play dirty, and you say "it's a deep past."
5    Q.   Does your wife have any type of sexual abuse
6  or victimization or sexual misconduct in her history?
7    A.   Yes, but I don't see why that is relevant to
8  the case.
9    Q.   It may or may not be.  What was her situation
10 that you were referring to in this letter that you
11 wrote to Mr. Hollenbach?
12   A.   Can I object on the grounds of relevance?
13   Q.   You can object; you still have to answer the
14 question.
15   A.   She was raped when she was younger.
16   Q.   And this is the past, the dirty-whatever that
17 you were talking about, your wife's past, the fact that
18 she was raped when she was younger?
19   A.   No.
20   Q.   What were you referring to there?
21   A.   That she had a messy divorce previously where
22 she was mistreated.
23   Q.   Physically abused by her husband?
24   A.   Yes.

Page 196

1    Q.   When you made these comments in your letter,
2  were you trying to indicate to Mr. Hollenbach that you
3  could bring up these types of things from your wife's
4  past to show that she was an unfit mother for some
5  reason?
6    A.   My attorney at the time in the divorce
7  proceeding was suggesting that could be a possible way
8  to go, and I told her --
9         MR. SANTARONE:  Wait.  You tell him the
10 law about everything else; you should tell him the
11 law about this.
12        MR. GROTH:  You shouldn't reveal what
13 discussions you had with your attorney.  That's
14 attorney-client privilege.
15        THE WITNESS:  Okay.
16 BY MR. GROTH:
17   Q.   But this was a way for you to -- did you
18 consider this a way -- bringing up this type of
19 information or dirt, as you call it, is this the type
20 of thing that you thought you might be able to use to
21 counter your wife's claim that you were an unfit
22 father?
23   A.   Absolutely not.
24   Q.   You also talked about the court system and the

49 (Pages 193 to 196)

Eric Romig                                        Nace vs. Pennridge School District
                        May 4, 2015

| Page 197 | Page 199 |
|---|---|

**Page 197**

1  law here in this letter. You say "The law and courts
2  are twisted on how they operate. If you did not
3  confess, you'd be home by to you. Telling the 'truth'
4  burns you and the laws are twisted."
5       What did you mean by that? Referring to the
6  Elizabeth Nace situation, correct?
7       A.  I was called a stupid criminal for confessing,
8  because confessing leaves you open to open pleas and
9  open pleas end up resulting in higher sentences than if
10 you would have kept your mouth shut; with two county
11 charges and essentially probation charges, that you
12 would have got far less time when I thought I was doing
13 the right thing by confessing.
14      Q.  Well, you actually pleaded guilty to what, six
15 felony counts?
16      A.  Yes.
17      Q.  So, everything they charged you with you
18 pleaded guilty to, correct?
19      A.  Yes, that is what was advised.
20      Q.  And sentencing on some of the charges was
21 suspended and you were sentenced for, I think, three of
22 the different counts in the criminal complaint,
23 correct?
24      A.  Yes.

**Page 198**

1       Q.  But you did plead guilty to everything they
2  charged you with.
3       A.  That's what I was advised, yes. It's very
4  rare in today's sentencing that charges are run
5  consecutive. Mine were run consecutive with no
6  criminal history.
7       Q.  At the sentencing hearing, do you believe that
8  was, in part, because the court-ordered psychiatrist or
9  psychologist that analyzed your situation found you to
10 be predatory?
11      A.  The probation officer.
12      Q.  Yes. The sentencing report, when you were
13 having a psychological examination, there was a
14 conclusion by the psychiatrist that --
15      MR. SANTARONE:  Objection. Are you
16   testifying about this? You're asking him --
17      MR. GROTH:  He can tell me if I'm
18   wrong. He knows what the --
19      MR. SANTARONE:  Are you asking him,
20   when he was finally sentenced, what was the reason
21   for the silence?
22      MR. GROTH:  No.
23 BY MR. GROTH:
24      Q.  I'm asking you -- you said that you would have

**Page 199**

1  gotten a lot lighter sentence under different
2  circumstances if you didn't confess.
3       A.  Absolutely.  I was told that many, many times.
4       Q.  Do you recall being informed at the sentencing
5  hearing by the judge that the court-ordered
6  psychologist or psychiatrist found actions to be
7  predatory?
8       A.  That was her opinion, but it was untrue
9  because there was stuff in her report that was not
10 true. She did not put in her report what I said,
11 completely subjective.
12      Q.  Did you know the principal at Pennridge, Tom
13 Creeden, before you went to work as a coach there?
14      A.  No.
15      Q.  This is so long ago I forget if we went over
16 this, but did you actually sign written contracts with
17 Pennridge?
18      A.  The first year I did; the second year, I gave
19 Paul Koehler permission to sign it.
20      Q.  Did Mr. Babb do any formal interview of you
21 before hiring you to coach at Pennridge?
22      A.  No, because he knew me from my time at
23 Quakertown.
24      Q.  So, he obviously didn't have to ask any

**Page 200**

1  questions about your time at Quakertown, but did he ask
2  you any questions at all about your time at FCA?
3       A.  No.
4       Q.  Did anybody else at Pennridge ask you about
5  your coaching experience at FCA?
6       A.  No.
7       Q.  Did anyone from Pennridge ever ask you whether
8  or not there were any problems in your coaching at FCA?
9       A.  (No response)
10      Q.  Problems with players, parents.
11      A.  In interviewing for the softball job?
12      Q.  Yes.
13      A.  No.
14      Q.  And I think you said before you didn't bring
15 it up yourself, the situation with Emily Mayer that led
16 to your resignation, correct?
17      A.  Correct.
18      Q.  You didn't volunteer that information to
19 anybody at Pennridge, correct?
20      A.  No.
21      Q.  After Elizabeth Nace's parents found the texts
22 that you were sending her, the inappropriate texts that
23 you were sending her on her cell phone and immediately
24 reported it to the police, how did you become aware

brusilow.com            brusilow + associates            215.772.1717

Appendix 0274

Eric Romig                                Nace vs. Pennridge School District
                    May 4, 2015

---

**Page 201**

1  that her parents found out about your relationship with
2  Elizabeth Nace?
3      A.  She texted me and told me.
4      Q.  Elizabeth did?
5      A.  Yes.
6      Q.  What did she text you on?
7      A.  Her original cell phone right before her
8  parents took it.
9      Q.  What was your reaction to that?
10     A.  Shocked.  I mean. . .
11     Q.  Were you scared?
12     A.  Absolutely.
13     Q.  Did she tell you in that text that her parents
14  were taking her phone away?
15     A.  I don't recall if that last text message told
16  me that they were taking her phone away, and I don't
17  believe it did because I believe I tried to text her
18  back, with no response.
19     Q.  Did she tell you that her parents were going
20  to the police to inform them of your relationship with
21  her?
22     A.  I think at some point she told me that.  I
23  don't know if it was by text or by email.
24     Q.  You only occasionally emailed her, correct?

---

**Page 202**

1      A.  The on time --
2      Q.  As compared to the texting?
3      A.  The only time I emailed her would have been
4  between the time her phone was taken and the time that
5  she had the second phone.
6      Q.  And when the police came and took her phone
7  and computer and everything else they took as part of
8  their investigation, you made arrangements with her to
9  provide her with a discrete cell phone so you could
10  contact her, correct?
11     A.  Two days after her phone was taken, we had a
12  practice which I did not expect her to be at.  Her
13  mother brought her to the practice, anyways.
14         At that time she told me that she wanted to
15  remain in contact with me, which I agreed to because I
16  wanted to find out what was going on at the time.
17     Q.  Who wanted to remain in contact with you?
18     A.  Liz.
19     Q.  But not the mother.  Liz -- Elizabeth Nace.
20     A.  Yes.
21     Q.  All right.
22     A.  So, we discussed about getting her a phone,
23  and then she told me how to go about getting her that
24  phone.

---

**Page 203**

1      Q.  She told you about how to get the phone.
2      A.  Yes, how to get the phone to her.
3      Q.  And it was decided that you were going to hide
4  it somewhere out on the property?
5      A.  She told me a spot to hide it in the back of
6  her home, yes.
7      Q.  And why did you want to provide her with a
8  discrete cell phone?
9      A.  To find out what was going on as far as her
10  parents going to the police or taking her phone over or
11  whatever the case may be.
12     Q.  And how many times did you communicate with
13  that discrete cell phone?
14     A.  It would have been on a Sunday and Monday, two
15  days in September.  Probably approximately maybe a
16  couple hundred times.
17     Q.  And what were you texting about?  What was the
18  content of the texts generally?
19     A.  What was going on with the investigation; what
20  was going on from her side; what was she doing, you
21  know, as far as me asking her to do everything that she
22  could not to get, you know -- for this to keep going
23  forward.
24     Q.  I'm sorry, I missed the last part.  She was

---

**Page 204**

1  going to do what?
2      A.  To do everything in her power to let me know
3  what was going on as far as what was going on with the
4  parents and the police and so on and so forth.
5      Q.  So, at that point you were both still
6  maintaining a relationship with each other, correct?
7      A.  Yes.
8      Q.  At some point in this texting, before her
9  parents found out about it, you started sending her
10  photos of yourself?
11     A.  Yes.
12     Q.  Naked photos of yourself?
13     A.  Yes.
14     Q.  And you asked her to send you back naked
15  photos of herself.
16     A.  Yes.
17     Q.  Did she do that?
18     A.  Yes.
19     Q.  At some point you also sent her videos of you
20  performing some sex acts, correct?
21     A.  Yes.
22     Q.  And you asked her to do the same, send videos
23  to you?
24     A.  I remember asking her for pictures.  I don't

---

51 (Pages 201 to 204)

Appendix 0275

Eric Romig                                    Nace vs. Pennridge School District
                                  May 4, 2015

Page 205

1   recall asking her to volunteer videos.
2       Q.   And how many videos did you send her?
3       A.   I don't recall.
4       Q.   More than one?
5       A.   I don't recall.
6       Q.   When were these photos and videos sent to her
7   by cell phone?
8       A.   Sometime near the summer of 2013.
9       Q.   June, July, August?
10      A.   June, July or August.
11      Q.   Did you send her video of yourself
12  masturbating in a shower naked?
13      A.   I don't recall if it was in the shower.
14      Q.   But you do recall sending a video of you
15  masturbating.
16      A.   Yes.
17      Q.   During any of that time period, in the late
18  spring and summer of 2013, was it your understanding
19  that you were doing anything wrong at all?
20      A.   Could you say that one more time?
21      Q.   Sure.  When you started this relationship with
22  Liz, both the inappropriate texts and sexually-charged
23  texting that was going back and forth and then physical
24  activity, was it your understanding that you were ever

Page 206

1   doing anything wrong?
2       A.   Yes.
3       Q.   When did you know that what you were doing was
4   wrong?
5       A.   Immediately.
6       Q.   Immediately with the first texts back and
7   forth that were inappropriate.
8       A.   Yes.
9       Q.   Did you have any understanding that initiating
10  or engaging in that type of activity with a girl who
11  had just turned sixteen could be very damaging or
12  harmful to her?
13      A.   No.
14      Q.   Did you think it was not going to be harmful
15  or injurious to her in any way?
16      A.   No.
17      Q.   What did you think?
18      A.   Obviously I wasn't thinking.  We discussed
19  many times in school that her, her teammates, her
20  friends constantly on a daily basis -- and I witnessed
21  this myself -- each one of her friends discussing which
22  teacher, which coach, which administrator they would
23  love to sleep with and what they would do to do that.
24      Q.   And this happened in school.

Page 207

1       A.   Absolutely.
2       Q.   In your presence.
3       A.   In my presence.
4       Q.   And what other teachers did they talk about?
5       A.   Some of the baseball coaches.  And the names I
6   don't remember, and I don't know if they were coaches
7   or players or administrators.  It wasn't Mr. Babb or Mr.
8   Creeden or anybody like that.
9       Q.   Did they know you were overhearing these
10  conversations?
11      A.   I would assume they would.  I was only about
12  ten, fifteen feet away.
13      Q.   And were any of them discussing you?
14      A.   Not that I know of, but I was told by Liz that
15  there were some, yes.
16      Q.   There were some what, that were interested in
17  you.
18      A.   Yes.
19      Q.   The girls on your own team.
20      A.   No.
21      Q.   Just girls in school.
22      A.   Girls on the varsity team.
23      Q.   On the varsity team.
24      A.   Yes.

Page 208

1       Q.   And when you overheard these conversations
2   while you were in school at Pennridge, did you do
3   anything to stop the conversations or admonish the
4   girls about having that type of conversation in public,
5   especially in a situation where you could hear them
6   talking about it?
7       A.   No, because, number one, I wasn't the coach of
8   the girls that were discussing that with the girls that
9   were on my team in that conversation; and number two, I
10  looked and figured, I'm not the head coach.  Who am I?
11  Some of these girls hardly even know me.
12      Q.   So, if they were saying or doing something
13  inappropriate that came to your attention because you
14  overheard it going on, you didn't think it was your
15  duty or responsibility or obligation to do anything to
16  stop it.
17      A.   To stop what, them talking about it?
18      Q.   Yes.
19      A.   No.
20      Q.   Are those the types of things you also texted
21  Elizabeth Nace about when you were texting her about
22  personal things, not the softball things:  Who is
23  interested in who, who wants to have sex with who in
24  the school, that type of thing?

                                        52  (Pages 205 to 208)

Appendix  0276

Eric Romig                                    Nace vs. Pennridge School District
                                              May 4, 2015

**Page 209**

1  A. The only thing I recall is her telling me the
2  story of one other girl that asked her about me.
3  Q. Who was that girl?
4  A. Olivia Campbell.
5  Q. Is she on a team?
6  A. She was on the varsity team.
7  Q. Did you ever coach her?
8  A. With the Sellersville Belles I did, for those
9  two months.
10  Q. How old was she at the time?
11  A. I don't know.
12  Q. Was she older than Elizabeth Nace or younger?
13  A. I believe they may be the same age.
14  Q. Did you ever discuss with Olivia Campbell
15  giving her a letter, telling her that you were going to
16  give her a letter that you didn't want her to open
17  until her sixteenth birthday?
18  A. No.
19  Q. Did you ever hear anything to that effect
20  before?
21  A. Yes.
22  Q. From whom?
23  A. I told her that I had something for her when
24  she graduated from the school, and that something was

**Page 210**

1  to tell her or to -- it was a prediction that she would
2  be the first Pennridge player to go to Division 1 and
3  receive a full-ride scholarship.
4  Q. Did you ever tell Elizabeth Nace about the
5  Emily Mayer situation that you were involved in at FCA?
6  A. No.
7  Q. Did you ever tell her of any involvement of
8  yours with -- strike that.
9  Did you ever tell her that there were some
10  claims or accusations that you may have had some
11  inappropriate relationship with Kristen Kennedy or
12  Lauren Fretz?
13  A. No, I told her nothing about FCA.
14  Q. Did Russ Hollenbach at any time after you
15  became a coach at Pennridge ever tell you that he had a
16  conversation with David Babb about the issues you had
17  at FCA involving Emily Mayer?
18  A. No.
19  Q. Do you know if Russell Hollenbach knew David
20  Babb?
21  A. I believe they knew of each other just from
22  being athletic directors.
23  Q. Did the principal of Pennridge, Thomas
24  Creeden, or the athletic director, David Babb, ever ask

**Page 211**

1  you about any of your work experience or problems or
2  issues you may have had while you were coaching at FCA
3  after you came to Pennridge? `
4  A. When interviewing for the softball position?
5  Q. No. You said you didn't interview for the
6  softball position at Pennridge. Babb just offered you a
7  job --
8  A. Right.
9  Q. Now I'm saying, after you actually worked as a
10  coach at Pennridge, did Clymer or Babb come to you and
11  ask you --
12  MS. SOMMER: Creeden. You're talking
13  about Creeden.
14  MR. GROTH: Yes. Let me start again.
15  BY MR. GROTH:
16  Q. After you began working as a coach at
17  Pennridge, did Mr. Creeden and Mr. Babb ever come to
18  you to ask you any questions about your work experience
19  or any issues you may have had while working as a coach
20  at FCA, including the Emily Mayer incident?
21  A. When I interviewed, I believe it was during
22  the summer of 2013. I had interviewed at Pennridge for
23  the basketball job that came open, and they asked me if
24  I left Faith on bad terms, and I said no.

**Page 212**

1  Q. Was that boys basketball or girls?
2  A. Girls.
3  Q. Girls at Pennridge.
4  A. I think so, yes.
5  Q. And that was the summer of 20. . .
6  A. I'm almost certain it was the summer of 2013.
7  It would be near the end of the school year, maybe
8  April or May.
9  Q. And they asked you, when you interviewed for
10  the boys job, whether or not you had any problems or
11  issues with FCA.
12  A. They asked me if I ever coached basketball
13  before, and I told them I coached basketball at FCA.
14  And she asked if I left FCA on bad terms, and I said
15  no.
16  Q. Did they specifically ask you any questions
17  about problems you may have had with a player that you
18  were coaching or parents of a player you were coaching?
19  A. Nothing specific.
20  Q. Did they ask you any questions about whether
21  or not you had a texting issue or problem with any
22  player that you were coaching at FCA?
23  A. No.
24  Q. Did they tell you that they had heard from

53 (Pages 209 to 212)

Appendix 0277

Eric Romig                                    Nace vs. Pennridge School District
                    May 4, 2015

| Page 213 | Page 215 |
|---|---|

**Page 213**

1  some source that there was a problem that you had that
2  caused you to leave FCA other than health?
3  　　A.  I don't recall.
4  　　Q.  When the Bucks County detectives were
5  investigating your relationship with Elizabeth Nace,
6  did they ask you about the Emily Mayer situation?
7  　　A.  No.
8  　　Q.  Did you tell them that there was a text issue
9  between you and Emily Mayer?
10  　　A.  I told them in the original interview on
11  October the 1st that they asked if there were any other
12  allegations ever made against me, and I told them what
13  the results of that were.
14  　　Q.  Did you ever discuss with Elizabeth Nace some
15  plan that you had for her and you to arrange to have
16  sex together at a tournament that was coming up in the
17  fall of 2013?
18  　　A.  I may have.
19  　　Q.  What happened with regard to your position at
20  Pennridge after you were arrested on October 1st, 2013?
21  　　A.  Once I pleaded guilty in January of 2014 I
22  received a letter from Pennridge -- I believe it was at
23  a board meeting or whatever the case may be -- stating
24  that my position was terminated.

**Page 215**

1  　　A.  Yes.
2  　　Q.  For how long?
3  　　A.  I believe it was once.
4  　　Q.  Do you know if she's still in the area?
5  　　A.  I do not.
6  　　Q.  When was the last time you had any contact
7  with her?
8  　　A.  It's been at least probably six, seven, eight
9  years.
10  　　Q.  Do you know if she had a Facebook page?
11  　　A.  At one time, yes.
12  　　Q.  Did you ever try to contact her or communicate
13  with her on her Facebook page?
14  　　A.  Not that I recall.
15  　　Q.  Did you ever look at her Facebook page?
16  　　A.  Not that I recall.
17  　　Q.  Did you ever look at Kristen Kennedy's
18  Facebook page?
19  　　A.  No.
20  　　Q.  Have you ever sought professional psychiatric
21  or psychological help during your lifetime for thoughts
22  or actions towards teenage students or players, that
23  type of thing?
24  　　A.  No.

**Page 214**

1  　　Q.  What about between October 1st and January?
2  　　A.  I didn't hear anything from Pennridge at all.
3  　　Q.  While you were at Pennridge did you ever hear
4  any facts or information from any source to indicate to
5  you that there were any other inappropriate sexual
6  relationships or abuse or harassment or inappropriate
7  conduct between employees of Pennridge and students at
8  Pennridge?
9  　　A.  No.
10  　　Q.  Did you ever attempt to contact Lauren Fretz
11  after she left FCA?
12  　　A.  I believe I texted her about helping out in
13  the summer of -- I don't recall.  It was after she
14  graduated from FCA, whatever year that was.  I
15  contacted her about helping out in the summer with our
16  basketball team.
17  　　Q.  You wanted her to help out with the basketball
18  team.
19  　　A.  Yes.
20  　　Q.  Doing what?
21  　　A.  We didn't have very many players at the time,
22  so I needed people to stand in so that we could
23  scrimmage and do things like that.
24  　　Q.  Did she do it?

**Page 216**

1  　　　　MR. GROTH:  I have no further
2  questions.  Thank you.  Other counsel may have
3  questions.
4  　　　　(EXAMINATION)
5  BY MR. KEMETHER:
6  　　Q.  Sir, I'm Sean Kemether.  I represent Mr.
7  Clymer and Mr. Hollenbach.  I do have a few questions
8  for you.
9  　　　　If I understand correctly from the questions
10  you were asked so far with regard to Elizabeth Nace,
11  from June of 2013 until the end of September 2013, you
12  sent her sexually explicit texts on repeated occasions?
13  　　A.  Yes.
14  　　Q.  And you sent her sexually explicit photos on
15  repeated occasions?
16  　　A.  I don't know how many times, but yes.
17  　　Q.  You sent her sexually explicit videos on
18  several occasions?
19  　　A.  I know I did at least once.
20  　　Q.  And you had sexual relation with her on
21  several occasions.
22  　　A.  Yes.
23  　　Q.  Did you do any of those things to any other
24  person, any person while you were at Faith Christian

Eric Romig

Nace vs. Pennridge School District
May 4, 2015

Page 217

1 Academy?
2    A. No.
3    Q. If I understand correctly from your testimony
4 earlier, Elizabeth Nace, between June of 2013 and
5 September of 2013, sent you sexually explicit texts?
6    A. Could you repeat that again?
7    Q. Sure: Between June of 2013 and September of
8 2013, Elizabeth Nace sent you sexually explicit texts
9 on repeated occasions?
10    A. Very often, yes.
11    Q. Emails?
12    A. No emails.
13    Q. Photographs?
14    A. Yes.
15    Q. Of herself?
16    A. Yes.
17    Q. Videos of herself?
18    A. I don't recall if there was a video.
19    Q. And on multiple occasions she had sexual
20 relations with you.
21    A. Yes.
22    Q. Did you ever force her to have sexual
23 relations with you?
24    A. Never. As you can tell by my charges, I have

Page 218

1 no charges that have to do with the sex act itself,
2 just relating to the cell phone.
3    Q. Prior to her parents finding out about your
4 relationship, did Elizabeth Nace ever tell you that she
5 was upset with you or didn't want to be in a
6 relationship with you?
7    A. Absolutely not. As a matter of fact, after
8 her parents found out about the text messages and
9 whatnot, she told me that -- you know, made it very
10 clear that she didn't want this to end.
11        And on many different occasions throughout the
12 few months that this went on, even when we discussed
13 about it being right or wrong or whatever the case may
14 be, even when I discussed with her that I was twenty
15 years older and it's just not right and this must end,
16 she made it very clear that she did not want it to end.
17    Q. Most of this activity took place while you
18 were the head coach of and she was a player on the
19 Sellersville Belles?
20    A. For most of this activity I was not -- we were
21 not in the Pennridge season nor in the Sellersville
22 Belles season. It was at the very tail end -- I
23 believe it was the end of August and March is when
24 there was contact between her and I on the Sellersville

Page 219

1 Belles.
2    Q. End of August and September.
3    A. Yes.
4    Q. And when was the Sellersville Belles season?
5    A. That was when I started with the Belles, was
6 the end of August, early September. When the conduct --
7 June, July, August.
8        I tried to fight the institutional charge
9 because my agreement with Pennridge was that my season
10 starts March 1st and ends the day of the last game, and
11 nothing occurred during that time.
12    Q. When was Elizabeth on the Sellersville Belles
13 in the summer of 2013?
14    A. The end of August and September.
15    Q. Okay.
16    A. And even after my arrest from. . .
17    Q. Okay. We talked earlier -- there were two
18 exhibits, and I forget the numbers, of handwritten
19 letters you wrote to Mr. Hollenbach from jail.
20    A. Yes.
21    Q. Have you written any other letters to anyone
22 else from jail pertaining to Elizabeth Nace or Emily
23 Mayer?
24    A. I wrote a letter recently to Faith Christian

Page 220

1 Academy, apologizing for talking behind their back and
2 whatnot, but nothing specifically pertaining to the
3 case.
4    Q. Any letters to anyone else outside of Faith
5 Christian Academy about those subjects?
6    A. No.
7    Q. As we sit here now, do you have any plans to
8 be with Elizabeth Nace once you get out of prison?
9    A. Absolutely not. I was wrong for what I've
10 done, and I have reached out in court and I have
11 reached out through the inmate accountability back here
12 in the DOC to express my remorse to her parents,
13 understanding that forgiveness probably will not be
14 given, but I want them to understand that I know what
15 I've done and that I'm deeply and truly sorry.
16    Q. Has Elizabeth Nace tried to contact you since
17 you've been in prison?
18    A. No, sir.
19        MR. KEMETHER: Those are the questions
20 I have for you right now. Thank you very much.
21        THE WITNESS: Thank you.
22        MR. SANTARONE: I don't have any
23 questions.
24        MS. SOMMER: I have a few. Do you mind

55 (Pages 217 to 220)

Eric Romig                              Nace vs. Pennridge School District
                    May 4, 2015

<table>
<tr><td>Page 221</td></tr>
</table>

Page 221

1    if we switch places?
2            MR. GROTH:  Not at all.
3            (There was a discussion held off the
4    record)
5            MS. SOMMER:  Back on the record.
6            (EXAMINATION)
7    BY MS. SOMMER:
8       Q.   Mr. Romig, as you know, I represent the
9    Pennridge School District, Mr. Creeden and Mr. Babb.
10      A.   Yes, ma'am.
11      Q.   You mentioned early on that you had not been a
12   teacher at any time; you had only been a coach.  Is
13   that correct?
14      A.   Yes, at the different institutions.
15      Q.   How about Sunday school?  Were you ever a
16   Sunday school teacher?
17      A.   Yes, ma'am.
18      Q.   And where was that?
19      A.   At Faith Baptist Church.
20      Q.   That's the church that's affiliated what Faith
21   Christian?
22      A.   They were at one time.
23      Q.   They were at one time.  Did you have to get
24   any kind of criminal-history clearance to be a Sunday

Page 222

1    school teacher at that time?
2       A.   I don't believe so, because the Sunday school
3    class I taught were married couples my age.  I wasn't
4    with younger people.
5       Q.   And when was that?
6       A.   My goodness.  For quite a few years.  Probably
7    from 2004 to -- off and on until my arrest.
8       Q.   You talked about, when you were at Quakertown,
9    you were the high school girls basketball coach.
10      A.   At Quakertown?
11      Q.   At Quakertown.
12      A.   I was the high school girls softball coach.
13   The only place I coached basketball was FCA.
14      Q.   Was that the girls or boys?
15      A.   At Quakertown?
16      Q.   No, at -- basketball, I'm sorry.  Basketball.
17      A.   It was girls.
18      Q.   Why did you leave Quakertown?
19      A.   As a result of what happened at FCA and the
20   physical issues I was having, there was absolutely no
21   way that I could pick up in two months and start to do
22   my duties at Quakertown.
23      Q.   So, you worked for Quakertown in 2008 and
24   2009.  The incidents with Faith Christian happened in

Page 223

1    2010?
2       A.   The meeting and whatnot happened at the very
3    beginning of 2010.  And soon after that meeting I sent
4    that email, I believe, to the current athletic director
5    at Quakertown and then actually had a meeting with her.
6    That was the first time I ever met her.
7       Q.   And you had to get the criminal-background
8    clearances to work at Quakertown as well, right?
9       A.   Yes.
10      Q.   When you applied for the position -- when you
11   were contacted by Mr. Babb, that was the summer of
12   2011, correct?
13      A.   That was for the Pennridge position?
14      Q.   Yes.
15      A.   Yes.
16      Q.   And he was calling you to take a position in
17   2011 as a junior varsity coach of the girls softball
18   team.
19      A.   Right.  This was for the school year
20   2011/2012, but I was not contacted until around the new
21   year of 2012.
22      Q.   And that was to start a coaching position in
23   March of 2012, correct?
24      A.   Right, two months later.

Page 224

1       Q.   What contact had you had with Mr. Babb when
2    Mr. Babb was working at Quakertown School District?
3       A.   What contact did I have with him?
4       Q.   Yes.
5       A.   We communicated through email and he would
6    show up at a game or two.  He would send an email, you
7    know, after we one a game just to say congratulations.
8       Q.   And the coaches at the Quakertown School
9    District received evaluations of their performance,
10   correct?
11      A.   I believe so.
12      Q.   And if you didn't get a good performance
13   evaluation, you would not be asked to return the
14   following year.
15      A.   Absolutely.
16      Q.   Likewise, at the Pennridge School District
17   there were annual evaluations, correct?
18      A.   Yes.
19      Q.   And was it Mr. Koehler who did the evaluation
20   or was it Mr. Babb?
21      A.   It was, I believe, Mr. Koehler.
22      Q.   Do you know whether Mr. Babb had to sign off
23   on those evaluations?
24      A.   I believe they were sent from the athletic

                              56  (Pages 221 to 224)

                                              Appendix 0280

Eric Romig

Nace vs. Pennridge School District
May 4, 2015

Page 225

1  office in Pennridge to Mr. Koehler, who evaluated all
2  of his other coaches, which were two assistant coaches
3  on his team and then me; and then I believe that the
4  parents did the evaluation on Paul Koehler.
5      Q.  The criminal-history background checks that
6  were done, you got them done for Quakertown and you got
7  them done for Pennridge, correct?
8      A.  Yes.
9      Q.  And there had been no charges filed against
10  you for violation of any criminal law or any
11  child-abuse statute, either during your time at
12  Quakertown, during your time at Faith Christian, after
13  you were left Faith Christian or during the time that
14  you were at Pennridge, until the Nace matter, right?
15      A.  Correct.
16      Q.  When you were discussing with Faith Christian
17  your resignation or whether or not you would be able to
18  continue to coach, was there any discussion about
19  whether Faith Christian would let prospective employees
20  for coaching jobs know about the incidents or the
21  allegations from Ms. Mayer?
22      A.  No.
23      Q.  When was the first time that you met Mr.
24  Koehler?

Page 226

1      A.  I believe it was February or March of 2012.
2      Q.  And that was right before you started as the
3  junior varsity coach?
4      A.  Yes.  When Mr. Koehler and Mr. Babb first
5  contacted me about the position, I agreed to come to a
6  practice to sit in and watch and whatnot to see if it's
7  something that would interest me or not, and that is
8  the first time I met him in person.
9      Q.  Do you have to be a member of the PIAA Coaches
10  Association?
11      A.  I don't know.
12      Q.  Do you --
13      A.  I never applied for anything, or there was no
14  paperwork saying you had to be a part of PIAA?
15      Q.  Did you attend any PIAA seminars, training,
16  meetings or anything like that?
17      A.  Just rules-interpretation meetings.
18      Q.  And when was that?
19      A.  At my time and Quakertown and FCA, and I did
20  not have to at Pennridge because Paul Koehler was the
21  varsity coach.
22      Q.  You mentioned that you heard girls at
23  Pennridge talking about having relations or who was
24  hot, which coaches or teachers or whatever were hot at

Page 227

1  school.  Did you tell Mr. Koehler about that?
2      A.  No.  We, as the assistant coaches, discussed
3  it.  I do not know if they discussed it with Paul
4  Koehler.
5      I mentioned to the two assistant coaches on
6  the varsity team that that was discussed, and it was
7  met with the reaction that they weren't surprised
8  because I believe they're both Pennridge or were both
9  Pennridge graduates, and I don't believe that it was
10  too long since they graduated at that time.
11      Q.  Who were those two assistant coaches that you
12  mentioned this to?
13      A.  Lee Ann Kramer and Tyler Penhallow.
14      Q.  I think you testified that the texts that you
15  started sending to Ms. Nace started after the end of
16  the Pennridge softball seem?
17      A.  After the end of the Pennridge junior varsity
18  season.
19      Q.  The junior varsity season.
20      A.  Yes.
21      Q.  Is Kevin Smith Emily Mayer's stepfather?
22      A.  Yes.
23      Q.  In October of 2013, when you met with the
24  detectives and when you were arrested, you weren't

Page 228

1  currently coaching for Pennridge School District,
2  correct?
3      A.  No, I already was not a Pennridge employee at
4  the time.  They said -- I believe it was my attorney
5  and the detectives went to Pennridge to obtain a copy
6  of my contract, because I was fighting that
7  institutional charge because I kept telling them I was
8  not a Pennridge employee at that time because I was
9  released from my contract at the end of the season.
10      I don't know what was discussed between the
11  attorney and the detectives, but I was told not to
12  worry about it because I wouldn't get jail time on it,
13  anyways.
14      Q.  You said that you had an interview with Mr.
15  Creeden and Mr. Babb about a basketball position.  Was
16  it the girls basketball position?
17      A.  Yes.
18      Q.  And when was that interview and when was the
19  job supposed to begin?
20      A.  I believe it was April or May of 2013, and it
21  was for the. . .
22      Q.  For the interview.
23      A.  That was when the interview took place.  The
24  job itself was opening up -- I think it was an open

57 (Pages 225 to 228)

Appendix 0281

Eric Romig                              Nace vs. Pennridge School District
                    May 4, 2015

Page 229

1   position. I think it was listed on the school website
2   or however that is done.
3       Q.   And at that time you didn't give them any
4   information about being terminated by Faith Christian?
5       A.   No.
6       Q.   Are you still in contact with Mr. Hollenbach?
7       A.   Those two letters that I sent that Mr. Groth
8   has, I sent those to him, but I have had no contact
9   with him since the second letter that I wrote. I
10  believe it was November.
11      Q.   And the job at the Pennridge School District,
12  you get paid a certain salary and that salary covers
13  the period of time for the season only, correct?
14      A.   For the season only. Once my season ends,
15  whatever date that is, I am required to get all the
16  equipment back to the school and the school releases
17  the check to me, and that's it. And then it is up to me
18  to decide what I want to do for the following season.
19      Q.   Mr. Groth, I believe, asked you -- someone
20  asked you a question about a tournament, arranging to
21  have sex at a tournament in the fall of 2013. What
22  tournament was that?
23      A.   I don't recall, but it was not anything
24  related to Pennridge. It had to do with the

Page 230

1   Sellersville Belles.
2       Q.   It's fair to say that the sexual contact that
3   you had with Ms. Nace did not occur on Pennridge School
4   District property?
5       A.   Never.
6       Q.   And it did not occur during your tenure as a
7   coach with the Pennridge School District from May of
8   2011 or 2012 on.
9           MR. KEMETHER: Objection to form.
10      A.   From March to May of 2013?
11      Q.   Right.
12      A.   No.
13          MS. SOMMER: Nothing further.
14          MR. SANTARONE: I have just a couple of
15  questions.
16          (EXAMINATION)
17  BY MR. SANTARONE:
18      Q.   Mr. Romig, as I understand, the first time you
19  were questioned by the Bucks County detectives at the
20  very first meeting, you volunteered your past
21  employment history, correct?
22      A.   Yes. That's the only time I was interviewed
23  by the Bucks County detectives.
24      Q.   And you told them that you worked at Faith

Page 231

1   Christian Academy.
2       A.   Yes.
3       Q.   And there were never any charges that have
4   ever been brought against you for anything involving
5   Emily Mayer or the Faith Christian Academy?
6       A.   No. The detectives and the district attorney
7   told my lawyer that after doing a full investigation,
8   that they were not going to pursue any charges at this
9   time with anything related to Faith Christian Academy.
10      Q.   And are you receiving any type of
11  psychological counseling in prison?
12      A.   No.
13      Q.   And you talked about some program where you
14  try to reach out to Emily Nace's family to apologize.
15      A.   Elizabeth Nace's family.
16      Q.   I'm sorry.
17      A.   It's something set up with the DOC. It's
18  called an inmate accountability bank, which is, I
19  believe, in Harrisburg, where inmates can write letters
20  to their victims or victim's families, which for me I
21  put it for the family because the mom and dad are
22  involved as well.
23          And if they are registered with -- I don't
24  know how it exactly goes, but if they are registered

Page 232

1   with the inmate accountability bank, they have the
2   option to receive the letter or not.
3       Q.   And you readily admitted and pled to the
4   issues involving Elizabeth Nace.
5       A.   Absolutely, because I didn't want to have to
6   even -- I didn't want them to even have to worry about
7   going to trial or anyone having to give testimony or
8   anything like that.
9           I did something wrong, and I didn't want to
10  follow it up by causing more heartache and pain to the
11  family.
12      Q.   Did you feel that you did anything wrong to
13  Emily Mayer to give her an apology?
14      A.   No.
15          MR. SANTARONE: That's all I have.
16  Thank you.
17          MR. GROTH: I just have a couple
18  follow-up questions.
19          (EXAMINATION)
20  BY MR. GROTH:
21      Q.   Were you ever given any written evaluations
22  for your coaching time at FCA?
23      A.   I don't believe so, no.
24      Q.   Weren't they just going to do that? I mean,

58  (Pages 229 to 232)

Appendix 0282

Eric Romig                              Nace vs. Pennridge School District
                              May 4, 2015

Page 233

1    wasn't it part of their policy at the FCA to do it?  If
2    the athletic director didn't do it, nobody else did it?
3        A.  I don't know if -- if there was, it would have
4    been by the athletic director.  But did I actually see
5    an evaluation?  I don't recall ever seeing an
6    evaluation, positively or negatively.
7        Q.  I've marked as Romig Exhibit 16 a Bucks County
8    Court of Common Pleas Court Summary for your criminal
9    charges relating to Elizabeth Nace.
10           We had talked about what happened while you
11   were under contract with Pennridge and what didn't
12   happened under your contract at Pennridge.
13           You just made a statement that the detectives
14   or somebody told you that you didn't have to worry
15   about the institutional sexual-contact charge?
16       A.  When I pled guilty in January of 2014 I
17   told -- I discussed with my attorney the issue, and he
18   went and talked to the district attorney.  And
19   basically the information he got from the district
20   attorney is that he wouldn't be sentenced off, anyways,
21   and the worst-case scenario is probation.
22       Q.  But you did plead guilty to "school
23   intercourse/sexual contact with student."  That was the
24   first count in the complaint, correct?

Page 234

1        A.  Institutional sexual assault?
2        Q.  Yes, institutional -- let me rephrase:  School
3    intercourse/sexual contact with student.
4        A.  Okay.  Yes, I did.
5            (Exhibit Romig-16 was marked for
6        identification)
7    BY MR. GROTH:
8        Q.  I'll show you Romig Exhibit 16.  It's the
9    first count there.  It has "Plea Entered" and it says
10   "Guilty Plea," correct?
11       A.  Yes.
12           MR. GROTH:  I have no further
13       questions.  Thank you.
14           (The deposition was concluded at 3:10
15       p.m.)
16
17
18
19
20
21
22
23
24

Page 235

1        Notice of Deposition                    5
2        Cover letter dated April 1, 2005 from J.
         Garton to L. Hornstine, with multipage
         attachment                              63
3        Letter dated April 28, 2015 from C. Connor
         to D. Groth, with attached document     128
4
5        Cover email dated December 23, 2009 from K.
         Smith to R. Clymer, with attached spreadsheets  135
6        Cover email dated December 31, 2009 from A.
         Smith to R. Clymer, with attached document  143
7        Cover email dated January 5, 2010 from K.
         Smith to R. Clymer, with attached spreadsheet  156
8        Email dated January 5, 2010 from R. Hollenbach
         to R. Clymer and others                 160
9        Email chain                             164
10       Email dated January 7, 2010 from E. Romig
         to R. Clymer                            166
         21
11       Email dated January 16, 2010 from A. Smith

Page 236

1    14   Eight-page handwritten document        180
              (INDEX - CONT'D.)
2
3    NO.          DESCRIPTION              PAGE
     15   Four-page handwritten document        180
4
5    16   Bucks County Court of Common Pleas Court
             Summary                             234
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Eric Romig
                                        Nace vs. Pennridge School District
                    May 4, 2015

Page 237

1        SIGNATURE PAGE
2
3            ------
4
5        I hereby acknowledge that I have read the
6    transcript, and the same is a true and correct
7    transcription of the answers given by me to the
8    questions propounded, except for the changes, if any,
9    noted on the Errata Sheet.
10
11
12            ------
13
14
15
16
17   SIGNATURE:        _____
18
     DATE:            _____
19
20
21
22
23
24

Page 238

1        ERRATA SHEET
2            ------
3
4    PAGE    LINE        CORRECTION
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 239

1        CERTIFICATION
2            ------
3        I, LANCE A. BRUSILOW, a Registered
4    Professional Reporter and Notary Public, hereby certify
5    that the foregoing is a true and accurate transcript of
6    the deposition of said witness who was first duly sworn
7    by me on the date and place herein before set forth.
8        I FURTHER CERTIFY that I am neither
9    attorney nor counsel for, not related to nor employed
10   by any of the parties to the action in which this
11   deposition was taken; and further certify that I am not
12   a relative or employee of any attorney or counsel
13   employed in this action, nor am I financially
14   interested in this case.
15
16            _____
             Lance A. Brusilow
             Registered Professional Reporter
17           Certified Realtime Reporter
18
19       The foregoing certification does not
20   apply to any reproduction of the same by any means
     unless under the direct control and/or supervision of
     the certifying shorthand reporter.
21
22
23           ------
24