Ryan Clymer

Nace vs. Pennridge School District
July 29, 2015

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
------

JAMES NACE, et al     : CIVIL ACTION
vs.
PENNRIDGE SCHOOL DISTRICT,     :
et al.         : NO. 15-333

------

Wednesday, July 29, 2015

------

Videotape deposition of RYAN CLYMER, held at

1880 John F. Kennedy Boulevard, Seventh Floor,

Philadelphia, Pennsylvania, beginning at 10:00 a.m., on

the above date, before LANCE A. BRUSILOW, Registered

Professional Reporter, Approved Reporter for the United

States District Court, and Notary Public, there being

present.

------

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

------

---

**Page 2**

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY: DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY: JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY: ROBERT M. COX, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, PA 18901
ph: 215.345.7000
(rcox@eastburngray.com)
Counsel for Pennridge School District and individual
Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY: CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA 19087
ph: 610.783.3513
(cconnor@ceplegal.com)
Counsel for FCA, Ryan Clymer and Russell Hollenbach

---

**Page 3**

(APPERARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY: SEAN V. KEMETHER, ESQUIRE
30 East Second Street
Media, PA 19063
ph: 610.585.0600
(skemether@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

DRAKE, HILEMAN & DAVIS
BY: JONATHAN J. RUSSELL, ESQUIRE
PO BOX 1306
Doylestown, PA 18901
ph: 215.348.2088
(jrussell@dhdlaw.com)
Counsel for Faith Christian Defendants

ALSO PRESENT:
Henry Thompson
Phillip Roller, Videographer

---

**Page 4**

1   THE VIDEOGRAPHER: Stand by, please.
2   We are now on the record. My name is Phillip
3   Roller. I'm a videographer retained by brusilow +
4   associates.
5       This is a video deposition for the
6   United States District Court for the Eastern
7   District of Pennsylvania. Today's date is July
8   29, 2015. The video time is 10:01 a.m.
9       This deposition is being held at 1880
10  JFK Boulevard in Philadelphia, Pennsylvania, in
11  the matter of Nace versus Pennridge School
12  District, et al. The deponent is Ryan Clymer.
13      All counsel will be noted on the
14  stenographic record, and the court reporter, Lance
15  Brusilow, will now swear in the witness.
16      RYAN CLYMER, having been first duly
17  sworn, was examined and testified as follows:
18          (EXAMINATION)
19  BY MR. GROTH:
20      Q.  Good morning. Mr. Clymer, as you know, my
21  name is David Groth, and I represent the plaintiffs in
22  a lawsuit that's currently pending in federal court in
23  Philadelphia regarding a civil rights matter that
24  involves you as a party as well as Faith Christian

---

1 (Pages 1 to 4)

Appendix  0285

Ryan Clymer                                   Nace vs. Pennridge School District
July 29, 2015

| Page 5 |
|---|

1  Academy, Pennridge School District, David Babb, Russell
2  Hollenbach and Thomas Creeden.
3          The subject matter of that litigation is a
4  personal-injury claim of my client as a result of
5  criminal sexual conduct toward her by an individual
6  named Eric Romig, who is also a defendant in the
7  action.
8          I'm going to ask you some questions about
9  things that I think are relevant and important to this
10  case. First of all, you were here yesterday during the
11  four-hour deposition of Mr. Hollenbach, were you not?
12      A.  I was.
13      Q.  And you heard me give him instructions as to
14  ways to get through this deposition more quickly and
15  efficiently, did you not?
16      A.  I did.
17      Q.  Did you understand those instructions?
18      A.  I did.
19      Q.  Is there any need for me to repeat them?
20      A.  There is not.
21      Q.  Okay, thank you. Let me ask you first: You
22  paid attention during Mr. Hollenbach's deposition
23  yesterday? You heard all of his testimony?
24      A.  Correct.

| Page 6 |
|---|

1      Q.  And I don't expect you -- I'm not asking you
2  to remember every word that he said or whatever, but is
3  there anything in his testimony about the investigation
4  of the Emily Mayer allegation against Mr. Romig that
5  you believe to be wrong?
6          In other words, where he said something that
7  you know is wrong.
8      A.  No.
9      Q.  Nothing.
10      A.  Nothing.
11      Q.  Not a single thing.
12      A.  Nothing that I can remember, no.
13      Q.  And just to give you an example --
14      A.  Sure.
15      Q.  He indicated, I believe, that you told him
16  that the issue of inappropriate sexual texting to Emily
17  Mayer was given to you by Chase Brunner.
18      A.  That is correct.
19      Q.  Is that what happened?
20      A.  That is what happened, yes.
21      Q.  He was the first person that came to you and
22  told you that Ms. Mayer was being subjected to
23  inappropriate sexual texts by Mr. Romig.
24      A.  Yes.

| Page 7 |
|---|

1      Q.  And did you ever speak to Mr. Brunner about
2  that issue after that first meeting?
3      A.  No.
4      Q.  How long was the meeting?
5      A.  It was approximately ten to fifteen minutes
6  until I told him to go get Ms. Mayer.
7      Q.  And as best that you can recall, what did Mr.
8  Brunner tell you?
9      A.  That Mr. Romig was texting some inappropriate
10  things, and I asked like what. He said something to
11  the effect of why are you dating Chase or why are you
12  with Chase, something like that.
13          So, we talked for a little while. He said --
14  I asked him if he had seen any texts, and he said he
15  had seen one text, which is the one I just referred to
16  as why-are-you-with-him type of deal. At that time I
17  said ""Please go get Emily and bring her phone."
18      Q.  Was this during the school day?
19      A.  I believe it was, yes.
20      Q.  What time of the day did he come to your
21  office?
22      A.  I want to say the afternoon, but I'm not
23  completely sure.
24      Q.  Do you know what relationship he had with Ms.

| Page 8 |
|---|

1  Mayer, if any?
2      A.  Yes, they were dating.
3      Q.  And the only text that he said was
4  inappropriate had to do with a question supposedly to
5  Emily Mayer by Mr. Romig asking why she was with or
6  dating Chase, correct?
7      A.  That was the one that he had seen, that is
8  correct.
9      Q.  Did you ask him to go get Emily?
10      A.  Did I.
11      Q.  Out of class?
12      A.  I did, yes.
13      Q.  Did you tell any Bucks County detectives that
14  it was Chase Brunner who informed you of these texts to
15  Emily Mayer?
16      A.  I did.
17      Q.  Do you know a person named Cheryl Alderfer?
18      A.  Yes.
19      Q.  Who is she?
20      A.  She is the lunch lady at our school.
21      Q.  What does that mean?
22      A.  It means she serves the lunches.
23      Q.  Does she make lunches or --
24      A.  She does sometimes, yes.

2 (Pages 5 to 8)

Appendix 0286

Ryan Clymer                              Nace vs. Pennridge School District
                              July 29, 2015

| Page 9 | Page 11 |
|---|---|

**Page 9**

1    Q.  How long has she been there?
2    A.  I don't know.  Eight years, maybe, something
3  like that.
4    Q.  Does she hold any other positions in the
5  school?
6    A.  She does not.
7    Q.  Is she a member of the church?
8    A.  I have no clue.
9    Q.  Did you ever discuss the Emily Mayer situation
10  with Cheryl Alderfer?
11    A.  No.
12    Q.  If Emily Mayer testifies that it was Cheryl
13  Alderfer who took her to your office to have her
14  discuss with you these allegations against Mr. Romig,
15  would that be truthful or not truthful?
16        MR. KEMETHER:  Object to form.  You can
17  answer.
18    A.  Chase was the one who came to me first.
19    Q.  I understand that.  If Cheryl -- I'm sorry.
20  If Emily Mayer testified that it was Cheryl Alderfer
21  who took her to your office to discuss the texts from
22  Mr. Romig, would that be truthful or untruthful?
23        MR. KEMETHER:  Object to form.  You can
24  answer if you're able.

**Page 10**

1    A.  I don't believe Mrs. Alderfer was involved at
2  all.
3    Q.  Does Ms. Alderfer ever act as a teacher's
4  assistant or teacher's aide?
5    A.  A teacher's assistant or teacher's aide?
6    Q.  Like a homeroom teacher's assistant or aide.
7    A.  She may help like plan parties and things like
8  that, but she's not like a teacher's aide.
9    Q.  Does she have a daughter?
10    A.  She does.  She's got a few daughters.
11    Q.  Is one named Allie?
12    A.  Yes.
13    Q.  That's A-l-l-i-e or Y?
14    A.  I have no idea.
15    Q.  Did you ever talk to Cheryl Alderfer about the
16  allegations made by Emily Mayer?
17    A.  No.
18    Q.  Did you ever receive any information from
19  anybody, including Emily Mayer, that she had talked to
20  Allie Alderfer about the texts that were sent to her by
21  Mr. Romig?
22    A.  No.
23    Q.  Did Cheryl Alderfer ever tell you that she
24  heard about the texts from Mr. Romig to Emily Mayer

**Page 11**

1  from her daughter Allie?
2    A.  Not that I know of.
3    Q.  That means you have no recollection of her
4  ever giving you that information or receiving that
5  information from anybody else?
6    A.  That is correct.
7    Q.  Do you know a person named Fateem Diabetes?
8    A.  Yes; she was a student.
9    Q.  Is she still at the school?
10    A.  No, she's not at the school.
11    Q.  Did you ever receive any information that she
12  was told by someone of the texts between Mr. Romig and
13  Emily Mayer?
14    A.  No.
15    Q.  So, as far as you know, would it be correct to
16  say that Cheryl Alderfer back in 2009, before Mr. Romig
17  resigned, had no information at all about Romig's texts
18  to Emily Mayer?
19        MR. KEMETHER:  Object to form.  You can
20  answer if you're able.
21    A.  I would not know.
22    Q.  Okay.  You didn't tell her; that's what I'm
23  getting at.  You didn't give her any information.
24    A.  No.

**Page 12**

1    Q.  There is a gentleman in the room named Henry
2  Thompson.  Who is he?
3    A.  He is the financial advisor at the school,
4  business office manager.
5    Q.  How long has he been in that position at FCA?
6    A.  Four or five years -- four, maybe.  Going on
7  his fourth, I believe.
8    Q.  Was he with the school back in 2009, when this
9  Mayer allegation was made?
10    A.  I do not believe he was.  He may have been
11  coaching, but he was not in a position where he was
12  hired by the school.
13    Q.  He's known as Coach Henry around the school?
14    A.  Yes.
15    Q.  Do you know if Coach Henry has been contacting
16  or attempting to contact potential witnesses in this
17  case to talk about the case?
18    A.  No.
19    Q.  You don't know that?
20    A.  No.
21    Q.  Did you ever hear him say that he was
22  attempting to contact witnesses in the case?
23    A.  No.
24    Q.  Did you direct him to attempt to contact

3 (Pages 9 to 12)

Appendix 0287

Ryan Clymer                                    Nace vs. Pennridge School District
                              July 29, 2015

---

Page 13

1  witnesses in the case?
2      A.  No.
3      Q.  Are you his superior?
4      A.  Yes.
5      Q.  I mean, he reports to you in the hierarchy or
6  chain-of-command?
7      A.  Yes.
8      Q.  Let's talk about your background.
9      A.  Okay.
10     Q.  You heard me question Mr. Hollenbach yesterday
11 about his personal background, educational background
12 and employment background. I'm going to try to go
13 through those same things with you.
14     A.  Okay.
15     Q.  Let's talk about your educational background
16 first. Can you tell me what your schooling has been,
17 starting with high school?
18     A.  Sure. I graduated from Faith Christian
19 Academy in 1995. I then attended Tennessee Temple
20 University, graduated in 2000.
21     Q.  With a degree in what?
22     A.  A BS in history, emphasis on political
23 science; and a minor in religion.
24     Q.  Okay. Any other formal education?

---

Page 14

1      A.  I took classes at the University of Texas at
2  Dallas while I was a teacher there.
3      Q.  What type of classes?
4      A.  Educational psychology, student assessments,
5  things like that.
6      Q.  Any other course study or education other than
7  what you've mentioned?
8      A.  No.
9      Q.  Have you ever taken any courses or studied or
10 met with a consultant or tried to educate yourself
11 about the manner and method of conducting sexual
12 harassment or abuse investigations?
13     A.  No.
14     Q.  Are you aware whether or not such instruction
15 is available?
16     A.  How to investigate?
17     Q.  Yes.
18     A.  No.
19     Q.  How to investigate a reported case of sexual
20 harassment or abuse.
21     A.  No.
22     Q.  Do you know whether or not there are
23 organizations, consultants or whomever that you could
24 go to educate yourself on that issue?

---

Page 15

1      A.  About specifically how to investigate? No. But
2  I do know there are organizations that talk about
3  precursors or things to watch out for that I have been
4  involved with. But how to investigate specifically?
5  No.
6      Q.  And before this Emily Mayer allegation of
7  sexual harassment by Mr. Romig, you had never
8  investigated any similar type case, correct?
9      A.  That's correct.
10     Q.  Who are the organizations that you were
11 referring to that give training or instruction on how
12 to spot sexual harassment?
13     A.  Nova.
14     Q.  Which stands for?
15     A.  It's a victim advocacy group.
16     Q.  Who else?
17     A.  That's primarily it.
18     Q.  Have you had any contact with Nova at all over
19 the years?
20     A.  Yes.
21     Q.  In what capacity?
22     A.  I had them come in and do good touch/bad touch
23 with the students and do some training with our
24 elementary teachers. They came in as well in 2009 or

---

Page 16

1  2010 to do a short symposium to our faculty as a
2  precursor before the start of the year. They were in
3  again more recently with going over reporting and
4  things like that as well.
5      Q.  And who is the person there who conducted
6  these symposiums or seminars?
7      A.  I don't know her name. Middle-aged lady.
8      Q.  Were there any materials handed out to
9  students or staff?
10     A.  To staff, yes.
11     Q.  What type of materials?
12     A.  There was her outline she was going over on
13 who to report to and things like that.
14     Q.  When did this take place?
15     A.  It was either the fall of 2009 or the fall of
16 2010. I know that because we had good touch/bad touch
17 come in before that with our elementary teachers.
18     Q.  Would you still have the materials from that
19 symposium?
20     A.  2010? I would not, no.
21     Q.  Are they somewhere in the school where they
22 could be located and copied and sent out?
23     A.  I can look. I would not have them.
24     Q.  Do you have some kind of calendar or something

---

Ryan Clymer                              Nace vs. Pennridge School District
                         July 29, 2015

Page 17

1   that would tell you whether or not it was the fall of
2   2010 or the fall of 2009?
3       A.   I would not have a calendar saying that. I
4   would probably call Nova and ask them.
5       Q.   So, it could have been, according to your
6   testimony, after this Emily Mayer situation took place,
7   correct?
8       A.   It could have been, yes.
9       Q.   How about before the Emily Mayer situation
10  took place? Did you ever have anybody from Nova or
11  anybody else come in and address the sexual harassment
12  issues with the faculty?
13      A.   Well, like I already stated, yeah, they came
14  into our elementary and went over good touch/bad touch
15  and they trained the teachers on that as well.
16      Q.   I'm talking about -- I'll be more specific --
17  I'm talking about middle school or high school.
18      A.   Specifically if, in fact, this took place
19  after, then no. But it occurred taking place in 2009.
20      Q.   Do you believe you called Nova to come in and
21  do the symposium after the Emily Mayer situation
22  because of the Emily Mayer situation?
23      A.   No.
24      Q.   You were the headmaster or principal at FCA,

Page 18

1   correct?
2       A.   Yes.
3       Q.   What do you call yourself?
4       A.   (No response)
5       Q.   Headmaster or principal?
6       A.   Both.
7       Q.   Yes.
8       A.   I answer to either.
9       Q.   How long have you been in that position?
10      A.   I just finished my seventh year.
11      Q.   You started what year?
12      A.   In that capacity?
13      Q.   Yes.
14      A.   I believe '08/09.
15      Q.   Who was the headmaster or principal before
16  that?
17      A.   That was my father, Bob Clymer.
18      Q.   For what period of time was he headmaster?
19      A.   I think it would have been '99 or 2000. I'm
20  not sure.
21      Q.   Until 2008.
22      A.   Yes.
23      Q.   Who was the headmaster in 1996, seven and
24  eight, if you know?

Page 19

1       A.   Six, seven and eight? There was a change -- it
2   took place in either '96 or '97.  Tim Kuhn was there in
3   '95 because that's when I graduated.  I'm not sure if
4   he was there the following year.  It would have been --
5   Brian Young would have been the next one after Tim
6   Kuhn.
7       Q.   So, from '96 to '99 or something like that?
8   Approximately?
9       A.   No, I think there was another one in between
10  there, too.  A Mr. Baker, I believe, was there at some
11  point, too.
12      Q.   After Young?
13      A.   I'm sorry?
14      Q.   After Mr. Young?
15      A.   Yes, sir.
16      Q.   Do you know who the headmaster was in 1996?
17      A.   It would have either been Kuhn or Young.
18      Q.   Kuhn or Young.
19      A.   I don't know for sure.
20      Q.   What was Baker's first name?
21      A.   I believe it was Wayne, but I'm shooting in
22  the dark.
23      Q.   Okay.  Where does your father live?
24      A.   He lives in Perkasie.

Page 20

1       Q.   Is he still associated with the school?
2       A.   Yes.
3       Q.   In what capacity?
4       A.   He teaches a history class.  He also coaches
5   at Pennridge.
6       Q.   What?
7       A.   What does he coach?
8       Q.   Yes.
9       A.   He helps out with the girls track team,
10  varsity high school.
11      Q.   I think we finished up with your educational
12  background.  Let's talk about your employment history.
13          You graduated Tennessee Temple in 2000,
14  correct?
15      A.   That's correct.
16      Q.   By whom were you employed from that date on?
17      A.   Garland Christian Academy in Garland, Texas.
18      Q.   In what capacity?
19      A.   I was a coach as well as a teacher.
20      Q.   What did you coach?
21      A.   I coached soccer, baseball, cross-country, as
22  well as I was on the football staff.  I coached
23  receivers.
24      Q.   What did you teach?

                                    5 (Pages 17 to 20)

Appendix 0289

Ryan Clymer                           Nace vs. Pennridge School District
                              July 29, 2015

| Page 21 |
| --- |

1        A.  I taught government and economics as well as
2    US history, then I took a Bible doctrines class.
3        Q.  And how long did you have that position?
4        A.  For five years.
5        Q.  Until 2005?
6        A.  That is correct.
7        Q.  Where were you employed after that?
8        A.  That was Faith Christian Academy.
9        Q.  In what capacity?
10       A.  I was hired as a teacher and assistant
11   principal.
12       Q.  Teaching what?
13       A.  I was teaching history, which was government
14   and economics, World History II.  I also took a speech
15   class as well as a driver's-ed class.
16       Q.  And you were assistant principal to your
17   father?
18       A.  That is correct.
19       Q.  Was the next position you held at FCA as
20   principal after your father stopped in that position?
21       A.  Yes.
22       Q.  Are there any other Clymers at FCA?
23       A.  There is my sister, who is no longer a Clymer.
24       Q.  Well, she's a family member.

| Page 22 |
| --- |

1        A.  That is correct.
2        Q.  What's her name?
3        A.  Jennifer Papernik.
4        Q.  And what's her position?
5        A.  She is -- this year she's the lead history
6    chair, so she teaches history.
7        Q.  Anyone else?
8        A.  My nephew was just hired this past year.
9        Q.  Is that Ben?
10       A.  That's Ben.
11       Q.  What's his position?
12       A.  He teaches PE and coaches wrestling.
13       Q.  Anyone else in your family?
14       A.  I think that's it.
15       Q.  Do you have a relative who is a politician in
16   the area?
17       A.  A former politician, yes.
18       Q.  Who is that?
19       A.  That's Paul Clymer.
20       Q.  Does he have any association with the school?
21       A.  None.
22       Q.  Or the church?
23       A.  I think he still goes to the church.
24       Q.  And what was his government position, if you

| Page 23 |
| --- |

1    know?
2        A.  He was a state representative of the 145th
3    District serving Bucks County and some of Montgomery
4    County.
5        Q.  From when to when?
6        A.  It was thirty-four years, so. . .
7        Q.  And when did he leave?
8        A.  I think he retired as of November or December,
9    whenever his term was ending, so this previous November
10   or December.
11       Q.  Of '94?
12       A.  Of '94?
13       Q.  I'm sorry, of 2000. . .
14       A.  Of 2014.
15       Q.  2014.
16       A.  Yes, that is correct.
17       Q.  Who was the head of the Board of Deacons in
18   2009?
19       A.  2009.  It may be Mr. Weiss.
20       Q.  First name?
21       A.  I don't know.
22       Q.  Who was chairman of the board of directors
23   now? Is it Mr. Schmidt?
24       A.  For the school?

| Page 24 |
| --- |

1        Q.  For the school.
2        A.  That is correct, Dan Schmidt:
3        Q.  What's his function?
4        Q.  What does Dan Schmidt do?
5        Q.  Yes.
6        A.  He heads up the board meetings, sends out the
7    minutes.  He basically is the lead in every meeting.
8        Q.  Is he your boss?
9        A.  Yes, he would be my boss.
10       Q.  Is there anybody else that you report to other
11   than Mr. Schmidt?
12       A.  Just the board.
13       Q.  The entire board.
14       A.  Yes.
15       Q.  How many members on the board?
16       A.  Seven, I believe.  I believe it's seven.
17       Q.  Can you give me their names?
18       A.  Dan Schmidt, Doug Bishop, Dwight Welkers,
19   Michelle Carr, Wally Alderfer, John Garber, Dan Smith.
20   How many is that?
21       Q.  I think seven.
22       A.  I think that's it.
23       Q.  Wally Alderfer, is he related to Cheryl
24   Alderfer?

brusilow.com              brusilow + associates              215.772.1717

Appendix 0290

Ryan Clymer                                    Nace vs. Pennridge School District
                                    July 29, 2015

### Page 25

1    A.  He is.
2    Q.  How?
3    A.  That is her husband.
4    Q.  Is there an employee at the school named
5  Brunner?
6    A.  Yes.
7    Q.  And who is that?
8    A.  That is Chase Brunner's father.  He teaches
9  Bible.
10   Q.  What's his name?
11   A.  Ted.
12   Q.  During Emily Mayer's investigation, did you
13  talk to Mr. Schmidt or Mr. Weiss, whoever the chairman
14  of the board was back then?
15   A.  No, I didn't.  Mr. Schmidt was not there.  He
16  is not part of the board.
17   Q.  Did you talk to Mr. Weiss about the
18  investigation at all?
19   A.  Yes, I did.  I also talked with his superior,
20  which would be the pastor of the church.
21   Q.  Paul Auckland?
22   A.  That is correct.  More so Paul because he is
23  on campus.
24   Q.  You don't know Mr. Weiss' first name?

### Page 26

1    A.  No.
2    Q.  Is he still associated with the school or
3  church in any way?
4    A.  I do not believe he is.
5    Q.  Does he live locally?
6    A.  I don't know where he lives.
7    Q.  At what point in the investigation did you
8  speak to Mr. Weiss or Mr. Auckland?
9    A.  I can approximate:  It was approximately three
10  or four, maybe five days into the investigation that I
11  spoke to them.
12   Q.  For what purpose?
13   A.  For what purpose did I speak to them?
14   Q.  Yes.
15   A.  To let them know what was going on and what I
16  had discovered.
17   Q.  You said the chairman of the board was your
18  supervisor or superior.  Was Pastor Auckland also your
19  superior?
20   A.  He would be the ultimate superior, yes.
21   Q.  Versus Mr. Weiss.  Was one above the other?
22  Does somebody have final say in the hierarchy?
23   A.  Yes, Paul.
24   Q.  Paul did, Paul Auckland.

### Page 27

1    A.  Yes.
2    Q.  And Paul Auckland was also the head pastor
3  back in 2000 -- I'm sorry, back in 1998 or 1999, when
4  the Kelly Romig situation became known, correct?
5    A.  I believe he was.
6    Q.  Did you speak to Mr. Weiss and Mr. Auckland
7  together or separately?
8    A.  I did speak to Mr. Weiss and Paul together one
9  time.  I had spoken with Paul other times.  So, there
10  was one time that I spoke with both of them together.
11   Q.  Did you, when you talked with them, ask them
12  for permission to do something that you wanted to do?
13   A.  About what?
14   A.  About the Emily Mayer situation.
15   A.  Did I ask them for permission to do something
16  I wanted to do?
17   Q.  Yes, either in terms of the investigation or
18  in terms of the resolution of the issue or whatever.
19  Did you ask for their permission to do something?
20   A.  I wouldn't have done anything without them
21  being informed.
22   Q.  And granting whatever you wanted to do.
23   A.  Correct.
24   Q.  Okay.  So, would it be correct to say that

### Page 28

1  whatever you decided to do in the investigation in
2  terms of investigating or the resolution was known to
3  and by and agreed to by Mr. Weiss and Pastor Auckland?
4    A.  More so the resolution than the investigation
5  itself.
6    Q.  And you resolved after your investigation that
7  you didn't want Mr. Romig coaching at your school any
8  more.  Is that correct?
9    A.  That's correct.
10   Q.  And you told that to Pastor Auckland?
11   A.  That is correct.
12   Q.  And you told Pastor Auckland that you wanted
13  to do whatever needed to be done to terminate Mr.
14  Romig, correct?
15       MR. KEMETHER:  Object to form.  You can
16  answer.
17   A.  Whatever the lawyer had told us to do.
18   Q.  What did you ask permission from Pastor
19  Auckland to do?  What did you ask him to give his
20  agreement for you to do?
21   A.  I didn't ask for anything.  We went with what
22  the lawyer said.
23   Q.  And the lawyer was Jeff Drake?
24   A.  At that time it was not.  It was Brett Mandes,

Appendix 0291

Ryan Clymer                                    Nace vs. Pennridge School District
                              July 29, 2015

---

**Page 29**

1  was our lawyer.
2      Q.  Did you ever talk to Jeff Drake about this at
3  all?
4      A.  Yes.
5      Q.  Did you ever talk to the attorneys along with
6  Pastor Auckland and Mr. Weiss?
7      A.  Mr. Mandes, yes.
8      Q.  Or Mr. Mandes, I'm sorry.
9      A.  Yes.
10         MR. KEMETHER:  You mean all at the same
11     time?
12         MR. GROTH:  Yes.
13         THE WITNESS:  Yes.
14  BY MR. GROTH:
15     Q.  Did you also have separate conversations,
16  telephone conversations or other conversations, with
17  either lawyer?
18     A.  Yes.
19     Q.  How many?
20     A.  With Mr. Mandes, it was one.  With Mr. Drake,
21  I would safely say two or three.
22     Q.  Why did you have to speak to two lawyers?
23     A.  Because it was determined it was more of an
24  employment issue than anything else.

---

**Page 30**

1      Q.  Determined by whom?
2      A.  It was determined by Jeff Drake.
3      Q.  You say "more of an employment issue than
4  anything else."  What was the "anything else" part?
5      A.  Than anything else as far as relieving someone
6  from their duties for accusations that were being made.
7      Q.  So, Mr. Drake told you that he didn't think
8  this was a sexual-harassment situation?
9      A.  That is correct.
10     Q.  What did Mr. Mandes tell you?  You said you
11  had one conversation with him?
12     A.  I had one telephone conversation.  You asked
13  if we spoke the phone.  Yes.
14     Q.  How many meetings?
15     A.  One.
16     Q.  What did he tell you?
17     A.  He told us to ask Mr. Romig to step down or
18  resign from his position.
19     Q.  What else did he tell you?
20     A.  That's pretty much it.
21     Q.  Did he tell you why he was giving you that
22  advice?
23     A.  Because of the amount of texts that were had,
24  that we had kind of in our hands.  No content, just the

---

**Page 31**

1  amount; and there was no other proof of anything else.
2      Q.  Did Mr. Mandes tell you that he thought simply
3  the amount, the quantity of texts, was inappropriate?
4      A.  I'm not sure if he said that, but it was
5  concluded.
6      Q.  By whom?
7      A.  By, you know, people that were there in the
8  room.
9      Q.  Who?
10     A.  Well, myself.
11     Q.  Yes.
12     A.  Probably Pastor Paul.  I don't want to assume
13  Mr. Mandes said that, but this is what the resolution
14  was after we spoke to him.
15     Q.  Well, going into that meeting what did you
16  conclude about the amount of the texts?
17     A.  That there were a lot of them, absolutely.
18     Q.  Well, you knew the number, correct?
19     A.  Yes.
20     Q.  Did you conclude that was appropriate,
21  regardless of what the content was?
22         MR. KEMETHER:  Object to form.  You can
23  answer if you're able.
24     A.  It was excessive.  At that time I didn't text,

---

**Page 32**

1  so I didn't know what was excessive or wasn't
2  excessive.
3      Q.  But at that time when you met with Mr. Mandes,
4  did you have the logs that Mr. Smith gave you of the
5  number of texts?
6      A.  I had the logs that Mr. Smith gave and Mr.
7  Romig gave.
8      Q.  Romig gave you logs, also.
9      A.  Yes.  I'm not sure which one gave them first.
10     Q.  Romig gave you logs of what calls for what
11  period of time?  What texts, I'm sorry, for what period
12  of time?
13     A.  It was just the logs.  There was no content.
14  Neither of them gave me content.  It was for the
15  basketball season, so November to December.
16         MR. GROTH:  There are four attorneys for
17  FCA here.  I haven't seen any logs given from
18  Romig to FCA.  Does anybody have them?
19         MS. CONNOR:  Actually, they're part of
20  our supplemental disclosures.  There was an email
21  from Romig attached to the front of the log.
22         MR. GROTH:  And the entire log?
23         MR. SANTARONE:  There are two separate
24  logs.

---

Appendix 0292

Ryan Clymer                           Nace vs. Pennridge School District
                        July 29, 2015

1  MS. CONNOR: Mr. Smith provided two
2  sets of logs and then Romig provided one.
3  MR. GROTH: Okay. I did get whatever
4  logs I have from FCA. And you're telling me that
5  some of those logs were Romig's logs, not Smith's
6  logs.
7  MS. CONNOR: There is a cover sheet.
8  Let me just double-check, take a look. Here it
9  is. Romig sent an email to Ryan dated January
10 7th, 2010.
11  MR. GROTH: Can we go off the record
12 for a second, please?
13  THE VIDEOGRAPHER: 10:39. Off the
14 record.
15  (There was a discussion held off the
16 record)
17  THE VIDEOGRAPHER: Stand by, please.
18 10:44. We're back on record.
19 BY MR. GROTH:
20  Q.  Okay. Ms. Connor was kind enough to give me
21 her copy of the log that was turned over to you by Mr.
22 Romig of his telephone calls.
23  To my very quick review of them, it looks like
24 it's only for the month of December, but they are what

1  they are.
2  This also shows that this was not transmitted
3  to you with his email dated January 7th, 2010, all of
4  which we've marked as Clymer exhibit number one.
5  MR. RUSSELL: Did you say not
6  transmitted?
7  MR. GROTH: They were transmitted.
8  Clymer exhibit number one is the email of January
9  7th from Romig to Clymer and all of the records.
10  (Exhibit Clymer-1 was marked for
11 identification.)
12 BY MR. GROTH:
13  Q.  They were transmitted to you on January 7th,
14 which was two days after he resigned, correct?
15  A.  Apparently.
16  Q.  So, you didn't have that log when you had this
17 meeting with Mr. Mandes and Pastor Auckland to talk
18 about the quantity of number of texts, correct?
19  A.  To be completely honest with you, I don't
20 know. I know that the letter of resignation was dated
21 January 5th, but I'm not sure when he turned that in.
22  We did have the Mayer log. We may have had
23 this log if, in fact, that letter was dated January
24 5th, but then he gave it to us later on. So, I don't

1  know if he actually gave it to us on the 5th.
2  Q.  Okay. In any event, when you talked to
3  Mandes, you talked about the quantity of texts,
4  correct?
5  A.  Uh-huh.
6  Q.  Based on the information you had. Is that
7  correct?
8  A.  That's correct.
9  Q.  Was that the only factor that was discussed
10 with regard to the decision that was being made to ask
11 Romig to step down as coach?
12  A.  I talked about my entire investigation.
13  Q.  Including the allegations that some of the
14 texts were inappropriate in a sexual way, correct?
15  A.  The list that Mrs. Mayer had distributed to
16 me.
17  Q.  Did you ever share that list with Mr.
18 Hollenbach?
19  A.  I don't think I did.
20  Q.  Is there some reason why you didn't share that
21 with him?
22  A.  No, I don't think there's a reason.
23  Q.  Did you discuss the list with him?
24  A.  I did not discuss the list with him.

1  Q.  Is there some reason you didn't discuss the
2  list with him?
3  A.  There is not a reason why I didn't discuss it
4  with him, no.
5  Q.  Did you discuss it with anybody other than Mr.
6  Weiss, Pastor Clymer and the attorneys?
7  A.  Pastor Paul Auckland?
8  Q.  Pastor Auckland and the attorneys.
9  A.  Some other board members. I don't know who
10 they were, but whoever was there.
11  Q.  There where?
12  A.  At the meeting with Mr. Mandes.
13  Q.  So, besides you and Pastor Auckland, were
14 other board members there as well?
15  A.  Yes.
16  Q.  Including Mr. Weiss.
17  A.  Yes.
18  Q.  Where was the meeting?
19  A.  At Faith Christian Academy.
20  Q.  Do you know what day?
21  A.  I do not know what day.
22  Q.  Was it before the new year, before January
23 1st, or after?
24  A.  I believe it was after, but I'm not one

9 (Pages 33 to 36)

Ryan Clymer                                    Nace vs. Pennridge School District
                          July 29, 2015

<table>
<tr><td>

**Page 37**

1  hundred percent sure.
2     Q.  Do you have any document at FCA that would
3  indicate that?
4     A.  I do not, no.
5     Q.  I don't mean you personally.  I mean does the
6  school have any document that would indicate what date
7  that meeting took place on?
8     A.  The school probably would not, no.
9     Q.  What does that mean?
10    A.  That means the school most likely doesn't have
11 a date of the board meeting.  The church may, but the
12 school will not.
13    Q.  Why would the church have it and not the
14 school?
15    A.  Because the board was made up of the church
16 deacons.
17    Q.  Who would have control over those records if
18 they existed?
19    A.  Paul Auckland; he could get them.
20        MS. CONNOR:  For clarification, those
21 meeting minutes are referenced on our supplemental
22 disclosures.  If you take a look at that, they're
23 dated 1/10/2010.  The meeting took place that day.
24 And we've asserted an attorney-client privilege

</td><td>

**Page 39**

1  telling me, the meeting with Mr. Mandes that I've
2  been discussing took place on January 10th, 2010?
3        MS. CONNOR:  Right.
4        MR. GROTH:  After Mr. Romig resigned.
5        MS. CONNOR:  Right -- well, depending
6  on when the letter was received.
7        MR. GROTH:  Depending on when the
8  letter from Mr. Romig was received?
9        MS. CONNOR:  Yes.
10 BY MR. GROTH:
11    Q.  I'm still confused, Mr. Clymer, by the
12 chronology here.  I may have misunderstood you. It was
13 my understanding that you had conversations with Mr.
14 Mandes about how to resolve this issue before a
15 decision was made on asking Romig to resign.
16    A.  Uh-huh.
17    Q.  Is that correct?
18    A.  That's correct.
19    Q.  So, there was a discussion or meeting with
20 Mandes before January 5th of 2010.
21    A.  It was over the phone, yes.  Remember I said
22 he called me one time.
23    Q.  Yes.  And that's when he advised you to ask
24 him to resign.

</td></tr>
<tr><td>

**Page 38**

1     with regard to that document in our supplemental
2     disclosure.  We indicate, you know, the reason for
3     that in the supplemental disclosure.
4        MR. KEMETHER:  Just for the record as
5     well, certainly over the last several minutes
6     counsel has been asking questions about
7     conversations between the witness and attorneys on
8     behalf of either himself or Faith Christian
9     Academy.
10       In light of the defense asserted, one
11    of the defenses asserted in this case, I've
12    allowed those questions to go forward.
13       MR. GROTH:  And I did discuss that issue
14    with Ms. Connor well before the deposition,
15    correct?
16       MS. CONNOR:  Right, we did.  And just
17    for further clarification, there was a distinction
18    between Brett Mandes, who is referenced in the
19    supplemental disclosure, and Jeff Drake.
20       We're not waiving any attorney-client
21    privilege with regard to Brett Mandes, who is an
22    employment attorney, who was asked by the church
23    to give an opinion as to the employment issue.
24       MR. GROTH:  If I understand what you're

</td><td>

**Page 40**

1     A.  Uh-huh.
2     Q.  Yes?
3        MR. KEMETHER:  Yes.
4        THE WITNESS: Yes. Sorry.
5  BY MR. GROTH:
6     Q.  Okay, let's back up a little bit.  We'll go
7  into much greater detail with your investigation in a
8  moment.
9        Let's talk about your knowledge of or training
10 with regard to the Child Protective Services Law in
11 Pennsylvania prior to the Emily Mayer situation in
12 December of 2009.
13       Have you had any training, instruction or any
14 type of seminar, or reviewed any type of course
15 material with regard to the requirements and
16 obligations of the Child Protective Services Law as
17 they relate to schools and school employees and
18 mandatory reporters?
19    A.  Before this had happened?
20    Q.  Yes.
21    A.  No.
22    Q.  Nothing at all, correct?
23    A.  Besides being talked to by Nova and things
24 like that, but nothing as far as directly -- not

</td></tr>
</table>

                                      10  (Pages 37 to 40)

Ryan Clymer                          Nace vs. Pennridge School District
                            July 29, 2015

---

Page 41

1  sitting in on a conversation with someone telling me
2  exactly what to do, no.
3      Q.  What did Nova discuss with regard to the
4  Pennsylvania Child Protective Services Law at your
5  school?
6      A.  That if there were signs of sexual abuse, we
7  needed to report it.
8      Q.  And when did this take place?
9      A.  I believe it was 2008/2009.  They came with
10  the good touch/bad touch in '08, and it was either '09
11  or '10 is when they came in.
12      Q.  So, if it was '10, you didn't have any
13  discussion with Nova before the Emily Mayer situation.
14      A.  I believe it was '09, but it could have been
15  '10.  You are correct, if that was the case.
16      Q.  So, if it was 2010 when Nova came in and had
17  some discussion with people at FCA, it would be true
18  that as of 2009 and the Emily Mayer situation, you had
19  no instruction or knowledge of or understanding of the
20  requirements of the Pennsylvania Child Protective
21  Services Law.
22          MR. RUSSELL:  Just objection to form.
23      He already answered that he had the good touch/bad
24      touch that predated that.

---

Page 42

1  BY MR. GROTH:
2      Q.  Other than that. . .
3      A.  Other than the good touch/bad touch?  No.
4      Q.  And that was only training with regard to
5  elementary teachers and elementary students.
6      A.  Well, that was pretty much how to report and
7  look for signs for those kids that are being abused or
8  things like that.
9      Q.  For elementary kids.
10      A.  Yes, for kids.
11      Q.  You don't use good touch/bad touch for senior
12  high school students, did you?
13      A.  No.
14      Q.  Or middle school, correct?
15      A.  I don't think it was middle school.
16      Q.  As of the Emily Mayer allegation in December
17  2009, had you ever heard the term "mandatory reporter"?
18      A.  Yes.
19      Q.  When and how did you hear it?
20      A.  I'm not sure when and where I heard it from,
21  but it was something that was around.  I don't know
22  where and when I heard it.
23      Q.  Did you read it in a media report?
24      A.  I could have read it.  I could have seen it.

---

Page 43

1  I could have listened to it.
2      Q.  Do you have any understanding of the
3  definition of the term?
4      A.  "Mandatory reporter"?
5      Q.  Yes.
6      A.  It's like I said before:  If a child has been
7  abused, then you have to report that.
8      Q.  But my question is -- I'm sorry, I'll be more
9  specific:  Did you have any understanding of who
10  mandatory reporters were?
11      A.  (No response)
12      Q.  Who.  Who is required to report something if
13  they saw or observed or found out or suspected
14  something?
15      A.  I would be one, yes.
16      Q.  You personally?
17      A.  Yes.
18      Q.  Anybody else at FCA that would be one?
19      A.  Well, they would have to report to me, yes.
20      Q.  Did you have any understanding prior to the
21  Emily Mayer situation with Mr. Romig that the person
22  responsible in the school such as yourself, a principal
23  or headmaster or whatever, had an obligation -- or
24  whether that person had an obligation to report

---

Page 44

1  suspected child abuse or sexual harassment to local
2  authorities, including the district attorney or police
3  officers or some other social welfare agencies like the
4  Department of Public Welfare?
5      A.  I know I had to report alleged abuse, whether
6  it be sexual or physical.  So, yes, I knew I had to
7  report those things.
8      Q.  How did you know that?
9      A.  Because I was a mandatory reporter.
10      Q.  Did you know who you were supposed to report
11  to?
12      A.  I believe it was Children & Youth and/or the
13  police.
14      Q.  Did you ever review the law itself?  I mean,
15  did you ever take the time to look at the law prior to
16  the Emily Mayer situation?
17      A.  I don't know if I specifically took a look at
18  the law before.  No, I don't recall.
19      Q.  Was it your understanding before the Emily
20  Mayer situation that if a mandatory reporter simply had
21  reasonable cause to suspect sexual abuse or harassment,
22  they were required to notify one of these outside
23  agencies or parties?
24      A.  Harassment?

---

                                11 (Pages 41 to 44)

Ryan Clymer                          Nace vs. Pennridge School District
                           July 29, 2015

Page 45

1     Q.   Yes, for sexual harassment or abuse or
2  exploitation.  Was it your understanding that all that
3  was needed or required in order to report to an outside
4  agency was a reasonable cause to suspect --
5           MR. KEMETHER:  As of 2009?
6           MR. GROTH:  As of 2009.
7           THE WITNESS:  No.  If it's abuse,
8       physical abuse.
9  BY MR. GROTH:
10    Q.   Physical abuse as determined by the mandatory
11 reporter by their own investigation?
12    A.   I think it says in there something about
13 through the knowledge gained, by being trained, by
14 experience, you know.
15    Q.   Was it your understanding prior to the Emily
16 Mayer situation that there had to be actual proven
17 physical abuse?
18    A.   Yes.
19    Q.   That was your understanding.
20    A.   Yes.
21    Q.   Okay.  And in the Emily Mayer case, would it
22 be fair to say that both Emily Mayer and Mr. Romig told
23 you that there was no physical abuse?
24    A.   That's correct.

Page 46

1     Q.   Did Emily Mayer ever tell you that he had on
2  at least one occasion touched her inappropriately?
3     A.   No.
4     Q.   Under FCA's -- strike.  We'll get back to
5  that.  Let's talk about the chronology of your
6  investigation of the Emily Mayer situation before we
7  get to the end result and your discussions with lawyers
8  and pastors and whatever.
9     A.   Sure.
10    Q.   You've already testified that Chase Brunner
11 was the first one to alert you to the issue of
12 inappropriate texts from Mr. Romig to Emily Mayer,
13 correct?
14    A.   That is correct.
15    Q.   And Mr. Romig was the basketball coach at the
16 time, correct?
17    A.   Correct.
18    Q.   Tell me about your relationship with Mr.
19 Romig, starting from when it began up until the time of
20 the Emily Mayer allegation.
21    A.   We went to school together from first grade
22 through twelfth grade at Faith Christian Academy.
23    Q.   Okay.  What else?
24    A.   We played sports together.

Page 47

1     Q.   What sports?
2     A.   We played basketball and baseball, for sure.
3  Sometimes he would play soccer.
4     Q.   Okay.  Did you see him socially outside the
5  school?
6     A.   I believe we went to a baseball game one time.
7  It was a Baltimore Orioles exhibition game in
8  Philadelphia.
9     Q.   Did you know his family?
10    A.   I did know his family, yes.
11    Q.   Did you know his sister?
12    A.   Kelly?
13    Q.   Kelly.
14    A.   I did, yes.
15    Q.   How did you know her?
16    A.   She is a grade behind me in school.
17    Q.   Did you ever spend time in his home?
18    A.   When I was young, maybe six or seven years
19 old.
20    Q.   What did you do there?
21    A.   I slept over.
22    Q.   Did you ever see him socially or his family
23 socially outside of any school activities other than
24 that baseball game?

Page 48

1     A.   While we were in high school.  I mean, they
2  would come to basketball games, if that counts as
3  anything.  They would come to sporting events and we
4  attended church at the same church.  But no, I was never
5  invited over for picnics and something like that.
6     Q.   And the church is Faith Baptist church?
7     A.   Yes.
8     Q.   What about after Mr. Romig became a coach at
9  FCA?  I think that starred in 2005 or earlier, 2003?
10    A.   He was there before I got there.
11    Q.   Well, you were teaching there.
12    A.   He had started before I got there, though.
13    Q.   Oh, okay.  So, when you got there as a teacher
14 and then as an assistant principal and then as
15 principal, he was already there.
16    A.   He was coaching, that's correct.
17    Q.   And he was hired by your father.
18    A.   That is correct.
19    Q.   What was your relationship after you came to
20 the school as a teacher and then assistant principal
21 and principal?  Was it simply employer/employee, or was
22 it more social than that?
23    A.   No, it wasn't more social than that.  He had a
24 family and I had a family.

12  (Pages 45 to 48)

Appendix  0296

Ryan Clymer                                    Nace vs. Pennridge School District
July 29, 2015

Page 49

1    Q.  Did you consider him a good friend during all
2   of the school years that you spent together?
3    A.  I think he would consider us good friends. As
4   far as when we were in school, there were only eight
5   boys in our class, I believe, so we didn't have that
6   many options to choose from. He was a nice kid.
7        So, we were friends. We didn't do very much
8   outside of school. We played sports together. That was
9   about it.
10    Q.  When Chase Brunner came in and told you about
11  this texting issue, what did you say to him?
12    A.  I asked him if he had seen any of the texts,
13  and he told me he had seen one, which was the one that
14  questioned why she is -- I don't remember exactly what
15  it was, but it was something along the lines of why are
16  you with him. He said he had seen it. And I said did
17  you see anything else, and he said no.
18        That was basically the gist of the
19  conversation. Like I said, it took ten or fifteen
20  minutes. It wasn't long.
21    Q.  That's a pretty quick conversation about one
22  text. What took up the other ten or fifteen minutes?
23    A.  He just said that Emily was distraught, you
24  know, how they had been texting, "so why didn't Emily

Page 50

1   come to me" and she is afraid or scared or embarrassed,
2   what the case was. I'm not sure what the exact words
3   were.
4        I kind of encouraged him to have her come talk
5   to me, and he said that was fine. You had asked
6   earlier if it was in the middle of class. I'm not sure
7   if it was in the middle of class. It could have been
8   during lunch. It could have been -- I don't know. But
9   he did go get her for me.
10    Q.  But you thought it was the afternoon.
11    A.  I believe it was in the afternoon, yes.
12    Q.  When he said Emily was distraught, did he
13  explain what he meant by that? Did he say what she was
14  distraught about? The fact that she was getting any
15  texts from him or that there were texts of a personal
16  nature, or what?
17    A.  They were questioning -- he said they were
18  questioning their relationship together, like why are
19  you with Chase, and he thought that was odd and
20  basically, you know, he didn't understand why this
21  coach was texting his girlfriend.
22    Q.  Okay. At the time did FCA have any policy at
23  all with regard to staff members texting students?
24    A.  I don't know if there was a written policy.

Page 51

1   There was a verbal from Mr. Hollenbach. I believe it
2   was that fall.
3        Texting was new. Texting was -- I don't think
4   many staff members were doing it. It just said when
5   you communicate, communicate using our female coaches
6   when we're communicating with females. And he
7   encouraged us just to -- if we're going to make a
8   change in the schedule, to use our captains, text them
9   and let them disseminate the information and things
10  like that.
11        So, written policy, there was probably no
12  written policy as far as texting, but there was an
13  indication where, you know, communication with students
14  should be kept to a minimum. If you're in a room with
15  somebody, keep the doors open and things like that.
16    Q.  What was the concern about a male coach
17  texting a female student?
18    A.  Back in the day, just basically it doesn't
19  look good, you know. That's why you have female
20  coaches to do that.
21    Q.  And Mr. Hollenbach, you believe, discussed all
22  of that texting stuff with his coaches, all his
23  coaches?
24    A.  I was there, yes.

Page 52

1    Q.  Oh, you were there, also?
2    A.  Yes.
3    Q.  Did you discuss it as well?
4    A.  No. I was a coach. It was a coaches'
5   meeting, so. . .
6    Q.  Did Chase Brunner say anything about the
7   number of texts -- let me finish -- not just the
8   content of this one text that he objected to, but the
9   number of texts that Emily had told him or he had seen
10  for himself that Romig was sending to her?
11    A.  He had only seen one, and I don't believe we
12  talked about the number of texts at that time.
13    Q.  How long after that did you meet with Emily?
14    A.  Like right away.
15    Q.  And he went and told her to go see you?
16    A.  Yes.
17    Q.  Did he come back with her?
18    A.  Yes, he did, and her phone.
19    Q.  Where did you meet with her?
20    A.  It was in my office.
21    Q.  Was Chase in the meeting?
22    A.  I believe he was.
23    Q.  For the entire meeting?
24    A.  I believe I was. To my recollection, yes, I

13 (Pages 49 to 52)

Appendix 0297

Ryan Clymer                          Nace vs. Pennridge School District
                              July 29, 2015

Page 53

1 believe he was with her the whole time.
2    Q.  If Chase Brunner testified in this case that
3 he never met with you at all, not once, that would be
4 totally contrary to your recollection of what happened?
5    A.  Yes.  He came first and brought her with him.
6    Q.  How long did the meeting in your office last?
7    A.  I couldn't say.  I'm not even going to guess.
8       MR. KEMETHER:  Just so we're clear,
9    this is the meeting with Emily Mayer?
10      MR. GROTH:  Emily and Chase Brunner,
11   yes.
12 BY MR. GROTH:
13   Q.  I don't want you to guess.  I want you to
14 estimate or approximate, if you can.
15   A.  I can't.  I don't know how long the
16 conversation was.  The conversation got into a little
17 bit more of -- I asked her what type of stuff is he
18 writing, and "I love you and I care for you" and a lot
19 of stuff about her dad or step-dad; something was going
20 on there.
21      That's when I asked Chase:  I said, "Chase,
22 did you see any of those?"  He said he only saw the
23 one.
24      The only reason I know that for sure is

Page 54

1 because he said he was sitting next to her when a text
2 came in, so that's how I know he said that was the only
3 one he had seen.  So, I asked him, when I dismissed him
4 to go get Emily, to tell her to bring her phone.
5      So, she brought her phone and I asked her, I
6 said, "Can I see these texts?"  He said she had deleted
7 them.  I said okay, you know.
8    Q.  What did you observe to be Emily Mayer's
9 emotional state when she was telling you this?
10   A.  I think she was nervous.  It's a small school,
11 you know, so information travels very, very quickly.
12 Yes, I think she was just nervous, just uncomfortable.
13   Q.  She told you that beside this text about her
14 not being with her boyfriend that Chase Brunner told
15 you about, that Romig also texted her that he had loved
16 her and he cared for her?
17   A.  Yes.
18   Q.  Did she also tell you that he texted her
19 information about a relationship he had with Lauren
20 Fretz?
21   A.  Yes, that was also discussed in the meeting.
22   Q.  Did she also tell you that he texted her while
23 on a trip for basketball that he wanted to be inside
24 her?

Page 55

1    A.  No, that was not mentioned at that meeting.
2    Q.  Did you know Lauren Fretz?
3    A.  Yes.
4    Q.  She was a student?
5    A.  She was.
6    Q.  She graduated the year before this?
7    A.  That is correct.
8    Q.  What else, if anything, did Emily Mayer tell
9 you during that first meeting?
10   A.  That's pretty much it, how he was discussing
11 things that he had done with Lauren and the
12 relationship that they had; how he is always, you know,
13 asking questions about Chase and things like that and
14 she is very uncomfortable.  So, that was the gist of
15 what that meeting was.
16   Q.  And again, you don't know if the meeting
17 lasted five minutes or fifteen minutes or half an hour?
18   A.  I do not recall.
19   Q.  Okay.  Was anybody else in there besides you
20 and Chase Brunner and Emily Mayer?
21   A.  No.
22   Q.  Did you tell her what you wanted her to do or
23 what you intended to do about this yourself?
24   A.  Yes, I told her to go home and talk to her mom

Page 56

1 and dad and that they were to call me immediately, and
2 they did.  I wasn't sure if it was that night or if
3 they called me the next day, but very soon after I made
4 contact with the Smiths.
5    Q.  Okay.
6    A.  When we left the meeting, that's what was
7 going on right there.
8    Q.  Did you tell her anything else about what you
9 intended to do?
10   A.  Besides to look into it?  I can't recall, you
11 had know, what I told her at that point.
12   Q.  Did you tell her that you intended to talk to
13 Mr. Romig?
14   A.  Oh, absolutely.  Yes.
15   Q.  Why did you send her home that day?
16   A.  I don't know if I did send her home.  If I did
17 send her home, it was because she was probably very
18 emotional.
19   Q.  You just said she was a little nervous.
20   A.  Yes.
21   Q.  But she became very emotional?
22   A.  No, I'm saying she was nervous.  It's a very
23 small environment.  I don't recall sending her home,
24 but if I did, it was probably for that reason.

14  (Pages 53 to 56)

Appendix  0298

Ryan Clymer                                  Nace vs. Pennridge School District
                           July 29, 2015

Page 57

1      Q.  Do you recall sending her home and telling her
2  she should not come back to school until you told her
3  to come back to school?
4      A.  I do not recall saying that, no.
5      Q.  Did you basically suspend her from school?
6      A.  I did not. ...................................
7      Q.  By telling her to go home, you were telling
8  her to not go to class that day, correct?
9      A.  If there was any class left, if it was the
10 afternoon.
11     Q.  How many days before the holiday did this
12 discussion take place?
13     A.  A couple days, maybe.
14     Q.  Okay.  And did you tell her not to come back
15 until after the Christmas break was over?
16     A.  No, I don't recall saying that.  No.
17     Q.  Did you tell her that she could not
18 participate in any basketball activities?
19     A.  I did, yes.
20     Q.  As of that point did you have any reason to
21 disbelieve anything she or Chase Brunner had told you
22 about the content of inappropriate texts that Mr. Romig
23 was sending to her?
24     A.  The inappropriate meaning that. . .

Page 58

1      Q.  Inappropriate about "I love you, I care about
2  you," asking her about her or her boyfriend, or saying
3  that she shouldn't be with her boyfriend, those types
4  of inappropriate texts.
5      A.  No.  I found it odd that she didn't have them,
6  but no, there was no reason for me not to believe that
7  that didn't happen.
8      Q.  So, from that alone, just that allegation that
9  she made and that her boyfriend made with regard to Mr.
10 Romig, did that cause you to suspect that there was
11 some type of potential sexual harassment or abuse or
12 exploitation going on between Mr. Romig and Ms. Mayer?
13     A.  No.
14     Q.  Never crossed your mind?
15     A.  No.
16     Q.  Did you ask her if anything physical had taken
17 place?
18     A.  Yes.
19     Q.  What did she say?
20     A.  She said no.
21     Q.  Did you ask if he had given her any presents?
22     A.  Did I ask if he had given her any presents?
23 No, I did not ask her.
24     Q.  Did you ask if he had sent heard any photos?

Page 59

1      A.  No.
2      Q.  Did you ask her if he had sent her any videos?
3      A.  No.
4      Q.  Did you ask her whether or not she had
5  discussed these texts with anybody other than Chase
6  Brunner? .....................................
7      A.  I did not, no.  That's why I told her to go
8  home and talk with her parents.
9      Q.  Did you ask if anybody had seen any of the
10 texts from Mr. Romig other than Chase Brunner seeing
11 the one?
12     A.  I don't believe I did, only because if
13 someone was to see them, it would have been her
14 boyfriend.  So, I don't believe I asked her if anyone
15 else saw them, no.
16     Q.  Did you ask her if she had already told her
17 parents about the texting?
18     A.  I don't know if I specifically told her.  By
19 her reaction to me, she had not.
20     Q.  Whether you asked her or not, it was pretty
21 clear to you that she hadn't told her parents.
22     A.  Correct.
23     Q.  So, basically you sent her home from your
24 office for whatever remained of the school day, and

Page 60

1  told her to talk to her parents about the situation and
2  then have the parents call you, correct?
3      A.  That's correct, yes.
4      Q.  At any point in your investigation did you
5  ever meet with the Smiths personally?
6      A.  I believe I did, yes.
7      Q.  When was that?
8      A.  I cannot tell you when it was, but I know they
9  came into my office, both of them -- I'm not sure when
10 it was, but I did meet with both of them and had
11 conversations with them on the phone via a conference
12 call.
13     I emailed back and forth with Annette and I
14 had phone conversations with her husband, Mr. Smith.
15     Q.  Do you believe you met with the Smiths in
16 person before Mr. Romig resigned?
17     A.  I believe I did, yes.
18     Q.  And what happened at that meeting?
19     A.  They wanted to know what was going on, what
20 steps were being taken.  I'm not sure at what point in
21 my investigation I was in; you know, this thing kind of settled and her back on the team, so I
22 thing kind of settled and her back on the team, so I
23 believe shortly after we met she was back on the team.
24     Q.  That would have been after the new year.

Page 61

1    A.  That's what you were alluding to yesterday. I
2 thought she was back on the team earlier than that.
3    Q.  When did you have this first meeting with her?
4    A.  It would be --
5    Q.  Emily Mayer.
6    A.  Right before Christmas break.
7    Q.  What day?
8    A.  I have no idea.
9    Q.  Do you have any notes, documents, any
10 memorialization of that meeting where you documented in
11 some fashion what was said to you?
12    A.  Yes, I --
13    Q.  And what you said to them?
14    A.  On a handwritten piece of paper, yes,
15 absolutely.
16    Q.  Where is that?
17    A.  I think -- I have no idea.  After this
18 investigation was done and everything had calmed down,
19 I probably didn't need them any more.
20    Q.  So, you wrote notes during your conversation
21 with her, with Emily Mayer, or after the meeting with
22 her.
23    A.  Summations, sure.
24    Q.  And then after this was resolved and Mr. Romig

Page 62

1 moved on, you got rid of the notes.
2    A.  Most likely cleaning my office and. . .
3    Q.  Did Romig have a personnel file?
4    A.  I don't know.  I don't know if he did or not.
5 I'm sure he probably did.
6    Q.  Isn't this the type of thing you would put in
7 a personnel file?
8         MR. KEMETHER:  Object to form.
9    A.  I don't. . .
10         MR. KEMETHER:  When you say "this,"
11    what do you mean, "this"?
12 BY MR. GROTH:
13    Q.  Handwritten notes of a meeting of an
14 allegation of improper texting to him.
15    A.  I didn't.
16    Q.  You didn't.
17    A.  I didn't.
18    Q.  Other than these handwritten notes that you
19 took but you disposed of, were there any other written
20 documents you prepared regarding the investigation you
21 conducted into Emily Mayer's allegations?
22    A.  Written documentation, like a chronological
23 time line. . .
24    Q.  Anything written, a single piece of paper.

Page 63

1    A.  I'm sure there was.
2    Q.  And tell me about them if you're sure.
3    A.  I know that when we met with Mr. Mandes, I had
4 that document in front of me telling him and the board
5 what I did as far as the investigation.
6    Q.  What document?
7    A.  My handwritten chronological sequence of order
8 of what I did.
9    Q.  So, you did do other handwritten documents.
10    A.  Yes.
11         MR. KEMETHER:  Object to form.
12    Q.  Other than these notes that you took at the
13 Emily Mayer meeting.
14    A.  Yes.
15    Q.  And what happened to those?
16    A.  They were -- I have no idea.
17    Q.  Did you throw them away?
18    A.  I can't say that I threw them away.  I don't
19 know -- I don't know.
20    Q.  Did you do anything to make sure that they
21 didn't get thrown away?
22    A.  I may have given them to Mr. Mandes so he can
23 use them, yeah.
24    Q.  And these are handwritten notes of the

Page 64

1 chronology of what you did in your investigation,
2 correct?
3    A.  It was pretty much a sequence of preparing for
4 a meeting, yes.
5    Q.  How many pages was this?
6    A.  It was just a page.
7    Q.  One page.
8    A.  Just a page, yes.
9    Q.  Handwritten, not typed.
10    A.  Handwritten, yes.
11    Q.  Did you give those to anybody else other than
12 Mr. Mandes?
13    A.  I do not recall.
14    Q.  Does Faith Christian Academy keep business
15 records?
16    A.  I believe they do, yes.
17    Q.  Does it keep personnel files?
18    A.  They do, yes.
19    Q.  Does it put evaluations in personnel files and
20 contracts and all the types of things that really good
21 teachers or coach's employment get?
22    A.  Yes.
23    Q.  And if there is an issue with a teacher or a
24 coach or somebody that's an employee of the school, are

Appendix 0300

Ryan Clymer                                    Nace vs. Pennridge School District
July 29, 2015

Page 65

1    those things noted and memorialized in some way and put
2    in their personnel file?
3        A.  Yes.
4        Q.  Evaluations of their coaching activities or
5    their teaching activities, those types of things?
6        A.  For the most part, yes.
7        Q.  Disciplinary issues?
8        A.  For the most part, yes.
9        Q.  Okay.  Why wasn't this document put in Mr.
10   Romig's personnel file?
11       MR. KEMETHER:  Object to form.  You can
12   answer if you're able.
13       A.  I can't answer that.  I don't know.
14       Q.  Well, it would be your job to make sure that
15   everything that was supposed to be in Mr. Romig's
16   personnel file was in his file, correct?
17       MR. KEMETHER:  Object to form.  You can
18   answer if you're able.
19       A.  I don't know if I ever put anything back at
20   that time in anyone's file.  I didn't have access to
21   the files as far as they went in my office also.
22       Q.  You're saying you didn't have access to
23   personnel files.
24       A.  They were not in my office.

Page 66

1        Q.  That's not what I asked you.  Access could be
2    they could be at the church, they could be in a
3    basement, they could be any place.
4        Didn't you have access to all personnel files
5    for everyone who worked at the school?
6        A.  Yes, I did.
7        Q.  So, you did have access.
8        A.  Yes.
9        Q.  All right.  So, my question is, what did you
10   do to make sure that this investigation was that you
11   were conducting -- and by the way, did you think this
12   was a serious matter?
13       MR. KEMETHER:  Object to form.
14       A.  Of course, yes.
15       Q.  Did the investigation that you were doing into
16   this serious matter, what did do you to make sure that
17   this was properly documented by you and kept in the
18   business records of Faith Christian Academy?
19       MR. KEMETHER:  Object to form.  You can
20   answer if you're able.
21       A.  I can't answer.
22       Q.  The answer is nothing, correct?
23       MR. KEMETHER:  Object to form.
24       A.  I can't answer.

Page 67

1        MR. KEMETHER:  The questions are
2    starting to get very argumentative.  Please stop
3    that.
4        MR. GROTH:  It's not argumentative.
5        MR. KEMETHER:  It really is.
6    BY MR. GROTH:
7        Q.  By the time the Smiths came into your office
8    in this meeting -- and you're clear there was a meeting
9    in person with them, right?
10       A.  Yes.
11       Q.  (Continuing) -- you never told them that you
12   were going away for the Christmas holiday and you could
13   only be in touch with them by telephone?
14       A.  I don't know if I did or not, but I was gone
15   on Christmas holiday, yes.
16       Q.  When did you leave?
17       A.  Probably shortly after the school week ended,
18   so maybe a Saturday or Sunday.
19       Q.  Before Christmas.
20       A.  Yes.
21       Q.  When did you come back?
22       A.  I do not know.  I know I became back early
23   because of this.
24       Q.  How long were you away?

Page 68

1        A.  A few days.  I'm not really sure.
2        Q.  Where?
3        A.  I was in Alabama.
4        Q.  Do you recall ever telling the Smiths that you
5    could not meet with them personally because you had
6    plans to go away for the holiday?
7        A.  That could have happened.
8        Q.  But you still believe you had this meeting in
9    your office.
10       A.  Yes, we met in my office, absolutely.
11       Q.  Before or after you went away?
12       A.  I don't know.
13       Q.  After you had the first meeting with Emily
14   Mayer and Chase Brunner, did you immediately contact
15   Mr. Romig to discuss the issue with him?
16       A.  Immediately right after that meeting, I did
17   not.
18       Q.  Why not?
19       A.  I wanted to speak with the Smiths first.
20       Q.  Why?
21       A.  To find out if, in fact, what Emily was saying
22   was in fact true.  She would definitely tell her
23   parents if it was true, so we could have a conversation
24   to that extent.

17 (Pages 65 to 68)

Ryan Clymer                                    Nace vs. Pennridge School District
                              July 29, 2015

Page 69

1    Q.  I asked you if you had any reason to believe
2  that Emily was not telling the truth, and you said you
3  had no reason.
4    A.  No.
5    Q.  Correct?
6    A.  That is correct.
7    Q.  But you wanted to get her parents to verify
8  that she was telling them the same thing that she told
9  you before you talked to Romig.
10   A.  Yes.
11   Q.  And how long did it take for the parents to
12  call you and talk about these issues?
13   A.  It was pretty swift, maybe the next day.
14   Q.  Not the same day?
15   A.  Like I said, I believe this happened in the
16  afternoon, so she went home and I believe the next day.
17   Q.  They didn't call you that night?
18   A.  They could have, absolutely. They could have.
19  I don't know.
20   Q.  And who called you?
21   A.  I can't say for sure. It was -- I can't say
22  for sure. It could have been both of them on the same
23  line.
24   Q.  One or both parents called you.

Page 70

1    A.  Yes.
2    Q.  And you had a discussion over the phone with
3  them?
4    A.  Yes.
5    Q.  Him or her or both.
6    A.  Yes.
7    Q.  And what was that discussion?
8    A.  They had said that they had talked with Emily
9  and that they believe her and wanted to know what was
10  going to happen with Coach Romig. He was the next day
11  relieve of his duties.
12       I told them that she had told me about Lauren
13  Fretz, that I was going to try to make contact with
14  Lauren.
15       I told them I thought it would be a good idea
16  for Emily if she stepped away from the team for a while
17  so that she wouldn't be confronted with anything.
18   Q.  Anything else?
19   A.  I don't want to say whether they thanked me or
20  not. I'm not really sure.
21   Q.  Thank you for what?
22   A.  For looking into this, for being concerned for
23  their daughter.
24   Q.  So, how did you leave it with them at the end

Page 71

1  of the conversation?
2    A.  I would get back to them as far as the
3  investigation I was doing and try to reach out to
4  Lauren Fretz.
5    Q.  Did you ask the Smiths to provide you had with
6  any additional information or documents?
7    A.  I believe Kevin said he was going to, which
8  are the phone records. I'm not sure if he -- we talked
9  numerous times. Like I said, mostly on the phone it
10  was with Kevin and/or both of them.
11       So, I wasn't sure if it was that time or
12  another time that we had spoken.
13   Q.  Did you know anything about Ken Smith before
14  this conversation, anything about his job or his
15  personal life?
16   A.  He was a police officer, I believe.
17   Q.  Do you know where?
18   A.  Montgomery County, I think?
19   Q.  Did he tell you that?
20   A.  I believe that was brought up in the
21  interview, the first interview, where you ask the
22  parents what they had do, where they're working and
23  probably where they live.
24   Q.  An interview when Emily was enrolled in the

Page 72

1  school.
2    A.  That's correct.
3    Q.  Did you tell them that up until the time of
4  their phone call you had not even spoken to Mr. Romig
5  about this?
6    A.  Did I tell them? I don't know if I told them
7  or not.
8    Q.  Well, you said that they wanted to know what
9  was happening with Romig, correct?
10   A.  That's correct.
11   Q.  Did you tell them that you had not even
12  discussed it with him yet?
13   A.  I don't know if I said that. I told them I
14  was going to do the investigation and talk with Lauren
15  Fretz. Because that was basically the one thing that
16  Emily had said: That was like, wow, officially
17  bringing someone else into this and what was being said
18  wasn't good.
19   Q.  What did Emily Mayer say about Lauren Fretz?
20   A.  Because Romig said they had a relationship.
21   Q.  Physical relationship.
22   A.  I believe so, yes.
23   Q.  Did she tell you that Romig had shown her any
24  texts that Romig had sent Lauren Fretz?

                                    18  (Pages 69 to 72)

Appendix  0302

Ryan Clymer                                    Nace vs. Pennridge School District
                          July 29, 2015

---

Page 73

1      A.  Did she show me or did she tell me?
2      Q.  Did she tell you that Mr. Romig showed Emily
3   Mayer texts that he had sent to Lauren Fretz?
4      A.  That Mr. Romig sent to Lauren Fretz?
5      Q.  Yes.
6      A.  She may have.  I don't recall.
7      Q.  I believe you testified that the next day
8   after this phone call with the Smiths you relieved Mr.
9   Romig of his duties.  Is that correct?
10     A.  Yes.  He took him away from coaching, yes.
11     Q.  Meaning that until the next day he was still
12   allowed to coach?
13     A.  The night this happened I believe there was a
14   game, so after I heard back from the Smiths, you know,
15   he went to that game, I believe, and I think then after
16   that is when I told both of them that they're stepping
17   aside.
18     Q.  So, you didn't tell him not to coach that
19   game?
20     A.  No, at that point it was conjecture.  It
21   was -- there were no texts that could be seen, no.
22     Q.  Do you know whether or not -- strike that.  I
23   believe Mr. Hollenbach testified yesterday that there
24   was a game that Mr. Romig was allowed to coach at that

Page 74

1   Lauren Fretz did not -- I'm sorry, that Emily Mayer did
2   not attend.
3         Do you know if there was also a practice that
4   was conducted by Mr. Romig that Emily Mayer did not
5   attend?
6      A.  I do not know.
7      Q.  Did you have any concerns that these
8   allegations were being made against your girls
9   basketball coach and that there may have been other
10   girls on the team or otherwise who he was engaged in
11   similar conduct with?
12     A.  No.
13     Q.  That never crossed your mind.
14     A.  No.
15     Q.  When Emily Mayer told you that Romig told her
16   or texted her that he had a physical relationship with
17   Lauren Fretz, did that give you any cause to be
18   concerned about allowing Mr. Romig to either coach a
19   practice or coach a game after that information was
20   given to you?
21     A.  No, because I didn't think it was true.
22     Q.  You didn't know, correct?
23     A.  Excuse me?
24     Q.  You didn't know if it was not true, correct?

Page 75

1      A.  I did not know if it was not true.
2      Q.  Had you ever heard any rumors or gossip or
3   scuttlebutt in the hallways of the school prior to this
4   that people suspected Lauren Fretz was having some
5   inappropriate relationship with Eric Romig?
6      A.  Scuttlebutt as far as there was one girl who
7   said that he invited her to the banquet or something
8   like that one year, and it was false.
9      Q.  That Romig invited Lauren Fretz to a banquet?
10     A.  Yes, to the high school banquet or whatever.
11     Q.  And that was before the Emily Mayer situation?
12     A.  Yes.
13     Q.  And how did you determine that was false?
14     A.  I had a female teacher go and talk with Lauren
15   Fretz, and then I spoke to Eric and they both denied
16   it.
17     Q.  What year?
18     A.  I'm sorry.
19     Q.  What year was this?
20     A.  Lauren was probably -- she was in high school,
21   obviously.  I don't know what year it was.  He denied
22   it and she denied it.
23     Q.  Was she at the banquet?
24     A.  I have no idea.  I have no clue.

Page 76

1      Q.  Just so I understand this correctly:  You
2   received some information prior to the Emily Mayer
3   situation that Mr. Romig had asked Lauren Fretz to go
4   to a high school banquet with him.
5      A.  Right.  It was through a third party, who then
6   admitted that she may not have heard that.
7      Q.  Who was the third party?
8      A.  I believe it was Eberhart.
9      Q.  What's her name?
10     A.  The last name is Eberhart.
11     Q.  First name?
12     A.  I believe Carolyn.
13     Q.  Student at the school?
14     A.  She was, yes.
15     Q.  And she came to you with this information?
16     A.  No, she came to somebody else.
17     Q.  Who?
18     A.  I think a teacher.
19     Q.  Who?
20     A.  It may be Mrs. Tatarro.  Mrs. Tatarro was the
21   one that I sent to Lauren, and she said it was not
22   true.  And then I went to Eric, and he said he never
23   said anything like that.
24     Q.  And you don't recall if it was the same year

19 (Pages 73 to 76)

Ryan Clymer                          Nace vs. Pennridge School District
                          July 29, 2015

Page 77

1  in 2009 as Emily Mayer's situation or some year before
2  that.
3      A.  It was probably -- it was some year before
4  that.
5      Q.  Well, it had to be before that because Lauren
6  Fretz left before that, correct?
7      A.  Yes.
8      Q.  She left in what year, 2007 or 2008?
9      A.  Yes, she graduated a couple of years before
10 Emily, I believe.
11     Q.  Did you ever talk to Romig about that?
12     A.  I just told you I did.
13     Q.  He denied it, and you talked to Lauren Fretz
14 about it?
15             MR. SANTARONE:  Objection.  It's been
16 asked and answered.  He said he sent somebody.
17     Q.  You can answer.
18     A.  Yes, Mrs. Tatarro talked to her.
19     Q.  And she denied it to Ms. Tatarro.
20     A.  That's correct.
21     Q.  When you sent Ms. Tatarro to talk to Lauren,
22 Lauren was no longer at the school, correct?
23     A.  No, she was.
24     Q.  Oh, she was still there?

Page 78

1      A.  Yes.
2      Q.  Is Carolyn Eberhart still there?
3      A.  No, she is not.
4      Q.  Where does she live?
5      A.  I think in Virginia somewhere.
6      Q.  Other than that situation that you just
7  described with Mr. Romig and Lauren Fretz, did you ever
8  hear anything else in the hallways or from a teacher or
9  staff member or student regarding any inappropriate
10 conduct between Ms. Fretz and Mr. Romig?
11     A.  No.
12     Q.  Do you know a teacher named Nicole Gross?
13     A.  Yes.
14     Q.  She still teaches there?
15     A.  She does.
16     Q.  Are you her supervisor?
17     A.  Yes.
18     Q.  Did you ever hear her, either before or after
19 the Emily situation, tell you or tell somebody in your
20 presence that not only her but other people at the
21 school suspected Lauren Fretz and Eric Romig were
22 having an inappropriate relationship?
23     A.  Not that I can recall.
24     Q.  Okay.  In the chronology of things, we've gone

Page 79

1  through your meeting with Emily Mayer.  We've gone
2  through your first telephone call with her parents.
3  When was the -- strike that.
4          Are you the person who informed Eric Romig of
5  these allegations against him as opposed to somebody
6  else telling him before you were able to tell him?
7      A.  I'm not sure.  I did tell him.  I'm not sure
8  if I was the first person to tell him.  I'm not sure if
9  he knew before I told him or whatnot, but. . .
10     Q.  Do you recall him calling you on the phone and
11 saying "I hear somebody's making allegations against
12 me.  What's going on?"
13     A.  No.  He did call many times during the course
14 of the investigation that I would not return his phone
15 calls, but no.
16     Q.  But you don't recall him making that phone
17 call?
18     A.  No.
19     Q.  Okay.  What did you do, then, after you had
20 the discussion with the Smiths in connection with your
21 investigation?
22     A.  What did I do after?
23     Q.  Yes.
24             MR. KEMETHER:  The initial phone call,

Page 80

1  correct.
2             MR. GROTH:  Yes.
3  BY MR. GROTH:
4      Q.  So far we've had the meeting with Emily and
5  the discussion with the parents.  Now I want to know
6  from there on what did you do.
7      A.  That night I reached out to a local police
8  chief friend of mine, Mark Toomey, and I just told him
9  I had someone come and talk to me about a girl who is
10 no longer here, said that there was some sexual
11 activity, some physical contact with Lauren Fretz.  I
12 didn't say any names or anything like that.
13          I said there were some texts.  I said
14 basically, you know -- he told me to contact my lawyer,
15 if I hadn't so already, which I had reached out to Jeff
16 Drake in a phone call, but I did not hear back from
17 him.
18          He said to look into the allegation with that
19 girl.  He asked me if I saw any texts --
20     Q.  Which girl?
21     A.  To Lauren Fretz.
22     Q.  Who told you this?
23     A.  This is the Chief Toomey --
24     Q.  Let's stick with him first.  We'll get to Jeff

Ryan Clymer                              Nace vs. Pennridge School District
                          July 29, 2015

**Page 81**

1   Drake in a moment.
2       A.  Right.
3       Q.  What did your conversation with Mr. Toomey
4   consist of?
5       A.  Oh, he told me to -- he asked me if I saw any
6   texts. I said I saw nothing. He said, you know, "You
7   should probably see if they're still available." I
8   said they're not.
9       He basically said call your lawyer and if you
10  have a chance -- he asked me if I knew Lauren. I said
11  yes. He said, "Do you think she'll tell you the truth?"
12  I said yes.
13      He said "I would call her and listen to what
14  your lawyer has to say," so I did. I had called Tracey
15  Fretz, who is Lauren's mom, and told her I had some
16  questions; some things were said about her daughter and
17  Eric. I asked her for Lauren's phone number out at
18  college in California, and she gave to it me. I called
19  Lauren and left a message. She called me back sometime
20  later. I believe it was like a day or two later.
21      Q.  Okay. Let's take this step-by-step.
22      A.  Sure.
23      Q.  Did you call -- you called him Chief Toomey?
24      A.  Yes.

**Page 82**

1       Q.  And where is he a chief?
2       A.  He was chief in Hatfield.
3       Q.  Where is he now?
4       A.  I this he's in Upper Providence.
5       Q.  As chief?
6       A.  I believe so, yes.
7       Q.  Is he a member of the church?
8       A.  He is not.
9       Q.  Does he have kids at the school?
10      A.  He does not, no.
11      Q.  Did he have any connections with the school?
12      A.  He had a child that went there, yes.
13      Q.  At the time?
14      A.  (No response)
15      Q.  2009?
16      A.  I'm thinking. Perhaps.
17      Q.  And why did you go to him?
18      A.  Because he was a wise man. I had thought,
19  there is an allegation of some sexual things brought to
20  me by a third party; what should I do with that.
21      So, I didn't think it was true. It turned out
22  not to be true, but he just said "I would contact your
23  lawyer and talk to this girl." That was the last
24  conversation I had with Chief Toomey.

**Page 83**

1       Q.  Did you have any conversation with him as to
2   whether or not you should actually report this formally
3   to the district attorney or police or the Department of
4   Public Welfare?
5       A.  No.
6       Q.  He didn't bring it up and you didn't ask the
7   question?
8       A.  That is correct.
9       Q.  But you went to Mark Toomey to get this advice
10  from him because you suspected there may be something
11  inappropriate going on.
12      MR. KEMETHER:  Can we just clarify? I
13  mean, because now we're talking about somebody
14  who's not a party to this lawsuit, in particular
15  Lauren Fretz, who was not a student at the school.
16  Who are you talking about?
17      MR. GROTH:  We're talking about
18  something inappropriate going on with Coach Romig,
19  who was still at the school coaching.
20      MR. RUSSELL:  With whom?
21      MR. KEMETHER:  With whom?
22      MR. GROTH:  With whomever.
23      THE WITNESS:  Right.
24      MR. KEMETHER:  With anyone.

**Page 84**

1       THE WITNESS:  With anyone.  It was
2   about -- the focus was on Lauren because that was
3   the allegation, the physical allegation.  And I
4   had just called him to get his input, you know, as
5   a guy that I look up to and trust.
6   BY MR. GROTH:
7       Q.  So, are you saying if you had been given the
8   information about Lauren from Emily Mayer, you wouldn't
9   have contacted him just about her allegations?
10      A.  No.
11      Q.  But the fact that Emily Mayer said that Coach
12  Romig had told her that he had a physical relationship
13  with Lauren Fretz, did that cause you any concern as to
14  whether or not he was any risk to either Emily Mayer or
15  any of the other females at your school?
16      A.  I don't believe so. Like I said before, I did
17  not think Lauren would have a relationship because she
18  is more of a tomboy type of deal. Keep in mind that
19  when Emily was not at that game, that was Coach Romig's
20  last -- his last game that he had coached, so he was
21  removed from the situation.
22      So, I did call Lauren and she called me back,
23  and I asked her basically, you know, "This is about Mr.
24  Romig. Did you ever have a physical relationship with

                                    21 (Pages 81 to 84)

Ryan Clymer                               Nace vs. Pennridge School District
                        July 29, 2015

Page 85

1   him?" And she said "Eww, no."
2       Q.  Did you tell her that somebody had informed
3   you that she had some relationship with Romig?
4       A.  Yes.  I didn't say who.  I just said "It's
5   come to my attention that someone brought your name up"
6   and she -- I don't think she would do that, so no.
7       Q.  And that was the last conversation you had
8   with Mark Toomey about this, correct?
9       A.  And Lauren Fretz, correct.
10      Q.  And Lauren Fretz.  One conversation with her.
11      A.  Correct.
12      Q.  How long was your conversation with Lauren
13  Fretz?
14      A.  It was very short.
15      Q.  Five minutes?
16      A.  No, less than that.  She seemed grossed out.
17  She said "Eww, no" and then she turned me on to another
18  name, which was Kristen Kennedy, and I had said "So,
19  what happened with them?" And she said, you know, "You
20  probably should call Kristen."  Well, I don't have
21  Kristen's phone number, so I asked Lauren to have
22  Kristen reach out to me.
23      Now, this is after Christmas, so it's after
24  the 25th, when this is going on because I'm receiving

Page 86

1   these phone calls while I'm on vacation in Alabama.
2       Q.  So, during a conversation with Lauren Fretz,
3   she told you of her suspicions of some relationship
4   between Coach Romig and Kristen Kennedy?
5       A.  No, she did not say anything about any
6   relationship.  She said "You should just call Kristen."
7       Q.  Did you ask her why you should call her?
8       A.  She said "you should called her" and that was
9   it.  I said okay.  I said, "Well, I don't have her
10  number, so could you have her call me."
11      Q.  She brings up another name of a student -- was
12  she still a current student or a former student?
13      A.  No, former student.
14      Q.  She brings up the name of a former student
15  that you should for information about Coach Romig, and
16  you don't ask her why she's mentioning Kristen?
17              MR. KEMETHER:  Objection. He just said
18  he did.
19      A.  I did.
20      Q.  Okay, you did ask her. And she wouldn't tell
21  you?
22      A.  She just said "I think you should call her."
23      Q.  Who did you ask to reach out for, Kristen
24  Kennedy?

Page 87

1       A.  I asked Lauren Fretz to have Kristen call me.
2       Q.  Did she?
3       A.  She did.
4       Q.  How soon after your conversation with Lauren
5   Fretz?
6       A.  Within a day she reached back out to me.  So,
7   twenty-four hours.
8       Q.  Do you know where Lauren Fretz lives -- I'm
9   sorry, strike that.  Do you know where Kristen Kennedy
10  lives?
11      A.  I do not know where she lives.
12      Q.  And what did Kristen Kennedy and you talk
13  about?
14      A.  Kristen said that she received an email from
15  Coach Romig that said "I'm attracted to you," and I
16  said "Do you have that email" and she said no.
17          I said, "Did you tell your parents about it?"
18  This is after the fact where she's graduated, so she's
19  in college. She said her dad saw it and reached out to
20  Mr. Romig and said "Don't contact my daughter."
21      Q.  This email that she referred to, the email was
22  sent after she graduated?
23      A.  Yes.
24      Q.  And she told her father, and the father

Page 88

1   contacted Romig and told him "Stay away from my
2   daughter"?
3       A.  Partly.
4       Q.  Something to that effect.
5       A.  Yes.
6       Q.  That's what Kristen's telling you?
7       A.  That is correct.  So, I asked her, was there
8   anything physical that I ever happened? She said no.
9   She thought it was strange because Coach Romig was kind
10  of like her mentor, her spiritual advisor, whatever you
11  want to say, a great guy, and she thought it was very
12  odd that he was reaching out to her this way.
13      Q.  Did you ask her if she still had the email?
14      A.  I just told you that, yes.  I asked her if she
15  still had the email.
16      Q.  And she said?
17      A.  She said no.
18              MR. KEMETHER:  Was it an email or a
19  text?
20              THE WITNESS:  I don't know if it was an
21  email or a text.  I think it was an email, but I
22  don't know, so. . .
23  BY MR. GROTH:
24      Q.  Did she give you any other information?

                                22  (Pages 85 to 88)

Ryan Clymer                           Nace vs. Pennridge School District
                              July 29, 2015

---

Page 89

1    A.  That was it.
2    Q.  Did she tell you about any other girls who may
3  have had some relationship with Romig that was
4  inappropriate in some way?
5    A.  Never.
6    Q.  Did you ask her if she knew of anybody?
7    A.  Absolutely, yes.
8    Q.  Did she tell you that while she was a student
9  at FCA, Coach Romig questioned her about her
10 relationship with her boyfriend?
11   A.  No.
12   Q.  Did she tell you that she asked -- I'm sorry,
13 strike that.
14       Did she tell that you Coach Romig asked her
15 about sexual-intimacy situations between her and her
16 boyfriend?
17   A.  No.
18   Q.  Such as what they did, how they did it, did
19 she like it, things of that nature.
20   A.  No.
21   Q.  You believed Lauren Fretz when she said they
22 had no physical contact, Romig and her, correct?
23   A.  Absolutely, yes.
24   Q.  You believed Kristen Kennedy when she said

---

Page 90

1  what she said about getting this email.
2    A.  Yes.
3    Q.  That nothing else happened, correct?
4    A.  Absolutely, yes.
5    Q.  But at this point you didn't know whether or
6  not to believe Emily Mayer got inappropriate texts from
7  Romig. Is that correct?
8    A.  Did I believe that she got inappropriate
9  texts? No, I'm going off of facts. I'm going off of,
10 you know, what people are telling me and trying to
11 decipher whether or not this is true about this coach
12 and about this young lady who is making these remarks
13 but has no -- doesn't have a text to show me.
14   Q.  Well, Lauren Fretz didn't show you anything,
15 did she?
16   A.  No. I knew Lauren very, very well. Her mom
17 and my sister were friends, and I found -- I don't
18 think Lauren would have a relationship.
19   Q.  So, you believed her.
20   A.  I did believe her, yes.
21   Q.  And Kristen Kennedy didn't have the mailed or
22 text to show you that she got from Romig, correct?
23   A.  That's correct.
24   Q.  But yet you believe that Romig had sent the

---

Page 91

1  email or text to her.
2    A.  I didn't know. I had no clue. I didn't see
3  it. That's why I had asked her for the conversation or
4  the statement that was made.
5    Q.  Back at this time did you understand or know
6  that there were trained professionals such as police
7  officers, district attorneys or Department of Public
8  Welfare employees whose job it was and who were taught
9  and trained how to investigate allegations of
10 inappropriate sexual conduct between a coach and a
11 teacher and a minor?
12       MR. KEMETHER:  You're talking about
13    anyone in particular?
14       MR. GROTH:  I just mentioned the
15    people:  DA, police officers --
16       MR. KEMETHER:  Mr. Smith himself?
17       MR. GROTH:  No.  Let me rephrase it.
18    Let me rephrase the question.
19 BY MR. GROTH:
20   Q.  Back at thew time when you're doing this
21 investigation, did you have an understanding or did you
22 know that there are trained professionals whose job it
23 is and who are trained to investigate allegations of
24 sexual harassment or abuse or exploitation of children?

---

Page 92

1    A.  I'm sure there are.  That's why you have to
2  report these allegations, as far as abuse, to people.
3  But these allegations were just -- they weren't even
4  allegations.  They were statements made that had no
5  proof.
6        So, I'm sure there are people out there that
7  can investigate them.  That's why we have
8  law-enforcement, so. . .
9    Q.  But you chose not to go to them.
10   A.  What.
11   Q.  In a formal way.
12   A.  In a formal way?
13   Q.  The chief that you knew who had a kid at the
14 school.  But you didn't go to anybody in a formal way.
15   A.  I went to Mr. Smith, who has a background.
16   Q.  You didn't go to him because he was a
17 law-enforcement officer.
18   A.  Well, I went to him because he could also
19 direct me where to go, specifically for his daughter.
20 He came to me and we had conversations about how to
21 retrieve documents and things like that.
22   Q.  My question is, you didn't go to any outside
23 third-party, not interested, not a parent of one of the
24 people making allegations, or not a parent of a student

---

23 (Pages 89 to 92)

Ryan Clymer

Nace vs. Pennridge School District
July 29, 2015

## Page 93

1  who is in the school, like Mr. Toomey. You didn't go
2  to any outside agency to get a trained professional to
3  come in and take over and handle this investigation.
4     A. No, I did not.
5     Q. Okay. And you never even considered that,
6  correct?
7     A. No.
8     Q. Wouldn't it be fair to say that you really
9  didn't want anything bad to happen to Eric Romig
10 because of your long-standing relationship with him?
11        MR. KEMETHER: Object to the form. You
12 can answer if you if you're able.
13    A. I wouldn't want anything bad to happen to him,
14 no, but not because of my long-standing relationship.
15 He's a human being, you know.
16    Q. So, you would have handled this the same way
17 even if it was somebody that you had no prior
18 relationship with.
19    A. Absolutely.
20    Q. Did you only have the one conversation with
21 Kristen Kennedy.
22    A. Yes, just one time.
23    Q. Did you know who her boyfriend was back in
24 high school?

## Page 94

1     A. I think they both came from Lansdale Catholic
2  together. I think his last name was Kirby. I'm not
3  sure what his first name was.
4     Q. Was he a student at FCA?
5     A. Uh-huh.
6     Q. Yes?
7     A. Yes.
8     Q. All right. I think we've gone over everything
9  I need to go over with Toomey, Fretz and Kennedy.
10 Let's go over your conversations with Jeff Drake.
11       THE VIDEOGRAPHER: The time is 11:55.
12 Off the record.
13       (A brief recess was taken)
14       THE VIDEOGRAPHER: Stand by, please.
15 The time is 12:08. We're back on the record.
16 BY MR. GROTH:
17    Q. Did you speak to any other students at the
18 school about Mr. Romig in relation to your
19 investigation of Emily Mayer's accusations?
20    A. I do not believe I did.
21    Q. Did you speak to any of the assistant coaches?
22    A. I did, yes.
23    Q. Who did you speak to?
24    A. Robin Landis.

## Page 95

1     Q. Who else?
2     A. Outside of Russ, that was it.
3     Q. Meaning Mr. Hollenbach.
4     A. That's correct, yes.
5     Q. What did you speak to Robin Landis about?
6     A. To see if there was any validity to what Emily
7  Mayer was saying, if she saw anything, anything that
8  would be out of the norm for a coach and a player.
9     Q. Well, she couldn't comment on the validity of
10 Emily Mayer getting these inappropriate texts, correct?
11    A. No, she didn't say she saw any of them or
12 anything like that. I was talking more about the
13 relationship, you know: Was it odd, was it
14 head-to-head confrontation, what was going on.
15    Q. What did she tell you?
16    A. She said she didn't see anything. She said
17 that Emily, I guess, had just been relieved from her
18 captain's duties, that Eric treated every girl the
19 same, basically.
20    Q. Did you tell her what allegations Emily Mayer
21 had made to you?
22    A. No.
23    Q. Did you say anything about the texts?
24    A. About the. . .

## Page 96

1     Q. The allegation about inappropriate texts.
2     A. I don't think I told her anything.
3     Q. Nothing about the quantity or the
4  inappropriateness of some of the texts?
5     A. Not the inappropriateness of the texts. I
6  think with Robin I was just trying to find out what she
7  saw. I wasn't going to give anyone any information. I
8  was trying to do this investigation as thoroughly as I
9  could without tainting anything.
10    Q. And she told you that there was nothing that
11 she noticed in terms of the interaction between Romig
12 and Mayer that was of any concern to her.
13    A. That's correct.
14    Q. Did you discuss with her whether or not she
15 thought or you thought that maybe, because of this
16 issue of Emily Mayer being relieved of her co-captaincy
17 of the team, that maybe Emily Mayer was doing something
18 to get revenge on Coach Romig or anything like that?
19    A. I don't think she said anything like that, no.
20 It was very matter-of-fact. It was a quick
21 conversation.
22       No, she just said that all she knew was that
23 the two captains had been relieved. She didn't see
24 anything different since then. She was very much like,

Ryan Clymer                                    Nace vs. Pennridge School District
                              July 29, 2015

Page 97

1   Eric treats everyone the same and I haven't noticed
2   anything and. . .
3       Q.   The other captain was Chelsea Romig, correct?
4       A.   I assume from yesterday's deposition, yes.
5       Q.   And that was Mr. Romig's daughter.
6       A.   His stepdaughter.
7       Q.   I think adopted daughter.  I was corrected on
8   that in his deposition.
9           Did Robin Landis tell you why he relieved both
10  of them as captains of the team?
11      A.   She may have at that time, but I can recall
12  more clearly from talking with Russ and listening to
13  Russ yesterday.
14          I don't know if she told me or not, but I'm
15  recalling Russ' conversation from yesterday, so. . .
16      Q.   Okay.  Let's talk about what you told Russell
17  Hollenbach during the course of the investigation that
18  you were conducting.  And would it be fair to say that
19  you were the only one conducting the investigation for
20  the school?
21      A.   Absolutely, yes.
22      Q.   You heard all this testimony yesterday and the
23  interaction that he says he had with you during this
24  investigation.

Page 98

1       A.   Yes.
2       Q.   Why don't you tell me how you kept him in the
3   loop or didn't keep him in the loop about the things
4   that you were finding out or discussing with other
5   people that you were interviewing?
6       A.   It started out with me letting him know that
7   something was said, and then I told him we were going
8   to relieve Eric of his duties.  He needs to step aside
9   until I can complete the investigation.
10          As details came in and I would dismiss
11  something as far as Lauren Fretz having no physical
12  contact with Mr. Romig, then I would tell him this is
13  what alleged had been said through Mrs. Mayer or Miss
14  Mayer.
15          As I would find out information, I would give
16  it to him so he wouldn't be blind-sided.  He probably
17  got more information from, you know, smaller circles
18  and things likes that, kids within a small school.
19  It's a small environment.  I wasn't on-purpose talking
20  to anyone.
21      Q.   When you said he probably got more information
22  from kids in the school, what information would kids in
23  the school have about any of them?
24      A.   Well, he didn't know the amount of texts until

Page 99

1   I told him.  I could see something being said through
2   one of Emily's friends to someone else who comes back
3   and says, well, this is what's going on.
4           Mr. Hollenbach had a senior at that time.
5   Garrett was his son, great kid.  I could see him saying
6   hey, this is what's going on, in your terms, the
7   scuttlebutt.  This is what's going on.
8           So, I purposely didn't talk to Russ until I
9   had information, but just kept him abreast of what was
10  going to be taking place.
11      Q.   So, when you tell him that there were
12  thousands of texts between Romig and Emily Mayer?
13      A.   Whenever I had seen the -- Kevin had given me
14  the documents.
15      Q.   Those documents were previously marked at Mr.
16  Romig's deposition as Romig exhibit seven.
17          MR. KEMETHER:   For the record, that's
18  Mr. Smith's stepfather?
19          THE WITNESS:   That is correct, yes.
20  BY MR. GROTH:
21      Q.   And Romig exhibit five:  Romig exhibit five
22  was an email from Kevin Smith to Ryan Clymer containing
23  the logs for the texts between September and November
24  of 2009 between Mr. Romig and Emily Mayer.

Page 100

1           Do you recall seeing this email and the
2   documents attached to it?
3       A.   Yes.  Do I have to look through every page?
4       Q.   No.
5       A.   That's what Kevin had sent me, yes.
6       Q.   Okay.  And he sent it to you, it looks like, on
7   December 23rd, 2009.
8       A.   I wouldn't have gotten that until I got back
9   from vacation, so. . .
10          But yes, it looks like he sent it to him on
11  December 23rd.
12      Q.   So, you were not getting emails while you were
13  away?
14      A.   I had Outlook.  I didn't have -- at that time
15  I didn't have a smart phone or anything like that.
16      Q.   And then on January 5th Kevin Smith sent you
17  another email which was marked Romig exhibit seven with
18  all the logs for the texts from Mr. Romig to Emily
19  Mayer in December of 2009.
20          Do you remember getting that email and logs?
21      A.   What's the difference?
22      Q.   The first group is for September, October,
23  November; the last one is for December.
24      A.   Okay.  I most likely got all of these --

Ryan Clymer                                    Nace vs. Pennridge School District
                                    July 29, 2015

Page 101

1  January 5th, December 23rd.  Yeah.  I mean, we had
2  talked.  We discussed about getting them.  He said he
3  could obtain them through his phone company, and he
4  did, yes.
5      Q.   And did you ever show these -- strike that.
6  First of all, did you ever hand-print or print out hard
7  copies of these documents?
8      A.   I did, yes.
9      Q.   Did you ever show those to Russ Hollenbach?
10     A.   I don't believe I showed them to Russ.  I
11 mentioned them to Russ.  I don't think I showed them to
12 Russ, no.
13     Q.   Is there some reason why you didn't show them
14 to him?
15     A.   There is no reason.  I mean, I just told him
16 there were a lot of texts that had been sent back and
17 forth between Emily and Eric.
18     Q.   Did you give him any idea what the number was
19 or you just said a lot?  Did you tell him it was
20 thousands?
21     A.   I may have mentioned it was thousands.
22     Q.   Did you tell him that you had gotten an email
23 from Annette Smith dated December 31st, 2009, which
24 included a typed page of Emily Mayer's recollections of

Page 102

1  the inappropriate sexual texts that Mr. Romig had sent
2  to her?  I'll show you Romig exhibit six.
3      A.   I may have mentioned that there was an email,
4  but I don't think I ever said specifically what was in
5  it.
6      Q.   You never told Mr. Hollenbach that the texts
7  that Emily Mayer was complaining about were not simply
8  questioning her relationship with Chase, but also
9  included statements such as "Beginning in November he
10 started telling me how he and Lauren did sexual things
11 and was hinting at me to be this way" or texting to her
12 "I want to be in you" or texting her every day that he
13 was in love with her, or texting her that "he," meaning
14 Romig, "would tell me he could give me everything that
15 I need and has so much to offer me and wants to marry
16 me"?  You never told him any of those specifics?
17     A.   I don't know if I told him specifics, no.  I
18 could have, but I don't think I did.
19     Q.   Okay.
20     A.   But I did tell him that I was receiving more
21 information that we had to investigate and look
22 through, and that was becoming -- working with Kevin
23 was totally fantastic, so. . .
24     Q.   Kevin Smith?

Page 103

1      A.   Yes.
2      Q.   This email that I just referred to, Romig
3  exhibit six, was dated December 31, 2009 from Annette
4  Smith to you.  Did you get this after you got back from
5  your holiday vacation?
6      A.   Yes.  There is no way I could have gotten
7  anything while I was on my vacation.
8      Q.   Were you back as of December 31st?
9      A.   I may have been.  I'm probably sure I was
10 because I think we met with Eric sometime in between
11 the two holidays.  I believe we did.
12     Q.   You met with Eric Romig in between December
13 25th and January 1st.
14     A.   I believe we did.  It was probably close to
15 the end of December.  It may be after the 1st.  I'm not
16 entirely sure.  What was the 1st?  The 1st was a Friday.
17 I don't know.
18     Q.   Did you ever have a discussion with Mr.
19 Hollenbach as to whether or not you should report what
20 you were finding out to police or the district attorney
21 or the Department of Public Welfare representatives
22 because you had a suspicion that there was some type of
23 inappropriate sexual abuse or exploitation going on
24 here?

Page 104

1      A.   No.  I told him we were in communication with
2  Jeff Drake and were receiving counsel on all this.
3      Q.   Were you in touch with Jeff because you had
4  some suspicions that something inappropriate was going
5  on here?
6      A.   Well, these were allegations that the Smiths
7  were bringing forward.  Did I suspect something was
8  going on?  I suspected that there was a lot of
9  conversation that was happening between Emily and Eric
10 and thousands of texts.
11         Like I told you at the beginning of this
12 deposition, to me at that point was a lot of
13 texts, but I didn't text at that time, so I didn't -- I
14 didn't really know.
15         But definitely something that -- you know,
16 when he sent me the same document that said the same
17 thing, it came down to basically he said/she said.  One
18 is denying it and the one is saying it is true.
19         I believe shortly after this is when Emily was
20 returned to the team, I believe.
21     Q.   You don't know the date?
22     A.   If I was to guess before today, it would have
23 been pretty soon after Christmas.  But then you're
24 telling me it happened after the new years.

                                   26 (Pages 101 to 104)

Ryan Clymer                                    Nace vs. Pennridge School District
                        July 29, 2015

---

Page 105

1         MR. KEMETHER:  We don't want you to
2   guess.  If you know, you know.  If you don't, we don't
3   want you to guess.
4         A.   No, I don't know when she was returned,
5   but. . .
6         Q.   You didn't start the school back up before the
7   new year, did you?
8         A.   No, but you can be returned to the team if
9   they're having practices and things like that.
10        Q.   I got it.  And how would you have informed her
11  of that?
12        A.   Through her mom and her dad.
13        Q.   In writing or not in writing?
14        A.   No, it would have been -- we communicated over
15  the phone, basically, between the Smiths and myself,
16  partly because I did not have access to my emails when
17  I was in Alabama.  So, the phone was the only thing
18  that we could communicate through.
19        Q.   When you finally got a chance to look at these
20  logs that were sent to you by the Smiths, did you
21  happen to note the times of the day and night when the
22  text were being sent by Mr. Romig to Emily Mayer?
23        A.   Yes.  There was a conversation that Kevin and
24  I had, and we discussed -- there was one that was long

---

Page 106

1   after midnight.  And I said, I'm going to ask Eric.
2   You can ask Emily, you know, what was going on.  So, he
3   agreed to do that with me.
4         You know, Eric said "Sometimes," you know, "I
5   would text late and not really know what time it was"
6   and things like that.
7         I said what are you texting about?  And a lot
8   of it was her relationship with her dad or her
9   step-dad.  There was a lot of that mentoring going on,
10  which is something that Robin alluded to as well.
11  There is a friction between one of her fathers -- I'm
12  not sure which one it was.
13        So, you know, talking with Kevin, I believe
14  that he said she was texting, but sometimes she
15  wouldn't answer him or something like that.
16        But yes, there were a couple times in there
17  that were like after 12:00.  So, he kind of just said
18  oh, it was probably just talking about things with her
19  dad or something like that.
20        Q.   After 12:00 at night.
21        A.   Right.
22        Q.   And you thought that was appropriate.
23        A.   I thought that probably shouldn't have been
24  done, you know, even if he is trying to do something

---

Page 107

1   good for somebody.  I think that was one of the things
2   that I told Kevin, which he already knew, that we had
3   to get the content of these texts.
4         So, that was kind of at the point where there
5   was a lot of texting.  I did ask Kevin to ask his
6   daughter is there was any physical, now that we've been
7   in this investigation for. . .
8         There was none.  And it was kind of a thing,
9   okay, so here we go.
10        There was that one text that said something
11  about "I want to be in you."  That was one that I
12  specifically asked her about.  And she told me when it
13  was, and so I investigated that for quite some time,
14  and that was basically he said he didn't have his phone
15  on him and --
16        Q.   That turned out to be a lie, right?
17        A.   Well, the lie came when he said he picked his
18  phone up off the trash can in the gym, which I had
19  previously basically emptied that morning.
20        Then he said he picked it up in the bleacher,
21  which I didn't clean the bleachers and he could have --
22  he could have picked it off the bleachers, but he
23  definitely didn't pick it up off the trash can.
24        So, that was the investigation that started at

---

Page 108

1   that point including Robin and some more, because I
2   think she was there, asking her if she knew anything
3   that was going on at that time.
4         Q.   He eventually admitted to you that he was
5   lying about the issue of him not having the phone when
6   all these texts were sent to Emily, correct?
7         A.   He eventually admitted to me he did not have
8   his phone?
9         Q.   Yes.  At some point he told you that he didn't
10  have his phone for a period of time, that somebody must
11  have been using his phone and sending texts to Emily.
12        A.   He did tell me that, yes.
13        Q.   And he eventually admitted that was not true.
14        A.   He admitted to me that it could have been
15  someone, and then he came back later and said that he
16  texted his wife, and then she said the same thing:
17  That basically that text was meant for her.
18        Q.   What text?
19        A.   The text that we were referring to, the one
20  that said "I want to be in you."
21        Q.   Oh, that's -- oh, I get it.  Okay.  So, he's
22  telling you in reference to that specific text that he
23  sent that to his wife.
24        A.   Yes.

27  (Pages 105 to 108)

Appendix 0311

Ryan Clymer                                    Nace vs. Pennridge School District
                                    July 29, 2015

---

Page 109

1    Q.  But you had heard about that from Emily Mayer
2  first, correct?
3    A.  That is correct.
4         THE WITNESS:  Through this.
5         MR. KEMETHER:  Through the email.
6         THE WITNESS:  Yes.
7         MR. GROTH:  Through the email.
8  BY MR. GROTH:
9    Q.  Then you concluded from that that -- I'm
10 sorry, strike that.  Then you had a discussion about
11 somebody else potentially using his phone, also, at the
12 same time?
13   A.  That's what he had said.  He said I didn't
14 have my phone on me.
15   Q.  Right.
16   A.  I left it on the trash can.
17   Q.  And you know that not to be true.
18   A.  I know that it wasn't on the trash can. I
19 don't know that he didn't have his phone, but I do know
20 that it wasn't on the trash can.
21   Q.  So, you knew that when he said he left it on
22 the trash can, it was not true?
23   A.  Right, and then he told me he picked it up in
24 the bleachers.

---

Page 110

1    Q.  So, he changed his story.
2    A.  He did.  That was the one time where his story
3  did not kind of mesh.
4    Q.  You indicated earlier in your testimony that
5  you had a rule at the school that if there had to be
6  texting to the female players on a team, that you would
7  want those texts to be sent by an assistant female
8  coach and whatever, correct?
9    A.  That's correct.
10        MR. KEMETHER:  Objection to the form.
11 You can answer.
12   Q.  And now you're telling me that despite knowing
13 that Mr. Romig was sending thousands of texts to Emily
14 Mayer at all times of the day and night, including
15 around midnight, that you didn't believe -- regardless
16 of the content, that you didn't believe that to be
17 totally inappropriate, even if it was a mentoring
18 situation or no matter what they were talking about,
19 that you didn't conclude that that was totally
20 inappropriate?
21        MR. KEMETHER:  Object to form.  And
22 just to clarify:  What was totally inappropriate?
23   A.  Yes, what was?  The amount of texts, you're
24 saying?

---

Page 111

1    Q.  Yes, the amount and the time of day of the
2  texts.
3    A.  When this was sent to me, that's when
4  basically we said the amount of texts that he's sending
5  is inappropriate, which is eventually why we let him go
6  or why he stepped aside.
7    Q.  Would it be fair to say that when Eric Romig
8  was confronted by you with actual allegations like this
9  one I-want-to-be-inside you allegation and he told you
10 that that is meant for his wife. . .
11   A.  I believe that was after the fact.
12   Q.  After the resignation?
13   A.  I believe it was.
14   Q.  But did you believe him when he told you that?
15   A.  I didn't know if I believed him.  I don't know
16 if I didn't believe him.  I know Emily's -- you know,
17 trying to figure out if what Emily was saying about
18 Lauren is true, which wasn't true, and Lauren wasn't
19 coming home at the times where Emily Lee said she was
20 coming home.
21   Q.  We didn't talk about that.  What did you say
22 about coming home?  Who said what about coming home?
23   A.  This is back in the beginning of the
24 conversation when the physical contact had been had and

---

Page 112

1  Lauren was coming home.
2         So, it was going to be a time for Coach Romig
3  to meet back up with Lauren.  That's what Emily told
4  me.
5         So, when I called Lauren I asked her, and she
6  said "I'm not even coming home that day," so just
7  trying to figure out who is telling the truth, who is
8  not telling the truth.
9         The amount of texts that were sent basically
10 led to him, you know, being relieved of his duties.
11   Q.  When did Emily tell you about this issue of
12 Lauren Fretz supposedly coming home and meeting Romig?
13   A.  I believe it was -- I don't know if it was the
14 first time that we met.
15   Q.  Did you meet her more than one time to talk
16 about this?
17   A.  I'm not sure.  I'm not positive.  The one time
18 her parents came in, I'm not sure if she was there as
19 well.  She may have been with her parents when they
20 came in.  It may have been the first time that we spoke
21 that she said, you know, he said he's had this
22 relationship and it's going to continue.
23   Q.  And did she say how she knew that Lauren Fretz
24 was supposedly coming back to the area to meet Mr.

---

28  (Pages 109 to 112)

Appendix 0312

Ryan Clymer                                     Nace vs. Pennridge School District
                           July 29, 2015

---

Page 113

1  Romig?
2      A.  He had told her.
3      Q.  In a text?
4      A.  I don't know.  I have no idea.
5      Q.  And you talked specifically to Lauren Fretz
6  about that and she denied it?
7      A.  Yes.
8      Q.  Okay.  We had talked about whatever your
9  conversation was with Lauren Fretz was before, and you
10 didn't mention this particular point that you discussed
11 with her.
12     A.  I'm sorry.
13     Q.  That's okay.  Is there anything else you can
14 remember now about your conversation with Lauren Fretz
15 that you didn't discuss with me before?
16     A.  No, but as we continue on it may come up.
17     Q.  Yes, it may refresh your recollection and you
18 may have more recall.  That's okay.  I just want to
19 know.  If something comes up, you'll let me know,
20 right?
21     A.  Yes.
22     Q.  Is there anybody else that you interviewed in
23 connection with your investigation that we have not
24 already talked about?

---

Page 114

1      A.  I interviewed -- we talked about Chase and
2  Emily.  We talked about Lauren and Kristen.  We talked
3  about the Mayers.  We talked about Eric.
4      Q.  We didn't talk about Eric yet, but we're going
5  to get to that in a minute.
6      A.  Russ being kept in the loop.
7      Q.  Landis?
8      A.  Robin Landis, yeah.  That was to see if she saw
9  anything.
10     Q.  Anybody else?
11     A.  I did not speak to Marc Hoover.  He is another
12 coach there.  I believe that was it.
13     Q.  Okay.
14     A.  I think that was it.
15     Q.  You already testified that he prepared a
16 one-page hand written document that you think you took
17 to the meeting, one of the meetings, with a pastor and
18 whatever.
19     A.  Right.
20     Q.  That is no longer available.
21     A.  Mr. Mandes may have it.
22     Q.  You're right, and we'll check with him to see
23 if he does.  We'll ask your attorneys to check with him
24 to see if he does.

---

Page 115

1          Did you make any handwritten notes or
2  memorialize in any way any of your interviews with any
3  of these people?
4      A.  Besides the first one with Emily and Chase?
5      Q.  Which is also not available, right?
6      A.  No, it's not available.
7      Q.  Any others?
8      A.  Unless -- the conversation I had with Robin
9  was in a gym.  We're standing there, so I did not write
10 it down.  She did not see anything.  There was nothing
11 alarming, no.
12     Q.  Okay.  Now, let's talk about your
13 conversations with Eric Romig.  I don't think we've
14 gone into those in any great detail.  You referred to
15 them occasionally, but how did you first let Eric Romig
16 know about these allegations against him?
17     A.  I believe I was the one who told him
18 specifically.  Now, Russ may have spoken to him before
19 I got to him, but Russ wouldn't have any details about
20 what was going on.
21          So, I believe I was the one who kind of told
22 him there are some things being said, some accusations
23 being made, and we're looking into them.  "Until that
24 time, you're going to have to be relieved of your

---

Page 116

1  duties."
2      Q.  Where did this conversation take place?
3      A.  That was over the phone.  Eric didn't work at
4  the school.
5      Q.  When?
6      A.  Okay.
7      Q.  When did the conversation take place?
8      A.  It would have been the day after Emily and I
9  talked.
10     Q.  After you talked to Emily and after you talked
11 to her parents.
12     A.  It was definitely after Emily.  It may have
13 happened after 1 -- I can't say for sure, but I know I
14 talked to -- you're talking the conversation on the
15 phone with -- yes, the Smiths.  Yes.
16     Q.  I thought you testified earlier that you
17 wanted to talk to the Smiths before you contacted Eric,
18 right?
19     A.  I did, yes.
20     Q.  So, that was either the same day or the day
21 after she made the allegations?
22     A.  I don't think it was the same day, because if
23 the Smiths called me that night, it would have been the
24 next morning.  If the Smiths would have called me the

---

                                    29  (Pages 113 to 116)

                                                        Appendix 0313

Ryan Clymer                              Nace vs. Pennridge School District
July 29, 2015

Page 117

1   next morning, then it would have been a phone call in
2   the afternoon to Eric before he came into school.
3       Q.  Did he call you or did you call him?
4       A.  I don't recall.  He may have reached out to me
5   and I just didn't pick up.  I believe I was the one
6   that called him.  Like I said, he may have called me
7   and I just didn't pick up.
8       Q.  What did you tell him during that first phone
9   call about the allegations that were made against him,
10  if anything?
11      A.  I mentioned something that had been said about
12  a former player.  I didn't want to say too much because
13  I hadn't done the investigation yet.
14      So, I wanted to talk to Lauren before anyone
15  else talked to Lauren, and I wanted to talk to other
16  people before he had a chance to talk or before anyone
17  else had a chance to go out and whisper-down-the-lane
18  type deal, which is why I kept Russ abreast only when I
19  needed to.  What was your question?
20      Q.  I want to know what you told him about the
21  allegations that were made about him.
22      A.  I just told him there were some things that
23  were said about him that we're looking into, but until
24  we figure out what was going on, he had to be -- he had

Page 118

1   to step down.
2       Q.  And that's all you told him.
3       A.  The first conversation, absolutely.
4       Q.  And you didn't tell him who made the
5   allegations?
6       A.  I don't know if I told him who made the
7   allegation.  He would have known.
8       Q.  How would he have known?
9       A.  Well, it's a very, very small school and --
10      Q.  So far the only people that have been talked
11  to about this at all are Emily Mayer, her parents, Russ
12  Hollenbach and you.  Who else would know?
13      A.  Chase would know.
14          MR. KEMETHER:  Object to form.
15      Q.  Yes, Chase.
16      A.  Yes, chase would know.  I don't know if Emily
17  told any of her friends or anything like that. I had no
18  idea.  But when you don't show up for a game or a
19  practice, and that's your captain or one of your best
20  players, people tend to ask.
21      Remember, there are only like 10 kids on the
22  team and it's or, very small.
23      Q.  Did you tell him about the allegations
24  involving Lauren Fretz?

Page 119

1       A.  Only after, I believe, I talked with Lauren.
2   I'm talking about on the first phone call.
3       A.  No, I don't believe I did.  No.
4       Q.  Did he ask any questions?
5       A.  He probably did. I didn't really tell him too
6   much just because I wanted to do this investigation.
7   He was upset.  He wanted me to tell him why, and I just
8   said I couldn't.
9       Q.  That's the first phone call you had with Eric
10  Romig about this allegation.
11      A.  Yes.
12      Q.  When was the next contact or communication you
13  had with Eric Romig?
14      A.  I believe it was when I was in Alabama, after
15  I had spoken with both Kristen and after I had spoken
16  with Lauren.
17      Like I said, he called me and I just didn't
18  pick up because I didn't have any new information at
19  that point.  And I did ask him if he ever had an
20  inappropriate relationship with either girl, and he
21  said no. I asked him if there was anything else that he
22  wanted to tell me, and that's all I can recall.
23      I'm sure there was more to the conversation,
24  but. . .

Page 120

1       Q.  You asked him if there was anything
2   inappropriate between him and Fretz and Kennedy,
3   correct?
4       A.  Yes.
5       Q.  Did you tell him about Emily Mayer's
6   allegations at that point?
7       A.  I did say that someone had made an allegation;
8   I may have said Emily:  That basically "you and Lauren
9   were physical when she was here."  He emphatically
10  denied.  I asked him if he ever contacted Kristen
11  Kennedy.  He denied.  I said that "she said you did"
12  and he said "I did not."
13      Q.  Anything else?
14      A.  I believe that's it.
15      Q.  In that telephone conversation, did you
16  finally pick up the phone from him calling you or did
17  you call him?
18      A.  No, I reached out to him.
19      Q.  Do you recall approximately what date that
20  was? Before New Year's?
21      A.  Oh, absolutely.  Yes.
22      Q.  How many days after the initial allegation by
23  Emily Mayer, approximately?
24      A.  I want to say three, maybe four, because she

30 (Pages 117 to 120)

Appendix 0314

Ryan Clymer                          Nace vs. Pennridge School District
                        July 29, 2015

---

Page 121

1 contacted me, Emily and then the Smiths, and then it
2 was Eric.
3       Q.   So, up to this point you had never had a
4 face-to-face with Eric Romig at all?
5       A.   No.  I was on vacation.  Like I said, up to
6 this point I don't believe I did.
7       Q.   What was the next communication you had with
8 Mr. Romig?
9       A.   What was the date of this?  The 31st.  I don't
10 recall.  I know we met with Eric prior to the 1st, I
11 believe, Russ and myself.  And this is when I showed
12 him all of the texts via my computer screen -- not the
13 texts, but the logs.  There were no texts.
14              MR. KEMETHER:  So we're clear, you're
15       referring to exhibit Romig-5 for the record.
16              THE WITNESS:  Yes, and said "what do
17       you say to this?"  And that's when he told me about
18       trying to help her out and how tough a time she
19       was having with one of her dads -- I'm not really
20       sure which one it was.
21 BY MR. GROTH:
22       Q.   So, he tried to give you explanations why he
23 is having thousands of texts with a student outside
24 school.

---

Page 122

1       A.   Right, why he was helping this girl go through
2 her problems.
3       Q.   Did you believe him?
4       A.   I did, actually, yeah.  He had a mentor when
5 he was in school, a guy that he looked up to, which is
6 Coach Johnson; we all did.  So, I could see that
7 happening, absolutely.  He was a very kind soul.  He
8 could still be a kind soul.  I don't know.  But I could
9 see him reaching out to someone like that.
10       Q.   And you believed him when he said that none of
11 the thousands of texts he sent Emory Mayer were
12 inappropriate in any way.
13              MR. KEMETHER:  Object to form.  You may
14       answer.
15       A.   I had no proof that they were otherwise.
16       Q.   You believed him?
17       A.   Yes.
18       Q.   And you didn't believe Emily Mayer.
19       A.   I believed that Emily did not have proof of
20 this, yeah.
21       Q.   Her saying it happened was not good enough for
22 you.
23              MR. KEMETHER:  Objection.  That's a
24       misrepresentation of the testimony.

---

Page 123

1       Q.   In terms of proof.
2       A.   In terms of proof?
3              MR. KEMETHER:  You can answer if you're
4       able to do so based upon that question.
5       A.   Yes, its a different time.  I'm trying to
6 pulled myself back in that position at that time.
7              I just found it odd that she wouldn't show
8 Chase because they were together, and Chase is and was
9 a great kid.  And if there were that many things that
10 were being said, that list that was given, why wouldn't
11 she show him?
12       Q.   And did you ask her that?
13       A.   I did, yeah.
14       Q.   When?
15       A.   Very early on.  I think after I asked Chase
16 about, you know, have you seen any of these, and she
17 said as she got them she deleted them.  That was her
18 answer.
19       Q.   When?
20       A.   Probably would have been the first
21 conversations we had.
22       Q.   The first meeting with her and Chase?
23       A.   Yes, probably, either the first meeting or
24 talking with Annette on the phone.

---

Page 124

1              It was kind of trying to figure out why it was
2 happening, meeting with Annette and Kevin, and trying
3 to validate what she was saying.  They believed her, but
4 there was no concrete proof that those had taken place.
5       Q.   Just as there was no concrete proof that they
6 had not taken place.
7       A.   That's correct.
8       Q.   You used the term "he said/she said"?
9       A.   Uh-huh.
10       Q.   Correct?
11       A.   Correct.
12       Q.   Didn't you at some point say to yourself I
13 shouldn't be the one who makes the decision who is
14 telling the truth and who's not telling the truth?  I
15 should get somebody outside of the school to come in
16 and look at this whole situation and make that
17 determination as to whether or not Mr. Romig did the
18 inappropriate texting that Emily Mayer said he did?
19              MR. KEMETHER:  Objection to the form of
20       the question.  You had answer if you're able.
21       A.   Yeah, I think by me going to Jeff Drake and
22 asking him for some advice on what to do, knowing that
23 Kevin was involved in his police work -- and I believe
24 he was a detective -- knowing that trying to find out

---

31 (Pages 121 to 124)

Ryan Clymer                              Nace vs. Pennridge School District
                                July 29, 2015

Page 125

1  -- and Kevin I came to the conclusion, we both agreed,
2  that we would have to get the context of the texts,
3  which was going to happen.
4      Q.  Based upon whatever understanding you had of
5  the PA Child Protective Services Law back in 2009, when
6  you did this investigation, was it your understanding
7  that reporting allegations of sexual abuse or
8  exploitation or harassment to an outside party did not
9  mean reporting it to your own lawyer or a parent of the
10 student or a police official who has a child in the
11 school?
12          MR. KEMETHER: Object to form.
13          MR. SANTARONE: Object to form.
14          MR. KEMETHER: Calls for a legal
15 conclusion. You can go ahead and answer.
16     A.  My interpretation of the law wasn't
17 allegations. It was evidence of proof of abuse, which
18 there was none.
19     Q.  Back at that time did you consider allegations
20 of the types of inappropriate sexual texting made by
21 Emily Mayer and shared with you in her typed statement
22 to be sexual abuse or exploitation?
23     A.  No.
24     Q.  You did not believe to that be so. Even if

Page 126

1  they were true, that was not sexual exploitation or
2  abuse or harassment?
3      A.  No. No, they weren't. There was no abuse or
4  there was no physical abuse that took place.
5      Q.  So, your understanding at the time was, there
6  had to be physical contact in order to have an abuse or
7  harassment or exploitation situation that had to be
8  reported to outside parties.
9      A.  Yes.
10     Q.  Okay. Did you ever discuss that issue with
11 Mr. Drake?
12     A.  Did I discuss what issue?
13     Q.  That specific issue that you just answered a
14 question about what constituted abuse, harassment or
15 exploitation that had to be reported to an outside
16 party.
17     A.  I believe I did, yes.
18     Q.  And to whom about that discussion.
19     A.  It's what I just told you: It was the way the
20 law read, that there is no physical abuse. There was
21 no abuse that had taken place.
22          There was no way we could get the texts
23 unless, like I told Kevin, you can bring up charges and
24 then subpoena the court, which Kevin said he is going

Page 127

1  to do, and that would be the way that everything was
2  going to be cleared up.
3      Q.  Did Jeff Drake tell you it was his legal
4  opinion that there was nothing here that had to be
5  reported to the Department of Public Welfare,
6  Department of Education, the DA or the police?
7      A.  I believe he would have told me if I had to,
8  yes.
9      Q.  Did he tell you you didn't have to?
10     A.  I don't know if he told me I didn't have to.
11 He didn't tell me I had to.
12     Q.  So, it wasn't discussed.
13          MR. KEMETHER: Objection to form.
14     A.  I think we went over the mandated reporting at
15 that time, absolutely.
16     Q.  And what was the conclusion that Mr. Drake
17 reached about reporting this to an outside agency?
18          MR. KEMETHER: Objection to form.
19 You're asking him for a mental impression of
20 someone who is not a party --
21          MR. GROTH: I'm asking him what Mr.
22 Drake told him.
23          MR. KEMETHER: That's a different
24 question. Go ahead.

Page 128

1          THE WITNESS: Looking at the way it's
2  stated, we did not have to report it.
3          MR. GROTH: Okay.
4  BY MR. GROTH:
5      Q.  And did you act subsequent to that with Mr.
6  Romig based upon that opinion by Mr. Drake?
7          MR. KEMETHER: Objection to the form.
8          THE WITNESS: Can you rephrase the
9  question?
10         MR. GROTH: Yes.
11 BY MR. GROTH:
12     Q.  Did you take action with regard to Mr. Romig,
13 the resolution of the issue with Mr. Romig, based upon
14 that representation by Mr. Drake?
15     A.  No, I think we took action based upon what Mr.
16 Mandes had told us.
17     Q.  Okay. Did you not report the allegations of
18 Emily Mayer to any outside agency because of the
19 discussion you had with Mr. Drake?
20     A.  I can't say at that point whether I did or I
21 didn't. It was something that we did not have to
22 report.
23     Q.  You concluded that yourself.
24     A.  No, we concluded that.

                            32 (Pages 125 to 128)

                                            Appendix 0316

Ryan Clymer                           Nace vs. Pennridge School District
                           July 29, 2015

Page 129

1      Q.  So, he told you that.
2           MR. KEMETHER:  Object to form.
3      A.  I don't know if he told me I didn't have to
4  report it.
5      Q.  That's what I'm asking you:  Do you have any
6  recollection that Mr. Drake told you, based upon his
7  understanding of the law and the facts that you gave
8  him, that you were not required to report this to an
9  outside agency?
10     A.  We did not have to report.
11     Q.  He said that.
12          MR. KEMETHER:  Objection to the form.
13     That's the third time you've answer that question.
14     Go ahead and answer it one last time.
15          THE WITNESS:  I can't tell you he told
16     me not to or to, but we didn't have to report it
17     by judging what the interpretation of the law was.
18  BY MR. GROTH:
19     Q.  Whose interpretation?
20     A.  It was Mr. Drake's.
21     Q.  Not your interpretation.
22     A.  No.  I mean, I read it with him, but. . .
23     Q.  You don't have any legal training, right?
24     A.  Very little -- no, I'm kidding.  I do not, no.

Page 130

1      Q.  We're going back now to the discussions you
2  were having with Mr. Romig.  You had two telephone
3  conversations with him and then you had a meeting with
4  him and Mr. Hollenbach.  That's where we left off in
5  the chronology.
6      A.  I believe so, yes.
7      Q.  That was at your office?
8      A.  Yes, we met with him in the office.
9      Q.  Do you recall having any telephone
10  conversations with Mr. Romig over a speakerphone; that
11  is, where you and Mr. Hollenbach were in an office at
12  the school and Mr. Romig was someplace else and he
13  called in or you called him and there was some
14  conversation on a speakerphone?
15     A.  I do not recall.
16     Q.  Do you recall having any conversations with
17  Mr. Romig over the telephone while you were in the
18  pastor's office of the school?
19     A.  I do not recall that, no.
20     Q.  Is there some reason why you would conduct
21  telephone calls or receive telephone calls from the
22  pastor's office, ever?
23     A.  Is there a reason?
24     Q.  Yes.

Page 131

1      A.  Not that I can think of.
2      Q.  I mean, have you ever done it?
3      A.  Not that I can recall.
4      Q.  Is there a speakerphone hookup in the pastor's
5  office?
6      A.  I don't know.  I have no idea.
7      Q.  Is there a speakerphone hookup in your office?
8      A.  There is a hands-free, if that's what you're
9  talking about.
10     Q.  I'm talking about a -- yes, where the --
11     A.  Multiple voices can hear?
12     Q.  Yes, where the voice coming into your place
13  where you're receiving or making the calls can be heard
14  by everyone in the room.
15     A.  Yes.
16     Q.  You have that in your office.
17     A.  Yes.
18     Q.  Does the pastor have that in his office?  Or
19  did he back in 2009, I should say.
20     A.  I can't -- I don't know.
21     Q.  Have you ever been in his office?
22     A.  Yes, absolutely.  I've never been in there
23  when he was on the phone, so. . .
24     Q.  Let's talk about this meeting with you and Mr.

Page 132

1  Hollenbach and Mr. Romig.
2       You said you showed him some of the text logs
3  that were provided to you by the Smiths on the computer
4  screen, correct?
5      A.  That was correct.
6      Q.  So, you had didn't have hard copies to show
7  him or let him look through.  Just showed him --
8      A.  I had hard copies, yes, but I turned to this
9  and said this is where these are from.  Yeah,
10  absolutely.
11     Q.  Did you show him the hard copies that you had?
12     A.  I don't know if I had -- I don't know if I
13  showed him the hard copies.  If you want to look
14  through them, you may. I mean, they were right there on
15  my desk. I turned my computer screen.
16     Q.  Bud instead of showing him the hard copies,
17  you believe you showed him the logs on the computer
18  screen?
19     A.  I did, yes.
20     Q.  Some of them, not all of them.
21     A.  No.  I mean -- no.
22     Q.  You showed him a couple pages?
23     A.  I controlled it with my mouse.
24     Q.  And which ones did you show him?

33 (Pages 129 to 132)

Ryan Clymer

Nace vs. Pennridge School District
July 29, 2015

Page 133

1     A.   Probably the ones from December 23rd,
2     November -- I believe whatever I had at that time.
3         Q.   I'm asking you, do you recall, did you pick
4     out a certain date or dates that you wanted to review
5     with him?
6         A.   No.
7         Q.   So, it was sort of a random I just showed him
8     a couple screens full of calls and it shows the time of
9     the day and that type of thing.
10        A.   Well, I just asked him why so many.
11        Q.   Okay.
12        A.   That's what I asked him.
13        Q.   And what did he tell you?
14        A.   Well, what we just said before: Like, he was
15    trying to help out and situations like that. I did ask
16    him about the -- there was one in here, which I had
17    already mentioned, about being late, and he said
18    "Sometimes I just lost track of time and I was just,
19    you know, checking up on her" and things like that.
20        Q.   Now, he was married throughout this whole
21    time, right?
22        A.   Correct.
23        Q.   Did you ask him whether his wife knew about
24    all this texting that was going on with Emory Mayer?

Page 134

1     A.   I did, yes.
2         Q.   What did he say?
3         A.   He said yes.
4         Q.   He said she knew about it.
5         A.   He said she knew.
6         Q.   Did you ever ask her about it?
7         A.   I never saw her. Eventually either I did or I
8     asked Russ to, and she said she did. Now, that may have
9     come via Russ or it may come in that meeting that
10    took place on the 31st of March afterwards, but she did
11    know. That's what she told us.
12        Q.   Okay. What else was discussed at that
13    meeting? And before you answer that, this was the first
14    face-to-face meeting that you had had with Romig after
15    the allegations were made, correct?
16        A.   That's correct.
17        Q.   Okay, go ahead.
18        A.   I think it was -- recalling exactly what
19    happened, I believe it was, you, you can't return.
20    We're still investigating. Here's what we have so far.
21    You know, I think I brought it to Lauren again
22    because I previously discussed it on the phone with
23    him. Lauren's situation, right?
24        Q.   Right.

Page 135

1     A.   I maybe had mentioned other things that were
2     supposedly said which were denied -- and I'm not sure
3     if this was the time where I had talked to him about
4     the one text that I had already, you know -- alleged
5     text that I already read, the "inside you." This may be
6     the time that I had talked to him about that.
7         Q.   You're referring to the statement of
8     inappropriate texts that you got from Annette Smith,
9     Emily's mother, correct?
10        A.   Uh-huh.
11        Q.   Yes?
12        A.   Yes, I'm sorry.
13        Q.   You believe you already had Romig exhibit six,
14    which is the email from Kevin Smith to you dated
15    December 31st, 2010, the night before this meeting with
16    Romig?
17        A.   Like I said, I'm not sure if I had this or
18    not, and there was -- I don't know. Maybe I did.
19        Q.   Well, you were back at school by the 31st,
20    correct?
21        A.   That's correct, yes.
22        Q.   So, you would have had access to your emails,
23    correct?
24        A.   That's correct, yes.

Page 136

1     Q.   But you think during this meeting you had
2     brought up specifics about the allegations of
3     inappropriate texts.
4         A.   That's correct.
5         Q.   Okay. And Russ Hollenbach was there to hear
6     all that.
7         A.   Yes.
8         Q.   Okay. So, as of the date of this meeting,
9     which you believe to be prior to January 1st, 2010,
10    Russ Hollenbach knew that there were specific
11    allegations of inappropriate sexual texts between Mr.
12    Romig and Emily Mayer.
13        A.   No.
14             MR. KEMETHER: Object to form.
15        A.   No.
16        Q.   Why?
17        A.   He didn't know what they were. He didn't see
18    them.
19        Q.   No, but you were talking about a meeting,
20    where he's attending, between you and Mr. Romig and Mr.
21    Hollenbach, so, if you're talking to Romig about it,
22    he's hearing it, correct?
23             MR. KEMETHER: Object to form.
24        A.   Right.

34 (Pages 133 to 136)

Appendix 0318

Ryan Clymer                                    Nace vs. Pennridge School District
                              July 29, 2015

Page 137

1      Q.  What else did you talk about?
2      A.  Going forward.  I think in this meeting he
3  talked about turning over -- he's going to get his own
4  phone record.  He's going to call and see if he can get
5  the contents of the phone records.
6          He talked about how, you know, he is upset,
7  that this is not true.  He may have mentioned something
8  along the fact that he was trying to help her out and
9  this is how she treats him and things like that.
10          But specifics I don't know besides the fact
11  that we called him in and just said, listen, here's the
12  information we have.  Here's what the Smiths have given
13  us.  We can't prove these texts happened, can't prove
14  they didn't happen.  We need some proof from you that
15  this didn't happen.  That's when he said he was going
16  to call and get the content and get the logs and
17  everything like that.
18      Q.  Did he ever get the content?
19      A.  He did not get the content.
20      Q.  Did you ask him get to get the content?
21      A.  I did ask him get to get the content.
22      Q.  Did you ask him why he didn't get the content?
23      A.  He told me he had to subpoena the records to
24  get them, and he said he is willing to do that, but --

Page 138

1  pretty much the same thing the Mayers said as well.
2  They both said they were going to do it and they never
3  did.
4      Q.  Didn't Mr. Smith tell you that in order to get
5  the actual texts he would need a subpoena?
6      A.  Who would need a subpoena, Mr. Smith?
7      Q.  Mr. Smith.
8      A.  Absolutely, yes.
9      Q.  And didn't he tell you that the only way to
10  get a subpoena is to get an outside agency that can
11  issue a subpoena to do that?
12      A.  No.  He said the way you do it is, you have to
13  go to the police, bring up a charge and then subpoena
14  them.
15      Q.  Okay.  Did you do that?
16      A.  He said he was going to do that.
17      Q.  He said he was going to do that?
18      A.  Yes.
19      Q.  Oh.  When did he say that?
20      A.  I want to say --
21          MR. SANTARONE:  I'm going to make an
22      objection to the tone of your question.  He's
23      already testified to this and now you're making it
24      like it's the first time you heard it.

Page 139

1          MR. GROTH:  I don't think he has
2      answered it, but your objection is noted.  Go
3      ahead, answer the question.
4          THE WITNESS:  Early January, I believe.
5      Sometime after I received this.
6          MR. KEMETHER:  "This" being Romig-6,
7      the December 31st, 2009 email from Mr. Smith.
8          THE WITNESS:  Right.  So, I told Mr.
9      Smith -- we were talking like we had done many
10      times before, and he said -- I began to tell him
11      how he can get the content.  He said "I know this
12      is what I have to do, and that's what we are
13      prepared to do."  I said fantastic, knowing he has
14      the wherewithal and he knows the connections and
15      how to get things faster than anyone else could.
16  BY MR. GROTH:
17      Q.  Did you ever follow up with Mr. Smith to see
18  if he ever did that?
19      A.  I did.
20      Q.  When?
21      A.  I'm about to tell you.  It was, I think, the
22  end of January, beginning of February.  He said they
23  still hadn't -- things had gotten better between Emily
24  and the girls on the team.

Page 140

1          When we had brought this up about, you know,
2  Emily, how she was being treated and things like
3  that -- and going back, I told him, I said the only way
4  we're going to figure this out is if we get the
5  content.
6      Q.  That was long after Mr. Romig already
7  resigned, right?
8      A.  No, this was --
9      Q.  Didn't you just say the end of January?
10      A.  No, I said the beginning of January.  We're
11  going back to my first conversation with Kevin Smith.
12  So, this is when it was first said.  So, it was shortly
13  after January when he told me he is going to go and
14  subpoena and get the records.
15          So, the end of January, when I followed up,
16  the beginning of February, I said "Mr. Smith, how are
17  things going?"
18          Annette and I had been communicating via
19  emails about different things that were going on
20  through January, and he said things have calmed down.
21  Emily's -- you know, things are better.  We're holding
22  off right now, but we probably may still get the
23  records.
24          But at that point, three or four weeks after

                                    35  (Pages 137 to 140)

| Page 141 |
|---|

1   he said he was going to, he did not, but still had
2   planned to perhaps grab those from whoever his friend
3   was.
4       Q.  And how that was finally resolved?
5       A.  How was what finally resolved?
6       Q.  The issue of trying to get the content of
7   these record, these text records with a subpoena?  Was
8   it just dropped or did Mr. Smith say to you that he
9   just decided not to, or did you tell him not to bother?
10  How was it resolved?
11      A.  No, I did not tell him not to bother.  It was
12  kind of like -- I guess he didn't.  I asked Mr. Romig
13  again back in January.  He said he was going to.  And
14  when I followed up with Mr. Smith, which was the
15  beginning of February, end of January, sometime at the
16  end of basketball season, whenever that was, he still
17  didn't know what he was going to do from his
18  standpoint.
19          The next time I talked with the Smiths in
20  person was after graduation, I believe.  That was the
21  last time that Kevin and I had spoken.  I think Annette
22  was there as well and they just thanked me for
23  everything I had done in the investigation for their
24  daughter.  That would have taken place, I believe, the

| Page 142 |
|---|

1   end of May.
2       Q.  2010.
3       A.  2010.
4       Q.  Okay.  We just are finishing up with your
5   meeting with Mr. Hollenbach and Mr. Romig where you
6   gave the information to Mr. Romig about your
7   investigation, and that you were still investigating
8   and we're going to go forward with this, then that
9   meeting ended, correct?
10      A.  Correct.
11      Q.  I'm sorry, where was that meeting?
12      A.  I believe that was in my office.
13      Q.  What was the next communication you had with
14  Mr. Romig?
15      A.  It had to be -- when did we say that meeting
16  was?  It was a few days --
17      Q.  You had said before January 1st.
18      A.  Yes, it was a few days after that.
19      Q.  January 2nd, 3rd?
20      A.  I would say -- it may have been a Saturday,
21  but it was sometime in there, the beginning of January.
22      Q.  Not on New Year's Day.
23      A.  No.
24      Q.  What happened then?

| Page 143 |
|---|

1       A.  Just told him that --
2       Q.  Did you meet with him?
3       A.  Yes.
4       Q.  Where was the meeting?
5       A.  This was in our office, my office, with Russ.
6   This is -- yesterday, when he said he kind of stormed
7   out and Russ went with him?  Russ didn't go with him.
8   Russ sat in the office with me after we told him here
9   are your options via our lawyer:  We'd like you to
10  resign, and that's when he said why.  I said excessive
11  texting.
12          He got very angry.  Basically, he said
13  everything he had said before.  He was trying to help
14  this girl out.  He talked about getting the content
15  again.  I believe this is the first time he mentioned
16  potentially suing the school or suing somebody for
17  defamation of character.
18      Q.  Meaning the Smiths.
19      A.  I don't know.  He was just -- I can't say he
20  said he's going to sue the Smiths, but I know he talked
21  about what we were doing to him was not right.
22          So, he asked me what I would like to put in
23  the letter.  I said you can put whatever you want in
24  the letter.  That's what the attorney told us, that we

| Page 144 |
|---|

1   can't tell, him what to put down.
2           He didn't say -- from my recollection, he
3   didn't say what he was going to do.  He just got very
4   upset and left.
5       Q.  So, going into that meeting, the beginning of
6   January, you already knew and had made up your mind and
7   made a decision that Mr. Romig was no longer going to
8   coach the team, correct?
9       A.  My own decision or the decision of the people
10  that were involved?
11      Q.  Well, it was ultimately your decision, wasn't
12  it, what to do with Romig?
13      A.  If Romig would not have see signed, it would
14  have gone to the board.  So, it would have been the
15  board's decision.
16      Q.  As far as you were concerned at the time of
17  this meeting, did you decide that the right thing to do
18  was to ask Romig to resign?
19      A.  I think I did, because like I said, I couldn't
20  prove what Miss Mayer was saying was true.  Mr. Romig
21  could have been telling the truth himself.
22          The only thing I had to go on was excessive
23  amount of texts, which was proof.  There were so many
24  texts.  So, that was the reason why we told him:  There