Ryan Clymer                              Nace vs. Pennridge School District
                                    July 29, 2015

Page 145

1  were so many texts.
2       We can't verify what she's saying, we can't
3  verify what you're saying, but there are way too many
4  texts.
5       Q.  So, you're saying he was told he had to resign
6  simply because of the excessive amount of texts?
7            MR. KEMETHER:  Object to form.  Again,
8       he said many, many times that he was asked to
9       resign.  He was not told he had to resign.  That's
10      what her keeps saying.
11           MR. GROTH:  Oh.  Well, I can ask the
12      question any way I want.
13           MR. KEMETHER:  You can't misrepresent
14      facts.
15           MR. GROTH:  I'm not misrepresenting
16      anything.  I'm asking him if that's what he told
17      Mr. Romig.
18  BY MR. GROTH:
19      Q.  You told him that he had to resign because of
20  excessive texting?
21      A.  We asked him to step down.
22      Q.  You asked him.  You didn't tell him.
23      A.  Well, the lawyer said, you know, here's what
24  you need to do.  You ask him to step down.

Page 146

1       Q.  All right.  Up until that point, isn't it
2  correct that there had never been a single conversation
3  between you and Mr. Romig regarding any health issue he
4  was having at the time?
5       A.  I knew about his health issues.
6       Q.  How did you know?
7       A.  We were at that point -- we were kind of in
8  flux as far as what church we were going to go to and
9  things like that.  So, we were still getting emails from
10 -- like prayer requests and things like that.
11      So, he had gone in I want to say
12 October/November, sometime in there, some heart
13 catheterization stuff and high blood pressure and
14 things like that.  So, I knew he was not doing well.
15      I went to watch one of his games one time and
16 he is a little overweight and he got super, super red,
17 had to sit down, which wasn't like him.  He always stood
18 up.
19      So, I didn't know it was a big issue, but I
20 knew he had some heart tests and things like that that
21 were done with him.
22      Q.  I'm not sure that was my question, so let me
23 repeat or rephrase the question.
24      Isn't it true that up until this point of this

Page 147

1  meeting with Mr. Romig that neither he nor you had
2  discussed any health issues of his as being a reason
3  for him to step down?
4       A.  As being a reason for him to step down?
5       Q.  Yes.
6       A.  No, but we were -- I was well aware of his
7  health tissue.  We talked about that.  But it wasn't for
8  him to step down.  We discussed his health issues
9  before.
10      Q.  That wasn't the question.
11      A.  I'm just telling you, though.
12      Q.  In connection with this investigation of Emily
13 Mayer's accusations, isn't it correct that there were
14 no discussions between you and Mr. Romig about any
15 health issues he had prior to the time when you asked
16 him to resign?
17      A.  Let me -- we had discussed his health prior to
18 him coming into my office.  Did we discuss the reason
19 --
20      Q.  Prior to him coming into your office when?
21      A.  When?  I just told you:  We had conversations
22 through the email, through the prayer request, you
23 know, how are you doing, what's happening.
24      Q.  I'm asking when.

Page 148

1       A.  October/November, whenever he had his health
2  issues.
3       Q.  My question is more specific than that.  My
4  question was, from the time Emily Mayer made the
5  allegations at the end of December of 2009 up until the
6  time where you asked him to resign at the beginning of
7  January 2010, there was no discussion with Mr. Romig
8  regarding any health issues he had at that time.
9            MR. KEMETHER:  So, for that ten-day
10      period or so.
11      Q.  Yes, during the investigation and up until the
12 time when you asked him to resign.
13      A.  During that ten-day period?  No.
14      Q.  There were no discussions at all?
15      A.  Not that I can recall.  I think we were more
16 focused on the investigation itself.
17      Q.  So, when you got his resignation dated January
18 5th, 2010, saying that he was resigning for health
19 reasons -- do you remember that?
20      A.  Yes.
21      Q.  (Continuing) -- did that surprise you?
22      A.  No, because he did have health issues.  So, it
23 didn't surprise me that that's what he put down.  It
24 didn't surprise me.

37 (Pages 145 to 148)

Appendix 0321

Ryan Clymer

Nace vs. Pennridge School District
July 29, 2015

---

Page 149

1    Q.  The date on that resignation was January 5th,
2  2010. Your meeting was a couple days before that. Was
3  there was any contact or communication with Mr. Romig
4  during that period of time?
5    A.  No, there was not. And like I said before, it
6  may have been dated the 5th... I'm not sure I received
7  it on the 5th.
8    Q.  Okay.
9    A.  I came into my office and there was an
10 envelope on my desk. So, I'm not sure exactly when it
11 was given to me.
12   Q.  When is the next time you had any
13 communication with Mr. Romig after January 5th?
14   A.  I believe it was probably -- I didn't talk to
15 him for a long time. It may have been -- I can't
16 answer. I know we met on the 31st. That may have been
17 the first time we were face-to-face.
18   Q.  31st of March?
19   A.  That is correct.
20   Q.  Yes, that exhibit we looked at of the meeting
21 with you and the pastor and he and Hollenbach and
22 whatever.
23   A.  Yes. I'm not saying that we didn't cross
24 paths, but I believe the next time we spoke was in that

---

Page 150

1  meeting. I believe it was.
2    Q.  Was he ever told by anybody at FCA that he
3  should not come back on the school grounds for any
4  reason?
5    A.  No. No, his daughter was a senior, and so
6  because he was a father watching his daughter play,
7  there was never an issue for him not to come on school
8  grounds.
9    Q.  Was that ever discussed at any of your
10 meetings with him, whether or not he would be allowed
11 to come to the basketball games. And if so, where he
12 could sit or what he could do at the games?
13   A.  I don't believe it was where he could sit or
14 anything like that. Now, that happened because
15 yesterday we had talked about at the end of the bench,
16 and then Annette wrote me, I contacted Russ, and Russ
17 said you can't sit there; you've got to sit over there.
18      She contacted me again and said it seems like
19 he's coaching from the stands, so Russ said "You can't
20 coach from the stands. You just have to sit there."
21      So, every time that was brought up, it was
22 kind of taken care of as far as him just being a parent
23 and sitting there.
24   Q.  Was the issue of him being allowed to come to

---

Page 151

1  the school to watch games of his daughter discussed
2  during any of your telephone conversations or meetings
3  with him?
4    A.  With him?
5    Q.  Yes.
6    A.  I cannot say for sure. One may have taken
7  place maybe after the first time that he was asked to
8  remove himself from that specific gym. He may have
9  emailed me or his wife may have emailed me or he may
10 have said what's going on.
11      But the conclusion is because his daughter was
12 a senior and in her final year are playing basketball,
13 that they would allow him to watch her games.
14   Q.  Did you ever have any direct discussions
15 yourself with Stephanie Romig?
16   A.  I did not. She would contact Russ and then
17 Russ would forward them to me. We did have that
18 conversation she was at on the 31st, but I don't think
19 I spoke to her.
20   Q.  The meeting with Mr. Drake, Attorney Drake,
21 was that at his office or a telephone conversation?
22   A.  It was probably a telephone conversation.
23 Which one? Which meeting? We spoke a few different
24 times.

---

Page 152

1    Q.  You had a few telephone conversations.
2    A.  Yes.
3    Q.  Did you have a meeting with him?
4    A.  Face-to-face? I don't believe I did.
5    Q.  Okay . How many phone calls do you think you
6  had?
7    A.  I think I said before:  Three or four, I'm
8  pretty sure. As I would, you know, discover things, I
9  would just say hey, what's this? What's going on?
10   Q.  Were any other employees of FCA participating
11 in those telephone conversations?
12   A.  To.
13   Q.  By speakerphone or whatever, the pastors or
14 Hollenbach or anybody else. It was just you and Mr.
15 Drake.
16   A.  No, Russ would not have been there. I believe
17 it was just me. I believe, if anybody would have been
18 on it, it would have been Pastor Paul, but I don't
19 believe he was involved in this.
20      I cannot say for sure, but Russ would not have
21 been more nor would any other employee have been
22 involved in those.
23   Q.  And the meeting at the other attorney's
24 office, Mandes?

---

38  (Pages 149 to 152)

Ryan Clymer                              Nace vs. Pennridge School District
                                        July 29, 2015

Page 153

1   A. That was at the school.
2   Q. Oh, that was at the school.
3   A. Yes.
4   Q. And who was at that meeting?
5   A. Pastor Paul, Weiss, some board members,
6   myself.
7   Q. And when was that meeting?
8   A. I want to say January 7th or 10th, somewhere
9   in there.
10  Q. After Mr. Romig had already resigned.
11  A. Yes. I was thinking about that yesterday. I
12  don't know if we met to accept his resignation. I don't
13  know if we met to -- maybe he hadn't resigned up to
14  that point.
15     That's why I keep saying it was dated the 5th,
16  but unless my meeting is off, I don't think he resigned
17  -- he may have resigned that day of the meeting or --
18  I'm not really sure. My recollection is, we met and
19  then he resigned.
20  Q. Okay.
21  A. So, the dates aren't correlating to me.
22  Q. Is it correct to say none of the issues
23  regarding the PA Child Protective Services Law were
24  discussed with Mr. Mandes?

Page 154

1   A. Mr. Mandes? I do not believe so. I believe it
2   was just employee type of things.
3   Q. Employee. . .
4   A. Like letting someone go or what
5   responsibilities they have.
6   Q. Termination, dismissal, whatever you want to
7   call it.
8   A. Correct.
9   Q. You were talking about those types of things.
10  A. Correct.
11     MR. RUSSELL: Do you want to get a
12  sense as to time and then do we need to take a
13  break for lunch, or are you going to plow through
14  or what's. . .
15     MR. GROTH: I'm certainly going to be
16  another 45 minutes to an hour.
17     MR. RUSSELL: If that's all it is, then
18  maybe we don't need to take a break.
19     MR. GROTH: I don't need a break.
20  Anybody else need a break?
21     THE VIDEOGRAPHER: 1:19. Off the
22  record.
23     (A brief recess was taken)
24     THE VIDEOGRAPHER: The time is 1:24.

Page 155

1   We're back on the record.
2   BY MR. GROTH:
3   Q. Mr. Clymer, at any time before Mr. Romig was
4   arrested with regard to my client's situation -- he was
5   arrested on October 1st, 2013 -- had anybody, to your
6   knowledge, contacted you or anybody at FCA from
7   Pennridge to ask about his performance as coach at FCA?
8   A. They did not reach out to me. I have no
9   recollection of them reaching out to anyone.
10  Q. Have you in the past gotten a request from
11  other schools or their coaches or athletic directors or
12  whatever inquiring about one of your coaches in terms
13  of an employment situation where somebody's applying
14  for a job somewhere?
15  A. I know I've gotten them for like faculty
16  members. I'm not sure if I ever got one for a coach.
17  Russ would deal with that. It would go through Russ.
18  Q. If it happened, okay. Let's talk about
19  something I went over with Mr. Hollenbach a bit
20  yesterday, but I'm not sure if he could given me a
21  conclusive answer to the question.
22     The question involves what sexual harassment
23  policy, if any, was in effect at FCA as of the time of
24  the Emily Mayer situation back in 2009. First of all,

Page 156

1   was there a sexual harassment policy in effect at the
2   school at that time?
3   A. I believe there was. I mean, that's it right
4   there, right?
5   Q. Well, I'm going to show you the documents that
6   were marked at Mr. Hollenbach's deposition yesterday.
7   A. Okay.
8   Q. Hollenbach number one was a student/parent
9   guide, middle and high school student/parent guide
10  which I printed off the internet last week.
11  A. Sure.
12  Q. Okay? And it has a sexual harassment policy.
13  A. Sure. Is this similar to this?
14  Q. Hold on, I'm getting to it.
15  A. Okay.
16  Q. On this Hollenbach exhibit one, it's on page
17  twenty-two of that student/parent guide. Hollenbach
18  number one is a document consisting of five pages and
19  titled "discipline," under which there is a section on
20  sexual harassment starting on the second page.
21     MR. KEMETHER: Just so we're clear, you
22  indicated this document that I'm touching is
23  Hollenbach-1. Whether by mistake, it's actually
24  Hollenbach-2.

39 (Pages 153 to 156)

Ryan Clymer

Nace vs. Pennridge School District
July 29, 2015

Page 157

1     MR. GROTH:  I'm sorry, that's right.
2     That's Hollenbach-2.  The document you're looking
3     at now, the five pages, is Hollenbach-2.
4   BY MR. GROTH:
5     Q.   I asked your attorney, Ms. Connor, if this was
6   the policy that was in effect back in 2009, and she
7   said that you would be able to tell me that.
8         MR. GROTH:  Is that correct, Ms.
9   Connor?
10         MS. CONNOR:  That's correct.
11         MR. GROTH:  Okay.
12   BY MR. GROTH:
13     Q.   So, my question to you is, was there a policy
14   for sexual harassment or abuse or exploitation in
15   effect back in 2009?  And if so, are either one of
16   these two documents the policy that was in effect?
17     A.   This is very similar?  What page did you say
18   this was on, twenty-two?
19     Q.   It's similar.  The numbering or lettering is
20   different, but the text is pretty much the same.  You
21   can look at it yourself and satisfy yourself that
22   that's an accurate representation.
23     A.   It is.  It looks very similar.
24     Q.   I know, but the question is, there is no date

Page 158

1   or anything to identify either document as to when it
2   was published, what years it applied to, or whether it
3   existed at all or not in 2009.
4         And that's what I'm trying to get a handle on,
5   is how do I determine that?  From these two documents
6   or from some other document?
7     A.   I would say, if this document was from 2009,
8   yes, this is probably what we were using.
9     Q.   Which document are you referring to?
10     A.   This one right here.
11     Q.   Hollenbach-2.
12     A.   Very similar, so I would say one of these two.
13     Q.   The question is, how do I answer the question
14   or how do we answer the question of what was in effect
15   2009 definitely?  Not as a matter of guesswork or
16   whatever, but definitely.  How can we tell?
17         Do you have documents or something in your
18   office or your school that would say this was the
19   policy in 2009?
20     A.   Yes, this is most likely the policy in 2009.
21   Yes.
22         MR. KEMETHER:  Referring to
23   Hollenbach-2.
24     A.   Without reading all the way through it.  So

Page 159

1   yes, I would say this looks like it would be something
2   that was done around that time.  Yes.
3     Q.   How can you tell just by looking at the
4   documents since it has no date on it, no markings, no
5   nothing on it?
6     A.   Because in 2008/2009, we revamped a lot of our
7   handbooks.
8     Q.   Okay.
9     A.   So, this is -- the student code of conduct is
10   a lot shorter now.  Office referrals, I think that was
11   something that was initiated in 2009.
12         So, looking at this, this is probably
13   something that was redone after 2007/2008.  So, my
14   guess is, this was in effect in 2009, yes.
15     Q.   Is there any way to establish that as fact
16   other than you guessing at it that you know?  Any way
17   you can look in your office records or whatever?
18     A.   Yes.  I can probably do that, absolutely.
19     Q.   And how would you go be doing that?  What would
20   you have to do?
21     A.   I'll have to do a search.
22     Q.   Yes.  Tell me what the search involves.
23     A.   Just go handbook 2009/2010, go handbook 2008,
24   whatever, and determine this is what it is.

Page 160

1     Q.   And you can do that, correct?
2     A.   I can probably do that, yes.
3     Q.   I'm going to ask your counsel -- and I'll put
4   this in writing, also -- to provide me with some
5   additional proof as to what policy was in effect back
6   in 2009/2010 other than the document that has been
7   produced as Hollenbach number two.
8     A.   But this was changed, so my bet is this is
9   very close to or this was what was used in 2009/2010,
10   only because we went through a whole summer of redoing
11   everything and it was the summer of 2008/2009.
12     Q.   Was this policy or guide, it's called, I
13   believe -- at least it's called on Hollenbach-1, called
14   a student/parent guide -- was that actually given to
15   the students and parents every year?
16     A.   At that time it was, yes.  Now we just have it
17   online because most people just go online and look at
18   things now.
19         So, when a new family would show up, they
20   would get one of those and -- yeah, new people would
21   get a packet of information.
22     Q.   When did it go online?
23     A.   Oh, man, I don't know.  I honestly don't know.
24   I know the last two times we revamped the web, we

brusilow.com          brusilow + associates          215.772.1717

Appendix 0324

Ryan Clymer                                Nace vs. Pennridge School District
                              July 29, 2015

Page 161

1   don't -- I'd say at least two years, maybe three.
2       Q.  Two years.
3       A.  At least.
4       Q.  Back in 2000 it would not have been online.
5       A.  I'm not saying it wouldn't have, but we don't
6   give them out any more.
7       Q.  Okay.
8       A.  Because they're online. We tell people where
9   to go look and they're online.
10      Q.  Back in 2009 did you provide hard copies of
11  these policies to your staff and faculty?
12      A.  Probably, yeah. Opening school, we put --
13  especially if this was new, we would have definitely
14  had stacks of in-service stuff, where the policies
15  would have been there and new things that were coming
16  out, asbestos things and healthcare things, yes.
17         So, if this was new at that time, this would
18  have definitely been there.
19      Q.  Did you ever ask the parents or students to
20  sign some kind of acknowledgment form acknowledging
21  that they had gotten and were able to review the
22  guidelines?
23      A.  Yes.
24      Q.  When did you get those acknowledgements?

Page 162

1       A.  It's on the back of the registration form. It
2   says I've read the handbook, and a parent has to sign
3   it and a student has to sign it.
4       Q.  So, you should have signatures for Emily
5   Mayer?
6       A.  Back in 2009? Usually we keep our registration
7   for like three or four years and then we get rid of it.
8   There is no need to have it. But you can't be
9   accepted, because on the back of there it talks about
10  using your likeness for ads and marketing and things
11  like that.
12      Q.  And you said it was on the back of the
13  registration form?
14      A.  Uh-huh.
15      Q.  Yes?
16      A.  Yes, I'm sorry.
17      Q.  Was there a new registration form every year
18  or just when you first entered the school?
19      A.  No, you have to register every year. No, the
20  form can be manipulated, but it's very similar to what
21  it was ten years ago, I believe, because you had to get
22  a new one every year. Everyone has to register.
23      Q.  Did FCA itself -- not any outside consultant
24  or any anybody from Nova or whatever -- did FCA itself

Page 163

1   ever conduct any in-house seminars or instructions with
2   regard to its sexual harassment policy with its
3   faculties or staff or coaches?
4       A.  With coaches, I believe -- I can't honestly
5   answer.
6       Q.  Let's start it this way: Did you ever provide
7   any type of instruction about a sexual harassment
8   policy to your staff people?
9       A.  Yes -- going over it and listing it? Yes.
10  Would I have done it every year? It depends if there
11  was new staff.
12         A lot times there is very little turnover, so
13  we just give them books, you know, tell them what
14  changes have been made. So, probably not every year,
15  but if there was new turnover and new people, we would.
16      Q.  Who would conduct that?
17      A.  It would be me. Way-back-when it would have
18  been Kevin Cripe, who was the facilities manager for
19  the school. You know, we're not talking about Nova or
20  we're not talking about Mr. Drake.
21      Q.  No, talking in-house.
22      A.  Yes, in-house. It would basically be. . .
23      Q.  And I'm not talking about all the things in
24  this student/parent guide. I'm just talking about the

Page 164

1   sexual harassment policy.
2       A.  Right.
3       Q.  All right? Do you recall having any meetings,
4   calling any meetings with any staff people at all to
5   specifically go over the provisions of that section of
6   the guide?
7       A.  For that year, the year we're talking about,
8   or any year?
9       Q.  For any year.
10      A.  Specifically for this guide? We probably did
11  that year.
12      Q.  Not for the guide. For the sexual harassment
13  policy that was in the guide.
14      A.  That was in the guide. That was the part that
15  was -- that wasn't in an old one. It was in a new one.
16         So, there are some things that weren't in
17  here, and there are some things that were added and
18  there were some things that were deleted.
19         So yes, when I make mention that we went over
20  the entire guide, we did. I think '08/'09, 09/10 we
21  went over everything.
22         So, this whole entire thing changed. Did we
23  go over that in in-service? We most likely did. I
24  would say probably say -- I'm ninety-nine percent sure

                                    41 (Pages 161 to 164)

Ryan Clymer                                    Nace vs. Pennridge School District
                          July 29, 2015

Page 165

1  that we did.
2      Q.  Would you have any documents at the school
3  that would indicate that?
4      A.  No, because we go over -- every change that
5  takes place in this we go over every year.
6      Q.  I mean, that there was a holding of a meeting
7  to go over changes in the guide.
8      A.  No.
9      Q.  Would there be a record in FCA to say that?
10     A.  No, because we just did it every year.  There
11 is no record of us going over a guide.
12     Q.  Did you know Kelly Romig?
13     A.  Did I know her?
14     Q.  Yes.
15     A.  Yes.
16     Q.  You testified to that before.  She was one
17 year before you at FCA?
18     A.  That is correct.
19     Q.  She was Eric Romig's sister?
20     A.  Yes.
21     Q.  Do you know the situation that she was in with
22 Mr. Longaker?
23     A.  I do.
24     Q.  You heard me discuss that yesterday with Mr.

Page 166

1  Hollenbach, correct?
2      A.  Yes.
3      Q.  When that -- strike that.  When did you first
4  become aware of that situation involving her and Mr.
5  Hollenbach?
6      A.  I was in college.
7      Q.  Away at college.
8      A.  Yes.
9      Q.  And how did you hear about it?
10     A.  Oh, man.  I don't even know.  It could have
11 been through my parents, who were at the church at the
12 time.  It could have been through the grapevine.  I
13 don't know.
14         She was going through a difficult time.  I
15 think that was -- the first time I heard about it may
16 be the '97/'98.  It was after she graduated.  I think
17 during the trial was when I heard.
18     Q.  Do you know Mr. Longaker?
19     A.  I do, yes.
20     Q.  Did you have any classes with him?
21     A.  I had a typing class with him.
22     Q.  While you were at the school as a student,
23 before you graduated, was there any discussion at the
24 school among students or among teachers or anybody that

Page 167

1  you know of that there was some type of inappropriate
2  relationship going on between Kelly Romig and. . .
3      A.  No.
4      Q.  . . .and Mr. Longaker?
5      A.  No.
6      Q.       MR. GROTH:  What are we up to?
7  Clymer-2?
8         (Exhibit Clymer-2 was marked for
9  identification)
10 BY MR. GROTH:
11     Q.  Mr. Clymer, I'm going to show you a bunch of
12 documents which I have had marked Clymer-2, which are
13 employment records for Mr. Longaker that were supplied
14 to me by FCA's counsel.  You're welcome to look at
15 these.  I'm only interested in one page.
16         My question is, are you the one that gathered
17 those documents to turn over to counsel?
18     A.  I do not believe I was, no.
19     Q.  There is one page here that says you started
20 work at FBC.  What's FBC?
21     A.  Faith Baptist Church.
22     Q.  In 1987 as a part-time custodian, and it says
23 on August 26, 1996 his teacher contract ended and it
24 says "teaching actually ended in June of 1996."

Page 168

1      Do you know anything about the employment
2  details of Mr. Longaker going back that far?
3      A.  No.
4      Q.  I mean, you were just a student.  You had
5  graduated college.  You had not been employed and your
6  father was not involved at that time, either.
7      A.  No.
8      Q.  Okay.  So, if I need to find out anything
9  about the details of Mr. Longaker leaving FCA sometime
10 in the summer of 1996, I would have to talk to one of
11 those people, either the pastor or somebody else who
12 was in charge of personnel back at that time.  Would
13 that be a fair statement?
14     A.  Yes.
15     Q.  Okay.  Have you talked to anybody, including
16 your father or anybody else at the church or the
17 pastor, regarding the circumstances of Mr. Longaker
18 leaving his teaching position in the summer of 1996?
19     A.  No.
20     Q.  You don't have any details about that at all?
21     A.  No.
22     Q.  Did you read news accounts of the charges
23 against Mr. Longaker regarding Kelly Romig and what the
24 resolution of that was?

Ryan Clymer                                Nace vs. Pennridge School District
                                  July 29, 2015

Page 169

1       A.   I think he got eleven months.  That's all I
2    know.
3       Q.   Do you know what he was charged with?
4       A.   I have no idea.
5       Q.   Did Emily Mayer ever inform you or did you ask
6    her whether or not she had ever received any type of
7    presents, like jewelry or something from Mr. Romig?
8       A.   No.  I believe I said no before.
9       Q.   Okay.  Were you interviewed about my client's
10   case which led to questions about Mr. Romig and Emily
11   Mayer by any Bucks County detectives?
12      A.   Yes.
13      Q.   Who interviewed you?
14      A.   A bald man and a man with hair.  I don't know
15   who they were.
16      Q.   You don't remember the names?
17      A.   No.
18      Q.   Does the name Kemmerer ring a bell?
19      A.   Yes, Kemmerer.
20      Q.   Does the name Slattery ring a bell with you?
21      A.   No.  Kemmerer does.
22      Q.   And where did that interview take place?
23      A.   In my office.
24      Q.   Did you ever tell the county detectives that

Page 170

1    Emily Mayer was suspended by you during the
2    investigation?
3       A.   No.
4       Q.   Did you ever tell --
5       A.   Suspended from school or from the team or
6    either?
7       Q.   From either.
8       A.   I may have used the term suspended, but she
9    wasn't suspended.  It was just a leave-of-absence, just
10   the same thing we did with Eric, but she was never
11   suspended from school.
12      Q.   The question, did you tell the detectives that
13   she was suspended from school?
14      A.   No.  She was never suspended from school.  I
15   never told the detectives she was suspended from
16   school.
17      Q.   Thank you.  Did you tell the detectives that
18   Mr. Romig did not do any more coaching once you were
19   aware of the accusations of Emily Mayer?
20      A.   I don't recall.  I may have.  I don't recall,
21   though.
22      Q.   But now you understand and know that,
23   according to Russell Hollenbach's deposition testimony,
24   that he did coach after the accusation was made,

Page 171

1    correct?
2               MR. KEMETHER:  Object to form.  What
3    accusation?
4               MR. GROTH:  Emily Mayer's accusation.
5               MR. KEMETHER:  Which accusation are we
6    talking about?
7               MR. GROTH:  The first time she came in
8    his office and made the accusations.
9               MR. KEMETHER:  So, the we're talking
10   about before Christmas, during the meeting --
11              MR. GROTH:  Yes, the first time --
12              MR. KEMETHER:  So, those accusations as
13   opposed to the ones that he --
14              MR. GROTH:  Let me reboot my question.
15   BY MR. GROTH:
16      Q.   Did you tell the Bucks County detectives that
17   Eric Romig did not coach any more after you were
18   informed of the accusations by Emily Mayer?
19              MR. KEMETHER:  Object to form for the
20   same reason.
21      A.   I may have.  I don't know.
22      Q.   Did you tell the Bucks County detectives that
23   Mr. Romig was allowed to resign for health reasons, but
24   that you told him that he was being let go for the

Page 172

1    excessive texting?
2       A.   I did tell him he was being let go for the
3    excessive texting, yes.  And he wrote in his
4    resignation letter that he was resigning because of
5    health reasons.
6       Q.   Were you told by anybody, Mr. Romig or
7    anybody else, that Chelsea Romig had been the subject
8    of sexual assault when she was a minor?
9       A.   No.
10      Q.   In any of your meetings or discussions with
11   Eric Romig about the Emily Mayer situation, did you
12   tell him or suggest to him that he get some kind of
13   marital counseling?
14      A.   I could see me saying that.  I don't know if I
15   did, but I could see myself saying that.
16      Q.   Do you know whether or not Robin Landis ever
17   apologized to Emily Mayer for Mr. Romig's conduct after
18   he resigned?
19      A.   I have no idea.
20      Q.   Did she ever tell you that she did?
21      A.   I don't know why she would.  I mean, I don't.
22      Q.   My question is, did she ever tell you that she
23   did?
24      A.   No.

Ryan Clymer                                Nace vs. Pennridge School District
                            July 29, 2015

Page 173

1       Q.  Do you know whether Russell Hollenbach ever
2   had any discussions at all with Emily Mayer during the
3   period of time that you were conducting your
4   investigation?
5       A.  I have no idea.
6       Q.  At any time during your investigation did Mr.
7   Romig deny sending any text messages to Emily Mayer,
8   even at the very beginning of the investigation?
9       A.  I don't believe he did.
10      Q.  You heard me ask Mr. Hollenbach yesterday
11  about the Michael Sheeler situation at FCA in 2010 or
12  '11?
13      A.  Yes.
14      Q.  Did you do any investigation of that
15  situation?
16      A.  I did not.
17      Q.  Do you know who did, if anyone?
18      A.  No one did.
19      Q.  Okay.  Was that all conducted by outside
20  police authorities?
21      A.  Yes.
22      Q.  DA's office?
23      A.  The Lehigh County, yes.  The two boys or three
24  boys brought a videotape to me on a Sunday, and I

Page 174

1   opened it up, I played it and shut it because it was
2   them getting undressed.  And I said is there more of
3   this; they said yes.
4       So, I called Chief Toomey and said, what do I
5   do? Where do I take this? And he told me where to take
6   it, which is up in that area, above the Quakertown area
7   in Lehigh County somewhere, small detectives.
8       Anyway, yeah, they did all that.  I just hid
9   the boys while they tried to get subpoenas and
10  everything else like that.
11      What did you say the date was for that?
12      Q.  I think 2010 or 2011 -- 2011.
13      A.  Okay.
14      Q.  The only question I have for you about that
15  is, was Michael Sheeler some type of volunteer worker
16  or any type of worker at the school or the church?
17      A.  I think he was a -- he volunteered to teach a
18  Bible class for like a semester.
19      Q.  At the school.
20      A.  At the school.  He wasn't paid.  That was
21  probably a year or two before that happened.
22      Q.  So, if this is 2011, you're talking about 2009
23  or '10?
24      A.  Yes, I think something like that.

Page 175

1       Q.  And he only taught for one or two years?
2       A.  No, semester.
3       Q.  One semester.
4       A.  Yes.
5       Q.  After this situation became known about Mr.
6   Sheeler through the press and the police investigation,
7   was there any investigation conducted by FCA to
8   determine whether or not Mr. Sheeler had engaged in any
9   type of inappropriate activity with any other students
10  at the school?
11      A.  Kevin Smith, another Kevin Smith, the lead
12  detective on it, interviewed tons of kids from FCA.  He
13  just kept me kind of abreast of the situation as far as
14  what was going on.  We did not do an internal
15  investigation as far as Mr. Sheeler was concerned.  We
16  left that up to Lehigh County.
17      Q.  Okay.  So, in that investigation involving
18  sexual exploitation or abuse or harassment, once you
19  saw the videotape that the students had brought in, you
20  immediately called your friend. . .
21      A.  Mr. Toomey.
22      Q.  . . .Captain Toomey. . .
23      A.  Chief.
24      Q.  . . .Chief Toomey, I'm sorry, and he told you

Page 176

1   to immediately contact outside detectives, correct?
2       A.  Yes.  He said, do you have visuals? I said
3   yes, I can see it.
4       Q.  Okay.
5       A.  And then he told me where to take it.
6       Q.  And you followed his advice?
7       A.  Yes.
8       Q.  At the meeting with Mr. Romig and Mr.
9   Hollenbach where you asked Mr. Romig to resign, was
10  there any discussion about a limit on the resignation,
11  that being that he should resign for the rest of the
12  year but that he could possibly come back the following
13  year?
14      A.  That was never discussed, that he could come
15  back the following year.  He asked, but that was never
16  an option.
17      Q.  He was told no?
18      A.  He also told no by me, yes.
19      Q.  Was that the subject of a discussion again in
20  March of 2010, when you had the meeting with the pastor
21  and him and whatever?
22      A.  Yes.
23      Q.  That was something that was discussed at that
24  meeting as well?

                              44  (Pages 173 to 176)

Ryan Clymer                                    Nace vs. Pennridge School District
July 29, 2015

Page 177

1       A.   Yes.
2       Q.   And what was the discussion?
3       A.   There were multiple things that were
4   discussed.  Just about whether or not --
5       Q.   Whether he could come back again as a coach.
6       A.   He had asked Pastor Paul if he could come
7   back, and I think Pastor Paul said in time or something
8   like that.
9       Q.   Do you remember something being mentioned
10  about some kind of probationary contract at the
11  meeting?
12      A.   I don't, no.
13      Q.   At any point, either by telephone or in
14  person, did you discuss the issue with Mr. Romig
15  directly as to whether or not you intended to report
16  his conduct or the allegations against him to outside
17  authorities?
18      A.   No.
19      Q.   Mr. Romig resigned in the middle of the
20  season.  Do you know if he was paid until the end of
21  the season?
22      A.   No, I think he was paid halfway through and
23  then the rest of his compensation was distributed
24  between the two coaches who took over for him.  I'm

Page 178

1   pretty sure.  I'm 99.9 percent sure.
2       Q.   Have you had any contact with Mr. Romig since
3   he went to prison?
4       A.   No.
5       Q.   Has he tried to contact you?
6       A.   I believe he wrote me a letter.  I did not
7   read it.
8       Q.   Do you have it?
9       A.   I do not have it.
10      Q.   What happened to it?
11      A.   The business office has it.  I gave it to --
12  it was addressed to me and Mr. Thompson, and I didn't
13  read it, so I didn't have it.
14          MR. GROTH:  I'm going to ask that your
15      counsel turn that letter over to me, just as I was
16      given Hollenbach's letters to Mr. Romig.
17          I have no further questions for the
18      time being.  Thank you.
19          MR. RUSSELL:  I just have a brief
20      follow-up.  I just want to make sure the record is
21      clear.
22          (EXAMINATION)
23  BY MR. RUSSELL:
24      Q.   Ryan, you were asked about some of your social

Page 179

1   involvement with Mr. Romig during your high school
2   years.  You said that you only had four people in your
3   class, and I just want to make sure.  It might not have
4   been asked correctly, but in order to try to complete
5   the record.
6       ...... Mr. Romig asked you to be in his wedding, did
7   he not?
8       A.   That is correct.
9       Q.   He wasn't in your wedding?
10      A.   No, he was not.
11      Q.   And you did oblige to his request and you were
12  in his wedding.
13      A.   I did.
14      Q.   Okay.  Additionally, you were shown an email
15  that was sent to you by Mrs. Smith, and it lists an
16  attachment.  It says "Emily Mayer statements" and it
17  gives a listing of those statements.  The first one
18  states "Beginning in November he started telling me how
19  he and Lauren did sexual things and was hinting at me
20  to be this way."
21          You stated that you followed up with Lauren
22  Fretz and that turned out not to be true, correct?
23      A.   It was false, correct.
24          MR. KEMETHER:  So we're clear for the

Page 180

1   record, you're referring to Romig-6.
2           MR. RUSSELL:  Thank you.
3   BY MR. RUSSELL:
4       Q.   The second one, it says "December 5th, DeSales
5   game.  He texted me and said "'I want to be in you.'"
6           Did Emily Mayer tell you before you saw this
7   email that Mr. Romig had said "I want to be with you"?
8       A.   Yes.
9       Q.   So, when you saw "I want to be in you," did
10  you think that was a paraphrase of something else?
11      A.   I didn't understand what it was.  It was
12  something that stood out to me.  It was something
13  different than had been told to me before.
14      Q.   But she had not told you that previously.
15          MR. GROTH:  Object to the form.
16      Q.   You can go ahead and answer.
17      A.   That's correct.
18      Q.   She had told you "He stated to her 'I want to
19  be with you?'"
20          MR. GROTH:  Objection to the form.
21          MR. RUSSELL:  You can answer.
22          THE WITNESS:  That is correct.
23  BY MR. RUSSELL:
24      Q.   I think you talked about this, but it wasn't

45  (Pages 177 to 180)

Appendix  0329

Ryan Clymer                          Nace vs. Pennridge School District
                          July 29, 2015

Page 181

1  followed up on: You did have some communication with
2  Mrs. Romig about certain texts that were sent, and she
3  said that those texts were intended for her?
4        MR. GROTH: Object to form.
5        A.  That is true, yes.  Whether it be through
6  someone that she worked with at Alderfer & Travis,
7  because we had many parents that worked there; it could
8  have been through their dialogue to me.  It was stated
9  in the meeting that we had -- I'm sorry, March 31st,
10 that she said that was meant for her after the fact.
11       So yeah, that's -- she said apparently "he
12 sends me stuff like that all the time," so. . .
13       Q.  Additionally, Smiths were informed of your
14 investigation.  You kept them apprised of what your
15 investigation revealed, correct?
16       MR. GROTH: Object to form.
17       A.  Probably more so than anybody else.  Yes.
18       Q.  Do you know if the Smiths ever contacted and
19 filed a report with Child Protective Services?
20       A.  I do not believe they did.
21       Q.  Do you know, did you receive any word back as
22 to whether any report was founded or unfounded?
23       A.  I did not receive anything.
24       Q.  Did Mr. Smith ever tell you that, based upon

Page 182

1  his experience and training as a county detective, that
2  he believed that his stepdaughter Emily Mayer was the
3  victim of sexual abuse?
4        A.  No.
5        Q.  Did he ever tell you, based upon his training
6  as a Montgomery County detective, that he felt Emily
7  Mayer was the victim of sexual exploitation?
8        A.  No.
9        Q.  Did he ever tell you, based upon his
10 experience and training as a Montgomery County
11 detective, that he felt that his stepdaughter was sent
12 texts that were intended to persuade her, induce her,
13 entice her, coerce her, to engage in sexually explicit
14 conduct?
15       A.  He did not.
16       Q.  Did he ever tell you that, based upon his
17 experience as a Montgomery County detective, that he
18 believed that his stepdaughter, Emily Mayer, was the
19 victim of serious bodily injury?
20       A.  No, he did not.
21       MR. RUSSELL: I have no further
22 questions.
23       MR. COX: I have just a few.
24

Page 183

1        (EXAMINATION)
2  BY MR. COX:
3        Q.  Mr. Clymer, my name is Rob Cox. I represent
4  Pennridge School District, David Babb and Tom Creeden.
5  I just have a few questions, as I mentioned.
6        Did you ever discuss Eric Romig with anyone at
7  Pennridge School District subsequent to the Emily Mayer
8  allegations?
9        A.  No, sir.
10       Q.  Ever before those allegations?
11       A.  Nothing else.
12       Q.  Do you have any knowledge of any conversations
13 that Mr. Hollenbach might have had with anyone from
14 Pennridge?
15       A.  I do not.
16       Q.  Do you have any knowledge -- and I guess that
17 means you don't have any knowledge of a conversation
18 that might have occurred between Mr. Hollenbach and Mr.
19 Babb.
20       A.  No, I do not.  There is no -- I don't know
21 anything.
22       MR. COX: That's all I have. Thank
23 you.
24       MR. KEMETHER: I have no questions.

Page 184

1        MS. CONNOR: I have no questions.
2        MR. SANTARONE: I have no questions.
3        MR. GROTH: Thank you very much.
4  Appreciate it.
5        THE WITNESS: Okay.
6        THE VIDEOGRAPHER: The time is 2:04.
7  We are off the record.
8        MR. GROTH: Just the normal request on
9  the record that all exhibits from both the
10 Hollenbach and Clymer depositions be attached to
11 the transcript when they're delivered, hard
12 copies.
13       MR. KEMETHER: Hard copies.
14       (The deposition also concluded at 2:05
15 p.m.)
16
17
18
19
20
21
22
23
24

46 (Pages 181 to 184)

Ryan Clymer                          Nace vs. Pennridge School District
                          July 29, 2015

---

Page 185

1                    INDEX
2    WITNESS: RYAN CLYMER
     By Mr. Groth:            Page 4
3    By Mr. Russell:          Page 178
     By Mr. Cox:              Page 183
4
5              EXHIBITS
     NO.      DESCRIPTION        PAGE
6    1  Email dated January 7, 2010 with attached
        phone logs               34
7
        2  Document entitled "Teacher's Contract"    167
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 187

1                 ERRATA SHEET
2                   ------
3
4    PAGE    LINE          CORRECTION
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 186

1            SIGNATURE PAGE
2                ------
3         I hereby acknowledge that I have read the
     aforegoing transcript, and the same is a true and
4    correct transcription of the answers given by me to the
     questions propounded, except for the changes, if any,
5    noted on the Errata Sheet.
6
                 ------
7
8
9    SIGNATURE:        _____
10
     DATE:             _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 188

1              CERTIFICATION
2
3                ------
4
5         I hereby certify that the testimony and
6    the proceedings in the aforegoing matter are contained
7    fully and accurately in the stenographic notes taken by
8    me and that the copy is a true and correct transcript
9    of the same.
10
11
12    _____
      Lance A. Brusilow
      Registered Professional Reporter
13    Certified Realtime Reporter
14
15
16         The foregoing certification does not
17   apply to any reproduction of the same by any means
18   unless under the direct control and/or supervision of
19   the certifying shorthand reporter.
20
21               ------
22
23
24

---

47  (Pages 185 to 188)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                    July 28, 2015

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
-----
JAMES NACE, et al        :   CIVIL ACTION
              vs.
PENNRIDGE SCHOOL DISTRICT,  :
et al.              :   NO. 15-333
- - - - - - - - - - - - - - - - - -

Tuesday, July 27, 2015
------

Videotape deposition of RUSSELL L. HOLLENBACH, JR.,

held at 1880 John F. Kennedy Boulevard, Seventh Floor,

Philadelphia, Pennsylvania, beginning at 9:55 a.m., on

the above date, before LANCE A. BRUSILOW, Registered

Professional Reporter, Approved Reporter for the United

States District Court, and Notary Public, there being

present.

------

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

------

**Page 2**

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY:  DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY:  JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY:  ROBERT M. COX, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
ph: 215.345.7000
(rcox@eastburngray.com)
Counsel for Pennridge School District and individual
Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY:  CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA  19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell Hollenbach

**Page 3**

(APPEARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY:  SEAN V. KEMETHER, ESQUIRE
30 East Second Street
Media, PA  19063
ph: 610.585.0600
(skemether@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

DRAKE, HILEMAN & DAVIS
BY:  JONATHAN J. RUSSELL, ESQUIRE
PO BOX 1306
Doylestown, PA  18901
ph: 215.348.2088
(jrussell@dhdlaw.com)
Counsel for Faith Christian Defendants

ALSO PRESENT:
Henry Thompson
Ryan Clymer
David Levin, Videographer

**Page 4**

1        THE VIDEOGRAPHER:  Stand by, please.
2    We are now on the record.  My name is David Levin.
3    I'm a videographer employed by brusilow +
4    associates.
5        This is a video deposition in the
6    United States District Court for the Eastern
7    District of Pennsylvania, Civil Trial Division,
8    number 15-333.
9        Today's date is July 28th, 2015, and
10   the video time is 9:55 a.m.  This deposition is
11   being held at 1880 JFK Boulevard, 7th Floor,
12   Philadelphia, Pennsylvania, in the matter of James
13   Nace, et al. versus Pennridge School District, et
14   al. The deponent is Russell Hollenbach.
15       All counsel will be noted on the
16   stenographic record.  The court reporter is Lance
17   Brusilow, who will now swear in the witness.
18       RUSSELL L. HOLLENBACH, JR., having been
19   first duly sworn, was examined and testified as
20   follows:
21           (EXAMINATION)
22   BY MR. GROTH:
23   Q.  Good morning, sir.
24   A.  Good morning.

1  (Pages 1 to 4)

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
                              July 28, 2015

Page 5

1    Q.  Would you state your full name for the record,
2    please?
3       A.  Russell Leroy Hollenbach, Jr.
4       Q.  Mr. Hollenbach, my name is David Groth, and I
5    represent the plaintiffs in a lawsuit that's currently
6    pending in federal district court, the subject matter
7    of which is a civil rights case against a number of
8    defendants, including Pennridge School District, Faith
9    Christian Academy and some of their employees; namely,
10   David Babb, Thomas Creeden, yourself, Russell
11   Hollenbach; and Ryan Clymer.
12      I asked you to come here today to answer some
13   questions about things that I think are important or
14   relevant to this litigation that I'm involved in.
15      Let me ask you before:  Have you ever given a
16   deposition before?
17      A.  No.
18      Q.  Let me start out by giving you some general
19   instructions about how this will proceed so that we can
20   get through this as quickly and efficiently as
21   possible. All right?
22      First of all, listen to my questions and make
23   sure you understand my questions before you begin to
24   answer.

Page 6

1       If you answer a question, I'll assume that you
2    understood it.  If you don't understand a question, ask
3    me to restate or rephrase or clarify the question for
4    you so that you do understand it before you give me an
5    answer.
6       Please let me complete the question before you
7    give me an answer, for two reasons:  Number one, you have
8    to know exactly what I'm asking you for, so you have to
9    hear the whole question; and secondly, the court
10   reporter can only take down one of us speaking at a
11   time.
12      So, if we talk over each other, it's hard to
13   make a transcript, a typed transcript, of the questions
14   and answers today.
15      If you do answer a question, I'll assume you
16   understood it and are giving me your best recollection
17   of facts and events going back for some period of time.
18   Some issues we'll cover go back ten years or more.
19      Please give me a verbal response, no gestures
20   or hand signals or head nods or head-shakes no.  The
21   court reporter can only make a transcript of what's
22   said here.
23      So, you have to verbalize all your answers, so
24   you'll give me an answer of yes, no or some narrative

Page 7

1    explanation in response to my question.
2       You're required to answer every question I ask
3    you fully and to the best of your ability, unless your
4    attorney objects to a question, and states a legal
5    basis for the objection and specifically instructs you
6    not to answer the question.
7       There may be objections to certain questions
8    raised by other counsel, and in most cases you'll
9    simply allow the objection to be stated for the record
10   and you'll answer the question anyway; again, unless
11   you have specific instruction from your attorney not to
12   answer the question.
13      I'll be asking you for facts and information
14   that you know personally or may have heard or learned
15   from others or got through other sources.  So, it's not
16   just what you know personally, but things that you
17   became aware of through other people.
18      If you don't know the answer to a question or
19   do not recall the facts and information I'm asking
20   about, tell me that and that will be a sufficient
21   answer.
22      I'm telling you now that I do not want you to
23   guess or speculate or assume anything in response to a
24   question.  Only give me the facts and information that

Page 8

1    you know or can recall.
2       Is there any reason today why you can't give
3    your deposition under oath in this case?
4       A.  No reason.
5       Q.  No medical problems or any other problems that
6    would stop you from answering my questions?
7       A.  No.
8       Q.  Do you understand that you're required to
9    answer all of my questions truthfully and that you've
10   taken an oath and sworn to do so?
11      A.  Yes.
12      Q.  Do you understand that your testimony under
13   oath at this deposition is the same as if you were at
14   the trial before a judge and jury?
15      A.  Yes.
16      Q.  I'm going to ask you questions about a number
17   of issues.  I don't want you to testify to me about any
18   discussions that you had with your attorneys on those
19   issues.
20      For some issues that you may have discussed
21   with your attorneys, they may have given you
22   information that you didn't know personally but your
23   source of that information was your attorney.  In those
24   instances, you should not be answering the question

Russell L. Hollenbach, Jr.                Nace vs. Pennridge School District
                              July 28, 2015

|                                          Page 9 |
| 1  unless your attorney gives you permission to do so. |
| 2          Finally, if you need to take a break for any |
| 3  reason, just ask me. It's not a problem. We'll go off |
| 4  the record and allow you to take care whatever you need |
| 5  to take care of, even if it's to talk to your attorney, |
| 6  go to the restroom, get a drink, whatever you want to |
| 7  do. |
| 8          Just understand that you cannot ask for a |
| 9  break in the middle of a question. If a question is |
| 10 pending, you have to answer the question before we take |
| 11 the break. |
| 12         Do you understand that? |
| 13    A.  Okay, yes. |
| 14    Q.  Okay. Keep your voice up because the |
| 15 attorneys at the end of the room also have to hear you. |
| 16 Even though you're mic'd for the court reporter's |
| 17 purposes, I want to make sure everybody hears |
| 18 everything that you testify to. |
| 19         Mr. Hollenbach, did you review any documents |
| 20 in preparation for the deposition today? |
| 21    A.  Yes. |
| 22    Q.  What documents did you review? |
| 23    A.  The school handbook and notes from a meeting I |
| 24 was in with Pastor Paul Auckland and Eric and his wife |

|                                          Page 10 |
| 1  and Ryan Clymer. |
| 2     Q.  I want to make sure I got all those people |
| 3  that were at this meeting: It was Pastor Auckland, |
| 4  Paul Auckland, correct? |
| 5     A.  Correct. |
| 6     Q.  Ryan Clymer? |
| 7     A.  Yes. |
| 8     Q.  Stephanie Romig? |
| 9     A.  Yes. |
| 10    Q.  Eric Romig? |
| 11    A.  Yes. |
| 12    Q.  Yourself? |
| 13    A.  Yes. |
| 14    Q.  And who else? |
| 15    A.  That's all. |
| 16    Q.  And what was -- |
| 17    A.  Well, Pastor Ron Jones -- maybe. I can't |
| 18 remember. |
| 19    Q.  When was that meeting? |
| 20    A.  March. |
| 21    Q.  2010? |
| 22    A.  Yes, or whatever, after -- I'm not sure what |
| 23 year, but. . . |
| 24    Q.  I'm going to show you what's been marked as |

|                                          Page 11 |
| 1  Romig-12. These documents were previously marked at |
| 2  the deposition of Eric Romig. Are those the documents |
| 3  that you reviewed? |
| 4     A.  Yes. |
| 5          MR. KEMETHER: Why don't you take a |
| 6     look at all of them just to be sure? |
| 7          THE WITNESS: Yes, that's correct. |
| 8  BY MR. GROTH: |
| 9     Q.  While we're on it -- and we'll get back to |
| 10 this later on -- but do you know who prepared those |
| 11 notes? |
| 12    A.  Pastor Auckland, I assume. |
| 13    Q.  It was not you? |
| 14    A.  It was not me. |
| 15    Q.  What was the purpose of that meeting? |
| 16    A.  I believe it was a meeting Eric wanted to have |
| 17 for some counseling, I would say, with the pastor, as |
| 18 well as to -- I guess he wanted to clarify or go over |
| 19 what had happened in his mind with the people involved. |
| 20    Q.  Go over what had happened with the Emily Mayer |
| 21 investigation. |
| 22    A.  Correct. |
| 23    Q.  Okay. |
| 24    A.  Yes. |

|                                          Page 12 |
| 1     Q.  And that meeting was documented by the pastor |
| 2  and those notes were provided to me by Faith Christian |
| 3  Academy's attorney. |
| 4          Do you know if there were any other notes |
| 5  taken by anybody at that meeting? |
| 6     A.  I do not know of any, no. |
| 7     Q.  Did you take any notes? |
| 8     A.  No, sir. |
| 9     Q.  Now, you mentioned looking at the student |
| 10 handbook as well as these meeting notes. Did you |
| 11 review any other documents in preparation for the |
| 12 deposition? |
| 13    A.  No, sir. |
| 14    Q.  I'm going to show you what we've marked as |
| 15 Hollenbach exhibit one. |
| 16         (Exhibit Hollenbach-1 was marked for |
| 17     identification) |
| 18 BY MR. GROTH: |
| 19    Q.  This is a document that doesn't have an -- it |
| 20 does at the bottom. It has a title of "Middle and high |
| 21 school student/parent guide," and it has forty total |
| 22 pages to it. |
| 23         Can you just take a look at that, please, |
| 24 Hollenbach-1, and tell me if that is the document that |

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                              July 28, 2015

---

Page 13

1    you just referred to that you reviewed?
2           MS. CONNOR:  Can we see a copy of that,
3    please? I don't need to keep it. Just one.
4           MR. GROTH:  Sure.
5           MR. SANTARONE:  What exhibit is this?
6           MS. CONNOR:  It's Hollenbach-1. Can we
7    go off the videotape record for a second?
8           MR. GROTH:  Certainly.
9           THE VIDEOGRAPHER:  The time is 10:05.
10   Off the video record.
11          MS. CONNOR:  David, did we provide this
12   as part of discovery?
13          MR. GROTH:  No. I'll represent to you
14   that I took that off the internet website for FCA
15   with their forms and documents sometime last week.
16          MS. CONNOR:  Can we just have a minute
17   to review it?
18          MR. GROTH:  Sure. The reason I showed
19   him that and I'll show him what you did provide to
20   me, Carla, earlier I think last week, to see if
21   that's what he's referring to, what you provided
22   to me, or if Hollenbach-1 is what he provided --
23   Hollenbach-1 is what he reviewed.
24          MS. CONNOR:  David, do you have an

---

Page 14

1    extra copy of this?
2           MR. GROTH:  I don't, just the one I
3    handed the witness. Back on.
4           THE VIDEOGRAPHER:  Stand by, please.
5    10:07, back on the video record.
6    BY MR. GROTH:
7       Q.  Mr. Hollenbach, I gave you a chance to review
8    what I've marked as Hollenbach exhibit one. Is that
9    the handbook or guide that you testified to a moment
10   ago that you reviewed prior to this deposition?
11      A.  Yes.
12      Q.  Okay. I want to show you another document
13   which I'll mark Hollenbach exhibit two.
14          (Exhibit Hollenbach-2 was marked for
15   identification)
16   BY MR. GROTH:
17      Q.  This document was produced by Faith Christian
18   Academy's attorney to me to provide me with
19   documentation of -- I'm going to call Faith Christian
20   Academy FCA. Is that okay with you?
21      A.  Yes.
22      Q.  It's FCA's sexual harassment and abuse policy.
23   Did you review that document, to your knowledge? I mean
24   just that document.

---

Page 15

1       A.  Yes.
2       Q.  Okay. So, you saw that as well?
3       A.  Yes.
4       Q.  The first document, Hollenbach exhibit one, as
5    I represented to you, I took that off the internet last
6    week, FCA's internet site.
7           Is that the specific guide that you reviewed?
8    That is, the one that's currently on the website, did
9    you review a guide that was in effect back in
10   2009/2010, if you know?
11      A.  I think I reviewed the most current one.
12      Q.  Most current.
13      A.  Yes.
14      Q.  Do you know whether or not the guide that was
15   utilized by FCA -- strike that.
16          Do you know whether or not there was such a
17   guide back in 2009/2010?
18      A.  Yes.
19      Q.  There was. Was it similar to what
20   Hollenbach-1 looks like?
21      A.  Similar?
22          MR. KEMETHER:  Objection.
23          THE WITNESS:  Similar, yes.
24   BY MR. GROTH:

---

Page 16

1       Q.  Did you review that guide from 2009/2010?
2       A.  I don't recall.
3       Q.  Any other documents that you reviewed in
4    preparation for your deposition?
5       A.  No, none that I can recall.
6       Q.  Did you review -- and by review I mean read --
7    all or any portions of the deposition transcript of
8    Eric Romig?
9       A.  No.
10      Q.  Did you review any documents maintained by FCA
11   with regard to its investigation of the allegations
12   made against Mr. Romig by Emily Mayer?
13      A.  No.
14      Q.  Just so we're on the same page about this:
15   When I refer to the Emily Mayer situation, I'm
16   referring to accusations or allegations that she made
17   about Eric Romig sending her excessive texts, including
18   texts of a sexual nature back in 2009. You're aware of
19   that situation?
20      A.  Yes.
21      Q.  Okay. Do you know whether or not anybody at
22   FCA prepared any documents relating to that
23   investigation back in 2009?
24      A.  Clarify that question again? Do I...

---

                                        4  (Pages 13 to 16)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

Page 17

1    Q.  Yes.  There was an investigation by
2  individuals at FCA into the allegations against Mr.
3  Romig made by Emily Mayer, correct?
4    A.  Correct.
5    Q.  Do you know whether or not there were any
6  written documents that memorialized or described or
7  referred to or documented that investigation?
8    A.  No, I don't know of any.
9    Q.  Were you involved in that investigation?
10    A.  No.
11    Q.  Not at all?
12    A.  Only that my principal kept me in the loop
13  with what was going on, what I was investigating.
14    Q.  You didn't interview anybody?
15    A.  I did not interview anybody.
16    Q.  You didn't discuss the investigation with
17  anybody at all, other than Mr. Clymer?
18    A.  No.
19    Q.  You didn't create any documents relating to
20  the investigations?
21    A.  No.
22    Q.  Did Mr. Clymer ever share with you any written
23  documents that he generated as part of the
24  investigation?

Page 18

1    A.  No.
2    Q.  Was it your understanding that Mr. Clymer was
3  the person who was the representative of FCA who was
4  actually conducting the investigation?
5    A.  Yes.
6    Q.  Do you know whether or not Mr. Clymer
7  generated a single written document with regard to his
8  investigation of that situation?
9    A.  I don't know.
10    Q.  You've never seen one, correct?
11    A.  Correct.
12    Q.  You said you never spoke to anybody as part of
13  the investigation into Emily Mayer's allegations.  You
14  did talk to Eric Romig, didn't you?
15      MR. KEMETHER: Just to clarify the time
16    frame: During the investigation?
17      MR. GROTH:  Yes.  I'm talking between
18    sometime around December 21st until January 5th --
19    December 21st, 2009 to January 5th, 2010.
20      THE WITNESS: Yes.
21  BY MR. GROTH:
22    Q.  Did you document those discussions?
23    A.  No.
24    Q.  How many discussions did you have with him

Page 19

1  between the time that you learned of the accusations
2  made by Emily Mayer and the time you had a meeting with
3  Mr. Romig along with Ryan Clymer to talk about what was
4  going to happen as a result of the investigation?
5    A.  I don't recall conversations in that time
6  frame with Eric outside of that meeting.
7    Q.  Are you talking about the last meeting where
8  it was decided what was going to happen to him?
9    A.  Yes.
10    Q.  And that meeting took place sometime a day or
11  two before January 5th, 2010, when he submitted his
12  resignation.  Is that correct?
13    A.  Yes.
14    Q.  So, you had no other discussions during that
15  period of time with him other than attending that
16  meeting and discussing with Mr. Romig what was to
17  happen to him.
18    A.  No, I don't recall any other discussions.
19    Q.  If Mr. Romig testified that he did have
20  discussions with you during that time period, would he
21  be not telling the truth?
22    A.  Would he be not telling the truth?
23    Q.  Yes.  If he testified under oath that he did
24  have discussions with you between December 21st/22nd

Page 20

1  and a meeting the beginning of January, would he be not
2  telling the truth?
3    A.  I can't say whether he's telling the truth or
4  not.  I just don't recall any conversations.
5    Q.  Did you have any meeting or discussion with
6  the players on his team that he coached after the
7  allegations by Emily Mayer were made?
8    A.  No.
9    Q.  I think the record shows that the allegation
10  was made on a Thursday, and I believe there is a
11  document that we'll look at later that says that you
12  were scheduled to meet with the team or the players on
13  that Saturday.
14      Do you recall having a meeting with the team
15  or players about the investigation of Mr. Romig?
16    A.  Did I have a meeting?
17    Q.  Yes.
18    A.  No, I didn't have a meeting.
19    Q.  We'll come back to this.  Did you review the
20  answer to the complaint that was filed on behalf of FCA
21  and you and Mr. Clymer?
22    A.  The original complaint?
23    Q.  The answer to the complaint.  The FCA filed an
24  answer to the complaint.

5  (Pages 17 to 20)

Appendix 0336

Russell L. Hollenbach, Jr.                Nace vs. Pennridge School District
                                        July 28, 2015

|  | Page 21 |
|---|---|
| 1 | MR. KEMETHER: In this litigation. |
| 2 | MR. GROTH: Yes. |
| 3 | THE WITNESS: I don't think so. |
| 4 | BY MR. GROTH: |
| 5 | Q. Who else was involved, if anybody, in the |
| 6 | investigation of Emily Mayer's allegations against Mr. |
| 7 | Romig other than Mr. Clymer? |
| 8 | A. None to my knowledge. |
| 9 | Q. So, he was running -- whatever investigation |
| 10 | there was, he was doing it, correct? |
| 11 | A. Yes. |
| 12 | Q. And he is keeping you in the loop. |
| 13 | A. Yes. |
| 14 | Q. Who else was he keeping in the loop? |
| 15 | A. I don't think there would be anyone else -- I |
| 16 | don't know. |
| 17 | Q. Let's talk a little bit, before we get into |
| 18 | that deeper, about you personally, your background. |
| 19 | Can you give me a brief description of your educational |
| 20 | background, please? |
| 21 | A. As in college? |
| 22 | Q. Starting with high school. |
| 23 | A. High school -- what school did I graduate |
| 24 | from? |

|  | Page 22 |
|---|---|
| 1 | Q. Yes. |
| 2 | A. I graduated from Faith Christian Academy in |
| 3 | 1979. |
| 4 | Q. Did you go there since elementary school? |
| 5 | A. No, I started attending in eighth grade. |
| 6 | Q. Okay. |
| 7 | A. College, Maranatha Baptist University. |
| 8 | Q. Did you get a degree? |
| 9 | A. Yes. |
| 10 | Q. In what? |
| 11 | A. BS in education and bible. |
| 12 | Q. Where is that located? |
| 13 | A. Watertown, Wisconsin. |
| 14 | Q. Do you have any other formal education or |
| 15 | training? |
| 16 | A. No. |
| 17 | Q. Let's talk about your employment history. |
| 18 | What year did you graduate from Maranatha? |
| 19 | A. 1983. |
| 20 | Q. By whom were you employed starting in 1983 |
| 21 | going up to the time when you were first employed by |
| 22 | Faith Christian? |
| 23 | A. I was employed by Faith Christian from '83 |
| 24 | until I retired in 2014. |

|  | Page 23 |
|---|---|
| 1 | Q. How old are you? |
| 2 | A. Fifty-four. |
| 3 | Q. And you retired from Faith Christian in 2014? |
| 4 | A. Yes. |
| 5 | Q. Have you worked since then? |
| 6 | A. Yes. |
| 7 | Q. Doing what? |
| 8 | A. Custodial maintenance, Central Bucks School |
| 9 | District. |
| 10 | Q. Starting in 2014? |
| 11 | A. Yes, all -- yes. |
| 12 | Q. Until present? |
| 13 | A. Yes. |
| 14 | Q. When you say you retired from FCA in 2014, was |
| 15 | that voluntary on your part? |
| 16 | A. Yes. |
| 17 | Q. Did you get some kind of pension from FCA? |
| 18 | A. Yes. |
| 19 | Q. What kind of pension do you get? |
| 20 | A. It's a -- I don't know what -- I guess it's |
| 21 | just an IRA or 401 -- I'm not quite sure of the name of |
| 22 | it. |
| 23 | Q. You have a retirement account. |
| 24 | A. Yes. |

|  | Page 24 |
|---|---|
| 1 | Q. Can you briefly go through a chronology of the |
| 2 | positions that you held at FCA from when you began |
| 3 | working there in 1983 until you retired in 2014? |
| 4 | A. Phys-Ed health teacher, bible teacher, |
| 5 | athletic director, coaching. Do you want the specifics |
| 6 | of sports? |
| 7 | Q. Yes, please. |
| 8 | A. Okay. Middle school soccer, varsity |
| 9 | baseball -- |
| 10 | Q. Boys or girls? |
| 11 | A. Varsity boys baseball, '83 to '91, I think; |
| 12 | middle school baseball, 2012 to 2014. |
| 13 | Q. Boys or girls? |
| 14 | A. Boys middle school baseball. I drove a bus |
| 15 | for sports events, field trips, and was an assistant to |
| 16 | the principal over discipline. I'm not sure what exact |
| 17 | year, 2009 or '10 to 2014. |
| 18 | Q. What did that position involve? |
| 19 | A. Overseeing the detention/discipline system, |
| 20 | the day-to-day. |
| 21 | Q. When did you become the athletic director? |
| 22 | A. 1984. |
| 23 | Q. And you were athletic director until 2014? |
| 24 | A. Yes. |

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                              July 28, 2015

Page 25

1   Q.  What did that involve?
2   A.  Scheduling all the sports, overseeing the
3 coaches, setup and cleanup of home-game events,
4 arranging transportation for the away events, arranging
5 for officials for home events.
6   Q.  That's it?
7   A.  Generally, yes, that's it.
8   Q.  Okay.  So, you were athletic director in 2009,
9 correct?
10   A.  Yes.
11   Q.  Who was your direct supervisor or superior?
12   A.  The principal.
13   Q.  Who was that?
14   A.  Ryan Clymer.
15   Q.  I've seen principal and headmaster as titles
16 for Mr. Clymer.  Are those interchangeable or. . .
17   A.  Yes.
18   Q.  Is there a board of directors for Faith
19 Christian Academy?
20   A.  Yes.
21   Q.  Do you know who the chairman of the board is
22 right now?
23   A.  Yes.
24   Q.  Who is that?

Page 26

1   A.  Dan Schmidt.
2   Q.  Has he been the chairman for a certain period
3 of time?
4   A.  Yes.
5   Q.  Do you know how long, approximately?
6   A.  Three to five years, something.
7   Q.  Was he the chairman of the board of directors
8 back in 2009?
9   A.  I don't believe so.
10   Q.  Do you know who was?
11   A.  I can't recall who that would have been then.
12   Q.  Do you know who was board chairman just before
13 Mr. Schmidt?
14   A.  I can't say for sure I would name the right
15 person, no.
16   Q.  Did you have any other employment that you
17 haven't mentioned to me other than at FCA for those
18 periods of years between 1984 and 2014?
19   A.  I was in part-time work.
20   Q.  Part-time work.  Any kind of work where you
21 made money?
22   A.  Drove a school bus for Pennridge School
23 District.
24   Q.  From when to when?

Page 27

1   A.  1996 or 1995 until 2006 or 2007.
2   Q.  Anything else?
3   A.  I currently work part time at Indian Valley
4 Country Club.
5   Q.  Doing what?
6   A.  Golf course maintenance.
7   Q.  Anything else?
8   A.  I also drive part time for Gordon Florist,
9 delivery.
10   Q.  Anything else?
11   A.  No.
12   Q.  Are you married?
13   A.  Yes.
14   Q.  What's your wife's name?
15   A.  Rebecca.
16   Q.  Where do you live?
17   A.  Sellersville.
18   Q.  The address?
19   A.  335 9th Street.
20   Q.  Do you have any children?
21   A.  Yes.
22   Q.  Are they adult children?
23   A.  Yes.
24   Q.  How many?

Page 28

1   A.  Three boys.
2   Q.  And their names?
3   A.  Dexter, Lucas and Garrett.
4   Q.  Do any of them live at home with you?
5   A.  Yes.
6   Q.  Who?
7   A.  Dexter and Lucas.
8   Q.  How old are they?
9   A.  They are twins, and they are twenty-six.
10   Q.  Do you have any arrest or conviction record
11 for anything?
12   A.  No.
13   Q.  Are you a member of Faith Baptist Church?
14   A.  Yes.
15   Q.  For how long?
16   A.  Since the mid '70s.
17   Q.  And your whole family as well are members?
18   A.  No.
19   Q.  Is anybody else a member from your family of
20 the church?
21   A.  My wife and one son.
22   Q.  Did your children go to FCA to be educated?
23   A.  Yes.
24   Q.  From elementary through high school?

7 (Pages 25 to 28)

Appendix 0338

**Page 29**

```
1     A.  Yes.
2     Q.  The current pastor is Paul Auckland, right?
3     A.  Yes.
4     Q.  And he was a pastor back in 2009 as well?
5     A.  Yes.
6     Q.  When did he start with FCA, or Faith Baptist
7  Church?
8     A.  I believe he started in 1979.
9     Q.  Does Pastor Auckland hold any position with
10 regard to the school as opposed to the church?
11    A.  Currently?
12    Q.  Yes?
13    A.  No.
14    Q.  How about back in 2009?
15    A.  Yes.
16    Q.  What was his position?
17    A.  I don't know what the official title would
18 have been.  The school was under the church at that
19 point, so being the lead pastor, he was the person in
20 charge, so to speak, or oversaw the school from the
21 church's standpoint.
22    Q.  Would he have been in 2009 a supervisor of Mr.
23 Clymer?
24    A.  Yes.
```

**Page 30**

```
1     Q.  Is the school no longer under the control of
2  the church?
3     A.  Yes, to my understanding.
4     Q.  When did that take place when there was some
5  split or separation?
6     A.  It's been a couple years, three to four years
7  or so. I'm not sure exactly of the exact year.
8     Q.  So, Mr. Auckland has no position with regard
9  to the school right now?
10    A.  Correct.
11    Q.  What was the reason for the split or
12 separation, as you had understand it?
13    A.  Financial independence for the school.
14    Q.  I'm not sure I understand what that means.
15    A.  The church had put -- obviously ran the
16 school, put money in the school, so that the school was
17 becoming independent financially and able to even raise
18 their own money to support themselves financially.
19    Q.  When you say support itself financially, you
20 mean in terms of fund-raising and/or tuition and that
21 kind of thing?
22    A.  Yes.
23    Q.  Did the school get any federal, state or
24 federal funding?
```

**Page 31**

```
1     A.  Not to my knowledge.
2     Q.  Going back to 2009, in terms of the overall
3  hierarchy of the school, we talked about you reporting
4  to Ryan Clymer, Ryan Clymer reporting to or was
5  surprised by Pastor Auckland.  Who was in charge, if
6  anybody, of Pastor Auckland?
7     A.  There was a deacon board.  The church had a
8  board.
9     Q.  Does that board hire the pastor?
10    A.  I'm not sure.
11    Q.  Back in 2009 do you know the names of anyone
12 who was on the deacon board?
13    A.  No.
14    Q.  Do you know approximately how many people were
15 on the deacon board?
16    A.  Approximately twelve or more.
17    Q.  Were these all church members as well?
18    A.  Yes.
19    Q.  And back in 2009 you didn't know who the --
20 strike that.
21        Is the deacon board separate or different from
22 the board of directors?
23    A.  In 2009?
24    Q.  Yes.
```

**Page 32**

```
1     A.  I don't understand separate from. . .
2     Q.  You talked about Dan Schmidt being chairman of
3  the board of directors.  When we talked about that, I
4  may be using the wrong term.
5        Is the board of directors really the deacon
6  board, or are they separate entities?
7     A.  There was only one board.
8     Q.  One board.  You're calling it the deacon
9  board, and Dan Schmidt for the last three to five years
10 has been the head of that board?
11    A.  It was the deacon board in 2009 because of the
12 church's involvement.  At the separation, the school
13 has its own board separate from the church board.  The
14 church has its own board; the school had its own board.
15    Q.  Okay.  So, in 2009, the period of time we're
16 talking about here, the Board of Deacons would have
17 been the board that controlled the school as well.
18    A.  Correct.
19    Q.  And somebody just prior to Dan Schmidt was the
20 head of the Board of Deacons for the deacon's board.
21    A.  Yes.
22    Q.  Okay.  And whoever that person was whose name
23 you don't know, would that person have been Ryan
24 Clymer's supervisor or boss?
```

8 (Pages 29 to 32)

Appendix 0339

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

Page 33

1    A.  Yes, I guess would be my answer.
2    Q.  Do you know the names of anybody who was on
3  the deacon board back in 2009?
4    A.  I would have to think back and assume or
5  guess. I know people who have been deacons in the
6  church. Whether they were at that time or not, I
7  could -- I would just be sort of guessing at that
8  point.
9    Q.  I don't want you to guess. Let me ask it a
10  different way:  Were there other school employees on
11  the deacon board back in 2009?
12    A.  No, not to my knowledge.
13    Q.  Was Ryan Clymer on the deacon board?
14    A.  No.
15    Q.  With regard to the Emily Mayer investigation,
16  do you know if -- strike that.
17        With regard to the Emily Mayer investigation,
18  did you ever discuss any part of that investigation
19  with anybody or any member of the Board of Deacons?
20    A.  I did not, no.
21    Q.  Do you know if Mr. Clymer did?
22    A.  I do not know if he did.
23    Q.  To your knowledge, he did not.
24    A.  To my knowledge, I don't know if --

Page 34

1    Q.  You don't know either way.
2    A.  I don't know either way.
3    Q.  Prior to the Emily Mayer allegations and
4  investigation, had you ever heard of a statute called
5  the Child Protective Services Law, Pennsylvania Child
6  Protective Services Law?
7    A.  Have I heard of it? Yes.
8    Q.  Prior to 2009.
9    A.  I'm not sure.
10    Q.  What is your understanding of the subject
11  matter of that statute?
12    A.  My understanding of Child Protective Services
13  Law?
14    Q.  Yes.
15    A.  To protect the safety of children.
16    Q.  Do you know if there are portions -- strike
17  that. Did you know back in 2009 whether or not there
18  were portions that referred to the investigation of
19  allegations of child abuse or sexual abuse or sexual
20  harassment or sexual exploitation?
21    A.  Would you repeat that?
22    Q.  Yes. Back at the time of Emily Mayer's
23  allegations, did you know whether or not that law
24  covered the investigation and reporting of suspected

Page 35

1  child sexual abuse, sexual harassment or sexual
2  exploitation?
3    A.  I can't recall what I would have known then.
4    Q.  Do you know if that law -- strike that.  Do
5  you now know whether or not that law covers those
6  topics?
7            MR. SANTARONE: The law as it's written
8  now, you're asking about?
9            MR. GROTH: Yes.
10            MR. SANTARONE: So, you're asking him
11  for his legal interpretation of a law that was
12  rewritten?
13            MR. GROTH: No, I don't want his legal
14  interpretation of anything.
15  BY MR. GROTH:
16    Q.  I want to know whether or not it is your
17  understanding, as a layman, that the Child Protective
18  Services Law covers the topics such as sexual abuse or
19  sexual harassment or sexual exploitation of children.
20    A.  I would assume it covers those topics.
21    Q.  You would assume that based on what?
22    A.  The safety of a child.
23    Q.  Let me ask it a different way.  Have you ever
24  received any training or instructions regarding the

Page 36

1  provisions of the Child Protective Services Law?
2    A.  The school had training as far as
3  teacher-in-service. People would come in for different
4  topics.
5    Q.  Did these topics include the Child Protective
6  Services Law?
7    A.  The exact law? No, that I recall.
8    Q.  As of the time of Emily Mayer's investigation
9  and allegations, had you ever heard the term "mandatory
10  reporter"?
11    A.  In 2009?
12    Q.  Yes.
13    A.  I don't think so.
14    Q.  And you were a teacher at that time, too,
15  correct? In 2009.
16    A.  Yes.
17    Q.  As well as being athletic director.
18    A.  Yes.
19    Q.  Did you ever have any training -- and I'm
20  talking about you personally -- did you ever receive
21  any training or instruction by way of seminar or
22  meetings or coursework or whatever in the methods or
23  manner in which school officials should investigate
24  allegations or charges of sexual abuse or harassment or

9  (Pages 33 to 36)

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                              July 28, 2015

| Page 37 | Page 39 |
|---------|---------|

**Page 37**

1  exploitation of children by one of the school
2  employees?
3      A.  Did I have training?
4      Q.  Yes.
5      A.  From a school employee?
6      Q.  From anybody.
7      A.  From anybody? I attended seminars as an
8  athletic director that involved related topics.
9      Q.  When you say "related topics," what does that
10 mean?
11     A.  To answer your question, related to all forms
12 of education, students, sexual abuse.
13     Q.  My question was more specific than that.
14     A.  Okay.
15     Q.  My question was, did you ever receive any
16 training or instruction with regard to the
17 investigation of charges of sexual abuse or
18 exploitation of students by employees of a school?
19     A.  I don't recall anything that specific.
20     Q.  Okay.  You mentioned seminars that you
21 attended as an athletic director.
22     A.  Yes.
23     Q.  When and where?
24     A.  I'm not going to remember.  I mean, those were

**Page 38**

1  on a year-to-year basis.
2      Q.  So, you went every year?
3      A.  Yes, to the ones that I could attend.
4      Q.  How many did you attend?
5      A.  In the years or over the course of all those
6  years?
7      Q.  Well, you didn't go to more than one, correct?
8      A.  I could have.
9      Q.  As of 2009 how many do you think you attended?
10 You can estimate or approximate.
11     A.  Like fifteen to twenty.
12     Q.  And in how many of those did the topic of
13 child sexual abuse come up in the seminar?
14     A.  Some, a few.
15     Q.  Were those seminars, since they were directed
16 toward people like you who were athletic directors --
17 is that correct?
18     A.  Yes.
19     Q.  (Continuing) -- did those seminars mainly deal
20 with sexual abuse of children or students by their
21 coaches?
22     A.  I can't recall exactly.  It was students in
23 schools.
24     Q.  Did you ever get any course materials from any

**Page 39**

1  of these seminars?
2      A.  None that I can recall of an extensive nature,
3  handouts -- some of them had handouts and paperwork.
4      Q.  Did you ever receive any training about the
5  reporting of allegations of child sexual abuse within
6  FCA?
7          And by that I mean where FCA, as a school,
8  brought in its teachers and coaches and athletic
9  directors and staff people of any type to discuss with
10 them the issue of child sexual abuse and the reporting
11 of it and investigation of it and resolution of it.
12     A.  Nothing that specific that I can recall.
13     Q.  When you were working at FCA in 2009, there
14 was a parent-student guide similar to what we've marked
15 as Hollenbach-1.  Is that correct?
16     A.  Yes.
17     Q.  Were you given a copy of that? In other words,
18 did you have your own personal copy of that back in
19 2009?
20     A.  Yes.
21     Q.  Does every teacher and coach and staff
22 member -- strike that.
23          Did every teacher, coach and staff member get
24 a copy of that back in 2009?

**Page 40**

1      A.  Get their own physical hard copy?
2      Q.  Yes.
3      A.  I can't -- I would have to be assuming that
4  they did.
5      Q.  I don't want you to assume.
6      A.  Then I don't know if they did.
7      Q.  How did you get your copy of it?
8      A.  I probably printed it out for myself.
9      Q.  From the website.
10     A.  Yes.
11     Q.  Okay.  Which is the way I got Hollenbach-1, as
12 I told you, correct?
13     A.  Yes.
14     Q.  Specifically, on page twenty-two -- and I
15 realize that this is the current guide on the
16 website -- there is a section on discipline, and as a
17 subsection of that there is a section on sexual
18 harassment policy on Hollenbach exhibit one.  It's on
19 page twenty-two.  Do you see where I'm referring to?
20     A.  Yes.
21     Q.  Also, on Hollenbach-2 there is a similar --
22 it's very similar; the lettering is a little different
23 for it -- section for a sexual harassment policy.  Do
24 you see what I'm referring to?

Russell L. Hollenbach, Jr.            Nace vs. Pennridge School District
                    July 28, 2015

---

Page 41

1    A. Yes.
2         MR. KEMETHER: Look at the whole thing.
3         THE WITNESS: Okay.
4         MR. GROTH: You're welcome to compare
5    the two, if you want. They're very similar,
6    except for, again, how the paragraphs are set up
7    or numbered or lettered or whatever.
8         THE WITNESS: Okay.
9    BY MR. GROTH:
10   Q. They appear to be fairly similar, correct?
11   A. Correct.
12   Q. Do you know whether or not Hollenbach exhibit
13   two was the policy that was in effect back in 2009?
14   A. If this was 2009?
15   Q. Yes. There are no dates on either one of
16   them.
17   A. Then I don't know.
18   Q. Okay. Let me ask you this: With regard to
19   the sexual harassment policy that's listed on both
20   those documents, Hollenbach exhibits one and two, did
21   you ever receive any training at FCA from any
22   administrator, principal, Board of Deacons member,
23   consultant or anybody else to explain to you in some
24   detail, in greater detail, the requirements under the

---

Page 42

1    sexual harassment policy that was in their guide?
2    A. The question is direct training?
3    Q. Yes.
4    A. In the school?
5    Q. Yes.
6    A. Yes, we went over these things.
7    Q. When did that happen?
8    A. Usually before the start of the school year.
9    Q. And when you say "these things" -- I'm only
10   referring --
11   A. Yes.
12   Q. --to specifically the sexual harassment part
13   of it. Yes?
14   A. Yes.
15   Q. Okay. The guide is forty pages long, and it
16   includes everything from attendance tardiness to dress
17   code to library and whatever. Did you go over every
18   section of this forty-page guide every year?
19   A. Every section? Not in extreme detail. Some
20   spent more time on certain sections than others.
21   Q. Was the sexual harassment policy a section
22   that more time was spent on than others?
23   A. I would say yes.
24   Q. And who would lead that discussion at FCA?

---

Page 43

1    A. The principal.
2    Q. Mr. Clymer.
3    A. Yes.
4    Q. Okay. Were you given more information
5    regarding the requirements and obligations under the
6    sexual harassment provision more than what is actually
7    written on that page?
8    A. Even more?
9    Q. Yes.
10   A. Not that I can recall.
11   Q. So, basically there was some discussion of
12   just what is written in the guide to go over it with
13   staff people and whatever, but no greater detail about
14   reporting requirements or investigation or how to spot
15   it, how to spot sexual abuse or exploitation of a
16   child?
17   A. Yes. From year to year any updates that would
18   be in the law, any helpful training. Speakers were
19   brought in. I don't know exactly what those speakers
20   would have spoken on, but all that was done throughout
21   the years.
22   Q. Who would give the updates on the law?
23   A. Usually the principal, whatever he would get
24   through the school legal counsel or he knew.

---

Page 44

1    Q. And who would the speakers at these meetings
2    be besides Mr. Clymer?
3    A. Just trained people in those fields that were
4    being discussed, was medical, was a nurse, that kind of
5    a thing.
6    Q. A school nurse?
7    A. Yes.
8    Q. Were there any outside speakers ever brought
9    in?
10   A. I think so. I can't recall who exactly it
11   would have been at this point.
12   Q. Okay. Under the sexual harassment policy,
13   subparagraph 2C states, "Sexual harassment includes
14   making unwelcome sexual advances, engaging in improper
15   physical contact, making improper comments or innuendo,
16   or otherwise creating an intimidating, hostile or
17   offensive educational learning environment."
18        Were you familiar with that section back in
19   2009?
20   A. Yes.
21   Q. Was it your understanding or were you ever
22   taught by anybody at FCA that simply making improper
23   comments or innuendo for a student was considered
24   sexual harassment?

11 (Pages 41 to 44)

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                                    July 28, 2015

Page 45

1    A. Yes.
2    Q. But there did not have to be any physical
3 contact between the employee or the student for it to
4 be sexual harassment?
5    A. Correct.
6    Q. Did you understand that, if you had become
7 aware of any sexual comments or innuendo to students by
8 any of the staff people or employees at FCA, that you
9 had a responsibility to report that to somebody?
10    A. Yes.
11    Q. And who would you have been reporting that to
12 in 2009?
13    A. The principal.
14    Q. Mr. Clymer.
15    A. Yes.
16    Q. Have you ever conducted an investigation of
17 alleged child abuse by a school employee?
18    A. Have I --
19    Q. Separate --
20    A. Have I conducted an investigation?
21    Q. Separate and apart from the Emily Mayer
22 situation, which we already talked to.
23       Have you ever conducted or helped to conduct
24 another investigation of an alleged child abuse or

Page 46

1 harassment?
2    A. No.
3    Q. After the Emily Mayer situation at the end of
4 2009, beginning of 2010, did FCA do anything
5 differently than it had done before with regard to
6 informing its employees about the sexual harassment
7 policy and how to spot or report sexual harassment or
8 abuse of children?
9    A. Did I do anything differently?
10    Q. Yes, anything different than before the Emily
11 Mayer allegations.
12    A. I can't recall.
13    Q. Okay. Do you know whether or not FCA ever
14 required its employees to sign some type of
15 acknowledgment, a written document, that they had
16 actually received or reviewed and read the middle and
17 high school student/parent guide?
18    A. To sign?
19    Q. Yes, an acknowledgment, a form saying "I
20 received" or "I've read a copy of the parent/student
21 guide."
22    A. No.
23    Q. Did you ever receive any such form or give any
24 written acknowledgment to anybody that you had received

Page 47

1 or read the guidelines?
2    A. Not that I recall.
3    Q. Okay. Do you know whether or not a copy of
4 this guide was ever given to Eric Romig during his term
5 of employment at FCA?
6    A. A copy of this guide? I don't know.
7    Q. Okay. You would not have given it to him,
8 correct?
9    A. No.
10    Q. You don't know if Mr. Clymer gave it to him,
11 correct?
12    A. I don't know.
13    Q. Do you know if there was any direction given
14 to Mr. Romig by anybody at FCA to go online and
15 actually look at and read the guide, including the
16 sexual harassment policy?
17    A. I don't know.
18    Q. You didn't give him such an instruction, did
19 you?
20    A. I did not.
21    Q. Nor any other coach, correct?
22    A. No.
23    Q. Let's talk a little bit about your history
24 with Eric Romig and Mr. Romig's family. When did you

Page 48

1 first meet Eric Romig?
2    A. He would have been an elementary student at
3 Faith Christian.
4    Q. You said at Faith Christian?
5    A. At Faith Christian.
6    Q. Oh, I'm sorry.
7    A. I'm sorry.
8    Q. I thought it was a different school.
9    A. No.
10    Q. Were you a teacher of his?
11    A. Yes.
12    Q. Were you a coach of his?
13    A. Yes.
14    Q. Do you know what grade you started with him as
15 a teacher or coach?
16    A. Middle school.
17    Q. Those are what years at FCA, seven through
18 nine?
19    A. Yes, seven through nine. It would have
20 probably been seven through nine.
21    Q. Did you coach him?
22    A. Yes.
23    Q. In what sports?
24    A. Middle school boys soccer.

12 (Pages 45 to 48)

Russell L. Hollenbach, Jr.                Nace vs. Pennridge School District
July 28, 2015

Page 49

1    Q.  Anything else?
2    A.  No.
3    Q.  Okay. What about in high school? What
4  contact, if any, did you have with Eric Romig?
5    A.  Physical education and health class.
6    Q.  Did you coach him in any sport?
7    A.  In high school, no.
8    Q.  Did you know his family?
9    A.  Yes.
10   Q.  Who did you know in his family?
11   A.  His parents and his siblings.
12   Q.  That would include his sister, Kelly?
13   A.  Yes.
14   Q.  When did you first meet her?
15   A.  At the same time when they all enrolled in our
16  school.
17   Q.  And she was a year younger than he was?
18   A.  I'm not sure.
19   Q.  Did you ever teach or coach her?
20   A.  Never coached her. I would only have taught
21  her middle-school bible.
22   Q.  Did you socialize with the Romig family at
23  all?
24   A.  What do you mean by "socialize"?

Page 50

1    Q.  Socialize: Did you go out to picnics? Did you
2  go to movies? Did you visit each other's houses? Did
3  you do any joint activities together, your family and
4  the Romig family?
5       MR. KEMETHER: Including through the
6  church itself?
7       MR. GROTH: Yes, including.
8       THE WITNESS: Yes, we attended the same
9  church, so we would have attended the same
10  activities of the church.
11      MR. GROTH: Okay.
12 BY MR. GROTH:
13   Q.  Such as? What type of activities?
14   A.  After-church socials, a church trip to the
15  Phillies game, something like that.
16   Q.  How about outside of church, church events or
17  church-sponsored activities? Did you socialize with
18  the Romig family for that type of activity?
19   A.  His parents or his mom did baby-sit my
20  children on a few occasions.
21   Q.  Anything else?
22   A.  No.
23   Q.  What position were you in at the school
24  between 1996 and 1998?

Page 51

1    A.  The same: Athletic director, PE teacher.
2    Q.  At some point did you become aware of a child
3  sexual abuse situation involving Kelly Romig at FCA?
4    A.  Yes.
5    Q.  When did you first become aware of that?
6    A.  It was after she had graduated. She had --
7  she told people that something happened while she was
8  attending high school and there was an investigation
9  pursuant to her claims.
10   Q.  An investigation by whom?
11   A.  I don't know.
12   Q.  Anybody at FCA?
13   A.  I don't believe so, only because she was no
14  longer a student and that person was no longer a
15  teacher.
16   Q.  The teacher we're talking about was John
17  Longaker? Is that correct?
18   A.  Yes.
19   Q.  Do you know Mr. Longaker?
20   A.  Yes.
21   Q.  How long did you know him?
22   A.  The years he was employed at Faith Christian
23  Academy.
24   Q.  Do you know when he started?

Page 52

1    A.  I don't know when he started.
2    Q.  Was he there for a number of years before
3  1996?
4    A.  Probably a few, yes.
5    Q.  Do you know when he left FCA?
6    A.  I can't say the exact year.
7    Q.  Do you know whether or not he left at the same
8  time or close to the same time when Kelly Romig
9  graduated from FCA?
10   A.  Yes, close, around the same time.
11   Q.  Was there any discussion at FCA that you were
12  aware of during that time as to why he was leaving the
13  school at that time?
14   A.  No discussion as to why he was leaving.
15   Q.  How well did you know him?
16   A.  As a coworker.
17   Q.  Did you socialize with him at all or his
18  family?
19   A.  No.
20   Q.  Did you ever coach Kelly Romig in any sport?
21   A.  No.
22   Q.  Did she play any sport?
23   A.  I can't remember, to be honest.
24   Q.  Do you know if Mr. Longaker left FCA on his

13 (Pages 49 to 52)

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                              July 28, 2015

Page 53

1   own voluntarily, or was he terminated for some reason?
2       A.  On his own terms.
3       Q.  How do you know that?
4       A.  That's just to my knowledge.  He just didn't
5   come back to teach.  I never heard anything otherwise,
6   that he just left.
7       Q.  Who was the principal back then?
8       A.  Tim Kuhn, I think.
9       Q.  Spell that last name?
10      A.  K-u-h-n.
11      Q.  And the pastor was Paul Auckland?
12      A.  Yes.
13      Q.  When Mr. Longaker decided to leave FCA, do you
14  know whether or not that was expected or anticipated by
15  staff or teachers or yourself?
16      A.  No, there was -- no, there was no expectation
17  of it.
18      Q.  Were there ever any rumors or innuendo or
19  gossip going around the school that he was involved
20  with one of the students in an inappropriate sexual
21  way?
22      A.  Any rumors or gossip?
23      Q.  Yes.  Did you ever hear anything from any
24  source to indicate that he may have been

Page 54

1   inappropriately sexually involved with a student?
2       A.  I never heard anything.
3       Q.  Did you follow media reports of his criminal
4   charges and sentencing?
5       A.  I did not follow it very closely.
6       Q.  Did you ever obtain information from any
7   source, media or someone at the school, that he had
8   been sexually involved with Kelly Romig from the age of
9   fourteen until the time she graduated FCA?
10      A.  I was told that's what happened.
11      Q.  Who told you that?
12      A.  I can't recall.
13      Q.  Were you told by anyone or find out from any
14  source of information that some of those sexual
15  activities took place in empty classrooms at FCA?
16      A.  That's what I heard or was told.
17      Q.  I think you said that she didn't report this
18  to the authorities, to the public authorities, until
19  sometime after she graduated from the school.  Isn't
20  that your recollection?
21      A.  That's my recollection.
22          MR. SANTARONE:  Objection to the form.
23      His answer was "some people."  She didn't tell any
24      people until after she graduated.

Page 55

1   BY MR. GROTH:
2       Q.  And the first that you became aware of the
3   situation was sometime after she graduated, a year or
4   two after she graduated?
5       A.  That is correct, yes.
6       Q.  Do you know at that time, after you became
7   aware of the situation, through whatever source --
8   media reports, scuttlebutt in the hallway, whatever --
9   do you know if FCA contacted any investigation into
10  that situation?
11      A.  Do I know if FCA conducted an investigation?  I
12  don't know of any investigation.
13      Q.  Do you know whether or not FCA took any steps
14  at all to try to determine whether or not Kelly Romig
15  was the only student that Mr. Longaker had sexually
16  abused and exploited at FCA?
17      A.  I don't know.
18      Q.  You certainly didn't participate in any such
19  activity, correct?
20      A.  No.
21      Q.  Did you ever talk to Kelly Romig about the
22  situation between her and Mr. Longaker?
23      A.  No.
24      Q.  Had you ever talked to her since she graduated

Page 56

1   from the school?
2       A.  Just in general?  In passing?
3       Q.  Yes.
4       A.  Yes.
5       Q.  When was the last time you spoke to her?
6       A.  I couldn't say.  It may be in the store where
7   she works or shopping with my wife.
8       Q.  Where does she work?
9       A.  Department store, Kohl's or something like
10  that.
11      Q.  Where?
12      A.  Quakertown, might have been.
13      Q.  Quakertown/Coopersburg area?
14      A.  Yes.
15      Q.  Is she a member of the church, Faith Baptist
16  Church?
17      A.  I don't believe so.
18      Q.  Did she ever talk to you about her situation
19  with Mr. Longaker?
20      A.  No, she never did.
21      Q.  Did she ever talk to you about Eric Romig's
22  situation at FCA?
23      A.  No.
24      Q.  Did she ever talk to you about Eric Romig's

14 (Pages 53 to 56)

Russell L. Hollenbach, Jr.               Nace vs. Pennridge School District
                                July 28, 2015

|  | Page 57 |
|---|---|

1  situation with my client at Pennridge?
2    A.  No.
3    Q.  After Kelly Romig's situation with Mr.
4  Longaker became known at FCA, did FCA do any special or
5  extra or additional training with regard to its sexual
6  harassment policy in terms of spotting it, reporting
7  it, investigating it or resolving it?
8    A.  I can remember some discussion more of a
9  teacher, more from the idea of protecting yourself as a
10  teacher, not to be alone in a room with a student, that
11  type of thing.
12    Q.  Was there any discussion about doing something
13  extra to protect the children in the school?
14    A.  I believe at that point glass windows were
15  installed in all the doors so that people could see in
16  to help...
17    Q.  Did you receive any additional training on how
18  to spot the signs of potential sexual abuse or
19  exploitation of students?
20    A.  Specific training?
21    Q.  Yes.
22    A.  I can't recall specific training.
23    Q.  Now, Mr. Romig was hired as a basketball coach
24  at FCA, correct?

|  | Page 58 |
|---|---|

1    A.  Correct.
2    Q.  That's girls basketball.
3    A.  Correct.
4    Q.  Do you know when he started there in that
5  position?
6    A.  The exact year?
7    Q.  Approximately.
8    A.  2004, 2005, somewhere around there.
9    Q.  Did he coach any other sports besides that?
10    A.  Assistant baseball coach, boys.
11    Q.  Anything else?
12    A.  No.
13    Q.  He was never a teacher there, correct?
14    A.  Correct.
15    Q.  Do you recall who hired him, who hired Mr.
16  Romig to be a coach originally?
17    A.  The principal at that time.
18    Q.  Who was?
19    A.  That would have been Mr. Bob Clymer.
20    Q.  Did you have anything to do with his hiring?
21    A.  Yes.
22    Q.  What part did you play?
23    A.  I had my opinion, my input as to the person,
24  his qualifications.

|  | Page 59 |
|---|---|

1    Q.  You don't make the final decision, though,
2  correct? The principal does.
3    A.  Correct.
4    Q.  Prior to the Emily Mayer allegations in
5  December of 2009, did you know whether or not Mr. Romig
6  was coaching at any other school other than FCA?
7    A.  Yes.
8    Q.  And what did you know?
9    A.  He coached girls softball at Quakertown High
10  School.  I'm not sure of the time line.  I believe that
11  was before or at the same time he was coaching at
12  Faith.
13    Q.  Was that an issue at all with you?
14    A.  No.
15    Q.  As long as he could make time for both, it was
16  okay?
17    A.  Correct.
18    Q.  Did you check with anybody at Quakertown High
19  School to find out any information about Mr. Romig
20  before he was hired at FCA?
21    A.  No.
22    Q.  Is that part of your hiring process normally,
23  that you would check with a previous employer to find
24  out if there is any problems, issues, complaints or

|  | Page 60 |
|---|---|

1  even obviously good information that you could get
2  about a prospective employee?
3    A.  I'm not sure it was my place to do that.
4    Q.  Do you know if the principal did it?
5    A.  I don't know if he did or did not.
6    Q.  Prior to the allegations by Emily Mayer in
7  December of 2009, did you know whether or not Mr. Romig
8  had any heart problems or any health problem?
9    A.  Yes.
10    Q.  When did you learn that?
11    A.  I can't say exactly when.  When he was first
12  coaching he said he had some health issues, but we just
13  talked about it from a coaching standpoint, that he
14  could physically still do it and he was having tests.
15  And as far as I remember, it was okay.
16    Q.  Leading up to December 2009, did you learn of
17  any specific health problems or physical issues that
18  Mr. Romig was having?
19    A.  I didn't know of any specific reasons.
20    Q.  Did Mr. Romig tell you that he had had some
21  type of heart procedure in the early fall of 2009 to
22  address a health problem?
23    A.  I can't recall him telling me that.
24    Q.  Do you recall him coming to you between

                                    15  (Pages 57 to 60)

Appendix 0346

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
July 28, 2015

Page 61

1    September of 2009 and the allegations by Emily Mayer in
2    December of 2009 and telling you that he was having
3    some health problems and some physical issues resulting
4    from that health problem?
5        A.  I can't recall.
6        Q.  Did you ever physically observe that yourself,
7    that he was having some health problems or issues that
8    would affect his coaching ability?
9        A.  No.
10       Q.  When is the first time that you learned that
11   Mr. Romig had some specific physical issues relating to
12   a health problem in the year 2009?
13           MR. KEMETHER: Object to the form.  Just
14       to clarify:  I understood the man to say that he
15       learned before 2009.  That was his earlier
16       testimony.  The question you just asked I
17       understood to mean when did he learn in 2009.
18           MR. GROTH:  Yes. I think Mr. -- and you
19       can correct me if I'm wrong -- Mr. Hollenbach said
20       that he knew of some health issues that Mr. Romig
21       had over the years, which could have been before
22       2009, then I asked him to be more specific and
23       tell me if he knew of any health issues
24       specifically between the fall and December of

Page 62

1    2009.
2           MR. KEMETHER: Okay.
3    BY MR. GROTH:
4        Q.  And the answer was no, you didn't know of any.
5        A.  Didn't know of any.
6        Q.  Or see any yourself.
7        A.  Correct.
8        Q.  At some point at or around the time of Emily
9    Mayer's allegations against him, did you ever learn
10   that Mr. Romig was having or complaining of certain
11   health problems?
12       A.  No.
13       Q.  Up until you and Mr. Clymer met with Mr. Romig
14   during the first few days of 2010, in January, and call
15   him in to talk about the results of the investigation
16   of the Emily Mayer allegations, did you have any
17   information at all about health problems that Mr. Romig
18   was having?
19       A.  I had no information.
20       Q.  Did you learn at that meeting of any health
21   problems he was having?
22       A.  I don't recall that being discussed.
23       Q.  But do you recall him submitting a letter of
24   resignation on January 5th, 2010 for health reasons?

Page 63

1        A.  Yes.
2        Q.  Is that the first time that you learned from
3    him or from anybody else that Mr. Romig had some health
4    issues that required him to stop coaching?
5        A.  It's not the first time I knew he had health
6    issues, if that's what you're asking.
7        Q.  That wasn't what I was asking.  I asked you
8    whether or not that was the first time that you heard
9    that he had health issues that required him to stop
10   coaching.
11       A.  No.
12       Q.  Was that the first time that you heard that?
13       A.  That's the first time, yes.
14       Q.  Just want to make sure we're on the same page.
15   So, during the time -- and I think it was like a
16   ten-day period or two-week period -- where Mr. Clymer
17   was investigating the Emily Mayer allegations, there
18   was no information developed that you were aware of
19   that indicated that Mr. Romig was having health
20   problems that would prevent him from coaching.  Is that
21   correct?
22       A.  Correct.
23       Q.  Back in 2009, how would you characterize your
24   relationship with Eric Romig?

Page 64

1        A.  Friendly, casual.  I was the athletic
2    director; he was a coach.  So, there was some -- I
3    don't want to say employer-employee, but something
4    where I was his supervisor.
5        Q.  Did you consider him a good friend?
6        A.  A good friend?
7        Q.  Yes, as opposed to a business acquaintance.
8        A.  We were friends.
9        Q.  Do you know if he considered you to be a good
10   friend back in 2009?
11       A.  I don't know what he would have considered it
12   to be.
13       Q.  What's your relationship with Mr. Romig now?
14       A.  Now? I haven't had any contact in a while, so
15   there isn't much of a relationship right now.
16       Q.  Well, since he went to prison he wrote you a
17   number of letters, correct?
18       A.  Correct.
19       Q.  Did you respond?
20       A.  I responded to one, yes.
21       Q.  How did you respond? Email, text --
22       A.  I wrote a letter. I answered his first letter.
23   I wrote a letter.
24       Q.  Do you have a copy of that letter?

16 (Pages 61 to 64)

Appendix 0347

Russell L. Hollenbach, Jr.                 Nace vs. Pennridge School District
                                July 28, 2015

|                                                Page 65 |
| --- |
| 1      A.  I do not. |
| 2      Q.  That was in response to his first letter to |
| 3  you? |
| 4      A.  Yes. |
| 5      Q.  How long was your letter? |
| 6      A.  Very short, a paragraph. |
| 7      Q.  Okay.  And basically, just summarize for me |
| 8  what you said in that letter. |
| 9      A.  Just acknowledging that I received his letter |
| 10  and probably answered a couple of questions he might |
| 11  have asked. |
| 12      Q.  About what? |
| 13      A.  I probably didn't hate him or didn't hold it |
| 14  against him, or something along those lines. |
| 15      Q.  Is that what you said to him, that you didn't |
| 16  hate him or hold anything against him? |
| 17      A.  Correct. I wasn't upset with him. |
| 18      Q.  Anything else that you put in the letter that |
| 19  you can recall? |
| 20      A.  Not that I can recall. |
| 21      Q.  That was the only letter you sent to him? |
| 22      A.  Yes. |
| 23      Q.  No emails? |
| 24      A.  I know his mom gave me access to his email.  I |

|                                                Page 66 |
| --- |
| 1  can't recall if I used it, though. |
| 2      Q.  Did you do anything of a social nature with |
| 3  Mr. Romig back in 2009? |
| 4      A.  We were in the same fantasy baseball league. |
| 5      Q.  That's Strat-O-Matic? |
| 6      A.  Correct. |
| 7      Q.  Anything else beside that? |
| 8      A.  No. |
| 9      Q.  And you kept involved in that activity with |
| 10  him until 2013, when he was arrested? |
| 11      A.  He quit before that. |
| 12      Q.  But it was for a number of years. |
| 13      A.  Yes. |
| 14      Q.  And Marc Hoover, an assistant coach, a former |
| 15  assistant coach at FCA, was also in that league? |
| 16      A.  Yes. |
| 17      Q.  Is he still at FCA, Marc Hoover? |
| 18      A.  He coached this past spring.  I think that |
| 19  was -- but he was no longer coaching at this point. |
| 20      Q.  Back in 2009, at the time of the Emily Mayer |
| 21  investigation, did you consider Mr. Romig to be a |
| 22  truthful or honest person? |
| 23      A.  Yes. |
| 24      Q.  Do you consider him to be truthful or honest |

|                                                Page 67 |
| --- |
| 1  person now? |
| 2      A.  Yes. |
| 3      Q.  Has he ever lied to you, that you know of? |
| 4      A.  Not that I know of. |
| 5      Q.  Did he ever lie to Mr. Clymer? |
| 6      A.  Did I? |
| 7      Q.  Did he. |
| 8      A.  Did he? |
| 9      Q.  That you know of. |
| 10      A.  Not that I know of. |
| 11      Q.  Did you know Emily Mayer prior to her |
| 12  allegation against Mr. Romig back in 2009? |
| 13      A.  Only as a student at our school. |
| 14      Q.  Do you teach her? |
| 15      A.  No. |
| 16      Q.  Did you know her by sight? |
| 17      A.  Yes. |
| 18      Q.  Did you know her by name? |
| 19      A.  Yes. |
| 20      Q.  She was a student athlete? |
| 21      A.  Yes. |
| 22      Q.  Playing what sport? |
| 23      A.  She played volleyball and basketball. |
| 24      Q.  And soccer? |

|                                                Page 68 |
| --- |
| 1      A.  I don't think so. |
| 2      Q.  She never played soccer? |
| 3      A.  I can't recall if she did or didn't. |
| 4      Q.  Did you ever have any reason to believe that |
| 5  she was not an honest or truthful person back in 2009? |
| 6      A.  Do I have any reason. . . |
| 7      Q.  Did you back then have any reason to believe |
| 8  that she was not an honest and truthful person back in |
| 9  2009? |
| 10      A.  I had no reason. |
| 11      Q.  By that I mean did you -- |
| 12      A.  Go ahead. |
| 13      Q.  -- did you receive any information from any |
| 14  source -- from any other students or faculty of |
| 15  whatever -- indicating to you that she is not an honest |
| 16  person? |
| 17      A.  No. |
| 18      Q.  Did you do periodic evaluations of Mr. Romig |
| 19  as a coach? |
| 20      A.  By "periodic" you mean once a year -- |
| 21      Q.  On a regular basis. |
| 22      A.  At the end of the season we would meet. |
| 23      Q.  Who meets? |
| 24      A.  The coach and myself. |

                                    17  (Pages 65 to 68)

                                             Appendix 0348

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
July 28, 2015

| Page 69 | Page 71 |
|---|---|

**Page 69**

1    Q.  Right.  And?
2    A.  To review his season.
3    Q.  Okay.  Do you report your own thoughts or
4  evaluation of your coach's activities to anybody else?
5  In other words, do you prepare any type of report to
6  give to Mr. Clymer or anybody else?
7    A.  No.
8    Q.  Were there ever any written evaluations?
9    A.  No.
10    Q.  Did you ever have any complaints about Mr.
11  Romig and his coaching activities prior to Emily
12  Mayer's accusations?
13    A.  None that I can recall.
14    Q.  Was there any FCA handbook or guidelines given
15  to its coaches?
16    A.  Yes.
17    Q.  What did that consist of back in 2009?
18    A.  It had school policies related to athletics.
19    Q.  Only athletics.
20    A.  I believe so.
21    Q.  Covering what type of topics?
22    A.  Topics related to coaching, everything from,
23  you know, practices and games and, you know, traveling
24  and. . .

**Page 70**

1    Q.  Was there anything listed in that handbook or
2  guide relating to sexual harassment or abuse of
3  students?
4    A.  I can't remember exactly what was all in that
5  at this point.
6    Q.  Is the guide today any different from what it
7  was back in 2009?
8    A.  I'm not sure.
9    Q.  As of the time you left in 2014 was it
10  different from what it was in 2009?
11    A.  I can't say.
12    Q.  Would it -- I'm sorry, I interrupted you.
13    A.  Go ahead.
14    Q.  What did it look like?  A pamphlet?  A binder?
15  What?
16    A.  It was a binder.
17    Q.  How many pages, approximately?
18    A.  Fifteen, twenty.
19        MR. GROTH:  I'm going to ask for a copy
20    from FCA's counsel of the -- what is it called?
21    What specifically would you call it?
22        THE WITNESS:  A coach's handbook,
23    possibly.
24        MR. GROTH:  (Continuing) -- for 2000.

**Page 71**

1        I'll put that in writing after the deposition.
2        MR. KEMETHER:  Thank you.
3  BY MR. GROTH:
4    Q.  Were there any prohibitions about coaches
5  transporting athletes to and from games in their own
6  vehicles?
7    A.  Prohibition?  No, because most transportation
8  was through school transportation.
9    Q.  Do you know of any coach that transported kids
10  to or from games in their own vehicles?
11    A.  It's possible with varsity baseball.
12    Q.  Did you ever do that when you were coaching?
13    A.  I never transported students in my vehicle.
14    Q.  As athletic director at FCA, did you have to
15  interface with the PIAA in any way?
16    A.  Yes.
17    Q.  In what way?
18    A.  Attended the yearly meeting for our district.
19    Q.  What district was that?
20    A.  District 1.
21    Q.  Where was that usually held?
22    A.  At the Westover Golf Club in Morristown or
23  somewhere there.
24    Q.  And who typically would attend that type of

**Page 72**

1  yearly meeting?
2    A.  Athletic directors and principals.
3    Q.  How about coaches?
4    A.  No.
5    Q.  Between the years of 2006 and 2010, would you
6  go to that yearly meeting?
7    A.  Yes.
8    Q.  Did you go with Mr. Clymer?
9    A.  Some years he went; some years he did not.
10    Q.  Did you ever go to with any other coaches?
11    A.  No.
12    Q.  What types of things were discussed at those
13  meetings?
14    A.  Updated rules changes.
15    Q.  Anything else?
16    A.  Any other general news that they -- any
17  updates they felt that the ADs needed to know.
18    Q.  Was there ever any discussion or training or
19  seminar with regard to the issue of coaches sexually
20  abusing or harassing their athletes?
21    A.  At that meeting?
22    Q.  At any meetings prior to, say, 2009, when
23  Emily Mayer made her allegations.
24        MR. KEMETHER:  Any PIAA meetings.

18  (Pages 69 to 72)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                    July 28, 2015

| Page 73 | Page 75 |
|---|---|
| 1          MR. GROTH: Yes.<br>2          THE WITNESS: No, not that I recall.<br>3   BY MR. GROTH:<br>4      Q.  Did they ever distribute any fliers,<br>5   information, pamphlets, any type of written, published<br>6   material regarding coaches involved with their<br>7   students?<br>8      A.  No.<br>9      Q.  And athletes?<br>10     A.  (No response)<br>11     Q.  Nothing?<br>12     A.  Nothing.<br>13     Q.  Up until the time of Emily Mayer's allegation<br>14  against Eric Romig, had you ever heard of any local<br>15  coaches sexually abusing or harassing their players?<br>16     A.  At what time?<br>17     Q.  Any time prior to Emily Mayer's allegations in<br>18  2009.<br>19     A.  I can't recall any one specific, no.<br>20     Q.  What about after 2009?<br>21     A.  Yes.<br>22     Q.  Other than the allegation Emily Mayer made<br>23  against Mr. Romig, do you recall any specific cases<br>24  that you heard about? | 1      A.  September.<br>2      Q.  September?  Would it be fair to say that the<br>3   majority of the athletic directors are male?<br>4      A.  The majority, yes.<br>5      Q.  Are there any female athletic directors?<br>6      A.  Yes.<br>7      Q.  Back in 2009 were there any female athletic<br>8   directors?<br>9      A.  Yes.<br>10     Q.  What percentage would you say of the total?<br>11     A.  Less than ten of those fifty or a hundred.<br>12     Q.  And can I assume that this was a full-day<br>13  activity, like a golf outing and --<br>14     A.  No.<br>15     Q.  Just meetings?<br>16     A.  Just the morning, like nine to noon.<br>17     Q.  Then what?<br>18     A.  That's it, it was over.<br>19     Q.  Oh, no lunch?  No nothing?<br>20     A.  No lunch.  There were some more meetings, but<br>21  it was for the executives.<br>22     Q.  The administrators?<br>23     A.  The league representatives, things like that.<br>24     Q.  Did you socialize with any of the athletic |

| Page 74 | Page 76 |
|---|---|
| 1      A.  At Delaware County Christian, Central Bucks<br>2   School District?  I saw a few of those in the news.<br>3      Q.  Okay.<br>4      A.  In the newspaper.<br>5      Q.  How did you become aware of the ones at the<br>6   two schools that you mentioned?  That was through news<br>7   accounts or somebody at the schools?<br>8      A.  News accounts.<br>9      Q.  Okay.<br>10         THE VIDEOGRAPHER:  That concludes DVD<br>11  number one.  The time is 11:31.  We are off the<br>12  record.<br>13         (A brief recess was taken)<br>14         THE VIDEOGRAPHER:  Stand by please.<br>15  This begins DVD number two.  The time is 11:42<br>16  a.m. We are on the record.<br>17  BY MR. GROTH:<br>18     Q.  Mr. Hollenbach, we were talking about your<br>19  activities with the PIAA as athletic director for FCA.<br>20         Approximately how many athletic directors or<br>21  principals would attend these conferences once a year?<br>22     A.  Fifty to a hundred.<br>23     Q.  And what time of the year was a conference<br>24  generally held?  In the summer -- | 1   directors or principals when you were at these<br>2   meetings?<br>3      A.  A little bit, yes.<br>4      Q.  Of the fifty to a hundred athletic directors<br>5   that would attend on a yearly basis -- and you started<br>6   doing this when, what year?<br>7      A.  I started in 1983, but we did not join the<br>8   PIAA until '98.<br>9      Q.  '98.  So, that's when you started going to the<br>10  meetings?<br>11     A.  Yes.<br>12     Q.  So, up until Emily Mayer's allegations, you<br>13  had been going to these meetings for ten years?<br>14     A.  Yes.<br>15     Q.  And you continued to go to them all the way up<br>16  until you retired from FCA in 2014.<br>17     A.  Yes.<br>18     Q.  How many of the athletic directors would you<br>19  estimate that you knew personally?  By "personally" I<br>20  mean by name and could talk to them or whatever.<br>21     A.  Half.<br>22     Q.  And would the athletic directors, when they<br>23  met for this yearly meeting, would they talk about<br>24  things among each other that might be of interest to |

19  (Pages 73 to 76)

Appendix 0350

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
July 28, 2015

Page 77

1    different schools?
2        For example, coaches they had hired, coaches
3    they were thinking about hiring, any type of personnel
4    issues like that.
5        A.  I never heard any personnel-conversation
6    issues.
7        Q.  Over the years you must have hired a lot of
8    coaches for FCA, right?
9        A.  Not a lot.
10       Q.  Really? How many would you estimate?
11       A.  Well, defining "a lot" -- I wouldn't define it
12   as a lot.  Maybe ten or fifteen.
13       Q.  Total in all your years there?
14       A.  A lot of the coaches coached a long time.
15       Q.  Let me qualify that by saying that you didn't
16   actually make the hiring decisions.  Somebody above you
17   did, but you had a hand in it.
18       A.  Correct.
19       Q.  And for any of those twelve or fifteen, or
20   whatever the actual number is, coaches that you were
21   involved in the hiring process for, did you ever
22   discuss those prospective employees with other athletic
23   directors?
24       A.  Not that I recall.

Page 78

1        Q.  During your involvement with the PIAA
2    meetings, did you ever meet an athletic director named
3    David Babb?
4        A.  Yes.
5        Q.  When did you first meet him?
6        A.  When he was the athletic director at Plumstead
7    Christian.
8        Q.  Do you know approximately what year that was?
9        A.  I can't say approximately.  Late '80s, maybe,
10   maybe early '90s.
11       Q.  Did he move around from school to school?
12       A.  To my knowledge, he went from Plumbstead to
13   Quakertown High School, then to Pennridge High School.
14       Q.  Would you see him at these annual meetings of
15   the PIAA?
16       A.  Sometimes.
17       Q.  But when he moved to Quakertown and Pennridge,
18   was he also in the position of athletic director at
19   those schools, also?
20       A.  Yes.
21       Q.  Did you ever meet or have any social contact
22   with David Babb outside of PIAA meetings?
23       A.  No.
24       Q.  Nothing social at all?

Page 79

1        A.  No.
2        Q.  Do you recall seeing David Babb at the annual
3    PIAA meeting in September of 2013?
4        A.  No.
5        Q.  How about September of 2012?
6        A.  I can't say what year I would have seen him or
7    spoke to him.
8        Q.  Do you have any recollection of discussing
9    Eric Romig with David Babb at any time?
10       A.  I have no recollection.
11       Q.  So, if Mr. Babb were to testify that he had a
12   recollection of speaking to you about Eric Romig, you
13   wouldn't say he's not telling the truth because you
14   don't recall either way, correct?
15       A.  I don't recall either way.
16       Q.  You could have had a conversation with him
17   about Mr. Romig.
18       A.  I don't recall if I did or didn't.
19       Q.  When is the last time you talked to Mr. Babb
20   about anything?
21       A.  It would have to go back to our girls
22   basketball played in the Pennridge High School
23   tournament.  I couldn't even say what year.  Maybe 2000
24   or something, or early 2000s.

Page 80

1        Q.  Do you recall what you talked about?
2        A.  Just if our team was going to enter the
3    tournament or not.
4        Q.  Had you ever talked to him about any issues
5    relating to this lawsuit?
6        A.  No.
7        Q.  Have you ever talked to him or had any
8    communication with him after 2014, when you left FCA?
9        A.  No.
10       Q.  We're going to talk now about the Emily Mayer
11   accusations and investigation.  First of all, how did
12   you learn of the accusations and allegations that she
13   was making with regard to Mr. Romig?
14       A.  Through my principal.
15       Q.  How did you learn that from your principal?
16       A.  He told me.
17       Q.  Do you remember where you were?
18       A.  No.
19       Q.  When did he tell you, as specifically as you
20   can recall? What did he tell you that Emily Mayer had
21   said about Eric Romig?
22       A.  Just that Emily accused Eric of sending text
23   messages.
24       Q.  That's all you remember?

20  (Pages 77 to 80)

Appendix 0351

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                              July 28, 2015

| | |
|---|---|
| **Page 81** | **Page 83** |

**Page 81**

1   A.  Yes.
2   Q.  Was there any prohibition about sending text
3   messages between coaches and players at that time?
4   A.  Not at that time.
5   Q.  Well, then why would that be something that
6   would have to be investigated, if that's all you were
7   told?
8           MR. KEMETHER: Objection to form. You
9   can answer if you're able.
10          THE WITNESS: Say that again?
11          MR. GROTH:  Yes.
12  BY MR. GROTH:
13  Q.  If there is no prohibition about sending text
14  messages between coaches and players and all you were
15  told by Ryan Clymer was that there were text messages
16  going from Mr. Romig to Emily Mayer, why was that an
17  issue?
18          MR. KEMETHER: Objection to form. You
19  can answer if you're able.
20          THE WITNESS: Her boyfriend made an
21  issue of it, that there was -- they were either
22  annoyed or bothered or offended. I'm not sure,
23  but. . .
24  BY MR. GROTH:

**Page 82**

1   Q.  Who is her boyfriend?
2   A.  Chase Brunner.
3   Q.  Do you know Chase Brunner?
4   A.  Yes.
5   Q.  How did you know him?
6   A.  He was a student.
7   Q.  Did you teach him?
8   A.  No.
9   Q.  Was he in athletics?
10  A.  Yes.
11  Q.  Basketball?
12  A.  Yes.
13  Q.  Anything else?
14  A.  No.
15  Q.  Did you ever coach him?
16  A.  No.
17  Q.  You knew him by name or by sight?
18  A.  By name.
19  Q.  And by sight?
20  A.  Yes.
21  Q.  Did Mr. Clymer -- when you first were told of
22  these allegations by Emily Mayer, did Mr. Clymer say
23  exactly what Chase Brunner told him?
24  A.  Did he tell me what Chase Brunner told him.

**Page 83**

1   Q.  Yes.
2   A.  I can't recall.
3   Q.  Did Ryan Clymer, when you had this -- strike
4   that.  How long after Emily Mayer reported these
5   allegations to Ryan Clymer did he speak to you?
6   A.  I'm not sure.  The same day or the next day.
7   Q.  Were you at the school building every school
8   day?
9   A.  Yes.
10  Q.  So, you told me that he told you that --
11  strike that.  You told me that Mr. Clymer informed you
12  that Chase Brunner was making an issue out of texts
13  that were being sent from Romig to Mayer, correct?
14  A.  Correct.
15  Q.  And that's all he told you about it?
16  A.  That's all I recall, yes.
17  Q.  Did Mr. Clymer tell you that he had already
18  seen and talked to or interviewed Emily Mayer about
19  these texts?
20  A.  I don't recall if he told me if he spoke to
21  Emily.
22  Q.  Did he ever tell you that a mother of one of
23  the students at the school, Cheryl Olderfer, actually
24  brought Emily Mayer to his office to report these

**Page 84**

1   allegations because she had heard of the allegations?
2   A.  I have no knowledge of that.
3   Q.  Did Mr. Clymer tell you -- and again we're
4   only talking about the first time he told you about
5   this investigation that he was doing -- did he tell you
6   whether or not the complaint was not just about an
7   excessive number of texts, but was about the content of
8   the texts because some of them were inappropriate and
9   of a sexual nature?
10  A.  No, he did not specifically -- he was not
11  specific about the content.
12  Q.  Did he say anything to you about the quantity
13  or number of texts that Mr. Romig was sending to Emily
14  Mayer?
15  A.  The first time?
16  Q.  Yes.
17  A.  No.
18  Q.  So, when he told you that there was an issue
19  about texting between Romig and Mayer that her
20  boyfriend complained about -- and it was your
21  understanding that he had talked to Chase Brunner,
22  correct?
23  A.  It was my understanding that -- yes.
24  Q.  Okay.  At that time, at that point, was it

21 (Pages 81 to 84)

Appendix 0352

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
                                 July 28, 2015

| Page 85 | Page 87 |
|---|---|

**Page 85**

1  your understanding that this was just an issue of a
2  coach texting a kid and nothing more?
3      A.  Just a coach texting a kid, nothing more?
4      Q.  Yes.
5      A.  Yes.
6      Q.  Did Mr. Clymer tell you why Chase Brunner was
7  annoyed or bothered or offended by some of the texts? I
8  think those were your words.
9      A.  I didn't get any specifics.
10     Q.  Did Mr. Clymer ask you to do anything in
11  connection with the investigation of these allegations?
12     A.  No.
13     Q.  Did you do anything?
14     A.  I was not a part of the investigation, no.
15     Q.  Okay.  So, you did -- whether you were part of
16  the investigation or not, you did not do anything to
17  investigate it, correct?
18     A.  Correct.
19     Q.  Did Mr. Clymer at that first conversation with
20  you about Emily Mayer tell you whether or not he had
21  already informed Mr. Romig about the allegations?
22     A.  Had Ryan told me that he informed Eric.
23     Q.  Uh-huh.
24     A.  I don't recall that.

**Page 86**

1      Q.  Did you ask?
2      A.  I don't remember asking.
3      Q.  Did you volunteer to talk to Romig about the
4  situation?  He was under your supervision, correct?
5      A.  Correct.
6      Q.  I mean, in terms of reporting, direct report,
7  he reports to you and you report to Clymer, correct?
8      A.  Correct.
9      Q.  And Clymer is telling you there is a problem
10  with one of your coaches, correct?
11     A.  Correct.
12     Q.  Did you volunteer to talk to Romig about the
13  issue?
14     A.  I don't recall volunteering.
15     Q.  Do you know why not?
16     A.  No.
17     Q.  Did you not want to get involved?
18     A.  No, that's not the reason.  No.
19     Q.  Is there a reason?
20     A.  No.
21     Q.  Had a texting issue ever arisen between a
22  coach and another player prior to this time?
23     A.  No.
24     Q.  So, based upon what you were told by Ryan

**Page 87**

1  Clymer, did you consider this to be a serious issue
2  when you first learned of it?
3      A.  First learned of it?
4      Q.  Yes.
5      A.  Serious issue?
6      Q.  Uh-huh.
7      A.  I'm not sure about the definition of serious,
8  but. . .
9      Q.  Your definition, whatever definition you
10  choose.
11     A.  I would say no.
12     Q.  What is the next contact you had with anybody
13  regarding Emily Mayer's accusations?
14     A.  The next contact.
15     Q.  The next person you had any discussion with
16  regarding what Ryan Clymer had told you about Emily
17  Mayer and the investigation that he was going to do.
18     A.  I can't recall my next contact with Mr.
19  Clymer.  I had a very brief discussion with Mr. Romig
20  at the next basketball game, which. . .
21     Q.  Which was how long after your first
22  conversation with Clymer?
23     A.  Again, to me, my recollection, it was the same
24  day or the next day.

**Page 88**

1      Q.  What was that conversation with Romig?
2      A.  Just observing him coaching and with his
3  daughter being on the team and knowing what was -- that
4  he was accused of something that he -- just if he was
5  okay and anything I needed to know.
6      Q.  Where did you have this conversation?
7      A.  At Morrisville High School.
8      Q.  An away game.
9      A.  Uh-huh -- yes.  Sorry.
10     Q.  That's okay.  Was it in a gym or outside the
11  gym?
12     A.  In the gym.
13     Q.  Anybody else around beside the two of you?
14     A.  No.
15     Q.  You said you discussed how he was because he
16  was accused of something.  Did you discuss what he was
17  accused of?
18     A.  No, just wanted -- well, just the texting
19  issue, whatever that was.  I didn't have any specifics
20  and I didn't ask for any.
21     Q.  From him or from Clymer or anybody?
22     A.  From him.
23     Q.  Is there some reason you didn't ask him for
24  more details?

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
                                July 28, 2015

Page 89

1    A.  Because of where we were.  I wasn't going to
2   do it there in the gym at Morrisville.
3    Q.  But you asked him about the issue?
4    A.  Yes.
5    Q.  At that point when you asked him about that --
6   again, you say this is about a day or so after you
7   first talked to Mr. Clymer -- was it your understanding
8   and impression from talking to him that he was aware of
9   the accusations?
10    A.  Yes.
11    Q.  Did he tell you how he became aware of the
12   accusations?
13    A.  No.
14    Q.  He didn't tell you whether or not Clymer said
15   something to him or some other person in the school
16   said something to him?
17    A.  No.
18    Q.  Did Mr. Romig ever call you to -- call you on
19   the phone to inquire as to what you knew about some
20   allegations Emily Mayer was making against him that he
21   learned of through some grapevine?
22    A.  I don't recall a conversation like that.
23    Q.  Did Mr. Romig ever call you on the phone to
24   ask you what was going on with the investigation into

Page 90

1   him based on the Emily Mayer accusations?
2    A.  I can't recall that he did.
3    Q.  How was he reacting to the allegations,
4   whatever those allegations were?
5    A.  That he was innocent.
6    Q.  Innocent of what?
7    A.  Whatever was being talked about.
8    Q.  As far as you knew as of the time that you had
9   this conversation with him at Morrisville, the only
10   thing you knew was that there was somebody that was
11   offended by the texts he was sending to Emily Mayer,
12   correct?
13    A.  Correct.
14    Q.  So, he told you that he was innocent of
15   sending --
16    A.  No --
17    Q.  Hold on.  He told you he was innocent of
18   sending texts to Emily Mayer?
19         MR. KEMETHER: Objection to form. You
20     can answer if you're able.
21         THE WITNESS:  Ask that question again?
22         MR. GROTH:  Yes.
23   BY MR. GROTH:
24    Q.  You said he told you just that he was

Page 91

1   innocent, and my question to you is:  Based upon what
2   you knew at the time, innocent -- what was your
3   understanding of what he was saying he was innocent of?
4         MR. KEMETHER: Objection to form. You
5     can answer if you're able.
6         THE WITNESS:  Anything inappropriate.
7   BY MR. GROTH:
8    Q.  Did you discuss what might have been
9   inappropriate about the texts?
10    A.  No.
11    Q.  Was it your understanding from Ryan Clymer
12   that the texts that were sent to Emily Mayer by Eric
13   Romig were on topics and subjects not related to her
14   being on the basketball team which he coached?
15    A.  The first time or at some point?
16    Q.  No, the first time, when Mr. Clymer told you
17   about these texts and Chase Brunner coming to him and
18   complaining.
19         Was it your understanding that these were
20   texts that were unrelated to any basketball activity
21   but were of a personal nature?
22    A.  Unrelated to basketball.  Personally that
23   dealt with Chase.  Is that what you mean?
24    Q.  No.  I'll rephrase it for you.

Page 92

1    A.  Okay.
2    Q.  Did Mr. Clymer tell you that the complaints
3   that Chase Brunner made to him about being annoyed,
4   bothered or offended by some texts Romig sent to Emily
5   Mayer was because they were of a personal nature, not
6   having anything to do with basketball activities?
7    A.  He never told me specifics.
8    Q.  Did you ask Mr. Clymer what the nature of the
9   texts were?
10         MR. KEMETHER: At that first meeting?
11         THE WITNESS:  At the first meeting?
12         MR. GROTH:  Yes.
13         THE WITNESS:  No, I did not.
14   BY MR. GROTH:
15    Q.  Do you remember anything else about your
16   discussion with Mr. Romig at this Morrisville game?
17    A.  No, very brief.
18    Q.  What was next discussion you had with anybody
19   regarding the Emily Mayer situation after seeing Mr.
20   Romig at that game?
21    A.  The next contact?
22    Q.  Uh-huh.
23    A.  It would have been after Mr. Clymer --
24   somewhere along in the investigations that he would

                                23  (Pages 89 to 92)

                                                    Appendix 0354

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

---

Page 93

1  have informed me what he was investigating.
2     Q.  Okay, we'll get to that in a second. If I
3  understand the time line here correctly, after Emily
4  Mayer went in and complained -- I'm sorry.
5     After Chase Brunner or whoever went in and
6  complained to Mr. Clymer about these texts from Mr.
7  Romig to Emily Mayer, he was still allowed to coach.
8     A.  Yes.
9     Q.  What happened to Emily Mayer? Did Mr. Clymer
10  tell you at the first meeting?
11     A.  No, I don't recall him telling me anything. I
12  know she did not go to that game, but I do not recall
13  why she did not go. I don't know whose decision that
14  was.
15     Q.  Ryan Clymer didn't tell you that immediately
16  upon Emily Mayer reporting these accusations of
17  inappropriate sexual-based texts to her to Mr. Romig,
18  that he suspended her and sent her home that same
19  morning?
20     A.  I don't recall that.
21     Q.  But you didn't see her at that game, correct?
22     A.  Correct.
23     Q.  Did you look for her?
24     A.  Did I look for her? I noticed she wasn't there

Page 94

1  because she played.
2     Q.  I mean, were you looking for her to see if she
3  was there because you were aware of this texting issue,
4  that Mr. Clymer told you that?
5     A.  I can't say that I was looking for her.
6     Q.  Do you know if Mr. Romig coached any other
7  games after that Morrisville game?
8     A.  I don't believe.
9     Q.  You were coming up on the Christmas holiday at
10  that point?
11     A.  Yes.
12     Q.  Were there any games after the Christmas
13  holiday?
14     A.  I don't believe so.
15     Q.  Tournament games or anything else?
16     A.  No.
17     Q.  When you talked to Eric Romig at that game,
18  did he tell you that he understood that Emily Mayer had
19  been suspended by Mr. Clymer after making the
20  allegation against him?
21     A.  No, he didn't tell me anything.
22     Q.  Let's move on down the line. Let's get to
23  your next conversation about the Emily Romig
24  allegations, who they were with, when they took place,

Page 95

1  what was said.
2     A.  What Mr. Clymer was informing me of?
3     Q.  Is that the next person you recall talking
4  about that to?
5     A.  Yes.
6     Q.  Let me start this way:  Did you have a meeting
7  with him?
8     A.  An official meeting? No --
9     Q.  Not official --
10     A.  Because it was over the Christmas holiday, I
11  believe it was just calling over the phone because I
12  think he was away.
13     Q.  He was traveling for Christmas holiday?
14     A.  Right.
15     Q.  He was out of town?
16     A.  For part of it, yes.
17     Q.  So, he wasn't physically there to discuss
18  things with you, correct?
19     A.  Correct.
20     Q.  Do you know if he was working on the
21  investigation while he was away for the Christmas
22  holiday?
23     A.  I believe so.
24     Q.  Was this telephone call you got from Clymer

Page 96

1  after Christmas day?
2     A.  I think so.
3     Q.  Okay. And what did Mr. Clymer tell you had
4  been going on up to that point?
5     A.  That he had met with the parents, Emily and
6  her parents, or talked to them -- I shouldn't say he
7  met with them.
8     Q.  You don't know if he met with them?
9     A.  Right. He had conversations with Emily and
10  her parents.
11     Q.  Let me stop you right there. We'll get to the
12  conversation.
13     Do you know if he ever met with Emily Mayer's
14  parents before Eric Romig resigned?
15     A.  I don't know.
16     Q.  Did you ever meet with them?
17     A.  I did not.
18     Q.  Did you ever see them before he resigned?
19     A.  No, I did not.
20     Q.  So, he talked with Smith, correct?
21     A.  Yes.
22     Q.  Did you know Kevin and Annette Smith?
23     A.  I knew her; I did not know him.
24     Q.  How did you know her?

24 (Pages 93 to 96)