Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
                    July 28, 2015

| Page 97 |
| --- |

1    A.   She would come to the games, school
2  activities.
3    Q.   And what did Mr. Clymer tell you? You talked
4  with the Smiths.
5    A.   Yes.  At some point in our conversations I was
6  informed of the amount of texts, that there was no
7  content.
8    Q.   Did he tell you why?
9    A.   Because she had deleted them all.
10   Q.   Okay.
11   A.   And that her parents were going to retrieve
12  them.
13   Q.   Retrieve what?
14   A.   The context of the texts, the deleted texts.
15   Q.   Okay.
16   A.   That there were two other girls' names
17  mentioned.
18   Q.   Were those Lauren Fretz and Kristen Kennedy?
19   A.   Yes.
20   Q.   Mentioned by whom?
21   A.   In his investigation.  I don't know who told
22  him.
23   Q.   Did he tell you he had spoken to them?
24   A.   Yes.

| Page 98 |
| --- |

1    Q.   Did he tell you what they told him?
2    A.   Generally, yes.
3    Q.   Tell me.
4    A.   That they denied the accusations that they had
5  any inappropriate relationship with Coach Romig.
6    Q.   Inappropriate in terms of physical or texts or
7  what?
8    A.   I'm not sure what the exact accusations were
9  with them and Eric.
10   Q.   Did Mr. Clymer ever tell you that Kristen
11  Kennedy stated that Romig had started asking her
12  questions about her sex life with her boyfriend?
13   A.   No.
14   Q.   Did you know who her boyfriend was at the
15  time?
16   A.   Who Kristen Kennedy's boyfriend was?
17   Q.   Yes.
18   A.   No.
19   Q.   What else did he tell you?  What else did Mr.
20  Clymer tell you?
21   A.   I think it's -- it's the same conversation or
22  it's another one.  It could have been a couple
23  conversations.
24   Q.   Let's just get that straight.

| Page 99 |
| --- |

1    A.   I don't know if I can time line what happened
2  when he called me and. . .
3    Q.   Because you never made any notes of anything,
4  correct?
5    A.   Yes.
6    Q.   And you never made any written notes to
7  yourself or even to the athletic department or any type
8  of written material talking about this investigation,
9  correct?
10   A.   Correct.
11   Q.   So, let's get this straight:  After the first
12  discussion with Mr. Clymer, there could have been a
13  number of telephone conversations leading up to the
14  meeting that you and he had with Mr. Romig in the
15  beginning of January.  Is that correct?
16   A.   Correct.
17   Q.   Fair statement.  And you can't distinguish
18  between those telephone conversations, which one
19  happened when and who said what when and whatever.
20   A.   Correct.
21   Q.   Okay.  So, let's talk about whatever number of
22  phone conversations there were.  Was there more than
23  one?
24   A.   I think there were.  I'm not saying there were

| Page 100 |
| --- |

1  five, but there were a couple.  So, over the Christmas
2  vacation, before school resumed after January 1st, you
3  had a number of phone calls, as many as five, with Mr.
4  Clymer where he kept you updated as to the
5  investigation he was conducting, correct?
6         MR. KEMETHER:  Objection to form.  You
7  can answer.
8         THE WITNESS:  Correct -- not five, but
9  maybe two or three.
10        MR. GROTH:  Okay.
11  BY MR. GROTH:
12   Q.   So, so far you said you talked to the Smiths
13  about the amount of texts.  What did he tell you?  What
14  did Mr. Clymer tell you in these conversations about
15  the amount of texts that we're talking about?
16   A.   That there were thousands -- a couple
17  thousand, I believe was the number.
18   Q.   Does that surprise you?
19   A.   Yes.
20   Q.   Shock you?
21   A.   Surprise.
22   Q.   Did it make you suspect that maybe some of
23  that activity was inappropriate?
24   A.   Make me suspect?  I wasn't drawing any

                              25 (Pages 97 to 100)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

Page 101

1  conclusions at that point.  I didn't know what they
2  said.
3      Q.  Did you know of any legitimate reason why
4  there would be thousands of texts going between Emily
5  Mayer and Eric Romig?
6      A.  Legitimate reason?
7      Q.  Yes.
8          MR. KEMETHER: Objection to form.  You
9  can answer if you're able.
10         THE WITNESS: I don't know of any
11  reason why they were texting.
12         MR. GROTH: Okay.
13 BY MR. GROTH:
14     Q.  And Clymer told you that there were no
15 contents available and that the parents were going to
16 retrieve the contents or the logs of the dates and
17 times of the texts?
18     A.  I thought the content -- they already had the
19 log, I believe.  At some point they had the log.  They
20 knew what the texts -- the days and times, that was
21 known, to my understanding.  I never saw any of that.
22 It was just to my understanding.
23     Q.  So, Mr. Clymer must have told you that --
24     A.  Yes.

Page 102

1      Q.  -- that he had logs of these calls.
2      A.  Yes.
3      Q.  And that there were thousands of calls.
4      A.  Yes.
5      Q.  But it didn't give any content. It just gave
6  the date and time of the texts.
7      A.  Correct.
8      Q.  And he told you that he talked to two other
9  women, either at or graduates of FCA, Lauren Fretz and
10 Kristen Kennedy, correct?
11     A.  Yes.
12     Q.  Did he tell you he interviewed them on the
13 phone or in person?
14     A.  The one lives in California, so I assumed it
15 was on the phone.
16     Q.  Okay.
17     A.  I assume over the phone. He didn't say how he
18 talked to them.
19     Q.  And the only information he gave you about
20 those phone conversations was that they denied that
21 there was any inappropriate activity or whatever
22 between them and Mr. Romig, correct?
23     A.  Right.  Whatever the accusation was, they
24 denied it.

Page 103

1      Q.  And did Mr. Clymer tell you where he got the
2  information to go talk to Lauren Fretz or Kristen
3  Kennedy?
4      A.  No.
5      Q.  Did you ask?
6      A.  I can't recall that I asked.
7      Q.  What else did Mr. Clymer tell you about his
8  investigation prior to the time where you and he and
9  Mr. Romig actually met?
10     A.  He sought our legal counsel.
11     Q.  Who was that?
12     A.  I believe Jeff Drake.
13     Q.  Did he tell you about his conversation with
14 Mr. Drake?
15     A.  Very little.  The only part I can recall was
16 to meet with him, was to meet with Eric.
17     Q.  Was to what?
18     A.  That we should meet with Eric.
19     Q.  So, it was your understanding Mr. Drake told
20 Mr. Clymer that the both you should meet with Eric
21 Romig, correct?
22         MR. KEMETHER: Objection to form.  You
23 can answer.
24         THE WITNESS: Right.

Page 104

1  BY MR. GROTH:
2      Q.  What else?
3      A.  That was it.
4      Q.  Did you ever talk to Jeff Drake yourself about
5  Emily Mayer?
6      A.  No.
7      Q.  Had Mr. Drake represented FCA before?
8      A.  To my understanding, yes.
9      Q.  And what type of legal situation?
10     A.  Oh, I don't know of any specific legal
11 situation, just that he was our school legal counsel
12 when we needed it -- if and when we needed it.
13     Q.  Had you ever had any contact with Mr. Drake
14 before this?
15     A.  No.
16     Q.  What else did Mr. Clymer tell you before your
17 meeting with Mr. Romig?
18     A.  What I told you is it.  That's it.
19     Q.  That's it?  Before the meeting with Mr. Romig,
20 that's all the information Mr. Clymer gave you about
21 his investigation.
22     A.  Generally speaking -- there is more specifics.
23 I can't recall the exact details.
24     Q.  Well, did he give you any information over the

26 (Pages 101 to 104)

Appendix 0357

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                                July 28, 2015

| Page 105 | Page 107 |
|---|---|

**Page 105**

1  telephone during these calls that made you or led you
2  to believe that this was a more serious allegation than
3  what you had originally thought?
4              MR. KEMETHER: Objection to form. You
5  can answer if you're able.
6              THE WITNESS: That I thought it was
7  more serious? Yes.
8  BY MR. GROTH:
9      Q.  Why did you think it was more serious?
10     A.  Because of the other accusations.
11     Q.  What accusations?
12     A.  Well, there's another two women that were. . .
13     Q.  But he didn't tell you anything about what the
14  accusations were with those women, did he?
15     A.  Not specifically, no.
16     Q.  Did you have any understanding of what the
17  accusations were?
18     A.  Something inappropriate.
19     Q.  Sexually inappropriate.
20     A.  That's assumed.
21     Q.  I don't want you to assume anything. I want
22  to know what your thinking was back when you were
23  hearing this about Lauren Fretz and Kristen Kennedy.
24     A.  I don't know, then. I don't recall.

**Page 106**

1      Q.  So, in these telephone conversation with Mr.
2  Clymer, there was nothing that he conveyed to you to
3  indicate to you that the allegations Emily Mayer was
4  making against him was that he was texting her with
5  sexually suggestive and inappropriate texts. Is that
6  correct?
7      A.  That's correct.
8      Q.  And there is nothing he told you in those
9  conversations to let you know that somebody had pointed
10  him in the direction of Kristen Kennedy and Lauren
11  Fretz because there may have been some inappropriate
12  texting or sexual activity between him and them. Mr.
13  Clymer did not tell you that?
14     A.  He didn't tell me any specifics.
15     Q.  And you didn't ask for any more specifics.
16     A.  No.
17     Q.  Okay. During that period of time did you have
18  any conversations with Mr. Romig by phone or in person
19  leading up to your meeting with him?
20     A.  Not that I recall.
21     Q.  Never transmitted any information to him?
22  Never asked any questions?
23     A.  Over that Christmas holiday? Not that I
24  recall.

**Page 107**

1      Q.  Were you asked by Mr. Clymer not to contact or
2  talk to Mr. Romig?
3      A.  No.
4      Q.  Were you asked by Mr. Clymer not to contact or
5  talk to anybody, any potential witness, about this
6  situation?
7      A.  No.
8      Q.  Did you talk to any of the assistant coaches
9  of Mr. Romig regarding this situation?
10     A.  I believe I talked to the one assistant coach,
11  yes.
12     Q.  Robin Landis?
13     A.  Yes.
14     Q.  What was your discussion with Robin Landis?
15     A.  I can't recall the specifics. It would be
16  just generally if she had noticed anything herself, saw
17  anything herself that would help the investigation to
18  find the truth.
19     Q.  Truth about what?
20     A.  What Emily was accusing him of.
21     Q.  Well, again, as of the time that you talked to
22  Robin Landis, the only thing that you knew that he was
23  being accused of was excessive texting. Is that
24  correct?

**Page 108**

1      A.  At the first time, yes.
2      Q.  Even after the phone calls there was no
3  discussion with Mr. Clymer about any sexual nature of
4  the texts or sexual activity between Mr. Romig and the
5  other two women, correct?
6      A.  Correct.
7      Q.  All right. Isn't it true that you knew from
8  Mr. Clymer exactly what the nature of these texts was,
9  that he told you that they were sexually suggestive in
10  nature?
11             MR. KEMETHER: Objection to form.
12             MR. GROTH: You can answer.
13             MR. KEMETHER: Well, you've actually
14      asked and he's answered that, so how many times
15      are you going to do that? Now you're accusing him
16      of something untoward as well.
17  BY MR. GROTH:
18     Q.  You can answer.
19     A.  Not at that time.
20     Q.  At what time did you finally know that?
21     A.  I can't recall the exact time where, you know,
22  more of the information came out or was made available
23  to Mr. Clymer.
24     Q.  I'm sorry, go ahead.

27  (Pages 105 to 108)

Appendix 0358

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

Page 109

1    A.  As he had information, and if -- when he told
2  me about it, I can't say the exact day or time of when
3  that happened.
4    Q.  But it was before the meeting with Romig.
5    A.  I can't recall that it was.
6    Q.  So, you may be hearing about these accusations
7  about --
8    A.  At --
9    Q.  Hold on.  You may have been hearing about
10  these accusations about sexually suggestive texting and
11  whatever at the meeting with Eric Romig?
12    A.  Yes.
13    Q.  Okay.  So, when you talked to Robin Landis,
14  which is before the meeting with Eric Romig, you didn't
15  know that there was anything other than an excessive
16  amount of texts between the two of them, correct?
17  Between Mayer and. . .
18    A.  Correct.
19        MR. KEMETHER: Objection to form. You
20    can answer.
21  BY MR. GROTH:
22    Q.  Did she say that she knew that he was sending
23  her any texts at all on issues unrelated to basketball?
24    A.  She had no knowledge.

Page 110

1    Q.  Did you talk to -- there was another assistant
2  coach, wasn't there?
3    A.  There was a middle school -- the middle school
4  girls basketball coach sometimes helped, if that's who
5  you were referring to.
6    Q.  Who is that?
7    A.  Marc Hoover.
8    Q.  That's M-a-r-c?
9    A.  Yes.
10    Q.  Did you talk to him?
11    A.  Yes.
12    Q.  What did you talk about?
13    A.  Again, just asking if he had any knowledge,
14  and in both cases that they needed to talk to Mr.
15  Clymer about anything -- any information regarding the
16  situation.
17    Q.  Did either one of them tell you that Mr.
18  Clymer had already contacted them themselves to talk
19  about this issue?
20    A.  I can't recall that they did, no.
21    Q.  Did it appear to you that they were surprised
22  or didn't know about these accusations Emily Mayer was
23  making until you talked to them?
24    A.  No, they were aware.

Page 111

1    Q.  Do you know how they were aware?
2    A.  I don't know how they were aware.
3    Q.  Any other information that you recall that Mr.
4  Clymer gave you prior to meeting with Mr. Romig?
5    A.  Any other information?
6    Q.  Uh-huh.
7    A.  No.
8    Q.  Did Mr. Clymer ever tell you that he asked Mr.
9  Romig to turn over his phone to Mr. Clymer to allow Mr.
10  Clymer to look at whatever texts he had on his phone?
11    A.  I was aware of that.
12    Q.  How were you aware of that?
13    A.  Like I say, I don't know exactly when, whether
14  it was at that meeting.  It could have been at that
15  meeting.
16    Q.  What exactly happened at that meeting in that
17  regard?
18    A.  That I was aware that he had asked for Eric's
19  phone.
20    Q.  What was the response?
21    A.  I believe Eric was willing to -- you know,
22  here's my phone.
23    Q.  So, did he turn it over at the meeting?
24    A.  I don't think so. I don't recall.

Page 112

1    Q.  But you recall Clymer asking Romig for the
2  phone.
3    A.  I recall a discussion about it, yes.
4    Q.  You don't recall how that was resolved.
5    A.  I do not.
6    Q.  Do you recall Mr. Clymer asking Romig to
7  obtain from his own company logs of his text
8  messages for a period of months?
9    A.  Yes, same discussion.
10    Q.  How that was resolved?
11    A.  I don't know if he got them or not.
12    Q.  Do you have any information that Mr. Romig
13  ever turned over his phone to anybody at FCA to look at
14  or got logs of his text messages for three or four
15  months before the end of the year in 2009?
16    A.  I don't have any information.
17    Q.  You never saw them, correct?
18    A.  I never saw them.
19    Q.  Did Mr. Clymer, to your knowledge, do anything
20  to try to determine whether or not Mr. Romig may have
21  engaged in an excessive texting situation with any
22  other students at FCA other than Emily Mayer?
23    A.  Investigate other students?  I'm not aware.
24    Q.  Not investigate the students.  Do you know

28  (Pages 109 to 112)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                    July 28, 2015

<table>
<tr><td>Page 113</td><td>Page 115</td></tr>
</table>

**Page 113**

1  whether or not Mr. Clymer -- did Mr. Clymer ever tell
2  you that he is doing things to try to determine whether
3  or not there was a texting issue between Mr. Romig and
4  any other students at FCA?
5     A.  No.
6     Q.  You've already testified that you never
7  prepared a single document with regard to the Mayer
8  situation or the investigation of the Mayer situation.
9        Have you ever seen a document shown to you by
10 Mr. Clymer or anybody else at FCA that lists the steps
11 taken to investigate that allegation against Mr. Romig?
12    A.  No, I have not seen any documentation.
13    Q.  Let's go back to Romig exhibit twelve, which
14 we just talked about briefly before.  It's the March
15 31, 2010 meeting with representatives of the school and
16 Eric Romig in which you participated, correct?
17    A.  Correct.
18    Q.  The purpose of that meeting, if I can just
19 summarize it, is to see if Mr. Romig can get back in
20 the good graces of his friends and coworkers and former
21 co-employees at Faith Christian Academy after he
22 resigned in January.  Would that be a fair statement?
23    A.  Yes.
24    Q.  And that was documented, correct?

**Page 114**

1     A.  Yes.
2     Q.  Who documented that?
3     A.  Paul Auckland.
4     Q.  Do you know if Eric Romig -- I'm sorry, strike
5  that.  Do you know if Mr. Clymer was keeping Pastor
6  Auckland advised of the investigation that he was
7  conducting into the Emily Mayer allegations?
8     A.  I don't know.
9     Q.  All right.  So, we've gone from your initial
10 information that you got from Mr. Clymer about the
11 problem with texting with Mr. Romig; a number of phone
12 calls, two or three phone calls, you had Mr. Clymer
13 updating you as to the results of his investigation; a
14 discussion you had with Mr. Romig at an away game about
15 the investigation; and eventually a decision had to be
16 made about what to do about the investigation, correct?
17    A.  Correct.
18    Q.  Did you have a meeting with Mr. Clymer before
19 the two of you met with Mr. Romig to discuss exactly
20 what you thought should be done?
21    A.  A meeting?  We talked about it, but we had an
22 official meeting -- face-to-face or on the phone, you
23 mean?
24    Q.  Face-to-face, phone, whatever.

**Page 115**

1     A.  Face-to-face, yes.
2     Q.  And that took place how long before you
3  actually met with Mr. Romig?
4     A.  I can't say how long.
5     Q.  It was after --
6     A.  A day or two, a couple days.  I mean, it's in
7  that whole same time frame.
8     Q.  It was after New Year's Day, right?
9     A.  It could have been before that.
10    Q.  Okay.  You don't recall if it was face-to-face
11 or by phone?
12    A.  I don't recall.
13    Q.  Tell me about that conversation.
14    A.  It was -- the legal counsel was to ask Eric to
15 resign.
16    Q.  "Legal counsel" being Jeff Drake.
17    A.  Yes.
18    Q.  Was Mr. Drake a part of this conversation?
19    A.  No.
20    Q.  What else did you discuss with Mr. Clymer?
21    A.  That was the conclusion.  That was it.
22    Q.  Did Mr. Clymer tell you why -- strike that.
23 Did Mr. Clymer indicate to you why FCA's legal counsel
24 was going to ask Mr. Romig to resign?

**Page 116**

1     A.  Why?
2     Q.  Yes.  In other words, what he did, what Mr.
3  Romig did to require his resignation?
4     A.  I don't know the conversation between Jeff
5  Drake and Mr. Clymer.
6     Q.  No, I'm asking you whether Mr. Clymer told you
7  why a decision was made to ask Eric Romig to resign,
8  based on what conduct of Mr. Romig.
9     A.  Based on the amount of texting, and that was
10 his legal advice.
11    Q.  Just the quantity of testing, nothing more.
12    A.  Yes, because there was no content, as far as I
13 understood.
14    Q.  Well, you understood that Emily Mayer met with
15 Ryan Clymer and actually told him what the contents
16 were of the emails, correct?
17    A.  At some point, yes.
18    Q.  And at some point Emily Mayer's mother sent to
19 Ryan Clymer a two-page document which was marked Romig
20 exhibit six which actually contained on the second page
21 a typed statement by Emily Mayer of the nature and
22 subject of the inappropriate texts that she was being
23 sent by Mr. Romig.
24       My first question to you is to take a look at

                              29  (Pages 113 to 116)

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

| Page 117 | Page 119 |
|---|---|

**Page 117**

1  this document and tell me whether you've ever seen this
2  before.
3          MR. GROTH:  Let me note for the record,
4      also, that the date of the email from Mrs. Smith
5      is December 31st, 2009.
6  BY MR. GROTH:
7      Q.  Let me ask you first:  Have you ever seen that
8  document before?
9      A.  Yes.
10      Q.  When did you see it first?
11      A.  Meeting with the lawyers over this case, the
12  lawsuit.
13      Q.  So, going back to 2009, when the investigation
14  by FCA into Eric Romig was going on, you were not shown
15  that document by Mr. Clymer at that time?
16      A.  No.
17      Q.  You were not shown that document until after
18  FCA, Mr. Clymer and you were sued?
19      A.  Correct.
20      Q.  Let me ask you to read to yourself -- I'm not
21  sure if you had a chance to do that -- the allegations
22  that Emily Mayer had made regarding the inappropriate
23  nature of the texts that she was being sent by Eric
24  Romig.

**Page 118**

1          Just read those to yourself and I'll ask you a
2  couple questions after that.
3          MR. KEMETHER:  I'll object to the form
4      of the question.  Certainly please do review.
5  BY MR. GROTH:
6      Q.  Have you had a chance to read those?
7      A.  Yes.
8      Q.  If you had known back in December of 2009 that
9  these are the specific allegations that Mr. Clymer was
10  made aware of regarding the texts sent by Mr. Romig to
11  Emily Mayer, would you have considered this to be a far
12  more serious situation than you were led to believe?
13          MR. KEMETHER:  Objection to form. You
14      can answer if you're able.
15          THE WITNESS:  Would I have assumed it
16      was more serious?
17          MR. KEMETHER:  Same objection.
18          THE WITNESS:  It's just her word, but
19      yes, it's serious.  But it's still just her word.
20      It's not the printed-out text messages.
21  BY MR. GROTH:
22      Q.  Does reading this now give you reason to
23  suspect that there was something more going on between
24  Ms. Mayer and Mr. Romig than you were being told by Mr.

**Page 119**

1  Clymer?
2          MR. KEMETHER:  Objection to form. You
3      can answer if you're able.
4          THE WITNESS:  More reason to suspect.
5  BY MR. GROTH:
6      Q.  Yes, more reason to suspect that there was
7  something inappropriate going on between Mr. Mayer and
8  Mr. Romig than what Mr. Clymer told you.
9          MR. KEMETHER:  Same objection.
10          THE WITNESS:  Not necessarily, because
11      again it's just her word.
12  BY MR. GROTH:
13      Q.  And under FCA's sexual-harassment policy, does
14  it not say that sexual harassment includes making
15  unwelcome sexual advances, engaging in improper
16  physical conduct, making improper comments or innuendo?
17  Is that part of the sexual-harassment policy?
18      A.  Yes.
19      Q.  Wouldn't these things that Emily Mayer
20  informed Mr. Clymer of fall under the category of
21  improper comments or innuendo?
22          MR. KEMETHER:  Objection to the form of
23      the question.  There is no indication that Emily
24      Mayer accused him of anything in that document.

**Page 120**

1  BY MR. GROTH:
2      Q.  Go ahead, you can answer.
3      A.  If they're true.  We don't know if -- as far
4  as I understand, I don't know if that's the truth.
5      Q.  Was it your understanding at the time that FCA
6  had a responsibility to determine the ultimate truth of
7  the matter, who was lying and who was not lying?
8          MR. KEMETHER:  Objection to the form of
9      the question.  You can answer if you're able.
10      A.  Was it the responsibility of the school to
11  determine the truth?
12      Q.  Yes, who was lying and who wasn't lying.
13      A.  Yes, I feel we tried.
14      Q.  Did you have any understanding back in 2009 as
15  to whether or not, under the law, this type of conduct
16  that is alleged against a teacher was supposed to be
17  reported to the state authorities or the local DA or
18  police department?
19          MR. KEMETHER:  Objection to the form.
20      You can answer.
21          MR. SANTARONE:  Objection to the form
22      of the question.
23      A.  Do I know under the law in 2009.
24      Q.  Yes, did you know in 2009.

30  (Pages 117 to 120)

Appendix  0361

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                              July 28, 2015

Page 121

1    A.  I did not know.
2    Q.  Was that ever the topic of discussion between
3  you and Mr. Clymer, whether or not this information
4  should be reported to law-enforcement authorities or
5  the State Department of Public Welfare back in 2009?
6           MR. KEMETHER: Just so we're clear, the
7  information you're talking about is the second
8  page of Romig-6?
9           MR. GROTH:  All information that he
10  gathered from Mr. Clymer during the course of his
11  conversations with him, including whatever was on
12  here.
13           MR. SANTARONE:  Objection. He never
14  saw that.
15           MR. GROTH:  I understand that, but --
16  let me rephrase the question.
17  BY MR. GROTH:
18    Q.  Based upon what Mr. Clymer told you back in
19  2009, was it your understanding as a layman, not as an
20  attorney, that that type of allegation should be
21  reported to outside authorities to investigate, meaning
22  the police, the DA or Department of Public Welfare or
23  somebody else?
24    A.  It was not my understanding that we had to

Page 122

1  report it.
2    Q.  Was that ever discussed between you and Mr.
3  Clymer, whether or not FCA should report this to any
4  outside authorities?
5    A.  Between me and Mr. Clymer?
6    Q.  Yes.
7    A.  No.
8    Q.  Did Mr. Clymer tell you that he discussed that
9  issue with his counsel?
10    A.  Did he tell me he did?
11    Q.  Yes.
12    A.  I can't recall that he told me he did.
13    Q.  When you talked to the assistant coaches --
14  and by the way, you said nobody asked you to do that,
15  right?
16    A.  No.
17    Q.  You just did it on your own.
18    A.  As I recall, yes.
19    Q.  Those are the only two people you talked to
20  about the Emily Mayer accusations.
21    A.  Yes.
22    Q.  Did they give you any information about any
23  health issue or physical issue that Mr. Romig was
24  suffering from over those past few weeks or months?

Page 123

1    A.  Not that I recall.
2    Q.  And you didn't notice anything yourself,
3  correct?
4    A.  Correct.
5    Q.  How about the Morrisville game you went to?
6  Seemed perfectly okay to you.
7           MR. KEMETHER: Objection to the form.
8  You can answer if you're able.
9  BY MR. GROTH:
10    Q.  Health-wise. I'm not talking being upset
11  about the allegations.
12    A.  Health-wise, yes.
13    Q.  He wasn't wheezing. He didn't act like he was
14  out of breath.
15    A.  No.
16    Q.  He didn't complain of headaches.
17    A.  No.
18    Q.  He didn't say I have to sit down; he couldn't
19  shout or stand up or jump around on the sideline?
20  Nothing like that?
21    A.  Nothing like that.
22    Q.  You had no reason to believe at that time that
23  he had any health issue that was going to adversely
24  impact his coaching.

Page 124

1    A.  I had no reason, no.
2    Q.  Going back to your conversation with Mr.
3  Clymer before you met with Mr. Romig for the last time,
4  Mr. Clymer told you that legal counsel, Jeff Drake, was
5  supposed to ask Eric Romig to resign, correct?
6    A.  Correct.
7           MR. KEMETHER: Objection to the form.
8    Q.  Not that Mr. Clymer was going to ask that
9  himself -- ask that of Mr. Romig himself.
10    A.  It was the legal -- no, it was the legal
11  counsel.
12    Q.  And as far as you knew at the time, it was
13  only because of the quantity, of the amount of texts,
14  the quantity of texting?
15           MR. KEMETHER: Just to clarify the
16  question: You say "it was." Regarding the reason
17  he was going to be asked to resign.
18           MR. GROTH:  The reason he was going to
19  be asked to resign.
20           THE WITNESS: Yes.
21           MR. GROTH:  Just the quantity of
22  texting, all right.
23  BY MR. GROTH:
24    Q.  What else did Mr. Clymer tell you during that

Appendix 0362

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                                July 28, 2015

Page 125

1    discussion before your meeting with Mr. Romig, if
2    anything?
3        A. Didn't I already answer that?
4            MR. KEMETHER: One more time.
5        A. The specifics again were just all of the
6    information he had collected, you know, the people he
7    had talked to, and basically the conclusion he had --
8    they had come to with counsel of what we should do or
9    what he was going to do.
10           They weren't asking for my approval, just what
11   was going on and what was happening and he wanted me to
12   be there when he met with Eric.
13       Q. Okay. Would it be correct to say, then, that
14   the decision that Eric Romig was no longer going to
15   coach for FCA was made by FCA, not by Mr. Romig?
16           MR. KEMETHER: Objection to the form.
17       A. He was asked to resign.
18       Q. Okay.
19       A. And he did.
20       Q. And FCA made the decision to ask him to
21   resign.
22       A. Yes.
23       Q. On its own it made that decision. You didn't
24   negotiate with Mr. Romig. It made that decision before

Page 126

1    even meeting with Mr. Romig, correct?
2        A. Correct.
3        Q. Were there any discussions between you and Mr.
4    Clymer, or Mr. Clymer telling you about a discussion
5    with counsel, to actually terminate or fire Mr. Romig
6    outright?
7        A. No. The conversation would have been if he
8    wouldn't have resigned, then the matter would have gone
9    to the board.
10       Q. The Board of Deacons?
11       A. Correct.
12       Q. Did Mr. Clymer tell you he had already
13   consulted with the Board of Deacons before he talked to
14   you and they were all in agreement, or whoever was in
15   charge was in agreement with what Mr. Romig was going
16   to be asked to do?
17       A. No, I don't know if he had any conversation.
18   I don't know.
19       Q. It never got to the point of going to the
20   Board of Deacons to do something further because Mr.
21   Romig, after you met with him, did agree to resign,
22   correct?
23       A. Correct. That's my understanding.
24       Q. Let's talk about the meeting with -- oh,

Page 127

1    strike that. One second.
2            Before the final meeting with you and Mr.
3    Clymer and Mr. Romig -- which was a face-to-face
4    meeting, correct?
5        A. Correct.
6        Q. Where was that meeting?
7        A. Mr. Clymer's office.
8        Q. Do you remember having a conference call with
9    Mr. Romig where you and Mr. Clymer were on a
10   speakerphone at the school building in an office and
11   Mr. Romig was on the other end of the phone calling in?
12       A. Do I recall this?
13       Q. Yes.
14       A. I don't recall it.
15       Q. You don't recall ever having a conversation
16   with Mr. Romig over the phone while you were with Ryan
17   Clymer?
18           MR. KEMETHER: Objection to the form.
19           You can answer if you're able.
20       A. Over the phone?
21       Q. Yes.
22       A. I don't recall.
23       Q. Okay. Let's talk about the last meeting with
24   Mr. Romig. Where did that -- oh, it took place at Mr.

Page 128

1    Clymer's office. What time of day was it?
2        A. I can't be sure. It was daylight still, I'm
3    pretty sure, when I left.
4        Q. It was after the return from holiday break? I
5    mean, was school in session?
6        A. I don't think school was in session, no.
7        Q. But I think you testified before it was within
8    a day or two before the January 5th resignation.
9        A. Correct.
10       Q. Okay. So, we're talking about January 3rd or
11   4th, something like that, correct?
12       A. It could have been.
13       Q. Okay. Do you know if at any time after the
14   Morrisville game Mr. Romig was allowed to coach or run
15   practices for the girls basketball team?
16       A. After the Morrisville game?
17       Q. Yes?
18       A. To my recollection, he did not coach practice
19   or a game after that.
20       Q. Prior to this meeting with Mr. Romig, were you
21   told by Ryan Clymer that he had suspended Emily Mayer
22   from school the same morning that she reported these
23   allegations to him?
24       A. Ask that again, please?

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                                    July 28, 2015

Page 129

1    Q.  Yes.  Prior to this meeting with Mr. Romig on
2    January 3rd or 4th, had Ryan Clymer told you that as
3    soon as Emily Mayer made these allegations he suspended
4    her?
5    A.  I do not recall it was right away.  I know at
6    some point she was not allowed to participate.  I don't
7    recall that it was right away.
8    Q.  Not allowed to participate in school or --
9    A.  On the team.
10   Q.  My question to you is, did you ever find out
11   from Mr. Clymer that he told her to go home and not
12   participate in school?
13   A.  No, I have no knowledge of that.
14   Q.  How long did the meeting last with Mr. Romig?
15   A.  Half an hour to an hour.
16   Q.  And were any documents shown to Mr. Romig
17   during that meeting?
18   A.  Not that I recall.
19   Q.  Do you recall Mr. Clymer having either Romig
20   exhibit five or Romig exhibit seven, which are the text
21   logs that he got from the Smith family of all the
22   thousands of phone calls -- thousands of texts that
23   Romig made to Mayer, do you recall whether or not any
24   of those logs were shown to Mr. Romig, either in

Page 130

1    hard-copy form like this or on a computer screen
2    because they were on some kind of disk?
3            MR. KEMETHER: During this meeting.
4            MR. GROTH: During the meeting.
5    A.  During this meeting?  I don't recall any
6    documents being shown.
7    Q.  Did you see either of these documents, Romig
8    exhibit five or Romig exhibit seven, at any time?
9    A.  No, I've never those --
10   Q.  Hold on.  At any time before the meeting?
11   A.  No.
12   Q.  And you don't recall seeing them at the
13   meeting.
14   A.  No.
15   Q.  Do you recall seeing them at any point prior
16   to FCA and Mr. Clymer and yourself being sued?
17   A.  No.
18   Q.  Tell me what the discussion was between the
19   three people at that meeting, as best you can recall.
20   A.  Best I can recall, in general, just Ryan
21   asking Eric if there was anything else that he wasn't
22   telling us, is there anything else, and they reviewed
23   the accusations against him.
24   Q.  Did Clymer tell him what the result of his

Page 131

1    investigation was?
2    A.  What the results?
3    Q.  Yes:  What he did, who he talked to, what
4    information he got:
5    A.  Yes.  He reviewed his investigation with Eric,
6    yes.
7    Q.  Was that the first time that you heard from
8    Ryan Clymer that he was investigating allegations of
9    improper sexual texting to Emily Mayer from Romig?
10   A.  Yes, that may have been the first time I heard
11   it, yes.
12   Q.  From what I gather from your testimony, no
13   documents were shown to Mr. Romig, including this
14   document from Emily Mayer's mother containing her
15   recollection of the inappropriate texts.  Is that
16   correct?
17           MR. KEMETHER: At the meeting.
18           MR. GROTH:  At the meeting.
19   A.  At the meeting, correct.
20   Q.  Whether the document was shown or not, did Mr.
21   Clymer recite to Mr. Romig the specific nature of the
22   accusations and allegations regarding improper or
23   inappropriate sexual texts?
24   A.  I don't recall him reading off anything like

Page 132

1    that.
2    Q.  In other words, did he say anything to Mr.
3    Romig like "Miss Mayer said that beginning of November
4    he started telling me how he and Lauren did sexual
5    things and was hinting at me to be this way"?  Did he
6    say anything like that to Mr. Romig?
7    A.  That specific? I don't recall.
8    Q.  Do you recall Mr. Clymer saying that Emily
9    Mayer accused Mr. Romig of sending her texts saying "I
10   want to be in you"?
11   A.  No.
12   Q.  Do you recall him telling Mr. Romig that Emily
13   Mayer said she received a text that "Romig would just
14   tell me every day he was in love with me"?
15   A.  No.
16   Q.  And that he wanted to marry her?
17   A.  No, I don't recall the specifics.
18   Q.  Okay.  Did Mr. Romig say Emily Mayer was
19   lying?
20           MR. KEMETHER: During the meeting?
21           MR. GROTH: Yes.  This is all during
22   the meeting, I'm sorry.
23   A.  During the meeting?  During the meeting -- I
24   can't say during the meeting that he said that exactly.

33  (Pages 129 to 132)

Appendix 0364

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                    July 28, 2015

|  |  |
|---|---|
| **Page 133** | **Page 135** |

**Page 133**

1  Q.  Okay. Did he say that he did not send any
2  inappropriate texts to Emily Mayer?
3  A.  Again, for that specific meeting, I don't
4  recall the exact things that were spoken of and not to
5  that -- to be that specific.
6  Q.  Well, that was the last meeting you had with
7  him before he resigned, right?
8  A.  Right.
9  Q.  So, there weren't any discussions of a
10  meeting, correct?
11  A.  No meetings, no.
12  Q.  So, what was Mr. Romig's reaction when Mr.
13  Clymer told him the results of his investigation?
14  A.  He didn't like it.
15  Q.  So, what did he say?
16  A.  Like I said, I can't recall the exact -- I
17  can't quote what he said word-for-word. He just
18  overall generally disagreed and said it wasn't true,
19  but -- that he didn't agree with it.
20  Q.  What did Mr. Clymer say to Mr. Romig about his
21  future status at the school?
22  A.  That he asked him to resign.
23  Q.  When you say he asked him to resign, do you
24  recall him actually asking Mr. Romig if he would resign

**Page 134**

1  or telling Mr. Romig that he had to resign?
2  A.  Asked him.
3  Q.  To resign.
4  A.  Yes.
5  Q.  But it was your understanding going into the
6  meeting that the decision had already been made by FCA
7  to tell him to resign.
8        MR. KEMETHER: Objection to form.
9  A.  I don't know that.
10  Q.  Well, didn't Mr. Clymer tell you that after
11  talking with counsel?
12        MR. KEMETHER: Objection to form.
13        MR. GROTH:  Go ahead, you can answer.
14        MR. KEMETHER: You can answer. I'm
15  sorry.
16        THE WITNESS: Ask the question again,
17  please.
18  BY MR. GROTH:
19  Q.  Didn't Mr. Clymer tell that you before the
20  meeting, that Mr. Romig was going to be told to resign?
21  A.  Was going to be asked to resign.
22        MR. KEMETHER: Objection to form.
23  Q.  Mr. Clymer told you before the meeting that
24  Jeff Drake was going to ask Mr. Romig to resign,

**Page 135**

1  correct?
2  A.  That was the legal advice.
3  Q.  So, what happened? Why didn't Jeff Drake ask
4  Mr. Romig to resign?
5  A.  Why wouldn't Jeff Drake ask Eric to resign?
6  Q.  Yes. You were told by Mr. Clymer that his
7  legal counsel's advice was to have legal counsel ask
8  Mr. Romig to resign, but at the meeting legal counsel
9  wasn't there.
10     So, something changed between what Mr. Clymer
11  told you and what actually happened at the meeting when
12  Mr. Clymer asked Mr. Romig to resign.
13  A.  Okay.
14        MR. KEMETHER: Objection to form.
15  Q.  All right. So, the question is, why did that
16  change?
17        MR. KEMETHER: Objection to form. You
18  can answer if you're able.
19  A.  Nothing changed. But to clarify the
20  statement: The legal counsel was for Ryan to tell
21  Eric to ask Ryan -- for Ryan to ask Eric to resign, not
22  for legal counsel to do the asking.
23  Q.  Then I misunderstood.
24  A.  If I misspoke, that's -- I'll clarify:  That

**Page 136**

1  legal counsel. . .
2  Q.  I understand.
3  A.  Okay.
4  Q.  All right. So, what you meant to say or what I
5  should have heard before was that Jeff Drake's advice
6  to Eric [sic] Clymer before the meeting was to ask Eric
7  Romig to resign.
8  A.  Correct.
9  Q.  Not that Jeff Drake was going to ask him.
10  A.  Correct, Jeff Drake was not going to do that.
11  Q.  Okay. Before that meeting with Mr. Romig, did
12  Mr. Clymer tell you what would happen if Mr. Romig
13  refused to resign?
14  A.  I believe so.
15  Q.  That was a discussion about going to the Board
16  of Deacons.
17  A.  I believe so, yes. If he did not, it would
18  have to go to the board.
19  Q.  So, at the meeting with Romig, Mr. Clymer
20  asked him to resign, correct?
21  A.  Correct.
22  Q.  And what was Mr. Romig's reaction?
23  A.  He didn't want to initially. I'd say
24  generally, in his words, he understands why he had to.

                              34  (Pages 133 to 136)

Appendix 0365

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                            July 28, 2015

Page 137

1    Q.  Did he agree at the meeting to resign?
2    A.  Yes.
3    Q.  Were there any qualifications or stipulations
4    that he wanted with regard to his resignation?
5    A.  No.
6    Q.  Did he tell you that he would not resign as a
7    result of the investigation into him based on the
8    allegations of Mayer, but he would resign for some
9    other reason?
10   A.  No, he did not say why.
11   Q.  And a day or two later you got a resignation
12   from him, correct?
13   A.  Correct.
14   Q.  What did that resignation say?
15   A.  That he was resigning as a basketball coach.
16   Q.  Why?
17   A.  For health reasons.
18   Q.  For health reasons, something that was never
19   discussed in your meeting with him, correct?
20   A.  Correct.
21   Q.  And did FCA, to your knowledge, accept that
22   resignation?
23   A.  Yes, we did.
24   Q.  Even though you knew it not to be true.

Page 138

1          MR. KEMETHER: Objection to form.
2          THE WITNESS: We didn't know it wasn't
3    true.
4          MR. KEMETHER: That's argumentative.
5    BY MR. GROTH:
6    Q.  When you got the resignation with that wording
7    about for health reasons, did you contact Mr.
8    Hollenbach to ask him why he put that in there?
9          MR. KEMETHER: You're asking him about
10   he asked himself.
11         MR. GROTH: I'm sorry.
12   BY MR. GROTH:
13   Q.  Did you ask Mr. Romig to put that in his
14   resignation?
15   A.  No, I did not.
16   Q.  Did you inquire at all about his health?
17   A.  Did I inquire about his health?
18   Q.  Yes. Did you talk to him about his health
19   after you got that resignation that said he had a
20   health problem?
21   A.  At some point I may have. I can't recall. I
22   didn't do it right away, no.
23   Q.  Sometime after his resignation.
24   A.  Sometime after.

Page 139

1    Q.  Have you ever heard the term "pass the trash"?
2    A.  Yes.
3    Q.  What's your understanding of what that term
4    refers to?
5    A.  That a school has evidence or knowledge of a
6    teacher or employee who has done something wrong and
7    doesn't report it or do what they're supposed to do,
8    then that employee goes to another school.
9    Q.  When did you first learn of that term or hear
10   that term?
11   A.  In the last couple of years.
12   Q.  After he left?
13   A.  After he left.
14   Q.  "He," meaning Romig, resigned.
15   A.  Yes.
16   Q.  Did just the mere quantity of texts give you
17   reason to suspect that something's going on between Mr.
18   Romig and Emily Mayer that was inappropriate?
19         MR. KEMETHER: Objection to form. You
20   can answer if you're able.
21   A.  That's a conclusion I can't come to without
22   the context.
23   Q.  And you really didn't have any other context
24   beside that up until the time you actually met with him

Page 140

1    and he resigned, correct? Agreed to resign.
2    A.  Context with the text messages?
3    Q.  Yes.
4    A.  There was never any context.
5    Q.  I mean, you didn't have the information from
6    Emily Mayer. You didn't have the email from the
7    mother, any of that stuff, right? So, in terms of your
8    own --
9    A.  I didn't.
10   Q.  -- thinking at the time, you really didn't
11   know of any other issues except for the excessive
12   nature of the texting before you met with Romig.
13   A.  Correct.
14   Q.  Was Eric Romig ever suspended at all from his
15   duties and responsibilities at FCA during the course of
16   this investigation?
17   A.  Yes.
18   Q.  When was he suspended?
19   A.  It was after the Morrisville game at some
20   point. I don't know the exact day, but he was told not
21   to coach. He was not allowed to coach until the
22   investigation was completed.
23   Q.  Well, were there any more basketball
24   activities scheduled after that Morrisville game before

                            35 (Pages 137 to 140)

                                                    Appendix 0366

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                                July 28, 2015

---

Page 141

1    the holiday and the new year?
2        A.   Practices.
3        Q.   Who took over the practices?
4        A.   The assistant coaches.
5        Q.   You know that for a fact, or are you just
6    assuming?
7        A.   Fact.
8        Q.   Did you tell Romig he couldn't handle
9    practices?
10       A.   No, I did not tell him.
11       Q.   Who told him?
12       A.   Clymer, I believe.
13       Q.   Do you know that to be true, or are you just
14   assuming?
15       A.   I guess I'll be assuming that.
16       Q.   At the end of your meeting with Mr. Romig, did
17   you and he leave the room together?
18       A.   No.
19       Q.   You left separately?
20       A.   Yes.
21       Q.   During the course of Mr. Clymer's
22   investigation did any private detective, police
23   officer, retired police officer or some kind of police
24   official get involved in the investigation at somebody

---

Page 142

1    from FCA's request?
2        A.   Yes.
3        Q.   Who was that?
4        A.   I don't know who the police officer was.
5        Q.   Did you meet with him?
6        A.   No.
7        Q.   Did Mr. Clymer meet with him?
8        A.   I don't know.
9        Q.   How do you know he was consulted?
10       A.   Mr. Clymer said that was part of his advice.
11       Q.   Whose advice?
12       A.   Advice he was seeking.
13       Q.   Advice on what to do?
14       A.   Correct.
15       Q.   How to handle the investigation?
16       A.   From the investigation, what he was. . .
17       Q.   Okay.  Do you know if this person was a church
18   member or a school member?
19       A.   I don't know.
20       Q.   Do you know anything about the person at all?
21       A.   Not with direct knowledge, no.
22       Q.   With any knowledge: Indirect, direct, gossip,
23   rumor, whatever you got.
24       A.   It was a friend of Mr. Clymer's.  I think his

---

Page 143

1    son attended our school. That's my guess or assumption.
2        Q.   Did Mr. Clymer ever tell you what the advice
3    was of that police officer or that detective, police
4    officer, whomever?
5        A.   No.
6        Q.   Did you ever learn after 2009 who that police
7    officer or detective was at any time?
8        A.   I was never directly told, no.
9        Q.   Indirectly.
10       A.   It would just be my guess or assumption who it
11   is.
12       Q.   Give me a name if you think you know who the
13   person might be.
14            THE WITNESS:  I can answer?
15            MR. KEMETHER:  Yes, you can answer.
16            THE WITNESS:  Officer Toomey.
17   BY MR. GROTH:
18       Q.   Is he still an officer?
19       A.   I don't know.
20       Q.   Is he still connected to the church or the
21   school in some way?
22       A.   No.
23       Q.   Do you know where he lives?
24       A.   No.

---

Page 144

1        Q.   Do you know what police department he works
2    for or worked for?
3        A.   I believe it was Hatfield.
4        Q.   Do you know anything about how many times he
5    was consulted by Mr. Clymer?
6        A.   No.
7        Q.   Do you know if he played an active role in the
8    investigation insofar as actually interviewing people
9    or contacting people or gathering materials or
10   evidence?
11       A.   I do not know.
12       Q.   At the meeting with Mr. Romig did you or Mr.
13   Clymer leave open the door for Mr. Romig to be
14   re-employed as a coach for FCA after his resignation on
15   January 5th, 2010?
16       A.   Leave the door open?
17       Q.   Yes.  Was it discussed?
18       A.   No.
19       Q.   Did you ever at any time after his resignation
20   tell him, whether at the meeting whose notes we have
21   here in March or at any other time, that there was a
22   possibility that he would be coming back or could be
23   coming back to FCA to be a coach?
24       A.   I don't recall that I did specifically.  I

---

36  (Pages 141 to 144)

Appendix 0367

Russell L. Hollenbach, Jr.                    Nace vs. Pennridge School District
                                    July 28, 2015

Page 145

1  know it was discussed in that meeting because he asked
2  about it.
3       Q.   You recall him asking about it.
4       A.   Yes.
5            MR. KEMETHER: You're talking about the
6  meeting -- this was the one in March.
7            THE WITNESS:  At the meeting in March,
8  yes.
9  BY MR. GROTH:
10      Q.   The one memorialized on Romig exhibit twelve?
11      A.   Yes.
12      Q.   What was the response?
13      A.   At the time the person was really Pastor Paul
14  Auckland, and he said -- I think it's even in those
15  notes:  Not at this time, or it's not possible.
16      Q.   Did he say it's never going to happen or did
17  he leave the door open?
18      A.   He didn't -- I don't think the word "never"
19  was used.
20      Q.   Did you ever specifically make an offer to Mr.
21  Romig that if he resigned, he could possibly come back
22  the next year?
23      A.   Come back the next year? No, I don't recall
24  that.

Page 146

1       Q.   I'm going to read you just a portion of Mr.
2  Romig's deposition transcript on that last question
3  that I just asked you.
4            His answer on page 101 at line 16, and this is
5  Romig's testimony under oath, "At that same meeting, at
6  the conclusion of that meeting -- I'm quoting from the
7  transcript at line 16:  "At that same
8  meeting -- at the conclusion of that meeting was when
9  the solution was, you know, presented to me to step
10  down, whether Mr. Hollenbach said at the time about
11  stepping down for the rest of the year and coming back
12  the following year, which I declined, and Mr.
13  Hollenbach and I left the meeting because I was very
14  mad."
15           Do you recall that happening at the meeting?
16      A.   I don't recall that.
17      Q.   Would it be correct to say that during your
18  association with Mr. Romig over the years at FCA that
19  you really did not want to see anything bad happen to
20  him because of this Emily Mayer allegation?
21      A.   Repeat that question?
22      Q.   Yes:  Based upon your association with Mr.
23  Romig and his family over the years, wouldn't it be
24  correct to say that you really didn't want to see

Page 147

1  anything bad happen to Mr. Romig as a result of the
2  allegations Emily Mayer made against him?
3       A.   I wouldn't want to see that, no -- I mean or
4  correct.
5       Q.   Did you ever bring up the topic with Mr.
6  Clymer or anybody else at FCA about reporting his
7  conduct to somebody outside of FCA, like the Department
8  of Public Welfare or the DA or the police department?
9       A.   I'm not aware of any of those conversations.
10      Q.   No, I'm not asking you if you're aware of it.
11  What I'm saying is, did you make any recommendation or
12  raise the topic of reporting his activity, Romig's
13  activity, to anybody outside of FCA?
14      A.   I did not.
15      Q.   Did you ever have a conversation with Mr.
16  Romig after he resigned where you told him to go and
17  confront the Smiths about the allegations?
18      A.   I know I said that to him afterwards.  I'm not
19  exactly sure when, but at some point when he was still
20  upset, whether it's months or a year I'm not sure, but
21  yes, I. . .
22      Q.   Why did you tell him to do that?
23      A.   Again, he was upset and he felt that they were
24  lying about him.  At that point it was just I said "Why

Page 148

1  don't you talk to them yourself?"
2       Q.   You never met with Mr. or Mrs. Smith regarding
3  these allegations, did you?
4       A.   No.
5       Q.   Never discussed it with them at all?
6       A.   No.
7       Q.   During the time that Lauren Fretz was at FCA,
8  did you ever hear any rumors or gossip or anybody make
9  any comments around the school, especially the faculty
10  or staff or whatever, that some people suspected that
11  Eric Romig's involved in an inappropriate way with
12  Lauren Fretz?
13      A.   No.
14      Q.   Do you know Nicole Gross?
15      A.   Yes, I do.
16      Q.   Who is she?
17      A.   Kindergarten teacher.
18      Q.   Did you ever hear her make any such comments
19  to anybody?
20      A.   No.
21      Q.   Was it ever suggested to you that she is
22  marking such comments about Mr. Romig and Lauren Fretz?
23      A.   No.
24      Q.   Have you ever been involved with an employee

brusilow.com           brusilow + associates           215.772.1717

Appendix 0368

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
                          July 28, 2015

| Page 149 | Page 151 |
|---|---|

**Page 149**

1  at FCA being asked to resign by the administration
2  before this with Mr. Romig?
3      A.  I can't recall right now specifically.  I
4  wouldn't have been involved, anyway.  I was just a
5  teacher, so I wouldn't have been involved.
6      Q.  Let me be more specific:  Were you ever
7  involved in FCA asking a coach, somebody who was under
8  your supervision, to resign from the school before the
9  Romig situation?
10     A.  Yes.
11     Q.  Who was that?
12     A.  I'm trying to think of if it was before.
13  Varsity boys basketball coach, Bob Kett.
14     Q.  Could you spell that last name?
15     A.  K-e-t-t.  I have to stop and think about the
16  date, but. . .
17     Q.  Before or after Romig?
18     A.  Yes, before or after.  I can't say for sure.
19  I think it was before, but it was -- I can't say for
20  sure before.
21     Q.  All right.  What was the reason why he was
22  asked to resign?
23     A.  The principal at that time, Mr. Bob Clymer,
24  just felt that he was ineffective as a coach and wanted

**Page 150**

1  to make a change.
2      Q.  He coached varsity boys baseball?
3      A.  Basketball.
4      Q.  Basketball, I'm sorry.  That was the only
5  reason you were aware of, his performance as a coach?
6      A.  That was it.  Yes, sorry.
7      Q.  Okay.  Have you ever visited Eric Romig in
8  jail?
9      A.  No.
10     Q.  Do you have any plans to?
11     A.  No.
12     Q.  I know you retired from FCA in 2014.  What was
13  the reason why you retired?
14     A.  Just a long time.  Just got tired and getting
15  older and ready to do something else.
16     Q.  And you're doing a lot of other, assorted
17  jobs.
18     A.  Yes.
19     Q.  Were you asked by anybody at FCA to leave?
20     A.  No. .
21     Q.  At the end of the meeting with Romig, when he
22  was asked to resign, was it your understanding that he
23  was going -- was it your understanding, first, that he
24  was going to resign?

**Page 151**

1      Q.  Did he agree at the meeting to resign, or did
2  he want time to think about it or talk about it with
3  his family or whatever?
4      A.  My recollection is that he would resign.
5      Q.  Okay.  But he didn't put any qualifiers on it
6  in terms of giving a reason for his resignation,
7  correct?
8      A.  No.
9      Q.  So, would it be fair to say you just expected
10  to get a brief sentence or two from him saying "I, Eric
11  Romig, am hereby resigning my position as coach,"
12  blah-blah-blah.
13     A.  Yes.
14     Q.  And the basketball season ran until that year?
15     A.  The end of February.
16     Q.  Was he coaching anything else at that time?
17     A.  I don't think so.
18     Q.  All right.  So, would his contract have
19  expired at the end of basketball season?
20     A.  Yes.
21     Q.  So, basically he left FCA and his coaching
22  activities in the middle of his contract, correct?
23     A.  Yes.
24     Q.  Was he paid for the rest of his contract?

**Page 152**

1      A.  I don't know.  I don't have knowledge of that.
2      Q.  Do you know if he got any type of severance
3  package or severance pay or anything like that?
4      A.  Not that I know of.
5      Q.  When did you first learn that Pennridge had
6  hired Romig?
7      A.  I have no idea.  I couldn't tell you what year
8  he started coaching there.
9      Q.  Okay.
10     A.  At Pennridge?  Yes, that's for softball.  I
11  don't know what year he started.
12     Q.  At some point you did become aware he became
13  employed there.
14     A.  Yes.
15     Q.  Do you know how you became aware?
16     A.  Word-of-mouth, somebody.
17     Q.  Up until that time when you first heard that
18  he had been coaching there -- I believe you testified
19  he started there in 2012, or something like that, and
20  he was coaching for two years, 2012 and 2013 -- had
21  anybody from Pennridge attempted to contact you to ask
22  about Mr. Romig's performance as a coach at FCA?
23     A.  No one contacted me.
24     Q.  Do you know whether or not anybody at

38  (Pages 149 to 152)

Appendix 0369

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

**Page 153**

1  Pennridge contacted anybody, including Mr. Clymer, at
2  FCA to find out about his coaching at FCA?
3      A.  Not to my knowledge.
4      Q.  Have you ever gotten calls from any other
5  schools or athletic directors looking to hire somebody
6  that had been working as a coach at FCA?
7      A.  No.
8      Q.  At any time after Mr. Romig resigned in
9  January of 2010, did you have any discussions about his
10  situation with Emily Mayer with any of the Board of
11  Deacons?
12      A.  The Board of Deacons? No.
13      Q.  How about with Paul Auckland?
14      A.  I could have.  I don't recall any.
15      Q.  By the time you had this meeting with Eric
16  Romig and these other folks on March 31st, 2010, had
17  you gotten more details about the sexual nature of the
18  alleged texting and sexual harassment that Emily Mayer
19  was claiming against him?
20      A.  I'm not sure of the time line of that.
21      Q.  Did you get more information eventually?
22      A.  Did I get more information?
23      Q.  Yes.
24      A.  No.

**Page 154**

1      Q.  Would it be fair to say that up until the time
2  this lawsuit was filed, you really didn't know much
3  more than the day he resigned.
4      A.  Correct.
5      Q.  On Romig exhibit twelve, paragraph six, it
6  says "I spoke," and I think you said Paul Auckland was
7  the one that prepared these notes, to your knowledge?
8      A.  Yes, to my knowledge.
9      Q.  So, when it says "I spoke," do you know that's
10  Paul Auckland?
11      A.  Yes, I do.
12      Q.  It says here under 6.5, "Can you coach again?
13          "A:  Yes, in time and under probation
14  contract."
15          Do you recall having that discussion with Mr.
16  Romig at the meeting?
17      A.  At that meeting? Yes, that was discussed.
18      Q.  What was your position at that time? Would you
19  have been open to hiring him again under a probation
20  contract?
21          MR. KEMETHER: Objection to the form.
22      You can answer.
23      A.  Not immediately.
24      Q.  After what period of time would you have

**Page 155**

1  considered it?
2      A.  Time would have been an issue, as well as was
3  any of this true.
4      Q.  And even at this meeting Mr. Romig never
5  admitted that any of it was true, correct?
6      A.  Correct.
7      Q.  Except for the quantity of texts.
8      A.  Correct.
9      Q.  There were discussions at the meeting, also,
10  that some people at the meeting at FCA had concluded
11  that Eric Romig had lied to them about things.  Isn't
12  that correct?
13      A.  Yes.
14      Q.  What were the subject of those lies?
15      A.  It had to do with Eric having his phone --
16  when the girls basketball team, some of them, I don't
17  know how many or who, went to watch a college
18  basketball game and if Eric had his phone that day at
19  that event.
20      Q.  Because a lot of texts were sent to Emily
21  Mayer that day.
22      A.  I believe that would be accurate.
23      Q.  And he said he didn't have his phone.
24      A.  Correct.

**Page 156**

1      Q.  And that was a lie.
2      A.  The evidence appears to be so.
3      Q.  Did you ever receive any information after
4  this Mayer and Romig investigation that Emily Mayer had
5  lied about anything?
6      A.  Evidence that she lied?
7      Q.  Yes.
8      A.  Not that I can recall.
9      Q.  And basically, that conversation with Mr.
10  Romig was to the effect that he was saying that a lot
11  of those text messages to Emily Mayer were not sent by
12  him; they were sent by somebody who had use of his
13  phone because he left it someplace and they had used it
14  for their own purposes, correct?
15      A.  Correct, that is one of the excuses.
16      Q.  And you didn't believe that excuse, did you?
17      A.  I didn't know what to believe at that point.
18      Q.  I'm going to go through a couple of documents
19  with you.
20          As part of Romig exhibit four there is a
21  letter of resignation to you and to Ryan Clymer dated
22  January 5th, 2010, signed by Eric Romig. Is that a
23  document you've seen before?
24      A.  Yes, I believe it is.

39 (Pages 153 to 156)

Appendix 0370

Russell L. Hollenbach, Jr.                 Nace vs. Pennridge School District
                                    July 28, 2015

Page 157

1    Q.  Do you recall this as being a document you
2  received as evidence of his resignation from FCA?
3    A.  Yes.
4    Q.  Again, do you recall being surprised that he
5  added to his resignation that he is doing it for health
6  concerns?
7    A.  I wasn't surprised or unsurprised.
8    Q.  You just didn't know anything about it.
9    A.  I just didn't know what he meant by that.
10   Q.  Do you know whether or not Mr. Clymer ever
11 spoke to Chase Brunner directly?
12   A.  Yes, my recollection is that Chase is the one
13 who came first.
14   Q.  Did Mr. Clymer tell you whether or not Chase
15 told him that Chase had actually seen some of the
16 inappropriate texts before they were deleted?
17   A.  I don't think anybody saw.  That's my
18 recollection, that Chase had not.
19   Q.  Romig exhibit eight is an email from Stephanie
20 Romig to you, which you forwarded to Mr. Clymer, dated
21 January 5th, 2010, the same day that he resigned.
22        On the second page -- I'm going to let you
23 look at this in a second -- on the second page of that
24 she makes this statement in her email: She says, "I'm

Page 158

1  sorry that I am venting like this, but I just don't
2  feel that the coaches and the students weren't
3  protected from something that could have been
4  prevented.  We pay for our children to go to a
5  Christian school so that they don't have to endure this
6  type of thing in public school.  I know kids are kids
7  and we will see bad ones.  However, lesbians, drinkers
8  and ones having sex shouldn't be allowed in Faith.  We
9  either stand by what we believe in or we get crapped
10 on, and that is what is happening.  I am embarrassed to
11 see on Facebook that people are cursing the school and
12 Emily and the lesbian are saying they are done with the
13 school."
14        If you want to read that yourself, go ahead
15 and I'll ask you questions about that.
16        MR. KEMETHER:  Which exhibit is that,
17 Romig-8?
18        MR. GROTH:  Yes.
19        MR. KEMETHER:  Thank you.
20        (Pause)
21        THE WITNESS:  Okay.
22 BY MR. GROTH:
23   Q.  First of all, do you recall getting this email
24 from Stephanie?

Page 159

1    A.  I do now.
2    Q.  Well, you sent it to -- sent a copy of it to
3  Mr. Clymer, correct?
4    A.  Yes, I did get it.
5    Q.  This refers to things she saw on Facebook
6  where people were "cursing the school and Emily and the
7  lesbian are saying they are done with the school."
8        Do you recall seeing anything on social media,
9  or was something going through the school after this
10 issue with Mr. Romig that was upsetting people in the
11 school?
12   A.  I have no knowledge of that.
13   Q.  Did anybody in school ever come up to you and
14 say, you know, we heard what was going on or what was
15 alleged to have gone on between Mr. Romig and Emily
16 Mayer, and you should do something about it, something
17 more than what you've done?
18   A.  No one came to me.
19   Q.  It says here -- refers to "Emily and the
20 lesbian."  Do you know who she's referring to?
21   A.  I have no idea.
22   Q.  Do you know of any problem Emily Mayer ever
23 had at the school?  I mean, to the extent that her
24 allegations were a problem, but anything other than the

Page 160

1  allegations she made about Romig, any disciplinary
2  problems, any academic problems, any problems with her
3  athletic endeavors?
4    A.  The only thing was during that season there
5  was some issue on that basketball team, and she was
6  relieved of her co-captain responsibility.
7    Q.  And how did you know that?
8    A.  I'm sure -- I would imagine through the
9  coaches.
10   Q.  And do you know what the reason was?
11   A.  Not specifically.  It was just a situation
12 between the girls and leadership and athletics.
13   Q.  Do you know specifically if Emily Mayer was
14 having a problem with Chelsea Romig, Mr. Romig's
15 daughter?
16   A.  That was part of the concern.  I believe they
17 both were relieved of their co-captain
18 responsibilities, if I remember accurately.
19   Q.  And do you remember what those issues were?
20   A.  No, just drama.
21   Q.  Okay.  After Mr. Romig left the school, Emily
22 Mayer was allowed to go back on the team, correct?
23   A.  Correct.
24   Q.  And who was the coach of the team after that?

brusilow.com              brusilow + associates              215.772.1717

Appendix 0371

Russell L. Hollenbach, Jr.             Nace vs. Pennridge School District
                              July 28, 2015

| Page 161 | Page 163 |
|---|---|

**Page 161**

1    A.  Dave Forker.
2    Q.  Were there any problems that you were made
3    aware of in terms of how Emily Mayer was treated on the
4    team, either on the relationship between Emily and the
5    players or Emily and the coach?
6    .A.. After Dave took over?
7    Q.  Yes.
8    A.  No, I was not aware of anything.
9    Q.  How about Chelsea? Were there any issues with
10   Chelsea Romig?
11   A.  Not that I was aware of.
12   Q.  Was there an issue that was brought to your
13   attention that the Clymers -- I'm sorry, that the
14   Smiths were upset because their daughter told them or
15   they saw for themselves that Mr. Romig was still
16   allowed to come to the games and sit on or near the
17   bench of the girls basketball team where Emily Mayer
18   was still playing?
19   A.  I believe I recall something to that extent,
20   yes.
21   Q.  Did you have to discuss that with the coach or
22   with Romig or with anybody?
23   A.  Yes.
24   Q.  Who did you discuss it with?

**Page 163**

1    resigned, was there any discussion about him getting
2    marital counseling?
3    A.  Not that I recall.
4    Q.  How about after his resignation, like at the
5    meeting in March or at any other time? Do you recall
6    anybody making a recommendation to him that he seek out
7    some marital counseling? Anybody at FCA.
8    A.  At FCA? No.
9    Q.  Did you ever have a telephone conversation
10   with Mr. Romig where he initially denied even sending
11   any excessive amount of texts to Emily Mayer?
12   A.  Not that I recall.
13   Q.  Do you ever recall being told by Mr. Clymer
14   that Mr. Romig denied sending any excessive amount of
15   texts to Emily Mayer when he first talked to him about
16   the allegations?
17   A.  I don't recall that.
18       MR. GROTH: I want to mark as
19   Hollenbach exhibit three a chain of emails between
20   Romig, you and Clymer, starting on January 6th,
21   2010 and going through January 7th, 2010. Would
22   you take a look at that, please?
23       (Exhibit Hollenbach-3 was marked for
24   identification)

| Page 162 | Page 164 |
|---|---|

**Page 162**

1    A.  With Eric.
2    Q.  What did you tell him?
3    A.  Just that he couldn't sit near the team. Some
4    gyms, that's kind of hard to do, and that's why a
5    situation arose. Some gyms, they're small, so. . .
6    Q.  Do you know if he was actually sitting on the
7    bench or the players bench or seats --
8    A.  He was on the bench -- it was a continuation
9    of the players bench in the first row of the gym. He
10   would have been down the row.
11   Q.  On the same row.
12   A.  Right, like other spectators.
13       MR. GROTH: Can we go off the record,
14   please?
15       THE VIDEOGRAPHER: That concludes DVD
16   number two. The time is 1:33. Going off the
17   record.
18       (A brief recess was taken)
19       THE VIDEOGRAPHER: Stand by, please.
20   This begins DVD number three. The time is 1:42.
21   We are on the record.
22   BY MR. GROTH:
23   Q.  Mr. Hollenbach, as part of the discussion
24   between you, Mr. Clymer and Mr. Romig right before he

**Page 164**

1    BY MR. GROTH:
2    Q.  Have you ever seen these texts before?
3        MR. RUSSELL: Just for the record, I
4    think it's an email, all right? As opposed to. . .
5        MR. GROTH: An email, thank you. Let me
6    start over.
7    BY MR. GROTH:
8    Q.  Have you ever seen these emails before?
9    A.  Yes.
10   Q.  The first one, let's talk about the first one,
11   which is January 6th, 2010, from Stephanie Romig to
12   you, correct?
13   A.  Correct.
14   Q.  And in it she -- now, this is a day after he
15   resigned. She talks about a number of things,
16   including some information she got from her daughter,
17   Chelsen, that word was going around that Emily Mayer
18   liked Eric and was attracted to him in some way.
19       Did you ever receive that kind of information
20   from anyone else at any time during the investigation?
21   A.  No.
22   Q.  There is also on the second page a statement
23   where Stephanie Romig said that her daughter told her
24   "At practice today she was standing," meaning Emily

Russell L. Hollenbach, Jr.                Nace vs. Pennridge School District
                            July 28, 2015

| Page 165 | Page 167 |
|---|---|

**Page 165**

1    Mayer, "at the gym doors the entire practice watching.
2    If she is not allowed to be on the team at practice or
3    in games, then she needs to also stay away. I think
4    this is pure intimidation she is trying to pull and I
5    don't think it's right. She was apparently standing
6    there with the boys, and my guess is she was running
7    her mouth, but that is just speculation on my part."
8         My question to you is, how long did it take
9    before Emily Mayer was reinstated to the team after
10   Eric Romig resigned?
11        MR. KEMETHER: Objection to the form.
12      You can answer if you're able.
13      A.  I'm not sure of the exact date.
14      Q.  It appears from Stephanie that it didn't take
15   place for two days after the resignation. Do you know
16   how long it took after that?
17      A.  I do not.
18      Q.  Do you know of any reason why Emily Mayer was
19   not reinstated to the team after Eric Romig resigned?
20        MR. KEMETHER: Objection to form.
21   You can answer.
22      A.  She was eventually.
23      Q.  I know, but why didn't it happen immediately
24   after his resignation?

**Page 166**

1         MR. KEMETHER: Objection to form.
2      A.  I don't know why it didn't happen immediately.
3      Q.  Who is the one that finally made the decision
4    to allow her back on the team?
5      A.  Mr. Clymer.
6      Q.  Let's go back to the first page of exhibit
7    three. You then sent an email to Mr. Clymer stating
8    "Can we legally tell Emily not to hang around, or would
9    this just be a request on our part, or do we need to go
10   back to the 'old rule' of no kids are here after school
11   unless they are on a team? Let me know what you
12   think."
13        Why did you ask Mr. Clymer if there was some
14   way to legally tell Emily not to hang around?
15      A.  It goes back to, there aren't really supposed
16   to be kids there after school unless they have
17   practice, unless they had a reason to be.
18        So, I was just kind of clarifying -- I'm sure
19   with all that happened, that if I go tell her that,
20   that I'm legally -- I'm not going to violate any legal
21   thing, that I'm okay to do that, to tell her that
22   obviously she was not on the team, that she needed to
23   go home.
24      Q.  Then Mr. Clymer answers you back the same day,

**Page 167**

1    like forty-five minutes later, saying "Tell Dave to do
2    what Eric did and put up the barriers. This way we
3    don't need to talk to anyone." Who is Dave?
4      A.  Dave Forker, the coach that took over.
5      Q.  And what are the barriers?
6      A.  Physical dividers that you can put in front of
7    the glass doors. Some coaches do that. That way they
8    feel their team is not distracted, where people can't
9    just walk in and interrupt their practice.
10     Q.  And when Mr. Clymer states here that "this way
11   we don't need to talk to anybody," did you take that to
12   mean you don't need to talk to either Chelsea or to
13   Emily Mayer?
14     A.  I would take that to be I wouldn't have to
15   tell Emily to go home. . .
16     Q.  Okay.
17     A.  . . . because she wouldn't be able to stand
18   there and watch, anyway.
19     Q.  And then the email above that from you to Ryan
20   Clymer on January 7th as well, you're reporting to him
21   "Emily has six total tardies, all excused. Is that okay
22   with her probation?" What did you mean by that?
23     A.  Good question. Some students, if they have
24   poor attendance records, they can be put on attendance

**Page 168**

1    probation where they're not like other students. They
2    can't just accumulate all these tardies at school.
3      Q.  Did somebody ask you to look that up?
4      A.  I'm not sure.
5      Q.  Is that part -- I'm sorry.
6      A.  There were years where I was in charge of
7    attendance.
8      Q.  I was going to ask: Is that part of your
9    normal repressibilities, to handle attendance issues?
10     A.  It could have been.
11     Q.  In 2010 you could have been doing that?
12     A.  Yes.
13     Q.  When you ask "is this okay with her
14   probation," what did you mean by that?
15     A.  That's what I mean: Probation can be an
16   attendance probation. It can be a discipline
17   probation. It can be an academic probation, depending
18   on -- when a new student comes to the school, if they
19   have had other issues, they can come on probation,
20   where you're less tolerated academically, you're less
21   tolerated discipline-wise. They have their own
22   contracts written up with the parents.
23     Q.  Was it your understanding on January 7th that
24   she was on -- Emily Mayer was on probation as of that

                              42  (Pages 165 to 168)

                                                    Appendix  0373

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
                        July 28, 2015

Page 169

1  day?
2      A.  It reads like that.
3      Q.  Okay.  Do you know why Emily Mayer was put on
4  probation in the first place?
5      A.  Like I said, I don't know.  This sounds like
6  it was an attendance issue, because tardies -- it's not
7  discipline.  It's not academics.
8      Q.  Did Ryan Clymer tell you that he sent her home
9  from school the day she reported this texting issue to
10  him?
11      A.  He did not tell me that, no.
12      Q.  But you knew that she was not at the practice
13  or basketball game at Morrisville?
14      A.  I knew she wasn't there.  I didn't know whose
15  decision that was.
16      Q.  Did you ever conclude that Emily Mayer did
17  anything -- you personally, did you ever personally
18  conclude that Emily Mayer did anything wrong that
19  should result in her being suspended from school?
20          MR. KEMETHER:  Objection to form.  You
21  can answer if you're able.
22      A.  Did I think she did anything else wrong?
23      Q.  Yes.  Back at that time did you have any reason
24  to conclude that she had done something wrong to result

Page 170

1  in her suspension from school?
2          MR. KEMETHER:  Same objection.
3      A.  She wasn't suspended from school at any time.
4      Q.  You believed at the time that she was just
5  suspended from basketball activities?
6      A.  Yes.
7      Q.  Okay.  Did anybody ever tell you at any time
8  that Ryan Clymer told her to leave school, not just
9  basketball but leave school, go home?
10          MR. KEMETHER:  This is the third time
11  you've asked that question.
12      A.  No, I have no recollection of that.
13      Q.  Did Mr. Romig ever give you any information
14  about Emily Mayer, about how she ended up at FCA for
15  her eleventh and twelfth grades, about her history at
16  other schools or anything like that?
17      A.  Did Mr. Romig give me information?
18      Q.  Yes.
19      A.  No.
20      Q.  At any time during your investigation of him.
21      A.  No.
22      Q.  Do you know who Michael Sheeler is?
23      A.  Yes.
24      Q.  Who is he?

Page 171

1      A.  He was, I think -- I think he had children in
2  our school.  He at least was a host parent of
3  international students.
4      Q.  Was he a member of the church?
5      A.  Not to my knowledge, no.
6      Q.  Was he a volunteer at the school or anything?
7  Working at the school, volunteering or. . .
8      A.  Not to my knowledge.
9      Q.  Do you know how many kids he had going to the
10  school?
11      A.  My memory says one elementary daughter.
12      Q.  Did you know him back in 2010/'11?
13      A.  When he was a host parent?
14      Q.  Yes.
15      A.  I knew who he was, yes.
16      Q.  Was there an investigation of Mr. Sheeler at
17  FCA for some criminal activity he eventually pled
18  guilty to in videotaping his host boys while they were
19  in his house, in the bathroom or in the bedroom?
20      A.  Yes, I'm aware of that.
21      Q.  You're aware of the criminal investigation.
22      A.  Yes.
23      Q.  Was there any investigation at FCA regarding
24  these activities?

Page 172

1      A.  By the principal?  I don't know what the
2  administration did in that case.
3      Q.  Do you know if the police officer who was
4  contacted by Mr. Clymer to assist in looking into this
5  Emily Mayer allegation was retained or consulted by FCA
6  for any other type of investigations?
7      A.  Not that I know of.
8          MR. GROTH:  I just want to note on the
9      record that this police officer's name was never
10      given to the plaintiffs in any mandatory
11      disclosures or any supplement to mandatory
12      disclosures, and I'd like them to provide me with
13      that name as soon as possible.
14          For the time being, I have no other
15      questions.  Thank you.
16          THE WITNESS:  Thank you.
17          MR. KEMETHER:  Let's go around the table
18      first.
19          MR. RUSSELL:  I have no questions.
20          MR. COX:  I have just a few.
21          (EXAMINATION)
22  BY MR. COX:
23      Q.  Mr. Hollenbach, my name is Rob Cox.  I
24  represent Pennridge School District, Tom Creeden and

                              43  (Pages 169 to 172)

Russell L. Hollenbach, Jr.              Nace vs. Pennridge School District
July 28, 2015

## Page 173

1   David Babb, and I probably just have a few questions
2   for you here.
3          Was Mr. Romig a good coach, setting aside the
4   issues with Emily Mayer, in your view?
5      A.   Yes.
6      Q.   Why do you say that?
7      A.   He understood athletics.  He knew his sports.
8   He handled his team well.  He involved parents.  He was
9   approachable for parents.  So, in all aspects of
10  coaching with kids and parents and the sport.  He
11  handled it all very well.
12     Q.   Other than the complaint which Emily Mayer
13  filed with FCA, are you aware of any other complaint
14  about Mr. Romig that was filed with FCA during his
15  tenure there?
16     A.   No.
17     Q.   Do you have any reason to know what Mr.
18  Romig's reputation was as a coach within the FCA
19  community? Do you understand my question?
20     A.   What his reputation was among the FCA
21  community?
22         MR. KEMETHER: As a coach.
23         THE WITNESS:  As a coach.
24         MR. COX: As a coach.

## Page 174

1          THE WITNESS: I thought it was good, as
2   far as I knew.
3   BY MR. COX:
4      Q.   I think you testified that you don't have any
5   recollection of ever discussing with Mr. Babb the
6   allegations that Emily Mayer made with respect to Mr.
7   Romig.
8          Did I understand that testimony correctly?
9      A.   Correct, I do not recall any conversation.
10     Q.   Do you recall discussing Mr. Romig with any
11  employee or staff member at Pennridge School District?
12     A.   No.
13     Q.   When you met with Mr. Romig and Mr. Clymer and
14  I believe Pastor Auckland on January 3rd or 4th of
15  2010, I believe you testified that Mr. Romig told the
16  group in that meeting that he hadn't done anything
17  wrong.
18         Did I understand you to say that -- did I
19  understand you to testify that Mr. Romig said that?
20         MR. KEMETHER: Just so I'm clear, the
21  meeting involving Pastor Auckland, I believe, was
22  in March of --
23         MR. COX: Was earlier?
24         MR. KEMETHER: Was after. It was March

## Page 175

1   of 2010.
2          MR. COX:  All right.
3          MR. KEMETHER: There was a meeting with
4   Mr. Romig and Mr. Hollenbach and Mr. Clymer at
5   about the 3rd or 4th of January 2010.
6          MR. COX:.All right.
7   BY MR. COX:
8      Q.   On the 3rd or 4th of January 2010, at the
9   meeting with you, Mr. Clymer and Mr. Romig, my
10  understanding was that Mr. Romig told the group that he
11  didn't believe he had done anything wrong vis-a-vis the
12  Emily Mayer allegations.  Did you testify to that?
13     A.   Yes, I believe that's what I said.  Yes.
14     Q.   Did you believe Mr. Romig at the time that he
15  said that?
16     A.   Yes.
17     Q.   Did you at any point subsequent to that
18  meeting change your view?
19     Q.   Of not believing him?
20     A.   Yes.
21     A.   No.
22     Q.   At the time of Mr. Romig's resignation from
23  FCA as the girl's basketball coach, did you believe him
24  to be a danger or a threat of any kind to students at

## Page 176

1   FCA or students anywhere else?
2      A.   No.
3      Q.   Subsequent to his resignation and up until his
4   arrest in October of 2013, did your assessment change
5   in that time period?
6          MR. KEMETHER: Until his arrest.
7          MR. COX: Until his arrest.
8          THE WITNESS: No.
9          MR. COX:  That's all I have.  Thank
10  you.
11         MR. SANTARONE:  I don't have any
12  questions.
13         MS. CONNOR:  I don't have any
14  questions.
15         MR. KEMETHER: I do have one.
16         (EXAMINATION)
17  BY MR. KEMETHER:
18     Q.   Did Emily Mayer ever come before you, whether
19  in person, by phone, email, text, letter, any other
20  way, to make any complaints whatsoever about Eric
21  Romig?
22     A.   To me?
23     Q.   To you.
24     A.   No.

44  (Pages 173 to 176)

Appendix  0375

Russell L. Hollenbach, Jr.          Nace vs. Pennridge School District
July 28, 2015

Page 177

1     MR. KEMETHER: No further questions.
2  Thank you.
3     MR. GROTH:  Give me one second, please.
4  Can we go off the record for a second?
5     THE VIDEOGRAPHER: 2:01. Off the
6  record.
7     (There was a discussion held off the
8  record)
9     MR. GROTH:  Let's go back on the
10  record, please.
11     THE VIDEOGRAPHER: Stand by, please.
12  2:02, back on the record.
13     (EXAMINATION)
14  BY MR. GROTH:
15     Q.  Mr. Hollenbach, is it your understanding that
16  whatever advice Jeff Drake gave to Mr. Clymer about how
17  the issue with Mr. Romig should be handled was actually
18  followed by Mr. Clymer?  Was that your understanding?
19     A.  That was my understanding.
20     Q.  Okay.  And as part of Romig exhibit four,
21  which is a group of documents from FCA regarding Mr.
22  Romig's employment there, including his contracts and
23  whatever, there is an undated notice, I think, of some
24  type from Daniel Schmidt, on behalf of the school

Page 178

1  board, to the parents at Faith Christian.
2     I just want to ask you about one part of it.
3  Let me let you read it first just briefly to yourself
4  and then I'll ask you a couple of questions about it.
5     (Pause)
6     THE WITNESS:  Okay.
7     MR. GROTH:  Okay?
8  BY MR. GROTH:
9     Q.  My question is this:  In the second paragraph
10  of that letter to parents it says "Regardless of
11  content, FCA believed the amount of text-message
12  communication between a student and school employee to
13  be inappropriate and concluded that FCA's association
14  with Mr. Romig could no longer continue. "
15     According to your understanding of what went
16  on during the investigation and this time period before
17  Mr. Romig resigned, would you say that's a correct
18  statement?
19     MR. KEMETHER: Objection to form. You
20  can answer if you're able.
21     A.  Not exactly.  It sounds like he was fired when
22  he was asked to resign.
23     Q.  Okay. What distinction do you make between
24  asking somebody to resign and firing them, if any?

Page 179

1     A.  Well, there was -- to ask someone to resign
2  gives them a choice.
3     Q.  And was it your understanding at the time that
4  he actually had a choice, Mr. Romig had an actual
5  choice as to whether to resign or not?
6     A.  At that time I'm not sure.
7     Q.  Have you ever heard of a corporation or a
8  government official giving an individual employee an
9  opportunity to resign instead of terminating them
10  directly?  Have you ever heard of that situation
11  happening?
12     A.  Sure.
13     Q.  Isn't that what happened here?
14     A.  That he was asked to resign?
15     Q.  No; that instead of terminating him directly,
16  he was asked to resign.
17     A.  No, he was asked to resign.
18     MR. KEMETHER: Objection to form.
19     Q.  Did Mr. Romig ever threaten to sue FCA for
20  telling him -- strike that: For asking him to resign?
21     A.  I wouldn't use the word threatened, but it was
22  discussed.
23     Q.  And what did he say, if anything, about what
24  the basis for his claim would be?

Page 180

1     A.  That he could have sued based on there was no
2  truth to the allegations.
3     Q.  Did he also threaten to sue the Smiths?
4     A.  I don't have any recollection of that.
5     Q.  Do you recall ever having a conversation or
6  seeing an email or other writing from him saying that
7  he should sue them for slander?
8     A.  Did I see that? I don't recall seeing
9  anything.
10     Q.  Do you remember if he ever put that in one of
11  the letters to you from jail?
12     A.  I don't remember it being in there, no.
13     Q.  Okay.
14     MR. GROTH:  No further questions.
15  Thank you.
16     MR. KEMETHER: Nothing further.
17     THE VIDEOGRAPHER:  That concludes this
18  deposition.  The time is 2:07.  We are off the
19  record.
20     (The videotaped deposition was
21  concluded at 2:07 p.m.)
22
23
24

45  (Pages 177 to 180)

Russell L. Hollenbach, Jr.            Nace vs. Pennridge School District
                          July 28, 2015

<table>
<tr><td colspan="2">Page 181</td></tr>
</table>

Page 181

1                   INDEX.
2     WITNESS: RUSSELL HOLLENBACH
3     By Mr. Groth:              Page 4 and 177
      By Mr. Cox:                Page 172
4     By Mr. Kemether:           Page 176
5
          · · ·   EXHIBITS
6     NO.        DESCRIPTION          PAGE
      1  Middle and High School Student/Parent
7        Guide                       12
8     2  Document entitled "Discipline"      14
9     3  Email chain                 163
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 183

ERRATA SHEET
------

PAGE    LINE        CORRECTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 182

SIGNATURE PAGE

------

        I hereby acknowledge that I have read the
aforegoing transcript, and the same is a true and
correct transcription of the answers given by me to the
questions propounded, except for the changes, if any,
noted on the Errata Sheet.


                ------


SIGNATURE:      ........................

DATE:           ........................

Page 184

CERTIFICATION

------

        I hereby certify that the testimony and
the proceedings in the aforegoing matter are contained
fully and accurately in the stenographic notes taken by
me and that the copy is a true and correct transcript
of the same.


                Lance A. Brusilow
                Registered Professional Reporter
                Certified Realtime Reporter


        The foregoing certification does not
apply to any reproduction of the same by any means
unless under the direct control and/or supervision of
the certifying shorthand reporter.

                ------

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

----

JAMES NACE, et al        : CIVIL ACTION

vs.        :

PENNRIDGE SCHOOL DISTRICT, :
et al.        : NO. 15-333

----

Thursday, November 5, 2015

----

Oral deposition of JEFFREY DRAKE, ESQUIRE, held

at the law offices of DRAKE, HILEMAN & DAVIS,

252 W. Swamp Road, #15, Doylestown, Pennsylvania,

beginning at 10:00 a.m., on the above date, before

LANCE A. BRUSILOW, Registered Professional

Reporter, Approved Reporter for the United States

District Court, and Notary Public, there being

present.

----

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

---

Page 2

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY: DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY: JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY: JOANNE D. SOMMER, ESQUIRE
60 East Court Street
Doylestown, PA 18901
ph: 215.345.7000
(jsommer@eastburngray.com)
Counsel for Pennridge School District and
individual Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY: CARLA E. CONNOR, ESQUIRE
255 East Swedesford Road
Suite #346
Wayne, PA 19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell
Hollenbach

---

Page 3

(APPEARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY: VERONICA N. OLSZEWSKI, ESQUIRE
36 East Second Street
Media, PA 19063
ph: 610.565.0600
(volszewski@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

DRAKE, HILEMAN & DAVIS
BY: JONATHAN J. RUSSELL, ESQUIRE
252 W. Swamp Road, #15
Doylestown, PA 18901
ph: 215.348.2088
(jrussell@dhdlaw.com)
Counsel for Faith Christian Defendants

ALSO PRESENT:
Henry Thompson

---

Page 4

INDEX

WITNESS: JEFFREY DRAKE, ESQUIRE

By Mr. Groth:              Page 6 and 101
By Ms. Sommer:                 Page 100

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Six pages of handwritten notes | 16 |

---

1 (Pages 1 to 4)

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                          November 5, 2015

Page 5

1     (It is hereby agreed by and among
2   counsel that sealing, certification and
3   filing are waived; and that all objections,
4   except as to the form of the question, are
5   reserved until the time of trial)
6     MR. RUSSELL: This is a little bit
7   unusual in the sense that Attorney Drake
8   serves as general counsel for FCA, and so I
9   want to make sure that the record is clear
10  as to what the discovery is able to deal
11  with and what's been waived.
12     Jeff Drake was and remains general
13  counsel for Faith Christian Academy, and it
14  is in that capacity that he has in the past
15  and continues to provide legal counsel to
16  FCA and its employees, such as Ryan Clymer.
17     It's my understanding that Jeff
18  Drake's deposition is being taken today
19  regarding his communications while providing
20  legal counsel to FCA and Ryan Clymer from
21  December 23rd, 2009, when he was first
22  contacted by Ryan Clymer about Eric Romig
23  and Emily Mayer, through January 6th, 2010,
24  when he had his last substantive

Page 6

1   conversation with Ryan Clymer regarding this
2   issue.
3     While such communications between
4   attorney and client are privileged and not
5   discoverable, because Ryan Clymer and FCA
6   have raised the defense of advice of
7   counsel, the privilege has been waived by
8   Ryan Clymer and FCA for all communications
9   between attorney and client from December
10  23rd, 2009 through January 6th, 2010.
11     Finally, Jeff Drake is appearing
12  here today as a fact witness relative to the
13  substance of any of his conversations
14  between himself and Ryan Clymer or any other
15  representatives of FCA, as well as the
16  advice he provided to FCA and its employees
17  between December 23rd, 2009 and January 6th,
18  2010.
19     JEFFREY DRAKE, ESQUIRE, having
20  been first duly sworn, was examined and
21  testified as follows:
22     (EXAMINATION)
23  BY MR. GROTH:
24  Q. Good morning, Mr. Drake.

Page 7

1   A. Good morning, Mr. Groth.
2   Q. Since you are an attorney and have been
3   in practice for a long time, I can assume I can
4   dispense with the instructions, the guidelines
5   about participating in a deposition?
6   A. Sure.
7   Q. Okay. Mr. Russell read a statement for
8   the record before we began your deposition and
9   actually provides me with some information I was
10  going to ask you about, anyway, but let's start
11  with that: How long have you been general counsel
12  for Faith Christian Academy?
13  A. I believe it goes back to around 2006.
14  Q. Have you ever been a member of Faith
15  Baptist Church?
16  A. No.
17  Q. Did you ever have any children who were
18  educated at Faith Christian Academy?
19  A. No.
20  Q. Did you ever attend Faith Christian
21  Academy?
22  A. No.
23  Q. Where did you go to high school?
24  A. Valley Central High school, Montgomery,

Page 8

1   New York.
2   Q. And was that a public school or Christian
3   school?
4   A. It was a public school.
5   Q. I have your bio from your website, so I
6   don't need to go over all the rest of your
7   educational background.
8     I would like to get some other
9   information from you, though, before I start
10  asking you about the matter at issue between
11  December 23rd, 2009 and January 6th, 2010
12  involving Emily Mayer and Eric Romig.
13     First, have you reviewed any documents in
14  preparation for this deposition?
15  A. I have.
16  Q. And what documents are those?
17  A. I looked at my notes from three
18  conversations I had with Ryan during those periods
19  that you mentioned, and I also looked at Ryan's
20  deposition, at Emily's deposition, and I may have
21  looked at the dad's deposition --
22  Q. That would be Ken Smith's deposition?
23  A. Yes, but the ones I looked at recently in
24  preparation to coming down here and talking to you

                                        2  (Pages 5 to 8)

Appendix  0379

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                           November 5, 2015

| Page 9 | Page 11 |
|---|---|
| 1 would have been Ryan's and Emily's. | 1 Q. Okay. |
| 2 Q. How about Pastor Paul Auckland's | 2 A. I knew there were transcripts -- that had |
| 3 deposition? Did you review that at all? | 3 been reported to me -- |
| 4 A. I did not. | 4 Q. Logs? Telephone logs? |
| 5 Q. Did you review the exhibits that were | 5 A. Logs, that's correct. |
| 6 marked at the deposition of Ryan Clymer? | 6 Q. That's okay. As I understand it, you're |
| 7 A. I did not, although -- I didn't go to the | 7 still general counsel, to this day, for Faith |
| 8 back of the book and look at them, but there may | 8 Christian Academy? |
| 9 be one in there that I did see. | 9 A. Yes, I am. |
| 10 Q. Do you recall which one that was? | 10 Q. Are you personally involved in their |
| 11 A. It was the one that was an email from | 11 defense in this case? |
| 12 Emily Mayer's mother to Ryan toward the end of | 12 A. I've tried to stay out of any involvement |
| 13 2009. | 13 with it once it was determined that they may be |
| 14 Q. Was that the email that was basically a | 14 going with an advice-of-counsel defense. |
| 15 typed recitation by Emily Mayer of the type of | 15 Q. But your firm is. |
| 16 inappropriate texts that she claimed she was | 16 A. My firm is. |
| 17 receiving from Mr. Romig? | 17 Q. Did you do anything prior to the |
| 18 A. I believe so. If you could show it to | 18 deposition in preparation for the deposition to |
| 19 me, I think I could identify it. | 19 obtain information or to refresh your recollection |
| 20 Q. I'll show you what was marked as Romig | 20 about the events that occurred with regard to the |
| 21 exhibit six at his deposition. | 21 Emily Mayer and Eric Romig allegations back in |
| 22 A. I don't remember the email, first thing. | 22 2009? |
| 23 Q. Okay. | 23 Did you try to accumulate some |
| 24 A. Yes, I've seen this document. | 24 information or get some facts from any source? |

| Page 10 | Page 12 |
|---|---|
| 1 MR. RUSSELL: "This," just for the | 1 A. I went to my notes -- early on, when we |
| 2 record, being the second page of what's been | 2 got Mr. Hornstine's letter, I would have talked to |
| 3 previously marked as Romig-6. | 3 Ryan Clymer or Henry. |
| 4 THE WITNESS: In preparation for | 4 But again, when it was determined that I |
| 5 talking to you today. | 5 might be giving a deposition, I stopped doing that |
| 6 BY MR. GROTH: | 6 kind of stuff. |
| 7 Q. And the heading of that page is "Emily | 7 Q. When you got these, you said -- I think |
| 8 Mayer's Statements," correct? | 8 Mr. Russell said -- no, you said three telephone |
| 9 A. Correct. | 9 conversations with Mr. Clymer? |
| 10 Q. Did you review any other documents other | 10 A. Correct. |
| 11 than the transcripts that you mentioned and some | 11 Q. (Continuing) -- you have notes of those |
| 12 of the exhibits? | 12 telephone conversations? |
| 13 A. That's all I'm remembering right now. | 13 A. I do. |
| 14 Q. Did you review the telephone logs for | 14 Q. Did you actually open a file with regard |
| 15 Emily Mayer's telephone showing text messages sent | 15 to that consultation with FCA? |
| 16 to her by Eric Romig that were marked Romig | 16 A. This is not as easy an answer. |
| 17 exhibits five and seven? | 17 Technically, I didn't open a file and give it a |
| 18 A. I don't believe so. | 18 new number. |
| 19 Q. Do you want to look at them just to make | 19 When you represent an organization, you |
| 20 sure? Again, they were attached to the back of the | 20 will sometimes just take notes and put it in a |
| 21 transcript of Mr. Clymer -- I'm sorry, they were | 21 manila folder and put it in, you know, a general |
| 22 not. They were attached to the deposition | 22 file or something like that. |
| 23 transcript of Mr. Romig. | 23 Q. Are you on retainer with FCA? |
| 24 A. Yes, I don't believe I've seen these. | 24 A. I'm not. |

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                          November 5, 2015

Page 13

1    Q. Do you get paid by the hour?
2    A. Yes.
3    Q. Did you get paid for whatever
4  consultation or advice or discussions you had with
5  Ryan Clymer or anybody else at FCA regarding the
6  Emily Mayer/Eric Romig situation?
7    A. I'd have to check. Sometimes, when
8  things don't go far, you know. . .
9    Q. You may not send a bill.
10   A. Right. But I could have, could not have.
11 I don't know.
12   Q. In connection with that issue, the Mayer
13 and Romig issue, did Ryan Clymer or anybody else
14 from Faith Christian Academy provide you with any
15 documents during the time frame referenced by your
16 attorney, December 23rd, 2009 to January 6th,
17 2010?
18   A. I do not believe so, and I'm fairly
19 confident of that because you previously sent out
20 discovery and you asked for correspondence and
21 communications, and I looked and I could not find
22 any correspondence that I either sent or received
23 from people at Faith during that time.
24   Q. On that issue.

Page 14

1    A. On that issue, right.
2    Q. So, the telephone logs and the Emily
3  Mayer statements were not provided to you back in
4  2009/2010.
5    A. Correct.
6    Q. And Mr. Clymer did not send you any
7  written documents, such as an email or a text or a
8  photocopy of something, anything of that nature?
9    A. I believe that is correct.
10   Q. Did you send him any letters or
11 correspondence or any written material?
12   A. I don't believe I did. I just want to
13 say, you know, it's almost six years ago.
14   Q. Sure.
15   A. I'm fairly confident of my answers here,
16 but. . .
17   Q. Do you recall requesting any documents
18 from Mr. Clymer? That if he had obtained through
19 the Emily Mayer/Romig situation any documents,
20 that you would like to see those documents?
21   A. We haven't really gotten to that point
22 yet.
23   Q. So, the answer is no, you didn't request
24 any documents.

Page 15

1    A. That's correct.
2    Q. Did you speak to any other individual at
3  Faith Christian Academy or Faith Baptist Church
4  regarding the Emily Mayer/Eric Romig situation
5  other than or besides Ryan Clymer?
6    A. The only person I had had contact with on
7  that matter back then was Ryan, the only person.
8    Q. Is that borne out by your notes that you
9  have in the file? I mean, do you have any notes
10 that show any conversations or contact with
11 anybody else at FCA about the issue?
12   A. No.
13   Q. You did review your notes before your
14 deposition, correct?
15   A. I did.
16   Q. And how extensive are your notes?
17   A. My notes are not great. They are initial
18 notes you would take during a phone call, jotting
19 things down. They're not easily read and they're
20 not in any way detailed.
21      The second time, second conversation, I
22 did try to go back and try to fill in some blanks
23 or fill in some gaps, but these are notes that
24 would never have been sent to the client or -- I

Page 16

1  thought they were for my own personal use and
2  they're not the best.
3    Q. How many pages of notes do you have?
4    A. Five, maybe six. I mean, that's a guess.
5    Q. Can I see those notes?
6       MR. RUSSELL: I'm fine with that.
7  I think, as part of the basis of the
8  privilege, we can disclose those.
9       MR. GROTH: These notes obviously
10 only have to do with this issue, correct?
11      MR. RUSSELL: Yes.
12      MR. GROTH: Thank you. Can we get
13 copies? I'm sure everybody would like to see
14 these. Can you just make copies and we can
15 mark them as an exhibit?
16      MR. RUSSELL: Do you want to take
17 a break and do it now?
18      MR. GROTH: Yes, please. Let's go
19 off the record.
20      (A brief recess was taken)
21      (Exhibit Drake-1 was marked for
22 identification)
23      MR. GROTH: For the record, Mr.
24 Russell was kind enough to make us copies of

                                    4  (Pages 13 to 16)

Appendix 0381

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                              November 5, 2015

| Page 17 | Page 19 |
|---|---|

**Page 17**

1    Mr. Drake's notes with regard to the
2  Mayer/Romig issue we're talking about.
3  BY MR. GROTH:
4    Q. Mr. Drake, are these all of the notes
5  that you took with regard to that issue?
6    A. They are.
7    Q. And was there any discussion between you
8  and anybody at FCA regarding the Mayer/Romig
9  situation after January 6th, 2010?
10   A. Only once the letter from Mr. Hornstine
11  came and we saw there was an action, but January
12  6th, 2010 was the last substantive conversation I
13  had with Ryan about this matter.
14      I closed my file and didn't think
15  anything more about it until the news broke about
16  your client.
17   Q. That would have been in 2013, correct?
18   A. Correct.
19   Q. I don't see any dates on any of the pages
20  of notes. Is that correct?
21   A. There are no dates.
22   Q. I'll come back to those in a minute.
23   A. These comprise three different
24  conversations.

**Page 18**

1    Q. I understand. Can you separate them by
2  the conversations, by page?
3    A. Not exactly, but I can tell you some
4  things about them. I feel confident about the
5  first conversation.
6    Q. Okay.
7    A. It would be the first two notes, pages of
8  notes, without the red additional comments.
9    Q. So, the last three pages of notes would
10  have been for the second and third telephone
11  conversations?
12   A. I believe, yes.
13   Q. Actually, the last four pages of notes.
14  There are six pages in total, correct?
15   A. Yes.
16   Q. Have you ever done any fund-raising for
17  Faith Christian Academy?
18   A. I have never done any fund-raising. I
19  did attend this past year an auction and had
20  dinner and there was an auction, but I didn't do
21  anything other than -- I don't know if we bought
22  something.
23   Q. Have you ever been on a board at -- I
24  know you're general counsel, but have you ever

**Page 19**

1  been on a board at Faith Christian Academy?
2    A. I don't believe so.
3    Q. Not the Board of Deacons or the board of
4  directors? Any board at all?
5    A. No.
6    Q. Do you know any members of Faith
7  Christian Academy or Faith Baptist Church
8  socially?
9      In other words, did you socialize with
10  any of the members or administrators of the school
11  or pastors or anything like that? Outside of your
12  professional capacity as representing them.
13   A. I know lots of people at Faith. My kids
14  go to another Christian school and we played Faith
15  for years. So, I know people there.
16      I don't believe I've ever socialized with
17  Ryan or Henry or Pastor Paul. Henry and I may
18  have been to lunch, and I'm not even sure about
19  that.
20      MR. RUSSELL: Just a moment,
21    please.
22      (There was a discussion held off
23    the record)
24      MR. GROTH: We're back on the

**Page 20**

1    record.
2  BY MR. GROTH:
3    Q. What school do your kids go to?
4    A. Plumstead Christian School.
5    Q. I notice from your bio on the internet
6  that you do a lot of representation of nonprofit
7  corporations, such as churches, Christian schools,
8  admission boards. Is that correct?
9    A. Correct.
10   Q. Does that include Plumstead Christian
11  School?
12   A. It does.
13   Q. Are you general counsel for them, also?
14   A. Yes.
15   Q. Are you general counsel for any other
16  Christian schools?
17   A. Yes.
18   Q. Which are those?
19   A. Calvary Baptist Christian School, Upper
20  Bucks Christian School. I think they're the four
21  right now.
22   Q. When you had your telephone conversations
23  with Ryan Clymer regarding the Mayer/Romig
24  situation, did you discuss with him the

5 (Pages 17 to 20)

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                              November 5, 2015

| Page 21 | Page 23 |
|---|---|

**Page 21**

1  Pennsylvania Child Protective Services Law?
2  A. No.
3  Q. Back in 2009 when those conversations
4  took place, did you have any professional
5  familiarity with the provisions of the
6  Pennsylvania Child Protective Services Law?
7  A. Yes.
8  Q. How did you have that familiarity?
9  A. Well, representing the types of clients I
10  do, these questions came up relatively often.
11  People would call and want to know do I have to
12  report something, you know, tell me about this.
13  I also taught a class down at what's now
14  Cairn University. It was a fourteen-week -- it
15  was a full-semester course. I think one of the
16  sessions we spent on this as well as other issues.
17  The name of the course was Law & Risk
18  Management, so we would have addressed this issue.
19  Q. "This issue" being the mandatory
20  reporting requirements of the. . .
21  A. Correct.
22  Q. . . .Child Protective Services Law of
23  Pennsylvania.
24  A. Correct.

**Page 23**

1  the statute, correct?
2  A. Correct.
3  Q. But you don't know for sure if you have
4  any other training, instruction or study with
5  regard to the interpretation or limitation of the
6  law? Before 2009.
7  A. Right. I read articles. There were
8  plenty of issues with the old law, plenty. And
9  then the legislature tried to pass a patch, and
10  that addressed some of them but not others.
11  So, yes, I had familiarity with it. I
12  can't tell you if I specifically took a seminar on
13  it.
14  Q. All right. In terms of the change in the
15  law that started at the end of 2014 or beginning
16  of 2015, do you know if David Hecker was involved
17  in that commission or group that implemented those
18  changes?
19  A. He may have even been the chairman.
20  Q. Do you know who else was on the
21  commission or consulted with regard to the changes
22  in the law? Any particular people?
23  A. I don't, other than I think the people
24  who gave the webinar, I got the impression that

**Page 22**

1  Q. When did you teach that course?
2  A. Well, I did it four different times over
3  probably a period of eight years.
4  Q. Starting when?
5  A. I don't remember.
6  Q. It's before 2009?
7  A. Before 2009, yes.
8  Q. Did you ever take any courses or training
9  yourself to familiarize yourself with the Child
10  Protective Services Law in Pennsylvania, including
11  how to interpret the law and how to implement the
12  law?
13  A. You know, I'm thinking several recently
14  because of the substantial change in the law, and
15  I did a few webinars.
16  Q. You're talking about the ones that
17  changed at the end of 2014?
18  A. Correct. I've done webinars. Whether I
19  did a seminar or a webinar before then, I don't
20  have a recollection one way or the other.
21  Q. Before 2009?
22  A. Yes, I don't know.
23  Q. So, your familiarity with the provisions
24  of the law were certainly from your own reading of

**Page 24**

1  they were on that commission.
2  Q. Okay.
3  A. There was a woman district attorney, and
4  I don't remember who the other gentleman was.
5  Q. Was this webinar run by some organization
6  like PBI or somebody?
7  A. I know I got credit. I don't know who
8  did it.
9  Q. CLE credit?
10  A. Yes.
11  Q. At Faith Christian Academy back in 2009,
12  was Ryan Clymer the person, the administrator or
13  the compliance officer who was a mandatory
14  reporter, someone who was required to report
15  instances of child abuse or harassment to the
16  authorities?
17  A. He was the headmaster of the school.
18  Q. Right.
19  A. I don't know if he was the compliance
20  officer. I don't know if they called them
21  mandated reporters back then. But in his capacity
22  as the administrator, he would have been a person
23  who would have had to report if he had the
24  necessary grounds to do so.

6 (Pages 21 to 24)

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                          November 5, 2015

Page 25

```
 1       Q.  I already asked you, I believe, if you
 2  had any conversations with anybody else at FCA
 3  regarding the Romig/Mayer situation other than
 4  Ryan Clymer, and I think you said no.  Is that
 5  correct?
 6       A.  During that time.
 7       Q.  During that time?
 8       A.  That's the only contact, yes.
 9       Q.  Not with Henry Thompson or any other
10  pastor or any other board member?
11       A.  Just Ryan, three phone calls with Ryan.
12       Q.  Was Doug Weiss a board member in 2009?
13       A.  I don't know.
14       Q.  Do you know if he was ever a board
15  member?
16       A.  The name Weiss sounds familiar, but I
17  don't know.
18       Q.  Other than these notes that you took of
19  your conversations with Ryan Clymer, did you ever
20  prepare any formal opinion letter or writing
21  expressing your opinion to your client regarding
22  any issue in connection with the Emily Mayer/Eric
23  Romig situation?
24       A.  No, I never sent -- I never prepared an
```

Page 26

```
 1  opinion letter nor did I send him anything.
 2       Q.  Were you asked to do that by Mr. Clymer?
 3       A.  No.  But in fairness, I don't know what
 4  would have happened.  As you may or may not know
 5  -- and I'm sure we'll get to it -- I got out of
 6  the case pretty abruptly.  So, whether he would
 7  have asked me to do that or not. . .
 8       Q.  I'm just asking if he did.
 9       A.  I don't know.
10       Q.  When you say you got out of case
11  abruptly, why was that?
12       A.  Well, I had that conversation with Ryan
13  on December 23rd and then another one on January
14  6th.  And while we haven't gotten into the content
15  of that yet, I can tell you that when we hung up
16  on January 6th I was planning on attending a
17  school board meeting the next night.
18           MR. GROTH:  Let's go off the
19       record.
20           (There was a discussion held off
21       the record)
22           MR. GROTH:  We're back on the
23       record.
24
```

Page 27

```
 1  BY MR. GROTH:
 2       Q.  You were starting to say you were going
 3  to attend a school board meeting?
 4       A.  Right.  I don't want to get ahead of your
 5  question, but --
 6       Q.  Go right ahead.
 7       A.  -- Romig had resigned as of January 5th,
 8  and as of January 6th it looked like he was having
 9  second thoughts about his resignation.
10           And there was going to be a school board
11  meeting the next night, and Ryan wanted Romig to
12  remain terminated or resigned from the school and
13  thought that, you know, maybe it would be helpful
14  if I could be at the meeting to give some
15  background and try to convince the board that
16  Romig should remain unemployed.
17       Q.  Remain unemployed.
18       A.  Right, by the school.
19       Q.  Okay.
20       A.  So --
21       Q.  By the way, let me stop you for a second:
22  When you say "the school board," you're talking
23  about the Board of Deacons for FCA?
24       A.  I think, yes.  I mean, whoever the board
```

Page 28

```
 1  is.
 2       Q.  FCA's board.  That's who your talking
 3  about.
 4       A.  FCA, yes.
 5       Q.  Okay, I'm sorry.  Go ahead.
 6       A.  There is a deacon board.  There is an FCA
 7  board.  I think they could be the same. . .
 8       Q.  I know, it changed over time, but go
 9  ahead.
10       A.  So, that's what I geared up to do.  The
11  next morning I come into work and somehow I'd --
12  because we have a conflicts checks that we
13  normally go through and whatnot, but somehow my
14  associate, who is no longer with us, heard the
15  name Romig and he said, "Oh, I represent Eric
16  Romig and his wife."  I said, you do?  And I asked
17  him to tell me what he did.
18           I don't feel at liberty to say what he
19  did just because of their confidentiality, but it
20  had nothing whatsoever to do with this case.
21       Q.  All right.
22       A.  So, then you think about potential
23  conflict.  So, I asked him are they present
24  clients?  And he said no, he wasn't doing anything
```

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                            November 5, 2015

## Page 29

1   for them right then.
2        But I said, could they consider us their
3   attorneys?  Do they believe we're still their
4   attorneys?  And based upon what he had done for
5   them, yeah, they would consider Drake, Hileman &
6   Davis their attorneys.
7        So, I said look -- I made this decision:
8   Whether technically it was a conflict of interest,
9   it certainly could have the appearance of a
10  conflict, so I made a decision right then and
11  there, on Thursday morning, the 7th of January, I
12  didn't want to represent the school in this matter
13  against Eric Romig.
14       Q.  So, you didn't go to that meeting.
15       A.  I did not.
16       Q.  Did you advise Mr. Clymer or FCA to get
17  another attorney?
18       A.  I said, "I think you need an attorney,"
19  and I knew an attorney who had done some
20  employment law and I gave him a call -- first I
21  asked Ryan if I could give him a call, and Ryan
22  said sure.  I gave this fellow a call.  He was
23  available that night.  I put him together with
24  Ryan and. . .

## Page 30

1        Q.  Okay.
2            MR. RUSSELL:  And what?  Just so
3        the record is clear.
4            THE WITNESS:  And no contact after
5        that.  That was it.
6   BY MR. GROTH:
7        Q.  And that was Brett Mandes?
8        A.  That was Brett Mandes.
9        Q.  Do you know if he attended the meeting?
10       A.  I do know he attended the meeting.
11       Q.  A couple things about what you just
12  testified to.  You said the first call that you
13  had from Mr. Clymer was on December 23rd, and the
14  last telephone conversation you had with him was
15  on January 6th.  Is that correct?
16       A.  Substantive.  When I found out I was
17  getting out of the case, I called him to say "Hey,
18  I can't handle this.  Do you want me to try to
19  find another lawyer?"
20       Q.  How do you know those dates since there
21  are no dates on your notes?
22       A.  Ryan called me right before Christmas the
23  first time.
24       Q.  All right.

## Page 31

1        A.  And I went back and looked -- Christmas
2   was on a Friday that year, the 25th.  Drake,
3   Hileman & Davis usually closed on the 24th, so I
4   believe it was the 23rd, the day before the
5   holiday.  Then when we got back, he was going to
6   continue his investigation.
7        When we got back in January of that year,
8   he called me or I called him.  That's when I found
9   out that Romig had resigned on the 5th and the
10  following night, Thursday, was a board meeting, so
11  that was the 7th.
12       And I think there is a note -- I don't
13  know if it says, but there is some reason that led
14  me to believe that the board meeting was -- yes,
15  "Meeting on Thursday evening, January 7th."
16       Q.  You're talking about the last sheet?
17       A.  The last sheet, the one that's on the
18  white paper.
19       Q.  Okay.
20       A.  So, if that was the meeting, then I know
21  I had to be talking to him on the 6th.
22       Q.  What about the second telephone
23  conversation with Mr. Clymer?  You had one on
24  December 23rd, one on January 6th.

## Page 32

1        A.  Two on January 6th.
2        Q.  Two on January 6th.  Were those the three
3   conversations?  Those were the only three
4   conversations?
5        A.  Correct.
6        Q.  Nothing between December 23rd and January
7   6th.
8        A.  Right.
9        Q.  Tell me what the conversation was between
10  you and Mr. Clymer on December 23rd, 2009.  And
11  you're free to refer to your notes to refresh your
12  recollection.
13       A.  Well, Ryan called me -- and I believe it
14  was the 23rd of December 2009 -- and said that he
15  had a situation at his school -- and by the way,
16  I'm almost positive Ryan was in Alabama when we
17  were having this phone conversation on December
18  23rd.  He evidently had some relatives down there
19  and was spending the holidays.
20       He said that a girl had come to him
21  several days before -- it could have been the
22  previous week, end of the week -- and said that
23  she had been getting some inappropriate text
24  messages from a coach.

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                          November 5, 2015

Page 33

1    Q. Did he tell you the name of the girl?
2    A. Yes, he did.
3    Q. Did he tell you the name of the coach?
4    A. Yes, he did.
5    Q. Did he tell you what the inappropriate
6    text messages were that were being alleged?
7    A. I wrote down the four that I believe he
8    gave me. They're found at the bottom of this
9    page.
10       The girl claimed that in the text message
11   he said "I love you"; the second, "I'm going to be
12   leaving my wife"; third, "I'll wait for you if you
13   want to marry me"; and fourth, "I want to get with
14   you."
15   Q. And those are the four -- I'm going to
16   mark these pages at the bottom pages one, two,
17   three, four, five and six, just so we know what
18   page we're referring to.
19       Those are the four notes that are in dark
20   ink at the bottom of the first page, correct?
21   A. Correct.
22   Q. Before we go on with that conversation,
23   let me ask you a question about what you've
24   already testified to. Your recollection is that

Page 34

1    the girl -- who was Emily Mayer? Is that correct?
2    A. Yes.
3    Q. Is her name written on the page
4    somewhere -- oh, I see it. In the middle?
5    A. Yes.
6    Q. To the right?
7    A. Yes.
8    Q. (Continuing) -- you said the girl came to
9    him. Did he tell you that she voluntarily came to
10   him to report this?
11   A. I believe she was brought by a woman.
12   The way this came down -- and my notes don't say
13   this, but my recollection, as good as that is six
14   years ago, was that this Emily Mayer had told one
15   of her friends, and either the friend told her
16   mother or the mother overheard them talking, and
17   it was this mother who then said "Well, you need
18   to go see Mr. Clymer."
19   Q. I know you already know this, but let me
20   just say it: I'm really interested in what you
21   knew back in 2009, not what you read in Mr.
22   Clymer's deposition or Emily Mayer's deposition or
23   her father's deposition, whatever.
24       So, I know it's hard to juggle the two,

Page 35

1    but let me ask you with regard to that last
2    answer: Did you know that information back in
3    2009, or was it your own recollection that the
4    girl went voluntarily to Mr. Clymer?
5    A. I don't think she went voluntarily. I
6    have this note here that says "Brought girl in."
7    Q. Where is that?
8    A. Kind of -- I apologize for my writing.
9    Q. That's okay.
10   A. The middle of the page. It's next to
11   "7th, brought girl in." So, I think this mother
12   brought the girl in.
13   Q. Okay.
14   A. I had no idea who that mother was then.
15   Q. The four alleged inappropriate texts that
16   Emily Mayer said she received were to the effect
17   of what she wrote here, according to Mr. Clymer,
18   "I love you; I'm going to be leaving my wife" --
19   is that "leaving"?
20   A. Yes, it is.
21   Q. (Continuing) -- and the last one is
22   "I'll. . .
23   A. The third one is "I'll wait for you if
24   you want to marry me."

Page 36

1    Q. And the last one was "I want to get with
2    you."
3    A. Correct.
4    Q. What other information did Mr. Clymer
5    give you during that first phone call?
6    A. Well, we talked a lot. I said do you
7    have the text messages, and he did not. Now,
8    before talking to me, my recollection is that Ryan
9    talked to the girl's parents and he also talked to
10   Romig.
11   Q. Was that your impression, or did he tell
12   you that?
13   A. I'm pretty sure he told me that. And
14   looking at my notes, that's how I know some of
15   these -- that's how my notes would contain certain
16   things here.
17   Q. Okay.
18   A. So, I asked him if he had the text
19   messages; he said no, that he was hoping to get
20   them.
21       And I asked, well, how. And he said that
22   Emily Mayer's stepfather, I believe it is -- I
23   believe it's Smith; I don't know his first name.
24   Mr. Smith thought he could get them.

Jeffrey Drake, Esq.                               Nace vs. Pennridge, et al.
                          November 5, 2015

Page 37

1       In fact, he already -- by the time Ryan
2   had spoken to me, Mr. Smith was able to get the
3   logs for the phone records from October 4th to
4   November 30th.  He was able to get them, and they
5   showed a thousand texts -- I'd say over a thousand
6   texts.  In parenthesis I have 1,077.  This is on
7   page two.
8       Mr. Smith was going to be getting the
9   logs from December and also believed he could get
10  the actual content of the text messages
11  themselves.
12      Q.  You had worked in the DA's Office for a
13  period of time?
14      A.  I did not.
15      Q.  Oh, okay.  Other people in your office
16  have.
17      A.  Mr. Hileman, yes, and Mr. Blackburn.
18      Q.  Did you back at that time know what could
19  be done to actually obtain the content of deleted
20  text message off a cell phone?
21      A.  I did not.  I have no idea.
22      Q.  Do you know now?
23      A.  Not really.
24      Q.  Okay, go ahead.

Page 38

1       A.  So, that was one thing he said to me.  He
2   said he had confronted Romig and Romig said --
3   this should be at the top of page two:  "That's
4   ridiculous, you know me.  I wouldn't do that."
5       I asked Ryan if the girl had any of these
6   text messages, and he said no.  I said any.  He
7   said not one, all right?
8       I asked if he had shown them to anybody,
9   and evidently Emily showed one text message to her
10  boyfriend, but it wasn't about this.  It had
11  something to do with the boyfriend.  It didn't
12  have anything to do with this.
13      I asked if he discussed anything with
14  her, and Emily evidently said that Ryan should
15  check with a girl who had graduated a few years
16  ago, that she may have had a relationship or
17  something.  He didn't get specific.  That girl's
18  name was Lauren Fretz.
19      Q.  Let me stop you for one minute.  At the
20  top of page two, you're saying that the coach,
21  Eric Romig, said, you know, that it was ridiculous
22  that these allegations were being made; "you know
23  me.  I couldn't do that."  Is that what it says in
24  your note?

Page 39

1       A.  "I wouldn't do that."
2       Q.  "I wouldn't do that."  At that time did
3   you know that Eric Romig had gone all through
4   school, from I think first grade through
5   graduation at FCA, with Ryan Clymer as classmates?
6       A.  I didn't know that, but toward the end of
7   the conversation I was trying to size up who the
8   people were.  I say tell me about Mr. Romig, tell
9   me about Emily Mayer.
10      And I think during that conversation Ryan
11  said "I've known," you know, "Romig a long time."
12  I don't know if he told me he went all through
13  school with him or anything like that, but he had
14  known him a long time.
15      Q.  What's the next note under that note?
16      A.  I can't. . .
17      Q.  "Preview. . .
18      A.  I couldn't get it.  I can read this:
19  "Apparently false" is the other one.
20      Q.  Right.
21      A.  I couldn't get that one.  I even asked my
22  secretary if she could read that, and she said no.
23      Q.  What's the word that you crossed out?  Do
24  you know that?  Is it "previous"?

Page 40

1       A.  I don't know.  Looks like "preview."
2       Q.  Okay.  What else did Mr. Clymer tell you?
3       A.  Well, he said that he had talked to
4   Lauren Fretz, who he knew, and I said, well, what
5   did she say?
6       Q.  This is all on the 23rd, right?
7       A.  This is on the 23rd.  This is in the
8   first conversation.
9       Q.  All right.
10      A.  And she said, "No.  Ewww, not with coach,
11  no.  Nothing ever happened between coach and me."
12      Q.  Is that in a note somewhere?
13      A.  This says "Lauren, a player, graduated
14  one or two years ago."
15      Q.  Where is that?
16      A.  That's at the bottom of page two.
17      Q.  Got it.
18      A.  But I have a clear recollection, clear,
19  of Ryan saying that she said nothing had ever
20  happened.
21      Q.  What does your note read after the word
22  "Lauren, a player, graduated"?
23      A.  "With" or "from her two years ago.  I'm
24  going to leave my wife."

                                    10  (Pages 37 to 40)

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                              November 5, 2015

| Page 41 | Page 43 |
|---|---|
| 1    Q. What does that mean? | 1    Q. What else did Mr. Clymer tell you? |
| 2    A. I'm not sure. I don't know if he asked | 2    A. I asked him about Emily and I asked him |
| 3  her did she say that. I don't know if he asked | 3  about Romig, and in regard to Emily he said that |
| 4  her if she said anything like that to him. I just | 4  she had had -- she is relatively new to the |
| 5  was writing as we were talking. | 5  school; that there had been some discipline issues |
| 6    Q. I'm trying to get the context from the | 6  with her, but he didn't make that a big deal or |
| 7  note. "A player graduated around two years ago. | 7  anything like that. He didn't emphasize that. He |
| 8  I'm going to leave my wife." | 8  didn't think that she shouldn't be believed or |
| 9    A. Oh, okay. | 9  anything, just that there had been some issues. |
| 10    Q. Go ahead. | 10    I said, well, what about Romig? And he |
| 11    A. Lauren said nothing had ever happened | 11  said, basically, Romig had been there for a long |
| 12  between her and the coach. | 12  time. He was known by a lot of people. He was a |
| 13    Q. That's not written down here, right? | 13  good coach. He was well liked. |
| 14    A. Right. But then she says a player | 14    I asked him if there had ever been any |
| 15  graduated with her two years ago; she may have | 15  incidents involving Romig in the past, and he said |
| 16  said to him "I'm going to leave my wife," and that | 16  not with Romig per se. He said the previous |
| 17  is Christine Kennedy. | 17  year -- and texting was all very new at this time. |
| 18    I asked Ryan, I said, "Did you talk to | 18    He had indicated that the teachers, the |
| 19  Christine Kennedy?" He said "No. I have a phone | 19  coaches had been instructed not to text their |
| 20  call in to her, but I haven't heard back from | 20  players, or at least male coaches were instructed |
| 21  her." | 21  not to text their players. |
| 22    Q. Just so the record is clear, it's Kristen | 22    I said, was that because of something |
| 23  Kennedy, K-r-i-s-t-i-n. I know you have it spelled | 23  that he did? Had there been a complaint? He said |
| 24  Christine, but so we're referring to the same | 24  no, that was just a policy -- I don't think it was |

| Page 42 | Page 44 |
|---|---|
| 1  person. | 1  a written policy -- that people thought that was |
| 2    A. All right. | 2  not a good idea. So, I don't think it was limited |
| 3      MR. SANTARONE: It's t-e-n. | 3  to Romig. I think coaches were not supposed to |
| 4      MR. GROTH: t-e-n, thank you. | 4  text. |
| 5  BY MR. GROTH: | 5    Q. Your notes says "Told him last year not |
| 6    Q. You have Kristen Kennedy's name and then | 6  to text." Is that right? |
| 7  what after that, "gone two years ago"? | 7    A. Correct. |
| 8    A. "Gone two years." | 8    Q. "Him" referring to Romig? |
| 9    Q. Then your notes say "Over 1,000 texts | 9    A. "Him" referring to Romig, but I believe |
| 10  (1,077)." Those are to Emily Mayer, correct? | 10  that was not just Romig. |
| 11    A. Texts to Emily Mayer, correct. | 11    Q. In general. |
| 12    Q. Let me ask you one more question about | 12    A. Right, in general. |
| 13  these notes: October 4th to November 30th, above | 13    Q. But did Mr. Clymer tell you that he had a |
| 14  Kristen Kennedy's name, what's that represent? Oh, | 14  specific issue with Mr. Romig himself in texting |
| 15  phone records. | 15  players the previous year? |
| 16    A. They're the phone records that Mr. Smith | 16    A. He may have said that Romig texted -- and |
| 17  was able to get that showed over a thousand texts. | 17  I was very clear: I said, well, was there |
| 18    Now, there is no breakdown -- in | 18  anything inappropriate, anybody alleging anything |
| 19  subsequent conversations it had breakdowns between | 19  like that? He said no. I think it was just the |
| 20  Emily -- the ones she sent and the ones Romig | 20  idea of him texting, and maybe a parent or so |
| 21  sent. This one was over a thousand texts. I | 21  didn't like that. |
| 22  don't know if it was back and forth -- | 22    Q. Let me go back to my question: Did Mr. |
| 23    Q. One way or both ways. | 23  Clymer tell you that there was an issue where Mr. |
| 24    A. You're right. | 24  Romig himself was texting a female student the |

                                                    11 (Pages 41 to 44)

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

| Page 45 |
|---|
| 1   year before Emily's Mayer's report or complaint? |
| 2       A.  My impression is that he would text his |
| 3   players, females.  And they were girls.  I didn't |
| 4   know it was one specific person, but I did -- I |
| 5   was trying to find out who to believe here. |
| 6       Q.  Sure. |
| 7       A.  I said, has anybody else said he made |
| 8   inappropriate comments to them?  And that was |
| 9   clearly no, nothing was inappropriate.  But the |
| 10  act of texting, yes. |
| 11      Q.  Did he tell you that Tracy Fretz, Lauren |
| 12  Fretz' mother, had an issue with Mr. Romig texting |
| 13  her daughter before this Emily Mayer situation |
| 14  arose? |
| 15      A.  No. |
| 16      Q.  When you said this was not a written |
| 17  policy about texting but people were told not to |
| 18  text players, was that just with regard to male |
| 19  coaches and female players, or even male coaches |
| 20  and male players, or it wasn't even discussed? |
| 21      A.  I don't believe it was discussed.  I was |
| 22  just trying to find out if Romig had a history of |
| 23  doing what he was being alleged to have done. |
| 24      Q.  But in any event, from the information |

| Page 46 |
|---|
| 1   Mr. Clymer gave you, it was your impression that |
| 2   if Mr. Romig was texting one of his players, |
| 3   regardless of the content of the text, that was |
| 4   against the school's policy. |
| 5       A.  Absolutely. |
| 6       Q.  Okay. |
| 7       A.  And one of the main reasons that Ryan was |
| 8   suspicious of Mr. Romig. |
| 9       Q.  Aside from the number of texts? |
| 10      A.  The number -- when we finished our |
| 11  conversation, we went over what there was.  And |
| 12  Romig had been told not to text and he had |
| 13  allegedly texted a thousand. |
| 14      On the other hand, you know, Emily Mayer |
| 15  made a claim.  She didn't keep any of the text |
| 16  messages.  No one had seen any of them.  And the |
| 17  one lead she gave to Ryan turned out to go |
| 18  nowhere.  At least, Lauren Fretz was pretty |
| 19  adamant that she didn't have a relationship. |
| 20      So, Ryan was thinking, well, I'm going to |
| 21  keep doing some investigation here, and we talked |
| 22  about getting the messages would be great because |
| 23  then we'd see what was there. |
| 24      And by the way, if it could ever be shown |

| Page 47 |
|---|
| 1   that Romig had said "I love you, I want to marry |
| 2   you," that that was so completely inappropriate |
| 3   that he could not continue to teach in Faith |
| 4   Christian Academy or, really, any school.  It was |
| 5   just completely outside the bounds of what could |
| 6   happen, but he didn't know that at the time. |
| 7       But he talked to Mr. Smith, and Ryan was |
| 8   thinking ahead and wanting to know, if his |
| 9   investigation were to reveal where he got to the |
| 10  point where he believed Emily was more likely |
| 11  accurate on this than Romig, you know, could he |
| 12  terminate Romig.  So, then we got involved in a |
| 13  conversation about termination. |
| 14      Q.  Okay. |
| 15      A.  And I told him "He's an employee-at-will, |
| 16  so yes, you can terminate him.  However, I don't |
| 17  know if you want to terminate him for -- accuse |
| 18  him of something that you really don't have any |
| 19  proof on."  In fact, the proof probably tipped the |
| 20  other way at that point. |
| 21      I said, "If you told him not to text and |
| 22  he's texting with a thousand messages, you could |
| 23  terminate him on that.  "And could he sue me?" |
| 24  Yes, he could sue you.  That's a possibility.  You |

| Page 48 |
|---|
| 1   can't stop one from doing that. |
| 2       And I said, therefore, if Romig is |
| 3   willing to resign, that would likely take away -- |
| 4   it would do a couple things:  It would take away |
| 5   to some degree Romig's ability to sue, not that |
| 6   Romig still couldn't sue; and also it would -- |
| 7   Romig had a following in the school. |
| 8       People believed Romig very strongly. |
| 9   It's one thing if you fire a guy.  It's another |
| 10  thing if a guy resigns himself. |
| 11      So, Ryan didn't know what he was going to |
| 12  do, but I kind of laid it out for him.  I asked him |
| 13  what's happened, and he said before he left he had |
| 14  asked both parties to step away from the team, the |
| 15  coach and Emily. |
| 16      And he was, I think, in Alabama -- it |
| 17  could have been Georgia, but I think it was |
| 18  Alabama -- and when he got back he would finish up |
| 19  his investigation or he would continue it, at |
| 20  least, and hoping we could have those text |
| 21  messages. |
| 22      Q.  Okay.  Did he tell you during that first |
| 23  telephone call that, even after Emily Mayer made |
| 24  these accusations and allegations about Mr. |

                                        12  (Pages 45 to 48)

Appendix  0389

Jeffrey Drake, Esq.                    Nace vs. Pennridge, et al.
                        November 5, 2015

**Page 49**

1  Romig's inappropriate text messages to her, that
2  he allowed Eric Romig to coach a practice after
3  those accusations were made and actually to coach
4  a game?
5     A. We did not discuss that at all on the
6  23rd, to my recollection.
7     Q. Did Mr. Clymer tell you that he did send
8  Emily Mayer home as soon as she made the
9  accusations, told her to leave school?
10          MR. SANTARONE:  Objection to the
11  form of the question.
12     A. My recollection is that -- and again I
13  don't know exactly the day.  It was right before
14  the Christmas break.  It could have been last day
15  of school.  My recollection is that they were
16  separating from the team, Emily's parents had been
17  notified, Romig was denying it, and he would
18  continue his investigation when he got back.
19     Q. All right.  Do you recall anything about
20  your first conversation on the phone with Mr.
21  Clymer other than what we've already discussed?
22     A. I mean, I don't.  I'm sure there could
23  have been some other things, but nothing is coming
24  to mind right now.

**Page 50**

1     Q. During that conversation was there any
2  discussion between you and Mr. Clymer at all about
3  the requirements of the Child Protective Services
4  Law in Pennsylvania and whether or not the
5  accusations that Emily Mayer was making should be
6  reported to outside authorities?
7     A. I do not recall that at all.  In
8  preparing for this deposition today, I acknowledge
9  to you I did read Ryan's deposition and I read
10  Emily's, and both say that during that
11  conversation Emily had never said anything was
12  sexual.  Very inappropriate, and I want to
13  emphasize that.
14       If a coach is saying these types of
15  things, that coach is going to be out of there.
16  He did not raise it nor did I think, oh, gee, this
17  is sexual exploitation or abuse.
18     Q. And how did you interpret the information
19  Mr. Clymer gave you when he told you that Eric
20  Romig supposedly sent a text saying "I want to get
21  with you"?  How did you interpret that?
22     A. Consistent with that he wanted to be with
23  her.  If Romig said this, he obviously has a very
24  weird infatuation with a young girl:  Wants to

**Page 51**

1  marry her; he loves her; he wants to be with her.
2  That's how I took that.
3     Q. You didn't take that as a sexual
4  connotation at all.
5     A. I didn't take that as a sexual
6  connotation at all, and I did not take it in any
7  way that Romig at that point was trying to entice,
8  induce, coerce or persuade Emily to engage in an
9  explicit sexual act, if These messages were even
10  true.
11     Q. If Mr. Clymer had reported to you that
12  Emily told him that one of the text messages from
13  Clymer said "I want to be in you --
14          MR. RUSSELL:  Just objection to
15     the form of the question to the extent that
16     it calls for --
17          MR. GROTH:  I didn't finish the
18     question yet.
19          MR. RUSSELL:  I thought that was
20     the question.
21          MR. GROTH:  Can I finish the
22     question first?
23          MR. RUSSELL:  Sure.
24          MR. GROTH:  Thanks.

**Page 52**

1  BY MR. GROTH:
2     Q. If Mr. Clymer had told you that one of
3  the text messages that Emily said she got from Mr.
4  Clymer was "I want to be in you," would you have
5  considered that to be a sexual connotation?
6          MR. RUSSELL:  Just objection to
7     the form of the question to the extent that
8     it calls for speculation.  He's not here as
9     an expert witness on that, but you can go
10     ahead and answer.
11          THE WITNESS:  That was not a fact
12     before me at that time.  Now, I did learn
13     about that "in you" comment, that only one,
14     on January 6th, but I can't say what I would
15     have said on December 23rd.
16  BY MR. GROTH:
17     Q. Based upon your familiarity and knowledge
18  of the Child Protective Services Law in
19  Pennsylvania, is that the type of communication
20  from a coach to a student that could be viewed as
21  exploitation?
22          MR. SANTARONE:  Pre the 2014
23     changes.
24          MR. GROTH:  Pre the 2014 changes.

                              13  (Pages 49 to 52)