Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                          November 5, 2015

---

Page 53

1          THE WITNESS: One would have to
2    determine what the word "in" means. When he
3    eventually did tell me that one statement, I
4    said, well, would it be "into"? It would
5    seem to be more consistent with "get with."
6    So, it could have two meanings. It's a
7    double-entendre.
8          If it is a sexual connotation,
9    then it would be sexualized talk, but I
10   don't know what I would -- you would have to
11   at that point determine, go back and look a
12   the actions and ask him -- and it would be
13   based upon Ryan's professional training and
14   background -- if he considered Romig trying
15   to induce, entice, coerce her to engage in
16   explicit sexual acts. That seems a stretch
17   to me, you know, but it would be what he
18   said.
19         Now, I will say, under the new
20   law -- and I think this illustrates the
21   point -- under the new law, sexually
22   explicit conversation is included under the
23   term of sexual abuse or sexual exploitation.
24         It wasn't at that time, which

---

Page 54

1    leads me to believe, although you can
2    certainly dispute it, that it wasn't back in
3    2009.
4          I thought about this all after the
5    fact. These thoughts did not come up on the
6    23rd because the "in" comment wasn't even
7    there.
8    BY MR. GROTH:
9         Q. You have already used the definition of
10   sexual abuse or exploitation from the Pennsylvania
11   statute. You had mentioned the definition of
12   sexual abuse or exploitation as "the employment,
13   use, persuasion, inducement, enticement or
14   coercion of a child to engage in or assist another
15   individual to engage in sexually explicit
16   conduct."
17         Back in 2009 was it your understanding of
18   that definition that it did not include explicit
19   text messages, emails, Facebook messages, those
20   types of communications?
21         A. I didn't think about that in 2009. And
22   again, especially in December, when there was no
23   reference to sex whatsoever, none.
24         Q. According to Mr. Clymer.

---

Page 55

1         A. According to Mr. Clymer. And I think
2    Emily Mayer also said that in her deposition, that
3    she had not mentioned that to Mr. Clymer on the
4    23rd.
5         And I do want to point out that that's
6    one definition of sexual abuse or exploitation
7    that existed in 2009. There are two other
8    definitions for that.
9         Q. Where are they?
10        A. In the same statute. The second one
11   doesn't apply because it's talking about
12   videotaping and showing.
13        But the third one is very interesting.
14   It defines sexual exploitation -- excuse me, it
15   defines child abuse as being guilty of one of
16   these crimes, and one of the crimes listed is
17   sexual exploitation and the other crime that's
18   listed is sexual abuse.
19        And I went and read those after the fact.
20   I read those sections. They clearly don't apply.
21   They're found in Title 18. I think 6312 is sexual
22   abuse, and I think 6320 is sexual exploitation.
23   They don't fit at all. So, then the question
24   becomes do they fit under the first definition.

---

Page 56

1         But again, I'm telling you, after the
2    fact on the 23rd, it wasn't on the radar. We
3    didn't discuss this at all.
4         Q. I understand. Did Ryan Clymer ask you to
5    actively participate in his investigation? And by
6    "actively participate" I mean get involved in
7    interviews, talking to people and gather
8    documents, trying to gather information.
9         A. No.
10        Q. Do you know if he asked anybody else to
11   help him with that? Did he tell that you?
12        A. Well, Mr. Smith was supposed to be
13   helping him get the log for December. He was
14   supposed to be trying to get the content of the
15   text messages. I think Ryan had some conversation
16   with the athletic director.
17        Q. Mr. Hollenbach.
18        A. Mr. Hollenbach.
19        Q. Did Mr. Clymer tell you that he had
20   contacted a friend who may have had children in
21   the school, a police chief, to ask him about what
22   he should do in this situation?
23        A. You know, when I looked at my notes I
24   wrote the words "police chief" here.

---

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

---

Page 57

1    Q. Where is that?
2    A. First page, on the left. And I was
3 wondering about that because I don't really
4 remember that.
5        But when I read Ryan's deposition, he
6 said that when he found out about Lauren Fretz and
7 someone making a claim that maybe she was involved
8 sexually with Mr. Romig, Ryan indicated in his
9 deposition that he talked to his police chief
10 friend, I think, about that.
11       So, I have no recollections if he talked
12 to his police chief friend about Emily Mayer and
13 the text situation.
14    Q. Did he tell you that he had spoken to
15 Kristen Kennedy?
16    A. Not on the 23rd.
17    Q. Okay.
18    A. That will come on the 6th.
19    Q. Let's just go through these notes for the
20 first two pages so I understand what they all
21 mean.
22    A. Okay.
23    Q. And you can tell me, also, about the
24 red-ink notes.

---

Page 58

1    A. Okay.
2    Q. Let's go over the dark-ink notes first.
3 At the top of page one there is the word "Ryan"
4 and then next to it says what?
5    A. "A coach. Inappropriate things."
6    Q. What's does "X 3330" three mean?
7    A. Could be his extension.
8    Q. What's the note on the right-hand side of
9 that?
10    A. "Step-dad Kevin Smith."
11    Q. There is what looks like 17?
12    A. "Brought in girl 17," so Emily was
13 seventeen.
14    Q. Under that it says what?
15    A. "Texting girl for last two, two and a
16 half months."
17    Q. Under that?
18    A. "She deleted everything."
19    Q. Under that?
20    A. "A couple texts that were suggestive."
21    Q. Are those the texts that you cite down
22 below?
23    A. I believe so.
24    Q. You have in the left-hand margin the word

---

Page 59

1 "resigned"?
2    A. Yes. During this conversation we talked
3 about it would be better if Romig had resigned, if
4 Ryan was going in that direction. And again,
5 Ryan, I think, was leaning in that direction, but
6 he wanted to be fair and he wanted to know what
7 his options were.
8        If you have an employment issue, it's
9 better if someone resigns as opposed to being
10 fired.
11    Q. Did you talk to Ryan about what would
12 happen or what should happen in the event that Mr.
13 Romig was offered the choice to resign but refused
14 to resign?
15    A. Well, I said, based upon what you have --
16 I don't think Ryan actually had the authority to
17 terminate. He might have.
18       I don't know the internals of the school,
19 but I think it's possible that he could have, but
20 it's also possible that he had to get board
21 approval.
22       Basically, if Ryan thought he had enough,
23 he said "You can resign, or else I'm going to the
24 board and I'm going to ask that you be

---

Page 60

1 terminated."
2    Q. So, you did discuss the issue of what
3 could happen if Mr. Romig refused to resign.
4    A. Right. And we also discussed that Romig
5 could sue either way. That was a possibility.
6    Q. Let's go over to the second page of your
7 notes.
8    A. Okay.
9    Q. These are still from the first
10 conversation, correct?
11    A. Correct.
12    Q. About a third of the way down there looks
13 like a three and some words after that. What is
14 that?
15    A. "Third party."
16    Q. "Third party."
17    A. "Texting someone in college."
18    Q. What's that about?
19    A. I don't know if Emily was saying that
20 Romig was texting Lauren. I don't know. I think
21 it might be Lauren because the next thing says
22 "Contacted girl from college. Came in and helped
23 with practice." I think Lauren Fretz used to come
24 back and practice.

www.brusilow.com          brusilow + associates          215.772.1717

Appendix 0392

Page 61

1      I'm giving you my best recollection after
2   a six-year hiatus.
3      Q. I understand.  That's all I'm asking for.
4   Did you discuss with Ryan Clymer during that first
5   telephone conversation whether or not just the
6   fact that Mr. Romig sent over a thousand texts to
7   Emily Mayer over this period of time was
8   sufficient grounds for termination?
9      A. I thought it could be.
10      Q. Did Ryan Clymer say anything about that,
11   whether he thought it should be?
12      A. I think he was inclined to -- I think he
13   was leaning in that direction.
14          MR. RUSSELL:  Can we briefly go
15      off the record?
16          (There was a discussion held off
17      the record)
18          MR. GROTH:  We're back on the
19      record.
20   BY MR. GROTH:
21      Q.  With regard to the issue of obtaining the
22   content of deleted text messages, did Ryan Clymer
23   tell you that he was going to make some effort to
24   try to do that?

Page 62

1      A. He told me that Mr. Smith, who had some
2   connection with law-enforcement -- I don't think
3   at that time but had a connection with
4   law-enforcement -- thought he was going to be able
5   to get that information.
6      Q. I'm not sure if you directly answered
7   this or not in previous testimony, but let me ask
8   you: Was there any discussion between you and Mr.
9   Clymer during this first conversation about
10   whether or not to report these allegations to any
11   outside agency?
12      A. There were no discussions.
13      Q. You didn't recommend it?
14      A. Correct.
15      Q. He didn't bring it up?
16      A. Correct.
17      Q. Before I forget it, let's go over the red
18   messages or notes on your written notes.  Starting
19   in the upper left-hand corner, what is that?  It's
20   on the first page.
21      A. Let me just give you a little bit of
22   background.
23      Q. Sure.
24      A. I'm not exactly sure when these were

Page 63

1   written in.  I think what happened was, when I had
2   the next conversation, I took some of the
3   information I learned from that conversation and
4   tried to fill it in at various places, but I'm not
5   sure about that.
6      Q. Okay.
7      A. This was all done in the time period
8   between December 23rd and January 6th.
9      Q. Okay.
10      A. Upper left --
11      Q. Let me stop you right there, though. The
12   information that you're filling in on your first
13   two pages in red would have been information that
14   you didn't receive until January 6th.
15      A. Correct.
16      Q. Nothing in between.
17      A. Nothing in red was known on December 23rd
18   and was not known until January 6th.
19      Q. I understand.  Go ahead.  Upper left on
20   the first page?
21      A. "Told Pastor Paul everything."
22      Q. What does that mean?
23      A. Well, I think it means that Ryan had --
24   this is on January 6th.  Ryan had gone and told

Page 64

1   Pastor Paul what was going on.
2      Q. Below that?
3      A. "The girl was still in school {not
4   playing BB}," basketball.  And Romig again, He
5   vehemently denied everything."
6      Q. That note about the girl, "girl still in
7   school, (not playing basketball)". . .
8      A. Right, that would be Emily.
9      Q. Okay.  Over on the right-hand side,
10   "November 9th"?
11      A. Okay.  "November 9th, 1st day of
12   practice" -- this is what Ryan had been able to
13   determine by the time I talked to him on January
14   6th.
15      Q. Okay.
16      A. The log had shown that there were forty
17   texts to/from Emily and Mr. Romig.
18      Q. First day of basketball practice?
19      A. I think so, yes.
20      Q. Then it says "Resigned 1/5/10"?
21      A. Yes.  That's how Ryan led our
22   conversation on the 6th.  That was the big event.
23      Q. That he already resigned?
24      A. That Romig had submitted a letter dated

Jeffrey Drake, Esq.                                   Nace vs. Pennridge, et al.
                        November 5, 2015

Page 65

1    January 5th, 2010 that he had resigned.
2         Q.  And under that it says "Health reasons,"
3    correct?
4         A.  Right.
5         Q.  Did Ryan tell you that the reason Mr.
6    Romig gave for resigning was health reasons?
7         A.  Yes.
8         Q.  Did you discuss that at all with him,
9    what the issued was with his health, if there was
10   any issue with his health?
11        A.  Well, honestly, I think he might have had
12   a heart issue, but I think the issue was that
13   Ryan -- and you'll see as we go further that by
14   now Ryan is going to terminate this guy.  This
15   guy's got to leave Faith.
16        Q.  Right.
17        A.  And I don't know what Ryan said.  Whatever
18   Ryan said to him, Romig resigned.
19        Q.  So, it was a forced resignation.
20        A.  Forced?  If Ryan didn't have the authority
21   to fire him, I guess he would still -- or even if
22   he did, I think he would still have an opportunity
23   to make his case before the board.
24        Q.  But it was your understanding back then

Page 66

1    that Ryan was trying to force him to resign.
2         A.  He was laying it out, that "You're not
3    going to be here any longer" and "I'm going to
4    recommend that you be fired."
5         Q.  And down below, in the middle of the
6    page, what does that say?
7         A.  "Her -- I don't know what that means.
8    The next word is "more" or "move" and I don't know
9    what that next word is, and I did study that.  I
10   asked my secretary that one, too.  And then "once
11   cleared she can play."
12        And we were talking about that with Ryan:
13   That, you know, at this point was the time to
14   bring Emily Mayer back on the team.
15        Q.  Does that word after "more" begin with a
16   D?  Is that how you write your Ds?
17        A.  I would think it's a D.
18        MS. OLSZEWSKI:  "Distress"?
19        THE WITNESS:  And I don't know.
20   BY MR. GROTH:
21        Q.  All right.  And in the lower left-hand
22   corner in red, what does it say?
23        A.  This is some of the stuff that Ryan had
24   found out and was updating me on on January 6th.

Page 67

1         Evidently the girls basketball team from
2    FCA had gone on a -- I don't know if you would
3    call it a field trip.  They went to watch a
4    college game at Drexel College on December 5th,
5    and it had been determined by Mr. Smith's logs
6    that 175 text messages had been sent to and from
7    Emily and Romig that day, even though they were
8    sitting next to one another.
9         And Romig claimed to Ryan that he did not
10   have his phone that day, and Mr. Smith, although
11   he did not have the content of the text messages
12   yet, was able to determine that in a period of --
13   I don't even think it was all December -- twenty
14   days in December Romig had sent Emily 2,100 text
15   messages and Emily had sent Romig 1,700 text
16   messages.  That's what that is.  That's what that
17   says.
18        MR. RUSSELL:  For the record, the
19   copy that I made, it looks like it had a
20   little dog-ear on that bottom corner.
21        MR. GROTH:  Yes.
22        MR. RUSSELL:  So, on your original
23   copy, I think you said 2,100 and 1,700.
24        MR. GROTH:  Can I see your copy?

Page 68

1         THE WITNESS:  Yes.
2         MR. GROTH:  Does anybody mind if I
3    write that on the original?
4         MR. RUSSELL:  That it is 2,100 and
5    1,700?
6         MR. GROTH:  Yes -- I mean on the
7    actual exhibit.
8         MR. RUSSELL:  That's fine.
9         MR. GROTH:  Thank you.
10   BY MR. GROTH:
11        Q.  Starting at the top of that column, what
12   do these words say?
13        A.  Where?
14        Q.  In red:  "Didn't. . .
15        A.  . . ."remember doing something that."
16   Romig, you know, said he didn't remember sending
17   her these text messages, and certainly not on
18   Drexel:  "Oh, by the way, I lost my phone and
19   I didn't have it when I was at Drexel."
20        Q.  "Didn't remember doing something that"?
21        A.  Yes.
22        Q.  What is that something?
23        A.  I don't know.
24        Q.  Did Ryan Clymer tell you, in connection

                                        17  (Pages 65 to 68)

Appendix  0394

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

**Page 69**

1    with this note, that he believed Mr. Romig was
2    lying about that, that Mr. Romig actually did have
3    his phone?
4        A. He did. I mean, I can get into
5    everything he told me on January 6th, but
6    that...
7        Q. We're going to get into the other notes.
8        A. ...but he did indicate that he believed
9    he had caught Mr. Romig in a lie.
10       Q. Mr. Romig said he left the phone
11   someplace, and Mr. Clymer knew it wasn't at that
12   place and it was at another place? Or he changed
13   the place? Romig changed the place where he left
14   the phone?
15       A. Mr. Romig -- and this is Ryan telling me
16   this: When Ryan asked Romig about these 175 text
17   messages on the day they went to Drexel, Romig
18   says, "I didn't have my phone that day." Where is
19   it? "Well, I left it in gym Friday night.
20           It just so happened that, even though
21   he's the headmaster at the school and the chief
22   guy, he's also a good guy and he was cleaning up.
23   He's cleaning the gym as the headmaster.
24           He said he was convinced that there was

**Page 70**

1    no phone on that trash can that night. I think
2    later he might have said that to Romig and Romig
3    said, "Oh, I left it in the bleachers." And Ryan,
4    I think, told me at one point, "Well, I didn't
5    necessarily check every bleacher, but I didn't see
6    any phone there."
7        Q. Right.
8        A. But Ryan did something once Romig had
9    told him that -- can I say?
10       Q. Yes, go ahead.
11       A. Ryan fairly quickly went down to talk to
12   the assistant coach -- whose name was Robin
13   Landis?
14       Q. Right.
15       A. (Continuing) -- and Robin Landis is a big
16   supporter, or at least at that point a big
17   supporter of Romig. But Ryan got to her before
18   Romig could -- and I want to step back. I think
19   Romig even said to Ryan "You can check with Robin.
20   She'll tell you I didn't have the phone."
21           So, Ryan goes right down and talks to
22   Robin and doesn't tell her all the reasons why,
23   but he says, "Did Eric have his phone when you
24   went to the Drexel game in early December?" And

**Page 71**

1    Robin evidently said "He had it and I saw him
2    using it."
3            So, now Ryan thinks Romig is lying to
4    him, at least about the number of text messages.
5    He's upset. Now he knows there were 2,100 text
6    messages that have been sent. There were 1,700
7    sent back, but 2,100 were sent by him. It could
8    be an infatuation or inappropriate relationship;
9    it could have been consensual. He didn't know, but
10   just knew it was wrong on Ryan.
11           So, this is what Ryan -- Ryan found this
12   out before he talked me on the 6th, so I'm
13   assuming -- in fact, I'm pretty sure that he then
14   went to Romig at some point, said "You lied to me
15   about..."
16       Q. Not having the phone?
17       A. "...not having the phone. You lied to
18   me -- I don't know if you lied, but there are all
19   these messages. I'm going to ask you to resign."
20           Romig had said something like "You're
21   going to fire me based upon the number of text
22   messages?" And Ryan says "That's right."
23       Q. All right.
24       A. Inappropriate.

**Page 72**

1        Q. So, on January 6th, when Ryan gave you
2    this information?
3        A. Yes?
4        Q. He knew that his friend, who he went to
5    school with all his life, had lied to him about an
6    important issue: Whether or not he had his cell
7    phone on a certain date, correct?
8        A. Correct.
9        Q. On January 6th, 2010 or at any time, did
10   Ryan Clymer tell you that he had caught Emily
11   Mayer in any lies?
12       A. He never said it that way, but he
13   wondered why -- he thought Emily had given him
14   wrong information with regard to Lauren Fretz.
15   You know, he didn't know if it was intentional or
16   not. Emily could have believed that, but it was
17   incorrect information.
18       Q. But not an outright fabrication?
19       A. Could have been, but might not have been.
20       Q. What did Emily supposedly say to Ryan
21   Clymer about Lauren Fretz?
22       A. "You should check with Lauren Fretz. She
23   may have had some kind of relationship with the
24   coach" or she did have. I don't know the actual

Jeffrey Drake, Esq.                    Nace vs. Pennridge, et al.
                    November 5, 2015

Page 73

1   wording.  And it was knocking in the back of
2   Ryan's mind -- and I would say mine, too -- that
3   Emily had deleted every message and hadn't shown
4   them to anybody.
5        So, Ryan still at this point -- and
6   again, we can talk about the employment aspect.
7   The investigation was not over.  It was ongoing.
8   Mr. Smith was hopefully going to be getting us
9   those text messages.
10       Ryan and I talked about did he have
11  enough -- well, can I back up a little?
12       Q.  Sure.
13       A.  Okay.  So, it's great, we got this
14  resignation letter here from Romig, but Romig
15  started to have second thoughts.
16       What does that mean?  Romig didn't know if
17  he should have resigned and was thinking about
18  maybe he didn't want to resign and somehow retract
19  that resignation.  The second thing is --
20       Q.  How did Ryan Clymer find that out?  Did he
21  tell you?
22       A.  I guess he heard it, and I don't know if
23  this is in the first conversation or the second
24  conversation that day.  Very small school; word

Page 74

1   passes.
2        Then Ryan hears -- and I don't know if
3   she called him.  Romig's wife was very supportive
4   of him:  Didn't do this; hey, some of those text
5   messages were from me or could have been from me.
6        Q.  What text messages?
7        A.  Well. . .
8        Q.  "I want to marry you"?
9        A.  She didn't say.
10       Q.  I'm asking whether he said --
11       A.  He didn't say.
12       Q.  Was it your impression from what Ryan was
13  telling you that, if there were inappropriate text
14  messages, they were actually from his wife, so
15  they weren't inappropriate?
16       A.  That's, I think, what the wife was
17  probably telling him.
18       Q.  But if the messages went to a student
19  that he was coaching, that would be inappropriate.
20       A.  Oh, yes.  Everything we talked about went
21  to -- is inappropriate for purposes of losing your
22  job.
23       Q.  Yes.
24       A.  The third thing -- and this was

Page 75

1   concerning -- was this Robin Landis, who had been
2   the assistant coach; who had been at practice, I
3   think, every day; who knew the girls and knew them
4   pretty well, was adamant that Eric Romig was
5   innocent and that Emily Mayer was lying.  And she
6   would know because she was there.  And if Eric
7   Romig, say, was fired or terminated, Robin Landis
8   was going to quit, and she may already have quit.
9   So, that was interesting.
10       So, Ryan was not deterred.  He wanted
11  Romig out because he had lied to him and he had
12  sent this inordinate number of text messages, so
13  that's when Ryan told me about the board meeting
14  the next night.  And, you know, whether Eric was
15  going to go; whether there was going to be support
16  for Romig.
17       I don't know what kind of Coach Romig
18  was, but I heard he was popular, which means at
19  high school he probably was winning, so he
20  probably had his supporters.  He certainly had a
21  supporter in Robin Landis.
22       We still did not have those text messages
23  or the contents at all, and he's saying "I'm being
24  fired for sending too many text messages?"

Page 76

1        He had a story that they weren't
2   inappropriate; that he was talking basketball;
3   that's he was helping her with her relationship
4   with her father and all this stuff.
5        So, Ryan and I started to gear up to come
6   to the meeting and, if I had to, tell the board
7   this is why he should remain terminated:  We don't
8   have all the information yet; hope to get it.  But
9   what we know now and he's resigned, don't let him
10  back in.
11       Q.  Okay.  Was there any discussion with Mr.
12  Clymer about continuing the investigation, even
13  though Mr. Romig had already resigned?
14       A.  That was my impression, that they wanted
15  those text messages.  Those text messages could
16  reveal a lot.
17       There are now over 2,500 of them, and
18  there could be stuff in there that -- you know,
19  it's interesting:  Emily said in her deposition
20  that, no, there wasn't -- she didn't say anything
21  sexual at the first one, but then later in her
22  deposition said, yeah, there was sexual stuff
23  there.  We didn't know what was there.
24       So, I thought the investigation would

                              19  (Pages 73 to 76)

Jeffrey Drake, Esq.                    Nace vs. Pennridge, et al.
                    November 5, 2015

Page 77

```
 1   probably continue on.  I was going to be
 2   continuing on in this case.
 3        Q.  Well, when you say you didn't know what
 4   the content was, as of January 6th Mr. Clymer had
 5   received Romig exhibit six, which was the email
 6   from Annette Smith with the Emily Mayer statements
 7   about what was in some of the texts that she was
 8   sent, for example, "Beginning of
 9   November he started telling me how he and Lauren
10   did sexual things and was hinting at me to be this
11   way."
12        "December 5th" -- she has DeSales and 1
13   think we know it's the Drexel game -- "he texted
14   me and said 'I want to be in you.'  This month he
15   would just tell me every day that he was in love
16   with me.  He would forward text messages he said
17   were between he and Lauren Fretz and asks if I was
18   jealous."
19        So, as of January 6th Mr. Clymer now has
20   these statements, these typed statements, from
21   Emily Mayer saying "these were some of the
22   inappropriate text messages that he sent to me."
23        Did Ryan Clymer discuss this document
24   with you at all on the 6th?
```

Page 78

```
 1        A.  He did not tell me about that document.
 2   However, if you say he had it and he knew about
 3   it, that makes perfect sense to me why he would
 4   continue his investigation, hoping that these text
 5   messages are going to -- the content's going to
 6   show up.
 7        Q.  Was there any discussion with you on
 8   January 6th and Mr. Clymer regarding whether or
 9   not Mr. Romig's activities should be reported to
10   Child Protective Services or any other outside
11   agency?
12        A.  No.  The facts remained the same, with
13   this one exception:  As Ryan and I were preparing
14   to go to the meeting the next night, I said, okay,
15   what do we have?  Because there were arguments on
16   both sides.
17        And I said, okay, here's what Emily
18   claims was said and I went through my list, and
19   when I got to number four Ryan said, "Oh, that's
20   'I want to be inside you' or 'in you'" -- I think
21   it was "in you," "I want to be in you."  Oh, I
22   hadn't heard that one before.
23        Again, that one, it does have a double
24   meaning.  You don't have much double meaning with
```

Page 79

```
 1   "I love you, I want to marry you."  But what does
 2   it mean, "I want to be in you"?  Is he trying to
 3   entice or induce her?  If it was actually said.
 4        And that one, I think, that remark -- I
 5   hope I would have gotten that list at a later
 6   point and I mostly hope that we would have gotten
 7   the text messages.
 8        But what we were doing on the 6th is, we
 9   were getting ready to go on the 7th to try to keep
10   Mr. Romig out of the school.
11        Q.  And the first statement that Emily Mayer
12   wrote that I read to you -- "Beginning of November
13   he started telling me how he and Lauren did sexual
14   things and was hinting at me to be this way" -- he
15   didn't tell you that on January 6th, either, did
16   he?
17        A.  He didn't, but if that's true -- could
18   you read that again?
19        Q.  Yes, I'll let's you read it yourself.
20   It's part of Romig exhibit six.
21             MS. SOMMER:  Could we take a brief
22        recess?
23             THE WITNESS:  Let me just answer
24        this question and then I'll be done.
```

Page 80

```
 1             MS. SOMMER:  All right.
 2             THE WITNESS:  If he said that, I
 3        mean, Lauren Fretz had already said no,
 4        didn't happen.
 5   BY MR. GROTH:
 6        Q.  That wasn't my question to you.  My
 7   question was, did he tell you about that text that
 8   Ms. Mayer said she got from him?
 9        A.  No.
10        Q.  Can you read that any other way than
11   asking her if she was interested in doing some
12   sexual activity with him?  Is there any double
13   meaning to that, to your interpretation?
14        A.  This was not a fact before me at the
15   time.  You've asked me to be drawing a conclusion,
16   and I can only comment on what facts were before
17   me at the time.
18        Q.  Okay.
19             MR. GROTH:  Do you need to take a
20        break?
21             MS. SOMMER:  Yes.
22             MR. GROTH:  Fine.
23             (A brief recess was taken)
24             MR. GROTH:  We're back on the
```

                              20  (Pages 77 to 80)

                                        Appendix  0397

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

---

**Page 81**

1     record.
2  BY MR. GROTH:
3        Q. Mr. Drake, we didn't go over some of the
4  red notes on the bottom of page one in the
5  right-hand column. After the date 12/5/09 there
6  is a note down below. What does that say?
7        A. Left-hand side, right?
8        Q. Correct.
9        A. I thought I did talk about these. The
10 father, Smith, had gotten the December phone
11 records and that's what showed that there were 175
12 texts that were sent.
13       Q. I'm just asking you to translate the --
14       A. "Father December phone records."
15       Q. Thank you. You said you had two
16 conversations with Ryan Clymer on January 6th,
17 correct?
18       A. Correct.
19       Q. Would it be fair to say that the second
20 conversation was pretty much just to talk about
21 what you were going to say or do with the board
22 the following night?
23       A. Sounds logical, but I'm not sure that's
24 what happened.

---

**Page 82**

1        Q. It's hard to separate what was said in
2  either conversation?
3        A. Right.
4        Q. And there is no indication in your notes
5  as to what was said in one conversation or the
6  other on January 6th?
7        A. Right.
8        Q. At any time on January 6th did Ryan
9  Clymer tell you that he had actually spoken to
10 Kristen Kennedy?
11       A. Yes.
12       Q. What did he say about that?
13       A. He had called Kristen Kennedy and she
14 said that she liked Coach Romig; that he had kind
15 of been some kind of a mentor to her or something;
16 that nothing really happened while they were at
17 Faith, but after she had left Faith he had sent
18 some kind of text message that she didn't like.
19       So, her father saw -- or she told her
20 father, and she didn't have any further contact
21 with Romig after that.
22       Q. Did Mr. Clymer tell you whether or not he
23 was told by Kristen Kennedy that she had received
24 numerous electronic communications from Mr. Romig

---

**Page 83**

1  while she was a student at FCA in which he asked
2  her repeatedly about her intimate sex life with
3  her boyfriend, including when they did it, how
4  they did it, what positions they did it in,
5  whether she liked it or not, those types of
6  things? Did Clymer tell you that?
7        A. Ryan never told me that, and I don't
8  believe that she told him that, but he didn't tell
9  me that.
10       Q. You didn't read Kristen Kennedy's
11 deposition, did you?
12       A. Well, I don't think -- I'm not sure.
13       Q. So, you don't know what she testified to
14 under oath.
15       A. Ryan didn't tell me that. That's all I
16 can tell you.
17       Q. That's all I was interested in. At any
18 time during either of the conversations on January
19 6th that you had with Mr. Clymer by telephone, did
20 you discuss the issue of whether or not these
21 allegations of Emily Mayer against Mr. Romig
22 should be reported to any outside agency or
23 authority?
24       A. No.

---

**Page 84**

1        Q. You read his deposition transcript,
2  correct?
3        A. I did.
4        Q. You saw his testimony where he says that
5  you discussed that exact issue with him, correct?
6        A. I saw that.
7        Q. And is he mistaken?
8        A. I think he's mistaken.
9        Q. Let's talk about your notes for the
10 conversations on January 6th, 2010. Let's start
11 on the third page.
12       I'm sorry I have to go through this with
13 you, have you translate, but it looks like you
14 don't have an issue reading it. That's the only
15 way we can actually know what your notes say or
16 mean.
17       A. I understand.
18       Q. Starting with the top note on page three,
19 what does that say?
20       A. "Met with everyone he needs to."
21       Q. Did he tell you who he met with?
22       A. I think he said he met with Robin Landis;
23 maybe the athletic director; he talked to the
24 parents. I don't know if he ever talked to the

---

Jeffrey Drake, Esq.                                    Nace vs. Pennridge, et al.
                              November 5, 2015

|  | Page 85 |
|---|---|
| 1 | boyfriend. |
| 2 | Q. Lauren Fretz and Kristen Kennedy? |
| 3 | A. Talked to Lauren Fretz and Kristen |
| 4 | Kennedy. |
| 5 | Q. Did he say whether or not he spoke to any |
| 6 | of the board members? |
| 7 | A. He told me earlier that he had talked to |
| 8 | Pastor Paul. I don't remember saying he talked to |
| 9 | the board members. |
| 10 | Q. Did he tell you what he discussed with |
| 11 | Pastor Auckland? |
| 12 | A. Just that he brought him up-to-speed as |
| 13 | to what was happening. |
| 14 | Q. The next note says "175 texts." What is |
| 15 | after that? |
| 16 | A. "Lost phone that day." |
| 17 | Q. Oh, "lost phone that day." |
| 18 | A. That's the Drexel game. |
| 19 | Q. Did Mr. Clymer tell you in this |
| 20 | conversation that when he determined that Mr. |
| 21 | Romig had lied about losing his phone on that day |
| 22 | of the trip to Drexel, that that was very |
| 23 | concerning or disturbing to him? That if he lied |
| 24 | about that, he might be lying about the content of |

|  | Page 86 |
|---|---|
| 1 | the text messages he sent to Emily Mayer? |
| 2 | A. He didn't say it that way. He was |
| 3 | concerned that he had lied about the number of |
| 4 | messages, but he didn't say "Oh, now maybe she's |
| 5 | telling truth." |
| 6 | He never didn't not believe her or |
| 7 | believe her. He was just trying to accumulate |
| 8 | some degree of evidence. |
| 9 | Q. Did you ever advise Mr. Clymer that one |
| 10 | way that he could get to the bottom of this was to |
| 11 | report this allegation to the authorities and let |
| 12 | them do whatever was necessary to get the content |
| 13 | of the text messages? Did you ever tell him that? |
| 14 | A. I did not. And we had not gotten to that |
| 15 | point. Our point was, keep Romig out of the |
| 16 | school. And I don't know what would have happened |
| 17 | after that. |
| 18 | Q. What's the next note say? |
| 19 | A. "Called coach he was with" -- that must |
| 20 | be Robin Landis, the assistant -- and then "Robin |
| 21 | Landis said had the phone, saw him using it." |
| 22 | Q. Did you read all of Emily Mayer's |
| 23 | deposition? |
| 24 | A. I believe I read the whole thing. |

|  | Page 87 |
|---|---|
| 1 | Q. Do you recall reading testimony from her |
| 2 | that, later on that year, at the end of the year, |
| 3 | she had a conversation with Robin Landis where |
| 4 | Robin Landis told her that she now believed her |
| 5 | accusations against Eric Romig? |
| 6 | A. I do remember that. |
| 7 | Q. What's the note in the left-hand margin? |
| 8 | A. "Thursday 7 p.m. at church offices." |
| 9 | Q. That was the board meeting. |
| 10 | A. Yes. |
| 11 | Q. What's the note starting with "When"? |
| 12 | A. "When did you find phone." I guess this |
| 13 | must be Romig. It says "Sunday morning in gym." |
| 14 | Q. That Romig was saying he found the phone |
| 15 | Sunday morning in the gym? |
| 16 | A. That's what I believe it means. And then |
| 17 | right below it Ryan's telling me nine a.m. |
| 18 | Saturday morning it wasn't there, at least on the |
| 19 | trash can. It just says "9:00 Saturday morning - |
| 20 | not there." |
| 21 | Q. What's it say under that? |
| 22 | A. "Wasn't there on the 6th of December." |
| 23 | That was Ryan saying, as far as he knew, it wasn't |
| 24 | there on the 6th. |

|  | Page 88 |
|---|---|
| 1 | Q. And then it says "Will call parents." |
| 2 | What did that refer to? |
| 3 | A. I think it might be all of the parents or |
| 4 | it could easily -- it is obviously either Emily's |
| 5 | parents or -- maybe it's just Emily's parents |
| 6 | because the next note says "a statement for the |
| 7 | girl coming back." |
| 8 | So, I don't really know for sure what |
| 9 | "will call parents" means. |
| 10 | Q. What was the meaning of the note "a |
| 11 | statement for the girl coming back"? |
| 12 | A. Ryan says, "Well, we've got to come up |
| 13 | with some kind of statement as to what happened |
| 14 | here, and I want to bring Emily back on the team." |
| 15 | Q. Statement to whom? |
| 16 | A. Probably the team and the other parents. |
| 17 | Q. Do you know if that was done? |
| 18 | A. I roughed something out, which is on the |
| 19 | last page, which I believe you have as the 6th. I |
| 20 | don't know if this was ever used. I don't know if |
| 21 | I sent this to him. I don't know if I would have |
| 22 | orally said this to him, but if Eric can read it |
| 23 | for you to get over my poor writing. |
| 24 | "Eric Romig was the girls varsity coach |

Jeffrey Drake, Esq.                              Nace vs. Pennridge, et al.
                        November 5, 2015

Page 89

1    from FCA from" blank "to 1/5/10. On 1/5/10 Mr.
2    Romig submitted his letter of resignation, citing
3    health reasons. Mr. Romig has had no further
4    involvement with FCA athletics since his
5    resignation."
6          .... So, again, I don't know if that letter
7    went out. I probably would have crafted a letter
8    to go out and worked on this stuff if I were still
9    on the case.
10         Q. Do you know whether or not Mr. Clymer or
11   anybody at FCA ever came up with a letter or
12   statement or explanation that was distributed to
13   the team or to parents or others at the school
14   regarding Mr. Romig's departure?
15         A. I don't know. I can tell you that when I
16   closed this file. . .
17         Q. On January 6th.
18         A. . . .the next time I thought about it was
19   when the story of your client hit the paper.
20         Q. In 2013.
21         A. 2013.
22         Q. So, to answer my question: No, you don't
23   know whether or not he sent any letter to the
24   parents or the team about Mr. Romig's departure.

Page 90

1          A. I have no recollection that he did.
2          Q. What is the note that starts with a
3    capital A?
4          A. "A 2 liner." I think it was a short
5    letter, a statement.
6          Q. Meaning give a minimal amount of
7    information and no details other than the fact
8    that he resigned.
9          A. I'm not sure that's what it means. Short
10   and sweet: I don't know what their intention was.
11         Q. Was that something he was proposing to
12   do, or is that something you were recommending to
13   him to do?
14         A. My recollection is that's what he wanted
15   me to do.
16         Q. Under that it has "Asked for phone
17   records for the 4th, 5th and 6th." What are those
18   dates?
19         A. I would think that they're December as
20   opposed to January, December 2009, because that
21   was around the Drexel-trip time, but I don't know.
22   I don't know for sure.
23         Q. And on page five, let's go over the notes
24   on there: "Meeting of parents"?

Page 91

1          A. Yes. My recollection is that if I'm
2    talking to him on a Wednesday, they're going to
3    have the meeting on Thursday. There's going to be
4    a game on Friday -- the girls are going to have a
5    game on Friday -- then he was going to have a
6    meeting with the parents after the game on Friday.
7          Q. To talk about Romig.
8          A. And to talk about the plan for the team.
9    There is a new coach, you know. "We're going to
10   move forward.
11         "Questions about Romig. Coach Romig has
12   resigned. We've accepted his resignation. We're
13   moving forward." It says "not further comments."
14   It should be "no further comments."
15         Q. I'm sorry, after 3A it says "Coach Romig
16   has resigned," and what's after that?
17         A. I do apologize for my writing: "We've
18   accepted his resignation."
19         Q. "We're moving forward"?
20         A. Correct.
21         Q. "No further comments"?
22         A. It's "not," but it should be "no."
23         Q. Are these four items things that Mr.
24   Clymer was telling you he is going to do, or were

Page 92

1    these recommendations that you were making to him,
2    or what?
3          A. I think this was his plan. I couldn't
4    absolutely be certain of that.
5          Q. So, you think he's telling you his plan
6    of what he's going to do and you're writing these
7    down numerically.
8          A. Yes -- you know, just the fact that I
9    wouldn't have known there was a game on Friday. I
10   don't think I would have known that.
11         Q. Paragraph four, is that "Emily"?
12         A. Yes.
13         Q. What does it say after that?
14         A. "We asked Emily to step away from team
15   until we could finish our investigation in this
16   matter." I think I might have said "Use the word
17   review. It sounds less formal. We have found
18   nothing that would preclude Emily from being on
19   the team."
20         See, at this point we didn't really know
21   if Emily was telling the truth. Emily had sent an
22   awful lot of text messages back to him and some of
23   her facts didn't pan out.
24         However, irrespective of that, what Romig

                                    23 (Pages 89 to 92)

                                            Appendix 0400

Jeffrey Drake, Esq.                          Nace vs. Pennridge, et al.
                        November 5, 2015

---

**Page 93**

1    did was wrong. He sent all those text messages and
2    then he lied, so he's got to go. So, we didn't
3    have anything that would preclude her from being
4    on the team. She was going to rejoin the team on
5    Monday.
6           I may have written number four. That
7    sounds more like something I would say, but I
8    don't really remember.
9        Q. Do you recall anything about your
10   conversations with Mr. Clymer on January 6th,
11   2010?
12       A. Not right now.
13       Q. Has Mr. Clymer or anybody from the board
14   or any administration person at Faith Christian
15   Academy or Faith Baptist Church ever referred to
16   you as their Christian lawyer? Have you ever
17   heard them refer to you in that way?
18       A. People refer to me as their lawyer,
19   sometimes their Christian lawyer. I mean, I'm a
20   lawyer who happens to be a Christian.
21       Q. I understand that. I'm just asking
22   you --
23       A. If people wanted to refer to me that
24   way -- I guess I've heard it. I don't ever

---

**Page 94**

1    remember if anybody from Faith refers to me that
2    way.
3        Q. There is a series of emails between Ryan
4    Clymer and Mr. Hollenbach which are marked
5    Hollenbach exhibit three, and it says, in part, in
6    one of those from Ryan Clymer to Hollenbach, "We
7    need to keep doing what our Christian lawyer is
8    telling us to do and pray for all parties."
9           To your knowledge or information, was
10   Ryan Clymer getting advice or counsel from any
11   other lawyer about what they should do about this
12   Romig and Mayer situation besides you?
13       A. What's the date of that?
14       Q. The date of that is January 7th.
15       A. Well, I was out by then. You know, they
16   did have another lawyer, Mr. Mandes, who is a
17   Christian as well, so I don't. . .
18       Q. I wasn't --
19       A. No, I don't know. I don't know what the
20   answer is.
21       Q. I wasn't asking you whether or not he was
22   referring to you. I'm not asking you to get in
23   his head.
24       A. Okay.

---

**Page 95**

1        Q. I'm asking you whether or not you know,
2    other than Mandes, who came in after you, was Ryan
3    Clymer, through the 6th of January of 2010, was he
4    getting legal advice from any other lawyer other
5    than you.
6        A. He better not have been -- no, I'm
7    kidding. I don't know if he was or not.
8        Q. On page 126 -- and you can look at it if
9    you need to -- of Mr. Clymer's deposition, he goes
10   into an a discussion about talking to you about
11   the issue of whether or not there had to be
12   physical abuse or physical contact as a
13   requirement for reporting to outside parties,
14   reporting suspected abuse or whatever to outside
15   parties; that if there was no physical abuse,
16   there was no abuse that had taken place, and that
17   you would have told him if he had to report the
18   allegations.
19          Do you recall any such conversation like
20   that with Mr. Clymer?
21          MR. RUSSELL: If you want to look
22      at the transcript?
23          MR. GROTH: He's welcome to look
24      at it. It's page 126 through -- actually,

---

**Page 96**

1    why don't you read 126 through 129 to
2    yourself?
3          (Witness complies)
4        A. Okay.
5        Q. Did you ever have that discussion with
6    Mr. Clymer?
7        A. Let's take me back to where you are.
8        Q. Sure. Starting on page 126, regarding
9    the issue as to whether there had to be physical
10   contact in order to have abuse, harassment or
11   exploitation that had to be reported to outside
12   parties, the question was, "Did you ever discuss
13   that issue with Mr. Drake?
14          "A: Did I discuss what issue?
15          "Q: That specific issue that you
16      just answered a question about what
17      constituted abuse, harassment or
18      exploitation that had to be reported to an
19      outside party.
20          "A: I believe I did, yes."
21   Did that discussion take place with Mr. Clymer?
22       A. To my recollection, it did not take place
23   in regard to this case. I mean, I've represented
24   Faith before --

Jeffrey Drake, Esq.                                      Nace vs. Pennridge, et al.
                              November 5, 2015

Page 97

1      Q.  I'm just talking about this case.
2      A.  Right.  I don't remember ever being there
3   because it is very clear that Emily had claimed,
4   at least at that time, that she had not been
5   touched by Romig in any way, and I had the four
6   statements that I've talked about earlier.  So,
7   this didn't even come up.
8      Q.  So, there was no discussion.
9      A.  I don't remember a discussion.
10     Q.  There are no notes in your file regarding
11  any discussion about mandatory reporting,
12  reporting to outside authorities, Pennsylvania
13  Child Protective Services Law, anything of that
14  nature, correct?
15     A.  That's correct.
16     Q.  Down to page 127, line 12 -- let's start
17  at line three: "Q: Did Jeff Drake tell you that it
18  was his legal opinion that there was nothing here
19  that had to be reported to the Department of
20  Public Welfare or Department of Education, the DA
21  or the police?
22       "A:  I believe he would have told
23  me if I had to, yes.
24       "Q:  Did he tell you you didn't

Page 98

1   have to?"
2       "A:  I don't know if he told me I
3   didn't have to.  He didn't tell me I had to.
4       "Q:  So, it wasn't discussed?"
5   There is an objection and then an answer:  "I
6   think we went over the mandated reporting at that
7   time, absolutely."
8       Again, my question to you is:  That
9   conversation never occurred with Mr. Clymer, to
10  your recollection, correct?
11     A.  Well, I don't ever remember going over
12  the mandated reporting with him at that time.
13     Q.  That's all I'm asking you about.
14     A.  All right.
15     Q.  On page 128, line 12, the question is:
16  "Did you take action with regard to Mr. Romig, the
17  resolution of the issue with Mr. Romig, based upon
18  that representation by Mr. Drake" -- strike that.
19  Let's go back a little further.
20       Page 127, line 16, the question is, "What
21  was the conclusion that Mr. Drake reached about
22  reporting this to an outside agency?"  And there
23  were a number of different objections, then the
24  answer was, "Looking at the way it's stated, we

Page 99

1   did not have to report it."
2       Did you ever tell Mr. Clymer that these
3   allegations did not have to be reported?
4      A.  No, it did not come up.
5      Q.  Do you recall ever giving Mr. Clymer
6   during your telephone conversation with him your
7   interpretation of any of the provisions of the
8   Child Protective Services Law?
9              MR. RUSSELL:  During the time
10         period that we're discussing?
11             MR. GROTH:  During the time
12         period, yes.
13             THE WITNESS:  No.
14  BY MR. GROTH:
15     Q.  So, you never had a face-to-face meeting
16  with Mr. Clymer about this issue, correct?
17     A.  During. . .
18     Q.  During those days.
19     A.  Right, no.
20     Q.  Was there any further investigation of
21  the allegations by Mr. Clymer or FCA after January
22  6th, that you know of?
23     A.  As I indicated earlier, when I closed my
24  file, I didn't even think about this case after

Page 100

1   that.
2      Q.  Did you ever talk to any of the people
3   Mr. Clymer spoke to, such as the witnesses he
4   interviewed or the administrators at the school
5   that he talked to, about the Romig and Mayer
6   situation?  Did you ever talk to any of those
7   people at all?
8      A.  I did not.  The only knowledge I have is
9   what Ryan told me during those three
10  conversations.
11             MR. GROTH:  I have no further
12         questions.  Thank you.
13             MR. RUSSELL:  Can we just take a
14         quick break?
15             MR. GROTH:  Sure.
16             (A brief recess was taken)
17             MR. RUSSELL:  Back on the record.
18  We have no further questions.
19             MS. SOMMER:  I have a few
20         questions.
21             (EXAMINATION)
22  BY MS. SOMMER:
23     Q.  Your notes, Drake-1, I just wasn't able
24  to hear or don't recall.  Very top corner, page

25  (Pages 97 to 100)

Appendix 0402

Jeffrey Drake, Esq.                              Nace vs. Pennridge, et al.
                        November 5, 2015

Page 101

1   one, on the right-hand side, it looks like there
2   is something that has a number and starts with an
3   F?
4       A.  Yes:  It's "Faith Christian 7912."
5       Q.  Is that the phone number?
6       A.  That's their general file number, right.
7           MS. SOMMER:  Okay, thank you.
8   That's all.
9           MR. GROTH:  I have one other
10  question.
11          (EXAMINATION)
12  BY MR. GROTH:
13      Q.  Would it be correct to state that you did
14  not investigate the Emily Mayer and Eric Romig
15  accusations?  You did not investigate it yourself.
16      A.  I think that's right.  I just want to
17  think through all the implications.
18      I got all my information from Ryan, so I
19  didn't talk to anybody or do an independent
20  investigation.
21      Q.  That was my next question:  Whatever
22  facts you got were facts developed solely by Ryan
23  Clymer, correct?
24      A.  Told to me by Ryan Clymer.

Page 102

1       Q.  Developed and told to you by Ryan Clymer,
2   correct?
3       A.  Correct.
4       Q.  And he never asked you to actively get
5   involved in the investigation, in his
6   investigation.
7       A.  Not in the investigation -- he wanted me
8   to come to the school and help convince the board,
9   if he needed it -- I understand he didn't need it,
10  but if he needed it -- to keep Romig out.
11      Q.  I'm asking about the fact-gathering
12  process:  Mr. Clymer never asked you to get
13  directly involved in the fact-gathering process.
14  Is that correct?
15      A.  Never, that I remember.
16      Q.  He did not ask you to.
17      A.  Not that I remember.
18      Q.  Okay.
19          MR. GROTH:  Thank you.  I have no
20  further questions.  Thank you very much, Mr.
21  Drake.
22          THE WITNESS:  Thank you, Mr.
23  Groth.
24          (The deposition was concluded at

Page 103

1       12:25 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 104

CERTIFICATION

------

I hereby certify that the testimony
and the proceedings in the aforegoing matter are
contained fully and accurately in the stenographic
notes taken by me and that the copy is a true and
correct transcript of the same.


Lance A. Brusilow
Registered Professional Reporter
Certified Realtime Reporter


The foregoing certification does
not apply to any reproduction of the same by any
means unless under the direct control and/or

supervision of the certifying shorthand reporter.


------

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

— — — — — —

JAMES NACE, et al              :   CIVIL ACTION

            vs.                :

PENNRIDGE SCHOOL DISTRICT,     :
et al.                         :   NO. 15-333

— — — — — —

                    COPY

Friday, November 20, 2015

— — — — — —

         Oral deposition of TRACY A. FRETZ, held

at the law offices of DRAKE, HILEMAN & DAVIS,

252 W. Swamp Road, #15, Doylestown, Pennsylvania,

beginning at 11:45 a.m., on the above date, before

LANCE A. BRUSILOW, Registered Professional

Reporter, Approved Reporter for the United States

District Court, and Notary Public, there being

present.

                    — — — — — —

                brusilow + associates
                255 South 17th Street
                     Suite 1503
                Philadelphia, PA 19103
                   215.772.1717
                  www.brusilow.com
                    — — — — — —

Page 2

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY:  DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY:  JANE ENNIS KANE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jekane@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY:  JOANNE D. SOMMER, ESQUIRE
     ERIN N. KERNAN, ESQUIRE
60 East Court Street
Doylestown, PA 18901
ph: 215.345.7000
(jsommer@eastburngray.com)
(ekernan@eastburngray.com)
Counsel for Pennridge School District and
individual Pennridge defendants


CASSIDY CONNOR PITCHFORD
BY:  CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA  19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell
Hollenbach

Page 3

(APPEARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

BY:  VERONICA N. OLSZEWSKI, ESQUIRE

36 East Second Street

Media, PA   19063

ph: 610.565.0600

(volszewski@kgpv.com)

Counsel for Ryan Clymer and Russell Hollenbach

DRAKE, HILEMAN & DAVIS

BY:  JONATHAN J. RUSSELL, ESQUIRE

252 W. Swamp Road, #15

Doylestown, PA   18901

ph:  215.348.2088

(jrussell@dhdlaw.com)

Counsel for Faith Christian Defendants

ALSO PRESENT:

Henry Thompson

Tracy A. Fretz
November 20, 2015
Nace vs. Pennridge, et al.

Page 4

INDEX

WITNESS:  TRACY A. FRETZ

By Mr. Groth:                    Page 5 and 90

By Mr. Russell:                  Page 87

EXHIBITS

NO.                 DESCRIPTION              PAGE

 1    Two-page letter dated April 10, 2015

      from D. Groth to L. Fretz                 19

Page 5

1              (It is hereby agreed by and among

2          counsel that sealing, certification and

3          filing are waived; and that all objections,

4          except as to the form of the question, are

5          reserved until the time of trial)

6              TRACY A. FRETZ, having been first

7          duly sworn, was examined and testified as

8          follows:

9              (EXAMINATION)

10   BY MR. GROTH:

11      Q.   Good morning.  Would you state your full

12   name for the record, please?

13      A.   Tracy Ann Fretz.

14      Q.   Mrs. Fretz, my name is David Groth, and I

15   represent Elizabeth Nace in a lawsuit that's

16   currently pending in Federal District Court in

17   Philadelphia regarding incidents and events that

18   occurred involving Eric Romig back in 2013.

19          I'm going to ask you some questions

20   regarding issues and topics that I think are

21   important to this case that go back well before

22   2013, even back to 2007, 2008 and 2009.

23          Let me ask you first, have you ever been

24   in a deposition before? Have you ever given a

Page 6

1    deposition?

2        A.   No.

3        Q.   Let me give you some brief instructions

4    that will help us get through this quickly and

5    efficiently, hopefully.

6            First of all, listen to the questions

7    that I ask you and make sure that you understand

8    the question before you give an answer.

9            If you don't understand the question,

10   because lawyers get wordy sometimes and there are

11   long, run-on sentences with maybe a short answer

12   to follow, but if you don't understand the

13   question, ask me to rephrase or clarify or restate

14   the question, and I'll be happy to do that for you

15   before you begin your answer.

16           If you give me answer to a question, I'll

17   assume that you understood the question and that

18   the information that you're giving me is your best

19   recollection of facts and events going back some

20   years.

21           Let me complete the question before you

22   answer, and I'll let you complete your answer

23   before I start the next question, for two reasons.

24           Number one, unless you hear the whole

Page 7

1    question, you don't know what I'm asking you, so

2    you have to listen to the whole question even if

3    you know where I'm going or want to jump in with

4    an answer.

5         Number two, the court reporter is going

6    to make a typed transcript of everything that's

7    said at the deposition, and he can only do that if

8    the parties aren't talking over each other. So, it

9    gives him a chance to get a clean transcript.

10        If you give me an answer to a question,

11   I'll assume you understood the question and that

12   you're giving me your best recollection of facts

13   and events going back, as I said, a number of

14   years.

15        You have to give a verbal response to all

16   questions; that is, a yes, a no, or some verbal

17   explanation or narrative answer to the question.

18        You can't gesture, shake your head no,

19   shake your head yes, hand gesture or say uh-huh,

20   because that could be unclear in the transcript.

21   So yes, no or a narrative.  All right?

22        A.   All right.

23        Q.   You have to answer every question I ask

24   you fully and to the best of your ability

Page 8

1    unless -- well, you don't have an attorney. You

2    have to answer every question I ask you fully and

3    totally to the best of your ability.

4          There may be objections to questions I

5    ask you from the other attorneys sitting around

6    the table.  If they do object to a question, just

7    allow them to state their objection and then

8    you're going to proceed to answer the question.

9    All right?

10   A.   Yes.

11   Q.   I'm going to ask you questions seeking

12   facts and information that you know personally or

13   may have heard or learned from others or gotten

14   through other sources.

15         People are familiar with the term

16   "hearsay."  In this deposition setting, as opposed

17   to the court, it doesn't really have any

18   importance.

19         Whether the information you know is

20   because you knew it yourself or somebody told you

21   or you got some information from another source,

22   any other source, you can give me the information.

23   You don't have to worry about being told something

24   by somebody else.

1          Since we are going back some time, there

2   is certainly a possibility that you may have

3   forgotten some information that you knew at one

4   time.  If you don't recall the information that I

5   ask you for, even though you knew if at one time,

6   you can tell me you don't recall it and that will

7   be a sufficient answer.

8          If you never knew the information I'm

9   asking you, you can tell me "I never knew that"

10  and that will be a sufficient answer. Don't feel

11  compelled to provide an answer to every question

12  just because it's asked.

13         I don't know what you know until I start

14  asking you questions and you start answering

15  questions.

16         Don't guess or assume or speculate in

17  response to any question.  I'm not asking you to

18  guess about anything here.  Again, if you don't

19  know the answer to a question or have any facts

20  responsive to it, that will be a sufficient

21  answer.

22         Are you feeling okay today? Is there any

23  health reason or medical reason or

24  prescription-drug reason or any other reason why

Page 10

1   you can't participate and answer questions to the

2   best of your ability?

3       A.  No.

4       Q.  Do you understand that you're required to

5   answer all of my questions truthfully and that

6   you've taken an oath and sworn to do so?

7       A.  Yes.

8       Q.  And do you understand that your testimony

9   under oath at this deposition today is the same as

10  if you would be testifying in court in front of a

11  judge and jury if this case goes to trial?

12      A.  Yes.

13      Q.  If you need a break at any time for any

14  reason, just let us know and we'll accommodate you

15  as best we can.

16          Do you understand those instructions?

17      A.  Yes.

18      Q.  As a witness, you have the right to read

19  and sign the transcript after the court reporter

20  makes a typed transcript of your testimony.  That

21  means you can look at it to see whether or not the

22  court reporter got down your testimony correctly.

23          You can waive that right, if you want to,

24  and nobody will send you a copy of the transcript

1    and you don't have to read it or sign it or do

2    anything with it.

3         If you want to read and sign, we'll send

4    you a copy of the transcript.  You can read it and

5    there will be an errata sheet, which is an error

6    sheet, and by page and line number you will say

7    "The transcript says this.  That's not what I said

8    in the deposition.  I said this" and you can

9    correct it that way.

10        Would you like to read and sign, or just

11   trust the court reporter has gotten the transcript

12   down correctly?

13       A.   I would like to read and sign.

14       Q.   Let me ask you first:  You received a

15   subpoena from me and my office regarding your

16   attendance at a deposition today, correct?

17       A.   Yes.

18       Q.   And that deposition was scheduled to take

19   place in my office in Philadelphia, correct?

20       A.   Yes.

21       Q.   Did you ever have any contact with me or

22   anybody else at my office in response to receiving

23   this subpoena?

24       A.   No.

Page 12

```
 1        Q.   Did anybody from Faith Christian
 2   Academy -- the athletic director, attorneys or any
 3   employees -- contact you about the deposition?
 4        A.   Yes.
 5        Q.   Who was that?
 6        A.   Henry.
 7        Q.   Henry Thompson, who is sitting in the
 8   room with us today?
 9        A.   Yes.
10        Q.   When did he contact you?
11        A.   The other day.  I don't recall.
12        Q.   A few days ago?
13        A.   Yes, this week, about changing the
14   location.
15        Q.   Did you know Mr. Thompson before that
16   telephone call?
17        A.   Yes.
18        Q.   How did you know him?
19        A.   I have known him for years, since he was
20   a little child from church.
21        Q.   From Faith Baptist Church?
22        A.   Yes.  A little child; I mean a teenager.
23        Q.   Tell me what you discussed with Mr.
24   Thompson during that telephone call.
```

1      A.   He contacted me and said "I know you have

2   a deposition on Friday at one o'clock in Philly.

3   Would you like to change it to Doylestown"? I said

4   sure.   That's pretty much it.

5      Q.   How long did the conversation last?

6      A.   Probably less than two minutes.

7      Q.   Did you talk about anything involving the

8   case, any facts about the case or anything about

9   why somebody might be asking you to give a

10  deposition in a case?

11     A.   No.

12     Q.   Did he tell you anything about Faith

13  Christian Academy's participation in the case?

14     A.   No.

15     Q.   Did he tell you that Faith Christian

16  Academy was a defendant in the case?

17     A.   No.

18     Q.   Did you know that?

19     A.   Yes.

20     Q.   From the subpoena?

21     A.   Yes.

22     Q.   Did you know that before receiving the

23  subpoena?

24     A.   Yes.

Page 14

1          Q.   How did you know that?

2          A.   Because of the relationship I have with

3     the school. My dad works there and I have friends

4     that work there.

5          Q.   And who is your dad?

6          A.   Joseph McGorry.   I will say he has never

7     discussed it with me.

8          Q.   What's his position at the church?

9          A.   He's a teacher.

10         Q.   Teaching what?

11         A.   History.

12         Q.   Did he ever teach Eric Romig?

13         A.   No.

14         Q.   Did he ever teach Ryan Clymer?

15         A.   No, I do not believe so, because he's

16    been there since 2001.

17         Q.   Okay.

18         A.   So. . .

19         Q.   Did he ever teach Emily Mayer?

20         A.   Possibly.   I didn't know who was in his

21    class, but possibly.

22         Q.   Did he teach your daughter?

23         A.   Yes.

24         Q.   What subjects?

```
 1        A.   History -- that I can recall -- and
 2   Bible.
 3        Q.   Do you know if he taught Kristen Kennedy?
 4        A.   Yes, possibly, because she was in her
 5   class, Lauren's class.  So, possibly.
 6        Q.   What about Kayla Young?
 7        A.   Yes, possibly.  Again, the same.
 8             MR. RUSSELL:  You're saying "yes,
 9        possibly."  It's trailing off a little bit.
10        I just want to make sure that --
11             THE WITNESS:  I'm not sure who my
12        dad had in his classes.  I just know he
13        taught there and I know my daughter was in
14        one of his classes.
15             I'm assuming the other ones were
16        because it's a small school and they're
17        usually all in the same class.
18   BY MR. GROTH:
19        Q.   Before this deposition today did you
20   review any documents, any written documents, to
21   help you prepare for the deposition?
22        A.   No.
23        Q.   Did you discuss your deposition with any
24   attorneys for Faith Christian Academy?
```

Page 16

1        A.   No.

2        Q.   Have you ever had any discussion with

3   Jonathan Russell, who is sitting on your left?

4        A.   No.

5        Q.   Did you know him before today?

6        A.   No.

7        Q.   Did you have any discussion with Ryan

8   Clymer prior to your deposition today about your

9   deposition?

10       A.   No.

11       Q.   Did you have any discussion with Ryan

12  Clymer before today about Emily Mayer's accusation

13  against Ryan Clymer with regard to inappropriate

14  texting?

15       A.   No.

16                MS. OLSZEWSKI:  Objection. You

17           said her allegation against Ryan Clymer.

18                MR. GROTH:  I'm sorry, against

19           Eric Romig.  Thank you.

20                MS. OLSZEWSKI:  Sure.

21                THE WITNESS:  I don't recall. I

22           mean, can you rephrase that, please?

23                MR. GROTH:  Yes.

24

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

1    BY MR. GROTH:

2        Q.   In terms of your preparation for this

3    deposition today, did you talk to Ryan Clymer at

4    all about the Emily Mayer/Eric Romig situation

5    back in 2009?

6        A.   No.

7        Q.   Did you talk to anybody else from the

8    school about that situation?

9        A.   No.

10       Q.   And by "situation" I'm referring to a

11   series of events where Emily Mayer made

12   allegations against Eric Romig about inappropriate

13   texting to her by him.

14           Are you aware of that series of events

15   back in 2009?

16       A.   Yes.

17       Q.   So, when I say the Emily Mayer/Eric Romig

18   situation, you know what I'm referring to.

19       A.   Yes.

20       Q.   Thank you.  Did you talk to your daughter

21   Lauren about your being subpoenaed to testify?

22       A.   Yes.

23       Q.   When did you talk to her?

24       A.   Approximately a week ago.  I'm trying to

Appendix  0420

Page 18

1    think when I received the subpoena, so it was

2    shortly -- maybe a day or two after that.

3        Q.   The subpoena was mailed out on November

4    3rd.

5        A.   Well, actually I was away that week. I

6    returned from Florida that Saturday, the 6th or

7    7th, whatever it was, so it may have been the

8    following Monday or Tuesday.

9        Q.   Did you call her?

10       A.   Yes.

11       Q.   Tell her about the subpoena?

12       A.   Well, I called her to talk to her and

13   then I mentioned it, because I didn't really want

14   to talk to her about it and it was on my mind, so

15   . .

16       Q.   Well, that was my next question:  Did you

17   talk to her at all about being subpoenaed to

18   testify in this case?

19       A.   Yes.

20       Q.   What was the discussion?  I want to know

21   what you said to her and what she said to you, as

22   best you can recall it.

23       A.   I basically said, "I can't believe this.

24   I have nothing to give." She said to me "Just

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

1    tell the truth, mom" and I said "I will."

2        Q.   Now, you knew that she had previously

3    received a letter from me that asked her to

4    contact me about information she might have

5    relevant to this case?

6        A.   I did not know she received it from you.

7    She did say she received a letter from an

8    attorney.

9        Q.   Did you ever see a copy of the letter?

10       A.   No.  She's in California; I'm here.

11       Q.   Well, there is --

12       A.   She never sent to it me, never told me

13   anything about the letter, other than that she

14   received a letter.

15                    (Exhibit T. Fretz-1 was marked for

16          identification)

17   BY MR. GROTH:

18       Q.   I'm going to show you what's been marked

19   T. Fretz exhibit number one.  It's a letter from

20   me to Lauren Fretz dated April 10, 2015.

21            Specifically, that's the letter I was

22   just referring to in my questions, and you can

23   just look at it briefly and tell me if you've ever

24   seen that letter.  You don't have read the whole

Page 20

1    thing.   If you've never seen it, you've never seen

2    it.

3        A.   I've never seen it.

4        Q.   Okay.   Do you recall Lauren telling that

5    you sometime back around April of 2015 that she

6    did receive a letter from an attorney?

7        A.   Yes.

8        Q.   Was there a discussion between you and

9    her at that time as to whether or not she was

10   going to respond to that letter in any way?

11       A.   She did tell me that she didn't know if

12   she would call back; that she said "I spoke to the

13   Bucks County Detectives.  I have nothing to give

14   them.   I don't know why I keep getting called up

15   about this."

16       Q.   Did she tell that you she never actually

17   did talk to me?

18       A.   Yes:   I asked her if she had called, and

19   she said no.

20       Q.   Did she tell you whether or not she had

21   ever received any calls from Faith Christian

22   Academy attorneys?

23       A.   No.

24       Q.   Did she say to you whether or not she's

Page 21

```
1    ever been contacted or had any discussion, rather,

2    with any Faith Christian Academy attorneys?

3         A.   No.

4         Q.   Did she tell you whether or not she was

5    ever contacted or was attempted to be contacted by

6    Henry Thompson from Faith Christian?

7         A.   No.

8         Q.   Did Henry Thompson tell you whether or

9    not he ever attempted to contact Lauren Fretz?

10        A.   No.

11        Q.   Is Lauren Fretz' address 123 Sun Ridge

12   Street, Playa del Rey, California?

13        A.   No.

14        Q.   What is it?

15        A.   She moved.  I can't find my calendar that

16   has it in there.  If you want to ask me another

17   question, I'll keep digging.

18        Q.   No, keep digging.  It's a big purse.

19        A.   Yes, I know.  It's 1051 Meadowbrook

20   Avenue, Los Angeles, California 90019.

21        Q.   Is that an apartment?

22        A.   I think it's an old home that's split

23   into -- I think there is only one apartment

24   attached to the house, but she's in the house.
```

Tracy A. Fretz                                                Nace vs. Pennridge, et al.
                          November 20, 2015

Page 22

1        Q.   How long has she lived there?

2        A.   I believe since July.

3        Q.   Do you know who she is employed by?

4        A.   Gosh.  Yes, it's a clinic.  It's

5    MetaTouch Clinic.  She's a massage therapist in

6    Culver City.

7        Q.   Do you know how long she's worked there?

8        A.   I am not sure.  It has probably been over

9    a year.

10       Q.   She's worked as a massage therapist at

11   other locations out in the Los Angeles area before

12   this? Is that correct?

13       A.   Yes.  I'm trying to think.  I believe so.

14   I'm trying to remember what she did before.

15       Q.   Do you have a Facebook account?

16       A.   Yes.

17       Q.   Does your daughter?

18       A.   Yes.

19       Q.   Do you communicate by Facebook?

20       A.   Rarely.

21       Q.   Sometimes?

22       A.   Very rarely.

23       Q.   What about back in 2009?  Did you have an

24   account on Facebook?

Appendix 0425

Page 23

1      A.   Possibly.  I don't know when I first
2  started.
3      Q.   What about your daughter, Lauren?
4      A.   Probably.
5      Q.   Do you know Pastor Tim Kuhn?
6      A.   Yes.
7      Q.   How do you know him?
8      A.   From church, from Faith Baptist.
9      Q.   He left sometime ago, correct?
10     A.   Yes.
11     Q.   Have you kept in touch with him?
12     A.   No.
13     Q.   Do you know if your daughter keeps in
14  touch with him?
15     A.   No.
16     Q.   Do you know if your daughter is listed as
17  a contact on his Facebook account?
18     A.   No, I do not.  When you say kept in
19  contact, his wife is a friend of mine on Facebook.
20  I mean, that's pretty much the only contact there
21  is.
22     Q.   What's his wife's name?
23     A.   Cindy.
24     Q.   I want to get some background information