Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

Page 24

1    about you before we start talking about some other

2    topics.

3            Can you give me your educational

4    background starting with your high school

5    graduation?

6        A.   I graduated in 1981 from North Valley

7    Christian School in Santa Clara, California, and I

8    graduated from Maranatha Bible College in

9    Watertown, Wisconsin in 1983 with an Associates

10   Degree.

11       Q.   Any particular subject?

12       A.   It is actually Practical Christian

13   Training, but with mostly elementary-education

14   subjects.

15       Q.   Any other formal education since 1983?

16       A.   No.

17       Q.   How about your employment history

18   starting with after college?

19       A.   I taught kindergarten at Faith Christian

20   Academy for one year, from -- I can't remember.

21   '83 to '84?

22       Q.   Okay. Any other employment?

23       A.   And then I worked for Univest

24   Corporation.  I have been there since January of

Page 25

1    '85, with a two-year break in between for

2    children.

3         Q.   You're working there now?

4         A.   Yes.

5         Q.   What position?

6         A.   I am a Community Reinvestment Act officer

7    and fair lending officer in the risk management

8    department.

9         Q.   Any other employment history?

10        A.   No.

11        Q.   Let's talk about your affiliation with

12   Faith Christian Academy or Faith Baptist Church.

13        A.   Okay.

14        Q.   Let's talk about Faith Christian Academy

15   first.  Other than being employed there for one

16   year, teaching kindergarten in 1983/1984, did you

17   hold any other type of position at the school?

18        A.   No.

19        Q.   Have your children gone to the school?

20        A.   Yes.

21        Q.   Give me your children's names, please.

22        A.   Andrew Fretz and Lauren Fretz.

23        Q.   When did they graduate?

24        A.   Andrew, 2007; Lauren, 2008.

Page 26

```
 1        Q.  Were you a school volunteer in any way?
 2        A.  Yes:  I guess, if I recall, volunteering
 3   at games and the concession stand.
 4        Q.  What games?
 5        A.  Any that my children were playing on:
 6   Basketball, soccer, those -- volleyball.
 7        Q.  Lauren played basketball and what else?
 8        A.  Soccer and volleyball.
 9        Q.  And Andrew?
10        A.  Andrew played soccer and basketball
11   briefly.
12        Q.  Was Henry Thompson his coach?
13        A.  Yes.
14        Q.  Was your daughter Lauren coached by Eric
15   Romig?
16        A.  Yes.
17        Q.  Playing basketball?
18        A.  Yes.
19        Q.  For what years?
20        A.  Graduated in '08, so 2006 through
21   graduation?
22        Q.  Six, seven and eight?
23        A.  Yes.
24        Q.  Do you know whether or not, after Lauren
```

Appendix 0429

1   graduated in May or June of 2008, she ever went

2   back to Faith Christian Academy to practice with

3   the team that Eric Romig was coaching?

4       A.   Yes.

5       Q.   Do you know on how many occasions she did

6   that?

7       A.   Only when she was home for Christmas

8   break from college, so it would be December,

9   probably, maybe once or twice during her time at

10  home.

11      Q.   Where did she go to college?

12      A.   Masters College in Santa Clarita,

13  California.

14      Q.   Studying what?

15      A.   She majored in kinesiology, pre-physical

16  therapy.  She also played soccer in college.

17      Q.   Eric Romig was arrested for his criminal

18  conduct on October 1st, 2013.  Do you know if

19  Lauren has had any contact with him at all, any

20  type of communication with him at all, since that

21  date?

22      A.   No.

23      Q.   You don't know or she hasn't, to your

24  knowledge?

Page 28

1      A.   To my knowledge, she has not had any

2   communication.

3      Q.   Do you know if Eric Romig has tried to

4   contact her?

5      A.   No, I do not.

6      Q.   By correspondence or telephone?

7      A.   No, I don't.

8      Q.   What affiliation, if any, do you have

9   with Faith Baptist Church?

10      A.   I was a member there since 1983 through

11   2011.

12      Q.   Why did you leave in 2011?

13      A.   My husband and I felt it was time to --

14   we just had differences -- I don't know how to

15   explain it.  Just felt God leading us to another

16   church.

17      Q.   Did you inform anybody at Faith Baptist

18   Church about why you were leaving?

19      A.   I sent an email to Pastor Paul.

20      Q.   Paul Auckland?

21      A.   Yes.

22      Q.   And what did it say in that email?

23      A.   Oh, from what I can recall, basically

24   that we just felt it was time for a changes, that

1    there were no hard feelings and that we wished the

2    church the best, and thanked him for his service.

3        Q.   You said, I think, in a couple answers

4    that you thought it was time for a change, that

5    God was leading you to another church.  Why did

6    you feel that way?

7        A.   Not being fed spiritually.

8        Q.   In what way?

9        A.   Through the messages.  The teachings

10   basically -- personally, nothing -- felt stagnant.

11       Q.   And you told Pastor Auckland that?

12       A.   Not necessarily, no.  I did not go into

13   detail.

14       Q.   Did you discuss that with anybody else at

15   the church?

16       A.   I do not recall.

17       Q.   Did you send that email to anybody other

18   than Paul Auckland?

19       A.   I do not recall.

20       Q.   Did you or your husband hold any

21   positions in the church during the time that you

22   were members there?

23       A.   No.

24       Q.   Where are you member now?

Page 30

1      A.   Calvary Chapel in Quakertown.

2      Q.   Did Pastor Auckland ever talk to you or

3   try to talk to you after he got the email from you

4   to go into any greater detail about why you were

5   leaving the church?

6      A.   No.

7      Q.   When is the last time you spoke to him?

8      A.   I believe it was Paul Clymer's retirement

9   party, which I'm not quite -- I don't recall when

10   that was.  It was about a year ago, within the

11   last year.

12      Q.   That's Ryan Clymer's father?

13      A.   No, uncle.

14      Q.   Uncle.  You knew Eric Romig when your

15   daughter and son went to Faith Christian Academy,

16   correct?

17      A.   Yes.

18      Q.   Did he coach your son in any sports?

19      A.   No.

20      Q.   He coached your daughter in basketball?

21      A.   Yes.

22      Q.   Any other sports?

23      A.   No.

24      Q.   Did you have any social relationship with

Tracy A. Fretz
November 20, 2015
Nace vs. Pennridge, et al.

Page 31

1    him?  And by that I mean you saw him outside of

2    any activities related to your daughter's playing

3    basketball at FCA?

4        A.  At church.

5        Q.  You say you might see him at church

6    functions or school services?

7        A.  Or even school functions.  So, basically

8    church or school functions.

9        Q.  What about outside of church or school?

10   Social functions at all?

11       A.  No.

12       Q.  Between the families, anything of that

13   nature?

14       A.  No.

15       Q.  Back in 2009 did you know that Eric

16   Romig's sister Kelly Romig -- by the way, did you

17   know Kelly Romig as well?

18       A.  Yes.

19       Q.  How did you know her?

20       A.  I taught her in kindergarten and I have

21   known her since that time.

22       Q.  Through church and school.

23       A.  Through church and school.

24       Q.  Did you know in 2009 that she had been

Page 32

1    criminally sexually abused by a teacher at Faith

2    Christian Academy for approximately four years,

3    between 1994 and 1997?

4        A.   I had heard that.

5        Q.   Do you recall who you heard it from?

6        A.   No, I don't.

7        Q.   Do you recall when you first learned

8    that?

9        A.   No, I don't.

10       Q.   But it was before 2009.

11       A.   Yes.

12       Q.   Did you ever have occasion in your

13   dealings with Eric Romig at the school to talk

14   about that with him at all?

15       A.   No.

16       Q.   Did you know Emily Mayer?

17       A.   No, not personally.  I just knew she went

18   to Faith Christian Academy and was on the

19   basketball team.

20       Q.   She was not on the basketball team at the

21   same time as Lauren Fretz, though, correct?

22       A.   I do not believe so.

23       Q.   Do you know any family members of Emily

24   Mayer's?

```
 1      A.   No.

 2      Q.   Her parents?

 3      A.   No.

 4      Q.   Did you know her by sight?

 5      A.   Not really.

 6      Q.   Did you know Kayla Young — we already

 7   went through that.  You knew Kayla Young and you

 8   knew Kristen Kennedy.

 9      A.   Yes.

10      Q.   Were they on the basketball team with

11   Lauren?

12      A.   Yes.

13      Q.   So, they were also coached by Eric Romig?

14      A.   Yes.

15      Q.   How would you characterize her friendship

16   with those two people?

17               MR. RUSSELL:  "Her" being Lauren

18          Fretz?

19               MR. GROTH:  Yes, I'm sorry.

20               THE WITNESS:  She was close

21          friends with Kayla and Kristen during high

22          school.

23   BY MR. GROTH:

24      Q.   What about after high school?
```

Page 34

```
 1        A.   Kayla she remained in contact with.

 2        Q.   Where does Kayla live?

 3        A.   In Lynchburg, Virginia, I believe.  I

 4   know she's in Virginia.

 5        Q.   Do you know if she's married?

 6        A.   No.

 7        Q.   Do you know if she's going to school?

 8        A.   She's a police officer.  She graduated

 9   from Liberty University.

10        Q.   When is the last time you spoke to her?

11        A.   A few months ago.

12        Q.   About what?

13        A.   I saw her in Franconia restaurant and

14   said hello, and I asked her how she was doing and

15   gave her a hug.  That's all.

16        Q.   Do you know Nicole Gross?

17        A.   Yes.

18        Q.   How do you know her?

19        A.   She's a good friend.

20        Q.   She one of your best friends?

21        A.   I would say she's one of my very close

22   friends.

23        Q.   How long have you known her?

24        A.   Oh, my goodness.  Years.
```

1      Q.   Going back to approximately when?

2      A.   Well, our children were in elementary

3   school together, our sons, so maybe close to

4   twenty years.

5      Q.   Have you ever talked to her about this

6   case?

7      A.   Yes.

8      Q.   When was that?

9      A.   I do not recall. It has been ─── it's been

10  a while.

11     Q.   Was it before or after her deposition was

12  taken?

13     A.   It may have been after.

14     Q.   Did she tell you about her deposition?

15     A.   Not in detail.

16     Q.   What did you talk with her about this

17  case?

18     A.   She just felt bad.

19     Q.   About what?

20     A.   For the whole ── that my daughter, her

21  name was brought into it.  That's basically it,

22  that she felt bad.

23     Q.   Did she talk to you about any of the

24  questions she was asked during the deposition?

Page 36

1       A.   I do not recall.

2       Q.   Did she tell you how or whether your

3   daughter's name was discussed during her

4   deposition?

5       A.   Yes.

6       Q.   What did she tell you about that?

7       A.   She just said that Lauren's name was

8   mentioned, and that she felt bad that Lauren's

9   name was brought into this.

10      Q.   She didn't give any details of how

11  Lauren's name came up or why Lauren's name came

12  up?

13      A.   Because of Emily Mayer's text messages,

14  which I was already aware of.

15      Q.   How were you aware of that?

16      A.   Because I had received a phone call back

17  in -- I'm trying to remember when this occurred,

18  if it was -- yes, it was December of '09.

19          Cheryl Alderfer called me because Emily

20  had spoken with her daughter, Ali, mentioning that

21  Eric had texted Emily saying that he could not --

22  and I'm paraphrasing -- that he could not meet

23  Emily because he was picking Lauren up from the

24  airport.

Page 37

1        Cheryl, being a concerned parent, called

2   me and asked me when Lauren was coming home; I

3   told her.

4        She asked, "Who is picking her up from

5   the airport?" I said "I am. Why?"  And then she

6   told me what her daughter told her, and I was

7   appalled.

8                MR. GROTH:  Lance, can you read

9        that back slowly?

10               (The record was read by the court

11       reporter as requested)

12   BY MR. GROTH:

13     Q.  You were appalled at what?

14     A.  Oh. The whole context of the text

15   message, whether it was true or not, of what Emily

16   was saying, because I knew for a fact that I was

17   picking up Lauren, that there was never any doubt,

18   and whether or not Emily's statement was true.

19     Q.  At that time did you know who Emily Mayer

20   was?

21     A.  I knew she was a student at the school

22   and that she was on the basketball team.  That's

23   all I knew.

24     Q.  And Cheryl Alderfer told you this because

Page 38

```
 1    she felt concerned that Eric Romig might be

 2    picking up your daughter at the airport?  Is that

 3    what she told you?

 4        A.  She was verifying whether or not that was

 5    true because she didn't think it was, so she was

 6    just verifying it, basically, because she said to

 7    me -- excuse me.

 8        Q.  That's all right.  Go ahead.

 9        A.  She said to me "If the shoe were on the

10    other foot, I would hope you would call me as

11    well."

12        Q.  If it was true, did she say she was

13    concerned that Eric Romig would be picking your

14    daughter up at the airport?

15        A.  Yes.

16        Q.  Did she say why she was concerned?

17        A.  Because it didn't make sense.

18        Q.  Why?

19        A.  Because why would he? He's not a parent

20    and he's not a friend of hers outside of school.

21    She just thought it was odd.

22        Q.  What was your relationship with Cheryl

23    Alderfer at that time?

24        A.  Friends, acquaintances.  We're not close
```

Page 39

1    friends, but we're friends.

2        Q.   Do you know if Cheryl Alderfer called you

3    about this after Emily Mayer made her allegations

4    about inappropriate texting with Eric Romig?

5        A.   I don't recall the time line. I just

6    remember Cheryl calling me and then I did find out

7    that Emily did go to the school, but that there

8    was nothing concrete, no proof.

9        Q.   In her phone call to you, did Cheryl

10   Alderfer tell you that she had taken Emily Mayer

11   to Principal Clymer because Emily Mayer told her

12   the story of Eric Romig's inappropriate texts to

13   her?

14       A.   Yes.

15       Q.   She did.

16       A.   Yes, but I don't recall the time line.

17       Q.   So, that's why she was concerned, as far

18   as you're aware.

19       A.   Yes.

20       Q.   Because she already knew that there had

21   been an allegation made -- "she," being Cheryl

22   Alderfer, already knew that there had been an

23   allegation made that Eric Romig was sending

24   inappropriate texts to another girl at the school.

Page 40

```
 1      A.   Yes.
 2                    MS. OLSZEWSKI:   Object to form.
 3                    MS. KANE:   Objection.
 4                    MR. RUSSELL:   Objection.
 5   BY MR. GROTH:
 6      Q.   You can answer.
 7      A.   Yes.
 8      Q.   Did she give you any details about that
 9   situation with the other girl and. . .
10      A.   I do not recall.
11      Q.   Did she tell you that she had sat through
12   a meeting with that girl, the other girl, who
13   happened to be Emily Mayer, and Ryan Clymer where
14   Emily Mayer described the texting that Eric Romig
15   was doing to her?
16                    MS. KANE:   Objection to the form.
17      A.   I don't recall.
18      Q.   Did she tell you that she was concerned
19   about the safety of Emily Mayer?
20      A.   We're going back six years. I'm trying
21   to -- I don't remember all the details.  She may
22   have.
23      Q.   Do you know the date on which your
24   daughter was coming back to the local area here
```

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

1    for that Christmas holiday back in 2009?

2        A.   I do not recall the exact date.

3        Q.   Do you recall if it was a day before

4    Christmas or a week before Christmas or two weeks

5    before Christmas?

6        A.   It was probably at least a week before

7    Christmas.

8        Q.   Prior to having this telephone

9    conversation with Cheryl Alderfer, had you ever

10   had any issues regarding Eric Romig texting your

11   daughter while she was a player for him?

12       A.   Yes.

13       Q.   On how many occasions did you have an

14   issue about that?

15       A.   There is one time that I can recall, and

16   it was when texting first came out and you were

17   paying per text --

18       Q.   And you were what?

19       A.   Paying per text message.

20       Q.   Right.

21       A.   And she was getting quite a few texts

22   from him and I was not comfortable with that, not

23   just because of the cost but also because I didn't

24   feel it was necessary. I approached him and asked

Page 42

1    him to stop, then it had slowed down.

2         The difficulty -- I'd say challenge -- is

3    because of the gray area of the relationship,

4    because of knowing them at church, knowing them

5    since they were younger; that there is kind of a

6    skewed, to use that -- it didn't surprise me that

7    he would text her about basketball and about plays

8    because she was the captain of the team, but I did

9    not like the frequency.

10        Q.  We're going to break that down and go

11   over that step-by-step.

12        First of all, when did you have this

13   conversation with Eric Romig?

14        A.  (No response)

15        Q.  Let's see if we can narrow it down.  Was

16   this Lauren's senior year --

17        A.  No.

18        Q.  -- or before that?

19        A.  It was before that.

20        Q.  So, it would have been in the 2007 time

21   frame?

22        A.  Possibly.

23        Q.  Was it just one meeting about this issue

24   with him?

1     A.  I recall just one.

2     Q.  You said you talked to him and the texts

3  slowed down, but they didn't stop?

4     A.  Correct.

5     Q.  Did you tell him to stop?

6     A.  Yes.

7     Q.  What did you do after he didn't stop?

8     A.  I talked to Lauren. I never saw any of

9  the text messages.

10     Q.  Why not?

11     A.  Because my daughter told me they were all

12  about basketball and I never had any concern.

13     Q.  Did you ever ask to see them?

14     A.  No -- I don't recall.

15     Q.  Do you know if she deleted them after she

16  got them?

17     A.  I don't recall.

18     Q.  This phone was given to her and paid for

19  by you and your husband, correct?

20     A.  Correct.

21     Q.  It wasn't her own account or anything,

22  right?

23     A.  Right.

24     Q.  Did she have a pass-code or password to

**Page 44**

1    get into the phone at that time?

2        A.   I don't recall.

3        Q.   So, when you made the statement before

4    that you were concerned about the frequency with

5    which he was texting her about basketball and

6    plays, you don't know yourself if he was only

7    texting her about basketball and plays.

8        A.   Correct.

9        Q.   That's just what she told you.

10       A.   Correct.

11       Q.   And you never asked to see the content of

12   any texts to find out if that was, in fact, the

13   case?

14       A.   Correct.

15       Q.   Is that correct?

16       A.   Yes, but I will explain.

17       Q.   Go ahead.

18       A.   I did also speak with the assistant

19   coach, Robin Landis, about the situation, and

20   asked her if I should have any reason for concern.

21       Q.   Concern about what?

22       A.   The excessive number of texts.

23       Q.   Even though you believe that it was only

24   about basketball and plays.

Page 45

1          MS. KANE:   Objection to the form.

2      A.   Yes.

3      Q.   Go ahead.

4      A.   And I was given the impression, because

5  Robin is a close friend and knows Lauren very

6  well, that there would be no concern, that she's

7  always with them, and I trusted Robin.

8      Q.   Concern about what?

9      A.   The relationship as far as the

10  basketball, the coach versus player, the number of

11  texts.

12          I mean, I'm not good at explaining

13  personalities. Eric has a very dynamic

14  personality.  He's very driven and passionate

15  about the sport, and you can see it on the court

16  as a coach.

17          I could see why he would be texting her a

18  lot, but I did not like it.

19      Q.   Did you actually get a log of the texts?

20      A.   No.

21      Q.   Was there a bill that was sent to you by

22  the telephone company that showed dates, times of

23  texts?

24      A.   I do not recall.

Page 46

1    Q.  Do you recall paying for them per text,

2  so it might have something like fifty texts at

3  three cents or something, but that was it?

4    A.  Yes.

5    Q.  So, you don't know what times of the day

6  or night he was texting her?

7    A.  No.

8    Q.  And except for whatever information was

9  on the phone bill, you didn't know any details

10  about the volume of the texts.

11    A.  Correct.  The bill never was an

12  exorbitant amount, so I did not have concern over

13  the volume or the number of texts. It's just I did

14  not feel it was necessary.

15    Q.  At that time in 2007 did you have any

16  reason, any reason at all, to suspect -- not

17  whether you knew or not, but just to suspect --

18  that there might be some kind of inappropriate

19  relationship outside of basketball between Lauren

20  and Eric Romig?

21    A.  No.

22    Q.  Did you at some point tell Eric Romig

23  that if he was going to text your daughter, that

24  you or your husband would want to be copied on the

1    texts?

2       A.   No.

3       Q.   Did you ask Robin Landis whether Eric

4    Romig texted all his players as much as he texted

5    your daughter?

6       A.   I don't recall.

7       Q.   I'm not sure if this was in your prior

8    answer or not, so that's why I'm asking: Did you

9    ever discuss with Robin Landis the issue of

10   whether or not Eric Romig was ever alone with your

11   daughter for any basketball-related activities?

12      A.   Yes.

13      Q.   What did you discuss about that?

14      A.   I asked her if there would be any reason

15   to believe, and she said no because she was always

16   with them.

17      Q.   Why did you ask her that?

18      A.   A concerned mom.  I didn't have any

19   reason --

20      Q.   Concerned about what?

21      A.   -- to believe that there was anything

22   going on.  I just didn't want to cross that line.

23      Q.   I understand you were a concerned mom

24   about the texts, but why did you ask her, Robin

Page 48

1    Landis, whether or not there was any time when

2    Eric Romig was going to be alone with your

3    daughter?

4        A.  I asked Robin if there was any reason

5    that I should be concerned and if there was any --

6    and I do not recall the exact conversation.  I

7    remember asking Robin if there was any reason to

8    be concerned.

9            I don't remember exactly if I asked her

10   about being alone. I may have asked that.  But

11   just from a concerned parent, just to say should I

12   be aware of anything.  Should I be alert.

13           I trusted my daughter.  We had good

14   communication.  And Robin knew my daughter since

15   she was an infant, so it was a very close-knit

16   group.

17       Q.  Did you ask your daughter outright if she

18   had any inappropriate relationship with Eric Romig

19   back in 2007?

20       A.  I asked her after all of this came out if

21   there was ever anything in her relationship during

22   basketball in high school, and she said "No, mom,

23   that's gross."

24       Q.  I think you went too far with my

Page 49

1    question.  I was speaking specifically about 2007,

2    not anything with the Emily Mayer situation in

3    2009.

4         But in 2007, when you had these

5    conversations with Eric Romig, with Robin Landis,

6    the assistant coach, about his frequent texting of

7    your daughter, did you ask her then whether or not

8    there was anything inappropriate going on between

9    Eric Romig and your daughter?

10        A.   I do not recall.

11        Q.   Did you talk to anybody in 2007 other

12   than Eric Romig directly and Robin Landis?

13        A.   I do not -- I don't recall.

14        Q.   Was Marc Hoover an assistant coach there?

15        A.   Yes.

16        Q.   Did you speak to him, also?

17        A.   I don't recall. I remember talking to

18   Robin.

19        Q.   Do you recall talking to the athletic

20   director?

21        A.   No.

22        Q.   Who was Russell Hollenbach, I believe?

23        A.   Yes.  I don't recall doing that.  I don't

24   believe I did.

Page 50

```
 1        Q.   Did you talk to Ryan Clymer at all?

 2        A.   I don't recall that.

 3        Q.   Does that mean you don't recall --

 4        A.   I don't recall if I did or not.

 5        Q.   So, you may have; you just don't recall

 6        A.   Correct.

 7        Q.   Did you speak to your husband about the

 8   issue?

 9        A.   Yes.

10        Q.   What did you two discuss?  I'm talking

11   about -- we're still back in 2007.

12        A.   I know.

13        Q.   What did you two discuss?

14        A.   I don't recall exactly.  I just remember

15   discussing that, you know, she seems to be getting

16   a lot of text messages.  I don't like it.  What do

17   you think I should do about it.

18             If I recall, he said talk to her, talk to

19   Eric.  He did not take it upon himself.

20        Q.   Do you know whether or not your husband

21   had any discussions with anybody besides you about

22   that issue?

23        A.   No.

24        Q.   No, he did not have any discussions.
```

Page 51

1    A.   No, he did not.

2    Q.   When you saw that the texts were

3  continuing, although they slowed down after your

4  conversation with Eric Romig, did you have another

5  conversation with him?

6    A.   I do not recall.

7    Q.   Did you have another conversation with

8  your daughter?

9    A.   Yes.

10   Q.   What was that conversation?

11   A.   Basically why does he continue, and she

12  said, "Mom, he's only texting about plays and

13  about when practice is because I was the captain

14  of the team."

15        At that point that was a lot of the way

16  how they would communicate -- people were

17  communicating, and I was trying to balance it out,

18  basically.

19   Q.   Did Eric Romig tell that you he was

20  texting, with any frequency at all, any of the

21  other players on the team other than your

22  daughter?

23   A.   I don't recall.

24   Q.   Did you ask him?

Page 52

1     A.   I may have.  It was not uncommon, so. . .

2     Q.   Well, was it your daughter's function, as

3   captain, to alert all the other team players as to

4   whatever discussion she had with Eric Romig about

5   practices or games or places or whatever?

6              MS. KANE:   Objection.

7     A.   I believe so.

8     Q.   What makes you believe that?

9     A.   Because she was the captain.

10    Q.   Did she ever tell you that one of her

11  functions was to get information from the coach

12  and give it to the rest of the teammates?  Not

13  during practice or whatever, but off-hours?

14    A.   No, she never told me.

15    Q.   Did you ever tell your daughter that you

16  didn't want Eric Romig texting her at all at any

17  time before she graduated?

18    A.   I do believe so.

19    Q.   What happened after you told her that?

20    A.   She did get a little defensive because

21  she said there was nothing there, that he's

22  texting her about basketball.

23            We had discussed it, and I did not fear

24  for any other improper conduct.  That's basically

Page 53

1   what I recall.

2        Q.   What happened after that?

3        A.   I don't recall exact details.  I just

4   remember being aware of it, being conscious of it,

5   monitoring my daughter's activity from a -- trying

6   to monitor it, and I did not have any reason to

7   believe that there was any inappropriate behavior.

8        Q.   Did she have any other phone other than

9   the phone that you and your husband supplied her

10  with?

11       A.   Not that I am aware of.

12       Q.   Do you know if Eric Romig ever supplied

13  her with a phone?

14       A.   Not that I'm aware of.

15       Q.   Did you attend the games?

16       A.   Yes.

17       Q.   Basketball games?

18       A.   Yes.

19       Q.   Did you attend any practices?

20       A.   I do not recall.  I don't believe so.

21       Q.   Can you tell me generally when practices

22  were held?

23       A.   After school.

24       Q.   Like late in the afternoon after the end

Page 54

1    of the school day?

2        A.  It depended on -- they only had one gym,

3    so it depended on who was having it, whether JV,

4    boys, girls.  And I believe the varsity usually

5    had it later after school, depending on the

6    schedule.

7            JV usually practiced first and then the

8    varsity teams, and I believe the girls would go

9    before the boys.

10       Q.  So, it could last some time into the

11   early evening?

12       A.  Yes.

13       Q.  And would you generally take her or pick

14   her up -- not take her because she's already in

15   school, but pick her up after the practices?

16       A.  Either myself or she had a ride.

17       Q.  Did she ever get rides from Eric Romig?

18       A.  I do not recall.

19       Q.  Do you know if she was ever in his car

20   for any reason?

21       A.  I do not recall.  I don't have any -- I

22   don't recall.

23       Q.  Do you know if the school had any rules

24   about coaches transporting players to practices or

Page 55

1    from practices, or to the games or from games?

2        A.   I do not.

3        Q.   Were there ever any weekend practices?

4        A.   There may be Saturday practices.

5        Q.   Did you ever attend any of those?

6        A.   No.

7        Q.   Do you know if there were ever any

8    one-on-one coaching sessions between Eric Romig

9    and individual players?

10       A.   No, not that I recall.

11       Q.   Did your daughter Lauren tell you that on

12   weekends she had occasion to go to the school and

13   the gym and meet Eric Romig for one-on-one

14   coaching?

15       A.   No.

16       Q.   Did you ever hear from any source that

17   Eric Romig had any one-on-one coaching sessions

18   with any of the girls on the basketball team at

19   the same time Lauren was on the team back in 2007,

20   2008?

21       A.   No.

22       Q.   Back in 2007 or 2008, if you had been

23   informed that your daughter was asked by Coach

24   Romig to go to a gym and have one-on-one coaching

Page 56

1    sessions with her -- no other players, no other

2    teammates or whatever -- on the weekends, would

3    you have objected to that?

4        A.  Yes.

5        Q.  Why?

6        A.  Because I think it's inappropriate for a

7    male coach and a female players to be like that in

8    general, because I think it just opens up doors

9    for problems.

10       Q.  What kind of problems?

11                   MS. KANE:  Objection.

12                   MR. GROTH:  Go ahead.

13                   MR. RUSSELL:   You can answer.

14          It's fine.

15                   THE WITNESS:   Inappropriate

16          behavior.  I mean, whether one person is

17          looking for it, when you're one-on-one like

18          that, it is not healthy in any role.

19   BY MR. GROTH:

20       Q.  Did Robin Landis ever tell you that there

21   were any one-on-one coaching sessions between the

22   coaching staff, including Eric Romig and her, Marc

23   Hoover and any of the girl players during the

24   years 2007, 2008?

Page 57

```
 1      A.  I do not recall.
 2      Q.  Did Kristen Kennedy ever stay over at
 3  your house?
 4      A.  Possibly.  I mean, again, you're talking
 5  six years ago.
 6      Q.  I know, but you said she was a good
 7  friend of --
 8      A.  She was at our house.  I don't know if
 9  she spent the night.
10      Q.  You said Lauren was a good friend of
11  hers.
12      A.  During high school.
13      Q.  Did Lauren ever tell you before she
14  graduated that she had been told by Kristen
15  Kennedy that Eric Romig was having Facebook chats
16  or messages with her on a frequent basis about her
17  intimate -- meaning Kristen Kennedy's -- intimate
18  sex life with her boyfriend Kirby?
19      A.  No.
20              MR. RUSSELL:  Objection to the
21  form.
22      Q.  Did your daughter tell you that Kristen
23  Kennedy had told her that Eric Romig was asking
24  questions, through Facebook, about the number of
```

Appendix  0460

Page 58

1    times they had sex, where they had sex, whether

2    she liked it, how many positions, what kind of

3    positions they had sex in?

4            Did Lauren ever tell you that during 2007

5    or 2008?

6                    MR. RUSSELL:  Objection.

7                    MS. KANE:  Objection.

8    BY MR. GROTH:

9        Q.  You can answer.

10       A.  No.

11       Q.  Do you know whether or not Lauren ever

12   went out to have a meal with Eric Romig and/or

13   others as a group or individually after she came

14   back from California and scrimmaged or practiced

15   with the Faith Christian Academy girls basketball

16   team?

17       A.  It's possible.

18       Q.  I'm asking you if she ever told you that.

19       A.  I don't recall.

20       Q.  Would you have had a problem with that?

21       A.  In a group setting, no.

22       Q.  Let's talk about the Emily Mayer

23   situation with Eric Romig in 2009.

24       A.  All right.

Page 59

1     Q.   In December of 2009 did you find out --

2     and we talked about this a little bit, I think,

3     with your conversation with Cheryl Alderfer -- did

4     you find out that there was an investigation going

5     on at the school, Faith Christian Academy,

6     regarding a texting issue between Emily Mayer and

7     Eric Romig?

8     A.   Yes.

9               MS. KANE:   Objection to the form.

10    Q.   And do you recall when you found that

11    out?

12    A.   No.

13    Q.   Do you recall how you found it out?

14    A.   No.

15    Q.   Do you recall anybody supplying you with

16    any details regarding that investigation?

17    A.   No.

18    Q.   Did you ever talk to Ryan Clymer about

19    the investigation?

20    A.   I don't recall.

21    Q.   Do you recall him attempting to contact

22    you around that time to discuss the issue with

23    you?

24    A.   I don't recall.

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

Page 60

1     Q.  So, you recall knowing about the

2  situation but nothing about how, who told you

3  anything of that nature.

4     A.  Well, Cheryl called me, obviously, about

5  the allegations, questioning who was picking

6  Lauren up.

7     Q.  Right.

8     A.  I called Lauren because I was very upset.

9  Lauren was shocked and appalled, and she didn't

10  appreciate her being brought into something that

11  wasn't true.

12        She did state that Emily has a tendency

13  to lie, and she did talk to Ryan Clymer when she

14  came back because she wanted to make sure that

15  nothing was -- that there was no truth to what was

16  texted, supposedly texted.

17     Q.  Texted between whom?

18     A.  Between Eric and Emily.

19     Q.  How would she know that?

20     A.  Because I shared with her after Cheryl

21  called me and told her that "I just got this phone

22  call. I'm upset. Why would this happen?"

23     Q.  You were just referring to the airport

24  texts, not any other texts that Emily Mayer may

1    have had with Eric Romig.

2        A.   Correct.

3        Q.   Okay. You say she talked to Ryan Clymer

4    when she came back?

5        A.   Yes.

6        Q.   When was that? That would have been the

7    Christmas of 2009?

8        A.   December of '09.

9        Q.   Ryan Clymer testified that he called

10   Lauren in California to talk about him.  Does that

11   change your recollection at all?

12       A.   No, I don't recall that.  He may have.  I

13   honestly do not recall.

14       Q.   Do you recall Lauren actually meeting

15   with Ryan Clymer when she came home for the

16   holidays?

17       A.   Yes, I do remember she went to the school

18   to meet with him.

19       Q.   What did she tell you about that meeting?

20       A.   I do not recall. I'm sorry.  I don't

21   recall the details.  I was just thankful that she

22   had nothing to do with anything.

23       Q.   Did she tell you anything about the

24   meeting that she had with Ryan Clymer in December

Page 62

1    of 2009?

2          A.   She may have, but I don't recall details.

3          Q.   Did you attempt to talk to Ryan Clymer

4    about it at all?

5          A.   I may have.  I don't recall.  Again, I

6    apologize; I don't recall the details.

7          Q.   You said that your daughter told you that

8    Emily had a tendency to lie.

9          A.   That is what she told me.

10         Q.   But your daughter didn't know Emily when

11   she went to school, did she?

12         A.   She was a couple years behind Emily.  I

13   don't know why she would say that.  I'm just

14   repeating what she told me.

15         Q.   Well, she graduated before Emily ever

16   went to the school.  Is that correct? To your

17   understanding.

18         A.   I don't know.

19         Q.   You said she was a couple years --

20         A.   Lauren graduated --

21         Q.   Hold on a second. You said that Lauren

22   was a couple years behind Emily?

23         A.   No.

24         Q.   The other way around.

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

1    A.   Correct.

2    Q.   Okay.  So, you don't know that she ever

3  went to school with Emily at all, correct?

4    A.   I do not know.  I don't know what year

5  Emily graduated.

6    Q.   Did Lauren give you any details as to how

7  she knew or what she knew about Emily having a

8  tendency to lie?

9    A.   No.

10    Q.   You didn't ask her any questions about

11  that?

12    A.   No.

13    Q.   How she would know that?

14    A.   I just said, "Why would you say that?"

15  And she said "Because she has a tenancy to do

16  that."

17        I didn't ask her for details.  She was in

18  California.  It wasn't like my daughter was here,

19  and I did not ask for details.

20    Q.   Did Lauren come home every Christmas?

21    A.   Yes.

22    Q.   So, she graduated in 2008.  She would

23  have been home for Christmas 2008?

24    A.   Yes.

Page 64

1      Q.   And Christmas 2009.

2      A.   Correct.

3      Q.   Did anybody from the school, from Faith

4   Christian Academy, in 2009 -- we're talking about

5   the Emily Mayer and Eric Romig situation -- did

6   anybody from the school try to contact you to ask

7   you any questions about Eric Romig, his coaching

8   style or texting of players, anything of that

9   nature?

10     A.   I don't recall.

11     Q.   Do you know if you spoke to Robin Landis

12  about that in 2009, when Emily Mayer's situation

13  with Eric Romig arose?

14     A.   I may have because we were good friends.

15     Q.   Did she tell you anything?

16     A.   She was very upset.

17     Q.   About what?

18     A.   About -- well, I'm going to future.  I

19  think she was shocked at that time to think that

20  anything would be going on.

21     Q.   Did she tell you that she didn't believe

22  Emily Mayer in what she was describing about the

23  texts from Eric Romig?

24     A.   I do believe so.

1      Q.   Did she tell you anything about Emily

2   Mayer herself?

3      A.   No, I don't recall.

4      Q.   Did she call Emily Mayer a liar?

5      A.   I don't recall.  I don't believe so.

6   From what I recall, she just was very shocked at

7   the allegations.

8      Q.   Was it your impression from your

9   discussion with Robin Landis that she was

10  defending Eric Romig and saying that he wouldn't

11  do that type of thing?

12     A.   To a degree, yes.

13     Q.   And you know Robin Landis to this day?

14     A.   Yes.

15     Q.   Do you stay in contact with her?

16     A.   Occasionally.

17     Q.   Have you ever discussed the Emily Mayer

18  situation with Eric Romig with her since

19  2009/2010?

20     A.   Probably, yes.

21     Q.   Did she he ever tell you that at some

22  point after Eric Romig left Faith Christian

23  Academy, she had a conversation with Emily Mayer

24  during which she apologized to Emily Mayer for not

Page 66

1    believing her and telling Emily Mayer that she

2    did, in fact, believe that Eric Romig had done

3    with her what she claimed he had done?

4        A.  I don't recall her telling me that.

5        Q.  At any time before October 1st, 2013,

6    when Eric Romig was arrested for criminally

7    sexually assaulting my client, did you have any

8    reason to suspect that Eric Romig might have

9    attempted to engage in inappropriate sexual

10   conduct with any of the people -- any of the girls

11   he coached at Faith Christian Academy?

12       A.  No.

13               MS. KANE:  Objection.

14       A.  No.

15       Q.  You testified that you weren't contacted

16   by anybody from the school, any administrator from

17   the school, about Emily Mayer's situation with

18   Romig.

19           Did you ever hear anything about how that

20   situation was resolved?

21       A.  I don't recall.  I know it's been an

22   ongoing -- this whole situation.  I don't know how

23   that was resolved.

24       Q.  Well, as of 2009 both your children were

1    already out of school, correct?

2        A.   They graduated, correct.

3        Q.   So, the only contact you still had with

4    the school and church was basically the

5    church-type activities versus the school?

6        A.   Yes.

7        Q.   Did anybody ever tell you back in 2009 or

8    2010 that Eric Romig had submitted a memo or

9    letter of resignation as coach?

10       A.   I knew he had left.

11       Q.   How did you know that?

12       A.   I don't recall exactly. I just knew he

13   had left.

14       Q.   Was there an announcement made to the

15   church or the school, parents, students, anything

16   of that nature?

17       A.   I don't recall because I was removed

18   already from --

19       Q.   Well, you were still in the church.

20       A.   Still in the church, but I don't recall

21   anything being said at church.

22       Q.   At any time after Eric Romig resigned as

23   coach at FCA in early 2010, did you ever hear from

24   any source anything about the alleged content of

Page 68

1    the texts that he was sending to Emily Mayer?

2        A.   All I recall is that she had stated she

3    had received text messages from Eric that were

4    inappropriate.  It was hearsay.  I didn't have

5    proof.  I never talked to her one-on-one. I did

6    not know her personally.

7        Q.   Who did you hear it from?

8        A.   It could have been various people. I

9    don't recall specifics.

10       Q.   You don't remember any names at all?

11       A.   Because of my friendships with Cheryl and

12   Nicole.  I mean, it's -- the friends I knew that

13   still worked there at the school.

14       Q.   Nicole Gross?

15       A.   Yes.

16       Q.   Did you ever discuss with Nicole Gross

17   any of the texting issues that you had with Eric

18   Romig back in 2007?

19       A.   I probably did.

20       Q.   Did you talk to Nicole Gross before your

21   deposition today about your deposition?

22       A.   I just told her I got a subpoena to come

23   here.

24       Q.   Did she tell you she had been deposed?

Page 69

```
 1      A.  No.

 2      Q.  Do you know if she has been deposed in

 3   the case?

 4      A.  Can you please rephrase that?

 5      Q.  Yes:  Did you ever find out that Nicole

 6   Gross has been deposed in this case, gave a

 7   deposition in this case?

 8      A.  Yes.

 9      Q.  When did you find that out?

10      A.  That was a while ago.  I don't recall

11   exactly when.

12      Q.  Like a month ago or weeks ago?

13      A.  Yes -- I don't remember.

14      Q.  Her deposition wasn't taken until

15   September 2nd, so it was sometime after that she

16   told you?

17      A.  Yes.

18      Q.  Did she call you up?

19      A.  Yes.

20      Q.  Did she call you up to tell you about her

21   giving a deposition?

22      A.  Yes.

23      Q.  Did she talk to you about any part of her

24   testimony?
```

Tracy A. Fretz                                              Nace vs. Pennridge, et al.
                          November 20, 2015

Page 70

1      A.   Just that Lauren's name was brought up

2   and that she felt bad that her name got dragged

3   into it.

4      Q.   Did she tell you that I asked her if she

5   had ever said to somebody that she suspected that

6   there was an inappropriate relationship between

7   Lauren and Eric Romig?

8                MS. KANE:   Objection.

9      A.   I don't recall exact details.

10      Q.   Did Nicole Gross ever tell that you she

11   suspected that there was an inappropriate

12   relationship with Lauren and Eric Romig?

13      A.   No.

14      Q.   Did she ever ask you whether your

15   daughter ever told you there was an inappropriate

16   relationship between Lauren and Eric Romig?

17            Did she ever ask you whether Lauren had

18   ever said anything about that?

19      A.   She may have through conversations that

20   we had had regarding -- after this all came out

21   and I said that I had spoken with Lauren in great

22   detail and Lauren, I believe, would tell me the

23   truth because I'm not one to judge. I said,

24   "Please be honest with me.  Nothing's going to

1    shock me any more."

2           So yes, I may have discussed that with

3    Nicole, but I do not recall Nicole ever saying

4    that she thought there was anything inappropriate.

5      Q.   Did you ever hear from anybody, Nicole

6    Gross or anybody else, that they had some

7    suspicions that there was an inappropriate

8    relationship between Lauren and Eric Romig?

9      A.   No.

10     Q.   Other teachers, other coaches--

11            MS. KANE:   Objection, asked and

12   answered.

13     Q.   -- other teachers, other coaches, other

14   players, students, anybody.

15     A.   No.

16     Q.   Did you ever have any conversations --

17   other than the conversation you mentioned with

18   Henry Thompson about changing the location of this

19   deposition, did you ever have any conversations

20   with him about this litigation?

21     A.   Yes, I do recall.

22     Q.   When was that?

23     A.   I saw him in passing a few months ago,

24   and I don't recall the exact time and place.

Page 72

1     Q.  What was the discussion?

2     A.  That Lauren had gotten a letter.  And I

3  think that's what I had said to him, that Lauren

4  had gotten a letter and was not happy.

5     Q.  What did you discuss with him?

6     A.  That was pretty much it.  He said -- I

7  don't recall the exact words, but "I'm sorry that

8  you have to be going through this."

9     Q.  Did he ask to talk to Lauren?

10    A.  Not that I recall.

11    Q.  Did you ask Lauren to get in contact with

12  any of Faith Christian Academy's attorneys?

13    A.  Not that I recall. He may have said, if

14  she has any questions, to call, but I don't recall

15  asking attorneys or whatever.

16    Q.  Not that you asked. Did he tell you or

17  say to you, you know, would you have her contact

18  FCA's attorneys about the lawsuit?

19    A.  I don't recall.

20    Q.  Did he tell you that he has been sitting

21  through all -- not all of them, but a lot of the

22  depositions, just like he's here in the room

23  today, sitting through this deposition today?

24    A.  No.

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

Page 73

1      Q.  Did he tell that you he had sat through

2  Eric Romig's deposition in jail up in Nanticoke

3  back in the summer of 2015?

4      A.  No.

5      Q.  Did you discuss any of the Emily

6  Mayer/Eric Romig situation with him at all?

7      A.  No.

8      Q.  I'm going to show you what's been marked

9  Romig exhibit six.  It's an email from Annette

10  Smith, who is Emily Mayer's mother, to Ryan Clymer

11  dated December 31st, 2009, which has attached to

12  it -- you don't have to look at the email, but

13  attached to it is a statement typed by Emily Mayer

14  on December 21st, 2009 stating, to the best of her

15  recollection, the type of inappropriate texts that

16  she was receiving from Eric Romig.

17          Let me ask you first, have you ever seen

18  this document before?

19      A.  No.

20      Q.  I'll ask you just to glance at it for a

21  moment. Have you ever seen the document at all?

22      A.  No.

23      Q.  Take a look at the second page.  Do you

24  recall ever seeing that document before?

Page 74

1      A.   No.

2      Q.   Now, I'd like you to read that document

3   to yourself and then I'm going to ask you some

4   questions about it when you're done reading it.

5                    (Pause)

6      A.   Okay.

7      Q.   Have you had a chance to read that?

8      A.   Yes.

9      Q.   Did Lauren ever tell you that even one of

10   the texts that he was sending her back in 2007 or

11   2008 involved sexual issues?

12                    MR. RUSSELL:   Objection, asked and

13          answered.   You can go ahead and answer.

14   BY MR. GROTH:

15      Q.   Go ahead.

16      A.   All I recall my daughter telling me is

17   that he texted her about basketball.   And when

18   this all came out I asked her again, and I asked

19   her to be honest with me --

20      Q.   "This all" meaning what?

21      A.   This October 13 incident --

22      Q.   And do you --

23                    MS. KANE:   Can we let her please

24          finish the answer to the question?

Page 75

1          MR. GROTH:  Sure.  I'm just asking

2     her to clarify what she's answering.

3          MS. KANE:  Why don't you wait

4     until she's completed her answer?

5          MR. GROTH:  Okay.

6          THE WITNESS:  When he was

7     arrested. .

8          MR. GROTH:  Okay.

9          THE WITNESS:  . . .I obviously was

10    concerned, then I asked her if anything had

11    ever happened between her and Eric Romig.

12    She said no.

13          I said, "How about texts messages?

14    You always told me it was basketball. Were

15    there ever any inappropriate text messages?"

16    She did say "Yes, on occasion."

17 BY MR. GROTH:

18    Q.  That was after my client's situation

19 became public in October of 2013.

20    A.  Yes.

21    Q.  Did she say how they were inappropriate,

22 in what way they were inappropriate?

23    A.  No.

24    Q.  Did you ask her?

Page 76

1     A.   I did. She said it was not sexual.  She

2   said -- I believe she may have said jokes, but she

3   did not go into detail.

4       I told her, if she ever wanted to talk to

5   me about it -- she's in her twenties at this

6   point.  She has a right to her privacy.

7       As much as it hurts a parent to know that

8   a child's been brought into a situation like this,

9   that if she was ever harmed in any way, that I

10   would want to know.

11     Q.   During that conversation or any other

12   conversation you had with her after October of

13   2013, did she tell you that she was aware that he

14   was sending inappropriate, sexually-based texts to

15   teammates of hers?

16               MR. RUSSELL:   Objection.

17               MS. KANE:   Objection as well.

18   BY MR. GROTH:

19     Q.   Did she mention Kristen Kennedy's name at

20   all?

21     A.   I knew Kristen's name was brought into

22   it, and I don't recall exactly if it was through

23   her or through somebody else that told me.

24     Q.   Lauren was contacted by the Bucks County

Page 77

1   Detectives as part of the investigation of my

2   client's criminal sexual abuse, correct?

3       A.   He.

4       Q.   She told you about that?

5       A.   Yes.

6       Q.   What did she tell you about it?

7       A.   She told me she was getting ready to work

8   and she heard a knock at the door.   There were two

9   gentlemen there, and they kind of scolded her for

10  opening the door to two strangers.   Then she told

11  me that they were from Bucks County Detectives.

12  They wanted to talk to her about the case.

13       She spoke with them for about ten minutes

14  or so because she was getting ready to leave for

15  work, and all she told me basically was that "I

16  have nothing to give them" and that they wasted

17  their time.

18       They asked what else -- they were there

19  for two more days, could she give them any ideas

20  of what to do while they're there.   And I thought,

21  oh, great, our tax dollars at work.

22       Q.   So, she said that she actually met with

23  these detectives as opposed to talking to them

24  over the telephone.

Page 78

1      A.   Yes.

2      Q.   Did she say she ever talked to them over

3   the telephone?

4      A.   No, I don't recall that.  She was

5   surprised.

6      Q.   Did anybody from the District Attorney's

7   Office or the Bucks County Detectives ever try to

8   contact you after October of 2013?

9      A.   No.

10      Q.   After your daughter told you in 2013 that

11   some of the texts that Eric Romig had sent to her

12   were inappropriate in some way, did you pass that

13   information along to anybody else?

14      A.   I may have.  I don't recall exactly who.

15   I mean, I'm a mom.  I talk to other moms.

16              MS. KANE:  Just tell us what you

17        remember.

18              THE WITNESS:  I may have said it.

19   BY MR. GROTH:

20      Q.   Do you recall to whom?

21      A.   No.

22      Q.   Do you recall speaking to anybody at

23   Faith Christian Academy and telling anybody at

24   Faith Christian Academy that?

Page 79

```
 1        A.   I do not recall.
 2        Q.   Did your daughter tell you that she told
 3   the investigating Bucks County detectives that
 4   some of the texts that she received from Eric
 5   roaming were inappropriate in some way?
 6        A.   I do not recall.
 7        Q.   Do you know Chelsea Boleski?
 8        A.   Yes.
 9        Q.   Who is she?
10        A.   She went to Faith Christian Academy.  I
11   believe she had been a year or two younger than my
12   daughter.  I believe she was on the basketball
13   team.
14        Q.   I'm going to read you just a page or so
15   of the deposition that I'd taken of Kristen
16   Kennedy on October 8th, 2015, at page forty-five.
17                  "Q:  How would you describe Lauren
18           Fretz' relationship with Coach Romig in
19           2008?
20                  "A:  They were close.
21                  "Q:  What does that mean?
22                  "A:  They talked a lot.  They
23           spent a lot of time together.  It seemed
24           like they were goods friends.  I know that
```

Page 80

1        they texted a lot and practiced a lot on

2        weekends.

3                    "Q:  What does that mean?

4                    "A:  What does that mean?

5                    "Q:  Practiced a lot on the

6        weekend.  Not with the team.  You mean just

7        the two of them.

8                    "A: Yes.

9                    "Q: Where, at the school or

10       someplace else?

11                   "A:  At the school."

12   Does that refresh your recollection at all about a

13   question I asked you previously about whether your

14   daughter had any one-on-one coaching sessions with

15   Eric Romig on the weekends at school?

16     A.  I did not recall that.  I do not remember

17   if there was ever any one-on-one.

18     Q.  I'm going to read you another page or two

19   starting at page forty-nine of Kristen Kennedy's

20   deposition.

21           The question is "Do you know whether or

22   not she and Mr. Romig ever had a physical

23   relationship?

24                   "A:  I don't know.

1        "Q:   Did she ever tell you that?

2        "A:   That they had a physical

3  relationship?

4        "Q:   Physical, yes, like a sexual

5  physical relationship.

6        "A:   No.

7        "Q:   Did you ever hear that from

8  anybody else other than Lauren Fretz?

9        "A:   I think people said that,

10  yes.   But I spent a lot of time with her and

11  I would think that, if that was going on,

12  she would have no problem telling me, but I

13  personally never heard anybody say that.

14        "Q:   I'm not sure I caught exactly

15  the first part of that answer where you said

16  that you heard something from other people.

17        "A:   Yes.

18        "Q:   Who are these other people?

19        "A:   I mean, specifically I'm not

20  sure.   It was definitely a rumor going

21  around that they were maybe spending a

22  little bit too much time together.   I mean,

23  obviously they, as I said, were practicing

24  together and seemed to be pretty close.   It

Page 82

1   was a small team.  There were only nine of

2   us, I think, so we were all close.

3                  "Q:  These rumors or suspicions

4   that you heard from other people, would

5   those include other students?

6                  "A:  Yes."

7   Now, after hearing that deposition testimony by

8   her, does that refresh your recollection as to

9   whether or not you ever had any discussion with

10  Kristen Kennedy about any suspicions about

11  Lauren's relationship with Eric Romig?

12      A.   I never had any conversation with Kristen

13  about Lauren's relationship with Eric Romig.   I

14  should say I don't recall ever having a

15  conversation with Kristen Kennedy about -- I never

16  really spoke to her one-on-one.

17      Q.   Annette Smith's deposition was recently

18  taken.  She is Emily Mayer's mother.  She

19  testified that she had a conversation with Nicole

20  Gross during which Nicole Gross said that she

21  and/or others had suspicions about a sexual

22  relationship between Lauren Fretz and Eric Romig,

23  and that even people at Calvary Baptist Church had

24  talked about it or spoken about it.

```
 1              Did Nicole Gross ever have any similar
 2    conversations with you about that?
 3                   MR. RUSSELL:  Objection to the
 4         form.
 5                   MS. KANE:  Objection.
 6                   MS. CONNOR:  Objection.
 7                   THE WITNESS:  No.
 8                   MS. KANE:  Do you need a break,
 9         Miss?
10                   MR. GROTH: I'm almost done.
11                   MS. KANE:  I can still ask her if
12         she wants a break.
13                   MR. GROTH:  Are you okay?
14                   THE WITNESS:  I'm good.
15    BY MR. GROTH:
16       Q.  Do you communicate with your daughter
17    through Facebook?
18                   MS. OLSZEWSKI:  Asked and
19         answered.
20                   MR. RUSSELL:  Asked and answered.
21    BY MR. GROTH:
22       Q.  You can answer.
23       A.  Occasionally.  Very rarely.  We talk on
24    the phone more than we communicate through
```

Page 84

1      Facebook.

2          Q.   Was there ever a conversation or an issue

3      that you're aware of about Eric Romig attending

4      some type of banquet with your daughter while she

5      was in high school?

6          A.   No.

7          Q.   I'm going to ask you to read to yourself

8      pages seventy-five through. . .

9                    MR. RUSSELL:  Whose deposition are

10              we talking about?

11                   MR. GROTH:  Ryan Clymer's

12              deposition, pages seventy-five through

13              seventy-seven, and I'll ask you some

14              questions about things he testified to

15              there.  It's these three pages, one, two and

16              three. .

17                   MS. KERNAN:  Can we go off the

18              record?

19                   MR. GROTH:  That's fine.

20                   (A brief recess was taken)

21                   MR. GROTH:  We're back on the

22              record.

23

24      BY MR. GROTH:

Page 85

1      Q.   Mrs. Fretz, you just had a chance to read

2   those pages of the Ryan Clymer deposition that I

3   showed you.   Is that correct?

4      A.   Yes.

5      Q.   Do you know anything about the topics

6   that are discussed generally in those pages, about

7   Eric Romig supposedly inviting Lauren to some kind

8   of banquet?

9      A.   No.

10     Q.   This is all news to you; what you've

11  read?   It's all news to you?

12     A.   Yes.

13     Q.   You know Mrs. Tatarro, right?

14     A.   Yes.

15     Q.   It says in this deposition that she was

16  actually sent by Ryan Clymer to talk to Lauren

17  about that issue.   You read that part, correct?

18     A.   Yes.

19     Q.   Did Lauren ever tell you that Mrs.

20  Tatarro was sent to her by Ryan Clymer to ask

21  about some rumor or information from somebody

22  named Carolyn Eberhart that Eric Romig had invited

23  your daughter to some type of banquet?

24     A.   No.

Page 86

1          Q.   From what you read, do you have any idea

2     what the banquet that's being referred to in here

3     might by referring to?

4                    MS. KANE:   Objection.  She said

5            she doesn't know.

6                    MR. GROTH:   I know what she said.

7            I' asking her a separate question.

8                    MS. KANE:   Objection.

9                    MS. OLSZEWSKI:   Objection.

10                   THE WITNESS:   They only have the

11           banquets for the students.  It's very small,

12           so. . .

13    BY MR. GROTH:

14         Q.   Are you talking about the sports banquets

15    or. . .

16         A.   Sports banquets the families go to.

17         Q.   Okay.

18         A.   Junior/Senior banquets; it's Boy/Girl.

19    They go away to New York to see a play.  Never has

20    any teacher ever taken a student, to my knowledge,

21    and that would not be acceptable.

22         Q.   One last thing:  I'm going to show you

23    what we've marked Romig exhibits seven and five at

24    his deposition.  These are logs of the 3,100 texts

Tracy A. Fretz                                                          Nace vs. Pennridge, et al.
                              November 20, 2015

Page 87

1    that Eric Romig sent to Emily Mayer in about a

2    three-month period before the allegations about

3    the texting were made in December 2009.

4              Have you ever seen these logs before?

5    They just show the date and the time of the

6    texting between them?

7         A.   No.

8         Q.   Has anybody shown you these or attempted

9    to show you these?

10        A.   No.

11                  MR. GROTH: No other questions.

12             Thank you.

13                  MR. RUSSELL:  I just have a few

14             follow-up.

15                  (EXAMINATION)

16   BY MR. RUSSELL:

17        Q.   On what you just read, and you were shown

18   this deposition, you read in there that everybody

19   in there denied what happened, correct?

20        A.   Correct.

21        Q.   You indicated that after Eric Romig was

22   arrested concerning the Elizabeth Nace matter, you

23   said you asked your daughter again about was there

24   ever anything inappropriate ever sent to you in

Page 88

1   texts messages, and you said that she did say that

2   on occasion there were a few inappropriate

3   messages but they were not sexual.  Did I hear

4   that right?

5       A.  I believe so.

6       Q.  And she said you thought it was related

7   to a joke or something like that?

8       A.  That was the impression.

9       Q.  But she never told you that he sent

10  anything sexually inappropriate to her.

11      A.  Correct.

12              MR. GROTH:  Objection.

13      Q.  Additionally, early on, when the text

14  messages were going back and forth between your

15  daughter and Mr. Romig, you stated that there was

16  a volume of texts, but your daughter had denied

17  that there was anything inappropriate at that

18  time, right?

19      A.  Yes.

20      Q.  You're not aware of her ever telling

21  anybody that there was something sexually

22  inappropriate in any text message, correct?

23      A.  I am not aware of that.

24              MR. GROTH:  Objection.

1      Q.   Just to make sure that we're clear, what

2   was your daughter's interaction with Emily Mayer?

3      A.   I do not know.

4      Q.   But whatever interaction she had with

5   Emily Mayer, she knew that she had a reputation

6   for not telling the truth?

7             MR. GROTH:   Objection to the form.

8      Q.   You can answer.

9      A.   That is what she said to me, so I'm just

10   recalling that.

11      Q.   Okay. Did she tell you anything about her

12   reputation for sexual promiscuity?

13      A.   No.

14      Q.   She just talked about her reputation for

15   not telling the truth?

16      A.   Correct.

17             MR. RUSSELL: I have no further

18        questions.

19             MS. CONNOR:  No questions.

20             MS. KANE:  No questions.

21             MS. OLSZEWSKI: No questions.

22             MR. GROTH:  I have two final

23        questions.

24             (EXAMINATION)

Page 90

```
 1    BY MR. GROTH:
 2        Q.  Have you ever seen on your daughter's
 3    Facebook account any provocative -- what you would
 4    consider to be provocative photographs?
 5        A.  Why is this relevant?
 6        Q.  I'm just asking the question.
 7                    MR. RUSSELL: You don't have to
 8        answer that if you don't want to.
 9                    MS. KANE:  You do not have to
10        answer that question.
11                    MR. GROTH: You can't instruct her
12        not to answer any question.
13                    THE WITNESS:  I am a mom --
14                    MR. RUSSELL: You don't have to.
15                    THE WITNESS:  -- and I do not wish
16        to answer that.  I do not think it has any
17        place in this.
18                    MR. GROTH: If that's your answer,
19        I understand your answer.
20    BY MR. GROTH:
21        Q.  When your daughter told you in 2013,
22    after my client's situation became known, that
23    there were some inappropriate texts to her from
24    Eric Romig, regardless of what was inappropriate
```

Page 91

```
 1   about them, did you ask her why she had never told
 2   you that before?
 3       A.  I don't recall.  I mean, I may have.  I
 4   don't recall exactly.  She was probably scared.
 5       Q.  When you did hear that from her in 2013,
 6   did that cause you to disbelieve things that she
 7   had told you before, that there was nothing
 8   inappropriate in the texts between them?
 9              MS. KANE:  Objection. I don't
10        understand the question.
11              THE WITNESS:  I mean -- yeah. Did
12        I have any reason to believe that the text
13        messages back in high school were
14        inappropriate due to the 2013 arrest?
15   BY MR. GROTH:
16       Q.  The question is, when your daughter told
17   you in 2013 that some of the text messages from
18   Eric Romig to her were inappropriate in whatever
19   way, did that cause you some concern that back in
20   2007 or 2008, when she said none of the text
21   messages were inappropriate, that she may not have
22   been telling you the truth?
23              MS. KANE:  Objection.
24       A.  Possibly.
```

Tracy A. Fretz

November 20, 2015

Nace vs. Pennridge, et al.

Page 92

1                    MR. GROTH:   No further questions.

2          Thank you.

3                    MR. RUSSELL:   Thanks for your

4          time.

5                    MS. CONNOR:   Thank you.

6                    MS. KANE:   Thank you.

7                    (The deposition was concluded at

8          1:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 93

## SIGNATURE PAGE

— — — — —

      I hereby acknowledge that I have read the aforegoing transcript, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

— — — — — —

SIGNATURE: _____

DATE: _____

Page 94

## CERTIFICATION
------

I hereby certify that the testimony
and the proceedings in the aforegoing matter are
contained fully and accurately in the stenographic
notes taken by me and that the copy is a true and
correct transcript of the same.

_____

Lance A. Brusilow
Registered Professional Reporter
Certified Realtime Reporter

The foregoing certification does

not apply to any reproduction of the same by any

means unless under the direct control and/or

supervision of the certifying shorthand reporter.