# COPY TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA
### CIVIL TRIAL DIVISION

JAMES NACE, et al.                              CIVIL ACTION

      vs.

PENNRIDGE SCHOOL DISTRICT,
et al.                                          NO. 15-333

Thursday, October 8, 2015

Oral deposition of KRISTIN A. KENNEDY,
held at the law offices of HORNSTINE, PELLONI &
HORNSTINE, 1500 Walnut Street, Suite 300, Philadelphia,
Pennsylvania, beginning at 1:30 p.m., on the above
date, before LANCE A. BRUSILOW, Registered
Professional Reporter, Approved Reporter for the
United States District Court, and Notary Public,
there being present.

## brusilow+associates

more than wordsmiths

215.772.1717
PHONE

1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.brusilow.com

877.763.4006
FAX

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

```
 1      APPEARANCES

 2      HORNSTINE PELLONI & HORNSTINE

 3      BY:  DAVID GROTH, ESQUIRE

 4      1500 Walnut Street

 5      Suite 300

 6      Philadelphia, PA 19102

 7      ph: 215.568.4968

 8      (david@hornstine.com)

 9      Counsel for Plaintiffs

10

11      MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

12      BY:  JOSEPH J. SANTARONE, ESQUIRE

13      2000 Market Street

14      Suite 2300

15      Philadelphia, PA 19103

16      ph: 215.575.2626

17      (jjsantarone@mdwcg.com)

18      Counsel for Faith Christian Academy

19

20

21

22

23

24
```

Appendix  0499

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

1       APPEARANCES CONTINUED:

2       EASTBURN & GRAY, P.C.

3       BY:  ERIN N. KERNAN, ESQUIRE

4       60 East Court Street

5       Doylestown, PA 18901

6       ph: 215.345.7000

7       (ekernan@eastburngray.com)

8       Counsel for Pennridge School District and

9       individual Pennridge defendants

10

11      CASSIDY CONNOR PITCHFORD

12      BY:  CARLA E. CONNOR, ESQUIRE

13      295 East Swedesford Road

14      Suite #346

15      Wayne, PA  19087

16      ph: 610.783.3513

17      (cconnor@ccplegal.com)

18      Counsel for FCA, Ryan Clymer and Russell

19      Hollenbach

20

21

22

23

24

Appendix 0500

```
 1      APPEARANCES CONTINUED:

 2      KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

 3      BY:  VERONICA N. OLSZEWSKI, ESQUIRE

 4      36 East Second Street

 5      Media, PA  19063

 6      ph: 610.565.0600

 7      (volszewski@kgpv.com)

 8      Counsel for Ryan Clymer and Russell

 9      Hollenbach

10

11      DRAKE, HILEMAN & DAVIS

12      BY:  JONATHAN J. RUSSELL, ESQUIRE

13      252 W. Swamp Road, #15

14      Doylestown, PA  18901

15      ph:  215.348.2088

16      (jrussell@dhdlaw.com)

17      Counsel for Faith Christian Defendants

18

19

20

21

22

23

24
```

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0501

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

```
 1      EXAMINATION INDEX

 2      WITNESS:  KRISTIN A. KENNEDY

 3        BY Mr. Groth: (page-6)

 4        BY Mr. Russell: (pages-84 & 102)

 5        BY Mr. Santarone: (page-97)

 6

 7      EXHIBIT INDEX

 8      NO. 1  Notice of Deposition (page-14)

 9

10      NO. 2  Letter dated September 17, 2015,

11      with attachment (page-14)

12

13      NO. 3  Letter dated April 10, 2015 from

14      D. Groth to K. Kennedy (page-14)

15

16

17

18

19

20

21

22

23

24
```

brusilow.com                brusilow + associates              215.772.1717

brusilow+associates
more than wordsmiths
215.772.1717    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103    FAX 877.763.4006
www.brusilow.com

Appendix 0502

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 6

1  (It is hereby agreed by and
2  among counsel that sealing, certification
3  and filing are waived; and that all
4  objections, except as to the form of the
5  question, are reserved until the time of
6  trial)
7      KRISTIN ANN KENNEDY, having been
8  first duly sworn, was examined and
9  testified as follows:
10  (EXAMINATION)
11  BY MR. GROTH:
12  Q.   Good afternoon, Ms. Kennedy.
13  My name is David Groth, and I asked you
14  to come here today to give testimony in a
15  case where I am the attorney for the
16  plaintiff that is currently pending in the
17  Federal Eastern District Court of
18  Pennsylvania, the subject matter of which
19  is a complaint against Pennridge School
20  District, Faith Christian Academy and some
21  of their employees, as well as Eric
22  Romig, relating to the sexual misconduct
23  he engaged in with my client back in
24  2013.

Page 7

1      I'm going to ask you some
2  questions about things that I think are
3  important and relevant to my client's
4  claims against these defendants.
5      Let me first -- I've already
6  introduced myself to you before the
7  deposition. I'll have all the attorneys
8  tell you what their names are and who
9  they represent in the case.
10      MS. KERNAN: I'm Erin Kernan.
11  I represent the Pennridge School District
12  and its defendants.
13      MS. OLSZEWSKI: I'm Veronica
14  Olszewski. I represent Ryan Clymer and
15  Russell Hollenbach.
16      MR. RUSSELL: I'm John Russell,
17  and I represent the Faith Christian
18  Academy defendants.
19      MR. SANTARONE: I'm Joe
20  Santarone, and I represent just Faith
21  Christian Academy.
22      MR. RUSSELL: I'm Carla Connor,
23  and I represent Faith Christian Academy,
24  Ryan Clymer and Russell Hollenbach.

Page 8

1  BY MR. GROTH:
2  Q.   Ms. Kennedy, I've asked you to
3  come here today, as I said, to give
4  testimony that I think might be important
5  to this case on certain issues of which
6  you may be aware going back to around
7  2008, 2009, in that time period.
8      I'm going to give you some
9  brief guidelines that will help us get
10  through the deposition more quickly if you
11  follow these and if all the attorneys
12  follow them as well.
13      First of all, please listen to
14  the question and make sure you understand
15  the question before you respond to it,
16  before you give a verbal response to it.
17      If you don't understand any
18  question that you're asked, please ask us
19  to rephrase or clarify or restate the
20  question so that you do understand it,
21  and then you can answer the question.
22      If you answer a question, I'll
23  assume that you understood the question
24  and that you're giving us your best

Page 9

1  recollection of facts and events going as
2  far as back as 2008 and '09.
3      Also, let me complete the
4  question before you begin your answer, for
5  two reasons: Number one, you should know
6  exactly what I'm asking you for before
7  you begin your answer; and if you jump in
8  in the middle of a question, you might
9  not have heard everything you need to
10  hear.
11      Secondly, the court reporter
12  will make a transcript of this deposition,
13  a typed transcript of the deposition, and
14  he can only take down one of us speaking
15  at a time, so allow me to complete the
16  question before you begin your answer,
17  I'll allow you to complete your answer,
18  and then I'll ask you another question so
19  that we're not talking over each other
20  and we get an accurate transcript.
21      You have to give a verbal
22  response to all questions, no gestures
23  like a head-shake yes or a head-shake no
24  or a hand gesture or any type of gesture.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix  0503

**Page 10**

1   The court reporter can only
2   take make a record of what's said here,
3   so if you answer with a gesture like a
4   shake of your head, he can't get that
5   down into the transcript, so have ` to
6   verbalize all your answers.  You need to
7   give a yes or a no or some narrative
8   response to any question that you're
9   asked.
10   You're required to answer every
11   question you're asked fully and to the
12   best of your ability and to the best of
13   your recollection.
14   From time to time one attorney
15   may object to a question that you're
16   asked by another attorney, and if that
17   occurs, if somebody objects to a question
18   I ask you or if I object to a question
19   somebody else asks you, just allow the
20   objection to be stated on the record and
21   then you will proceed to answer the
22   question.
23   The fact that somebody objects
24   to the question doesn't mean you're not

**Page 11**

1   going to answer it. It's just to reserve
2   issues for a judge at some later time, if
3   necessary.  So, don't be put off that
4   somebody says "object to the form of the
5   question." You're still to answer the
6   question.
7   I'm going to ask you for facts
8   and information that you know personally
9   or that you may have heard about or
10   learned from others or gotten through
11   other sources.
12   If I ask you for information
13   and you've gotten some information in
14   response to the question from a media
15   report, from talking to parties in this
16   case, from talking to witnesses in this
17   case, something other than your own
18   personal knowledge, you can tell me that.
19   Hearsay is an issue at trial, where
20   somebody can't say what somebody else told
21   them, but it's not an issue in this
22   deposition.
23   If I ask you for information
24   about a discussion between you and Lauren

**Page 12**

1   Fretz or a discussion between you and
2   somebody at FCA or you and Mr. Romig or
3   whatever, you're required to give me that
4   information, even though it's not your
5   facts.  You're telling me about things
6   that other people told you.
7   If you don't know the answer to
8   a question or do not recall the facts and
9   information I'm asking you about, tell me
10   that and that's a sufficient answer.
11   I don't want you to guess or
12   speculate or assume anything in response
13   to a question, but you are required to
14   give me all the facts and information
15   that you can recall.
16   If you don't know the answer to
17   a question -- in other words, if I ask
18   you for information that you never had at
19   any time, never knew; you didn't forget
20   it, you just never knew it -- tell me
21   that and that's a sufficient answer as
22   well.
23   Again, I don't want you to
24   believe that you are required to give an

**Page 13**

1   answer to every question just because the
2   question is asked.  We don't know what
3   you know and what you don't know. That's
4   why you're here answering questions for us
5   today.
6   Are you feeling okay? Is there
7   any reason, medical or otherwise, why you
8   can't answer our questions today?
9   A.   No.
10   Q.   If you need a break for any
11   reason during the deposition, please let
12   us know and we'll arrange for you to get
13   whatever you need during the break, okay?
14   Do you understand those instructions?
15   A.   Yes.
16   Q.   You're here today in response
17   to a subpoena that was served on you.
18   Is that correct?
19   A.   Yes.
20   MR. GROTH:  Let me mark as
21   exhibit Kennedy-1 a Notice of Deposition
22   and Certification of Service for Kristin
23   Kennedy's deposition for October 8, 2015,
24   which is today, at 1:30.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX 877.763.4006
www.brusilow.com

Appendix  0504

**Page 14**

1  I'm going to mark as exhibit
2  two a letter I sent to Ms. Kennedy on
3  September 17th, providing her with
4  subpoena and a witness fee, as rules
5  require, and also telling her of the
6  deposition on this date and time.
7  (Exhibits Kennedy-1 and
8  Kennedy-2 were marked for identification)
9  BY MR. GROTH:
10  Q.   Is this the subpoena that you
11  received and that you are responding to?
12  A.   Yes.
13  MR. GROTH:  I'll also going to
14  mark as Kennedy exhibit three a letter
15  which I sent to Ms. Kennedy on April 10,
16  2015, telling her some information about
17  the case that we're involved in here and
18  asking her to contact me so I can ask
19  her some questions about things that I
20  thought were important to the case.
21  (Exhibit Kennedy-3 was marked
22  for identification)
23  BY MR. GROTH:
24  Q.   Did you receive this letter

**Page 15**

1  sometime after April 10, 2015?
2  A.   I did receive it.
3  Q.   Did you respond to that letter
4  at all?
5  A.   No, I did not.
6  Q.   You never tried to contact me
7  and you never had a discussion?
8  A.   No, I did not.
9  Q.   Would it be correct to say that
10  you and I have never discussed anything
11  about this case or anything prior to two
12  days ago, when you called me up to try
13  to see if I could change the date of
14  your deposition to a different day?
15  A.   Yes.
16  Q.   Is that correct?
17  A.   That is correct.
18  Q.   And we talked about doing that,
19  and I said I would do it if that's what
20  you wanted, but you decided to come in
21  today.  Is that correct?
22  A.   That's correct.
23  Q.   And we didn't discuss any
24  details of your testimony or any facts

**Page 16**

1  about Eric Romig or your contact with him
2  back in 2009 or anything of that nature,
3  correct?
4  A.   No, we did not.
5  Q.   And today you got here a little
6  bit before the rest of the attorneys and
7  I talked to you for about seven minutes
8  in the office here just to tell you
9  basically what a deposition was, how it
10  would be conducted, how I would do the
11  initial questioning, and the other
12  attorneys would, in turn, ask questions of
13  you to find out information that they
14  wanted to know.  Is that correct?
15  A.   Yes.
16  Q.   But you didn't tell me anything
17  that you were going to testify to or
18  anything that you thought I might be
19  interested in or anything of that nature.
20  A.   No.
21  Q.   In other words, we didn't talk
22  about the substance or facts or anything
23  regarding your testimony today?
24  A.   No, we did not.

**Page 17**

1  MR. RUSSELL:  Can I see that
2  letter, please?
3  MR. GROTH: Sure.
4  MR. RUSSELL: Thank you.
5  BY MR. GROTH:
6  Q.   Let me get some background
7  information about you first, Ms. Kennedy.
8  A.   Sure.
9  Q.   Let me ask you first:  Besides
10  me, other than me, have you talked to any
11  representatives of Faith Christian Academy
12  about any issues regarding this case or
13  about anything involving Mr. Romig's
14  conduct back in 2009/2010?
15  A.   I have not spoken with any of
16  these representatives.
17  Q.   No attorneys?
18  A.   No.
19  Q.   Nobody who identified himself or
20  herself as an attorney?
21  A.   No.
22  Q.   How about any employees of FCA?
23  I'm talking about the principal or Pastor
24  Auckland or Henry Thompson or anybody

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix 0505

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 18

1  else.  Did anybody else speak to you
2  about any issues involving this case?
3     A.    No, not about the case with
4  your client.
5     Q.    Who did you speak to?
6     A.    A while ago I spoke to Ryan
7  Clymer.
8     Q.    What's "a while ago"?
9     A.    Probably after I graduated in
10 2008, maybe 2009 or 2010.
11    Q.    Was that a telephone
12 conversation or in person?
13    A.    Telephone.
14    Q.    Just one conversation?
15    A.    Just one conversation.
16    Q.    What was the subject of that
17 conversation?
18    A.    Conversations that I had with
19 Mr. Romig.
20    Q.    Is that the only time you spoke
21 to Ryan Clymer?
22    A.    That is the only time I spoke
23 to Ryan Clymer.
24    Q.    You graduated in June of 2008

Page 19

1  from Faith Christian Academy in
2  Sellersville?
3     A.    Yes, sir.
4     Q.    Have you had any contact at all
5  with Eric Romig since your graduation?
6     A.    Yes.
7     Q.    What contact was that?
8     A.    I spoke with him, Facebook
9  Chat, and that was really it, Facebook
10 Message.
11    Q.    When was that?
12    A.    The year after I graduated, the
13 summer, and the year that I was -- 2009,
14 when I was going to Mercy.
15    Q.    We'll get into that.  Was that
16 just one Facebook contact?
17    A.    No.
18    Q.    There were multiple?
19    A.    Yes.
20    Q.    Over what period of time --
21 strike that.  Let me ask it a different
22 way.
23        Did you ever communicate with
24 Mr. Romig by Facebook during the time

Page 20

1  that you were a student at FCA?
2     A.    Yes.
3     Q.    And was that your own account?
4     A.    I don't know what that means.
5     Q.    Was the Facebook account your
6  account, your parents' account?
7     A.    My account.
8     Q.    What about Mr. Romig?  Was that
9  his account or his wife's account?
10    A.    His wife's account.
11    Q.    And how many times would you
12 estimate -- and if you can estimate or
13 approximate, that's fine.  I don't need
14 an exact number, but how many times would
15 you think that you communicated with Mr.
16 Romig by Facebook during the time you
17 were a student at FCA?
18    A.    I talked to him a lot.  I
19 mean, he was a coach of mine and it was
20 regular stuff.  I mean, he was coaching me
21 and I was seeing him every day, so it
22 wasn't that weird for him to contact me.
23    Q.    Was he contacting you about
24 only basketball-related activities?

Page 21

1     A.    No.
2     Q.    What other types of things
3  would he contact you about on Facebook?
4     A.    We were just talking.  I guess
5  anything that was brought up, from what I
6  was doing or any sort of normal
7  conversation.  It wasn't just basketball.
8  It was life and other stuff.
9     Q.    Such as?  Give me an example.
10    A.    He talked a lot about -- I had
11 a boyfriend at the time.  He was pretty
12 interested in that kind of stuff.
13        I was also kind of moving
14 toward Christianity at that point, and he
15 was kind of taking on a mentor role,
16 just, you know, temptations, sins, that
17 kind of stuff.
18    Q.    Was your boyfriend at the time
19 named Sean?
20    A.    Yes.
21    Q.    What was his last name?
22    A.    Kirby.
23    Q.    When you said you talked to him
24 or he asked you about your boyfriend and

brusilow.com            brusilow + associates            215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103    FAX 877.763.4006
www.brusilow.com

Appendix 0506

**Page 22**

1  he was interested in that kind of stuff
2  -- I think those were the words you used
3  -- what kind of stuff was he interested
4  in?
5      A.    Just what we did with our time,
6  if we were intimate, how that made me
7  feel.  That's pretty much it.
8      Q.    How what made you feel?
9      A.    Being intimate with him.
10     Q.    Did you think it was
11  appropriate at that time for him to ask
12  you those kinds of questions?
13     A.    I wasn't extremely alarmed by
14  it.  It definitely seemed like something
15  no other adult has asked me before, but I
16  trusted him.  I had a pretty good
17  relationship with him, and at that time I
18  didn't think it was the weirdest thing.
19     Q.    Did you think it was weird at
20  all?
21     A.    Looking back, I think it's
22  weird knowing what happened, but at the
23  time I wasn't extremely alarmed by it,
24  no.

**Page 23**

1      Q.    And this is while you were
2  still going to FCA, correct?
3      A.    Yes.
4      Q.    Were all those communications by
5  Facebook or electronic means as opposed to
6  talking face-to-face about those kinds of
7  issues including your boyfriend?
8      A.    There was some face-to-face.
9  Most of the stuff that he said that was
10  more related to the intimate stuff seemed
11  to not be face-to-face. It was mostly on
12  Facebook, late at night or something.
13     Q.    What's "late at night"?
14     A.    Like ten or eleven o'clock.
15     Q.    Did he ever send you any text
16  messages on those same topics?
17     A.    I don't believe so.
18     Q.    Did you have a cell phone at
19  that time?
20     A.    Did I?
21     Q.    Yes.
22     A.    Did I have a cell phone?  We
23  just never really communicated that way.
24     Q.    When you said you spoke to him

**Page 24**

1  about issues of intimacy with your
2  boyfriend, I mean, did he ask for details
3  of your personal life, sex life, physical
4  life with your boyfriend?
5      A.    Yes.
6      Q.    What kind of details was he
7  asking about?
8      A.    Where we had sex, how many
9  times we had sex.
10     Q.    Did you answer his questions?
11     A.    Yes.
12     Q.    Did you tell your boyfriend he
13  was asking you these questions?
14     A.    I don't think so.  Maybe in
15  passing, but he didn't really care, so
16  no.
17     Q.    Where did he go to school?
18     A.    He went there with me for the
19  last year as well.
20     Q.    Where did he go to school
21  before then?
22     A.    We both were at Lansdale
23  Catholic.
24     Q.    Why did you leave Lansdale

**Page 25**

1  Catholic?
2      A.    I was kicked out.
3      Q.    For what?
4      A.    Just getting a bunch of
5  demerits, I guess; and incidents, I guess.
6      Q.    Such as?
7      A.    Drinking at a dance, and there
8  was an incident with Adderall and
9  Percocet, which Faith was aware of.
10     Q.    Did you tell Mr. Romig in your
11  communication, whether in person or on
12  Facebook, your history from Lansdale
13  Catholic, the trouble you had been in and
14  why you were going to Faith Christian for
15  your senior year?
16     A.    I think everybody knew.  It was
17  a small school and people talk about
18  things. I don't really have anything to
19  hide.  I was not dealing the Percocet.
20  It was just something I got involved in.
21     Q.    I'm not suggesting you have
22  anything to hide.  I just wondered if you
23  remembered talking about those issues with
24  him directly.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 26

1 You said he acted as a mentor
2 for you and that type of thing?
3 A.   Sure, yes.
4 Q.   Are those the types of things
5 you told him about?
6 A.   Yes.
7 Q.   And you knew Sean Kirby at
8 Lansdale Catholic as well?
9 A.   Did I know him?
10 Q.   Yes.
11 A.   Yes, he was my boyfriend.
12 Q.   Was he your boyfriend at
13 Lansdale Catholic as well?
14 A.   Yes.
15 Q.   Was he kicked out as well?
16 A.   Yes.
17 Q.   Did you talk to Mr. Romig about
18 that?
19 A.   Him being kicked out?
20 Q.   Yes, that you were both kicked
21 out for --
22 A.   I talked about myself more,
23 yes. It was the same thing.
24 Q.   You said that you weren't

Page 27

1 overly alarmed
2 BY Mr. Romig asking you about your
3 intimate life with your boyfriend,
4 including details of it: When, what time,
5 how it made you feel, the whens, wheres
6 and whatever.
7 You say, looking back in
8 hindsight, after everything that happened
9 with Mr. Romig afterwards, you can see
10 now that it might be a little weird.
11 The question to you is: At
12 the time when you were in FCA, did you
13 talk about these Facebook Chats and
14 communications you were having with Mr.
15 Romig with any employees of FCA:
16 Administrators, faculty, coaches, any other
17 coaches?
18 A.   No.
19 Q.   Did you talk to your parents
20 about them?
21 A.   I did speak with my parents.
22 As I remember it, I think they caught a
23 glimpse of a Facebook Chat or something.
24 As I said, at that point I had

Page 28

1 a pretty good relationship with him and I
2 was more kind of worried about him -- I
3 don't know -- thinking that he was
4 drinking.
5 I know his wife was having a
6 hard pregnancy and I thought maybe he was
7 just having a bad -- is he lonely or --
8 I don't know.
9 Q.   Did he tell you that he was
10 having problems with his wife?
11 A.   He wasn't having problems. She
12 was having problems with her pregnancy, so
13 she wasn't really around and I'm sure
14 that's hard.  He never verbalized that to
15 me.  That's just an assumption on my
16 part.
17 Q.   How do you know his wife was
18 having a hard pregnancy?
19 A.   Because I was involved with
20 them. He coached my team.  She was at
21 the games. I was friends with his
22 daughter.
23 Q.   Which daughter, Chelsea?
24 A.   Chelsea.  We were all kind of

Page 29

1 involved in her pregnancy. She was
2 pregnant the year I was there.
3 Q.   How friendly were you with
4 Chelsea?
5 A.   Pretty friendly. It's a small
6 basketball team.  She's a great girl, so.
7 . .
8 Q.   Did she ever tell you she had
9 been the victim of sexual abuse as a
10 child?
11 A.   No.
12 Q.   Did you ever hear that from
13 anybody else?.
14 A.   I never heard that.
15 Q.   As I understand your testimony
16 -- and you'll tell me if I'm wrong --
17 your parents got a glimpse of one of
18 these Facebook messages while you were
19 still going to school?
20 A.   No, I believe that was the
21 summer after.
22 Q.   Yes, that's what I want to do,
23 separate the two:  What happened while
24 you were actually still at school before

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX 877.763.4006
www.brusilow.com

Appendix 0508

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 30

1  you graduated and what happened after you
2  graduated.
3     A.   Okay.
4     Q.   These chats that you had with
5  him, these messages that you exchanged
6  back and forth on Facebook as a student
7  while he was your coach, involved
8  conversations of these intimate issues
9  between you and your boyfriend.
10    A.   Yes.
11    Q.   Your sex life with your
12  boyfriend.
13    A.   Yes.
14    Q.   Correct?
15    A.   Yes.
16    Q.   Did you tell your mother or
17  father about those conversations with him
18  before you graduated from FCA?
19    A.   I don't think so.  I might
20  have told my mom in passing, but it
21  wasn't really a big thing until she
22  really saw them, I guess, herself after I
23  graduated.
24        As I said, I might have said

Page 31

1  it like out of concern, like "I think
2  there is something going on with Coach
3  Romig."  But no, I don't think I really
4  elaborated too much.
5     Q.   Other than telling Sean about
6  these communications you were having with
7  Coach Romig, did you tell any of the
8  other girlfriends or teammates at school?
9     A.   Yes, I definitely think I
10  mentioned it to Lauren Fretz or Kayla
11  Young or Chelsea Voleski, who were all
12  teammates.
13    Q.   What was Chelsea's last name?
14    A.   Chelsea Voleski.
15    Q.   Do you know how to spell it?
16    A.   V-o-l-e-s-k-i.
17    Q.   And what did you tell them?
18    A.   Just that I thought he was
19  asking stuff that was a little bit too
20  far.  I mean, there is a lot of openness
21  kind of at Faith, people that are willing
22  to talk about temptation.
23        I spoke with many other, you
24  know, teachers just about sinning and

Page 32

1  stuff like that, so it wasn't really too
2  far-fetched for him to be asking, although
3  he did seem to go a little bit too far
4  every once in a while, but it wasn't
5  really off-topic.
6     Q.   What was going too far? What
7  was he asking you about or what were you
8  discussions with him that you thought was
9  going a bit too far?
10    A.   I just think he really
11  shouldn't have been asking.  He wanted
12  details:  Places, positions, that kind of
13  stuff.  It seemed like he was kind of
14  taking that he-doesn't-deserve-that stance
15  that I didn't really like.
16    Q.   And did you tell Lauren Fretz
17  or Kayla Young and Chelsea Voleski that
18  he was asking you those types of
19  questions?
20    A.   Yes.
21    Q.   Did any one of them ever tell
22  you that he was also asking any of them
23  those types of questions or having those
24  kind of communications with him?

Page 33

1     A.   No.
2     Q.   They never told you?
3     A.   They never said anything to me.
4     Q.   And you never asked them?
5     A.   No, not if they were asked
6  about having sex with their boyfriends.
7  They didn't have boyfriends.
8     Q.   Did Mr. Romig in these
9  conversations with you by Facebook or in
10  person ever ask you why you were with
11  Sean Kirby or try to get you to break up
12  with Sean Kirby?
13    A.   Yes.
14    Q.   Did he tell you if he thought
15  you should do that?
16    A.   He just thought he didn't
17  deserve me.
18    Q.   Did Mr. Romig make any messages
19  to you or comments to you saying that
20  instead of Sean Kirby, you should be with
21  him?
22    A.   No.
23    Q.   Did he ever tell you that he
24  wanted to start or was interested in

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix  0509

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 34

1  starting a physical relationship with you?
2  A.    No.
3  Q.    Did you get that impression
4  from your messages with him and your
5  communications with him that he was
6  interested in you in something other than
7  a mentor-type role?
8  A.    Looking back -- that's why I
9  said it's hard to -- no, I wasn't
10  alarmed. But now, knowing that he was in
11  a relationship with a sixteen-year-old
12  does change your opinion a little bit.
13  Q.    I know it's hard to separate
14  what you know now from what you knew back
15  in 2009 or 2008 when I'm asking you these
16  questions, but let's see if you can go
17  back and just keep it at 2008, what you
18  knew or what you thought being in 2008,
19  before any of this other stuff happened
20  later.
21       Did you ever hear any comments
22  from him that gave you the impression
23  that he was interested in you in terms of
24  a physical relationship or a

Page 35

1  non-basketball -- certainly a
2  non-basketball relationship?
3       MR. SANTARONE: For
4  clarification, you're asking her what she
5  thought at the time, not what she's
6  thinking now.
7       MR. GROTH: Now.
8  BY MR. GROTH:
9  Q.    I'm asking you, back in 2008 --
10  A.    While I was in school.
11  Q.    -- while you were in school,
12  did you get the impression from anything
13  he was saying to you that he was trying
14  to get you to consider him as somebody
15  that you would have a personal or
16  physical relationship with?
17  A.    Not in 2008, not while I was a
18  student.
19  Q.    Did you have other people at
20  FCA at that time who you considered to be
21  mentors to you?
22  A.    Absolutely.
23  Q.    Name some.
24  A.    Ms. Tatarro.

Page 36

1  Q.    She was your homeroom teacher?
2  A.    Homeroom teacher, yes.
3  Q.    Okay.
4  A.    Ms. Alderfer.
5  Q.    Cheryl?
6  A.    Yes.
7  Q.    Okay.
8  A.    Mrs. Landis.
9  Q.    Robin?
10  A.    Yes.
11  Q.    Anybody else?
12  A.    No.
13  Q.    Any other males?
14  A.    Not really.
15  Q.    Did you discuss your
16  relationship with your boyfriend, including
17  your sex life, with any of these three
18  women?
19  A.    I did.
20  Q.    With who?
21  A.    I mean, he went there, so it
22  wasn't -- they knew who he was, and
23  obviously I was not a Christian at the
24  time, so everybody knew we were engaging

Page 37

1  in sexual activities.
2       I did speak to Ms. Tattaro. I
3  spoke with Ms. Alderfer, just not in
4  depth, really, but they were aware.
5  Q.    How do you know they were aware
6  if you didn't tell them?
7  A.    Because it's just kind of
8  implied. I mean, if you've seen us
9  together, I guess you would know. Why
10  would you not -- what seventeen-year-old
11  is not sleeping with their boyfriend of
12  two years.
13  Q.    If you talked to any of these
14  female mentors about that type of issue
15  -- your boyfriend issues and aspects of
16  your physical relationship with him -- did
17  they give you any advice?
18       Did they try to tell you not
19  to do that, that it wasn't right, that it
20  was a sin, that it was God-less, all of
21  the above?
22  A.    All of the above.
23  Q.    When you said that you weren't
24  as Christian at the time, what does that

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths
215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0510

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 38

1 mean?
2    A.    It means I was coming from a
3 Catholic school. I really didn't have any
4 beliefs. I wasn't even really a
5 Catholic. I was just there because my
6 parents put me there.
7    Q.    Was it at this time that you
8 are turning more toward religion and
9 considering religious principles more than
10 you had before?
11    A.    I got saved my year at Faith.
12    Q.    What month?
13    A.    Toward the end, on a trip to
14 Florida with my teammates.
15    Q.    The springtime or winter?
16    A.    Maybe around March or April.
17    Q.    March or April 2008.
18    A.    Yes.
19    Q.    And what does that mean, you
20 got saved on a trip with your teammates?
21    A.    I became a Christian.
22    Q.    How did that happen? What did
23 you do?
24    A.    You don't do anything.  You

Page 39

1 just believe that you're a Christian.
2    Q.    I'm just --
3    A.    It wasn't like a ritual or
4 anything, just an internal kind of saving.
5 I just thought that that was the right
6 path for me. I wanted to be a
7 Christian.
8         I was around a lot of
9 Christians who I really respected and who
10 really helped me through a tough time in
11 my life.
12    Q.    Is there some kind of
13 announcement you make as a student or as
14 a member at Faith Christian Academy that
15 you've been saved or you've had this
16 conversion or this enlightenment or
17 whatever?
18    A.    I did do that, yes, but that's
19 not always the case. Our class took a
20 trip to Florida.  We were at a seminary
21 and everyone was kind of just sitting
22 around and talking. It was our last
23 time, really, together, so I did kind of
24 tell everybody, you know, thank you for

Page 40

1 the support; it's changed my life.
2    Q.    During your year at FCA, Faith
3 Christian Academy — and that was your
4 only year there, correct, your senior
5 year?
6    A.    Correct.
7    Q.    (Continuing) -- did you ever
8 have occasion to talk to any of the
9 pastors about your religious life, your
10 sex life, your relationship with your
11 boyfriend, any issues at all?
12    A.    I didn't really talk to any of
13 the pastors there.
14    Q.    Not to Pastor Auckland?
15    A.    No, I never spoke with him,
16 really.
17    Q.    Not to Pastor Jones?
18    A.    No.
19    Q.    Again, just prior to your
20 graduation from FCA, which had been
21 sometime in June 2008, did Mr. Romig say
22 or do anything to give you the impression
23 or let you know or communicate to you
24 that he found you attractive and wanted

Page 41

1 to have some kind of personal relationship
2 with you?
3    A.    Not have a personal relationship
4 with me. I mean, there have been times
5 when he told me that I was beautiful and
6 I deserve better than somebody who wasn't
7 respecting me or there for me.
8         But it's more like a general
9 conversation. It wasn't like "You're
10 beautiful, I want you to be mine."
11    Q.    That somebody who wasn't there
12 or respecting you, was that supposed to
13 be Sean Kirby?
14    A.    Yes.
15    Q.    Did you tell him that Sean
16 Kirby was not respecting you or there for
17 you?
18    A.    Yes, he wasn't a great
19 boyfriend. We were seventeen.
20    Q.    Did you have any other male
21 mentors at FCA other than Mr. Romig?
22    A.    No. I was only there a year.
23    Q.    Did you ever talk to Robin
24 Landis about relationship issues with your

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix  0511

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 42

1  boyfriend or sex issues with your
2  boyfriend?
3     A.   Yes.
4     Q.   And in what way would you talk
5  to her about those things?
6     A.   I was really good friends with
7  her daughter, so I spent a lot of time
8  with her family and at her house.  She
9  was a very understanding person.  I would
10 speak to her about really anything I
11 needed to.  She was a great woman.
12    Q.   Did you ever tell her that Mr.
13 Romig -- she was his assistant coach at
14 the time, correct?
15    A.   Yes.
16    Q.   Did you ever tell her at any
17 time during your senior year that Mr.
18 Romig had asked you questions regarding
19 the when, where, how of your sex life
20 with your boyfriend?
21    A.   No.
22    Q.   Why not?
23    A.   I just didn't.  I don't know
24 why not.

Page 43

1     Q.   Did you think Mr. Romig would
2  get in trouble if you started telling
3  people that. . .
4     A.   I'm just not the type of person
5  that needs to tell anybody my business.
6  I was handling myself just fine and I
7  didn't really need to speak with her
8  about it.
9     Q.   You played basketball your
10 senior year, correct?
11    A.   Yes.
12    Q.   At FCA?
13    A.   Yes.
14    Q.   Did you continue to practice
15 with the team after you graduated?
16    A.   Yes.
17    Q.   During what years?
18    A.   Just the year after.  Not on a
19 daily basis, but we did pop in there to
20 scrimmage or help out every once in a
21 while.  I was going to Gwynedd, so I
22 wasn't far.  I was still living at home.
23    Q.   Who did you pop in there with?
24    A.   Either Lauren or Kayla when

Page 44

1  they were home, so that was really the
2  only time I was there, if they wanted me
3  to be there.
4     Q.   Who is "they"?
5     A.   Kayla and Lauren.
6     Q.   They would ask you to go, not
7  Mr. Romig?
8     A.   No, he did ask me to go, but I
9  wasn't going to go by myself.  So, if
10 they were around, I would go with them.
11    Q.   How many times do you think you
12 went back to FCA to scrimmage or practice
13 with the team?  An estimate is fine.  I
14 mean, was it once or ten times or twenty
15 times?
16    A.   Definitely under ten.  It
17 wasn't a whole bunch.  It was breaks or
18 something like that where everyone was
19 kind of around.  It was more about seeing
20 my friends that had gone to school than
21 seeing anybody else.
22    Q.   Did you ever see Mr. Romig
23 after your graduation from FCA?  Did you
24 ever see him socially outside of these

Page 45

1  practices at the school?
2     A.   I did not.  I don't think so.
3     Q.   Nowhere off the school grounds,
4  no place at a restaurant or gathering
5  place?
6     A.   Maybe once or twice he came out
7  to eat or something after we were all
8  there, but not like I ran into him like
9  we invited him to maybe -- I really don't
10 know.  I would assume. . .
11    Q.   I'm sorry, go ahead.
12    A.   I would assume that he was
13 there.  I mean, he was the coach of our
14 team and nobody had any issues with him.
15    Q.   It was a group thing.
16    A.   Yes.
17    Q.   If you had a meal with him or
18 he whatever.  It was just not you.  It
19 was other teammates as well?
20    A.   Of course.
21    Q.   How would you describe Lauren
22 Fretz' relationship with Coach Romig in
23 2008?
24    A.   They were close.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix  0512

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 46

1  Q.   What does that mean?
2  A.   They talked a lot. They spent
3  a lot of time together. They seemed like
4  they were really good friends. I know
5  that they texted a lot or practiced a lot
6  on weekends.
7  Q.   What does that mean?
8  A.   What does what mean?
9  Q.   Practiced a lot on the weekend,
10 not with the team. You mean just the
11 two of them?
12 A.   Yes.
13 Q.   Where, at the school or
14 someplace else?
15 A.   At the school.
16 Q.   Did he do that with any other
17 teammates?
18 A.   I've been there. It's been
19 like a couple of us have been there.
20 Lauren played a lot of basketball. She's
21 very athletic. It didn't seem that weird
22 to have your coach one-on-one. She was a
23 great player. She scored a thousand
24 points. She was very dedicated.

Page 47

1       There is not much to do in
2  Sellersville, so to go play basketball on
3  the weekend really is not that. . .
4  Q.   Did he ever give you any
5  one-on-one instruction in basketball on
6  the weekend?
7  A.   Maybe.
8  Q.   You can't recall?
9  A.   I cannot recall.
10 Q.   Did Mr. Romig ever give any
11 other player other than Lauren Fretz any
12 one-on-one practice on the weekend that
13 you know of?
14 A.   I don't think so.
15 Q.   Were you a teammate of Emily
16 Mayer's at any time?
17 A.   No. She was, I believe, the
18 year after me. I don't think she played
19 on that team. I wasn't close with her
20 like that. I don't believe so. I don't
21 believe so.
22 Q.   You're talking about practicing
23 or scrimmaging with the team after you
24 graduated. That would have been the 200

Page 48

1       --
2  A.   Yes, I did that with her.
3  Q.   That's what I'm getting at. She
4  wasn't a teammate of yours during your
5  senior year, but you scrimmaged or
6  practiced against her when you went back
7  to FCA after you graduated.
8  A.   Yes, I did.
9  Q.   How well did you know him?
10 A.   I don't know her. As I said,
11 I was at the school for a year. She was
12 not in my grade. I don't really know her
13 at all.
14 Q.   Did Eric Romig ever talk about
15 her?
16 A.   No.
17 Q.   How do you know that Eric Romig
18 texted Lauren Fretz a lot?
19 A.   She is a really good friend of
20 mine. I was with her a lot. I saw the
21 phone ringing.
22 Q.   Did you ever see any of the
23 texts?
24 A.   No.

Page 49

1  Q.   Did she ever show you a text?
2  A.   No.
3  Q.   Did she ever tell you what they
4  were texting or talking about?
5  A.   No.
6  Q.   Do you know whether or not she
7  and Mr. Romig ever had a physical
8  relationship?
9  A.   I don't know.
10 Q.   Did she ever tell you that?
11 A.   That they had a physical
12 relationship?
13 Q.   Physical, yes, like a sexual
14 physical relationship.
15 A.   No.
16 Q.   Did you ever hear that from
17 anybody else other than Lauren Fretz?
18 A.   I think people said that, yes.
19 But I spend a lot of time with her, and
20 I would think that, if that was going on,
21 she would have no problem telling me. But
22 I've never -- I personally never heard
23 anybody say that.
24 Q.   I'm not sure I caught exactly

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix 0513

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 50

1  the first part of that answer, where you
2  said that you've heard something from
3  other people.
4    A.    Yes.
5    Q.    Who are these other people?
6    A.    I mean, specifically I'm not
7  sure. It was definitely a rumor going
8  around that they were maybe spending a
9  little bit too much time together.
10   I mean, obviously they, as I
11 said, were practicing together and seemed
12 to be pretty close. It was a small team.
13 There were only nine of us, I think, so
14 we were all close.
15   Q.    These rumors or suspicions that
16 you heard from other people, would those
17 include other students?
18   A.    Yes.
19   Q.    How about other teachers?
20   A.    I never heard a teacher say
21 that they were being --
22   Q.    I'm talking about Ms. Tatarro
23 or Ms. Alderfer or. . .
24   A.    No.

Page 51

1    Q.    Do you know a teacher named
2  Nicole Gross?
3    A.    I do.
4    Q.    How did you know her?
5    A.    She just was around a lot.
6  She used to play sports. She came to
7  games. She was a good fan. She's a
8  very supportive lady.
9    Q.    Do you know whether or not she
10 ever told anybody that she suspected that
11 Lauren Fretz and Mr. Romig had an
12 inappropriate physical relationship with
13 each other?
14   A.    I've never heard that from her,
15 really.
16   Q.    Did you ever discuss that with
17 her at all?
18   A.    No. I really wasn't that close
19 with her.
20   Q.    Did anybody ever tell you
21 before you graduated that Mr. Romig made
22 them feel uncomfortable or was asking
23 inappropriate questions to them, or seemed
24 to be interested in them in some kind of

Page 52

1  inappropriate relationship?
2    A.    Did anybody ever tell me?
3    Q.    Yes.
4    A.    That they were uncomfortable
5  with him?
6    Q.    Yes.
7    A.    No.
8    Q.    Or that Mr. Romig appeared to
9  be interested in another female teammate
10 or another student for an inappropriate
11 relationship.
12   A.    I think Lauren felt that way.
13   Q.    That Lauren felt that he was
14 interested in her?
15   A.    Yes.
16   Q.    Did she say why she felt that
17 way?
18   A.    No. It's not like she ever
19 said that. I seemed like that was the
20 case.
21   Q.    When is the last time you spoke
22 to Lauren?
23   A.    It's been years.
24   Q.    Years going back to when?

Page 53

1    A.    I probably talked to her -- a
2  friend of ours died that graduated with
3  us about two years ago.
4    Q.    2013?
5    A.    Right around the time that this
6  whole thing happened, two years ago in
7  November.
8    Q.    Yes, but he was arrested in
9  October of 2013. Mr. Romig was arrested
10 then. Would it have been after he was
11 arrested?
12   A.    It was. It was the second
13 week of November that he passed.
14   Q.    And you saw Lauren then?
15   A.    She went to the funeral.
16   Q.    Did you talk to her about Mr.
17 Romig's arrest?
18   A.    No. She wasn't -- I spoke
19 with her. I don't think she flew back
20 for the funeral. I can't really recall.
21 Obviously it was a terrible tragedy. I
22 wasn't focused on Lauren Fretz.
23   Q.    So, you don't recall talking to
24 her at all about Mr. Romig being arrested

brusilow.com            brusilow + associates            215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX 877.763.4006
www.brusilow.com

Appendix  0514

Page 54

1  for --
2      A.   I spoke with Kayla Young, who I
3  guess spoke with Lauren, but I never
4  spoke with Lauren.
5      Q.   Aside from talking to her,
6  either in person or over the telephone,
7  do you stay in communication with her by
8  Facebook or other electronic or
9  social-media means?
10     A.   I don't stay in contact with
11 her. I am friends with her. I don't
12 talk to her. I just kind of see what
13 she's doing. It's Facebook.
14     Q.   Did you ever discuss with her
15 my sending a letter to talk to me about
16 issues in this lawsuit?
17     A.   No. I asked Kayla if she had
18 received a letter or spoke with the
19 detectives the way that I did; I also
20 asked the detectives. But other than
21 that, I never had a direct conversation
22 with her. I don't think I even had a
23 phone number at the time.
24     Q.   When is the last time you had

Page 55

1  a Facebook or other social media contact
2  with Lauren Fretz?
3      A.   Maybe never. I look at her
4  stuff. I don't know what you mean by
5  "contact."
6      Q.   I'm talking about where you're
7  sending messages back and forth or
8  communicating on social media at all.
9      A.   No.
10     Q.   Twitter or anything like that?
11     A.   No.
12     Q.   We're now past your graduation
13 from FCA. Now I want to know about your
14 communication with Mr. Romig after you
15 graduated. You started telling me about
16 that before.
17     A.   Sure.
18     Q.   Tell me about any contact you
19 had with Mr. Romig after you graduated in
20 2008.
21     A.   It's still just Facebook
22 messages. It seemed to get a little bit
23 more intense as far as questioning and
24 maybe wanting to see me or something

Page 56

1  along those lines.
2      Q.   How long after you graduated
3  did that communication take place?
4  Approximately. Was it the same year,
5  like later in the fall and winter, or was
6  it the next year?
7      A.   I can remember sitting at my
8  dorm room doing it, so it had to be
9  September, I guess, around there.
10     Q.   Your first semester in college.
11     A.   Yes.
12     Q.   And at that time -- I guess
13 that's around basketball season for the
14 girls basketball team at FCA -- is that
15 during the time that you were practicing
16 with the team on occasion?
17     A.   Yes.
18     Q.   So, you were seeing him at
19 these practices and whatever, and at the
20 same time you're seeing him at these
21 practices he's sending you messages on
22 Facebook.
23     A.   Yes.
24     Q.   And when you say these messages

Page 57

1  got more intense, I want you to tell me
2  as much as you can remember about what
3  the messages said.
4      A.   It just seemed like wanted to
5  meet up, which was never brought up
6  before, to actually hang out or spend
7  some time together, but it wasn't all
8  from a sexual side. It was just to
9  catch up or just talk. I mean, it's not
10 like all the messages were sexual, just
11 some.
12     Q.   What were the sexual messages
13 about?
14     A.   I guess he just wanted to know
15 if I was, I guess -- just who I was
16 having sex with.
17     Q.   Were you still dating Sean
18 Kirby at that time?
19     A.   Not really.
20     Q.   You were dating somebody else?
21     A.   No.
22     Q.   Did you answer his questions
23 about who you were having sex with?
24     A.   Yes.

brusilow.com        brusilow + associates        215.772.1717


brusilow+associates
more than wordsmiths

215.772.1717    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103    FAX 877.763.4006
www.brusilow.com

Appendix  0515

Page 58

1    Q.    Did he ask you more questions
2   about exactly what you were doing with
3   these other people?
4    A.    Yes.
5    Q.    So, he is asking for details.
6   He's asking for specifics.
7    A.    Yes.
8    Q.    You didn't find anything strange
9   or weird about that?
10   A.    No. I mean, I was nineteen.
11  He really wasn't that old. I don't know.
12   Q.    Were you interested in him?
13  Were you attracted to him?
14   A.    No.
15   Q.    Since these messages are going
16  back and forth the same time that you're
17  scrimmaging with the girls basketball team
18  and Lauren Fretz is still there and Kayla
19  is still there, are you telling them
20  about these messages you're getting from
21  Mr. Romig?
22   A.    Not really.
23   Q.    Not really. Does that mean
24  never? You never mentioned a single

Page 59

1   message that he was sending you about
2   your sex life and the details of your sex
3   life? You never mentioned that to
4   Lauren? You never mentioned that to
5   Kayla?
6    A.    Not about my sex life. I
7   mean, I asked them a couple times "is he
8   talking to you" or "is he still texting
9   you," but I was never like "because he
10  seems to be asking me a lot of
11  questions."
12          I just wanted to know if they
13  were still in contact with him, which
14  they weren't.
15   Q.    And when you said you told them
16  that he was asking you a lot of
17  questions, you told them that he was
18  asking you a lot of questions about your
19  sex life, about your boyfriend and. . .
20   A.    No, I didn't tell them that.
21  I just asked them if they were speaking
22  to him.
23   Q.    Well, you said you already told
24  them about what when you were still in

Page 60

1   school.
2    A.    Yes, but not after -- I thought
3   we were past that.
4    Q.    No, I understand that. I just
5   want to make sure I understand your
6   testimony.
7          While you were still at FCA,
8   you did tell Kayla and Lauren about these
9   texts where he was asking you details
10  about your sex life, correct?
11   A.    Yes.
12   Q.    But you're saying you didn't
13  ask them anything when they got more
14  intense after you left FCA -- and you're
15  practicing with the team and you're
16  scrimmaging and Lauren's there and Kayla's
17  there and whatever -- you didn't tell
18  them that he was still doing it, even
19  though you were no longer at FCA?
20   A.    Yes, I just didn't -- I guess
21  the weird factor was gone. I mean, I
22  wasn't a student of his or a student
23  there, and I was young -- I really didn't
24  see anything wrong with it. I mean. . .

Page 61

1    Q.    And I'm not trying to be
2   judgmental at all. I'm just trying to get
3   the facts of what was said and what was
4   not said.
5    A.    I mean. . .
6          MR. GROTH: Do you want
7   something to drink?
8          THE WITNESS: No, I'm all right.
9          MR. GROTH: You sure?
10          THE WITNESS: Yes.
11          MR. GROTH: We could get you
12  some cold water, a water bottle.
13          THE WITNESS: I'm fine.
14          MR. GROTH: I know it's a little
15  warm in here.
16          THE WITNESS: It's like really
17  hot in here. Is it just me?
18          MR. GROTH: No, it's not. And
19  the lights are going to make it hotter,
20  too.
21          MR. SANTARONE: And you're
22  asking her the same question over and
23  over again.
24          MR. GROTH: Thanks for that.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0516

Page: 20 (62 - 65)

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 62

1   MR. SANTARONE: You're welcome.
2   That's exactly what you're doing. You're
3   not accepting her answer. You're going
4   back and asking her the same question
5   over and over again. I think you've been
6   very rude to this witness.
7   MR. GROTH: You can state your
8   objection.
9   MR. SANTARONE: I just did.
10  BY MR. GROTH:
11  Q.    Did you tell your parents about
12  the communications between you and Mr.
13  Romig that were taking place after you
14  graduated?
15  A.    They saw it.
16  Q.    How did they see it?
17  A.    I was logged onto my Facebook
18  and it popped up and it shows -- you can
19  go backwards.
20  Q.    Did they read going backwards?
21  A.    I guess so.
22  Q.    Did they read some of these
23  messages going back and forth about your
24  sex life?

Page 63

1   A.    Yes.
2   Q.    What discussions did you have
3   with your parents?
4   A.    They just wanted to know what
5   was going on with it, why he was asking
6   that stuff; if I was kind of egging it
7   on or -- and I really said it wasn't
8   that big of a deal.
9   I mean, I can handle myself.
10  If I don't want to do something, I'm not
11  going to do something.  If I think he's
12  being weird, I would have no problem to
13  say stop talking to me, which it wasn't,
14  so. . .
15  Q.    Okay.  Did your parents do
16  anything with regard to these
17  communications between you and Mr. Romig
18  after they saw the messages on your
19  Facebook?
20  A.    I'm really not sure.  I have
21  no idea if they spoke with somebody or if
22  they never really addressed it with me.
23  I would assume that they said something
24  to somebody, but I honestly don't know.

Page 64

1   I received a call from Ryan
2   Clymer a couple months after that, so I
3   didn't know if they did it or maybe
4   somebody like Kayla or something had
5   mentioned it to somebody at school.  I'm
6   not sure who brought it to their
7   attention.
8   Q.    Do you know whether or not your
9   father tried to contact or did in fact
10  contact Mr. Romig directly?
11  A.    I don't think so.
12  Q.    He never told you that he did?
13  A.    No, he never told me that he
14  did.
15  Q.    Never told you he had a
16  conversation with Mr. Romig and told him
17  to back off communicating with his
18  daughter?
19  A.    No.
20  Q.    Did the messages and the
21  communications between you and Mr. Romig
22  end at a certain point?
23  A.    They did.
24  Q.    When did they end?

Page 65

1   A.    When I asked him to stop.
2   Q.    You asked him to stop.
3   A.    Yes.
4   Q.    Was that close in time to the
5   period where your parents saw and read
6   through the messages?
7   A.    It wasn't as close -- it wasn't
8   like my parents found out and I asked him
9   to stop. I mean, at some point I just
10  really had no interest in talking to him,
11  so I asked him to stop talking to me.
12  Q.    And did he? Did he stop?
13  A.    He did.
14  Q.    Has Mr. Romig tried to contact
15  you since he was arrested in October of
16  2013?
17  A.    Absolutely not.
18  Q.    Where are you working?
19  A.    Right now?
20  Q.    Yes.
21  A.    At an eye doctor.
22  Q.    In Lansdale?
23  A.    No.
24  Q.    What's the name of it, the eye

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix  0517

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 66

1  doctor?
2  A.   (No response)
3  Q.   Just in case I have to contact
4  you in the future for some reason and I
5  have trouble getting ahold you.
6  A.   You have my cell phone number.
7  Q.   I do, but cell phone numbers
8  change. People move.  There are all kinds
9  of --
10  A.   My job is going to change as
11  well.
12  Q.   Well, who are you employed by
13  right now?
14  A.   That's a weird question.  It's
15  EyeMax.  I really don't feel you should
16  ever be calling me at work.
17  Q.   I didn't say I was going to
18  call you at work, but if this comes to
19  trial and I need to contact you for some
20  reason, I'd like to have more than one
21  way to try to contact you in case your
22  phone number changes, in case you move,
23  in case you change jobs, whatever.
24       Where are you living right now?

Page 67

1  A.   In West Chester.
2  Q.   And what's your residence
3  address?
4  A.   34 North New Street, West
5  Chester.
6  Q.   So I'm clear on this:  Did you
7  at some point ask Mr. Romig to stop
8  trying to communicate with you?
9  A.   Yes.
10  Q.   In the communications that you
11  had by Facebook with Mr. Romig after you
12  graduated, did he ever tell you that he
13  was attracted to you?
14  A.   Yes.
15  Q.   You mentioned a little bit ago
16  about a conversation you had with Mr.
17  Clymer after you graduated.  Was that by
18  telephone?
19  A.   Yes.
20  Q.   Do you recall approximately what
21  year that was?
22  A.   Not at all.
23  Q.   And what was the subject of the
24  telephone conversation?

Page 68

1  A.   He just wanted to know details
2  about what kind of conversations I was
3  having with him.  I'm not sure if that
4  was the time where the stuff with Emily
5  Mayer came out or word got back to him.
6  I have no idea why he called.
7  Q.   Do you recall what you told
8  him, what you told Mr. Clymer?
9  A.   Yes, I told him what happened.
10  Q.   Meaning what?
11  A.   What was sent, Facebook messages
12  and what was kind of said, I guess.
13  Q.   Did you tell Mr. Clymer that he
14  had been asking you questions about your
15  boyfriend and about your sex life with
16  your boyfriend?
17  A.   I did.
18  Q.   Did you tell Mr. Clymer that
19  you had stayed in contact with Mr. Romig
20  after you graduated and that he was still
21  sending you Facebook messages regarding
22  your boyfriend and your sex life?
23  A.   I don't believe he asked.  I
24  don't think he cared what happened after

Page 69

1  I graduated.  I was nineteen.  I'm
2  considered -- why would he care.
3  Q.   I'm not asking you to get in
4  his head. I'm just asking you whether or
5  not you discussed that with him:  That
6  even after you graduated, he was sending
7  you Facebook messages about your sex life.
8  A.   That was not the intention of
9  the phone call, I don't believe.
10  Q.   Did he give you any details
11  about why he was asking you any questions
12  at all?
13  A.   He really didn't.
14  Q.   Did you hear from anybody,
15  whether it was Mr. Clymer or anybody
16  else, that he was calling you in response
17  to some allegations that Emily Mayer had
18  made about some inappropriate texts that
19  he, Mr. Romig, sent to her?
20  A.   I mean, that's just what I
21  heard through the grapevine.  I don't
22  think that he addressed that with me.  I
23  mean, I guess he could have.  I don't
24  know. This is like eight years ago.

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX 877.763.4006
www.brusilow.com

Appendix  0518

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 70

1  Q.   I understand. Did Mr. Clymer
2  ask you whether or not you knew of any
3  inappropriate relationship between Mr.
4  Romig and Lauren Fretz?
5  A.   No. It was a quick
6  conversation, just wanted to know what was
7  going on with me personally and then he
8  hung up the phone.
9  Q.   How long do you think the
10  conversation lasted?
11  A.   Ten minutes.
12  Q.   Was that the only time since
13  you graduated that you had occasion to
14  speak to Mr. Clymer?
15  A.   Yes.
16  Q.   Did you talk to any of your
17  former teammates about that conversation?
18  A.   Yes.
19  Q.   To see if they had been
20  contacted by Clymer as well?
21  A.   Yes.
22  Q.   Who did you speak to?
23  A.   Kayla Young.
24  Q.   And what did you tell her?

Page 71

1  A.   Exactly what happened.
2  Q.   That he had called you, and you
3  gave him this information about these
4  messages between you and Mr. Romig while
5  you were a student.
6  A.   Yes.
7  Q.   Correct?
8  A.   Yes.
9  Q.   Did Kayla say whether or not
10  Mr. Clymer had tried to talk to her?
11  A.   I don't recall.
12  Q.   Did you speak to Lauren Fretz
13  about that conversation with Mr. Clymer?
14  A.   I did not. I did not. I had
15  asked Kayla if she spoke with her, and I
16  don't think she did, either.
17        MR. GROTH: Let's take a few
18  minutes?
19        THE WITNESS: Yes, thank you.
20        (A brief recess was taken)
21        MR. GROTH: We're back on the
22  record.
23  BY MR. GROTH:
24  Q.   Joust to finish up with this

Page 72

1  Clymer conversation that you had back
2  around 2009 or so, did Mr. Clymer tell
3  you that he was contacting you because he
4  had been given your name by Lauren Fretz
5  to contact?
6  A.   No.
7  Q.   Mr. Clymer's deposition was
8  taken in this case earlier, previous to
9  yours.
10  A.   Sure.
11  Q.   And on page eighty-seven he
12  testified that you told your father about
13  these Facebook communications Mr. Romig
14  was sending you about your sex life, and
15  that you told him that your father told
16  Romig to stay away from you.
17        Do you recall telling Mr.
18  Clymer that?
19  A.   No.
20  Q.   Did you ever hear of any
21  instance after Lauren Fretz graduated
22  where she is asked to go to some type of
23  athletic banquet with Mr. Romig?
24  A.   No.

Page 73

1  Q.   Do you know a student named
2  Carolyn Eberhart?
3  A.   Yes.
4  Q.   How do you know her?
5  A.   She went to school with me.
6  Q.   Was she on the basketball team?
7  A.   Not my team.
8  Q.   Some other team?
9  A.   I don't know if she played
10  basketball when I wasn't there.
11  Q.   I'm sorry. Did you ever have
12  any conversations with her at all about
13  Mr. Romig?
14  A.   No.
15  Q.   Do you know Mrs. Fretz, Lauren
16  Fretz' mother?
17  A.   Of course I do.
18  Q.   How do you know her?
19  A.   I was really good friends with
20  her daughter.
21  Q.   What's her name?
22  A.   Lauren.
23  Q.   Not the daughter. The mother.
24  A.   Oh, Mrs. Fretz. Tracy, I want

brusilow.com            brusilow + associates            215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX 877.763.4006
www.brusilow.com

Appendix  0519

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 74

1  to say.
2      Q.    Have you ever talked to her
3  about this lawsuit or anything about Mr.
4  Romig's conduct while you were at FCA?
5      A.    No.
6      Q.    At some point after Mr. Romig
7  was arrested on October 1st, 2013, were
8  you contacted by Bucks County Detectives
9  to talk about Mr. Romig's conduct when
10 you were a student there?
11     A.    Yes.
12     Q.    And did you meet with
13 detectives and talk to them about Mr.
14 Romig?
15     A.    Yes.
16     Q.    Where did that meeting take
17 place?
18     A.    Lansdale Police Department, I
19 believe.
20     Q.    And who was there besides you
21 and a detective? Anybody else?
22     A.    No, I think there were a couple
23 detectives. I don't know if it was just
24 one person.

Page 75

1      Q.    Do you remember their names at
2  all?
3      A.    Not at all.
4      Q.    Does the name Kemmerer ring a
5  bell?
6      A.    Yes.
7      Q.    Slattery?
8      A.    No.
9      Q.    Okay. How long did you meet
10 with them?
11     A.    About an hour.
12     Q.    Did they take a recorded
13 statement from you? I mean by tape
14 recorder.
15     A.    Yes.
16     Q.    Did you ever hear that
17 statement after you gave it?
18     A.    I did not.
19     Q.    What kind of questions did they
20 ask you?
21     A.    Just what exactly was said to
22 me, if I had any contact with him; if I
23 got physical with him; if I felt like
24 offended by him or felt as if he was

Page 76

1  taking it too far, I guess.
2      Q.    And you answered all their
3  questions?
4      A.    Yes.
5      Q.    Did you answer truthfully?
6      A.    Yes.
7      Q.    When they asked you whether or
8  not you ever got physical with him, what
9  did you say?
10     A.    No.
11     Q.    Did you tell the detectives
12 about the Facebook messages that Mr. Romig
13 was sending about your sex life while you
14 were a student at FCA?
15     A.    I did. I believe so.
16     Q.    Did Mr. Romig ever send you any
17 photos or videos?
18     A.    No.
19     Q.    Did the detectives ask you
20 whether or not Mr. Romig had ever sent
21 you any texts?
22     A.    They did ask me.
23     Q.    What was your answer?
24     A.    I do not believe he sent me

Page 77

1  any texts. I don't even think I had his
2  phone number.
3      Q.    I'm sorry if I asked you this
4  before, but do you know whether or not
5  Mr. Romig was Facebook messaging any other
6  teammates on your basketball team while
7  you were there?
8      A.    I don't know.
9           MS. OLSZEWSKI: That's been
10 asked and answered.
11     A.    Go ahead.
12     A.    I don't know. I have no idea.
13     Q.    Did Mr. Romig ever send you a
14 message on Facebook or otherwise, or talk
15 to you in person and tell you that he
16 was in love with you?
17     A.    No.
18     Q.    Did he ever tell you that he
19 could give you everything that you need
20 and he has so much to offer you?
21     A.    While I was in school, you're
22 asking me?
23     Q.    At any time.
24     A.    It was sort of along those

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix  0520

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

**Page 78**

1 lines after I graduated.
2 Q. I think we already covered
3 this, but he ask you at some point why
4 you were still about your boyfriend, that
5 you shouldn't be with your boyfriend?
6 A. Yes.
7 MS. OLSZEWSKI: Asked and
8 answered.
9 Q. Did he tell you that the things
10 that he was sending to you on Facebook he
11 was hiding from his wife?
12 A. He never said "I'm hiding these
13 things," no.
14 Q. You enrolled in FCA for the
15 2007/2008 school year. Is that correct?
16 A. Yes.
17 Q. That was your senior year.
18 When you enrolled were you given any type
19 of student handbook or guidelines that
20 covered the policies and practices of
21 Faith Christian Academy?
22 A. I don't recall.
23 Q. Do you recall filling out with
24 maybe your parents, or maybe without,

**Page 79**

1 registration forms for the school?
2 A. I would assume you have to fill
3 out a registration form.
4 Q. I'm asking you if you recall
5 doing it.
6 A. No; I probably didn't do it,
7 anyway.
8 Q. During the time that you went
9 to FCA, were there ever any instructions
10 or training or education given to students
11 that you're aware of on the topic of
12 sexual-harassment abuse or misconduct?
13 A. From teachers?
14 Q. From anybody at the school.
15 A. I don't recall.
16 Q. What I'm asking you is whether
17 or not somebody from the school or
18 somebody that the school brought in to an
19 assembly or to a seminar or just to a
20 class or to female athletes or whatever
21 to talk to them about the subject of
22 child sexual abuse or harassment and the
23 recognition of it and reporting of it.
24 A. No.

**Page 80**

1 Q. And you don't recall actually
2 getting any handbook from FCA that talked
3 about their policies and guidelines with
4 regard to many things, including, for
5 example, alcohol-free policy or sexual
6 abuse policy.
7 A. I don't recall getting any of
8 that. I mean, maybe they have it, maybe
9 they don't. I don't remember getting
10 that. I'm sure I wouldn't read it,
11 anyway.
12 Q. Let me just show you two
13 things, and you can tell me if you've
14 ever seen these before.
15 A. Sure.
16 Q. The first one is Hollenbach-1,
17 and it says at the bottom of it "Middle
18 and high school student/parent guide," and
19 on page twenty-two of that handbook there
20 is a sexual harassment policy.
21 Let me ask you first whether or
22 not you have ever seen that document at
23 all, that handbook at all. You can flip
24 through it, if you want.

**Page 81**

1 MS. CONNOR: David, for
2 clarification, is that the current
3 handbook that you obtained from the
4 internet?
5 MR. GROTH: That is the
6 handbook I copied off the internet.
7 THE WITNESS: I'd never seen
8 it; that doesn't mean I wasn't given it.
9 As I said, I was a seventeen-year-old.
10 Who would read this?
11 BY MR. GROTH:
12 Q. The only question I have for
13 you is, do you recall getting a copy of
14 this from the school?
15 A. No.
16 MS. OLSZEWSKI: For
17 clarification, does she recall receiving a
18 copy of the parent handbook when she was
19 a student at the school.
20 MR. GROTH: The student/parent
21 handbook. It says "student/parent" on it.
22 MS. OLSZEWSKI: You described
23 it as a student handbook.
24 MR. GROTH: I said

brusilow.com          brusilow + associates          215.772.1717



brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix 0521

Page 82

1  student/parent.
2  BY MR. GROTH:
3  Q.   Do you recall seeing anything,
4  maybe not that specific handbook --
5  A.   I don't recall anything.  It
6  was eight years ago, almost nine.  I
7  don't recall any of this.  This is not
8  something I would dwell on or stick out
9  in my brain.  This is a handbook.
10  Q.   The only question I'm asking
11  you is if you recall getting a handbook.
12  A.   No, I don't remember.  That
13  doesn't mean I didn't get it.  It was
14  nine years ago.
15  Q.   When you received a handbook,
16  was there ever any discussion about the
17  section of the handbook that has to do
18  with sexual harassment?
19  MS. OLSZEWSKI:  Objection, asked
20  and answered twice.
21  Q.   Go ahead, you can answer.
22  A.   No.  Is there a policy that
23  Faith has?  I don't understand.  If
24  they're supposed to give it out, then I

Page 83

1  got it.
2  Q.   Well, you don't recall if you
3  got it.
4  A.   If they give to it every
5  student and I'm a student, wouldn't I get
6  it?
7  Q.   I didn't say they give to it
8  every student.  I'm just asking you if
9  you got it.
10  MR. SANTARONE:  She said she
11  doesn't remember whether she got it or
12  not, so why don't we move on?
13  MS. OLSZEWSKI:  For the fifth
14  time.
15  BY MR. GROTH:
16  Q.   Let me show you another
17  document that was marked in Mr.
18  Hollenbach's deposition as Hollenbach
19  exhibit number two.  I'll have you just
20  briefly take a look at that and I'll ask
21  you whether or not you recall ever seeing
22  that document before.
23  A.   No, I don't recall seeing this.
24  Q.   Was there ever any discussion

Page 84

1  from your coaches, your basketball coaches
2  -- did you play any other sports at FCA?
3  A.   I played softball, but it was
4  outsourced.  They don't have a softball
5  team.  I had to play for another school.
6  Q.   From any of your coaches or
7  assistant coach at FCA, did you ever
8  receive any education or training or
9  instruction from them on the topic of
10  child sexual abuse, reporting or
11  identifying?
12  A.   No.
13  MR. GROTH:  No further
14  questions.  Thank you.  The other attorneys
15  will get a chance to ask you questions
16  now.
17  THE WITNESS:  Sure.
18  (EXAMINATION)
19  BY MR. RUSSELL:
20  Q.   Kristin, thanks for being here.
21  I know it's interrupted your day, and
22  we're just going to get some additional
23  information that you may have.
24  When you received this letter

Page 85

1  from Mr. Groth, you didn't call him?
2  A.   No.
3  Q.   Why not?
4  A.   I really didn't want to be
5  involved.
6  Q.   Did you think that the school
7  had done something wrong, "the school"
8  being Faith Christian Academy?
9  A.   Not at all.  It didn't seem like
10  something that affected me.  I really
11  don't -- they're making it seem like I'm
12  very involved, but I really wasn't that
13  involved, as far as I'm concerned.
14  As I said, I never felt
15  threatened by him.  It's not something I
16  felt like I needed to step into.  I
17  don't know this man.  I don't have any
18  loyalties to this man.
19  I love Faith Christian Academy.
20  I would never -- I don't need to be
21  involved if I didn't have to be, but now
22  that I'm subpoenaed, I guess I have to
23  be.
24  Q.   You didn't believe that Faith

brusilow.com          brusilow + associates          215.772.1717
brusilow+associates
more than wordsmiths
215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0522

Page 86

1  Christian Academy did anything wrong with
2  regard to the information that you relayed
3  to me.
4      A.   I don't know --
5          MR. GROTH: Objection.
6      A.   I don't believe they did
7  anything wrong. I mean, it's a personal
8  matter against Eric Romig and they can't
9  -- I don't know.
10     Q.   With regard to what you
11 communicated to Ryan Clymer, when he
12 called you, his deposition indicates that
13 he said he spoke to you, and you said
14 that you received an email from Coach
15 Romig saying that "I'm attracted to you."
16 Did you tell him that?
17     A.   I never received an email. I
18 think what he's referring to is probably
19 a Facebook mention, and I might have told
20 him that. At the point he had called
21 after I graduated, it may have already
22 happened.
23     Q.   Do you recall whether or not
24 you ever told him anything about anything

Page 87

1  occurring between you and Eric Romig while
2  you were a student?
3      A.   Well, yes. He did ask exactly
4  what happened, and as I said, I did tell
5  him what happened, that his messages
6  seemed to be a little bit -- maybe a
7  little inappropriate, but it was nothing
8  to be super-alarmed by.
9      Q.   You didn't feel threatened by
10 them in any way?
11     A.   I didn't feel threatened by
12 him. I mean, I'm not one of those
13 people -- I don't know. I wasn't
14 alarmed.
15         I can stand up for myself. If
16 I felt like he was going too far, which
17 eventually I did, I told him to stop and
18 he did, so. . .
19     Q.   And that conversation took place
20 on the phone after you graduated?
21     A.   Yes.
22     Q.   Did you ever tell Mr. Clymer
23 that you felt that Mr. Romig was trying
24 to manipulate you in some way, coerce you

Page 88

1  to engage in some sort of sexual
2  activity?
3      A.   I don't feel like I did say
4  that to him, no.
5      Q.   With regard to -- what is your
6  date of birth?
7      A.   2/25/1990.
8      Q.   And you were at Faith for one
9  year?
10     A.   Yes, sir.
11     Q.   Did you graduate from Gwynedd
12 Mercy?
13     A.   College?
14     Q.   Yes.
15     A.   No. I transferred to West
16 Chester and I'm still there.
17     Q.   Do you recall whether there was
18 anything different in what you told the
19 police versus what you told Ryan Clymer?
20     A.   No, I don't think there was
21 anything different.
22     Q.   Do you know that Lauren Fretz
23 also spoke to Ryan Clymer? Did you know
24 that at all?

Page 89

1      A.   I don't know. She might have.
2  I would assume that she did. I mean,
3  instead of calling me over Facebook
4  messages, I would have assume he would
5  have called her.
6      Q.   Did you tell him to call Lauren
7  Fretz?
8      A.   I might have.
9      Q.   You might have said "Look,
10 nothing happened with me, but maybe you
11 want to call Lauren Fretz"?
12     A.   Maybe. I might have. I don't
13 know. I don't recall.
14     Q.   Did you ever speak with Emily
15 Mayer --
16     A.   I never spoke to her.
17     Q.   Did you know that Emily Mayer
18 was -- I'm sorry, strike that. Your
19 senior year there was a party at the end
20 of the year. Do you recall whether you
21 and Emily Mayer were at a party together
22 at the end of your senior year?
23     A.   My senior year?
24     Q.   Yes.

brusilow.com                    brusilow + associates              215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix  0523

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 90

1   A.   Maybe.

2   Q.   Do you recall whether Emily

3  Mayer engaged in some sort of

4  inappropriate sexual activity at that

5  party?

6      MR. GROTH: Objection.

7   A.   With Coach Romig?

8   Q.   No, with another student.

9  There is some allegation that she was

10  engaging in oral sex in front of the rest

11  of the party.

12      MR. GROTH: Objection.

13   Q.   Do you recall that at all?

14   A.   Yes, I recall that.

15   Q.   What happened?

16   A.   I don't really know what

17  happened. I mean, I wasn't worried about

18  Emily Mayer at a party. I don't care

19  what Emily Mayer does. She can have sex

20  with anybody she wants.

21   Q.   Mr. Groth asked you about

22  Chelsea and whether she was abused as

23  child. Did you know that Chelsea

24  ultimately was adopted by Mr. Romig?

Page 91

1   A.   I did know that.

2   Q.   So, Chelsea didn't grow up with

3  Mr. Romig.

4   A.   No, I believe they met on Match

5  or something.

6   Q.   With his wife, you mean. Mr.

7  Romig's wife, they --

8   A.   Stephanie?

9   Q.   They met on Match?

10   A.   Yes, some kind of dating site,

11  I believe.

12   Q.   I think you testified that you

13  understood that there was some sort of

14  stuff going on with Emily Mayer. What

15  did you mean by that, "stuff"?

16   A.   I just heard through the

17  grapevine that they were maybe talking a

18  lot. I'm not exactly sure what happened.

19      I just know that they seemed to

20  have some sort of relationship similar to

21  the relationship he had with Lauren Fretz,

22  just kind of close, talking a lot.

23      Emily Mayer was also really

24  athletic, so she probably was doing

Page 92

1  similar things, just practicing with him.

2  But I personally don't know anything.

3  Like I said, I don't talk to Emily Mayer

4  like that.

5   Q.   Other than Lansdale Catholic,

6  had you attended any other schools before

7  coming to Faith?

8   A.   I was at North Penn for about

9  three months.

10   Q.   What happened then?

11   A.   The school year ended.

12   Q.   And then you went to Lansdale

13  Catholic or --

14   A.   No, I went to Lansdale

15  Catholic. They asked me to leave. I had

16  three months left. I went to North Penn

17  for my three months left, and then for my

18  senior year I decided to go to Faith.

19   Q.   When you spoke with Ryan

20  Clymer, did he ever tell you who else he

21  had -- strike that. He never told you

22  why he was calling you. You thought this

23  it was because of something, the Facebook

24  messaging.

Page 93

1   A.   He never really said much of

2  anything. I mean, I don't know if it

3  was really any of my business when he was

4  calling about. It was a quick

5  conversation, so it was not really spoken

6  about, I don't believe.

7   Q.   And just so I'm clear on the

8  sequencing of this: When you felt that

9  things were different after you graduated

10  between the communication that you had

11  with Mr. Romig, you didn't call Faith

12  Christian Academy, right?

13   A.   No.

14   Q.   Were you ever touched

15  inappropriately by Mr. Romig while you

16  were a student?

17   A.   I was not.

18   Q.   Did you ever at any time

19  believe that you were the victim of

20  sexual abuse by Mr. Romig?

21   A.   I did not.

22   Q.   And while you were a student,

23  did you ever believe that he was

24  attempting to persuade, induce, entice or

brusilow.com           brusilow + associates        215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0524

Page 94

1  coerce you to engage in sexually explicit
2  activity?
3      A.   With him?
4      Q.   Yes.
5      A.   No.
6      Q.   Attorney Groth asked you about
7  a conversation that you had with him.
8  When you first -- and I realize that you
9  had contacted him over the phone.
10          When you contacted him over the
11  phone, what was the substance of that
12  conversation?
13      A.   I just wanted to see if I
14  could move the deposition to a day I had
15  off. But after speaking with him, I
16  decided it was just better to do what was
17  scheduled because, as I said, I don't
18  really know him.
19          I know that he's not here to
20  look out for my best interests, so I just
21  figured I would do what the subpoena
22  said.
23      Q.   And then you met here with him
24  this morning again. You were in talking

Page 95

1  with him when I arrived.
2      A.   Yes.
3      Q.   And did he ask you any other
4  questions?
5      A.   No. He just explained what was
6  going on.
7      Q.   Meaning that you were going to
8  be deposed?
9      A.   Exactly. Who was coming, maybe
10  what was going to happen first and then
11  everybody else, so nothing. . .
12      Q.   Of substance.
13      A.   No.
14      Q.   Did he tell you at all what
15  his belief was concerning what Faith
16  Christian Academy did or did not do?
17      A.   He did not.
18      Q.   Do you have any information
19  that Faith Christian Academy was
20  attempting to cover anything up?
21      A.   No.
22      Q.   Do you know Elizabeth Nace?
23  She's the plaintiff in this case that Mr.
24  Groth represents. Do you know her at all?

Page 96

1      A.   I don't. I've never seen her
2  name until the subpoena.
3      Q.   Did you ever meet her parents?
4      A.   No.
5      Q.   Did you know that Emily Mayer
6  was on probation her senior year when you
7  would go back and interact with her at
8  the basketball game? Did you know that
9  she was on probation?
10      A.   I did not.
11          MR. GROTH: Objection.
12      A.   I don't know anything about
13  Emily Mayer.
14      Q.   Did you ever hear that, when
15  Lauren Fretz was asked about ever having
16  a relationship with Eric Romig, that she
17  would say "Eww, yuck"? Did you ever hear
18  that from anyone?
19          MR. GROTH: Objection.
20      A.   No.
21          MR. RUSSELL: I have no further
22  questions. Thank you.
23          MR. SANTARONE: I'm sorry, I
24  just have a couple follow-up.

Page 97

1  (EXAMINATION)
2  BY MR. SANTARONE:
3      Q.   You talked about going back for
4  the practices with the team and that you
5  only went -- well, because you wanted to
6  see your friends you graduated with. So,
7  you would go when your friends were home
8  on a break.
9          Were your friends away at
10  college? I know you were at Gwynedd, so
11  you're local. Were they away?
12      A.   I think they were away. I
13  know Kayla was at Liberty. I can't
14  remember if Lauren went right to
15  California or not.
16      Q.   So, if you came back to
17  practice when they were on a break, when
18  the school year started would the first
19  break be Thanksgiving?
20      A.   Yes, we definitely did go back
21  Thanksgiving break.
22      Q.   Because you talked about
23  September/October. Is it possible you
24  didn't start going back until the first

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix 0525

Page 98

1  break, which is Thanksgiving?
2     A.   Yes, it's possible.
3     Q.   And then maybe over Christmas
4  time, too?
5     A.   Definitely over Christmas time.
6     Q.   And nobody felt strange or
7  uncomfortable about going back to practice
8  with Mr. Romig's team at that time?
9     A.   No.
10    Q.   And you said that he is the
11 coach of the team.  No one had any
12 issues with him, is what you had said,
13 correct?
14    A.   Yes.
15       MR. GROTH: Objection.
16    Q.   And afterwards, if the team
17 went out or you went out, would you
18 invite him along or sometimes he came
19 along? He might have gone along to get
20 something to eat?
21    A.   Why would we not invite him?
22 I'm sure he was invited. I'm sure he's
23 popped up a couple of times.  It was
24 nothing to -- it was nothing. . .

Page 99

1     Q.   That's my point: There was no
2  reason why he would not have been
3  invited.
4     A.   Right.
5     Q.   Your conversation with Ryan
6  Clymer was a number of years ago.
7     A.   Yes, it was.
8     Q.   Because Mr. Clymer, in his
9  testimony, said that you said nothing was
10 going on while you were at school, that
11 he sent you some -- that you had had
12 some kind of communications with after you
13 graduated that might have crossed the line
14 or you were uncomfortable.
15       MR. GROTH: Objection.
16    Q.   Did you tell him that you
17 looked at Mr. Romig as a mentor when you
18 were in school?
19    A.   I'm not sure. I don't recall
20 what I told him. It was a really short
21 conversation a very long time ago.
22    Q.   Is it possible that what you
23 told him about was the conversations that
24 happened post-graduation? You told him

Page 100

1  nothing had happened that alarmed you
2  while you were in school?
3        MR. GROTH: Objection.
4     Q.   Is that possible?
5        MR. GROTH: Objection.
6     A.   I don't recall.  As I said, I
7  believe that I told him the truth, which
8  was obviously that it was year-round. I
9  don't know why I would have. . .
10    Q.   Okay. But what he was asking
11 you about, you looked at his role as a
12 mentor --
13    A.   Well, at that point. . .
14    Q.   Back at that point, yes.
15    A.   I mean, at that point, that's
16 when he was kind of talking to me a
17 little bit more, so I don't know.
18       Maybe I did say like he was
19 being kind of a little over the line
20 right now and I just -- because the
21 conversation was so short.  I don't know.
22 I can't recall what I said to him.  I
23 really can't.  I didn't think it was be
24 a big deal like this.

Page 101

1
2     Q.   The nature of the conversations,
3  when you would -- or in your Facebook
4  conversations, did you reply back to him?
5     A.   Yes.
6     Q.   So, you're replying back to his
7  wife's account.
8     A.   Yes.
9     Q.   So, no reason to think there
10 were any secrets here as to what was
11 being said?
12       MR. GROTH: Objection.
13    A.   I wouldn't think that he would
14 want his wife to read it. I don't know
15 his personal life or what kind of a
16 couple they were or where they were at in
17 their relationship, but he was on her
18 account most of the time.
19    Q.   As you said, you knew about her
20 pregnancy issues, but you didn't know a
21 lot about the personal life or his
22 marriage or how things were.
23    A.   No idea.
24       MR. SANTARONE:  That's all I

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths
215.772.1717     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX 877.763.4006
www.brusilow.com

Appendix  0526

Page: 30 (102 - 104)

ORAL DEPOSITION OF KRISTIN KENNEDY, 10/8/2015

Page 102

1  have. Thank you.
2         MS. KERNAN: I have no
3  questions. Thank you.
4         MS. OLSZEWSKI: No questions.
5         MR. RUSSELL: I just have a
6  follow-up to that.
7      (EXAMINATION)
8  BY MR. RUSSELL:
9      Q.   Robin Landis -- she was the
10 assistant coach.
11     A.   Yes.
12     Q.   (Continuing) -- was she the
13 type of personality that, if you had a
14 problem with Coach Romig, that you could
15 approach Robin Landis?
16     A.   Absolutely.
17     Q.   And you never approached Robin
18 Landis --
19     A.   I did not.
20     Q.   -- with a problem with Eric
21 Romig?
22     A.   I wasn't really feeling very
23 problematic. As I said, it was a little
24 bit off, but -- I mean, until you hear

Page 103

1  that he's in a relationship, it doesn't
2  seem that weird.  I talked to other
3  people about. . .
4      Q.   And while you were a student at
5  Faith Christian you never reported to
6  anybody, anybody in an official capacity
7  at Faith Christian, that you felt that
8  this was an appropriate communication from
9  Eric Romig.
10     A.   No, I really didn't tell
11 anybody about that until I was approached
12 afterwards.
13     Q.   And at that time you were no
14 longer a student?
15     A.   I was not.
16     Q.   And you were over eighteen.
17     A.   I was over eighteen for a lot
18 of it.
19        MR. RUSSELL: I have no further
20 questions.
21        MS. KERNAN: No questions.
22        MR. SANTARONE: Thank you.
23        MR. GROTH: Thank you very
24 much. I'll walk you out.

Page 104

1          (The witness was excused)
2          (A brief recess was taken)
3          MR. GROTH: We're back on the
4  record.
5          I wanted to put on the record
6  that I spoke to Ms. Kennedy about reading
7  and signing the transcript, and she said
8  that she would like to get a copy of the
9  transcript and read and review it, and
10 attach an errata sheet if there is
11 something wrong with the testimony.
12         She asked me to send it to her
13 parents' address, which is 706 Patricia
14 Way, Lansdale, Pennsylvania 19446.
15         (The deposition was concluded at
16 3:00 p.m.)

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103      FAX 877.763.4006
www.brusilow.com

Appendix 0527

```
 1              CERTIFICATION

 2

 3         I hereby certify that the

 4    testimony and the proceedings in the

 5    aforegoing matter are contained fully and

 6    accurately in the stenographic notes taken

 7    by me and that the copy is a true and

 8    correct transcript of the same.

 9

10

11

12

13

14         _____

15         Lance A. Brusilow

16         Registered Professional Reporter

17         Certified Realtime Reporter

18

19

20         The foregoing certification does

21    not apply to any reproduction of the same

22    by any means unless under the direct

23    control and/or supervision of the

24    certifying shorthand reporter.
```

brusilow.com          brusilow + associates          215.772.1717

brusilow+associates
more than wordsmiths

215.772.1717        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX 877.763.4006
www.brusilow.com

Appendix  0528

1                          CERTIFICATION

2

3                            ------

4

5                I hereby certify that the testimony and

6 the proceedings in the aforegoing matter are

7 contained fully and accurately in the stenographic

8 notes taken by me and that the copy is a true and

9 correct transcript of the same.

10

11                    _Lance A. Brusilow_

12                  LANCE A. BRUSILOW
                    Certified Realtime Reporter

13                     Registered Professional Reporter

14

15

16                The foregoing certification does not

17 apply to any reproduction of the same by any means

18 unless under the direct control and/or supervision of

19 the certifying shorthand reporter.

20

21                            ------

22

23

24

Appendix  0529

David Babb                                    Nace vs. Pennridge School District
August 12, 2015

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

------
JAMES NACE, et al          : CIVIL ACTION
          vs.               :
PENNRIDGE SCHOOL DISTRICT,  :
et al.                      : NO. 15-333

------

Wednesday, August 12, 2015

------

Videotape deposition of DAVID BABB, held at

1880 John F. Kennedy Boulevard, Sixth Floor,

Philadelphia, Pennsylvania, beginning at 10:05 a.m.,

on the above date, before LANCE A. BRUSILOW, Registered

Professional Reporter, Approved Reporter for the United

States District Court, and Notary Public, there being

present.

------

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

------

---

Page 3

(APPERARANCES - CONT'D.)


KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

BY:  SEAN V. KEMETHER, ESQUIRE

30 East Second Street

Media, PA  19063

ph: 610.585.0600

(skemether@kgpv.com)

Counsel for Ryan Clymer and Russell Hollenbach

---

Page 2

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY:  DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY:  JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY:  ROBERT M. COX, ESQUIRE
     ERIN N. KERNAN, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
ph: 215.345.7000
(rcox@eastburngray.com)
(ekernan@eastburngray.com)
Counsel for Pennridge School District and individual
Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY:  CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA  19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell Hollenbach

---

Page 4

1       THE VIDEOGRAPHER:  Stand by.  We're now
2   on the video record.  This is the video deposition
3   of David Babb, taken by the plaintiffs in the
4   matter of James Nace and April Nace, as guardians
5   of EN, a minor, versus Pennridge School District,
6   et al. in the United States District Court for the
7   Eastern District of Pennsylvania, Civil Action
8   number 15-333, out of the offices of JD Reporting,
9   1880 John F. Kennedy Boulevard, Philadelphia,
10  Pennsylvania on August 12, 2015.  The time is
11  10:06 a.m.
12      I'm David Williams, the videographer.
13  The court reporter is Lance Brusilow.  We're from
14  the firm of brusilow + associates in Philadelphia,
15  Pennsylvania.
16      Counsel, will you be please introduce
17  yourself for the record.
18      MR. GROTH:  David Groth, for the
19  plaintiff.
20      MR. COX:  Robert Cox, for the Pennridge
21  defendants.
22      MS. CONNOR:  Carla Connor, for Faith
23  Christian Academy, Russell Hollenbach and Ryan
24  Clymer.

---

1 (Pages 1 to 4)

David Babb                                Nace vs. Pennridge School District
                        August 12, 2015

Page 5

1           MS. KERNAN:  Erin Kernan, for the
2   Pennridge Defendants.
3           THE VIDEOGRAPHER:  The reporter will
4   now swear in the witness.
5           DAVID BABB, having been first duly
6   sworn, was examined and testified as follows:
7           (EXAMINATION)
8   BY MR. GROTH:
9       Q.  Good morning.
10      A.  Morning.
11      Q.  Mr. Babb, my name is David Groth, and I
12  represent the plaintiff, Elizabeth Nace, in the case
13  that's currently pending in the federal district court
14  in Philadelphia.
15          You were here yesterday and attended the
16  deposition of Thomas Creeden, the former principal of
17  Pennridge High School.  Were you not?
18      A.  Yes.
19      Q.  You heard the instructions that I gave him at
20  the beginning of the deposition to help us get through
21  the deposition more quickly and efficiently?
22      A.  Yes.
23      Q.  Did you understand those instructions?
24      A.  Yes.

Page 6

1       Q.  Do I need to repeat those instructions?
2       A.  No.
3       Q.  Okay.  Let me just remind you that you are
4   testifying under oath just as if you were testifying in
5   court in front of a judge and jury, and you've taken an
6   oath to tell the truth in response to the questions
7   you're being asked today.
8           Let me first ask, what is your full fame?
9       A.  David Sherrill Babb.  It's a family name.
10      Q.  Okay.  Where do you live?
11      A.  Quakertown.
12      Q.  What's the address?
13      A.  12 Red Oak Drive.
14      Q.  And by whom are you employed?
15      A.  Pennridge School District.
16      Q.  In what position?
17      A.  Athletic director.
18      Q.  How long have you been in that position?
19      A.  This is my seventh year I'm starting.
20      Q.  So, you started in 2008 or '09?
21      A.  Fall of 2009.
22      Q.  At the beginning of the school year?
23      A.  Yes.
24      Q.  Did you review any documents in preparation

Page 7

1   for giving testimony today in this case?
2       A.  Yes.
3       Q.  What documents did you review?
4       A.  The documents that Mr. Cox shared with me.
5       Q.  And what were those?
6       A.  Papers from the file of Eric Romig.
7       Q.  Personnel file?
8       A.  Yes.
9       Q.  Okay.
10      A.  Papers from Mark Ludlow's file, Heath's file
11  and Hart's file.
12      Q.  Now, the Ludlow and Heath sexual abuse
13  allegations that we talked about with Mr. Creeden
14  yesterday, those occurred well before employment at
15  Pennridge, correct?
16      A.  Correct.
17      Q.  The situation with Mr. Hart occurred during
18  your tenure there?
19      A.  I don't know.  I don't remember it.  I'm not
20  sure when it was.
21      Q.  Did you have anything to do with the
22  investigation of it?
23      A.  No.
24      Q.  Did you know Mr. Hart?

Page 8

1       A.  No.
2       Q.  Do you know Mr. Ludlow?
3       A.  Yes.
4       Q.  How do you know him?
5       A.  He's a teacher at the high school.
6       Q.  Does he have anything to do with the athletics
7   at the high school?
8       A.  None.
9       Q.  Any other documents that you reviewed?
10      A.  That's it.
11      Q.  Did you read any of the deposition of Eric
12  Romig?
13      A.  Yes.
14      Q.  Taken in this case?
15      A.  Yes.
16      Q.  When did you do that?
17      A.  Shortly after I received it from Mr. Cox.
18      Q.  That would have been back in June or so,
19  maybe?
20      A.  Sounds correct.
21      Q.  Did you read the whole transcript?
22      A.  Yes.  It was long.  I mean, yes.
23      Q.  Did you review any other documents?
24      A.  No.  I don't think there was another

David Babb                                          Nace vs. Pennridge School District
                                    August 12, 2015

| Page 9 | Page 11 |
|---|---|

**Page 9**

1  deposition that was sent to us, was there? I don't
2  think so. I don't think so.
3  　　Q. I don't think we have any other --
4  　　　　MR. COX: Just Mr. Romig's deposition.
5  　　Q. Oh, there was a transcript of the HR person
6  from Quakertown. Did you read that?
7  　　A. I read that, yes.
8  　　Q. Any other documents you reviewed?
9  　　A. No.
10 　　Q. Let me find out about your educational
11 background. Starting in high school, can you tell me
12 where you graduated, when you graduated, and what
13 formal education you had since high school?
14 　　A. Castle Rock High School, 1987; Bucks County
15 Community College, I'm going to say '93.
16 　　Q. Did you get a degree?
17 　　A. I'm sorry, make that '91.
18 　　Q. Okay.
19 　　A. Associates Degree in Business Administration,
20 and I also graduated from Philadelphia College of Bible
21 in 1991, also, and that was a BS in Bible.
22 　　Q. Any other formal education?
23 　　A. Masters Degree from Temple University in
24 Education and Sports Administration.

**Page 10**

1  　　Q. When was that?
2  　　A. 1992 -- '93, I guess. '93.
3  　　Q. Any education after that, formal education?
4  　　A. No.
5  　　Q. Would you please give me a summary of your
6  employment history starting after high school? You can
7  estimate or approximate dates and years.
8  　　A. I worked for the University of Pennsylvania,
9  1991 and '92.
10 　　Q. Doing what?
11 　　A. It was a co-op internship in their athletic
12 department.
13 　　Q. Okay.
14 　　A. I worked at Heartland Christian School in
15 Seabring, Florida from '93 to '94.
16 　　Q. What position?
17 　　A. I was the athletic director and teacher,
18 phys-ed teacher.
19 　　Q. Is that an elementary, high school, middle
20 school?
21 　　A. It was K through twelve. I played soccer for
22 the Charlotte Eagles in '93.
23 　　Q. Is that professional?
24 　　A. It's semi-pro.

**Page 11**

1  　　Q. Okay.
2  　　A. I taught at Plumstead Christian School from
3  1994 through '98. I was the athletic director.
4  　　Q. Did you say you also taught there?
5  　　A. Yes.
6  　　Q. What course?
7  　　A. Phys-ed.
8  　　Q. Okay.
9  　　A. Quakertown High School from 1998 to 2009,
10 coordinator of student activities. Is that the same
11 athletic director? Athletics plus activities, yes.
12 　　Q. What type of activities?
13 　　A. Clubs.
14 　　Q. Such as.
15 　　A. Student government. They had all kinds of
16 clubs. They had a yoga club --
17 　　Q. A what?
18 　　A. Yoga.
19 　　Q. Yoga.
20 　　A. I'm trying to remember some of the clubs. A
21 lot of different ones.
22 　　Q. Okay.
23 　　A. They had a legal club, mock trial.
24 　　Q. And after that?

**Page 12**

1  　　A. Pennridge High School from 2009 to present.
2  　　Q. What position?
3  　　A. Athletic director.
4  　　Q. Any other teaching position?
5  　　A. No.
6  　　Q. Is that a full-time job?
7  　　A. Yes. It's ten and a half months, but. . .
8  　　Q. Have you had any other employment at all
9  unrelated to education?
10 　　A. I've worked --
11 　　Q. And soccer that you mentioned?
12 　　A. Yes. I've worked sports camps, I've painted,
13 lifeguarded.
14 　　Q. Anything else?
15 　　A. I think that's pretty much it.
16 　　Q. When did you first meet Eric Romig?
17 　　A. I met him, interviewed him for a head softball
18 position at Quakertown High School, and I don't know
19 exactly the year. I can give you an approximate.
20 　　Q. Okay.
21 　　A. He coached two years for me at Quakertown, and
22 that was 2009 and 2008. And before he coached then, I
23 had a softball coach for two years -- so that would
24 have been 2007 and 2006 -- named Dave Souder; and

                                                        3 (Pages 9 to 12)

Appendix 0532

David Babb                                    Nace vs. Pennridge School District
                          August 12, 2015

---

Page 13

1  before Dave Souder took the position I interviewed Eric
2  Romig for that position.
3        So, it would have been prior to the 2006
4  spring softball season that I first met Eric.  So, he
5  did not get the job the first time I met her.  Dave
6  Souder got it.
7     Q.  And then he re-interviewed for the job in
8  2008?
9     A.  Right.
10    Q.  And when you say head softball coach, it is
11 girls softball, correct?
12    A.  Yes.
13    Q.  Is there any boys softball?
14    A.  No.
15    Q.  Did he have any coaching experience prior to
16 applying for the position at Quakertown?
17    A.  He had coached at RASA, Richland Area Softball
18 Association.
19    Q.  Is that a club?
20    A.  Yes.
21    Q.  Is that a paid job; do you know?
22    A.  I don't believe so.
23    Q.  Did he coach softball?
24    A.  Yes.

Page 14

1     Q.  So, he coached for you in 2008.  That would be
2  the spring of 2008?
3     A.  Correct.
4     Q.  And then the spring of 2009.
5     A.  Correct.
6     Q.  And were you there the whole season in 2009?
7     A.  Yes.
8     Q.  So, you started the fall of 2010 at Pennridge?
9     A.  Fall of 2009 at Pennridge.
10    Q.  I'm sorry, fall of 2009.  Okay. Did you ever
11 engage in any activity with Mr. Romig of a social
12 nature; that is, separate and apart from his being a
13 coach for you at Quakertown?
14    A.  The only time I saw him other than at school
15 or on a softball field was at preschool graduation.  He
16 had two twin boys that were in the same class as my
17 middle son.
18    Q.  How did Mr. Romig perform as a softball coach
19 at Quakertown?
20    A.  I thought he did a great job.
21    Q.  Did you evaluate him?
22    A.  Yes.
23    Q.  Written evaluations?
24    A.  Yes.

Page 15

1     Q.  Were there any issues or problems with him
2  there in terms of his coaching or his conduct or
3  behavior toward players or parents or anything of that
4  nature?
5     A.  No.
6     Q.  Was there a softball player there by the name
7  of Alicia Hughes?
8     A.  Yes.
9     Q.  Did you know her personally?
10    A.  Yes.
11    Q.  How did you know her?
12    A.  She was a pitcher on the team.
13    Q.  Did you ever hear any rumors or comments from
14 anybody to the effect that they thought there might be
15 some inappropriate relationship between Alicia Hughes
16 and Eric Romig?
17    A.  No.
18    Q.  He coached her, correct?
19    A.  Yes.
20    Q.  Do you know whether or not -- strike that.
21 Did you know whether or not at the time you were
22 athletic director at Quakertown Eric Romig was coaching
23 for any other club or school?
24    A.  No.  He may have, but. . .

Page 16

1     Q.  You did not know?
2     A.  No.
3     Q.  You learned from reading his deposition that
4  he was actually coaching at Faith Christian Academy at
5  the same time that he was coaching at Quakertown,
6  correct?
7     A.  I think that was in there, yeah.
8     Q.  But you did not know at the time.
9     A.  No.
10    Q.  He never mentioned it to you at all.
11    A.  No.
12    Q.  Okay.  Mr. Romig was the coach of the softball
13 team throughout the spring of 2009, and that season
14 would have ended in May or so 2009?
15    A.  Yes, mid-May.
16    Q.  And you were still athletic director at that
17 time.
18    A.  Correct.
19    Q.  Who took over your position at Quakertown
20 after you left?
21    A.  Sylvia Kalazs.
22    Q.  Did Mr. Romig coach anything else at
23 Quakertown other than girls softball?
24    A.  No, that was it.

4 (Pages 13 to 16)

Appendix 0533

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

---

Page 17

1      Q.   Do you know if he coached in the fall of 2009
2    any sport at Quakertown?
3      A.   I'm going to say no, not that I know of.  I
4    was gone by that time.
5      Q.   Right.  Between the time that you left
6    Quakertown as athletic director and the time that --
7    strike that.
8          Did Mr. Romig ever apply for a coaching
9    position at Pennridge after you became athletic
10   director there?
11     A.   No.  He later applied for a girls basketball
12   position.
13     Q.   I meant any coaching position.
14     A.   Right, no.
15     Q.   When did he do that?
16     A.   Shortly after he started coaching softball at
17   Pennridge.
18     Q.   Okay.  Maybe you didn't understand my
19   question.  At some point Mr. Romig did apply for a
20   coaching position at Pennridge, correct?
21     A.   Right.
22     Q.   When was the first time that he applied for a
23   coaching position?
24     A.   Well, I talked to him initially for softball.

---

Page 18

1      Q.   Do you know when that was?
2      A.   I would think in the winter of -- I'm trying
3    to think. . .
4      Q.   Let me help to refresh your recollection.  Let
5    me show you Creeden exhibit two.  The first document is
6    Bates-stamped 22851.  It's a contract between Pennridge
7    and Eric Romig for the 2011/2012 season.
8      A.   Yes, that would be the first -- that was his
9    first season, so yes.
10     Q.   So, that would have been the winter of
11   2011/12?
12     A.   Right.
13     Q.   Did he apply for any position at Pennridge
14   before that that he didn't get?
15     A.   No, not while I was there.
16     Q.   From the fall of 2009 until the winter of
17   2011.
18     A.   Right.
19     Q.   Did you have any contact with Mr. Romig at all
20   during that period of time?
21     A.   I called him in the winter of 2012 -- I'm
22   thinking it was after Christmas -- looking for a
23   softball coach, but I don't know exactly when that time
24   was.

---

Page 19

1      Q.   But that's a contract we just looked at,
2    correct?
3      A.   Yes.
4      Q.   My question is, before applying for that
5    position, did he apply for a coaching position at
6    Pennridge which he didn't get?
7      A.   No.
8      Q.   You had a position that winter that was open
9    for the softball coach, girls softball coach.  Was that
10   posted?
11     A.   Yes.
12     Q.   Did you get any applicants?
13     A.   No.
14     Q.   Did Mr. Romig contact you about the position
15   or did you contact Mr. Romig?
16     A.   I contacted him.
17     Q.   By telephone?
18     A.   I think the first contact was most likely
19   through email.
20     Q.   Okay.
21     A.   But then we did talk on the phone.
22     Q.   And tell me about that discussion, what he
23   said, what you said.
24     A.   I told him I was looking for a softball coach,

---

Page 20

1    and I asked him if he would be interested.
2      Q.   And he said?
3      A.   His initial response was no, but that he would
4    get back to me.
5      Q.   Okay.  Did you ask him what he was currently
6    doing?
7      A.   I think I talked to him about heart issues.
8    He had a heart issue, and we talked about that. He said
9    he was recovered from that. That was pretty much our
10   conversation.
11     Q.   Did he say the heart issues was?
12     A.   I think it was something to do with an
13   irregular heartbeat.
14     Q.   Did you ask him if he was currently coaching?
15     A.   No.
16     Q.   Did you know at that point when you called him
17   that he had left Quakertown?
18     A.   Yes.
19     Q.   How did you know that?
20     A.   I was talking to Sylvia Kalazs, their athletic
21   director, and we usually talk about our needs as far as
22   coaching, and I told her I was looking for a softball
23   coach and she said she was, also, because Eric had
24   resigned.

---

5 (Pages 17 to 20)

David Babb                                      Nace vs. Pennridge School District
                                                August 12, 2015

---

Page 21

1     Q.  Did she say when Eric resigned?
2     A.  No.
3     Q.  Did she say why he resigned?
4     A.  She said heart issues.
5     Q.  Okay.  Did you talk to her before you talked
6  to Mr. Romig?
7     A.  Yes.
8     Q.  So, by the time you called Mr. Romig you
9  already knew that he had some kind of health issue and
10  that's why he left Quakertown, correct?
11     A.  Correct.
12     Q.  Yes?
13     A.  Yes.
14     Q.  So, you called Mr. -- you eventually called
15  Mr. Romig and spoke to him about the coaching position
16  at Pennridge, and you had some discussion about his
17  health issue to make sure that was cleared up, correct?
18     A.  Yes.
19     Q.  And that he was, at least health-wise, able to
20  perform the duties of a coach.
21     A.  Yes.
22     Q.  What other things did you discuss with Mr.
23  Romig at that time?
24     A.  That was it.

---

Page 22

1     Q.  Did you ask him if he had coached anywhere
2  else after Quakertown since he left there at the end of
3  2009 and this is now the winter of 2011?
4     A.  No.
5     Q.  Did you ask him if he had -- strike that.  Did
6  he mention to you that he had coached somewhere else in
7  2009 that you might not have been aware of?
8     A.  No.
9          MR. COX:  Object to the form.
10     Q.  Did he mention to you at all in that
11  conversation that he had also coached basketball at
12  girls -- girls basketball at Faith Christian Academy?
13          MR. COX:  Object to the form.  You can
14  answer.
15     A.  No.
16     Q.  Did he make any mention at all of any
17  employment connection that he had with Faith Christian
18  Academy?
19     A.  No.
20     Q.  Other than asking him if he would be
21  interested in the position, did you ask him for any
22  other information about him personally or about
23  coaching, anything at all?
24     A.  No.

---

Page 23

1     Q.  And you said at first he didn't want the job?
2     A.  Correct.
3     Q.  Was that the end of that conversation?
4     A.  He said he wasn't interested, but I think it
5  was kind of like he would think about it.
6     Q.  Okay.  And you had a subsequent discussion
7  with him.
8     A.  Right.
9     Q.  How long after that?
10     A.  I'd say maybe -- at least a week after that.
11     Q.  Did he call you or did you call him?
12     A.  I'm not sure.
13     Q.  What was said in that conversation between the
14  two of you?
15     A.  He said he could coach.
16     Q.  Did he say he wanted the job?
17     A.  Yes.
18     Q.  Okay.  At that point did you then question him
19  about any of his health or coaching situations?
20     A.  No.
21     Q.  Did you request that he provide you with any
22  information about his employment between 2009 at
23  Quakertown and 2012 when he was going to coach the
24  softball team at Pennridge?

---

Page 24

1     A.  No.
2     Q.  So, would it be fair to say that you didn't
3  really conduct an interview of him during those
4  teleconferences?  You simply asked him if he wanted a
5  job and he finally or eventually said yes, he did?
6  Would that be a fair statement?
7     A.  You know, as far as an interview, I'm sure we
8  talked about, you know, what the job would entail, who
9  he would be working with, what the makeup of the team
10  was, how things were run at Pennridge.  So, in that
11  regard, you know, there was an interview.
12     Q.  And that happened during that telephone
13  conversation?
14     A.  Yes.
15     Q.  You never had an in-person interview with him,
16  correct?
17     A.  No.
18     Q.  And Paul Koehler, the head varsity softball
19  coach, did he have an in-person interview with Mr.
20  Romig about the job?
21     A.  I know they talked.  I know they met.
22     Q.  How do you know that?
23     A.  From what they told me.
24     Q.  When?

---

6 (Pages 21 to 24)

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

Page 25

1      A.  I asked Paul to contact him.  Paul's the head
2  coach.
3      Q.  Right.
4      A.  And to let me know what his input was.
5      Q.  How do you know they met?
6      A.  I know they talked about the position.
7      Q.  I meant --
8      A.  I wasn't there physically when they met.
9      Q.  I was making a distinction between them
10  talking on the phone and meeting.
11      You read Mr. Romig's transcript.  Did you read
12  the section where he said he never met Mr. Koehler
13  before he was hired in person?
14      A.  Okay.
15      Q.  Do you recall that testimony?
16      A.  I don't.
17      Q.  So, you don't have any personal knowledge that
18  he actually met the head coach before he was hired by
19  Pennridge, correct?
20      A.  Correct.
21      Q.  Up until that time when he was hired in the
22  winter of 2011 and '12, there is no date on this
23  contract that's part of Creeden exhibit two, is there?
24      A.  Nothing from the applicant that's signed.  The

Page 26

1  only date is the school year that he would be coaching.
2      Q.  That's what I'm saying, though:  There is no
3  date that the contract was actually signed.
4      A.  Right.
5      Q.  All right.  Up until that time did you know a
6  gentleman named Russell Hollenbach?
7      A.  Yes.
8      Q.  How did you know him?
9      A.  Mostly from working with him when I was at
10  Plumstead Christian school.  We played against Faith
11  Christian.
12      Q.  You knew him from playing against Faith
13  Christian's teams.
14      A.  Right.
15      Q.  And did you know him to be the athletic
16  director at Faith Christian?
17      A.  Yes.
18      Q.  When did you first meet him?
19      A.  I can't tell you for sure, but I would think I
20  talked to him each school year that I was at Plumstead
21  Christian School.  So, that would have been '94.
22      Q.  As part of your duties as athletic director at
23  Quakertown, were you required to go to PIAA
24  conferences?

Page 27

1      A.  Yes.
2      Q.  And those were held once a year?
3      A.  There's District 1 meetings that are held
4  twice a year.
5      Q.  Where back then?
6      A.  Westover Country Club.
7      Q.  And what's discussed at those meetings?
8      A.  They go over rules, rules changes, proposed
9  rules.
10      Q.  Anything else?
11      A.  Usually news.
12      Q.  In any of those PIAA conferences, did they
13  ever discuss issues of sexual harassment between
14  coaches and players?
15      A.  No, not to my knowledge.
16      Q.  You knew Mr. Hollenbach since 1994.  Did he
17  attend those PIAA conferences as well?
18      A.  I would think.
19      Q.  Do you recall seeing him at the conferences?
20      A.  When I was at Plumstead Christian they were
21  not a PIAA school, and I don't believe Faith Christian
22  was a PIAA school back then.  They may have been, so I
23  did not attend until I was at Quakertown.
24      So, the first time I would have seen him at a

Page 28

1  PIAA meeting would be my first year at Quakertown.
2      Q.  1998?
3      A.  Correct.
4      Q.  Did you ever have any social relationship with
5  Mr. Hollenbach outside of your position as athletic
6  director at schools?
7      A.  No.  I've only seen him at a meeting and I saw
8  him at a game at Faith one time.
9      Q.  Do you belong to a church?
10      A.  I'm not a member.  I go to a church.
11      Q.  What church is that?
12      A.  Calvary Church of Soudertown.
13      Q.  Since what time?
14      A.  Since 1998.
15      Q.  Do you know if Mr. Hollenbach has ever been a
16  member of that church?
17      A.  I do not know.  I've never seen him there.
18      Q.  Tell me about the hiring procedure that was
19  followed at Pennridge for assistant coaches back in
20  2011/2012.
21      What was the procedure that was suppose to be
22  followed in hiring an assistant coach such as Mr. Romig
23  or any other assistant coach?
24      A.  A position is posted through human resources.

7 (Pages 25 to 28)

Appendix 0536

David Babb                          Nace vs. Pennridge School District
                           August 12, 2015

---

Page 29

1   I accept the applications, if there are any, and I
2   interview them.  I also take the input of the assistant
3   coaches.
4       Q.  Assistant or head coaches?
5       A.  I'm sorry, head coach.  And then a candidate
6   is taken to the school board for approval.
7       Q.  Taken by whom?
8       A.  I'll send up the posting with a name on it so
9   that it can be filled.
10      Q.  Does that go through the HR department?
11      A.  Yes.
12      Q.  So, it's the HR department that presents it to
13  the school board?
14      A.  Correct.
15      Q.  And who was the head of the HR department back
16  in 2011/12?
17      A.  Ray Scarpantonio.
18      Q.  Did Mr. Creeden have any input into that
19  process at all?
20      A.  Yes.
21              MR. COX:  Object to the form.  You may
22  answer.
23      A.  Yes.  A lot of times I would say this is the
24  candidate we're taking to be approved.

Page 30

1       Q.  Other than you telling him you have a
2   candidate and this is the person's name, did he have
3   any other vetting function?
4       A.  I would ask him for input from time to time,
5   yes.
6       Q.  What type of input?
7       A.  Some of the candidates that applied, and run
8   them by him for his input.
9       Q.  If you had multiple candidates or you wanted
10  to go over their qualifications with him, that type of
11  thing, before making a decision?
12      A.  If it was a teacher in the building, you know,
13  what he thought about that teacher coaching, also.
14      Q.  In terms of actually making the offer for the
15  job to the applicant, that was your function?
16      A.  Yes.
17      Q.  And it was your decision?
18      A.  Yes.
19      Q.  That decision had to be approved by somebody,
20  but initially was your decision?
21      A.  Correct.
22      Q.  The position for which you hired Mr. Romig, if
23  you look back at Creeden exhibit two, the first page,
24  page 22851, was softball varsity and then it has "(JV

Page 31

1   coach)."
2       Does that mean that he would be the JV coach,
3   the JV head coach, and the assistant varsity coach?
4       A.  He would coach the JV team.  That would be his
5   first responsibility.
6       Q.  And he would be the head coach of that.
7       A.  He would be the head coach of that.
8       Q.  Okay.
9       A.  The head coach would oversee the varsity team
10  and the JV team and the freshman team, if there is a
11  freshman staff, but he would still be part of that
12  softball staff.
13      Q.  Including the varsity team.
14      A.  Right.
15      Q.  Okay.  So, if the varsity team, for example,
16  played longer during a season than the JV team, he
17  would be an assistant coach on the varsity team.
18      A.  His season ended with the JV team, so he was
19  on a contract.  He was paid as soon as the JV season
20  was over.
21      Q.  I'm not sure that answered my question.  He's
22  listed on this contract as an assistant varsity coach,
23  is he not?
24      A.  Yes, that's what it says.

Page 32

1       Q.  And the varsity season might last longer than
2   the JV season, correct?
3       A.  Correct.
4       Q.  There might by more games and there might be
5   playoffs, correct?
6       A.  Correct.
7       Q.  And that could go all the way until the end of
8   May, correct?
9       A.  Correct.
10      Q.  When did the JV season end in 2012?  Do you
11  know?
12      A.  I would say mid May.  I'm not sure exactly
13  what the date is.
14      Q.  So, the varsity season may have lasted a
15  couple weeks longer, until the end of May.
16      A.  Correct.
17      Q.  And during that time would he be sitting in
18  the dugout, sitting on the bench, participating in the
19  games of the varsity team?
20      A.  He can.
21      Q.  He can.
22      A.  He does not have to.
23      Q.  Do you know if he did?
24      A.  He did.

brusilow.com          brusilow + associates          215.772.1717

Appendix 0537

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

---

Page 33

1    Q.  You said he is paid at the conclusion of the
2  JV season.  What method of payment was used to pay him?
3    A.  A check.
4    Q.  Issued by whom?
5    A.  The school district.
6    Q.  For this amount on the contract, $2,530?
7    A.  Yes, minus taxes.
8        MR. GROTH:  I'm going to request a copy
9    of that check, and I'll do a separate request for
10   production of documents from Pennridge.
11 BY MR. GROTH:
12   Q.  There is a certain amount of paperwork that
13 has to be done in order for the hiring of the coach to
14 be completed.  Is that correct?
15   A.  Correct.
16   Q.  Who is responsible for actually assembling and
17 making sure all the paperwork is completed?
18   A.  HR does that checklist there.
19   Q.  Would you turn to that third page in?  Looking
20 at page 22853 of exhibit two, Creeden exhibit two, it's
21 a checklist of forms and background checks and whatever
22 that have to be completed in order to have the
23 applicant become an employee of Pennridge as a coach,
24 correct?

---

Page 34

1    A.  Correct.
2    Q.  And who actually does this checklist? Is this
3  an HR checklist or your checklist?
4    A.  That's HR.
5    Q.  At any time before Mr. Romig actually signed
6  the contract for the 2011/2012 season, did you meet him
7  personally?
8    A.  I'm not sure.  I know he was in my office.
9  You're saying prior to what time?
10   Q.  Prior to actually signing the contract,
11 whatever date it was signed on.  We don't have a date.
12       MR. COX:  I assume you mean after they
13   knew each other at Quakertown.
14       MR. GROTH:  No.  I'm talking about
15   after the telephone calls where he offered the
16   position and Romig accepted the position.
17 BY MR. GROTH:
18   Q.  Did you meet with him at all?
19   A.  Yes, I know he came in before the season.
20   Q.  Okay.  And the season starts in March?
21   A.  March, early March.
22   Q.  March of 2012.
23   A.  Correct.
24   Q.  What did you talk about then?

---

Page 35

1    A.  You know, we went over logistics of what it
2  would be like to coach here:  This is where the
3  training room is; this is where the bus picks up the
4  kids; this is how we get them out of class; this is who
5  handles your umpires; this is who handles, you know,
6  your field preparation, things like that.
7    Q.  Did you introduce him to Coach Koehler?
8    A.  I'm not sure.  I may have at that time.  I'm
9  not sure.
10   Q.  Did he actually sign the contract at that
11 time?
12   A.  I'm not sure, but I believe so at that time.
13   Q.  Go to page 22858, please, in Creeden exhibit
14 two.
15   A.  225?
16   Q.  22858.  That document states that it is the
17 application for service staff personnel.  Is that the
18 employment application for somebody that is applying
19 for a coaching position?
20   A.  Yes.
21   Q.  And this is the application that was given to
22 you or filled out by Mr. Romig for you before he was
23 hired in 2011/'12, correct?
24   A.  Yes.

---

Page 36

1    Q.  There are a number of boxes on page two of
2  that application form to give his complete employment
3  history, and on that form it only lists one employer,
4  R&R Service Group, correct?
5    A.  Yes.
6    Q.  You had hired coaches before Mr. Romig,
7  correct?
8    A.  Yes.
9    Q.  Coaches that had been employed at other
10 schools for other sports?
11   A.  Yes.
12   Q.  Would those coaches generally put on their
13 employment history their paid employment history as
14 coaches?
15       MR. COX:  Objection to form.  You can
16 answer.
17   A.  I guess, yes.
18   Q.  I don't want you to guess. You've looked at
19 employment applications ever since you've become the --
20   A.  This is the employee --
21   Q.  Hold on.  You've looked at employment
22 applications ever since you've become the athletic
23 director at Pennridge.  And I'm asking you, typically
24 or generally, do the people who apply for coaching

---

Appendix 0538

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

---

Page 37

1  positions list their prior coaching positions in this
2  employment history?
3      A.  Yes.
4      Q.  You see here that Mr. Romig did not list any
5  employment position as a coach.  Is that correct?
6      A.  Yes.
7      Q.  Did you review this application when he
8  submitted it?
9      A.  No.
10     Q.  This goes right to HR?
11     A.  Yes.
12     Q.  And you see it doesn't even have his position
13 at Quakertown as a coach on here.
14     A.  Correct.
15     Q.  Okay.  If you do not see these generally -- if
16 these are submitted directly to HR -- how do you know
17 on other applications for coaching positions that
18 applicants have actually listed their coaching
19 positions, prior coaching positions?
20     A.  Usually if I don't know the candidate, I'm
21 working off of their resume.
22     Q.  Okay. And you would expect them to list their
23 coaching positions on their resume?
24     A.  Yes.

Page 38

1      Q.  So, as of the time Mr. Romig was hired, the
2  only coaching position that you knew that he had at a
3  school prior to working at Pennridge was at Quakertown.
4      A.  Yes, I knew he had coached at Quakertown.  I
5  may have known he was at Faith.  I'm not sure.  I can't
6  tell you for sure.
7      Q.  I thought we went over that a little bit
8  before, but let me just make sure I understand your
9  testimony.
10        Prior to Mr. Romig actually signing the first
11 contract with Pennridge for the 2011/2012 season, did
12 you have any knowledge or information that he had done
13 any coaching at all at Faith Christian Academy?
14     A.  I'm going to say no, but I'm not sure.  He
15 might have said something to me, but I'm not sure.
16     Q.  If he had said something to you about
17 coaching -- if he had, assuming he had, said something
18 to you about coaching at Faith Christian -- is that
19 something you would typically discuss with an
20 applicant, how his performance was, how he conducted
21 himself as a coach at a previous school?
22        MR. COX:  Object to the form.  You can
23 answer.
24     A.  Yes.

Page 39

1      Q.  And you don't recall asking him any questions
2  about Faith Christian, correct?
3      A.  No.
4      Q.  On the next page -- I'm sorry, two pages over.
5  On page 22861 of Creeden exhibit two, there are
6  personal references listed:  Russ Hollenbach, Marc
7  Hoover and Ray Hunsberger.  You knew Mr. Hollenbach,
8  correct?
9      A.  Correct.
10     Q.  Who was Mark Hoover?
11     A.  He's a friend of Eric's.
12     Q.  Did you know that at the time that he applied
13 for this job?
14     A.  No.
15     Q.  How about Ray Hunsberger?
16     A.  I don't know him.
17     Q.  Okay.  Did you call any of these references
18 listed on Mr. Romig's application to Pennridge to ask
19 them any questions about their knowledge of his
20 performance as a coach or as a friend or an employee or
21 whatever?
22     A.  No.
23     Q.  Okay.  Is that something that is supposed to
24 be done under the employment policies in effect at

Page 40

1  Pennridge back in 2011/2012?
2      A.  We do check their references; not every
3  reference.
4      Q.  In this case you didn't check any reference.
5      A.  You know, I had a reference myself working
6  with him.  I talked to Sylvia Kalazs, you know, when he
7  was leaving, and she said there were no issues.
8      Q.  But you did not check any of the personal
9  references he listed on his employment application.
10     A.  No.
11     Q.  And you also did not contact the only previous
12 employer that he mentioned in Mr. Romig's application,
13 which was R&R Service Group, correct?
14     A.  Correct.
15     Q.  Go to page 22865 of Creeden exhibit two,
16 please.  What is this document?
17     A.  Looks like this is a Pennridge School District
18 Staff Computer and Information Systems User Agreement.
19     Q.  Is this something that's requested of all
20 coaches or assistant coaches, something that's required
21 to be signed?
22     A.  I think it's all employees.
23     Q.  All employees at the school district, correct?
24     A.  Correct.

10 (Pages 37 to 40)

David Babb                                    Nace  vs.  Pennridge School District
                              August 12, 2015

---

**Page 41**

1      Q.   And is this an HR form? This is something you
2  wouldn't generally have anything to do with.  Is that
3  correct?
4      A.   Right.
5      Q.   The criminal background checks that are done,
6  are those done -- strike that.  Are those checks given
7  directly to the HR department as opposed to given to
8  you to give to the HR department?
9            MR. COX:  Object to the form.  You can
10 answer.
11     A.   Yes, they're given to the HR.
12     Q.   Do you ever see them at all?
13     A.   I do see them.  Sometimes a coach will bring
14 them in and I'll tell him to go straight to HR.
15     Q.   The coaches themselves have to request a check
16 as opposed to the school requesting them?
17     A.   Correct, the coaches do it.
18     Q.   Go to page 22874 in Creeden exhibit two,
19 please.  This is an evaluation -- assistant coach
20 evaluation form, date of evaluation 6/6/2012 for Eric
21 Romig.  Is this a form that you filled out?
22     A.   No.
23     Q.   Who did?
24     A.   Coach Koehler.

---

**Page 42**

1      Q.   Is this a form that he has to submit to you
2  for your review?
3      A.   Yes.
4      Q.   And did he do that?
5      A.   Yes.
6      Q.   Were there any issues, problems, concerns
7  about Eric Romig's coaching performance after his first
8  year coaching the JV girls softball team and being an
9  assistant coach to the varsity team?
10     A.   No.
11     Q.   When Mr. Romig was first hired by Pennridge
12 for this first season that he coached, was there any
13 texting policy, written policy, at Pennridge High
14 School with regard to any staff members, faculty,
15 administration, coaches, whatever, and students?
16     A.   Not that I know of.
17     Q.   Is there any now that you know of?
18     A.   Not that I know of.
19     Q.   Was there any sexting policy in place at any
20 time during the time that you've been at Pennridge?
21           MR. COX:  Object to the form.  You can
22 answer.
23     A.   There is a policy for sexual harassment that
24 says you can't, you know, touch, write, you know,

---

**Page 43**

1  things that would be sexually inappropriate.
2      Q.   Is sexting specifically mentioned in that
3  policy; do you know?
4      A.   I believe it's -- I can't say for sure.
5      Q.   Okay. I want you to take a look at Creeden
6  exhibit one.  It's called "employment of district
7  staff."  It has the number 304.  Have you ever seen
8  that document before?
9      A.   I'm sure I've seen it.  You know, I haven't
10 really delved into it.
11     Q.   On the second page of that document it states,
12 about three-quarters of the way down, The
13 superintendent or designee shall seek recommendations
14 from former employers and others in assessing the
15 candidate's qualifications.  Recommendations and
16 references shall be retained confidentially and for
17 official use only."
18          Would it be fair to say, with regard to the
19 hiring of Mr. Romig by you, that you basically relied
20 on your own former history with Mr. Romig and didn't
21 check any further references, either in terms of
22 employer references or personal references?
23          MR. COX:  Objection to the form.  You
24 may answer.

---

**Page 44**

1      A.   I checked references on him when I first hired
2  him at Quakertown, and I checked at Quakertown after I
3  had left.
4      Q.   Thank you for that information; that's not
5  what I asked you.  This is Pennridge's policy that you
6  had to follow while you were athletic director at
7  Pennridge, correct?
8      A.   Correct.
9      Q.   Okay.  My question is, in hiring Mr. Romig,
10 would it be correct to say -- hiring Mr. Romig at
11 Pennridge, not at Quakertown -- that you did not check
12 any of his employer or personal references that were
13 given on his application?
14          MR. COX:  Object to the form.  You may
15 answer.
16     A.   Yes, I did not contact those references.
17     Q.   You've been athletic director at Pennridge
18 since 2009.  During that period of time, between 2009
19 and 2013, did you personally receive any in-service,
20 meaning in-school, training or instruction with regard
21 to the school's unlawful harassment policies, including
22 the sexual harassment policy?
23     A.   Not that I know of.
24     Q.   Okay.  Were you ever instructed to actually

---

David Babb                                    Nace vs. Pennridge School District
                          August 12, 2015

---

Page 45

1   obtain a copy and read whatever unlawful harassment,
2   including sexual harassment, policy was in effect at
3   Pennridge High School between 2009 and 2013?
4       A.  I received a Pennridge professional handbook
5   manual with it.
6       Q.  Professional employee handbook?
7       A.  Yes.
8       Q.  Did you read it?
9       A.  Yes.
10      Q.  Between 2009 and 2013 were the head coaches
11  and assistant coaches provided with written copies of
12  the unlawful harassment, including sexual harassment,
13  policies of Pennridge High School?
14      A.  No.
15      Q.  Were you ever asked to do that, to provide
16  your coaches and assistant coaches with copies of those
17  policies by anybody above you in the administration,
18  including Mr. Creeden or the superintendent or anybody
19  else?
20      A.  No.
21      Q.  Other than being provided a copy of the
22  professional employees handbook, have you ever received
23  any instruction from any source inside Pennridge or
24  outside Pennridge with regard to the issues of sexual

---

Page 46

1   harassment and unlawful harassment?
2       A.  I've taken a National Federation of High
3   School Sports online class on creating a safe
4   environment.
5       Q.  When was that?
6       A.  That was last school year.
7       Q.  2015.
8       A.  Correct.
9       Q.  So, nothing before Mr. Romig was hired and
10  nothing during his tenure at Pennridge.
11      A.  Correct.  We have every year a faculty meeting
12  where the HR director would come out and talk about
13  that.  So, if you would count that as training.
14      Q.  Would you attend those meetings yourself?
15      A.  Yes.
16      Q.  But you're not faculty.
17      A.  Right.
18      Q.  Why would you attend?
19      A.  I've been asked to.
20      Q.  By whom?
21      A.  Superintendent.
22      Q.  Were the coaches and assistant coaches asked
23  to attend those meetings?
24      A.  No.

---

Page 47

1       Q.  Did you take whatever information you obtained
2   from those meetings about unlawful harassment,
3   including sexual harassment, and give a discussion or
4   have a discussion with your head coaches or assistant
5   coaches about that information?
6       A.  (No response)
7       Q.  Up until 2013.
8       A.  Yes, not to my knowledge.
9       Q.  So, would it be fair to say that the head
10  coaches and assistant coaches at Pennridge High School
11  between 2009 and 2013 basically got no training or
12  instruction or guidance or direction with regard to
13  Pennridge's unlawful harassment or sexual harassment
14  policies?
15      A.  They would get a coaching handbook.  That
16  would not be in the handbook, but it would ask them to,
17  you know, as an employee, follow the procedures of
18  Pennridge School District.
19      Q.  Is there a new handbook for every year?
20      A.  No.
21      Q.  It's been the same handbook for a number of
22  years?
23      A.  Yes.
24          MR. GROTH:  I'm going to ask for a copy

---

Page 48

1   of that as well. I don't think that was part of
2   anything that was turned over, Rob, but I'll do a
3   request for production.
4           MR. COX:  That's fine.
5           MR. GROTH:  And if it was turned over,
6   if you just give me the Bates numbers. . .
7           MR. COX:  I'll tell you where it is.
8           MR. GROTH:  Fine.
9   BY MR. GROTH:
10      Q.  Do you know whether or not the term unlawful
11  harassment or sexual harassment is even mentioned there
12  that handbook?
13      A.  I don't believe it is.
14      Q.  Did you ask Mr. Romig whether or not he wanted
15  to remain the assistant varsity coach for softball at
16  Pennridge High School for the 2012/2013 season?
17      A.  Yes.
18      Q.  And did he agree to?
19      A.  Yes.
20      Q.  And he signed a new contract?
21      A.  Well, we're finding out he had somebody sign
22  it for him.
23      Q.  You learned that in his deposition?
24      A.  Correct.

---

12 (Pages 45 to 48)

Appendix 0541

David Babb                                    Nace vs. Pennridge School District
                                        August 12, 2015

---

Page 49

1    Q.  Correct?
2    A.  Yes.
3    Q.  If you look at that contract, which is page
4  22852 of Creeden exhibit two, and compare it to the
5  first contract, which is 22851, you'll see the
6  signature is not the same, correct?
7    A.  Correct.
8    Q.  How was he provided with that contract? Who
9  provided the contract to him -- strike that.  You've
10 already said he didn't sign it.  Do you know if he was
11 even given the contract to look at?
12   A.  It was put in the mailbox for him to sign, and
13 I guess somebody just signed it for him.
14   Q.  Okay.  Do you recall reading in Mr. Romig's
15 deposition transcript that he was busy and didn't want
16 to come in, so he instructed Mr. Koehler to sign the
17 contract for him?
18   A.  I read that.
19   Q.  All right.  Do you know if that's what
20 happened?
21   A.  I didn't see it happen, so I. . .
22   Q.  Well, did you ask Mr. Koehler if he signed the
23 contract for him?
24   A.  I haven't.

---

Page 50

1    Q.  Do you recognize Mr. Koehler's handwriting?
2         MR. COX:  Objection to the form.  You
3  can answer.
4    A.  No.
5    Q.  Now, that contract says "assistant varsity
6  coach softball," does it not?
7    A.  Yes.
8    Q.  It doesn't mention anything about the JV team,
9  correct?
10   A.  Correct.
11   Q.  Was he still coaching the JV team?
12   A.  Yes.
13   Q.  But he was also an assistant varsity coach for
14 the girls softball team, correct?
15   A.  Correct.
16   Q.  And again, that season for the varsity team
17 could have gone all the way until the end of May of
18 2013?
19   A.  Correct.
20   Q.  All right.  Does it ever go into June?
21   A.  If you're in the state championship, it could.
22   Q.  What about back in 2013?
23   A.  I'm not sure exactly what day it ended.
24   Q.  Would you have a schedule or some written

---

Page 51

1  material at your office to indicate exactly when the
2  season ended?
3    A.  Yes.
4    Q.  Did Mr. Romig coach with the varsity team as
5  an assistant coach up until the end of that season in
6  2013?
7    A.  I know he was on the bench for one of their
8  playoff games.
9    Q.  How do you know that?
10   A.  I was at the game.
11   Q.  Was there more than one playoff game?
12   A.  There were three, I believe.
13   Q.  Would this information -- how many games were
14 played by the girls varsity team in 2013 and what their
15 record was and whether they went to the playoffs and
16 what the scores were -- is that all on website
17 somewhere at Pennridge?
18   A.  Yes.  It wouldn't have the scores, but it
19 would have the games.
20   Q.  Win/loss?
21   A.  I don't think it would have win/loss.
22   Q.  Okay.  Now, up until the time when Mr. Romig
23 signed this second contract with Pennridge in 2013, the
24 date of the contract itself is January 28th, 2013 --

---

Page 52

1  did you know, did you have any information that Mr.
2  Romig had previously coached basketball at Faith
3  Christian Academy?
4    A.  I may have.  I'm not sure. I saw him at a
5  Faith Christian basketball game at our gym and he was
6  doing the scorebook.
7    Q.  When was that?
8    A.  That would be, I'm thinking -- I think it
9  would be '10/'11, that winter of '10/'11.  That's the
10 only time I've seen him or heard of him with
11 basketball.
12   Q.  I'm sorry, I didn't follow you.  You saw him
13 doing the scorebook for the Faith Christian basketball
14 team when?
15   A.  I'm going to say 2010/'11, maybe.
16   Q.  At your gym at Pennridge?
17   A.  I believe, yes. I'm not sure.  I'd have to
18 check the schedule book.
19   Q.  And Faith Christian was playing Pennridge?
20   A.  They were playing in a tournament at our
21 school.
22   Q.  Was Pennridge in the tournament?
23   A.  Yes.
24   Q.  And this was before he was hired as a softball

---

David Babb                                    Nace vs. Pennridge School District
                          August 12, 2015

| Page 53 |
|---|

1   coach at Pennridge.
2      A.  Correct.
3      Q.  Did the tournament have a name?
4      A.  Tipoff Tournament.
5      Q.  And what month is it in?
6      A.  December.
7      Q.  Do you know who the coach of the FCA team in
8   that tournament was back in 2020 or '11?
9      A.  No.
10     Q.  And when you say Mr. Romig was handling the
11  scorebook, what does that mean? What was he doing?
12     A.  Doing stats for the team.  He had a scorebook
13  in his hand. He said he was doing stats.
14     Q.  Do you know if his daughter was on the team at
15  that time?
16     A.  I don't know for sure.
17     Q.  Do you know his daughter?
18     A.  No, I never met her.
19     Q.  Do you know the name Chelsea Romig? Just from
20  the deposition?
21     A.  Yeah, I guess.  I never met her.
22     Q.  And where was he sitting to do these stats?
23     A.  I saw him in the corner of the gym.
24     Q.  Not with the team?

| Page 54 |
|---|

1      A.  No.
2      Q.  Did you talk to him at that time?
3      A.  Yes.  I said hi, how are you doing.  He said
4   he was doing stats for the basketball.
5      Q.  And you had seen him doing this scorebook for
6   Faith Christian at the basketball tournament prior to
7   the time that you called him about becoming a softball
8   coach.
9      A.  Correct.
10     Q.  Correct.  But even though you had seen him
11  doing the scorebook for the basketball team at Faith
12  Christian, you didn't ask him any questions about Faith
13  Christian when you hired him, correct?
14     A.  Correct.
15     Q.  Okay. Were there any discussions with your
16  coaches and assistant coaches in 2011 -- or between
17  2011 and 2013 about texting students regarding
18  basketball-related activities?  You know, practice
19  change, game change, things of that nature.
20         MR. COX:  Object to the form. You may
21  answer.
22     A.  I'm sorry, what's the question again?
23     Q.  Yes.  Did you ever have any discussion with
24  your head coaches or assistant coaches about them

| Page 55 |
|---|

1   texting the athletes that played for their teams?
2      A.  Not that I can remember.  I know coaches have
3   used phones to text, say practice is off.
4      Q.  I guess my more specific question is, did you
5   as athletic director give your coaches or assistant
6   coaches any directions or instructions regarding the
7   number of texts they could send to their players, a
8   type of text they could send to their players, whether
9   it had to be basketball-related activity or could it be
10  personal activity?  Any direction with regard to
11  texting between coaches and students at all?
12     A.  Nothing that I can remember specifically.
13     Q.  All right.  Had there ever arisen an issue
14  prior to 2013 of some texting problem between coaches
15  or assistant coaches and players that you've had to get
16  involved in and handle?
17     A.  Uh-huh.
18         MR. COX:  You have to say yes.
19         THE WITNESS:  Yes.
20  BY MR. GROTH:
21     Q.  What kind of issue?
22     A.  We've had coaches send a parent or student a
23  text, and the parent or student would say, you know
24  what does this mean, or this makes me feel not part of

| Page 56 |
|---|

1   the team, or like I'm not working hard or something
2   like that.
3      Q.  Well, what was in the text that generated that
4   response? Was it a criticism of the player or --
5      A.  Sometimes there would be confusion.  Sometimes
6   there would be -- I'm trying to think of one
7   specifically, but we have had kids come to us, parents
8   come to us and say hey, I've received a text and I want
9   to talk about it.
10     Q.  I'm trying to get a handle on what kind of
11  issues or what type of information was in the text that
12  they needed to talk to the athletic director about.
13         What generated their concern to come to you
14  and say "I want to talk to you about this text to me or
15  my kid"?
16     A.  I'm trying to think.  We've had some where
17  they kind of critiqued them as a player.  Maybe they're
18  not working as hard as they thought they should and a
19  kid or a parent will say, you know, I wonder why that
20  was sent, you know, or feel that it's too hard on them.
21     Q.  So, there was actually criticism of the
22  player's performance by a coach or assistant coach that
23  was sent by text to the player or to the parent?
24     A.  Yes -- I don't know if it's criticism or

Appendix 0543

David Babb                                      Nace vs. Pennridge School District
                                August 12, 2015

---

Page 57

1  critiquing and they -- you know, the coaches meaning it
2  to be one way and a parent would see it or a kid would
3  see it another way.
4      Q.  Did the parent or student complain about the
5  form of the communication as opposed to the substance;
6  that is, why this is being texted to me instead of the
7  coach taking me aside and talking to me face-to-face?
8      A.  I don't know if they have ever said it that
9  exact way.  Some people like to be talked to
10  face-to-face.  Some people are fine with texts.  I
11  don't know that ever came up.
12      Q.  How many times did this come up before the
13  2013 season, softball season?
14      A.  I know we dealt with one coach.
15      Q.  Which coach?
16      A.  Field hockey.
17      Q.  Male or female?
18      A.  Female.
19      Q.  And what was the issue that you had to deal
20  with?
21      A.  Critiquing them as a player.
22      Q.  By text.
23      A.  Yes.
24      Q.  Anybody else?  Any other coaches or assistant

---

Page 58

1  coaches have an issue regarding texting?
2      A.  No, not that I can remember.
3      Q.  How did you handle that issue?
4      A.  Took it to the principal.
5      Q.  Why did you have to go to the principal -- let
6  me rephrase that.  Why did you decide to go to the
7  principal with that issue?
8      A.  I think actually the girl took it to the
9  principal and I was brought into it.
10      Q.  What was the resolution?
11      A.  I think there was a meeting with the coach and
12  there was a meeting with the athlete.
13      Q.  At the same time or separately?
14      A.  I believe they were both separate.
15      Q.  What was the resolution?
16      A.  They were able to work it out.  Each person's
17  viewpoint was taken, and that was the resolution.
18      Q.  Well, did you or Mr. Creeden give any
19  instructions to the coach regarding the issue of what
20  type of information should be communicated in a text?
21      A.  I'm not sure.  I mean, I'm not sure.
22      Q.  Did you give any instruction to the coach not
23  to critique players through texting?
24      A.  I've always tried to keep it simple.  I might

---

Page 59

1  have said that to them, you know:  If you're going to
2  communicate, keep it simple.
3      Q.  What does that mean?
4      A.  Practice is on, practice is off.
5      Q.  Okay.  Did you ever give any instructions to
6  your coaches as a group, head coaches and assistant
7  coaches, not to text anything of a personal nature to
8  any of the players?  And by "personal" I mean either
9  personal to the coach or personal to the player,
10  something totally unrelated to any sports activity.
11      A.  Not formally.
12      Q.  Formally or informally.
13      A.  No.
14      Q.  How did Mr. Romig perform as a coach during
15  the 2012/2013 softball season?
16      A.  He did well.  The team did well.  They had one
17  loss, I believe.
18      Q.  Did you do another evaluation of him?
19      A.  Paul did not.  I was still waiting for that.
20      Q.  Those are normally done over the summer?
21      A.  Usually.
22      Q.  Were there any issues that arose with Mr.
23  Romig's coaching performance during the spring 2013
24  softball season that you know of?

---

Page 60

1              MR. COX:  Object to the form.  You may
2  answer.
3      A.  No.
4      Q.  As of the end of that season did you know at
5  that time that Mr. Romig had coached at Faith Christian
6  Academy before going to Pennridge to coach?
7      A.  I don't believe so.  I'm not sure.  I can't
8  tell you.
9      Q.  Those PIAA or -- what is it, Suburban 1?
10      A.  PIAA meetings.
11      Q.  Yes, the PIAA meetings, were those generally
12  attended by Mr. Hollenbach?
13      A.  I've seen him at them, yes.
14      Q.  Before the end of the 2013 softball season at
15  Pennridge, did you have occasion to discuss Mr. Romig
16  with Mr. Hollenbach?
17      A.  Can you say it again?  I'm sorry.
18      Q.  Yes.  Prior to the end of the 2013 baseball
19  season, in May of 2013, did you have occasion to
20  discuss Mr. Romig with Russell Hollenbach of FCA?
21      A.  Yes.
22      Q.  When and where?
23      A.  At the PIAA meeting at Westover Country Club
24  in Norristown.

---

brusilow.com              brusilow + associates              215.772.1717

Appendix  0544

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

Page 61

1    Q.  When?
2    A.  It would have been in April of 2012.
3    Q.  That was during Mr. Romig's first season at
4  Pennridge.
5    A.  Correct.
6    Q.  And do you recall the circumstances of that
7  discussion? And what I'm talking about is, where you
8  had the discussion, who else, if anybody, was involved
9  in this discussion, was it just you and Mr. Hollenbach.
10   A.  Yes.
11   Q.  Tell me the circumstances of the discussions
12  first and I'll ask you about the actual discussion.
13   A.  Okay.  The meeting had ended.
14   Q.  All right.
15   A.  And we were all standing up and leaving, and I
16  went over and asked him. . .
17   Q.  Asked him what?
18   A.  Asked him what kind of basketball coach Eric
19  Romig was.
20   Q.  How did you know at that time?  Because I
21  thought up until that time you hadn't known that he
22  coached --
23   A.  Okay.
24   Q.  Hold on.  I thought you testified already that

Page 62

1  up to that time you hadn't known that he coached at all
2  at Faith Christian.
3    A.  Well, okay.  When I -- when he started
4  coaching softball for us, he said that he would be
5  interested in coaching basketball and the position was
6  open, and that's when I found out.  He gave me his
7  resume may and Faith was on there.
8    Q.  Romig gave you a resume.
9    A.  Right.
10   Q.  And when was that?
11   A.  That would have been the spring of 2012.
12   Q.  During the softball season at Pennridge.
13   A.  Correct.
14   Q.  Do you keep those resumes on file?
15   A.  I don't know if I have it.
16          MR. GROTH:  I'm going to make a request
17    for that document as well.
18          THE WITNESS:  I don't think I have it
19    because I would have looked. . .
20  BY MR. GROTH:
21   Q.  Mr. Romig did not give you a resume when you
22  hired him as a softball coach.
23   A.  Correct.
24   Q.  But he gave you a resume during the season

Page 63

1  because you asked him if he would be interested in
2  coaching basketball?
3    A.  He came to me.
4          MR. COX:  Objection to the form.  You
5  may answer.
6    A.  He came to me and wanted to coach basketball.
7    Q.  Oh, he knew there was a position open, that he
8  knew about?
9    A.  Right.
10   Q.  And that would have been for the fall and
11  winter of 2013?
12   A.  Yes, '12, '13.
13   Q.  12/13, okay.  That was a head coaching
14  position?
15   A.  Yes.
16   Q.  And that resume, you believe -- was it a typed
17  resume?
18   A.  Yes.
19   Q.  (Continuing) -- that resume, you believe,
20  included his coaching position at FCA for girls
21  basketball.
22   A.  Correct.
23   Q.  And do you recall, from reading that resume,
24  for what number of years he coached girls basketball

Page 64

1  there?
2    A.  I don't know.
3    Q.  Did Mr. Romig give you the resume at the same
4  time he said he was interested in the position?
5    A.  I believe he brought it to the interview.
6    Q.  There was an actual interview.
7    A.  Yes.
8    Q.  And that interview included you and he and Mr.
9  Creeden?
10   A.  Correct.
11   Q.  Was the interview that you had with Mr. Romig
12  and Mr. Creeden before you saw Russell Hollenbach at
13  the PIAA meeting and talked about Romig?
14   A.  Yes.
15   Q.  Why was Mr. Creeden involved in that
16  interview?
17   A.  Because it was a head-coach position.
18   Q.  He participates in all the interviews of head
19  coaches, head-coach applicants?
20   A.  Yes.
21   Q.  An did you ask Mr. Romig at that time about
22  his performance as a head coach at FCA?
23   A.  Yes.
24   Q.  What did he say?

16  (Pages 61 to 64)

Appendix 0545

David Babb                          Nace vs. Pennridge School District
                        August 12, 2015

---

Page 65

1      A.  That he coached basketball there.  He left.
2  That's pretty much it.
3      Q.  It was a short interview.
4      A.  We talked about our program and the aspects of
5  it.
6      Q.  I'm really trying to get what information you
7  requested from him about his performance as a coach at
8  Faith Christian Academy.
9      A.  I mean, he might have said how the team did.
10 I'm not sure.  I mean, that's basically what we talked
11 about.
12     Q.  Did he tell you why he left?
13     A.  He said a difference of opinion.
14     Q.  And what did you do to find out exactly what
15 that difference of opinion involved?
16     A.  I talked to Mr. Hollenbach.
17     Q.  What did you do at the interview with Mr.
18 Romig when he said "I left because of a difference of
19 opinion"?  Did you get any details about what the
20 difference of opinion involved?
21     A.  Not that I remember.
22     Q.  You didn't ask him any questions about that.
23     A.  No.
24     Q.  So, when somebody leaves a -- strike that.

---

Page 66

1  When Mr. Romig said "I left as a coach there due to a
2  difference of opinion," you didn't ask who he had a
3  difference of opinion with?
4      A.  I think he said difference of philosophy.
5      Q.  Did you ask him who he had a difference of
6  philosophy with?
7      A.  No.
8      Q.  He didn't tell that he left for health
9  reasons, correct?
10     A.  It was hard to say.  I mean, we talk about his
11 heart.  I believe at one point he told me he left
12 because of heart reasons.
13     Q.  Did he tell you that, or is that something
14 that you're maybe confusing with something Ms. Kalazs
15 told you?
16         MR. COX:  Object to the form.  You may
17 answer.
18     A.  No, he told me he had heart issues.
19     Q.  In that interview.
20     A.  We talked about the heart, I believe, in that
21 interview.
22     Q.  I think earlier you might have said that you
23 talked about heart issues even before you hired him as
24 softball coach.

---

Page 67

1      A.  Correct.
2      Q.  So, you knew about that even before this
3  interview.
4      A.  Correct.
5      Q.  Did you ask Mr. Romig in that interview any
6  specific questions as to whether or not he had any
7  problems or issues with the athletic director or
8  parents or students or teachers or anybody at FCA
9  during his coaching activities there?
10     A.  I can't say for sure.
11     Q.  Did he tell you that he had problems with
12 parents or teachers or the athletic director or the
13 administration while he was a basketball coach there?
14     A.  I can't say for sure.
15     Q.  You don't recall him volunteering that
16 information to you.
17     A.  No.
18     Q.  Okay.  At that interview -- and again, when do
19 you recall that interview, the date of that interview,
20 approximate date of that interview?
21     A.  It would by in the spring of that 2012 year.
22 I don't know the date.
23     Q.  When was the -- you don't recall the date.  Do
24 you recall the month of the interview?

---

Page 68

1          MR. COX:  Object to the form.  The
2  interview or the. . .
3          MR. GROTH:  The interview.
4          MR. COX:  You may answer.
5          THE WITNESS:  I'm not sure.
6  BY MR. GROTH:
7      Q.  But the Westover PIAA meeting was in April of
8  2002.
9          MR. COX:  Objection.  2012.
10         MR. GROTH:  2012, I'm sorry.  My bad
11   handwriting.
12 BY MR. GROTH:
13     Q.  But this interview happened before that,
14 correct?
15     A.  Correct.
16     Q.  Okay.  So, going back to the circumstances of
17 your conversation with Mr. Hollenbach, you saw him at
18 the meeting after the meeting was over, and you had a
19 discussion with him which included some discussion of
20 Mr. Romig, correct?
21     A.  Correct.
22     Q.  Did you bring up Romig or did he bring up
23 Romig?
24     A.  I asked him what kind of basketball coach Eric

---

David Babb                                    Nace vs. Pennridge School District
                              August 12, 2015

---

**Page 69**

1  Romig was.
2  Q.  Was anybody else involved in the conversation?
3  A.  No.
4  Q.  Just the two of you alone.
5  A.  Yes.  I mean, there were other people in the
6  room, but we were the only ones talking.
7  Q.  You weren't talking to anybody and nobody was
8  in your group listening to your conversation, correct?
9  A.  Correct.
10  Q.  And you asked Mr. Hollenbach the question what
11  kind of basketball coach was he.
12  A.  Right.
13  Q.  What did he say?
14  A.  He Sid he was a good coach. I might have ask
15  asked him -- I can't tell you exactly, but I think when
16  I asked him does he know basketball -- I knew he was a
17  good coach from softball. I wanted to know what kind of
18  basketball coach he was.
19  Q.  So, he gave him a good recommendation as a
20  coach?
21  A.  What?
22  Q.  So, Mr. Hollenbach said he was a good coach.
23  A.  Said he knew basketball.
24  Q.  And what else did Mr. Hollenbach tell you

**Page 70**

1  about Mr. Romig?
2  A.  I said, you know, I guess he left because of
3  heart conditions, and he didn't say yes or no. He
4  didn't say why he left, didn't say if he resigned or
5  fired.
6  Q.  Did you ask him any of those questions?
7  A.  No, I didn't ask him.
8  Q.  You didn't ask him why he left?
9  A.  No.
10  Q.  You didn't ask him if he resigned?
11  A.  I said -- I think I said to him "I heard he
12  left because of heart conditions," and you know, there
13  was no response back from that.
14  Q.  Okay.
15  A.  He said, you know, "He's coached softball for
16  me.  He's doing a great job now."  He said he had an
17  issue with him texting.
18  Q.  What did he say the issue was?
19  A.  He did not say.
20  Q.  Did you ask him?
21  A.  No.
22  Q.  So, you didn't know if it was an issue about
23  texting with parents, texting with students, texting
24  with other teachers or coaches?  Nothing.  You did not

**Page 71**

1  ask a single question?
2  A.  No.
3  Q.  How did that issue come up? When in the
4  conversation did that fact come up?
5  A.  I think Russ Hollenbach said, you know, it's a
6  difficult job and he kind of put that in there, that
7  there was an issue with texting.
8  Q.  Did he tell you if the texting involved a
9  parent or a student or some other specific individual?
10  A.  No.
11  Q.  Did you tell him that you had already
12  interviewed Mr. Romig for the job and he stated to you
13  that he left FCA because he had some difference of
14  opinion or difference of philosophy with somebody at
15  FCA?
16          MR. KEMETHER:  Object to the form.
17  A.  No.
18  Q.  But Mr. Romig had already told you that in
19  your interview?
20  A.  Yes.
21  Q.  And you didn't ask Mr. Hollenbach about that.
22  A.  No.
23  Q.  What else did you discuss with Mr. Hollenbach
24  about Mr. Romig?

**Page 72**

1  A.  That's pretty much it.  It was very brief.
2  Q.  Did you document that conversation at all?
3  A.  No.
4  Q.  You didn't make any notes of it or put
5  something in Mr. Romig's personnel file or anything
6  like that?
7  A.  No.
8  Q.  Would you consider this conversation that you
9  had with Mr. Hollenbach checking references for an
10  applicant -- namely, Mr. Romig -- who was applying for
11  a head coaching job?
12  A.  Yes, I take it as I was trying to find out
13  what he knew about basketball.  I knew him as a
14  softball coach and I was trying to find out, you know,
15  did he know the game of basketball, is he able to coach
16  that.
17  Q.  What I'm asking you is, isn't this the type of
18  thing that the employment hiring policies of Pennridge
19  say you're supposed to do, check with former employers
20  and check references and that type of thing?  Correct?
21  A.  Correct.
22  Q.  That's why you went up to him, to ask him
23  these questions, correct?
24  A.  (No response)

18 (Pages 69 to 72)

Appendix 0547

David Babb                                    Nace vs. Pennridge School District
                                              August 12, 2015

---

**Page 73**

1    Q.  Yes?
2    A.  Yes.
3    Q.  Did you, after having this conversation with
4  Mr. Hollenbach -- strike that.  As of the time that you
5  had the conversation with Mr. Hollenbach, had you
6  offered the job to Mr. Romig, the basketball job?
7    A.  No.
8    Q.  After you had the discussion with Mr.
9  Hollenbach, did you go back to Mr. Creeden and discuss
10 with him the information that you had learned from Mr.
11 Hollenbach?
12   A.  Yes.
13   Q.  How soon after having that discussion with Mr.
14 Hollenbach did you talk to Mr. Creeden?
15   A.  I believe it was that day. I'm not positive.
16   Q.  Where did you talk to Mr. Creeden about this
17 issue?
18   A.  In his conference room.
19   Q.  What did you tell him?
20   A.  That I had talked to Russ Hollenbach and that
21 he said he knows basketball and he's a good coach, and
22 that there was an issue with texting.
23   Q.  Did Mr. Creeden ask you any questions about
24 what the issue was?

---

**Page 74**

1    A.  Yes.  He asked if, you know, I knew anything
2  more about it.
3    Q.  And?
4    A.  And I told him no.  He asked me if I ever had
5  an issue with him coaching at Quakertown, and I said
6  no.
7    Q.  Did Mr. Creeden ask you to check back with Mr.
8  Hollenbach or to check with anybody else at Faith
9  Christian, including the principal or headmaster,
10 regarding exactly what the nature of the texting issue
11 was while Mr. Romig was a coach at Quakertown?
12   A.  No.
13       MR. COX:  Object to the form. You mean
14     at Faith Christian?
15       MR. GROTH:  I'm sorry, at Faith
16     Christian. Let me restate the question.
17 BY MR. GROTH:
18   Q.  Did Mr. Creeden ask you to contact Mr.
19 Hollenbach again or to contact anyone else in the
20 administration of Faith Christian to find out exactly
21 what the texting issue was?
22   A.  No.
23   Q.  Was Mr. Romig offered the position?
24   A.  For basketball?

---

**Page 75**

1    Q.  Yes.
2    A.  No.
3    Q.  Why not?
4    A.  We had a better candidate.
5    Q.  As of the time of that conversation with Mr.
6  Hollenbach in the spring of 2012, you had known him for
7  eighteen years?
8    A.  I had known Hollenbach since my Plumstead
9  Christian days.
10   Q.  1994.
11   A.  Right.
12   Q.  So, you had known him for eighteen years.
13   A.  Yes.
14   Q.  If you have an applicant for a job, just in
15 general, for a coaching job that has listed references
16 as prior coaching employment at different schools, was
17 it your custom or practice to contact some of the prior
18 coaches or athletic directors that that applicant
19 worked for to find out information about them?
20   A.  Yes.
21   Q.  And in those discussions do the coaches
22 sometimes advise you of problems or concerns with a
23 coach's performance at the previous school?
24   A.  Yes.

---

**Page 76**

1    Q.  And again in general, when you were informed
2  of a prior issue or problem or a concern about an
3  applicant's coaching at a previous school, do you try
4  to get as much information about that before you make
5  decision on the applicant yourself?
6        MR. COX:  Object to the form.  You can
7  answer.
8    A.  Yes.
9    Q.  But you didn't do it in this case with Mr.
10 Hollenbach when Mr. -- with Mr. Romig when Mr.
11 Hollenbach told you that there was an issue.
12       MR. COX:  Object to the form.  You may
13 answer.
14   Q.  Is that correct?
15   A.  What was the question again?
16   Q.  You didn't do any questioning or any other
17 investigation to find out more about the texting issue
18 with regard to Mr. Romig, correct?
19   A.  No.
20   Q.  How did you learn about Mr. Romig's arrest?
21   A.  The superintendent called me up to her office
22 and she told me.
23   Q.  And that was whom?
24   A.  Dr. Rattigsn.

---

19 (Pages 73 to 76)

Appendix 0548

David Babb

Nace vs. Pennridge School District
August 12, 2015

Page 77

1    Q.  She was the superintendent in October, as of
2  October 1st, 2013?
3    A.  Yes.
4    Q.  Did she ask you any questions about Mr. Romig?
5    A.  Yes.
6    Q.  What did she ask you?
7    A.  How I knew him, what kind of coach he was,
8  "did you have any signs of this."
9    Q.  Do you know how she became aware of the
10 charges against Mr. Romig?
11   A.  I believe the police contacted her.
12   Q.  Okay.  And in your conversation with Ms.
13 Rattigan, did she tell you any information about what
14 the police had told her about Mr. Romig's involvement
15 with Elizabeth Nace?
16   A.  I believe she told me that, you know, there
17 was a sexual relationship.
18   Q.  Anything else?
19   A.  She told me to keep it confidential.
20   Q.  She gave you Elizabeth Nace's name, right?
21   A.  She did.
22   Q.  What else did she tell you about what she had
23 been informed was the relationship between Mr. Romig
24 and Mr. Nace other than it was a sexual relationship?

Page 78

1    A.  She pretty much described it as, you know the
2  girl had fallen for this coach.  That's pretty much it.
3    Q.  Did she state to you whether or not she had
4  been given any information from the detectives that
5  were investigating the case that the relationship
6  started with texting between Mr. Romig and Ms. Nace
7  that turned into sexually-based texting between the two
8  of them and led into an eventual physical relationship?
9    A.  I'm not sure at that time.
10   Q.  Okay.  Did you come to find that out at some
11 point?
12   A.  Yes.
13   Q.  How?
14   A.  I believe the police.
15   Q.  The police --
16   A.  Detectives.
17   Q.  Okay. You heard Mr. Creeden testify yesterday
18 regarding an interview that took place involving you,
19 Mr. Creeden, Detective Kemmerer and maybe another
20 detective. Is that correct?
21   A.  Yes.  I think there were two detectives.
22   Q.  Two total.
23   A.  Yes.
24   Q.  Do you remember the other detective's name?

Page 79

1    A.  I don't. The name you said, Slattery, sounds
2  familiar, but. . .
3    Q.  Where was that interview conducted?
4    A.  In the conference room of the high school.
5    Q.  Was it taped?
6    A.  Yes.
7    Q.  Did you and Mr. Creeden both answer questions
8  on the tape?
9    A.  Yes.
10   Q.  Was Detective Kemmerer doing most of the
11 questioning?
12   A.  I think it was a little bit of both.
13   Q.  You believe at that interview that the
14 detectives gave you information about how this
15 relationship between Eric Romig and his player,
16 Elizabeth Nace, began?
17   A.  They said how their contact began?
18   Q.  Yes.
19   A.  They gave you information.
20   Q.  Yes.
21   Q.  And did they give you information that it
22 began with texting of a personal nature from Eric Romig
23 to Elizabeth Nace?
24   A.  I'm not sure if they said who it was -- who

Page 80

1  texted who first.
2    Q.  But you gathered from them that there were
3  texts between the two of them going back that had
4  nothing to do with his coaching activities or her
5  playing activities.  It had to did with personal
6  issues.
7    A.  I'm not sure if they said exactly -- I know
8  there was sexting involved.  I'm not sure -- when you
9  say "personal issues," I'm not sure what. . .
10   Q.  When I say "personal," I am referring to
11 anything other than sports-related issues.
12   A.  The police didn't really say what the -- other
13 than sexting.
14   Q.  And at some point did you make statements or
15 Mr. Creeden make statements to the detectives about the
16 information that Mr. Hollenbach had given you regarding
17 a texting issue with Mr. Romig at Faith Christian
18 Academy?
19        MR. COX:  Objection to the form. You
20 can answer.
21   A.  Yes.
22   Q.  Did they ask you specifically about that, or
23 did you volunteer that information?
24   A.  I don't know.

20 (Pages 77 to 80)

Appendix 0549

David Babb                                    Nace vs. Pennridge School District
                          August 12, 2015

---

Page 81

1       Q.  Did they tell you whether or not they had
2   interviewed anybody at Faith Christian Academy before
3   they interviewed you?
4       A.  I don't know.
5       Q.  Did they say they interviewed the principal
6   there or the athletic director at Faith Christian?
7       A.  I don't know.
8       Q.  Okay.  So, do you have any recollection at all
9   of how the subject of the Hollenbach conversation with
10  you about Mr. Romig came up in the interview?
11      A.  I think they asked, you know, if I had ever
12  had any contact with regard to Eric Romig, you know,
13  with Russ Hollenbach.
14      Q.  They asked you that question.
15      A.  I don't know how it actually came up.  You
16  know, I don't know if this is something I just told
17  them what my experiences were or if they point-blank
18  asked me a question.
19      Q.  Okay. What did you tell the detectives about
20  your conversation with Mr. Hollenbach in the spring of
21  2012 involving Mr. Romig?
22      A.  That I asked him what kind of basketball coach
23  he was; you know, that he had done a great job at
24  softball here and that there was an issue -- he said

Page 82

1   there was an issue with texting.
2       Q.  You told the detectives that Hollenbach said
3   that.
4       A.  Yes.
5       Q.  Did you give him any more details with the
6   discussion you had with Mr. Hollenbach about texting,
7   Mr. Romig's texting?
8       A.  I'm sorry, say that again?
9       Q.  Yes: Did you give him any more details about
10  what Mr. Hollenbach told you about Mr. Romig's texting
11  issue at Faith Christian?
12          MR. KEMETHER:  Object to the form.
13          MR. SANTARONE:  Object to the form.
14      A.  No.
15      Q.  Just that there was a texting issue.
16      A.  There was a texting issue.
17      Q.  Did you state to the detectives that you
18  thought that the issue had to do with texting between
19  Mr. Romig and parents of the athletes that he coached?
20      A.  No.
21      Q.  Did you have any information that the texting
22  issue was between Mr. Romig and parents?
23      A.  No, I didn't know who it was with.
24      Q.  Okay.

---

Page 83

1           THE VIDEOGRAPHER:  Going off the video
2   record. This is the end of disc one.  The time is
3   11:53 a.m.
4           (A brief recess was taken)
5           THE VIDEOGRAPHER:  Stand by.  Back on
6   the video record. This is the start of tape two.
7   The time is 12:05 p.m.
8   BY MR. GROTH:
9       Q.  Mr. Babb, when you told Mr. Creeden that Mr.
10  Hollenbach had informed you of a texting issue with Mr.
11  Romig while he was at FCA, did Mr. Creeden make any
12  comments to you about what, if anything, you should do
13  about it or he should do about it?
14      A.  Keep an eye on it.
15      Q.  And what did you understand that to mean?
16      A.  You know, if I had heard anything of that
17  nature, to let him know; to watch, see if you see
18  anything.
19      Q.  And after you had that discussion with Mr.
20  Hollenbach, did you go to Mr. Romig and ask Mr. Romig
21  what the texting issue was that he had at FCA?
22      A.  No.
23      Q.  Why not?
24      A.  To be honest, I thought it was not an issue of

Page 84

1   sexting. I thought it was just, you know, an issue
2   between a parent or a kid where it was not sexting. I
3   think if it would have been, Russ Hollenbach would have
4   let me know.  He would have said, hey, this is an issue
5   that disqualifies him from coaching.
6       Q.  Well, you found out later on that there were
7   reports that Mr. Romig was sending sexually -- an
8   allegation that Mr. Romig was sending sexually-based
9   texts to a female student at FCA, correct?
10      A.  Uh-huh.
11      Q.  You found that out.
12      A.  Yes, in the deposition.
13      Q.  In the deposition. That's the first time you
14  found out?
15      A.  I heard people talking about it, but that was
16  the first time I've ever seen it in writing.
17      Q.  But as of the time that you decided not to
18  discuss what Mr. Hollenbach had told you about texting
19  with Mr. Romig, you didn't have any concrete
20  information on exactly what the texting issue was.
21          MR. COX:  Object to the form.  You can
22  answer.
23      A.  Can you repeat that again? I'm sorry.
24      Q.  Yes. After you spoke to Mr. Hollenbach and he

---

Appendix 0550

David Babb                          Nace  vs.  Pennridge  School  District
                          August 12, 2015

---

Page 85

1  told you there was a texting issue with Mr. Romig at
2  FCA, and you decided not to go to Mr. Romig and ask
3  specifics, for specifics, about what the texting issue
4  was, you didn't have any specifics at all about what
5  the texting issue was.
6              MR. COX:  Objection as to form.  You.
7  may answer.
8      A.  Correct.
9      Q.  Including whether or not it was sexting and
10  not texting.  You didn't know that, either, at the
11  time.
12              MR. COX:  Objection.  You may answer.
13      A.  Correct.
14      Q.  Okay.  Did that issue ever come up with Mr.
15  Romig at all -- strike that.
16      Did you have any conversation with Mr. Romig
17  before the end of the 2013 softball season about any
18  texting issue that he had at FCA?
19      A.  No.
20      Q.  When you interviewed and Mr. Creeden
21  interviewed Mr. Romig for the basketball position in
22  the spring of -- did you say '12 or '13?
23      A.  It would have been '12.
24      Q.  Not '13.

---

Page 86

1      A.  '12.
2      Q.  Okay.  And the position was open for. . .
3      A.  Girls basketball head coach.
4      Q.  In the fall of 2013?
5      A.  For the fall of '12/'13.
6      Q.  Fall of '12/'13.  Did you specifically or did
7  Mr. Creeden specifically ask Mr. Romig if he left FCA
8  on bad terms?
9      A.  I don't recall that.
10      Q.  Do you recall reading in Mr. Romig's
11  deposition transcript that he stated -- he testified
12  that you asked or Mr. Creeden asked him if he left FCA
13  on bad terms, and he said no?
14              MR. COX:  Object to the form.  You may
15  answer.
16      A.  I don't recall reading that in the deposition.
17  If it was there, I. . .
18      Q.  I'm just going to read you a couple answers
19  and questions from his transcript, Mr. Romig's
20  transcript, at page 211 and 212.
21      You give an answer on page 211 --
22              MR. COX:  He gives his answer, Mr.
23  Romig.
24              MR. GROTH:  That Mr. Romig gives an

---

Page 87

1      answer.  I'm sorry.
2  BY MR. GROTH:
3      Q.       "Q: "When I interviewed, I believed
4  it was during the summer of 2012.  I had interviewed at
5  Pennridge for the basketball job that came open, and
6  they asked me if I left Faith on bad terms, and I said
7  no.
8              "Q:  Was that boys basketball or girls?
9              "A:  Girls.
10              "Q:  Girls at Pennridge?
11              "A:  I think so, yes.
12              "Q:  And that was the summer of 2000"
13  and I didn't finish the question, and he
14  answered "I'm almost certain it was the summer of
15  2013.  It would be near the end of the school
16  year, maybe April or May.
17              "Q:  And they asked you, when you
18  interviewed for the boys job, whether or not you
19  had any problems or issues with FCA.
20              "A:  They asked me if I ever coached
21  basketball before and I told them I coached
22  basketball at FCA."  And it says "she."  I think it
23  means "he asked if I left FCA on bad terms, and I
24  said no."

---

Page 88

1      If you want to read those two to yourself, you're
2  welcome to do that.
3      A.  I read it.
4      Q.  Okay.  Now, does reading that testimony from
5  Mr. Romig change your recollection of when that
6  interview took place, whether it was 2012 or 2013?
7      A.  I still believe it was 2012.
8      Q.  Okay.  And he indicates in that testimony that
9  he was specifically asked whether or not he left FCA on
10  bad terms and said no to two separate questions of
11  mine.
12      Does that refresh your recollection at all as
13  to whether or not you or Mr. Creeden asked him whether
14  or not he left FCA on bad terms?
15      A.  I did not ask that question.  Mr. Creeden
16  might have.  I'm not sure.
17      Q.  You're not sure if he did or not.
18      A.  Right.
19      Q.  Okay.  Would there still be a record of the
20  posting of that position being available in the HR
21  department or some records department at Pennridge
22  going back to 2012 or 2013?
23      A.  There may.
24              MR. GROTH:  I'm going to request a copy

---

22 (Pages 85 to 88)

Appendix 0551

David Babb                              Nace vs. Pennridge School District
                        August 12, 2015

---

Page 89

1      of the posting for that position, whether it was
2      2012 or '13.
3   BY MR. GROTH:
4      Q.   Going back to your interview with the
5   detectives along with Mr. Creeden, do you recall
6   whether you or Mr. Creeden told the detectives that
7   after you received the information regarding the
8   texting issue at FCA from Mr. Hollenbach, Mr. Creeden
9   said that "We should take a let's-keep-an-eye-on-it
10  strategy"?
11         Do you recall you or Mr. Creeden saying that
12  to the detectives?
13     A.   Yes.
14     Q.   And who said that, you or Mr. Creeden?
15     A.   Myself.
16     Q.   And you were basically quoting Mr. Creeden
17  from your meeting with him after you met with
18  Hollenbach, correct?
19     A.   Yes.
20     Q.   After you met with the detectives or at any
21  time after Mr. Hollenbach -- strike that.
22         After Mr. Romig was arrested on October 1st,
23  2013, did you ever have any discussion about Mr. Romig
24  with Mr. Hollenbach again?

---

Page 90

1      A.   No.
2      Q.   Had you seen Mr. Hollenbach since October 1st
3   of 2013 at any conferences or any other games or sports
4   activities?
5      A.   Not that I can recall.  We might have been at
6   a meeting together but, you know, we didn't see each
7   other after that, not that I can remember.
8      Q.   You never attempted to go up to Mr. Hollenbach
9   at any of these meetings or sports activities and say
10  to him, "Hey, you told me there was a texting issue.
11  Why didn't you tell me what the issue was?"
12     A.   No.
13     Q.   Nothing like that?
14     A.   No.
15     Q.   When you were the athletic director at
16  Quakertown, were the coaches and assistant coaches
17  asked to sign a document, acknowledgment form, that
18  said that they had received the written published
19  policies at Quakertown on drug-free policy and sexual
20  harassment policy?
21     A.   I can't remember.
22     Q.   Was there any such acknowledgment or written
23  form that had to be signed by the coaches or assistant
24  coaches at Pennridge, stating that they had received

---

Page 91

1   copies of and reviewed the sexual harassment policies
2   of Pennridge?
3      A.   I do not know.
4      Q.   You don't know whether that was ever required?
5      A.   No.
6      Q.   Is that because you would think that would be
7   an HR function and not yours?
8      A.   HR, right.
9      Q.   Have you ever seen such a form?
10     A.   I don't know.  I don't know.
11     Q.   Did you ever sign a form?
12     A.   I may have.  It's a while ago and I don't
13  remember doing it.
14     Q.   Did you ever have any other interviews, any
15  follow-up interviews, with the detectives other than
16  the one that we've been discussing?
17     A.   No.
18     Q.   You heard Mr. Creeden's testimony yesterday
19  about he thought that there may have been some
20  discussion about sexual harassment policies and other
21  school policies at Pennridge when a Ms. Feola, I
22  believe, was the head of HR, which he thought was in
23  the mid 2000s.
24         Do you recall hearing that testimony?

---

Page 92

1      A.   Yes.
2      Q.   Were there any discussions of that sort
3   between the HR department and the coaches or assistant
4   coaches with regard to any of the policies at
5   Pennridge, including the sexual harassment policy,
6   since you've been the athletic director there in 2009?
7      A.   Not that I know of.
8      Q.   Has Mr. Scarpantonio been the director of HR
9   since you've been the athletic director?
10     A.   Yes.
11     Q.   Have you ever talked to him about getting some
12  training for coaches or assistant coaches on the issues
13  of drug-free policy or harassment policy or sexual
14  harassment policy?
15     A.   Not that I can remember.
16     Q.   Have there ever been any complaints or
17  accusations or investigations of sexual harassment by
18  any coaches other than Mr. Romig at Pennridge while you
19  were the athletic director at Pennridge?
20     A.   Not that I know of the.
21     Q.   And by complaints or accusations, I don't mean
22  that criminal charges or whatever were brought. I mean
23  any athlete coming up to any administration official at
24  Pennridge, including yourself as athletic director, and

---

23 (Pages 89 to 92)

Appendix 0552

David Babb                                    Nace vs. Pennridge School District
                              August 12, 2015

**Page 93**

1  making some complaint or accusation about a coach or an
2  assistant coach.
3          MR. COX:  Object to the form.  You may
4  answer.
5      A.  Not that I know of.
6      Q.  What is your understanding of who the person
7  is at Pennridge who you should report such complaints
8  or accusations of sexual harassment to if they are made
9  by a student?
10     A.  Well, I need to report to my superior.
11     Q.  Who is?
12     A.  The principal.
13     Q.  And that was true ever since 2009, correct?
14     A.  Yes.  I mean -- yes.
15     Q.  So, back in 2012 or '13 it would be Mr.
16  Creeden?
17     A.  Right.
18     Q.  After the arrest of Mr. Romig became known,
19  did you have any discussion with Paul Koehler regarding
20  any knowledge that he may have had about Mr. Romig's
21  relationship with Elizabeth Nace?
22     A.  Yes.
23     Q.  When did you have that discussion?
24     A.  Right after I talked with Dr. Rattigan, when

**Page 94**

1  she informed me.
2      Q.  And what was the discussion between you and
3  Mr. Koehler?
4      A.  Just asked him if he had seen anything, knew
5  of anything, of any signs.
6      Q.  And what did he say?
7      A.  Completely shocked.
8      Q.  When Russell Hollenbach told you that there
9  was a texting issue with Mr. Romig at FCA and you came
10  back and told the principal, Mr. Creeden, about that
11  conversation, did you also tell Coach Koehler?
12     A.  No.
13     Q.  Coach Koehler was Mr. Romig's direct
14  supervisor?
15     A.  He does the evaluations for him.
16     Q.  Okay.  If Mr. Romig needs direction or
17  instruction about something, or to be told how to do
18  something and when to do something, whatever, would he
19  normally get those instructions from the head coach,
20  Mr. Koehler, or from you?
21          MR. COX:  Object to the form.  You may
22  answer.
23     A.  It would depend on the issue.
24     Q.  Is there some reason, after Mr. Creeden told

**Page 95**

1  you that you should take a let's-keep-an-eye-on-it
2  strategy with regard to the texting issue that you were
3  informed about by Mr. Hollenbach, did you not bring Mr.
4  Koehler into that loop and ask him to keep an eye on
5  it?
6          MR. COX:  Object to the form.  You can
7  answer.
8      A.  It was just the two of us were going to do
9  that.
10     Q.  So, you did not inform Mr. Koehler about
11  anything.
12     A.  Correct.
13     Q.  Did you ever receive any information during
14  the time of Mr. Romig's coaching at Pennridge for the
15  2012 and the 2013 softball seasons that there was
16  discussion among the women players about what coach or
17  teacher they were attracted to or interested in or
18  wanted to sleep with, anything of that nature
19  whatsoever?
20     A.  No.
21     Q.  Do you recall reading that in Mr. Romig's
22  deposition transcript?
23     A.  Yes.
24     Q.  If he, in fact, heard those discussions, were

**Page 96**

1  those discussions something he should have reported to
2  you?
3          MR. COX:  Objection to the form.  You
4  may answer.
5      A.  Yes.
6      Q.  Do you recall Mr. Romig in his deposition
7  saying that he did discuss that issue of the women
8  players talking about coaches and teachers and other
9  people that they were attracted to at the school, that
10  he did discuss that with other assistant coaches on the
11  varsity teams, including LeeAnn Kramer and Tyler
12  Penhallow?
13     A.  I think that was in a deposition, yes.
14     Q.  If he, in fact, did do that, should LeeAnn
15  Kramer or Tyler Penhallow have reported that to you?
16     A.  Yes.
17     Q.  Did they?
18     A.  No.
19     Q.  Was reading about that issue in Mr. Romig's
20  deposition transcript the first you heard of that
21  issue?
22     A.  Yes.
23     Q.  At any time did you ever learn of the actual
24  details of Mr. Romig's leaving his coaching position at

24 (Pages 93 to 96)

Appendix 0553

David Babb                                    Nace vs. Pennridge School District
                            August 12, 2015

|  | Page 97 |
| --- | --- |

1  FCA?
2      A.  No. I mean, the deposition, I think, said he's
3  resigned.  That's what I learned.
4      Q.  Other than from getting information from Mr.
5  Romig's deposition, you never got any information from
6  anybody else?
7      A.  No.
8          MR. GROTH:  I have no further
9      questions.  Thank you.
10          (EXAMINATION)
11  BY MR. KEMETHER:
12      Q.  Again, I represent Mr. Hollenback, and I have
13  a couple of questions for you.  I just want to make
14  sure I understand your testimony.
15          First, do I understand correctly that as of
16  the time of Mr. Romig's arrest in October of 2013, no
17  one had ever told you that Mr. Romig had been accused
18  of either sexual abuse or sexual harassment of any
19  students at Faith Christian Academy while he had been a
20  coach there?
21      A.  No one had told me of any sexual abuse.
22      Q.  Okay.  And I think you testified that during
23  the interview for the basketball position at Pennridge,
24  there was a discussion with Mr. Romig about his

|  | Page 98 |
| --- | --- |

1  coaching basketball at Faith Christian Academy, and
2  that Mr. Romig said something to you about a difference
3  of opinion or a difference of philosophy that he
4  had there.
5      A.  Correct.
6      Q.  Do I understand correctly that neither you nor
7  anyone else at Pennridge followed up on that with
8  anyone at Faith Christian Academy?
9      A.  No, we did not follow up.
10          MR. KEMETHER:  Those are all the
11      questions I have.  Thank you.
12          MS. CONNOR:  No questions.  Thank you.
13          MR. SANTARONE:  I just have a couple
14      follow-ups.
15          (EXAMINATION)
16  BY MR. SANTARONE:
17      Q.  Mr. Babb, at the time that you were
18  interviewed by the police, had Mr. Romig already been
19  arrested?
20      A.  Yes.
21      Q.  Had there been any articles that appeared in
22  the newspaper about the arrest before you were
23  interviewed?
24      A.  I don't know for sure.

|  | Page 99 |
| --- | --- |

1      Q.  Other than when you spoke to Mr. Creeden, was
2  speaking with detectives the first time that you had
3  raised this issue about what you say you and Mr.
4  Hollenbach spoke about at the PIAA meeting?
5      A.  Well, that was the first time it was brought
6  to the police's attention.
7      Q.  Okay.
8      A.  You know, I told Tom before that, Tom Creeden.
9      Q.  Right, and that's the meeting where you say
10  that you and Creeden were in a room and Creeden says
11  keep an eye on it?
12      A.  Right.
13      Q.  Other than those two times -- other than that
14  one time, had you told anybody else that story before
15  you spoke with the detectives?
16      A.  No.
17      Q.  And you heard Mr. Creeden say yesterday that
18  he doesn't remember that ever happening, correct?
19      A.  Correct.
20      Q.  Outside the presence of your counsel, have you
21  and Mr. Creeden discussed that difference that you have
22  on that conversation? And I don't want to know anything
23  you talked about in front of your attorney.
24      A.  Yes, he's told me he doesn't remember it.

|  | Page 100 |
| --- | --- |

1      Q.  Okay.
2          MR. SANTARONE:  That's all I have.
3      Thank you.
4          MR. GROTH:  No other questions.  Thank
5      you very much, Mr. Babb.
6          THE WITNESS:  Thank you.
7          THE VIDEOGRAPHER:  This concludes the
8      video deposition.  We're going off the record at
9      12:32 p.m.
10          (The deposition was concluded at 12:32
11      p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

                                    25 (Pages 97 to 100)

Appendix 0554

David Babb                          Nace vs. Pennridge School District
                          August 12, 2015

Page 101

INDEX

WITNESS:  DAVID BABB

By Mr. Groth:                    Page 5
By Mr. Kemether:                 Page 97
By Mr. Santarone:                Page 98

EXHIBITS
(None marked at this time)

Page 102

SIGNATURE PAGE

------

I hereby acknowledge that I have read the aforegoing transcript, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

------

SIGNATURE:        _____

DATE:           _____

Page 103

ERRATA SHEET

------

PAGE     LINE          CORRECTION

Page 104

CERTIFICATION

------

I hereby certify that the testimony and the proceedings in the aforegoing matter are contained fully and accurately in the stenographic notes taken by me and that the copy is a true and correct transcript of the same.

_____
Lance A. Brusilow
Registered Professional Reporter
Certified Realtime Reporter

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of

the certifying shorthand reporter.

------

26 (Pages 101 to 104)

Appendix 0555

Thomas Creeden                              Nace vs. Pennridge School District
August 11, 2015

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

------ .

JAMES NACE, et al.        : CIVIL ACTION
  vs.                     :
PENNRIDGE SCHOOL DISTRICT,  :
et al.            : NO. 15-333

------

Tuesday, August 11, 2015

------

Videotape deposition of THOMAS CREEDEN, held

at 1880 John F. Kennedy Boulevard, Seventh Floor,

Philadelphia, Pennsylvania, beginning at 10:11 a.m.,

on the above date, before LANCE A. BRUSILOW, Registered

Professional Reporter, Notary Public, and Approved

Reporter for the United States District Court.

------

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

------

---

**Page 2**

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY:  DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
BY:  JOSEPH J. SANTARONE, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(jjsantarone@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY:  ROBERT M. COX, ESQUIRE
     ERIN N. KERNAN, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
ph: 215.345.7000
(rcox@eastburngray.com)
(ekernan@eastburngray.com)
Counsel for Pennridge School District and individual
Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY:  CARLA E. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA  19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell Hollenbach

---

**Page 3**

(APPERARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY:  SEAN V. KEMETHER, ESQUIRE
30 East Second Street
Media, PA  19063
ph: 610.585.0600
(skemether@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

ALSO PRESENT:
David Babb
Christopher Capitanio, Videographer

---

**Page 4**

1        THE VIDEOGRAPHER:  We are now on the
2    video record.  This is the video deposition of
3    Thomas Creeden, taken by the plaintiff, in the
4    matter of James Nace and April Nace versus
5    Pennridge School District, et al. in the United
6    States District Court for the Eastern District of
7    Pennsylvania, civil action number 15-333, held at
8    1880 JFK Boulevard, Philadelphia, Pennsylvania, on
9    Tuesday, August 11, 2015, at 10:11 a.m.
10        I'm Christopher Capitanio, the
11    videographer, and the court reporter is Lance
12    Brusilow.  We are from the firm of brusilow +
13    associates Court Reporting & Videographers in
14    Philadelphia, Pennsylvania.
15        Counsel will now introduce themselves.
16        MR. GROTH:  David Groth, for the
17    plaintiff.
18        MR. COX:  Robert Cox, for the Pennridge
19    defendants.
20        MR. SANTARONE:  Joe Santarone, for
21    Faith Christian Academy.
22        MS. CONNOR:  Carla Connor, for Faith
23    Christian Academy, Russell Hollenbach and Ryan
24    Clymer.

1 (Pages 1 to 4)

Thomas Creeden                          Nace vs. Pennridge School District
                          August 11, 2015

---

**Page 5**

1         MS. KERNAN: Erin Kernan, on behalf of
2    the Pennridge defendants.
3         THE VIDEOGRAPHER:  The reporter will
4    now swear in the witness.
5         THOMAS CREEDEN, having been first duly
6    sworn, was examined and testified as follows:
7         (EXAMINATION)
8    BY MR. GROTH:
9    Q.  Good morning.
10   A.  Good morning.
11   Q.  My name is David Groth, and I represent
12   Elizabeth Nace in a lawsuit that's currently pending in
13   the Federal District Court for the Eastern District of
14   Pennsylvania.
15        I'm going to ask you some questions about
16   issues that I think are relevant and important to that
17   litigation. Let me ask you first:  Have you ever been
18   involved in a deposition before?
19   A.  I have not.
20   Q.  Okay.  Let me give you some quick directions
21   and instructions that may allow us to proceed with the
22   deposition as quickly and as efficiently as possible.
23        First of all, make sure you listen to the
24   question and that you understand it before you begin to

---

**Page 6**

1    answer.
2         If you don't understand the question -- the
3    question could be wordy or unclear in some way -- just
4    ask my to restate, rephrase or clarify the question and
5    I'll be happy to do that for you.
6         If you give me an answer to a question, I will
7    assume that you understood the question and that you're
8    giving me your best recollection of facts and events
9    going back as far as 1998, 1999, 2000.
10        Please let me complete the question before you
11   give an answer, for two reasons:  Number one, so that
12   you know exactly what it is I'm asking you; and number
13   two, so that the court reporter only has to take down
14   one of us speaking at a time. So, I'll try to make sure
15   I don't interrupt your answer, and if you do the same
16   with my questioning, that will be helpful.
17        You have to give a verbal response to all
18   questions; no gestures such as a head-nod yes or no or
19   some kind of hand gesture. The court reporter is making
20   a typed transcript of what is said here today, so you
21   have to verbalize all your answers.
22        You must answer every question that I ask you
23   fully and to the best of your ability, unless your
24   attorney objects to a question.  He will state his

---

**Page 7**

1    legal objection to the question, and unless he
2    specifically instructs you not to answer the question,
3    you will still answer the question.
4         Other attorneys in the room may also object to
5    a question.  You will allow them to state the objection
6    for the record and, again, you'll go ahead and answer
7    the question.
8         I'm going to ask you questions looking for
9    facts and information that you know personally or that
10   you may have heard from somebody else or learned from
11   others or gotten through other sources.
12        If you do not know the answer to a question I
13   ask you, please let me know that.  You're not here to
14   guess or speculate or assume anything in response to a
15   question.
16        If you can estimate or approximate in response
17   to a question, that might be helpful.  If I ask you for
18   a date or a time of day or something like that and you
19   can't give me a specific answer but you can say
20   generally, you know, what time of day something
21   happened or approximately what a date was that
22   something happened, please tell us that and that could
23   be helpful.
24        Is there any reason that you could not testify

---

**Page 8**

1    or would not be able to testify today in response to
2    all my questions? Any medical reasons, health reasons
3    or any other reasons?
4    A.  No.
5    Q.  If I ask you a question about facts that you
6    knew at one time but you simply can't recall now
7    because of the passage of time, please tell me that and
8    that will be a sufficient answer as well.
9         That's as opposed to a situation where I ask
10   you facts which you never had and you just don't know
11   the answer to a question; then you will indicate to me
12   that you don't know the answer to the question.
13        Do you understand that you're required to
14   answer all of the questions today truthfully and that
15   you have taken an oath and sworn to do so?
16   A.  Yes.
17   Q.  And do you understand that your testimony here
18   today is the same as if you would be testifying in
19   court in front of a judge or jury?
20   A.  Yes.
21   Q.  If you need a break for any reason or need to
22   talk to your attorney for any reason, please let me
23   know that and we'll take a break off the record.
24        Just understand that you cannot ask for a

---

                          2  (Pages 5 to 8)

Appendix 0557

Thomas Creeden                                Nace vs. Pennridge School District
                            August 11, 2015

|  | Page 9 | | Page 11 |
|---|---|---|---|

**Page 9**

1  break to consult with your attorney while a question is
2  pending. You have to answer the question and then you
3  can take a break after the question is answered.
4      A.  Okay.
5      Q.  Do you understand those instructions?
6      A.  Yes, I do.
7      Q.  Okay.  Let me get some background information
8  about you first -- well, let me ask this first,
9  actually:  Have you reviewed any documents in
10  preparation for your deposition today?
11      A.  Yes.
12      Q.  What documents have you reviewed?
13      A.  Documents with my attorney and Mr. Babb of
14  cases that happened at Pennridge High School.
15      Q.  Cases of sexual abuse of students?
16      A.  Yes.
17      Q.  Would those be documents that would be found
18  in the personnel records of Mr. Hart, Mr. Heath, Mr.
19  Ludlow and Mr. Romig?
20      A.  Hart, Heath and Ludlow.
21      Q.  And what did those documents consist of?
22      A.  Mostly personnel files.
23      Q.  How about newspaper articles about any of
24  them?

**Page 10**

1      A.  I don't recall seeing a newspaper article.  If
2  there was, I didn't read it.
3      Q.  Did you review any information about those
4  three individuals -- any documents, I'm sorry,
5  regarding those three individuals other than documents
6  from their personnel files?
7      A.  Just trying to recall here. Yes, I think there
8  was.
9      Q.  What were those?
10      A.  Trying to remember:  Correspondence, so maybe
11  some emails. I'm not sure if they were the files or
12  just separate, but they were part of the communications
13  I was going through with my attorney.
14      Q.  Things such as suspensions of these teachers?
15      A.  Yes.
16      Q.  Due to accusations or complaints about them?
17      A.  Yes.
18      Q.  Correspondence like termination of a teacher
19  due to a finding that they were involved in sexual
20  abuse of students?
21      A.  Yes.
22      Q.  You said you reviewed the personnel files of
23  Hart, Heath and Ludlow. Did you review the personnel
24  file of Mr. Romig?

**Page 11**

1      A.  No, I don't believe I saw anything on Mr.
2  Romig.
3      Q.  Did you review any other documents that you
4  haven't mentioned?
5      A.  Not that I recall.
6      Q.  Did you read Mr. Romig's deposition
7  transcript?
8      A.  Yes.
9      Q.  When did you do that?
10      A.  I don't have an exact date.
11      Q.  Was it within the -- well, his deposition was
12  taken the beginning of May, I believe.  Did you read it
13  in June, July or August?
14      A.  It was probably early June, but I can't
15  specify a date.
16      Q.  Did you make any attempt to talk to other
17  employees -- not your attorney but other employees --
18  at Pennridge High School in order to obtain information
19  that you might be asked about at this deposition?
20      A.  Yes.
21      Q.  Who did you speak to?
22      A.  Assistant Principal Nick Schnoover.
23      Q.  Okay.  Who else?
24      A.  Assistant Principal Scott Hagen and Assistant

**Page 12**

1  Principal Ray Ott.
2      Q.  Okay.
3      A.  And Mr. Babb.
4      Q.  And these discussions that you had were not in
5  the presence of your attorney, correct?
6      A.  Correct.
7      Q.  What did you discuss with the assistant
8  principals?
9      A.  I was looking for documents.
10      Q.  What kind of documents?
11      A.  Curriculum-type documents, athletic
12  contract -- trying to recall some of the things I
13  wanted to review.  Policies, school policies, because
14  I'm not around school now since I'm retired.  That's
15  why I contacted. . .
16      Q.  Okay. The curriculum documents, were those for
17  Elizabeth Nace?
18      A.  No, they were for health class.
19      Q.  Health class. And why did you ask for that?
20      A.  That was pertaining to curriculum related
21  to -- we've had been for many years dealing with
22  relationships.
23          It's done by Nova, which is an agency that
24  comes in and does programs for our students in their

Thomas Creeden                           Nace vs. Pennridge School District
                              August 11, 2015

| Page 13 | Page 15 |
|---|---|

**Page 13**

1   health classes in tenth grade.  It talks about
2   different subjects relating to relationships.
3        Q.   What kind of relationships?
4        A.   Dating, harassment, sexting -- I'm just trying
5   to name a few off the top of my head here, but we've
6   had them since I've been at Pennridge.
7        Q.   And when was that? When did you start?
8        A.   1999.
9        Q.   Is this part of a curriculum, or is this just
10  like a couple-hour course, or what?
11       A.   We contract with Nova to come in and run
12  these.  It gives the students opportunities to know
13  what's available in the community and also to get, for
14  a better word, a second opinion, you know, coming from
15  an outside source on how to deal with issues such as
16  the ones I mentioned.
17       Q.   And is it a full-semester course or just a
18  health-aide course?
19       A.   Health is a semester course.
20       Q.   I'm talking about the Nova part of it.
21       A.   No, it's just a few days.
22       Q.   Given only once during the tenth grade?
23       A.   Once during the tenth grade, yes.
24       Q.   Not eleventh or twelfth.

**Page 14**

1        A.   Not eleventh or twelfth.
2        Q.   The harassment part of that training, for lack
3   of a better word, does that include harassment or
4   sexual abuse of students by teachers or employees of
5   the school district?
6        A.   I don't believe so.
7        Q.   Since 1999 has there been any training to high
8   school students with regard to sexual abuse or
9   harassment or exploitation by teachers or other school
10  district employees?
11       A.   Not that I recall.
12       Q.   So, the harassment that you were referring to
13  that Nova would address would be harassment by other
14  students?
15       A.   I don't sit in on the sessions; they're
16  supposed to be confidential.  So, basically all I can
17  do is look at what Nova gives me in handouts or
18  pamphlets of what they're going to cover.
19       Q.   And did it cover harassment between students
20  or among students?
21       A.   It was an overall harassment.  It didn't go
22  student-to-student.  They might have mentioned that in
23  the sessions, but if you look at the document, it just
24  talks about harassment.

**Page 15**

1        Q.   It's not just sexual harassment? It could be
2   harassment based on ethnicity, race, religion, anything
3   like that, correct?
4        A.   If I recall the document, yes.
5        Q.   And this document you referred to, you said
6   it's some kind of pamphlet or something like that?
7        A.   There are pamphlets that are handed out to the
8   students. I know that because I've seen them before
9   they go into the session.  So, the students can pick
10  what they might be concerned about or want knowledge
11  about.
12       Q.   You also said that you talked to the assistant
13  principals about the athletic contracts.  Those the
14  contracts for Mr. Romig?
15       A.   No, I just wanted a blank copy of the contract
16  to make sure to review the wording.
17       Q.   And is that contract titled "Extra duty
18  contract, coach/assistant coach"?
19       A.   I'm not sure what it says on the top, but it
20  sounds right.
21       Q.   Did you ever look at the contract or contracts
22  for Mr. Romig?
23       A.   I believe I did the other day with Mr. Cox.
24       Q.   The other thing you said that you discussed

**Page 16**

1   with these assistant principals were the school
2   policies.  Is that correct?
3        A.   Just to review them, yes.
4        Q.   Which policies?
5        A.   Sexual harassment.
6        Q.   Any others?
7        A.   No.
8        Q.   Did you actually look at the policies? Did
9   they give you documents to look at?
10       A.   No.
11       Q.   When was the last time that the sexual
12  harassment policy for the school district was revised?
13       A.   I don't recall.
14       Q.   Are the policies that you looked at
15  designated -- I think it's number 248 and 448?
16       A.   I don't recall numbers.
17       Q.   How many policies did you look at? How many
18  different documents?
19       A.   That was the only one.
20       Q.   Have the policies on sexual harassment changed
21  over the years?
22       A.   I know policies get updated yearly or, you
23  know, I review them every -- all the new policies with
24  the faculty on the first day.  If there is a revision,

                                        4 (Pages 13 to 16)

Appendix  0559

Thomas Creeden                    Nace vs. Pennridge School District
                          August 11, 2015

---

Page 17

1   I review it with the faculty.
2       Q.  We're going to look at the policies later, but
3   the last policy I saw in the documents that were
4   provided to me by Mr. Cox seem to be revised sometime
5   during 2004.
6           Do you know if there have been any revisions
7   since 2004 to that policy?
8       A.  I don't believe -- I don't recall a revision
9   to that policy.
10      Q.  Did you review any documents on texting or
11  sexting?
12      A.  No.
13      Q.  Does Pennridge to this day have any policy
14  with regard to texting or sexting between teachers and
15  students or students and students, or any staff, any
16  employees and students?
17      A.  I don't recall.
18      Q.  You don't recall if there ever was one?
19      A.  I don't recall if there ever was one.
20      Q.  Do you know if there was ever a discussion at
21  the school district regarding the inclusion of the
22  policy with regard to texting or sexting between
23  district employees and students or between students and
24  students?

---

Page 18

1       A.  I don't recall.
2       Q.  Are there any other documents that you recall
3   reviewing in preparation for this deposition other than
4   those that we've mentioned?
5       A.  Those are the only ones I recall.
6       Q.  Did you ever see the complaint in this case?
7       A.  Yes.
8       Q.  Do you recall when you saw that?
9       A.  Sometime -- I'm not going to guess. I don't
10  recall.
11      Q.  Do you recall seeing the answer that was filed
12  on behalf of Pennridge and you and Mr. Babb to the
13  complaint?
14      A.  I don't recall.
15      Q.  Let's start with your educational background
16  starting with high school. Can you just give me a
17  chronology of all the formal education you've had?
18      A.  Names of the schools?
19      Q.  Yes, names, years, degrees.
20      A.  Bishop Egan High School, Fairless Hills, PA,
21  1974 graduation; West Virginia University, Morgantown,
22  West Virginia, 1979 graduation.
23      Q.  Degree?
24      A.  Special-education degree.

---

Page 19

1       Q.  BA?
2       A.  Yes.
3       Q.  Okay.
4       A.  Lehigh University, Masters of Education,
5   Principal's Certificate.
6       Q.  Year?
7       A.  (No response)
8       Q.  Approximately.
9       A.  '86, 1986.
10      Q.  Any other formal education?
11      A.  Doctoral degree, Walden University.
12      Q.  Walden, where is that?
13      A.  Minnesota.
14      Q.  What year?
15      A.  2011.
16      Q.  Anything else?
17      A.  That's it.
18      Q.  Let's go over your employment background.
19  Maybe it's easier to work our way backwards. You
20  retired when?
21      A.  2014.
22      Q.  What month?
23      A.  June.
24      Q.  And by whom were you employed before you

---

Page 20

1   retired?
2       A.  Pennridge School District.
3       Q.  From when to when?
4       A.  1999 to 2014.
5       Q.  So, you were the principal at Pennridge High
6   School during the period of time when all of those
7   sexual-abuse incidents took place involving Mr. Ludlow,
8   Mr. Hart, Mr. Heath and Mr. Romig?
9           MR. COX:  Objection to the form.  You
10  can answer.
11      A.  Hart and Heath, yes, but Ludlow was
12  exonerated.
13      Q.  Let me rephrase it.
14      Q.  Okay.
15      Q.  The accusations or complaints about Mr.
16  Ludlow.
17      A.  Yes.
18      Q.  And the exoneration you're talking about is,
19  he was found not guilty of having improper or
20  inappropriate contact with a number of fifteen-year-old
21  students, correct?
22      A.  Can you clarify "number"?
23      Q.  Three.
24      A.  Yes.

5 (Pages 17 to 20)

Appendix 0560

Thomas Creeden                          Nace vs. Pennridge School District
                          August 11, 2015

---

**Page 21**

1    Q.   Okay.  Was he the subject of a later complaint
2  by a teacher of sexual harassment?
3    A.   Yes.
4    Q.   What was that teacher's name?
5    A.   Brooke Roush.
6    Q.   And that was around 2010?
7    A.   I believe so.
8    Q.   We'll get into that a little bit later.  So,
9  for Mr. Ludlow, who was found not guilty of the
10  criminal charges against him around 2000/2001, he is
11  the subject of a later complaint by a teacher of
12  inappropriate physical contact with him.  Is that
13  correct?
14    A.   I don't recall physical contact.  I recall,
15  for a better word, stalking.
16    Q.   And Brooke Roush was a teacher?
17    A.   Correct.
18    Q.   Is she still at Pennridge?
19    A.   I believe so.
20    Q.   You were principal of Pennridge for that
21  entire time, 1999 through 2014?
22    A.   Yes.
23    Q.   And by whom were you employed, and in what
24  position, prior to that?

---

**Page 22**

1    A.   Upper Perkiomen School District, assistant
2  principal.
3    Q.   What years?
4    A.   1987 to 1999, in that general vicinity.
5    Q.   And by whom were you employed before that?
6    A.   Pekriomen Valley School District.
7    Q.   In what position?
8    A.   Assistant principal.
9    Q.   What years?
10    A.   '83 to when I started at Upper Perk.
11    Q.   '87?
12    A.   '87.
13    Q.   And by whom were you employed before that?
14    A.   Colonial Northampton Intermediate Unit Number
15  20.
16    Q.   In what position?
17    A.   Special-education teacher.
18    Q.   For what years?
19    A.   '80 until the employment at Perkiomen Valley.
20    Q.   '83?
21    A.   Yes.
22    Q.   What about before that?
23    A.   Pulaski County Schools, Pulaski, Virginia.
24    Q.   What years?

---

**Page 23**

1    A.   '79/'80, one year.
2    Q.   What position?
3    A.   Special-education teacher.
4    Q.   Before that?
5    A.   That was it.
6    Q.   So, you started teaching as soon as you got
7  out of West Virginia?
8    A.   Correct.
9    Q.   Back in 2012/2013 how many students,
10  approximately, were at Pennridge?
11    A.   2,400.
12    Q.   And how many employees in the high school,
13  approximately?
14    A.   Over two hundred.
15    Q.   That includes faculty, administrative staff,
16  coaches, everybody.
17    A.   Correct.
18    Q.   Within the school itself, were you the top of
19  the pyramid with regard to all of those people in terms
20  of being their supervisor, boss, whatever you want to
21  call it?
22    A.   Not in all instances.
23    Q.   In what instances would you not be at the top
24  of the pyramid?

---

**Page 24**

1    A.   IU personnel that came in.
2    Q.   What is IU?
3    A.   Intermediate Unit.  They worked with speech
4  and hearing and they came in as contracted by the
5  district.  Cafeteria workers, custodial staff, teacher
6  aides.  That would probably be about it.
7    Q.   Who would be in charge of those people?
8    A.   Custodial was head of maintenance.
9    Q.   Did he report to you?
10    A.   No.
11    Q.   Who did he report to?
12    A.   Superintendent.
13    Q.   Okay.
14    A.   Cafeteria was food services, director of food
15  services.  She reported to the business manager.
16    Q.   Okay.
17    A.   Teacher aides reported to the director of
18  people services.
19    Q.   And that person reported to the
20  superintendent?
21    A.   Correct.
22    Q.   Were those workers -- cafeteria, custodial and
23  teacher's aides -- were those part of the two hundred
24  that you said were employed by Pennridge?

6 (Pages 21 to 24)

Appendix  0561

Thomas Creeden                          Nace vs. Pennridge School District
                            August 11, 2015

---

Page 25

1      A.  That would be an estimation.
2      Q.  But they were included in that number.
3      A.  Yes.
4      Q.  During your tenure as principal at Pennridge
5    from 1999 to 2014, were there any other allegations or
6    accusations of sexual abuse of an employee of Pennridge
7    High School against a student other than the ones that
8    we've already talked about?
9          Just sexual abuse.  I'm not talking about any
10   other form of harassment, based on gender, religion,
11   race or whatever, but just sexual harassment.
12     A.  The only one I can recall is maybe Chris
13   Seider.
14     Q.  What was his position?
15     A.  Physical education and health teacher.
16     Q.  When was that, approximately?
17     A.  2012.  That's an estimate.
18     Q.  What was the accusation?
19     A.  What came to my attention is that he was
20   inappropriately looking at girls as they stretched for
21   track practice.
22     Q.  And who made the accusation?
23     A.  A female student.
24     Q.  What was done about it?

---

Page 26

1      A.  Mr. Seider was relieved of his duties as track
2    coach and put on an improvement plan.
3      Q.  What is that?
4      A.  It's a professional improvement plan where a
5    teacher has to meet with administration about lesson
6    planning and other things associated with the
7    classroom.
8          Administration goes into the class more
9    frequently to observe, and then an evaluation is done
10   to see if there is improvement as stated in the plan.
11     Q.  And who made the decision to have him perform
12   that improvement plan?  Is that your decision or
13   somebody else's?
14     A.  I could have done it myself, but I know it was
15   a joint decision between the human resource director,
16   the superintendent and myself.
17     Q.  Is this information in his personnel file?
18     A.  I believe so.
19     Q.  What was the resolution of that?
20     A.  He was still on the improvement plan, I
21   believe, when I left.
22     Q.  Were there any other instances reported about
23   him?
24     A.  Not while I was there, that I recall.

---

Page 27

1      Q.  There was no allegation of any type of
2    physical contact?
3      A.  Not to me.
4      Q.  That you learned of?
5      A.  Learned of later? Yes.
6      Q.  What was that?
7      A.  Inappropriate touching.
8      Q.  Involving what?
9      A.  I know the human resource director dealt with
10   that; I did not.
11     Q.  Who was that?
12     A.  Ray Scarpantonio.
13     Q.  What did he tell you about the allegation or
14   accusation of inappropriate touching?
15     A.  I don't recall.
16     Q.  Did it have to do with his work as a coach for
17   the track team?
18     A.  I believe so.
19     Q.  Was it just one person or more than one
20   person?
21     A.  I don't recall.
22     Q.  Did he deny the allegations or accusations
23   against him?
24     A.  I don't recall.

---

Page 28

1      Q.  Was there a discussion between you, the
2    superintendent and the HR director about reporting his
3    activities to the DA's office, the police or Department
4    of Public Welfare?
5      A.  I don't recall.
6      Q.  There could have been? You just don't recall
7    if there was?
8      A.  There could have been.
9      Q.  But it was not reported, correct?
10     A.  I don't recall that.
11     Q.  Do you have any reason to believe that it was
12   reported?
13     A.  I know Mr. Scarpantonio was handling the case
14   once it came to my attention, and I reported it to him
15   and Dr. Kish, the superintendent.
16     Q.  If a decision was made -- strike that.  If
17   there was a discussion about whether or not to report
18   this to the authorities, this inappropriate touching,
19   who would make the final decision whether or not it
20   would be reported?
21         MR. COX:  Objection to the form.  You
22   can answer if you can.
23     A.  Usually the final decisions were decided by
24   the superintendent.

---

7 (Pages 25 to 28)

Appendix 0562

Thomas Creeden                          Nace vs. Pennridge School District
                          August 11, 2015

---

Page 29

1      Q.   And who was the superintendent at that time?
2      A.   Dr. Kish.
3      Q.   Now, other than accusations of sexual abuse or
4   harassment or exploitation by Mr. Seider, Mr. Hart, Mr.
5   Ludlow, Mr. Heath and Mr. Romig, were there any other
6   accusations or complaints about any other male teachers
7   or staff members or employees of Pennridge School
8   District during your tenure as principal?
9      A.   Not that I recall.
10     Q.   Has there ever been an accusation of sexual
11  harassment, abuse or exploitation of a student by a
12  female employee of Pennridge School District?
13     A.   Not that I recall.
14     Q.   Let's talk about hiring policies and practices
15  at Pennridge School District.  First of all, in
16  general, what is the procedure for hiring -- let's be
17  specific -- a coach or an assistant coach for Pennridge
18  School District?  What was the procedure back in
19  2011/2012?
20     A.   The athletic director would gather
21  applications -- this is only for the head coach now.
22  Those applications were discussed between the athletic
23  director and myself.  We would interview the candidates
24  and select from there.  All paperwork was distributed

---

Page 30

1   to HR.  HR would check on clearances --
2      Q.   Criminal clearances?
3      A.   Correct, and all other paperwork.  References
4   would be either done by myself or the athletic
5   director, depending on the time of year because the
6   athletic director wasn't always full time.
7      Q.   Let me stop you there, please.  Who makes the
8   final decision whether or not to hire somebody?
9      A.   For head coach?
10     Q.   Yes.  You started with head coach; let's start
11  with that.
12     A.   That was an agreement between myself and the
13  athletic director.
14     Q.   Does it involve the school board?
15     A.   They would approve it once we put it into HR.
16     Q.   And was that sort of a formality?  Unless you
17  had some specific reason not to approve it, it would be
18  approved?
19     A.   Some of those were questioned.
20     Q.   What about the superintendent's role in that?
21  Any at all?
22     A.   No.
23     Q.   What about for assistant coaches?
24     A.   That was done between the athletic director

---

Page 31

1   and the head coach, basically following the same type
2   of format.
3      Q.   What would your involvement in that process
4   be, if any?
5      A.   That was the decision of the athletic director
6   and head coach.  I had no input to that.
7      Q.   Did they have the authority to actually make
8   the offer and hire somebody without your approval?
9      A.   Correct.
10     Q.   Without the board's approval?
11     A.   No.
12     Q.   Still had to go to the board?
13     A.   Correct.
14     Q.   But it would go directly from them to the
15  board or through you?
16     A.   Usually through HR.
17     Q.   Through HR.
18     A.   HR was, again, gathering all paperwork before
19  they submitted it to the board.  The athletic director
20  and/or head coach would check references.
21     Q.   Is there an employee-hiring policy at
22  Pennridge High School?
23     A.   Not that I'm aware of.
24          MR. GROTH:  I'm going to mark as

---

Page 32

1          Creeden exhibit one a document entitled "Pennridge
2          School District Number 304," section "employees,"
3          titled "Employment of district staff" dated --
4          adopted, rather, October 22nd, 2012.
5              I'm going to ask you to take a look at
6          that, please, for a second and then I'll ask you
7          some questions about it.  If you want to flip
8          through and read some of it, you're welcome to do
9          that.  Take as much time as you need.
10             THE WITNESS:  Okay, go ahead.
11             (Exhibit Creeden-1 was marked for
12         identification)
13  BY MR. GROTH:
14     Q.   Number one, have you ever seen that document
15  before?
16     A.   Yes, I believe I have, during an
17  administrative staff meeting.
18     Q.   What is that document?
19     A.   What it states at the top?
20     Q.   Is it a document that recites the procedures
21  to be followed to hire employees at Pennridge School
22  District?
23     A.   I can speak to just the front two pages.  The
24  other ones talk about Title 1, special education,

---

Appendix 0563

Thomas Creeden                          Nace  vs.  Pennridge  School  District
                            August 11, 2015

---

Page 33

1   personal-care assistants.  They weren't hired --
2   educational interpreters.  They were hired by either
3   director of pupil services or HR.
4       Q.   But you're familiar with the procedure on
5   pages one and two of that document, and it's pretty
6   much the procedure that you just testified to, correct?
7       A.   Correct.
8       Q.   Is there any separate hiring procedure for
9   coaches or assistant coaches, something separate and
10  apart from this document, including exhibit one, that
11  applied specifically to coaches or assistant coaches?
12      A.   Not that I recall.
13      Q.   On the second page of that document, about
14  two-thirds of the way down it states "The
15  superintendent or designee may apply necessary
16  screening procedures to determine a candidate's ability
17  to perform the job functions of the position for which
18  a candidate is being considered.  The superintendent or
19  designee shall seek recommendations from former
20  employers and others in assessing the candidate's
21  qualifications.  Recommendations and references shall
22  be retained confidentially and for official use only."
23      It says "The superintendent or designee shall
24  seek recommendations from former employers and

---

Page 34

1   references from others..."
2       Are you the designee that's being referred to
3   in that policy, to your understanding?
4       A.   To my understanding.
5       Q.   And was it your understanding that as that
6   designee, you could designate the athletic director and
7   the head coach to do those checks -- check for
8   references and check with former employers -- you could
9   designate the athletic director or the head coach to
10  make those checks?
11      A.   That's my understanding.
12      Q.   And that's what you did in the situation
13  involving Mr. Romig.  Is that correct?
14      A.   Yes.
15      Q.   And that's what you generally did for all head
16  coaching or coaching positions, correct?
17      A.   Correct.  The only difference here is,
18  superintendents saw all teaching staff before they were
19  hired.  They did not see coaching staff.
20      Q.   If the athletic director or the assistant
21  coach actually does check with former employers of an
22  applicant for a coaching position, is that supposed to
23  be documented in some way and put in the applicant's
24  file?

---

Page 35

1       MR. COX:  Objection to the form.  You
2   may answer.
3       A.   Not in every circumstance.
4       Q.   In what circumstance would it not be
5   documented?
6       A.   Only if there were concerns, they would be
7   documented.
8       Q.   If there were no concerns -- would it be
9   correct to say that there would be no documentation
10  that anybody, either the AD or the head coach, made any
11  calls to former employers?
12      MR. COX:  Objection to the form.  You
13  may answer.
14      A.   Can you repeat the question?
15      Q.   Yes.  If such -- strike that.  If it would
16  only be documented if there were some concerns based
17  upon a check with a former employer, is it correct that
18  if there were no concerns, there would be no
19  documentation whatsoever?
20      A.   Everybody kept their own sort of
21  documentation.  I know, when I called for references, I
22  documented.  Did it go in the personnel file? No, but I
23  kept my own notes.
24      Q.   Okay.

---

Page 36

1       A.   So, usually I wrote something down on my pad
2   or typed something.  So, I know personally I wrote
3   every reference down -- name, time -- and followed it
4   up that way.
5       Q.   Do you know if your athletic director and head
6   coach did the same thing with regard to Mr. Romig?
7       A.   I don't know that.
8       Q.   Do you know if they made any contact with
9   former employers of Mr. Romig before he was hired?
10      A.   I don't know that.
11      Q.   Did you ever ask them?
12      A.   I did not.
13      Q.   To this day you've never asked them whether or
14  not they contacted Faith Christian Academy about Mr.
15  Romig's prior coaching experience there?
16      A.   To this day?
17      Q.   To this day.
18      A.   Yes, I have asked that.
19      Q.   And what did Mr. Babb tell you?
20      A.   I don't recall specifically.
21      Q.   Mr. Koehler was the head coach?
22      A.   Correct.
23      Q.   Head softball coach, girls softball?
24      A.   Yes.

---

brusilow.com            brusilow + associates           215.772.1717

Appendix  0564

Thomas Creeden                           Nace vs. Pennridge School District
                                         August 11, 2015

---

Page 37

1    Q. Did you talk to him as well?
2         MR. COX: Can we just specify the time
3    frame we're talking about here?
4         MR. GROTH: At any time up until today.
5    A. Did I talk to Mr. Koehler. . .
6    Q. About whether or not he made any checks of Mr.
7    Romig's prior employers prior to Mr. Romig's hire by
8    Pennridge.
9    A. One of my Romig's employers -- it wasn't Mr.
10   Koehler. Mr. Babb was his prior employer at one time,
11   so I think -- I can't tell you exactly.
12        I know he was at Quakertown and Mr. Babb was
13   the employer -- or the athletic director at that time,
14   not the employer.
15   Q. Okay. So, that was contact with -- strike
16   that. Is it your testimony that you understood that
17   Mr. Babb had hired Mr. Romig to coach at Quakertown
18   when Mr. Babb was the athletic director at Quakertown?
19   A. Yes.
20   Q. So, that's one former employer that Mr. Babb
21   already knew about because he did the hiring, correct?
22   A. That is correct.
23   Q. Did Mr. Babb or Mr. Koehler ever tell you that
24   they had checked with or sought a recommendation from

Page 38

1    any other employer of Mr. Romig before he was hired at
2    Pennridge?
3    A. I know Mr. Babb told me that Mr. Romig was
4    formerly employed at Faith Christian Academy.
5    Q. When did he tell you that?
6    A. That was during a softball game.
7    Q. Approximately what year?
8    A. I don't recall.
9    Q. Was it a girls softball game?
10   A. Yes.
11   Q. Was it before Mr. Romig's arrest?
12   A. Yes.
13   Q. Was it before Mr. Romig's hiring at Pennridge?
14   A. No.
15   Q. So, sometime after Pennridge hired him, hired
16   Mr. Romig, you had a conversation with Mr. Babb at a
17   girls softball game when he told you that Mr. Romig had
18   been previously employed as a coach at FCA, correct?
19   A. Correct.
20   Q. What did he tell you?
21   A. Mr. Romig introduced himself to me at the
22   softball game, and that's the first time I met him. I
23   was there by myself watching the game. Mr. Babb
24   arrived afterwards and I questioned him about Mr.

Page 39

1    Romig, and that's when he told me about Faith Christian
2    Academy.
3    Q. Was that the first year that Mr. Romig was a
4    coach?
5    A. I believe so.
6    Q. So, that would have been the 2011/2012 school
7    year?
8    A. I believe so.
9    Q. And the softball season was in the spring, so
10   that would have been 2012 in the spring, correct?
11   A. That would have been the first year, yes.
12   Q. Okay. And you said Mr. Babb came after you
13   spoke to Mr. Romig?
14   A. It was probably a ten-second introduction. He
15   came up, introduced himself. The JV game was over. He
16   went on into the bleachers and then Mr. Babb came up
17   later.
18   Q. By that time Mr. Romig was no longer talking
19   to you?
20   A. Correct.
21   Q. And tell me as precisely as you can what Mr.
22   Babb told you.
23   A. I asked him who the coach was because I knew
24   all the other coaches because they were former

Page 40

1    graduates, and he told me that he was from -- he had
2    him in Quakertown as a coach and he also coached at
3    Faith Christian.
4    Q. Did he tell you what he coached at FCA?
5    A. I don't recall.
6    Q. Did Mr. Babb tell you anything else?
7    A. No.
8    Q. About Mr. Romig.
9    A. About Mr. Romig?
10   Q. Yes.
11   A. Not at that time.
12   Q. Did you discuss with him at that time anything
13   about the reason for Mr. Romig's departure from FCA?
14   A. I don't recall.
15   Q. Did Mr. Babb tell you how he knew that Mr.
16   Romig coached at FCA?
17   A. I don't recall.
18   Q. So, let me just go back a second. So, in
19   terms of Mr. Romig's initial hiring, you pretty much
20   played no part in the procedures that are required to
21   be followed to hire Mr. Romig as an assistant coach?
22   Would that be a fair statement?
23        MR. COX: Objection to the form. You
24   may answer.

10 (Pages 37 to 40)

Appendix 0565

Thomas Creeden                          Nace vs. Pennridge School District
                        August 11, 2015

---

Page 41

1      A.  That's correct.
2      Q.  And that would have all been Mr. Babb as
3  athletic director, Mr. Koehler as head coach making a
4  recommendation to HR, which then sends it to the board.
5      A.  Correct.
6      Q.  Would it also be true, then, that you really
7  wouldn't have had any need to and did not review any of
8  the paperwork that's generally prepared by an applicant
9  for an assistant coaching position for Mr. Romig?
10     A.  Assistant coaching position? Yes.
11     Q.  And is it correct, then, that you did not
12 review any of that paperwork?
13     A.  That is correct.
14     Q.  For Mr. Romig.
15     A.  That's correct.
16     Q.  What was your initial impression of Mr. Romig
17 upon meeting him?
18     A.  I didn't really have an impression.  It was,
19 like I said, probably ten seconds.
20     Q.  How long was your discussion with Mr. Babb
21 about Mr. Romig?
22     A.  A few minutes, at the most.
23     Q.  And during that time did you discuss with Mr.
24 Babb Mr. Romig's performance as a coach at Quakertown?

---

Page 42

1      A.  I don't recall.
2      Q.  Do you recall Mr. Babb telling you anything
3  more about Mr. Romig's coaching performance at FCA?
4      A.  I don't recall.
5      Q.  Did Mr. Babb ever tell you prior to Mr.
6  Romig's arrest on October 1st, 2013 any information
7  that he had obtained regarding the circumstances of Mr.
8  Romig's leaving FCA as a coach?
9      A.  I don't recall.
10     Q.  You don't recall whether or not you had any
11 conversations with Mr. Babb in which Mr. Babb informed
12 you of some information he had obtained about why Mr.
13 Romig left FCA?
14         MR. COX:  Objection to the form.  You
15 may answer.
16     A.  No.
17     Q.  After Mr. Romig was arrested, were you
18 interviewed by the Bucks County detectives who were
19 investigating the charges of sexual abuse involving Mr.
20 Romig and Elizabeth Nace?
21     A.  Yes.
22     Q.  Do you remember where that discussion took
23 place?
24     A.  The conference room in the main office of the

---

Page 43

1  high school.
2      Q.  Do you recall how long after October 1st, 2013
3  that took place?
4      A.  I do not recall.
5      Q.  Do you recall discussing with -- strike that.
6  Do you remember who the detective was or detectives who
7  discussed the criminal investigation with you?
8      A.  I remember one detective.
9      Q.  Who was that?
10     A.  Detective Kemmerer.
11     Q.  Was there more than one detective there?
12     A.  Yes.
13     Q.  Do you know if the other detective's name was
14 Slattery?
15     A.  I don't recall.
16     Q.  Was anybody else in the meeting besides you?
17     A.  Yes, Mr. Babb.
18     Q.  Anybody else?
19     A.  I only recall us two.
20     Q.  How long did it take, the meeting?
21     A.  Approximately forty-five minutes to an hour.
22     Q.  Was it a taped interview?
23     A.  Yes.
24     Q.  Did you ever receive any type of transcript of

---

Page 44

1  the taped interview?  Typed transcript, written
2  transcript?
3      A.  Personally?
4      Q.  Yes.
5      A.  No.
6      Q.  Do you know if one exists?
7      A.  I do not.
8      Q.  What kind of questions did Mr. -- strike that.
9  Did Mr. Babb make any statements during the interview?
10     A.  He did most of the talking.
11     Q.  Mr. Babb did most of the talking?
12     A.  Yes.
13     Q.  Was Detective Kemmerer the one asking you most
14 of the questions?
15     A.  I don't believe he was solely asking all the
16 questions. I think the other detective -- Slattery, as
17 you stated -- also asked some questions.
18     Q.  What was discussed?  What did they ask and
19 what did you respond?  Or what did Mr. Babb respond, as
20 best you can recall?
21     A.  Mr. Babb gave information about Mr. Romig and
22 his background with him at Quakertown.  He shared
23 during that time that he was in conversation with Mr.
24 Hollenbach from FCA.

---

                                    11 (Pages 41 to 44)

Appendix 0566

Thomas Creeden                          Nace vs. Pennridge School District
                        August 11, 2015

---

Page 45

1    Q.  At what time?
2    A.  During that interview.
3    Q.  When was he having a conversation with Mr.
4  Hollenbach?
5    A.  I believe he stated during the athletic
6  director's meeting.
7    Q.  PIAA meeting?
8    A.  Either that or Suburban 1, one or the other.
9    Q.  And what was said?
10   A.  Mr. Babb stated that Mr. Hollenbach said
11 something about texting.
12   Q.  Tell me as much of what Mr. Babb said as you
13 can recall.
14   A.  That's pretty much what I recall.
15   Q.  So, in this taped interview Mr. Babb told the
16 interviewer that he got some information from Mr.
17 Hollenbach about Mr. Romig and some texting issue at
18 FCA?
19   A.  I don't know if he stated it that way.  He
20 said something about texting.
21   Q.  What did he say? What did Mr. Babb say?
22   A.  I can't quote him.  I just remember something
23 about texting.
24   Q.  Did Mr. Babb say that was a reason Mr.

---

Page 46

1  Hollenbach gave Mr. Babb about why Mr. Romig left FCA?
2          MR. COX:  Objection to the form.  You
3  may answer.
4    A.  I believe he stated that Mr. Romig left
5  because of health reasons.
6    Q.  Did Mr. Babb say what the health reasons were?
7    A.  Something to do with his heart.
8    Q.  Did Mr. Babb state whether or not the texting
9  that Mr. Romig was doing at FCA involved parents or
10 students or somebody else?
11   A.  I don't recall that.
12   Q.  At the time of this interview with the Bucks
13 County detectives, did you become aware from some
14 source of information that Mr. Romig had been texting
15 Elizabeth Nace for a few months, to the tune of
16 hundreds and hundreds of texts?
17   A.  I don't recall hundreds and hundreds of texts.
18   Q.  You don't recall being informed by the
19 detectives that there was an excessive texting
20 situation between Elizabeth Nace and Mr. Romig, and
21 that her parents found out about it and questioned her
22 and that's how they came to know what was happening?
23   A.  I don't remember the word "excessive." I do
24 remember that there was texting between Elizabeth and

---

Page 47

1  Mr. Romig.
2    Q.  And were you aware at the time of this
3  interview with the Bucks County detectives that it was
4  inappropriate sexual texting between them?
5    A.  Yes.
6    Q.  So, when Mr. Babb at the interview talked
7  about something about texting and Mr. Romig at FCA, as
8  told to him by Mr. Hollenbach, you don't recall Mr.
9  Babb saying anything else about the nature of the
10 texting, the quantity of the texting, the content of
11 the texting, nothing about that at all?
12   A.  All I remember --
13        MR. KEMETHER:  Objection to the form.
14   A.  All I remember is texting.
15   Q.  You also said Mr. Babb stated in this
16 interview that Mr. Romig left FCA due to some health
17 reason involving his heart.  Is that correct?
18   A.  Correct.
19   Q.  Did Mr. Babb state when he first obtained that
20 information?
21   A.  I don't recall.
22   Q.  Did Mr. Babb state whether or not he knew that
23 information, that there was some kind of health problem
24 with Mr. Romig, before Mr. Babb hired him for

---

Page 48

1  Pennridge?
2    A.  I don't recall.
3    Q.  Did Mr. Babb prior to this interview with the
4  detectives ever tell you that there was some kind of
5  health problem with Mr. Romig at his last coaching
6  position at FCA?
7    A.  I don't recall.
8    Q.  Did Mr. Babb say he obtained this information
9  from Mr. Hollenbach at FCA after he had already hired
10 Mr. Romig?
11        MR. SANTARONE:  Objection to the form.
12  of the question.  What information?
13        MR. GROTH:  The information about the
14  texting.
15        THE WITNESS:  Can you repeat the
16  question?
17        MR. GROTH:  Sure.
18 BY MR. GROTH:
19   Q.  During the interview or at any time after the
20 interview, did Mr. Babb ever indicate to you or state
21 to you that he had obtained from Mr. Hollenbach the
22 information about texting involving Mr. Romig at FCA?
23   A.  Can you clarify "obtain"?
24   Q.  Yes.  Did he say when he got this information

---

12 (Pages 45 to 48)

Appendix 0567

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 49

1  from Mr. Hollenbach at this conference, PIAA or
2  Suburban 1, regarding the texting situation with Mr.
3  Romig at FCA?
4      A.   All I remember is he's saying that Mr.
5  Hollenbach said something about texting.  It was during
6  the conversation.
7      Q.   Did you ever ask him -- ask Mr. Babb after
8  that interview when he obtained that information from
9  Mr. Hollenbach?
10     A.   A date?
11     Q.   A date or a time frame.  In other words,
12 whether he got the information before Mr. Romig was
13 hired by Pennridge or after Mr. Romig was hired by
14 Pennridge.
15     A.   Mr. Romig was already hired by Pennridge.
16     Q.   Okay.  At any time after the interview with
17 the county detectives, did you ask Mr. Babb whether or
18 not he did anything to find out more about the texting
19 issue involving Mr. Romig while at FCA?
20     A.   I don't recall.
21     Q.   Was it at this interview with the Bucks County
22 detectives after October 1st of 2013 when you first
23 heard of this texting issue involving Mr. Romig at FCA
24 from Mr. Babb?

Page 50

1      A.   Yes.
2      Q.   Do you recall Mr. Babb stating at the
3  interview with the county detectives that he had
4  discussed the issue of Mr. Romig's texting at FCA with
5  you before anything was known about Elizabeth Nace and
6  Mr. Romig?
7      A.   Yes, he did state that.
8      Q.   Was that true?
9      A.   Not that I recall.
10     Q.   So, if he had a conversation with you about
11 this texting issue, whatever the something about
12 texting was that you heard him say in the interview,
13 you didn't recall him and you don't recall Mr. Babb
14 ever telling you that before the interview?  Is that
15 correct?
16     A.   That is correct.
17     Q.   That does not mean that he might not have told
18 you before the interview.  You just simply don't
19 recall.  Is that correct?
20     A.   I don't recall.
21     Q.   Do you recall stating with the Bucks County
22 detectives in the interview that after you received
23 this information about the texting issue and Mr. Romig
24 from Mr. Babb, that you would take a

Page 51

1  let's-keep-an-eye-on-it approach?
2      A.   I don't recall.
3      Q.   Do you recall making that statement to the
4  Bucks County detectives at all, something to the effect
5  of "I told Mr. Babb let's keep an eye on it"?
6      A.   No.
7      Q.   I think we may have touched upon this a little
8  bit:  Did Pennridge in 2012/2013 have any texting
9  policies in place at all referring to texting between
10 district employees and students?
11     A.   I can't recall the policy.  I know it was
12 discussed, but was there a policy? Off the top of my
13 head, I cannot recall that.
14     Q.   I'm talking about a written policy.
15     A.   I understand.
16     Q.   But you don't believe there was a written
17 policy.
18     A.   I know we discussed it as a faculty, but the
19 written policy? I don't recall the time frame when that
20 was designed or created. But you said the year of. . .
21     Q.   2012/13, any time before that year.
22     A.   I don't recall a written policy.
23     Q.   Was there a written policy after the Elizabeth
24 Nace accusations about texting between employees and

Page 52

1  students in the Pennridge School District?
2      A.   I don't recall.
3      Q.   You say it was discussed with faculty.  That
4  would not include coaches or the athletic director or
5  the assistant coaches, correct?
6      A.   Correct.
7           MR. GROTH:  We're going to take a
8       break.
9           THE VIDEOGRAPHER:  The time is now
10      11:28 a.m.  We're going off the record.
11          (A brief recess was taken)
12          THE VIDEOGRAPHER:  The time is now
13      11:41 a.m. This begins DVD number two in the
14      deposition of Thomas Creeden.  We are back on the
15      record.
16 BY MR. GROTH:
17     Q.   Mr. Creeden, when you heard Mr. Babb tell the
18 county detectives about this issue he learned of about
19 texting and Mr. Romig while at FCA from Mr. Hollenbach,
20 did Mr. Babb say that he did anything further to
21 investigate exactly what the issue was?
22     A.   Not that I recall.
23     Q.   And you don't recall Mr. Babb saying anything
24 about the texting issue being between Mr. Romig and a

13 (Pages 49 to 52)

Appendix  0568

Thomas Creeden                          Nace vs. Pennridge School District
                          August 11, 2015

---

Page 53

1    student versus Mr. Romig and a parent or Mr. Romig and
2    another staff member?
3              MR. COX:  Objection to the form.  You
4    may answer.
5        A.  I believe he said student.
6        Q.  Did he say female student?
7        A.  Not that I recall.
8        Q.  Now, you said -- I believe you testified
9    before we went on break that Mr. Babb may have provided
10   you with that information about Mr. Romig and a texting
11   issue while at FCA at some point prior to this
12   interview with the county detectives.
13             MR. COX:  Objection to the form.
14       Q.  Is that correct?
15       A.  What I recall is that he stated it during the
16   interview.
17       Q.  Okay.
18       Q.  Okay? That's the first time I heard it.
19       Q.  He stated in the interview that he had
20   informed you of this at some point before the interview
21   and before Mr. Romig was arrested.  Is that correct?
22             MR. COX:  Objection to the form.
23       Q.  Is that correct?
24       A.  That's correct.

Page 54

1        Q.  And as he stated that to the county
2    detectives, you did not recall that conversation.
3        A.  I did not recall that conversation.
4        Q.  Do you know whether or not Mr. Babb did
5    anything after receiving the information from Mr.
6    Hollenbach to get more information on the texting issue
7    involving Mr. Romig while he was a coach at FCA?
8        A.  Information from whom or when?
9        Q.  From anybody:  From Mr. Hollenbach, from FCA,
10   from anybody.
11       A.  I did not recall him mentioning it.
12       Q.  Do you recall either you or Mr. Babb stating
13   to the county detectives that after receiving that
14   information from Mr. Hollenbach, after Mr. Babb
15   received that information about Mr. Romig's texting
16   issue at FCA, that you or he would keep a
17   "let's-key-an-eye-on-it strategy"?
18       A.  I don't recall that.
19       Q.  You didn't say that to the detective?
20             MR. COX:  Mr. Groth, you're going over
21        terrain you covered before the break.  I assume
22        that's purposeful.  I'll object to the form.  You
23        can answer.
24             THE WITNESS:  Restate the question,

Page 55

1        please.
2              MR. GROTH:  Sure.
3    BY MR. GROTH:
4        Q.  You didn't make that statement about let's
5    keep an eye on it to the detectives.
6              MR. COX:  Objection to the form.  You
7    can answer.
8        A.  To the detectives?
9        Q.  Yes.
10       A.  I don't recall the conversation, so I wouldn't
11   have said it to the detectives.
12       Q.  I'm talking about during the interview with
13   the detectives after Mr. Babb relayed the information
14   about the texting issue with Mr. Romig at FCA.
15            Do you recall yourself making a comment to the
16   detectives that -- strike that.
17            Do you recall Mr. Babb making a comment to the
18   detectives that he would take a let's-keep-an-eye-on-it
19   strategy after receiving this information from
20   Hollenbach?
21       A.  That he would keep an eye on it.
22       Q.  Yes.
23       A.  That Mr. Babb would keep an eye on it?
24       Q.  Yes.

Page 56

1        A.  I know he made that statement.  I don't know
2    if he designated himself, that he said it.
3        Q.  What do you recall about that?
4        A.  I think he said that "we discussed it" and
5    that was the comment that came out of it.  I don't know
6    if he designated himself or me.
7        Q.  Just so I understand this:  Mr. Babb made the
8    comment that after you and he discussed the texting
9    issue, the issue which you didn't recall discussing
10   with him before the interview, somebody said "We'll
11   take a let's-keep-an-eye-on-it strategy"?
12       A.  According to Mr. Babb, that's what he recalls.
13       Q.  And did he say whether or not you said that or
14   he said that?
15       A.  I don't recall that.  I don't think he
16   designated a person.
17       Q.  He designated somebody?
18       A.  I don't believe he designated a person.
19       Q.  Okay. During the investigation of Mr. Romig's
20   activities at Pennridge, did any other female student's
21   name come up as part of the investigations other than
22   Elizabeth Nace?
23       A.  That's the only name I know of.
24       Q.  Was there a student there at the time named

14 (Pages 53 to 56)

Appendix 0569

Thomas Creeden                          Nace vs. Pennridge School District
                                August 11, 2015

Page 57

1   live Campbell?
2       A.  I don't recall that name.
3       Q.  Do you know whether or not Mr. Romig
4   interviewed for a coaching position at Pennridge in
5   2008/2009?
6       A.  2008/2209? I do not know that.
7       Q.  Did that come up in the interview with the
8   county detectives?
9       A.  Not that I recall.
10      Q.  Do you recall anything else about your
11  interview with the county detectives after October 1st,
12  2013?  Anything else that was discussed among the
13  detectives and you and Mr. Babb.
14      A.  There was a request by Detective Kemmerer, or
15  maybe both detectives, to not let this be known to the
16  community or the players or Liz' teachers.
17      Q.  Not let what be known?
18      A.  That this event took place.
19      Q.  But by the time of this interview the event
20  was already published in the media, correct?
21      A.  But the name of the person wasn't published.
22      Q.  That's what I was getting to. The discussion
23  was that Elizabeth Nace's name was not to be revealed
24  to anybody, correct?

Page 58

1       A.  Yes.
2       Q.  The information about the alleged sexual abuse
3   and misconduct had already been out in the press.
4       A.  That is correct.
5       Q.  And were there efforts by Pennridge High
6   School to ensure that her identity did not become
7   knowledge within the high school community?
8       A.  Yes.
9       Q.  What was done?
10      A.  Well, we met with Mrs. Nace after the
11  interview and we took her recommendation, which was not
12  to share her name with the players or with the
13  teachers, and to do everything we can to make sure she
14  stayed on National Honor Society, to keep her grades
15  up. I told her that she would not be taken off of the
16  National Honor Society.
17      Q.  Did Mrs. Nace say why she thought there was a
18  possibility that she might -- that Elizabeth Nace might
19  not be able to stay on the National Honor Society
20  because of this?
21      A.  She was just concerned that she may fall off
22  of her grades.
23      Q.  Do you know if her grades did fall off at all?
24      A.  No, not that I'm aware of.  But I know I --

Page 59

1   when questions arose, I asked them to give Elizabeth
2   extra time.
3       Q.  Asked who?
4       A.  Asked the teachers.
5       Q.  And what reason did you give for that?
6       A.  I didn't give them a reason.
7       Q.  Your attorney provided all counsel with the
8   academic record of Ms. Nace, including her grades,
9   attendance record and disciplinary records.  Did you
10  review those prior to this deposition?
11      A.  I don't remember reviewing those.
12      Q.  Any other topics that you can recall were
13  discussed with the detectives during their interview
14  with you and Mr. Babb?
15      A.  I don't recall any other ones.
16      Q.  Did the detectives ask you or Mr. Babb to
17  accumulate any information for them as part of their
18  investigation?
19      A.  Not that I recall.
20      Q.  Did Pennridge conduct its own investigation
21  into the allegations of Elizabeth Nace against Mr.
22  Romig after Pennridge was informed of the investigation
23  by the police authorities?
24      A.  Not that I recall.

Page 60

1       Q.  Did the police authorities instruct you or Mr.
2   Babb not to try to conduct your own investigation, that
3   they would handle it all themselves?
4       A.  Not that I recall.
5       Q.  Did anybody at Pennridge do anything after Mr.
6   Romig was arrested on October 1st, 2013 to try to
7   determine if Mr. Romig had engaged in any improper
8   sexual conduct with any other females at Pennridge High
9   School?
10      A.  There were sessions by the counselors with the
11  girls from the softball team, so there were questions
12  asked during those sessions.  Some of them were
13  individuals; some of them were groups of two or three.
14      Q.  What counselors?
15      A.  Most of that was done by Shannon O'Sullivan,
16  the coordinator of counselors.
17      Q.  When you say "counselors," are you talking
18  about guidance counselors or psychologist counselors or
19  what type of counselors?
20      A.  We're talking about guidance counselors, and I
21  don't know if our school psychologist was involved at
22  all.  But most of my communication was with Ms.
23  O'Sullivan.
24      Q.  What was her title -- oh, coordinator of

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 61

1   counselors?
2       A.   Yes.
3       Q.   Who was the school psychologist?
4       A.   They changed around that time, so I'm not sure
5   if it was John Davison -- I'm trying to remember the
6   other school psychologist.  I don't recall his name.
7       Q.   Another male?
8       A.   Another male.
9       Q.   Did you have any direct contact with Mr. Romig
10  after his arrest?
11      A.   The only time I saw Mr. Romig was when I was
12  in the courtroom.
13      Q.   For what?
14      A.   For his sentencing.
15      Q.   So, you never spoke to him directly.
16      A.   No.
17      Q.   Do you know if Mr. Babb spoke to Mr. Romig
18  directly after his arrest?
19      A.   I don't know.
20      Q.   With regard to the sentencing hearing, was
21  there an issue that arose between you and some of the
22  players on the girls softball team about permitting
23  them to miss school to attend his sentencing hearing?
24      A.   It was not about missing school.  It was about

---

Page 62

1   how they were going to get to the courthouse.
2       Q.   What was the issue?
3       A.   I didn't want them driving together in one
4   car, as they proposed. I would prefer that a parent
5   accompany them.
6       Q.   Did you ever have a discussion with anybody at
7   the school, including school employees and/or parents
8   or the students themselves, that if they attended the
9   sentencing hearing, it would be considered an unexcused
10  absence?
11      A.   I don't recall that.
12      Q.   Why did you attend the hearing?
13      A.   I wanted to make sure the girls were safe.
14      Q.   Safe from what?
15      A.   Well, it was an emotional time and I wanted to
16  follow up if there were any girls that were still
17  upset.
18      Q.   And at the sentencing hearing did it appear to
19  you that the girls that were there were upset?
20      A.   Most of girls there handled it very well.  I'm
21  not sure -- they were visibly upset, but I know most of
22  them handled it well.  And most of them were with their
23  parents, and that was a good thing about it: They
24  didn't come as a group.

---

Page 63

1            MR. GROTH:  I've marked as Creeden
2   exhibit two a group of documents that are
3   Bates-numbered 022851 through 022976 that were
4   provided to me by your counsel as constituting the
5   Romig personnel file at Pennridge.
6            Let me just state that the Romig part
7   of that file goes between numbers 022851 and
8   022945, and that the remaining documents between
9   002946 and 022976 are documents relating to the
10  allegations involving Mr. Heath and Mr. Hart.
11           I'll show you those documents.  I want
12  to go over some of the documents with you.  I'll
13  refer to the Bates numbers so you know what pages
14  we're dealing with here.
15           (Exhibit Creeden-2 was marked for
16  identification)
17  BY MR. GROTH:
18      Q.   The first document -- I'll give the actual
19  numbers, leaving out the zero -- is 22851.  That
20  purports to be the contract between Mr. Romig and
21  Pennridge School District to act as "softball assistant
22  varsity (JV) coach."  And it is not dated, but it has a
23  listing that he's going to be the assistant coach for
24  the years 2011 to 2012.

---

Page 64

1            Let me ask you first about the title of this
2   document: "Extra Duty Contract," and it has
3   "coach/assistant coach."
4            What does that mean? Is that a special kind of
5   contract?
6       A.   Well, there are other extra-duty contracts
7   that are not coaches.
8       Q.   For whom?
9       A.   Clubs, activities.
10      Q.   Would it be fair to say that this type of
11  contract is used, for example, for some faculty members
12  who may be in charge of sponsoring clubs and
13  extracurricular activities, something separate and
14  apart from their teaching contract?
15      A.   Correct.
16      Q.   And in this particular case it actually lists
17  coach/assistant coach, correct?
18      A.   Yes.
19      Q.   Did you consider Mr. Romig to be a contract
20  employee of Pennridge as of the years 2011 through
21  2013?
22      A.   For that designated season, yes.
23      Q.   Who is the Board of Education president who
24  signed that contract?

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 65

1      A.  Looks like David Thompson.
2      Q.  Is he still the president?
3      A.  No, not that I'm aware of.
4      Q.  Will you go over to the next page? It's
5  another contract -- same form, I believe that's
6  correct -- for the school year 2012 to 2013.  It is
7  also signed -- I'm sorry, it dated January 28, 2013 and
8  signed by whom?
9      A.  Looks like Dwayne Demming's signature.
10     Q.  Who was he?  Was he president at that time?
11     A.  I believe so, yes.
12     Q.  I would take it you're not familiar with Mr.
13  Romig's signature?
14     A.  I am not.
15     Q.  Do you see that the signatures on the two
16  contracts for employer are completely different?
17               MR. COX:  Objection to the form.  You
18  can answer.
19     A.  Yes.
20     Q.  Do you know whether or not Mr. Romig signed
21  either one of these contracts?
22     A.  I do not.
23     Q.  And the title that Mr. Romig -- strike that.
24  The position that he applied for and was given by

---

Page 66

1  Pennridge is that of assistant varsity coach -- is that
2  correct? -- for softball?
3      A.  It's stated on the contract.
4      Q.  It's the same thing on the second contract:
5  Softball, assistant varsity coach, correct?
6      A.  Yes, but then there's a JV on the first one.
7      Q.  Do you know if Mr. Romig, in his two years at
8  Pennridge, acted as an assistant coach on the varsity
9  team as well as being the head coach of the JV team?
10     A.  I do not know that.
11     Q.  The game that you saw from the stands where he
12  introduced himself to you, was that a JV game or a
13  varsity game?
14     A.  The JV game was over and he walked over from
15  the other field and came to the varsity game, but I
16  don't recall if he even sat on the bench.  I think he
17  was talking to people.
18     Q.  Look at the next page, 22853.  What is this
19  document?
20     A.  It says it's a coaching/EMT application and
21  summary form.
22     Q.  Are you familiar with this form at all?
23     A.  I've seen it, but I didn't use it.  This was
24  something used with HR.

---

Page 67

1      Q.  And who on behalf of Pennridge would be
2  responsible for filling this out? There is no signature
3  at the bottom.
4      A.  That would be the head of HR.
5      Q.  Who was who at the time?
6      A.  2012, I believe that was Ray Scarpantonio.
7      Q.  And would it have been his job to make sure
8  that all these boxes on here were checked and
9  everything that was listed on here was actually
10  completed and submitted?
11     A.  Like I said, I don't remember this form too
12  much, but I would assume that would be his job under
13  his job description, yes.
14     Q.  As opposed to the athletic director doing it?
15     A.  Yes.
16     Q.  Please flip over to number 22855.  It's titled
17  "Pennridge School District - PAR Personnel Action
18  Request."  It's dated down at the bottom February 18th,
19  2014.
20         Is that Ray Scarpantonio's signature down at
21  the bottom?
22     A.  That looks like it.
23     Q.  What is this form for?
24     A.  I believe that goes to the board to complete

---

Page 68

1  the hiring process.
2      Q.  There's a line near the bottom that says
3  "Termination, last date worked 5/10/13," then it has a
4  word handwritten "paid" next to it.  Do you know what
5  that means?
6      A.  I do not.
7      Q.  Let's go to page 22858, please.  This is an
8  application for service staff personnel filled out by
9  Mr. Romig.  I think it consists of four pages.
10         On that application for a coaching position,
11  the box at the top that's marked "coach," there are
12  spaces for employment history.
13         If you turn to the second page, 022859?  Do
14  you see there is one employer listed there, R&R Service
15  Group? Do you see where I'm referring to?
16     A.  Yes, I do.
17     Q.  Do you know whether, in filling out this form,
18  that somebody applying for a coaching position is
19  supposed to also list all of their prior paid,
20  compensated coaching positions?
21     A.  Not that I'm aware of.
22     Q.  You don't believe that they're required to
23  list their prior coaching positions on this form?  I'm
24  not talking about club or volunteer work or whatever.

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 69

1   I'm talking about paid, compensated coaching positions
2   with another school, school district or private school,
3   whatever.
4        A.  I don't know if it's required.
5        Q.  In this case it wasn't done, correct?
6        A.  It wasn't done.
7        Q.  If you go to page 22861?  There are a number
8   of references listed by Mr. Romig in this application:
9   Russ Hollenbach, Marc Hoover and Ray Hunsberger.
10       Now, I know you've already testified that you
11   played little, if any, part in Mr. Romig's hiring
12   because he was an assistant coach.  But do you know from
13   any source of information -- Mr. Babb or Mr. Koehler or
14   anybody else -- whether or not anybody from Pennridge
15   contacted any one of those references prior to the time
16   that Mr. Romig was hired by Pennridge?
17       A.  I do not.
18       Q.  Go over to page 022865, please.  This is
19   titled "Pennridge School District, Staff Computer and
20   Information Systems User Agreement."
21       Basically, it is signed by Thomas Creeden and
22   dated February 7, 2012, and it states that the employee
23   agrees to use all of the computer and network
24   information systems "in accordance with the Acceptable

---

Page 70

1   Use Policy and the Guidelines promulgated thereunder,"
2   correct?
3        A.  Correct.
4        Q.  My question to you is, is there any
5   acknowledgment or written document that Pennridge used
6   at this time, back in 2012, to indicate that the
7   employee was agreeing to abide by the harassment
8   policies or the sexual harassment policies of Pennridge
9   School District?
10       By that I mean any written document signed by
11   the employee stating that "I have been informed of,
12   reviewed, understand, and agree to abide by the
13   unlawful harassment or sexual harassment policies in
14   place at Pennridge"?
15       MR. COX:  Objection to the form.  You
16   can answer.
17       A.  Well, that specifically?  No.  But in the
18   contract it does say abide by all rules, regulations,
19   and policies of Pennridge School District, but it
20   doesn't say exactly sexual harassment.
21       Q.  So, what I'm getting at is, there's no
22   acknowledgment form signed by Mr. Romig that says that
23   he has been given a copy of or reviewed or agrees to
24   abide by the unlawful harassment or sexual harassment

---

Page 71

1   policies of Pennridge.  Is that correct?
2        MR. COX:  Objection to the form.  You
3   can answer.
4        A.  Not that's documented here.
5        Q.  Have you worked at other schools where a
6   school or district employee has to sign such an
7   acknowledgment that they've read either a handbook or a
8   guide or some type of written publication by the school
9   outlining its policies, including policies for unlawful
10   harassment or sexual harassment, and that they agree to
11   follow those policies?
12       A.  Yes, Pennridge.
13       Q.  Pennridge does that.
14       A.  Yes.
15       Q.  For who?
16       A.  I did it for every high school faculty.
17       Q.  Faculty, not coaches.
18       A.  Not coaches.
19       Q.  Why not coaches?
20       A.  Again, that was determined by HR.  I did that
21   on a personal basis with my high school faculty.
22       Q.  And HR determined it didn't have to be done
23   with coaches?
24       A.  I don't know --

---

Page 72

1        MR. COX:  Objection to the form.  You
2   can answer.
3        A.  I can't say that was a statement from HR.  I
4   just personally had the teachers sign off that they
5   went over the policies each school year.
6        Q.  Was it a similar form to the form that you
7   gave the students to sign off on and their parents?
8        A.  No, it was a form that had the teacher's
9   signature that they received the policies or the
10   teacher handbook, I should say, and the policies were
11   in there.  Not all the policies, but the policies
12   pertaining to, because the policies was like a binder,
13   but they would sign off each year about the teacher's
14   manual.
15       Q.  Sign off on a written document.
16       A.  Yes.
17       Q.  And was each teacher given their own binder
18   with the policies and practices?
19       A.  The teacher handbook.  It didn't have every
20   policy in it, but it had a lot pertaining to what
21   directly affected the high school.
22       Q.  And the handbook did include the sexual
23   unlawful harassment and sexual harassment policies?
24       A.  Yes.

---

18 (Pages 69 to 72)

Appendix 0573

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 73

1      Q.  Drug-free policy?
2      A.  Yes.
3      Q.  I'm not clear on whose decision it was --
4   strike that.  You indicated that it was your decision
5   as principal to have the teacher sign off on getting
6   their copy of and reviewing the teacher handbook,
7   correct?
8      A.  Yes.
9      Q.  Did you decide whether or not any other type
10  of district employee at the high school had to sign off
11  on a similar handbook or some other written publication
12  given the school's policies and practices?
13     A.  Did I decide if other employees besides the
14  faculty?
15     Q.  Yes.
16     A.  No.
17     Q.  You didn't decide that.
18     A.  I didn't decide that.  I just took care of the
19  teachers.
20     Q.  So, it would be correct to say you did not
21  decide not to include the coaches, correct?
22     A.  Right.
23     Q.  Did anybody at Pennridge decide not to make
24  the coaches sign a written document saying that they

---

Page 74

1   had received and reviewed the guidelines and policies
2   at Pennridge with regard to unlawful harassment or
3   sexual harassment or any other policy of the
4   school. . .
5          . . .yes, or any other policy of school?  Was
6   it somebody else's decision not to have coaches do
7   that?
8          MR. COX:  Objection to the form. If you
9   understand the question, you can answer it.
10     Q.  I'll try to rephrase it if you need to hear it
11  again.
12     A.  The only document I know they signed was the
13  contract, which has that statement about the guidelines
14  and policies of Pennridge School District.
15     Q.  Okay.  Do you know if there was a procedure in
16  place at Pennridge at the time Mr. Romig was first
17  hired to provide coaches or assistant coaches with hard
18  copies of the policies and procedures of Pennridge
19  which they were expected to adhere to?
20     A.  Was there a procedure?
21     Q.  Yes.
22     A.  Not that I'm aware of.
23     Q.  So, you don't personally have any information
24  that Mr. Romig was ever given any school district

---

Page 75

1   policy with regard to unlawful harassment or sexual
2   harassment.
3      A.  I'm not aware of that.
4      Q.  Was Mr. Romig's improper conduct toward
5   Elizabeth Nace the first time you had heard of a coach
6   engaging in that type of activity with a player in this
7   area, the area that you've lived and worked in for many
8   years?
9      A.  I can't recall that.
10     Q.  You don't know whether or not you knew of some
11  other, similar situation before?
12         MR. COX:  Objection to the form.  You
13  can answer.
14     A.  I can't recall a similar nature that I can
15  recall right now.
16     Q.  Does Mr. Babb, as athletic director, report
17  directly to you?
18     A.  Yes.
19     Q.  Did you ever instruct Mr. Babb to make sure
20  that the coaches or assistant coaches that were hired
21  by Pennridge were made aware of and were provided with
22  copies of Pennridge's policies with regard to unlawful
23  harassment, including sexual harassment?
24     A.  They were presented policies?

---

Page 76

1      Q.  Yes.
2      A.  As two policies.  No.
3      Q.  Did you ever require coaches or assistant
4   coaches to undergo the same type or any type of sexual
5   harassment training in terms of recognition of,
6   reporting of, investigation of, or resolution of sexual
7   harassment allegations to coaches or assistant coaches?
8      A.  Did I personally?
9      Q.  Yes, did you personally instruct Mr. Babb to
10  make coaches and assistant coaches aware of those
11  policies.
12     A.  The sexual harassment policies?
13     Q.  Yes.
14     A.  No.
15     Q.  Do you know whether or not Pennridge ever
16  provided any training or instruction to any of its
17  coaches or assistant coaches with regard to Pennridge's
18  policies and practices involving unlawful harassment,
19  including sexual harassment?
20     A.  Only if those coaches were part of the
21  faculty.
22     Q.  I'm sorry?
23     A.  Only if those coaches were part of the
24  faculty.

---

19 (Pages 73 to 76)

Appendix 0574

Thomas Creeden                    Nace vs. Pennridge School District
                              August 11, 2015

---

Page 77

1     Q.  So, for those coaches that were hired, or
2   assistant coaches such as Mr. Romig who were hired who
3   were not part of the faculty, to your knowledge they
4   never received any training from Pennridge with regard
5   to Pennridge's sexual-harassment policies?
6     A.  To my knowledge, no.
7     Q.  Go over to page 22874, please.  Do you have
8   that?  I think it goes to page 22877 and it's titled
9   "Assistant coach evaluation form for Eric Romig" dated
10   6/6/12.
11       On the last page of that, on 22877, is that
12   Mr. Koehler's signature?
13     A.  The second one?
14     Q.  Yes.  Where it says "signature of head coach."
15     A.  Yes.
16     Q.  And that's Mr. Babb's signature as athletic
17   director?
18     A.  It looks like it, yes.
19     Q.  Are they the people who are responsible for
20   actually doing the evaluations of coaches or assistant
21   coaches?
22     A.  Assistant coaches, yes.
23     Q.  What about coaches?
24     A.  Head coaches?

---

Page 78

1     Q.  Yes.
2     A.  I'm part of that.
3     Q.  You would be a part of it along with Mr. Babb
4   and Mr. Koehler -- just Mr. Babb.
5     A.  Not Mr. Koehler.
6     Q.  Go to page 22911, please.  This is a number of
7   emails between Shannon O'Sullivan and Jacqueline
8   Rattigan.  Who is Jacqueline Rattigan?
9     A.  She was the president and superintendent of
10   Pennridge School District.
11     Q.  Who was she on October 14, 2013?  What was her
12   position?
13     A.  Superintendent -- October 4th of 20. . .
14     Q.  13.
15     A.  Jacqueline Rattigan was the superintendent.
16     Q.  Do you know when she became superintendent?
17     A.  It would be the beginning of that school year,
18   in the summer.
19     Q.  What was her position at Pennridge before
20   that?
21     A.  She didn't have a position.
22     Q.  I thought I saw a document that listed her as
23   CEO of something.  Does that ring a bell with you at
24   all?

---

Page 79

1     A.  No.
2     Q.  This document refers to the person whose name
3   I brought up before, Olivia Campbell.  Have you ever
4   seen this document before?
5     A.  I don't recall it, but my name is on it,
6   so. . .
7     Q.  Does this refresh your recollection as to
8   whether or not Pennridge looked into whether or not
9   there was any inappropriate conduct between Mr. Romig
10   and Liev Campbell?
11       MR. COX:  Take your time and review it.
12     A.  Okay.
13     Q.  Does that refresh your recollection of what we
14   talked a little bit about before involving Liev
15   Campbell?
16     A.  I talk to a number of students; not every day.
17   I don't recall this specifically, but there must have
18   been a conversation according to Shannon.
19     Q.  Do you know whether or not there was any
20   follow-up to this email, any further investigation with
21   Liev Campbell?
22     A.  I do not know.
23     Q.  Does looking at this document refresh your
24   recollection as to whether or not Liev Campbell's name

---

Page 80

1   came up when you and Mr. Babb met with and talked to
2   the county detectives?
3     A.  It doesn't. I don't recall it.
4     Q.  Go over to the next page, 228912.  Who is
5   James Dugan?
6     A.  James Dugan? I don't know who James Dugan is.
7   I'm trying to recall.  James Dugan.  I don't recall a
8   James Dugan, a teacher.
9       MR. GROTH:  Mr. Cox, can you enlighten
10   me?
11       MR. COX:  Mr. Dugan was the interim HR
12   director probably after Dr. Creeden's tenure came
13   to an end.  So, that's who it was.
14       MR. GROTH:  I actually can see the date
15   on that.  Thank you.
16   BY MR. GROTH:
17     Q.  Do you know whether or not any other students
18   had ever complained about Mr. Romig's conduct prior to
19   the time that he was arrested on October 4th, 2013?
20     A.  I don't recall any complaints.
21     Q.  Other than this information that was given by
22   Liev Campbell to Ms. O'Sullivan, do you know if any
23   other student reported something to the administration
24   of Pennridge about Mr. Romig's conduct after he was

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

|  | Page 81 |
|---|---|

1   arrested on October 1st, 2013?
2       A.  Reported to administration?
3       Q.  Anybody in Pennridge's administration.
4       A.  Not that I recall.
5       Q.  After Mr. Romig was arrested was there some
6   type of notice that went out to parents or students or
7   both or faculty asking that if anybody has any
8   information regarding Mr. Romig's conduct, that they
9   should contact the administration or the police
10  authorities?
11      A.  Not that I recall.
12      Q.  Go to page 22927, please.  This is a memo from
13  David Babb to Ray Scarpantonio, received in human
14  resources October 8, 2013. This is about a week after
15  Mr. Romig was arrested.
16          This purports to review the hiring process for
17  Eric Romig as a high school softball coach.  Have you
18  ever seen this document before?
19      A.  I have not.
20      Q.  Take a moment to read it.
21          MR. COX:  Just this.
22          THE WITNESS:  Okay.
23  BY MR. GROTH:
24      Q.  You've had a chance to read it?

|  | Page 82 |
|---|---|

1       A.  Yes.
2       Q.  This document states that Mr. Babb interviewed
3   Mr. Romig over the phone for the position that was open
4   as a softball coach.
5           Can you tell me whether those interviews are
6   typically conducted over the telephone as opposed to in
7   person?
8       A.  Over the phone instead of in person?
9       Q.  Yes.
10      A.  Not that I'm aware of.  They're usually done
11  in person.
12      Q.  Did Mr. Babb ever tell that you Mr. Romig did
13  not actually apply for the position; that he contacted
14  Mr. Romig because of his past association with him and
15  asked Mr. Romig if he would be interested in the
16  position?
17          MR. COX:  Objection to the form.  You
18  can answer.
19      A.  I don't recall that.
20      Q.  It says here "He," meaning Mr. Romig, "also
21  met with our head coach Paul Koehler for his approval."
22  I think I spelled Koehler wrong, or is that spelled
23  wrong? Is it K-o-e-h-l-e-r or k-o-h-l-e-r?
24      A.  I think it's an E.

|  | Page 83 |
|---|---|

1       Q.  I think it's an E, also.
2           MR. COX:  There's an E.
3           MR. GROTH:  It's on the evaluation
4       form.  It looks like an E.
5   BY MR. GROTH:
6       Q.  For an assistant coach to be hired, is it also
7   typical for the applicant to meet in person with the
8   head coach?
9       A.  Correct.
10      Q.  Do you know whether or not Mr. Romig actually
11  met with Paul Koehler in person before he was hired by
12  Pennridge?
13      A.  I do not know that.
14      Q.  This document for Mr. Babb says "met with Mr.
15  Romig, also met with our head coach Paul Koehler for
16  his approval," does it not?
17      A.  Yes, it does.
18      Q.  After Mr. Romig was arrested on October 1st,
19  2013, did anybody from Pennridge contact FCA to learn
20  any more details of the reason for Romig leaving FCA at
21  the end of 2009?
22      A.  Not that I'm aware of.
23      Q.  Did Mr. Babb ever tell you that he contacted
24  Mr. Hollenbach or anybody at FCA to try to find out

|  | Page 84 |
|---|---|

1   more about why Mr. Romig left FCA at the end of 2009?
2       A.  Not that I recall.
3       Q.  Before this lawsuit was filed, did you ever
4   find out from any source that Mr. Romig was forced to
5   resign from FCA because of a texting situation with a
6   female student?
7           MR. KEMETHER:  Objection to the form.
8       A.  Forced to resign?
9       Q.  Yes.
10      A.  I don't know if -- I know he resigned, but I'm
11  not sure if "forced" is the right word, so. . .
12      Q.  How did you learn whatever you learned about
13  the circumstances surrounding his resignation?
14          MR. COX:  Again, now you're talking,
15      Mr. Groth, before the lawsuit.
16          MR. GROTH:  Yes, before the lawsuit was
17      filed, in and around the time the investigation by
18      the police was going on.
19          THE WITNESS:  Can you restate the
20      question?
21          MR. GROTH:  Yes.
22  BY MR. GROTH:
23      Q.  Did you ever learn any more details about the
24  circumstances surrounding Mr. Romig's resignation as a

                                    21 (Pages 81 to 84)

                                                        Appendix 0576

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

Page 85

1  coach from both Quakertown and FCA at the end of 2009
2  at or around the time of the police investigation of
3  Mr. Romig?
4      A.  The only thing I remember is health reasons,
5  his heart.
6      Q.  Do you recall where you got that information?
7      A.  I believe Mr. Babb stated it in the interview
8  with the detectives.
9      Q.  Do you recall reading anything about that in
10 the newspaper articles regarding Mr. Romig and the
11 police investigation and criminal charges against him?
12     A.  I don't recall that.
13     Q.  Going back to Mr. Romig's personnel file,
14 number 22928, do you know who prepared this two-page
15 document?  There is no signature or indication who the
16 author is.
17     A.  I'm just briefly reading through it.  I don't
18 know --
19         MR. COX:  Take your time with it.
20         THE WITNESS:  Okay.
21         (Pause)
22     A.  It could have been one of our counselors.
23     Q.  But you can't tell just by reading it?
24     A.  No.

Page 86

1      Q.  No?
2      A.  No.
3      Q.  It's dated October 7th, I think it's 2013.  In
4  the top paragraph it says "Two of the girls talked
5  about the game.  The Bells played at Quakertown over
6  the weekend, where players from Quakertown were
7  taunting them and asking who it was."
8          Was there any taunting or harassment of the
9  girls softball team within the school after Mr. Romig
10 was arrested?
11     A.  That I was made aware of?
12     Q.  Yes.
13     A.  Not that I recall.
14     Q.  Were there any -- was there any taunting of
15 the -- strike that.
16         Would you go to page 22931, please?  This is a
17 letter from the Hornstine, Pelloni & Hornstine law firm
18 to a number of people, including Jacqueline Rattigan of
19 Pennridge School District and Dwayne Demming from
20 Pennridge School District, with regard to the Nace and
21 Romig situation.
22         Do you recall seeing this letter?
23     A.  I don't recall seeing this letter.
24     Q.  There is a handwritten "received 11/22/13" at

Page 87

1  the top.  Do you know whose handwriting that is?
2      A.  I do not.
3      Q.  Is it your handwriting?
4      A.  No.
5      Q.  Go to page 22935, please.  I think I asked you
6  before whether or not there was some kind of notice
7  that went out to parents or students about the Romig
8  situation and reporting any information they may have
9  about his conduct or behavior.
10         Do you recall this document at all?
11     A.  I do not.
12     Q.  It's not dated.  It's to parents and guardians
13 of the Pennridge softball team.  It basically talks
14 about Mr. Romig being taken into custody and students
15 being able to talk to counselors if they needed to, or
16 reporting any information they may have about the case
17 to the Bucks County district attorney's office.
18         It's from Jacqueline Rattigan and it has her
19 listed as CEO, Pennridge School District.  Do you
20 remember I asked you about her being CEO?
21     A.  The only thing I can remember about that is
22 that Dr. Kish was still under contract as
23 superintendent, and I think for her to transition she
24 was given that title, but that's the only thing I could

Page 88

1  recall why she would have that title.
2      Q.  And is that chief executive officer?  If you
3  know.
4      A.  I don't -- I don't know.
5      Q.  I want to spend some time with you going over,
6  at least in summary form, the sexual abuse allegations
7  and complaints and the investigations of the other
8  teachers that we discussed earlier in the deposition
9  going back to the end of the 1990s and beginning of the
10 2000s.
11         If my chronology is correct here, the first
12 person that was accused of some sexual misconduct
13 during your tenure starting in 1999s was Mark Ludlow.
14 Would that be correct?
15     A.  That's correct.
16     Q.  Can you just summarize for me basically what
17 the allegations or complaints were against him and what
18 action was taken?
19     A.  The two students came down with their
20 guidances counselor, and they said that while Mr.
21 Ludlow was passing out papers he touched their breast,
22 but they were unsure if it was an accident or on
23 purpose.
24     Q.  So, what happened?

Appendix 0577

Thomas Creeden                    Nace vs. Pennridge School District
                        August 11, 2015

Page 89

1    A.  We talked to the girls -- that's the guidance
2    counselor and myself -- and after that information was
3    given to me I called Dr. Kish and informed him of the
4    allegations.
5    Q.  So, what happened?
6    A.  Dr. Kish asked me to investigate more.  Again,
7    the guidances counselor and I talked to the girls and
8    tried to get more information.  It was the same,
9    whether it was an accident or on purpose.  They also
10   shared some things about the way he was teaching.
11   Q.  About some of the comments he is making in
12   class.
13   A.  Correct.
14   Q.  Personal issues.
15   A.  Correct.
16   Q.  Having nothing to do with the curriculum.
17   A.  Correct.
18   Q.  Something about Betsy Ross.
19   A.  I don't know about that one.
20   Q.  Being a prostitute.
21   A.  That's 1999, but I'm trying to remember if
22   that was the direct quote, but there were comments in
23   class that were inappropriate.
24   Q.  By the way, what did he teach?

Page 90

1    A.  Social studies.
2    Q.  So, what happened next?
3    A.  I continued to report to Dr. Kish my findings,
4    and -- trying to get a sequence here.  I asked the
5    counselor to remove the girls from the class. The girls
6    and their parents objected to that very strongly.
7        At that time I continued to contact Dr. Kish,
8    letting them know that the girls did not want to
9    proceed with anything else.
10   Q.  Now, the girls told you that this had happened
11   to them on more than one occasion, correct?
12   A.  I don't recall that.
13   Q.  Did they tell you that he was doing more than
14   just brushing against them or touching their breasts;
15   that he was also rubbing their shoulders or back or
16   leaning into them where his face is almost touching
17   theirs, that type of thing?
18   A.  Not the specifics, but he would get close to
19   them, yes.
20   Q.  Close --
21   A.  Close to the students, yes.
22   Q.  Close to where they were uncomfortable.
23   A.  Yes.
24   Q.  So, what happened next?

Page 91

1    A.  We began to talk to parents of the two girls.
2    We brought them in, talked to them, trying to see if we
3    could get the girls to move forward with this, and they
4    refused.
5    Q.  What did you want the girls to do?
6    A.  It was either report it to the authorities or
7    Children & Youth.
8    Q.  And you asked the girls if they wanted to do
9    that?
10   A.  No, the parents.
11   Q.  You asked the parents.
12   A.  Yes.
13   Q.  What was the response?
14   A.  They just wanted it to end. I think in the
15   meantime Dr. Kish also talked to the parents.
16   Q.  Now, at that time were you aware of the
17   provisions of the Child Protective Services law in
18   terms of mandatory reporting of sexual harassment?
19   A.  Yes.
20   Q.  Had you ever taken any training or course of
21   study or seminars or anything that explained the
22   definition of sexual harassment as well as the
23   reporting requirements and the investigation
24   requirements?

Page 92

1    A.  No.
2    Q.  Okay.  Have you ever read the statute? Strike
3    that.  Had you ever read the statute up until the time
4    of this situation back in I believe it was 1999 or so?
5    A.  Not that I recall.
6    Q.  Did you have an understanding that if there
7    was sexual harassment of a student by a teacher as
8    defined by the statute, that there was an obligation of
9    the school administration or compliance officer to
10   report that to either the Department of Public Welfare
11   or the district attorney or the police department?
12   A.  I reported it to my superior and waited for
13   direction on that.
14   Q.  I'm not sure that answered my question.  Were
15   you aware that in 1999, or whenever this occurred with
16   Mr. Ludlow, that if there was a claim of sexual
17   harassment as defined in the statute against a teacher
18   by a student, that was to be reported, first of all, to
19   the administration of the school and then by the
20   administration to the public authorities?
21        MR. COX:  Objection to the form.  You
22   can answer.
23   A.  Again, I reported that to Dr. Kish.
24   Q.  You still didn't answer my question.  I'm

                                    23 (Pages 89 to 92)

Thomas Creeden                          Nace vs. Pennridge School District
                          August 11, 2015

---

**Page 93**

1    asking what you were aware of with regard to the Child
2    Protective Services law.
3        A.  Yes, I was aware of that.
4        Q.  And since you reported it to Dr. Kish, is it
5    your statement that Dr. Kish made the decision not to
6    report it to the authorities?
7        A.  Dr. Kish did not direct me to report it nor
8    did he report it.
9        Q.  So, it's his decision not to report it.
10       A.  In that situation, yes.
11       Q.  Did you have any discussion with him about why
12   neither he nor you was going to report this situation
13   to the authorities?
14       A.  I don't know if it was a discussion, but I
15   asked him what he wanted me to do.
16       Q.  Did you make a recommendation to him? Did you
17   tell him "we should report it"?
18       A.  Not that I recall.
19       Q.  Did he say to you anything to the effect of "I
20   know we should report it, bud we're not going to report
21   it"?
22       A.  Not that I recall.
23       Q.  What did he say to you?
24       A.  Continue to investigate.

---

**Page 94**

1        Q.  What other investigation was there to do?
2        A.  Well, if I recall correctly, I wanted to --
3    the girls were going to tell me if there were any other
4    students that they may have been aware of that this
5    happened to, and they could not tell me at that time.
6        Q.  What happened next?
7        A.  I know we were trying to move forward to take
8    them out of the class, and basically at that time the
9    parents and students refused to move forward, then I
10   had to conclude my investigation.
11       Q.  How did you conclude it?
12       A.  With a memo to Mr. Ludlow.
13           MR. GROTH:  Can we go off the record a
14       second?
15           THE VIDEOGRAPHER:  The time is now
16       12.51 p.m. We are going off the record.
17           (There was a discussion held off the
18       record)
19           MR. GROTH:  Back on the record.
20           THE VIDEOGRAPHER:  The time is now
21       12:51 p.m. We are back on the record.
22   BY MR. GROTH:
23       Q.  What did the memo to Mr. Ludlow from you say?
24       A.  I'm paraphrasing here: That I concluded the

---

**Page 95**

1    investigation and that I made several recommendations
2    to him in the future to be aware of, and I don't recall
3    what those recommendations are off the top of my head.
4        Q.  Were they something to the effect of don't
5    stand so close to the students, don't say anything in
6    class that doesn't involve the curriculum, that type of
7    thing?
8        A.  Well, we started a constant visitation of Mr.
9    Ludlow's class. And I say "we": It was the supervisor,
10   assistant principal and myself started going to the
11   class on a regular basis.
12       Q.  I'm sorry, it was you, who and who?
13       A.  Assistant principal.
14       Q.  Okay.
15       A.  And supervisor, social studies supervisor.
16       Q.  Who were they?
17       A.  The assistant principal was Keith Gotschall
18   saw and the supervisor was Dan Poncol.
19       Q.  So, you're monitoring his classroom
20   activities?
21       A.  Yes.
22       Q.  Anything else in that memo that you can
23   recall?
24       A.  Not that I can recall.

---

**Page 96**

1        Q.  You told me about talking to the kids, you
2    told me talking to the parents, you told me about
3    talking to Dr. Kish, and then we skipped to a memo to
4    Mr. Ludlow. You never told me about talking to Mr.
5    Ludlow.
6        A.  Oh, I did talk to Mr. Ludlow.
7        Q.  All right.
8        A.  On at least two occasions.
9        Q.  What was the discussion?
10       A.  I put forth the allegations; he denied them.
11   I started monitoring -- I said I wanted to see his
12   plans and what he was presenting in class and that that
13   could go to Mr. Poncol, the social studies supervisor,
14   to make sure that he was doing the curriculum.
15           And I think he started printing those
16   documents to Mr. Poncol somewhere along the road of
17   this whole process because I wanted to see if Mr.
18   Poncol was on board or what he was teaching and
19   comments that he was making.
20       Q.  What did Mr. Ludlow say when you told him what
21   the accusations were?
22       A.  He denied them.
23       Q.  Denied ever having any contact at all?
24       A.  I'm pretty sure he denied everything I said.

---

                                    24 (Pages 93 to 96)

                                                        Appendix 0579

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

---

Page 97

1    Q.  Did he give you any reason why he thought
2  these girls may be lying?
3    A.  I don't recall that.
4    Q.  Did you conclude when you talked to the girls
5  and to their parents that you thought the girls were
6  lying?
7    A.  No.
8    Q.  Would it be fair to say that based upon your
9  discussion with Mr. Ludlow, then your memo to Mr.
10  Ludlow -- strike that.  When you met with Mr. Ludlow
11  was anybody else present?
12    A.  The first time, no; and then I was told by the
13  union rep that I should have a union rep present, then
14  I met the second time with the union rep.
15    Q.  What took place at that meeting?  What was
16  said?
17    A.  We basically rehashed what was in the first
18  meeting and to inform the union rep and to let him know
19  that, you know, these allegations were put forth.
20    Q.  Would it be fair to say that you and Mr. Kish
21  and these other people -- the assistant principal and
22  the social studies supervisor -- were taking a
23  lets-keep-an-eye-on-it strategy?
24          MR. COX:  Objection to the form.  You

---

Page 98

1  can answer.
2    A.  No.
3    Q.  But you were monitoring him more closely,
4  correct?
5    A.  Monitoring him more closely, but visitations
6  were not uncommon.  I probably increased them and asked
7  the supervisor and assistant principal to increase them
8  because they both had social studies backgrounds.
9    Q.  So, you were keeping an eye on it.
10          MR. COX:  Objection to the form.  You
11  may answer.
12    A.  Visitations were common on a regular basis, so
13  that was not something -- I used to walk the halls and
14  just pop into class, so this was not uncommon, that we
15  would be visiting.  It was not a formal observation.
16    Q.  But one of your resolutions was to visit him
17  more often.
18    A.  Yes.
19    Q.  Because of those allegations.
20    A.  Well, yes. When things are brought to your
21  attention, whether -- in any of those situations, we
22  would go out and visit if there were concerns.
23    Q.  All right.  Do you recall the time of the year
24  when these two girls first made these allegations?

---

Page 99

1  Fall? Spring?
2    A.  I believe it was fall.
3    Q.  Sometime around October?
4    A.  The fall, yes.
5    Q.  And you met with Mr. Ludlow; you discussed the
6  issues with him. You met with a Dr. Kish, and the
7  decision was made not to report this to authorities.
8  And you had the memo to Mr. Ludlow.
9        Despite all that, in January of 2000 you got
10  yet another report unrelated to the first two girls
11  from another girl who said he was doing the same thing
12  to her, correct?
13    A.  That is correct.
14    Q.  Okay. So, whatever you had decided to do
15  after the first two girls came forward and made the
16  allegation, it didn't work.
17          MR. COX:  Objection to the form. You
18  can answer.
19    Q.  Correct?
20    A.  I think we got information on what he was
21  teaching and we did work through the process of that.
22  But if you're talking about the inappropriate touching,
23  yes.
24    Q.  It did work.

---

Page 100

1    A.  It didn't work.
2    Q.  It did not work.
3    A.  Right.
4    Q.  And the girl that reported that in, I believe,
5  January of 2000 was totally unrelated to the two other
6  girls.  There was not the same class or whatever.  It
7  was just a separate girl altogether?
8    A.  I believe so.
9          MR. GROTH:  Let's go off the record.
10          THE VIDEOGRAPHER:  The time is now
11  12:58 p.m. We're going off the record.
12          (A brief recess was taken)
13          (The following takes place off the
14  video record:
15          MR. COX:  I have an objection to him,
16  David, basically going through these articles and
17  telling you about whether he thinks they're
18  accurate or inaccurate.
19          I think a better approach would be to
20  go through, and if you want to ask him questions
21  about particular facts set forth in them, that you
22  do so.  He can tell you if he remembers them,
23  agrees with them, disagrees with them.
24          MR. GROTH:  You can put the objection

---

25 (Pages 97 to 100)

Thomas Creeden                          Nace vs. Pennridge School District
                        August 11, 2015

---

Page 101

1     on the record. I'm going to do it the way I told
2     you originally.
3              Let's go back on the record.
4              (Exhibit Creeden-3 was marked for
5     identification)
6              THE VIDEOGRAPHER:  The time is now 1:58
7     p.m. This begins DVD number three in the
8     deposition of Thomas Creeden. We are back on the
9     record.
10    BY MR. GROTH:
11    Q.  Mr. Creeden, when we left we were talking
12    about the sexual abuse allegation against Mark Ludlow
13    back in 1999/2000.
14       I gave you what I've marked Creeden exhibit
15    number three, which is four local media articles, short
16    media articles, reporting on those allegations and the
17    outcome of those criminal allegations and charges
18    against Mr. Ludlow.
19       I gave you an opportunity to read through
20    those articles. Did you read through the articles?
21    A.  Yes, I did.
22    Q.  Then I asked you to mark with a red pen with
23    an asterisk or some designation on the article any
24    facts that are reported in those articles which you

---

Page 103

1     think the witness really understands or can
2     understand what you're asking him to do here, and
3     I don't think he can answer these questions
4     accurately.
5              If there are specific facts, Mr. Groth,
6     that are set forth in these newspaper articles
7     that you want to ask him about, I think that's a
8     fair line of inquiry.
9              But for him to just go through these
10    articles and try to ascertain what is accurate or
11    what's inaccurate, what relates to this case, I
12    think is very difficult, makes it virtually
13    impossible for him to answer the questions.
14    I object to this approach.
15             MR. GROTH:  Let me ask Mr. Creeden.
16    BY MR. GROTH:
17    Q.  Do you understand what I asked you to do, to
18    mark with a red pen if there was some fact reported in
19    the articles that you believed or knew not to be true?
20    Do you recall me giving you that instruction?
21    A.  I do recall.
22    Q.  And did you understand that instruction?
23    A.  As it pertains to me or as it pertains to
24    other people stated in the articles?

---

Page 102

1     believe to be or know to be incorrect.
2              Do you recall me giving you that instruction?
3     A.  Yes, I do.
4     Q.  After reading through those four articles, did
5     you find any -- and I'm only talking reported facts,
6     not other things that may be in the articles or things
7     that you don't know anything about, but about the facts
8     of which you have knowledge -- did you find any
9     reporting in these four articles to be incorrect in any
10    way?
11             MR. COX:  Objection to the form.
12    Q.  You can answer.
13    A.  What about the comments from people in the
14    community.
15    Q.  Those aren't facts that you have knowledge of.
16    A.  All right.  I just want to clarify it, that's
17    all.
18    Q.  I'm asking about the investigative facts that
19    you have specific knowledge of, the comments that were
20    attributed to you in the articles, that type of thing.
21    A.  Okay, I'm going to review my comments, if you
22    don't mind.
23             MR. COX:  And again, I just want to
24    note for the record my objection:  That I don't

---

Page 104

1     Q.  As opposed to any facts of which you have
2     personal knowledge based upon your involvement in the
3     investigation of Mr. Ludlow and comments that you made.
4     A.  Well, number one is, I just didn't leave it at
5     "don't touch the girls again." I'm looking at page one
6     of three. So, if you want to give me your pen, I'll
7     mark that.
8              There were instructions given to him as per
9     that memo.  There were other things, if I recall, like
10    leaving his door open; make sure he's teaching the
11    curriculum.  You know, just trying to call it off the
12    top my head.
13       So, on this it just says "He spoke to the
14    girls as well as advised the teacher not to touch the
15    students again."  That was just the minimum of what I
16    told him not to do.  That's the only statement in there
17    that I see right now.
18    Q.  Well, is what's reported there incorrect?
19             MR. COX:  Where?
20             MR. GROTH:  What he's marked on the
21    article.
22             THE WITNESS: Well, there is a lot more
23    to it.
24

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

| Page 105 | Page 107 |

**Page 105**

BY MR. GROTH:
1    Q.   I'm not saying there is not more to it.  I'm
2    saying is what is reported in the article correct or
3    incorrect? I'm not saying this is everything that
4    happened; obviously it's not.  But is what is reported
5    here correct?
6            MR. COX:  Where specifically?
7            MR. GROTH:  Where he's put his
8        parenthesis.
9            THE WITNESS:  Yes, I said not to touch
10       the students again, but there is a lot more to it.
11   BY MR. GROTH:
12   Q.   So, what is reported here is correct.
13   A.   That one statement.
14   Q.   Yes.
15   A.   Just looking for a response, and I know there
16   is more to this, so I'm. . .
17   Q.   All right, let's do it another way.  Let's go
18   to the first article starting from the back.  This is
19   an article dated August 19th, 2000, The Morning Call.
20   A.   Is that the one? Am I on the right page?
21   Q.   Yes.
22   A.   Okay.
23   Q.   It says here about eight lines down, "The

**Page 106**

1    District conducted it's own investigation."  In terms
2    of who conducted that investigation, that would have
3    been you, correct?
4    A.   I was one of the people to conduct it, yes.
5    Q.   Along with Dr. Kish?
6    A.   He is part of some of those, not all of them.
7    I had assistant principals and even a guidance
8    counselor in there, too.
9    Q.   It states in this article "After Ludlow
10   allegedly failed to heed a warning from Principal Tom
11   Creeden, the District dismissed Ludlow and contacted
12   Pennridge Regional Police in February."  Is that
13   correct?
14   A.   I'm not sure about the month, but he was
15   dismissed, yes.
16   Q.   Well, the initial reports from the two girls
17   were October of 1999, correct?
18   A.   I believe so.
19   Q.   And then another girl reported the same type
20   of improper behavior by Mr. Ludlow in January of 2000,
21   correct?
22   A.   I believe so.
23   Q.   Okay.  And it was only after the third girl
24   came in and reported that conduct that a decision was

**Page 107**

1    made to report to local authorities.  Is that correct?
2    A.   That is correct.
3    Q.   Who made that decision?
4    A.   Dr. Kish.
5    Q.   Did you agree with that decision?
6    A.   Yes.
7    Q.   When Dr. Kish decided -- after the first two
8    girls reported improper conduct by Mr. Ludlow in
9    October of 1999, when Dr. Kish made the decision not to
10   report to authorities at that time, did you agree with
11   that decision?
12   A.   I discussed my apprehension with that
13   decision.
14   Q.   Does that mean you told them that you didn't
15   agree with it?
16   A.   I told them that we should report it.
17   Q.   Okay.  On the last page of that -- or the
18   second page of that article, rather, it says,
19   "Regarding the allegations of sexual impropriety, Kish
20   said, the school was made aware of the situation and
21   conducted an investigation, which was monitored by our
22   attorney, and remained in constant touch with the
23   parents of the children involved."
24   Q.   When we talked about the investigation, you

**Page 108**

1    didn't mention anything about an attorney.  Was an
2    attorney involved?
3    A.   Not that I recall.
4    Q.   Was there a school district solicitor back in
5    1999?
6    A.   Yes.
7    Q.   Who was that?
8    A.   Eastburn & Gray.
9    Q.   Any attorney specifically?
10   A.   Trying to remember.  It was kind of a
11   combination of Joanne Sommer and Jeff Finley.  Now, Dr.
12   Kish might have contacted the attorney, but I don't
13   think I was in that loop.  I don't remember that
14   discussion from 1999, to tell you truth.
15   Q.   After the third girl reported this conduct by
16   Mr. Ludlow in January of 2000 he was suspended.  Is
17   that correct?
18   A.   That is correct.
19   Q.   Whose decision was that?
20   A.   Dr. Kish's.
21   Q.   And the allegations by the girls involved, the
22   first two girls, were not simply that he had done this
23   once or twice.  Were they not that he was doing this on
24   a consistent basis?

27 (Pages 105 to 108)

Thomas Creeden                    Nace vs. Pennridge School District
                          August 11, 2015

Page 109

1      A.   Touching of the breast or just being close?
2      Q.   Inappropriate touching.
3      A.   Again, trying to remember from 1999, proximity
4   to the students was a big concern; he was too close to
5   them.  But the only touching I remember the girls
6   stating was maybe a shoulder or when he is passing out
7   the papers and touching the breast.
8      Q.   Now, that case went to trial in 2001 and Mr.
9   Ludlow was acquitted of any criminal charges, correct?
10     A.   Correct.
11     Q.   And while the case was pending was he
12  terminated by the school district?
13     A.   Yes.
14     Q.   After the trial did he ask to be reinstated?
15     A.   I think PDE reinstated him.
16     Q.   What's PDE?
17     A.   Pennsylvania Department of Education.
18     Q.   Was that over your objection?
19     A.   I think it was over Dr. Kish and my
20  objections.
21     Q.   So, even after he was not criminally convicted
22  of the criminal charges brought against him, would it
23  be fair to say that both you and Dr. Kish believed the
24  girls were telling the truth?

Page 110

1      A.   Yes.
2      Q.   And in the article -- I think it's the second
3   one in -- dated January 10th, 2010, from the Inquirer
4   suburban staff, down at the third-to-last paragraph it
5   says "Throughout out the trial the three students
6   testified that during the fall of 1999 Ludlow
7   frequently touched their breasts, rubbed and massaged
8   their backs and shoulders and pressed his body against
9   them as he handed out papers or answered questions in
10  class."
11          Is that what the girls told you when you did
12  your investigation?
13     A.   They didn't get that specific.  It was more
14  proximity, but they did talk about touching the breasts
15  and the shoulder.  But it made them uncomfortable when
16  he was so close to them.
17     Q.   Did you attend the trial?
18     A.   Well, just for -- for my testimony, then I had
19  to sit outside for the rest of it.
20     Q.   And your testimony was about your
21  investigation?
22     A.   Yes.
23     Q.   So, after the trial Mr. Ludlow was reinstated
24  by the Pennsylvania State Education Association?

Page 111

1      A.   Yes.
2               MR. COX:  Objection to the form.
3      Q.   And he got back-pay and benefits going back to
4   the time that he was terminated?
5      A.   That's my understanding.
6      Q.   And then did you have any additional issues or
7   problems with Mr. Ludlow after that?
8      A.   Clarify "problems."
9      Q.   Problems of a female complaining about Mr.
10  Ludlow's behavior toward her or them.
11     A.   Yes.
12     Q.   When did that take place?
13     A.   I'm not sure of the date.
14     Q.   Was it sometime in 2010?
15     A.   It's very possible.
16     Q.   Who was the person that complained?
17     A.   Brooke Roush.
18     Q.   And who was she?
19     A.   She was a teacher.
20     Q.   What did she teach?
21     A.   English.
22     Q.   Between 2001, after the trial, and 2010 had
23  you had any complaints about Mr. Ludlow?
24     A.   There were some student complaints about his

Page 112

1   behavior in class.
2      Q.   What type of complaints?
3      A.   Again, too close; if I recall, holding their
4   hand.  Those are some of the things I remember.
5      Q.   These were all female students that
6   complained?
7      A.   Yes.
8      Q.   And do you recall approximately when those
9   complaints were made?
10     A.   I do not.
11     Q.   Sometime between 2001 and 2010?
12     A.   I don't remember the date, to tell you the
13  truth.
14     Q.   What, if anything, did you do in response to
15  those complaints?
16     A.   Called authorities.
17     Q.   Who did you call?
18     A.   Local police.
19     Q.   Who?
20     A.   It was Pennridge Regional.
21     Q.   Did they do any investigation?
22     A.   Yes.
23     Q.   Who was the officer or detective?
24     A.   I don't recall.

                              28 (Pages 109 to 112)

Appendix 0583

Thomas Creeden                     Nace vs. Pennridge School District
                                   August 11, 2015

Page 113

1    Q.   What kind of investigation did they do?
2    A.   I know they interviewed many of the students
3    in the class.
4    Q.   And what was the result?
5    A.   Unfounded.
6    Q.   The police investigator found the complaints
7    unfounded?
8    A.   Right.
9    Q.   Now, what did Brooke Roush actually allege Mr.
10   Ludlow was doing?
11   A.   Probably stalking.
12   Q.   In what sense?
13   A.   He would be out of his area where his room was
14   and down by her room.
15   Q.   Doing what?
16   A.   Just being around.  She was in a class of his,
17   which was a class for staff development run by -- I'm
18   not sure if it was PDE or something like that, but he
19   was conducting a class for a teacher certification, you
20   know, continue your certification, and he was the
21   instructor in that class.
22   Q.   And she is in the class.
23   A.   Correct.
24   Q.   Do you recall if she said that they were

Page 114

1    having lunch together or meals together sometimes and
2    that he attempted to touch her inappropriately during
3    those lunches?
4    A.   I don't remember that statement directly, but
5    there was concern from her about, again, being too
6    close or too much touching, too close to her.
7    Q.   I'm sorry, too much --
8    A.   Too close to her personal space.
9    Q.   And she reported that to whom?
10   A.   Well, she reported it to the union people,
11   first of all, and then to me.
12   Q.   What did you do about it?
13   A.   Immediately notified Dr. Kish and HR, had a
14   meeting with him about the allegations, and not soon
15   after that he took a sabbatical, if I remember right.
16   Q.   And then?
17   A.   HR took over the investigation and found the
18   allegations to be founded.
19   Q.   Founded.
20   A.   Yes.
21   Q.   Who at HR took over the investigation?
22   A.   Ray Scarpantonio.
23   Q.   Would you look at Creeden exhibit two, page
24   22973?  Just read that to yourself for a minute and

Page 115

1    then I'll ask you some questions about it.
2       In fact, look at that page and the next two
3    pages, three pages total. Does that help refresh your
4    recollection about what the complaint was and what the
5    resolution was?
6    A.   Yes.
7    Q.   Have you ever seen these documents before? And
8    I'm referring to an unlawful harassment complaint form
9    by Brooke Roush dated 12/16/10 and a handwritten note
10   from Brooke Roush dated 22974 --
11       MR. COX: That's a page number.
12       MR. GROTH: Yes, page number 22974.
13   BY MR. GROTH:
14   Q.   (Continuing) -- and a memo of a meeting with
15   Brooke Roush and Kennedy DeStefano with the Pennridge
16   Regional Police with a Bates number of 022975.  Okay?
17   A.   Yes.
18   Q.   Have you seen these before?
19   A.   Yes.
20   Q.   As part of your investigation?
21   A.   Yes.
22   Q.   First of all, there are witnesses named on
23   number 22973:  Kristin Young, Charlie Lainhart, Carol
24   Ressler and Mary-Anna Harvie. Who are those people?

Page 116

1    A.   All teachers.
2    Q.   Did you talk to them?
3    A.   Yes.
4    Q.   What information did they give you?
5    A.   Each one of them had a different take to it.
6    Specifically what they said was, you know, Brooke was
7    very upset.  There was some contact being made by
8    Ludlow and, you know, they were coming to them to
9    discuss it with them.
10   Q.   She was going to them.
11   A.   Right.
12   Q.   And did they say to you that they had actually
13   witnessed some of this inappropriate touching?
14   A.   I can't recall if anybody witnessed it.  I
15   thought maybe Mr. Lainhart did, but I don't recall if
16   anybody said that directly that they saw it.
17   Q.   So, Ms. Roush's complaint was not just that
18   she was being stalked by this guy, but she says that
19   "During lunch, Mark would often touch me
20   inappropriately (rub my back, shoulders, knee) and this
21   would be uncomfortable for me."  Is that correct?
22   A.   Yes.
23   Q.   "And that he also entered her locked classroom
24   and left gifts such as cards, inspirational stories and

29 (Pages 113 to 116)

Thomas Creeden                          Nace  vs.  Pennridge  School  District
                        August 11, 2015

---

Page 117

1  gifts, et cetera, in her classroom.
2       Q.  Do you recall her reporting that to you as
3  well?
4       A.  Yes.  It's in the statement and I do recall
5  it, yes.
6       Q.  There is a sentence here -- and I'm not sure
7  if I'm reading this correctly.  I'm not sure if I have
8  the names wrong.
9       "In October 2010, I sought help from Carol
10  Ressler and Marianna Harvie & informed them of my
11  concerns with Mark.  Carol and Mary-Anna (& John
12  Winstanley) spoke privately to Mark."
13       Do you know anything about that conversation?
14       A.  It did take place.
15       Q.  Do you know any details about it?  Did any of
16  these people tell you the details, what they talked
17  about?
18       A.  John did.  I spoke to him directly.
19       Q.  Who was he?
20       A.  He is the building rep.
21       Q.  Union?
22       A.  Union.
23       Q.  Okay.  And is he the one that spoke to Mark
24  Ludlow to try to get him to stop this behavior?

---

Page 118

1       A.  Yes.
2       Q.  According to Ms. Roush, Mr. Ludlow kept
3  emailing her.
4       A.  Correct.
5       Q.  And in category on the document, the complaint
6  form, that says "What do you expect to happen to
7  correct or resolve the situation?  Why?" she writes
8  "Mark needs to seek psychological care & be dismissed
9  from his position as a social studies teacher.  Mark
10  has a history of instability, and I believe he poses a
11  great risk to children."
12       Did she discuss that with you?
13       A.  Discuss it with me or just did I read the
14  document?  That's all I remember.  I don't know if she
15  said that directly to me.
16       Q.  My question is, did she give you any more
17  information as to why she thought he posed a great risk
18  to children?
19       A.  Not that I recall.
20       Q.  The next page, 22974, is a handwritten note, I
21  believe, by Ms. Roush:  It says, "Received a packet
22  from Mark in my school mailbox.  The packet contained a
23  letter asking me to help him with preparations for
24  after his death. Mark states in his letter that he

---

Page 119

1  believes he will die soon.  I promptly showed the
2  letters/packet to Ressler and Marianna Harvey.  The
3  packets included stamped letters addressed to his
4  children, friends, family members that I was to mail
5  after his death.  The situation was brought to the
6  attention of district administration (Mr. Creeden)."
7       Do you recall how this information was brought
8  to your attention?
9       A.  She came directly up to my office.
10       Q.  And up until that point was Mr. Ludlow still
11  working?
12       A.  Yes.
13       Q.  Doesn't have a date on it, does it.  No.  The
14  complaint form that we just looked at before is dated
15  12/16/2010. Do you recall when Mr. Ludlow stopped
16  working?
17       A.  I do not.
18       Q.  And again, he decided to take a sabbatical? Is
19  that correct?
20       A.  It wasn't automatic, but it happened within a
21  week or so that that's what he came to do.
22       Q.  Had you talked to him before he took a
23  sabbatical?
24       A.  As soon as Brooke Roush came up to my office,

---

Page 120

1  I covered his class with another teacher and brought
2  him up to the office with a union rep.
3       Q.  What was discussed?
4       A.  The allegations that Brooke brought to my
5  attention.
6       Q.  Did he deny them?
7       A.  I don't think he totally denied them.  He just
8  said, you know -- I'm not sure what he said exactly,
9  but he didn't totally deny them, no.  He had a
10  different spin on it than Brooke did.  What those words
11  were, I can't recall.
12       Q.  On page 22975 in this memo, a meeting with
13  Pennridge Regional Police in mid December, Brooke Roush
14  and Kim DiStefano.  Who is Kim DeStefano?
15       A.  Union rep.
16       Q.  It says in paragraph six, "Near the end of
17  October 2010 PE talked to Mark."  Do you know who that
18  was?
19       A.  That's the union.  That's their initials,
20  Pennridge Educational Association.
21       Q.  And did you know about that meeting?
22       A.  No.
23       Q.  She had not reported anything to you as of
24  then.  Under the sexual harassment policy that was in

---

Thomas Creeden                              Nace vs. Pennridge School District
                                            August 11, 2015

---

Page 121

1  effect at that time, who was the person to whom any
2  complaints or allegations about sexual harassment were
3  to be reported in Pennridge High School?
4      A.  That was to HR.
5      Q.  And that would have been Mr. . .
6      A.  Is that Mr. Scarpantonio at that time?
7      Q.  There was another woman. . .
8      A.  No.
9      Q.  Shellie Feola.
10     A.  I'm not sure of the transition, but she was an
11 HR director.  I'm not sure the year she was in there
12 or. . .
13     Q.  Was she before Mr. Scarpantonio?
14     A.  I believe so.
15     Q.  And who is Charles Weber?
16     A.  Director of Pupil Services at that time, but
17 he had different -- I had a couple different jobs, so
18 I'm not sure what his title at that time was.
19     Q.  Was there a position in the school district
20 called Title 9 Coordinator?
21     A.  Shellie?
22     Q.  I'm just saying, was there a position?
23     A.  She was; Shellie Feola was.
24     Q.  And was he ever the Title 9 coordinator?

---

Page 122

1          MR. COX:  Objection to the form.  Who
2      is "he"?
3          MR. GROTH:  Mr. Weber, Charles weber.
4          THE WITNESS:  I'm trying to recall if
5      he was or not.  I don't recall.
6  BY MR. GROTH:
7      Q.  In any event, apparently from the time,
8  according to this memo, PEA talked to Mark in October
9  of 2010 and December 16th, 2010, none of this was
10 reported to you.  Is that correct?
11     A.  Just trying to remember dates here.
12     Q.  Go back.  The complaint is December 16, 2010,
13 by Ms. Roush.
14     A.  Yes.
15     Q.  So, you had no knowledge before her complaint
16 of anything?
17     A.  I did not, no.
18     Q.  So, in any event, do you know how long after
19 the complaint was made by Ms. Roush on December 16,
20 2010 the police were contacted?
21     A.  Immediately.
22     Q.  And do you know if the police ever actually
23 interviewed Mr. Ludlow?
24     A.  I believe they did.

---

Page 123

1      Q.  And his going on sabbatical, was that close in
2  time after the filing of the complaint by Ms. Roush on
3  December 16, 2010?
4      A.  Yes.
5      Q.  What happened after that with regard to Mr.
6  Ludlow's status in the Pennridge School District?
7      A.  Trying to recall.
8      Q.  First, did he come back from sabbatical?
9      A.  Yes, he did.
10     Q.  And did he teach for a while?
11     A.  I'm trying to remember if the allegations were
12 founded or not.
13     Q.  I thought you said it was decided they were
14 founded by the HR department.
15     A.  Yes, but I'm trying to remember if that was
16 Feola or was Scarpantonio in then.
17     Q.  Regardless of who it was, what happened to
18 them after they determined that the complaint was
19 founded?
20     A.  I can't remember what the punishment was.
21     Q.  Was he ever terminated?
22     A.  He was suspended, but I'm not going to say
23 that right to the point.
24     Q.  Is he still teaching there now?

---

Page 124

1      A.  Yes, he is.
2      Q.  Do you know if the school district ever moved
3  to terminate him?
4          MR. COX:  Objection to the form.
5      Q.  Or took any direct action to try to terminate
6  him.
7          MR. COX:  Objection.  You can answer.
8      A.  Once again, he was suspended.  And I'm not
9  sure of the word termination.  I think on the first
10 case he was then wanted to be terminated, but the court
11 placed him back -- the arbitrator put him back in and
12 PE reinstated him with a certificate.
13     Q.  I'm talking about after the Roush complaint.
14     A.  I'm trying to recall.  I don't remember what
15 happened with that one, how he was disciplined.  I do
16 recall there is some discipline.
17     Q.  Was the Pennsylvania Department of Education
18 notified?
19     A.  I believe so.
20     Q.  Do you know what action they took, if any?
21     A.  I don't know.
22     Q.  As of the time you left in 2014 he is still
23 teaching.
24     A.  Correct.

---

31 (Pages 121 to 124)

Thomas Creeden                    Nace vs. Pennridge School District
                                  August 11, 2015

---

**Page 125**

1       Q.   Do you know if he taught in 2015?
2       A.   Yes, he did.
3       Q.   One last question about Mr. Ludlow:  The last
4   document in that group, 22976, is that the memo to Mr.
5   Ludlow dated November 16, 1999 that you sent him after
6   you did your investigation of the complaints of the
7   first two girls in October of 1999?
8       A.   Yes.
9       Q.   Those are the directives, the instructions you
10  gave to him to try to resolve that situation?
11      A.   Yes.
12      Q.   It says, "Please make sure you are not alone
13  with students in your room in the building, vehicle or
14  at your home."
15           When you wrote that, were you meaning alone
16  with one student at a time?
17      A.   Any students.
18      Q.   Well, wouldn't he be alone in a room with his
19  students when he was teaching them?
20           MR. COX:  Objection to the form. You
21  can answer.
22      A.   Not when there was a class in there.
23      Q.   Who else would be in there other than the
24  students?

---

**Page 126**

1       A.   Oh, you're talking about other students. I
2   meant alone with one student.
3       Q.   That's what I was asking.
4       A.   Oh, okay. I'm sorry.
5       Q.   Okay. It says also on that Pennridge Regional
6   Police memo, on page 22975, that "Mark was a PLS
7   teacher instructing off district grounds and had a
8   habit of inviting students to lunch at his home after
9   instructing the course."
10           Who were these students again?
11      A.   They were teachers.
12      Q.   I take it Pennridge had no policy regarding
13  that particular activity, taking those types of
14  students back to his house?
15      A.   They were adults.
16      Q.   Okay. Let's go to the next allegation of
17  sexual abuse involving a male employee of Pennridge
18  named David Heath.
19           Are you familiar with the allegations in that
20  particular situation and the resolution?
21      A.   Yes, I am.
22      Q.   According to the documents we were provided,
23  this occurred sometime around January of 2005. Who was
24  the complaining person in that situation?

---

**Page 127**

1       A.   It was a student.
2       Q.   That's Sarah Webster?
3       A.   Yes, it was.  The complaint came through her
4   father.
5       Q.   And in that situation did her parents find
6   some love letters from Mr. Heath in Sarah Webster's
7   possession and that's when they brought this to your
8   attention?
9       A.   I believe that to be true.
10      Q.   Okay.  Why don't you go to page 22946 in
11  Creeden exhibit two, please?
12      A.   229. . .
13      Q.   46.
14      A.   . . .46.  Okay.
15      Q.   This is a mandatory report form? Is that
16  correct?
17      A.   Yes.
18      Q.   Filled out and signed by Dr. Kish on 1/31/05?
19      A.   Yes.
20      Q.   It indicates that he was suspended -- Mr.
21  Heath was suspended, with pay, on 11/18/04 and then
22  suspended without pay on 12/13/04.  Is that correct?
23      A.   That is correct.
24      Q.   And this report form states that there was an

---

**Page 128**

1   allegation of an inappropriate relationship between Mr.
2   Heath and a sixteen-year-old student which was reported
3   by the students' parents on 11/17/04. An investigation
4   followed, concluding that Mr. Heath was not truthful
5   during the investigation and an inappropriate sexual
6   relationship existed between Mr. Heath and the student.
7   An unsatisfactory rating was issued and the teacher has
8   been recommended for termination to the Board of
9   Education.  The board has not acted on this
10  recommendation.  Additionally, the teacher was charged
11  with corruption of a minor and endangering the welfare
12  of a minor on 1/28/05 in Bucks County."
13           Who was this mandatory report sent to?
14      A.   I thought it was PDE because it's their form.
15      Q.   That form also refers to "Violation of board
16  policies" -- this is on the second page -- "248 and
17  448, unlawful harassment."
18           Do you see what I'm referring to?
19      A.   Yes.
20      Q.   Were those the Pennridge policies in effect at
21  that time with regard to unlawful harassment, including
22  sexual harassment?
23      A.   I would assume it would be, because it's
24  stated there in the document.

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

Page 129

1     Q.  I'm going to mark as Creeden exhibit four two
2  documents entitled unlawful harassment, one saying it
3  applies to students, and the other one applies to
4  professional employees.  They are Bates numbers 10545
5  through 10550.  There you go.
6          (Exhibit Creeden-4 was marked for
7     identification)
8  BY MR. GROTH:
9          Are you familiar with these documents?
10    A.  Yes, I am.
11    Q.  These documents, both policies 248 and 448,
12  indicate that they were adopted on August 20, 1990 and
13  revised -- 248 was revised December 21, 1999 and June
14  21st, 2004; policy number 448 for professional
15  employees unlawful harassment, was revised March 15th,
16  '99 and June 21st, 2004.
17        I'm going to ask you a question I asked you
18  before and maybe this will refresh your recollection;
19  maybe it won't:  Do you know whether or not these two
20  policies have been further revised since June of 2004
21  up until the time of Mr. Romig's sexual harassment?
22        MR. COX:  Objection to the form.
23    A.  Can we go back to what you were stating there?
24  You were reading that from where?

Page 130

1     Q.  The dates --
2     A.  From up here, okay.  But you were reading
3  other dates.
4     Q.  If you go halfway back, there is another
5  policy number, 448.
6     A.  So, you're reading the second.  All right.
7     Q.  My question to you is, do you know if those
8  documents or those policies were further revised after
9  June 21st, 2004 up until the time of the allegations
10  about Mr. Romig?
11    A.  I do not recall that.
12    Q.  You don't know of any?
13    A.  I don't know of any, but it's possible they
14  could have been revised.
15        MR. GROTH: Let me ask Mr. Cox:  I
16    didn't see anything in the documents that you
17    provided to me including these policies.
18        Do you know if there are any subsequent
19    revisions to these that I should be aware of?
20        MR. COX: Not offhand.
21        MR. GROTH:  I'm going to hold you to
22    it.  I'm not seeing anything later than the June
23    2014 revisions.
24        MR. COX:  The current policy would be

Page 131

1     on the website and theoretically would have the
2     last date of revision on it.
3          MR. GROTH:  Okay.  Let me mark another
4     document Creeden exhibit five.
5          (Exhibit Creeden-5 was marked for
6     identification)
7  BY MR. GROTH:
8     Q.  These are the same two policies -- I'm sorry,
9  this is policy 248, section "Pupils," titled "unlawful
10  harassment," adopted September 24th, 2012.
11        My question to you is whether or not you know
12  if this was the policy that was in effect as of the
13  time of the allegations against Mr. Romig in 2013.
14    A.  I don't know of another revision.
15    Q.  Okay.  That document that's in front of you,
16  exhibit five, refers on the third page in the middle to
17  a compliance officer.
18        It states, "If the building principal is the
19  subject of a complaint, the student, third party or
20  employee shall report the incident directly to the
21  compliance officer. "
22        Who was the compliance officer in 2013?
23    A.  I believe that was the HR director, Ray
24  Scarpantonio.

Page 132

1     Q.  Going back to exhibit four, the unlawful
2  harassment policy last revised June 21st, 2004, number
3  248 in front of you?
4          In the fourth paragraph there it says "The
5  District shall inform students, staff, parents,
6  independent contractors and volunteers that unlawful
7  harassment of and by students will not be tolerated via
8  the annual distribution of this policy and the posting
9  of notices/signs in all district-owned buildings or
10  leased sites. The aforementioned individuals also shall
11  be notified that the unlawful harassment of and by
12  students will not be tolerated through the publication
13  of a notice outlining the same in the school calendar."
14        Back in 2011 and '12 and '13, just before Mr.
15  Romig was arrested, was this policy published on a
16  notice in the school calendar?
17    A.  District calendar?
18    Q.  It jut says here "in the calender."  I don't
19  know what it's referring to.
20    A.  I believe it was in our student handbook.
21    Q.  Okay.
22    A.  But students used that as a calendar.  It was
23  their handbook and calendar.
24    Q.  Okay.  Now, that student handbook would not

33 (Pages 129 to 132)

Appendix  0588

Thomas Creeden                    Nace vs. Pennridge School District
                         August 11, 2015

<table>
<tr><td>

Page 133

1  have been given to any of the coaches or assistant
2  coaches, correct?
3      A.  I'm thinking, because there was always extra
4  and I put them in the offices.  Did I hand it to them
5  directly or did Dave?  I'm not sure.
6      Q.  You testified earlier that you don't think
7  you -- you didn't know of any published harassment
8  policies or whatever that were given to Mr. Romig
9  during the time of his employment, correct?
10     A.  That is correct.
11     Q.  So, this --
12     A.  But this talks about the handbook -- or the
13  school calendar, I'm sorry.
14     Q.  So, who does the school calendar go to?  It's
15  in the handbook?
16     A.  Yes.
17     Q.  But the coaches aren't on the distribution
18  list for the student handbook, correct?
19     A.  All faculty is given, and like I said, I
20  always have extra and I put them in the offices.  So,
21  do I hand it to them directly?  No.
22     Q.  Yes.
23     A.  No.
24     Q.  And you had no idea whether any coach or

</td><td>

Page 135

1  provisions that you see in these policies, number 248
2  and 448, correct?  It's just a general posting that
3  harassment of any form is unlawful?
4      A.  I believe so.
5      Q.  Okay.  And it says that "The District shall
6  inform students, staff" -- and Mr. Romig was part of
7  the staff, right?
8      A.  I classify staff as the secretaries and the
9  clerks and those who are there on a daily basis.
10     Q.  Well, do you consider him or somebody in his
11  position as an assistant coach as an independent
12  contractor?
13         MR. COX:  Objection to the form.  You
14  can answer.
15     A.  I don't know if that's the right term,
16  independent contractor, but he did sign an extra-duty
17  pay, so he was contracted for that time, yes.
18     Q.  Okay.  It says, "The district shall
19  information students, staff, parents, independent
20  contractors and volunteers that unlawful harassment of
21  and by students will not be tolerated via the annual
22  distribution of this policy."
23         Is what's being referred to there your annual
24  distribution of the policy to the faculty at the

</td></tr>
<tr><td>

Page 134

1  assistant coach ever looked at them all all for any
2  reason.
3      A.  I don't have any clarification of that, no.
4      Q.  And you never directed any coach or assistant
5  coach to read the student handbook.
6      A.  I can't recall if we directed, but I know they
7  were available.
8      Q.  It says, Staff shall be informed of the policy
9  by posting of notices and signs in all district-owned
10  buildings or leased sites."
11         What are the notices and signs that are being
12  referred to?
13     A.  They were hung right out of the main office,
14  right in the -- if you go in our high school, there is
15  an office with windows.  They are posted there.
16     Q.  Is that the only place they are posted in
17  Pennridge High School?
18     A.  I believe at the other end of the building as
19  well they were posted.  The entrances, two entrances.
20     Q.  Is it in some kind of --
21     A.  Frame.
22     Q.  -- frame, glass frame?
23     A.  Right on the window of the office itself.
24     Q.  And that posting did not contain all of the

</td><td>

Page 136

1  beginning of the year?
2      A.  Yes.
3      Q.  And the annual distribution of the student
4  handbook to the students in the school?
5      A.  Yes.
6      Q.  But there was no annual distribution of
7  anything to the coaches or assistant coaches, correct?
8      A.  Again, I'm going to state that they were
9  available for them.  Did they give them -- they don't
10  have a mailbox, so they were available to them in the
11  athletic office.
12     Q.  But there was no requirement that they ever
13  read them or study them or understand them, correct?
14     A.  No, they didn't sign off on them like the
15  faculty did.
16     Q.  Why is there a separate policy number for a
17  section called "pupils" and a section called
18  "professional employees"?
19     A.  Okay, I'm not sure where you're reading -- oh,
20  here.
21         MR. COX:  Which exhibit?
22         MR. GROTH:  It's the same exhibit,
23  Creeden exhibit four.
24  BY MR. GROTH:

</td></tr>
</table>

                                    34  (Pages 133 to 136)

                                              Appendix 0589

Thomas Creeden                     Nace vs. Pennridge School District
                          August 11, 2015

---

Page 137

1    Q.  It's halfway back.  Both policies are part of
2  one exhibit.
3    A.  You're at where?
4    Q.  If you look at 10548?
5    A.  48, okay.
6    Q.  That's policy number 448.  See the top?
7    A.  Uh-huh.
8    Q.  At one, in the front is policy number 248?
9  They're both dealing with unlawful harassment, but one
10  is for section "pupils "and the other section is
11  "professional employees."
12       Do you know why there's a separate category or
13  separate policy for those category's employees?
14    A.  I do not.  Looks like they're stated
15  differently.
16    Q.  I see that the definition on sexual harassment
17  on both is somewhat different for pupils and for
18  professional employees.  Is that your reading of it as
19  well?
20    A.  Yes.
21    Q.  The definition is different for both of them.
22    A.  There might be other things in the document as
23  well.
24    Q.  Okay. Now let's go back to David Heath. If you

---

Page 138

1  look at page 22948 in Creeden exhibit two, dated
2  January 11, 2005, a letter from Robert Kish to David
3  Heath, this document in the second paragraph refers to
4  a harassment investigation report.  Do you see that?
5  The second line.
6    A.  Yes.
7    Q.  Is that the report that follows next page, on
8  page 22949 through 22960?
9    A.  That's what it looks like, yes.
10    Q.  Who prepared that report?
11    A.  The director of human resources, Shellie
12  Feola.
13    Q.  You were involved in the investigation as
14  well?
15    A.  Correct.
16    Q.  And Dr. Kish was involved as well.
17    A.  Correct.
18    Q.  The facts of the allegations against him and
19  the findings of your investigation are actually pretty
20  much spelled out in that investigative report.  Is that
21  correct?
22    A.  Not getting a chance to read it, I would say
23  it was probably spelled out, yes.
24    Q.  Were there any -- strike that.  Did your

---

Page 139

1  investigation find that there were teachers and staff
2  people in the school who were concerned about Mr.
3  Heath's conduct with regard to the trainers, the
4  student trainers, who were working under him before her
5  parents came forward with these letters which discuss
6  their relationship?
7       MR. COX:  Objection to the form. You
8  may answer.
9    A.  I'm trying to recall.  I know that one of the
10  other trainers or EMTs, Mrs. Gotschal, and there is
11  also Carol Miller that were part of that group that
12  helped Mr. Heath with the athletic training.
13       I'm sorry, can you restate your question?
14    Q.  Yes.  Were there any indications before Sarah
15  Webster's parents came forward with these letters from
16  Mr. Heath that there were some problems in the way that
17  Mr. Heath was behaving toward Ms. Webster and/or other
18  student trainers?
19       MR. COX:  Objection to the form. You
20  can answer.
21    A.  Not that I recall.
22    Q.  Back at that time was there any prohibition
23  about school employees such as Mr. Heath driving
24  students to and from games in their own personal

---

Page 140

1  vehicles or in school vehicles?
2    A.  I know there was -- I'm not sure of the date,
3  but I know that there was something in writing about
4  transporting students in your own vehicle.
5    Q.  Something against doing that, correct?
6    A.  Yes.
7    Q.  During the course of your investigation did
8  you ever determine that there were teachers or other
9  staff members at the school who actually knew that Mr.
10  Heath was actually doing that and that it was not
11  proper?
12       MR. COX:  Objection to the form.  You
13  can answer.
14    A.  Not that was brought to my attention.  I'm
15  trying to recall it, but not that I recall.
16       MR. GROTH:  I'm going to mark as
17       Creeden exhibit six some newspaper media reports
18       regarding Mr. Heath's criminal charges against
19       him.
20       (Exhibit Creeden-6 was marked for
21       identification)
22  BY MR. GROTH:
23    Q.  I'm going to ask you to go to the third
24  article in.  It has a heading from the Inquirer staff

---

Thomas Creeden                          Nace vs. Pennridge School District
                              August 11, 2015

| Page 141 |
|---|
| 1   writer Larry King "Pennridge teacher convicted of |
| 2   sexual relations with teen," third article in. |
| 3       A. Okay. |
| 4       Q. Okay? Did you go to the trial? |
| 5       A. I can't recall if I was there. |
| 6       Q. If you look about two-thirds of the way down |
| 7   the first page of that article, it says "At the time |
| 8   she," meaning the girl, "was involved with sports and |
| 9   was learning to be an athletic trainer. Teachers |
| 10   testified of warning Heath not to have a student alone |
| 11   in his car, but he took no heed." |
| 12       Do you recall determining that to be a factor |
| 13   in your investigation? |
| 14       A. I would have to look at the investigation |
| 15   document. |
| 16       Q. Go ahead, take a look at it. |
| 17         MR. COX: What's the Bates-stamp, Dave? |
| 18         MR. GROTH: 22949. |
| 19   BY MR. GROTH: |
| 20       Q. Why don't you go to page 22955? Down at the |
| 21   bottom. |
| 22       A. Will you restate the question? |
| 23       Q. Yes. Did it come to your attention before Ms. |
| 24   Webster's parents brought her in with the letters from |

| Page 142 |
|---|
| 1   Mr. Heath that Ms. Webster had been alone in a vehicle, |
| 2   either a school vehicle or a personal vehicle, of Mr. |
| 3   Heath's going to and from athletic events? |
| 4       A. I believe I was aware. |
| 5       Q. Did you read this report before it was sent |
| 6   out to Dr. Kish? |
| 7       A. (No response) |
| 8       Q. Actually, it went sent out to Dr. Kish. He |
| 9   was part of the investigation. |
| 10       A. Trying to recall back in 2004, I probably read |
| 11   the report. But do I recall it word-for-word? No, I |
| 12   do not. |
| 13       Q. Reading the bottom of page seven and the top |
| 14   paragraph of page eight doesn't refresh your |
| 15   recollection about that issue? |
| 16       A. Five and seven? |
| 17       Q. The bottom of page seven and the top of page |
| 18   eight of this document. |
| 19         THE WITNESS: Am I looking at the right |
| 20   thing? |
| 21         MR. COX: Yes. Give me a second to read |
| 22   it. I may not be following your question, but I |
| 23   don't see anything in there about transportation, |
| 24   being alone in a car. |

| Page 143 |
|---|
| 1       MR. GROTH: That's not the right page, |
| 2   page seven and eight. Here, bottom of page seven, |
| 3   top of page eight. |
| 4       THE WITNESS: So, your question is |
| 5   asking was he informed by -- |
| 6       MR. COX: Why don't you repeat the |
| 7   question? |
| 8       THE WITNESS: Yes. |
| 9       MR. GROTH: Okay. |
| 10   BY MR. GROTH: |
| 11       Q. The question is, do you recall getting |
| 12   information about other teachers or staff members at |
| 13   Pennridge knowing of and reporting Mr. Heath being |
| 14   alone in his car or a school district car with female |
| 15   trainers? |
| 16       MR. COX: Prior to the Webster |
| 17   allegation -- |
| 18       Q. Yes, prior to the time Sarah Webster's parents |
| 19   came in and reported a situation to you. |
| 20       A. I do not recall that. |
| 21       Q. You don't recall it coming to your attention |
| 22   before. |
| 23       A. Come to my attention before. |
| 24       Q. Okay. Now, were the policies and practices in |

| Page 144 |
|---|
| 1   effect at that time, isn't it correct that the |
| 2   teachers, if they had seen this conduct that violated |
| 3   school policy, they should have reported it to you? |
| 4       A. Yes. |
| 5       Q. And the Chris Seider here who is reported to |
| 6   be the person who gave the investigators this |
| 7   information, he's the same Chris Seider who was removed |
| 8   as the track coach because of some complaints of the |
| 9   female athletes about how he observed them. |
| 10       A. That's correct. |
| 11       Q. And if you look at the bottom of page seven, |
| 12   it says "Among those interviewed were Mr. Chris Seider, |
| 13   physical education teacher at the high school. Mr. |
| 14   Seider stated that another teacher had come to him, |
| 15   informed him that Mr. Heath had been observed alone in |
| 16   his car with student trainers. Mr. Seider reminded Mr. |
| 17   Heath that he should avoid being alone with student |
| 18   trainers, all of whom are presently female." |
| 19       A. Okay. |
| 20       Q. Now, isn't it true that under the policies |
| 21   that were in existence at that time, the teacher who |
| 22   informed Mr. Seider of Mr. Heath transporting these |
| 23   female trainers, as well as Mr. Seider, should have |
| 24   both reported to you that he was engaging in conduct |

36 (Pages 141 to 144)

Appendix 0591

Thomas Creeden                          Nace vs. Pennridge School District
                        August 11, 2015

Page 145

1    which was against the policy of the high school?
2              MR. COX:  Objection to the form.  You
3    can answer.
4        A.  They should have.
5        Q.  But they didn't.
6        A.  Not that I'm aware of; not to me.
7        Q.  Do you recall ever asking Mr. Seider or this
8    teacher that's implicated here why they had never
9    informed you of that information?
10       A.  I don't recall that, no.
11       Q.  Do you remember there being any backlash at
12   Pennridge against Sarah Webster for reporting this
13   information to school administration?
14       A.  Yes.
15       Q.  Was there any backlash with regard to the
16   faculty? In other words, complaints that she made that
17   the faculty was treating her badly after this became
18   public knowledge.
19       A.  Not that I recall.
20       Q.  Was there was information that students, other
21   students, in the school were treating her badly?
22       A.  There was information that was reported to the
23   assistant principal, yes.
24       Q.  Who was the assistant principal?

Page 146

1        A.  Ray Ott.
2        Q.  And what information was reported to him?
3        A.  That there were T-shirts and some signs with
4    Heath's name on it around the school.
5        Q.  Signs?
6        A.  Like little signs, stick them on locker, like
7    stick-em notes.
8        Q.  What did the sign say?
9        A.  Just Heath on it.
10       Q.  Prior to these allegations against Mr. Heath,
11   would you say that he was a popular staff member?
12       A.  I would say yes.
13       Q.  Did the girls stay in school?  Did Sarah
14   Webster stay in school after this allegation?
15       A.  Yes, she did.
16       Q.  Did she have any vandalism to her property
17   while she was on school grounds?
18       A.  "Her property" meaning what?
19       Q.  Any of her property:  Any of her personal
20   property, her locker, if she had a vehicle, any type of
21   vandalism at all.
22       A.  There were things stuck on her locker, that I
23   recall.  That wasn't one of the things.  And then we
24   investigated or Ray Ott investigated and disciplined

Page 147

1    the students that he found, but some things were not
2    told to us totally.
3        Q.  Did you receive information that her car had
4    been vandalized?
5        A.  I'm not sure about that one.
6        Q.  Did you receive any information about her
7    property had been stolen since she returned to school
8    in the fall after these initial allegations became
9    public?
10       A.  I don't recall that.  I would have to ask Mr.
11   Ott if that was reported to him directly.
12       Q.  Did you ever receive any information that
13   vandals had tossed eggs at her house six times?
14       A.  To me personally? No.
15       Q.  Did you receive any information that students
16   had decorated her locker with Heath candy bar wrappers?
17       A.  I didn't hear about that, no. That's one of
18   the things we investigated.
19       Q.  What did you do to try to, if anything,
20   protect Ms. Webster from this type of behavior by
21   students or people who worked in the school?
22       A.  Well, with the students, I talked to different
23   athletic teams, myself or Mr. Ott; and told them if you
24   were involved in any of these allegations, that you

Page 148

1    were going to be disciplined and/or suspended or
2    whatever we had enough on to even, you know, remove
3    them.
4            I remember talking to certain teams, sports
5    teams.  Staff? Trying to remember after this one.  I
6    know there was a staff meeting after that, but I'm
7    trying to remember if it was immediately after that or
8    as part of the regular staff meeting.
9            So, I'm not sure if it was right away, but I
10   know we talked about it with the staff, especially her
11   teachers, to keep an eye on her as she traveled from
12   class to class or, you know, in class, if there were
13   comments made.
14           So, I know we -- I know I personally talked to
15   several sports teams who were active at that time.
16       Q.  The people who were found to be doing this
17   candy bar attachment to the locker and these sticker
18   signs and whatever, were those athletes, male athletes?
19       A.  Off the top of my head I don't remember, but I
20   don't think it was all male.
21       Q.  Was there also an allegation or finding that
22   he had engaged -- Mr. Heath had engaged in excessive or
23   numerous phone calls to Ms. Webster?
24       A.  Yes, I believe there was.

                        37 (Pages 145 to 148)

Appendix 0592

Thomas Creeden                    Nace vs. Pennridge School District
                          August 11, 2015

---

Page 149

1    Q.  Do you recall there being testimony in the
2   case or a finding in your investigation that on of the
3   telephone calls actually happened on his wedding night?
4    A.  Yes, I do remember that.
5    Q.  His wife, did she teacher at Pennridge?
6    A.  She did not.
7    Q.  Do you know what her name is?
8    A.  I do not.
9    Q.  Her first name, I mean.
10    A.  I do not.
11    Q.  Did the teachers, any of the teachers or
12   faculty at the school, do anything in support of Mr.
13   Heath during the time when he is charged and up through
14   the time of trial, anything if support of him:  Have a
15   rally, collect money for his defense, anything of that
16   nature?
17    A.  Not that I recall.
18    Q.  Would it be fair to say that there were people
19   at the school -- faculty persons and students -- who
20   did not believe Ms. Webster's allegations?
21        MR. COX:  Objection to the form.
22    Q.  That came to your attention; I mean, where you
23   heard that people were not believing what she was
24   saying that he was doing?

---

Page 150

1        MR. COX:  Objection to the form.  You
2   may answer.
3    A.  I don't recall that.
4    Q.  Okay.  You did testify at his trial?
5    A.  I don't believe I did.
6    Q.  You testified at Mr. Ludlow's trial.
7    A.  Yes.
8    Q.  Did you sit through Mr. Heath's trial?
9    A.  I think you asked me that before. I don't
10   believe I was there.
11    Q.  Do you know whether or not Mr. Heath
12   maintained his innocence of these charges all the way
13   up through the end of the trial?
14    A.  Again, not being there, I don't know what he
15   said in the trial.
16    Q.  Okay.  You know he went to trial and he was
17   convicted of a number of counts, correct?
18    A.  I remember.
19    Q.  And do you know whether or not at his
20   sentencing Mr. Heath actually admitted to having
21   engaged in this sexual physical contact with Ms.
22   Webster?
23    A.  I do not know that.
24    Q.  Did you go to the sentencing?

---

Page 151

1    A.  I don't believe so.
2        MR. GROTH:  Let's go off the record.
3        THE VIDEOGRAPHER:  The time is now 3:16
4   p.m. We're going off the record.
5        (A brief recess was taken)
6        THE VIDEOGRAPHER:  The time is now 3:31
7   p.m. This begins DVD number four in the deposition
8   of Thomas as Creeden.  We are back on the record.
9   BY MR. GROTH:
10    Q.  Mr. Creeden, after Mr. Heath was found guilty
11   and sentenced, do you know whether or not he ever went
12   back to teaching?
13    A.  Not that I know of.
14    Q.  Did Pennridge take steps to terminate him?
15    A.  Yes.
16    Q.  Did Pennridge take steps or did the PDE take
17   steps to pull his teaching certification?
18    A.  I don't know that directly, but I'm pretty
19   sure Ms. Feola followed through with that.
20    Q.  Now, if I recall correctly, when Ms. Webster's
21   parents brought these letters in, they were brought to
22   you?
23    A.  I don't recall.  I'm trying to remember. I
24   don't know if they got to me or they were taken over to

---

Page 152

1   HR directly because Ms. Feola was conducting the
2   investigation.
3    Q.  How soon after that occurred was a decision
4   made to report this behavior to the public authorities?
5    A.  Immediately.
6    Q.  There was no investigation conducted by
7   Pennridge personnel prior to notifying the police?
8    A.  Not that I recall.
9    Q.  And the sexual contacts that occurred with
10   regard to this particular situation was some type of
11   fondling and groping and whatever in the training room,
12   in Mr. Heath's personal car, and in a school district
13   vehicle?
14        MR. COX:  Objection to the form.  You
15   may answer.
16    Q.  You can answer.
17    A.  As far as I recall -- I don't remember all the
18   allegations, if that was all of them or if that was
19   some of them and not all of them, if that makes sense.
20    Q.  All right.  Do you remember any of them?  What
21   did she allege that he did that was sexually harassing
22   or abusive?
23    A.  Inappropriate touching I do remember, because
24   it was the fondling -- I think that's something I do

---

38 (Pages 149 to 152)

Appendix  0593

Thomas Creeden                    Nace vs. Pennridge School District
                         August 11, 2015

| Page 153 |
|---|
| 1  remember, but I don't remember every one specifically. |
| 2     Q.  Okay.  Let's talk about Mark Hart.  If you go |
| 3  to, on exhibit two, if you go to page 22964, near the |
| 4  very end. 22964. |
| 5     A.  All right. |
| 6     Q.  This is a letter from assistant counsel Shane |
| 7  Crosby to the Secretary of Board of School Directors, |
| 8  Pennridge School District, dated December 2, 2010, |
| 9  indicating that Mr. Hart surrendered his Pennsylvania |
| 10 teaching certificate in lieu of discipline. |
| 11        What were the allegations against him that led |
| 12 up to his surrender of his teaching certification? |
| 13    A.  Inappropriate contact with a female student. |
| 14    Q.  Who was that student? |
| 15    A.  I don't recall her name. |
| 16    Q.  At the time that the allegation was made, was |
| 17 the female student that made the allegation still a |
| 18 student at Pennridge or had she already graduated? |
| 19    A.  Already graduated. |
| 20    Q.  And is the name of that student Laura |
| 21 Interrante? |
| 22    A.  I believe so, yes. |
| 23    Q.  What were the allegations? |
| 24    A.  That Mr. Hart had inappropriate relationships |

| Page 154 |
|---|
| 1  with that student. |
| 2     Q.  While she was a student. |
| 3     A.  While she was a student. |
| 4     Q.  All right.  How did that come to your |
| 5  attention? |
| 6     A.  I was asked to come up to Dr. Kish's office, |
| 7  and a police officer was there and informed us. |
| 8     Q.  So, she went first to the police, who came to |
| 9  Pennridge afterward. |
| 10    A.  Correct. |
| 11    Q.  Did you say she was there with the police |
| 12 officer? |
| 13    A.  I don't recall if she was there. I thought it |
| 14 was just the police officer initially. |
| 15        MR. GROTH:  I'm going to mark as |
| 16    Creeden exhibit seven some documents provided to |
| 17    me by Pennridge's counsel that consist of Bates |
| 18    numbers 933710482, 10483 and 10484 and 10485. |
| 19        (Exhibit Creeden-7 was marked for |
| 20        identification.) |
| 21 BY MR. GROTH: |
| 22    Q.  These are some documents that were produced by |
| 23 your counsel with regard to the Mark Hart situation. |
| 24        On page 010484, third page from the back -- |

| Page 155 |
|---|
| 1  second page from the back, there are a series of |
| 2  messages between Laura Interrante and a person named |
| 3  Maureen Heath Kosa.  Who is Maureen Heath Kosa? |
| 4     A.  She was an English teacher at the high school. |
| 5     Q.  Is she related in some way to David Heath? |
| 6     A.  Oh, no. |
| 7     Q.  Did anybody at Pennridge do an investigation |
| 8  of these allegations by a former student? |
| 9     A.  Not that I recall. |
| 10    Q.  Would it be fair to stay that that was left up |
| 11 to the police authorities? |
| 12    A.  That would by fair to say. |
| 13    Q.  Prior to the police informing you of their |
| 14 investigation, had you received any complaints or |
| 15 allegations at all with regard to Mr. Hart? |
| 16    A.  No. |
| 17    Q.  After being informed of the investigation by |
| 18 the police, did anybody come forward to say that there |
| 19 were other incidents of inappropriate conduct by Mr. |
| 20 Hart while he was employed at Pennridge? |
| 21    A.  No. |
| 22    Q.  Did you talk to Mr. Hart about those |
| 23 allegations? |
| 24    A.  The allegations with -- |

| Page 156 |
|---|
| 1     Q.  The allegations that he had been involved in |
| 2  an improper sexually abusive, exploitive relationship |
| 3  with one of his students while she was still at the |
| 4  school. |
| 5        MR. COX:  Objection to the form.  You |
| 6  may answer. |
| 7     A.  I did not have a one-on-one conversation with |
| 8  him. |
| 9     Q.  Was it. . . |
| 10    A.  No. |
| 11    Q.  . . .no conversation at all? |
| 12    A.  No conversation.  I gave a letter to him from |
| 13 Dr. Kish and he was sent on his way.  That's all I |
| 14 recall. |
| 15    Q.  Is that letter that you're referring to page |
| 16 10482 in Creeden -- |
| 17        MR. COX:  Exhibit seven? |
| 18    Q.  -- in Creeden exhibit seven? It's the second |
| 19 page. |
| 20    A.  It's here. |
| 21    Q.  Is that the letter to which you were |
| 22 referring? |
| 23    A.  Yes. |
| 24    Q.  And after that letter was provided to Mr. |

                              39 (Pages 153 to 156)

Thomas Creeden                    Nace vs. Pennridge School District
                        August 11, 2015

Page 157

1  Hart, did you have any further contact with him at all?
2      A.  I did not.  He did not come back to the
3  school.
4      Q.  Did Pennridge do anything to determine whether
5  or not -- do itself to determine whether or not Mr.
6  Hart had had any inappropriate relationship with any of
7  the female students at Pennridge after the Interrante
8  situation was reported to Pennridge?
9      A.  Nothing was reported to us that he had
10  relations with other students.
11      Q.  Did you know Laura Interrante while she was a
12  student?
13      A.  All I can say is I know the name, and I would
14  have to recall how -- she was involved in student
15  council, I believe, but that's how I think I knew her,
16  through student council.
17      Q.  Were any criminal charges brought against Mr.
18  Hart?
19      A.  I really don't know.
20      Q.  Do you know if his -- I'm sorry, strike that.
21  Did Mr. Hart voluntarily surrender his teaching
22  certification?
23      A.  Immediately?
24      Q.  At any time.

Page 158

1      A.  I think eventually he did, yes.
2      Q.  Did the authorities ever discuss with anybody
3  at Pennridge, to your knowledge, you or anybody else in
4  Pennridge's administration, whether or not any criminal
5  charges should be brought against Mr. Hart?
6      A.  I don't recall that.
7      Q.  Do you have any understanding or recollection
8  of how long the sexual relationship between Ms.
9  Interrante and Mr. Hart lasted before she graduated?
10      A.  I don't recall.
11      Q.  If you look at page 9337, the first page?
12      A.  Yes.
13      Q.  Second-to-last paragraph?
14      A.  Okay.
15      Q.  "I like that this one went for so long.  It's
16  about been almost seven months." She's writing this to
17  Mr. Hart on December 1st, 2008.  She says "not counting
18  the six months before anything really started."
19      Did you become aware during your investigation
20  that her sexual involvement with Mr. Hart had lasted
21  for a number of months while she was a student at
22  Pennridge?
23      A.  I do not recall that.
24      MR. GROTH:  I'm going to mark as

Page 159

1      Creeden exhibit number eight a number of pages,
2  although not the whole document, from the
3  2013/2014 student handbook for Pennridge High
4  School.
5      Take a look at that for a second.  I
6  have included the first seven pages of that
7  handbook, which includes the unlawful harassment
8  policy, which includes a sexual harassment policy.
9  Those are found on pages five and six.
10      THE WITNESS:  Correct.
11      MR. GROTH:  All right.
12      (Exhibit Creeden-8 was marked for
13  identification)
14  BY MR. GROTH:
15      Q.  Would it be correct to say that this is the
16  harassment policy that was in effect at Pennridge High
17  School as of 2012/2013?
18      A.  That's the same one that we looked at before.
19      MR. COX:  Wait.  So, Creeden-8 is the
20  '13/'14 student handbook, Mr. Groth.  Are you
21  asking if it was also in effect the prior year?
22  You said '12/'13.
23      MR. GROTH:  I'm sorry.  I meant
24  '13/'14.  Let me restate that.

Page 160

1  BY MR. GROTH:
2      Q.  Is this the harassment policy, including
3  sexual harassment policy, that was in effect at
4  Pennridge High School during the school year 2013/'14?
5      A.  I believe it was.
6      MR. GROTH:  I don't know if I need to
7  mark this or not, but I also have in front of me a
8  handbook for professional employees revised in
9  2004.
10  BY MR. GROTH:
11      Q.  Is this a handbook just for professional
12  employees?
13      A.  That's the one -- that would be a late
14  revision.  It gets revised just about every year.
15      Q.  So, there should be one for 2012 to 2013?
16      A.  Should be.
17      Q.  Okay.  Is this handed out to all the
18  professional employees every year? I mean an actual
19  copy of it.
20      A.  Yes, and they are to keep it and they sign off
21  on it, at least at the high school.
22      Q.  And who are considered professional employees?
23      A.  Well, the teachers -- I'm trying to recall if
24  the teacher aides got this, got a copy as well, but I

40 (Pages 157 to 160)

Thomas Creeden                    Nace vs. Pennridge School District
                          August 11, 2015

| Page 161 |
| --- |

1  can't recall right now if they got it as well.  I think
2  it's just the teachers, but I would have to think about
3  that a little bit.
4      Q.  This would not apply to somebody like Mr.
5  Romig, an assistant coach?
6      A.  It would not.
7      Q.  I'm going to mark as Creeden exhibit ten three
8  documents:  One is a blank form, and the next two have
9  Elizabeth Nace's name and signature and her mother's
10  signature as well.  One is dated 9/4/12; the other is
11  dated 9/3/13.
12          (Exhibit Creeden-10 was marked for
13      identification)
14  BY MR. GROTH:
15      Q.  Are these the acknowledgment letters that are
16  signed by the student and parent, affirming that they
17  got a copy of that year's student handbook?
18      A.  Yes.
19      Q.  And this is the type of document I asked you
20  about before with regard to coaches and assistant
21  coaches.
22          Is it correct to say that this type of
23  document is never given to a coach or an assistant
24  coach to sign as an acknowledgement that they received

| Page 162 |
| --- |

1  any paperwork on Pennridge's policies and procedures,
2  and especially with regard to harassment or sexual
3  harassment?
4              MR. COX:  Objection to the form.  You
5  can answer.
6      A.  Coaches didn't get a form like this, no.
7      Q.  Okay.  We looked at one of the exhibits for
8  unlawful harassment, policy number 248.  Do you have
9  the exhibit there?
10      A.  This one here?
11      Q.  No.
12      A.  Oh, okay.
13              MR. COX:  Which exhibit?
14              MR. GROTH:  It was 248 --
15              MR. KEMETHER:  Two of them.
16              MR. GROTH:  248 and 448 are in exhibit
17      four.
18              MR. KEMETHER:  There were two 248s
19      marked.
20              THE WITNESS:  These are different
21      dates.
22              MR. COX:  Exhibit four and exhibit
23      five.
24  BY MR. GROTH:

| Page 163 |
| --- |

1      Q.  I have a document here that says Pennridge
2  School District Administrative Guidelines, Bates
3  numbers one through four.  They are given a number
4  248A.  Does that A stand for administrative guideline?
5      A.  I believe so, yes.
6              MR. GROTH:  I'm going to mark that as
7      Creeden exhibit eleven.  That is a four-page
8      document that talks about reporting harassment,
9      investigation of harassment.
10              (Exhibit Creeden-11 was marked for
11      identification)
12  BY MR. GROTH:
13      Q.  Who is that prepared for -- I'm sorry.  Who is
14  that prepared by, an administrative guideline?
15      A.  That is prepared by human resources.
16      Q.  And is that updated on a yearly basis?
17      A.  I don't know if it's yearly.  I don't recall.
18      Q.  On page two of that document it states in the
19  center, "An investigative file with the following
20  information should be maintained."  Do you see where
21  I'm reading? Right above one?
22      A.  Oh, okay.
23      Q.  Is there somewhere in Pennridge's records, at
24  a central location, where all investigative files with

| Page 164 |
| --- |

1  regard to unlawful harassment are maintained?
2          In other words, not in somebody's -- not in a
3  teacher's or coach's personnel file or whatever, but is
4  there a separate filing just for all unlawful
5  harassment claims?
6      A.  I don't know that answer.  I know they are
7  given to HR.  I don't know if they keep a file just
8  separated.
9      Q.  Who would know that, the HR director?
10      A.  That would be my guess.
11      Q.  Okay.  And this guideline refers not only to
12  sexual harassment, but also to any type of harassment
13  based on race, religion, gender, sexual orientation,
14  all that stuff, correct?
15      A.  Correct.
16      Q.  As stated in the first paragraph?
17      A.  Yes.
18      Q.  Do you know if there is any separate file or
19  the maintaining of any separate file just including
20  claims of sexual harassment?
21      A.  A separate file?
22      Q.  Yes, as a subsection of harassment files.
23      A.  I don't know that.
24      Q.  That would be the HR director?

                          41 (Pages 161 to 164)

Appendix  0596

Thomas Creeden                              Nace vs. Pennridge School District
                              August 11, 2015

---

Page 165

1      A.  HR again.
2          MR. GROTH: I'm looking at Creeden
3      exhibit twelve, which is just a couple of pages
4      lifted out of something I think we've already
5      looked at.  It's Bates numbers 10634 and 10635.
6          (Exhibit Creeden-12 was marked for
7      identification)
8  BY MR. GROTH:
9      Q.  I would like to refer you to the first page,
10  about three-quarters of the way down. There is a short
11  paragraph, one sentence, that says "The District also
12  shall provide in-service training for employees
13  concerning all aspects of unlawful harassment."
14         Do you see where I'm reading?
15     A.  Yes.
16     Q.  Again, we covered this I think before, but let
17  me ask you:  Did Mr. Romig ever receive, to your
18  knowledge, in-service training concerning all aspects
19  of unlawful harassment while he was employed at
20  Pennridge?
21     A.  Not that I'm aware of.
22     Q.  Do any coaches or assistant coaches, or have
23  they in the past ever received any in-service training
24  concerning all aspects of unlawful harassment?

---

Page 166

1      A.  I'm thinking about that because I know there
2  was some training done, but I couldn't recall what year
3  that was done.
4      Q.  There was some training of who?
5      A.  The coaches.
6      Q.  Not the assistant coaches.
7      A.  All coaches, I'm sorry. All coaches.
8      Q.  On what topic?
9      A.  Harassment.
10     Q.  You believe there was some training done.
11     A.  Yes.
12     Q.  By whom and when?
13     A.  It was -- I'm not sure of when, but I know --
14  I'm not going to say who because -- it was from HR.
15  What year? I can't recall what year.
16         I just remember it being in the -- they call
17  them the round rooms.  There is a big auditorium, a
18  smaller auditorium than the big one, and it was held
19  there.
20     Q.  For whom?
21     A.  For all coaches.
22     Q.  And who was involved in it? Who ran it? Who
23  taught it?
24     A.  HR did it.

---

Page 167

1      Q.  HR.  And do you recall whether it was in the
2  early 2000s, late 1990s, late 2010?
3      A.  I'm not sure.  It was about mid 2000s.
4      Q.  Only done once?
5      A.  No, I think it was during the time Ms. Feola
6  was there.
7      Q.  Not since Mr. Scarpantonio?
8      A.  I don't believe he followed through on that.
9      Q.  Okay.  Do you know whether or not in any of
10  the sexual harassment policies that we have in front of
11  us or that you know of, even if we don't have it in
12  front of us, there was ever any reference in the policy
13  or stated position with regard to inappropriate sexual
14  texting or sexting?
15     A.  Any unlawful harassment policy?
16     Q.  Yes, under any unlawful harassment policy,
17  including the sexual harassment provisions.
18         I think I had ask you before if there was a
19  policy on texting or sexting and you said no, and I
20  want to know whether or not you knew whether or not any
21  such policy existed in the written policies on unlawful
22  harassment and sexual harassment.
23         MR. COX:  Objection to the form. You
24  can answer.

---

Page 168

1      A.  I can't recall.
2      Q.  Do you know if one exists now?
3      A.  I don't know.
4          MR. GROTH:  I'm going to mark as
5      Creeden-13 documents provided by your counsel with
6      Bates numbers 17317 through 17320.
7          (Exhibit Creeden-13 was marked for
8      identification)
9  BY MR. GROTH:
10     Q.  I'm going to ask you first, do you know who
11  prepared this document?
12     A.  With there not being a signature, I don't
13  know.
14     Q.  Again, Mr. Ludlow was a social studies
15  teacher?
16     A.  Yes.
17     Q.  Did he do any other coaching or phys-ed or
18  anything like that teaching?
19     A.  No.
20     Q.  It's marked page number one.  It's actually
21  the second page of that exhibit.  It states in the
22  second paragraph "On January 11, 2000 two additional
23  female students from another of Mr. Ludlow's classes
24  attempts to see their counselor regarding inappropriate

---

Thomas Creeden                        Nace vs. Pennridge School District
                        August 11, 2015

Page 169

1  behavior on the part of Mr. Ludlow.  The first met with
2  assistant principal Joann Rubin, who then contacted Mr.
3  Creeden, who initiated the investigation which is now
4  underway."
5       I think before we talked about one additional
6  girl coming forward in January with allegations about
7  Mr. Ludlow? Is that correct?
8     A.  I don't remember.
9     Q.  Is that correct?
10    A.  Yes.
11    Q.  Does this refresh your recollection that there
12  were two girls in October, as stated in the first
13  paragraph of that page, and two different girls in
14  January that made allegations against him?
15    A.  I only remember one girl making allegations,
16  and I think the other girl was a friend to walk her
17  down to the office.
18    Q.  Okay.
19         MR. GROTH:  I'm going to mark as
20    exhibit fourteen a document with Bates numbers
21    17327 through 17331.  It's entitled "Notice to
22    individuals complaining of unlawful harassment."
23         There is a second document in the same
24    exhibit starting at 17329 from Charles Weber to

Page 170

1         Robin Landis dated February 27, 2003.
2         (Exhibit Creeden-14 was marked for
3    identification)
4  BY MR. GROTH:
5     Q.  Who is Robin Landis?
6     A.  I can't recall.
7     Q.  Do you recall her being an assistant softball
8  coach?
9     A.  I don't.
10    Q.  Do you know who Charles Weber is?
11    A.  Yes:  He was district personnel.  Eventually
12  he headed up HR there for a period of time.
13    Q.  Paragraph two says "The District will
14  investigate the allegations of improper conduct that
15  you have brought to its attention.  The investigation
16  will be conducted by the Title 9 coordinator, Charles
17  Weber."
18        What investigation of allegations is being
19  referred to here?
20    A.  I don't recall.
21    Q.  Do you know against whom the allegations of
22  improper conduct were being brought?
23    A.  I do not.
24    Q.  You've had dealings with the Bucks County

Page 171

1  District Attorney's Office almost since you started as
2  principal of Pennridge back in 1999 or 2000, correct?
3         MR. COX:  Objection to the form.  You
4  can answer.
5     A.  Yes.
6     Q.  And you had contact with and worked with a
7  number of their assistant district attorneys over the
8  years?
9     A.  I recall being in contact with district
10  attorneys.  I don't know if there's a number of them.
11    Q.  Do you remember being in contact with Jennifer
12  Shorn with regard to the Romig situation?
13    A.  I remember her name.
14    Q.  Okay.
15    A.  I don't know if I was in direct contact with
16  her.
17    Q.  How would you characterize the relationship
18  between the administration at Pennridge High School and
19  the DA's office with regard to the investigations that
20  were conducted by the Bucks County DA's office of some
21  of the teachers that we talked about today?
22         MR. COX:  Objection to the form.  You
23  may answer.
24    A.  How would I -- I'm sorry, rephrase that.

Page 172

1     Q.  How would you characterize the relationship
2  between the administration of Pennridge High School and
3  the representatives of the DA's office who investigated
4  some of the teachers that we talked about today?
5         MR. COX:  Same objection.  You may
6  answer.
7     A.  Cooperative.
8     Q.  Going back to the hiring of Mr. Romig one last
9  time, did you know or were you aware that Mr. Romig had
10  coached at Faith Christian Academy before he was hired
11  as a coach at Pennridge?
12    A.  I believe it came up with that conversation at
13  the softball field with Mr. Babb.
14    Q.  Okay.  That was after he was already hired.
15    A.  Correct.
16    Q.  Did you know before he was hired that he had
17  been a coach at FCA?
18    A.  No.
19    Q.  Do you have any understanding of the term
20  "at-will employee"?
21         MR. COX:  Objection to the form.  You
22  can answer.
23    A.  I do not.
24    Q.  In Pennridge's answer to plaintiff's

Thomas Creeden                      Nace vs. Pennridge School District
                          August 11, 2015

---

Page 173

1   complaint, paragraph sixty-nine, it is stated that "It
2   is admitted that Babb was acting in his capacity at
3   athletic director at Pennridge High School at the time
4   Romig was hired as the girls softball coach.  It is
5   denied that Romig was a contracted employee as that
6   term is understood pursuant to the Pennsylvania school
7   code.  Romig was an employee-at-will."
8        Do you have any understanding of what the term
9   "contracted employee" means pursuant to the
10  Pennsylvania School Code?
11       MR. COX:  Objection.  You may answer.
12       A.   I do not.
13       Q.   Do you have any understanding of what is meant
14  when it states here in this answer in paragraph
15  sixty-nine "Romig was an employee-at-will"?
16       MR. COX:  Objection.  You can answer.
17       A.   I do not.
18       Q.   In the complaint, in paragraph sixty-three, it
19  states, "The victim in 2004" referring to Sarah
20  Webster -- it's not referred to by name here, but it's
21  referred to the Heath situation -- "was relentlessly
22  harassed by students that attended Defendant Pennridge,
23  including vandalism to her care, stealing her property,
24  throwing eggs at her residence, vandalism of her locker

---

Page 174

1   and students wearing T-shirts to the school that stated
2   they wanted the teacher freed." And in the answer to
3   that by Pennridge has "Denied."
4        Were you aware back in 2004 that at least some
5   of that harassment was taking place with regard to
6   Sarah Webster?
7        MR. COX:  Objection to the form.  You
8   can answer.
9        A.   It's my understanding, once it was reported,
10  it was investigated.
11       Q.   What was reported?
12       A.   Any type of harassment.
13       Q.   Including some of the things that were
14  mentioned that I just read to you?
15       MR. COX:  Objection to the form.  You
16  can answer.
17       A.   Not specific to those, but it was my
18  understanding that the assistant principal investigated
19  those when they were brought to his attention.
20       Q.   Paragraph eighty-four of the complaints
21  states, in part, "No one from defendant Pennridge ever
22  contacted Defendant Faith Christian before hiring
23  Defendant Romig to inquire about Defendant Romig's
24  employment history or conduct while he was employed

---

Page 175

1   there."
2        And then it says further, "Even after
3   receiving information that Defendant Romig had been
4   dismissed for cause from Defendant Faith Christian,
5   Defendant Pennridge failed to contact anybody at
6   Defendant Faith Christian and request further
7   information."  The answer to that paragraph by
8   Pennridge is "Denied."
9        My question to you is, do you know whether or
10  not anybody from Pennridge ever contacted Faith
11  Christian before hiring Defendant Romig to inquire
12  about his employment history or conduct while he was
13  employed there?
14       A.   I don't recall.
15       MR. GROTH: I think I have no other
16  questions.  Thank you.
17       MR. SANTARONE:  I don't have any
18  questions.
19       MR. KEMETHER: I don't have any
20  questions.
21       MS. CONNOR:  No questions.
22       MR. COX:  I just have a couple of brief
23  questions, Mr. Creeden. Was the last exhibit
24  fourteen?

---

Page 176

1        MR. GROTH:  I believe so.
2        MS. KERNAN:  Yes.
3        (Exhibit Creeden-15 was marked for
4   identification.)
5        (EXAMINATION)
6   BY MR. COX:
7        Q.   Mr. Creeden, I'll show you what I've just
8   marked as exhibit fifteen. I'll let Mr. Groth take a
9   look at it as well.  I'd like you to take a look at
10  that document and review it, please.
11       MR. GROTH:  You want this marked
12  exhibit fifteen?
13       MR. COX:  Yes.  I marked it, but you're
14  welcome to --
15       MR. GROTH:  I'll put a sticker on it
16  just to be consistent here.
17       MR. COX:  Thank you.
18  BY MR. COX:
19       Q.   Mr. Creeden, I'll represent to you that this
20  is a document produced by Pennridge to the plaintiff in
21  this matter.  It's Bates-stamped 012942 and 012943.
22  Take a minute and read that document, if you would,
23  please; let me know when you've done so.
24       (Witness complies)

---

44 (Pages 173 to 176)

Appendix 0599

Thomas Creeden                                    Nace vs. Pennridge School District
August 11, 2015

| Page 177 | Page 179 |
|---|---|

**Page 177**

1    Q.  Does that document refresh your memory as to
2  what steps the District took in response to the
3  allegations by Ms. Roush?
4    A.  Yes.
5    Q.  Against Mr. Ludlow?
6    A.  Right.
7    Q.  And what specifically did the District do?
8    A.  There is a ten-day suspension effective
9  immediately.
10    Q.  Does the letter state whether the District
11  concluded that Ms. Roush's allegations were founded or
12  unfounded?
13    A.  Founded.
14    Q.  All right.  I'd like to go back to the earlier
15  allegations with respect to Mr. Ludlow by the students
16  back in the late '90s/early 2000 time frame.
17       After the second round of allegations with
18  respect to Mr. Ludlow by the students in the January
19  time frame that came to your attention, what did the
20  District do at that time?
21    A.  I believe there was one student.  I believe
22  the other student was, for want of a better word, an
23  escort.
24    Q.  All right.

**Page 178**

1    A.  Only Katie Snyder was the one that I remember
2  with the allegations.
3    Q.  Did those allegations result in criminal
4  charges against Mr. Ludlow?
5    A.  Yes.
6    Q.  Did you testify at the criminal trial against
7  Mr. Ludlow?
8    A.  Yes.
9    Q.  Do you remember what the outcome of that trial
10  was?
11    A.  He was exonerated.
12    Q.  Was Mr. Ludlow's employment with the District
13  terminated?
14    A.  After the trial or before?
15    Q.  In that time frame.
16    A.  Yes.
17    Q.  Do you recall whether Mr. Ludlow and/or his
18  union grieved that termination?
19    A.  They grieved it.
20    Q.  And what was the outcome of that grievance?
21    A.  He was reinstated by the Pennsylvania
22  Department of Education.
23    Q.  Do you recall what PDE did with respect to his
24  teaching certificate in that --

**Page 179**

1    A.  They reinstated it.
2       MR. COX:  That's all I have.  Thank
3  you.
4       MR. GROTH:  Can we go off the record,
5  please?
6       THE VIDEOGRAPHER:  The time is now 4:22
7  p.m.  We're now off the record.
8       (There was a discussion held off the
9  record)
10       THE VIDEOGRAPHER:  The time is now 4:23
11  p.m.  We are back on the record.
12       MR. GROTH:  There being no other
13  questions, the deposition is concluded.  Thank
14  you.
15       THE VIDEOGRAPHER:  The time is now 4:23
16  p.m.  This concludes today's deposition and DVD
17  number four.
18       (The deposition was concluded at 4:23
19  p.m.)
20
21
22
23
24

**Page 180**

1  Document entitled "Employment of District
   Staff"                              32
2  Extra Duty Contract (Coach-Assistant Coach)    63
3  Inquirer Article, posted January 14, 2001    101
4  Pennridge School District Unlawful Harassment
   Policy, Section 248, Revised December 21,
   1999 and June 21, 2004              129
5  Pennridge School District Unlawful Harassment
   Policy, No. 248, Adopted September 24, 2012    131
6  Articled in The Morning Call, dated November
   10, 2005                          140
7  Email dated December 15, 2008          154
8  Student Handbook                    159
9  ***NOT MARKED***
10  Letter dated September 3, 2013          161
11  Document entitled "Pennridge School District
   Administrative Guidelines, Unlawful Harassment" 163
12  Document entitled "Retirement"          165
13  Four-page document, Bates SD-017317 through
   320, inclusive                    168
14  Memo, undated, entitled "Notice to Individuals
   Complaining of Unlawful Harassment," Bates
   017327 through 331, inclusive        170
15  Letter dated February 22, 2001, from R.

45 (Pages 177 to 180)

Appendix  0600

Thomas Creeden                    Nace vs. Pennridge School District
                        August 11, 2015

Page 181

### SIGNATURE PAGE

------

    I hereby acknowledge that I have read the aforegoing transcript, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

------

SIGNATURE: _____

DATE: _____

Page 183

CERTIFICATION

------

    I hereby certify that the testimony and the proceedings in the aforegoing matter are contained fully and accurately in the stenographic notes taken by me and that the copy is a true and correct transcript of the same.

_____
Lance A. Brusilow
Registered Professional Reporter
Certified Realtime Reporter

    The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of

the certifying shorthand reporter.

------

Page 182

### ERRATA SHEET

------

PAGE     LINE          CORRECTION

```
 1              THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                   CIVIL TRIAL DIVISION

 3   JAMES NACE, et al            CIVIL ACTION

 4

 5        vs.

 6

 7   PENNRIDGE SCHOOL DISTRICT,
     et al.                       NO. 15-333
 8

 9                   Friday, August 28, 2015

10

11              Oral deposition of KEVIN R. SMITH, held at

12   the offices of HORNSTINE PELLONI & HORNSTINE,

13   1500 Walnut Street, Suite 300, Philadelphia,

14   Pennsylvania, beginning at 1:45 p.m., on the above date,

15   before LANCE A. BRUSILOW, Registered Professional

16   Reporter, Approved Reporter for the United States

17   District Court, and Notary Public, there being present.

18

19

20

21

22

23

24
```

Appendix 0602

```
1        APPEARANCES

2        HORNSTINE PELLONI & HORNSTINE

3        BY:  DAVID GROTH, ESQUIRE

4        1500 Walnut Street

5        Suite 300

6        Philadelphia, PA 19102

7        ph: 215.568.4968

8        (david@hornstine.com)

9          Counsel for Plaintiffs

10

11

12       MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

13       BY:  JOSEPH J. SANTARONE, ESQUIRE

14       2000 Market Street

15       Suite 2300

16       Philadelphia, PA 19103

17       ph: 215.575.2626

18       (jjsantarone@mdwcg.com)

19         Counsel for Faith Christian Academy

20

21

22

23

24
```

Appendix 0603

```
 1     APPEARANCES CONTINUED:

 2     EASTBURN & GRAY, P.C.

 3     BY:  ERIN N. KERNAN, ESQUIRE

 4     60 East Court Street

 5     Doylestown, PA 18901

 6     ph: 215.345.7000

 7     (ekernan@eastburngray.com)

 8        Counsel for Pennridge School District

 9        and individual Pennridge defendants

10

11

12     CASSIDY CONNOR PITCHFORD

13     BY:  CARLA E. CONNOR, ESQUIRE

14     295 East Swedesford Road

15     Suite #346

16     Wayne, PA  19087

17     ph: 610.783.3513

18     (cconnor@ccplegal.com)

19        Counsel for FCA, Ryan Clymer and

20        Russell Hollenbach

21

22

23

24
```

Appendix  0604

Case 2:15-cv-00333-WB Document 53-12 Filed 01/27/16 Page 108 of 147

```
 1      APPEARANCES CONTINUED:

 2      KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

 3      BY:  SEAN V. KEMETHER, ESQUIRE

 4      30 East Second Street

 5      Media, PA  19063

 6      ph: 610.585.0600

 7      (skemether@kgpv.com)

 8        Counsel for Ryan Clymer and Russell

 9        Hollenbach

10

11

12      DRAKE, HILEMAN & DAVIS

13      BY:  JONATHAN J. RUSSELL, ESQUIRE

14      252 W. Swamp Road, #15

15      Doylestown, PA  18901

16      ph:  215.348.2088

17      (jrussell@dhdlaw.com)

18        Counsel for Faith Christian Defendants

19

20

21      ALSO PRESENT:

22        Henry Thompson

23

24
```

Appendix  0605

1      EXAMINATION INDEX

2    WITNESS:  KEVIN R. SMITH

3      By Mr. Groth (page-6, 149)

4      By Mr. Russell (page-99)

5      By Mr. Santarone (page-135, 151)

6

7

8      EXHIBIT INDEX

9    Smith-1 Letter dated April 10, 2015

10    from D. Groth to Kevin and Annette

11    Smith (page-96)

12

13

14

15

16

17

18

19

20

21

22

23

24

Appendix  0606

Page 6

1    (It is hereby agreed by and
2  among counsel that sealing, certification
3  and filing are waived; and that all
4  objections, except as to the form of the
5  question, are reserved until the time of
6  trial)
7    KEVIN R. SMITH, having been
8  first duly sworn, was examined and
9  testified as follows:
10  EXAMINATION
11  BY MR. GROTH:
12  Q.    Would you state your full name,
13  please?
14  A.    Kevin Ross Smith.
15  Q.    Mr. Smith, my name is David
16  Groth, and I represent the plaintiff in a
17  lawsuit that's currently pending in the
18  Federal District Court for the Eastern
19  District of Pennsylvania, and I'm going to
20  ask you some questions about facts and
21  issues that I think are important to that
22  litigation.
23    Have you ever given a
24  deposition before?

Page 7

1  A.    Yes, I have.
2  Q.    On how many occasions?
3  A.    One.
4  Q.    Criminal or civil?
5  A.    Civil.
6  Q.    What type of case?
7  A.    It was a lawsuit that my
8  ex-wife had filed against the hospital
9  regarding damages to my youngest son.
10  Q.    So, you're somewhat familiar
11  with the process?
12  A.    Yes.
13  Q.    Let me just go through a couple
14  instructions that will hopefully get us
15  through this quickly and efficiently.
16    First, make sure you listen to
17  the questions that you're asked and that
18  you understand them before you give an
19  answer.
20    If you give an answer to a
21  question, we will assume that you
22  understood the question and that you're
23  giving us your best recollection of facts
24  and events going back to around 2008/2009.

Page 8

1    Please allow us to complete the
2  question before you begin your answer so
3  the court reporter only has to take down
4  one of us speaking at the same time and
5  so that you know exactly what the
6  question is asking you for before you
7  begin your answer.
8    If you don't understand a
9  question, let us know and we'll try to
10  clarify or rephrase or restate the
11  question for you so that you do
12  understand it before you give us an
13  answer.
14    You have to give a verbal
15  response to all questions -- yes, no, or
16  a narrative explanation -- as opposed to
17  a head-shake yes or a head-shake no. The
18  court reporter can only make a
19  transcription of what's said here, so you
20  have to verbalize all of your answers and
21  you can't use any hand gestures or other
22  types of gestures. You are required to
23  answer every question you are asked to
24  the best of your ability and fully.

Page 9

1    There may be objections to
2  questions that you are asked.  I may
3  object to a question somebody else asks
4  you or they may object to a question that
5  I ask you.  If that's the case, just
6  allow the objection to be stated on the
7  record and then proceed to answer the
8  question.
9    There are legal formalities that
10  require us to object to certain question,
11  but they really don't have anything to do
12  with you.  That will be resolved, if
13  necessary, at a later time.  So, you'll
14  answer the question even if there is an
15  objection.
16    I'll be asking you questions
17  looking for facts and information that you
18  know personally or that you may have
19  heard or learned from other sources or
20  gotten through other sources. There is no
21  hearsay issue in a deposition as opposed
22  to at trial, so that even if your source
23  of information is another person, that you
24  don't know personally but you heard it

Page 10

1 from some other person or source, you're
2 required to give us that information as
3 well.
4         If you don't know the answer to
5 a question or you have do not recall the
6 facts and information I'm asking about,
7 tell me and that will be a sufficient
8 answer.
9         I know that some of this goes
10 back a number of years and you may have
11 known something at one time that you
12 simply don't recall sitting here today; if
13 that's the case, just tell us that.
14         I don't want you to guess or
15 speculate or assume anything in response
16 to any of the questions that you're asked
17 here today. Don't feel that you have to
18 come up with an answer to a question just
19 because it's been asked and you think you
20 should know something. Unless you have a
21 specific recollection of those facts and
22 events, don't be afraid to say that you
23 don't recall.
24         Are you taking any medication

Page 11

1 or other drugs today that would inhibit
2 your ability to testify in a deposition?
3    A.    No.
4    Q.    Do you understand that
5 testifying under oath today is the same
6 as if you were testifying at a trial of
7 this case in front of a judge and jury?
8    A.    Yes.
9    Q.    If you need to take a break
10 during the course of the questioning, just
11 let us know and we'll be happy to
12 accommodate you, even if it's just to get
13 a breath of fresh air, go to the mens
14 room or whatever. Whatever you need, we'll
15 be happy to accommodate you.
16    A.    Okay.
17    Q.    Mr. Smith, where do you live?
18    A.    219 Stonehaven Drive, Red Hill,
19 Pennsylvania.
20    Q.    And how long have you lived
21 there?
22    A.    Fifteen years.
23    Q.    Who do you live there with now?
24    A.    My wife.

Page 12

1    Q.    Her name is Annette?
2    A.    Annette Smith.
3    Q.    And when were you married?
4    A.    2001.
5    Q.    Back in 2009, 2008 and 2009,
6 2010, were you living at the same
7 address?
8    A.    Yes.
9    Q.    Who were you living with at
10 that time at that residence?
11    A.    At that time it was my wife,
12 Annette, and Emily.
13    Q.    That's your step-daughter, Emily
14 Mayer?
15    A.    That's correct.
16    Q.    Can you tell us a little bit
17 about your educational background, where
18 you graduated high school, what year,
19 where you went to college, what year you
20 graduated, what degrees you got, that type
21 of thing?
22    A.    Sure.  I went to Central Bucks
23 West High School in Doylestown.  I
24 graduated in 1983.  I went to Bucks

Page 13

1 County Community College for two years,
2 received an Associates Degree in Music.
3    Q.    In music?
4    A.    Yes.
5    Q.    All right.
6    A.    I transferred to West Chester
7 University, where I got a Bachelor of
8 Science Degree in Criminal Justice and a
9 minor in music.  Subsequent to that my
10 next education was at Stevens Institute of
11 Technology in Hoboken, New Jersey.  I
12 have a Masters of Science in Information
13 Management.
14    Q.    What year was that?
15    A.    2007.
16    Q.    And what was the degree in
17 again? I'm sorry.
18    A.    Its Masters of Science in
19 Information Management.
20    Q.    And what does that involve?
21    A.    It's related to the IT
22 industry, technology industry, technology
23 systems for managing large amounts of
24 information.

Page 14

1  Q.  Do you have any other formal
2  education?
3  A.  No.
4  Q.  Let's go over your employment
5  history for a moment.
6  A.  Uh-huh.
7  Q.  Starting after college, can you
8  tell me by whom you were employed?
9  A.  Yes:  After college I was
10  employed by the Montgomery County District
11  Attorney's Office, Office of County
12  Detectives.
13  Q.  What years?
14  A.  It was 1988 through 1994.
15  Q.  In what position?
16  A.  I was an investigator.
17  Q.  Of what?
18  A.  A general investigator.  I
19  worked in several units within the county
20  detectives:  I worked the Narcotics
21  Enforcement Team and I worked for Staff &
22  Special Services.
23  Q.  What is that?
24  A.  It's kind of a catchall for all

Page 15

1  things that don't have an investigative
2  arm:  Homicide, major crimes and so
3  forth.  This was pretty much any other
4  kind of investigation that would come up.
5  Q.  Did you ever work in homicide
6  or major crimes?
7  A.  I did not.
8  Q.  What about sexual assaults?
9  A.  No.
10  Q.  What training did you get in
11  order to allow you to work as an
12  investigator for the Montgomery County
13  DA's Office?
14  A.  It was primarily my degree, my
15  Bachelor of Science Degree in Criminal
16  Justice, then I had individual training
17  sponsored by the county, and that training
18  had to do with investigative techniques,
19  specifically arson investigation.
20  Q.  Any other investigative
21  techniques for any other types of crimes?
22  A.  No.
23  Q.  With the arson investigations,
24  would you work with the county fire

Page 16

1  marshal?
2  A.  Yes, we worked with the
3  Montgomery County Fire Academy.  They
4  hosted the training.
5  Q.  I'm talking about out in the
6  field, when you did an investigation.
7  Would you generally be doing it with a
8  fire marshal?
9  A.  Absolutely, yes.
10  Q.  Why did you leave that
11  position?
12  A.  During that time I had an
13  opportunity to change careers and go into
14  IT technology based on work that I had
15  done with the county detectives.
16  Q.  What was the first position you
17  had in that field?
18  A.  I was a technical writer for
19  General Accident Insurance.
20  Q.  What did that involve?
21  A.  Systems analysis, mainframe
22  systems analysis; writing essentially user
23  manuals, technical manuals related to the
24  mainframe systems that were in use by the

Page 17

1  insurance company.
2  Q.  Is this to track data, like the
3  amount of claims or status of claims,
4  stuff like that?
5  A.  It was for office systems that
6  were in use at that time, so yes, certain
7  insurance sales systems and so forth.
8  Basically any technology system in the --
9  Q.  Sales, claims, policies, all
10  that stuff?
11  A.  Yes.
12  Q.  What year did you start there?
13  A.  1994.
14  Q.  Until when?
15  A.  1997.
16  Q.  What was the position --
17  technical writer was the position for
18  General Accident?
19  A.  Yes.
20  Q.  What was your next employment
21  after 1997?
22  A.  So, after 1997 I was employed
23  by Noble Consulting, and I was assigned
24  to work in Merck Pharmaceutical.

Appendix  0609

Page 18

1   Q.   Until when?
2   A.   December of 1997.
3   Q.   Just one year?
4   A.   It was approximately six months,
5   and I was converted from a consultant to
6   an employee at Merck.
7   Q.   What was your position at
8   Merck?
9   A.   In 1997 it would have been a
10  systems analyst.
11  Q.   What did that involve?
12  A.   In general, supporting and
13  analyzing failures in desktop systems,
14  desktop/laptop computers; some degree of
15  network operations as well, and that was
16  diagnosing token ring network and so
17  forth.
18  Q.   And how long were you in that
19  position?
20  A.   I was in that position
21  approximately a year and a half, and I
22  received a promotion after that.
23  Q.   Within Merck?
24  A.   Yes.

Page 19

1   Q.   To what position?
2   A.   Senior systems analyst.
3   Q.   And then?
4   A.   Your question? I'm sorry?
5   Q.   Yes: After you became senior
6   systems analyst, how long were you in
7   that position?
8   A.   Approximately two years.  The
9   actual time, I don't remember.
10  Q.   You can estimate or approximate.
11  A.   I'm going to estimate about two
12  years.
13  Q.   Until 2000/2001?
14  A.   Yes, correct.
15  Q.   What employment after that?
16  A.   Then I was promoted to a team
17  leader.
18  Q.   For what years?
19  A.   2001 to approximately 2008.
20  Q.   And after that?
21  A.   After that I was promoted to
22  associate director.
23  Q.   From what years?
24  A.   From approximately 2008 until

Page 20

1   December of 2014.
2   Q.   And what happened December of
3   2014?
4   A.   Merck went through a
5   transformation and my position was moved
6   to the Czech Republic.  I chose not to
7   move to the Czech Republic, so I was
8   released from my employment at Merck.
9   Q.   Are you employed now?
10  A.   I am.
11  Q.   In what position?
12  A.   I am an associate manager of
13  delivery for Accenture Consulting.
14  Q.   I'm sorry, I missed that, the
15  name of the company.
16  A.   Accenture Consulting.
17  Q.   Doing what?
18  A.   I'm working at Merck, in the
19  office of the CIO, doing Enterprise
20  Performance Benchmarking.
21  Q.   And you're still in that
22  position?
23  A.   Yes, I am.
24  Q.   So, basically, during the time

Page 21

1   period that we're talking about back in
2   2009/2010, you were working at Merck as
3   an associate director.
4   A.   Yes.
5   Q.   When you were working as an
6   investigator for the Montgomery County
7   DA's office, did you have occasion as
8   part of your investigations to try to get
9   telephone records?
10  A.   No.
11  Q.   When I say "telephone records,"
12  I am referring to any type of telephone
13  record:  A record of telephone calls
14  made, record of text messages, any type
15  of telephone information.
16  A.   No, at the time.
17  Q.   Whether or not that was part of
18  your investigation, did you know what
19  procedure had to be followed if you
20  wanted to, for example, get or attempt to
21  get from a telephone company a record of
22  actual text messages sent between two
23  individuals?
24  A.   I'm sorry, the question was

Page 22

1  text messages or telephone messages?
2      Q.     Specifically text messages.
3      A.     I would not have known at that
4  moment.  At that time we didn't have a
5  lot of cell phones, so text messaging --
6  I didn't experience any kind of
7  investigation that would have involved
8  text messages in my capacity as an
9  investigator at my time.
10     Q.     At any time up until, say,
11 2010, did you learn of what procedure
12 would have to be followed if you wanted
13 to try to get ahold of the content of
14 text messages between two people?
15     A.     Yes.
16     Q.     How did you find out about
17 that?
18     A.     Telephone records, I would have
19 needed a search warrant to obtain
20 telephone records.  Text messaging, I
21 can't say specifically when or how I knew
22 that, but I knew that I would need --
23 you would need a search warrant or some
24 type of case identification to get text

Page 23

1  messages.  I may have read it.  I don't
2  recall specifically how I knew that
3  information.
4      Q.     When you said "search warrant,"
5  you mean search warrant or subpoena or --
6      A.     A subpoena, I'm sorry.
7      Q.     -- or some court document that
8  enables you to serve it upon a
9  communications company and require them to
10 deliver to you documents that give you
11 the information you're looking for.
12     A.     Correct.
13     Q.     And you don't recall how you
14 found that out or when you found that
15 out?
16     A.     I don't.
17     Q.     Was it your understanding back
18 in 2009/2010 that you couldn't just simply
19 go to your phone company for accounts
20 that you were listed on, you were the
21 owner of the accounts, and ask them or
22 demand that they provide with you these
23 telephone records or text-message-content
24 records?

Page 24

1      A.     Yes, I understood that.  And
2  again, I don't know whether by reading
3  articles on it or what, how I had that
4  thought, but my understanding was that you
5  couldn't just contact the company and have
6  them send you the text messages.
7      Q.     Back in 2009/2010, you didn't
8  have any residual power, after working for
9  the DA's Office, of getting subpoenas or
10 search warrants or whatever to get
11 telephone records?
12     A.     No.
13     Q.     You got married to Annette in
14 2001.  Did you and Annette and Emily live
15 together for that entire period of time
16 between 2001 and 2009/2010?
17     A.     No, not the entire time.  There
18 was a custody arrangement for Emily and
19 her father, and at that time I believe
20 Emily would go to her father's on the
21 weekends.  We had Emily and her sisters
22 during the week, and then Emily and her
23 sisters would go to her father's house on
24 the weekends.

Page 25

1      Q.     Every weekend?
2      A.     Yes, pretty much every weekend,
3  unless we had something, you know, planned
4  for that weekend or her father wasn't
5  available to have them.
6      Q.     What about during the years of
7  2008/2009?  Was it customary for Emily to
8  go live with her biological father during
9  the weekends of the school year?
10     A.     No, not at that time.
11     Q.     What was the arrangement then?
12     A.     I don't remember the exact
13 dates, but at one point Emily decided
14 that she did not want to spend the
15 weekends at her father's home and she
16 asked if she could stay with us for a
17 time.
18     Q.     Was there a reason why she
19 didn't want to stay with him?
20     A.     The environment in the house
21 was not something that she felt
22 comfortable in.  It was a bit chaotic.
23 Her father had a girlfriend who had
24 children there as well, and I think there

Page 26

1  was quite a bit of competition for
2  attention, so she -- it was just chaos.
3  She just said "I don't really want to go
4  there and stay on the weekends."
5      Q.    In 2009 how would you
6  characterize your relationship with Emily?
7      A.    My relationship was good.  It
8  has always been very good with Emily.
9      Q.    Was there ever a period of time
10 where there was a falling-out with her?
11     A.    Not from my perspective, no.
12     Q.    How about her relationship with
13 her mother? How would you characterize
14 that back in 2009?
15     A.    I think her relationship with
16 her mom was good. I mean, typical teenage
17 girl, you know, some of the stresses with
18 mom.
19         Her relationship with me was
20 unique because I was a step-parent. So,
21 she had more, you know, normal tension
22 sometimes with mom, but overall her
23 relationship was good.
24     Q.    Was there ever a time when

Page 27

1  Emily threatened to run away with a
2  boyfriend?
3      A.    No.
4      Q.    Either while she was at Calvary
5  Baptist or Upper Perkiomen or at Faith
6  Christian Academy?
7      A.    No.
8      Q.    Was she ever kicked out of any
9  of the schools she went to prior to going
10 to FCA?
11     A.    No.
12     Q.    Were there any behavioral
13 problems that she had at any of the prior
14 schools before FCA?
15     A.    No behavioral problems, no.
16     Q.    I mean like
17 in-the-school-building type problems,
18 classroom issues, that type of thing.
19     A.    Can you rephrase that?
20     Q.    Yes.  Not in her personal life;
21 I'm talking about issues the school would
22 have to get involved in and handle in
23 some way:  Truancy, acting out in class,
24 disrespectful to teachers, cheating on

Page 28

1  exams, anything like that.
2      A.    No.
3      Q.    In November of 2009 -- we just
4  took Emily's deposition, as you know, and
5  she said that's when she started dating
6  Chase Brunner.  Did you know Chase before
7  that?
8      A.    No.
9      Q.    Had you ever met him before
10 they were dating?
11     A.    No.
12     Q.    Had you met him after they
13 started dating?
14     A.    Yes.
15     Q.    Did he pick her up at the
16 house? Did she introduce him to you, that
17 type of thing?
18     A.    I don't recall specifically. I
19 know he came over to the house at some
20 point after they started dating, and I
21 would have met him then.
22     Q.    Okay.  Do you recall if you
23 met him prior to the time where the
24 inappropriate text messages from Mr. Romig

Page 29

1  to Emily came to your knowledge?
2      A.    Yes.
3      Q.    You had met him before that.
4      A.    Yes.
5      Q.    Did you know anything about him
6  at all?
7      A.    I think just the general:  You
8  know, who he was, his parents, who his
9  parents were. I mean, once Emily had
10 expressed an interest in him and that
11 they liked each other, I -- that's why I
12 don't remember the specific date, but I
13 wanted to meet him, obviously, and find
14 out about him.
15     Q.    And he was a student at FCA,
16 also?
17     A.    I believe at that time, yes.
18     Q.    Emily did attend Calvary Baptist
19 for a while.
20     A.    Yes.
21     Q.    High school.
22     A.    Yes.
23     Q.    Why did she leave there?
24     A.    She was having difficulty with

Appendix  0612

Page 30

1  the circle of girls that she had gone up
2  through school with when she was in
3  elementary and so forth. She was having
4  some difficulty fitting in.
5        She wasn't born and raised in
6  that environment, so you never really fit
7  in, and that's kind of where she felt
8  that way.
9        So, she had come to a point
10  where there was a lot of tension, and she
11  had asked us at one point -- she had
12  said several times that she didn't want
13  to attend there any more, and at -- so,
14  to answer your question...
15    Q.    So, it wasn't anything that you
16  initiated. It was something that she
17  asked you about.
18    A.    Yes; we could see it.
19    Q.    Does Calvary Baptist have a
20  church associated with it?
21    A.    Yes.
22    Q.    Were you members of that
23  church?
24    A.    Yes, we were.

Page 31

1    Q.    When you testified that she
2  didn't fit in there or she thought she
3  didn't fit in, did she say in what
4  respect she didn't think she fit in with
5  the girls that she had been going to
6  school with for a couple of years?
7    A.    I would use the term -- the
8  term that would be used I would
9  characterize as worldly. Emily lived in a
10  different world than a lot of the other
11  girls her age in that environment, coming
12  from a divorced family, broken home or
13  broken -- divorced situation, and her
14  exposure to things in the world were
15  different than a lot of those girls.
16        So, there were certain elements
17  that she couldn't connect with, and I
18  think that created a lot of tension for
19  her.
20    Q.    Did she say she was getting
21  teased or bullied or harassed about some
22  issue of her circumstance by the other
23  girls that she knew?
24    A.    She had related, yes, that

Page 32

1  certain things were being said about her,
2  her character and so forth, that were
3  upsetting to her. And I don't know if I
4  would use the term bully, but there were
5  some pretty -- what she relayed to us
6  were some pretty unkind and nasty things.
7    Q.    Such as?
8    A.    She was out sick -- this
9  precipitated us actually pulling her out
10  of Calvary: She had been out sick, and
11  when she came back one of the girls had
12  said to her, gosh, I wish you had died.
13  She was quite upset about that, and so we
14  made a determination then.
15    Q.    She went to Upper Perkiomen for
16  a year?
17    A.    Yes.
18    Q.    What precipitated her leaving
19  Upper Perkiomen to go to Faith Christian
20  Academy?
21    A.    The environment primarily. She
22  had just -- she had gone through school
23  in a very controlled environment, a decent
24  environment, and going to a public school

Page 33

1  was a little bit of a culture shock for
2  her, even though she was accustomed to,
3  you know, her circle and her father's
4  house was all public school.
5        I don't think at that point --
6  and this is my estimation -- she made the
7  right choice of friends. So, she
8  recognized at one point after being there
9  for a while that she was not -- that
10  this was not a healthy environment for
11  her.
12    Q.    In terms of her choice of
13  friends, in what way was she getting
14  involved with the wrong friends?
15    A.    At Upper Perk she didn't take
16  part in sports. Emily was very active in
17  sports. It was an extremely important
18  part of her life, and she couldn't be at
19  Upper Perk -- again, my estimation is
20  that the lack of that structure, the lack
21  of the sports, gave her too much time on
22  her hands, perhaps, would be a way of...
23    Q.    Did she use that time in a way
24  that you didn't think was appropriate?

Page 34

1   A.   There were occasions, yes.
2   Q.   And give me an example.
3   A.   She would sleep over a friend's
4 house and she would lie and say that she
5 was sleeping at one person's house when,
6 in reality, she also sleeping at someone
7 we didn't like, someone else's house.
8   Q.   Did she argue about leaving
9 Upper Perk? I mean, did she give you any
10 argument, say no, I want to stay here?
11   A.   No.
12   Q.   How did you come to choose
13 Faith Christian Academy for her to go to?
14   A.   After we made the decision to
15 have her leave Upper Perk, we had really
16 a couple of choices. One was a charter
17 school, a home school.  That was an
18 option that we were considering.
19       I can't remember whether she
20 brought up Faith Christian Academy or
21 whether it was a thought that we had.  I
22 had heard very good things about the
23 school. She knew several people -- they
24 were rival schools with Calvary, so we

Page 35

1 knew a lot of kids that went to Faith,
2 and based on Faith's reputation we thought
3 that that was an appropriate choice.
4   Q.   Did she know some of the girls
5 who played athletics at FCA?
6   A.   Yes, she knew -- yes.
7   Q.   From playing them when she was
8 at Calvary.
9   A.   Right.  I wouldn't characterize
10 them as friends, but she had
11 acquaintances.
12   Q.   She started playing a number of
13 sports when she went to Faith Christian
14 Academy, including, I think she said,
15 soccer and volleyball and basketball.
16   A.   Yes.
17   Q.   When did you first have any
18 contact with her basketball coach, Eric
19 Romig?
20   A.   My first contact with Eric
21 Romig was the orientation day, her first
22 day there.  He was very excited to have
23 her on the basketball team.
24       He had watched her when she was

Page 36

1 at Calvary, knew that she was very good,
2 and I was at that time very pleased that
3 he was interested in her as a player.
4       I felt that she would get the
5 attention that she needed to become a
6 superb basketball player.  And my contact
7 with him was an introduction, a discussion
8 with him, that I was excited about that
9 and that he would be doing that to help
10 Emily.
11   Q.   And that would have been the
12 beginning of her junior year, correct, in
13 2008/2009?
14   A.   Yes.
15   Q.   Because what we're talking about
16 later is the fall of 2009.  So, this
17 would have been in 2008.
18   A.   Right.
19   Q.   How would you rate her
20 ability -- I know you're prejudiced as
21 a parent, but how would you rate her
22 ability as a basketball player on the
23 two teams that she played for at Faith
24 Christian?

Page 37

1   A.   I am no judge of sports.  I've
2 never been involved.  I was not a sports
3 person.  I thought that she was good.  I
4 thought she had the capacity to be
5 outstanding if she worked hard at it, but
6 I thought she was very good.
7   Q.   Was she one of the higher
8 scorers on the team?
9   A.   I don't know about scoring,
10 whether that was it.  I know that she
11 played very well as a team.  So, I don't
12 know that I paid attention to her scoring
13 as opposed to her technique and her
14 ability to work on a team.
15   Q.   Chelsea Romig was one of her
16 teammates?
17   A.   Yes.
18   Q.   Did Chelsea ever come over to
19 your house?
20   A.   (No response)
21   Q.   Emily had told us about
22 sleep-overs where she went and slept at
23 Chelsea Romig's house.  I just wonder if
24 she ever came over to your house.

Appendix 0614

Page 38

1    A.    I don't remember.  I can't
2   specifically recall if she did or not.
3    Q.    Did you go to the games
4   occasionally?
5    A.    Yes.
6    Q.    You watched your daughter play,
7   obviously.  You watched Eric Romig coach
8   the team?
9    A.    Yes.
10   Q.    Was your daughter happy playing
11  on the team?  I'm talking about the first
12  year, as a junior.
13   A.    Yes.
14   Q.    Did she tell you that there was
15  anything strange or uncomfortable in her
16  relationship with Coach Romig during that
17  junior year?
18   A.    No.
19   Q.    Had you heard from any source,
20  from any other students, parents, people
21  at the school, whatever, any reason to
22  believe that there might have been some
23  inappropriate behavior by Mr. Romig with
24  any of his players?

Page 39

1    A.    No.
2    Q.    Emily started the basketball
3   season at FCA in November of 2009, and
4   that's where we're going into detail here
5   of what happened in the months of
6   November and December.
7         Up until the time when Emily
8   was sent home to talk to you about the
9   texting issue she was having with Mr.
10  Romig, did you have any facts or
11  information or any reason to believe or
12  to suspect that there was an inappropriate
13  texting situation going on between Eric
14  Romig and Emily Mayer?
15   A.    No.
16   Q.    Did she ever say anything to
17  you to indicate that she was uncomfortable
18  playing for him that season before the
19  meeting with Clymer took place?
20   A.    No.
21   Q.    Did you notice any change in
22  her?  I know she's a teenager, so they
23  change all the time, but did you notice
24  any specific change in her in terms of

Page 40

1   her habits or her personality or her
2   emotions or anything of that nature
3   whatsoever?
4    A.    Not that I recall, no.
5    Q.    Prior to the time when Emily
6   was sent home by Ryan Clymer from school
7   to tell you about the texting situation
8   with Romig, did you have any discussions
9   with Romig where he discussed your
10  daughter with you, anything about her
11  basketball activities or her attitude or
12  anything at all?
13   A.    No, not that I recall.
14   Q.    For that season, her senior
15  season, do you know if she was a
16  co-captain of the team?
17   A.    I believe she was.
18   Q.    Do you know of any situation
19  that arose before Emily met with Ryan
20  Clymer -- I believe on December 21st,
21  2009 -- where she was suspended as the
22  co-captain or one of the co-captains on
23  the basketball team for some reason by
24  Coach Romig?

Page 41

1    A.    No.
2    Q.    Did Coach Romig ever contact
3   you or have any discussion with you
4   complaining about any of Emily's conduct
5   or behavior on or off the basketball
6   court?
7    A.    No.
8    Q.    Did he ever communicate to you
9   in some way, whether in person or by text
10  or email or whatever, that she had been
11  having problems with some of the girls on
12  the team in terms of sort of back-biting
13  and getting into arguments with them and
14  generally not getting along with them the
15  way he expected a co-captain to get along
16  with her teammates?
17   A.    No.
18   Q.    Again, I believe on December
19  21st Emily had a meeting with Ryan Clymer
20  in his office, then came home to talk to
21  you about the reason for that meeting and
22  what was going on between Eric Romig and
23  her in terms of texting.  Do you recall
24  that occurring?

Page 42

1    A.    I do, yes.
2    Q.    Do you recall the date of that?
3    A.    You just said December 21st.
4  That's how I would recall it.  I don't
5  remember the exact date.  I know it was
6  right before the holiday season.
7    Q.    Let me just show you a document
8  that was previously marked Romig exhibit
9  six, which was an email from your wife to
10  Ryan Clymer on December 31st, 2009.
11        Why don't you just look at the
12  first couple paragraphs of that and tell
13  me if that matches your recollection of
14  when this meeting with Clymer occurred and
15  when Emily came home to you to tell you
16  about the meeting.
17    A.    Okay.
18        (The witness complies)
19    Q.    Does what's written in that
20  email by your wife match your recollection
21  in terms of dates?
22    A.    Yes.
23    Q.    Before that day had Emily ever
24  stated to you that she was in some way

Page 43

1  attracted to Eric Romig in any way --
2  strike that:  That she was in some way
3  attracted to Eric Romig as a male?
4    A.    No.
5    Q.    Did you ever hear her talking
6  about him, that she thought he was
7  handsome or, you know, athletic or
8  anything of that nature whatsoever?
9    A.    No.
10    Q.    Prior to that date had you ever
11  had any personal contact or involvement
12  with Ryan Clymer?
13    A.    Yes.  The only -- yes, I had
14  contact with him.
15    Q.    What would that be?
16    A.    We went to, I think, Great
17  Adventure.  I don't remember the year,
18  maybe 2008/2009.  It was prior to this
19  event.  We went to Great Adventure with
20  her physics class, the teacher, and Ryan
21  drove the bus and I sat up front.  My
22  wife and I went along as well.
23    Q.    Chaperones?
24    A.    Yes, and I had conversations

Page 44

1  with Ryan at that time.
2    Q.    Do you recall anything that you
3  talked about with him?
4    A.    No.
5    Q.    Just general...
6    A.    Just general chitchat.
7    Q.    Was that the first time you
8  recall meeting him?
9    A.    That's my first recollection of
10  contact with him, yes.
11    Q.    And between that time and
12  whatever date that was Monday,
13  December 21st, do you recall ever talking
14  to him and meeting with him again?
15    A.    No.
16    Q.    Was there any interview process
17  to get Emily into this private school?
18    A.    I don't recall.
19    Q.    What was the tuition back then?
20    A.    My wife pays the bills.  She's
21  the CFO, so I don't know.
22    Q.    Do you have any idea?
23    A.    I would be guessing if I said.
24    Q.    Did you know any of the

Page 45

1  assistant coaches on the basketball team
2  at that time:  Robin Landis or Marc
3  Hoover?
4    A.    I know who they were.  I
5  wouldn't characterize it as I knew them.
6    Q.    Did you know who Mr. Hollenbach
7  was?
8    A.    Yes.
9    Q.    I knew he was the athletic
10  director?
11    A.    Correct.
12    Q.    When Emily was going to FCA,
13  were you still members of the Calvary
14  Baptist Church?
15    A.    I believe our membership was
16  still there, but we weren't attending.
17  So, we were still officially members of
18  it, yes, but we weren't attending.
19    Q.    But what I was also getting at
20  is, you didn't switch over to go to Faith
21  Baptist Church?
22    A.    No, we did not.
23    Q.    Let's talk about the day that
24  Emily came home from school and told you

Page 46

1  about her meeting with Ryan Clymer and
2  the texting issue with Eric Romig.
3       First of all, do you recall
4  what time of day that was?
5     A.   I believe it was in the
6  afternoon.
7     Q.   Do you know approximately what
8  time, like midday or later in the
9  afternoon?
10    A.   I don't recall the exact time.
11    Q.   You and your wife were both
12  working at home at that time, so you were
13  home pretty much during the work week?
14    A.   That's correct.
15    Q.   And what did you say to Emily
16  when she walked in the door when you
17  thought she was supposed to be in school?
18    A.   I don't remember my exact
19  words, but I remember we were surprised
20  that she was home and wanted to know why
21  she was home.
22    Q.   And what discussion did you
23  have? Tell us as much as you can recall
24  about what she told you and what you said

Page 47

1  to her.
2     A.   If I recall, she was visibly
3  upset. She sat down and she began to
4  tell us that Eric Romig had been texting
5  her. She didn't give any detail at that
6  time as to what was in the texts, but
7  they made her uncomfortable and that this
8  had been going on and that one of her
9  teachers or one of the -- I guess one of
10  the teachers at the school had taken her
11  down to Ryan's office to let him know
12  what was going on with that.
13       General discussion -- I don't
14  recall the exact discussions around it,
15  and I know my first question was did you
16  save the text messages and she said no,
17  that she had deleted them all.
18    Q.   You just testified that she
19  told you that this had been going on,
20  this texting, for some time. Did she
21  tell you when it started?
22    A.   I don't recall that she said
23  exactly when it started. It wasn't -- I
24  don't recall.

Page 48

1     Q.   Was it your impression that it
2  had been going on for more than a couples
3  days or a week or something like that?
4     A.   Correct.
5     Q.   And what did she tell you about
6  the texts at that time?
7     A.   She was very uncomfortable, I
8  think potentially, in my presence to
9  describe what the texts were. And I do
10  remember saying to her would you feel
11  more comfortable just you and your mom
12  talking and you tell her what the texts
13  were, and she said no, that was fine, but
14  she had difficulty expressing some of
15  them.
16       She did mention specifically a
17  basketball game on the bus where he was
18  sitting next to her, and I think she
19  generalized that he was interested in her
20  in an inappropriate way, and that was how
21  she had described it.
22       At that point I thought that
23  perhaps it would be easier for her to
24  write down what she recalled of the text

Page 49

1  messages rather than to articulate it in
2  front of us.
3     Q.   Before we get to the point
4  where she wrote down what she could
5  remember about the text messages, did you
6  question her at all as to whether or not
7  she had reported this to anybody herself?
8  Obviously she had not reported it to you
9  or your wife, correct?
10    A.   Correct.
11    Q.   She told you she had a meeting
12  with Clymer. Did she tell you how that
13  you meeting arose, what circumstances led
14  to that meeting?
15    A.   Eventually she did. At that
16  moment in time, I don't recall that she
17  did.
18    Q.   What did she tell you
19  eventually, how it happened?
20    A.   I don't know if it was her
21  homeroom teacher or someone in her
22  homeroom in a teaching capacity had
23  overheard some part of a conversation and
24  had asked Emily specifically if that

Appendix 0617

Page 50

1 activity was going on, and she said it
2 was, and that she said "We need to go
3 down and alert Ryan right away."
4     Q.    Do you know if that person was
5 Cheryl Alderfer?
6     A.    It was, yes.
7     Q.    Did you know Cheryl Alderfer
8 before this?
9     A.    I did not, no.
10     Q.    Did you know Emily's homeroom
11 teacher?
12     A.    I don't know. I know one
13 teacher she had, Mrs. Tatarro, was one
14 person that I met, but she really, you
15 know, had endeared herself to -- I don't
16 know at that moment in time who her
17 homeroom teacher was. I don't recall.
18     Q.    Okay. When Emily first told you
19 that she had been getting some texts from
20 Mr. Romig that she felt were
21 inappropriate, did she tell you, after a
22 little prompting and questioning go by you
23 and your wife, that they were sexual in
24 nature?

Page 51

1     A.    Yes.
2     Q.    Did she start to describe to
3 you verbally before she wrote anything
4 down, did she describe to you what some
5 of those texts stated, what types of
6 things -- what type of content was in the
7 texts?
8     A.    She again referenced
9 specifically the situation on the bus
10 where -- yes, the bus, where he said that
11 he wanted to be in her, and that was
12 very difficult for her to articulate.
13     I specifically recall that
14 because she was quite upset by that, that
15 he wanted to be with her and be alone
16 with her. I do recall that.
17     Q.    Did she tell you any other
18 contents of any other text messages that
19 she found offensive or objectionable?
20     A.    Not at that moment, no.
21     Q.    Did your wife ask her whether
22 or not she had informed other people
23 about this texting issue with Mr. Romig?
24     You already said that somebody

Page 52

1 told Mrs. Alderfer about it. Did she
2 tell you that she told some of her
3 girlfriends about it?
4     A.    Yes. Eventually she did say
5 that, that she had been with several of
6 her friends. I don't recall who they
7 were, but she had brought it up or she
8 had said something about it and they
9 were -- and that was when it was
10 overheard, apparently.
11     Q.    Do you know whether or not at
12 that point -- that is, when she's first
13 sitting down with you and your wife and
14 telling you about this -- whether she had
15 told her boyfriend, Chase Brunner?
16     A.    At the time that she was
17 telling us?
18     Q.    Yes.
19     A.    She did not -- I did not know
20 that. She did not tell me that.
21     Q.    You did not know that then.
22 Did she tell you some later time?
23     A.    Yes.
24     Q.    Approximately when did she tell

Page 53

1 you, within the same week or...
2     A.    Within the same month time
3 frame that she had told Chase about it.
4     Q.    Did Emily tell you whether or
5 not she had ever shown any of the
6 inappropriate texts to anybody else? Not
7 just told them about them, but actually
8 showed them to somebody.
9     A.    Yes.
10     Q.    Who was that?
11     A.    Her boyfriend Chase.
12     Q.    Did she tell you how many texts
13 she had showed him?
14     A.    She did not.
15     Q.    You testified that after you
16 had this initial conversation with Emily,
17 that you asked her to write down some of
18 the inappropriate texts -- that is, the
19 content of those texts -- as well as she
20 could remember it.
21     A.    Right.
22     Q.    In order to have it fresh in
23 her mind before too much time had passed?
24     A.    That's correct.

Page 54

1    Q.    While you were having that
2  discussion with her, did you ask her why
3  she didn't report this to you and your
4  wife earlier?
5    A.    I did.
6    Q.    What did she say?
7    A.    She said that she was
8  uncomfortable with it and she wasn't sure
9  really what to do.  She was afraid what
10 potentially my response or my wife and my
11 response would be.
12   Q.    Afraid in what way?
13   A.    She didn't elaborate, but I
14 thought -- my impression was that she was
15 afraid that we would be mad at her.
16   Q.    At her.
17   A.    Yes; or mad about it, her
18 included.
19   Q.    Mad at the fact that she didn't
20 report it to you earlier?
21   A.    No, just that it was an
22 uncomfortable situation and she was afraid
23 to bring it to our attention.
24   Q.    Did Emily do what you asked her

Page 55

1  to do, which was to write out, to the
2  best of her recollection, some of the
3  texts that she found offensive or
4  inappropriate that she had received from
5  Mr. Romig?
6    A.    She did.
7    Q.    Did she tell you in that
8  initial discussion about how many texts
9  had gone back and forth between the two
10 of them?
11   A.    She said a lot.
12   Q.    A lot.
13   A.    A lot.
14   Q.    Did you have any idea at that
15 time -- I know we'll get to later what
16 happened, but at that time did you have
17 any idea of the quantity of texts that
18 had been going between them over a
19 few-month period?
20   A.    I did not.
21   Q.    I'm going to show you the
22 second page of Romig exhibit six and ask
23 you if you can identify what that
24 document is.

Page 56

1    A.    This is the document that Emily
2  produced when we asked her to write down
3  what she remembered from the text messages
4  she had deleted.
5    Q.    Did you ask her to write down
6  all of the content of all of the text
7  messages she deleted?
8    A.    I don't recall if I used that
9  exact terminology, "all of it." I wanted
10 her to document what she could remember
11 of the text messages that she had sent
12 back and forth.
13   Q.    Did she tell you whether or not
14 some of the text messages were sort of
15 neutral; that is, that they really didn't
16 have a sexual content?  They were talking
17 about things other than basketball, maybe
18 personal things other than basketball, but
19 nothing sexual?
20   A.    She didn't clarify to me at
21 that time.
22   Q.    The content of the texts?
23   A.    At that time content other than
24 the specific texts that made her

Page 57

1  uncomfortable.
2    Q.    Did she hand this list over to
3  you and your wife?
4    A.    Yes, she did.
5    Q.    Did she prepare any other
6  document about the texting situation with
7  Mr. Romig other than this document, to
8  your knowledge?
9    A.    To my knowledge no.
10   Q.    Did anybody from FCA ever ask
11 her or ask you to ask her to come up
12 with more specific information or some
13 other information about the texting
14 between the two of them?
15   A.    No.
16   Q.    Do you know if she ever had
17 another or a second meeting with Ryan
18 Clymer after the first meeting she had
19 with him on December 21st?
20   A.    Yes.
21   Q.    She did or didn't?
22   A.    She did.
23   Q.    Where was that?
24   A.    I don't remember the specific

Page 58

1 date. It would have been, I believe, in
2 the month of January at some point.
3    Q.    What was the circumstance?
4    A.    My apologies. That's incorrect.
5    Q.    I'm asking about Emily now, not
6 you or your wife or whatever. I'm asking
7 about whether Emily had a second meeting
8 with Ryan Clymer.
9    A.    I'm not aware that she did.
10    Q.    When Emily turned over this
11 document to you -- that's the second page
12 of Romig-6 -- did you go over any of
13 this with her?
14        Did you go over line-by-line
15 what she meant to convey in all these
16 statements that she attributes to Eric
17 Romig in the texts?
18    A.    I don't know that I went over
19 it line-by-line, but I did ask her if
20 these were accurate, to her knowledge,
21 what she had written, and to put down as
22 much as she could remember from those
23 text messages.
24    Q.    Now, Chase Brunner wasn't there

Page 59

1 at the time, right? The time of this
2 first discussion between you, your wife
3 and Emily.
4    A.    Correct, he was not there.
5    Q.    I'm sorry if I asked you this
6 before: Do you know whether or not she
7 had shown Chase Brunner some of these
8 texts up to this point?
9    A.    I knew subsequent to this date,
10 yes, she indicated that she had shown
11 Chase text messages.
12    Q.    Did you ask to see Emily's
13 phone yourself?
14    A.    Yes.
15    Q.    And did you go through it to
16 see if you could find any texts that were
17 on there?
18    A.    Yes.
19    Q.    And did you find any?
20    A.    No.
21    Q.    We're jumping ahead a little
22 bit, but did you ever have a conversation
23 with Chase Brunner where he told you that
24 he had in fact seen some of the

Page 60

1 inappropriate text messages to Emily?
2    A.    Yes.
3    Q.    When did he tell you that?
4    A.    I don't remember specifically
5 when it was that he indicated that he had
6 seen them. I would say on two occasions
7 recently, as well, I asked him, you know,
8 hoping to refresh my memory, and he
9 indicated again that, yes, he had seen
10 those text messages.
11    Q.    Did Emily ever tell you that
12 forwarded any of the test messages to
13 anybody, including Chase Brunner?
14    A.    No.
15    Q.    When she showed you this typed
16 list of the content of inappropriate texts
17 she received from Eric Romig, did you
18 question her then as to why she didn't
19 bring this up to you beforehand as it was
20 happening?
21    A.    I don't believe I did at that
22 time. She was very upset and I didn't
23 feel it was -- and she -- no, I did not
24 ask her at that time because she was very

Page 61

1 upset.
2    Q.    This list of statements
3 reflected in the content of inappropriate
4 texts to her by Eric Romig was sent to
5 Ryan Clymer on Thursday, December 31st,
6 2009 by your wife, according to that
7 email attached to it, correct?
8    A.    Correct.
9    Q.    Do you know why you did not
10 forward this to him until approximately
11 eight days after Emily made the list?
12    A.    (No response)
13    Q.    Oh, you have it there.
14    A.    Yes. I don't know specifically
15 why we sent it on the 31st. I don't
16 recall what -- I don't recall why we
17 would have sent it then. I don't know.
18    Q.    Let me ask it this way: After
19 Emily met with you on the 21st of
20 December and typed up this list and you
21 had whatever discussion with her, did you
22 do anything or your wife do anything to
23 contact Ryan Clymer or anybody else at
24 FCA that same day?

Page 62

1    A.    Yes.
2    Q.    And who tried to make that
3 contact, you or your wife?
4    A.    Both my wife and I.
5    Q.    Were you on some kind of
6 speakerphone or whatever?
7    A.    Yes.
8    Q.    Were you able to reach anybody
9 that day?
10    A.    I don't believe we were, and
11 that was that Ryan was on vacation or was
12 going on vacation.  I don't believe on
13 that specific day, on the 21st, we
14 contacted Ryan.
15        I don't recall exactly the
16 date.  I know it was within that next
17 day that we reached out to Ryan. We were
18 more focused on Emily at that moment in
19 time. And I don't recall specifically the
20 date, but I know that we contacted Ryan.
21 It would have been potentially the next
22 day.
23    Q.    Let's stay on the 21st for a
24 second.

Page 63

1    A.    All right.
2    Q.    Did Emily tell that you she was
3 told to leave the school by Ryan Clymer?
4    A.    Yes.
5    Q.    Did she tell you that she was
6 told by Ryan Clymer that she could not
7 engage in any basketball activities?
8    A.    Yes, she told us that.
9    Q.    Did she tell you that Cheryl
10 Alderfer sat through the meeting that she
11 had with Ryan Clymer?
12    A.    Emily has told us that, yes.
13 At that moment in time -- I don't recall
14 whether she told us at that moment.
15    Q.    Have you ever had any
16 discussion about any of these issues with
17 Cheryl Alderfer?
18    A.    I have not myself, no.
19    Q.    Do you know if your wife has?
20    A.    I do not, know.
21    Q.    You said that if you didn't get
22 ahold of Ryan Clymer that day, the 21st,
23 you got ahold of him the next day?
24    A.    Approximately -- yes.

Page 64

1    Q.    By telephone?
2    A.    Yes.
3    Q.    Did you ask to see him?
4    A.    I believe we did. The intention
5 was to see him.  And if I recall
6 correctly, he was going on vacation and
7 he couldn't see us.
8    Q.    So, would it be fair to say
9 that all your communications with him
10 pretty much took place over the telephone
11 or through email or some electronic
12 communication?
13    A.    That is correct.
14    Q.    Did you ever have a
15 face-to-face meeting with him about this
16 issue of FCA's coach sending inappropriate
17 text messages to one of his players at
18 any time before Mr. Romig left as coach
19 of the team?
20    A.    No, we did not.
21    Q.    Did Mr. Clymer ever call you or
22 your wife in to try to make an
23 appointment to see you personally to tell
24 you what, if anything, he was doing to

Page 65

1 investigate what was going on?
2    A.    No, he did not.
3    Q.    Did Emily tell you how long her
4 meeting with Ryan Clymer lasted?
5    A.    She did:  She said it was
6 fairly short.
7    Q.    Did she tell you whether or not
8 he asked her for any details or any
9 actual content of any of the texts
10 between Ryan Clymer and her?
11    A.    I don't recall that she told
12 me that.
13    Q.    When Emily told you this
14 story -- you said she was visibly
15 upset -- did you have any reason to
16 disbelieve her?
17    A.    No.
18    Q.    Did you and your wife ever
19 discuss between each other that there
20 might be some reason for her to make this
21 up?  Not about the number of texts
22 specifically, because that could be
23 verified and it eventually was verified,
24 but about the content of the texts, about

Page 66

1  the inappropriate nature of the texts.
2        Did you ever discuss with your
3  wife or think to yourself, you know, I'm
4  not sure I believe what she's telling me?
5      A.    No.
6      Q.    Had Emily ever had a texting
7  issue before this, to your knowledge?  I
8  mean, where you found out that she was
9  texting somebody she shouldn't have been
10 texting or texting in too great a volume
11 or quantity or anything of that nature at
12 all?
13     A.    No.
14     Q.    Any problem with the use of her
15 cell phone?
16     A.    No.
17     Q.    You believe you did get ahold
18 of Ryan Clymer the next day?
19     A.    Yes.
20     Q.    What was said during that
21 conversation?
22     A.    I informed him of what Emily
23 had told us.  At that point in time I
24 had gone out to my cell phone provider

Page 67

1  and was able to download a spreadsheet of
2  text-message numbers, indicators of text
3  messages; and that I had put together a
4  spreadsheet that had pivot tables in it
5  that showed the number of texts between
6  what I was told was Eric Romig's
7  telephone number and Emily's telephone
8  number.
9        I informed him that I had that
10 information and, you know, wanted to know
11 what was going to happen, what was
12 happening at this point.
13     Q.    First of all, who was your
14 telephone provider?
15     A.    Verizon.
16     Q.    Did you have to go to an
17 office somewhere for Verizon, or did they
18 just give you access to it somehow?
19     A.    That's part of my online
20 account. I was able to bring up all my
21 telephone numbers and be able to download
22 telephone call/texting records for -- it
23 goes back, I think, about six months.
24     Q.    So, you never had to actually

Page 68

1  discuss that with anybody at Verizon?
2      A.    Correct.
3      Q.    And you told Mr. Clymer that
4  you had already downloaded this
5  information and could make it available to
6  him.
7      A.    Yes.
8      Q.    And what did he say in
9  response?
10     A.    I don't recall a specific
11 response from him. I told him I was going
12 to be sending it to him.
13     Q.    You didn't ask him whether he
14 wanted it or whatever. You just said "I'm
15 going to send you this information."
16     A.    That's correct.
17     Q.    Did Ryan Clymer tell you
18 anything about what he was doing, if
19 anything, to investigate the allegations
20 that your daughter had made against Mr.
21 Romig?
22     A.    He indicated that he was
23 looking into the matter.  He indicated
24 that there was -- that he would be

Page 69

1  looking into the matter.
2        I don't remember the exact
3  dialogue conversation, but he indicated
4  that there was -- that he was going to
5  be speaking with someone, either the Bucks
6  County detectives or someone in that
7  capacity, to begin to look and to begin
8  to investigate what was going on.
9      Q.    Did he tell you who that would
10 be?
11     A.    No, he did not.
12     Q.    Did he tell you anything that
13 he was doing himself within the school to
14 investigate, whether he was interviewing
15 people or trying to find out more
16 information internally to FCA as opposed
17 to going outside of FCA?
18     A.    No, he did not.
19     Q.    Did he tell you that he wanted
20 to speak to Emily again?
21     A.    No, he did not.
22     Q.    Did you go over with him any
23 of the information that Emily had written
24 or typed on that statement of the

Appendix  0622

Page 70

1 offensive text messages she got from
2 Romig?
3     A.    I think I did articulate a
4 couple of them and would be providing
5 that as well.  I don't recall
6 specifically which ones I told him or
7 what the conversation, but I did indicate
8 that we had Emily write down what she
9 remembered.
10     Q.    And do you recall having a
11 conversation with Mr. Clymer where you
12 discussed inappropriate sex-based texts
13 from Mr. Romig to your daughter?
14     A.    Yes.  I believe the bus
15 situation sticks in my mind as a key
16 element with what was going on, and I'm
17 fairly sure I told him about that.  I
18 want to say that I -- I know that that
19 was an element in what she had told us.
20     Q.    And that's the second item on
21 her list, her statement that she typed up
22 December 5th? That's the text that you're
23 referring to?
24     A.    Yes.

Page 71

1     Q.    And do you recall telling him
2 exactly what that text said as she has in
3 quotes, "I want to be in you," as opposed
4 to saying something like "I want to be
5 with you"?
6     A.    I believe I articulated that
7 statement, "I want to be in you," the
8 sexual connotation of it, yes.
9     Q.    Did Mr. Clymer tell you that he
10 wouldn't have access to his work emails
11 because he was away on the holidays, so
12 he wouldn't be getting emails right away?
13     A.    He indicated that he would be
14 away on the holidays; away, out of the
15 area, for the holidays. Nothing specific
16 to his email.
17     Q.    Do you recall when it was that
18 you had the next conversation with Mr.
19 Clymer?
20     A.    I don't remember the exact
21 date, but it was, I believe, after he
22 returned from -- I don't remember the
23 exact date.  It would have been when he
24 returned from vacation.

Page 72

1     Q.    Well, the first conversation we
2 talked about would have happened no later
3 than December 22nd, 2009. It was the day
4 after Emily told you about her meeting
5 with Clymer.
6         Do you remember approximately
7 how many days later it was?
8     A.    I don't. I'm sorry.
9     Q.    That's okay.  I don't want you
10 to guess. If you can estimate or
11 approximate, that's fine, but don't just
12 guess.
13         Was there another conversation
14 with Mr. Clymer?
15     A.    I recall another conversation
16 with Mr. Clymer.
17     Q.    Was your wife a party to that
18 conversation as well?
19     A.    I believe so, yes.
20     Q.    On a speakerphone at home?
21     A.    Yes.
22     Q.    And what was discussed during
23 that second Clymer telephone conversation?
24     A.    My recollection of that

Page 73

1 conversation is sparse.  I know that he
2 indicated that he had received the
3 information that I had sent him.
4         I don't recall specifically
5 other than he was still investigating or
6 still looking into it, but unfortunately I
7 don't recall much of the context of that
8 other conversation.
9     Q.    Do you remember him telling you
10 that he was conducting any interviews of
11 people who might have some knowledge about
12 Mr. Romig's conduct at the school?
13     A.    I do not recall.
14     Q.    Students or other staff people
15 or assistant coaches or anything like
16 that?
17     A.    I don't recall if he told me
18 that.
19     Q.    When he told you during the
20 first conversation, telephone conversation,
21 that he had discussed this allegation with
22 a police official, some police official,
23 did he tell you that he was actually
24 reporting this to police officials or that

Page 74

1  he just knew somebody who was a police
2  official and wanted to get some guidance?
3      A.    He indicated that he knew
4  someone -- I could tell you my impression
5  was that it was someone in the church or
6  within his circle that was in a
7  law-enforcement capacity.
8      Q.    Okay.
9      A.    A Bucks County detective comes
10 to mind in that recollection, and that he
11 was going to be speaking with him.
12         And subsequent to your question,
13 that other conversation, I do recall now
14 that he indicated that the initial
15 conversation did not -- that he had that
16 initial conversation with this individual
17 and that they didn't feel that there was
18 a lot there.
19         I don't want to elaborate
20 because I don't remember exactly the
21 conversation.  I know my impression from
22 that conversation, although I don't
23 remember the exact words, was that the
24 impression was that there wasn't anything

Page 75

1  that they could do from that perspective.
2  They didn't feel it warranted it because
3  they didn't feel -- they couldn't do
4  anything with that.
5      Q.    Did he tell you that the reason
6  was that Ryan -- did Ryan Clymer tell you
7  that the reason they couldn't do much
8  with it was because Emily had deleted the
9  texts?
10     A.    I believe so, yes.
11     Q.    Did Ryan Clymer, in either of
12 the two conversations with you and your
13 wife, ever tell you to try to get the
14 actual content of the texts yourself?
15     A.    No.
16     Q.    Did you tell Ryan Clymer during
17 either of those two telephone
18 conversations that you would attempt to
19 get the content of the texts?
20     A.    Yes.
21     Q.    And what did you tell him
22 specifically?
23     A.    That I would try to get the
24 content of the text messages from Verizon.

Page 76

1      Q.    How did you plan on doing that?
2      A.    I wrote Verizon an email to
3  their customer support, and they indicated
4  that they could not send me that
5  information. I reached out to --
6      Q.    Did she say why?
7      A.    No, other than they're not
8  permitted to send me that information.
9      Q.    Okay.
10     A.    I reached out to Henry
11 Thompson.  I believe Emily gave me his
12 telephone number.  He indicated he knew
13 an attorney that may be able to get that,
14 that this attorney's potentially was
15 involved or had contacts within Verizon
16 and that I would potentially be able to
17 get that information.
18         Again, how I knew I don't
19 recall, but I knew I would need a
20 subpoena, would probably need some court
21 action or official document to be able to
22 subpoena those records.
23         I left two messages for the
24 attorney that I had been given the number

Page 77

1  for, and she never responded to any of my
2  telephone calls.
3      Q.    Do you know who that attorney
4  was?
5      A.    I don't remember.
6      Q.    Do you recall the name at all?
7      A.    I do not.  I do not.
8  Subsequently I did talk to actually my
9  divorce attorney, who I had a
10 long-standing relationship with, and asked
11 her if she could send a letter to Verizon
12 to get -- to see if that had any kind of
13 weight to get...
14     Q.    The content.
15     A.    Yes, and there was nothing. She
16 couldn't get them.
17     Q.    I don't understand how you got
18 directed to Henry Thompson.  How did your
19 daughter know Mr. Thompson?
20     A.    He was Chase's basketball coach.
21     Q.    And why did she direct you to
22 him?
23     A.    I don't recall.  I don't know
24 if there was information exchanged there,

Page 78

1  but Emily was given a telephone number to
2  give to me -- I received the telephone
3  number.
4      I don't recall exactly the mode
5  of how I got that telephone number,
6  whether Emily gave it to me or whether
7  Henry called me. I don't recall the
8  instance, but I know that I was given the
9  number.
10     I know I had a conversation
11 with Henry about the situation and that I
12 had gotten that telephone number. Again, I
13 don't recall the relationship of this
14 attorney, but I was given the number to
15 contact her.
16     Q.   Was it your impression or
17 understanding that the attorney whose
18 number you were given was a private
19 attorney, like with a law firm, as
20 opposed to a district attorney or
21 whatever?
22     A.   Yes.
23     Q.   Did Mr. Thompson say anything
24 about his wife having potentially some

Page 79

1  contacts somewhere?
2      A.   The context of that
3  conversation, how I got that number, I
4  don't know if it was his wife or someone
5  his wife knew.  Somewhere the wife came
6  into the conversation.  I don't honestly
7  recall.
8      Q.   And you actually called the
9  number he gave you.
10     A.   Yes.
11     Q.   On more than one occasion.
12     A.   Yes.
13     Q.   And you left messages?
14     A.   Yes.
15     Q.   Was it a male or female
16 attorney?
17     A.   Female attorney.
18     Q.   And you never got any response
19 to either message.
20     A.   Correct.
21     Q.   When you called Henry Thompson,
22 did he know anything about why you were
23 calling him?  In other words, was it your
24 impression or understanding that he knew

Page 80

1  something about this texting situation and
2  was given information about it before you
3  gave him any information or talked about
4  it with him?
5      A.   It was my impression that he
6  understood some element of the situation
7  in giving me that information to call the
8  attorney.
9      Q.   Do you recall writing that
10 phone number down, the attorney's phone
11 number?
12     A.   I would have written it down,
13 yes.
14     Q.   Do you remember storing it in
15 your phone at all?
16     A.   To.
17     Q.   We were talking about the
18 second telephone conversation you had with
19 Ryan Clymer where you discussed, in part,
20 that you had sent him these telephone
21 logs of the text messages between Emily
22 and Eric Romig, correct?
23     A.   Correct.
24     Q.   And I think you said that he

Page 81

1  told you that he had received them.
2      A.   That's correct.
3      Q.   Did he ask you to do anything
4  else?
5      A.   No.
6      Q.   As part of his investigation,
7  did he ask you to report this to the
8  authorities:  ChildLine, Department of
9  Public Welfare, DA's Office, police
10 department?  Did he ask you to do that?
11     A.   No, he did not.
12     Q.   Did you ever discuss that with
13 him?
14     A.   I believe in the first
15 conversation that we had -- I retract
16 that.  In a conversation -- and I don't
17 recall whether it was the first or the
18 second -- we had talked about the impact
19 potentially that it would have on the
20 school.
21     I had some concern for -- I
22 use the term the cause of Christ, that
23 there was concern there, but that...
24     Q.   I don't understand what you

Appendix 0625

Page 82

1    meant by that term.
2        A.    At that time there had been a
3    lot in the media bashing Christianity,
4    bashing the schools, churches and so
5    forth.
6        Q.    Right.
7        A.    So, I remember specifically
8    expressing that to him, that there was
9    concern about this.
10       Q.    Of the negative impact on the
11   school or the church?
12       A.    Yes, but that it needed to be
13   addressed.  It needed to be investigated.
14   But he never asked me to do any of the
15   investigation or anything like that.
16       Q.    Did Ryan Clymer say anything
17   about the negative impact this might have
18   on the school if this got out into the
19   public realm?
20       A.    No.
21       Q.    Did he tell you whether or not
22   he was actually consulting with an
23   attorney to get some instruction or
24   guidance about what to do with this

Page 83

1    information he was generating?
2        A.    No.
3        Q.    Do you recall anything else
4    about that second conversation with Ryan
5    Clymer regarding your daughter's situation
6    with Mr. Romig?  Anything else that was
7    said by either party.
8        A.    No.  At the moment, no.
9        Q.    Was there another conversation
10   after that?
11       A.    Not that I recall.
12       Q.    With Ryan Clymer.
13       A.    Not that I recall.
14       Q.    Did you have any contact with
15   any other administrator or employee of
16   Faith Christian Academy other than Ryan
17   Clymer about this issue?
18       A.    (No response)
19       Q.    And the conversation you said
20   you had with Henry Thompson.  Anybody
21   other than those two.
22       A.    Myself personally, no.
23       Q.    What about your wife?
24       A.    My wife might have had

Page 84

1    conversation with potentially the
2    basketball -- I don't know who exactly.  I
3    know my wife had conversation with several
4    people there at the school.
5              She is a little bit more
6    involved with regard to Emily's basketball
7    and the women that were involved with it.
8        Q.    Do you know if she's talked to
9    the assistant coaches at all, Robin Landis
10   or Marc Hoover?
11       A.    Robin Landis, I believe, she
12   might have had a conversation with.
13       Q.    Did she tell you what the
14   conversation involved with Robin Landis?
15       A.    I don't recall specifically, no.
16       Q.    At some point there had to be
17   a resolution to this, correct?  A
18   resolution by the school.  They had to do
19   something.
20              Did somebody tell you what the
21   school was doing based upon its
22   investigation of this allegation?
23       A.    I don't recall that we had a
24   direct contact from the school telling us

Page 85

1    a resolution.  That's why I hesitated.  I
2    don't recall a specific resolution that
3    was articulated to us other than we did
4    hear things from other folks in the
5    school.
6        Q.    Let's stick with Ryan Clymer
7    first.
8        A.    Okay.
9        Q.    You don't recall getting a
10   telephone call from him or an email or
11   something from him saying exactly what
12   he's going to do about the allegation?
13       A.    No.
14       Q.    Did you ever request an
15   in-person meeting with him during your
16   telephone calls?
17       A.    I believe we did, actually.
18       Q.    What did he say?
19       A.    I don't recall specifically what
20   he said, but it could never -- it never
21   was able to be scheduled.
22       Q.    Did you ever consider
23   yourself informing local authorities --
24   ChildLine, police, DA, Department of

Page 86

1  Public Welfare -- of the allegations your
2  daughter was making against Mr. Romig?
3      A.    I did.
4      Q.    And what did you decide and
5  why?
6      A.    When Emily first indicated what
7  was going on, that was a thought that
8  went through my mind, was to contact
9  Bucks County Detectives.
10         At that point I had been away
11  from any kind of law-enforcement capacity
12  for a long time. I didn't know what had
13  changed.  I didn't really keep a finger
14  in that realm to understand what was
15  going on, but my first thought was to
16  potentially call.  Emily was very upset.
17  She did ask both of us not to.
18     Q.    Did she say why?
19     A.    She just wanted to get through
20  the year and get out of school, is
21  essentially what she indicated. The
22  situation was difficult. Frankly, both my
23  wife and I were at a point where we
24  wanted to get Emily through school and

Page 87

1  graduate.
2         I still thought, you know, in
3  my mind, that potentially that should be,
4  but what I did do when I spoke with Ryan
5  is, I had a certain degree of assumption
6  or a certain degree of confidence that
7  the school would do the right thing, that
8  the school should be investigating this.
9         And based on that conversation
10  after -- that first thought after my
11  conversation where Ryan said he would be
12  contacting someone within the school that
13  he trusted in a law-enforcement capacity,
14  at that point I believed that the school
15  would investigate the matter.
16     Q.    Okay.
17     A.    And therefore I did not contact
18  law-enforcement.
19     Q.    Did you come to regret that
20  decision?
21     A.    I have, yes.
22     Q.    Why is that?
23     A.    Excuse me.  When I saw the
24  news about his arrest, I felt that I

Page 88

1  could have assisted in the prevention of
2  that potentially.  Again, I was saddened
3  that that happened for my daughter's sake.
4      Q.    Is the first time you heard
5  about my client's situation in the news,
6  newspaper or media accounts?
7      A.    Yes.
8      Q.    And whatever you heard or read,
9  did you see any similarities between the
10  type of thing that your daughter had gone
11  through with Mr. Romig and the type of
12  things that was being reported about my
13  client and Mr. Romig?
14         MR. SANTARONE:  Objection.
15     Q.    You can answer.
16     A.    Yes, I did.
17     Q.    Specifically, did you see
18  anything reported about the texting that
19  was going back and forth between the two
20  of them?
21     A.    I don't recall specifically the
22  texting.  I recall just the, I think,
23  predatory nature of it. When I read the
24  article, I realized it was very similar,

Page 89

1  starting with what happened to Emily.
2      Q.    Did you ever receive any
3  information eventually, from whatever
4  source you can recall, to indicate to you
5  that FCA asked Mr. Romig to resign or, if
6  he didn't, he would be terminated?
7      A.    That was the information that
8  we received, yes.
9      Q.    How did you receive that
10  information?
11     A.    I don't recall specifically
12  where I received that information.  What
13  I do know is, I did not receive that
14  information from the school directly
15  because I didn't receive it from the
16  school officials or Ryan Clymer.
17     Q.    Did Ryan Clymer or any
18  administration official at the school ever
19  send you or your wife a single piece of
20  paper about their investigation or the
21  resolution of this accusation by your
22  daughter with regard to Mr. Romig?
23     A.    I'm sorry, the question was did
24  they ever send me...

Appendix 0627

Page 90

Q.    Yes, a single piece of paper, a
letter, a memo, an email, handwritten
note, anything at all telling you what
they did about this allegation and how
they were going to resolve it.
A.    No, they did not.
Q.    Did Emily ever tell you that
she had received text messages from
Chelsea Romig that Chelsea had been abused
as a child, sexually abused as a child?
Did she ever tell you that?
A.    Prior to the incident, no.
Q.    At any point during the
investigation of Romig's text to her.
A.    Yes, sometime after that she
had indicated that.
Q.    Did you ever have any
discussion with Robin Landis regarding the
allegations by your daughter against Mr.
Romig?
A.    I did not.
Q.    Did your daughter ever telling
you that she had a conversation with
Robin Landis after Mr. Romig was no

Page 91

longer the coach of the girls basketball
team?
A.    Yes.
Q.    What did she tell you?
A.    I don't remember the specific
detail of what she said, but that there
was -- I'm not going to be able to
answer that.  It would be a guess.  I
don't recall exactly.
Q.    Fair enough.  Mr. Smith, I'm
going to show you what's been marked
Romig exhibit five and ask if you have
ever seen those documents and if you can
identify them for me.  You can flip
through those just to see what's attached.
(The witness complies)
A.    Yes, I have seen this before.
Q.    What is that?
A.    That is an email that I sent
to Ryan containing the Excel spreadsheet
of the text messages sent and received
that I had downloaded.
Q.    Would it be fair to
characterize this as a log of all of the

Page 92

text messages that went between your
daughter and Mr. Romig for a period of
time; as it's stated in this email, from
September through November of 2009?
A.    That would be correct, yes.
Q.    And did you do this by hand,
or did you use some kind of program to
come up with the number of 1,077 texts
for a three-month period?
A.    I used the program Microsoft
Excel.
Q.    And those were the number of
text messages received from 267-218-5232
from Mr. Romig to your daughter?
A.    Correct.
Q.    And you indicate in this that
you will have the detail of December
2009's texts on or about January 4th,
2010.  What was the reason it took longer
to get the December texts?
A.    Because at that point in time
the December monthly was still in effect,
so it wasn't completed.  It would have
been completed -- it's usually about the

Page 93

fourth day of the next month that I'm
able to download the complete text.
Q.    I'm going to show you now Romig
exhibit seven, which is an email from you
to Ryan Clymer dated January 5th, 2010,
with the cover memo and then again logs
of texts.
Does that document reflect the
information you got from Verizon or
uploaded from Verizon to indicate how many
texts were sent between your daughter and
Mr. Romig during the month of December of
2010?
A.    Yes.
Q.    When you got both of these
groups of documents, did you show them at
all to Emily?
A.    I don't recall that I
specifically showed her this.  I don't
recall a specific instance where I sat
down and showed her these documents.
Q.    Do you recall, after seeing the
quantity of texts involved, thinking to
yourself that "This is more or less texts

Page 94

1  than I thought when I first started
2  looking into this"?
3       You testified previously your
4  daughter said there were a lot of texts
5  that went back and forth. Did you have
6  any idea of the number that was showing
7  up on these documents?
8       A.   No, I had no idea.
9       Q.   When you saw the number, which
10 was 1,077 from September until the end of
11 November, and then 2,140 from Eric Romig
12 to Emily just for the month of December,
13 did you ask her what, aside from that
14 typed statement she had written up about
15 what some of the inappropriate texts were,
16 what was being texted back and forth
17 between them for that quantity of texts
18 over that period of time?
19      A.   I don't recall that I had a
20 specific conversation with her.  I know
21 that I had told her about the number of
22 texts.  And I couldn't do it now, but I
23 know I did a quick calculation that would be
24 averaged out how many texts that would be

Page 95

1  in a day based on that, and I don't
2  recall asking her for the content of that
3  volume even for the month of December.
4       Q.   Okay.
5       A.   She had indicated that this was
6  the type of thing that was being said.  I
7  didn't ask for more detail at that point.
8       Q.   At some point Emily was allowed
9  to go back to school and resume her
10 activities on the basketball team,
11 correct?
12      A.   Correct.
13      Q.   How was that communicated to
14 you or to her?
15      A.   I don't think that there was a
16 specific contact to us that she was
17 permitted to come back. I think -- I
18 don't recall specifically.
19      My impression was that when she
20 had come home, that she would be going
21 back after the start of the school year.
22      Q.   After the end-of-year holiday?
23      A.   Yes.
24      Q.   Again, did you have any

Page 96

1  conversation with anybody at FCA about
2  that, about her being allowed to go back
3  to school and being allowed to participate
4  in basketball?
5       A.   Not that I recall.
6       (Exhibit Smith-1 was marked for
7  identification)
8  BY MR. GROTH:
9       Q.   Let me just ask you one more
10 thing.  I've marked as Smith exhibit one
11 a letter that I sent to you and your
12 wife dated April 10th, 2015.  Do you
13 recall seeing that letter on or after
14 that date?
15      A.   Yes, I do.
16      Q.   And that letter asked you to
17 contact me to discuss the issues of your
18 daughter's texting situation with Mr.
19 Romig back in 2009, correct?
20      A.   Yes.
21      Q.   And did your wife and you
22 decide to meet with me?
23      A.   Yes, we did.
24      Q.   Why did you make that decision?

Page 97

1       A.   We felt that we had an
2  obligation to -- we had information that
3  would be available for the situation.
4       Q.   Did you feel some sense of
5  responsibility, since you did not report
6  this back in 2009 to the authorities, to
7  talk about it now?
8       A.   I wouldn't characterize that as
9  the reason. More or less, we had
10 information that may be of value to this.
11      I would say no, I didn't look
12 at it and go, oh, here's an opportunity
13 for me to make myself feel better for any
14 particular reason.  This is information
15 that can be shared.
16      Q.   Did you come to the conclusion,
17 your own personal conclusion, whether or
18 not you believe that Ryan Clymer handled
19 this allegation correctly or incorrectly?
20      A.   I have come to a conclusion,
21 yes.
22      Q.   When did you come to that
23 conclusion?
24      A.   I would say after I saw in the

Appendix  0629

Page 98

1 newspaper about Romig's arrest. And I
2 know that I had a definitive thought at
3 that point in time, but it occurred to me
4 that I was surprised to see that
5 situation happened.
6 Q.    And what conclusion did you
7 come to?
8 A.    That it should have been
9 stopped. In the situation with Emily, it
10 should have been handled differently.
11 Q.    Stopped in what way? It was
12 stopped with regard to Mr. Romig, right?
13 He left the school.
14 A.    Some form of official action
15 should have happened that would have
16 prevented him from being able to be a
17 teacher or a coach or to be around
18 students again.
19 Q.    When your daughter graduated
20 from FCA in the spring or summer of 2010,
21 did you have any discussions with Ryan
22 Clymer at that time?
23 A.    No.
24 Q.    Do you recall ever thanking him

Page 99

1 for any efforts that he took in
2 connection with the investigation of your
3 daughter's allegations against Mr. Romig?
4 A.    No.
5 Q.    Do you recall having any
6 conversations with Mr. Clymer after the
7 second telephone call that you referred to
8 in your testimony, which I think is
9 before the end of the year, end of 2009?
10 Did you have any conversation with him
11 after that before your daughter graduated?
12 A.    I did not, no.
13 MR. GROTH: I have no further
14 questions. Thank you.
15 (A brief recess was taken)
16 MR. RUSSELL: We're back on the
17 record.
18 EXAMINATION
19 BY MR. RUSSELL:
20 Q.    Mr. Smith, I introduced myself
21 to you: I'm John Russell, and I
22 represent Faith as well as Ryan Clymer
23 and Ross Hollenbach, who have been sued
24 as a result of the action that was

Page 100

1 brought by Attorney Groth on behalf of
2 his clients.
3 A couple things. I just want
4 to make sure that my understanding is
5 correct. You did have a criminal justice
6 degree from West Chester State University,
7 right?
8 A.    Correct.
9 Q.    And your minor was in music.
10 Was that in percussion?
11 A.    Yes.
12 Q.    And you still do some bands or
13 things, right?
14 A.    Yes, I still do stuff like
15 that.
16 Q.    Back in 2009 and 2010, did you
17 have any contacts or people that you knew
18 that still worked at the Montgomery County
19 District Attorney's Office?
20 A.    No, none that I had kept in
21 touch with.
22 Q.    But were there people still
23 there that you had worked with?
24 A.    I would assume that they were,

Page 101

1 a couple of them, yes.
2 Q.    Is there anything that prevented
3 you from picking up the phone and calling
4 them as a result of this situation?
5 A.    No.
6 Q.    You mentioned in your deposition
7 that you felt that one of the reasons
8 Emily left her biological father's house
9 and came to live with you on a permanent
10 basis was that she wasn't getting the
11 attention she desired at her
12 house. Is that right?
13 A.    That's correct.
14 Q.    Did Emily have an issue with
15 attention?
16 A.    No.
17 Q.    What do you mean, she wasn't
18 getting the attention she desired?
19 A.    Emily's biological father had a
20 girlfriend who had several children. They
21 were involved in sports as well. So,
22 everyone was involved in sports and her
23 father would go to all their games. He
24 was in the football league.

Page 102

1    They were boys, these children,
2  and they were all part of football and
3  everything.  He spent a lot of time
4  helping them with their sports and so
5  forth, and he would miss Emily's games to
6  be at their sports.
7    Q.    Would you say that Emily craved
8  attention, or how would you describe that?
9    A.    I wouldn't describe it as
10  craving attention. I think it hurt her
11  that her father chose to pay attention
12  and to spend this time with these boys
13  and not come and support her in her
14  sports.
15    Q.    In your working at the DA's
16  office, you received a law-enforcement
17  achievement award for Citizens Crime
18  Commission?
19    A.    Yes.
20    Q.    What was that for?
21    A.    A good part of my time with
22  county detectives was with the
23  narcotics-enforcement team, and at that
24  time we were -- that specific event was a

Page 103

1  large wiretap that we had going on with
2  crime families from New York through
3  Philadelphia, and we made a lot of large
4  arrests and cleared out a good section of
5  a criminal element that was associated
6  with trafficking drugs from New York down
7  the corridor toward Philadelphia -- down
8  toward Florida, actually. So, we won a
9  Citizens Crime Award for that work that
10  we did.
11    Q.    And in your work in IT, that
12  you kind of transformed from dealing with
13  law-enforcement to IT, did you ever have
14  to deal with getting data off of
15  hardware?
16    A.    Yes.
17    Q.    And that's something that you're
18  knowledgeable about how to do?
19    A.    Yes, I am.
20    Q.    So, even if someone deletes
21  something, it's not really deleted, right?
22    A.    That is correct. In 2009 I
23  did not have the tools or the skills,
24  actually, to do that.

Page 104

1    Q.    And would it be accurate that
2  even though Emily deleted the text
3  messages from her phone, that the messages
4  could conceivably have been retrieved from
5  her phone itself, the hard phone?
6    MR. GROTH:  Object to the form.
7  You can answer.
8    A.    Yes.
9    Q.    Do you still have the phone?
10    A.    I don't believe so.
11    Q.    Even after this came to light,
12  did you think about trying to get the
13  content of those text messages off of the
14  cell phone itself?
15    A.    Can you clarify what came to
16  light?
17    Q.    Say with the Nace situation:
18  Say hey, now that I have that knowledge,
19  see if we can download those deleted
20  messages.
21    A.    No, that thought didn't occur
22  to me.
23    Q.    And in a three-year period
24  Emily went to three different schools,

Page 105

1  right?  Isn't that accurate?  She went to
2  Calvary and then she went to Upper
3  Pekriomen and then she went to Faith
4  Christian Academy?
5    A.    Yes.
6    Q.    There were no instances where
7  the school said hey, you can't come back.
8  It was always a decision that Emily had
9  to make?
10    A.    That's correct.
11    Q.    And I think you said that Emily
12  asked not to go back to Calvary and then
13  you agreed with her on that decision.
14    A.    Yes, she asked if she could
15  leave Calvary. She wasn't comfortable.
16    Q.    If Emily had asked to leave
17  Faith, would you have honored that
18  request, if she had asked to leave Faith
19  Christian Academy?
20    MR. GROTH:  Object to the form.
21    Q.    Go ahead and answer.
22    A.    I think, if we believe that
23  there was a specific reason, yes, we
24  would have probably asked her to leave --

Page 106

1 if she had expressed a desire to leave.
2      I hesitate because it was at
3 the end of the year --
4      Q.    Sure.
5      A.    -- so we would have encouraged
6 her to just continue out.
7      Q.    I understand, and I'm trying to
8 sort through this.  This is a private
9 school.  It's not like a public school,
10 where you don't have other options.  This
11 is a private school, where you choose to
12 enroll her and pay the tuition, right?
13      A.    Correct.
14      Q.    And if I felt that my
15 daughter's situation was not handled
16 properly, I don't think personally I would
17 keep her there.  I would pull her out.
18 So, I'm just trying to get behind that.
19      Did you think that the school
20 handled this situation properly?
21      A.    Well, I...
22      Q.    At the time.
23      A.    At the time I did not believe
24 that the school handled the situation to

Page 107

1 what I would have liked to have seen.
2      Q.    What else would you have liked
3 them to have done?
4      A.    I would have preferred contact
5 relative to it. I would have preferred
6 that there was an official action taken
7 with regard to Mr. Romig.
8      Q.    Did Ryan Clymer ever tell you
9 that he spoke directly with Lauren Fretz
10 based upon the information that was
11 provided to him by Emily?
12      A.    I don't recall that he told me
13 that.
14      Q.    Did you know whether or not
15 Lauren Fretz told her that she was not
16 involved in a sexual relationship with
17 Romig?
18      A.    I believe that information came
19 to me well past the event.  I do recall
20 hearing that, but I know it wasn't at
21 that time.
22      Q.    And it wasn't through Ryan, or
23 was it?
24      A.    Not that I recall.

Page 108

1      Q.    And was that a bit of
2 information that was used to confirm
3 Emily's story, or do you know whether
4 that was --
5      A.    No.
6      Q.    The follow-up was to try to
7 verify what Emily was telling you was
8 correct, or what Emily was telling Ryan
9 was correct.
10      A.    And I apologize, so the
11 question is...
12      Q.    Do you know whether or not what
13 was disclosed to Ryan through Lauren Fretz
14 was able to confirm or verify something
15 that Emily had told Ryan or told you
16 about what had transpired between Eric
17 Romig and Lauren Fretz?
18      A.    I don't know.
19      Q.    Did Ryan ever tell you that he
20 spoke with Kristen Kennedy?
21      A.    Not that I recall, no.
22      Q.    Did you ever find out that
23 Kristen Kennedy indicated that she was
24 never sexually involved with Mr. Romig at

Page 109

1 any time while at Faith Christian Academy?
2      MR. GROTH:  Object to the form.
3 You can go ahead and answer.
4      A.    No.
5      Q.    Did Mr. Groth, in your meeting
6 with him, ever tell you that he had no
7 evidence of anything happening between
8 Lauren Fretz and Mr. Romig?
9      A.    I don't believe he did.
10      Q.    Did he ever tell you that he
11 had no evidence of anything happening
12 between Kristen Kennedy and Mr. Romig
13 while at Faith Christian Academy?
14      A.    Can I take a step back?
15      Q.    Sure.
16      A.    Lauren Fretz -- I don't recall
17 where I understood that Lauren Fretz had
18 said that she had never had any relations
19 with Eric Romig.  With Kristen Kennedy, I
20 don't recall.  I don't know.
21      Q.    Did you know that the police
22 also contacted Lauren Fretz and contacted
23 Kristen Kennedy?  Were you aware of that?
24      MR. GROTH:  At what point?

Appendix 0632

Page 110

1   MR. RUSSELL: During their
2   investigation with regard to the Nace
3   matter.
4   MR. GROTH: Yes, not his
5   daughter's matter, the Nace matter.
6   THE WITNESS: Yes.
7   BY MR. RUSSELL:
8   Q.   And did you learn that anything
9   was revealed to them differently than what
10  your understanding is that was revealed to
11  Mr. Clymer?
12  A.   No.
13  Q.   And Ryan told you that he did
14  contact the police officer, correct?
15  A.   Ryan indicated that he spoke
16  with someone in a law-enforcement
17  capacity. My impression was that -- as I
18  recall, he said something around Bucks
19  County Detectives. That sticks in my
20  head as a recollection that he indicated
21  in our conversation.
22  Q.   Did Ryan ever tell you that he
23  spoke to the assistant basketball coach,
24  Robin Landis?

Page 111

1   A.   No.
2   Q.   Did he ever tell you that he
3   spoke with anybody as part of his
4   investigation?
5   A.   Named specifically? No. When
6   we had a conversation, he said that he
7   was investigating it. He didn't indicate
8   that he was speaking to anyone. I would
9   have made an assumption that he was
10  speaking to people.
11  Q.   And I think you've stated that
12  you would have hoped that Ryan Clymer/FCA
13  would have notified the authorities in
14  addition to doing whatever investigation
15  they did, correct?
16  A.   My assumption was that that was
17  going to happen, yes.
18  Q.   Do you know whether Ryan Clymer
19  assumed that you were going to be doing
20  that?
21  A.   I don't know if he assumed
22  that. I don't know.
23  Q.   What's interesting -- and we've
24  already taken Mr. Clymer's deposition, but

Page 112

1   he indicated that you were supposed to
2   look into whether or not you could get
3   the actual text messages, and he was
4   waiting for you to get back to him on
5   that.
6   Did you ever get back to him
7   on whether you could obtain the messages
8   themselves, the content?
9   A.   I wouldn't characterize it as I
10  told him that I would be getting them for
11  him. I did, indeed, say that I would try
12  to get them, which I indicated that I
13  did, but that there was nothing that -- I
14  didn't say that I was -- that he should
15  wait for me or that there was any
16  indication that I was handling any part
17  of that that should stop him or prevent
18  him from continuing on.
19  Q.   Did you ever tell him that you
20  had been unable to obtain the actual
21  content of the text messages after that
22  last conversation where you told him that
23  you were going to follow up on that?
24  A.   I don't believe I did.

Page 113

1   Q.   Do you know why you didn't tell
2   him that?
3   A.   I don't know a specific reason.
4   We didn't have contact after that.
5   Q.   You said you spoke to your
6   divorce attorney to try to find out what
7   you could determine about getting the
8   content of these messages, right?
9   A.   Right.
10  Q.   Who was that divorce attorney?
11  A.   Meg Groth.
12  Q.   Did you disclose to her what
13  you believed the contents to be based
14  upon what Emily had told you?
15  A.   Yes.
16  Q.   And did she tell you, look, you
17  need to go to Children & Youth, report to
18  Children & Youth?
19  A.   No.
20  Q.   Did she indicate to you that
21  she felt that the content of the messages
22  that you disclosed to her were done to
23  entice or somehow raise the level of
24  sexual abuse with your daughter?

Page 114

1    A.    If I can clarify.
2    Q.    Sure.
3    A.    I didn't go into detail with
4  her concerning what was actually said in
5  the -- what was alleged to have been said
6  in the text messages.
7        I simply asked her if she
8  could write me a letter to Verizon to try
9  to get the text messages, and she said
10 what are the dates that you need. I said
11 that Emily received inappropriate text
12 messages from her coach, but I didn't go
13 into any...
14   Q.    Did you tell her that the
15 inappropriateness was of a sexual nature?
16   A.    I don't recall whether it was
17 assumed. I don't recall that I said it
18 directly.
19   Q.    Do you know why you wouldn't
20 have said that?
21   A.    No, I don't know why I wouldn't
22 have. I don't recall actually telling
23 her that specifically, that they were
24 sexual in nature.

Page 115

1    Q.    I think you've answered this,
2  but the reason you didn't file a report
3  with the police was that Emily told you
4  not to, right?
5    A.    That was one of several -- that
6  was one part of the entire decision
7  process.
8    Q.    What were the other parts?
9    A.    The stress of the situation,
10 the overall feeling that both my wife and
11 I had where -- we were concerned about
12 getting Emily through school and
13 graduating; her resistance, not wanting to
14 create a situation; and, you know, a
15 certain degree of assumption that the
16 school was going to handle the situation
17 correctly. So, at that point I made the
18 decision not to.
19   Q.    Did you expect the school to go
20 against your wishes? If you didn't wish
21 personally to report it to the police,
22 where you're hopeful that the school would
23 somehow do something different than what
24 you desired, you and Emily?

Page 116

1    A.    No. I wouldn't -- no, to answer
2  your question.
3    Q.    Faith Christian Academy is a
4  small school, right? And they take pride
5  in working with the parents. They don't
6  make decisions in a vacuum. They try to
7  work with the parents. And it's my
8  understanding that that was part of this
9  investigation, was working with you once
10 Emily had reported it, correct?
11       MR. GROTH: Objection to form
12 of the question. You can go ahead and
13 answer.
14   A.    I apologize. Can you rephrase
15 the question?
16   Q.    Sure. Faith Christian Academy
17 is a small school, correct?
18   A.    Relatively, yes.
19   Q.    And they take pride in working
20 with the parents of their students as
21 situations arise, right?
22       MR. GROTH: Object to the form.
23   Q.    You can go ahead and answer.
24   A.    I would assume they do.

Page 117

1    Q.    And once Emily reported this,
2  Faith Christian Academy reported directly
3  to you and your wife on the results of
4  the investigation. They no longer dealt
5  with Emily. They were dealing with you,
6  correct?
7        MR. GROTH: Object to the form
8  of the question.
9    A.    I wouldn't characterize them
10 dealing with us.
11   Q.    Okay.
12   A.    I felt in the situation after
13 we reported it and talked to them, that
14 the lines of communication kind of shut
15 down and kind of became guarded.
16   Q.    At some point -- and I know
17 you testified that you weren't sure
18 how -- Emily was reinstated on the team,
19 right, and she still remained co-captain?
20   A.    I don't believe she was -- I
21 don't know if she was still a co-captain
22 or not. She came back to play.
23   Q.    She testified that she remained
24 co-captain, but you don't have any basis

Page 118

1  to disagree with that.
2      A.   No.
3      Q.   And Mr. Romig was removed from
4  the team.
5      A.   Yes.
6      Q.   And you hoped that that would
7  be the case, is that your daughter would
8  be believed about the numerous text
9  messages, she would be put back on the
10  team, and that Mr. Romig would be
11  removed, right?
12      A.   That would be one action, I
13  would assume, that should be done, yes.
14      Q.   Were you concerned at all that,
15  if you went forward with the police and
16  reported this incident, that Mr. Romig was
17  going to sue you and your wife or Emily
18  for slander or defamation?
19      A.   No.
20      Q.   Was there ever any indication
21  that Mr. Romig was going to sue anybody
22  because of the insinuation of the contents
23  of the messages that had been sent?
24      A.   Not that I'm aware of.

Page 119

1      Q.   At any time in 2009 or 2010,
2  did Emily ever tell you that she was
3  touched inappropriately by Mr. Romig?
4      A.   Yes.
5      Q.   What did she tell you?
6      A.   She said in one instance he had
7  touched her back end at a practice.  I
8  think it was after she had gotten hit or
9  something to that effect.
10      Q.   Do you know if that was ever
11  communicated to Mr. Clymer?
12      A.   I don't know if it was or not.
13      Q.   The one thing is, on what has
14  been marked as Romig-6, which is the
15  email with the attachment, when we looked
16  at that, which you had sent or your wife
17  had sent to Mr. Clymer, there's no
18  mention of any physical contact in there.
19  Would you agree with me on that?
20      A.   Yes, I would agree with you on
21  that.
22      Q.   Do you know when was the first
23  time that you learned that there was some
24  allegation of physical contact between Mr.

Page 120

1  Romig and Emily?
2      A.   I don't remember a specific
3  time frame.  I believe it was after this
4  was brought up.  We didn't know about it
5  prior to this instance.
6      Q.   What do you mean, "instance"?
7  The Nace matter?
8      A.   No, prior to this.
9      Q.   "This" being the documented
10  paper that you asked her to prepare,
11  which is part of Romig-6?
12      A.   Correct.  I did not have
13  knowledge of that.
14      Q.   Do you know if anybody ever
15  emailed or communicated to Mr. Clymer or
16  any representative of Faith Christian
17  about an inappropriate-touching instance?
18      A.   I don't know if anyone did.
19      Q.   At any time in 2009 or 2010
20  did you believe that Emily was the victim
21  of sexual abuse?
22           MR. GROTH:  Object to the form.
23  You can answer.
24      A.   No.

Page 121

1      Q.   At any time in 2009 or 2010
2  did you believe that Emily was the victim
3  of serious bodily injury?
4      A.   No.
5      Q.   At any time in 2009 or 2010
6  did you believe that Emily was the victim
7  of sexual exploitation?
8           MR. GROTH:  Object to the form.
9      A.   Can you define "sexual
10  exploitation" for me?
11      Q.   Yes:  Do you believe that Mr.
12  Romig was attempting to persuade her,
13  induce her, entice her or coerce her to
14  engage in some sexually explicit conduct?
15      A.   Yes.
16      Q.   What is it that gave you that
17  impression?
18      A.   The manner in which he was
19  texting her his actions; the things that
20  he was saying and texting her, that's how
21  I made that assumption.
22      Q.   And even though you had that
23  impression, you didn't go to the police.
24      A.   No.

Appendix 0635

Page 122

1      Q.    Do you know whether or not your
2  wife had anything kind to say about Mr.
3  Clymer at Emily's graduation?  Did she go
4  up to him and just thank him for all
5  that he did this past year for Emily and
6  you guys?
7      A.    I don't recall an instance
8  where she did that.
9      Q.    You were subpoenaed to be here
10  today.  Do you know why your wife was
11  not subpoenaed to be here today?
12      A.    No, I do not.
13      Q.    You talked about one of the
14  reasons you didn't report it was, you and
15  your wife just wanted to make sure Emily
16  graduated and got through it, right?
17          Was there anything that
18  prevented you from reporting this incident
19  after Emily graduated?
20      A.    No.
21      Q.    Did Emily ever tell that you
22  Mr. Romig was texting her, commenting on
23  the characteristics of her backside?
24      A.    Yes.

Page 123

1      Q.    Do you know when that occurred,
2  when that first occurred?
3      A.    I don't. I'm sorry.
4      Q.    And I understand that a lot of
5  these conversations may start to meld
6  together.  It's my understanding she may
7  have told the police that as a result of
8  the Nace investigation, but I didn't see
9  that in any documents prior to that time.
10          Do you have any recollection of
11  whether she communicated either the
12  touching on the butt or the comments
13  about the characteristics of her backside
14  before she was questioned by the
15  detectives in the Nace matter?
16      A.    I can't recall.  No, I can't
17  recall.
18      Q.    The other thing she talked to
19  the police about, which I didn't see on
20  any of the other material that you
21  reported to Ryan, at least in written
22  form, was the image that she received of
23  Mr. Romig in his jeans, his new jeans.
24  Did you have some knowledge of that?

Page 124

1      A.    Yes, sir.
2      Q.    Were there any other images
3  that were sent that you're aware of?
4      A.    Not that I'm aware of, no.
5      Q.    Do you know why that text, that
6  picture, was not indicated in what has
7  been identified as Romig-6?
8      A.    I don't believe I knew it at
9  that time.
10      Q.    Was the first time you learned
11  of that when you were interviewed by the
12  detectives with Emily?
13      A.    Very possibly.
14      Q.    In the other instance, the Nace
15  matter, there were images that were sent
16  between each other, there was sexting that
17  was going on, and there was sexual
18  intercourse that occurred.
19          You know none of that occurred
20  with regard to Emily's situation, correct?
21      A.    Correct.
22      Q.    In fact, whatever relationship
23  existed was halted before anything got to
24  that level, correct?

Page 125

1      A.    Correct.
2      Q.    And the school intervened and
3  determined that there were excessive texts
4  going on between these two individuals,
5  right?
6          MR. GROTH:  Object to the form.
7      A.    I can't -- I assume that that
8  was what they did.
9      Q.    You indicated that there were a
10  thousand or more text that went from Mr.
11  Romig to your daughter Emily.  Did you
12  determine how many texts were going from
13  Emily back to Mr. Romig?
14      A.    I did; I don't recall off the
15  top of my head.
16      Q.    Were there an equal amount
17  or...
18      A.    I don't recall.
19      Q.    In your meetings with Mr.
20  Groth, did he tell you that he believed
21  Faith Christian Academy was trying to
22  cover something up?
23      A.    No.
24      Q.    In your meeting with Mr. Groth,

Appendix 0636

Page 126

1 did he indicate to you that he had other
2 girls that had come forward and stated
3 that they had been sexually abused or
4 assaulted while at Faith Christian
5 Academy?
6   A.   No.
7   Q.   The letter that was sent to
8 you -- I think that was marked as
9 Smith-1 -- in that letter, if you look
10 at the second paragraph on the first
11 page, it says beginning right here, "More
12 specifically, we believe that Mr. Romig
13 engaged in conduct designed to induce,
14 entice, persuade, encourage or coerce a
15 number of his female softball players" --
16 I think he meant basketball players --
17 "at FCA to participate in an exploitative
18 sexual relationship."
19       Did he ever tell you what
20 number of female players he thought were
21 involved?
22   A.   No.
23   Q.   He never gave you any names or
24 anything like that?

Page 127

1   A.   No.  Aside from Fretz and
2 Kennedy, the two names that I recall, I
3 don't know of any other names.
4   Q.   But you don't even know that
5 they were sexually involved with Mr.
6 Romig, correct?
7   A.   I don't know for a fact they
8 were.
9   Q.   Do you know for any reason that
10 they were?
11   A.   It was alleged or there were
12 indications that they were.
13   Q.   So, rumors?
14   A.   Yes.
15   Q.   Did you ever speak with Lauren
16 Fretz?
17   A.   No.
18   Q.   Did you ever speak with Kristen
19 Kennedy?
20   A.   No.
21   Q.   There was one email that was
22 not deleted.  Did you ask Emily why she
23 deleted all the emails if she was
24 concerned that no one would believe her?

Page 128

1   A.   Her answer to us was that she
2 was very uncomfortable with receiving
3 those emails and she deleted it.
4   Q.   Did she explain why she
5 continued to email back Mr. Romig because
6 she was so uncomfortable?
7   A.   No, she did not.
8   Q.   The one email that you were
9 able to obtain says "This is going to be
10 rough.  Ewing Oil contracts are difficult
11 to negotiate."  It says this text message
12 was saved.  Did you save it or did Emily
13 save it?
14   A.   I believe I instructed Emily to
15 save it.  It came after the discussion
16 with Ryan after it had come, you know,
17 come out.
18   Q.   Did you have any idea what that
19 text messages related to?
20   A.   No.
21   Q.   What we previously marked as
22 Mayer-3 -- and this purports to be an
23 email that was cc'd to you.  Do you see
24 that?

Page 129

1   A.   Yes.
2   Q.   On the last line of that email
3 it says "Ryan, thank you again for the
4 support you have given us and Emily," and
5 it's signed by your wife, right?
6   A.   Correct.
7   Q.   Do you have knowledge that she
8 communicated to Ryan that she was thankful
9 for the support that he had given to both
10 you and her as well as Emily?
11   A.   I don't have any knowledge
12 about that.
13   Q.   Did you receive that email?  It
14 says it was cc'd to you.
15   A.   I'm sure I did, yes.
16   Q.   Did you tell your wife that
17 you're not at all thankful for the
18 support that Ryan gave you and Emily
19 during this time?
20   A.   I don't believe I did.
21   Q.   And did you disagree with the
22 sentiment expressed by your wife in that
23 email?
24       (Pause)

Appendix 0637

Page 130

1    A.    My apologies.  I was reading it
2  in context to see what the email was
3  about.  I would characterize that I'm not
4  pleased now.  I don't know that I really
5  drew a conclusion at the moment when I
6  got that.
7    Q.    And I agree.  With 20/20
8  hindsight the world is a whole different
9  place, but we're dealing with the whole
10  allegation that's made by Mr. Groth and
11  his clients related to, you know, realtime
12  back in 2008, 2009, 2010.  And what we're
13  trying to figure out is did Faith
14  Christian Academy do everything that you
15  expected of them with regard to this
16  investigation.
17       And do you agree that your
18  wife said that she was thankful for the
19  support that was provided to Emily and
20  both of you?  And what's the date of
21  that email?
22    A.    January 16th.
23    Q.    Would you agree that it does
24  state that?

Page 131

1    A.    I would agree that it states
2  that, yes.
3    Q.    Did you have any conversations
4  with your wife after that, that you were
5  not thankful for the support or you
6  wouldn't call it support that was given
7  to you?
8    A.    I don't know that -- not
9  directly to the support that they were
10  giving us, no, I wouldn't have had a
11  conversation with her.  I don't recall a
12  conversation related to that.
13    Q.    And because we are dealing in
14  realtime at the moment trying to sort
15  through what the issues of Faith Christian
16  Academy was, your daughter was on
17  probation after her junior year.  Is that
18  right?
19    A.    On probation...
20    Q.    From FCA.  Do you remember her
21  getting -- she was involved in a party
22  after the junior/senior?
23    A.    Oh, okay.  I do recall.
24    Q.    Were there certain disciplinary

Page 132

1  restrictions that were imposed on her in
2  order for her to come back her senior
3  year?
4    A.    I believe there were, yes.
5    Q.    Do you know what it is that
6  alleged that transpired at that party,
7  after the junior/senior?
8    A.    I don't recall directly.  I know
9  there might have been drinking and a mix
10  of boys and girls.
11    Q.    Were there any sexually
12  inappropriate allegations that occurred at
13  that party that you're aware of?
14    A.    I do recall -- I believe there
15  was some kind of allegation.  I believe
16  there was.  I don't recall directly what
17  it was.
18    Q.    Did you confront Emily about
19  that?
20    A.    I believe we did.
21    Q.    Do you recall what she told
22  you?
23    A.    I do not.
24    Q.    Do you have any

Page 133

1  understanding -- and I talked about Emily
2  being reinstated as the co-captain, but
3  do you have any recollection that she
4  was ever removed as co-captain with
5  Chelsea Romig at any time before this
6  came to light of the excessive texting?
7    A.    I do not.
8    Q.    Do you know whether your
9  daughter was ever disciplined while at
10  Faith Christian Academy for issues
11  involving truthfulness or dishonesty such
12  as cheating on a test?
13    A.    I don't have any knowledge of
14  that.
15    Q.    Again, it's our desire to get
16  to the truth of this and figure out what
17  transpired at the time.
18       Do you have any information
19  that you think would be helpful in
20  understanding Faith Christian Academy's
21  role in investigating Mr. Romig and the
22  emails?  Any other information that you
23  think would be helpful.
24       MR. GROTH:  Object to the form.

Appendix  0638

Page 134

1  Q.    You can answer.
2  A.    I don't believe I do at this
3  point.
4  Q.    Do you know of anybody else
5  that Ryan Clymer should have contacted at
6  the time in order to ascertain anything
7  more about this inappropriate-texting
8  situation?
9  A.    Do you want me to speculate?
10 Q.    Not speculate.  Just tell me
11 what your thoughts are.  It's not
12 speculating if it's your thoughts.  Who
13 else should he have contacted?
14      MR. GROTH:  Object to the form.
15 You can answer.
16 A.    I don't really know.  I would
17 be making an assumption at this moment.
18 I will look back and say he should have
19 contacted the District Attorney's Office
20 or potentially Bucks County Detectives.
21 The assumption was that he had.
22 Q.    Could the same statement by
23 made of you, though?
24 A.    Sure.

Page 135

1  Q.    And Mrs. Smith.
2  A.    Yes, it could be.
3      MR. RUSSELL:  I have no further
4  questions.  Thank you.
5  EXAMINATION
6  BY MR. SANTARONE:
7  Q.    Mr. Smith, you talked about the
8  probation or some kind of discipline that
9  Emily received after some dance, and you
10 talked about some drinking and some boys
11 and girls.
12      Was there any allegation that
13 Emily was involved in some sexual act?
14 A.    I don't remember specifically
15 what the allegation was, but I would
16 characterize it that, yes, she was
17 involved with something.
18 Q.    And as a result of that, did
19 she have to go to counseling with a
20 pastor?
21 A.    Yes, she did.
22 Q.    And did she sign a contract
23 saying "This is what I agree to"?
24 A.    Yes.

Page 136

1  Q.    Was there talk at that time of
2  the school wanting to put her out of the
3  school?
4  A.    Not that I'm aware of, no.
5  Q.    If she didn't go along with
6  this counseling -- was that part of the
7  agreement, that she could stay in the
8  school if she went along with this
9  counseling?
10 A.    I didn't see the contract or
11 the agreement.  I don't know if that's a
12 fact or not.
13 Q.    Okay.  You talked about that
14 email that came -- you were asked about
15 the Ewing oil email, the one that doesn't
16 seem to make any sense that was on
17 Emily's phone?
18 A.    Yes.
19 Q.    At that point you had taken
20 Emily's phone from her, correct?
21 A.    Yes, that's correct.
22 Q.    How long did you keep the
23 phone?
24 A.    I don't recall the exact amount

Page 137

1  of time. I know it was for several months
2  that we kept the phone. We kept -- I
3  know there was a period of time that we
4  held onto the phone.
5  Q.    Did she eventually get that
6  phone back or another phone?
7  A.    I don't recall.
8  Q.    She kept the same phone number,
9  though, correct?
10 A.    Correct.
11 Q.    The breakdown that you did of
12 the number of emails that were from Romig
13 to Emily, did you ever print out the
14 number of emails that were from Emily to
15 Romig?
16 A.    Yes.
17 Q.    And is that on the -- is that
18 on these --
19 A.    Yes.
20 Q.    Can you tell me where it is?
21 A.    Yes.
22      MR. GROTH:  If you want to
23 use the ones that are marked so he
24 knows...

Page 138

1    MR. SANTARONE:  Okay.
2    MR. GROTH: ...which one he's
3  talking about.
4    MR. SANTARONE:  Okay.
5    MR. GROTH:  Tell us what
6  exhibit you're looking at.
7    THE WITNESS:  Exhibit Romig-5?
8  Again, let me look at Exhibit Romig-7.
9  What I'm looking for is a pivot table
10  that was cited in the original electronic
11  Excel file that broke down the to-and-from
12  and it had a sum for both of them.
13    That's in the electronic file.
14  I would have to sit here and count each
15  one of these to be able to tell you.
16  BY MR. SANTARONE:
17  Q.   Well, let's look at number
18  seven.  That has -- no, it's the front
19  page.
20  A.   Oh, I'm sorry.
21  Q.   You have there texts to Emily,
22  you have 2,140.  Do you see that?
23  A.   I'm sorry.
24  Q.   Here.

Page 139

1  A.   Yes.
2  Q.   Then what's the next from...
3  A.   From Emily to Romig, 1,886.
4  Q.   Okay.  And for the September,
5  October and November time frame, the other
6  exhibits you looked at...
7  A.   Yes.
8    MR. RUSSELL:  Is that Romig
9  exhibit five.
10  Q.   ...you don't have it broken
11  down there on that one.
12  A.   On this email I do not.
13  Q.   Okay.  Is it broken down -- I
14  mean, not that I'm asking you to do it,
15  but could it be counted up on this
16  document that's attached to that?  Did
17  you print out that information or did you
18  just print it one way?
19  A.   I did not print these
20  documents.
21  Q.   Well, you printed them out from
22  your computer when you looked at your
23  bill.
24  A.   I downloaded them from my

Page 140

1  computer directly into Excel, so it
2  automatically populated the cells in the
3  program, and from there I manipulated --
4  I took the numbers and I created a pivot
5  table based on that.  It will do a
6  compare and tally them up.
7    I never actually printed them.
8  It was always in electronic form.
9  Q.   Always in electronic form, okay.
10  A.   Yes.
11  Q.   And when you created these two
12  separate files, did you create a separate
13  file that says Emily to Romig?
14  A.   Yes, there is a tab in the
15  Excel spreadsheet that has Emily to Romig
16  and one that is Romig to Emily, and those
17  two pivot tables total up the number.
18  Q.   Okay. Did you give that pivot
19  table for September/October/November, Emily
20  to Romig, did you give that to Mr.
21  Clymer?
22  A.   I did, yes.
23  Q.   Is it in this exhibit?
24  A.   It is not printed off, no.

Page 141

1  Q.   Do you have a copy of that?
2  A.   I believe I do still, yes.
3  Q.   In the course of speaking with
4  your daughter and what you've learned from
5  any source, you've never heard that Mr.
6  Romig ever asked Emily to send him a
7  picture of her, correct?
8  A.   Correct.
9  Q.   When you met with Mr. Groth
10  your wife was there, correct?
11  A.   Yes.
12  Q.   Was she there for both of the
13  meetings?
14  A.   Yes.
15  Q.   And they both occurred at your
16  house.
17  A.   Yes, they did.
18  Q.   Other than what you testified
19  here to today, did your wife add anything
20  else?  Did your wife say, oh, I told Mr.
21  Clymer this?
22  A.   Yes, my wife had specific
23  conversations that I did not have.
24  Q.   What did she say in those

Appendix  0640

Page 142

1  specific conversations? What did she say
2  at that meeting that you had with the
3  attorney?
4      A.    I think they were related to
5  the assistant basketball coach, a
6  conversation with the assistant basketball
7  coach.
8          I apologize, I don't remember
9  what she said exactly, but I know that
10  she had a conversation with perhaps Robin
11  Landis or the assistant basketball coach.
12  She interjected some piece of information
13  that I did not have as a conversation.
14      Q.    But your wife never said "Oh, I
15  told Ryan Clymer" or "I told anybody at
16  Faith Christian Academy that Emily alleged
17  that Romig had touched her at some
18  point"? She didn't say that, did she?
19      A.    I don't recall that, no.
20      Q.    When you talked about, you
21  know, you just went through how you
22  pulled this up and you downloaded and you
23  created a matrix and separated it, you
24  said in 2009 you didn't have the capacity

Page 143

1  to retrieve deleted text messages from a
2  phone.
3          Did you know it could be done?
4  There is a difference between having the
5  capacity and knowing it. Because you know
6  computers: Everything is always there,
7  right?
8      A.    Yes. To answer your
9  question, technically, yes, I knew that
10  you could -- that it could be done.
11      Q.    You never took Emily's phone
12  in for a forensic examination by anyone?
13      A.    Correct, I didn't.
14      Q.    And you wouldn't need a
15  subpoena to do that. It's your phone.
16      A.    That's correct.
17      Q.    Did you ever speak to anyone
18  from Verizon? I know you went on and you
19  searched, but did you ever speak with
20  anyone from Verizon about whether or not
21  the content of text messages even exists
22  other than just on this phone?
23      A.    I did not.
24      Q.    Do you know today whether

Page 144

1  that's true or not?
2      A.    I do not.
3      Q.    When you were an investigator
4  with Montgomery County -- you were there
5  for how many years?
6      A.    Five and a half.
7      Q.    (Continuing) -- for five and a
8  half years, did you make any friends with
9  people that worked there?
10      A.    Sure.
11      Q.    Oscar Vance a friend?
12      A.    An acquaintance, yes.
13      Q.    Did you ever think of calling
14  Oscar to say "This is what I got. What
15  do you think I should do?"
16      A.    No.
17      Q.    How about in the context of
18  being an investigator with Montgomery
19  County? You had a lot of contact with
20  police cars, different officers, correct?
21      A.    I did, yes.
22      Q.    Some of those chiefs were there
23  for years and years. Did you know any
24  of those chiefs?

Page 145

1      A.    In Montgomery County?
2      Q.    Montgomery, yes.
3      A.    I didn't deal in Bucks County.
4  I dealt with Montgomery County.
5      Q.    Okay. Did you ever think of
6  calling any of them?
7      A.    No.
8      Q.    The Montgomery County detectives
9  have, for want of a better word, a sex
10  crimes unit, correct?
11      A.    I believe they do now, yes.
12      Q.    Did they not have one then?
13      A.    I believe they had one
14  detective who handled cases of that
15  nature, but not a particular unit.
16      Q.    That was a female?
17      A.    Yes.
18      Q.    Did you know her?
19      A.    Yes.
20      Q.    Did you ever think of calling
21  her?
22      A.    No, I did not.
23      Q.    You talked about a resolution,
24  not really knowing what was going on, but

Appendix 0641

Page 146

1 when Emily came home from school it was
2 December 21st. That was the last day of
3 school for that school year before the
4 holiday. That's the day she talked to
5 you, correct?
6       MR. GROTH: Object to the form.
7   A.   That was the day that she
8 talked to us.
9   Q.   Okay. So, you have the
10 Christmas holiday, then you have the first
11 day of school. She goes back the first
12 day of school, correct?
13   A.   I don't recall whether she went
14 back that first day.
15   Q.   If she said she did, do you
16 have any reason to doubt that's not true?
17   A.   I have no reason to doubt it.
18   Q.   When she goes back to school
19 that first day, she's on the basketball
20 team, correct?
21   A.   She is, yes.
22   Q.   And Romig is gone, correct?
23   A.   Can you define what "gone"
24 means?

Page 147

1   Q.   He's not the coach any more.
2   A.   Yes.
3   Q.   And you knew that because you
4 wouldn't have let her go back to school
5 if he was still the coach, would you, or
6 would you?
7   A.   No. I would assume that -- I
8 don't recall exactly what we were thinking
9 at the time. I would not have wanted her
10 to be there if he was still there.
11   Q.   Right. And my point is, you
12 knew he was going to be gone as the
13 coach before she went back that first
14 day.
15   A.   I don't know that I knew that.
16 I don't know that I knew that she -- I
17 don't know that I knew that.
18   Q.   Well, if you didn't know it,
19 you wouldn't have let her go back to
20 school, would you?
21   A.   I would not have let her play
22 on the basketball team.
23   Q.   You know, you talked about that
24 day, December 21st, where she's told, you

Page 148

1 know, to leave school that day. She's
2 told to leave school and go home and tell
3 your parents, right?
4       MR. GROTH: Object to the form.
5   Q.   Correct?
6   A.   She did come home and tell us,
7 yes.
8   Q.   Would you have wanted the
9 school to do anything different other than
10 saying tell your parents right away about
11 this?
12   A.   For that particular moment? No.
13   Q.   You mentioned that Emily has
14 sisters?
15   A.   Yes.
16   Q.   How many sisters?
17   A.   Two other sisters.
18   Q.   Are they younger, older?
19   A.   They're both older.
20   Q.   Where did they going to school?
21   A.   They went to Calvary Baptist.
22       MR. SANTARONE: That's all I
23 have.
24       Thank you.

Page 149

1       MS. CONNOR: I don't have any
2 questions. Thank you, Mr. Smith.
3       MR. GROTH: Excuse me, I just
4 have a couple.
5   EXAMINATION
6   BY MR. GROTH:
7   Q.   Mr. Smith, were you aware that
8 after Emily made these allegations about
9 Mr. Romig to Ryan Clymer, that although
10 she was sent home to tell you about it,
11 Mr. Romig was allowed to coach at
12 practice of the girls team and also coach
13 a game for the girls basketball team
14 after the allegation was made about him?
15 Did you know that?
16   A.   Yes.
17   Q.   How did you know that?
18   A.   I don't recall specifically who
19 told us, but we were made aware of it.
20 We were made aware that he had coached a
21 practice and a game.
22   Q.   And Emily was not participating
23 in that practice or that game. Is that
24 correct?

Appendix 0642

Page 150

1    A.    That is correct.
2    Q.    That was Ryan Clymer's decision,
3  correct?  As she told you?
4    A.    Yes, correct.
5    Q.    Were you ever interviewed by
6  the Bucks County Detectives?
7    A.    Yes, I was.
8    Q.    Were you interviewed at the
9  same time as Emily?
10    A.    Yes.
11    Q.    Two people in the room at the
12  same time?
13    A.    Yes.
14    Q.    Was that recorded?
15    A.    I don't recall.
16    Q.    Did Ryan Clymer ever ask you to
17  provide him with Emily's cell phone so
18  that he could give to it somebody who
19  could do any forensic testing of the
20  phone to determine if they could reveal
21  the contents of the texts between Romig
22  and Emily?
23    A.    No.
24    MR. GROTH:  I have no other

Page 151

1  questions.
2    Thank you.
3    MR. SANTARONE:  Just one
4  follow-up.
5  EXAMINATION
6  BY MR. SANTARONE:
7    Q.    With all due respect, you were
8  the IT guy. Did you ever tell Mr. Clymer
9  "There's a possibility we can have a
10  forensic examination of the phone done"?
11    A.    I did not.
12    MR. GROTH:  Thank you very
13  much.
14    Appreciate it.
15    (The deposition was concluded
16  at 4:00 p.m.)
17
18
19
20
21
22
23
24

Page 152

1    WITNESS CERTIFICATION
2
3
4    I hereby certify that I have
5  read the foregoing transcript of my
6  deposition testimony, and that my answers
7  to the questions propounded, with the
8  attached corrections or changes, if any,
9  are true and correct.
10
11
12
13
14  DATE        KEVIN R. SMITH
15
16
17
18  PRINTED NAME
19
20  FILE 11780
21  NACE
22  vs.
23  PENNRIDGE SCHOOL DISTRICT
24

```
 1                    CERTIFICATION

 2

 3

 4          I hereby certify that the

 5     testimony and the proceedings in the

 6     aforegoing matter are contained fully and

 7     accurately in the stenographic notes taken

 8     by me and that the copy is a true and

 9     correct transcript of the same.

10

11

12

13

14          _____

15          Lance A. Brusilow

16          Registered Professional Reporter

17          Certified Realtime Reporter

18

19          The foregoing certification

20     does not apply to any reproduction of

21     the same by any means unless under the

22     direct control and/or supervision of the

23     certifying shorthand reporter.

24
```