05341.00162

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION - LAW

JAMES NACE and APRIL NACE, as  :  NO. 15-0333
Guardians of E.N., a minor,  :
                             :
            Plaintiffs    :
                             :
        vs.          :
                             :
ERIC ROMIG, PENNRIDGE SCHOOL   :
DISTRICT, DR. THOMAS CREEDEN and:
DAVID BABB,                 :
                             :
        and         :
                             :
FAITH CHRISTIAN ACADEMY, RYAN  :
CLYMER, RUSSELL HOLLENBACH,   :
                             :
        Defendants    :
----------------------------------

DEPOSITION OF ANNETTE SMITH

Taken in the law offices of
Drake, Hileman and Davis, 252 West Swamp Road, Suite 15,
Doylestown, Pennsylvania, on Wednesday, November 18, 2015,
commencing at 2:00 p.m., by Stacy D. Serba, Notary Public.

* * *

ERSA OF ALLENTOWN
Professional Court Reporters
Commerce Corporate Center, Plaza III
5050 Tilghman Street, Suite 120
Allentown, PA   18104
610.366.7119

COPY

APPEARANCES:

HORNSTINE, PELLONI & HORNSTINE
BY:   DAVID J. GROTH, ESQ.
1500 Walnut Street-Suite 300
Philadelphia, PA  19102
 -- For the Plaintiffs

EASTBURN AND GRAY, P.C.,
BY:   ERIN N. KERNAN, ESQ.
60 East Court Street
Doylestown, PA  18901
 -- For Pennridge School District
        Dr. Thomas Creeden
        David Babb
KELLY, GRIMES, PIETRANGELO &
VAKIL, P.C.
BY:   SEAN V. KEMETHER, ESQ.
36 East Second Street
Media, PA  19063
 -- For Faith Christian Academy
        Ryan Clymer
        Russell Hollenbach

DRAKE, HILEMAN & DAVIS
BY:   JONATHAN J. RUSSELL, ESQ.
Bailiwick Office Campus
252 West Swamp Road, Suite 15
Doylestown, PA  18901
-- For Faith Christian Academy
        Ryan Clymer
        Russell Hollenbach

CASSIDY, CONNOR & PITCHFORD
BY:   CARLA E. CONNOR, ESQ.
295 East Swedesford Road, Suite 346
Wayne, PA  19087
 -- For Faith Christian Academy
        Ryan Clymer
        Russell Hollenbach

MARSHALL, DENNEHEY, WARNER COLEMAN & GOGGIN
BY:   DAVID SALAZAR, ESQ.
2000 Market Street, Suite 2300
Philadelphia, PA  19103
 -- For Faith Christian Academy

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

3

# I N D E X
## WITNESSES

| ALL WITNESSES | PAGE |
|---|---|
| ANNETTE SMITH | |
| Examination by MR. KEMETHER | 4:11 |
| Examination by MR. RUSSELL | 47:9 |
| Examination by MS. CONNOR | 92:4 |
| Examination by MR. GROTH | 97:21 |
| Examination by MR. KEMETHER | 128:1 |
| Examination by MR. RUSSELL | 131:8 |
| Examination by MR. SALAZAR | 134:23 |

## EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A. SMITH | | |
| No. 1 | Letter dated 4/10/15 | 82:17 |
| No. 2 | E-mail dated 12/31/09 | 85:1 |
| No. 3 | E-mail dated 1/16/10 | 88:7 |
| No. 4 | Letter dated 6/11/09 | 97:18 |
| No. 5 | Basketball Schedule | 116:8 |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1              (It is stipulated by and between

2       counsel for the respective parties that all

3       objections except as to the form of the question are

4       reserved until the time of trial, and the reading,

5       signing and sealing of the deposition transcript is

6       waived.)

7              ANNETTE SMITH, having been duly

8       sworn, was examined and testified as follows:

9                     * * *

10                    EXAMINATION

11      BY MR. KEMETHER:

12      Q.       Good afternoon.  I'm Sean Kemether and I

13      represent Ryan Clymer and Russ Hollenbach in a

14      litigation that we're here for.

15              Your deposition is about to be taken.

16      And a right that you have as a witness is to read and

17      sign the transcript, which is the book that's going

18      to be created after everything is said and done

19      today.  You'll notice that the court reporter's

20      taking down everything that I'm saying, and she does

21      likewise when you speak, as well.

22              Once that gets produced, you have the

23      right to read and sign, which means you get to review

24      it to make sure that she took down everything that

25      you say correctly.  It's not an opportunity to change

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    your testimony, but rather to review and you say --

2    if you believe that you said something different than

3    what was taken down, you have a right to let us know

4    that.   If you want to make that arrangement, let us

5    know and we will have it sent to you and you'll have

6    the opportunity to make that change.   Just let us

7    know any time before we leave today.

8    A.        Okay.

9    Q.        Thank you for coming today.   We're here for

10    your deposition.   And a deposition is a question and

11    answer session.   One difference out of ordinary

12    conversations it that it's sworn court testimony that

13    you're about to give.   Even though we're not in a

14    courthouse, you're about to give sworn testimony.

15            Once you answer a question, I'll assume

16    you heard it and understood it and that you're

17    answering it truthfully to the best of your

18    knowledge.   Okay?

19    A.        Okay.

20    Q.        If you don't understand my question, let me

21    know and I'll rephrase it.

22            Try to remember to use words in answering

23    questions.   It sounds obvious, but in day-to-day

24    life, people do things like nod their head, shrug

25    their shoulders and say uh-huh or huh-uh.   You can do

ANNETTE SMITH

1    all of those things, but in addition to that you have

2    to say words because that's all the court reporter

3    can take down.

4              Try to remember to wait for me to finish

5    before you answer and I'll try to do likewise when

6    you're answering.  The main reason for that is for

7    the court reporter's benefit.  If we speak at the

8    same time, it's make her job very difficult.  Just

9    take a moment and make sure I'm finished speaking and

10   I'll try to do likewise with you.

11              I don't want you to guess the answer to

12   anything.  If you don't know or don't remember

13   something, please tell me that.  I might ask for

14   things involving measurements of things like time,

15   for instance, how long ago an event happened, and in

16   all likelihood you may not know exactly how long

17   something was, but you might be able to give an

18   estimate or a range.  For those type of measurement

19   questions, if you can give a range, try to.  If

20   you're just pulling numbers out of the sky, let me

21   know -- tell me that and don't guess.  Okay?

22              If you need to take a break for any

23   reason during this deposition, including to go to the

24   bathroom, use the phone, whatever it may be, just

25   need to stretch your legs or something, let me know.

ANNETTE SMITH

1    We'll make that arrangement.  I just ask that you

2    don't do it in the middle of answering a question.

3    Answer the question and then we'll go from there.

4    Okay?

5              Any question before we get started?

6    A.      No.

7    Q.      Okay.  What is your full name?

8    A.      Annette Smith.

9    Q.      What is your date of birth?

10   A.      2/10/64.

11              MR. KEMETHER:  And off the record.

12              (Discussion off the record.)

13              MR. KEMETHER:  Let's go back on the

14   record.  On the record.  I asked the witness her

15   Social Security number while we were off the record

16   and she declined to give it, which is fine.

17   BY MR. KEMETHER:

18   Q.      Where do you live?

19   A.      You want an address?

20   Q.      Yes.

21   A.      219 Stonehaven Drive, Red Hill, PA, 18076.

22   Q.      And about how long have you lived there?

23   A.      Fourteen years.

24   Q.      Currently, who do you live there with?

25   A.      My husband.

ANNETTE SMITH

1    Q.       And that's Kevin Smith?

2    A.       Uh-huh.  That's correct.

3    Q.       How long have you been married to Kevin

4    Smith?

5    A.       Fourteen years.

6    Q.       I understand Emily Mayer is your daughter?

7    A.       Yes.

8    Q.       She's your biological daughter?

9    A.       Correct.

10   Q.       All right.  When did she last live with you?

11   A.       Full time, I would say probably 2012.  2011,

12   2012.

13   Q.       What year did she graduate from high school?

14   A.       2010.

15   Q.       Okay.  Going to ask some background

16   questions about her.  Before I get to that, a little

17   more about you.  What do you do for a living?

18   A.       I am a senior specialist at Merck.

19   Q.       And what sort of work do you do?

20   A.       I work on their grant program.

21   Q.       Where did -- is it all right to call her

22   Emily?

23   A.       Uh-huh.  Correct.

24   Q.       Where did Emily start high school?

25   A.       She started high school -- I mean, she was

ANNETTE SMITH

1   in the same school from fourth grade to 10th grade

2   and that was Calvary Baptist.

3   Q.        And did I understand she left there after

4   ninth grade?

5   A.        No.  She left February of 10th grade.

6   Q.        February of 10th grade.  Roughly halfway

7   through 10th grade?

8   A.        Correct.  Correct.

9   Q.        Why did she leave there?

10  A.        She was having trouble with the students

11  there.

12  Q.        Would you explain what you mean by that?

13  A.        Sure.  It's a small private school.  And the

14  girls are pretty unkind at times, very clicky.  We

15  were not from that school -- I mean, she wasn't kind

16  of born and raised in that environment, in that

17  church.  So, we didn't come to a relationship with

18  the Lord until that -- that year.  And so she was

19  never really accepted.

20            My husband and I were divorced and

21  remarried.  So generally you're kind of, like, on the

22  outside.

23  Q.        When you say we didn't come to God, who are

24  you talking about?

25  A.        Pretty much the whole family, except my

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    husband.  He was a believer before we got married.

2    And so it was a difficult environment to be in and

3    Emily was not real accepted.

4    Q.      Was there a certain issue or topic that she

5    was having to deal with with these other girls that

6    you describe as not being so nice or was it just

7    anything?

8    A.      It was pretty much anything.  I mean, they

9    were just pretty much unkind.  Since it was a divorce

10   situation, she wasn't, you know, with us on the

11   weekends, so she went to her dad -- her biological

12   father's house.  So that's unusual in that

13   environment.

14          And, you know, the girls, they're just

15   not real understanding, not real accepting.  There

16   wasn't anything that triggered it.  There wasn't an

17   event.  It was a culmination of really just not a

18   good -- a good, healthy environment.  So, in that

19   February we decided to pull her out.

20   Q.      Okay.  And where did she then attend high

21   school for the rest of her sophomore year?

22   A.      Upper Perk.

23   Q.      Upper Perkiomen High School?

24   A.      Yes.

25   Q.      A public school?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.        That's correct.

2    Q.        And how long did she remain there?

3    A.        She finished that grade there.  So that was

4    until June.

5    Q.        So roughly half of the school year?

6    A.        Uh-huh.

7    Q.        Yes?

8    A.        Correct.  I'm sorry.

9    Q.        One thing I should have mentioned, you have

10   to -- I understand uh-huh, but you have to say the

11   word.

12   A.        Yes.

13   Q.        Why did she not return there for her junior

14   year of high school?

15   A.        Again, it wasn't an environment we wanted

16   her in.

17   Q.        Can you explain what you mean by that?

18   A.        Upper Perk is a pretty big party school.

19   And Emily was put into situations where she would

20   have to make decisions, you know, am I going to go

21   one way or am I going to do the other and it was just

22   not a good situation.  She picked two girls as

23   friends that Kevin and I didn't approve of.

24   Q.        Do you know their names?

25   A.        No.  I don't remember, to be honest with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

12

```
 1    you.
 2    Q.        What was it about them that you didn't
 3    approve of?
 4    A.        The lying.  You know, the one girl, Emily
 5    would go and stay at this one girl's house and that's
 6    where we thought she would be and come to find out
 7    she would be at somebody else's house.
 8    Q.        Emily would be at someone else's house?
 9    A.        That's correct.  And, you know, because she
10    was in a Christian environment for many years, that
11    was not acceptable.  It wasn't acceptable to us and
12    we just weren't going to continue with that
13    situation.  So we were faced with another decision.
14    Q.        And is that the point where she -- where did
15    she go from there?
16    A.        She went to Faith.
17    Q.        And that would have been for her junior and
18    senior years of high school?
19    A.        That's correct.
20    Q.        All right.  Before she got to Faith
21    Christian Academy, was she involved in any sports in
22    school?
23    A.        Yes.  But not at Upper Perk because they
24    didn't have -- I don't think they had volleyball and
25    basketball was over, I think, at that point.  That's
```

ANNETTE SMITH

1     my recollection.

2     Q.        Were those the two sports she generally was

3     involved in before going to --

4     A.        That's correct.

5     Q.          -- Faith Christian?

6     A.        Yes.

7     Q.        Did she become -- is volleyball a fall

8     sport?

9     A.        In the Christian schools, yes.

10    Q.        So the fall of her junior year of high

11    school, was she involved with volleyball at Faith

12    Christian Academy?

13    A.        Yes.

14    Q.        As fall turned to winter, did she become

15    involved in girls basketball?

16    A.        That's correct.

17    Q.        Is that when she met Eric Romig?

18    A.        Yes.  She probably knew him before that

19    because it was the opposing team when she was at

20    Calvary.

21    Q.        Do you know that to be true?  In other

22    words, are you aware that she actually knew Eric

23    Romig?

24    A.        When you say --

25    Q.        Prior to --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

14

1    A.        She would know of him.

2    Q.        That's what I mean.  When I say know him,

3    meaning --

4    A.        I don't know if she knew him or not.

5    Q.        All right.  Did Emily report anything to you

6    about any issues, anything irregular about her

7    experience being on the girls basketball team at

8    Faith Christian during her junior year of high

9    school?

10   A.        No.

11   Q.        Did you get meet Coach Romig during that

12   year?

13   A.        Yes.

14   Q.        Was there anything unusual about that, any

15   time you spent with him, anything you learned from

16   him, about him, during that year?

17   A.        Not that I recall.

18   Q.        Was there anything unusual that happened

19   during the junior school year in general with Emily

20   other than she had a favorable experience at Faith

21   Christian during that year?

22   A.        We were pretty happy with the experience.

23   Q.        And we also includes Emily?

24   A.        I wouldn't want to speak for her, but I

25   would think she, you know, did.

ANNETTE SMITH

1    Q.        From your observations of her, was that

2    true?

3    A.        Yes.  Uh-huh.

4    Q.        Okay.  Was there some sort of a ball or a

5    social gathering at the end of the junior year?

6    A.        A banquet.

7    Q.        A banquet.  And do you know what that was

8    about?

9    A.        The situation there?

10   Q.        No.  First of all, the banquet itself.

11   A.        Oh, yes.

12   Q.        What was the banquet about?

13   A.        It's typical for Christian schools.  It's

14   like a prom, but it's a little bit more controlled.

15   You know, they get dressed up, they -- you know, they

16   have a dinner.  Generally they don't dance, but, you

17   know, it's a gathering like that.

18   Q.        Okay.  And she attended that one?

19   A.        She did.

20   Q.        Is that one the parents attend, too, or is

21   it just for the students?

22   A.        Parents do not attend that.

23   Q.        Did you learn anything about what happened

24   at that junior year event that we're talking about?

25   A.        Yes.

ANNETTE SMITH

1    Q.       How did you learn?

2    A.       The best of my recollection was we got a

3    phone call from Ryan that there was an incident after

4    the banquet.

5    Q.       And Ryan, being Ryan Clymer?

6    A.       That's correct.

7    Q.       What do you recall him telling you?

8    A.       That there was a party after the banquet and

9    that Emily was there and that there was drinking.

10   Q.       Was there anything else said about what

11   happened at that party?

12   A.       No.

13   Q.       Did Ryan say anything else aside from that

14   there was a party that Emily was at?

15   A.       That -- you know, there was a situation then

16   that we had to deal with.

17   Q.       That's what he said to you?

18   A.       I don't remember his exact words, but, yeah.

19   Q.       What did you understand --

20   A.       It was unacceptable, you know, the behavior

21   of Emily and the kids there, it was unacceptable.

22   You don't drink, you know, shouldn't have been a

23   party like that.

24   Q.       The issue was that there was a drinking

25   party, that was the unacceptable behavior?

ANNETTE SMITH

1    A.        Uh-huh.

2    Q.        Yes?

3    A.        Yes.

4    Q.        Did something happen to her as a result of

5    her being at that party in terms of attending Faith

6    Christian?

7    A.        That she had to do counseling with Pastor

8    Ron.

9    Q.        When did you learn that was going to be a --

10   something she had to do?

11   A.        I think when Ryan called.

12   Q.        So it would have been in June?

13   A.        Yeah.  That's correct.

14   Q.        Were you ever told that she was either

15   suspended or asked not to come back to the school?

16   A.        Doing the counseling was kind of a

17   stipulation to have her go back.

18   Q.        Did Ryan say to you, communicate to you in

19   some way, that she had been -- basically we don't

20   want her back, but if she does X, Y and Z, she can

21   come back?

22   A.        I don't recall how he said it.  You know, I

23   don't know that -- it wasn't a suspension, it was --

24   you know, this is unacceptable behavior for the kids

25   that go to Faith, for Emily to continue here, she has

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    to do the counseling.

2    Q.        All right.  When did the counseling start?

3    A.        I don't remember exactly if we did it over

4    the summer or if -- I guess we did.  I just -- I

5    don't recall.

6    Q.        How long did the counseling continue?

7    A.        Maybe five sessions.

8    Q.        Did you ever learn anything about the

9    counseling itself, either from Emily or someone else

10   involved with the counseling?

11   A.        I attended one session.

12   Q.        What do you recall about that?

13   A.        I don't remember much about it.  It was at

14   Pastor Ron's house.

15   Q.        Did you learn anything other than from

16   attending that one session about what happened in

17   those five counseling sessions?

18   A.        No.  No.

19   Q.        Did Emily complain about it to you?

20   A.        No.

21   Q.        Do you have an idea of when it ended, when

22   the last one was?  Was it in the fall of her senior

23   year, spring, some other time?

24   A.        I would say it was probably towards the end

25   of summer.

ANNETTE SMITH

1    Q.        So the counseling happened basically before

2    her senior year started?

3    A.        Yes.

4    Q.        Did you get any communication from Faith

5    Christian that, okay, the counseling's done, she can

6    go to school here again, something to that effect?

7    A.        I remember a phone call.

8    Q.        And was this after the counseling had

9    finished?

10   A.        Before the -- before the school year

11   started.

12   Q.        Who was that phone call from?

13   A.        From Ryan Clymer.

14   Q.        Okay.  What do you remember about that phone

15   call?

16   A.        Just that she was, you know, approved to

17   return.  There were four or five kids that had that

18   same requirement.

19   Q.        All right.  During -- I'm going to jump back

20   a little bit here.  During her junior year of high

21   school at Faith Christian, did she become friends

22   with Chelsie Romig?

23   A.        Yes.

24   Q.        And did you understand Chelsie to be Eric

25   Romig's stepdaughter?

ANNETTE SMITH

1    A.        Yes.

2    Q.        How would you describe her relationship in

3    her junior year between Emily and Chelsie?

4    A.        They were very close.

5    Q.        Did you get to see Chelsie outside of the

6    basketball court setting?

7    A.        Yes.  She stayed at our house a couple

8    times.

9    Q.        Do you know if the nature of that

10   relationship changed during Emily's senior year of

11   high school?

12   A.        After the situation came to light, yes, it

13   changed.

14   Q.        During the fall of 2000 -- the fall of 2009,

15   which would have been the fall of her senior year,

16   did she -- do you understand that she had a friend --

17   an ongoing friendly relationship with Chelsie Romig?

18   A.        Yes.

19   Q.        Roughly when did basketball start in her

20   senior year?  What time period?

21   A.        Probably starts in November.

22   Q.        All right.  Do I understand that the events

23   that gave rise to some issues you had with Coach

24   Romig, you learned about something shortly before

25   Christmas?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.       Yes.

2    Q.       All right.  So would it be fair to say that

3    roughly for a month or so, at least, before that,

4    Chelsie -- or Emily was playing basketball under

5    Coach Romig?

6    A.       Yes.

7    Q.       Did you notice anything that was different

8    or unusual or a problem about either Emily or Coach

9    Romig during that time?

10   A.       No.

11   Q.       Did you have any interactions with Coach

12   Romig before learning of the texting?

13   A.       I'm sorry.  Could you repeat that?

14   Q.       That year, in the fall of her senior year,

15   did you have any -- you yourself have any

16   interactions with Coach Romig before you learned of

17   that texting situation?

18   A.       Probably at the school, you know, during

19   volleyball games or he'd say hello.  And if Chelsie

20   stayed over -- I remember one particular time he came

21   to pick her up.

22   Q.       Was that before learning of the texting

23   situation?

24   A.       Yes.

25   Q.       Anything unusual about any of those

ANNETTE SMITH

1    interactions?

2    A.        No.

3    Q.        Can we agree that within a week or so before

4    Christmas day of Emily's senior year, you somehow

5    learned of a texting situation that was going on

6    between her and Eric Romig?

7    A.        It was probably December 21st or 22nd.

8    Q.        Do you recall how you learned of it?

9    A.        Emily came home from school early.

10   Q.        Yes.

11   A.        And came in and we were surprised that she

12   was home.  And asked her why she was there and she

13   told us what happened.

14   Q.        Okay.  When you say early, can you ballpark

15   how early?

16   A.        I would say probably between 11 and 12,

17   maybe.  It was pretty early.

18   Q.        Would this have been the last day before the

19   winter break, the Christmas break in terms of

20   attending school?

21   A.        I remember it to be that last day.  But I

22   could be wrong.

23   Q.        So you're at home and Emily comes home early

24   that day, you say you learn something.  What

25   happened?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   A.      She told us that she went to Ryan Clymer and

2   told him about the situation with coach, that he had

3   been texting her inappropriately.

4   Q.      To the best of your memory, is that what she

5   actually said or are you summarizing it?

6   A.      I'm summarizing it.  I don't remember

7   exactly.  It wasn't a lot of words.  She was upset.

8   Q.      As best you can remember, what did she

9   actually say that day?  When she got home from

10  school.

11  A.      That she was sent home.  She went to Ryan

12  Clymer because of the situation with her coach,

13  Romig, texting her inappropriately.  If I remember

14  correctly, she said that Ryan did not want her at the

15  school for her safety.

16  Q.      Did she tell you for what period of time?

17  A.      No.

18  Q.      I might have interrupted you.

19  A.      That's okay.

20          And so then we asked her, well, what --

21  you know, what do you mean he was texting you

22  inappropriately.

23  Q.      What did she say?

24  A.      And she said -- I don't remember exactly,

25  but, you know, they were things about wanting to, you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   know, be with her.  We were all pretty shocked, I

2   remember that.  And, you know, she was pretty upset.

3   We were pretty upset.

4   Q.       And be with her, did you understand that to

5   mean sexually?

6   A.       We didn't get into details.  So that's --

7   you know, we wanted to try to pull that out, like

8   what are you talking about.

9   Q.       Did you ask questions to that effect to her,

10  to be more clear as to what she meant?

11  A.       We did.  She was really pretty upset and it

12  was very difficult to get her to -- to open up about

13  it, so that's when we then asked her to write things

14  down.  We didn't -- I think that Kevin probably asked

15  her, do you have the text messages, and she said no,

16  which was not unusual to us.

17  Q.       What wasn't unusual?

18  A.       That she would delete her text messages just

19  because at that time cell phones, you didn't have a

20  lot of memory and the kids texted so much that you'd

21  wipe everything out so that, you know, you could keep

22  texting your friends.  So that -- it wasn't a

23  surprise to us that she didn't have anything current.

24  Q.       Okay.  And do you believe that first

25  evening -- that morning, I should say, when she got

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    home, you asked her to write things down?

2    A.       Yes.

3    Q.       And did you -- was that basically a one page

4    piece of paper?

5    A.       Yes.

6    Q.       And did she actually write it or type it up?

7    A.       I think she was on a computer.

8    Q.       And do I understand that some time later,

9    from the records, it looked like right around New

10   Year's or New Year's Eve, you e-mailed that to Ryan

11   Clymer?

12   A.       That's correct.

13   Q.       Was there anything before the end of 2009

14   that Emily told you that this was an actual content

15   of his -- Eric Romig's texts?

16   A.       Pretty much what was written down on the

17   paper.  There wasn't anything that she went into

18   detail about.  She did tell us how he didn't like

19   Chase, wanted her to, you know, break up with Chase.

20   Q.       Chase is Chase Brunner, who she's now

21   married to?

22   A.       That's correct.  Emily did not like to talk

23   about the sexual nature of it.  She just didn't.

24   Q.       And that's actually -- are you aware that

25   she told anyone that there was a specific sexual

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    nature to any of these texts?

 2    A.        Only Chase.

 3    Q.        You're aware that she told Chase this?

 4    A.        Yes.

 5    Q.        How did you find that out?

 6    A.        Because she told us.

 7    Q.        Emily told you that she told Chase what?

 8    A.        The nature of the texts.

 9    Q.        Did she tell you when she told Chase this?

10    A.        I don't remember.

11    Q.        I mean, was it in this time frame or years

12    later?

13    A.        No.  It was in that time frame.  Whether it

14    was a week or two weeks, or over that course of that

15    month that it was going on, I just don't remember

16    exactly.

17    Q.        Have you ever spoken to Chase Brunner about

18    whatever Emily told him about the contents of these

19    texts between your daughter and Eric Romig?

20    A.        Probably after the fact.

21    Q.        You did?

22    A.        Yes.

23    Q.        And did Chase respond to you?

24    A.        Yes.

25    Q.        What did Chase tell you was in these texts?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.        He did not remember a lot of things.  He

2    knew that they were inappropriate.

3    Q.        Did he tell you there was anything sexual

4    about any of the texts?

5    A.        I don't remember.

6    Q.        Has anyone to your memory told you that

7    there was anything sexual about any of the texts

8    besides whatever is in Emily's one page summary that

9    you asked her to prepare?

10   A.        No one else said anything.

11   Q.        Would that one page be the most complete

12   description of whatever was in those texts that

13   you're aware of?

14   A.        That I'm aware of.

15   Q.        Okay.  So go back in time now.  We're at

16   your house on the 20th or the 21st of December of

17   2009 and Emily's come home and told you what you just

18   related to us.

19             What happens next?

20   A.        We called the school to speak with Ryan

21   Clymer.

22   Q.        Same day?

23   A.        Same day.

24   Q.        All right.  Did you reach him?

25   A.        I don't remember if we reached him that day

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    or if we left a message and --

2    Q.        Do you have a memory of him -- whether it

3    was the same day, next day -- hearing from him?

4    A.        Yes.  We did hear from him.

5    Q.        What do you remember about that?

6    A.        It was a short teleconference, short phone

7    call with him.  We wanted to schedule a time to

8    discuss it.  He was going away.  We didn't -- it was

9    not a long conversation.

10   Q.        Okay.  Was there anything discussed about

11   specifically what had happened?

12   A.        I don't remember the details.

13   Q.        I'm talking about during this particular

14   phone call.

15   A.        I don't remember, to be honest.

16   Q.        Jumping back a hair.  Did Emily tell you

17   what led her to go to Ryan Clymer's office that day?

18   A.        Mrs. Alderfer.

19   Q.        What did she say in that regard?

20   A.        That -- that she had told Mrs. Alderfer's

21   daughter and another friend -- she did tell us that,

22   that she had told those two girls.  And I guess Mrs.

23   Alderfer had overheard it or her daughter told her.

24   So then she saw Emily in the hall or in the classroom

25   or something and said we need to go down.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.       Did Emily mention anything about Chase

2    Brunner going with her to speak to Ryan Clymer?

3    A.       No.  It was only Mrs. Alderfer.

4    Q.       And is it Allie Alderson is the daughter?

5    A.       Allie Alderfer was her name then.

6    Q.       Was that one of your daughter's friends

7    during her senior year of high school?

8    A.       Yes.

9    Q.       You were aware of that?

10   A.       Yes.

11   Q.       You mentioned that your daughter told a

12   second person.  Do you know who that was?

13   A.       I think it was Fatime and I don't know what

14   her last name is.

15   Q.       Now, we go back to the phone conversation

16   that you had with Ryan Clymer, the first one after

17   learning of these texts.  What was the end result of

18   that phone conversation?

19   A.       That he would be looking into the situation.

20   I don't know.  He may have spoke directly to my

21   husband.  I don't know if we were on speaker phone or

22   not.  That he would look into the situation.  He was

23   aware of it.  And, you know, the holiday was coming,

24   so we would hear back from him, you know, at a later

25   time.  And that Emily could -- there might have been

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    games or practices during that holiday time and Emily

 2    was not to go back.

 3    Q.        Okay.  When is the next time you recall

 4    communicating with Ryan Clymer?

 5    A.        After the holiday.

 6    Q.        Just so we're clear, there's actually two.

 7    A.        Right.

 8    Q.        Which holiday are we talking about?

 9    A.        I would say it was probably after Christmas

10    because at some point we were told that she could go

11    back to school.  So it had to have been, you know --

12    it couldn't have been right after New Year's because

13    she returned to school.  You know what I mean?

14    Q.        All right.  So was that a phone call?

15    A.        Yes, again.

16    Q.        So somewhere after Christmas, but before New

17    Year's, you think there was a second phone

18    conversation with Ryan Clymer?

19    A.        Correct.

20    Q.        Were you involved in that one?

21    A.        Yes.

22    Q.        What do you remember about it?

23    A.        That she was able to return and that they

24    were going to have Coach Romig resign.

25    Q.        Anything else you remember about that phone
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    conversation?

2    A.        I do not remember.

3    Q.        Did Coach Romig -- did -- if I said Coach

4    Romig, I meant Ryan Clymer. Anything else about that

5    phone conversation with Ryan Clymer that you recall?

6    A.        No.

7    Q.        The second one.

8    A.        It was pretty short again.  Not a lot of

9    discussion.  You know, my main concern was what was

10   going to happen to Emily.

11   Q.        Do you think that you had e-mailed him the

12   copy of that list that Emily had prepared before this

13   conversation, the second conversation?

14   A.        I don't know if it was before or after.  I

15   think we were waiting for some phone records to come

16   in and -- because my husband had pulled the -- you

17   know, the logs.  So I think that we may have sent

18   that with.

19   Q.        Did you and/or your family take any steps to

20   try to find if you could actually recover any of the

21   texts themselves as opposed to the phone bill showing

22   when texts happened?

23   A.        Yes.  Kevin -- we either called Verizon or,

24   you know, tried to get information from Verizon's

25   website to get the content.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   Q.        Do you recall what you learned in those

2   efforts?

3   A.        Needed a subpoena, I believe, if I remember.

4   I think we spoke to his divorce attorney to see what

5   her thoughts were.

6   Q.        And did you or your husband take any steps

7   beyond speaking to the divorce attorney or Verizon to

8   learn how to get the -- to get the -- the actual

9   texts?

10  A.        Kevin spoke with Henry Thompson, who had

11  given him a name of another attorney.

12  Q.        Okay.  And did your husband, to your

13  knowledge, speak to that other attorney?

14  A.        We did not.  We weren't -- we were unable to

15  make contact.  He tried.

16  Q.        He called and the attorney didn't call back,

17  you're saying?

18  A.        Correct.

19  Q.        Did you and your husband call any other

20  attorneys?

21  A.        No.

22  Q.        Did you and your husband call the district

23  attorney's office?

24  A.        No.

25  Q.        Were there any other conversations with Ryan

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Clymer before school resumed after the Christmas and

2    New Year's holidays?

3    A.      Not that I recall.

4    Q.      When school resumed after those two

5    holidays, do I understand that Emily was playing on

6    the team?

7    A.      Correct.

8    Q.      That Emily was in school?

9    A.      Yes.

10   Q.      That Eric Romig was no longer coaching the

11   team?

12   A.      That's correct.

13   Q.      Did Emily continue for the remainder of the

14   basketball season playing on the team?

15   A.      Yes.

16   Q.      All right.  Did there come a point where you

17   had some sort of communication with Ryan Clymer

18   thanking him for his efforts to deal with this

19   matter?

20   A.      It was part of a communication.  It was part

21   of an e-mail I had sent him.  That's how I closed the

22   e-mail.

23   Q.      Was that after the New Year's?

24   A.      Uh-huh.

25                   MR. RUSSELL:  That's a yes?

ANNETTE SMITH

1                    THE WITNESS:  Yes.

2     Q.       That was shortly after the New Year's

3     holiday?

4     A.         It was in January.

5     Q.       Was there a specific reason you wrote that

6     e-mail, other than to express your gratitude?

7     A.       The e-mail was -- it was the e-mail where --

8     did I send him the document that -- there were a

9     couple e-mails that I had sent him.  So I don't

10    remember which one that was.  It was either when I

11    sent him the document --

12    Q.       I'll represent to you that the one on

13    December 31st is the one where you sent him Emily's

14    list.  And that was not in that e-mail.

15    A.         Okay.  Thank you.  So it was the

16    following -- the next e-mail where we had a concern

17    because the coach was coming to the games and sitting

18    down on the floor with the girls.  And, you know,

19    that -- I closed it, thank you for your continued,

20    you know, support.  We were hoping that there would

21    still be -- the resolution was, yes, he would, you

22    know, resign.  But we were hoping to be able to, you

23    know, continue to work with Ryan.

24    Q.       Okay.  I am -- can you just clarify what you

25    mean by that?

ANNETTE SMITH

1    A.        To make sure that Emily was safe, you know.

2    You keep your lines of communication good.  I mean, I

3    would not want to, you know, not correspond that way.

4    Q.        Okay.  So tell me if I'm getting this

5    correct.  You were satisfied that Coach Romig was no

6    longer coaching the basketball team right after New

7    Year's, correct?

8    A.        Yes, correct.

9    Q.        Your concern after New Year's was not that

10   he was actually coaching the team, he was not?

11   A.        That's correct.

12   Q.        But he was going to the games and sitting

13   close to the bench?

14   A.        Correct.

15   Q.        While the games were going on?

16   A.        Correct.

17   Q.        Was his daughter still on the team?

18   A.        Yes.

19   Q.        Did Ryan respond to you about your concern

20   about having the coach either at the games or so

21   close to the bench at the games?

22   A.        I don't remember what the response was.

23   Q.        Whatever the response was, were you unhappy

24   with it, with that part of it?

25   A.        I wasn't happy with the situation.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   Q.        What part of the situation were you not

2   happy about?

3   A.        That he was still coming, was still in --

4   not in contact, but still in the environment was

5   really what I was pretty unhappy about.

6   Q.        And just so we're clear, when you say the

7   environment, you mean still allowed to go to games?

8   A.        Yes.

9   Q.        Was there anything beyond being allowed to

10  go to games that you were dissatisfied with?

11  A.        Not that I recall.

12  Q.        Did you ever express anything to anyone at

13  Faith Christian Academy that you wanted the district

14  attorney, the police, some other law enforcement

15  agency involved in this situation?

16  A.        No.

17  Q.        Do you know if your husband did?

18  A.        Not that I'm aware.

19  Q.        Do you know if your daughter did?

20  A.        Not that I'm aware.  I would think not.

21  Q.        In the -- in 2010, from the beginning of the

22  year until she graduated, did Emily ever express to

23  you any sentiments that she was unhappy with the way

24  that the Ryan -- the Eric Romig situation had been

25  handled?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   A.      Not that I remember, no.

2   Q.      Did there come a point in time when Eric

3   Romig stopped --

4   A.      Could we go back to that question?

5   Q.      Sure.

6   A.      Because maybe I wasn't thinking of it

7   correctly.  She never voiced to me that she was

8   unhappy the way it was handled.  The situation she

9   was unhappy with, the way the team treated her.

10  Q.      Okay.

11  A.      That was very uncomfortable.  And she wasn't

12  happy about that.

13  Q.      Okay.  We'll get into that in a minute.  I

14  just want to be clear.  Did she ever express to you

15  during her senior year of high school after Coach

16  Romig stopped coaching the team that she was

17  dissatisfied with how the school handled dealing with

18  Eric Romig?

19  A.      No.  She never said that.

20  Q.      You mentioned that she did express some sort

21  of dissatisfaction about how -- after the incident

22  had been handled with Coach Romig, the way she was

23  treated by some of the other girls on the team?

24  A.      Yes.

25  Q.      Was it the whole team, part of the team?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    A.        It was pretty much the whole team.

 2    Q.        And did she tell you what she was unhappy

 3    about in that regard?

 4    A.        The way they treated her, on court, off

 5    court.

 6    Q.        Let's talk about how they treated her off

 7    court.

 8    A.        Off court, nobody really talked with her

 9    much anymore.  The people that were her close friends

10    really didn't have a lot to do with her.

11    Q.        Who were her close friends on the team?

12    A.        Chelsie, Ashley -- was it Ashley?  Makowski

13    was her last name.  Becca.  Just remembering first

14    names, sorry.

15    Q.        That's fine.

16    A.        There was a girl that lived close to us and

17    for the life of me I can't remember her first name.

18    But I know her sister's name was Sarah.  And she was

19    very close with Coach Romig and with Chelsie, as

20    well.  So those were -- it's such a small school and

21    the grade was so small.  It's not like you had your

22    basketball friends and other friends.  That was your

23    friends.

24    Q.        Aside from not talking to Emily, was there

25    anything else that Emily was upset about with how
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    these girls were treating her?

2    A.        Not that I remember.  I don't remember

3    details.

4    Q.        Did she relate anything about any specific

5    act -- affirmative acts that they did to her?

6    A.        No.  Not off the court.

7    Q.        Now, on the court, you expressed that she

8    told you that she had some problems with the way they

9    treated her on the court.  What did she tell you?

10   A.        She told us and we watched -- I mean, nobody

11   would pass her the ball.  She was, you know, a pretty

12   high scorer.  She was generally in the Reporter for

13   her playing.  And it was very obvious that they --

14   you know, they were not including her in the play.

15   Q.        And did you or she talk to the coach, the

16   new coach about that?

17   A.        I don't remember if we did.  I don't think

18   so.

19   Q.        Do you recall the coach expressing any

20   concern about how the team was playing and basically

21   they only had four players on offense?

22   A.        No.  There were no discussions about it.

23   Q.        Okay.  Did the nature of her relationship

24   with the other girls on the team change during the

25   remainder of her senior year?  You told me that they

ANNETTE SMITH

1   basically stopped talking to her.  Did that change?

2   A.      It did get -- I mean, it got a little bit

3   better and she was able to finish the year.

4   Q.      Was there anything specific that you became

5   aware of in terms of her relationship with Chelsie

6   Romig, communications that they had with each other?

7   A.      No.

8   Q.      Did her relationship with Chelsie Romig ever

9   change, to your knowledge?

10  A.      No. It --

11  Q.      It went down and didn't come back?

12  A.      It never came back.

13  Q.      All right.  Are you -- are you aware prior

14  to learning that Eric Romig had been arrested, that

15  you, your husband, your daughter, anybody else in

16  your family wanted to go to the police about Eric

17  Romig?

18  A.      No.

19  Q.      Or to the district attorney?

20  A.      No.

21  Q.      Or that any of you wanted Faith Christian to

22  report anything about Eric Romig to government

23  authorities of any kind?

24  A.      I mean, we assumed when we went to the

25  school that that would have been the course of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    action.  But it didn't happen that way.  And the

2    resolution was that he was going to, you know, resign

3    and that -- I don't remember if he said specifically

4    that they didn't have to report.  But it just -- that

5    did not happen.

6    Q.       Okay.  I just want to clarify something you

7    said a moment ago.  You said you assumed that Faith

8    Christian would report to some sort of government

9    agency about your daughter's texting interactions

10   with Eric Romig?

11   A.       Correct.

12   Q.       What did you base that assumption on?

13   A.       That -- that's what you do, you know, if you

14   have a situation like this, you know, with a minor,

15   that it would be reported to authorities.

16   Q.       How did you know that?

17   A.       I don't know that -- how I knew it.  It

18   wasn't, like, something I read.  But, you assume that

19   that's --

20   Q.       That's your assumption?

21   A.       Right.

22   Q.       Did you ever ask Ryan Clymer if he had done

23   that?

24   A.       In that second conversation?

25   Q.       Ever.

Appendix 0685

ANNETTE SMITH

1    A.        No.  In the second conversation, he told us

2    that he had a discussion with someone, whether it was

3    a -- I don't remember if it was a police officer or

4    a --- somebody with Bucks County.  He had a discussion

5    with them and they were told that they didn't have to

6    report or something to that effect.

7    Q.        That's something that you understand Eric --

8    Ryan Clymer told you?

9    A.        In that second phone conversation.

10   Q.        Did you tell him that that was not

11   acceptable to you?

12   A.        No.

13   Q.        Do you know if your husband said that was

14   unacceptable to him?

15   A.        No.

16   Q.        Did your daughter say that that was not

17   acceptable to her?

18   A.        No.

19   Q.        Did you or your husband feel it was for you

20   to report it to any state or local government

21   authorities about anything pertaining to Eric Romig's

22   texting relationship with your daughter?

23   A.        No.

24   Q.        Some time in 2013, you learned that Eric

25   Romig had been arrested?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   A.        (Witness nods head.)

2   Q.        How did you learn that?

3   A.        Newspaper.  Well, on-line paper.

4   Q.        And at that point, did you contact any

5   government -- any police or government authorities?

6   A.        In the article, they asked if you had any

7   information and, you know, to contact these two

8   detectives, so that's what my husband did.

9   Q.        Your husband did that?

10  A.        Yes.

11  Q.        Are you aware what your husband told the

12  detectives?

13  A.        I don't know the conversation, no.

14  Q.        Did you ever speak to the detectives?

15  A.        Only when we met with them, which was after

16  that.

17  Q.        And you say we, who is we?

18  A.        My husband and Emily and I had a meeting

19  with two detectives.

20  Q.        Was it one meeting?

21  A.        Yes.

22  Q.        Was that shortly after you learned that Eric

23  Romig had been arrested?

24  A.        Yes.

25  Q.        What do you remember about that meeting?

ANNETTE SMITH

1   A.        We went to meet them in Langhorne and they

2   went through the -- kind of the same questioning with

3   Emily, you know, what -- you know, the time line,

4   what took place.  I don't remember if Emily brought

5   even the documentation that we had given Faith.  I

6   can't remember.  And we sat with them for maybe an

7   hour or so.  They didn't really question me very

8   much.

9   Q.        Do you remember what they asked -- they --

10  most of the questioning was to your daughter?

11  A.        That I remember.

12  Q.        Do you remember what they asked her and what

13  she told them?

14  A.        Basically the time line of events, what

15  happened.  They did ask her about content, you know,

16  could she recall the content.

17  Q.        Do you know if she wrote something up for

18  them?

19  A.        I don't know if she wrote something

20  different or if she brought the document that we

21  have.  I don't remember.

22  Q.        I'll represent to you that there's actually

23  a different document that was supplied.

24  A.        Okay.

25  Q.        Do you know if any of the three of you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    advised the detectives that the document from 2009

2    had been made?

3    A.        I don't remember.

4    Q.        Is that something that's still in your

5    family's records?

6    A.        I would --

7    Q.        The ones she did when you learned of the

8    texting incident.

9    A.        I would think it's somewhere on a hard

10   drive.

11   Q.        Was there any other interactions with the

12   investigators after Eric Romig's arrest of your

13   daughter or you and your husband?

14   A.        No.

15   Q.        By the time that your daughter graduated,

16   which was the spring of 2010, did you feel that Ryan

17   Clymer had done anything wrong in terms of how he

18   handled the situation with Eric Romig?

19   A.        I didn't really think about it.  You know,

20   the issue was done and closed.  And we just really

21   wanted Emily to graduate and get away from the

22   environment, get away from the situation and kind of

23   move on.

24   Q.        And has your husband ever told you that he

25   felt that Ryan Clymer didn't do anything -- did

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    something improper or didn't handle the situation

2    properly in some manner?

3    A.        I don't know that we had conversations.  I

4    mean, you know, the situation was what it was and we

5    trusted what he said, you know, that this person,

6    whether Bucks County police officer or someone,

7    advised him that, you know, he didn't have to report,

8    so we kind of trusted it.  You know -- you know in

9    your own mind -- I mean Emily was 17, I guess almost

10   18, so, you know, in your own mind, well, she's not

11   16, she's not before 16, she's not a minor, you know,

12   what -- what really had to take place, what -- we

13   just didn't know.

14   Q.        Did you have a specific understanding back

15   in 2009 and 2010 of what type of events, what had to

16   be reported or required to be reported to state

17   agencies or local agencies?

18   A.        I did not.

19   Q.        And do you know if your husband did?

20   A.        I don't know.

21   Q.        Your husband was involved in law enforcement

22   for a while before all this happened?

23   A.        Before I knew him.

24   Q.        Are you aware if he contacted anybody he

25   knew in law enforcement to figure out the answer to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    that question as far as what was required?

2    A.        I don't believe so.

3              MR. KEMETHER:  I don't think I have

4    any further questions, but some of the other

5    attorneys will.  Thanks so much.

6              THE WITNESS:  Thank you.

7                     * * *

8                  EXAMINATION

9    BY MR. RUSSELL:

10   Q.        Miss Smith, my name is Jonathan Russell and

11   I represent the Faith Christian defendants.  And I do

12   have some questions for you that I want to go

13   through.

14             You had indicated that you are employed

15   at Merck.  Is that right?

16   A.        That's correct.

17   Q.        And you're actually a communications

18   specialist.  Is that accurate?  Or something like

19   that?

20   A.        No.  I'm a senior -- it's called a senior

21   specialist.  We have job categories.  And I'm a grant

22   coordinator.

23   Q.        I just saw -- just on some information that

24   you were awarded as communications and project

25   manager lead across several divisions, so some aspect

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    of your job involves communication?

2    A.        That was an appointed role.  I was the

3    communications lead for the women's employee resource

4    group.  It was a two year role.

5    Q.        And as part of that, you were responsible

6    for developing and implementing a multi-faceted

7    annual communication plan?

8    A.        Correct.

9    Q.        So you had skills in communicating.  Would

10   that be accurate?

11   A.        Correct.

12   Q.        Do you still have those skills?

13   A.        Yes.

14   Q.        It said you also -- this is, I assume,

15   something that you presented, but you seek new and

16   innovative ways to communicate with and grow the

17   global marketing -- I'm sorry -- global membership of

18   4300 employees?

19   A.        Correct.

20   Q.        So you're trying to allow communication

21   between those 4300 employees?

22   A.        Yes.

23   Q.        And I think you touched on this.  That you

24   removed her from -- Emily from Calvary mid year.  You

25   didn't want her to finish that year.  And that was

ANNETTE SMITH

1    because -- had basketball just ended and you thought

2    that was a good time to make the change?  Or what was

3    the thinking?  Why not wait until the end of the

4    year, why do it mid year?

5    A.       Basketball had ended and she was really

6    pretty unhappy and pretty miserable.  You know, she

7    had been sick that year, I think earlier in the year.

8    Every year Emily kind of gets mono at the same time.

9    And when she returned, some of the girls were pretty

10   mean about it.

11   Q.       Okay.

12   A.       It was just really not a healthy environment

13   and had enough to pull her out.

14   Q.       And then you said you didn't want her to

15   continue at Upper Perk because she was hanging around

16   with some friends that you didn't find acceptable and

17   she was lying to you?

18   A.       That's correct.

19   Q.       Did she -- when -- when she went on to

20   Faith, did she continue to deceive you in any way

21   with regard to her behavior at Faith?

22   A.       No.

23   Q.       At Faith, did you know about the party that

24   she went to after --

25   A.       No.  That was --

ANNETTE SMITH

1    Q.          -- the banquet?

2    A.          I'm sorry.  That was the one thing that she

3    was dishonest about there.

4    Q.          Was that the last time that she was

5    dishonest with you?

6    A.          Yes.

7    Q.          Now, if you didn't want her to continue at

8    Faith Christian, you could have pulled her out like

9    you did at Calvary, right?

10   A.          At what point?

11   Q.          At any -- say if you -- like unhappy, you

12   know, the coach is inappropriately texting her, let's

13   pull her out.  That was something that you would make

14   the decision or you and your husband?

15   A.          Right.  We would have made the decision.  I

16   mean, sports was a really big thing for Emily.  And

17   if -- our options were to pull her out and home

18   school her.  And that would have --

19   Q.          Just trying to think it through.  You're

20   paying tuition to Faith, right?

21   A.          Yes.

22   Q.          You're paying for them to educate your

23   child?

24   A.          Yes.

25   Q.          So if you were -- you know, it's one thing

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   if you're in public school, I guess, you know, you're

2   paying through taxes, but there you're actually

3   paying them.  But you had the ability to just yank

4   her out and say I'm not going to pay tuition to the

5   school if they're handling it this way, right?

6   A.        Right.

7   Q.        Now for a period of time Emily did live with

8   her biological father.  When was that?  From when to

9   when?

10  A.        We had shared custody.

11  Q.        So what type of arrangement was that?

12  A.        She would be with me and Kevin during the

13  week and then she'd go down to her dad's on the

14  weekend.  And that happened really from the

15  beginning, you know, when we were divorced through

16  probably 2007, 2008.

17  Q.        And what changed then?

18  A.        She had asked to live with us.  It was an

19  environment she didn't want to be in.

20  Q.        What was your understanding of that

21  environment?

22  A.        My ex-husband had a girlfriend, long time

23  girlfriend that he was with.  And there were three

24  other children there.  They were kind of the

25  priority, Emily was not.  And, you know, she was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    sad -- you know, she'd go down on the weekends and

2    everything surrounded the boy sports.  If Emily had

3    games, she was dropped off and everybody went to the

4    boy sports.

5    Q.        I think your husband when he was deposed, he

6    said he didn't feel that Emily felt she was getting

7    the attention she deserved.  Would that be an

8    accurate statement?

9    A.        That's correct.  And I think it was more

10   than that.  You know, the -- the love wasn't there,

11   you're not feeling, you know, very cared for.

12   Q.        Did she ever do anything that you felt was

13   to gain attention in any way?

14   A.        No.  There was more -- it wasn't only the

15   sports aspect down there.  There was a girl that

16   lived there.  You know, she would take Emily's

17   clothes, the girlfriend wouldn't correct the

18   situation.  So there was a lot, you know, going on.

19   Q.        So she just didn't feel that that was a good

20   place where she wanted to be?

21   A.        Right.

22   Q.        How would you characterize the relationship

23   between you and the administration at Faith Christian

24   Academy before this e-mail inappropriateness came to

25   light?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.        I mean, I guess it was okay.  We didn't

2    really have a lot of interactions.  I mean, other

3    than the banquet situation.  And Ryan was very, you

4    know, open about what happened and what he would do

5    and I liked Pastor Ron and my interactions.  I'm

6    not -- at that point in time Emily was a junior,

7    senior, I'm not there all the time.  You know, I

8    wasn't a volunteer there.  So, I didn't -- there

9    wasn't a lot of interaction with the administration.

10   Q.        And did that relationship change at all

11   after this incident came to light?  Did you feel that

12   your relationship -- you would characterize it any

13   different?

14   A.        Yeah.  I would say it was different.  I

15   think we were pretty put off by the way we were not

16   given the attention that we felt we would have -- or

17   should have gotten.  I mean, we had two phone

18   conversations, very difficult to get those scheduled,

19   we did feel kind of put off and, you know, not

20   addressed.  So it was -- --

21   Q.        One thing that I learned in going through

22   this, it didn't seem like anyone ever closed the

23   communication loop with you.  And I don't think that

24   you may not have been aware what Ryan did, but it

25   doesn't sound like -- and I'll find out as I ask you

ANNETTE SMITH

1    some questions.  But would that be an accurate --

2    that you didn't feel that you were informed of the

3    investigation process?

4    A.        Right.  Right.  I mean, I don't think we

5    were informed of any of that at all.  And I think as

6    a parent, you know, I don't have to know your

7    confidential details, but I think we should have been

8    more in the loop other than just she can come back

9    and he's not here.  So it left a bad taste.

10   Q.        Did you ever conclude that Ryan Clymer

11   should have done something differently than what he

12   had informed you that he did?  What were your

13   expectations that he would have done, if you had any,

14   than what was communicated to you?

15   A.        I don't know that I would have had an

16   expectation that he would have done any particular

17   thing.

18   Q.        What about --

19   A.        Other than resolve it for my daughter.

20   Q,        And did you feel it was resolved for your

21   daughter?

22   A.        Yes.

23   Q.        Because they, too, found that the -- at

24   least the volume of text messages were clearly

25   inappropriate and Mr. Romig was no longer able to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    coach, right?

2    A.          Correct.

3    Q.          What about you and your husband, did you

4    conclude that you and your husband should have done

5    something or anything different than what you did as

6    a result of this incident?

7                    MR. GROTH:   At what point?

8    Q.          At any point, in retrospect.

9    A.          At the time, no, with all the information

10   that we knew and understood.   In hindsight, would you

11   like me to answer that?

12   Q.          Sure.   Let's do it both ways.   But at the

13   time you didn't feel that you or your husband needed

14   to do anything different.   And at what point did that

15   change?

16   A.          I mean, it changes now, you know, when you

17   know what continued to happen.   I would have driven

18   to the school that day, I would have been in his

19   office, I would have been demanding of his time and

20   his attention.   I would have been more involved to

21   know what -- what are you doing.

22   Q.          And what changed for you in that regard to

23   make that distinction?

24   A.          That some other child was, you know, taken

25   advantage of by him.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.        And by that other child, you mean Elizabeth

2    Nace?

3    A.        Yes.

4    Q.        And that's the student at Pennridge?

5    A.        Correct.

6    Q.        Did you ever tell -- you may have been asked

7    this, but maybe not this way.  Did you ever tell Ryan

8    Clymer or anyone else at the school that you thought

9    that they handled the investigation improperly?

10   A.        No.

11   Q.        If you felt the investigation wasn't being

12   handled properly at the time, would you have told

13   someone?

14   A.        Yes.

15   Q.        Now, your husband was a former Montgomery

16   County detective and that was before you were married

17   to him, correct?

18   A.        Correct.

19   Q.        Do you know if he still maintained any

20   contacts at the Montgomery County district attorney's

21   office?

22   A.        Not that I was ever aware.

23   Q.        And he's also an IT specialist, right?

24   A.        Correct.

25   Q.        And part of the issue here was trying to get

ANNETTE SMITH

1    the text messages off of Emily's cell phone, right?

2    A.       Correct.

3    Q.       And you also spoke to -- at least he --

4    Kevin spoke to his attorney.  Is that right?

5    A.       That's correct.

6    Q.       Do you know if he talked to the attorney

7    about what was disclosed in these messages?

8    A.       I don't know.  I wasn't part of the

9    conversations.

10   Q.       Do you know whether the attorney ever told

11   him that he needs to go and report this to the police

12   or he needs to go and report it to the district

13   attorney's office?  He, being Kevin.

14   A.       I don't -- I don't recall.

15   Q.       Did you feel that Ryan Clymer was responsive

16   to your request during the investigation?

17   A.       I mean, I guess he was.  It wasn't, you

18   know, the way you would professionally want it to be,

19   you know.

20   Q.       But was he responsive enough to your

21   satisfaction?

22   A.       Yes.

23   Q.       Were there any requests of yours that Ryan

24   Clymer did not respond to?

25   A.       I mean, the coach still being at the games

ANNETTE SMITH

```
 1    and sitting on the floor was really an issue for me.
 2    I realized that he had a daughter there.
 3    Q.        Sure.
 4    A.        It's a tough situation.  I think I would
 5    have wished that that would have been handled
 6    differently.
 7    Q.        How would you have liked to have seen that
 8    handled?
 9    A.        I would have liked to have seen him not be
10    able to see the games.
11    Q.        At all?
12    A.        At all.
13    Q.        Regardless of whether his daughter was on
14    the team?
15    A.        Right.
16    Q.        Did you believe that Ryan Clymer or anyone
17    at FCA ever concealed anything which was later
18    revealed, either in news media or paper or from
19    communications with Attorney Groth?
20    A.        They didn't conceal anything because we
21    didn't have conversations.
22    Q.        I mean later, after this came out, the
23    situation with Elizabeth Nace and maybe whatever you
24    read in the paper and said, oh, Faith Christian knew
25    something else and they didn't disclose that?  Did
```

ANNETTE SMITH

```
 1    you ever have that impression or --

 2    A.        I didn't think of it, no.

 3    Q.        As far as you know, Faith Christian Academy

 4    has never concealed anything to you regarding their

 5    investigation?

 6    A.        They never shared anything about the

 7    investigation.

 8    Q.        I'll get into that in a little bit.  Ryan

 9    Clymer has been deposed already and I just want to

10    gain an understanding of whether this refreshes your

11    recollection at all concerning the dynamics.  And

12    it's about getting the content of the e-mails.

13              It said -- he was asked, did you ask him,

14    meaning Kevin Smith, your husband, to get the

15    content.  And Ryan's response was, I did ask him to

16    get the content.  And then the question was, did you

17    ask him why he didn't get the content.  And then his

18    answer was, he told me he had to subpoena the records

19    to get them.  And he said he's willing to do that,

20    but pretty much the same thing Mayer said, as well,

21    they both said they were going to do it and never

22    did.  Didn't Mr. Smith tell you that in order to get

23    the actual texts, he would need a subpoena.  And

24    answer was, who would need a subpoena, Mr. Smith.

25    Question, Mr. Smith.  Answer, absolutely, yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

60

1              And then the question was, and didn't he

2    tell you that the only way to get a subpoena is to

3    get an outside agency that can issue a subpoena to do

4    that.  Answer, no.  He said the way you do it is you

5    have to go to the police, bring up a charge and then

6    subpoena them.

7              Question, okay.  Did you do that.

8    Answer, he said he was going to do that.  And then

9    the question again was, he said he was going to do

10   that.  The answer was yes.

11             Did your husband ever indicate he was

12   going to go to the police and try to get them to pull

13   up the texts?

14   A.        No.

15   Q.        Did you ever communicate to Ryan Clymer that

16   you were going to try to get the texts?

17   A.        Not that I recall.

18   Q.        And you guys had the phone, right?

19   A.        Correct.

20   Q.        You never gave the phone to Ryan Clymer and

21   said, look, here's the phone, try to get these texts?

22   A.        No.

23   Q.        Did you believe -- and even as I read this

24   now -- that Ryan Clymer was of the impression that if

25   this investigation was to go further, you or your

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1   husband was going to get the actual texts messages?
 2   A.       Can you repeat that again, please?
 3   Q.       Sure.
 4                    MR. RUSSELL:  What did I say?
 5                (Whereupon, the reporter read back the
 6   referred-to portion of the record.)
 7   A.       We were never going to get the text
 8   messages.
 9   Q.       And why was that?
10   A.       I mean, because we were -- Ryan was handling
11   it, so.
12   Q.       But understanding that he had to handle the
13   part -- component with the school, but he can't get
14   the text messages from your daughter's phone.
15   A.       Right.
16   Q.       And you had your daughter's phone?
17   A.       Right.  I'm sorry.
18   Q.       So what we're trying to find out through
19   here, there seems to be one piece that was not able
20   to be completed and that was getting the actual text
21   messages.  At any time -- does this refresh your
22   recollection, too -- did you indicate to Ryan that
23   you or your husband were going to be trying to get
24   those actual texts messages?
25   A.       I don't know.  I did not communicate that to
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    him.   Maybe Kevin communicated that.   But I don't

2    know.

3    Q.        In fact, Ryan said he did follow up with Mr.

4    Smith to see if he ever did that.   And then he says,

5    I think it was the end of January, beginning of

6    February, he said that they still hadn't.   Things had

7    gotten better between Emily and the girls on the

8    team.

9             Do you remember things getting better

10   between Emily and the girls on the team?

11   A.        That never happened.

12   Q.        It did not?

13   A.        (Witness shakes head.)

14   Q.        But you don't know whether your husband may

15   have said that -- told that to Ryan?

16   A.        I'm quite certain he didn't.

17   Q.        And why are you quite certain?

18   A.        Because we didn't have any more

19   communications.

20   Q.        And then he also testified, at the end of

21   January, the beginning of February, I said, Mr.

22   Smith, how are things going.   And he said, Annette

23   and I -- this is Ryan -- Annette and I had been

24   communicating via e-mails about different things that

25   were going on.   And he said, things have calmed down,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Emily's -- you know, things are better, we're holding

2    off right now, but we'll probably -- may still get

3    the records.

4                    Do you remember any discussion about

5    trying to get those text messages?

6                         MR. GROTH:  Can you tell us what

7    pages you're on?

8                         MR. RUSSELL:  Sure.  This is Page

9    137 through 141.

10                        MR. GROTH:  Thank you.

11                        MR. RUSSELL:  Of Ryan Clymer's

12   deposition.

13   BY MR. RUSSELL:

14   Q.         And then the question was, how was that

15   finally resolved.  And the answer was, how was what

16   finally resolved.  Question, the issue of trying to

17   get the content of these records, these text records

18   with a subpoena.  Was it just dropped or did Mr.

19   Smith say to you that he just decided not to or did

20   you tell him not to bother, how was it resolved.  And

21   the answer was, no, I didn't tell him not to bother,

22   it was kind of, like, I guess he didn't.  I asked Mr.

23   Romig again back in January.  He said he was going

24   to.  And then I followed up with Mr. Smith, which was

25   at the beginning of February, end of January, some

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    time at the end of basketball season, whenever that

2    was.  He still didn't know what he was going to do

3    from his standpoint.  The next time I talked with the

4    Smiths in person was after graduation; I believe.

5    And that was the last time that Kevin and I had

6    spoken.  I think Annette was there, as well.  And

7    they just thanked me for everything that I had done

8    in the investigation for their daughter.

9              Does that refresh your recollection at

10   all?

11   A.        None of that ever occurred.

12   Q.        Did you ever have a conversation with Mr.

13   Clymer at graduation?

14   A.        No.

15   Q.        Do you know why you didn't pursue getting --

16   trying to get the text messages from the phone that

17   you had of your daughter's?

18   A.        I don't remember specifics of why we didn't.

19   I know that we couldn't get them through Verizon.

20   You would have to have a subpoena.  And, you know, he

21   had tried the one angle with the one attorney and

22   that didn't work out.  And because it wasn't -- you

23   know, it wasn't going to be reported, then, you know,

24   it didn't have to be reported.

25   Q.        Did you know that you could report it if you

1    wanted to?

2                    MR. GROTH:   Object to the form.

3    Q.        At that time.   You can go ahead and answer

4    it.

5    A.        So did I know at that time?

6    Q.        That you could report it.

7    A.        I mean, I guess I did.

8    Q.        And your husband was a former Montgomery

9    County detective, right?

10   A.        Uh-huh.

11   Q.        Yes?

12   A.        Yes.

13   Q.        You had indicated that you sent an e-mail

14   and you wanted to try to keep the lines of

15   communication open with Ryan and that's why you were

16   thanking him at that time.   Is that right?

17   A.        That's correct.

18   Q.        And did you feel that those lines of

19   communication remained open throughout the course of

20   Emily's continuation of her school career there at

21   Faith?

22   A.        I mean, I guess they would have if we needed

23   to communicate.   But there was -- there was no

24   communication.

25   Q.        And the one -- this does seem like a