ANNETTE SMITH

1    communication issue.  Apparently from Mr. Clymer's

2    perspective, at least from what I read, he was

3    thinking that you or your husband were going to get

4    the content of the text messages and you were

5    thinking he was going to be doing something else.

6    Would that be accurate?

7    A.       I don't know that he ever -- we ever told

8    him that we were going to get the content and that we

9    would get back to him.

10   Q.       But he couldn't get the content because he

11   didn't have the phone.

12                  MR. GROTH:  Object to the form of

13   the question.

14   Q.       Is that right?

15   A.       Say again.

16   Q.       He didn't have the phone?

17   A.       No.  That's correct.

18   Q.       And we've learned later that Verizon

19   probably didn't even have the content on there, you

20   would have to get the content by an IT specialist

21   from the phone?

22   A.       I guess.

23                  MR. GROTH:  Object to the form of

24   the question.

25   Q.       Did Ryan ever tell you that -- let me back

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    up a second.

2              Did Emily ever tell you that she had

3    suspicions about a former student, Lauren Fretz,

4    being involved with Mr. Romig?

5    A.        At what point did she --

6    Q.        At any point and then --

7    A.        I mean, after the fact.

8    Q.        After what fact?

9    A.        After the situation occurred, she told me

10   about it.

11   Q.        And which -- after it came to light about

12   Elizabeth Nace or after it came to light about the

13   inappropriate text messages?

14   A.        I don't remember specifically the time

15   frame.  Sorry.

16   Q.        But she did tell you that she thought that

17   Lauren Fretz might have had an inappropriate

18   relationship with Coach Romig?

19   A.        Yes.

20   Q.        And did you ever learn that Ryan Clymer

21   contacted Lauren Fretz?

22   A.        No.

23   Q.        So no one ever told you that he contacted

24   her and she said -- she denied that there was

25   anything ever inappropriate between the two of them?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.        No.

2    Q.        Did Emily ever tell that you she thought

3    there might be something inappropriate with Kristen

4    Kennedy, a former student, as well?

5    A.        I don't remember us talking about her

6    because I don't know her.

7    Q.        Okay.  Did Ryan Clymer ever tell you that he

8    contacted Kristen Kennedy and his testimony is that

9    she told him that nothing inappropriate ever happened

10   between the two of them at school while she was a

11   student?

12   A.        No.  He never told us.

13   Q.        Kristen Kennedy has already been deposed and

14   she stated that she was never touched inappropriately

15   by Coach Romig and she stated that she never felt

16   that she was the victim of sexual abuse by Coach

17   Romig.  But you didn't know any of that information,

18   right?

19                   MR. GROTH:  Object to the form of

20   the question.

21                   You can answer.

22   Q.        Did you know any of that information?

23   A.        No.

24   Q.        Were there -- what efforts, that you know

25   of, were made by either you or your husband to obtain

ANNETTE SMITH

```
 1    the actual text messages, the content?
 2    A.       He had contacted Verizon and he had this
 3    lead from Coach Henry --
 4    Q.       For an attorney?
 5    A.       For this attorney that -- I don't know if
 6    she had experience with Verizon or what the situation
 7    was.
 8    Q.       Did someone call that attorney one time?
 9    A.       I think he called her a couple times and
10    just didn't get back.  And then I think he followed
11    up with Coach Henry, too, and he didn't get back.
12    Q.       Anything else other than that?
13    A.       No.
14    Q.       Why not?
15    A.       I guess because the situation -- you know,
16    there was no reporting going to be done.
17    Q.       But you could report.  I mean, if you wanted
18    a report to be done, you could report it, right?
19    A.       Right.  Yes.
20    Q.       Why didn't you report it?
21    A.       Because we believed that it didn't have to
22    be reported.  We believed that -- we believed what
23    Ryan said.
24    Q.       Did you ever follow up with Ryan to find out
25    if -- strike that.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1              And after this incident occurred, why did
 2    you allow Emily to continue at FCA?
 3    A.        Because our options were to pull her out,
 4    home school her.  She only had, what, five months
 5    left, maybe.  If we pulled her out, there would be no
 6    sports.  At that time she really was a very good
 7    basketball player.
 8    Q.        But you could have pulled her out after the
 9    end of the basketball season like you did at Calvary,
10    right?
11    A.        Right.  But it was her senior year.  We
12    wanted her to graduate.  I wasn't going to do another
13    transition, you know, for a two month period of time.
14    Q.        But her diploma would be from Faith
15    Christian Academy, right?
16    A.        If we had pulled her out?
17    Q.        No.  If you keep her there.
18    A.        Right.
19    Q.        If you had -- I mean, if you harbored bad
20    feelings towards the school, she's going to have that
21    as her diploma, right?
22    A.        That's correct.
23    Q.        Did you ever contact Children and Youth
24    concerning this incident?
25    A.        No.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.        And why not?

2    A.        Because we didn't -- we were working through

3    Ryan, you know, with Ryan.  That's how we --

4    Q.        Did you know that you could independently

5    report this if you felt that you wanted to?

6    A.        I don't know that I knew that at the time,

7    to be honest.  I mean, this wasn't something that we

8    had dealt with and I don't know the law.

9    Q.        But your husband was a former detective,

10   right?

11   A.        Uh-huh.

12   Q.        That's a yes?

13   A.        That's correct.

14   Q.        Did Emily ever tell you that she didn't want

15   this reported to the police?

16   A.        Yeah.  She really pretty much wanted

17   everything to kind of go away.  She wanted to play

18   basketball, she wanted to get on with, you know, her

19   life.

20   Q.        Did she specifically tell you that she

21   didn't want you to report it or take it further?

22   A.        I don't remember the full conversations.

23   But, you know, she really just wanted it to be done.

24   Q.        If she wanted that, was your expectation

25   that the school would do something beyond what she

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    wanted?
 2                    MR. GROTH:   Object to the form.
 3              You can answer.
 4    A.        Sorry?
 5    Q.        I'm just saying, you indicated that Emily
 6    didn't want it to be reported further, but you had
 7    certain expectations that the school would do it
 8    anyway.  Is that what you're saying?
 9    A.        I mean, if it was the appropriate thing and
10    that had to be done, then Emily, I'm sorry, you know,
11    this has to be done.
12    Q.        But you didn't feel that it was the
13    appropriate thing to report yourself or for Kevin to
14    report it?
15    A.        I don't know that it was whether it was
16    appropriate or not.  It was just --
17    Q.        As a parent -- I'm a parent, too -- and if I
18    felt that my daughter was being -- did you feel that
19    your daughter was being sexually abused?
20    A.        I felt --
21                    MR. GROTH:   Object to the form.
22    Q.        You can go ahead and answer.
23    A.        I'm sorry.  Felt like she was being taken
24    advantage of by a coach.
25    Q.        Sexually?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   A.        Yeah, you could say it was sexually.

2   Q.        And I'm just wondering as a parent, if I

3   felt that way and I didn't feel that something

4   further was being taken or being accomplished by the

5   school, you know, I'd probably pull my kid out of the

6   school and I'd report it myself.   And I'm just

7   wondering why not on your end with that.

8                MR. GROTH:   Object to the form.

9   It's been asked and answered, like, eight times.

10               But go ahead.

11  A.        Because we trusted what Ryan said.   It's

12  not -- we don't have to report, you know.   That's why

13  we --

14  Q.        He may not --

15               MR. GROTH:   Finish your answer.

16  You're sort of trailing off at the end of a sentence.

17               THE WITNESS:   Okay.   I'm sorry.

18  A.        So that's why we didn't report, was we

19  trusted what the school -- you know, what his

20  investigation, if you want to call it that, we

21  trusted what he -- the information that he gave us.

22  Q.        Did you ever ask him what his investigation

23  revealed?

24  A.        No.   We didn't have many conversations with

25  him.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

74

1    Q.      I know, but I'm asking -- I'm not asking

2    whether he contacted you, I'm asking whether you

3    contacted him and said, hey, what has your

4    investigation revealed?

5    A.      No.

6    Q.      Why not?

7    A.      We didn't.  No particular reason.  You're

8    dealing with a tough situation.  And we didn't --

9    didn't ask.

10    Q.      And just because on the flip side we have

11    the -- Elizabeth Nace's parents, they didn't go to

12    Pennridge, they went directly to the Pennridge

13    Regional Police.  And I just wondering why you and

14    Kevin didn't go directly to the police department and

15    you've answered that.

16           Emily turned 18 during the investigation

17    that Ryan was conducting, correct?

18    A.      Correct.

19    Q.      Her date of birth is 12/29/91?

20    A.      Correct.

21    Q.      And so when you sent that e-mail that had

22    the list that Emily had prepared for you, that was

23    after she turned 18, right?

24    A.      I mean, she typed it up before.

25    Q.      But it wasn't communicated to Mr. Clymer

ANNETTE SMITH

1    until after she turned 18?

2    A.        Right.   That was the date I sent it.

3    Q.        Did you encourage Emily to go to the police

4    with her concerns?

5    A.        No.

6    Q.        Even though she was an adult at that time?

7    A.        No.

8    Q.        In 2009 and 2010, did Emily ever tell you

9    that she was inappropriately touched by Mr. Romig?

10   A.        No.

11   Q.        At any time in 2009 or 2010, did you believe

12   that Emily was the victim of serious bodily injury?

13   A.        No.

14   Q.        At any time in 2009 or 2010, did you believe

15   that Mr. Romig was attempting to persuade, induce,

16   entice or coerce Emily to engage in sexually explicit

17   conduct?

18   A.        2009, 2010?

19   Q.        Yes.

20   A.        After it came to light, yes.

21   Q.        And what specifically did you believe that

22   he was doing to try to persuade her, induce her,

23   entice her, coerce her to engage in sexually explicit

24   conduct?

25   A.        By the way he was texting her.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

76

1    Q.       Which text in particular?

2    A.       I want to be in you.  Texting a girl at

3    night.  All the things that she kind of detailed out,

4    yeah, I think he was trying to persuade her.

5    Q.       And did you believe that what your daughter

6    was telling you to be true?

7    A.       Yes.

8    Q.       Did you ever have any discussion with anyone

9    that Mr. Romig might try to sue you for defamation or

10   slander?

11   A.       No.

12   Q.       Was that ever an issue that you discussed

13   with anyone?

14   A.       Not me personally, no.

15   Q.       Did you ever ask your daughter as to why she

16   deleted all the texts?  I know you have an

17   explanation that you thought it was to save space.

18   Was that ever told to you specifically by Emily?

19   A.       No.  I think she was uncomfortable.

20   Q.       When your daughter gave her testimony --

21   deposition testimony, she indicated that she was

22   unsure whether anybody would believe her, which led

23   me to ask, well, why not keep some of the texts to

24   prove the content.

25            Did you ever ask her if -- did she ever

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1   tell that you she was concerned that no one would

 2   believe her?

 3   A.        I don't remember us talking about that.

 4   Q.        Do you know how many texts your daughter

 5   sent back to Mr. Romig?

 6   A.        I don't remember the number.

 7   Q.        Was it over a thousand?

 8   A.        Probably close to a thousand.

 9   Q.        And I read you a portion of Mr. Romig's --

10   Mr. Clymer's deposition.  But it's your recollection

11   as you sit here today that you never had kind words

12   for Ryan at Emily's graduation?

13   A.        Never.

14   Q.        Did you harbor ill feelings toward him at

15   that time?

16   A.        No.  I just wanted to be out of the

17   environment.

18   Q.        Since Emily's graduation, who have you

19   spoken to about the texting issue involving Emily and

20   Mr. Romig?

21   A.        Since her graduation?

22   Q.        Since her graduation.

23   A.        Nobody really.

24   Q.        I think you said you spoke to the police,

25   right?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    A.          (Witness shakes head.)

 2    Q.          Did you --

 3    A.          I'm sorry.  I'm sorry.  Other than the

 4    situation.  We went to the detectives.

 5    Q.          Anyone else?

 6    A.          No.

 7    Q.          Did you speak with Attorney Groth?

 8    A.          Yes.

 9    Q.          Okay.  When did that happen?

10    A.          Earlier in the year, maybe April -- it was

11    before Emily got married, so I guess it was April.

12    Q.          And he came to your house and spoke to you,

13    your husband and Emily?

14    A.          That's correct.

15    Q.          What did he ask or tell you?

16    A.          We went over the details of the situation.

17    Q.          Did he tell you who he was representing?

18    A.          I don't remember.

19    Q.          Did he tell you that he had filed a lawsuit

20    against Faith Christian Academy and Pennridge and

21    certain individuals?

22    A.          If I recall, yes.

23    Q.          And did you have an understanding what he

24    was attempting to do with that lawsuit, what the

25    purpose of the lawsuit was?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.        I don't remember.

2    Q.        Did he say it was to get compensation for

3    Elizabeth Nace, monetary compensation?

4    A.        I don't remember.  Sorry.

5    Q.        When you went to the police detectives, you

6    went with your daughter.  Did Emily state anything

7    different to the detectives about Mr. Romig and the

8    incident than what you recall her telling you back at

9    the time?

10   A.        I remember her stating that he had touched

11   her.

12   Q.        To whom?

13   A.        To the detectives.

14   Q.        And she had never told you that before?

15   A.        I don't ever remember her telling me that.

16   I remember sitting there and being shocked and she

17   was crying.

18   Q.        And what did she say about being touched?

19   How did she characterize that?

20   A.        That he had touched her butt.

21   Q.        Like as a smack as a player or --

22   A.        No.  More --

23   Q.        Like, groped her in some way?

24   A.        Maybe like that.  I don't remember what her

25   words were.  But it wasn't a smack, you know, high

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    five.

2    Q.        Did you follow up with her after the

3    discussion with the detective?

4    A.        No.

5    Q.        Why not?

6    A.        She was pretty upset.

7    Q.        Did you ask her why she never told that to

8    you?

9    A.        No.

10   Q.        Did you ask her if she had ever told that to

11   Mr. Clymer?

12   A.        No.

13   Q.        And that was not in the list of things that

14   she communicated to you and that you communicated to

15   Mr. Clymer?

16   A.        No.

17   Q.        Did she ever indicate that she had sent --

18   that Mr. Romig had sent a picture of him wearing

19   jeans, new jeans?  Did you hear that when you spoke

20   to the detectives?

21   A.        Yes.

22   Q.        Did she tell you that before?

23   A.        I don't remember if she did or not.  I think

24   she may have.  I think she did because when she came

25   home that day, we told her to outline things.  The

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    first thought was, did he send you pictures.  So,

2    yeah.

3    Q.      But she didn't indicate there were any

4    sexually explicit pictures exchanged between the two

5    of them?

6    A.      No.  Just this one picture.

7    Q.      Do you know whether you shared that

8    information with Mr. Clymer back in 2009, 2010 of a

9    picture having been sent to him wearing -- or a

10   picture had been sent to Emily wearing new jeans?

11   A.      No.  I don't remember that we discussed that

12   at all.

13   Q.      Did you hear Emily at that communication

14   with the detective that Emily stated that Mr. Romig

15   had told her that he'd like it if Emily changed on

16   the bus like the other girls did because he wanted to

17   watch?  Was that an issue that came up?

18   A.      Sorry.  Repeat the question.

19   Q.      Did you hear Emily say at this meeting with

20   the detectives that Mr. Romig would like if Emily

21   changed on the bus like the other girls did because

22   he wanted to watch?

23   A.      No.  I don't remember her saying that.  I

24   mean, the changing on the bus had nothing to do with

25   Faith.  That was taking place at another school.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.        When Mr. Groth met with you, did he tell you

2    that he felt that there were other girls at Faith

3    Christian Academy that had been sexually involved

4    with Mr. Romig?

5    A.        I don't remember.  I'm sorry.

6    Q.        Did he tell that you it was his belief that

7    Faith Christian Academy was somehow covering

8    something up --

9    A.        No.

10   Q.        -- with regard to the dismissal or

11   resignation of Mr. Romig?

12   A.        No.

13   Q.        I'm going to show you --

14             MR. RUSSELL:  Why don't we mark

15   this as A. Smith 1.

16             (Whereupon, A. Smith Exhibit 1, Letter dated

17   4/10/15, was marked for identification.)

18             MR. GROTH:  This was already marked

19   as Kevin Smith Exhibit 1, right?

20             MR. RUSSELL:  Yes.  That's correct.

21   BY MR. RUSSELL:

22   Q.        I'm showing you a letter that's been marked

23   as A. Smith 1.  Do you recognize this document?

24   A.        Yes.

25   Q.        And this was a letter that you received, you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

83

1    and your husband?

2    A.        Uh-huh.

3                    MR. GROTH:   Yes?

4                    THE WITNESS:   Yes.  I'm sorry.

5    BY MR. RUSSELL:

6    Q.        From Attorney Groth?

7    A.        Yes.

8    Q.        It's dated April 10th, 2015?

9    A.        Yes.

10   Q.        You indicated that when you saw in the

11   paper, that you contacted the police, do you know

12   whether you spoke to the police before or after you

13   received this letter from Mr. Groth?

14   A.        Oh, it was before.

15   Q.        And when you received this letter from Mr.

16   Groth, what did you do?

17   A.        My husband contacted him, I guess.

18   Q.        Did you have a discussion with your husband

19   before he did it?

20   A.        I don't remember.  I guess we did.  I don't

21   remember what we talked about.

22   Q.        Did you have a discussion with Emily before

23   you decided -- your husband decided to contact Mr.

24   Groth?

25   A.        I don't remember.  I think I might have sent

Appendix 0727

ANNETTE SMITH

84

```
 1    her a copy of the letter, you know, and said that,

 2    you know, we'll be contacting him, just so you're

 3    aware.

 4    Q.        In the second paragraph of this letter, it

 5    says, to summarize our case, we contend that both

 6    FCA, which is Faith Christian Academy, and Pennridge

 7    knew of Mr. Romig's prior sexual misconduct while he

 8    was employed by FCA, but failed to adequately

 9    investigate and report to state authorities as

10    required by state law.  More specifically, we believe

11    that Mr. Romig engaged in sexual conduct -- I'm

12    sorry -- conduct designed to induce, entice,

13    persuade, encourage or coerce a number of his female

14    softball players at FCA to participate in an

15    exploitative sexual relationship.

16                Did he ever discuss that with you, what

17    his thinking was in that regard?

18    A.        Mr. --

19    Q.        Mr. Groth.

20    A.        I don't remember.

21    Q.        Did you ever ask him about that?

22    A.        No.

23                MR. RUSSELL:  I want to mark this

24    A. Smith 2.

25                (Whereupon, A. Smith Exhibit 2, E-mail dated
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    12/31/09, was marked for identification.)

2    BY MR. RUSSELL:

3    Q.        This is a copy of an e-mail.  I think it's

4    whoever prints it out, it puts that person's name on

5    the top of the page.

6                    MS. CONNOR:   That's correct.

7    Q.        And this is an e-mail that's dated December

8    31st, 2009, and it's to Ryan Clymer, from you -- is

9    that your Merck e-mail address?

10   A.        Correct.

11   Q.        And you've also cc'd your husband on this?

12   A.        That's correct.

13   Q.        And it says, Ryan, hope your holidays were

14   good.  I wanted to follow up on the voice mail I sent

15   you and include the document which I told you we had

16   Emily write out some of the information she indicated

17   verbally.

18                    Does that refresh your recollection as to

19   whether you actually spoke to Mr. Clymer before you

20   sent this e-mail or whether you had just left him a

21   voice mail?

22   A.        I think we just left him a voice mail.

23   Q.        Do you know whether he was away on vacation

24   over this break?

25   A.        He had told us that he was going away.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

86

1    Q.        And in the voice mail, does that refresh

2    your recollection as to what you would have left in

3    the voice mail?

4    A.        I don't remember.

5    Q.        And it says this document was written on

6    Monday, December 22nd, when Emily came home early

7    from school after having talked to you.  Kevin asked

8    her to sit down and document some of the content of

9    the text messages and some of the key texts that she

10   can remember that were fresh in her mind.  I had also

11   referenced Robin Landis in the voice mail that I left

12   for you.

13             And Robin Landis, she's the assistant

14   coach?

15   A.        That's correct.

16   Q.        Did she continue to be the assistant coach

17   the rest of that season?

18   A.        Yes.

19   Q.        And then it says, on the bottom of that

20   paragraph that I just started, says, additionally,

21   Robin stated that perhaps the coach sent them to

22   Emily by mistake intending them for his wife, dealing

23   with the text messages.

24             Did anybody ever tell you that Eric

25   Romig's wife actually spoke to Ryan and said that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    some of those messages were intended for her?
 2    A.       No.
 3    Q.       Did you ever learn that at any time?
 4    A.       No.
 5    Q.       Did you review your -- any depositions prior
 6    to coming today to your deposition?
 7    A.       Just Emily and Kevin's.
 8    Q.       Their transcripts?
 9    A.       That's correct.
10    Q.       But you don't recall anybody making mention
11    of that?
12    A.       I don't remember.  Sorry.
13    Q.       And the last paragraph there, the full
14    paragraph, it seems like you were aware that he was
15    continuing to conduct an investigation.  Would that
16    be accurate?
17    A.       Uh-huh.
18    Q.       That's yes?
19    A.       Yes.  I'm sorry.
20    Q.       And attached to that is the list, if you go
21    to the next page.  And this I think you referred to
22    before.  It says Emily Mayer's statements at the top.
23    A.       Correct.
24    Q.       Did Emily type this herself?
25    A.       Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.        Did you review it before it was sent to Mr.

2    Clymer?

3    A.        Yes.

4    Q.        Did you edit it in any way?

5    A.        No.

6              (Whereupon, A. Smith Exhibit 3, E-mail dated

7    1/16/10, was marked for identification.)

8    BY MR. RUSSELL:

9    Q.        And this again is an e-mail that's dated

10   January 16th, 2010.  And it looks like again it's

11   coming from you at your Merck e-mail address,

12   correct?

13   A.        Correct.

14   Q.        It's to Ryan Clymer with a cc to your

15   husband, Kevin?

16   A.        Correct.

17   Q.        It says, follow up on our conversation is

18   the subject line?

19   A.        Correct.

20   Q.        And this talks about Mr. Romig being at the

21   games and sending a mixed message.  Is that right?

22   A.        That's right.

23   Q.        And then you conclude that e-mail with,

24   Ryan, thank you again for the support you have given

25   us and Emily.  Is that right?

ANNETTE SMITH

1    A.        Correct.

2    Q.        What support do you feel that you were given

3    by Ryan?

4    A.        That he allowed her back on the team and

5    that, you know, Coach Romig resigned.

6    Q.        Do you know Elizabeth Nace?

7    A.        No, I do not.

8    Q.        Did you ever meet her or her parents, to

9    your knowledge?

10   A.        No.

11   Q.        Did you ever tell Emily's biological father

12   about the texting situation with Eric Romig?

13   A.        Yes.

14   Q.        And when did you do that?

15   A.        Probably the end of December, I would think.

16   Q.        And did he say, look, I'm going to report

17   this to -- was he going to do anything further?

18   A.        No.

19   Q.        He told you he wasn't or --

20   A.        We didn't discuss it.  He wasn't involved.

21   Q.        Did you ever update him in any way after

22   this incident?

23   A.        Not that I recall.

24   Q.        You were asked some questions -- and I think

25   you may not have discussed the word, but was your

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

```
 1    daughter on probation for the after party that

 2    occurred at the end of her junior year in order to

 3    come back to her senior year?  Did they call it

 4    probationary period?

 5    A.        No.  Not that I remember.

 6    Q.        Did you have to sign some sort of form?

 7    A.        I vaguely remember something about it.

 8    Q.        And it's your understanding that coming back

 9    for her senior year was conditioned upon having

10    counseling sessions with Pastor Ron?

11    A.        That's correct.

12    Q.        And you went to Pastor Ron, at least the

13    first session?

14    A.        No, it wasn't the first.  It was towards the

15    end.

16    Q.        Did you have to pay anything for these

17    counseling sessions?

18    A.        I don't remember.  I honestly can't

19    remember.

20    Q.        Do you know whether Emily was ever given a

21    detention for cheating on a test during her junior

22    year?

23    A.        No.  She never was that I know of.

24    Q.        And you had indicated that the last time

25    that you know that she lied to you was when she went
```

ANNETTE SMITH

1    to that after party after the junior --

2    A.        Yes.

3    Q.        -- banquet?

4    A.        That's correct.

5    Q.        At the time this incident occurred with the

6    revelation of the inappropriate texting, was it your

7    understanding that Emily was still on probation or

8    did you not have that understanding?

9    A.        I did not have that understanding.

10   Q.        To your knowledge, was Emily ever removed as

11   co-captain of the basketball team at any time before

12   this incident came to light?

13   A.        No.

14   Q.        No, you don't know or, no, it never

15   happened?

16   A.        No, it never happened.

17   Q.        Is there anyone else that you think it would

18   be helpful for us to discuss or contact concerning

19   Faith Christian Academy's role in investigating Mr.

20   Romig and the texting situation with Emily?  Anybody

21   else?

22   A.        Not that I know of.

23              MR. RUSSELL:  I have no further

24   questions, but some of these attorneys may have.

25              MS. CONNOR:  I just have a few

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

92

```
 1    questions.

 2                        * * *

 3                     EXAMINATION

 4    BY MS. CONNOR:

 5    Q.        Mrs. Smith, did you ever see any of the text

 6    messages that Eric Romig sent to your daughter?

 7    A.        No.

 8    Q.        When she came home on either December 21st

 9    or 22nd, you said she came home at around, I think,

10    11 a.m.?

11    A.        Yeah.  It was the early part of the day.  I

12    know it was midday.

13    Q.        When she got home, did you or your husband

14    ask to see her phone?

15    A.        I don't remember.  I don't recall that.  My

16    husband might have.  I personally did not.

17    Q.        Do you know what happened to her phone that

18    day?  Did she retain control of it?

19    A.        No.  We kept it.  My husband had it.

20    Q.        So when did he take possession of the phone?

21    A.        I guess when she came home.

22    Q.        Okay.  And do you know if Eric Romig had

23    texted her any time after that -- after the time when

24    your husband took the phone?

25    A.        There was one -- one final text message.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   Q.        And that was on December 22nd?

2   A.        The day that she came home.

3   Q.        And your husband saved that text message,

4   right?

5   A.        I believe so.

6   Q.        It had something to do with Ewing Oil?

7   A.        Yes.

8   Q.        The records seem to indicate that there was

9   another text message from Eric Romig that came in the

10  afternoon around 3:30 of the 21st.  Do you remember

11  seeing that text message?

12  A.        I think that was the Ewing Oil text message.

13  Q.        Actually, the Ewing Oil text message was on

14  the 22nd.  Do you remember seeing any other text

15  messages?

16  A.        No.

17  Q.        After your daughter came home on the 21st or

18  22nd.

19  A.        Right.  I think my note said she came home

20  on the 21st.

21  Q.        Right.

22  A.        Which was the day that Kevin took her phone.

23  Q.        Okay.

24  A.        And then that was the last text message that

25  came in, that I'm aware of.

ANNETTE SMITH

1    Q.        So you're only aware of one?

2    A.        Correct.

3                    MS. CONNOR:  I don't have any more

4    questions.  Thanks.

5                    MR. SALAZAR:  I don't have

6    questions for you at the moment, but I may come back.

7                    MS. KERNAN:  The same for me.

8              Do you mind if we take a brief recess?

9                    MR. GROTH:  Sure.

10             (Whereupon, a brief recess was held.)

11                   MR. GROTH:  Before I begin my

12   questioning of Mrs. Smith, I want to put a statement

13   on the record.  I noticed that Jonathan Russell was

14   reading from some documents when he was asking Mrs.

15   Smith about the issue of Emily Mayer being required

16   by Faith Christian Academy to undergo some counseling

17   sessions based upon the party activities that she was

18   a part of, along with a number of other FCA students,

19   after the banquet in May or June of 2009.

20             I have not seen those documents, those

21   documents have not been produced either in initial

22   disclosure or during the depositions of Emily Mayer

23   or her father.  I asked to see those documents.  Mr.

24   Russell -- he can certainly add to this statement

25   after I'm finished -- indicated he had some privacy

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   concerns about issuing school records with regard to

2   Emily Mayer without her prior consent.  Mrs. Smith,

3   who is Emily's mother, who is present here today

4   being deposed, has no objection to the release of the

5   documents.  But Mr. Russell asked that Emily Mayer

6   e-mail him her consent to have those documents

7   released to all the parties in the litigation.

8              Have I stated that correctly, Mr.

9   Russell?

10             MR. RUSSELL:  That's correct.  It's

11  not that -- it was my understanding that this

12  document has not been requested of us, so it's not

13  like I was trying to withhold documentation.  I don't

14  want there to be an inference that we were trying to

15  hold something back.

16             But I agree with the rest of the

17  characterization.

18             MR. GROTH:  The only other thing I

19  would say is that if -- again, if these documents

20  were to be used in trial for any reason by defendant,

21  Faith Christian Academy, they would have to be listed

22  on a pre-trial order and exchanged at that point,

23  probably with or without anybody's consent.

24             MR. RUSSELL:  But for impeachment

25  purposes, you wouldn't have to disclose it.  If it's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

```
 1    a document that is going to be used to impeach, it
 2    would not need to be disclosed.
 3                MR. GROTH:  In any event, we seem
 4    to have reached an agreement that the documents Mr.
 5    Russell has in his possession and that we're
 6    referring to in Mrs. Smith's deposition will be
 7    turned over to all parties upon receipt of the e-mail
 8    from Emily Mayer that she has no objection to the
 9    release.  Is that correct?
10                MR. RUSSELL:  That's correct.
11                THE WITNESS:  Do you want her to
12    reference what the documents are?
13                MR. GROTH:  Can you just describe
14    the documents that you have.
15                MR. RUSSELL:  I have a letter
16    agreement dated September 10th, 2009, with the
17    salutation, dear Emily.  It begins, attending the
18    academy --
19                MR. GROTH:  I'm sorry.  What was
20    that date again?
21                MR. RUSSELL:  September 10th, 2009.
22    Dear Emily, attending the academy is a privilege and
23    should be viewed as such.  And then it goes through
24    certain requirements.  It's from Ryan Clymer.  It's
25    signed by Annette Smith, dated 9/24/09.  It's signed
```

ANNETTE SMITH

1    Emily Mayer, dated 9/17/09.  And Ryan Clymer, dated

2    9/16/09.

3            Then I also have a detention assignment

4    for cheating on a test, which was December 11th,

5    2008, which would be her junior year.

6            And then the letter that we just

7    disclosed that was written to Annette Smith that she

8    indicated she didn't have a problem with us

9    releasing.

10           THE WITNESS:  And she doesn't have

11   to reference that letter?

12           MR. RUSSELL:  No.

13           MR. GROTH:  Let's mark the document

14   that was produced, the letter from Ryan Clymer to Mr.

15   and Mrs. Smith date June 11th, 2009, as A. Smith

16   Exhibit 4.

17           (Whereupon, A. Smith Exhibit 4, Letter dated

18   6/11/09, was marked for identification.)

19                         * * *

20                      EXAMINATION

21   BY MR. GROTH:

22   Q.      Mrs. Smith, you've had an opportunity to

23   review Exhibit 4, correct?

24   A.      Yes.

25   Q.      It mentions there that there will be a $20

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1    fee charged per session.  Does that refresh your

2    recollection as to whether or not --

3    A.      It --

4    Q.       Let me finish the question, please.  Does

5    that refresh your recollection as to whether or not

6    you did have to make some type of payment to the

7    school to compensate the school for these counseling

8    sessions or counseling appointments?

9    A.      Yes.

10   Q.      Do you recall the amount, $20 per session?

11   A.      I mean, that's what's written here, so I

12   guess that's what it was.  I don't recall.

13   Q.      Your daughter Emily in her deposition, I

14   think, testified that the amount was $100 per

15   session.  Does that change your recollection -- your

16   own independent recollection at all or refresh your

17   recollection at all?

18   A.      No.

19   Q.      This also says, if your child is readmitted,

20   a probationary period would follow.  Do you recall

21   ever getting a subsequent letter or any information

22   from Mr. Clymer that there was still a probationary

23   period after Emily finished the five counseling

24   sessions?

25   A.      Not that I recall.

Appendix 0742

ANNETTE SMITH

1  Q.       Do you know if she finished those five

2  counseling sessions before the new school year began

3  the following September?

4  A.       I thought she did.

5  Q.       Again, while we're on that topic, do you

6  know whether or not any other Faith Christian

7  students were sent the same type of letter that you

8  and your husband received about that party incident

9  involving a number of Faith Christian students?

10  A.       Yes.

11  Q.       Do you know who those people are, who those

12  students are?

13  A.       Maybe a Ryan Clymer -- not Ryan Clymer.

14  There's a couple Ryans.  Ryan Sheffer.  I don't know

15  if -- I think Ryan Fertch had to.

16  Q.       Do you know how to spell his last name?

17  A.       F-E-R-T-C-H.  And there was a girl Devon --

18  I don't remember her last name.  And then the girl

19  that the party's house -- I don't remember her name.

20  Q.       Does the name Brittany Kulp ring a bell?

21  A.       Thank you.  Yes.

22  Q.       Do you know if any of those students --

23  strike that.

24           Were there any other students whose names

25  you can remember who attended that party?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.       Not that I remember.

2    Q.       Do you know if any of those students who you

3    do know about who were at the party left FCA as a

4    result of that party or -- I shouldn't say that, not

5    a result, but following that party?

6    A.       Brittany did not return.

7    Q.       Do you know why she did not return?

8    A.       I do not know.

9    Q.       Do you know whether or not any of the other

10   people whose names you did mention actually

11   participated or were requested to participate in

12   counseling sessions with the pastor as a result of

13   their attendance at that party?

14   A.       It was my understanding they all got this

15   (indicating).

16   Q.       This letter, you're referring to Exhibit 4?

17   A.       Correct.

18   Q.       Did you speak to any of them at all?

19   A.       No.

20   Q.       Did you speak to any of their parents at all

21   about this issue?

22   A.       No.

23   Q.       Sitting here today, do you believe that

24   Emily still has not told you complete details about

25   the type of sexually inappropriate text messages she

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    received from Eric Romig between October and November

2    and December 21st, 2009?

3                   MR. KEMETHER:   Objection to form.

4                   You can answer.

5    A.       I don't believe she's told us the detail.

6    Q.       Have you tried to question her, you or your

7    husband, tried to question her to get more details

8    out of her about that situation?

9    A.       No.

10   Q.       Does she -- strike that.

11            Have you observed her to be emotional

12   about recalling or discussing that issue of the

13   texting from Eric Romig back in 2009, whenever that

14   topic comes up?

15   A.       Yes.  On a number of occasions.

16   Q.       Does she get emotional to the point of tears

17   in talking about it?

18   A.       Yes.

19   Q.       In the exhibit marked Annette Smith No. 2,

20   the attachment to that is the statement that Emily

21   typed up on December 21st at the request of your

22   husband to give her recollection of the type of

23   sexually inappropriate texts that she had received

24   from Eric Romig.  Is that correct?

25   A.       That's correct.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1              MR. RUSSELL:   Objection to form.

2     Q.        I think you were asked by Mr. Russell

3     whether or not you had any knowledge that -- or facts

4     to indicate that Eric Romig had some prior

5     inappropriate sexual relationship with Lauren Fretz.

6     Do you remember being asked that question?

7     A.        I do.

8     Q.        And your answer was what?

9     A.        Not at the time I did not.  I wasn't aware

10    of it.

11    Q.        At the time, meaning at the time this

12    investigation was going on into the texting issue

13    between Eric Romig and Emily, correct?

14    A.        Correct.

15    Q.        But in the first line of Emily Mayer's

16    statement, it reads and I quote, beginning of

17    November, he, meaning Eric Romig, started telling me

18    how he and Lauren, referring to Lauren Fretz, did

19    sexual things and was hinting at me to be this way.

20              Now, did you see that on December 21st,

21    2009, when Emily wrote it?

22    A.        Yes.

23    Q.        Okay.  And down below, there's another entry

24    by Emily on her statement that says, quote, he would

25    forward text messages he said were between he and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Lauren Fretz and ask if I was jealous, unquote.

2              Do you recall reading that, as well?

3    A.     I do.

4    Q.       So does that refresh your recollection as to

5    whether or not back in December of 2009 you had some

6    information from Emily that there may have been or

7    actually was an inappropriate sexual relationship

8    between Lauren Fretz and Eric Romig?

9    A.     Yes.

10   Q.     Did you have any discussion with Ryan Clymer

11   about those two entries involving Lauren Fretz after

12   you turned this document in to him with your e-mail

13   of December 31st, 2009?

14   A.     Not that I recall.

15   Q.     Okay.  And Mr. Clymer didn't tell you that

16   he had attempted to contact or did contact Lauren

17   Fretz and asked her if there was anything

18   inappropriate going on between her and Mr. Romig and

19   that she denied anything inappropriate going on?  He

20   didn't tell you that, did he?

21   A.     Not that I recall.

22   Q.       In fact, he never told you any details of

23   any part of the investigation that he did, correct?

24   A.       Correct.

25   Q.       Including the fact that after speaking to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    your daughter Emily on the 21st, when Mrs. Alderfer

2    took her in to see him, he never spoke to her again

3    about the accusations or allegations, did he?

4    A.        Not that I'm aware.

5    Q.        He never asked her to come in to

6    re-interview her?

7    A.        No.

8    Q.        He never asked her to send him any

9    information?

10   A.        No.

11   Q.        He never asked for her phone?

12   A.        No.

13   Q.        Did Emily tell you how long her initial

14   meeting with Miss Alderfer and Mr. Clymer was,

15   approximately how long, how many minutes it lasted?

16   A.        Maybe ten minutes.  It was short.

17   Q.        She said it was a short meeting?

18   A.        Correct.

19   Q.        And back in 2009 on December 31st -- I'm

20   sorry, December 21st, did she tell you that he asked

21   her very few questions at all during the meeting?

22   A.        Back then did she tell us that?

23   Q.        Yes.  Did she tell you that?

24   A.        I can't remember.

25   Q.        You recall reading her deposition

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    transcript?

2    A.        Yes.

3    Q.        Do you recall her in the deposition

4    transcript testifying that he asked her very few

5    questions about anything during that meeting?

6    A.        Yes.

7    Q.        And that the meeting was very short?

8    A.        Yes.

9    Q.        You've been asked a number of questions as

10   to whether or not you or your husband -- strike that.

11            Back in 2009, did you know what had to

12   take place, technically, in connection with an

13   electronic device in order to retrieve or attempt to

14   retrieve deleted messages, text messages off a cell

15   phone to get the content of them?  Did you personally

16   know how to do that?

17   A.        No.

18   Q.        Do you know if your husband knew how to do

19   that back then?

20   A.        I don't know.

21   Q.        Your husband went to Verizon and got a log

22   that showed approximately 3150 texts from Eric Romig

23   to your daughter in about a three month period.  Do

24   you know whether he asked anybody at Verizon whether

25   or not Verizon could supply the content of the texts?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1    A.       Yes.

2    Q.       And did you have a conversation with your

3    husband about that?

4    A.       That I remember.

5    Q.       And what did he say?

6    A.       We did try to get that information from

7    Verizon and they said that we needed a subpoena.

8    Q.       Was it your impression back in 2009 that

9    Verizon actually has the content of text messages?

10   A.       Say that again.  I'm sorry.

11   Q.       Yes.  Was it your understanding or

12   impression back in 2009 that if subpoenaed, Verizon

13   could actually turn over the content of the text

14   messages?

15   A.       Yes.

16   Q.       Sitting here today, do you know if that

17   belief back in 2009 is actually true?

18   A.       I don't know.

19   Q.       Even to this day, you don't know exactly how

20   the text messages could be retrieved?

21   A.       No.

22   Q.       You were asked a number of questions about

23   whether or not after Mr. Smith got your daughter's

24   phone and saw that there were all -- these text

25   messages were all deleted except for the one that you

ANNETTE SMITH

1    testified to about Ewing Oil, you know, did you ever

2    take that to anybody to try to retrieve or was

3    anything done to try to retrieve the text messages

4    off the phone?

5    A.      No.

6    Q.      Okay.  You understood at that time that Eric

7    Romig was an employee during this investigation --

8    was still an employee of Faith Christian Academy,

9    correct?

10    A.      Correct.

11    Q.      Did Ryan Clymer ever tell you that Faith

12    Christian Academy ordered or requested Ryan Clymer to

13    turn his phone over to Faith Christian Academy so

14    that they could try to get the text messages content

15    off of the phone, off of his phone?

16    A.      No.

17    Q.      Did you ever suggest that to Faith Christian

18    Academy?

19    A.      No.

20    Q.      Did you ever suggest anything to Mr. Clymer

21    about how he should be going about conducting his

22    investigation?

23    A.      No.

24    Q.      Did Mr. Clymer ever tell you that he had, in

25    fact, ordered or requested that Mr. Romig turn over

Appendix 0751

ANNETTE SMITH

1    his phone to the school, to the school's attorney or

2    to somebody so that they could lift the -- attempt to

3    lift the text messages that Emily was referring to

4    off Mr. Romig's phone?

5    A.        No.

6    Q.        You said that Mr. Romig -- I'm sorry.

7    Strike that.

8              You said that Mr. Clymer told you during

9    your second telephone conversation -- and while we're

10   on that point, you had an initial conversation with

11   him that was just very brief, correct?

12   A.        Correct.

13   Q.        There was basically no information going

14   back and forth?

15   A.        Correct.

16   Q.        The second information -- the second

17   telephone conversation is when he told you about he

18   completed his investigation, Eric Romig was going to

19   resign and Emily could come back to school and play

20   on the basketball team?

21   A.        That's correct.

22   Q.        Was there anything more to that conversation

23   other than that?

24   A.        Not that I remember.  Very short.

25   Q.        Did he tell you during that conversation

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    that -- strike that.

2              Do you recall when that conversation was?

3    A.       It had to have been before Emily went back

4    to school.

5    Q.       So I think you may have testified before,

6    was the end of December, probably before January 1st,

7    because she would have gone back to school right

8    after the new year?

9    A.       Correct.  After the Christmas holiday.

10   Q.       Do you know if it was after you sent him

11   Annette Smith Exhibit 2, which contained Emily's

12   statement about the inappropriate sexual texts that

13   he was sending to her?  Was it after that?

14   A.       I would say it was after that.

15   Q.       Okay.  Well, that's the last day of the year

16   before New Year's, so do you believe it was that same

17   day that he told you that?

18   A.       I don't recall.  I don't recall.

19   Q.       Could it have been after the new year, after

20   New Year's day, the telephone conversation?

21   A.       I guess it could have been.

22   Q.       Okay.  Because up until you transmitted this

23   information to him on Exhibit 4 -- on Exhibit 2,

24   rather, on December 31st, 2009, including Emily's

25   statement, he didn't have this information, to your

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   knowledge, correct?

2   A.          That's correct.

3   Q.          Because he didn't ask Emily specifically --

4   strike that.

5               Did Mr. Clymer tell you in that

6   conversation that he had asked for Mr. Romig's

7   resignation and that if he didn't get it, he was

8   going to terminate Mr. Romig?

9   A.          I'm sorry.  Say that again.

10  Q.          Yes.  When you had the second conversation

11  with Mr. Clymer, the one where he told you about how

12  this was going to be resolved, did he tell you that

13  he was asking for Mr. Romig's resignation, and if he

14  didn't get it, he was going to be terminated?

15  A.          Correct.

16  Q.          Okay.  Did you have any further discussions

17  with Mr. Clymer about the whole texting situation

18  with Eric Romig after that conversation?

19  A.          No.

20  Q.          Even in passing at school, in the hallway or

21  at a sporting event or any place you may have seen

22  him on the premises, no further conversations at all?

23  A.          No.

24  Q.          I think you indicated that it would have

25  been your preference after hearing about this texting

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    situation from Coach Romig to your daughter on

2    December 21st, to march down to the school and meet

3    with the principal and find out what was going to be

4    done about it?

5    A.      Correct.

6    Q.      Did you ever request a face-to-face meeting

7    with Mr. Clymer?

8    A.      I believe we did.

9    Q.      Did you get one?

10   A.      No.

11   Q.      Did he ever offer to come to you or ask you

12   to come to him so that you could have a face to face,

13   in the same room conversation about everything that

14   had gone on?

15   A.      No.

16   Q.      You indicated that Emily finished the school

17   year out at Faith Christian after the basketball

18   season then.  Is that correct?

19   A.      That's correct.

20   Q.      Did she ever play any other sports at Faith

21   Christian Academy?

22   A.      She played soccer the first year.

23   Q.      And soccer was a spring sport?

24   A.      That's correct.

25   Q.      So that would have started after basketball

ANNETTE SMITH

112

1    season?

2    A.        Correct.

3    Q.        Were a number of her teammates from the

4    basketball team also on the soccer team?

5    A.        I believe so.

6    Q.        Did Emily play soccer after the Romig

7    situation occurred?

8    A.        No.

9    Q.        Why didn't she play soccer?

10   A.        I don't remember the reason.  It wasn't

11   because of the Romig situation.  It was just -- I

12   don't --

13   Q.        Did Emily ever tell you that one of the

14   reasons or the reason why she wasn't going to play

15   soccer that spring was because some of the teammates

16   on the soccer team are the same girls on the

17   basketball team who were not acting the same way with

18   her that they had acted before the Eric Romig

19   situation became known?

20   A.        We didn't discuss it.  Sorry.

21   Q.        In the conversation where Mr. Clymer -- and

22   again, it had to be the second conversation because

23   he didn't tell you anything in the first

24   conversation, right?

25   A.        Correct.

ANNETTE SMITH

1    Q.        So the only other conversation you had with

2    Ryan Clymer about his investigation, which was the

3    second conversation, did he tell you that he had

4    spoken to an attorney about whether or not he was

5    required by law or otherwise to report these

6    allegations made by your daughter against Faith

7    Christian Academy employee Eric Romig?

8    A.        I don't recall who he said he spoke to.

9    Q.        You had mentioned in your prior testimony,

10   it could have been a policeman or somebody in Bucks

11   County, but you didn't recall who?

12   A.        I don't.

13   Q.        And you don't recall him ever saying, I

14   actually went to an attorney and talked to an

15   attorney about this issue?

16   A.        No.

17   Q.        With regard to the after party from the

18   banquet in end of the 2009 school year in the spring

19   of 2009, when you got this letter from Ryan Clymer

20   that we've marked Annette Smith Exhibit 4, did you

21   have a telephone conversation with him, as well?

22   A.        I believe we did.

23   Q.        At any time in any form, whether by

24   telephone communication or letter or any other type

25   of communication, did Ryan Clymer ever tell you or

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    suggest to you that aside from drinking that was

2    going on at this party -- I assume that means

3    alcohol, correct?

4    A.        Correct.

5    Q.        Drinking going on at this party, there were

6    also some type of sexual acts that were performed or

7    engaged in by participants at this party?  Did he

8    ever tell you that?

9    A.        Not that I remember.

10   Q.        Did anybody else at the school ever tell you

11   that?

12   A.        Not that I recall.

13   Q.        Did you ever hear any rumors or any

14   suspicions from anybody at the school about whether

15   or not there was any sexual activity going on at the

16   party?  By that I mean, students, parents, faculty,

17   coaches, administration, anybody at all?

18   A.        Not that I recall.

19   Q.        Did Emily ever say to you that there was any

20   sexual activity that went on at that party between

21   anybody, her or anybody else?

22   A.        No.  Not that I recall.

23   Q.        When you went to one of the counseling

24   sessions with Emily and Pastor Jones, Ron Jones, did

25   he indicate that he had been having these same types

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    of sessions with the students who were at that party?

2    A.        Not that I recall.

3    Q.        Do you know whether or not Eric Romig was

4    permitted by Faith Christian Academy to coach a

5    practice or a game after Ryan Clymer became aware of

6    the allegations that Emily Mayer made regarding his

7    inappropriate sexual testing?

8                     MR. KEMETHER:  Objection to form.

9              You may answer.

10   A.        I'm sorry.  Can you repeat?

11   Q.        Do you know whether or not on December 21st,

12   when Emily -- when he first found out about the

13   allegations Emily was making about the inappropriate

14   sexual texting by Eric Romig, did Eric Romig coach a

15   practice or a game at Faith Christian Academy?

16                    MR. KEMETHER:  Objection to form.

17             You can answer.

18   A.        I don't know.

19   Q.        Did Emily tell you at any point during that

20   time frame or after that time frame that she was

21   aware that even after Ryan Clymer was made aware of

22   the texting by her on December 21st, he allowed Ryan

23   Clymer to continue to coach practices and games?

24   A.        I'm sorry.  Say that again.

25   Q.        Did Emily ever tell you that she found out

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    or knew that Eric Romig was allowed to coach a

2    practice or a game after she told Ryan Clymer about

3    the allegations of his texting?

4    A.        I don't recall.

5                    MR. GROTH:   I don't have a copy of

6    it, but can we mark this as A. Smith 5.

7            (Whereupon, A. Smith Exhibit 5, Basketball

8    Schedule, was marked for identification.)

9                    MR. GROTH:   Just for the record,

10   this is an internet printout from Faith Christian

11   Academy's website of the basketball schedule in 2009

12   and 2010.

13   BY MR. GROTH:

14   Q.        And it shows on there that on December 22nd,

15   2009, there was a basketball game at Morrisville.   Is

16   that what the schedule indicates?

17   A.        Yes.

18   Q.        Am I reading that correctly?

19   A.        Yes.

20   Q.        And it shows it was 63-31 loss by Faith

21   Christian Academy.   Is it correct that Emily was not

22   allowed to participate in that game?

23   A.        That's correct.

24   Q.        All right.   And do you know whether or not

25   Eric Romig coached that game?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1   A.        I do not know.

 2   Q.        You went to Emily's graduation?

 3   A.        Yes.

 4   Q.        Did you see Ryan Clymer there?

 5   A.        Yes.

 6   Q.        Is there any reason why you wanted to speak

 7   to Ryan Clymer at that point at graduation?

 8   A.        No.

 9   Q.        What were your feelings about him as Emily

10   was graduating and leaving Faith Christian?

11   A.        I was ready to be done with -- with the

12   school.  I had no particular feelings towards Ryan.

13   You know, I was ready to move on.

14   Q.        And you were asked if you had a conversation

15   with him where you thanked him for the way that he

16   handled the investigation of your daughter's

17   accusations.  Do you remember that?

18   A.        Yes.

19   Q.        And your answer is?

20   A.        I never spoke to him about that.

21   Q.        Is there a doubt in your mind about that?

22   A.        No.

23   Q.        Could you be wrong in your recollection?

24   A.        No.

25   Q.        Because Mr. Clymer said that you did, that
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    there was a conversation with you and him where you
 2    went up to him and thanked him for how he handled
 3    Emily's situation with Mr. Romig.
 4    A.        No.
 5    Q.        Do you know Robin Landis?
 6    A.        Yes.
 7    Q.        And how did you become familiar or
 8    acquainted with her?
 9    A.        She was Emily's assistant coach.
10    Q.        Was Emily friendly with her?  Did she like
11    Robin Landis?
12    A.        Yes.
13    Q.        Did Robin Landis go to your daughter's
14    wedding?
15    A.        Yes.
16    Q.        Were other former coaches or faculty at
17    Faith Christian invited to her wedding?
18    A.        Yes.
19    Q.        Who were they?
20    A.        Mrs. Tatarro.
21    Q.        Anybody else?
22    A.        That was it.
23    Q.        Was Mrs. Tatarro Emily's homeroom teacher?
24    A.        Yes.
25    Q.        Did you ever -- strike that.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1                      Were you ever told by anybody that Robin
 2    Landis told your daughter Emily that she was sorry
 3    about what happened between Eric Romig and her and
 4    that she believed Emily's allegations?
 5    A.         Yes.
 6    Q.         Who told you that?
 7    A.         Emily.
 8    Q.         When did Emily tell you that?
 9    A.         It was after the fact.
10    Q.         You mean after the investigation was over?
11    A.         Yes.
12    Q.         Eric Romig had resigned?
13    A.         Yes.
14    Q.         Do you know how long after?  Was it the same
15    year, was it some time after that?
16    A.         I cannot remember if she was still in school
17    at the time or if it was the summer after that.  I
18    don't remember.
19    Q.         When Emily told you that, regardless of when
20    it was after the investigation of Eric Romig had been
21    concluded and he had resigned, whenever she told you
22    that, did you think back to the e-mail that you wrote
23    to Ryan Clymer on December 31st, 2009, that's marked
24    Annette Smith Exhibit 2, where you were somewhat
25    critical of Robin Landis and what information you
```

ANNETTE SMITH

```
 1    were receiving about how she was interviewing other
 2    players on the basketball team about whether or not
 3    they believed these allegations against Eric Romig?
 4    A.          Yes.
 5    Q.          In that e-mail marked Smith Exhibit 2, you
 6    wrote, quote, I also had referenced Robin Landis in
 7    the voice mail I left for you.  Ashley Makowski had
 8    relayed to Emily on Wednesday, the 30th of 2009 --
 9    December 2009, that Robin had been talking to the
10    girls and questioning whether they believed Emily.
11    If they stated that they did, she then challenged
12    them as to why they believed her and that Emily
13    doesn't know the character of the coach.  And then it
14    says, additionally, Robin stated that perhaps the
15    coach sent them, referring to the e-mails --
16    referring to the text -- to Emily by mistake and
17    intended them for his wife.
18               When Emily finally told you that she had
19    this conversation with Robin Landis where Robin
20    Landis said I'm sorry this happened to you and I
21    believe you, did Emily tell you that she had any
22    further discussion with Robin Landis as to why she
23    made that statement to Emily?
24    A.          No.
25    Q.          When Emily gave you the information, told
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    you about the conversation with Robin Landis where

2    Robin Landis said she was sorry and that she believed

3    Emily in terms of her allegations against the coach,

4    did you do anything to follow up on that with Robin

5    Landis yourself?

6    A.       No.

7    Q.       Did you discuss it at all with Robin Landis

8    at the wedding?

9    A.       No.

10   Q.       Do you know an individual named Nicole

11   Gross?

12   A.       Yes.

13   Q.       How do you know her?

14   A.       She was a teacher at Faith Christian.

15   Q.       Was she a teacher of Emily's?

16   A.       No.

17   Q.       At any point during the -- or immediately

18   following the investigation of Eric Romig's

19   activities regarding texting your daughter, did you

20   have any conversations with Nicole Gross about the

21   situation with your daughter or any other situation

22   involving Eric Romig?

23   A.       Yes.  I recall having a phone call.

24   Q.       Tell me when that happened, first of all,

25   approximately.  If you can approximate.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.      You mean the timing of it?

2    Q.      Yes.

3    A.      It was probably during the basketball season

4    because I know I was waiting for Emily.  And I had a

5    telephone, you know, conversation with her about it.

6    Q.      Did she call you or did you call her?

7    A.      I called her.

8    Q.      And had you had any other telephone

9    conversations with her before that conversation for

10   any reason?

11   A.      We may have for school purposes.  I think

12   she had a son maybe that was in Emily's grade and

13   there might have been, like, this thing we were

14   planning.  I vaguely remember something of that.

15   Q.      So you had previously spoken to her?

16   A.      Yes.

17   Q.      You knew her, she knew you?

18   A.      Yes.

19   Q.      Okay.  Not --

20   A.      Not well.

21   Q.      Not well because Emily was -- she was not

22   Emily's teacher at any time, correct?

23   A.      Correct.

24   Q.      And did she make any statements to you about

25   things that she became aware of regarding Eric Romig,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1   not having to do with your own daughter?

2   A.        Yes.

3   Q.        What did she say to you?

4   A.        That, you know, there were suspicions and

5   that people in the school suspected his activities

6   with another player.

7   Q.        Did she say who the player was?

8   A.        Lauren Fretz.

9   Q.        Did she give you any information at all

10  about where she heard that information, who she heard

11  it from or whether she observed it herself, any other

12  details about it at all?

13  A.        No.

14  Q.        Did she -- do you know where she was going

15  to church at that time?

16  A.        I do not.

17  Q.        She testified in her deposition, I believe,

18  that at that time she was going to Calvary Baptist

19  Church and not Faith Baptist Church.  Did she mention

20  anything about Calvary Baptist Church when she told

21  you that she had heard things about -- suspicions

22  about a relationship between Lauren Fretz and Eric

23  Romig?

24  A.        I remember her saying that people at Calvary

25  suspected -- you know, suspected that that was going

ANNETTE SMITH

1    on.

2    Q.        Did she give any more details about why or

3    how she heard that from people at Calvary?

4    A.        No.

5    Q.        Or as to how people at Calvary may have

6    heard anything about Eric Romig and his involvement

7    with female students that he was coaching at Faith

8    Christian?

9    A.        Not that I recall.

10   Q.        Was the discussion that you had with her

11   involving any other topics other than this

12   information that she was giving you about Eric Romig

13   and these things that she had heard about him and

14   Lauren Fretz?

15   A.        No.

16   Q.        Do you know Tracy Fretz?

17   A.        No, I do not.

18   Q.        To make sure I understand this correctly,

19   your daughter, Emily, did not voluntarily walk into

20   the principal's office one day and say, I want to

21   report some bad activity by my basketball coach.  Is

22   that correct?

23   A.        Correct.

24   Q.        She was forced to go there by somebody?

25                  MS. CONNOR:  Objection to form.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1                    MR. KEMETHER:  Objection to form.

2    Q.       Correct.

3    A.       She was taken by Mrs. Alderfer.

4    Q.       You described how Mrs. Alderfer found out

5    about it through her daughter somehow, either

6    overhearing or directly telling her about it or

7    whatever.

8                    In any event, did Emily tell you that it

9    was Mrs. Alderfer that came to her on a school day

10   and said, something to the effect of, is there

11   something going on between you and Coach Romig and

12   she said, yes.  And Mrs. Alderfer immediately said we

13   have to go talk to the principle.

14                   MS. CONNOR:  Objection to form.

15                   MR. KEMETHER:  Objection to form.

16   Q.       Is that your recollection of how Emily

17   explained it to you when she got home on December

18   21st?

19   A.       Yes.

20   Q.       Up until that point, did you have any reason

21   to believe that your daughter harbored any type of

22   ill will or animosity toward Coach Romig?

23   A.       No.

24   Q.       Had she ever made any statements to you to

25   the effect of, you know, I don't like him, he's a bad

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

126

1    coach, he doesn't treat me right, I have some axe to

2    grind with him, anything of that nature at all where

3    she might make a false allegation about him in order

4    to get revenge or to get some kind of -- to get Eric

5    Romig in some kind of trouble in the school?

6                    MR. KEMETHER:  Objection to form.

7             You can answer.

8    A.       No.  I think that she thought he was a good

9    coach, he pushed their skills.  He took an interest

10   in developing her.

11   Q.       Did you believe -- I'm talking about your

12   subjective opinion -- did you believe at the time

13   that your daughter Emily was the best, if not one of

14   the best, players on the team?

15   A.       Yes.

16   Q.       At any time during the two seasons that Eric

17   Romig coached her as her basketball coach, did he

18   ever ask her to come in to the school on a weekend to

19   get one-on-one coaching with her?

20   A.       No.

21   Q.       Did you ever hear from any of the other

22   parents of her teammates, of Emily's teammates, that

23   Eric Romig asked her to come in -- I'm sorry -- that

24   Eric Romig asked any of the players to come in and

25   get one-on-one coaching with him on a weekend?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.       No.

2    Q.       Just one last thing.  Going back to Annette

3    Smith Exhibit 2, the e-mail from you to Ryan Clymer

4    of December 31st, 2009, including Emily's typed

5    statements of her recollection of the inappropriate

6    texts that were sent to her by Mr. Romig.  The second

7    entry is December 5th, DeSales game.  He texted me

8    and said, quote, I want to be in you, unquote.

9            Did you ask her about that entry on her

10   statement when she gave you it?

11   A.       I don't recall.

12   Q.       You were asked, I believe, a question of,

13   was this document edited in any way by you or your

14   husband?

15   A.       No.

16   Q.       This was Emily's own list made from her own

17   words and typed up by Emily herself?

18   A.       Correct.

19            MR. GROTH:  I have no other

20   questions.  Thank you.

21            MR. KEMETHER:  Going to have a

22   slight go round and hopefully it will be much, much

23   shorter.

24                    * * *

25                 EXAMINATION

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    BY MR. KEMETHER:

2    Q.        Mrs. Smith, on December 21st, 2009, that was

3    the day of Emily's only conversation with Ryan Clymer

4    about this testing issue, correct?

5    A.        That's correct.

6    Q.        You were not present for that meeting?

7    A.        No.

8    Q.        So would it be fair to say that you don't

9    know what your daughter told Mr. Clymer that day?

10   A.        I know what Emily told me.

11   Q.        You don't know what she told him?

12   A.        No.

13   Q.        And you don't know what Ryan Clymer said to

14   her or asked of her during that meeting, do you?

15   A.        No.  Just what Emily said to me about it.

16   Q.        The contents of what -- the contents of the

17   text messages, however many thousands of them there

18   were between your daughter and Coach Romig back and

19   forth, you don't know the content of any of them,

20   aside from what your daughter put into her one page

21   statement that's attached as the second page of

22   Annette Smith 2, correct?

23   A.        Correct.

24   Q.        And she created that document on December

25   21st, 2009, at your husband's request?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
 1    A.        Correct.

 2    Q.        You provided this document to Ryan Clymer on

 3    December 31st, 2009, ten days later, correct?

 4    A.        Correct.

 5    Q.        To your knowledge, Ryan Clymer didn't have

 6    knowledge of anything inside of this list that --

 7    your daughter's list, until you gave it to him on

 8    December 31st, 2009, correct?

 9                   MR. GROTH:  Object to the form.

10              You can answer.

11    A.        That's correct.

12    Q.        To your knowledge, whatever's in this list

13    that your daughter created is everything that you're

14    aware of that she believes that Eric Romig did

15    inappropriately with her in terms of either texts or

16    talking or touching, anything like that?

17    A.        I think there's a lot more to it.

18    Q.        As far as you know, is there any more detail

19    besides what's in this document?

20    A.        That's all I know.

21    Q.        You've asked your daughter and she hasn't

22    told you anything more than that, correct?

23    A.        Yeah, we haven't -- no discussions.

24    Q.        In fact, the only thing in addition to this

25    that you've ever learned of -- if I understand
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    correctly -- is when you were in the meeting with the

2    detectives in 2013 and she indicated that he had

3    groped her buttocks, correct?

4    A.        Correct.

5    Q.        That's the only additional thing?

6    A.        Correct.

7    Q.        After December 31st or December 31st, 2009,

8    did you, your husband or your daughter ever go back

9    to either Ryan Clymer or anyone else at Faith

10   Christian and say, we have more information as to

11   what Eric Romig did to our daughter?

12   A.        No.

13   Q.        And you were asked something about -- you

14   said something during Mr. Groth's questioning about a

15   face-to-face meeting that you had requested of Mr.

16   Clymer.

17             Did you ever go back to him after your

18   phone conversation, which was somewhere around New

19   Year's of 2009, where he told you that Emily's back

20   on the team and the coach is not going to coach any

21   more, did you ever go to him and say, I still want to

22   have that face-to-face meeting?

23   A.        No.

24   Q.        Do you know if your husband did?

25   A.        Not that I'm aware of.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES