ANNETTE SMITH

131

```
1    Q.         Do you know if Emily did?

2    A.         No.

3                     MR. KEMETHER:  Thank you.  I don't

4    have anything further.

5                     MR. RUSSELL:  Few follow up.

6                          * * *

7                      EXAMINATION

8    BY MR. RUSSELL:

9    Q.         The first conversation that you had with

10   your daughter when she was sent home and you asked

11   her what happened -- and you may have said this and I

12   apologize -- but what do you recall about that

13   initial conversation before your husband said, go

14   write down some things?  What did she tell you

15   specifically?

16   A.         That he was texting her inappropriately.

17   Q.         But you don't recall her saying anything

18   sexual at that time?

19   A.         I don't recall.  She was -- she was upset.

20   We were upset.  It was kind of a shocking moment

21   because it's something you see on TV or you hear and

22   you never think that you're going to be in that

23   situation.  It was like a lot of shock.

24   Q.         And then after you went to the police with

25   your daughter and with your husband, were you all
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

```
1    there together, the three of you?
2    A.        That's correct.
3    Q.        And you told -- or you heard Emily go
4    through and say what happened while she was at Faith
5    Christian and then you also heard that she
6    testified -- or she indicated that she was
7    inappropriately touched on her back side.  They never
8    brought charges against Eric Romig relating to
9    anything associated with your daughter and Eric
10   Romig, correct?
11   A.        The police officer?
12   Q.        The police, right.  Your daughter was never
13   part of any prosecution?
14   A.        No.
15   Q.        And as far as you know, was anyone else
16   other than Elizabeth Nace -- was anyone else a victim
17   that you're aware of with regard to Eric Romig?
18   A.        Not that I'm aware of.
19   Q.        Did you ever thank Mrs. Alderfer for taking
20   your daughter to Ryan Clymer?
21   A.        No.
22   Q.        You're glad she did, though, right?
23   A.        Yes.
24   Q.        And she was a school employee at the time?
25   A.        I don't know what she was at the time.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    Q.        And Mr. Groth asked you about sexual

2    components of the party and the reason some of that

3    goes on, is you were asked about rumors about Lauren

4    Fretz. And rumors can be terrible things, but they

5    also can be areas that we can inquire and try to find

6    out if there's any truth or anything to that.

7              One of the aspects that came in some

8    rumors was that your daughter had exchanged in some

9    type of oral sex at the party. Does that refresh

10   your recollection at all as to any allegation against

11   your daughter?

12   A.        No.

13   Q.        When she was at the Perkiomen school, the

14   high school, was there any problems with her sexually

15   at parties and things like that?

16   A.        No.

17   Q.        You asked about Ryan -- or wanting a

18   face-to-face meeting with Ryan Clymer. Did you ever

19   just show up at the school and request a meeting

20   or --

21   A.        No.

22   Q.        And what was -- was there anything that you

23   hoped to accomplish in the face-to-face meeting that

24   you weren't able to accomplish via e-mail

25   communication or over the telephone?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

ANNETTE SMITH

1    A.       I think it's better to have a face-to-face

2    conversation and it would have given us opportunity

3    to have a dialogue about the situation, much easier

4    than over the phone.

5    Q.       Was there anything -- other than maybe just

6    more proper protocol under the circumstances, was

7    there something that you wanted accomplished in a

8    face-to-face setting that wasn't accomplished?

9    A.       Yeah.  I mean, maybe it would have given us

10   an opportunity to ask questions.

11   Q.       Could you ask questions over the phone?

12   A.       We could have, but it was such an odd

13   situation.  You know, you can't reach him, oh, I can

14   call -- we can have this teleconference, you know, at

15   this certain particular time, you know.  It was just

16   very odd.

17                      MR. RUSSELL:  I have no further

18   questions.

19                      MS. CONNOR:  I don't have any

20   questions, thank you.

21                      * * *

22                      EXAMINATION

23   BY MR. SALAZAR:

24   Q.       I have one question, ma'am.  You testified

25   earlier that the statement that is attached as the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1   second page of A. Smith 2, was a -- was written on
2   December 21st, correct?
3   A.      Correct.  That's correct.
4   Q.      Was there a reason why ten days elapsed
5   between the date this was written and the date it was
6   communicated to Mr. Clymer?
7   A.      My recollection is when we had that first
8   telephone call with him, that we said that after the
9   holidays, you know, we would send him the
10  documentation and he was going to be out of town.  He
11  wouldn't have access -- I remember him saying he
12  wouldn't have access to his e-mail.  He was not
13  bringing his computer with him.
14  Q.      Did he tell you when he would be returning
15  from his holiday?
16  A.      I just remember after the holidays.  I don't
17  remember if he said specifically.
18  Q.      Did he say after New Year's?
19  A.      I don't remember, I'm sorry.
20              MR. GROTH:  No questions.
21              MS. KERNAN:  No questions.
22              MR. KEMETHER:  Thank you very much
23  for your time.
24              (Concluded at 4:33 p.m.)
25

ANNETTE SMITH

1  NOV 3 0 2015
2  _____, 2015
3
4
5
6
7       I hereby certify that the evidence
8  and proceedings are contained fully and accurately in
9  the notes taken by me of the testimony of the within
10 witness who was duly sworn by me, and that this is a
11 correct transcript of the same.
12
13
14
15      _Stacy D Serba_
        Stacy D. Serba
16          Notary Public
17
18
   The foregoing certification does not apply to any
19 reproduction of the same by any means unless under
   the direct control and/or supervision of the
20 certifying reporter.
21
22
23
24
25

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Paul Koehler                                      Nace vs. Pennridge

November 4, 2015

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

JAMES NACE, et al    : CIVIL ACTION

vs.                  :

PENNRIDGE SCHOOL DISTRICT, :
et al.               : NO. 15-333

Wednesday, November 4, 2015

Oral deposition of PAUL KOEHLER, held at

the law offices of EASTBURN & GRAY, 60 East Court

Street, Doylestown, Pennsylvania, beginning at

1:45 p.m., on the above date, before LANCE A

BRUSILOW, Registered Professional Reporter,

Approved Reporter for the United States District

Court, and Notary Public, there being present.

brusilow + associates
255 South 17th Street
Suite 1300
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

---

**Page 2**

APPEARANCES

HORNSTINE PELLONI & HORNSTINE
BY: DAVID GROTH, ESQUIRE
1500 Walnut Street
Suite 300
Philadelphia, PA 19102
ph: 215.568.4968
(david@hornstine.com)
Counsel for Plaintiffs

MARSHALL WARNER COLEMAN & GOGGIN
BY: DAVID SALAZAR, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, PA 19103
ph: 215.575.2626
(dsalazar@mdwcg.com)
Counsel for Faith Christian Academy

EASTBURN & GRAY, P.C.
BY: JOANNE D. SOMMER, ESQUIRE
ERIN N. KERNAN, ESQUIRE
60 East Court Street
Doylestown, PA 18901
ph: 215.345.7000
(jsommer@eastburngray.com)
(ekernan@eastburngray.com)
Counsel for the Pennridge School District and
individual Pennridge defendants

CASSIDY CONNOR PITCHFORD
BY: CARLA R. CONNOR, ESQUIRE
295 East Swedesford Road
Suite #346
Wayne, PA 19087
ph: 610.783.3513
(cconnor@ccplegal.com)
Counsel for FCA, Ryan Clymer and Russell
Hollenbach

---

**Page 3**

(APPEARANCES - CONT'D.)

KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.
BY: VERONICA N. OLSZEWSKI, ESQUIRE
36 East Second Street
Media, PA 19063
ph: 610.565.0600
(volszewski@kgpv.com)
Counsel for Ryan Clymer and Russell Hollenbach

DRAKE, HILEMAN & DAVIS
BY: JONATHAN J. RUSSELL, ESQUIRE
252 W. Swamp Road, #15
Doylestown, PA 18901
ph: 215.348.2088
(jrussell@dhdlaw.com)
Counsel for Faith Christian Defendants

---

**Page 4**

INDEX

WITNESS: PAUL KOEHLER

By Mr. Groth        Page 5 and 115
By Ms. Russel       Page 86
By Ms. Sommer:      Page 115

EXHIBITS

NO.    DESCRIPTION                    PAGE
1  Letter dated November 20, 2013     110

---

1 (Pages 1 to 4)

Appendix 0781

Paul Koehler

Nace vs. Pennridge

November 4, 2015

**Page 5**

1    (It is hereby agreed by and among
2  counsel that sealing, certification and
3  filing are waived; and that all objections,
4  except as to the form of the question, are
5  reserved until the time of trial)
6  --------PAUL KOEHLER, having been first
7  duly sworn, was examined and testified as
8  follows:
9    (EXAMINATION)
10  BY MR. GROTH:
11    Q.  Good afternoon, Mr. Koehler.  My name is
12  David Groth, and I represent the Naces in the
13  lawsuit that's currently pending in Federal
14  District Court in Philadelphia.
15    I'm going to ask you some questions about
16  issues that I think are important to this
17  litigation and your knowledge of facts or
18  information relating to those issues.
19    Have you ever given a deposition before?
20    A.  Yes, sir.
21    Q.  In what kind of case?
22    A.  It was work-related.
23    Q.  Work as a . . .
24    A.  Outside salesperson.  It was a

**Page 6**

1  noncompete -- actually, it was in federal court
2  because it was a noncompete/right-to-work type of
3  going-on.
4    Q.  We're going to talk a little bit about
5  your work experience in a second.  Let me just
6  give you some guidelines and instructions about
7  depositions that might help us to get through it
8  more efficiently.
9    First of all, make sure you listen to the
10  question that I ask you and make sure you
11  understand the question before you begin an
12  answer.
13    If you don't understand the question,
14  just ask me to rephrase it or restate it or
15  clarify it and I'll be happy to do that for you
16  before you give an answer.
17    If you give an answer to a question, I'll
18  assume that you understood it and that you're
19  giving your best recollection of facts and
20  information going back a number of years back in
21  the 2000s.
22    Please let me complete the question
23  before you begin your answer, and I'll let you
24  complete your answer before I start another

**Page 7**

1  question, for two reasons: Number one, so that you
2  know exactly what I'm asking you because you heard
3  the end of the question before you answered; and
4  number two, the court reporter is making a typed
5  transcript of your testimony, and it's hard to
6  take down two voices speaking over each other.
7  So, if we keep stepping on each other's toes in
8  terms of talking, it's hard to make a transcript.
9    So, I'll try not to interrupt your
10  answer, and please let me finish my sentence
11  before you jump in with an answer, even though you
12  think you understand where I am going with the
13  question.
14    You have to give a verbal response to all
15  questions, no head-shakes yes or head-shakes no,
16  or hand gestures or any other gestures.
17    The court reporter can only take down
18  what's said here, so you have to answer any
19  question with a yes, a no, or a narrative
20  explanation as opposed to a gesture.
21    Please answer every question I ask you
22  fully and to the best of your ability, unless your
23  attorney objects to a question and states a legal
24  basis for the objection and specifically instructs

**Page 8**

1  you note to answer the question.
2    There may be objections to questions that
3  I ask you where your attorney will still say "I
4  object, but you can answer the question."
5    If that's the case, just answer the
6  question as if there were no objections.  The
7  objection has nothing to do with you.  It has to
8  do with the attorneys and maybe a judge at some
9  point.
10    I'm going to ask you questions looking
11  for facts and information that you know personally
12  or may have heard or learned from others or gotten
13  through other sources.  Hearsay is not an issue in
14  these discovery proceedings as opposed to trial.
15    So, if the information that you have on a
16  certain issue is not something that you knew
17  yourself or developed yourself but something
18  somebody told you, something you heard from
19  somebody else, some information you got from any
20  source other than your own knowledge, you're
21  allowed to tell us that information and tell us
22  who gave you the information and when the
23  information was given and details about the facts
24  or information.

2 (Pages 5 to 8)

Paul Koehler                                              Nace vs. Pennridge
                          November 4, 2015

Page 9

1      If you don't know the answer to a
2   question because you never knew the facts, any of
3   the facts, that I'm asking for, just tell me that.
4   That's a sufficient answer.
5      If you knew facts relating to my question
6   but you have forgotten them due to the passage of
7   time -- it happened three or four years ago,
8   whatever -- and you just don't recall them any
9   more, let me know that, and that's a sufficient
10  answer as well.
11     I don't want you to guess or speculate or
12  assume anything in response to a question. Just
13  because I ask you a question about something
14  doesn't mean that you know the answer to the
15  question. I don't know what you know until I
16  start asking you the questions. Okay?
17     A. Okay.
18     Q. But if I do ask you a question and you do
19  have knowledge or facts or information regarding
20  or responsive to that question, you're required to
21  give me all the information that you have.
22     Do you understand that this deposition
23  today is being taken -- you've taken an oath to
24  tell the truth? It's the same as if you were in a

Page 10

1   courtroom testifying in front of a judge and jury.
2      Do you understand that?
3      A. Yes, sir.
4      Q. You can estimate or approximate. Even
5   though I don't want to you guess or speculate or
6   assume anything in response that a question, if I
7   ask you things like for a date or a year or a
8   distance between objects or whatever, and you
9   can't give me a specific answer but you can
10  estimate or approximate, that's not a guess.
11  That's based on some facts that you know. Just
12  tell us you're estimating or approximating.
13     If I say what year did something happen
14  and you think it was around 2010 or 2012, just
15  tell us that and tell us you're estimating or
16  approximating.
17     Are you feeling okay today? Is there any
18  medical or other reason why you couldn't properly
19  respond to my questions today?
20     A. No.
21     Q. Okay. I'm going to ask for information
22  from you, but I don't want you to disclose any
23  information that you learned from your attorneys.
24  There is an attorney-client privilege.

Page 11

1      So, if the only source of information
2   that you have on a certain topic is from one of
3   your attorneys, you can tell me that and that will
4   be a sufficient answer; you don't have to give me
5   the information. But if you got that information
6   from some other source outside of your legal........
7   representation, you are required to give me that
8   information.
9      Finally, if you need to take a break for
10  any reason, just let us know -- a bathroom break
11  or fresh-air break or whatever you need -- and
12  we'll accommodate you if we can.
13     Do you understand those instructions?
14     A. Yes, I do.
15     Q. Mr. Koehler, what's your home address?
16     A. 112 Green Street in Sellersville,
17  Pennsylvania 18960.
18     Q. 18960?
19     A. Yes.
20     Q. And how long have you lived there? You
21  can estimate.
22     A. Since 1978.
23     Q. In preparation for this deposition today
24  did you review any documents?

Page 12

1      A. No.
2      Q. There are deposition transcripts of other
3   witnesses that have already been taken, including
4   Mr. Creeden and Mr. Babb and witnesses from Faith
5   Christian Academy. Did you see or review or even
6   skim through parts of those deposition
7   transcripts?
8      A. No, I have not. I haven't seen them.
9      Q. Have you seen any exhibits, deposition
10  exhibits, that were attached to those deposition
11  transcripts? And by that I mean contracts or
12  policies from Pennridge or things of that nature.
13     A. No.
14     Q. Did you review the deposition
15  transcript -- and by "review," again I mean
16  whether you read the whole thing or skimmed
17  through it or just read a section of it -- did you
18  review the deposition transcript of Eric Romig?
19     A. No.
20     Q. Did you talk to anybody about your
21  pending or upcoming deposition other than your
22  counsel?
23     A. Just my two assistant coaches at that
24  time.

Paul Koehler                                                          Nace vs. Pennridge
                              November 4, 2015

Page 13

1      Q. And who are they?
2      A. LeeAnn Kramer and Tyler Penhallow.
3      Q. Those two individuals are assistants for
4    the varsity girls softball team?
5      A. Yes.
6      Q. Are they coaches for any other team or
7    assistant coaches?
8      A. For any other teams. . .
9      Q. At Pennridge.
10     A. At Pennridge? No.
11     Q. What about the Sellersville Belles?
12     A. Tyler Penhallow is still an assistant
13   with the Sellersville Belles.
14     Q. LeeAnn Kramer and Tyler Penhallow have
15   been your assistants for a number of years.
16     A. Yes.
17     Q. When did they start?
18     A. My relationship with Tyler is five years
19   ago. And with LeeAnn Kramer, she used to play for
20   me. But as an assistant coach, five years ago.
21     Q. Somewhere around 2010?
22     A. Probably.
23     Q. And they were your assistant coaches for
24   the varsity girls softball team during the entire

Page 14

1    time that Eric Romig was a softball coach also at
2    Pennridge, correct?
3      A. Yes.
4      Q. Mr. Romig was the head JV girls softball
5    coach, I believe, since the 2012 season. Did he
6    have any assistants?
7      A. No.
8      Q. So, LeeAnn or Tyler would not have acted
9    as assistants for him as well?
10     A. No.
11     Q. But he was always an assistant for you,
12   for the varsity team?
13     A. Correct.
14     Q. For the 2011 and 12, and 2012 and 13
15   seasons?
16     A. Yes, sir.
17     Q. And what did Mr. Romig do as an assistant
18   coach for the girls varsity softball team?
19     A. He really didn't do anything directly for
20   the varsity softball team other than coach our JV
21   team.
22     Q. If the varsity team went to the playoffs,
23   was Mr. Romig part of the team in terms of being
24   on the bench?

Page 15

1      A. Yes, we took him along as a bench coach.
2    And during those weeks of practice he would help
3    us during practice.
4      Q. And for the season that ended in the late
5    spring or early summer of 2013, do you recall if
6    the varsity team, the girls varsity team, went to
7    the playoffs that year?
8      A. I believe that we did.
9      Q. Do you recall how deep they went into the
10   playoffs?
11     A. No, I can't remember that now.
12     Q. Do you remember when the last game was,
13   the date of the last game?
14     A. No.
15     Q. Was it in May or June?
16     A. I can guess. I can't tell you.
17     Q. Can you estimate or approximate?
18     A. I can tell you it's probably May because
19   we wouldn't have gone -- the state championships
20   is always the first week in June. We were not
21   close to that.
22     Q. Did you speak to either Mr. Babb or Mr.
23   Creeden with regard to your deposition today?
24     A. No.

Page 16

1      Q. When is the last time you spoke to Eric
2    Romig?
3      A. Probably a week before he was arrested.
4      Q. That would have been September of 2013? I
5    think he was arrested on October 1st, 2013. Sound
6    about right?
7      A. That sounds about right.
8      Q. Do you remember what you talked about
9    with him that day?
10     A. No.
11     Q. Let's talk about your educational
12   background. Can you tell me what your formal
13   education has been starting with high school
14   graduation, what year?
15     A. I graduated from Pennridge High School in
16   1974, and I graduated from Penn State University
17   in 1978.
18     Q. With a degree in. . .
19     A. Forest Products.
20     Q. Any other formal education since then?
21     A. No.
22     Q. Let's talk about your work experience
23   starting with your graduation from Penn State in
24   1978. Can you tell me who you worked for, what

                                    4 (Pages 13 to 16)

Paul Koehler                                                     Nace vs. Pennridge
                          November 4, 2015

| Page 17 | Page 19 |
|---|---|
| 1 careers you worked in, and what your position was? | 1   Q. Again, all in the Sellersville area? |
| 2   A. After graduation from Penn State I was | 2   A. All in the Sellersville area. |
| 3 employed by Scholl Lumber Company out of | 3   Q. And what were the names of the teams or |
| 4 Bethlehem, Pennsylvania. | 4 the organizations that you coached for? |
| 5   Q. In what position? | 5   A. Well, in the beginning years I coached at |
| 6   A. I was an outside salesperson. | 6 Deep Run, so Deep Run's athletic association. I |
| 7   Q. After that? | 7 coached intramural teams there and a year in the |
| 8   A. Starting in March of 1982 I went to work | 8 all-star team. And then -- twenty-two years ago |
| 9 for a company called Rotanium Products. | 9 would be... |
| 10   Q. Where are they located? | 10   Q. 2003? |
| 11   A. They are based in Chicago, Illinois. | 11   A. No. |
| 12   Q. In what position? | 12   Q. 1993? |
| 13   A. And I was an outside salesperson. | 13   A. In 1993 I started the Sellersville |
| 14   Q. Did you still live in the area here? | 14 Fast-Pitch organization. |
| 15   A. Still lived in Sellersville, yes. | 15   Q. You started it? |
| 16   Q. After that? | 16   A. Yes. |
| 17   A. That company was bought nineteen years | 17   Q. And you've been the head coach of that |
| 18 later and I now -- it's now Lawson Products, and I | 18 ever since? |
| 19 have continued in the same position, the same | 19   A. Yes. |
| 20 territory, for some thirty-three years or whatever | 20   Q. Is there more than one team? |
| 21 it is. | 21   A. Not today, there is not. |
| 22   Q. In sales. | 22   Q. Was there at one point? |
| 23   A. Yes, outside sales. | 23   A. At various times throughout the history |
| 24   Q. From like 2001? | 24 of the organization, we've had upwards of four |

| Page 18 | Page 20 |
|---|---|
| 1   A. Fourteen years ago, yes, from 2001 until | 1 teams in different age brackets. |
| 2 present with Lawson Products. | 2   Q. What are the ages? |
| 3   Q. What kind of products do you sell? | 3   A. Currently we have -- and our focus for |
| 4   A. Lawson -- we sell consumable maintenance | 4 probably the last fifteen years has been strictly |
| 5 hardware. | 5 in the 18-and-under age bracket. |
| 6   Q. Translate. | 6   Q. Going to how young? |
| 7   A. Nuts and bolts, drill bits. | 7   A. That's it. We typically focus on having |
| 8   Q. Thank you. | 8 one team. We have in the past -- in the beginning |
| 9   A. If you need anything further, I can't | 9 years we had a 12-and-under team, a 14-and-under |
| 10 figure that one out. | 10 team, and a 16-and-under team. But our focus |
| 11   Q. When did you become involved in coaching? | 11 recently, in the last decade, has been the |
| 12   A. Coaching. 1978, when I graduated from | 12 18-and-under age bracket. |
| 13 Penn State. | 13   Q. But in terms of the youngest somebody can |
| 14   Q. Where did you coach? | 14 be to be on the team, is there an age limit? |
| 15   A. I coached the Pennridge youth wrestling | 15   A. No. |
| 16 program at -- it was a youth wrestling | 16   Q. So, if somebody is really good at |
| 17 organization in the Pennridge community. | 17 thirteen, they could be on the team? |
| 18   Q. For how long, how many years? | 18   A. Absolutely. |
| 19   A. Nine years. | 19   Q. But is it fair to say that most of the |
| 20   Q. Any other coaching experience? | 20 girls on the team are in high school or late |
| 21   A. And for the past -- well, let's see. For | 21 middle school? |
| 22 the past twenty-five years I've been involved with | 22   A. Right, they're ages fourteen to eighteen. |
| 23 coaching girls fast-pitch softball, which started | 23   Q. Was Eric Romig ever hired as an assistant |
| 24 when my oldest daughter was eight years old. | 24 coach for any of the Sellersville Belles teams? |

                                                         5  (Pages 17 to 20)

Paul Koehler                                                    Nace vs. Pennridge
                              November 4, 2015

| Page 21 | Page 23 |
|---|---|

**Page 21**

1   A. Yes.
2   Q. When was that?
3   A. That was the summer of -- I'm terrible
4   with dates, so I can't remember this year that I
5   want to forget.
6   Q. The summer he was arrested?
7   A. Correct, the summer he was arrested.
8   Q. Well, he was arrested on October 1.
9   A. Yes, so it would have been that summer.
10  Q. When did the Belles start practicing or
11  playing that summer?
12  A. We would have started with tryouts the
13  second week in August, and we would have had our
14  tryouts throughout the month. We would have had
15  eight dates that summer. It would have taken us
16  to the last week in August. The teams were then
17  picked and then we started practicing after that.
18  Q. So, it would be correct to say, then,
19  that the Sellersville Belles' season didn't even
20  begin, in terms of tryouts, until a couple months
21  after Pennridge High School's season was over.
22  A. The team that Eric was involved with, the
23  Sellersville Belles, that's correct.
24  Q. That's what I'm interested in. You may

**Page 23**

1   A. I don't know that.
2   Q. With regard to the Belles.
3   A. Absolutely, yes. He would not have had
4   it in the name of the Belles.
5   Q. Well, you knew that he had contact with
6   her as a JV coach for Pennridge's girls softball
7   team, correct?
8   A. Absolutely.
9   Q. But I was limiting my question just to
10  the Sellersville Belles connection.
11  A. Correct.
12  Q. Maybe I interrupted you when we started
13  talking about the Belles, but you've been a
14  softball coach at Pennridge for how many years?
15  A. I was there for five years.
16  Q. Starting?
17  A. I guess it would be -- because I'm no
18  longer, so that ended in 2015. So, 2010 would
19  have been my first year.
20  Q. 2010? And you stopped being coach when?
21  A. This past spring, 2015.
22  Q. Why did you stop coaching there?
23  A. They didn't renew my contract.
24  Q. Do you know why?

| Page 22 | Page 24 |
|---|---|

**Page 22**

1   have had other teams that had different schedules.
2   A. Right, because our team literally runs
3   all year long.
4   Q. And the team that Eric Romig was involved
5   with, did that have a name, A Team, B Team?
6   A. We were calling it the Sellersville
7   Belles Showcase Team.
8   Q. When did their games actually begin?
9   A. They played in the fall. I can't give
10  you a date.
11  Q. Starting in September?
12  A. Late September.
13  Q. Was Elizabeth Nace a member of that
14  Showcase Team before the summer of 2013?
15  A. No, because the team didn't exist.
16  Q. Was she a member of any Sellersville
17  Belles team before August or September of 2013?
18  A. No.
19  Q. Was Mr. Romig involved in tryouts for
20  that summer showcase team?
21  A. Yes.
22  Q. So, in terms of Mr. Romig's contact with
23  Elizabeth Nace, he wouldn't have any contact with
24  her prior to the tryouts in August of 2013.

**Page 24**

1   A. What I was told in a meeting was that
2   they had unfavorable feedback from players and
3   parents on an anonymous year-end survey.
4   Q. Unfavorable in what way?
5   A. The numbers that were told to me, they
6   got thirty-five responses. When asked the
7   question would you play for this coach next year,
8   they got seventeen no's. They didn't feel that it
9   was favorable for me to continue.
10  Q. So, you weren't terminated by them. You
11  just didn't sign another contract for the next
12  season. Is that correct?
13  A. That's correct. I think I said my
14  contract was not renewed.
15  Q. Okay. Have you coached at any other
16  school?
17  A. No.
18  Q. Have you --
19  A. Well, that's not true, because I did
20  coach for Pennridge as a ninth-grade coach four or
21  five years prior to when I coached as a varsity
22  coach.
23  Q. Softball.
24  A. Softball, yes.

6 (Pages 21 to 24)

Paul Koehler                                                    Nace vs. Pennridge
                            November 4, 2015

| Page 25 | Page 27 |
|---|---|
| 1    Q. Just for one year? | 1    Q. So, like two-thirds of the roster were |
| 2    A. It was for three seasons. | 2  Pennridge players. |
| 3    Q. Three seasons, okay. What team was that? | 3    A. But they were split on two teams. |
| 4    A. That was the ninth-grade team at | 4    Q. Right. |
| 5  Pennridge. | 5    A. Yes. |
| 6    Q. So, those years would have been like 2005 | 6    Q. Oh. |
| 7  to 2008, approximately? | 7    A. So, in other words, some of the Pennridge |
| 8    A. I think it's approximately 1996 to 1999. | 8  girls were on our gold roster and some of the |
| 9    Q. And was there some reason you stopped | 9  girls were playing on the showcase roster. |
| 10  doing that coaching? | 10    Q. So, out of twenty-eight total girls on |
| 11    A. My daughter became a senior varsity | 11  the two teams, about ten of them -- |
| 12  pitcher for Pennridge, and they didn't have enough | 12    A. Might have been ten, yes. |
| 13  ninth-grade players out, so I said we just need to | 13    Q. I understand, thank you. Did Elizabeth |
| 14  stop this and I'm going to watch my daughter play. | 14  Nace try out for the Belles Showcase Team in |
| 15    Q. After your contract was not renewed, did | 15  August of 2013? |
| 16  you talk to any of the players or parents to find | 16    A. Yes. |
| 17  out who may have made these complaints about | 17    Q. Did she make the team? |
| 18  you and to discuss it | 18    A. Yes. |
| 19  with any of them at all? | 19    Q. Did she play for the Belles that season? |
| 20    A. Yes. There are discussions that go on | 20    A. Yes. |
| 21  because I have several of my high school players | 21    Q. And that was her first season for the |
| 22  who play for me in the summer. | 22  Belles, correct? |
| 23    Q. On the Belles. | 23    A. Correct. |
| 24    A. On the Belles, yes, and that invariably | 24    Q. Did you know Elizabeth Nace before then? |

| Page 26 | Page 28 |
|---|---|
| 1  comes up, you know, about why you're not coming | 1    A. Yes. |
| 2  back. So, yes, there were discussions about that. | 2    Q. How did you know her? |
| 3    Q. Were there any discussions with the | 3    A. From the high school softball team. |
| 4  Naces? | 4    Q. Pennridge High School. |
| 5    A. No. | 5    A. Yes. |
| 6    Q. Were there members of the Sellersville | 6    Q. By the way, I know you gave me your |
| 7  Belles team that did not come back to play for you | 7  employment history, but you've never taught in a |
| 8  because they had some unfavorable comments about | 8  school? |
| 9  you? | 9    A. No. |
| 10    A. No. | 10    Q. Never obtained a teaching certificate? |
| 11    Q. That they either got from players or | 11    A. No. |
| 12  parents. | 12    Q. So, when you were at Pennridge from 2010 |
| 13    A. No. | 13  until your contract was not renewed in 2015, you |
| 14    Q. And back in 2013, how many of the Belles | 14  were on the girls softball coach? |
| 15  players were Pennridge softball players, in terms | 15    A. Correct -- for Pennridge? |
| 16  of the number or percentage? | 16    Q. For Pennridge. |
| 17    A. I'll give you a guess: That on both of | 17    A. Yes. |
| 18  our teams, because that fall we would have | 18    Q. Were you coaching for any other school? |
| 19  formed -- we had two teams. | 19    A. No. |
| 20    Q. Okay. | 20    Q. Were you coaching for any other |
| 21    A. (Continuing) -- it will probably be a | 21  organization other than the Sellersville Belles? |
| 22  number as high as ten. | 22    A. No. |
| 23    Q. And how many girls are on a team? | 23    Q. In the spring and the early summer of |
| 24    A. Fourteen on a roster. | 24  2013 Elizabeth Nace was finishing up her junior |

brusilow.com          brusilow + associates          215.772.1717

Paul Koehler                                                    Nace vs. Pennridge
                              November 4, 2015

---

**Page 29**

1  year as a student at Pennridge.
2        Did you have any contact with her during
3  that season of her playing for the JV team that
4  year?
5        A. No, other than at practices: "Hello, Liz.
6  Hi."
7        Q. You knew her by sight?
8        A. And to talk to JV players as a varsity
9  coach, right.
10       Q. Were there tryouts for the JV team?
11       A. You tried out for the high school squad.
12       Q. Okay.
13       A. And then the best fourteen players or
14  thirteen, whatever it may have been that year,
15  were varsity players, and the other players that
16  would have scored high enough would have been the
17  JV players.
18       Q. So, there was just a tryout for the
19  varsity, and the people who were in the lower
20  fourteen were on the JV team.
21       A. Correct.
22       Q. Who decided whether or not she made the
23  twenty-eight?
24       A. The coaching staff.

---

**Page 31**

1  form, but you can answer.
2        THE WITNESS: Very positive, very
3  supportive mom, knew how to do a really good
4  scorebook, because I'm real picky about the
5  scorebook and it was an excellent scorebook.
6        So, a lot of attention to detail
7  from that aspect of what went on, and she
8  was a mom who kept her mouth shut.
9        I don't like parents in dugouts,
10  so she conducted herself in a manner that
11  was okay with me.
12  BY MR. GROTH:
13       Q. When you stated something about parents
14  in dugouts, you're talking about -- was she in the
15  dugout as a scorekeeper?
16       A. Yes.
17       Q. And there were no other parents in the
18  dugout.
19       A. No.
20       Q. In that 2013 season where Elizabeth Nace
21  played for the JV team under Eric Romig in the
22  spring and early summer of 2013, was she brought
23  up to the varsity team at the end of the year?
24       A. I don't remember.

---

**Page 30**

1        Q. Consisting of?
2        A. LeeAnn Kramer, Tyler Penhallow, Eric
3  Romig, and myself.
4        Q. Did you know anything about her family at
5  that time, when she first made the team?
6        A. I know her dad had coached softball in
7  the local community program.
8        Q. James Nace?
9        A. Yes.
10       Q. How about April Nace? Did you know her at
11  all?
12       A. No, other than a mom and a scorekeeper.
13       Q. What was her function as a scorekeeper?
14  What did she do?
15       A. Well, she didn't do that until -- for us,
16  she didn't do that until Elizabeth's
17  junior year, when I needed a scorekeeper.
18       Q. And she was a scorekeeper for Liz' team?
19       A. She kept score for half the season for
20  the varsity squad, and she was also keeping score
21  for the Sellersville Belles Showcase Team that
22  year.
23       Q. What was your impression of April Nace?
24       MS. SOMMER: Objection to the

---

**Page 32**

1        Q. Was it a custom or practice to bring some
2  of the junior varsity players up to the varsity if
3  the varsity team made the playoffs?
4        A. Yes.
5        Q. And do you recall whether or not -- I
6  think maybe we talked about this -- whether the
7  varsity team made the playoffs in 2013?
8        A. Yes.
9        Q. They did. Does that refresh your
10  recollection at all as to whether or not Elizabeth
11  was called up to play on the varsity team?
12       A. I can't tell you yes or no.
13       Q. It could have happened.
14       A. And because she was a pitcher, she could
15  have been one of the players that we took along.
16       Q. When did you first meet Eric Romig?
17       A. I'm going to say March or -- I'm sorry,
18  I'll say February -- the year that he was hired by
19  the school district.
20       Q. So, if he was hired for the 2012 season,
21  you're talking about February 2012?
22       A. Correct.
23       Q. So, the spring season in 2013 would have
24  been his second year as a coach.

brusilow.com              brusilow + associates              215.772.1717

Paul Koehler                                                    Nace vs. Pennridge
                          November 4, 2015

---

Page 33

1    A. Correct.
2    Q. And how did you meet him? Where did you
3  meet him?
4    A. I physically face-to-face met him for the
5  first time at our gym.
6    Q. In February of 2013.
7    A. Yes.
8    Q. Had you talked to him before then on the
9  telephone?
10   A. Yes.
11   Q. Did somebody instruct you to talk to him
12 about a coaching position?
13       MS. SOMMER: I'm sorry, can we go
14    back? Did you say -- was your question --
15    would you repeat the question?
16       MR. GROTH: It should have been
17    2012.
18       MS. SOMMER: Yes.
19       MR. GROTH: I'm sorry, I gave the
20    wrong date.
21 BY MR. GROTH:
22   Q. You met him at the gym in 2012, in
23 February. That was the first year?
24   A. Yes.

---

Page 34

1        MR. GROTH: Is that what you were
2    asking about?
3        MS. SOMMER: Yes.
4  BY MR. GROTH:
5    Q. Did somebody instruct you to talk to him,
6  the athletic director, the principal, whatever,
7  about an assistant coaching position?
8    A. No one instructed me to contact him, but
9  we were looking for a JV coach. It was probably in
10 November of the -- I guess it would be now 2011.
11   David Babb had contacted me and said "I
12 got a contact by Eric Romig, former high school
13 coach at Quakertown, looking for a coaching
14 position in softball. He was looking for any
15 coaching job," and that's what David had told me.
16   I told him that we didn't have a -- we
17 didn't need a head coach, but that I would pass
18 the information on to you if you wanted to contact
19 him. So, I contacted him in November --
20   Q. By phone?
21   A. -- by phone, yes, and asked him if he
22 would be interested in -- do you know what? Not by
23 phone. It was by email. It was by email.
24   Q. Okay.

---

Page 35

1    A. I contacted him by email, would he be
2  interested in applying for the JV position at
3  Pennridge, and he replied no. And then, of course,
4  I asked why not? And he said "Because I want to
5  run a program."
6    I explained to him that the way I run our
7  JV program, our JV program needs to prepare our JV
8  players to play varsity one day, and he said,
9  "Well, that's not what I'm looking for."
10   I said, "Fine. After the beginning of
11 the year, if you've got nothing, feel free to give
12 me a call."
13   Q. Okay.
14   A. "If we're still looking."
15   Q. Let me interrupt you right there: Did
16 David Babb tell you that his prior coaching
17 experience with Romig at Quakertown was as a
18 basketball coach?
19   A. No, as a softball coach at Quakertown.
20   Q. I'm sorry, okay. What happened after
21 that?
22   A. After the first of the year I followed up
23 because I had not heard anything. We were still
24 looking for a JV coach and I sent him a note, an

---

Page 36

1  email, and he said, "Well, maybe I'll come out.
2  I'd like to come out to an open gym and see what
3  you've got going on, what's happening."
4    Q. All right.
5    A. So, that's when I first met him. He came
6  to one of our open gyms to see what Tyler, LeeAnn
7  and myself were doing with our players who would
8  be out in an open gym.
9    Q. For practice?
10   A. Yes, a voluntary, unplanned practice.
11   Q. Does the PIAA know about that?
12   A. For the PIAA officials who might be in
13 the room.
14   Q. When you spoke to Mr. Romig first or
15 emailed him in November 2011, was there also a
16 follow-up telephone conversation where you talked
17 about "There is no head coaching position
18 available, but I need somebody as an assistant to
19 run the varsity program"?
20   A. I don't know if it was via phone or
21 email.
22   Q. Okay. You think you had some
23 back-and-forth with him where he said he wanted to
24 run his own program.

---

brusilow.com           brusilow + associates           215.772.1717

Appendix 0789

Paul Koehler                                                      Nace vs. Pennridge
                          November 4, 2015

---

**Page 37**

1    A. Correct.
2        Q. Did he tell you during any of those
3    discussions, whether by email or telephone, that
4    he had actually run the varsity girls basketball
5    program at Faith Christian Academy for a number of
6    years?
7    A. No.
8        Q. Did you know from any source of
9    information, Mr. Romig or anybody else, that he
10   had coached from, I think, approximately 2005 to
11   2009 at Faith Christian Academy as a head
12   basketball coach?
13   A. No.
14       Q. Did you ask him if he had any other
15   coaching experience other than his coaching
16   experience at Quakertown?
17   A. No.
18       Q. When you first met Mr. Romig at the open
19   gym in February of 2012, did he tell you that he
20   had been a coach for -- a head basketball coach,
21   varsity basketball coach, for a number of years at
22   Faith Christian Academy?
23   A. No.
24       Q. Did you ask him about his coaching

---

**Page 38**

1    experience, either at Quakertown or anywhere else
2    he may have coached?
3        A. At Quakertown.
4        Q. You already knew that from David Babb.
5        A. I knew that from David Babb. I also
6    recalled that because I followed Pennridge
7    softball and knew coaches in this area.
8        So, we briefly talked about the fact
9    that, as he would say, his claim to fame was that
10   Quakertown beat CB South the year they were state
11   champions.
12       Q. Do you recall asking him if he had any
13   other coaching experience other than Quakertown?
14   A. No.
15       Q. Did you ask him why he stopped coaching
16   at Quakertown?
17   A. No.
18       Q. Did you know that he had not coached at
19   Quakertown since sometime in 2009 or early 2010?
20   A. Wasn't aware of the date.
21       Q. Were you aware that he wasn't coaching
22   anywhere for a number of years before he was
23   looking into this Pennridge position?
24   A. Yes.

---

**Page 39**

1        Q. Did you ask him why he wasn't coaching?
2    A. No.
3        Q. What happened after this meeting with Mr.
4    Romig at the open gym in February of 2012?
5        A. He said, "Look, I'll think it over. I'll
6    give you a call."
7        Q. And?
8        A. A couple of days later he called me and
9    said "I really like what you're doing. I'd like
10   to be involved in the program. If you still need
11   a JV coach, I'd love to fill the position."
12       I told him that David Babb was the guy
13   who makes those final decisions, "but go ahead and
14   talk to him."
15       Q. Did he do that, to the best of your
16   knowledge?
17       A. To the best of my knowledge, he did.
18       Q. Did you do any formal, in-person
19   interview with Mr. Romig for the JV position?
20   A. No.
21       Q. Do you know if Mr. Babb did?
22   A. No.
23       Q. No, he didn't or --
24       A. I don't know.

---

**Page 40**

1        Q. Did Mr. Babb consult with you before
2    deciding to extend an offer to Mr. Romig?
3        A. I don't know that -- I can't recall if we
4    had an exact conversation about it.
5        Q. But you did direct Mr. Romig to talk to
6    Mr. Babb about the position --
7        A. Correct.
8        Q. -- and sometime after that Mr. Babb
9    offered the position and Mr. Romig accepted,
10   correct?
11       A. Yes.
12       Q. Before any contract was signed by Mr.
13   Romig, did Mr. Babb or Principal Creeden ask you
14   to conduct any type of background investigation
15   into Mr. Romig?
16       And by that I mean checking out any of
17   his references or contacting any prior supervisors
18   who were his superiors when he was coaching
19   someplace, or anything of that nature at all?
20   A. No.
21       Q. Did they ask you to get involved in the
22   hiring process in any way?
23   A. No.
24       Q. Have you ever been asked by David Babb or

---

Paul Koehler                                              Nace vs. Pennridge
                              November 4, 2015

---

**Page 41**

1  Tom Creeden to do that for any of the assistant
2  coaches in softball?
3      A. No.
4      Q. Assistant coaches LeeAnn and Tyler, were
5  they hired at the time that you were the head
6  coach?
7      A. Yes.
8      Q. And what was the process that LeeAnn went
9  through to get hired as an assistant coach to your
10  program?
11      A. I knew she had to fill out -- have all
12  her background checks done, had to sign a
13  contract. I think she was -- that's all that I
14  know.
15      Q. Did you do anything to vet her, to check
16  with her references, to check about or ask her
17  about her prior coaching experience or anything of
18  that nature?
19      A. No. I knew LeeAnn for eight years. She
20  played for me. I followed her through college. I
21  know that she was a grad assistant at Pitt
22  Bradford, where she played, and that it was my
23  desire to have a female assistant coach involved
24  with our varsity program because, as a male, there

**Page 42**

1  are those situations where girls get hurt or
2  whatever and it's better handled by a female than
3  a male.
4      Q. And by "handle," you mean in case there
5  is any physical contact, that type of thing.
6      A. Exactly.
7      Q. Is there physical contact between coaches
8  or assistant coaches and girls softball players in
9  terms of training and instructions: How to hit
10  the ball; how to throw the ball; what position to
11  be in; how to turn your body a certain way? Is
12  there hands-on type coaching that has to go on?
13      A. For the most part, no. But on occasion,
14  if a girl just doesn't get it; if she's just not
15  getting into a position that you need her to be
16  in, it's sometimes best to just physically move a
17  knee or rotate a hip to give her the sense of
18  what's going on.
19      Q. So, in the coaching process, the normal
20  coaching process for girls softball, there could
21  be some hands-on instruction on how to do certain
22  things as a softball player.
23      A. Yes.
24      Q. Would you leave those types of things to

**Page 43**

1  a female assistant, or would you sometimes do that
2  yourself?
3      A. I don't know that I would stop and go
4  "Oh, here, LeeAnn, you come do this." It happens
5  when it happens. It happens in the moment; you
6  know, a team situation. So, I don't know that we
7  would intentionally stop and switch off to someone
8  else.
9      Q. So, you might do it yourself?
10      A. Yes.
11      Q. Tyler Penhallow may do it himself?
12      A. Correct.
13      Q. Eric Romig, you would expect, would have
14  done it with his JV team girls.
15      A. Correct.
16      Q. Back in 2013 were you cognizant, as
17  somebody who has coached first wrestling and then
18  girls fast-pitch softball for a number of years,
19  of reports in the media, whether it be the
20  television or newspapers or whatever, of incidents
21  of coaches getting physically sexually involved
22  with players, female players?
23      A. Probably every week.
24      Q. And how would you become aware of that

**Page 44**

1  type of thing?
2      A. On the TV, see it in a newspaper. It
3  happened. It appears -- it just happens.
4      Q. In your coaching experience, has anything
5  like that ever happened to a team that you were
6  involved with, with any assistant coaches or any
7  players, female players?
8      A. One time.
9      Q. What was that?
10      A. Mr. Eric Romig.
11      Q. Did you happen to see a newspaper article
12  in The Inquirer within the last year where they
13  had the names, faces and accounts of coaches in
14  the Philadelphia area, male coaches, having
15  inappropriate sexual relationships with female
16  players?
17      A. No.
18      Q. Mr. Romig being one of them? You don't
19  recall seeing that article?
20      A. No.
21      Q. During your time as a head coach of girls
22  fast-pitch softball at Pennridge -- and you
23  haven't coached any other sport of Pennridge,
24  correct?

Paul Koehler                                                    Nace vs. Pennridge
                              November 4, 2015

---

Page 45

1    A. No.
2    Q. (Continuing) -- during your time as a
3  girls fast-pitch softball coach, did you ever
4  receive any training or instruction, either
5  in-service in the school by school employees or
6  administrators or from some outside person brought
7  in to train, about sexual abuse and harassment
8  issues?
9    A. No.
10   Q. Never?
11   A. No.
12   Q. Not from David Babb?
13   A. No.
14   Q. Not from Mr. Creeden?
15   A. No.
16   Q. Not from Ray Scarpantonio?
17   A. Don't even know who he is.
18   Q. Were you ever invited to any training or
19  instruction sessions dealing with the topic of the
20  recognition of and reporting of suspected sexual
21  harassment or abuse of female players?
22   A. No.
23   Q. Were you ever given any training or
24  instruction with regard to -- at Pennridge; not

---

Page 46

1  anything outside Pennridge, but Pennridge -- any
2  training or instruction with regard to the
3  mandatory-reporting provisions of the Pennsylvania
4  Child Protective Services Law?
5    A. No.
6    Q. Have you ever heard of the Pennsylvania
7  Child Protective Services Law?
8    A. No.
9    Q. Do you know what a mandatory reporter is?
10   A. No.
11   Q. Do you know, back in 2010 through the end
12  of 2014, when your contract was not renewed by
13  Pennridge, were you considered to be a mandatory
14  reporter? Did anybody ever tell you that?
15   A. No.
16   Q. That if you suspected -- not that you
17  knew; not that you had proof; not that you saw it
18  with your own eyes, that you just suspected that
19  there may have been some inappropriate contact or
20  conduct between a coach and a student -- that you
21  were required to report it to somebody at
22  Pennridge?
23   A. No.
24   Q. Were you ever given a written copy of any

---

Page 47

1  policy, practice or procedure at Pennridge that
2  described what sexual harassment was and what was
3  to be done if you knew or suspected or had
4  reasonable cause to believe that there was some
5  sexually inappropriate activity going on between a
6  coach and a player?..
7    A. I will tell you the only thing that I was
8  given by Pennridge was a coach's binder that
9  stated the policies and everything from picking a
10  team and informing players to fund-raising.
11       To my recollection, I will tell you I did
12  not read it cover-to-cover and I do not recall
13  having seen any of that in there. Was it there?
14  I'm not sure of that.
15   Q. Was there only one binder given to you
16  when you first started coaching, or did you get a
17  new one every year?
18   A. Yes, the beginning of the year I -- when
19  I was first hired I was given the binder.
20   Q. No subsequent binders after that.
21   A. No.
22   Q. Do you still have that binder?
23   A. Yes.
24   Q. Can you turn that over to your attorneys,

---

Page 48

1  please, and I'll request it from them?
2    A. Sure.
3    Q. And that would be for the year 2010 going
4  up until the end of 2014, correct?
5    A. Yes.
6    Q. What I'm specifically asking you about is
7  whether or not you were given any written material
8  by Pennridge, whether it was in the coaches binder
9  or handbook -- some people refer to it as a
10  handbook or whatever -- or in any other fashion
11  that dealt with the topic of unlawful harassment
12  and actually gave a definition of sexual
13  harassment as contained on the second page of the
14  document I'm showing you.
15       I'm showing you the Pennridge School
16  District Professional Employees Policy on Unlawful
17  Harassment, policy number 448, revised June 21st,
18  2004.
19       You don't have to read the whole thing,
20  but I just want to know whether you have ever seen
21  that document or a similar document from Pennridge
22  before.
23   A. Are you asking me if I've ever seen this
24  or if I believe I've ever seen this?

---

12  (Pages 45 to 48)

Appendix 0792

Paul Koehler                                          Nace vs. Pennridge
                          November 4, 2015

<table>
<tr><td>

**Page 49**

1    Q.  Yes.
2    A.  I don't believe I've ever seen this.
3    Q.  And on the second page there is a section
4  that actually, I think, defines the term sexual
5  harassment.
6    A.  Yes.
7    Q.  Did you ever see that policy in any
8  written form during your four years or five years
9  at Pennridge?
10    A.  Not to the best of my recollection.
11    Q.  And nobody from Pennridge or somebody
12  Pennridge hired ever came to you and tried to
13  instruct you or teach you about the reporting of
14  sexual harassment.
15    A.  Correct, no.
16    Q.  Do you know whether or not anybody at
17  Pennridge ever trained or instructed your
18  assistant coaches with regard to the issue of
19  sexual harassment or abuse?
20    A.  Someone from Pennridge?
21    Q.  Yes.
22    A.  No.
23    Q.  Do you know if somebody outside of
24  Pennridge ever did that?

</td><td>

**Page 51**

1    Q.  And why was that?
2    A.  Because in today's world of litigation
3  and things and accusations and things that can go
4  on, I just did not want my coaching staff to be
5  put in a situation where it was one-on-one and one
6  person's word against another.
7    Q.  He said/she said.
8    A.  Correct.
9    Q.  Was there any policy that Pennridge, the
10  school district, gave to you regarding texting
11  between coaches and players?
12    A.  No.
13    Q.  Did you have your own policy with regard
14  to texting between coaches and players?
15    A.  No.
16    Q.  Was there any prohibition of Tyler
17  Penhallow or Eric Romig texting their own players
18  or players that they were coaching about change of
19  practice times, cancellation of games due to rain,
20  anything like that?
21    A.  What was the question? I'm sorry.
22    Q.  Were there texts that were sent by you or
23  your assistant coaches to the female players on
24  the Pennridge teams, JV or varsity, regarding

</td></tr>
<tr><td>

**Page 50**

1    A.  The only discussions that ever went on --
2  and it was at the beginning of each season -- I
3  would meet with our coaches.
4    Q.  Just your coaches.
5    A.  Just our coaches.
6    Q.  Not all --
7    A.  Just the softball program, so that we
8  could plan what we were going to do, how we were
9  going to approach the tryouts, etcetera, etcetera.
10    And Paul Koehler's discussion and
11  instruction to my assistant coaches were -- and
12  then of course we also passed this on to our
13  parents -- that we will not leave a player at a
14  field by herself; we as coaches will not by
15  ourselves stay with a player; that there will
16  always be two of us; and that we as coaches,
17  unless there are two of us, we will never offer a
18  girl a ride home, will not do anything that would
19  put a one-on-one situation between a player and a
20  coach.
21    Q.  Is that just the player and a male coach
22  or even --
23    A.  Player and male or female coach.  It did
24  not matter.

</td><td>

**Page 52**

1  things such as change in practice time or
2  cancellation of games due to rain or anything like
3  that? Sports related.
4    A.  I can only speak for myself.  My
5  assistants Tyler or LeeAnn would have not done it,
6  to the best of my knowledge.
7    Q.  Why?
8    A.  Because it wasn't their job.
9    Q.  Whose job was it?
10    A.  It would have been my job to communicate
11  that.
12    Q.  Okay.
13    A.  Information that Eric would have passed
14  on to his team would have been his job to pass
15  that on.  I would have only texted or communicated
16  with a captain of our team, and that was typically
17  about practices.  But if a game was cancelled and
18  it was announced at school, there was no real
19  reason for me to text a player to say a game was
20  cancelled.
21    Q.  Did you ever have occasion to text your
22  players?
23    A.  I would have texted a captain about make
24  sure girls are ready for practice tomorrow, but it

</td></tr>
</table>

13 (Pages 49 to 52)

Paul Koehler                                        Nace vs. Pennridge
                        November 4, 2015

Page 53

1    was very, very minimal.
2        Q. Was that on purpose?
3        A. On purpose.
4        Q. What was the reason?
5        A. Because I don't want people -- a
6    59-year-old male does not need to be texting
7    16-year-old girls.
8        Q. Had you heard of situations -- when you
9    said that you saw in the media almost weekly
10   reports of coaches having inappropriate physical
11   contact with female athletes, did you hear or read
12   or of know of stories of coaches who were
13   inappropriately texting females that they were
14   coaching?
15       And by "inappropriate" I mean about
16   sexual things and things of that nature.
17       A. I can't recall that.
18       Q. Okay. Did you instruct Eric Romig -- he
19   was an assistant coach under you, correct?
20       A. Correct.
21       Q. (Continuing) -- did you instruct him not
22   to text any of those female players on the team?
23       A. No.
24       Q. Before he was arrested did you know

Page 54

1    whether or not he was texting any female players
2    on the Pennridge JV team?
3        A. No.
4        Q. If you had known that he was, would you
5    have objected to that?
6        A. I would have recommended that he did not.
7        Q. Would have you recommended that he maybe
8    just text like the captain of the team and have
9    that person text everybody else?
10       A. Yes.
11       Q. Was there ever a situation where you
12   texted or any of your assistant coaches texted any
13   female player on your teams about
14   non-sports-related activities, personal
15   information, personal activities having nothing to
16   do with the girls fast-pitch softball teams?
17       A. No.
18       Q. Did you know prior to Mr. Romig getting
19   arrested on October 1st, 2013 that he was texting
20   Elizabeth Nace thousands of times about
21   non-sports-related issues?
22       A. No.
23       Q. Did anybody ever give you any information
24   about Mr. Romig's texting practices to his

Page 55

1    students who he was coaching?
2        A. Prior to his arrest?
3        Q. Prior to his arrest.
4        A. No.
5        Q. Now, you had pretty limited contact with
6    Elizabeth Nace prior to Mr. Romig's arrest,
7    correct?
8        A. Correct.
9        Q. In fact, the only direct contact you
10   would have with her as a player would have been
11   when she came up to the varsity team at the end of
12   her junior year from the JV team.
13       A. Would have been her. . .
14       Q. That would have been --
15       A. . . .sophomore year.
16       Q. -- her sophomore year, okay?
17       A. Yes.
18       Q. What were your impressions of Elizabeth
19   Nace as a player, as a person?
20       A. She was a pitcher, so she was very
21   hard-working, very focused, never seemed to get
22   rattled based on things that went on.
23       Q. To outward appearance?
24       A. Correct. She was just very calm, level,

Page 56

1    never an up or a down. So, that would have been
2    what I would have remembered of her.
3        Q. Was that unusual for somebody that you
4    coached of her age?
5        A. If you've ever coached teenage females,
6    drama is a favorite. So, a squad of fourteen
7    girls, there is a lot of drama that goes on. Liz
8    was not a drama queen, not someone involved in
9    that type of behavior.
10       Q. Was she a tough competitor?
11       A. Very competitive.
12       Q. In terms of her size, especially compared
13   to other pitchers, was she large or small, right
14   in the middle?
15       A. Small.
16       Q. Small.
17       A. Yes.
18       Q. What do you believe her height and weight
19   to be back in 2013?
20       A. Do we get in trouble for guessing weights
21   of girls?
22       Q. When they're fifteen, probably not.
23       A. She can't have been 115 pounds if she was
24   carrying 35-pound weights in her pockets, and

14  (Pages 53 to 56)

                                                    Appendix 0794

Page 57

1 maybe five foot four.
2 Q. Did she ever have any outbursts of
3 emotion?
4 A. Never.
5 Q. Very controlled. Very -- you said
6 focused before?
7 A. Uh-huh.
8 Q. Yes?
9 A. Yes. I'm sorry.
10 Q. What about if she wasn't doing well or if
11 she was, you know, not pitching well or the team
12 was losing? How did she comport herself in those
13 situations?
14 A. There is no difference. She was the
15 same.
16 Q. Was there else, any other girl on the
17 team, who was like that?
18 A. I can't attest to yes or no.
19 Q. They're all different in a certain
20 respect. I understand that.
21 A. Yes.
22 Q. Did she seem to you to be mature beyond
23 her age, how she handled things in the competitive
24 atmosphere and in terms of how she was doing as an

Page 58

1 athlete?
2 A. Yes, because my oldest daughter was also
3 a pitcher and was physically very different than
4 what Liz was, but mentally and the way she
5 approached the game, they were both very similar.
6 So, like I said, she didn't act like a
7 fourteen- or a fifteen-year-old. She acted like
8 she was a seasoned veteran, although she wasn't.
9 Q. And she didn't have the physical
10 attributes that a lot of other pitchers have in
11 terms of size and weight and strength, that type
12 of thing?
13 A. Correct.
14 Q. But she still managed to compete?
15 A. Correct.
16 Q. Was she a pitcher? I mean, if you had to
17 compare her to others in her league, on her team
18 or whatever, in her junior and senior years.
19 A. Well, her senior career -- I'll refer to
20 the paper, but I believe she was second-team
21 all-league as a pitcher. We went into both her
22 junior and senior years expecting to use a
23 committee of pitchers.
24 Q. Within one game?

Page 59

1 A. Within one game.
2 Q. Right, no one would pitch the whole game.
3 A. I didn't view that I would have a pitcher
4 who would be that dominant. In Liz' senior year
5 especially, Liz ended up being the pitcher.
6 Q. For your team?
7 A. For our team. She was the shut-town
8 person. When we needed a top performance, she was
9 the one who ended up being the performer.
10 Q. And this was after Eric Romig's arrest.
11 A. Correct.
12 Q. And did she pitch complete games
13 sometimes?
14 A. Yes.
15 Q. Was she on the varsity or junior year as
16 well, or just her senior year?
17 A. Her junior year as well.
18 Q. Did you notice any differences in her as
19 a player, as a competitor, as a student athlete,
20 between the time or after the time Eric Romig was
21 arrested and before he was arrested?
22 A. I really can't compare the before and the
23 after because I didn't see her play all that --
24 she played JV for us.

Page 60

1 Q. Right.
2 A. So, I really can't comment on the
3 difference between her sophomore year and her
4 junior year.
5 Q. Did you ever discuss her situation with
6 Eric Romig with her?
7 A. Did I ever discuss. . .
8 Q. Yes. After Eric Romig was arrested and
9 she played softball for the varsity team, did you
10 discuss her situation with Mr. Romig at all?
11 A. Until I got a letter, email, requesting
12 that I come for -- informing me of a lawsuit,
13 officially I was never informed that Elizabeth
14 Nace was in fact the player involved with Eric
15 Romig.
16 Q. How about unofficially?
17 A. Not even unofficially. Just by conjecture
18 and the word on the street.
19 Q. Word on the street from other players,
20 parents of players, that type of thing?
21 A. Yes, yes, and yes.
22 Q. Other coaches in the school? Other
23 administrators in the school?
24 A. No, it would not have come from anybody

                                   15 (Pages 57 to 60)

Appendix 0795

Paul Koehler                                          Nace vs. Pennridge
                        November 4, 2015

Page 61

1    from school. So, to answer your original
2    question, I never discussed it with her.
3        Q. He was arrested, Mr. Romig, on October
4    1st, 2013, so she would have been playing for the
5    varsity team starting in March of 2014.
6        A. Correct.
7        Q. And certainly by that time you had heard
8    through the grapevine, through whatever sources
9    you had, that she was the person that was the
10   victim of Mr. Romig's sexual's misconduct.
11       A. Correct.
12       Q. During that period of time, between the
13   time Mr. Romig was arrested and the time she
14   started playing for you in 2014 in the springtime,
15   did you have any conversations about her or her
16   relationship with Mr. Romig with the principal,
17   Mr. Creeden?
18       A. No.
19       Q. Did you have any conversations with the
20   athletic director, David Babb?
21       A. No.
22       Q. Did they give you any direction or
23   instruction or guidance or any help at all in how
24   you should handle the situation with her as a

Page 62

1    coach?
2        A. No.
3        Q. Did they send you to see any guidance
4    counselor in the school to say that "A member" --
5    even without giving a name -- "a member of your
6    team has been the subject and victim of sexual
7    abuse by a coach who coached under you. This is
8    the way you should handle things that you might
9    want to do as a coach with that player"?
10       A. I was given the name of the guidance
11   counselor who was having meetings, discussions
12   with players, the team, as this whole thing
13   unfolded in that fall.
14       I was also able to talk to her in the
15   spring as we came into the season about -- and she
16   just continued to inform me that the players are
17   very mature about that; they're handling it very
18   well; that things are going very well. So, that's
19   all I knew of it.
20       Q. Who was that?
21       A. O'Connor, last name O'Connor. Her name
22   flies out of my mind right now.
23       Q. And did you seek her out or did she come
24   to talk to you about Elizabeth Nace?

Page 63

1        A. I believe I sought her out.
2        Q. And you weren't sent to her by David Babb
3    or Thomas Creeden?
4        A. Correct.
5        Q. Other than you seeking out the guidance
6    counselor, Ms. O'Connor, to talk about the
7    situation, did anybody from the administration at
8    Pennridge offer you any type of guidance, support,
9    help, information on how to deal with one of your
10   players who was a victim of sexual abuse?
11       A. No.
12       Q. Do you know, other than the guidance
13   counselor --
14       A. Let me clarify that: No, but it was a --
15   how do I say this? We can't get involved. You
16   can't discuss this with the player. You can't ask
17   her to do things, talk to her team about it.
18       In other words, told me what I shouldn't
19   do than how I could deal with it.
20       Q. Did the guidance counselor give you any
21   guidance that you as a coach could benefit from on
22   how to treat or how to deal with a victim of
23   sexual abuse on your team, even without talking to
24   the victim herself, but what you as a coach could

Page 64

1    do or should be doing to help that player along in
2    her athletic pursuits?
3        A. No.
4        Q. Was there any special arrangement made to
5    ensure that, for example, Tyler Penhallow was not
6    alone with Elizabeth Nace for any period of time
7    or for any reason?
8        A. No.
9        Q. Or you yourself.
10       A. No.
11       Q. Did you talk to the detectives that
12   investigated Mr. Romig's conduct, the Bucks County
13   detectives?
14       A. No.
15       Q. They never asked you for an interview?
16       A. Never.
17       Q. Do you know if they interviewed any of
18   your assistant coaches?
19       A. No.
20          MR. RUSSELL: No, you don't
21       know --
22          THE WITNESS: I do not know that,
23       no.
24

                                    16 (Pages 61 to 64)

                                          Appendix 0796

Paul Koehler                                          Nace vs. Pennridge
                        November 4, 2015

---

Page 65

1   BY MR. GROTH:
2       Q. Your assistant coaches never told you
3   that they were interviewed by the detectives.
4       A. Correct, they did not. To the best of my
5   knowledge, they were never interviewed.
6       Q. Did it ever come to your attention from
7   any source that girls on the varsity softball team
8   were speaking in front of Mr. Romig about
9   attractions they had to male teachers in the
10  school or coaches in the school and having some
11  kind of sexual relationship with them?
12      Did anybody ever come to you and report
13  to you that that type of conversation was taking
14  place among your varsity female athletes?
15      A. No.
16      Q. Mr. Romig never came to tell you that he
17  had overheard or been present when girls from the
18  varsity team were making those kind of statements
19  and comments, did he?
20      A. Never.
21      Q. And your own assistant coaches never told
22  you that they had overheard the varsity girl
23  players making those kind of comments.
24      A. No.

---

Page 66

1       Q. Did your own assistant coaches tell you
2   that Eric Romig had told them that he had been
3   present when the varsity girls were talking about
4   being attracted to and having some kind of sexual
5   relationship with teachers or coaches at the
6   school?
7       A. No.
8       Q. If they had been told that by Mr. Romig,
9   who was the JV coach, would that be something that
10  you would expect your own coaches, assistant
11  coaches, to tell you about?
12      MS. SOMMER: Objection to the
13  form. You can answer.
14      A. I would hope they would have.
15      Q. Were the assistant coaches given copies
16  of the coach's binder or handbook that you're
17  referring to?
18      A. No.
19      Q. Just the head coaches were.
20      A. Yes.
21      Q. And you don't believe there was anything
22  in the binder about a sexual harassment policy at
23  the school, correct?
24      A. Not that I can recall.

---

Page 67

1       Q. Okay. Did you discuss with your assistant
2   coaches Mr. Romig's arrest and the accusations or
3   allegations against him shortly after this came to
4   light?
5       A. Absolutely.
6       Q. Did you ask them whether or not they had
7   seen anything, heard anything, knew anything,
8   suspected anything regarding Mr. Romig's conduct
9   with any of the female softball players at
10  Pennridge?
11      A. Yes.
12      Q. And what did they say?
13      A. Nothing. They were shocked, as I was.
14      Q. Do you know whether or not your assistant
15  coaches had any conversation with the girls
16  softball players about Mr. Romig's conduct after
17  he was arrested?
18      In other words, whether your assistant
19  coaches went to the girls on the softball team and
20  said did you hear anything, know anything, suspect
21  anything?
22      A. No.
23      Q. You don't know if that ever happened?
24      A. I don't know if that ever happened.

---

Page 68

1       Q. You did not do that, correct?
2       A. No.
3       Q. Was there any effort at Pennridge that
4   you're aware of, Pennridge High School, to try to
5   determine whether or not Elizabeth Nace was the
6   only victim of Mr. Romig's sexual abuse at
7   Pennridge?
8       A. Repeat again? I'm sorry.
9       Q. Sure. Was there anybody at Pennridge
10  High School that made any effort, to your
11  knowledge, to determine whether or not Elizabeth
12  Nace was Eric Romig's only victim, sexual abuse
13  victim, at Pennridge High School?
14      A. No.
15      Q. Do you know whether the county detectives
16  or the DA's Office made any effort to do that?
17      A. No.
18      Q. When you said the guidance counselor came
19  in to meet with the players on the team after Mr.
20  Romig's arrest, who was at that meeting beside the
21  players? Were you there?
22      A. No. I was not involved in any of the
23  meetings, nor were any of my assistant coaches.
24      Q. That was my next question. This was just

---

Paul Koehler                                          Nace vs. Pennridge
                         November 4, 2015

Page 69

1    the players, female players, and the guidance
2    counselor.
3        A.  My understanding is just the players and
4    the female guidance counselor.
5        Q.  Was it your understanding or impression
6    that within a relatively short period of time the
7    rest of the girls on the softball team, varsity
8    and JV knew who the person was that Mr. Romig
9    victimized?
10       A.  That would be my assumption, yes.
11       Q.  What kind of reaction did the players
12   have to Elizabeth Nace when she came back to play
13   softball after Mr. Romig's arrest?
14       A.  If you came to our practice or you came
15   to a game, you would have seen none.  They
16   practiced and played as though nothing had
17   happened.
18       Q.  Was there ever a reaction -- comment,
19   statements, heckling or whatever -- from others
20   outside the community at any of the games that
21   Elizabeth Nace participated in?
22       A.  Never.
23       Q.  You never heard anyone yell out something
24   about "Hey, you're the one with the coach" or

Page 70

1    anything like that?
2        A.  No.
3        Q.  Did you at some point learn, after Mr.
4    Romig was hired at Pennridge, that he had had a
5    coaching position as the head basketball coach at
6    FCA from approximately 2005 until the end of 2009?
7        A.  Not until after his arrest.
8        Q.  Not until after 2013, October 1st?
9        A.  I did not know until after he was
10   arrested.
11       Q.  Did Mr. Babb ever come to you in 2012 or
12   in 2013, before Mr. Romig's arrest, and tell you
13   that he had gotten information from Russell
14   Hollenbach, the athletic director at FCA, that
15   Eric Romig left there because of a texting problem
16   while he was basketball coach at FCA?
17       A.  No.
18       Q.  Did Mr. Creeden ever come and give you
19   that information?
20       A.  No.
21       Q.  When Mr. Romig was the assistant varsity
22   coach under you, did he ever mention to you before
23   he was arrested that he had in fact coached at FCA
24   as the head girls basketball coach?

Page 71

1        A.  No.
2        Q.  Do you know whether or not he ever
3    applied or was asked to apply for the position of
4    the head girls basketball coach at Pennridge after
5    he came there as an assistant softball coach?
6        A.  No.
7        Q.  Mr. Romig was hired by Pennridge to coach
8    in the 2012 JV girls softball season, then he
9    signed another contract for the 2013 season.
10           Did you sign that contract on behalf of
11   Mr. Romig?
12       A.  I can't say that.  I don't know.
13       Q.  Do you recall if you contacted Mr. Romig
14   to say "You've got to sign this contract" and he
15   said "I don't want to come in" or whatever, "would
16   you sign it for me"?
17       A.  No.
18       Q.  I'm showing you Creeden-2.  It's the
19   first contract Mr. Romig signed with Pennridge.
20   It has a signature of Mr. Romig here.
21       A.  Okay.
22       Q.  Actually, there is no date on that, but
23   that was for the 2011/'12 season.
24       A.  Okay.

Page 72

1        Q.  The second contract -- by the way, the
2    first contract has a Bates number of 22851.  The
3    second contract for the 2012/'13 season is
4    Bates-numbered 22852.  There is Mr. Romig's
5    signature again.
6            Do you see that, between the two, it's
7    nowhere near the same?
8        A.  I agree.
9        Q.  Is that your handwriting?
10       A.  No.
11       Q.  It's not your handwriting.
12       A.  No.
13       Q.  So, if Mr. Romig testified in his
14   deposition that you signed that contract for him,
15   you don't have a recollection of doing that.
16       A.  He's mistaken.
17       Q.  Okay.
18           MR. RUSSELL:  What was the Bates
19   number on that again?
20           MS. SOMMER:  22851 and 22852.
21   BY MR. GROTH:
22       Q.  Prior to Mr. Romig's arrest, did Mr.
23   Romig present any type of behavioral, professional
24   or any type of problem to you as his head coach

18  (Pages 69 to 72)

Appendix 0798

Paul Koehler                                                                    Nace vs. Pennridge
                              November 4, 2015

| Page 73 |
|---|
| 1   during the two seasons that he coached at |
| 2   Pennridge? |
| 3      A.  None whatsoever. |
| 4      Q.  You never had to reprimand him about |
| 5   anything or correct something that he was doing |
| 6   wrong, in your opinion, anything like that at all? |
| 7      A.  Nothing. |
| 8      Q.  Mr. Koehler, as part of the pretrial |
| 9   discovery process, the attorneys have to identify |
| 10  potential witnesses and tell each other what those |
| 11  witnesses have information about. |
| 12     And Pennridge's attorneys identified you |
| 13  as a potential witness with knowledge of |
| 14  information relevant to the litigation, and it |
| 15  says this, that this is the information that you |
| 16  have: "Facts and documentation relating to Mr. |
| 17  Romig's employment by Pennridge School District |
| 18  and the Sellersville Belles, and the termination |
| 19  of employment with Pennridge School District." |
| 20     We've talked about your conversations |
| 21  with Mr. Romig and the hiring process, when he was |
| 22  first hired, back in 2011/2012. |
| 23     Do you have any documentation about any |
| 24  of his hiring? Do you keep any records yourself? |

| Page 75 |
|---|
| 1      Q.  But this also says you have information |
| 2   "regarding contact with Faith Christian |
| 3   representatives prior to and during the course of |
| 4   Romig's employment with Pennridge." |
| 5      Do you have any facts or information |
| 6   regarding Mr. Romig's coaching activities at Faith |
| 7   Christian Academy that you learned prior to the |
| 8   date of his arrest? |
| 9      A.  None. |
| 10     Q.  After Mr. Romig was arrested, did you |
| 11  ever have an opportunity or occasion to discuss |
| 12  Elizabeth Nace's situation with her parents? |
| 13     A.  No. |
| 14     Q.  Did Elizabeth Nace's parents ask you for |
| 15  any special treatment of their daughter, or to do |
| 16  or not do certain things in terms of your coaching |
| 17  of her after Mr. Romig was arrested? |
| 18     A.  None. |
| 19     Q.  Was Elizabeth Nace still the scorekeeper |
| 20  for you? |
| 21     A.  She was for half of our varsity season, |
| 22  Liz' junior year. |
| 23     Q.  And why did she stop? Do you know? |
| 24     A.  Because there were complaints about Coach |

| Page 74 |
|---|
| 1      A.  No. |
| 2      Q.  Other than the things that we've |
| 3   discussed already -- your conversation with him or |
| 4   email to him, and his meeting you at the gym and |
| 5   whatever -- are there any other facts regarding |
| 6   his hiring by Pennridge that we have not |
| 7   discussed that you had direct knowledge of? |
| 8      A.  No. |
| 9      Q.  It also says that you have facts relating |
| 10  to the investigation of Romig's background prior |
| 11  to hiring by Pennridge School District. |
| 12     Do you have any facts relating to the |
| 13  investigation of Romig's background prior to his |
| 14  hiring by Pennridge? |
| 15     A.  No. |
| 16     Q.  And it says "and contact with Quakertown |
| 17  School District and Faith Christian |
| 18  representatives prior to and during the course of |
| 19  Romig's employment with Pennridge." |
| 20     I'm interested in the Faith Christian |
| 21  part of that. You already testified that you knew |
| 22  from David Babb that he had hired him and coached |
| 23  under Babb at Quakertown, correct? |
| 24     A.  Correct. |

| Page 76 |
|---|
| 1   Koehler's no-parent-in-the-dugout rule, that there |
| 2   was now a parent in the dugout, that she shouldn't |
| 3   be there. |
| 4      Q.  Were other parents complaining that they |
| 5   would have wanted to be in the dugout, also? |
| 6      A.  No, they were complaining because they |
| 7   didn't want a parent in the dugout. |
| 8      Q.  And because of those complaints, did you |
| 9   ask her to stop being scorekeeper? |
| 10     A.  Yes, I did. |
| 11     Q.  And who took over that job? |
| 12     A.  Our players. |
| 13     Q.  The players themselves handled the |
| 14  scorebook? |
| 15     A.  Yes. |
| 16     Q.  How did April Nace react to that, when |
| 17  you told her that she could no longer be the |
| 18  scorekeeper because of other parents' complaints? |
| 19     A.  She was fine. |
| 20     Q.  She was okay? |
| 21     A.  She just left. |
| 22     Q.  Did April Nace attend her daughter's |
| 23  games? |
| 24     A.  Every one of them. |

brusilow.com            brusilow + associates            215.772.1717

Appendix 0799

Paul Koehler                                          Nace vs. Pennridge
                        November 4, 2015

| Page 77 |
|---|
| 1      Q. How about James Nace? |
| 2      A. I don't know that I saw him at games, but |
| 3  I don't see a lot of people over there. |
| 4      Q. What about after Mr. Romig's arrest? Do |
| 5  you recall seeing James Nace at any games after |
| 6  October 1st, 2013? |
| 7      A. I don't recall seeing him at a game, |
| 8  except Senior Night.  He was there Senior Night. |
| 9      Q. And what is Senior Night? |
| 10     A. When seniors are recognized.  And Liz, |
| 11  being a senior, would have been recognized at our |
| 12  Senior Night. |
| 13     Q. At the game? |
| 14     A. Yes.  Her mom and dad were there, too. |
| 15     Q. Was there was a banquet at the end of the |
| 16  year? |
| 17     A. Yes. |
| 18     Q. Were the Naces there for that? |
| 19     A. I know Liz was there and -- I would bet |
| 20  that her mom was there.  I don't know about dad. |
| 21     Q. Was the banquet just for the girls |
| 22  fast-pitch softball team or for all sports? |
| 23     A. Just for the fast-pitch softball team. |
| 24     Q. Do you know anybody at Faith Christian |

| Page 78 |
|---|
| 1  Academy? |
| 2      A. Does Pastor Paul Auckland have anything |
| 3  to do with Faith Christian Academy? |
| 4      Q. Sure does. |
| 5      A. He was my quarterback when I played high |
| 6  school football. |
| 7      Q. When you played for. . . |
| 8      A. Pennridge. |
| 9      Q. He was the quarterback? |
| 10     A. Yes, and I was one of his tackles. |
| 11     Q. You protected him. |
| 12     A. Correct. |
| 13     Q. Do you have any continuing relationship |
| 14  with him at all? |
| 15     A. Only when we run into each other on the |
| 16  street or talk -- see each other at an event or |
| 17  something like that. |
| 18     Q. Are you a member of Faith Baptist Church? |
| 19     A. No. |
| 20     Q. Are you a member of any church? |
| 21     A. Yes. |
| 22     Q. Which church? |
| 23     A. St. Paul's United Church of Christ in |
| 24  Sellersville. |

| Page 79 |
|---|
| 1      Q. Do you know Russell Hollenbach at all, |
| 2  the athletic director at FCA for a certain period |
| 3  of time? |
| 4      A. Not personally, just the name. |
| 5      Q. Do you know anybody in the Clymer family? |
| 6  His father was a principal there, and his son is a |
| 7  principal there. |
| 8      A. I know Bob Clymer. |
| 9      Q. The father? |
| 10     A. The father, I guess; and Ryan is his son, |
| 11  who is the headmaster, the principal now. |
| 12     Q. How do you know that? |
| 13     A. I know Bob Clymer because he was my track |
| 14  coach in high school, and I just know the name |
| 15  Ryan because I know it's his son. |
| 16     Q. Did you ever go to PIAA meetings, rules |
| 17  meetings, the annual meeting that they would have |
| 18  that athletic directors may attend, or people in |
| 19  the athletic department of various schools? |
| 20     A. Yes.  There is a required coaches meeting |
| 21  each spring for softball.  Before the beginning of |
| 22  the season it's mandatory that each head coach |
| 23  attend, so I would attend that meeting. |
| 24     Q. Where was that? |

| Page 80 |
|---|
| 1      A. Typically it was held at CB South High |
| 2  School. |
| 3      Q. And were the athletic directors there, |
| 4  also? |
| 5      A. No. |
| 6      Q. Just coaches? |
| 7      A. Just coaches and umpires were there. |
| 8      Q. What types of things were discussed at |
| 9  those? |
| 10     A. It was rules interpretation.  It was |
| 11  basically game stuff. |
| 12     Q. Is that it? |
| 13     A. That's it. |
| 14     Q. Have you ever received any type of |
| 15  training or instruction or guidance from the PIAA |
| 16  or any governing body regarding the issue of |
| 17  sexual abuse or harassment of players by coaches? |
| 18     A. No. |
| 19     Q. Have you ever sought out any information |
| 20  from any source regarding the recognition of |
| 21  sexual abuse of players by coaches and the |
| 22  reporting of that abuse? |
| 23     A. No. |
| 24     Q. Do you know an individual named Robin |

                                          20  (Pages 77 to 80)

Appendix 0800