Paul Koehler                                                    Nace vs. Pennridge
                              November 4, 2015

---

**Page 81**

1    Landis, L-a-n-d-i-s?
2        A. No.
3        Q. Are you aware of any other instances of
4    sexual harassment or abuse of students during your
5    time at Pennridge High School between 2010 and the
6    end of 2014 other than the Elizabeth Nace
7    situation?
8        A. No.
9        Q. And I'm not talking about somebody who
10   was found guilty or pleaded guilty to a criminal
11   charge. I'm talking about somebody who was
12   suspected of or there were allegations or
13   complaints made against them. Anything like that?
14       A. No.
15       Q. Did you go to any of the legal hearings
16   involving Mr. Romig after he was arrested?
17       A. No.
18       Q. Did you ever talk to any members of his
19   family: Wife, parents, anything like that?
20       A. The only communication that went on
21   between myself and his family was, I sent -- I got
22   an email from his wife apologizing for what
23   happened concerning the Sellersville Belles.
24       And I simply replied to her "You need not

---

**Page 82**

1    apologize. I have no idea what you're going
2    through. If we can ever do anything for you,
3    please let me know."
4        Q. Did Mr. Romig ever make any attempt to
5    contact you after his arrest?
6        A. No.
7        Q. Up until the time of his present
8    incarceration up by Nanticoke.
9        A. No.
10       Q. He's never tried to contact you from
11   prison by letter or any other form of
12   communication?
13       A. No.
14       Q. After Mr. Romig's arrest, would it be
15   fair to say that you looked back at your
16   relationship with Mr. Romig over those two years
17   where he was a coach, an assistant coach, under
18   you to try to figure out if there were any
19   signals, tip-offs or whatever that he was engaged
20   in conduct that he shouldn't have been engaged in
21   with a female player? Would that be fair to say?
22       A. I think as a coach -- I've never gone
23   through this before. When a person that you
24   believe is doing a good job is found to not be,

---

**Page 83**

1    you definitely look to see if you missed
2    something. I don't know that you would be human
3    if you didn't.
4        So, there were conversations between
5    myself and my assistant coaches, and we saw
6    nothing that we missed or thought of nothing that
7    we could have missed.
8        Q. Was your direct supervisor David Babb,
9    the athletic director?
10       A. Yes.
11       Q. If there was a suspicion of or reasonable
12   cause to believe that there was some sexual abuse
13   or harassment of one of your players by one of the
14   coaches, did you have any understanding or idea of
15   what the policy of Pennridge was as to how that
16   was to be handled?
17       By that I mean who it's to be reported
18   to, who does the investigation, who does the
19   resolution, anything like that at all?
20       A. No.
21       Q. That was never explained to you by
22   anybody at Pennridge.
23       A. No.
24       Q. How about after Mr. Romig was arrested?

---

**Page 84**

1    Did anybody bother to explain that to you then?
2        A. No.
3        THE WITNESS: Can I get a cup of
4    that water?
5        MR. GROTH: Absolutely.
6        (There was a discussion held off
7    the record)
8        MR. GROTH: We're back on the
9    record.
10   BY MR. GROTH:
11       Q. Are there yearly PIAA meetings that
12   athletic directors have to attend, to your
13   knowledge?
14       A. I can't comment on that.
15       Q. You don't know one way or the other?
16       A. My assumption would be yes, but. . .
17       Q. You were never invited by Mr. Babb to go
18   to any of those?
19       A. No.
20       Q. If Mr. Romig testified under oath in his
21   deposition that he was never given any information
22   in terms of written policies or practices or
23   procedures at Pennridge with regard to sexual
24   harassment or unlawful abuse of students or

---

21 (Pages 81 to 84)

Appendix 0801

Paul Koehler                                          Nace vs. Pennridge
                        November 4, 2015

---

Page 85

1    harassment of students, would you have any reason
2    to not believe that?
3            MS. SOMMER:  Objection to the
4    form, but you can answer.
5        A. No, because...
6        Q. Because you weren't given any, either,
7    correct?
8        A. Correct.
9            MS. SOMMER:  Are you almost done,
10   Dave?
11           MR. GROTH:  Yes.
12           MS. SOMMER:  Because I need a
13   break.
14           MR. GROTH:  Just checking my notes
15   here for a second.
16   BY MR. GROTH:
17       Q. Do you know an individual named Chris
18   Seider?
19       A. No.
20       Q. A phys-ed and health-ed teacher and coach
21   at Pennridge?
22       A. No.
23           MR. GROTH:  No further questions.
24   Thank you.

---

Page 86

1            MR. RUSSELL:  If we want to take a
2    break, we can take a break.  I have a number
3    of questions.
4            MS. SOMMER:  That's fine.
5            (A brief recess was taken)
6            MR. RUSSELL:  We're back on the
7    record.
8            (EXAMINATION)
9    BY MR. RUSSELL:
10       Q. Mr. Koehler, my name is John Russell, and
11   I represent the Faith Christian defendants.  I
12   have a few questions for that you I want to go
13   through.
14           I'm going to ask you a little bit about
15   the Belles.  You incorporated the Belles.  They're
16   a non-profit, right?
17       A. Yes -- we're not actually a nonprofit.
18   We've done all that wonderful paperwork to approve
19   that.
20       Q. But you are incorporated as Sellersville
21   Belles Fast-Pitch, Inc.?
22       A. Yes, sir.
23       Q. And it was created in 1998?
24       A. I think that's when the incorporation

---

Page 87

1    happened.
2        Q. Did you operate prior to incorporating?
3        A. I'm horrible with dates.  I would believe
4    so, yes.
5        Q. And did you do the incorporation or did
6    an attorney do the incorporation?
7        A. I believe it was done by one of our
8    assistant coaches who took it to Grimm & Grimm and
9    all those Grimms that are in Perkasie, and that's
10   who did it.
11       Q. And the address that's listed, at least
12   from the corporation bureau, is 112 Green Street
13   in Sellersville, and that's your home address?
14       A. Yes, sir, it is.
15       Q. Do you have any officers to the
16   corporation?
17       A. No.
18       Q. It's just you?
19       A. It's just me.
20       Q. How about board members?  Are there any --
21       A. It's just me.
22       Q. And I think you answered this -- and
23   that's why it's hard sometimes going second.
24   Sometimes you have questions that may be prepared

---

Page 88

1    and I have to fill it in a little bit, but you
2    hired Eric Romig -- when did you hire him for the
3    Belles?
4        A. Well, let me explain to you how that came
5    about, because it's not a simple yes-or-no answer
6    or date.
7            Eric Romig was the JV coach at Pennridge
8    and had watched some of our JV players playing on
9    their typical summer ball teams, and he contacted
10   me after the school year that summer that he ended
11   up being arrested.
12           He asked me if the Sellersville Belles
13   would entertain having two 18-and-under softball
14   teams.  I said we had done it once before.  I was
15   not really in favor of it, but it required three
16   things:  A, we would have to have coaching; B, we
17   would have to have pitching; and C, we would have
18   to have enough players of quality to justify
19   having a team.
20           So, he then informed me that he had
21   talked to Tyler Penhallow and LeeAnn Kramer, who
22   were my varsity assistants from high school, and
23   they had consented to be his assistant coaches if,
24   in fact, we could field a team.

---

                                    22  (Pages 85 to 88)

Paul Koehler                                                  Nace vs. Pennridge
                          November 4, 2015

**Page 89**

1      Q. So, they were his assistant coaches,
2  Tyler and...
3      A. LeeAnn Kramer.
4      Q. They weren't your assistant coaches.
5      A. They were my assistant coaches on the
6  high school team.
7      Q. Okay.
8      A. LeeAnn Kramer had helped me on the Belles
9  in previous summers. But this year, if the
10 showcase team were to come about, she would
11 consent to help him and Tyler with this second
12 team.
13     Q. And my questions are all going to deal
14 with the Belles, and I think it's somewhat
15 difficult to keep that separate, but I want to try
16 to just focus on that.
17         There was a gold team and a showcase
18 team. You coached the gold team?
19     A. Correct.
20     Q. And the gold team was the higher level?
21     A. Correct.
22     Q. And the showcase team was going to be
23 coached -- the lead coach or the head coach of
24 that team, would that be Eric Romig?

**Page 90**

1      A. That was going to be Eric Romig.
2      Q. And his assistant coaches would be LeeAnn
3  Kramer and Tyler Penhallow?
4      A. Correct.
5      Q. LeeAnn and Tyler, they would be at all
6  the games and practices as well?
7      A. Yes.
8      Q. And I think you indicated that he, being
9  Eric Romig, was brought on for the tryouts, which
10 started the second week of August?
11     A. Correct.
12     Q. And you had eight days of tryouts.
13     A. Correct.
14     Q. And would Tyler and LeeAnn be part of
15 that as well?
16     A. Yes, they would.
17     Q. Do you have a formal application process?
18     A. No, we don't have a formal application
19 process.
20     Q. It's just kind of if you know them and it
21 works out?
22     A. Correct. I mean, we knew Tyler and we
23 knew LeeAnn because of their relationship, and we
24 knew Eric and his relationship because he had

**Page 91**

1  coached for two years at the JV level, and
2  everything I had seen him do was done well.
3      Q. When we think of the Belles, in some way
4  the Belles are you, right? I mean, you make the
5  decisions concerning what to do or what not to do.
6      A. Correct.
7      Q. So, there was no formal hiring process.
8      A. No.
9      Q. For the Belles.
10     A. No.
11     Q. Did you obtain a criminal history on him
12 from the state police?
13     A. No, we didn't, because that was the --
14 our assumption was, of course, that was all done
15 by the district.
16         We knew all those background checks had
17 been done by Pennridge School District, so he and
18 all of our coaches were either teachers -- they
19 had all had background checks done.
20     Q. Did you have him sign any affidavit or
21 anything like that?
22     A. No.
23     Q. Did you try to obtain a child-abuse
24 clearance from the Department of Human Services,

**Page 92**

1  which was then known as the Department of Public
2  Welfare, prior to hiring him on the Belles?
3      A. No.
4      Q. Did you check any references on him prior
5  to bringing him on the Belles?
6      A. No.
7      Q. Was he paid?
8      A. No.
9      Q. So, it was purely a voluntary position.
10     A. Yes.
11     Q. On the Belles.
12     A. Yes.
13     Q. Now, the players have to pay, correct?
14     A. Yes.
15     Q. And what do those funds go toward?
16     A. They go toward the expense that are
17 incurred: Uniforms, tournament fees, umpires,
18 hotels, meals, balls, equipment, whatever we
19 happen to spend.
20     Q. And with regard to the Belles, did the
21 Belles ever have at any time any written policy
22 on, say, sexual harassment or sexual abuse or
23 anything like that?
24     A. No.

23 (Pages 89 to 92)

Appendix 0803

Paul Koehler                                                    Nace vs. Pennridge
                          November 4, 2015

---

Page 93

1    Q. Was there any oral policy that you
2  communicated to the coaches about that?
3    A. Yes.
4    Q. And when was that communicated to the
5  coaches of the Belles?
6    A. Every year before we started our tryouts
7  and before we started our season. It was then
8  also reiterated -- every year we would have a
9  meeting with all the parents and players, and at
10  that point in time we would also tell the parents,
11  "Please, if you're picking up your daughter, make
12  sure you're there at 8:30, when we're done at
13  8:30, because we will not leave your daughter
14  alone -- I don't care if you're five minutes
15  away -- and we will not have one coach stay. We
16  will not bring your daughter home. There will be
17  two coaches. So, if you're late, two of us need to
18  wait."
19    Q. So, is that kind of the gist of your
20  policy, though, just telling them "At no time will
21  we have a child alone with a coach"?
22    A. Correct.
23    Q. Was there any policy on texting that you
24  communicated at the Belles level?

---

Page 94

1    A. No.
2    Q. Was there any policy on sexting? Do you
3  know what I mean by that?
4    A. Oh, yes.
5    Q. Any policy on that that was communicated?
6    A. No.
7    Q. But there was -- this was my question, I
8  guess, that correlates with that: You did have a
9  policy about you couldn't drive a player alone --
10  a coach not drive a player alone.
11    A. Correct.
12    Q. And you talked about, kind of with regard
13  to trying to coach someone, that you may have to
14  position them in some way.
15    Did you ever have a conversation with any
16  of your coaches at any time -- and then we'll
17  clarify when if you did -- concerning what would
18  be considered appropriate touching or
19  inappropriate touching?
20    MR. GROTH: Excuse me: You're
21  talking about just the Belles or. . .
22    MR. RUSSELL: Just the Belles.
23    THE WITNESS: No.
24  BY MR. RUSSELL:

---

Page 95

1    Q. And why not?
2    A. It was an assumption that we didn't
3  really need to. I mean, every one of us -- we
4  knew each other very well. We knew our girls very
5  well. We knew the environment in which we
6  coached.
7    If the Sellersville Belles are guilty are
8  something, it's that we don't have written
9  policies on that.
10    Q. Did you ever have anyone come in to the
11  Belles and provide training to coaches?
12    A. No.
13    Q. Did you ever have anyone come in to the
14  Belles and provide training to the team members
15  about what would be, you know, good touch or bad
16  touch?
17    A. No.
18    Q. Did anyone ever come in and provide
19  training, either to the coaches or the players, as
20  to what is appropriate with regard to behavior?
21    A. No.
22    Q. Did you ever have any discussions with
23  the players of the Belles about what they should
24  do if they felt that another player was being

---

Page 96

1  inappropriate with them or a coach was being
2  inappropriate with them?
3    A. No.
4    Q. How is Eric Romig as a coach? I think you
5  testified to this, but. . .
6    A. He was excellent. He was very good.
7    Q. Did you ever see anything, based upon
8  your education, training and experience, that
9  would cause you to believe that anything
10  inappropriate was going on between him and
11  Elizabeth Nace?
12    A. No.
13    Q. Anything between him and any other player
14  on the Belles?
15    A. No.
16    Q. How did you learn that Eric was accused
17  of inappropriate conduct between himself and
18  Elizabeth Nace?
19    A. It was a Tuesday afternoon. My cell
20  phone rang. At the end of the phone was David Babb
21  and he said, "Paul, we have a problem."
22  I said, "What is that?" And he said, "Eric Romig
23  has just been arrested." And I said, "For what?"
24  And he said, "For having sexual" whatever-he-said

---

brusilow.com            brusilow + associates            215.772.1717

Paul Koehler                                          Nace vs. Pennridge
November 4, 2015

---

**Page 97**

1  "with a sophomore player of the JV team last year.
2  He's been arrested." And you could have knocked
3  me over with a feather.
4      Q.  You were shocked.
5      A.  Shocked.
6      Q.  Did you try to find out if that player
7  was also involved on your Belles team?
8      A.  Yes, we did, because -- yes, I did.
9      Q.  And how did you do that?
10     A.  Well, I didn't ask anybody, but I knew
11 that night -- we had practice Tuesday night and
12 both teams would be practicing, and Eric Romig was
13 not going to be at practice.
14     So, I called Tyler and I called LeeAnn,
15 and I said "We're going to have to discuss this
16 with the team." First, I said, "Well, we'll just
17 say he's not here so we can wrap our hands around
18 this thing and figure out what's going on."
19     Shortly thereafter I got a phone call
20 from David Babb, saying, "You need to know that if
21 you're being contacted by anybody, you need to
22 talk to -- the school district will be in
23 contact."
24     And right after that the phone rang and

---

**Page 98**

1  it was a reporter from Channel 10 Action News, or
2  it was one of the -- they wanted to come to my
3  practice to photograph players and interview
4  players and parents.
5      So, we talked to our players and our
6  parents that night about what had happened.
7      Q.  What did you tell them?
8      A.  We just said that he's been arrested for
9  having inappropriate sexual contact with a player
10 on our JV team.
11     Q.  But you didn't tell them that it was also
12 a player on the Belles team?
13     A.  Oh, no, because I didn't know that for a
14 fact. I did not know that at all. So, their
15 biggest concern, obviously, was their
16 daughters now involved on the team where the head
17 coach of that team has now been arrested. Now, who
18 is going to take charge of what goes on.
19     So, that's where we tried to work through
20 a year of battling and working with two teams
21 instead of one team.
22     Q.  Did Tyler and LeeAnn take over the team
23 then?
24     A.  Tyler and LeeAnn -- Tyler ended up by the

---

**Page 99**

1  end of our summer season taking charge of that
2  team completely.
3      But the fall season and obviously the
4  winter months of getting through it and assuring
5  parents that their daughters would be getting the
6  attention that they needed and the coaching that
7  they needed and the exposure in tournaments that
8  they needed, it was difficult, to say the least.
9      Q.  While you said you didn't know for sure
10 that the player that was involved was also on the
11 Belles, you knew that that was a possibility?
12     A.  Knew it was a possibility, yes.
13     Q.  Now, you had indicated that Pennridge had
14 provided a guidance counselor to come and talk to
15 the players at Pennridge.
16     Did you seek to have a guidance counselor
17 or somebody come and talk to your players, knowing
18 that they might be in a similar situation?
19     A.  No.
20     Q.  Was there any concern that any of the
21 other Belles players had also been involved with
22 Eric Romig?
23     A.  No.
24     Q.  Did you communicate to the parents at

---

**Page 100**

1  all, "Look, if you guys have any information about
2  anything with Eric Romig and your daughter, I want
3  to know about it"?
4      A.  That night, when we talked about him
5  being arrested, one of the things I did say to
6  them, I said, "If you know anything, because I
7  know nothing, if you know something, please let me
8  know what that is so we can go forward from here."
9      Q.  And I think you indicated that the Naces
10 never came to you.
11     A.  Never.
12     Q.  Did they ever ask for any accommodation
13 for their daughter at all while she was playing?
14     A.  No, none.
15     Q.  She not only finished that season with
16 the Belles; did she play the next year with the
17 Belles?
18     A.  No.
19     Q.  She only played the one year?
20     A.  Correct.
21     Q.  And you had testified you never discussed
22 this with Elizabeth.
23     A.  Never.
24     Q.  You indicated the police never contacted

---

25 (Pages 97 to 100)

Paul Koehler                                                    Nace vs. Pennridge
                          November 4, 2015

**Page 101**

1  you. Did you contact the police?
2      A. No.
3      Q. Do you have any knowledge that they were
4  aware that Eric was coaching for you at the time
5  that he was arrested?
6      A. (No response)...................................
7      Q. With the Belles.
8      A. I had no knowledge of that.
9      Q. Did you ever file a report with Children
10  & Youth once you learned that your coach of the
11  Belles had been arrested?
12      A. No.
13      Q. And why not?
14      A. Because my understanding of what had
15  occurred is, this happened during the summer,
16  before he was actually coaching our team.
17      Q. The one thing that's come out when we
18  took Elizabeth Nace's deposition, she said while
19  she was being coached at the Belles, she at least
20  had two sexual-intercourse encounters with Eric
21  Romig during that time period.
22          The times that occurred before that had
23  started apparently in June or July, which we're
24  trying to sort through, but it seems like you

**Page 102**

1  testified that the season was over before the
2  first week of June, right?
3      A. Right.
4      Q. So, that means his contract would have
5  been over by the end of May, correct?
6          MR. GROTH: Objection to the form
7  of the question.
8      A. You would have to talk to the district
9  about when contracts end and when they don't.
10      Q. Well, the human resource person was here
11  and said the contract ends at your last game. You
12  know, if you continue into the playoffs, it
13  continues, but basically for the season it ends
14  the last game.
15          MR. GROTH: Objection to the form.
16      Q. Would that be consistent with your
17  understanding?
18          MR. GROTH: Objection to the form
19  of the question.
20      Q. You can go ahead and answer.
21      A. Sure.
22      Q. So, when Elizabeth Nace testified, she
23  said that there started to be some inappropriate
24  texting that occurred in June, some sexting

**Page 103**

1  occurred in July, and then that was followed by
2  sexual intercourse or sexual touching, and at
3  least two, possibly three, of those encounters
4  occurred during the Belles season.
5          Is this the first time you're hearing
6  that?
7              MR. GROTH: Objection to the form
8  of the question. That is a
9  mischaracterization of Ms. Nace's testimony.
10  You can answer.
11          THE WITNESS: Yes.
12  BY MR. RUSSELL:
13      Q. But the police never came and talked to
14  you.
15      A. Never.
16      Q. Did you ever receive a letter from
17  Elizabeth Nace's attorneys regarding this matter?
18      A. No.
19      Q. Did you ever speak to them on the phone?
20      A. Her attorneys or --
21      Q. Yes, her attorneys.
22      A. No.
23      Q. Or her parents' attorneys.
24      A. No.

**Page 104**

1      Q. And you did say that you had a meeting
2  with your players and the players' parents.
3      A. Yes.
4      Q. And how did you put off the news coming
5  to the field? How were you able to handle that?
6      A. They came.
7      Q. And nobody talked to them?
8      A. No.
9      Q. No, that no one talked to them; or...
10      A. I don't believe anyone talked to them. I
11  was on the 11:00 news that night, my picture from
12  afar.
13      Q. Did you ever formally terminate Mr. Romig
14  from his coaching position with the Belles?
15      A. I informed everybody that night that Eric
16  Romig no longer will be coaching with the
17  Sellersville Belles, nor will he ever coach with
18  the Sellersville Belles again.
19      Q. And I understand that you informed the
20  parents that, but did you ever inform Mr. Romig of
21  that?
22      A. I've had no communication with him.
23      Q. So, that would be no?
24      A. No.

                                    26 (Pages 101 to 104)

Paul Koehler                                                Nace vs. Pennridge
                          November 4, 2015

---

Page 105

1    Q. And you indicated that Elizabeth
2  continued to play the whole season with the
3  Belles.
4    A. Correct.
5    Q. Do you know why she didn't come back the
6  next year, her senior year, and play with the
7  Belles?
8    A. We folded that team.
9    Q. Just so I understand: The showcase team.
10   A. The showcase team disappeared. We
11 dissolved that team.
12   Q. Did she try out for the gold team?
13   A. No.
14   Q. Do you know why she didn't try out for
15 the gold team?
16   A. No.
17   Q. Now, there was a tournament -- Mrs. Nace
18 testified that there was a tournament in October
19 of 2013. It was an overnight tournament
20 somewhere. Do you know where that was?
21   A. Delaware.
22   Q. Did she go on that overnight tournament?
23   A. I can't recall.
24   Q. But she did continue the season.

---

Page 107

1  whatsoever?
2    A. No.
3    Q. Did you ever notice any ongoing severe
4  physical injury that she was dealing with?
5    A. No.
6    Q. Did you ever notice her being more
7  fatigued in her junior and senior year when she
8  played for you?
9    A. No.
10   Q. Did you notice her becoming more
11 lethargic, meaning slower?
12   A. No.
13   Q. Did you ever notice that she was having
14 an increased dermatological condition with
15 anything about her face?
16   A. No.
17   Q. Did she ever indicate to you that she was
18 tired more during your junior and senior year?
19   A. No.
20   Q. Did she ever say to you that she was
21 going through severe and ongoing emotional
22 distress?
23   A. No.
24       MR. GROTH: Objection to the form.

---

Page 106

1    A. Yes.
2    Q. Did you notice any problems with
3  Elizabeth -- and this is going to be either while
4  she played for the Belles during that season or
5  with Pennridge at the varsity level in the spring
6  of -- it would be 2014 and 2015, correct?
7    A. Correct.
8    Q. (Continuing) -- did you ever notice any
9  problems that she was having as she played
10 softball with you?
11   A. None at all.
12   Q. And I think you gave a lot of
13 characterizations of who she was as an individual,
14 and you said she ended being the second-team
15 all-league as a pitcher her senior year, correct?
16   A. Correct, or it may have been third, so
17 don't hold me to first or second.
18   Q. But did her play improve each year that
19 she played for you?
20   A. She was a stronger player her senior year
21 than she was her junior year. That's just, I
22 think, a physical maturity and her working her
23 craft of pitching more.
24   Q. Did she ever ask for any accommodations

---

Page 108

1    Q. Did she look to you, as a coach looking
2  at her players, like she was depressed?
3        MR. GROTH: Objection to the form.
4    Q. You can answer.
5    A. No.
6    Q. Did she ever look like she was anxious?
7        MR. GROTH: Objection to the form.
8    A. No.
9    Q. Did she ever look like she was fearful?
10       MR. GROTH: Objection to the form.
11   A. No.
12   Q. Did she ever appear to you that she was
13 experiencing a loss of self-worth and self-esteem?
14       MR. GROTH: Objection to the form.
15   A. No.
16   Q. Did she ever appear to you that she was
17 embarrassed?
18   A. No.
19       MR. GROTH: Objection to the form.
20   A. No.
21   Q. When we deposed the Naces, I was trying
22 to figure it out in my mind, because the one thing
23 I didn't understand is why the Sellersville Belles
24 weren't sued as part of this litigation.

---

27 (Pages 105 to 108)

Page 109

1    Faith Christian was sued, and there was
2  no sexual intercourse that occurred with anyone
3  that we're aware of between Mr. Romig at Faith
4  Christian.
5    And Ms. Nace has testified that she did
6  have sexual relations with Mr. Romig while he was
7  coaching for the Belles, and I felt, well, perhaps
8  the Naces knew you in some way. But you don't have
9  a good relationship with the Naces in some way?
10   A. No more than I do with any other parent
11 of a softball player that played for me. There is
12 none.
13   Q. Mr. Nace has testified. He stated that
14 you are not a good coach and not a good man. Do
15 you know of any reason why he would say that?
16   A. No.
17   Q. Do you know of anything that would give
18 him that impression, to make that statement?
19   A. No.
20   Q. How would you describe your relationship
21 with Jim Nace while he was the --
22   A. There is none.
23   Q. How about when he was a parent of your
24 players?

Page 110

1    A. He was not there. I had none.
2    Q. And you talked a little bit about April
3  Nace. She also testified that she had kept the
4  book, like you said, but she didn't say that she
5  was asked to stop keeping the book because you had
6  complaints about parents being in the dugout.
7    Did you communicate to her why she was
8  asked to stop keeping the scorebook?
9    A. No; didn't really matter. I didn't need
10 to create any friction between parents. I said I'm
11 going to have my players do the book.
12   Q. Okay. I'm going to show you a letter
13 that we'll mark as Koehler-1.
14     (Exhibit No. Was marked for
15 identification)
16 BY MR. RUSSELL:
17   Q. Mr. Koehler, this is a letter that was
18 sent initially to a variety of people, some of
19 whom are my clients. It was sent to the Quakertown
20 Community School District, Pennridge School
21 District, Faith Christian Academy, Mr. Romig, as
22 well as an attorney at Rubin, Glickman, Steinberg
23 & Gifford, notifying them that Mr. Hornstine and
24 his firm had been retained by the Naces to pursue

Page 111

1  a claim dealing with the incident with Mr. Romig.
2    Does this document at all refresh your
3  recollection as to whether or not you received a
4  letter from the Hornstine law office?
5    A. No.
6    Q. So, it's your recollection that you never
7  received such a letter?
8    A. Never seen this before.
9    Q. Do you know Louis Hornstine is?
10   A. No.
11   Q. Do you know Brian Pelloni?
12   A. No.
13   Q. Do you know Blair Hornstine?
14   A. No.
15   Q. And today is the first time that you've
16 ever met David Groth?
17   A. Yes.
18   Q. Have you ever been recommend by anybody
19 at their firm?
20   A. These people?
21   Q. Yes.
22   A. No.
23   Q. I think you've testified to this before:
24 You knew Eric Romig for approximately how many

Page 112

1  years before this incident came to light?
2    A. Two seasons of softball, two years.
3    Q. And that would be at Pennridge and then
4  the beginning of the season for the Belles.
5    A. Correct.
6    Q. And at no time did you ever suspect that
7  he was having an improper sexual relationship with
8  any of your players.
9    A. None.
10   Q. You trusted him?
11   A. Trusted him.
12   Q. You had no reason not to?
13   A. No.
14   Q. You thought he was a good guy.
15   A. Thought he was a good guy.
16   Q. Do you believe that there is anything
17 that you could have done differently to avoid
18 having Mr. Romig have a sexual relationship with
19 one of your players while he was coaching on the
20 Belles?
21     MS. SOMMER: Object to the form.
22 of the question. You can answer.
23   A. No.
24   Q. I want to go through a couple of other

Paul Koehler                                           Nace vs. Pennridge
                      November 4, 2015

---

**Page 113**

1    things here. You have on your Belles website
2    something called 18-and-under Sellersville Belles,
3    Belles in College. It's like a page?
4        A. Yes.
5        Q. It has players that you've coached that
6    are going to college. Is it just players on this
7    listing that you have that are playing softball in
8    college?
9        A. Correct. They have gone on to play
10   softball in college.
11       Q. I did not see Elizabeth Nace on this. Is
12   it your understanding that she's gone on to
13   college but she's not playing softball?
14       A. She left the team -- I don't make it a
15   practice to claim players who have left the Belles
16   before their travel-ball career is done as players
17   in college.
18       Q. And then also, are you familiar that
19   players can fill out like a CaptainU College
20   Sports Recruiting Player Profile?
21       A. Yes.
22       Q. And on that Elizabeth Nace has a player
23   profile, and she lists the Sellersville Belles as
24   a club that she played for, but the coach is not

---

**Page 114**

1    listed and there is no coach recommendation on
2    that.
3        Were you ever asked to write -- it's
4    called a coach endorsement? Were you ever asked
5    to write a coach endorsement?
6        A. Not that I recall.
7        Q. Is there any reason why you would not
8    have endorsed Elizabeth Nace?
9        A. No.
10       Q. She was endorsed here by Tony Helvling --
11       A. Helbling.
12       Q. Helbling? Do you know him?
13       A. Yes.
14       Q. Coach at Deep Run?
15       A. Yes.
16       Q. And she also had a coach endorsement from
17   Ken Shanks of the Harleysville Thunderbirds?
18       A. Yes.
19       Q. Do you know him?
20       A. Yes.
21       Q. So, there is not like a rift or anything
22   between you and Elizabeth Nace in some way?
23       A. No, not at all.
24           MR. RUSSELL: That's all the

---

**Page 115**

1    questions I have. Thank you.
2            THE WITNESS: You're welcome.
3            (EXAMINATION)
4    BY MS. SOMMER:
5        Q. Were the Naces present for this meeting
6    that you had with the players and the parents the
7    night that you learned about Eric Romig's arrest?
8        A. I can't say for certain.
9            MS. SOMMER: Nothing further.
10           MS. CONNOR: No questions.
11           MR. GROTH: I just have one
12   question.
13           (EXAMINATION)
14   BY MR. GROTH:
15       Q. You were under a year-to-year contract
16   with Pennridge, also. Is that correct?
17       A. Yes.
18       Q. When your contract was up at the end of a
19   year, did you have to get another criminal check
20   and all the background checks and whatever that
21   they had done for your prior contract?
22       A. No.
23       Q. You only got one criminal background
24   check the first year you were hired?

---

**Page 116**

1        A. Correct.
2            MR. GROTH: No further questions.
3    Thank you.
4            MR. SALAZAR: I have no questions.
5            MR. GROTH: Thank you very much.
6            (The deposition was concluded at
7    4:00 p.m.)

---

29 (Pages 113 to 116)

Appendix 0809

Paul Koehler                                          Nace vs. Pennridge
                    November 4, 2015

Page 117

CERTIFICATION

------

   I hereby certify that the testimony
and the proceedings in the aforegoing matter are
contained fully and accurately in the stenographic
notes taken by me and that the copy is a true and
correct transcript of the same.


        Lance A. Brusilow
        Registered Professional Reporter
        Certified Realtime Reporter


        The foregoing certification does
not apply to any reproduction of the same by any
means unless under the direct control and/or

supervision of the certifying shorthand reporter.


        ------

brusilow.com           brusilow + associates          215.772.1717

# COPY TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## CIVIL TRIAL DIVISION

JAMES NACE, et al                    CIVIL ACTION

      vs.

PENNRIDGE SCHOOL DISTRICT,
et al.                               NO. 15-333

             Wednesday, September 2, 2015

             Oral deposition of CHERYL A. ALDERFER, held at the law offices of DRAKE, HILEMAN & DAVIS, 252 W. Swamp Road, #15, Doylestown, Pennsylvania, beginning at 11:30 a.m., on the above date, before LANCE A. BRUSILOW, Registered Professional Reporter, Approved Reporter for the United States District Court, and Notary Public, there being present.

215.772.1717
PHONE

**brusilow + associates**
more than wordsmiths
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.brusilow.com

877.763.4006
FAX

```
 1      APPEARANCES

 2      HORNSTINE PELLONI & HORNSTINE

 3      BY:  DAVID GROTH, ESQUIRE

 4      1500 Walnut Street

 5      Suite 300

 6      Philadelphia, PA 19102

 7      ph: 215.568.4968

 8      (david@hornstine.com)

 9      Counsel for Plaintiffs

10

11      MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

12      BY:  JOSEPH J. SANTARONE, ESQUIRE

13      2000 Market Street

14      Suite 2300

15      Philadelphia, PA 19103

16      ph: 215.575.2626

17      (jjsantarone@mdwcg.com)

18      Counsel for Faith Christian Academy

19

20

21

22

23

24
```

Page: 3 (3)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

```
 1      APPEARANCES CONTINUED:

 2      EASTBURN & GRAY, P.C.

 3      BY:  ERIN N. KERNAN, ESQUIRE

 4      60 East Court Street

 5      Doylestown, PA 18901

 6      ph: 215.345.7000

 7      (ekernan@eastburngray.com)

 8      Counsel for Pennridge School District and

 9      individual Pennridge defendants

10

11      CASSIDY CONNOR PITCHFORD

12      BY:  CARLA E. CONNOR, ESQUIRE

13      295 East Swedesford Road

14      Suite #346

15      Wayne, PA  19087

16      ph: 610.783.3513

17      (cconnor@ccplegal.com)

18      Counsel for FCA, Ryan Clymer and Russell

19      Hollenbach

20

21

22

23

24
```

Appendix 0813

Page: 4 (4)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

```
 1    APPEARANCES CONTINUED:

 2    KELLY, GRIMES, PIETRANGELO & VAKIL, P.C.

 3    BY:  VERONICA N. OLSZEWSKI, ESQUIRE

 4    36 East Second Street

 5    Media, PA  19063

 6    ph: 610.565.0600

 7    (volszewski@kgpv.com)

 8    Counsel for Ryan Clymer and Russell

 9    Hollenbach

10

11    DRAKE, HILEMAN & DAVIS

12    BY:  JONATHAN J. RUSSELL, ESQUIRE

13    252 W. Swamp Road, #15

14    Doylestown, PA  18901

15    ph:  215.348.2088

16    (jrussell@dhdlaw.com)

17    Counsel for Faith Christian Defendants

18

19    ALSO PRESENT:

20    Henry Thompson

21

22

23

24
```

Appendix 0814

Page: 5 (5)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

```
1      EXAMINATION INDEX

2    WITNESS:   CHERYL A. ALDERFER

3      BY Mr. Groth: (pages-6 & 92)

4      BY Mr. Santarone: (page-89)

5

6    EXHIBIT INDEX

7    NO. 1  Letter dated April 10, 2015,

8    from D. Groth to C. Alderfer (page-84)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Appendix  0815

Page: 6 (6 - 9)

ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 6**

1     (It is hereby agreed by and
2 among counsel that signing, sealing,
3 certification and filing are waived; and
4 that all objections, except as to the
5 form of the question, are reserved until
6 the time of trial)
7     CHERYL A. ALDERFER, having been
8 first duly sworn, was examined and
9 testified as follows:
10     (EXAMINATION)
11 BY MR. GROTH:
12 Q.   Good morning.
13 A.   Good morning.
14 Q.   Will you state your full name
15 for the record, please?
16 A.   Cheryl Ann Alderfer.
17 Q.   Ms. or Mrs. Alderfer?
18 A.   Mrs.
19 Q.   Mrs. Alderfer, my name is David
20 Groth, and I represent Elizabeth Nace in
21 a lawsuit that's pending in the Federal
22 District Court for the Eastern District of
23 Pennsylvania in which Faith Christian
24 Academy, Ryan Clymer, Russell Hollenbach,

**Page 7**

1 as well as Pennridge School District and
2 Thomas Creeden and David Babb, are
3 defendants.
4     I'm going to ask you questions
5 today about things that I think are
6 important and relevant to this litigation,
7 but let me ask you first: Have you ever
8 been in a deposition before? Have you
9 ever given a deposition?
10 A.   No.
11 Q.   Let me just go through a
12 couple of quick instructions regarding
13 what's going to take place so that we can
14 do this with as much efficiency as
15 possible.
16     First of all, please listen to
17 the question that I ask you and make sure
18 that you understand the question before
19 you give an answer.
20     If you give me an answer to a
21 question, I'll assume that you understood
22 the question and that you're giving me
23 your best representation of facts and
24 events that go back to 2009 or so and

**Page 8**

1 maybe even further back than that.
2     If you don't understand a
3 question I ask you, please ask me to
4 rephrase or clarify or restate the
5 question for you so that you do
6 understand it before you start giving an
7 answer, and I'll be happy to do that.
8     Let me complete the question
9 before you begin the answer. The court
10 reporter, who is making a transcript of
11 everything that's said here, can only take
12 down one of us speaking at a time. If
13 we're speaking over each other, it's hard
14 for him to make a transcript of
15 everything that's said.
16     And again, you want to let me
17 finish the question before you give an
18 answer so that you know exactly what it
19 is I'm asking you. You may think at
20 some point in the middle of the question
21 you know what I'm going for and want to
22 jump in with an answer, but let's not try
23 to speak over each other.
24     You have to give a verbal

**Page 9**

1 response to all questions: A yes, a no,
2 or some narrative explanation. You can't
3 shake your head yes, shake your head no,
4 give a hand gesture, because the court
5 reporter can't get that down onto a
6 transcript.
7     Also, if you can avoid uh-huh
8 and un-huh, which are hard to spell and
9 are subject to different interpretations,
10 that would help, also.
11     You're required to answer every
12 question I ask you fully and to the best
13 of your ability, unless your attorney
14 objects to the question and instructs you
15 not to answer the question.
16     There may be objections to
17 questions that I ask you or the objection
18 is stated for the record, but you're
19 going to be asked to answer the question,
20 anyway.
21     However, there may also be
22 times when you're instructed not to answer
23 a question. So, if that comes up,
24 ninety-nine times out of a hundred you'll

Appendix 0816

Page: 7 (10 - 13)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 10**

1  be answering the question even though one
2  the attorneys objects to it or I object
3  to one their questions to you, if they
4  have any.
5  I'll be asking for facts and
6  information that you know personally or
7  may have heard or obtained or learned
8  from others about the issues or topics
9  I'm gong to discuss with you. And by that
10  I mean that you may have personal
11  knowledge of facts in response to a
12  question I ask or you may have been given
13  information from other people.
14  Hearsay is a common term;
15  people have some idea of what it means.
16  It's something somebody else told you that
17  doesn't have any relevance to this
18  deposition. It may in court, when you
19  testify in court, but it doesn't here, so
20  you are free to and obligated to tell me
21  things that you've heard from other people
22  as well as things you know for yourself.
23  If you don't know the answer
24  to a question, please tell me that. If

**Page 11**

1  I ask you for information or facts that
2  you never knew, never had, never had any
3  knowledge of, please tell me that. That
4  would be a sufficient answer.
5  If I ask you for facts or
6  information that you may have known at
7  one time in the past but, because of the
8  passage of time or failure of memory or
9  anything, you just simply can't recall it
10  right now, tell me that and that will be
11  sufficient answer.
12  I don't want you to guess or
13  speculate or assume anything in response
14  to a question. Just because I ask you
15  about something doesn't mean you have to
16  know anything about it; I'm just trying
17  to find out if you do.
18  So, again, if you don't know
19  anything factually responsive to a
20  question I ask you, just simply tell me
21  and that will be a sufficient answer.
22  Are you feeling okay? Is
23  there any reason why you won't be able to
24  testify in this deposition and answer my

**Page 12**

1  questions?
2  A.  No, I'm fine.
3  Q.  Are you taking any type of
4  medication that would affect your memory
5  or anything of that nature?
6  A.  No.
7  Q.  If you need a break for any
8  reason -- stretch your legs, want to talk
9  to your attorney, use the restroom,
10  whatever -- just let us know. We'll be
11  happy to accommodate you, okay?
12  A.  Okay.
13  Q.  Can you tell me what your
14  residence address is, please??
15  A.  1015 Cedar Meadow Lane, Green
16  Lane. Zip is 18054.
17  Q.  How long have you lived there?
18  A.  Thirty-one years.
19  Q.  Do you know Kevin and Annette
20  Smith?
21  A.  Not personally. I know of
22  them.
23  Q.  Do you know Emily Mayer?
24  A.  Yes.

**Page 13**

1  Q.  How did you know her?
2  A.  A student at Faith Christian
3  Academy.
4  Q.  Did you know that Kevin Smith
5  and Annette Smith are her stepfather and
6  mother?
7  A.  I was not aware that it was
8  her stepfather until, you know, things
9  started unfolding and questions coming,
10  but I didn't really know the parents.
11  Q.  Back in 2009 or so did you
12  know that they lived up near Red Hill?
13  A.  No.
14  Q.  Red Hill is sort of near Green
15  Lane, correct?
16  A.  Yes.
17  Q.  So, in 2009 you didn't know
18  where they lived?
19  A.  Not that I recall.
20  Q.  What's your husband's name?
21  A.  Terry W. Alderfer, Jr.
22  Q.  And where does he work?
23  A.  He's self-employed.
24  Q.  As what?

Appendix 0817

Page: 8 (14 - 17)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 14

1  A.   General contractor.
2  Q.   Has he ever been employed by
3  FCA in any capacity?
4  A.   No.
5  Q.   By whom are you currently
6  employed?
7  A.   Faith Christian Academy.
8  Q.   In what capacity?
9  A.   I do the lunch cooking.
10 Q.   How long —
11 A.   And help with the senior
12 advising.
13 Q.   What does that involve, senior
14 advising?
15 A.   Working along with the main
16 senior advisor and helping her out with
17 fund-raising and things of that nature.
18 Q.   How long have you been employed
19 at FCA?
20 A.   Three years.
21 Q.   Always in the same position?
22 A.   Yes.
23 Q.   Who has been your direct
24 supervisor for the last three years? Who

Page 15

1  is your boss that you would take orders
2  from?
3  A.   Ryan Clymer.
4  Q.   Were you employed in any
5  position at FCA prior to the last three
6  years?
7  A.   No.
8  Q.   Can you tell me a history of
9  your educational background starting with
10 high school?
11 A.   I finished high school, and
12 that was. . .
13 Q.   What year?
14 A.   Twelfth grade -- graduated in
15 1984.
16 Q.   What school?
17 A.   Faith Christian Academy.
18 Q.   And what about post high school
19 education, formal education? Any?
20 A.   No.
21 Q.   Did you go to Faith Christian
22 Academy from kindergarten or first grade
23 through twelfth?
24 A.   Fifth through twelfth.

Page 16

1  Q.   Were your parents members of
2  the church, Faith Baptist Church?
3  A.   Yes.
4  Q.   Were you a member of the
5  church since birth?
6  A.   Yes.
7  Q.   Can you give me a brief
8  description of your employment history
9  starting in 1984 after you graduated from
10 FCA? For whom did you work, the kind of
11 position, for what period of time.
12 A.   For just FCA, or any
13 employment?
14 Q.   Any employment going back to
15 1984/1985.
16 A.   I worked for the Clemens food
17 chain.
18 Q.   Doing what?
19 A.   Worked in the produce
20 department.
21 Q.   For what period of time?
22 A.   Approximately two years.
23 Q.   And then what?
24 A.   That was it.

Page 17

1  Q.   Were those two years '84 and
2  '85, or somewhere back around that time?
3  A.   Yes.
4  Q.   And what did you do for
5  employment, if anything, between 1985 and
6  approximately 2012?
7  A.   Nothing.
8  Q.   You were a stay-at-home mom?
9  A.   Yes.
10 Q.   Did you do any type of
11 volunteer work for the Faith Christian
12 Academy back around the years 2008, 2009,
13 2010?
14 A.   Yes.
15 Q.   What did you do as volunteer
16 work?
17 A.   Helped with the senior class,
18 junior/senior class.
19 Q.   Doing what?
20 A.   Fund-raising, grading papers,
21 entering data into the computer.
22 Q.   When did you start doing that?
23 A.   Approximately 2004.
24 Q.   Until when?

Page: 9 (18 - 21)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 18**

1　A.　Now.
2　Q.　You still do that?
3　A.　I still volunteer for that,
4　yes.
5　Q.　Back in 2009 were you still a
6　teacher's aide to a Ms. Tatarro? I'm not
7　sure what the title might be.
8　A.　Yes.
9　Q.　What was that position called?
10　A.　Just a teacher's aide.
11　Q.　What type of functions would
12　you perform for Ms. Tatarro?
13　A.　Grading, entering her data into
14　the computer, arranging fund-raising,
15　making phone calls for her.
16　Q.　Is that a five-day-a-week job?
17　A.　Not necessarily.
18　Q.　You were working in the
19　cafeteria five days a week, correct --
20　I'm sorry, that's starting in 2012 or so.
21　A.　Correct.
22　Q.　So, back in 2009 you weren't
23　working in the cafeteria. You were just
24　doing this volunteer work.

**Page 19**

1　A.　Correct.
2　Q.　And how many days a week would
3　you generally do that kind of work?
4　A.　Approximately three; three to
5　four.
6　Q.　Was she a homeroom teacher for
7　a group of students, Ms. Tatarro?
8　A.　Yes.
9　Q.　During 2009 was Emily Mayer one
10　of her students in homeroom?
11　A.　Yes.
12　Q.　Do you have any children?
13　A.　Yes.
14　Q.　How many?
15　A.　Five.
16　Q.　Do you have a daughter named
17　Alli?
18　A.　Yes.
19　Q.　How do you spell her complete
20　first name?
21　A.　A-l-l-i-s-o-n.
22　Q.　And back in -- let's work
23　backwards: How old is she now?
24　A.　Twenty-three.

**Page 20**

1　Q.　So, back in 2009 she would
2　have been approximately seventeen or
3　sixteen?
4　A.　Yes.
5　Q.　Did you know Emily Mayer back
6　in 2009?
7　A.　Yes.
8　Q.　Was Emily Mayer in Ms.
9　Tatarro's homeroom back in 2009?
10　A.　Yes.
11　Q.　Were you a teacher's aide or
12　assistant to anybody in 2009 other than
13　Ms. Tatarro?
14　A.　No.
15　Q.　And again, at that time when
16　you were working as a volunteer, who did
17　you consider to be your supervisor?
18　A.　Ultimately Ryan Clymer.
19　Q.　Was your daughter Allison in
20　Ms. Tatarro's homeroom back in 2009?
21　A.　No.
22　Q.　Whose homeroom was she in?
23　A.　She was home-schooled that
24　year.

**Page 21**

1　Q.　By whom?
2　A.　Me.
3　Q.　When you went in to do this
4　teacher-aide work in 2009 three or four
5　days a week, how many hours a day would
6　you spend there at school?
7　A.　Can you please repeat that?
8　Q.　Yes. When you were working as
9　a teacher's aide to Ms. Tatarro in 2009
10　three or four days a week, I believe you
11　said, how many hours a day would you
12　spend at the school?
13　A.　Approximately five.
14　Q.　Generally from what time to
15　what time?
16　A.　Maybe eight to one.
17　Q.　So, would it be correct to say
18　that you were generally there in the
19　classroom of Ms. Tatarro when the students
20　arrived for class at eight o'clock in the
21　morning?
22　A.　Usually.
23　Q.　And you usually left around
24　1:00.

Page: 10 (22 - 25)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 22

1  A.  Approximately. It varied.
2  Q.  Did you know Emily Mayer in
3  2009?
4  A.  Yes.
5  Q.  How did you meet her?
6  A.  Through working at the school.
7  Q.  Was your daughter Allison a
8  friend of hers?
9  A.  Yes.
10  Q.  Were they best friends, casual
11  acquaintances? How would you characterize
12  their friendship?
13  A.  Basically just at school.
14  Q.  Meaning they didn't socialize
15  outside of school at all?
16  A.  Not really, no.
17  Q.  Back in 2009 were you
18  home-schooling any of your other children?
19  A.  No.
20  Q.  Where do they go to school?
21  A.  Faith.
22      MR. RUSSELL: Do you need to
23  correct something on the home schooling?
24      THE WITNESS: I do.

Page 23

1      MR. RUSSELL: Go ahead.
2      THE WITNESS: Because I'm
3  thinking my daughter graduated in 2010, so
4  I have 2010 in my head. So, she was
5  there --
6  BY MR. GROTH:
7  Q.  Are you talking about Allison?
8  A.  -- Allison was there from 2009,
9  September, and graduated in 2010. It was
10  the year prior -- the school year prior
11  to that that she --
12      MR. RUSSELL: That would be
13  2008/2009.
14      THE WITNESS: Correct.
15      MR. GROTH: Thank you for that
16  correction.
17      THE WITNESS: Yes.
18      MR. GROTH: I was losing
19  something there.
20      THE WITNESS: I'm so sorry.
21  BY MR. GROTH:
22  Q.  So, in 2009/2010 who was
23  Allison's homeroom teacher?
24  A.  Mrs. Tatarro.

Page 24

1  Q.  So, she was in the same
2  homeroom as Emily Mayer.
3  A.  Yes.
4  Q.  Do you recall first meeting
5  Emily Mayer in 2009, or was it sometime
6  before that?
7  A.  I'm going to say -- I don't
8  recall when the actual first time was.
9  Q.  Did she ever visit your home
10  to meet with Alli, to do things with
11  Alli?
12  A.  No.
13  Q.  Was your daughter ever at Emily
14  Mayer's home?
15  A.  No.
16  Q.  Back in 2009 was anybody living
17  in your house who was not a member of
18  your immediate family?
19  A.  I do exchange students, so I
20  can't remember what years I had and did
21  not have. It's possible that I had an
22  exchange student.
23  Q.  Let me be more specific: Was
24  there a student named Fateem Diabetes

Page 25

1  living at your house in 2009?
2  A.  No.
3  Q.  Did she ever live in your
4  house?
5  A.  No.
6  Q.  Do you know who she is?
7  A.  Yes.
8  Q.  Was she an exchange student?
9  A.  No.
10  Q.  She was a local student?
11  A.  Yes.
12  Q.  Was she a friend's of Alli's?
13  A.  Yes.
14  Q.  Did you know her back in 2009?
15  A.  Yes.
16  Q.  How would you characterize
17  Alli's friendship with Fateem?
18  A.  Close friends.
19  Q.  Was she ever at your house?
20  A.  Yes.
21  Q.  On what type of basis, weekly,
22  monthly, occasionally?
23  A.  Occasionally.
24  Q.  Did you know Eric Romig back

Appendix 0820

Page: 11 (26 - 29)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 26**

1  in 2009?
2  A.  Yes.
3  Q.  How did you know him?
4  A.  As the coach.
5  Q.  Of the girls basketball team?
6  A.  Correct.
7  Q.  Was your daughter a player?
8  A.  No.
9  Q.  Did she play any sports?
10  A.  She played soccer in maybe her
11  sophomore year. That was all.
12  Q.  How did you know that Eric
13  Romig was the coach of the girls
14  basketball team in 2009?
15  A.  From working at the school,
16  just knowing, seeing.
17  Q.  Did you ever go to any of the
18  games?
19  A.  Occasionally.
20  Q.  Did you ever meet him
21  personally?
22  A.  Yes.
23  Q.  In what setting?
24  A.  Just in casual passing.

**Page 27**

1  Q.  Did he know you by name?
2  A.  Yes.
3  Q.  He had a daughter or step- or
4  adopted daughter at the school at the
5  time named Chelsea. Do you know her?
6  A.  Yes.
7  Q.  How did you know her?
8  A.  Just as a student.
9  Q.  Was she in Ms. Tatarro's
10  homeroom?
11  A.  Not at that time.
12  Q.  Was she a grade behind your
13  daughter and Emily Mayer?
14  A.  I'm not one hundred percent
15  sure.
16  Q.  Did there come a time back in
17  2009 when Fatcom Diabetes was at your
18  house where you overheard a conversation
19  between her and your daughter Allison
20  relating to Eric Romig?
21  A.  Well, that is how my daughter
22  -- well, they probably did talk about it,
23  but I did not actually overhear that
24  conversation. My daughter came to me and

**Page 28**

1  told me of the conversation.
2  Q.  The conversation she had with
3  Emily Mayer?
4  A.  Correct.
5  Q.  Do you know when that occurred,
6  approximately when? If I ask you for a
7  date or something specific and you can't
8  give me a specific response, but you can
9  estimate or approximate, that's not the
10  same as guessing.
11  So, if you can give us any
12  information, that might be helpful.
13  A.  All I can say is during
14  basketball season is when -- the girls
15  basketball season. So, in the fall, I
16  believe that was.
17  Q.  The fall of 2009.
18  A.  Correct.
19  Q.  Do you know if it was in
20  December of 2009?
21  A.  I wouldn't be able to recall
22  that.
23  Q.  When your daughter came to you
24  to talk about this conversation she had

**Page 29**

1  had with Emily Mayer, was it only you and
2  your daughter involved in the
3  conversation?
4  A.  Yes.
5  Q.  There was nobody else there:
6  No other children, no other students, not
7  your husband, nobody else?
8  A.  No, but I did talk to my
9  husband about it.
10  Q.  Afterward.
11  A.  Yes.
12  Q.  All right. And do you
13  remember the time of day that you had
14  this conversation with your daughter?
15  A.  In the evening.
16  Q.  At home?
17  A.  Yes.
18  Q.  I'd like you to tell me as
19  much as you can recall about that
20  conversation, including what your daughter
21  said to you, what you said to your
22  daughter, information that she gave you,
23  information that you may have asked for,
24  anything else that you can recall about

Appendix 0821

Page: 12 (30 - 33)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 30**

1 the conversation. Just give it to me in a
2 narrative form.
3     A.    She came to me and said that
4 Emily had approached her and was upset
5 because of text messages that she was
6 receiving from Eric Romig.
7         The only ones I can recall
8 that we discussed was that she felt —
9 they had been together other texts, but
10 the only one we discussed was that Emily
11 had felt that he had gone over the line
12 with trying to have her spend some time
13 at his house on a weekend while his
14 stepdaughter was present.
15     Q.    Meaning Chelsea.
16     A.    Correct.
17     Q.    Okay.
18     A.    So, you know, I told her —
19 she said that Emily didn't want her to
20 say anything to anybody, but at that
21 point I said that, you know, that's --
22 that obviously cannot stay that way. I
23 told her that I would have to go to the
24 authority at school and report it.

**Page 31**

1     Q.    As I understand your testimony,
2 what your daughter told you was that
3 Emily was upset that Romig wanted her to
4 spend some time at Romig's home while
5 Chelsea was at the home?
6     A.    Well, the weekend in question
7 Chelsea was home. Eric's wife and other
8 small children were going to be away on
9 this specific weekend. And I do not
10 recall the date of that, but Chelsea was
11 still at home.
12         But he had been texting her,
13 and I do not know the exact words, but
14 just in general that he wanted her to
15 spend the weekend. That's what she was
16 saying was in the text.
17     Q.    Was it your impression from
18 your daughter's comments that Emily told
19 Allison that it was Eric Romig who was
20 inviting her to spend time at his house,
21 not Chelsea?
22     A.    Correct.
23     Q.    Did your daughter say anything,
24 even in general, about any of the other

**Page 32**

1 types of texts that Emily told her she
2 was receiving from Eric Romig?
3     A.    I cannot recall any specific
4 texts other than they were just making
5 her uncomfortable, but I do not recall
6 any specific texts other than the one
7 about the weekend.
8     Q.    Do you recall Allison telling
9 you anything about her conversation with
10 Emily and the information that Emily gave
11 to her that we have not discussed
12 already?
13     A.    No.
14     Q.    Did your daughter discuss with
15 you anything in terms of the quantity or
16 volume, the number of texts that she was
17 receiving, that Emily was receiving, from
18 Eric Romig?
19     A.    No.
20     Q.    Did Allison tell you anything
21 that she had heard from Emily Mayer about
22 texts from Eric Romig to the effect of "I
23 love you. I want to marry you. I can
24 take care of you. I'll be good for you,"

**Page 33**

1 anything of that nature whatsoever?
2     A.    No, I don't recall that.
3     Q.    Did you get the impression from
4 what your daughter told you that Mr.
5 Romig's invitation to Emily to spend the
6 weekend at his house was for a not
7 appropriate or an inappropriate purpose?
8     A.    I would say I thought that it
9 was inappropriate.
10     Q.    Thank you for that answer, but
11 let me ask it a different way: Did you
12 feel personally that Mr. Romig, if he did
13 in fact ask Emily to come over and stay
14 at his house with his step- or adopted
15 daughter for the weekend, that that was
16 inappropriate? When his wife and kids
17 were away, other kids, that that was
18 inappropriate?
19     A.    Correct.
20     Q.    I was trying to figure out
21 your motivation for going or having to
22 take her to Ryan Clymer to talk about
23 this.
24         So, that was your motivation:

Appendix 0822

Page: 13 (34 - 37)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 34

1  You thought there could be something
2  inappropriate going on.
3  A.   Correct.
4  Q.   You suspected there might be
5  something inappropriate going on.
6  A.   Correct.
7  Q.   You had started doing volunteer
8  work at the school, at FCA, in 2004,
9  approximately, you said?
10  A.   Approximately.
11  Q.   I believe Eric Romig testified
12  he started working there as basketball
13  coach in 2005.
14  Before receiving this
15  information from Allison that she had been
16  told by Emily Mayer, had you heard any
17  rumors or gossip or innuendo or comments
18  from anybody at the school -- students,
19  staff, administrators, anybody -- of any
20  suspected or rumored inappropriate conduct
21  by Mr. Romig with any other student?
22  A.   No.
23  Q.   So, you had never heard
24  anything about Mr. Romig's reputation or

Page 35

1  how he was with the girls on his team or
2  what type of person he was or what kind
3  of character he had?  Nothing of that
4  nature whatsoever?
5  MR. SANTARONE:  Objection.
6  Q.   Is that correct?
7  A.   No.
8  Q.   You did not hear anything of
9  that nature.
10  A.   No.
11  Q.   Did you know Lauren Fretz?
12  A.   Yes.
13  Q.   How did you know her?
14  A.   Student at FCA.
15  Q.   Was she in Ms. Tatarro's
16  homeroom at any time?
17  A.   Yes.
18  Q.   Did you at any time before or
19  after Lauren Fretz graduated from FCA hear
20  any rumors, gossip, innuendo, comments,
21  suspicions about some type of relationship
22  or inappropriate relationship with Lauren
23  Fretz and Eric Romig?
24  A.   Yes.

Page 36

1  Q.   When did you hear that?
2  A.   After it had come out with --
3  probably after he resigned or was let go.
4  Q.   We've already established on
5  the record that Mr. Romig left in January
6  of 2010, so it would have been somewhere
7  around that time?
8  A.   Yes.
9  Q.   What did you hear, and who did
10  you hear it from?
11  A.   I don't recall who I heard it
12  from.  I don't know if it was kids just
13  in general that he had been texting her
14  as well, but I don't recall or remember
15  her at any of those texts.
16  Q.   I'm sorry, I missed the last
17  part of that answer.  That he had been
18  texting Lauren Fretz as well, but. . .
19  A.   I didn't know of any of those
20  texts.  I didn't. . .
21  Q.   You didn't have any direct
22  knowledge of any of that.
23  A.   Right.
24  Q.   And don't recall if you heard

Page 37

1  that from students versus teachers versus
2  other coaches?
3  A.   No.  I would say it was --
4  I'm guessing it would be --
5  MR. RUSSELL:  Nobody wants you
6  to guess.
7  THE WITNESS:  Sorry.
8  BY MR. GROTH:
9  Q.   What's your best recollection?
10  A.   My daughter.
11  Q.   If it is your daughter, did
12  she tell you or do you recall her
13  mentioning to you from whom she heard it?
14  A.   No.
15  Q.   When you heard this about Mr.
16  Romig allegedly texting Lauren Fretz, did
17  you hear anything about whether the texts
18  were inappropriate in some way as opposed
19  to just texting about basketball or some
20  coaching issue?
21  A.   I don't recall.
22  Q.   Did you hear that from any
23  other source, of any relationship,
24  inappropriate relationship, between Mr.

Appendix  0823

Page: 14 (38 - 41)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 38

1  Romig and Lauren Fretz?
2      A.   I don't recall.
3      Q.   Did Ms. Tatarro ever tell you
4  anything about some suspected relationship
5  between Mr. Romig and Lauren Fretz that
6  was inappropriate?
7      A.   No.
8      Q.   Did she ever tell you that she
9  had been --
10     MR. RUSSELL: "She "being Ms.
11 Tatarro.
12     MR. GROTH:  Yes.  Sorry.
13     BY MR. GROTH:
14     Q.   And you worked with her as an
15 aide back in 2009, correct?
16     A.   Correct.
17     Q.   In fact, you started working
18 for her even earlier than that as an
19 aide?
20     A.   Yes.
21     Q.   Back in 2004, or around there?
22     A.   Correct.  Yes.
23     Q.   Did she ever tell that you she
24 had been asked to go to Lauren Fretz

Page 40

1      Q.   Let's go back to the time
2  after your daughter Allison told you what
3  Emily Mayer had told her about Romig's
4  text to Emily Mayer.
5           Did you make some decision when
6  you received that information that you
7  were going to do something with that
8  information?
9      A.   Yes.
10     Q.   What did you decide to do?
11     A.   That I would go into school --
12     Q.   The next day?
13     A.   Yes.
14     Q.   And do what?
15     A.   And talk to Ryan Clymer.
16     Q.   Why?  Why did you make that
17 decision?
18     A.   I thought it was an obligation
19 to report something that seemed
20 inappropriate.
21     Q.   While we're on that topic, had
22 you ever received any information or
23 training or instruction or explanation of
24 Faith Christian Academy's sexual harassment

Page 39

1  personally and ask Lauren Fretz some
2  questions regarding an alleged relationship
3  between Eric Romig and Lauren Fretz?
4      A.   No.
5      Q.   Did you ever have occasion
6  while you were working at FCA as a
7  volunteer to see Lauren Fretz and Eric
8  Romig together?
9      A.   No.
10     Q.   Other than your daughter
11 Allison telling you about hearing
12 something to the effect that Mr. Romig
13 was texting Lauren Fretz as well, did you
14 hear anything of that nature from anybody
15 else?
16     A.   Not that I can recall.
17     Q.   Where does your daughter live,
18 Allison?
19     A.   At 1015 Cedar Meadow Lane.
20     Q.   Your address?
21     A.   Yes.
22     Q.   Oh, I'm sorry.  I thought it
23 sounded familiar.
24     A.   Correct.

Page 41

1  policy with regard to middle and high
2  school students as of that time, in 2009?
3      A.   No.
4      Q.   Your daughter was a student at
5  the school, and you had other children at
6  the school in 2009?
7      A.   Correct.
8      Q.   Had you ever seen the
9  student/parent handbook which contained all
10 of the policies and procedures at the
11 school?
12     A.   Yes.
13     Q.   How did you see that handbook?
14 How did it happen that you saw that
15 handbook?
16     A.   It would come home with the
17 students.  They would go over it themselves
18 at school, but then they would bring it
19 home.
20     Q.   Did you ever go over it
21 yourself?
22     A.   I can't say that I read it
23 cover to cover, but I did glance.
24     Q.   Did you ever read the sexual

Appendix 0824

Page: 15 (42 - 45)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 42

1  harassment policy that existed back in
2  2009?
3      A.   I can't recall.
4      Q.   Did you ever read the sexual
5  harassment policy in any handbook that you
6  might have received from your children
7  between 2004 and 2009?
8      A.   Not that I recall.
9      Q.   Did you personally as a
10 volunteer receive any training or
11 instruction or explanation from Faith
12 Christian Academy on the school's sexual
13 harassment policy?
14     A.   Can you repeat that?
15     Q.   Yes.  In your capacity as a
16 volunteer, as a teacher's aide and doing
17 volunteer work and fund-raising work and
18 whatever, did you ever receive any
19 training or instruction or explanations
20 from Faith Christian Academy regarding its
21 sexual harassment policies?
22     A.   No.
23     Q.   When you decided after your
24 discussion with Allison to go to Mr.

Page 43

1  Clymer with this information, did you also
2  decide to confront Emily Mayer about the
3  information that your daughter said that
4  Emily Mayer gave to your daughter?
5      A.   Yes.
6      Q.   Did you decide to actually do
7  that before you went to Ryan Clymer?
8      A.   I don't recall.
9      Q.   I'm trying to get the
10 chronology.  Did you go to Ryan Clymer
11 without Emily Mayer or did you --
12     A.   No.
13     Q.   -- did you go with Emily
14 Mayer?
15     A.   I went with Emily Mayer.
16     Q.   And was it the first thing in
17 the morning, during homeroom period?
18     A.   I don't recall.
19     Q.   Is that when you would have
20 normally seen her at school?
21     A.   Yes.
22     Q.   Seen Emily Mayer at school.
23     A.   Yes.
24     Q.   Would you have seen her later?

Page 44

1  Other than at cafeteria time, did you
2  ever see her later in the day at school
3  other than homeroom time and cafeteria
4  time?
5      A.   Passing in the hallway.
6      Q.   In the hallway.
7      A.   Yes.
8      Q.   So, do you believe it's likely
9  that, if you saw her first thing that
10 morning in the homeroom, that you had
11 confronted her at that time as opposed to
12 waiting until later in the day?
13     A.   Yes.
14     Q.   And when you first spoke to
15 Emily Mayer about it, where did you do
16 it?
17     A.   Bathroom.
18     Q.   Ladies room.
19     A.   The ladies room.
20     Q.   Was there anybody else in the
21 ladies room at the time?
22     A.   No.
23     Q.   Did you ask her to go to the
24 ladies room with you to discuss it?

Page 45

1      A.   No, I came across her.
2      Q.   In the ladies room.
3      A.   Yes.
4      Q.   And you took that opportunity
5  to raise this issue with her.
6      A.   Correct.
7      Q.   What did you say to her during
8  that discussion and what did she say to
9  you?
10     A.   I told her that I knew of the
11 situation and that we had to go to Ryan
12 Clymer.
13     Q.   Did you tell her what situation
14 you were referring to?
15     A.   The texts that she had received
16 from Eric Romig.
17     Q.   What did you tell Emily Mayer
18 about the information that had been given
19 to you by your daughter Allison?
20     A.   I told her that I had heard
21 the information and that it needed to be
22 reported.
23     Q.   Did you ask Emily Mayer for
24 any additional information, for any other

Appendix  0825

ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 46**

1 explanations or facts concerning this
2 texting issue with Mr. Romig?
3    A.   I asked her if she had the
4 texts to be able to show them for proof,
5 and she said no.
6    Q.   Did she tell you why she
7 didn't have them?
8    A.   She said she erased them.
9    Q.   Did she have her phone with
10 her in the bathroom?
11    A.   I don't recall.
12    Q.   Did you ask to see her phone?
13    A.   No.
14    Q.   Did she say she had any of the
15 messages at all, text messages, on her
16 phone, or had they all been deleted?
17    A.   She told me they were all
18 deleted.
19    Q.   What was her reaction when you
20 confronted her with the fact that
21 something she had confided to your
22 daughter had been told to you by her
23 daughter?  What was her reaction?
24    A.   She was nervous.

**Page 47**

1    Q.   How did she appear to be --
2 what was it about her that appeared to
3 look nervous?
4    A.   She was crying slightly and
5 just shaky.
6    Q.   Did she try to talk you out of
7 taking her to Ryan Clymer?
8    A.   No.
9    Q.   Did she say that she didn't
10 want to go see Ryan Clymer?
11    A.   I don't recall that.
12    Q.   Did you ask her whether or not
13 she had told anybody else the information
14 that she told your daughter?
15    A.   I did not ask her that, no.
16    Q.   Did she volunteer to you any
17 information that anybody else besides your
18 daughter knew anything about the texting
19 between Romig and her?
20    A.   She said her boyfriend had seen
21 some texts.
22    Q.   Some texts.
23    A.   Yes.
24    Q.   Did you know who her boyfriend

**Page 48**

1 was?
2    A.   Yes.
3    Q.   And who was that?
4    A.   Chase.
5    Q.   Brunner?
6    A.   Brunner.
7    Q.   Did she have to tell you that,
8 or you already knew that?
9    A.   I knew that.
10    Q.   So, when she referred to her
11 boyfriend, you knew who she was talking
12 about?
13    A.   Yes.
14    Q.   Did you ask her what texts
15 Chase Brunner had seen?
16    A.   No.
17    Q.   Did she tell you?  Did she
18 volunteer that information?
19    A.   Not that I recall, no.
20    Q.   Did she tell you whether or
21 not anybody else other than Chase Brunner
22 and your daughter and maybe this Fateem
23 Diabetes had been told by her of the
24 texting by Romig to her?

**Page 49**

1    A.   No.
2    Q.   Was there any other
3 conversation between the two of you at
4 that time that we have not gone over,
5 between you and Emily Mayer?
6    A.   No.
7    Q.   Did you ask her whether or not
8 her parents knew?
9    A.   I don't recall.
10    Q.   Did she tell you whether or
11 not her parents knew?
12    A.   I don't recall.
13    Q.   Did you have a discussion with
14 Emily Mayer about the specific texts that
15 Allison told you about; that is, where
16 Mr. Romig invited Emily Mayer over to his
17 home to spend the weekend with him and
18 his daughter Chelsea?
19    A.   Yes, that's the one I recall
20 her talking about.
21    Q.   Did you ask her about that
22 specific text?
23    MR. RUSSELL: Ask Emily.
24    MR. GROTH: Ask Emily, yes.

Page: 17 (50 - 53)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 50**

1   A.   I don't recall who started the
2   conversation.
3   Q.   But that specific text was
4   discussed between you and Emily.
5   A.   Correct.
6   Q.   Did Emily tell you that
7   receiving that text from Mr. Romig made
8   her uncomfortable?
9   A.   Yes.
10  Q.   Or upset.
11  A.   Yes.
12  Q.   Did she tell you why it made
13  her uncomfortable or upset that she was
14  invited to Mr. Romig's house to spend the
15  weekend with him and his adopted daughter,
16  Chelsea?
17  A.   Yes.
18  Q.   What did she say?
19  A.   She said that she had received
20  other texts, but this one crossed the
21  line with the knowledge that his wife was
22  going to be away with her two small
23  children and that he wanted her to come
24  over.

**Page 51**

1   Q.   So, did Emily Mayer tell you
2   that she herself thought that that text
3   was inappropriate?
4   A.   Yes.
5   Q.   And did you discuss with Emily
6   Mayer whether or not Emily thought that
7   Mr. Romig was trying to establish some
8   type of inappropriate sexual relationship
9   with her?
10       MR. RUSSELL:  Objection.
11  Q.   You can answer.
12  A.   Can you repeat it again? Sorry.
13  Q.   Yes.  Did Emily Mayer tell you
14  that, because of that text or other texts
15  that she had received from Mr. Romig,
16  that she thought that Mr. Romig was
17  trying to establish some type of
18  inappropriate sexual relationship with her?
19       MR. RUSSELL:  Same objection.
20       MS. OLSZEWSKI:  Objection.
21  Q.   You can answer.
22  A.   I would say to the last and
23  only text that she talked to me about,
24  yes.

**Page 52**

1   Q.   That from that text, it was
2   her belief that he was trying to
3   establish a sexual relationship with her.
4   A.   Correct.
5   Q.   Did Emily Mayer tell you that
6   she had received texts from Mr. Romig to
7   the effect of that Eric Romig was in love
8   with her; that Eric Romig could give her
9   everything that she needed and had a lot
10  to offer her; that he wanted Emily Mayer
11  to pick him, Eric Romig, over Chase,
12  those types of things?
13       Did you have any discussion
14  about anything like that?
15  A.   No.
16  Q.   How long did the discussion in
17  the ladies room last, approximately?
18  A.   Maybe ten, fifteen, twenty
19  minutes.
20  Q.   It was a while.
21  A.   Yes.
22  Q.   Longer than a normal ladies
23  room visit.
24  A.   Correct.

**Page 53**

1   Q.   Did anybody else come into the
2   ladies room during that time?
3   A.   No.
4   Q.   What did you do after having
5   that conversation with Emily Mayer?
6   A.   We walked up to Ryan Clymer's
7   office.
8   Q.   Did you go right from the
9   ladies room?
10  A.   Yes.
11  Q.   She didn't stop at her locker
12  or pick up anything or get her phone or
13  anything of that nature?
14  A.   Not that I recall, no.
15  Q.   Was Ryan Clymer in his office?
16  A.   Yes.
17  Q.   Was there anybody else in the
18  office other than you, Emily Mayer and
19  Ryan Clymer?
20  A.   No.
21  Q.   Did you leave the door open?
22  A.   No.
23  Q.   I take it you sat down in
24  front of his desk?

brusilow.com          brusilow + associates          215.772.1717

Appendix 0827

Page: 18 (54 - 57)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 54**

1  A.   Correct.
2  Q.   And who said something first?
3  A.   I told Ryan that Emily had
4  some information that I believed should be
5  shared with him, and that's what started
6  it.
7  Q.   And did you tell him why you
8  believed that she should be sharing that
9  information with him?
10  A.   Yes.
11  Q.   What did you say?
12  A.   That there was inappropriate
13  texting going on.
14  Q.   From Mr. Romig to Emily Mayer.
15  A.   Correct.
16  Q.   Did you tell Ryan Clymer when
17  you first sat down that you thought the
18  texting had a sexual component to it;
19  that it appeared to you from what you
20  heard from your daughter and discussed
21  with Emily that there might be some
22  sexually inappropriate texting going on?
23  A.   I let Emily answer the
24  questions that Ryan had, so they were

**Page 55**

1  talking back and forth, discussing the
2  texts.
3  Q.   We'll get to that in a second,
4  but did you tell him that straight off at
5  the beginning of the meeting, that you
6  thought, based upon what you had been
7  told by your daughter and heard from
8  Emily Mayer herself, that you thought
9  there might be something sexually
10  inappropriate going on?
11  A.   Yes.
12  Q.   What happened after you made
13  that initial statement?
14  A.   Ryan asked her questions about
15  the texts and asked her if he could see
16  them or, you know, did she have the texts
17  on her phone, and she said she had
18  deleted them all.
19  Q.   Did he ask to see her phone?
20  A.   I don't recall.
21  Q.   Did he ask her to go get her
22  phone?
23  A.   I don't recall.
24  Q.   When you told Ryan Clymer why

**Page 56**

1  you wanted to have this meeting with him
2  and Emily Mayer, did it appear to you
3  that Ryan Clymer had ever heard of this
4  issue before from anybody else; that is,
5  that somebody had told him before you
6  even went there with Emily to tell him
7  about it; that he had received some
8  information about it before?
9       MS. OLSZEWSKI:  Objection.
10  Q.   You can answer.
11  A.   No.
12  Q.   Did it appear from his reaction
13  to what you told him and the subsequent
14  conversation that he had that this is the
15  first that he was hearing of it?
16       MS. OLSZEWSKI:  Objection.
17  Q.   You can answer.
18  A.   Yes.
19  Q.   Did he make any comment during
20  the meeting with you and Emily Mayer that
21  Chase Brunner had approached him even
22  before you approached him and said
23  something about the texting issue?
24  A.   No.

**Page 57**

1  Q.   So, what kind of questions did
2  Ryan Clymer ask Emily Mayer and what were
3  her responses to those questions, as best
4  you can recall?
5  A.   I cannot recall anything
6  specific other than the fact that he
7  asked if she had the texts, would he be
8  able to see them, and she said "No, I
9  deleted them."
10  Q.   Did he ask her any questions
11  about the content of the texts other --
12  strike that.
13       Did he ask her any questions
14  about the content of the texts that she
15  was uncomfortable with?
16  A.   I don't recall.
17  Q.   Was there a discussion about
18  the specific texts that your daughter had
19  told you about, about Mr. Romig inviting
20  Emily Mayer to his house to spend the
21  weekend with him and Chelsea?
22  A.   Yes.
23  Q.   What was the discussion about
24  that?

Appendix 0828

Page: 19 (58 - 61)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 58**

1     A.   Well, just that he had texted
2 her and approached her with that as far
3 as spending the weekend.
4     Q.   And did Emily say that made
5 her uncomfortable?
6     A.   Yes.
7     Q.   Did it also come out in the
8 meeting that when Romig sent her this
9 text, he also texted that his wife and
10 the other children would be out of town
11 for that weekend?
12     A.   Yes.
13     Q.   Did Ryan Clymer make any
14 statement during the meeting that he felt
15 that that kind of text to Emily Mayer was
16 inappropriate?
17     MS. OLSZEWSKI:  Objection.
18     A.   I can't recall his comments.
19     Q.   And believe me, I understand.
20 This goes back to 2009, and I can see
21 you're struggling with trying to remember
22 things. All I'm asking for is your
23 best recollection.
24     So, I understand that there may

**Page 59**

1 have been things discussed at that meeting
2 that you don't recall today.
3     A.   Right.
4     Q.   Even though it was not maybe
5 just one text that was discussed. There
6 may be other texts discussed, correct?
7     MR. SANTARONE:  Objection.
8     Q.   Is that correct?
9     A.   There may be.
10     Q.   You just don't recall anything
11 other than this one text. . .
12     A.   Correct.
13     Q.   . . .being discussed.
14     A.   Correct.
15     Q.   And the situation with the
16 phone.
17     A.   Correct.
18     Q.   How long did the meeting last?
19 Approximately.
20     A.   Twenty minutes.
21     Q.   What was Emily Mayer's demeanor
22 during the meeting?
23     A.   Shaken.
24     Q.   Did she appear nervous?

**Page 60**

1     A.   Yes.
2     Q.   Did she appear upset?
3     A.   Yes.
4     Q.   Did she appear uncomfortable?
5     A.   Yes.
6     Q.   Embarrassed?
7     A.   Yes.
8     Q.   Was she crying?
9     A.   Slightly.
10     Q.   Do you remember anything about
11 any more information that -- do you
12 remember any additional information or
13 facts that Emily gave Ryan Clymer other
14 than those that we have already discussed?
15     A.   No.
16     Q.   Do you recall Ryan Clymer
17 asking Emily for anything other than the
18 phone?
19     A.   No.
20     Q.   Do you remember him asking
21 whether or not she had discussed this
22 issue with anybody other than you and
23 your daughter?
24     A.   No.

**Page 61**

1     Q.   Do you recall Ryan Clymer
2 asking her whether or not she had shown
3 any of the texts to anybody before she
4 deleted them?
5     A.   Yes.
6     Q.   And do you know what the
7 response was?
8     A.   That she had shown some to
9 Chase Brunner.
10     Q.   Was it discussed whether or not
11 her parents had any knowledge of this
12 situation with Mr. Romig?
13     A.   I don't recall.
14     Q.   During the meeting, the
15 fifteen- or twenty-minute meeting with Mr.
16 Clymer, did any other female students'
17 names come up?
18     MR. RUSSELL:  Objection.
19     MS. CONNOR:  Objection.
20     MR. RUSSELL:  She stated twenty
21 minutes.
22     BY MR. GROTH:
23     Q.   Whatever amount of time it was,
24 did any other female student's name come

Appendix 0829

Page: 20 (62 - 65)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 62**

1 up in the conversation in connection with
2 Mr. Romig.
3    A.   I don't recall.
4    Q.   Do you remember if Lauren
5 Fretz' name came up?
6    A.   I don't recall.
7    Q.   Do you recall if Kristen
8 Kennedy's name came up?
9    A.   I don't recall that.
10    Q.   And by "came up," I mean
11 either was mentioned by Emily Mayer or by
12 Ryan Clymer.
13    A.   I don't recall.
14    Q.   Okay. Did Ryan Clymer
15 specifically ask if any of the texts from
16 Mr. Romig were sexual in nature; that is,
17 trying to entice or induce or coerce or
18 convince Emily to engage in some type of
19 sexual activity?
20    A.   I don't recall, no.
21    Q.   Did Emily volunteer that
22 information, whether or not she was asked
23 by Ryan Clymer?
24    A.   I don't remember that.

**Page 63**

1    Q.   Did Ryan Clymer ask you to do
2 anything at that meeting, anything more in
3 connection with this texting issue between
4 Mr. Romig and Ms. Mayer?
5    A.   No.
6    Q.   Did he ask Emily to do
7 anything?
8    A.   I don't recall what he asked.
9    Q.   I think you testified very at
10 the very beginning that you came to the
11 meeting with Emily and you left with
12 Emily.
13    A.   Correct.
14    Q.   So, there was no meeting
15 between Mr. Clymer and Emily that you
16 know of that you weren't a part of?
17    MR. RUSSELL: At that time.
18    MR. GROTH: At that time,
19 correct.
20    A.   Correct.
21    Q.   Did Ryan Clymer make any
22 statement to Emily as to whether or not
23 she should remain in school that day?
24    A.   I don't recall.

**Page 64**

1    Q.   Do you recall Ryan Clymer
2 telling Emily to go home and tell her
3 parents about the situation?
4    A.   I don't recall that.
5    Q.   Do you recall Ryan Clymer
6 telling Emily Mayer that she should not
7 participate from that point forward in any
8 basketball activities with the girls
9 basketball team that Eric Romig coached?
10    MS. OLSZEWSKI: Objection.
11    A.   I don't recall.
12    Q.   Do you recall Mr. Clymer making
13 any statements whatsoever about what he
14 planned to do with the information that
15 you and Emily Mayer had come forward with
16 about Mr. Romig?
17    A.   I just remember him telling us
18 that he was going to look into it and
19 take it from there.
20    Q.   Did he ask you or Emily not to
21 mention this information to anybody else
22 at the school?
23    A.   Yes.
24    Q.   Did he tell you why he didn't

**Page 65**

1 want you to talk about this with anybody
2 else at school?
3    A.   No.
4    Q.   At that time did Faith
5 Christian Academy have some type of
6 guidance counselor or psychological
7 counselor as part of its staff?
8    A.   I don't recall.
9    Q.   Did Mr. Clymer direct Emily to
10 go to any other teacher, guidance
11 counselor or anybody else at the school
12 to give this information to or discuss
13 this information with?
14    A.   I don't recall.
15    Q.   At some point you and Emily
16 got up and left the office, correct?
17    A.   Correct.
18    Q.   What did do you?
19    A.   I went back to my job.
20    Q.   Did you go back to the
21 homeroom, Ms. Tatarro's homeroom?
22    A.   Right.
23    Q.   Did Emily go with you to the
24 homeroom?

Appendix 0830

Page: 21 (66 ~ 69)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 66

1    A.    I dont remember.
2    Q.    Do you know if she went home
3 right after the meeting?
4    A.    I don't remember.
5    Q.    Did you have any discussion
6 with her -- in the ladies room or in the
7 hallway or any other place in the school
8 -- after leaving Mr. Clymer's office?
9    A.    No.
10   Q.    Did Mr. Clymer thank you for
11 reporting this information to him?
12   A.    Yes.
13   Q.    Did Mr. Clymer say whether or
14 not he was going to report this
15 information to anybody else himself?
16   A.    He said he would take care of
17 it.
18   Q.    I remember that part, but did
19 he say he was going to tell anybody else;
20 for example, Pastor Auckland or the board
21 of directors or anybody else at the
22 school?
23   A.    I don't recall.
24   Q.    I would assume that you didn't

Page 67

1 write any notes or memos or anything
2 written about this situation at the time
3 it was happening back in 2009. Is that
4 correct?
5    A.    Correct.
6    Q.    Did Mr. Clymer ask you to
7 prepare anything written for him, a memo
8 of what your daughter told you or any
9 type of writing at all to document what
10 you had been told, either by your
11 daughter or by Emily Mayer?
12   A.    No.
13   Q.    Did he ask to speak to your
14 daughter?
15   A.    I don't recall.
16   Q.    Do you know if your daughter
17 ever spoke to Ryan Clymer as part of his
18 taking care of this situation?
19        MS. OLSZEWSKI:  Objection.
20   A.    I don't recall.
21   Q.    Do you think that if your
22 daughter had been called in to talk to
23 Mr. Clymer about what Emily Mayer told
24 her, that she would have told you? Your

Page 68

1 daughter would have told you that?
2    A.    Yes.
3    Q.    When you got home that day and
4 saw your daughter, did you tell her that
5 you had taken Emily Mayer in to talk to
6 Ryan Clymer about Mr. Romig's texts?
7    A.    Yes.
8    Q.    What did you tell her?
9    A.    I told her that we went in,
10 gave Mr. Clymer the information, and that
11 he was going to investigate.
12   Q.    When your daughter first told
13 you about the texts that she had been
14 told about by Emily Mayer, did your
15 daughter believe Emily Mayer?
16   A.    Yes.
17   Q.    And your daughter said that
18 Emily Mayer never showed her any of the
19 texts, correct?
20   A.    Correct.
21   Q.    After you sat with Ryan Clymer
22 and Emily Mayer for twenty minutes to
23 discuss the issue, did you believe Emily
24 Mayer?

Page 69

1    A.    Yes.
2    Q.    By "believe" I mean -- I know
3 you don't have any direct knowledge about
4 exactly what happened, but did you find
5 her to be credible in the information
6 that she was providing to Ryan Clymer?
7    A.    Yes.
8    Q.    Did Ryan Clymer during the
9 meeting do anything or say anything to
10 give you the impression that he did not
11 believe her or that he did not find her
12 credible?
13        MS. OLSZEWSKI:  Objection.
14   A.    Can you repeat that, please?
15   Q.    Yes. Did Ryan Clymer say or
16 do anything during the meeting with you
17 and Emily Mayer that led you to believe
18 or gave you the impression that he did
19 not believe Emily Mayer concerning what
20 she was saying about these texts from Mr.
21 Romig?
22   A.    No.
23   Q.    During that meeting or at the
24 time of that meeting did you have any

Appendix  0831

Page: 22 (70 - 73)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 70**

1  knowledge or information that Ryan Clymer
2  had gone to FCA as a student with Eric
3  Romig from grades one through twelve, that
4  they were classmates at FCA from one
5  through twelve?
6  A.   No.
7  Q.   Did you know that before you
8  came here today and I just told you that?
9  A.   I knew that.
10  Q.   How did you know that?
11  A.   I don't recall.
12  Q.   Did you also tell your husband
13  about what you had done with Emily in
14  taking her to meet with Ryan Clymer?
15  A.   Yes.
16  Q.   Did he think that you had done
17  the right thing?
18  A.   Yes.
19  Q.   During the meeting with Ryan
20  Clymer and Emily Mayer and yourself, was
21  there any discussion by Ryan Clymer that
22  he was considering or planning to report
23  the information to any public authorities?
24  And by "public authority" I

**Page 71**

1  mean the Department of Education, the
2  Department of Public Welfare, DA's Office,
3  police department, anything of that
4  nature.
5  MS. OLSZEWSKI:  Objection.
6  A.   No.
7  Q.   Did you have any additional or
8  further discussions with Emily about the
9  texting issue with Mr. Romig after that
10  meeting?
11  A.   Not that I recall.
12  Q.   Do you remember her showing up
13  for class the next day?
14  A.   No.
15  Q.   You don't have a memory either
16  way, or you remember that she did not
17  show up for class the next day?
18  A.   I don't remember either way.
19  Q.   Did Mr. Clymer ever call you
20  back to talk to you or call you by phone
21  to talk to you about any other
22  information in connection with the
23  investigation of Romig's texts to Emily
24  Mayer?

**Page 72**

1  A.   Not that I recall, no.
2  Q.   Was the next thing that you
3  heard about the situation hearing from
4  some source that Eric Romig was leaving
5  FCA and was no longer going to coach the
6  girls basketball team?
7  A.   Correct.
8  Q.   Do you recall who you heard
9  that information from?
10  A.   No.
11  Q.   Do you recall if it was Mr.
12  Clymer or Mr. Hollenbach?
13  A.   No.
14  Q.   Do you recall Mr. Clymer ever
15  giving you any information about Mr. Romig
16  leaving school and leaving the position as
17  coach of the girls basketball team after
18  it happened?
19  A.   No.
20  Q.   This lawsuit was filed in
21  January of 2015.  Did you have any
22  discussion with Ryan Clymer about the
23  Emily Mayer/Eric Romig texting situation
24  between 2009 or 2010 and the time this

**Page 73**

1  lawsuit was filed in the beginning of
2  2015?
3  A.   No.
4  Q.   Did you ever have any
5  discussion during that period of time with
6  Emily Mayer?
7  A.   No.
8  Q.   Or with her parents?
9  A.   I spoke with her mother.
10  Q.   When did you speak to her
11  mother?
12  A.   After she had gone to Mr.
13  Clymer.
14  Q.   You're talking about Annette
15  Smith.
16  A.   Yes.
17  Q.   After you took her to see Mr.
18  Clymer.
19  A.   Uh-huh.
20  Q.   After you took Emily to see
21  Mr. Clymer.
22  MR. RUSSELL:  That's a yes?
23  THE WITNESS:  Yes.
24  BY MR. GROTH:

Appendix  0832

Page: 23 (74 - 77)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 74**

1 Q.   How long after that meeting did
2 you talk to Annette Smith?
3 A.   Approximately a day.
4 Q.   Did she contact you or did you
5 contact her?
6 A.   I don't recall.
7 Q.   Was it by phone?
8 A.   Yes.
9 Q.   Was it at home or at school?
10 A.   Home.
11 Q.   In the evening?
12 A.   Yes.
13 Q.   And what was the conversation,
14 at best you can recall, between you and
15 Annette Smith?
16 A.   I remember us discussing the
17 text messages.  She told me that there
18 were a lot of text messages, and I
19 suggested that she try to get them the
20 actual text messages so that she could
21 know exactly was going on.  That the only
22 thing I remember about the conversation,
23 Q.   Let me ask you about the term
24 "a lot of text messages." Was there any

**Page 75**

1 number given to you about what "a lot"
2 consisted of?
3 A.   I don't recall the number at
4 that time.
5 Q.   Was it your impression from the
6 conversation with Annette Smith that she
7 had already obtained some information
8 about the quantity of text messages?
9 A.   Yes.
10 Q.   Did she say how she got that
11 information?
12 A.   No.
13 Q.   Did she say whether or not she
14 was simply told by her daughter that
15 there were hundreds or thousands of text
16 messages or they had gotten information
17 from some other source, like the phone
18 company?
19 A.   I don't recall.
20 Q.   Or a bill, a telephone bill?
21 A.   I don't recall that.
22 Q.   Did she thank you for taking
23 her daughter to see Ryan Clymer?
24 A.   Yes.

**Page 76**

1 Q.   Now that you think about it,
2 was that what prompted the call to begin
3 with?
4 A.   (Pause)
5 Q.   Did Annette Smith tell you that
6 that's what was prompting her call to
7 you, that she wanted to thank you for
8 taking her daughter in to see Ryan
9 Clymer?
10 A.   I don't recall.
11 Q.   Why did you recommend to
12 Annette Smith that something should be
13 done to find the content of the test
14 messages, to get the actual content of
15 the text messages?
16 A.   As a parent, I would want to
17 know.
18 Q.   Why?
19 A.   To help either do something
20 about the person that was sending the
21 inappropriate texts and to maybe clear my
22 own daughter from any wrongdoing or get
23 to the bottom of it.
24 Q.   Back at that time, if your

**Page 77**

1 daughter came to you and gave you the
2 same information that Emily Mayer gave you
3 -- that she was receiving these texts
4 from some male staff member at the school
5 and she had deleted all of them so that
6 you could not see them -- would you have
7 believed your daughter still?
8 MS. OLSZEWSKI:  Objection.
9 A.   Yes.
10 Q.   Back in 2009 or '10, did you
11 know whether or not that actual
12 text-message content could be retrieved
13 after it was deleted?
14 A.   No.
15 Q.   I mean technically, you know,
16 did you know that there was a way that
17 that could or could not be done?
18 A.   No.
19 Q.   Did you ever do anything to
20 find that out, whether or not you could
21 obtain the content of a deleted test
22 message?
23 A.   No.
24 Q.   Do you recall anything about

Appendix 0833

Page: 24 (78 - 81)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

**Page 78**

1 the conversation that you had with Annette
2 Smith?
3  A.  No.
4  Q.  Did you ever meet Annette
5 Smith?
6  A.  I don't recall.
7  Q.  Did she call you again or try
8 to communicate with you again after that
9 telephone conversation?
10  A.  No.
11  Q.  Just one telephone conversation
12 after Mr. Romig had already left as coach
13 of the girls basketball team.
14  A.  Right.
15  MS. OLSZEWSKI:  Actually, I
16 thought the testimony was that --
17  MR. RUSSELL:  The next day.
18  MS. OLSZEWSKI:  -- the mother
19 called after she went to Mr. Clymer.
20  MR. RUSSELL:  The next day.
21  MS. OLSZEWSKI:  The next day
22 --
23  MS. OLSZEWSKI:  Not after he
24 resigned.

**Page 79**

1  MR. RUSSELL:  I agree.
2  MR. GROTH:  Okay.
3 BY MR. GROTH:
4  Q.  Is that the case?
5  A.  Can you say that again?
6  Q.  Yes; I may have misspoken. You
7 said the telephone conversation between
8 you and Annette Smith happened after Mr.
9 Romig resigned.
10  Was it your testimony it
11 happened the day after the meeting with
12 Clymer?
13  A.  The day after the meeting, yes.
14  Q.  After Mr. Romig resigned or
15 left as coach of the team, did you have
16 any further conversation with Annette
17 Smith?
18  A.  No.
19  Q.  Did you have any connection
20 with Faith Christian Academy during the
21 years 1996 through 1998?
22  A.  (No response)
23  Q.  Let me see if I can help you
24 a little bit.  You graduated in 1984,

**Page 80**

1 correct?
2  A.  Right.
3  Q.  You started helping as a
4 volunteer in 2004, correct?
5  A.  Correct.
6  Q.  My question is, did you have
7 any connection with the school as a
8 volunteer or any other connection with the
9 school during the years 1996 through 1998?
10  A.  No.
11  Q.  Before the Emily Mayer
12 situation with the texting with Eric Romig
13 in 2009, had you ever heard of a
14 situation at school involving a teacher
15 named John Longaker who was arrested and
16 convicted of a number of crimes in
17 connection with sexual physical contact
18 with a student at FCA?
19  A.  I heard about it.
20  Q.  When did you first hear about
21 it?
22  A.  I wouldn't recall the year that
23 that was.
24  Q.  Was it at or around the time

**Page 81**

1 that it happened, back in '96, '97, '98?
2  A.  Correct, when it happened.
3  Q.  How did you become aware of
4 that situation?
5  A.  People talking.
6  Q.  People at FCA talking?
7  MR. RUSSELL:  She wasn't at
8 FCA.
9  A.  I wasn't at -- I would say
10 through church.
11  Q.  You were a member of the
12 church.
13  A.  Correct.
14  Q.  So, somebody at Faith Baptist
15 Church talking about the situation,
16 correct?
17  A.  Correct.
18  Q.  And do you recall who that
19 person or who those people were?
20  A.  No.
21  Q.  Do you recall what you heard?
22  A.  That he was somehow involved
23 with a student that used to attend Faith
24 Christian Academy.

Appendix 0834

Page: 25 (82 - 85)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 82

1  Q.    "Somehow involved" meaning what?
2  A.    Inappropriately.
3  Q.    Sexually inappropriately?
4  A.    Yes.
5  Q.    There were media reports about
6  this. It was in the newspapers.  I'm not
7  sure if it was on television or whatever.
8  ........ But do you recall reading any
9  of the media accounts of what Mr.
10 Longaker was alleged to have done and
11 what he eventually pleaded guilty to
12 doing?
13 A.    No.
14 Q.    Did you have children at the
15 school at the time, in 1996 to '98?
16 A.    No.
17 Q.    At any time between the time
18 Mr. Romig left as coach of the girls
19 basketball team in 2010 and the time the
20 complaint in this case was filed in
21 January of 2015, did you hear from any
22 source rumors about Eric Romig and any
23 other females who attended FCA during the
24 time that he was coaching there?

Page 83

1  A.    Can you repeat that again? I'm
2  sorry.
3  Q.    Yes. Between the time that he
4  stopped coaching, Eric Romig stopped
5  coaching, in 2010 and the time when this
6  complaint was filed in 2015, did you hear
7  from any source information that Eric
8  Romig was suspected of being involved in
9  an inappropriate way with any other female
10 students at the school while he was there
11 at FCA?
12 A.    No.
13 Q.    No?
14 A.    Other than the texting with
15 Lauren?
16 Q.    Other than with texting with
17 Lauren.
18 A.    Correct.
19 Q.    You never heard anything about
20 some physical relationship between Lauren
21 Fretz and Mr. Romig?
22 A.    Possibly.
23 Q.    That means you have some fuzzy
24 recollection of hearing some. . .

Page 84

1  A.    Yes.
2  Q.    . . .information about that,
3  but you can't give me any specifics?
4  A.    No, just that it was possible
5  that it was more than texting, but I
6  don't recall exactly as to what.
7  Q.    And you don't recall who you
8  heard that from.
9  A.    No.
10 Q.    And you heard that during a
11 period of time when you were volunteering
12 at the school after 2009.
13 A.    This would have been like way
14 after, you know -- after he was gone.
15        (Exhibit Alderfer-1 was marked
16 for identification)
17 BY MR. GROTH:
18 Q.    I'm going show you an exhibit
19 which I'm marking as Alderfer-1. It's a
20 letter to you from me dated April 10th,
21 2015. I'll give you a chance to look at
22 that. You don't have to read the whole
23 thing.  I assume you've read this before,
24 correct?

Page 85

1  A.    Correct.
2  Q.    Did you receive this letter at
3  some point in the mail shortly after
4  April 10, 2015?
5  A.    Yes.
6  Q.    What did you do in response to
7  receiving that letter?
8  A.    I showed it to my husband and
9  discussed it with him, and then decided
10 to let the lawyers, school lawyers, handle
11 it.
12 Q.    How did you find out who the
13 school's lawyers were?
14 A.    Through Henry Thompson.
15 Q.    So, you contacted Henry
16 Thompson after you received this letter.
17 A.    Correct.
18 Q.    And what discussion did you
19 have with him?
20 A.    Just that they would go over
21 the letter and contact the lawyer.
22 Q.    That they, meaning Henry
23 Thompson, and somebody at the school would
24 go over the letter and contact the

Appendix 0835

Page: 26 (86 - 89)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 86

1  lawyer?
2      A.    Correct.
3      Q.    Did Mr. Thompson give you any
4  instruction not to respond to me directly
5  about the letter?
6      A.    I'm sorry, can you say that
7  again?
8      Q.    Yes. Did Mr. Thompson, when
9  you told him about the letter -- did you
10  do that by phone, by the way?
11      A.    Correct.
12      Q.    Okay. You weren't standing
13  with him showing him the letter. You
14  called him and told him about it?
15      A.    Correct.
16      Q.    Did he tell you not to respond
17  to me that you had received the letter?
18      A.    Correct. I responded -- yes.
19      Q.    Did he ask you to provide him
20  with a copy of the letter?
21      A.    I don't recall that.
22      Q.    But in any event, he told you
23  that he would bring it up to the
24  attorneys that were representing Faith

Page 87

1  Christian Academy. Is that correct?
2      A.    Correct.
3      Q.    It is correct, is it not, that
4  you and I have never spoken about this
5  case before today?
6      A.    Correct.
7      Q.    So, you did not respond to me
8  at any time in connection with the
9  letter.
10      A.    Correct.
11      Q.    You understood in this letter
12  that I was representing somebody who was
13  suing FCA and Ryan Clymer and Mr.
14  Hollenbach, correct?
15      A.    Correct.
16      Q.    When you told Mr. Thompson
17  about the letter, did you have any
18  discussion with him about the Emily Mayer
19  and Eric Romig situation back in 2009?
20      A.    Yes.
21      Q.    Just tell me about that
22  discussion.
23      A.    Just that you would probably
24  want to know what I knew and just to

Page 88

1  tell truth and tell what I knew.
2      Q.    He said that or you said that?
3      A.    He said that.
4      Q.    Did you specifically discuss
5  with him the Emily Mayer situation with
6  Mr. Romig that had occurred back in 2009?
7      A.    I don't recall the
8  conversation.
9      Q.    Do you recall Mr. Thompson
10  telling you that he had seen the
11  complaint in the case, the complaint that
12  my client filed against FCA and Mr.
13  Clymer and Mr. Hollenbach and the others,
14  and that there were allegations about the
15  Emily Mayer texting issue with Mr. Romig
16  back in 2009? Did he tell you that?
17      A.    I don't recall.
18      Q.    Did you ever hear any
19  information about Emily Mayer back in 2008
20  or 2009 attending some type of party
21  after a sports banquet where there was
22  some kind of drinking or other activity
23  going on between a number of FCA students
24  after the banquet?

Page 89

1      A.    No, I don't recall that.
2      Q.    After this lawsuit was filed
3  did you ever prepare any written
4  materials, any type of written document,
5  concerning your recollections of what went
6  on with you and Emily Mayer and Ryan
7  Clymer back in 2009 when the texting
8  issue with Mr. Romig arose?
9      A.    No.
10          MR. GROTH: No further
11  questions.
12          (A brief recess was taken)
13          MR. SANTARONE: Just a couple
14  a quick questions.
15      (EXAMINATION)
16  BY MR. SANTARONE:
17      Q.    When you first approached
18  Emily, did you tell her that your
19  daughter had told you this or that you
20  had overheard something?
21      A.    I told her I had overheard
22  something.
23      Q.    And what is the reason you
24  told her that?

Appendix 0836

Page: 27 (90 - 92)
ORAL DEPOSITION OF CHERYL A. ALDERFER, 9/2/2015

Page 90

1   A.   Because I didn't want her to
2 know my daughter, you know . . .
3   Q.   Had confided in you.
4   A.   Had confided in me, correct.
5   Q.   When you first spoke with Emily
6 in the ladies room before you went to see
7 Mr. Clymer, did you ask her whether or
8 not there had been physical contact
9 between her and Mr. Romig?
10   A.   Could you repeat that?
11   Q.   Yes. Did you ask her if Mr.
12 Romig had ever touched her?
13   A.   I would say I asked if it ever
14 got physical.
15   Q.   What did she say?
16   A.   No.
17   Q.   And did Ryan Clymer ask her a
18 similar type of question: Did anything
19 ever physically -- did anything physical
20 happen? Do you remember him asking that
21 kind of question?
22   A.   I don't remember.
23   Q.   But you do recall that you
24 asked her that.

Page 91

1   A.   Correct.
2   Q.   When you spoke with Annette
3 Smith, did you -- was it you who said to
4 her "you should try to get the content of
5 the text messages"? You told her that?
6   A.   In the conversation I know I
7 said that to her.
8   Q.   Did you ever tell her that if
9 you think there's something there or you
10 think the content is important, that you
11 should go to the police, that you told
12 her that she should go to the police?
13   MR. GROTH: Object to the
14 form.
15   MR. RUSSELL: You can answer.
16   A.   Yes, I remember using the term,
17 you know, can you go to the police and
18 get this or check.
19   Q.   Did Annette Smith seem like
20 they were going to try to get the
21 content?
22   MR. GROTH: Object to the
23 form.
24   MR. RUSSELL: You can answer.

Page 92

1   A.   I would say at the time they
2 didn't seem like they were going to.
3   MR. SANTARONE: That's all I
4 have. Thank you.
5   MR. GROTH: I have a follow-up
6 question.
7   (EXAMINATION)
8   BY MR. GROTH:
9   Q.   During the meeting with Mr.
10 Clymer, did he tell you that he would do
11 what he was able to do or find somebody
12 who was able to try to get the content
13 of the text messages that Emily had told
14 him about?
15   A.   I don't recall that.
16   MR. GROTH: No further
17 questions.
18   (The deposition was concluded
19 at 1:15 p.m.)

1                          CERTIFICATION

2

3

4

5              I hereby certify that the testimony and

6        the proceedings in the aforegoing matter are

7        contained fully and accurately in the stenographic

8        notes taken by me and that the copy is a true and

9        correct transcript of the same.

10

11

12        LANCE A. BRUSILOW
          Certified Realtime Reporter
13        Registered Professional Reporter

14

15

16              The foregoing certification does not

17        apply to any reproduction of the same by any means

18        unless under the direct control and/or supervision of

19        the certifying shorthand reporter.

20

21                          -------

22

23

24