Ms. Schneider testified that the grievant told her class that he had gone out on dates with his college professor. (T. 337)

Ms. Schneider testified that, beginning in September, or early October, she told her parents that the grievant was getting very close to her, rubbing her shoulders, and making her uncomfortable. Ms. Schneider told her parents the grievant was touching her breasts beginning in December. Ms. Schneider complained that the grievant had gotten close enough to touch her face with his moustache, which she said "really grossed me out" and her mother insisted that she speak to a guidance counselor. There was a two week lag time between when Ms. Schneider spoke to her parents about the alleged breast touching, and her seeing school officials. (T. 317; 324; 327; 365-368; 385-386) At the preliminary hearing for the underlying criminal matter, Ms. Schneider testified that she told her parents in September that the grievant was touching her breast. (T. 366)

Ms. Schneider testified that she spoke to Erin Kotchetovsky, who spoke to Hollie Schwartz, another girl in the class, who purportedly claimed that the grievant also touched her back. The three went to see Ms. Martin who was busy with another student. Mrs. Schneider then called the school, and, on January 19, Ms. Schneider and her parents met first with Ms. Rubin, the assistant principal, and then with Mr. Creeden. Erin Kotchetovsky was then called down. Ms. Schneider was told to go into Ms. Rubin's office and write a statement. (SDX 4) Erin and Katie then went to see Ms. Martin. (T. 321-324; 330-333)

SD -012859
Appendix 0979

Ms. Martin prepared notes of that meeting. In those notes, she recounts that Katie Schneider told her the following:

> Mr. Ludlow started touching Katie early in the year (Sept-Oct). It occurred often when M.L. walked around to help out during testing. He touched her neck, leaned over her back, touched the back of her arm and as a result, grazed her breast, massaged her back. One time he was so close, his moustache touched Katie's face. (SDX 2)

Ms. Martin also recorded the following with respect to Erin Kotchetovsky:

> Erin stated she did not want to be involved, but acknowledged Mr. Ludlow does touch her (on the back). She does not believe the touching is inappropriate. She did state that Mr. L. touches Katie more often and that she would be willing to support Katie's story. She felt Mr. Ludlow should be warned. (SDX 2)

Erin Kotchetovsky gave a written statement on January 19, which she testified she wrote in Ms. Schneider's presence in Ms. Rubin's office. In that statement, Erin writes:

> Mr. Ludlow always decides to sit in the empty desk in the front of Katie's in class when there is another empty desk in the front of the class but in front of a boy (no bigger) When I raise my hand to ask a question he will come behind me and rub my back to let me know he is there....I think that he gets maybe a little too close to Katie & she always lets me know how uncomfortable she feels. I am not having any touchy feely problems with him myself, but I definitely think that he does more to Katie than he would ever with me maybe because I am more aggressive but I give him crap if I think that what he is doing or saying is not on the topic. Everyday when Katie and I leave the class he touches our back and says thank you for coming, have a good day (normal)----nothing really big for me. I am just here to support Katie S. (SDX 14)

At the criminal trial, Ms. Kotchetovsky testified that the grievant touched her shoulders and arms and the shoulders of other students. She testified that the grievant never touched her any other place nor did she tell anyone that he did so. Ms. Kotchetovsky testified that she never saw the grievant touch Ms.

SD -012860
Appendix  0980

Schneider anywhere other than her shoulders or arms, and never saw the grievant reach around and grab Ms. Schneider's breast, or touch her breast. She testified that she should not have used the word "rub" in her written statement. (JX 5, 1/5/01 at 121-133)

At arbitration, Ms. Kotchetovsky testified that she did not see the grievant touch Ms. Schneider's breasts, caress her shoulders in a sexual fashion, touch her bra strap, or place his genitals on her. Ms. Kotchetovsky testified that the grievant touched the shoulders of anyone who asked for help. (T. 841-842; 850) Ms. Kotchetovsky testified that she wrote the statement, with Ms. Schneider, in Ms. Rubin's office, where they were alone. Ms. Schneider was crying. Ms. Kotchetovsky testified that Ms. Schneider asked her to accompany her to support her. (T. 843; 852) Ms. Kotchetovsky testified that "rub" in her statement was a bad choice of words, that she should have said, "touch." (T. 854)

Christina Miller sat on a diagonal from Ms. Schneider, and directly next to Ms. Kotchetovsky. Ms. Miller testified that she never saw the grievant touch Ms. Schneider's breast, massage her shoulders, caress her back in a sexual fashion, or touch anyone sexually. Ms. Miller testified that the grievant touched her own shoulders and the shoulders of others, and patted her back. (T. 875-877; 883) Trent Greiser, who sat in the back corner of the room, Megan Dunlap, who sat in the front of the room, Luke Ozeck, who sat diagonally to the front of Ms. Schneider, Mike Thompson, who sat both in the back corner and a few seats behind Ms. Schneider, and Joe Polachek, who sat in the back left, similarly

20

testified that they saw no inappropriate conduct; most confirmed that the grievant had a habit of shaking the hands of others, and patting the shoulders or back. (T. 887-890; 907-915; 916-932; 933-940)

Mr. Polachek testified that Ms. Schneider told some of the boys to snap their fingers when the grievant came near her, and he heard some finger snapping, although he did not do it himself. (T. 949-950) No other witness confirmed Ms. Schneider's account of the finger snapping.

### The grievant's response to the allegations

As stated, the grievant acknowledged that he had a habit of patting students on the shoulder, either in recognition of a job well done, or in support. He further acknowledged that he would talk closely and softly to students who would ask him a question during tests, and that it was possible that his moustache might get near a student in that situation.

The grievant denied that he engaged in any inappropriate touching of female students. He denied that he intentionally touched, cupped or massaged their breasts. He denied that he intentionally placed his genitals upon the backs of female students or had an erection while he did so. He denied massaging shoulders or rubbing necks. (T.1216-1226)

With respect to the allegation he hugged students, the grievant testified that he had no specific recollection of hugging either Ms. Albritton or Ms. Hancock near the holidays, but said that he sometimes had students initiate a hug with him at the end of a semester. (T. 1219-1220) He denied that he rubbed Ms. Schneider on the leg or thigh, and testified that it would not have been

21

SD -012862

physically possible to do so if he was sitting on a student desk as she described. (T. 1221-1222) He further testified that in Ms. Schneider's physical demonstration, at arbitration, of his alleged conduct, she showed he touched her breast with his right hand, while using her pencil and writing with his left hand, would not have been possible, as he is right-handed and cannot write with his left. (T. 1223-1224)

The grievant testified that he was requested by Ms. Albritton's mother to fill out a weekly evaluation of her school work and the grades she was getting, which the grievant did. Mr. Ludlow testified that in the beginning of October, he told Ms. Albritton the grade she was probably going to get on her midterm. According to the grievant, in response, Ms. Albritton started crying and begged him not to put down that grade, as she was concerned as to what her mother would do. Mr. Ludlow still gave her the same grade. (T. 1174-1177)

Mr. Ludlow testified with respect to the alleged inappropriate class discussions. With respect to the due process discussion, the grievant testified that this was part of his lecture on the Federalist laws. The grievant produced his original lecture notes which indicate that he spoke about the Alien Act and the Alien Enemies Act, and the fact that power was given to the president to expel or imprison those he "judged" to be a danger. In the margin of the notes, the grievant wrote, "How would you feel if falsely accused & could not defend yourself."(AX 20) The grievant testified that the class engaged in a discussion of the denial of due process rights, which he taught every year before, and is in line with the School-sponsored curriculum. (T. 1177-1188; AX 19)

22

The grievant testified that his discussion of Betsy Ross dealt with his teaching of how lies in history are taught as truth. Mr. Ludlow testified that he taught the class that Betsy Ross was widowed and excommunicated, and probably was forced to become a "woman of ill-repute." The grievant denied using the term whore or prostitute. The grievant testified that he told that story on September 3, at the beginning of the semester, and has told that story at parents' night, where he was complimented by the former superintendent. (T. 1189-1194)

Mr. Ludlow testified that in a discussion with his college prep class about one of his former college professors, he was asked by some male students if he had gone out with her. He replied that after the semester was over they went out a few times. (T. 1195-1197)

As to the grievant's talk about his wife's delivery, he testified that it was part of a discussion of how Jefferson's wife died in childbirth and colonial medicine in general. According to the grievant, he told the class that his wife had a C-section. (T. 1205-1207)

The grievant testified that the discussion about his father came in response to student questions dealing with the handicapped, prompted by a current event project given by a student on celebrities with disabilities. The grievant testified that it was a very productive discussion and made the students more aware of the limits of disability. (T. 1200-1203)

SD -012864

<u>The investigation of the alleged misconduct</u>

Mr. Creeden, who was principal since June, 1999, testified that in October, 1999, he got a telephone call from Ms. Graybill, counselor, asking to meet with her, Ms. Albritton, her mother, and Ms. Merlo, which he did. Mr. Creeden took no notes of the meeting. According to Mr. Creeden, the girls told him that the grievant had "touched them inappropriately in the breast, they were touched on the back, rubbed, buttocks, by Mr. Ludlow." Mr. Creeden did not meet with the girls separately nor did he have their statements taken on school property. He directed them to write out statements and return them later. Mr. Creeden contacted Karen Gokay, Esquire, the District Human Resource officer, and Superintendent Dr. Robert Kish. (T. 498-506)

According to Mr. Creeden, the girls told him that they were very concerned that Mr. Ludlow would lose his job, that he was their favorite teacher, and they just wanted the conduct to stop. Mr. Creeden testified that he conducted no investigation of the incident, including interviewing other students, because they had stated that they just wanted the conduct to stop. (T. 503-508)

Mr. Creeden met with the grievant on October 14, 1999, without a Union representative. According to Mr. Creeden, he informed Mr. Ludlow that there were allegations against him, numerous in nature, especially touching the breasts and buttocks of female students. Mr. Creeden would not tell him who the girls were, nor did he give him their statements. According to Mr. Creeden, the grievant suggested that the girls could be motivated by the fact that they had bad grades, and he acknowledged that he touched or patted students to congratulate

SD -012865
Appendix 0985

them. Mr. Creeden testified that he told the grievant to keep some distance between himself and his students so nothing could be misconstrued. Mr. Creeden asked the grievant to prepare a statement. Mr. Creeden took no notes of the meeting. Mr. Creeden testified that he did not ask Mr. Ludlow about the non-teaching allegations, such as the classroom discussions and tests. (T. 509-511; 626)

The grievant testified that the initial meeting with Mr. Creeden took less than five minutes, and he was not told the purpose of it prior to meeting. According to the grievant, Mr. Creeden told him that two girls had made allegations of inappropriate conduct against the grievant, which Mr. Creeden said appeared to be accidental contact. Mr. Ludlow testified that he asked, "Like what?" and Mr. Creeden told him that was all he needed to know. According to Mr. Ludlow, Mr. Creeden told him that what really concerned him was the sexually explicit stories, such as Betsy Ross. Mr. Ludlow testified that he told the Principal he would not tell that story again. According to Mr. Ludlow, Mr. Creeden told him that he had to be careful of accidental contact. (T. 1207-1213)

Mr. Ludlow wrote a statement, which includes the following:

On October 14, 1999, I was informed by Mr. Creeden of allegations brought to him by two female students charging me with inappropriate conduct. Needless to say I was shocked and devastated. I can honestly testify before man and God that I have no recollection of ever having had physical contact with any student in a way that could be misconstrued as being unprofessional, inappropriate, or sexual in nature...While I can honestly say my actions have been completely professional, I sincerely apologize for any misinterpretation or mistrust which has developed by my students. (SDX 9)

25

Mr. Creeden testified that he checked the grievant's personnel file, and contacted former administrators who had worked with the grievant, who knew of no prior allegations against the grievant. According to Mr. Creeden, Ms. Gokay directed him to have the parents of Ms. Albritton and Ms. Merlo sign a "Notice to Individuals Complaining of Unlawful Harassment." The forms indicate that the District will conduct an investigation, and sets forth certain rights of the parents, as well as those of alleged employee perpetrators. (SDX 3; 10)

Mr. Creeden next met with the grievant, and his Union representative, Mrs. McGinty. Mr. Creeden testified that the purpose of the meeting was to inform the grievant that the parents had returned the forms signed by them. The grievant was not given copies of the forms. Mr. Creeden testified that he told the grievant that his conversations in class about due process had made it more difficult for him to get the forms signed. On her form, Mrs. Albritton complained of the due process discussion. (SDX 3) According to Mr. Creeden, he again told the grievant not to put himself in a situation where there were students alone in his room, anywhere outside the building, or any place that would be a source of more allegations. Mr. Creeden testified that he believed there was some concern about the content of the grievant's tests, but he did not bring it up at that time. Mr. Creeden took no notes of the meeting. (T. 517-529)

Mr. Creeden gave the grievant the following memo, which was placed in his file:

As per our conversation, I have received all paper work to conclude my investigation of an alleged sexual harassment between you and two female students. In investigation these allegations I believe there are comments or statements you are making in class that made this

SD -012867

investigation very difficult. As we discussed during our meeting, you need to be sensitive to comments made to students about sexual relationships even when you are discussing people in history.

Also, we talked about in our meeting you need to be aware of situations that put you or students in an uncomfortable environment. Please make sure that you are not alone with students in your room, in the building, vehicle or at your home.

I know this has not been a pleasant experience for any of us, but if there are anymore allegations I will have to turn them over to our solicitor, and or legal authorities. (SDX 13)

At no time was Mr. Ludlow observed in the classroom after the initial allegations. Dr. Kish testified that the District's response was not a formal investigation but was for the purpose of the cessation of the behavior. Dr. Kish testified that it was not an effort to uncover the truth because that was not the wish of the parents. Dr. Kish testified that the original allegations could have constituted grounds for immediate termination, but that they were only dealing with accusations, and were dealing with the intent of the accusers to simply have the behavior stop. (T. 629; 661; 756-760; 1034-1036)

Mr. Creeden testified that, in January, he got a call from Ms. Rubin, asking him to meet with her, Ms. Schneider, and her parents. According to Mr. Creeden, Ms. Schneider complained that the grievant had been touching her in the breast area, massaging her back, and making her uncomfortable. Ms. Schneider told him that other students were aware of what was happening. Mr. Creeden asked her to write a statement. Ms. Schneider was not questioned alone, nor did Mr. Creeden takes notes of the meeting. (T. 528-533; 652)

Mr. Creeden met with the grievant and Mrs. McGinty the next day and told them that there were more allegations, and that he was turning the matter over to

SD -012868 Appendix 0988

Dr. Kish. (T. 538-539) By letter dated January 26, 2000, the grievant was informed that he was being suspended with pay pending investigation, for "recurring accusations by female students." (T. 537-538; SDX 18)

Dr. Kish testified that when he learned of Ms. Schneider's allegations, it was clear that they needed to go forward with an investigation as they had thought they had caused the behavior to stop in October.

The grievant met with Dr. Kish and a Union representatives McGinty and Vince Putin on January 28, 2000, where, according to the grievant, he was told for the first time what the specific allegations were, namely breast touching, buttocks patting and rubbing of girls' legs. (T. 1227-1228)

Mr. Creeden was directed to interview boys in Ms. Schneider's class. Mr. Creeden interviewed Brett Pforter, Matt Wallace and Trent Geiser. Mr. Creeden testified at the criminal trial that he did not take any notes of his interviews with the boys. At arbitration, Mr. Creeden testified that he made notes of the interviews, after the fact, in response to the criminal investigation. Those notes were produced in response to counsel for the Union's request to review a folder which Mr. Creeden had with him during his arbitral testimony. Dr. Kish acknowledged that the boys did not corroborate the allegations of inappropriate touching. No students from the Albritton/Merlo class were ever interviewed. Dr. Kish testified that efforts were made to determine if the girls had any pre-existing relationship, by observing the students to see if they ate lunch together or rode the same bus; determining that they did not. (T. 559-560; 655-656; 770-771; 1056-1062; AXs 5-7)

SD -012869
Appendix  0989

A meeting was conducted on February 3, 2000, between Dr. Kish, Ms. Albritton, Ms. Merlo and their parents, along with Mr. Creeden, Mr. Crawford, who is Director of Human Resources, and counsel for the District, wherein the girls were asked about the allegations and notes were taken by the District. (SDX 19) A similar meeting was conducted on February 4, 2000 with Katie Schneider and Hollie Schwartz. The notes of that meeting mistakenly refer to Ms. Schwartz as Erin. (SDX 21)

A second meeting with Dr. Kish and the grievant was held on February 7, 2000 with Mrs. McGinty, Mr. Putiri, Mr. Creeden and other school officials. The conduct was described to the grievant without the District disclosing the names of the complainants. The grievant was given an opportunity to respond to the general allegations, as well the issues with respect to class topics and tests. At the meeting, the grievant was informed that he was being suspended without pay. The grievant was not told the identity of the girls who made the allegations until after he was fired. (T. 798; 1176; SDX 21)

The Union sought the production of the student statements. By letter dated February 7, 2000 Dr. Kish advised the Union that the District would not provide the witness statements nor the names of the witnesses until after there was a decision made to terminate the grievant. (AX 11)

Dr. Kish prepared a report to the School Board, recommending termination. (SDX 23) The report references allegations of "two sophomore girls" who went to see their guidance counselor on October 5, 1999, as well as the allegations of "two additional female students" who complained on January 11,

29

Appendix  0990

2000 of inappropriate touching of breasts and buttocks. Dr. Kish testified that, with respect to the latter, he was referring to Ms. Schneider and Hollie Schwartz. Ms. Schwartz' written statement does not corroborate that she claimed she was touched in that fashion. Ms. Schwartz did not testify at arbitration. The Report also references alleged improper classroom discussions and inappropriate questions on tests. The School Board voted to terminate the grievant based upon this investigation report, and Mr. Ludlow was so informed by letter dated March 6, 2000. (JX 3)

<u>Rebuttal and Surrebuttal Testimony</u>

The District presented the testimony of former students of the grievant, Kelly Arcaro and Melissa Troxell. This testimony was not available to the District when the decision to discharge was made, and, therefore, could have played no part in the District's decision. This after-acquired evidence was taken for the sole purpose of addressing credibility issues on this record, and, if pertinent, going to the issue of the grievant's fitness for reinstatement, if determined to be an appropriate remedy.

Ms. Arcaro is a 1999 graduate of Pennridge and had the grievant in both her 9th and 10th years. She testified that in both years the grievant rubbed his hand against her breast when he gave back a test, and that he did so 8 to 10 times per year. Ms. Arcaro testified that she did not complain, or flinch or otherwise physically react when he did so. Ms. Arcaro testified that she only complained to one other student. Ms. Arcaro knew Ms. Albritton's sister who was in her class. Ms. Arcaro testified that she read about the grievant's criminal trial

SD -012871

Appendix 0991

in the paper, and did not know how her name was given to counsel for the District. Ms. Arcaro was given a copy of the transcript of the arbitration testimony of one of the other complainants before her arbitral testimony. She testified that her mother read the transcript. The Union presented the testimony of Shannon Greener, Andrew Guzman and Ryan Wimmer, who were in Ms. Arcaro's class, and who testified that they saw no inappropriate touching of Ms. Arcaro by Mr. Ludlow. (T. 1246-1278; 1285-1297; 1416-1427)

Melissa Troxell, who did not graduate from Pennridge, but stopped school in her Junior year in 1999, had Mr. Ludlow in sophomore year, and was in Ms. Arcaro's class. She testified that the grievant brushed her breast two or three times when he put papers on her desk. Ms. Troxell testified that it seemed like an accident and didn't seem important. Ms. Troxell testified that her mother called the District Attorney when the criminal matter was pending. The parties stipulated that, if called to testify, Ms. Greener, Mr. Guzman and Mr. Wimmer would say that they did not see the grievant inappropriately touch Ms. Troxell. (T. 1428-1438)

## DISCUSSION

The positions of the parties may be briefly summarized. The School District contends that the grievant was terminated for just cause based upon his inappropriate sexual touching of students in violation of the sexual harassment

SD -012872 Appendix 0992

policy. It contends that Mr. Ludlow violated a specific directive from Principal
Creeden to refrain from being alone with students and to refrain from engaging in
any conduct that might be construed as inappropriate. The District argues that
the grievant further violated the District's harassment policy because of the
grievant's attempt to intimidate the complainants. The District contends that the
only issue for the Arbitrator is whether it was reasonable for the Board of School
Directors to accept as credible the statements of the three students regarding the
grievant's inappropriate behavior and to find that his explanation for some
behavior and his denial of inappropriate conduct was not credible. The District
argues that the School Board was provided with a summary of the evidence
provided by the three female complainants which established the misconduct of
the grievant. The District opines that it is not for the arbitrator to substitute her
judgment regarding the credibility of the witnesses and she is required to give
due deference to the findings of the decision maker. The District further argues
that compelling, credible evidence was presented to the arbitrator supporting the
conclusion reached by the Board. The District contends that the testimony of its
rebuttal witnesses demonstrates that the grievant was not credible. The District
urges that the grievance be denied.

   To the contrary, the Association argues that there was no just cause for
discharge. The Association argues that the District failed to carry its burden of
demonstrating that the grievant violated the School Code provisions alleged.
The Association contends that the District's witnesses are not credible. The
Association opines that the District Administrators conducted an incompetent

SD -012873

investigation in violation of the District's sexual harassment policy. The
Association contends that the grievant credibly denied the allegations made
against him, and the District failed to obtain corroboration from any other student
supporting the claims of the three female students. The Association argues that
the grievant was denied his right to procedural due process. The Association
urges that the grievance be upheld, and requests, as remedy, that the grievant
be reinstated to his former position, and be made whole.

On the basis of the record evidence and the arguments of the parties, I
find that the District failed to prove through competent evidence that the
discharge of the grievant, Mark Ludlow, was for just cause.

The allegations against the grievant, which form the basis for his
discharge, involve inappropriate touching of female students, inappropriate
classroom discussions, as well as test questions. Initially, I note that these
allegations, for the most part, formed the basis of criminal charges leveled against
the grievant. At the criminal hearing, many of the arbitral witnesses testified,
including the grievant, Ms. Albritton, Ms. Merlo, and Ms. Schneider. The grievant
was acquitted of all criminal charges by a jury. While I am aware that the
standard by which the District's decision to discharge is measured, that of just
cause, is different than the criminal standard, it is relevant that another finder of
fact, the jury, concluded that the grievant's behavior did not rise to the level of
criminal misconduct.

Turning to the charge of inappropriate touching, it is apparent that the
conduct as alleged, if true, would form a basis of a finding of a violation of the

33

School Code, a violation of the District's sexual harassment policy, as well as just cause for discharge. It is my conclusion that the District failed to prove through competent evidence that the conduct occurred as alleged by the three complainants.

Initially, it is necessary to highlight the serious procedural defects in the investigation of this matter. Not only did the District violate certain due process rights of the grievant, but its faulty probe contaminated the evidence, i.e. the testimony of the three student complainants, which contributes to my conclusion that their versions are inconsistent, and do not support a finding that misconduct occurred.

The sexual harassment policy of the District provides that "The Board directs that complaints of harassment will be investigated promptly, thoroughly and impartially and that corrective action be taken immediately when allegations are verified." Both administrators admitted in their arbitral testimony that such a thorough and impartial investigation was not conducted when the initial charges against the grievant by Ms. Albritton and Ms. Merlo were levied. Indeed, Dr. Kish testified that that the District was not interested in ascertaining the truth with respect to the Albritton/Merlo allegations, but was merely bowing to the wishes of the complainants and their parents, that the "conduct would stop." While Dr. Kish contends that the District's reaction to the allegations was not a search for the truth, what it shows is that the District chose to believe the girls that some inappropriate conduct took place, without any attempt to give the grievant an

34

Appendix 0995

adequate opportunity to respond to the charges, or any attempt to secure independent corroboration.

This is demonstrated by Mr. Creeden's actions. Mr. Creeden never interviewed Ms. Albritton or Ms. Merlo separately. He did not take notes of their meeting to document their claims. He did not have the girls write their statements separately on school property so that there was a better chance that the statements reflected the girl's own words without risk of taint by others.

The conduct allegedly took place in a classroom, apparently in front of approximately eleven other students, yet Mr. Creeden made no effort to speak to the other students to determine if the girls were lying, or to judge if the conduct was even possible without being seen by others. Indeed, even though these allegations eventually formed the basis for the discharge of the grievant, the Administration never interviewed another student in the Albritton/Merlo class. Further, Mr. Ludlow taught in a class with a window in it which looked into the classroom of a fellow teacher. There was no apparent attempt made to interview that teacher to see if he or she could speak to whether Mr. Ludlow taught in close proximity to students, or whether he taught from the front of the room. No observation was ever made of the grievant's teaching after the complaints.

When Mr. Creeden eventually did speak to Mr. Ludlow, without benefit of Union representation in their first meeting, the credible evidence confirms that he never advised the grievant of the specific nature of the complaints, i.e. that girls had alleged that he touched their breasts while handing back papers, or that he massaged their backs and shoulders in a sexual fashion. Rather, the grievant

35

was merely informed that two girls had alleged inappropriate conduct of a sexual nature. The general nature of Mr. Creeden's conversations with the grievant are reflected by the warning letter given to Mr. Ludlow, which merely indicates that the grievant needs "to be aware of situations that put you or students in an uncomfortable environment. Please make sure that you are not alone with students in your room, in the building, vehicle or at your home." Ms. Albritton and Ms. Merlo were complaining of conduct that took place in the classroom, not while alone with the grievant or in other places. Because of Mr. Creeden's failure to be more specific, Mr. Ludlow was not given an opportunity to address the specific conduct alleged, i.e. how he taught and how he handed back papers, nor was he given an opportunity to curb any accidental activity which could be misconstrued.

If the conduct alleged by Ms. Albritton and Ms. Merlo in October, 1999 was as egregious as alleged, and as demonstrated at the arbitration hearing, it is hard to understand why the District did not see a need to conduct a full and complete investigation, or to properly and fully remedy the situation. As stated, the grievant was not apprised of the specific nature of the offenses, or warned that the specific conduct alleged may never happen again. Moreover, if the District believed that such egregious conduct took place, why would the District Administrators view a mere written warning to be sufficient discipline? Why would the District fail to move the girls out of the classroom? Ms. Graybill's testimony confirmed that alternatives existed, one of which was moving the girls to a classroom in the Freshman Center, which would have only been slightly

36

SD -012877

inconvenient, and in line with what some other students did. It is not enough to say that the District was respecting the wishes of the complainants and their parents. The District has an obligation to grant due process to a person alleged of misconduct in a sexual harassment investigation, as well as maintain an environment free of sexual harassment for all students.

When Ms. Schneider came forward, again Mr. Creeden took no notes of his interview with her and her parents and interviewed her in the presence of Ms. Kotchetovsky. The girls were instructed to write out their statements in the same room, where they could influence each other's writing. The fact that Ms. Kotchetovsky felt pressured in this situation was reflected in her testimony, as well as her written statement in which she says that she did not view the grievant's conduct to be inappropriate and "I am just here to support Katie."

Mr. Creeden interviewed four boys in Ms. Schneider's class, none of whom corroborated her account. Mr. Creeden later memorialized these discussions in writing in February, 2000, a fact which is contrary to his sworn testimony at the criminal trial, and only discovered when counsel for the Union appropriately requested to look at documents which were before Mr. Creeden when he testified at arbitration.

The District also failed to investigate the obvious linkage between Ms. Schneider, and the two students who accompanied her to complain about the grievant, and Ms. Merlo. There was no explanation given for why Ms. Merlo's name was put on the slip to see the counselor with the other girls, when Ms.

SD -012878
Appendix 0998

Merlo was not in their class, and Ms. Merlo testified that she told no other student other than Ms. Albritton about the grievant's conduct.

The interviews conducted by Dr. Kish were also faulty. Again, interviews of the complainants were taken in the presence of each other, providing an environment where the student's recounting could be influenced by others. The notes taken were replete with inaccuracies, with respect to who was present and who was speaking, making them an unreliable record. Finally, Dr. Kish's report to the Board is not factually correct, as it indicates that a female student, which Dr. Kish testified was Ms. Schwartz, complained of breast and buttocks touching, which was not supported by her written statement.

It is most troubling that when the grievant was suspended and then interviewed by Dr. Kish, he was not told the names of the complainants. Indeed, the District informed the Union by letter that it would not provide those names until after the grievant was terminated. This deprived the grievant of providing any specific information as to the girls, or the classes, in question. For instance, the grievant was unable to relate the story of Ms. Albritton and her extreme reaction to the grade she was getting in Mr. Ludlow's class, a fact not contradicted at arbitration.

In my view, the most troubling aspect of the District's reaction to the complaints, and the fact that has the most serious ramifications in assessing the credibility of the grievants, is that the District sponsored joint counseling sessions, during class time while school was in session, from February, 2000 up until the time of the arbitration hearings, the purpose of which was to discuss the

38

Ludlow matter. It is apparent that, in this forum, the girls had conversations together about what purportedly took place, in which their own memories could be confused and "enhanced" by the words of the others. Given the problems in the documentation of the girls initial complaints, the contamination of their accounts through a faulty interview process, and these institutionalized joint meetings, the line between what was ever "truth" and fantasy has been forever blurred.

In sum, the investigation was rife with irregularities, which deprived the grievant of due process rights, and which compromised the credibility of the complainants.

Turning to that credibility determination, I must first respond to counsel for the District's assertion in its brief that I have no jurisdiction to substitute my judgment regarding the credibility of the witnesses and I am required to give due deference to the findings of the Administration. This argument reflects a misunderstanding of the arbitration process. It is well established that the arbitrator is to make credibility determinations in assessing whether an employer has demonstrated, in arbitration, competent evidence that a discharge was for just cause. Arbitration is not merely an appellate tribunal, which is reflected by the fact that witnesses testify at hearing so that their demeanor may be judged, and certain testimony, such as the rebuttal evidence allowed in this proceeding, may be reviewed to make a full and complete credibility assessment.

As stated above, the accounts of the female students have been contaminated by the irregularities in the investigation process, and the District's

SD -012880
Appendix 1000

placing of the girls in joint counseling sessions up until the time of arbitration. It was also a troubling fact learned in arbitral testimony that the District jointly prepared the testimony of Ms. Abritton and Ms. Schneider, two girls who were not in the same class, did not complain together, and who, it is argued, had no apparent connection. The contamination of the three girls' testimony is reflected, in part, by the fact that their versions "parroted" each other, by using the same words and gestures to describe the purported misconduct.

The accounts of the female students also have inherent inconsistencies. Ms. Albritton's testimony has changed with respect to the timing of the conduct. At arbitration she said Mr. Ludlow touched her breast every time he passed her, everyday, while at the prior criminal trial she testified that it was only when he was handing back exams, which were given about every three weeks. At the criminal trial, Ms. Albritton testified that the grievant squeezed her breast for five seconds in the October incident, a fact at odds with her written statement, where she wrote that he had meant to pat her shoulder, missed, and patted her breast instead.

No student corroborated her account, other than Ms. Merlo whose testimony is problematic as will be discussed below. At arbitration, counsel conducted a demonstration of the alleged misconduct, with counsel acting as the student, and the arbitrator sitting in the student desk behind. From my observation, it was apparent, at the very least, that a student sitting in the following desk must have seen the massaging of the back and bra strap area as described, as it would have taken place only a few inches from the student's

40

lace. No student supported this claim. From my vantage point, I could also adjudge that a student sitting diagonally from a student would see if a teacher touched that student's breast as described. My observation made the lack of corroboration a pivotal factor in my determination of credibility.

It is also troubling that neither Ms. Albritton, or the other complainants, testified that they flinched or otherwise immediately reacted when touched, which, one would assume, would be a normal reaction, and one that would be witnessed by others. Instead, in an example of the parroting of testimony, they testified they "froze." It is hard to believe that if this conduct occurred as frequently as described that no girl would flinch or cry out.

Ms. Albritton's testimony as to other misconduct also has inherent inconsistencies. For instance, she testified at arbitration that when grievant hugged her she felt his erection, while at the criminal trial she testified that she felt his waste up, and did not know if she felt his genitals.

Ms. Albritton had a diary at the time, yet made no mention of these incidents which she testified were so troubling to her and which allegedly occurred daily. She also testified that she and Ms. Merlo did not want to move from the grievant's class, even though the alternative of taking the class in the Freshman Center was available. As to the inconvenience, Ms. Graybill and her notes confirm that the girls could have merely left lunch a little early, and walked through the Lower House to the history class. Ms. Graybill's notes further reflect that the following class would have been in the Lower House, which made the alternative even less burdensome. Ms. Albritton's claimed concern that it would

41

SD -012882
Appendix 1002

have been noticed if she left the class is less convincing given her testimony that many students dropped out of the class. If the grievant engaged in the egregious misconduct described, it is hard to understand why she and Ms. Merlo did not want to leave that classroom. Indeed, Mr. Creeden testified that they described Mr. Ludlow, to him, as their favorite teacher, an incongruous assertion given the behavior alleged.

It is most troubling that Ms. Albritton claims that the conduct ended, but resumed after a few weeks, and yet she did nothing to report it. She knew how to report the purported misconduct, given her prior complaint. She was also aware that her family, and the school, would support her. Her claim that she did not want to see the grievant fired is not compelling, as she has since testified three times against the grievant, in support of the criminal charges against him, and as District witness to support his discharge.

Ms. Merlo's testimony is replete with additional contradictions. Her account of the alleged misconduct changes between her arbitral testimony, her written statement, and her trial testimony. In her arbitration testimony, Ms. Merlo testified that the breast touching happened up to five times a week, while in her statement, she said that it happened five or six times. The most dramatic difference is that, in her arbitration testimony, she testified that the grievant ceased touching her after she complained in October, while at the criminal trial, she testified in sync with the other two complainants that the touching ceased for a few weeks and then resumed. In her arbitration testimony, Ms. Merlo says that she kept a look-out for herself and Ms. Albritton after the initial complaint and no

SD -012883
Appendix 1003

further misconduct occurred, contradicting Ms. Albritton. Ms. Merlo also had no explanation for why she was asked to go to counseling with Ms. Schneider if there was no connection between the two and she had complained to no one else. No other student corroborated the account of Ms. Albritton and Ms. Merlo.

With respect to Ms. Schneider's testimony, again, the seeming connection between her and Ms. Merlo is not explained. No other student corroborated her account, including Ms. Kotchetovsky, who accompanied her to support her, and who sat directly behind her.

Ms. Schneider also testified that she sat in the front center seat inches from where the grievant sometimes sat and taught, yet she made no effort to sit in another seat. This is so even though she alleges that the grievant touched her leg while he was seated in that location. Testimony confirmed that students often changed seats.

Testimony further showed that Ms. Schneider told her parents about the alleged misconduct weeks before she reported it to administration. If the conduct was indeed in line with that described at arbitration, it is hard to understand why Ms. Schneider remained in the classroom and she, or her parents, did nothing to stop the purported harassment for such a period.

Ms. Martin, who took the only contemporaneous notes by a District official in this investigation, contradicts Ms. Schneider's testimony in those notes. Ms. Martin reports the breast touching, as described by Ms. Schneider, as a "graze" brought about by the touching of the back of her arm, showing that it seemed accidental. While Ms. Schneider testified at arbitration that the breast touching

SD -012884
Appendix 1004

occurred every time the grievant had a chance. Ms. Martin reports that Ms. Schneider told her that it occurred during testing.

The grievant, in credible testimony, denied the misconduct. He acknowledges that he had a habit of touching students, to show support, and a habit of talking, apparently, very close to students. However, I found compelling his testimony that he did not intend to touch any student in a sexual manner, and that if he did touch a student in a manner that a student found uncomfortable, that he did so accidentally and unknowingly.

My determination as to the grievant's credibility is not altered by a review of the rebuttal evidence. Again, neither the testimony of Ms. Troxell and Ms. Arcaro were available to the District at the time it made its decision, so it cannot be used to support a finding of just cause. Ms. Troxell's testimony adds nothing, as she testified that any touching by the grievant was accidental and unimportant. Ms. Arcaro, who testified that the grievant brushed her breast 8 or 10 times a year, took the grievant's class a second time despite the alleged misconduct, and did not come forward until this proceeding years later. It is unclear how Ms. Arcaro's testimony came to the District's attention. It is also very troubling that counsel for the District gave Ms. Arcaro the transcript of the arbitration testimony of one of the other complainants, in violation of my sequestration order. Even though Ms. Arcaro testified she did not read the transcript, her mother did so, and could obviously have communicated its contents. This breach of the sequestration order calls into question the reliability of Ms. Arcaro's account. Moreover, students from that class testified, and did not

44

SD -012885
Appendix 1005

support Ms. Arcaro's version. Accordingly, I find that the rebuttal evidence does nothing to hurt the credibility of the grievant, nor does it call into question his fitness for reinstatement. Similarly, the witness testimony of the criminal trial taken for the truth does not alter my finding herein.

Based upon the above credibility analysis, as well as the investigation irregularities and the contamination of the evidence, I find that the District did not meet its burden of establishing that the grievant engaged in intentional inappropriate touching of female students. The evidence, at most, indicates that the grievant was a teacher who may have gotten too close to students, or patted students on the shoulder and back, with too much exuberance. At a time of heightened awareness of sexual harassment, a teacher must be careful how they touch a student. A teacher cannot touch a student in a manner which may make them uncomfortable, or speak so closely that their face or moustache comes in contact with a student. However, based upon my above analysis, I conclude that the District did not establish that the grievant engaged in the charged inappropriate touching worthy of supporting a finding of just cause for discharge.

The other charges against the grievant also do not provide just cause for discharge. The so-called inappropriate class discussions, about Betsy Ross and other topics, were the subject of the written warning given by Mr. Creeden to the grievant. Even if one assumes that the topics were inappropriate, the District did not establish that the grievant repeated any of these stories in violation of Mr. Creeden's written directive. In line with the concept of double jeopardy, once the District has decided upon and levied discipline for alleged misconduct, it may not

45

later use that misconduct, which was not repeated, as a basis for further discipline. Similarly, as to the inappropriate test questions, Mr. Creeden testified that he was aware of them prior to giving the grievant the written warning, and chose to levy no additional discipline. Accordingly, this misconduct may not serve as support for the grievant's discharge. As to the charge, in the termination letter, that the grievant failed to provide the exams and quizzes in question, that fact was not demonstrated by the District on this record. Similarly, as to the charge that the grievant violated a specific directive from Principal Creeden to refrain from being alone with students, no evidence of such conduct was introduced.

As to the charge that the grievant intimidated students, no competent evidence was presented that the grievant contacted students in an attempt to coerce their testimony. The due process discussion was a regular part of U.S. History curriculum, as supported by Ms. Graybill, another history teacher. Further, that conduct was the subject of the written warning, was not repeated, and cannot now be cited as a basis for additional discipline. The letter sent by counsel for the Association threatening legal proceedings against potential District witnesses, while inappropriate, was not authored by the grievant, and there was no evidence that it resulted in any witness failing to testify for the District.

In sum, I conclude that the District failed to establish that it had just cause to discharge the grievant, or that the grievant engaged in conduct in violation of the School Code. As there is no evidence on this record which would support a

46

SD -012887

finding that the grievant is unfit for duty as a teacher, I shall order his reinstatement, as well as a make whole remedy.

It is apparent that this situation has created a true nightmare for all involved, exacerbated by the actions of the District. I am aware that the female students who complained have gone through much difficulty, and the problems with their testimony are not due solely to their own actions. It is my hope that they can put this incident behind them and move forward. It is also my hope that the District will comply with this Award, put an obviously talented teacher back in the classroom, and give a community some end and closure to a very hurtful episode.

SD -012888
Appendix 1008

## AWARD

In line with the above Opinion, the grievance is upheld. The District is hereby ordered to reinstate the grievant, Mark Ludlow, to his former or substantially similar position, with full seniority, and with full back pay dating back to the date of his suspension without pay in January, 2000. The District is further ordered to make the grievant whole for all benefits he lost, as a result of his suspension without pay and eventual discharge, less any substitute interim earnings, and less any unemployment insurance benefits received.

The undersigned arbitrator shall retain jurisdiction for a period of six months from the date of this Award, for purposes of resolving issues with respect to the remedy, and then only if the parties cannot agree.

Margaret R. Brogan, Arbitrator

Date: February 5, 2002

48

SD -012889
Appendix 1009