IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION - LAW

JAMES NACE and APRIL NACE, as   :   NO. 15-0333
Guardians of E.N., a minor,     :
                                :
            Plaintiffs          :
                                :
    vs.                         :
                                :
ERIC ROMIG, PENNRIDGE SCHOOL    :
DISTRICT, DR. THOMAS CREEDEN and:
DAVID BABB,                     :
                                :
            and                 :
                                :
FAITH CHRISTIAN ACADEMY, RYAN   :
CLYMER, RUSSELL HOLLENBACH,     :
                                :
            Defendants          :
---------------------------------

DEPOSITION OF JAMES EDWARD NACE

Taken in the law offices of
Drake, Hileman and Davis, 252 West Swamp Road, Suite 15,
Doylestown, Pennsylvania, on Friday, October 16, 2015,
commencing at 1:00 p.m., by Stacy D. Serba, Notary Public.

* * *

ERSA OF ALLENTOWN
Professional Court Reporters
Commerce Corporate Center, Plaza III
5050 Tilghman Street, Suite 120
Allentown, PA   18104
610.366.7119

JAMES  EDWARD  NACE

2

APPEARANCES:

   HORNSTINE, PELLONI & HORNSTINE
   BY:  DAVID J. GROTH, ESQ.
   1500 Walnut Street
   Suite 300
   Philadelphia, PA  19102
    -- For the Plaintiffs
   EASTBURN AND GRAY, P.C.,
   BY:  ROBERT M. COX, ESQ.
   60 East Court Street
   Doylestown, PA  18901
    -- For Pennridge School District
     Dr. Thomas Creeden
     David Babb
   KELLY, GRIMES, PIETRANGELO &
   VAKIL, P.C.
   BY:  SEAN V. KEMETHER, ESQ.
   36 East Second Street
   Media, PA  19063
    -- For Faith Christian Academy
     Ryan Clymer
     Russell Hollenbach

   DRAKE, HILEMAN & DAVIS
   BY:  JONATHAN J. RUSSELL, ESQ.
   Bailiwick Office Campus
   252 West Swamp Road, Suite 15
   Doylestown, PA  18901
   -- For Faith Christian Academy
     Ryan Clymer
     Russell Hollenbach
    CASSIDY, CONNOR & PITCHFORD
    BY:  CARLA E. CONNOR, ESQ.
    295 East Swedesford Road, Suite 346
   Wayne, PA  19087
    -- For Faith Christian Academy
     Ryan Clymer
     Russell Hollenbach

ELECTRONIC  REPORTING  STENOGRAPHIC  AFFILIATES

JAMES EDWARD NACE

3

```
APPEARANCES:   (Continued)
               MARSHALL, DENNEHEY, WARNER
               COLEMAN & GOGGIN
               BY:   JOSEPH J. SANTARONE, ESQ.
               2000 Market Street, Suite 2300
               Philadelphia, PA  19103
                -- For Faith Christian Academy
                      Ryan Clymer
                      Russell Hollenbach


ALSO PRESENT:  April Nace
```

Appendix1040

JAMES EDWARD NACE

4

1                          I N D E X
2                          WITNESSES
3    ALL WITNESSES                                      PAGE
4
5      JAMES EDWARD NACE
6         Examination by MR. KEMETHER
                                                        5:11
7         Examination by MR. RUSSELL
                                                        45:13
8         Examination by MS. CONNOR
                                                        70:1
9         Examination by MR. SANTARONE
                                                        71:4
10        Examination by MR. COX
                                                        81:2
11        Examination by MR. KEMETHER
                                                        90:5
12        Examination by MR. RUSSELL
                                                        91:3
13
                           EXHIBITS
14
     NO.      DESCRIPTION                               PAGE
15
     J. NACE
16
     No. 1   Letter
17                                                      68:4
18
19
20
21
22
23
24
25

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1              (It is stipulated by and between

2    counsel for the respective parties that all

3    objections except as to the form of the question are

4    reserved until the time of trial, and the reading,

5    signing and sealing of the deposition transcript is

6    waived.)

7              JAMES EDWARD NACE, having been

8    duly sworn, was examined and testified as follows:

9                        * * *

10                     EXAMINATION

11   BY MR. KEMETHER:

12   Q.      Good afternoon, sir, my name is Sean

13   Kemether.   I represent Ryan Clymer and Russ

14   Hollenbach in a litigation that you and your family

15   have brought relating to your daughter.

16              We're here today to take your deposition.

17   I don't know if you've have been through a process

18   like this, but let me give you some instructions that

19   should make the process easier for you and for us.

20              The oath you just took is essentially the

21   oath you would take if we were down in the courthouse

22   before a judge and jury, so even though we're sitting

23   in a lawyer's office, you're about to give sworn

24   court testimony.

25              Once you answer a question, it will be

JAMES EDWARD NACE

1    assumed you understood the question.  Is that fair?

2    A.        Yes.

3    Q.        Okay.  Try to remember to use words in

4    answering my question.  It sounds obvious, but in

5    day-to-day life people communicate in ways other than

6    words.  For instance, they shake their head, they

7    shrug their shoulders and they say uh-huh or huh-uh.

8    You can do all those things, but in addition to that,

9    you have to say the words because the court reporter

10   who is taking down everything that's being said can

11   only take down words.  All right?

12             Try to wait for me to finish my question

13   before you answer and I'll try to give you the same

14   courtesy, for the same reason, for the court

15   reporter's benefit, it's important that only one of

16   us speaks at a time.

17             I may ask you questions involving --

18   strike that.  Let me put it this way.

19             If you don't know the answer to a

20   question or you don't remember something, tell me

21   that.  I don't want you to guess at anything.  I

22   might ask you some questions involving measurements

23   and things like time or distance.  And if I ask those

24   questions, I'd ask you to at least try to give an

25   estimate.  An estimate isn't a guess, but it's a

JAMES EDWARD NACE

1   range or an approximation, though not an exact

2   figure.   For instance, if I asked how far are you

3   sitting from me right now, we would need a tape

4   measure to figure out the exact figure.   But you'd

5   probably be comfortable saying, we're sitting about

6   five feet from each other.   That's an estimate.   If

7   you can do that, great.   If you're just pulling

8   numbers out of the sky, I don't want you to do that.

9   Okay?

10          If you need to take a break for any

11   reason, including to speak to counsel, let me know,

12   we'll make arrangements for that.   I just ask that

13   you not do it in the middle of answering a question.

14   Just answer the question and then take a break.

15   Okay?

16   A.       Okay.

17   Q.       All right.   A little bit about your

18   background.   What's your date of birth?

19   A.       6/4/62.

20   Q.       And off the record.   What's your Social

21   Security number?

22               MR. GROTH:   I'm going to object to

23   that and instruct him not to answer.

24               MR. KEMETHER:   We can put that on

25   the record.

Appendix1044

JAMES EDWARD NACE

8

1                    There was a question that asked about

2    Social Security number and the witness was instructed

3    not to answer.

4    BY MR. KEMETHER:

5    Q.        Back on the record.  Sir, do you have a job?

6    A.        Yes.

7    Q.        What do you do for a living?

8    A.        I'm a machinist.

9    Q.        A machinist.  Who do you work for?

10   A.        Greene, Tweed and Company.

11   Q.        About how long have you worked for them?

12   A.        Thirty-four years.

13   Q.        Do you -- talk about your formal education.

14   What's the highest level of formal education that you

15   have had?

16   A.        Twelfth grade high school.

17   Q.        You graduate?

18   A.        Yes.

19   Q.        Where and when?

20   A.        Perkiomen Valley, 1980.

21   Q.        All right.  And I take it you're married?

22   A.        Yes.

23   Q.        And how long have you been married?

24   A.        Twenty-five years and two weeks.

25   Q.        Congratulations.

JAMES EDWARD NACE

```
 1                    How many children do you have?

 2     A.        Two.

 3     Q.        And their names?

 4     A.        Amanda and Elizabeth.

 5     Q.        How old is Amanda?

 6     A.        She'll be 27 in December.

 7     Q.        Okay.  And we've taken Elizabeth's

 8     deposition, so we know her details.

 9                    Talk a little bit about, what are you

10     comfortable having me refer to your daughter?  What

11     name would you like me to use?

12     A.        Liz is fine.

13     Q.        Going to talk about Liz's education from

14     high school forward.  Did she go to the same high

15     school all four years?

16     A.        Yes.

17     Q.        All right.  And that was which school?

18     A.        Pennridge.

19     Q.        All right.  The issues that we're talking

20     about here that are the subject of this lawsuit were

21     roughly either between the junior and senior year and

22     during the junior year of high school?

23     A.        I don't understand the question.

24     Q.        All right.  We're here because of the

25     lawsuit that you and your wife have filed and your
```

Appendix1046

JAMES EDWARD NACE

1   daughter have filed pertaining to issues of improper

2   conduct by Eric Romig.

3   A.        Yes.

4   Q.        To your knowledge, those issues occurred

5   during the end of junior year and the summer of

6   junior year -- between junior and senior year?

7   A.        No.

8   Q.        No.  What time frame during Liz's high

9   school were they?

10  A.        Sophomore year, after sophomore year.

11  Q.        After sophomore year.  Okay.  What year did

12  she graduate from high school?

13  A.        2014.  I'm sorry, 2015.  This year.

14  Q.        All right.  During her freshman year of high

15  school, were there any problems that you're aware of

16  in terms of Liz at Pennridge in terms of either

17  problems in the school itself, behavioral problems,

18  anything like that, emotional problems?

19  A.        No.

20  Q.        During the sophomore year of high school,

21  same question.

22  A.        No.

23  Q.        When did you first become aware of a person

24  by the name of Eric Romig?

25  A.        I don't recall.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1   Q.        Do you remember how you became aware of his

2   existence?

3   A.        He was her softball coach for high school.

4   Q.        I just want to speak in detail, to your

5   knowledge, where and when was he coaching her.  So

6   was that during her freshman year?

7                     MR. GROTH:  Just so we're on the

8   same page, when you're saying freshman, sophomore,

9   you're talking 9th, 10th, 11th grade?

10                     MR. KEMETHER:  Yes.

11                     MR. GROTH:  Maybe it's easier to do

12   it --

13                     MR. KEMETHER:  Okay.

14   BY MR. KEMETHER:

15   Q.        Was that during 9th grade?

16   A.        Yes.

17   Q.        And the season for softball, was that the

18   spring, the fall, the winter, all of the above?

19   A.        It's in the spring.

20   Q.        Okay.  Did you meet him, Mr. Romig, during

21   her 9th grade year when she was on the softball team?

22   A.        Yes.

23   Q.        About how many times, if you know?

24   A.        Once or twice.

25   Q.        Any issues during your meetings with him

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1    that were anything out of the usual?

2    A.        No.

3    Q.        Did you become aware during her 9th grade

4    year that -- of any allegations against him that he

5    was acting in any improper way either towards your

6    daughter or towards anyone else?

7    A.        No.

8    Q.        Was there any softball over the summer

9    between 9th and 10th grade that your daughter was

10   involved in?

11   A.        Yes.

12   Q.        What would that have been?

13   A.        It would have been for Deep Run.

14   Q.        Deep Run?

15   A.        Yes.

16   Q.        To your knowledge, was Eric Romig involved

17   in that program?

18   A.        No.

19   Q.        During the 10th year, school year, were

20   there any interactions with Eric Romig?  In other

21   words, was he her coach again for the softball team

22   in the 10th grade, as well?

23   A.        Yes.

24   Q.        And that would have started in the spring?

25   A.        Yes.

Appendix1049

JAMES EDWARD NACE

```
 1    Q.       Did you deal with him during that school

 2    year?  Meet with him, talk to him, anything like

 3    that?

 4    A.       Yes.

 5    Q.       Anything unusual about those occasions?

 6    A.       No.

 7    Q.       During Liz's 10th grade school year, did you

 8    become aware of anything unusual about Eric Romig

 9    either involving Liz or involving anybody else?

10    A.       No.

11    Q.       During the summer between her sophomore and

12    junior year, or I should say 10th grade and 11th

13    grade, did she participate in any softball teams?

14    A.       Yes.

15    Q.       What was the name of that team or those

16    teams?

17    A.       I believe that's when she started for the

18    Belles.

19    Q.       That would be the Sellersville Belles?

20    A.       Yes.

21    Q.       And was, to your knowledge, Eric Romig

22    involved in coaching that team?

23    A.       Yes.

24    Q.       Did you deal with him in the context of

25    being a coach of the Sellersville Belles?  Did you
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

14

```
 1    have interactions with him during that summer?
 2    A.      No, not really.
 3    Q.      Did anything unusual come to your attention
 4    about Eric Romig during that summer where he was
 5    coaching your daughter for Sellersville Belles
 6    between 10th and 11th grade?
 7    A.      No.
 8    Q.      Did your daughter play softball for
 9    Pennridge in 11th grade?
10    A.      Yes.
11    Q.      And was Eric Romig the coach on that team in
12    11th grade?
13    A.      No.
14    Q.      Did you have any dealings with Eric Romig
15    during your daughter's 11th grade?
16    A.      No.
17    Q.      Do you have an understanding of what
18    happened to him in 11th grade that he wasn't coaching
19    with Pennridge that year?
20    A.      Yes.
21    Q.      What's your understanding of that?
22    A.      He was arrested.
23    Q.      When do you understand that he was arrested?
24    A.      September -- October 1st, 2013.
25    Q.      Okay.  And what year would your daughter
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Appendix1051

JAMES EDWARD NACE

1   have been in on that date?  What year of school?

2   A.        Sophomore, junior.  I don't know.

3   Q.        If you don't know, that's okay.

4   A.        I don't know.

5   Q.        You told me that she graduated in the

6   summer -- spring of 2015?

7   A.        Yes.

8   Q.        So doing the math, would she have been in

9   the beginning of her 11th grade school year in

10  October of 2013?

11  A.        Yes.

12  Q.        All right.  When did you first become aware

13  of anything unusual about Eric Romig, whether it

14  involved your daughter or not?

15  A.        September 26th, 2015.

16  Q.        Would that have been a Thursday, to your

17  knowledge?

18  A.        Yes.

19  Q.        How did you become aware of something

20  unusual about Eric Romig on that day?

21  A.        My wife came home very upset and she was

22  crying.  And told me that he had texted her or called

23  her several hundred times, at least.

24  Q.        Your wife told you this?

25  A.        Yes.

JAMES EDWARD NACE

16

1   Q.      All right.  Do you recall her saying

2   anything else at that time?

3   A.      Yes.

4   Q.      What else did she tell you at that time?

5   A.      She said, I think something unappropriate is

6   going on and we should go to the police.

7   Q.      Was there anything else about that

8   conversation that you recall, the one where your wife

9   first told you that there was something going on with

10  Eric Romig and your daughter?

11  A.      No.

12  Q.      What happened in response to that

13  conversation?

14  A.      We went to the police department in

15  Perkasie.

16  Q.      Had you spoken to your daughter before you

17  went to the police?

18  A.      No.

19  Q.      Do you know if your wife had?

20  A.      No.

21              MR. GROTH:  No, you don't know?

22              THE WITNESS:  I don't know.

23  BY MR. KEMETHER:

24  Q.      You mentioned something about texts or

25  e-mails between your daughter and Eric Romig.

Appendix1053

JAMES EDWARD NACE

```
 1    A.        Yes.

 2    Q.        Did you see any of them that day?

 3    A.        No.

 4    Q.        Do you know if your wife did?

 5    A.        No.

 6    Q.        Do you know how your wife learned about

 7    them?

 8    A.        She -- my daughter had just gotten a new

 9    phone.  And for some reason my wife looked at the

10    bill and saw a number.

11    Q.        And do you know what your wife did in

12    response to seeing the number on that bill?

13    A.        No.

14    Q.        When you spoke to the police on September

15    26th, 2013, who was with you?

16    A.        My wife.

17    Q.        Did you do this in person or by phone?

18    A.        In person.

19    Q.        You drove to the police department and had

20    the talk?

21    A.        Yes.

22    Q.        Do you know who you spoke with?

23    A.        No.

24    Q.        What do you recall about that conversation

25    when you were at the police station on September
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1    26th, 2013?

2    A.        They had -- he -- the officer had asked why

3    we thought there might be something inappropriate

4    going on and we explained to them about the numerous

5    phone calls and texts.

6    Q.        Did you have the bill that you were talking

7    about with you?

8    A.        The bills with the number on it many times?

9    I don't recall.

10   Q.        Did you have your daughter's phone with you

11   at that time?

12   A.        I don't recall.

13   Q.        Is there anything else you recall about your

14   conversation with the police on September 26th, 2013?

15   When I say your conversation, I'm including your wife

16   because I understand she was there with you.

17   A.        No.

18   Q.        How long did that conversations last, if you

19   recall?

20   A.        Half an hour maybe.  I don't recall, really.

21   Q.        Do you recall if you left any materials with

22   the police that day?

23   A.        No, I don't.

24   Q.        Where did you go from the police station?

25   A.        Went back home.

Appendix1055

JAMES EDWARD NACE

```
 1    Q.       Was your daughter with you at the police

 2    station?

 3    A.       No.

 4    Q.       Was your daughter at home when you got home?

 5    A.       No.

 6    Q.       Do you know where she was?

 7    A.       Yes.

 8    Q.       Where was she?

 9    A.       She was at practice.

10    Q.       Softball practice?

11    A.       Yes.

12    Q.       And to your knowledge, was Mr. Romig at that

13    practice?

14    A.       Yes.

15    Q.       Do you remember which team that practice was

16    for?

17    A.       The Sellersville Belles.

18    Q.       Do you have a rough time of day that that

19    practice would have been?

20    A.       Early evening.

21    Q.       Do you know how your daughter got to the

22    practice?

23    A.       My wife dropped her off.

24    Q.       And then you went from there to the police?

25    A.       Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

20

1   Q.      And when you went home, your daughter wasn't

2   there, she was still at practice.  Did someone go get

3   her?

4   A.      Yes.

5   Q.      That night after you got home from the

6   police, did you talk to Liz about anything pertaining

7   to Eric Romig?

8   A.      Yes.

9   Q.      What do you recall that discussion

10  involving?

11  A.      When she entered the house, she said she was

12  going out with a friend.  And then we basically said,

13  no, you need to sit down and we got to talk to you

14  about something.  I asked her if there was anything

15  going on.

16  Q.      And did she respond to you?

17  A.      Yes.

18  Q.      What did she say?

19  A.      She said, what do you mean by that.

20  Q.      Did you respond?

21  A.      Yes.

22  Q.      What did you say?

23  A.      I said, is there something going on with you

24  and Romig.

25  Q.      Did she respond to that question?

JAMES EDWARD NACE

21

```
 1   A.        Not at first.

 2   Q.        What did you do when she didn't respond?

 3   A.        I asked her again, is something going on

 4   with you and Romig.

 5   Q.        And did she respond to the third question?

 6   A.        Yes.

 7   Q.        What did she tell you?

 8   A.        She told me, yes, that there was.

 9   Q.        Did she say anything besides yes, there was?

10   A.        Not at that time.

11   Q.        Once you heard her say yes, there was, what

12   did you do?

13   A.        I asked her what.

14   Q.        Did she respond to that question?

15   A.        Yes.

16   Q.        What did she say?

17   A.        I don't recall exactly what she said.

18   Q.        And do you recall approximately what she

19   said?

20   A.        Yes.  That she was having an affair with

21   him.

22   Q.        Did you follow up on that after she told you

23   the words to that effect?

24   A.        Yes.

25   Q.        What did you say?
```

JAMES EDWARD NACE

```
 1    A.        I asked her if it was sexual.

 2    Q.        Did she respond to that question?

 3    A.        Yes.

 4    Q.        What did she say?

 5    A.        She said no at first.

 6    Q.        When she said no, did you follow up with

 7    her?

 8    A.        Yes.

 9    Q.        What did you say?

10    A.        I asked her again, is it a sexual

11    relationship, did he have sex with you.

12    Q.        Did she respond to that second question?

13    A.        Yes.

14    Q.        What did she say?

15    A.        She said yes.

16    Q.        What did you say in response to that?

17    A.        I don't recall.

18    Q.        How much longer did the conversation with

19    your daughter last that evening?

20    A.        I don't recall.

21    Q.        Do you recall anything else being said by

22    you, your wife or your daughter that evening about

23    Eric Romig?

24    A.        Not really, no.

25    Q.        And did your daughter remain home that
```

Appendix1059

JAMES EDWARD NACE

```
 1    evening?

 2    A.         Yes.

 3    Q.         Was your wife involved during this

 4    conversation, as well?

 5    A.         Yes.

 6    Q.         Was she talking to your daughter at the same

 7    time as you were?  I don't mean at the same moment,

 8    but during this group conversation.

 9    A.         No.

10    Q.         Did you have her phone with you that day,

11    that evening when you were talking to your daughter?

12    A.         Yes.

13    Q.         Did you see it?

14    A.         Could you clarify see it?

15    Q.         Sure.  I assume she had a phone.  Did you

16    see that she had it with her?

17    A.         Yes.

18    Q.         Did you ask for it?

19    A.         Yes.

20    Q.         Did you look at it?

21    A.         Not inside -- like -- looked at the phone,

22    it was in my hand, yes.

23    Q.         Did you look to see that there were any

24    texts on it between her and Mr. Romig?

25    A.         No.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

```
 1    Q.        Did you look on it to see if there were any

 2    e-mails between her and Mr. Romig?

 3    A.        No.

 4    Q.        Did you ever discuss the topic of whether

 5    there were e-mails or texts on that phone you had

 6    that night with your daughter?

 7    A.        No.

 8    Q.        Do you know what became of that phone?

 9    A.        Yes.

10    Q.        What became of that phone?

11    A.        We took it to the police station.

12    Q.        When did you do that?

13    A.        If I recall, it was the next day.

14    Q.        Do you have any awareness of whether anyone,

15    you, your wife, someone at your request, looked at

16    the phone that your daughter had on the 26th to see

17    if there were any texts on it between her and Eric

18    Romig or e-mails, for that matter?

19    A.        No.  No one had.

20    Q.        I want to make sure I'm clear.  My

21    understanding is that no one, to your knowledge,

22    looked at the phone to see if there were any texts or

23    e-mails on it or that they did and found that there

24    were none?

25    A.        That night?
```

Appendix1061

JAMES EDWARD NACE

25

1   Q.        On the 26th.

2   A.        No.  It's my understanding no one looked at

3   it that night.

4   Q.        How about on the 27th before you brought it

5   to the police?

6   A.        No.

7   Q.        When you were at the police station on the

8   27th giving them the phone, did you look at the phone

9   to see any texts or e-mails on it?

10  A.        No.

11  Q.        Do you know if your wife did that day on the

12  27th?

13  A.        I don't believe so, no.

14  Q.        Are you aware of anyone who looked at the

15  phone looking for texts or e-mails between your

16  daughter and Eric Romig before it was given to the

17  police on September 27th?

18  A.        No.

19  Q.        Did you have any other conversations with

20  your daughter about the Eric Romig situation before

21  you went back to the police on the 27th?

22  A.        No.

23  Q.        The 27th would have been a Friday.  Did she

24  go to school that day?

25  A.        No, I don't believe so.

JAMES EDWARD NACE

```
 1    Q.       She stayed home?

 2    A.       Yes.

 3    Q.       Did she have a schedule of practice with the

 4    Sellersville Belles that day?

 5    A.       No.

 6    Q.       What time of day do you think you went to

 7    the police on the 27th?

 8    A.       I do not recall.

 9    Q.       Morning, afternoon, evening?  You don't

10    know?

11    A.       I don't recall.

12    Q.       Did you work that day?

13    A.       No.

14    Q.       Does your wife have a job?

15    A.       Yes.

16    Q.       Did she work that day?

17    A.       I don't believe so.

18    Q.       Had you planned to go back to the police on

19    the 27th or is that something once you had the phone,

20    you thought, this would be a good idea to give it to

21    the police?

22    A.       Yes.

23    Q.       Did you bring anything else with you to the

24    police on the 27th besides the phone?

25    A.       I believe we took her old phone, also.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

27

1   Q.        When you say her old phone --

2   A.        She had just gotten a new phone.

3   Q.        When had she gotten the new phone?  Do you

4   remember what day?

5   A.        I have no idea.  I don't recall.

6   Q.        All right.  Did you bring the old phone to

7   the police, as well?

8   A.        Yes.

9   Q.        Same question.  Did someone look at that

10  phone, what we're calling the old phone, before

11  giving it to the police to see if there were any

12  texts or e-mails on there between your daughter and

13  Eric Romig?

14  A.        No.

15  Q.        Did you ever talk to your daughter before

16  giving the phones to the police about the nature of

17  any e-mails or texts --

18  A.        No.

19  Q.        -- between her and Eric Romig?

20  A.        (Witness shakes head.)

21  Q.        What happened during the meeting on the 27th

22  with the police?

23  A.        I don't recall.

24  Q.        Was it the -- did you meet with the same

25  person you'd met with the day before?

Appendix1064

JAMES EDWARD NACE

1    A.        I believe so.

2    Q.        How long do you think that meeting was on

3    the 27th with the police?

4    A.        I don't recall.

5    Q.        What else do you remember -- what else, if

6    anything, do you remember about the 27th of

7    September?

8    A.        I don't.

9    Q.        You don't?

10   A.        I don't know.

11   Q.        The 28th was a Saturday, obviously no

12   school.  Do you know if there was a Sellersville

13   Belles practice that day?

14   A.        Yes.

15   Q.        Did your daughter attend it?

16   A.        Yes.

17   Q.        Was Eric Romig there?

18   A.        Yes.

19   Q.        Who brought her to that practice?

20   A.        My wife.

21   Q.        Were there any talks with your daughter on

22   the 28th of September about anything pertaining to

23   Eric Romig?

24   A.        I don't recall.

25   Q.        Was there anything else about the 28th of

JAMES EDWARD NACE

```
 1    September that you do remember besides your daughter

 2    going to the Sellersville Belles practice?

 3    A.      Just the fact that I did not want her to go.

 4    Q.      Did you tell her that?

 5    A.      Yes.

 6    Q.      And what did she say?  She, being your

 7    daughter.

 8    A.      She said, I want to go.

 9    Q.      And you ultimately decided to let her go?

10    A.      Yes.

11    Q.      Did your wife want her to go to the

12    practice?

13    A.      I don't know.

14    Q.      When, if at all, did you next speak to your

15    daughter about anything pertaining to Eric Romig?

16    A.      I didn't.

17    Q.      To this day, have you ever spoken to her

18    again about Eric Romig?

19    A.      No.

20    Q.      Do you know if your wife has?

21    A.      I do not know.

22    Q.      Were there any other Sellersville Belles

23    practices that you're aware of that your daughter

24    went to before Eric Romig was arrested on October

25    1st?
```

JAMES EDWARD NACE

```
 1   A.        No.

 2   Q.        Prior to September 26th, 2013, had your

 3   daughter ever been to a psychiatrist, psychologist,

 4   any mental health provider for any reason?

 5   A.        No.

 6   Q.        Are you aware that she's been to any

 7   psychiatrist, psychologist or mental health providers

 8   since September 26th, 2013?

 9   A.        Yes.

10   Q.        What are you aware of in that regard?

11   A.        I'm aware that she's been to two or three of

12   them, possibly.

13   Q.        Two or three different ones?

14   A.        Two or three different ones.

15   Q.        Do you know the names of any of them?

16   A.        I believe the one she is with now is --

17                  MR. GROTH:  Hold on a second.  I'm

18   going to object in terms of the witness answering any

19   questions regarding any expert evaluation or

20   assessment of Liz that is being done for this case,

21   the reports for which are due on December 15th.

22                  MR. KEMETHER:  Okay.  I'm not

23   seeking to find out expert information.

24                  MR. GROTH:  I want to make sure the

25   witness understood.
```

1                    MR. RUSSELL:  Asking for treating

2     doctors.

3                    MR. GROTH:  He's asking whether or

4     not she was treated by any counselors or

5     professionals after the Romig revelation up until

6     this lawsuit, I would say.

7     BY MR. KEMETHER:

8     Q.        Up until now -- and I'm aware that -- at

9     least I'm now aware that there may be someone that

10    may be what we call an expert in this case who is

11    going to evaluate her just for purposes of this

12    litigation.  I'm not asking about that.

13                    Do you understand the distinction we're

14    making?

15    A.        Not really, no.

16    Q.        All right.  People that you or your wife or

17    your daughter have arranged to go to see on your own,

18    on your own for -- to give her mental health

19    assistance as opposed to people that have been

20    arranged through your attorney.  Does that help for

21    the distinction?

22    A.        A little.

23    Q.        Okay.  Using that scope or definition, do

24    you know who she's been seeing, if anyone?

25    A.        No.

JAMES EDWARD NACE

1    Q.      Do you know how often she's been to see a

2  mental health provider of any kind?

3    A.      I think it's approximately 15 times.

4    Q.      About 15 times in total?

5    A.      (Witness nods head.)

6    Q.      Did you become aware prior to October 1st

7  that your daughter had a third phone, this one

8  supplied to her from Eric Romig?

9    A.      No.

10   Q.      Were you aware of that before today?

11   A.      Yes.

12   Q.      Do you know anything about the details of

13  when or how she got that phone?

14   A.      Yes.

15   Q.      What do you know about that?

16   A.      That it was placed on our back porch by Eric

17  Romig.

18   Q.      On your back porch?

19   A.      Yes.

20   Q.      Do you know roughly when?  I understand it

21  was before he was arrested, but approximately when?

22   A.      No.

23   Q.      And how did you learn about that?

24   A.      Through the detectives, I believe.

25   Q.      How many times did you speak with the police

JAMES EDWARD NACE

```
 1    overall about this situation, if you can recall?

 2    A.       Maybe four.

 3    Q.       Were the other two before or after Mr. Romig

 4    was arrested?

 5    A.       Before.

 6    Q.       Did you speak to the police at all -- I'm

 7    not talking about being in court for any sort of

 8    hearings -- did you speak to the police at all after

 9    he was arrested?

10    A.       Possibly.  I'm not sure.

11    Q.       Did they ask to record a statement with you

12    or your wife?

13    A.       I don't think so.

14    Q.       Are you aware if they asked to record

15    anything involving your daughter; in other words,

16    speaking to your daughter?

17    A.       I'm not aware of it.

18    Q.       Prior to Mr. Romig's arrest on October 1st,

19    did you or your wife contact anyone at Pennridge High

20    School about this situation?

21    A.       I did not.

22    Q.       Do you know if your wife did?

23    A.       I do not.

24    Q.       Do you know if anyone on behalf of your

25    family did?
```

JAMES EDWARD NACE

1    A.       I do not.

2    Q.       To this day, have you or your wife contacted

3    anybody at Faith Christian Academy about Eric Romig?

4    A.       I have not.

5    Q.       Do you know if your wife has?

6    A.       I don't know.

7    Q.       Anyone other than your attorney, are you

8    aware -- have done so on your behalf?

9    A.       No.  Not that I'm aware of.

10   Q.       Prior to September 26th, 2013, which is the

11   day you told me you learned about your daughter's

12   relationship with Eric Romig, was there anything

13   about her high school experience that you were aware

14   that was negative, that she was doing bad in school,

15   having emotional problems, having behavioral

16   problems, anything of that sort?

17   A.       No.

18   Q.       So would it be fair to say that she spent

19   another two years in high school after the situation

20   with Eric Romig came to light?

21   A.       Yes.

22   Q.       During those two years of high school, did

23   her grades change significantly, one way or the

24   other?

25   A.       In the very beginning, they dropped

Appendix1071

JAMES EDWARD NACE

1    somewhat.

2    Q.        When you say in the very beginning, so

3    basically in the fall of 2013?

4    A.        Yes.  After the incident.

5    Q.        For how long a period do you think that they

6    changed?

7    A.        I'm not positive on that.  Say maybe a

8    marking period, but I'm not sure.

9    Q.        For the remainder of the -- of her

10   schooling, did her grades remain roughly the same as

11   they had been before this incident, before you

12   learned of this incident, I should say?

13   A.        Yes.

14   Q.        In terms of her participation in school or

15   extracurricular activities, did that change at all

16   after September 26th, 2013?

17   A.        I don't believe so, no.

18   Q.        She continued to stay on the Pennridge

19   softball team for the last two years of high school?

20   A.        Yes.

21   Q.        Did she play for the Sellersville Belles,

22   did she continue to play for them?

23   A.        Yes.

24   Q.        Was your daughter involved in any other

25   teams, clubs, groups of any kind, whether through the

Appendix1072

JAMES EDWARD NACE

36

```
1    school or outside of the school during this two year

2    period?

3    A.        Yes.

4    Q.        What other ones were you aware that she was

5    part of?

6    A.        I believe it was called a Key Club at the

7    school.

8    Q.        Do you know what that has to do with?

9    A.        Not really.

10   Q.        Do you know if she'd been part of the Key

11   Club before September of 2013?

12   A.        I don't recall.

13   Q.        Any other clubs, teams?

14   A.        She was in Girl Scouts, involved in Girl

15   Scouts.

16   Q.        Was that still in high school she was?

17   A.        Yes.

18   Q.        Did she continue in her junior and senior

19   year?

20   A.        Yes.

21   Q.        Any other ones?

22   A.        I believe the National Honor Society.  I

23   don't know if that --

24   Q.        Do you know if she'd been on the National

25   Honor Society before September of 2013?
```

JAMES EDWARD NACE

```
 1   A.        Yes, I believe so.

 2   Q.        And at any point did she come off of it

 3   because of grades or some other reason?

 4   A.        No.

 5   Q.        Do you have an understanding of where she

 6   was in her class when she graduated, you know, grade

 7   wise?

 8   A.        Yes.

 9   Q.        Ballpark, tell me where that would have

10   been.

11   A.        If I recall, it was somewhere in the 70's,

12   70's.

13   Q.        Okay.  And how many were in the class?

14   Ballpark.

15   A.        Not positive, but I think five or 600.

16   Q.        Did your daughter's experience in her junior

17   year of high school, was it as positive as the ones

18   in freshman and sophomore year had been overall?

19                      MR. GROTH:  Object to the form.

20                 You can answer.

21   A.        I don't know.

22   Q.        Did you notice any difference in her

23   behavior during her junior year?

24   A.        Yes.

25   Q.        Or 11th grade year, I'm sorry, I should say.
```

Appendix1074

JAMES EDWARD NACE

1    A.       As far as school?

2    Q.       As far as just her overall behavior.

3    A.       She seemed a bit clingier, seemed afraid of

4    some things, didn't like being alone.

5    Q.       Do you know did she express what she was

6    afraid of?

7    A.       No.

8    Q.       Does she have friends through the school?

9    A.       Yes.

10   Q.       Did she continue to spend time with those

11   friends?

12   A.       Not all of them.

13   Q.       Not all of them.  Were there some that she

14   stopped being friends with?

15   A.       I wouldn't say stopped being friends, but --

16   Q.       What would you say?

17   A.       Not hanging around.

18   Q.       Do you have an understanding of why that was

19   the case?

20   A.       No.

21   Q.       Did she ever tell you?

22   A.       No.

23   Q.       Do you know if she had a boyfriend at all

24   after -- in her 11th grade or 12th grade?

25   A.       Yes.

Appendix1075

JAMES EDWARD NACE

39

```
1    Q.       Do you know his name or their names?

2    A.       I believe it's Brooks.  Countiss, I believe

3    his last name is.

4    Q.       How did you become aware that he and your

5    daughter were seeing each other?

6    A.       He was her prom date.

7    Q.       Do you know if they had a relationship other

8    than going to the prom?

9    A.       Yes.

10   Q.       What do you know about that?

11   A.       Just that they would go to the park on

12   occasions and they would -- I guess dating.

13   Q.       Over what period of time did you understand

14   that they were dating?

15   A.       I don't recall.

16   Q.       Do you know if she's still friends with him?

17   A.       I don't believe so.

18   Q.       Any other boyfriends that you're aware of

19   during her 11th or 12th grade years?

20   A.       No.

21   Q.       Does she have one now?

22   A.       Yes.

23   Q.       Do you know his name?

24   A.       Josh.

25   Q.       Did she meet him in college?
```

JAMES EDWARD NACE

```
 1   A.        No.

 2   Q.        Do you know Josh's full name?

 3   A.        No.

 4   Q.        How long are you aware that she's dated

 5   Josh?

 6   A.        Not exactly sure.

 7   Q.        Was it while she was still in high school?

 8   A.        Not sure.

 9   Q.        Have you met Josh?

10   A.        Once.

11   Q.        Other than anything involving Eric Romig or

12   having to testify here in court or anything like

13   that, are you aware of any negative experiences

14   during her 11th or 12th grade years?

15                    MR. GROTH:  Object to the form.

16              You can answer.

17   A.        No.

18   Q.        Did she ever express to you that she wanted

19   to go to a different high school after you learned of

20   the Eric Romig situation?

21   A.        No.

22   Q.        Prior to your learning of the Eric Romig

23   situation, had your daughter started to make any

24   plans to go to college?  Was she looking at schools,

25   thinking about certain schools, anything like that?
```

JAMES EDWARD NACE

```
 1   A.         She talked about going to college.

 2   Q.         Did she talk about any schools in

 3   particular?

 4   A.         I don't think at that time.

 5   Q.         Do I understand that during her 11th and

 6   12th grade years she started looking at specific

 7   colleges to go to?

 8   A.         Yes.

 9   Q.         Do you know how many of them there were?

10   A.         Three or four.

11   Q.         Do you know the names of them?

12   A.         One was York.  One was Lycoming where she is

13   now.  One was Kutztown.  She looked at one in

14   Virginia.  I forget the name of it.

15   Q.         Were there any schools that you understood

16   that she might have wanted to go to originally, but

17   didn't because of something having to do with this

18   Eric Romig situation?

19   A.         No.

20   Q.         Were there any activities that you're aware

21   of that she had an interest in or whether she was

22   actually doing them or wanted to do them, but chose

23   not to do them because of this Eric Romig situation?

24   A.         No.

25   Q.         Between September 26th and October 1st,
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

```
 1    2013, did you speak to Eric Romig?

 2    A.        No.

 3    Q.        Do you know if your wife did?

 4    A.        I do not know.

 5    Q.        Do you know if anyone at your request did?

 6    I'm not talking about your daughter.

 7    A.        No.

 8    Q.        Did your daughter have a plan as to what

 9    field she wanted to get into in college before you

10    learned of this Eric Romig situation?  Did she want

11    to be a teacher, lawyer, doctor, anything like that?

12    A.        Yes.

13    Q.        Do you understand what that would have been?

14    A.        Criminal justice.

15    Q.        And did that change after you learned of the

16    Eric Romig situation?  In other words, the field that

17    she expressed an interest in getting involved in.

18    A.        No.

19    Q.        Is that something she's studying now?

20    A.        Yes.

21    Q.        Has she declared a major?  I know it's her

22    freshman year, first year of college, I don't know if

23    she declared a major yet.

24    A.        No, she has not.

25    Q.        She's been in college now for about almost
```

Appendix1079

JAMES EDWARD NACE

43

```
 1    two months?

 2    A.       Yes.

 3    Q.       Do you have any understanding of how that

 4    experience is going for her?

 5    A.       Yes.

 6    Q.       Can you tell me?

 7    A.       She seems to be acclimating fairly well.

 8    Q.       Do you know if she's made some new friends

 9    there?

10    A.       Yes.

11    Q.       Have you met any of them?

12    A.       No.

13    Q.       Has she been home yet?

14    A.       Yes.

15    Q.       How many times?

16    A.       Possibly three.

17    Q.       Have you been up to her college yet?

18    A.       Yes.

19    Q.       Aside from moving her in, how many times?

20    A.       Twice, I believe.

21    Q.       Have you expressed -- excuse me.  Has she

22    expressed anything to you so far in college about any

23    bad experiences or negative experiences she's having

24    there?

25    A.       No.
```

JAMES EDWARD NACE

1  Q.       Do you know if she's receiving mental health

2  treatment now while she's in college?

3  A.       No.

4  Q.       Does she have a job?

5  A.       Not right now.

6  Q.       Did she have one before she went to college?

7  A.       Yes.

8  Q.       What did she do this last summer?

9  A.       She worked for Acme Markets.

10 Q.       As a --

11 A.       Bagger, in the bakery.

12 Q.       And do you have an understanding what she's

13 going to do over winter break in terms of a job or

14 anything like that, is she going to come home, stay

15 up there?

16 A.       I believe she's coming home and working.

17 Q.       Is she a member of any teams in college?

18 A.       Yes.

19 Q.       What teams is she on?

20 A.       Softball team.

21 Q.       And is she a member of any other clubs or

22 programs in college that you're aware of?  Seems like

23 a pretty full schedule she's got going right now, but

24 I thought I'd ask.

25 A.       Not sure.

JAMES EDWARD NACE

1    Q.        Have you had any mental health treatment in

2    the last two years that you attribute to what

3    happened to your daughter?

4    A.        No.

5    Q.        Are you aware if your wife has?

6    A.        No.

7                    MR. KEMETHER:  I think those are

8    all the questions I have for you at the moment.  I

9    will let some of the other lawyers ask some.  If I

10   have any more, I'll follow up with you.

11                        *  *  *

12                    EXAMINATION

13   BY MR. RUSSELL:

14   Q.        Mr. Nace, my name is Jonathan Russell.  And

15   I represent the Faith defendants.  And one of the

16   opportunities we have when we take your deposition is

17   to ask some questions trying to figure out some

18   things that may not make sense to us and hopefully

19   you can shine some light on that.  So I hope I don't

20   cover some information that's already been addressed.

21                    We already took your daughter's

22   deposition.  And in listening to your daughter talk

23   about this whole experience, she seemed to be the

24   type that didn't want to have her name or her

25   reputation out in the public at all.  Would that be

Appendix1082

JAMES EDWARD NACE

1    accurate?

2    A.        Yes.

3    Q.        And knowing that the criminal case was

4    completed, one of the things that was curious to me

5    was why file the civil lawsuit knowing that her name

6    would be protected in the criminal case, but in the

7    civil lawsuit, you know, there's -- there's going to

8    be a document associated with this, be it's going to

9    be memorialized for all time.

10            I just wondered, was it your idea to file

11   the civil lawsuit or whose idea was it?

12   A.        No, it was not my idea.

13   Q.        Whose idea was it?

14   A.        It was our idea, my wife's and I and my

15   daughter's.

16   Q.        She wanted to do it, as well?

17   A.        Yes.

18   Q.        I was curious, too, knowing that you had a

19   certain amount of time to file the lawsuit, why file

20   the lawsuit during her senior year before her

21   softball season ended or her academic career at

22   Pennridge ended?

23   A.        I don't know that the time mattered.

24   Q.        Well, your daughter testified that after the

25   lawsuit was filed, there was some press about this

JAMES EDWARD NACE

1   case.   It was in the local papers that the lawsuit

2   had been filed.   Certainly that press exposure put

3   exposure on her and you acknowledge, too, that she

4   didn't really want exposure put on her.   I just

5   wondered, do you know why you filed at that time?

6   A.        No.

7   Q.        Do you know if you could have filed later

8   after she had graduated from high school and finished

9   her career at Pennridge?

10               MR. GROTH:  I'll object to the

11  question insofar as it may ask for some legal

12  expertise or whatever.

13               But you can answer.

14  A.        I don't know.

15  Q.        It's my understanding that in filing this

16  lawsuit, your hope is to have your daughter

17  compensated monetarily.   Is that right?

18  A.        Yes.

19  Q.        And Mr. Groth has communicated to us that

20  the monetary expectation is in excess of a million

21  dollars.   Is that your understanding, as well?

22               MR. GROTH:  Object to the form.

23  Instruct him not to answer.   Any discussions that I

24  have with my clients about the value of the case or

25  settlement discussions is not something that's

Appendix1084

1    discoverable, No. 1.

2              And No. 2, I'm not sure the settlement

3    discussions that counsel have with each other are

4    also something that should be discovered -- subject

5    of pre-trial discovery.

6              But he can answer the question.

7                   MR. RUSSELL:  What was the

8    question?

9         (Whereupon, the reporter read back the

10   referred-to portion of the record.)

11                  MR. GROTH:  I'll object to the

12   question, also, because that assumes a fact not in

13   evidence, No. 1.

14             And the settlement discussions that I've

15   had with one person in this case, I don't think were

16   in terms of expectations at all.  We were talking in

17   terms of possible ranges in values or whatever.  So I

18   think your question is misleading in that way.

19             But, again, if you can answer, you can

20   answer.

21                  THE WITNESS:  I have no knowledge

22   of that.

23   BY MR. RUSSELL:

24   Q.      Because part of what our job is is to

25   understand the damages that have been claimed and

JAMES EDWARD NACE

1    sustained and then trying to monetize that in some

2    way.  So that's our job as the attorneys that are

3    representing those who have been sued.  So we have to

4    kind of ask questions about those damages in order to

5    gain an understanding of what's a fair and reasonable

6    value for the damages that are claimed.

7             It's my understanding what's been put

8    forth to us right now, we have 14 visits to a

9    counselor.  I think you said it may have been 15, 14

10   or 15 visits.  Is that right?

11   A.      Yes.

12   Q.      Did you go to any of those visits or

13   appointments?

14   A.      No.

15   Q.      Did your wife go to any of those

16   appointments?

17   A.      Yes.

18   Q.      Your daughter has previously testified --

19   did you review her deposition before today?

20   A.      Yes.

21   Q.      Did you review any other depositions other

22   than your daughter's?

23   A.      No.

24   Q.      In your daughter's deposition, she testified

25   that she didn't want to go to the counselor, but that

JAMES EDWARD NACE

1   you and your wife insisted that she go.  Do you

2   remember reading that?

3   A.      Yes.

4   Q.      And we have been provided with no treatment

5   notes from any medical doctors.  Are you aware that

6   she treated with any medical doctors at all?

7               MR. GROTH:  Relating to the Romig

8   situation?

9   Q.      Relating to the Romig situation.

10  A.      No, not at all.

11  Q.      We have been provided no indication that

12  she's ever been prescribed prescription medication.

13  Are you aware that she's ever been prescribed

14  prescription medications as a result of anything

15  associated with her claim?

16  A.      No.

17  Q.      Additionally, in looking through her school

18  records, it doesn't look like she missed any more

19  school in her junior and senior years than she missed

20  in any other -- in her sophomore or freshman year.

21  Is that your understanding, as well?

22  A.      Yes.

23  Q.      And would it be accurate to say that this

24  incident with Mr. Romig did not impact her academic

25  career?  I think you've testified she finished 74th

JAMES EDWARD NACE

1    out of -- it's actually 560, she knew that.  You knew

2    it was between five and 600.  Is that right?

3                   MR. GROTH:  I'll object to the

4    form.  I think it's a couple questions there.  But

5    I'll object to the form of the question with regard

6    to impact on her academic life.

7                   MR. RUSSELL:  Let me rephrase and I

8    apologize if it was inartfully phrased.

9    BY MR. RUSSELL:

10   Q.        Are you aware that this incident with Mr.

11   Romig has impacted your daughter's academic career at

12   all?

13                  MR. GROTH:  Object to the form of

14   the question.

15                  You can answer.

16   A.        No.

17   Q.        You're not aware or it has not impacted?

18   A.        It has not impacted.

19   Q.        In fact, she was able to get a scholarship

20   to Lycoming College for about $26,000, right?

21   A.        I'm not sure if that's the amount, but, yes,

22   she had a scholarship.

23   Q.        And she applied and was admitted to all

24   three colleges -- she was admitted to all three

25   colleges she applied to.  I think you thought she

JAMES EDWARD NACE

1    went to four, but I think she testified, if you read

2    her deposition, that she applied to three and got in

3    to all three.  Is that right?

4    A.        Yes.

5    Q.        In her deposition, she also talked about she

6    thought about going out of state, but that her

7    parents didn't want her to go out of state.  Do you

8    remember telling her not to apply to colleges out of

9    state?

10   A.        Just Texas.

11   Q.        And why was that?

12   A.        It's Texas.

13   Q.        Too far or you just don't like Texas?

14   A.        It's Texas.

15   Q.        But was there any other reason?  I mean,

16   could she have gone to New Jersey or gone to

17   Massachusetts or anything like that?

18   A.        Yes.

19   Q.        It was okay with you?

20   A.        Yes.

21   Q.        And would it be accurate to say that this

22   incident with Mr. Romig did not impact her softball

23   career?

24                    MR. GROTH:  Object to the form.

25   Asks for speculation.

JAMES EDWARD NACE

```
 1                You can answer.
 2   Q.        As it related to high school.  Let me
 3   qualify it.  I'm not talking about college at this
 4   point.  But did this incident with Mr. Romig impact
 5   her softball career at all?
 6                      MR. GROTH:  Object to the form.
 7                You can answer.
 8   A.        No.
 9   Q.        And, in fact, I think she testified that
10   personally she continued to do better in her junior
11   year and then her senior year, correct?
12   A.        Is the question that she testified or what I
13   think?
14   Q.        Let's go both ways.  She testified her
15   personal stats were better in her junior year and
16   senior year.  Do you recall her testifying to that?
17   A.        I don't recall her testifying to that, no.
18   Q.        Were they better or not?
19   A.        My opinion, absolutely not.  She didn't get
20   as much playing time.
21   Q.        She also testified that her relationship
22   with you and your wife was better after all this
23   happened than it was before.  Would that be -- she
24   testify to that?
25   A.        Yes.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

54

1    Q.        And do you recall -- would that be

2    consistent with your characterization of your

3    relationship?

4    A.        No.

5    Q.        How so?  Tell me why.

6    A.        I think it's about the same.

7    Q.        It's not gotten worse?

8    A.        No.

9    Q.        It's my understanding in this lawsuit

10   there's no claim by you or your wife for any

11   emotional distress that this situation has caused

12   either of you, correct?

13   A.        Yes.

14   Q.        Additionally, in trying to aid in my

15   understanding, is why you sued certain entities and

16   not others.  I'm not asking for a legal opinion, but

17   I'm asking to why certain people were sued and others

18   were not.

19             It's my understanding that you sued Faith

20   Christian Academy defendants because you believe that

21   Eric Romig had done something similar to students at

22   Faith Christian Academy.  Is that your understanding?

23   A.        Yes.

24   Q.        Do you still believe that now as you sit

25   here today?

JAMES EDWARD NACE

```
 1    A.         Yes.

 2    Q.         Do you think that sexual intercourse

 3    occurred between Mr. Romig and any girls at Faith

 4    Christian Academy?

 5    A.         I don't know.

 6    Q.         So what gives you the belief that it did

 7    happen?

 8                    MR. GROTH:  I'm going to object to

 9    the form of the question insofar it asks him to

10    reveal conversations he had with counsel that are

11    privileged.  And if he has any information other than

12    information that he got from his own counsel, he can

13    testify to it.

14                    But not anything that you've heard from

15    your own attorney.

16    A.         Could you please repeat the question?

17    Q.         Other than in conversation or information

18    that you've learned from your attorney, what

19    knowledge do you have, if any, that Mr. Romig engaged

20    in sexual intercourse with any students at Faith

21    Christian Academy?

22    A.         None.

23    Q.         And I would tell you that we don't have any

24    information that that occurred, either.

25                    Do you have any information, other than
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1    what you may have heard from your attorney or been

2    told by your attorney, that sexting occurred between

3    Mr. Romig and any students at Faith Christian

4    Academy?

5    A.        Yes.

6    Q.        You have information that that happened?

7    A.        Yes.

8    Q.        And what is your knowledge of that?

9    A.        That it had happened on a school bus.  I

10   believe it was a basketball -- going to a basketball

11   game.

12   Q.        And what happened?

13   A.        He was inappropriately texting.

14   Q.        And let me back up.  When I said sexting, I

15   meant sending video or pictures of someone's sexual

16   organs and sending it to someone else.  So I'll get

17   to texting in a second.

18             Do you have any information -- because my

19   understanding, that happened between your daughter

20   and Mr. Romig, that they sent pictures to one another

21   of themselves in various stages of undress.  Do you

22   have any information that that happened to -- between

23   Mr. Romig and another student at Faith Christian

24   Academy?

25   A.        No.

JAMES EDWARD NACE

1    Q.       It's my understand that your daughter slept

2    over Mr. Romig's house.  Is that right?

3    A.       I don't know.

4    Q.       Do you have any information that any

5    students at Faith Christian Academy ever slept over

6    at Mr. Romig's house alone together?

7    A.       No.

8    Q.       Do you have any information that any content

9    of actual text messages sent between Mr. Romig and

10   any student of any inappropriate nature was ever

11   obtained or disclosed at Faith Christian Academy?

12                    MR. GROTH:  Other than through

13   conversations with counsel.

14   A.       No.

15   Q.       The Complaint that you filed on behalf of

16   your daughter when she was a minor, states that there

17   was a student with initials E.M.  And we've

18   subsequently taken -- her name is Emily Mayer.  Did

19   you ever talk to Emily Mayer?

20   A.       No.

21   Q.       Emily Mayer's father is Kevin Smith,

22   stepfather is Kevin Smith, the mother is Annette

23   Smith.  Have you ever spoken to Kevin Smith or

24   Annette Smith?

25   A.       No.

JAMES EDWARD NACE

1    Q.       Do you have any understanding, other than

2    what's been told to you through your counsel, why

3    Emily Mayer never reported anything to the police or

4    to child protective services or to Children and Youth

5    about any -- any interaction between herself and Eric

6    Romig?

7    A.       No.

8    Q.       Do you know why Kevin Smith or Annette Smith

9    never reported to the police or Children and Youth

10   any interaction between their daughter and Eric

11   Romig?

12   A.       No.

13   Q.       Did you ever -- do you know that Emily

14   Mayer's father was a former Montgomery County

15   detective?

16   A.       No.

17   Q.       Your Complaint that you filed on behalf of

18   your minor daughter also mentions a student Kristen

19   Kennedy.  Did you ever speak to Kristen Kennedy?

20   A.       No.

21   Q.       Kristen Kennedy has also already given her

22   deposition in this case and she's testified that she

23   didn't consider any communication between herself and

24   Mr. Romig at the time to be sexual abuse.  Did you

25   ever hear that from anyone other than your attorney?

JAMES EDWARD NACE

```
 1    A.        No.

 2    Q.        Your Complaint mentions a Lauren Fretz.  Did

 3    you ever speak to -- or L.F. is actually Lauren

 4    Fretz.  Have you ever spoken to Lauren Fretz?

 5    A.        No.

 6    Q.        Are you aware that Lauren Fretz has

 7    indicated that nothing inappropriate ever happened

 8    between her and Mr. Romig?

 9                   MR. GROTH:  Object to the form of

10    the question.

11                   You can answer.

12    A.        No.

13    Q.        With that being said, is it still your

14    belief as you sit here today that Faith Christian

15    Academy should have reported something about Eric

16    Romig when Eric Romig was a coach at Faith Christian

17    Academy?

18                   MR. GROTH:  I'll object insofar as

19    the allegations in the complaint are based upon the

20    investigation of counsel which were shared with

21    clients at some point during the investigation and

22    led to the preparation of the Complaint.

23                   To the extent that he has any other

24    information outside of what counsel told him about

25    that, he's -- whether it comes from detectives or
```

JAMES EDWARD NACE

```
 1    somebody else who may have discussed them with him,

 2    he's free to answer.

 3    A.        No.

 4    Q.        Do you know why you didn't sue Emily Mayer

 5    as part of your Complaint?  She turned 18 during the

 6    middle of her reporting what transpired between

 7    herself and Mr. Romig, meaning she was legally an

 8    adult.  Do you know why you didn't sue her?

 9                   MR. GROTH:  Object to the form

10    insofar as it requires some legal expertise.

11                   But he can answer.

12    A.        No.

13    Q.        Do you know why you didn't sue Kevin Smith

14    or Annette Smith who are the parents of Emily Mayer?

15                   MR. GROTH:  Same objection.

16                   You can answer.

17    A.        No.

18    Q.        One thing that's really intrigued me a

19    little bit here, as to why the Sellersville Belles

20    were never sued.  Do you know why they were never

21    sued?

22                   MR. GROTH:  Same objection.  Calls

23    for legal opinion and legal expertise.

24                   You can answer if you can.

25    A.        No.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1   Q.        According to Elizabeth, when she testified,

2   she had sex several times while Mr. Romig was

3   coaching the Belles after the season had ended with

4   Pennridge.  Is that your understanding, as well?

5   A.        Yes.

6   Q.        And I thought that there was some indication

7   that she was with the Belles for two years, but was

8   she only with the Belles for one year or at least --

9   was the first year she was with the Belles, was it

10  the summer between her sophomore and junior year?

11  A.        I believe so.

12  Q.        Did you ever go on any overnight trips with

13  the Belles where you had to stay in a hotel because

14  there was a tournament somewhere?

15  A.        Yes.

16  Q.        How many times?

17  A.        I don't recall.

18  Q.        And Mr. Romig would have been on those

19  overnight trips, as well?

20  A.        No.

21  Q.        Did the team stay in a particular hotel?

22  A.        Yes.

23  Q.        But he didn't stay there?

24  A.        I don't believe he was the coach at the

25  time.

Appendix1098

JAMES EDWARD NACE

1    Q.        So when -- in the summer between the

2    sophomore and junior years, there have been no

3    overnight trips that you're aware of at that time or

4    before that time, before he was arrested?

5                      MR. GROTH:  While he was the coach?

6    Q.        While he was the coach.

7    A.        I don't believe so.

8    Q.        Was -- did you reach a settlement with the

9    Belles?

10   A.        No.

11   Q.        And I don't want you to take this the wrong

12   way.  But to the extent that you're trying to put

13   some degree of blame on Faith Christian Academy, I'm

14   not trying to put any blame on you any more than

15   what's being posited on Faith Christian Academy.  But

16   it's my understanding that the cell phone that

17   Elizabeth used to text, call and send naked pictures

18   of herself to Eric Romig was owned by you.  Is that

19   right?

20   A.        Yes.

21   Q.        And you paid the bill for that phone?

22   A.        My wife did, yes.

23   Q.        And you could go on line and look at the

24   texts, who they're sent from and the numbers that

25   they're sent from, you had access to that, or you or

Appendix1099

JAMES EDWARD NACE

1   your wife did?

2   A.        I don't know.

3   Q.        It's my understanding that there was some

4   indication that for at least perhaps a year before

5   Mr. -- before you found out about the relationship

6   between Eric Romig and Elizabeth, your daughter, that

7   your daughter had been secretive about the use of her

8   cell phone.  Were you aware of that at all?

9                   MR. GROTH:  Object to the form of

10   the question.

11                   You can answer.

12   A.        No.

13   Q.        It's my understanding one of the covers that

14   Elizabeth had for spending the night over at Eric

15   Romig's house was she was spending the night at her

16   friend Ally's house.  Is that your understanding?

17   A.        Yes.

18   Q.        Do you know why no one -- did you ever call

19   Ally or Ally's mom to confirm that she was going over

20   there or that everything was okay?

21   A.        No.

22   Q.        Do you know why you didn't?

23   A.        I trusted her.

24   Q.        Trusted who?

25   A.        Liz.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

JAMES EDWARD NACE

```
 1   Q.        The other thing that I don't understand and

 2   I'm hopeful that you can help me out with, is that

 3   you reported this to the police on the 26th of

 4   September, correct?

 5   A.        Yes.

 6   Q.        And at the time that you reported it, you

 7   felt that something was going oddly on between Eric

 8   Romig and your daughter, right?

 9   A.        Yes.

10   Q.        That's why you went to the police?

11   A.        Yes.

12   Q.        But yet at the same day that you reported

13   it, you allowed your daughter to go to the Belles

14   practice that same night.  Is that right?

15   A.        She was already there when I found out, yes.

16   Q.        Okay.  Was there any discussion about

17   going -- picking up your daughter from this person

18   that you believed had some sort of relationship,

19   enough that you were going to go to the police, and

20   remove her from that situation?

21   A.        Yes.

22   Q.        And why didn't you do that?

23   A.        We were at the police station.

24   Q.        Before you went to the police, I mean.  You

25   had to make a decision to go to the police.  You felt
```

JAMES EDWARD NACE

1   that it was enough -- you had enough evidence or

2   something was amiss for you to go to the police,

3   right?

4   A.        Yes.

5   Q.        Why didn't you go pick up your daughter

6   first before you went to the police?

7   A.        Wasn't thinking clearly.  Wanted to do the

8   right thing.  Went directly to the police.

9   Q.        Then that occurred on the 26th and it's my

10  understanding that you spoke to your daughter that

11  evening after you picked her up from practice, you

12  confronted her in your home, right?

13  A.        Yes.

14  Q.        She initially denied it and then she

15  acknowledged that she was having an inappropriate

16  sexual relationship with Eric Romig?

17  A.        Yes.

18  Q.        And then that was Thursday.  The 27th is

19  Friday and the 28th is another Belles practice,

20  right?

21  A.        Yes.

22  Q.        And you allowed her to go to the Belles

23  practice, correct?

24  A.        Yes.

25  Q.        Why?

JAMES EDWARD NACE

1    A.        We wanted things to be as normal as

2    possible.

3    Q.        But did you believe that Eric Romig was a

4    sexual predator at that time?

5    A.        No.

6    Q.        But you believed he had done something

7    improper, you confronted your daughter on the 26th

8    and she acknowledged that she had been having sexual

9    relations with a married man, you know, twice her

10   age, right?

11   A.        Yes.

12   Q.        And you thought it was okay for her to go to

13   practice on the 28th?

14   A.        No.  I said absolutely not.  We argued about

15   it and we wanted to keep it as normal as possible and

16   my wife was not to leave the field during the

17   practice.

18   Q.        I think your daughter may have testified

19   that she had communication with Eric Romig and they

20   discussed the cell phone issue at that time.  Are you

21   aware of that -- the third cell phone?

22   A.        No.

23   Q.        Additionally, when did you learn that

24   Elizabeth's charm necklace in the shape of a heart

25   was given to her by Eric Romig?

JAMES EDWARD NACE

```
 1    A.        Didn't know anything about it.

 2    Q.        So it was never told to you by your wife or

 3    your daughter that was given to her by Eric?

 4    A.        No.

 5    Q.        It's my understanding that you knew Mr.

 6    Romig for at least two years before this incident

 7    occurred, right?

 8    A.        Approximately, yes.

 9    Q.        And you trusted him?

10    A.        Yes.

11    Q.        You had no reason to believe that there was

12    anything inappropriate going on between him and your

13    daughter?

14    A.        No.

15    Q.        Would you characterize him as a good guy

16    before this incident happened?

17    A.        Didn't know him that well.

18    Q.        Do you believe as you sit here today that

19    there's anything that you could have done or your

20    wife could have done differently that would have

21    prevented your daughter from developing an

22    inappropriate sexual relationship with Eric Romig?

23                        MR. GROTH:  Object to the form of

24    the question.  Calls for speculation.

25                        But you can answer.
```

Appendix1104

JAMES  EDWARD  NACE

```
 1    A.          No.

 2                      MR. RUSSELL:  I'm going to show you

 3    and we can mark this as --

 4                (Whereupon, J. Nace Exhibit 1, Letter, was

 5    marked for identification.)

 6    BY MR. RUSSELL:

 7    Q.          I'm showing you what's been marked as J.

 8    Nace 1.  I'd ask for you to read that quietly to

 9    yourself and then let me know when you're finished.

10    A.          Okay.

11    Q.          Is this your statement that you prepared?

12    A.          Yes.

13    Q.          This was prepared for the sentencing of Mr.

14    Romig?

15    A.          Yes.

16    Q.          In there you talked about -- and this is the

17    second paragraph, the third sentence in.  This is a

18    person that we, and a lot of people, I have known for

19    years, trusted with our children on a daily basis.

20                      Was it more than two years that you knew

21    him?

22    A.          No.

23    Q.          And then if you go down to the fourth

24    paragraph, it said, when we first became aware of

25    this on September 29th, 2013, I was in total shock.
```

JAMES EDWARD NACE

1    I think you testified that you actually became aware

2    of it on September 26th.  Is that right?

3    A.      Yes.

4    Q.      Are you aware of whether or not there had to

5    be any special accommodations made for Elizabeth when

6    she went off to Lycoming?

7    A.      No.

8    Q.      There were no special accommodations needed

9    for her?

10   A.      No.

11   Q.      And she is trying out for the girl's

12   softball team or she's on the team?

13   A.      She's on the team.

14   Q.      When does the season start or has it

15   started?

16   A.      They played one tournament this fall.  That

17   was it.  It's over.

18   Q.      And then they start up in the spring?

19   A.      Yes.

20           MR. RUSSELL:  That's all the

21   questions I have.

22           MS. CONNOR:  I just have a few

23   questions for you for clarification.

24                   * * *

25                   EXAMINATION

JAMES EDWARD NACE

```
 1    BY MS. CONNOR:

 2    Q.        When you went back to the police station on

 3    the 27th and you had Liz's phone with you, did you

 4    bring Liz with you, as well?  You said that she

 5    didn't go to school, I think, that day.

 6    A.        I don't -- no, I don't think so.

 7    Q.        So she didn't go with you to the police

 8    station?

 9    A.        No.

10    Q.        And on the 26th when you confronted her

11    concerning Romig, what was her demeanor during that

12    conversation?

13    A.        She was very quiet.  Didn't want to speak

14    too much.

15    Q.        What about your demeanor during that

16    conversation?

17    A.        Angry.  Scared.  Didn't know what to do.

18    Confused.

19    Q.        What about your wife, was she part of the

20    conversation?

21    A.        She was in the room, yes.

22    Q.        Okay.  Did she say anything during that

23    conversation?

24    A.        I don't recall.

25                     MS. CONNOR:  I don't have any other
```

Appendix1107

JAMES EDWARD NACE

71

```
 1    questions.  Thank you.

 2                         * * *

 3                    EXAMINATION

 4    BY MR. SANTARONE:

 5    Q.        Mr. Nace, you talked about the fall

 6    tournament in Lycoming.  Did your daughter play in

 7    that?

 8    A.        Yes.

 9    Q.        Did you go to that tournament?

10    A.        Yes.

11    Q.        And where did that take place?

12    A.        It was out around Altoona.

13    Q.        And was it something you had to stay

14    overnight a couple days?

15    A.        Yes.

16    Q.        You first -- you and your wife first

17    confronted your daughter on September 26th.  Is that

18    what you said?

19    A.        Yes.

20    Q.        And what day was it that she admitted that

21    she was involved in a physical relationship with Mr.

22    Romig?

23    A.        The same day.

24    Q.        That same day, the 26th?

25    A.        Yes.  Yes.
```

Appendix1108

JAMES EDWARD NACE

```
 1    Q.        And you went to the police what day?

 2    A.        The 26th.

 3    Q.        After -- before you spoke to your daughter?

 4    A.        Yes.

 5    Q.        And when she acknowledged this relationship,

 6    how long did that total meeting between you, your

 7    wife and your daughter last?

 8    A.        I don't recall.

 9    Q.        Was your daughter crying?

10    A.        Yes.

11    Q.        Was your daughter -- what was your

12    daughter's demeanor?  Was she angry because this

13    relationship was going to be broken up or did she

14    seem relieved that you found out about it?

15    A.        I'd say she was probably angry.

16    Q.        She was angry?

17    A.        (Witness nods head.)

18    Q.        Did she tell about her personal feelings for

19    Mr. Romig?

20    A.        Yes.

21    Q.        What did she say?

22    A.        She said she loved him.

23    Q.        And I was confused because you talked about

24    how many times then after that you spoke to your

25    daughter about the Romig relationship and I thought
```

JAMES EDWARD NACE

1   you said you spoke to her just that one time.

2   A.        Just the one time, yes.

3   Q.        That night we're talking about?

4   A.        Yes.

5   Q.        And after you -- what happened then after

6   that conversation came to an end, the three of spoke?

7   A.        In what regards?

8   Q.        Did she go into her room and lock herself in

9   her room or --

10  A.        I don't recall.

11  Q.        Okay.  Do you recall whether the three of

12  you spent the night in the same bed, you, your wife

13  and your daughter?

14  A.        Yes, we did.

15  Q.        How long did that last?  For how many

16  nights?

17  A.        If I remember correctly, maybe a week.

18  Q.        I thought you said she was angry at you,

19  though?

20  A.        No.  I said she was angry about the

21  situation.

22  Q.        She wasn't angry about you finding out about

23  the relationship and the fact that she wouldn't see

24  Mr. Romig any more?

25  A.        I don't know.

JAMES EDWARD NACE

1    Q.        You talked about the overnight trips with

2    the Belles and that Mr. Romig wasn't there.  These

3    overnight trips that you went on were after Mr. Romig

4    had been arrested?

5    A.        Yes.

6    Q.        And how many of those were there, do you

7    remember?

8    A.        I do not.

9    Q.        You went to -- did you ever -- when she was

10   younger before she got good, did you coach her ever?

11   A.        Yes.

12   Q.        And what years did you coach?

13   A.        Oh, wow.  I coached her on and off from

14   probably the time she was nine or ten to 16.

15   Q.        Okay.  And you obviously -- we talked about

16   these overnight trips you're going on, you went on

17   and you still went on and still going on.  Did you

18   miss any games after -- in her junior or senior year?

19   A.        Yes.

20   Q.        And how many games did you miss her junior,

21   senior year?

22   A.        Most of them.

23   Q.        But you went enough to know what her playing

24   time was because you said you saw a change in her

25   playing time.  So you did go to some games, correct?

JAMES EDWARD NACE

```
 1   A.          Yes.

 2   Q.          What difference did you see in her playing

 3   time?

 4   A.          She didn't play nearly as much.

 5   Q.          And how many games was it that you went to

 6   that you saw this pattern that you could say, oh,

 7   she's not playing as much as she used to?

 8   A.          I don't recall.

 9   Q.          How many games are in a season?

10   A.          I'm not even sure for school.  Twelve maybe,

11   14.  I don't know.

12   Q.          Okay.  Did you -- at the time that you saw

13   that her playing had decreased, who was the coach of

14   the team then?

15   A.          It was Coach Koehler.

16   Q.          Did you talk to Coach Koehler at all about

17   your daughter's playing time?

18   A.          No.

19   Q.          And how long did that decrease in the

20   playing time, how long did that last, that you saw?

21   A.          Both years.

22   Q.          Both her junior and her senior year?

23   A.          Yes.

24   Q.          There would be box scores of the games that

25   showed how much she played, right?
```

Appendix1112

JAMES EDWARD NACE

1    A.        Probably not with him.  He didn't give a lot

2    of box scores.

3    Q.        In a high school team, they didn't have

4    somebody who was keeping box, keeping score?

5    A.        The girls, I believe, kept score on the

6    team.

7    Q.        When you talked about a decrease in her

8    playing time, was she not starting or was she

9    starting and being taken out of the game?

10   A.        Both.

11   Q.        And she was a pitcher?

12   A.        Yes.

13   Q.        And a pitcher wouldn't start every game,

14   right?

15   A.        Yes, they do in softball.

16   Q.        They do in softball?

17   A.        Yes.

18   Q.        How many pitchers were on the team in her

19   junior year?

20   A.        I believe three, counting her.

21   Q.        Okay.  And in her sophomore year, was she

22   the primary pitcher?  Did she start most of her

23   games?

24   A.        Her sophomore year?

25   Q.        Her 10th grade year.

JAMES EDWARD NACE

1  A.        Yes.

2  Q.        And 11th grade that changed?

3  A.        Yes.

4  Q.        This scholarship that she has at Lycoming,

5  is that a full scholarship or do you and your wife

6  have to pay something or does Liz have to take out

7  loans?

8  A.        Yes, we have to pay loans.

9  Q.        How much is the difference above what her

10  scholarship is?  Do you know -- is the scholarship 75

11  percent of the ride?  Do you know that?

12  A.        I do not.

13  Q.        Do you know how much you pay every year?

14  A.        I do not.

15  Q.        You were asked a question about whether or

16  not -- do you know whether she's getting any

17  mental -- you were asked do you know whether she's

18  getting mental health treatment at Lycoming and you

19  said no.  Is that, no, she's not getting or, no, you

20  don't know?

21  A.        She's not getting any at Lycoming.

22  Q.        You were asked that same question about you

23  and your wife, you haven't had mental health

24  treatment as a result of what happened between your

25  daughter and Mr. Romig?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1    A.        No.

2    Q.        Has your wife had any mental health

3    treatment?

4    A.        Not that I'm aware of, no.

5    Q.        You said that after that first night, you

6    didn't speak -- you and Liz haven't talked about what

7    happened at all.  Have you and your wife talked about

8    what happened?

9    A.        Yes.

10   Q.        And other than when you went to the police

11   department or you met with your attorney, have you

12   talked about it other than that?

13   A.        Yes.

14   Q.        And what discussions have you had with your

15   wife?

16   A.        Well, just basically about what's going on

17   as far as how Liz is doing and how we're doing

18   together.

19   Q.        And what have you heard from any source

20   about -- from your wife or any other source about

21   what's a negative in how Liz is doing?  Anything?

22   A.        Now?

23   Q.        No.  From the time you've talked about it

24   since that first night until now.

25   A.        Well, I know she was losing weight for a

JAMES EDWARD NACE

```
 1    while.  She had a pretty bad skin condition.  Said

 2    she didn't like being left alone.  She was very

 3    clingy.  She was tired at times, not as energetic as

 4    she used to be.  She's a pretty energetic kid

 5    normally.

 6    Q.      And how long did that last that she didn't

 7    seem as energetic?

 8    A.      I think it's still that way.

 9    Q.      And how long was it that she said she was

10    clingy?

11    A.      Still that way.

12    Q.      Was there any discussion about her not going

13    away to college, to go into a local college and

14    living at home?

15    A.      No.

16    Q.      Why not?

17    A.      She didn't want to.

18    Q.      She wanted to go away to college?

19    A.      Yes.

20    Q.      The question -- you talked about the losing

21    weight and the skin condition.  They were both

22    conditions that existed before the start of her --

23    before the fall of 2013, correct?

24    A.      The weight loss I believe was.  I'm not sure

25    about the skin condition as far as time.
```

JAMES EDWARD NACE

1    Q.        And what did you know before the fall of

2    2013 about the weight loss?  What was the issue

3    there?

4    A.        Just that she was -- I found out later that

5    she was not eating properly.  I didn't really know

6    about it.  She's always been small.

7    Q.        Do you know -- do you know roughly what her

8    weight is?

9    A.        Now?  105.

10   Q.        And do you know whether she -- before the

11   relationship with Eric Romig, whether or not she had

12   sought any counseling regarding any eating disorders

13   or her weight loss?

14   A.        No.

15   Q.        Do you know whether after -- since the

16   incident with Eric Romig she sought any counseling or

17   treatment for weight loss or eating disorders?

18   A.        No.

19   Q.        No, you don't know or, no, she hasn't?

20   A.        I don't know.

21   Q.        But not to your knowledge?

22   A.        Not to my knowledge, no.

23             MR. SANTARONE:  That's all I have.

24   Thank you.

25                      * * *

JAMES EDWARD NACE

```
 1                    EXAMINATION
 2   BY MR. COX:
 3   Q.        Mr. Nace, my name is Rob Cox and I represent
 4   Pennridge School District and Tom Creeden and David
 5   Babb.  And I have just a few questions for you.  I'm
 6   going to try to not cover areas that you've already
 7   covered with the other attorneys here, but there may
 8   be some overlap.
 9                 I'm also going to ask you some questions
10   about what you know about the case.  And I just want
11   to remind you, I'm not asking you for information
12   about this case or the facts of this case that you've
13   heard from your attorney.  I just want to know about
14   information that you have independent of your
15   conversations with Mr. Groth and his colleagues.
16                 Can you tell me, please, what your
17   opinion of Eric Romig was as a coach prior to
18   September 26th when you learned about the
19   relationship?
20   A.        Seemed like a good coach.
21   Q.        And why do you say that?  What about him?
22   A.        He had knowledge of the game.  He did the
23   e-mailing very well as far as what was going on with
24   the players and practices.  And basically he had
25   knowledge of the game, it seemed.
```

JAMES EDWARD NACE

```
 1    Q.        How was he with -- when you say he was good

 2    about e-mailing, what do you mean by that?

 3    A.        Well, coaches send out e-mails as far as, I

 4    guess, schedules or whatever.

 5    Q.        So he kept you in the loop?

 6    A.        Yes.

 7    Q.        Basically.  All right.  What else

 8    contributed to your assessment of him as a good

 9    coach, if anything?

10    A.        That's probably about it.

11    Q.        Did you -- when did you interact with him?

12    Like what was the context of your interactions with

13    him typically when Liz was playing softball for the

14    Belles and for Pennridge?

15    A.        Typically I didn't have any interactions

16    with him.  I worked with him one time at a practice

17    that he had called that a couple kids came over for,

18    me and a couple of my buddies, because we all

19    coached.

20              And interacted, talked to him for maybe a

21    minute or two at the picnic that he had had for the

22    team and that was about it.

23    Q.        And was there anything unusual about those

24    interactions with him?

25    A.        No.
```

JAMES EDWARD NACE

83

1    Q.        What was your impression of him as a result

2    of those interactions?

3    A.        I don't know.  Didn't really have an

4    impression of him for that.

5    Q.        Did you perceive him as a threat or

6    dangerous in any way?

7    A.        No.

8    Q.        Did those interactions occur in Liz's 9th

9    and 10th grade years at Pennridge?  When did they

10   occur?  Is it fair to say they were during her 9th

11   and 10th grade years?

12   A.        Yes.

13   Q.        Do you have any reason to believe anyone at

14   Pennridge had knowledge of the relationship between

15   Romig and Liz prior to his arrest?

16   A.        No.

17   Q.        Do you have any knowledge about a

18   conversation between David Babb and Russell

19   Hollenbach about Mr. Romig?

20                   MR. GROTH:  Other than --

21   Q.        Again, other and what you've learned from

22   your attorneys.

23   A.        No.

24   Q.        Did anyone at Pennridge other than Mr. Romig

25   ever treat Liz inappropriately during her career

JAMES EDWARD NACE

1    there?

2    A.        No.

3    Q.        How about including after Mr. Romig's

4    arrest, did anyone ever treat her inappropriately at

5    Pennridge?

6    A.        No.

7    Q.        Are you aware that any other students

8    treated her inappropriately or bullied her while she

9    was at Pennridge?

10   A.        No.

11   Q.        How about members of the staff other than

12   Mr. Romig?

13   A.        No.

14   Q.        Did you have any interaction with Tom

15   Creeden while Liz was at Pennridge?

16   A.        No.

17   Q.        Do you know who he is?

18   A.        I believe he was the principal.

19   Q.        All right.  Do you have any reason to

20   believe that he acted inappropriately at any point

21   while Liz was at Pennridge?

22                   MR. GROTH:  Other than through

23   discussions with counsel.

24   A.        No.

25   Q.        Do you know who David Babb is?

JAMES EDWARD NACE

1    A.        Yes.

2    Q.        And how do you know him?

3    A.        I don't know him personally.  I know --

4    Q.        How do you know --

5    A.          -- he's athletic director.

6    Q.        I'm sorry I cut you off.  How do you know of

7    David Babb?

8    A.        I believe he's the athletic director.

9    Q.        To your knowledge, did he ever act

10   inappropriate in any way while Liz was at Pennridge?

11   A.        No.

12   Q.        And you mentioned Paul Koehler during your

13   testimony.  He was Liz's head coach when she was a

14   varsity player, correct?

15   A.        Correct, yes.

16   Q.        So that would have been her junior and

17   senior years?

18   A.        Yes.

19   Q.        All right.  And Romig was her head coach

20   while she was on the 9th and 10th grade teams, on the

21   JV teams.  Is that correct?

22   A.        Yes.

23   Q.        What was your impression of Paul Koehler as

24   a coach?

25   A.        Horrible.

JAMES EDWARD NACE

1   Q.        Why do you say that?

2   A.        Not a good coach and not a good man.

3   Q.        Why do you say he's not a good man?

4   A.        Didn't treat the girls with respect.

5   Q.        Can you expand on that?  In what way did he

6   not treat the kids with respect?

7   A.        Mainly his comments towards girls, what you

8   would say in front of the other players to a player.

9   Just not the way I coached a team.  Not --

10  Q.        What kinds of things would he say?

11  A.        Just little digs, constant, you know, berate

12  somebody for making an error.

13  Q.        So they were comments that related to their

14  performance?

15  A.        Yes.

16  Q.        Did he make sexually explicit or

17  inappropriate comments to the girls?

18  A.        No.

19  Q.        Why do you say he's a -- you said he was a

20  bad coach and a bad man, I think.

21            MR. RUSSELL:  Not a good man.

22  Q.        Not a good man.  Tell me how you reached

23  those assessments of him.

24  A.        Well, I've been around the game of softball

25  for about 38 years and that's just my opinion.

JAMES EDWARD NACE

1   Q.        I understand why you believe he wasn't a

2   good coach because of comments he made and the way he

3   criticized the performance of his players, right?

4   That was what you took issue with?

5   A.        Yes.

6   Q.        Why do you assess him as not a good man?

7   A.        Same reason.

8   Q.        Because of his -- the way he coaches?

9   A.        You don't treat kids like that.

10  Q.        Did you ever -- did you take issue with

11  anything that Mr. Koehler did specifically with Liz?

12  A.        No.

13  Q.        Was he ever inappropriate to her

14  specifically?

15  A.        No.

16                  MR. GROTH:   Inappropriate in a

17  critical way or --

18  Q.        In any way.

19  A.        No.

20  Q.        You mentioned that you noticed that she had

21  a decrease in her playing time in her junior year.

22  Did I understand that correctly?

23  A.        Yes.

24  Q.        Did that decrease in playing time occur

25  after she moved from junior varsity to the varsity

Appendix1124

JAMES EDWARD NACE

```
 1   team?

 2   A.        Yes.

 3   Q.        Was that in your view the reason that her

 4   playing time decreased or one of the reasons that her

 5   playing time decreased?

 6   A.        Yes.

 7   Q.        Did you interact with Pennridge -- with

 8   anyone at Pennridge after Mr. Romig's arrest?

 9   A.        No.

10   Q.        Did you speak to any of Liz's teachers?

11   A.        No.

12   Q.        How about her guidance counselors?

13   A.        No.

14   Q.        I think you already testified that you did

15   not speak to Principal Creeden.  Is that true, as

16   well?  After Romig's arrest, you didn't speak to

17   Creeden about the situation?

18   A.        Correct.

19   Q.        How about Babb?

20   A.        No.

21   Q.        Were there softball team banquets after

22   Liz's 9th -- was there a softball banquet after Liz's

23   9th grade season, do you recall?

24   A.        Yes, I believe so.

25   Q.        Did you attend that banquet?
```

JAMES EDWARD NACE

```
 1   A.        No.

 2   Q.        How about after her 10th grade season, was

 3   there a banquet?

 4   A.        Yes.

 5   Q.        Did you attend that banquet?

 6   A.        No.

 7   Q.        Mr. Russell, I think, asked you a question

 8   about whether sitting here now you think you should

 9   have done anything differently.  Do you remember that

10   question?

11   A.        Yes.

12   Q.        And you said no to that.

13             Sitting here now, what should Pennridge

14   or someone at Pennridge have done differently?

15                     MR. GROTH:  Object to the form

16   insofar as it asks for some legal opinion or

17   expertise.

18                     But, otherwise, you can answer.

19   A.        I don't know.

20   Q.        Do you have -- do you have any problem with

21   the way the Pennridge administration handled things

22   with Liz after Mr. Romig's arrest?

23   A.        No.

24                     MR. COX:  Mr. Nace, that's all I

25   have.  Thank you.
```

JAMES EDWARD NACE

1                    MR. KEMETHER:  Couple of quick

2     follow ups.

3                         * * *

4                      EXAMINATION

5     BY MR. KEMETHER:

6     Q.      I just want to make sure I'm clear.  You had

7     a lot of questions about the loss of playing time

8     junior, senior year.  Are you in any way attributing

9     this to the Eric Romig situation?

10    A.      No.

11    Q.      Have you or your wife spent any money out of

12    pocket relating to anything pertaining to the Eric

13    Romig situation, medical treatment, anything at all?

14    A.      I don't know.

15    Q.      During the summer of 2013, did you or your

16    wife check your daughter's cell phone on any basis at

17    all to see what sort of texts or e-mails were going

18    on?

19    A.      I did not, no.

20    Q.      Do you know if your wife did?

21    A.      I do not know.

22    Q.      And the last question I have.  Do you and

23    your wife live together?

24    A.      Yes.

25                    MR. KEMETHER:  Thank you very much.

JAMES EDWARD NACE

```
 1                       * * *

 2                   EXAMINATION

 3   BY MR. RUSSELL:

 4   Q.        I just have a couple, as well.  You

 5   indicated that Mr. Koehler was not a good coach and

 6   not a good man.  At least outwardly, was Mr. Romig a

 7   good coach and appeared to be a good man?

 8   A.        Yes.

 9   Q.        And back to the Belles issue.  Who's the

10   coach of the Belles at the time that you made the

11   report to -- other than Mr. Romig, who was the other

12   coach?  Who were the other coaches?

13   A.        There was two teams.

14   Q.        Two Belles teams?

15   A.        Yes.

16   Q.        And your daughter was on both teams?

17   A.        No.  Well -- well, no.

18   Q.        Was it like an A and a B team or something?

19   A.        Yes.

20   Q.        And was she -- which team was she on?

21   A.        The B team.

22   Q.        And then sometimes they would call her up as

23   a guest player or something on the A team?

24   A.        I don't think that happened.  I think they

25   did on occasion with some kids.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

1    Q.       Who else was on -- who was the other coach

2    of the B team, if there was one?

3    A.       I do not recall.

4    Q.       Do you know any of the people personally

5    that are on the Belles in the administration and

6    coaching?

7    A.       No.

8    Q.       And were any of the coaches from the Belles,

9    were they also coaches at Pennridge?

10   A.       Yes.

11   Q.       Which --

12   A.       On the gold team.

13   Q.       What was the nomenclature for the non-gold

14   team?  Was it the silver team?

15   A.       Possibly.

16   Q.       They have silver Belles and gold Belles, I

17   guess, maybe.  Would that be accurate?

18   A.       Yes.

19   Q.       But on the gold Belles, the coach of that,

20   was that Koehler?

21   A.       Yes.

22   Q.       So he was also the coach -- the varsity

23   coach at Pennridge?

24   A.       Yes.

25                    MR. RUSSELL:  I have no further

JAMES EDWARD NACE

1    questions.

2                         MS. CONNOR:  No.

3                         MR. SANTARONE:  No.

4                         MR. KEMETHER:  Thank you, sir.

5                    (Concluded at 2:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAMES EDWARD NACE

1

2

3

4 _____ OCT 22 2015 _____, 2015

5

6

7          I hereby certify that the evidence

8 and proceedings are contained fully and accurately in

9 the notes taken by me of the testimony of the within

10 witness who was duly sworn by me, and that this is a

11 correct transcript of the same.

12

13

14 _____

15

         Stacy D. Serba

16          Notary Public

17

18

    The foregoing certification does not apply to any

19 reproduction of the same by any means unless under

    the direct control and/or supervision of the

20 certifying reporter.

21

22

23

24

25

Honorable Judge:

I am writing you this statement, because my daughter is a victim of a sexual crime committed by her softball coach, Eric Roemig. It is difficult for me to even say his name with the hatred I have towards this man, for what he has done to our child. I never thought I could feel this way toward another human being.

It's hard for me to put into words how I am feeling, other than shocked, disgusted, sickened, deceived, and hatred. There aren't enough words to describe it. This is a person that we, and a lot of people I have known for years, trusted with our children on a daily basis to teach them the game, and to protect them on and off the field if necessary. He took that trust and used it to satisfy his perverted needs. He used that trust against our daughter, told her what she wanted to hear, so she would be comfortable around him, and then took full advantage of her.

My daughter and I have spent a lot of quality time together on a softball field for the past 10 years. It was " our thing " Now I am having a very difficult time even going to watch her play. Our friends have been very supportive, but I still feel uncomfortable around them knowing what this man did to her.

When we first became aware of this on Sept 29th, 2013 I was in total shock! Its something I never expected. He took something from our daughter that she can never get back. I pray every night that she can get past this, and live a somewhat normal life. She deserves that, she is a great kid!

We are aware that this is not the first time the defendant has acted in an inappropriate manner with children, and I can guarantee it won't be the last. People like him don't change, he's already proven that. When he gets released, it's only a matter of time that he strikes again. I am hoping you will give him the maximum sentence that the law will allow.

He is a true predator, He knew exactly what he was doing.

Thank You

Sincerely,

EXHIBIT

J. Nace 1

Appendix 113

JAMES EDWARD NACE

95

**A**

able 51:19
absolutely 53:19
  66:14
abuse 58:24
academic 46:21
  50:24 51:6,11
Academy 1:10 2:11
  2:16,20 3:4 34:3
  54:20,22 55:4,21
  56:4,24 57:5,11
  59:15,17 62:13,15
access 62:25
acclimating 43:7
accommodations
  69:5,8
accurate 46:1 50:23
  52:21 92:17
accurately 94:8
acknowledge 47:3
acknowledged 65:15
  66:8 72:5
Acme 44:9
act 85:9
acted 84:20
acting 12:5
activities 35:15 41:20
actual 57:9
addition 6:8
Additionally 50:17
  54:14 66:23
addressed 45:20
administration 89:21
  92:5
admitted 51:23,24
  71:20
adult 60:8
affair 21:20
afraid 38:3,6
afternoon 5:12 26:9
age 66:10
aid 54:14
allegations 12:4
  59:19
Allentown 1:22,24
allowed 64:13 65:22

Ally 63:19
Ally's 63:16,19
Altoona 71:12
Amanda 9:4,5
amiss 65:2
amount 46:19 51:21
and/or 94:19
angry 70:17 72:12,15
  72:16 73:18,20,22
Annette 57:22,24
  58:8 60:14
answer 5:25 6:13,19
  7:14,23 8:3 37:20
  40:16 47:13,23 48:6
  48:19,20 51:15 53:1
  53:7 59:11 60:2,11
  60:16,24 63:11
  67:25 89:18
answering 6:4 7:13
  30:18
anybody 13:9 34:3
apologize 51:8
APPEARANCES 2:1
  3:1
appeared 91:7
applied 51:23,25
  52:2
apply 52:8 94:18
appointments 49:13
  49:16
approximately 21:18
  32:3,21 67:8
approximation 7:1
April 1:3 3:6
areas 81:6
argued 66:14
arranged 31:17,20
arrangements 7:12
arrest 33:18 83:15
  84:4 88:8,16 89:22
arrested 14:22,23
  29:24 32:21 33:4,9
  62:4 74:4
Aside 43:19
asked 7:2 8:1 18:2
  20:14 21:3,13 22:1

22:10 33:14 77:15
  77:17,22 89:7
asking 31:1,3,12
  54:16,17 81:11
asks 52:25 55:9 89:16
assess 87:6
assessment 30:20
  82:8
assessments 86:23
assistance 31:19
associated 46:8 50:15
assume 23:15
assumed 6:1
assumes 48:12
athletic 85:5,8
attend 28:15 88:25
  89:5
attention 14:3
attorney 31:20 34:7
  55:15,18 56:1,2
  58:25 78:11 81:13
attorneys 49:2 81:7
  83:22
attribute 45:2
attributing 90:8
aware 10:15,23 11:1
  12:3 13:8 15:12,19
  25:14 29:23 30:6,10
  30:11 31:8,9 32:6
  32:10 33:14,17 34:8
  34:9,13 36:4 39:4
  39:18 40:4,13 41:20
  44:22 45:5 50:5,13
  51:10,17 59:6 62:3
  63:8 66:21 68:24
  69:1,4 78:4 84:7
awareness 24:14

**B**

B 91:18,21 92:2
Babb 1:8 2:8 81:5
  83:18 84:25 85:7
  88:19
back 8:5 18:25 25:21
  26:18 32:16,18 48:9
  56:14 70:2 91:9

background 7:18
bad 34:14 43:23 79:1
  86:20,20
Bagger 44:11
Bailiwick 2:14
bakery 44:11
Ballpark 37:9,14
banquet 88:22,25
  89:3,5
banquets 88:21
based 59:19
basically 20:12 35:3
  78:16 81:24 82:7
basis 68:19 90:16
basketball 56:10,10
bed 73:12
beginning 15:9 34:25
  35:2
behalf 33:24 34:8
  57:15 58:17
behavior 37:23 38:2
behavioral 10:17
  34:15
belief 55:6 59:14
believe 13:17 25:13
  25:25 26:17,25 28:1
  30:16 32:24 35:17
  36:6,22 37:1 39:2,2
  39:17 43:20 44:16
  54:20,24 56:10
  61:11,24 62:7 66:3
  67:11,18 76:5,20
  79:24 83:13 84:18
  84:20 85:8 87:1
  88:24
believed 64:18 66:6
Belles 13:18,19,25
  14:5 19:17 26:4
  28:13 29:2,22 35:21
  60:19 61:3,7,8,9,13
  62:9 64:13 65:19,22
  74:2 82:14 91:9,10
  91:14 92:5,8,16,16
  92:19
benefit 6:15
berate 86:11

Appendix1133

better 53:10,15,18,22
bill 17:10,12 18:6
  62:21
bills 18:8
birth 7:18
bit 7:17 9:9 38:3
  60:19
blame 62:13,14
box 75:24 76:2,4
boyfriend 38:23
boyfriends 39:18
break 7:10,14 44:13
bring 26:23 27:6 70:4
broken 72:13
Brooks 39:2
brought 5:15 25:4
  28:19
buddies 82:18
bullied 84:8
bus 56:9

**C**

call 31:10 62:17
  63:18 91:22
called 15:22 36:6
  82:17
calling 27:10
calls 18:5 60:22 67:24
Campus 2:14
career 46:21 47:9
  50:25 51:11 52:23
  53:5 83:25
CARLA 2:18
case 30:20 31:10
  38:19 46:3,6 47:1
  47:24 48:15 58:22
  81:10,12,12
CASSIDY 2:18
caused 54:11
cell 62:16 63:8 66:20
  66:21 90:16
Center 1:23
certain 40:25 46:19
  54:15,17
Certainly 47:2
certification 94:18

certify 94:7
certifying 94:20
change 34:23 35:15
  42:15 74:24
changed 35:6 77:2
characterization
  54:2
characterize 67:15
charm 66:24
check 90:16
child 58:4
children 9:1 58:4,9
  68:19
chose 41:22
Christian 1:10 2:11
  2:16,20 3:4 34:3
  54:20,22 55:4,21
  56:3,23 57:5,11
  59:14,16 62:13,15
civil 1:2 46:5,7,11
claim 50:15 54:10
claimed 48:25 49:6
clarification 69:23
clarify 23:14
class 37:6,13
clear 24:20 90:6
clearly 65:7
clients 47:24 59:21
clingier 38:3
clingy 79:3,10
Club 36:6,11
clubs 35:25 36:13
  44:21
Clymer 1:10 2:12,16
  2:20 3:5 5:13
coach 11:3 12:21
  13:25 14:11 59:16
  61:24 62:5,6 74:10
  74:12 75:13,15,16
  81:17,20 82:9 85:13
  85:19,24 86:2,20
  87:2 91:5,7,10,12
  92:1,19,22,23
coached 74:13 82:19
  86:9
coaches 82:3 87:8

  91:12 92:8,9
coaching 11:5 13:22
  14:5,18 61:3 92:6
**COLEMAN** 3:2
colleagues 81:15
college 39:25 40:24
  41:1 42:9,22,25
  43:17,22 44:2,6,17
  44:22 51:20 53:3
  79:13,13,18
colleges 41:7 51:24
  51:25 52:8
come 14:3 37:2 44:14
comes 59:25
comfortable 7:5 9:10
coming 44:16
commencing 1:20
comments 86:7,13,17
  87:2
**Commerce** 1:23
communicate 6:5
communicated 47:19
communication
  58:23 66:19
**Company** 8:10
compensated 47:17
complaint 57:15
  58:17 59:2,19,22
  60:5
completed 46:4
concerning 70:11
**Concluded** 93:5
condition 79:1,21,25
conditions 79:22
conduct 10:2
confirm 63:19
confronted 65:12
  66:7 70:10 71:17
confused 70:18 72:23
**Congratulations** 8:25
**CONNOR** 2:18,18
  4:8 69:22 70:1,25
  93:2
consider 58:23
consistent 54:2
constant 86:11

contact 33:19
contacted 34:2
contained 94:8
content 57:8
context 13:24 82:12
continue 35:22 36:18
  38:10
continued 3:1 35:18
  53:10
contributed 82:8
control 94:19
conversation 16:8,13
  17:24 18:14,15
  22:18 23:4,8 55:17
  70:12,16,20,23 73:6
  83:18
conversations 18:18
  25:19 55:10 57:13
  81:15
**Corporate** 1:23
correct 53:11 54:12
  64:4 65:23 74:25
  79:23 85:14,15,21
  88:18 94:11
correctly 73:17 87:22
counsel 5:2 7:11 48:3
  55:10,12 57:13 58:2
  59:20,24 84:23
counseling 80:12,16
counselor 49:9,25
counselors 31:4
  88:12
counting 76:20
**Countiss** 39:2
**County** 58:14
couple 51:4 71:14
  82:17,18 90:1 91:4
court 1:1,22 2:6 5:24
  6:9,14 33:7 40:12
courtesy 6:14
courthouse 5:21
cover 45:20 81:6
covered 81:7
covers 63:13
**Cox** 2:5 4:10 81:2,3
  89:24

Appendix1134

JAMES EDWARD NACE

97

**Creeden** 1:7 2:7 81:4
  84:15 88:15,17
**criminal** 42:14 46:3,6
**critical** 87:17
**criticized** 87:3
**crying** 15:22 72:9
**curious** 46:4,18
**cut** 85:6

### D

**D** 1:20 4:1 94:15
**daily** 68:19
**damages** 48:25 49:4
  49:6
**dangerous** 83:6
**date** 7:18 15:1 39:6
**dated** 40:4
**dating** 39:12,14
**daughter** 5:15 9:10
  10:1 12:6,9 14:5,8
  14:25 15:14 16:10
  16:16,25 17:8 19:1
  19:4,21 20:1 22:19
  22:22,25 23:6,11
  24:6,16 25:16,20
  27:12,15 28:15,21
  29:1,7,15,23 30:3
  31:17 32:7 33:15,16
  35:24 39:5 40:23
  42:6,8 45:3,22
  46:24 47:16 49:18
  56:19 57:1,16 58:10
  58:18 63:6,7 64:8
  64:13,17 65:5,10
  66:7,18 67:3,13,21
  71:6,17 72:3,7,9,11
  72:25 73:13 77:25
  91:16
**daughter's** 14:15
  18:10 34:11 37:16
  45:21 46:15 49:22
  49:24 51:11 72:12
  75:17 90:16
**David** 1:8 2:2,8 81:4
  83:18 84:25 85:7
**Davis** 1:18 2:13

**day** 15:20 17:2 18:22
  19:18 23:10 24:13
  25:11,24 26:4,6,12
  26:16 27:4,25 28:13
  29:17 34:2,11 64:12
  70:5 71:20,23,24
  72:1
**days** 71:14
**day-to-day** 6:5
**deal** 13:1,24
**dealings** 14:14
**December** 9:6 30:21
**decided** 29:9
**decision** 64:25
**declared** 42:21,23
**decrease** 75:19 76:7
  87:21,24
**decreased** 75:13 88:4
  88:5
**Deep** 12:13,14
**defendants** 1:11
  45:15 54:20
**definition** 31:23
**degree** 62:13
**demeanor** 70:11,15
  72:12
**denied** 65:14
**DENNEHEY** 3:2
**department** 16:14
  17:19 78:11
**deposition** 1:14 5:5
  5:16 9:8 45:16,22
  49:19,24 52:2,5
  58:22
**depositions** 49:21
**DESCRIPTION** 4:14
**detail** 11:4
**details** 9:8 32:12
**detective** 58:15
**detectives** 32:24
  59:25
**developing** 67:21
**difference** 37:22 75:2
  77:9
**different** 30:13,14
  40:19

**differently** 67:20
  89:9,14
**digs** 86:11
**direct** 94:19
**directly** 65:8
**director** 85:5,8
**disclosed** 57:11
**discoverable** 48:1
**discovered** 48:4
**discovery** 48:5
**discuss** 24:4
**discussed** 60:1 66:20
**discussion** 20:9 64:16
  79:12
**discussions** 47:23,25
  48:3,14 78:14 84:23
**disorders** 80:12,17
**distance** 6:23
**distinction** 31:13,21
**distress** 54:11
**District** 1:1,1,7 2:7
  81:4
**DIVISION** 1:2
**doctor** 42:11
**doctors** 31:2 50:5,6
**document** 46:8
**doing** 15:8 34:14
  41:22 78:17,17,21
**dollars** 47:21
**Doylestown** 1:19 2:6
  2:15
**Dr** 1:7 2:7
**Drake** 1:18 2:13
**dropped** 19:23 34:25
**drove** 17:19
**due** 30:21
**duly** 5:8 94:10

### E

**E** 2:18 4:1
**Early** 19:20
**easier** 5:19 11:11
**East** 2:6,10,19
**EASTBURN** 2:5
**EASTERN** 1:1
**eating** 80:5,12,17

**education** 8:13,14
  9:13
**EDWARD** 1:14 4:5
  5:7
**effect** 21:23
**either** 9:21 10:16
  12:5 13:9 54:12
  55:24
**Elizabeth** 9:4 61:1
  62:17 63:6,14 69:5
**Elizabeth's** 9:7 66:24
**Emily** 57:18,19,21
  58:3,13 60:4,14
**emotional** 10:18
  34:15 54:11
**ended** 46:21,22 61:3
**energetic** 79:3,4,7
**engaged** 55:19
**entered** 20:11
**entities** 54:15
**Eric** 1:7 10:2,24
  12:16,20 13:8,21
  14:4,11,14 15:13,20
  16:10,25 20:7 22:23
  24:17 25:16,20
  27:13,19 28:17,23
  29:15,18,24 32:8,16
  34:3,12,20 40:11,20
  40:22 41:18,23 42:1
  42:10,16 54:21 58:5
  58:10 59:15,16
  62:18 63:6,14 64:7
  65:16 66:3,19,25
  67:3,22 80:11,16
  81:17 90:9,12
**error** 86:12
**ERSA** 1:22
**ESQ** 2:2,5,10,14,18
  3:3
**essentially** 5:20
**estimate** 6:25,25 7:6
**evaluate** 31:11
**evaluation** 30:19
**evening** 19:20 22:19
  22:22 23:1,11 26:9
  65:11

JAMES EDWARD NACE

evidence 48:13 65:1 94:7
exact 7:1,4
exactly 21:17 40:6
Examination 4:6,7,8 4:9,10,11,12 5:10 45:12 69:25 71:3 81:1 90:4 91:2
examined 5:8
excess 47:20
excuse 43:21
Exhibit 68:4
EXHIBITS 4:13
existed 79:22
existence 11:2
expand 86:5
expectation 47:20
expectations 48:16
experience 34:13 37:16 43:4 45:23
experiences 40:13 43:23,23
expert 30:19,23 31:10
expertise 47:12 60:10 60:23 89:17
explained 18:4
explicit 86:16
exposure 47:2,3,4
express 38:5 40:18
expressed 42:17 43:21,22
extent 59:23 62:12
extracurricular 35:15
e-mailing 81:23 82:2
e-mails 16:25 24:2,5 24:18,23 25:9,15 27:12,17 82:3 90:17
E.M 57:17
E.N 1:4

**F**

fact 29:3 48:12 51:19 53:9 73:23
facts 81:12

fair 6:1 34:18 49:5 83:10
fairly 43:7
Faith 1:10 2:11,16,20 3:4 34:3 45:15 54:19,22 55:3,20 56:3,23 57:5,11 59:14,16 62:13,15
fall 11:18 35:3 69:16 71:5 79:23 80:1
family 5:14 33:25
far 7:2 38:1,2 43:22 52:13 78:17 79:25 81:23 82:3
father 57:21 58:14
feelings 72:18
feet 7:6
felt 64:7,25
field 42:9,16 66:16
figure 7:2,4,4 45:17
file 46:5,10,19,19
filed 9:25 10:1 46:25 47:2,5,7 57:15 58:17
filing 47:15
find 30:23
finding 73:22
fine 9:12
finish 6:12
finished 47:8 50:25 68:9
first 10:23 15:12 16:9 21:1 22:5 42:22 61:9 65:6 68:24 71:16,16 78:5,24
five 7:6 37:15 51:2
follow 21:22 22:6 45:10 90:2
follows 5:8
foregoing 94:18
forget 41:14
form 5:3 37:19 40:15 47:22 51:4,5,13 52:24 53:6 55:9 59:9 60:9 63:9 67:23 89:15

formal 8:13,14
former 58:14
forth 49:8
forward 9:14
found 24:23 63:5 64:15 72:14 80:4
four 9:15 33:2 41:10 52:1
fourth 68:23
frame 10:8
free 60:2
freshman 10:14 11:6 11:8 37:18 42:22 50:20
Fretz 59:2,4,4,6
Friday 1:19 25:23 65:19
friend 20:12 63:16
friends 38:8,11,14,15 39:16 43:8
front 86:8
full 40:2 44:23 77:5
fully 94:8
further 92:25

**G**

gain 49:5
game 56:11 76:9,13 81:22,25 86:24
games 74:18,20,25 75:5,9,24 76:23
getting 42:17 77:16 77:18,19,21
Girl 36:14,14
girls 55:3 76:5 86:4,7 86:17
girl's 69:11
give 5:18,23 6:13,24 26:20 31:18 76:1
given 25:16 58:21 66:25 67:3
gives 55:6
giving 25:8 27:11,16
go 9:14 16:6 18:24 20:2 25:24 26:18 29:3,8,9,11 31:17

39:11 40:19,24 41:7 41:16 49:12,15,25 50:1 52:7 53:14 61:12 62:23 64:13 64:19,25 65:2,5,22 66:12 68:23 70:5,7 71:9 73:8 74:25 79:13,18
GOGGIN 3:2
going 7:22 9:13 16:6 16:9 18:4 20:12,15 20:23 21:3 29:2 30:18 31:11 39:8 41:1 43:4 44:13,14 44:23 46:7,8 52:6 55:8 56:10 63:19 64:7,17,19 67:12 68:2 72:13 74:16,17 78:16 79:12 81:6,9 81:23 90:17
gold 92:12,16,19
good 5:12 26:20 67:15 74:10 81:20 82:1,8 86:2,2,3,21 86:22 87:2,6 91:5,6 91:7,7
gotten 17:8 27:2,3 54:7
grade 8:16 11:9,15 11:21 12:3,9,22 13:7,12,13 14:6,9 14:12,15,18 15:9 37:6,25 38:24,24 39:19 40:14 41:6 76:25 77:2 83:9,11 85:20 88:23 89:2
grades 34:23 35:10 37:3
graduate 8:17 10:12
graduated 15:5 37:6 47:8
GRAY 2:5
great 7:7
Greene 8:10
GRIMES 2:9
Groth 2:2 7:22 11:7

11:11 16:21 30:17
30:24 31:3 37:19
40:15 47:10,19,22
48:11 50:7 51:3,13
52:24 53:6 55:8
57:12 59:9,18 60:9
60:15,22 62:5 63:9
67:23 81:15 83:20
84:22 87:16 89:15
**group** 23:8
**groups** 35:25
**Guardians** 1:4
**guess** 6:21,25 39:12
82:4 92:17
**guest** 91:23
**guidance** 88:12
**guy** 67:15

## H

**Half** 18:20
**hand** 23:22
**handled** 89:21
**hanging** 38:17
**happen** 55:7
**happened** 14:18
16:12 27:21 45:3
53:23 56:6,9,12,19
56:22 59:7 67:16
73:5 77:24 78:7,8
91:24
**head** 6:6 27:20 32:5
72:17 85:13,19
**health** 30:4,7 31:18
32:2 44:1 45:1
77:18,23 78:2
**hear** 58:25
**heard** 21:11 55:14
56:1 78:19 81:13
**hearings** 33:8
**heart** 66:24
**help** 31:20 64:2
**high** 8:16 9:14,14,22
10:8,12,14,20 11:3
33:19 34:13,19,22
35:19 36:16 37:17
40:7,19 47:8 53:2

76:3
**highest** 8:14
**Hileman** 1:18 2:13
**Hold** 30:17
**Hollenbach** 1:10 2:12
2:17,21 3:5 5:14
83:19
**home** 15:21 18:25
19:4,4 20:1,5 22:25
26:1 43:13 44:14,16
65:12 79:14
**Honor** 36:22,25
**hope** 45:19 47:16
**hopeful** 64:2
**hopefully** 45:18
**HORNSTINE** 2:1,1
**Horrible** 85:25
**hotel** 61:13,21
**hour** 18:20
**house** 20:11 57:2,6
63:15,16
**huh-uh** 6:7
**hundred** 15:23

## I

**idea** 26:20 27:5 46:10
46:11,12,13,14
**identification** 68:5
**III** 1:23
**impact** 50:24 51:6
52:22 53:4
**impacted** 51:11,17,18
**important** 6:15
**impression** 83:1,4
85:23
**improper** 10:1 12:5
66:7
**inappropriate** 18:3
57:10 59:7 65:15
67:12,22 85:10
86:17 87:13,16
**inappropriately**
56:13 83:25 84:4,8
84:20
**inartfully** 51:8
**incident** 35:4,11,12

50:24 51:10 52:22
53:4 67:6,16 80:16
**including** 7:11 18:15
84:3
**independent** 81:14
**indicated** 59:7 91:5
**indication** 50:11 61:6
63:4
**information** 30:23
45:20 55:11,12,17
55:24,25 56:6,18,22
57:4,8 59:24 81:11
81:14
**initially** 65:14
**initials** 57:17
**inside** 23:21
**insisted** 50:1
**insofar** 47:11 55:9
59:18 60:10 89:16
**instance** 6:6 7:2
**instruct** 7:23 47:23
**instructed** 8:2
**instructions** 5:18
**interact** 82:11 88:7
**interacted** 82:20
**interaction** 58:5,10
84:14
**interactions** 12:20
14:1 82:12,15,24
83:2,8
**intercourse** 55:2,20
**interest** 41:21 42:17
**intrigued** 60:18
**investigation** 59:20
59:21
**involved** 12:10,16
13:22 15:14 23:3
35:24 36:14 42:17
71:21
**involving** 6:17,22
13:9,9 20:10 33:15
40:11
**issue** 66:20 80:2 87:4
87:10 91:9
**issues** 9:19 10:1,4
11:25

## J

**J** 2:2,14 3:3 4:15 68:4
68:7
**JAMES** 1:3,14 4:5
5:7
**Jersey** 52:16
**job** 8:5 26:14 44:4,13
48:24 49:2
**Jonathan** 2:14 45:14
**JOSEPH** 3:3
**Josh** 39:24 40:5,9
**Josh's** 40:2
**judge** 5:22
**junior** 9:21,22 10:5,6
10:6 13:12 15:2
36:18 37:16,23
50:19 53:10,15
61:10 62:2 74:18,20
75:22 76:19 85:16
87:21,25 90:8
**jury** 5:22
**justice** 42:14
**JV** 85:21

## K

**keep** 66:15
**keeping** 76:4,4
**KELLY** 2:9
**Kemether** 2:10 4:6
4:11 5:11,13 7:24
8:4 11:10,13,14
16:23 30:22 31:7
45:7 90:1,5,25 93:4
**Kennedy** 58:19,19,21
**kept** 76:5 82:5
**Kevin** 57:21,22,23
58:8 60:13
**Key** 36:6,10
**kid** 79:4
**kids** 82:17 86:6 87:9
91:25
**kind** 32:2 35:25 49:4
**kinds** 86:10
**knew** 51:1,1 67:5
68:20
**know** 5:17 6:19 7:11

9:8 11:23 15:2,3,4
16:19,21,22 17:4,6
17:11,22 19:6,21
24:8 25:11 26:10
28:10,12 29:13,20
29:21 30:15 31:24
32:1,12,15,20 33:22
33:24 34:5,6 36:8
36:10,23,24 37:6,21
38:5,23 39:1,7,10
39:16,23 40:2 41:9
41:11 42:3,4,5,21
42:22 43:8 44:1
46:7,23 47:5,7,14
55:5 57:3 58:8,13
60:4,8,13,20 63:2
63:18,22 66:9 67:1
67:17 68:9 70:17
73:25 74:23 75:11
77:10,11,13,16,17
77:20 78:25 80:1,5
80:7,7,10,15,19,20
81:10,13 83:3 84:17
84:25 85:2,3,3,4,6
86:11 89:19 90:14
90:20,21 92:4
**knowing** 46:3,5,18
**knowledge** 10:4 11:5
12:16 13:21 15:17
19:12 24:21 48:21
55:19 56:8 80:21,22
81:22,25 83:14,17
85:9
**known** 68:18
**Koehler** 75:15,16
85:12,23 87:11 91:5
92:20
**Kristen** 58:18,19,21
**Kutztown** 41:13

**L**

**Lauren** 59:2,3,4,6
**law** 1:2,17
**lawsuit** 9:20,25 31:6
46:5,7,11,19,20,25
47:1,16 54:9

**lawyer** 42:11
**lawyers** 45:9
**lawyer's** 5:23
**learn** 32:23 66:23
**learned** 17:6 34:11
35:12 40:19 42:10
42:15 55:18 81:18
83:21
**learning** 40:22
**leave** 66:16
**led** 59:22
**left** 18:21 79:2
**legal** 47:11 54:16
60:10,23,23 89:16
**legally** 60:7
**Letter** 4:16 68:4
**Let's** 53:14
**level** 8:14
**life** 6:5 51:6
**light** 34:20 45:19
**line** 62:23
**listening** 45:22
**litigation** 5:14 31:12
**little** 7:17 9:9 31:22
60:19 86:11
**live** 90:23
**living** 8:7 79:14
**Liz** 9:12 10:16 13:9
20:6 30:20 63:25
70:4 77:6 78:6,17
78:21 82:13 83:15
83:25 84:15,21
85:10 87:11 89:22
**Liz's** 9:13 10:8 13:7
70:3 83:8 85:13
88:10,22,22
**loans** 77:7,8
**local** 47:1 79:13
**lock** 73:8
**long** 8:11,23 18:18
28:2 35:5 40:4 72:6
73:15 75:19,20 79:6
79:9
**longer** 22:18
**look** 23:20,23 24:1
25:8 27:9 50:18

62:23
**looked** 17:9 23:21
24:15,22 25:2,14
41:13
**looking** 25:15 40:24
41:6 50:17
**loop** 82:5
**losing** 78:25 79:20
**loss** 79:24 80:2,13,17
90:7
**lot** 68:18 76:1 90:7
**loved** 72:22
**Lycoming** 41:12
51:20 69:6 71:6
77:4,18,21
**L.F** 59:3

**M**

**M** 2:5
**machinist** 8:8,9
**major** 42:21,23
**making** 31:14 86:12
**man** 66:9 86:2,3,20
86:21,22 87:6 91:6
91:7
**mark** 68:3
**marked** 68:5,7
**Market** 3:3
**Markets** 44:9
**marking** 35:8
**married** 8:21,23 66:9
**MARSHALL** 3:2
**Massachusetts** 52:17
**materials** 18:21
**math** 15:8
**matter** 24:18
**mattered** 46:23
**Mayer** 57:18,19 58:3
60:4,14
**Mayer's** 57:21 58:14
**mean** 20:19 23:7
52:15 64:24 82:2
**meaning** 60:7
**means** 94:19
**meant** 56:15
**measure** 7:4

**measurements** 6:22
**Media** 2:11
**medical** 50:5,6 90:13
**medication** 50:12
**medications** 50:14
**meet** 11:20 13:2
27:24 39:25
**meeting** 27:21 28:2
72:6
**meetings** 11:25
**member** 44:17,21
**members** 84:11
**memorialized** 46:9
**mental** 30:4,7 31:18
32:2 44:1 45:1
77:17,18,23 78:2
**mentioned** 16:24
85:12 87:20
**mentions** 58:18 59:2
**messages** 57:9
**met** 27:25 40:9 43:11
78:11
**middle** 7:13 60:6
**million** 47:20
**minor** 1:4 57:16
58:18
**minute** 82:21
**misleading** 48:18
**missed** 50:18,19
**mom** 63:19
**moment** 23:7 45:8
**monetarily** 47:17
**monetary** 47:20
**monetize** 49:1
**money** 90:11
**Montgomery** 58:14
**months** 43:1
**Morning** 26:9
**mother** 57:22
**moved** 87:25
**moving** 43:19

**N**

**N** 4:1
**Nace** 1:3,3,14 3:6 4:5
4:15 5:7 45:14 68:4

JAMES EDWARD NACE

68:8 71:5 81:3
89:24
naked 62:17
name 5:12 9:11 10:24
13:15 39:1,3,23
40:2 41:14 45:14,24
46:5 57:18 81:3
names 9:3 30:15 39:1
41:11
National 36:22,24
nature 27:16 57:10
nearly 75:4
necklace 66:24
need 7:3,10 20:13
needed 69:8
negative 34:14 40:13
43:23 78:21
never 58:3,9 60:20,20
67:2
new 17:8 27:2,3 43:8
52:16
night 20:5 24:6,25
25:3 63:14,15 64:14
73:3,12 78:5,24
nights 73:16
nine 74:14
nods 32:5 72:17
nomenclature 92:13
non-gold 92:13
normal 66:1,15
normally 79:5
Notary 1:20 94:16
notes 50:5 94:9
notice 37:22
noticed 87:20
number 7:21 8:2
17:10,12 18:8
numbers 7:8 62:24
numerous 18:4

**O**

oath 5:20,21
object 7:22 30:18
37:19 40:15 47:10
47:22 48:11 51:3,5
51:13 52:24 53:6

55:8 59:9,18 60:9
63:9 67:23 89:15
objection 60:15,22
objections 5:3
obtained 57:11
obvious 6:4
obviously 28:11
74:15
occasion 91:25
occasions 13:5 39:12
occur 83:8,10 87:24
occurred 10:4 55:3
55:24 56:2 65:9
67:7
October 1:19 14:24
15:10 29:24 32:6
33:18 41:25
oddly 64:7
office 2:14 5:23
officer 18:2
offices 1:17
oh 74:13 75:6
okay 6:3 7:9,15,16
9:7 10:11 11:13,20
14:25 15:3 30:22
31:23 37:13 52:19
63:20 64:16 66:12
68:10 70:22 73:11
74:15 75:12 76:21
old 9:5 26:25 27:1,6
27:10
once 5:25 11:24
21:11 26:19 40:10
ones 30:13,14 36:4,21
37:17
opinion 53:19 54:16
60:23 81:17 86:25
89:16
opportunities 45:16
opposed 31:19
order 49:4
organs 56:16
originally 41:16
outside 36:1 59:24
outwardly 91:6
overall 33:1 37:18

38:2
overlap 81:8
overnight 61:12,19
62:3 71:14 74:1,3
74:16
owned 62:18

**P**

PA 1:24 2:3,6,11,15
2:19 3:4
page 4:3,14 11:8
paid 62:21
papers 47:1
paragraph 68:17,24
parents 52:7 60:14
park 39:11
part 36:5,10 48:24
60:5 70:19
participate 13:13
participation 35:14
particular 41:3 61:21
parties 5:2
pattern 75:6
Paul 85:12,23
pay 77:6,8,13
PELLONI 2:1
Pennridge 1:7 2:7
9:18 10:16 14:9,19
33:19 35:18 46:22
47:9 61:4 81:4
82:14 83:9,14,24
84:5,9,15,21 85:10
88:7,8 89:13,14,21
92:9,23
Pennsylvania 1:1,19
people 6:5 31:16,19
54:17 68:18 92:4
perceive 83:5
percent 77:11
performance 86:14
87:3
period 35:5,8 36:2
39:13
Perkasie 16:15
Perkiomen 8:20
person 10:23 17:17

17:18 27:25 48:15
64:17 68:18
personal 53:15 72:18
personally 53:10
85:3 92:4
pertaining 10:1 20:6
28:22 29:15 90:12
Philadelphia 2:3 3:4
phone 17:9,17 18:5
18:10 23:10,15,21
24:5,8,10,16,22
25:8,8,15 26:19,24
26:25 27:1,2,3,6,10
27:10 32:7,13 62:16
62:21 63:8 66:20,21
70:3 90:16
phones 27:16
phrased 51:8
physical 71:21
pick 65:5
picked 65:11
picking 64:17
picnic 82:21
pictures 56:15,20
62:17
PIETRANGELO 2:9
pitcher 76:11,13,22
pitchers 76:18
PITCHFORD 2:18
place 71:11
placed 32:16
Plaintiffs 1:5 2:4
plan 42:8
planned 26:18
plans 40:24
play 14:8 35:21,22
71:6 75:4
played 69:16 75:25
player 85:14 86:8
91:23
players 81:24 86:8
87:3
playing 53:20 74:23
74:25 75:2,7,13,17
75:20 76:8 82:13
87:21,24 88:4,5

JAMES EDWARD NACE

90:7
**Plaza** 1:23
**please** 55:16 81:16
**pocket** 90:12
**point** 37:2 53:4 59:21
  84:20
**police** 16:6,14,17
  17:14,19,25 18:14
  18:22,24 19:1,24
  20:6 24:11 25:5,7
  25:17,21 26:7,18,21
  26:24 27:7,11,16,22
  28:3 32:25 33:6,8
  58:3,9 64:3,10,19
  64:23,24,25 65:2,6
  65:8 70:2,7 72:1
  78:10
**porch** 32:16,18
**portion** 48:10
**posited** 62:15
**positive** 35:7 37:15
  37:17
**possible** 48:17 66:2
  66:15
**possibly** 30:12 33:10
  43:16 92:15
**practice** 19:9,10,13
  19:15,19,22 20:2
  26:3 28:13,19 29:2
  29:12 64:14 65:11
  65:19,23 66:13,17
  82:16
**practices** 29:23 81:24
**predator** 66:4
**preparation** 59:22
**prepared** 68:11,13
**prescribed** 50:12,13
**prescription** 50:12
  50:14
**PRESENT** 3:6
**press** 46:25 47:2
**pretty** 44:23 79:1,4
**prevented** 67:21
**previously** 49:18
**pre-trial** 48:5
**primary** 76:22

**principal** 84:18 88:15
**prior** 30:2 32:6 33:18
  34:10 40:22 81:17
  83:15
**privileged** 55:11
**probably** 7:5 72:15
  74:14 76:1 82:10
**problem** 89:20
**problems** 10:15,17
  10:17,18 34:15,16
**proceedings** 94:8
**process** 5:17,19
**Professional** 1:22
**professionals** 31:5
**program** 12:17
**programs** 44:22
**prom** 39:6,8
**properly** 80:5
**protected** 46:6
**protective** 58:4
**provided** 50:4,11
**provider** 30:4 32:2
**providers** 30:7
**psychiatrist** 30:3,7
**psychologist** 30:3,7
**public** 1:20 45:25
  94:16
**pulling** 7:7
**purposes** 31:11
**put** 6:18 7:24 47:2,4
  49:7 62:12,14
**P.C** 2:5,9
**p.m** 1:20 93:5

**Q**
**qualify** 53:3
**question** 5:3,25 6:1,4
  6:12,20 7:13,14 8:1
  9:23 10:21 20:25
  21:5,14 22:2,12
  27:9 47:11 48:6,8
  48:12,18 51:5,14
  53:12 55:9,16 59:10
  63:10 67:24 77:15
  77:22 79:20 89:7,10
  90:22

**questions** 6:17,22,24
  30:19 45:8,17 49:4
  51:4 69:21,23 71:1
  81:5,9 90:7 93:1
**quick** 90:1
**quiet** 70:13
**quietly** 68:8

**R**
**range** 7:1
**ranges** 48:17
**reach** 62:8
**reached** 86:22
**read** 48:9 52:1 68:8
**reading** 5:4 50:2
**really** 14:2 18:20
  22:24 31:15 36:9
  47:4 60:18 80:5
  83:3
**reason** 6:14 7:11 17:9
  30:4 37:3 52:15
  67:11 83:13 84:19
  87:7 88:3
**reasonable** 49:5
**reasons** 88:4
**recall** 10:25 16:1,8
  17:24 18:9,12,13,19
  18:20,21 20:9 21:17
  21:18 22:17,20,21
  24:13 26:8,11 27:5
  27:23 28:4,24 33:1
  36:12 37:11 39:15
  53:16,17 54:1 61:17
  70:24 72:8 73:10,11
  75:8 88:23 92:3
**receiving** 44:1
**record** 7:20,25 8:5
  33:11,14 48:10
**records** 50:18
**refer** 9:10
**referred-to** 48:10
**regard** 30:10 51:5
**regarding** 30:19
  80:12
**regards** 73:7
**related** 53:2 86:13

**relating** 5:15 50:7,9
  90:12
**relations** 66:9
**relationship** 22:11
  34:12 39:7 53:21
  54:3 63:5 64:18
  65:16 67:22 71:21
  72:5,13,25 73:23
  80:11 81:19 83:14
**relieved** 72:14
**remain** 22:25 35:10
**remainder** 35:9
**remember** 6:3,20
  11:1 19:15 27:4
  28:5,6 29:1 50:2
  52:8 73:17 74:7
  89:9
**remind** 81:11
**remove** 64:20
**repeat** 55:16
**rephrase** 51:7
**report** 91:11
**reported** 58:3,9
  59:15 64:3,6,12
**reporter** 6:9 48:9
  94:20
**Reporters** 1:22
**reporter's** 6:15
**reporting** 60:6
**reports** 30:21
**represent** 5:13 45:15
  81:3
**representing** 49:3
**reproduction** 94:19
**reputation** 45:25
**request** 24:15 42:5
**requires** 60:10
**reserved** 5:4
**respect** 86:4,6
**respective** 5:2
**respond** 20:16,20,25
  21:2,5,14 22:2,12
**response** 16:12 17:12
  22:16
**result** 50:14 77:24
  83:1

reveal 55:10
revelation 31:5
review 49:19,21
ride 77:11
right 6:11 7:3,17 8:21
  9:17,19,24 10:14
  15:12 16:1 27:6
  31:16 44:5,23 47:17
  49:8,10 51:2,20
  52:3 57:2 62:19
  64:8,14 65:3,8,12
  65:20 66:10 67:7
  69:2 75:25 76:14
  82:7 84:19 85:19
  87:3
Road 1:18 2:15,19
Rob 81:3
ROBERT 2:5
Romig 1:7 10:2,24
  11:20 12:16,20 13:8
  13:21 14:4,11,14
  15:13,20 16:10,25
  19:12 20:7,24 21:4
  22:23 23:24 24:2,18
  25:16,20 27:13,19
  28:17,23 29:15,18
  29:24 31:5 32:8,17
  33:3 34:3,12,20
  40:11,20,22 41:18
  41:23 42:1,10,16
  50:7,9,24 51:11
  52:22 53:4 54:21
  55:3,19 56:3,20,23
  57:9 58:6,11,24
  59:8,16,16 60:7
  61:2,18 62:18 63:6
  64:8 65:16 66:3,19
  66:25 67:6,22 68:14
  70:11 71:22 72:19
  72:25 73:24 74:2,3
  77:25 80:11,16
  81:17 83:15,19,24
  84:12 85:19 90:9,13
  91:6,11
Romig's 33:18 57:2,6
  63:15 84:3 88:8,16

89:22
room 70:21 73:8,9
rough 19:18
roughly 9:21 32:20
  35:10 80:7
Run 12:13,14
Russ 5:13
Russell 1:10 2:12,14
  2:17,21 3:5 4:7,12
  31:1 45:13,14 48:7
  48:23 51:7,9 68:2,6
  69:20 83:18 86:21
  89:7 91:3 92:25
Ryan 1:10 2:12,16,20
  3:5 5:13

## S

SANTARONE 3:3
  4:9 71:4 80:23 93:3
Saturday 28:11
saw 17:10 74:24 75:6
  75:12,20
saying 7:5 11:8 16:1
Scared 70:17
schedule 26:3 44:23
schedules 82:4
scholarship 51:19,22
  77:4,5,10,10
school 1:7 2:7 8:16
  9:14,15,17,22 10:9
  10:12,15,17,20 11:3
  12:19 13:1,7 15:1,9
  25:24 28:12 33:20
  34:13,14,19,22
  35:14,19 36:1,1,7
  36:16 37:17 38:1,8
  40:7,19 47:8 50:17
  50:19 53:2 56:9
  70:5 75:10 76:3
  81:4
schooling 35:10
schools 40:24,25 41:2
  41:15
scope 31:23
score 76:4,5
scores 75:24 76:2

Scouts 36:14,15
sealing 5:5
Sean 2:10 5:12
season 11:17 46:21
  61:3 69:14 75:9
  88:23 89:2
second 2:10 22:12
  30:17 56:17 68:17
secretive 63:7
Security 7:21 8:2
see 17:2 23:13,14,16
  23:23 24:1,16,22
  25:9 27:11 31:17
  32:1 73:23 75:2
  90:17
seeing 17:12 31:24
  39:5
seeking 30:23
Sellersville 13:19,25
  14:5 19:17 26:4
  28:12 29:2,22 35:21
  60:19
send 62:17 82:3
sending 56:15,16
senior 9:21 10:6
  36:18 46:20 50:19
  53:11,16 74:18,21
  75:22 85:17 90:8
sense 45:18
sent 56:20 57:9 62:24
  62:25
sentence 68:17
sentencing 68:13
September 14:24
  15:15 17:14,25
  18:14 25:17 28:7,22
  29:1 30:2,8 34:10
  35:16 36:11,25
  41:25 64:4 68:25
  69:2 71:17 81:18
Serba 1:20 94:15
services 58:4
settlement 47:25 48:2
  48:14 62:8
sex 22:11 61:2
sexting 56:2,14

sexual 22:1,10 55:2
  55:20 56:15 58:24
  65:16 66:4,8 67:22
sexually 86:16
shake 6:6
shakes 27:20
shape 66:24
shared 59:20
she'd 36:10,24
She'll 9:6
shine 45:19
shock 68:25
shoulders 6:7
show 68:2
showed 75:25
showing 68:7
shrug 6:7
significantly 34:23
signing 5:5
silver 92:14,16
similar 54:21
sir 5:12 8:5 93:4
sit 20:13 54:24 59:14
  67:18
sitting 5:22 7:3,5
  89:8,13
situation 25:20 33:1
  33:20 34:19 40:20
  40:23 41:18,23
  42:10,16 50:8,9
  54:11 64:20 73:21
  88:17 90:9,13
skin 79:1,21,25
sky 7:8
slept 57:1,5
small 80:6
Smith 57:21,22,23,23
  57:24 58:8,8 60:13
  60:14
Social 7:20 8:2
Society 36:22,25
softball 11:3,17,21
  12:8,21 13:13 14:8
  19:10 35:19 44:20
  46:21 52:22 53:5
  69:12 76:15,16

Appendix1141

JAMES EDWARD NACE

82:13 86:24 88:21 88:22
**somebody** 60:1 76:4 86:12
**someone's** 56:15
**somewhat** 35:1
**sophomore** 10:10,10 10:11,20 11:8 13:11 15:2 37:18 50:20 61:10 62:2 76:21,24
**sorry** 10:13 37:25 85:6
**sort** 33:7 34:16 64:18 90:17
**sought** 80:12,16
**sounds** 6:4
**source** 78:19,20
**speak** 7:11 11:4 29:14 32:25 33:6,8 42:1 58:19 59:3 70:13 78:6 88:10,15 88:16
**speaking** 33:16
**speaks** 6:16
**special** 69:5,8
**specific** 41:6
**specifically** 87:11,14
**speculation** 52:25 67:24
**spend** 38:10
**spending** 63:14,15
**spent** 34:18 73:12 90:11
**spoke** 17:14,22 65:10 72:3,24 73:1,6
**spoken** 16:16 29:17 57:23 59:4
**spring** 11:18,19 12:24 15:6 69:18
**Stacy** 1:20 94:15
**staff** 84:11
**stages** 56:21
**start** 69:14,18 76:13 76:22 79:22
**started** 12:24 13:17 40:23 41:6 69:15

**starting** 76:8,9
**state** 52:6,7,9
**statement** 33:11 68:11
**states** 1:1 57:16
**station** 17:25 18:24 19:2 24:11 25:7 64:23 70:2,8
**stats** 53:15
**stay** 35:18 44:14 61:13,21,23 71:13
**stayed** 26:1
**stepfather** 57:22
**stipulated** 5:1
**stopped** 38:14,15
**Street** 1:23 2:2,6,10 3:3
**strike** 6:18
**student** 56:23 57:10 57:17 58:18
**students** 54:21 55:20 56:3 57:5 84:7
**studying** 42:19
**subject** 9:20 48:4
**subsequently** 57:18
**sue** 60:4,8,13
**sued** 49:3 54:15,17 54:19 60:20,21
**Suite** 1:18,23 2:3,15 2:19 3:3
**summer** 10:5 12:8 13:11 14:1,4 15:6 44:8 61:10 62:1 90:15
**supervision** 94:19
**supplied** 32:8
**sure** 23:15 24:20 30:24 33:10 35:8 40:6,8 44:25 48:2 51:21 75:10 79:24 90:6
**sustained** 49:1
**Swamp** 1:18 2:15
**Swedesford** 2:19
**sworn** 5:8,23 94:10

| T |
|---|

**take** 5:16,21 6:11 7:10,14 8:21 45:16 62:11 71:11 77:6 87:10
**taken** 1:17 9:7 57:18 76:9 94:9
**talk** 8:13 9:9,13 13:2 17:20 20:6,13 27:15 41:2 45:22 57:19 75:16
**talked** 41:1 52:5 68:16 71:5 72:23 74:1,15 76:7 78:6,7 78:12,23 79:20 82:20
**talking** 9:19 11:9 18:6 23:6,11 33:7 42:6 48:16 53:3 73:3
**talks** 28:21
**tape** 7:3
**teacher** 42:11
**teachers** 88:10
**team** 11:21 12:21 13:15,22 14:11 19:15 35:19 44:20 61:21 69:12,12,13 75:14 76:3,6,18 82:22 86:9 88:1,21 91:18,20,21,23 92:2 92:12,14,14
**teams** 13:13,16 35:25 36:13 44:17,19 85:20,21 91:13,14 91:16
**tell** 6:20 16:4 21:7 29:4 37:9 38:21 43:6 54:5 55:23 72:18 81:16 86:22
**telling** 52:8
**ten** 74:14
**terms** 10:16,16 30:18 35:14 44:13 48:16 48:17
**testified** 5:8 46:24

49:18,24 50:25 52:1 53:9,12,14,21 58:22 61:1 66:18 69:1 88:14
**testify** 40:12 53:24 55:13
**testifying** 53:16,17
**testimony** 5:24 85:13 94:9
**Texas** 52:10,12,13,14
**text** 57:9 62:17
**texted** 15:22
**texting** 56:13,17
**texts** 16:24 18:5 23:24 24:5,17,22 25:9,15 27:12,17 62:24 90:17
**Thank** 71:1 80:24 89:25 90:25 93:4
**thing** 60:18 64:1 65:8
**things** 6:8,23 38:4 45:18 46:4 66:1 86:10 89:21
**think** 16:5 26:6 28:2 32:3 33:13 35:5 37:15 41:4 45:7 48:15,18 49:9 50:25 51:4,25 52:1 53:9 53:13 54:6 55:2 66:18 69:1 70:5,6 79:8 86:20 88:14 89:7,8 91:24,24
**thinking** 40:25 65:7
**third** 21:5 32:7 66:21 68:17
**Thirty-four** 8:12
**Thomas** 1:7 2:7
**thought** 18:3 26:20 44:24 51:25 52:6 61:6 66:12 72:25 73:18
**threat** 83:5
**three** 30:11,13,14 41:10 43:16 51:24 51:24 52:2,3 73:6 73:11 76:20

JAMES EDWARD NACE

**Thursday** 15:16
  65:18
**Tilghman** 1:23
**time** 5:4 6:16,23 10:8
  16:2,4 18:11 19:18
  21:10 23:7 26:6
  38:10 39:13 41:4
  46:9,19,23 47:5
  53:20 58:24 61:25
  62:3,4 64:6 66:4,20
  73:1,2 74:14,24,25
  75:3,12,17,20 76:8
  78:23 79:25 82:16
  87:21,24 88:4,5
  90:7 91:10
**times** 11:23 15:23
  18:8 32:3,4,25
  43:15,19 61:2,16
  72:24 79:3
**tired** 79:3
**today** 5:16 32:10
  49:19 54:25 59:14
  67:18
**told** 15:5,22,24 16:9
  21:8,22 34:11 56:2
  58:2 59:24 67:2
**Tom** 81:4 84:14
**topic** 24:4
**total** 32:4 68:25 72:6
**tournament** 61:14
  69:16 71:6,9
**transcript** 5:5 94:11
**transpired** 60:6
**treat** 83:25 84:4 86:4
  86:6 87:9
**treated** 31:4 50:6
  84:8
**treating** 31:1
**treatment** 44:2 45:1
  50:4 77:18,24 78:3
  80:17 90:13
**trial** 5:4
**trips** 61:12,19 62:3
  74:1,3,16
**true** 88:15
**trusted** 63:23,24 67:9

68:19
**try** 6:3,12,13,24 81:6
**trying** 45:17 49:1
  54:14 62:12,14
  69:11
**turned** 60:5
**Tweed** 8:10
**Twelfth** 8:16
**Twelve** 75:10
**Twenty-five** 8:24
**twice** 11:24 43:20
  66:9
**two** 8:24 9:2 30:11,13
  30:14 33:3 34:19,22
  35:19 36:1 43:1
  45:2 61:7 67:6
  68:20 82:21 91:13
  91:14
**type** 45:24
**typically** 82:13,15

**U**

**uh-huh** 6:7
**ultimately** 29:9
**unappropriate** 16:5
**understand** 9:23
  14:23 18:16 31:13
  32:20 39:13 41:5
  42:13 48:25 57:1
  64:1 87:1,22
**understanding** 14:17
  14:21 24:21 25:2
  37:5 38:18 43:3
  44:12 47:15,21 49:5
  49:7 50:21 54:9,15
  54:19,22 56:19 58:1
  61:4 62:16 63:3,13
  63:16 65:10 67:5
**understood** 6:1 30:25
  41:15
**undress** 56:21
**UNITED** 1:1
**unusual** 13:5,8 14:3
  15:13,20 82:23
**ups** 90:2
**upset** 15:21

**use** 6:3 9:11 63:7
**usual** 12:1

**V**

**V** 2:10
**VAKIL** 2:9
**Valley** 8:20
**value** 47:24 49:6
**values** 48:17
**various** 56:21
**varsity** 85:14 87:25
  87:25 92:22
**video** 56:15
**view** 88:3
**Virginia** 41:14
**visits** 49:8,10,12
**vs** 1:6

**W**

**wait** 6:12
**waived** 5:6
**Walnut** 2:2
**want** 6:21 7:8 11:4
  24:20 29:3,8,11
  30:24 42:10 45:24
  47:4 49:25 52:7
  62:11 70:13 79:17
  81:10,13 90:6
**wanted** 40:18 41:16
  41:22 42:9 46:16
  65:7 66:1,15 79:18
**WARNER** 3:2
**wasn't** 14:18 20:1
  65:7 73:22 74:2
  87:1
**way** 6:18 12:5 34:23
  48:18 49:2 62:12
  79:8,11 83:6 85:10
  86:5,9 87:2,8,17,18
  89:21 90:8
**Wayne** 2:19
**ways** 6:5 53:14
**week** 73:17
**weeks** 8:24
**weight** 78:25 79:21
  79:24 80:2,8,13,17
**went** 16:14,17 18:25

19:24 20:1 25:21
  26:6 29:24 44:6
  52:1 64:10,24 65:6
  65:8 69:6 70:2 72:1
  74:3,9,16,17,23
  75:5 78:10
**West** 1:18 2:15
**we'll** 7:12
**we're** 5:16,22 7:5
  9:19,24 11:7 27:10
  31:13 73:3 78:17
**we've** 9:7 57:17
**wife** 9:25 15:21,24
  16:8,19 17:4,6,9,11
  17:16 18:15 19:23
  22:22 23:3 24:15
  25:11 26:14 28:20
  29:11,20 31:16
  33:12,19,22 34:2,5
  42:3 45:5 49:15
  50:1 53:22 54:10
  62:22 63:1 66:16
  67:2,20 70:19 71:16
  72:7 73:12 77:5,23
  78:2,7,15,20 90:11
  90:16,20,23
**wife's** 46:14
**winter** 11:18 44:13
**wise** 37:7
**witness** 8:2 16:22
  27:20 30:18,25 32:5
  48:21 72:17 94:10
**WITNESSES** 4:2,3
**wondered** 46:10 47:5
**words** 6:3,6,9,11
  12:21 21:23 33:15
  42:16
**work** 8:9 26:12,16
**worked** 8:11 44:9
  82:16
**working** 44:16
**worse** 54:7
**wouldn't** 38:15 73:23
  76:13
**wow** 74:13
**wrong** 62:11

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JAMES EDWARD NACE

**X**

**X** 4:1

**Y**

**year** 9:21,22 10:5,6,6
  10:10,10,11,11,13
  10:14,20 11:6,21
  12:4,19,19 13:2,7
  13:12 14:19,25 15:1
  15:9 36:1,19 37:17
  37:18,23,25 42:22
  42:22 46:20 50:20
  53:11,11,15,16 61:8
  61:9,10 63:4 74:18
  74:21 75:22 76:19
  76:21,24,25 77:13
  87:21 90:8
**years** 8:12,24 9:15
  34:19,22 35:19
  39:19 40:14 41:6
  45:2 50:19 61:7
  62:2 67:6 68:19,20
  74:12 75:21 83:9,11
  85:17 86:25
**York** 41:12
**younger** 74:10
**Youth** 58:4,9

**$**

**$26,000** 51:20

**1**

**1** 4:16 48:1,13 68:4,8
**1st** 14:24 29:25 32:6
  33:18 41:25
**1:00** 1:20
**10th** 11:9 12:9,19,22
  13:7,12 14:6 76:25
  83:9,11 85:20 89:2
**105** 80:9
**11th** 11:9 13:12 14:6
  14:9,12,15,18 15:9
  37:25 38:24 39:19
  40:14 41:5 77:2
**12th** 38:24 39:19
  40:14 41:6
**120** 1:23

**14** 49:8,9 75:11
**15** 1:18 2:15 32:3,4
  49:9,10
**15th** 30:21
**15-0333** 1:3
**1500** 2:2
**16** 1:19 74:14
**18** 60:5
**18104** 1:24
**18901** 2:6,15
**19063** 2:11
**19087** 2:19
**19102** 2:3
**19103** 3:4
**1980** 8:20

**2**

**2** 48:2
**2:40** 93:5
**2000** 3:3
**2013** 14:24 15:10
  17:15 18:1,14 30:2
  30:8 34:10 35:3,16
  36:11,25 42:1 68:25
  79:23 80:2 90:15
**2014** 10:13
**2015** 1:19 10:13 15:6
  15:15 94:4
**2300** 3:3
**252** 1:18 2:15
**26th** 15:15 17:15 18:1
  18:14 24:16 25:1
  30:2,8 34:10 35:16
  41:25 64:3 65:9
  66:7 69:2 70:10
  71:17,24 72:2 81:18
**27** 9:6
**27th** 25:4,8,12,17,21
  25:23 26:7,19,24
  27:21 28:3,6 65:18
  70:3
**28th** 28:11,22,25
  65:19 66:13
**29th** 68:25
**295** 2:19

**3**

**300** 2:3
**346** 2:19
**36** 2:10
**38** 86:25

**4**

**45:13** 4:7

**5**

**5:11** 4:6
**5050** 1:23
**560** 51:1

**6**

**6/4/62** 7:19
**60** 2:6
**600** 37:15 51:2
**610.366.7119** 1:24
**68:4** 4:17

**7**

**70's** 37:11,12
**70:1** 4:8
**71:4** 4:9
**74th** 50:25
**75** 77:10

**8**

**81:2** 4:10

**9**

**9th** 11:9,15,21 12:3,9
  83:8,10 85:20 88:22
  88:23
**90:5** 4:11
**91:3** 4:12

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES