APRIL NACE

1    Q.        She seems to be making friends?

2    A.        Yes.

3    Q.        You're happy with the -- with what's going

4    on with her so far with her experience in college?

5    A.        I worry about her, but, yes.

6    Q.        Are you aware if she has had any

7    interactions with Eric Romig since his arrest?

8    A.        To my knowledge, no.

9    Q.        Have you spent any money out of pocket

10   relating to anything pertaining to this Eric Romig

11   situation?

12   A.        My husband, although not seeking any mental

13   health, had medical health issues, so, yes, we've had

14   some.  He did seek medical attention.

15   Q.        For what?

16   A.        Not being able to sleep, anxiety, stress.

17   Q.        And what's the nature of that?  In other

18   words, what sort of provider are you going to see?

19   A.        His family doctor.

20   Q.        And is there some sort of medication or

21   something that he's getting?

22   A.        There had been for -- I'd say maybe three

23   quarters of a year to a year, at least, maybe.

24   Q.        How much money did you spend on those visits

25   and whatever medications and so forth?

Appendix1192

APRIL NACE

1    A.        Couple hundred dollars.  Less than a

2    thousand.

3    Q.        Have you had any medical treatment relating

4    in any way relating to this Eric Romig situation,

5    including mental health?

6    A.        I don't believe in doctors, so, no.

7    Q.        You mentioned something about one of -- I

8    forget if it's Dr. L or Dr. T, that you were paying

9    for out of pocket?

10   A.        That was Dr. T, yes.

11   Q.        How much do you think you spent on Dr. T?

12   A.        It was a co-pay.  Insurance covered most of

13   it.

14   Q.        Are you aware of any plans that your

15   daughter has to seek mental health treatment in the

16   future?

17   A.        At this time she's -- I don't know of any.

18   She had been -- spoken to by Dr. L to -- who was very

19   concerned that she wasn't getting any more

20   treatments, that she should seek somebody while she's

21   at college.  But to my knowledge, she has not.

22             MR. KEMETHER:  I don't think I have

23   any further questions for you at this time.  But I'm

24   going to let everybody ask some.  If I have a few

25   follow up, I will.

APRIL NACE

1                           * * *

2                        EXAMINATION

3    BY MR. RUSSELL:

4    Q.       My name's Jonathan Russell.  And I represent

5    the Faith Christian defendants.  I have some

6    questions that are similar to the questions that I

7    asked your husband just because your perspective is

8    going to be a little bit different and you may add

9    some additional information to that.

10            Would you agree that your daughter is

11   primarily a private person?

12   A.       She's extremely private.  My take on this

13   whole situation was that God put her in this

14   situation because she's a strong person.  She's

15   extremely private, but she's extremely strong.  And

16   when it became apparent that there may have been

17   other victims that either couldn't or didn't come

18   forward, I felt God knew that she would be able to

19   handle it and that she would see it through to stop.

20   Q.       Just so you're aware, there's no other

21   victims that we know of that had sexual intercourse

22   with Mr. Romig.

23   A.       There are other ways --

24            MR. GROTH:  Excuse me.  There's not

25   a question there.  And I'll object to the extent that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

```
 1    you're giving this witness information that may or

 2    may not be true.  It's certainly not something that's

 3    on the record.

 4                    MR. RUSSELL:  Certainly not

 5    anything that the police or anyone has discovered in

 6    this case.  And I want to make sure that she's aware

 7    of that.

 8                    MR. GROTH:  Well, she -- go ahead.

 9    Ask your next question.

10    BY MR. RUSSELL:

11    Q.       What depositions have you reviewed in

12    preparation for today or at all?

13    A.       Just Liz's.

14    Q.       Is there any reason why you haven't reviewed

15    anyone else's deposition?

16                    MR. GROTH:  Other than discussions

17    with me.

18    A.       No.

19    Q.       So you know that we've deposed Emily Mayer,

20    you know that Kristen Kennedy has been deposed?

21    A.       I've been told.

22    Q.       You know that the Smith -- Mr. Smith, Kevin

23    Smith, the father of Emily Mayer, has been deposed?

24                    MR. GROTH:  Again, don't answer any

25    of these questions to the extent that it has to do
```

APRIL NACE

1   with discussions that you and I had.  If you had

2   information from another source that these were

3   taken, you tell this gentleman.  If not, don't answer

4   the question.

5   A.        No.

6   Q.        You've not asked to review any depositions,

7   as far as you know --

8                    MR. GROTH:  Object to the form of

9   the question.  It has to do with conversations

10   between counsel and client.

11   Q.        Fair enough.  Why don't you believe in

12   doctors?

13   A.        I'm a generally healthy person.  And I feel

14   people -- I don't need to see one personally very

15   often, so I just don't.

16   Q.        You've testified to some degree about you're

17   a person of faith.  Do you believe in faith healing?

18   A.        I don't disbelieve or believe.  It's --

19   Q.        But do you have a religious opposition to

20   getting medical treatment --

21   A.        No.

22   Q.        -- for you or your family members?

23   A.        No.

24   Q.        With regard to the filing of this civil

25   Complaint -- the criminal matter, and I agree with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1    you that your daughter went forward, she was able to

2    talk to the police and she was willing to see through

3    on the criminal end to make sure justice was served

4    against Mr. Romig.  Now what we're dealing with is

5    the civil aspect.

6              Was it your idea to file the civil

7    complaint?

8    A.       We talked it over amongst all of ourselves.

9    Q.       Meaning?  You, yourself --

10   A.       And Liz and my husband.

11   Q.       And she knew that in filing the civil

12   complaint, that she would no longer be anonymous, so

13   to speak, correct?

14   A.       Correct.

15   Q.       Was there any discussion about the timing of

16   the filing of the Complaint, filing it before she

17   completed her academic and softball career at

18   Pennridge?

19   A.       It was not -- it's all legal.  We didn't

20   seek the timing or dis-seek.

21   Q.       Because Liz testified that she felt that

22   maybe her dad was ostracized a little bit at the

23   games, he would sit by himself.  And obviously the

24   lawsuit was filed and reported in the paper before

25   the spring season of softball at Pennridge.

APRIL NACE

1          And I'm just wondering, were you aware of

2    any kind of push back or fallout from the filing of

3    the civil litigation?

4               MR. GROTH:  Object to the form of

5    the question only insofar as it assumes that

6    everything was anonymous and nobody knew about Liz

7    except for the lawsuit, which is what you seem to be

8    implying.

9          But you can answer the question.

10   A.     Liz was aware that the team knew who she

11   was -- the team came to all of the court hearings and

12   supported me.  So she was well aware.

13         As far as outside press and everything

14   else and -- I believe in her deposition that she did

15   not state that it was due to the lawsuit that my

16   husband sat apart.

17   Q.     But it would have been after the lawsuit was

18   filed?

19   A.     That is correct.

20   Q.     I think you testified that she had some

21   concern when she walked through the halls at

22   Pennridge, that people knew, you know, what had

23   happened between her and Romig?

24   A.     She was very mortified.

25   Q.     That's what I'm trying to inquire about.

APRIL NACE

1    She's so mortified about that.  Why file a civil

2    lawsuit before she completes her senior year at

3    Pennridge?

4    A.        Again, it wasn't something that we sat down

5    and said this will happen at this time.

6    Q.        And as I indicated to your husband, part of

7    our job is to evaluate claims for damages.  You know,

8    you've made a claim.  You've asserted a theory of

9    liability against my clients and then an expectation

10   that you'll be compensated or your daughter will be

11   compensated in terms of money.

12             And what we're trying to figure out, is

13   there anything other than what we've gone over with

14   regard to her damages?  You indicated she went to

15   NOVA and she had a counselor there.  Was NOVA free?

16   A.        Yes.

17   Q.        And so then she went -- we have two notes

18   from another therapist outside of that and I think

19   it's Dr. --

20             MR. GROTH:  Trushel or something.

21   Q.        I couldn't read the handwriting, frankly.

22   It was two visits that I have, both in May.  May of

23   2014.  Does that sound right?

24   A.        (Witness nods head.)

25   Q.        That's a yes?

Appendix1199

APRIL NACE

```
 1    A.        I believe so, yes.

 2    Q.        And there's a note with Dr. Levenberg that

 3    you -- did you go with Liz to the NOVA appointments?

 4    A.        I drove her to all of the appointments.  I

 5    was not in the room.  She was by herself with the

 6    counselor.

 7    Q.        There's a note in here dated May 21st, 2015,

 8    which would be after Mr. Romig was already sentenced.

 9    It says, received contact from client's mother

10    requesting appointment for client and mother to meet

11    with counselor to review client's record.  Do you

12    know what that was about?

13    A.        I believe that was when we picked up her

14    records from NOVA.

15    Q.        And why were you picking up her records?

16              MR. GROTH:  To give them to you.

17    Q.        You had to make an appointment to do that?

18    You couldn't ask them to send them to you or

19    something?

20    A.        NOVA doesn't work that way.

21    Q.        And then it looks like you had to sign an

22    authorization form in order to have those records

23    released to you and Liz?

24    A.        Correct.

25    Q.        And just so I'm clear, we don't have any
```

APRIL NACE

1    information provided to us other than those NOVA

2    visits and those two visits with the therapist.  Are

3    you aware of any other counselors, therapists,

4    psychologists, psychiatrists that she's gone to for

5    treatment purposes?

6    A.        I am not aware of any.

7    Q.        And no one ever provided her with

8    prescription medication that she needed to take?

9    A.        No, they did not.

10   Q.        And again, I know there was indication that

11   she missed time from school, but the records that

12   we've been provided from Pennridge indicate that her

13   absences are the same before this incident occurred

14   as they were after this incident.  Is that your

15   understanding, as well?

16   A.        That is correct.

17   Q.        And with regard to her academic career, is

18   she -- she maintained her 4.0 average when she

19   graduated?

20   A.        With her weighted classes, yes.

21   Q.        And she was on the National Honor Society?

22   A.        Correct.

23   Q.        That was not impacted in any way by this,

24   correct?

25   A.        No, it was not.  I had a meeting that I told

APRIL NACE

1    them I did not feel that it was fair if it would

2    impact her.

3    Q.       But they never said that it was going to

4    impact her, right?

5    A.       They said it would be taken care of if it

6    was -- if it would be.

7    Q.       And she continued to play softball.  You

8    said that you had some concerns that she may not play

9    softball, but she finished out her career?

10   A.       Yes.

11   Q.       In fact, she's playing collegially now,

12   right?

13   A.       Yes.

14   Q.       You thought she might not go to college, but

15   in fact she got an academic scholarship to go to

16   college?

17   A.       Correct.

18   Q.       Is it a $26,000 a year scholarship that she

19   received?

20   A.       Maybe a little more.

21   Q.       And do you know how much you have to pay as

22   part of the tuition -- annual tuition?

23   A.       Approximately another 20,000.

24   Q.       With regard -- I'm going to show you --

25                     MR. RUSSELL:  Why don't we mark

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1    this as A. Nace 1.

2              (Whereupon, A. Nace Exhibit 1, Letter, was

3    marked for identification.)

4    BY MR. RUSSELL:

5    Q.        Have you seen this document before?

6    A.        Yes.

7    Q.        And this is your impact statement.  Did you

8    actually read this at the sentencing of Mr. Romig?

9    A.        I read most of it.  My copy, I found out, as

10   I started reading it, was missing a few pages.

11   Q.        Do you know if those few pages are in this

12   document or not?  They're not numbered.  So it's --

13   A.        Yes, they're all here.

14   Q.        They're all here?

15   A.        Yes.

16   Q.        I just want to ask you a couple things about

17   this.  When I read through this, it sounded like you

18   and your husband actually suffered physically,

19   requiring medical care in reading through this.

20   Would that be accurate?  You sought out a medical

21   doctor and your husband sought out a medical doctor?

22   A.        I did not seek any for myself.

23   Q.        Your husband did?

24   A.        Yes.

25   Q.        It said that you had chest pains often?

APRIL NACE

```
 1    A.        Yes.

 2    Q.        But you didn't seek out --

 3    A.        No.

 4    Q.        Did Liz ever have chest pains?  Did she ever

 5    complain of chest pains that you know of?

 6    A.        Possibly.  I'm not sure.

 7    Q.        And then your husband, it said that he went

 8    to the doctor and he was prescribed medication,

 9    correct?

10    A.        That is correct.

11    Q.        Would it be fair to say that you and your

12    husband were affected physically as a result of this

13    incident more than Liz was?

14              MR. GROTH:  Object to the form

15    insofar as it requires some medical expertise to

16    respond to.

17              But you can respond.

18    A.        Liz was a minor at the time, so if medical

19    attention should have been gotten other than the

20    doctors I did take her to, that would have been my

21    fault.  My husband's an adult and he seeks -- he is

22    under regular medical attention.  I believe it had

23    the same affects on her and she is a much slighter

24    person than my husband is.  But I did not seek

25    medical attention for any physical ailments.
```

APRIL NACE

1    Q.       In here on the first page it talked about

2    you were not sure if she was going to commit suicide.

3    Did she make an attempt to commit suicide?

4    A.       No, she did not.  But I know she was

5    extremely upset and angry with us at that given time

6    when we found out.

7    Q.       Did she ever threaten to do so?

8    A.       She did not.

9    Q.       And then also the next -- underneath that

10   you said, or she would try to run away with him.  Did

11   she ever threaten to run away with Eric Romig?

12   A.       She did tell us that she had plans to do so,

13   so I was afraid if we let her continue to be in

14   contact with him, that they would take the easy way

15   out and would disappear somewhere and I would -- to

16   another state or wherever they could.

17   Q.       The other thing that -- on here is that you

18   talked about your first thoughts were, if you're

19   wrong, you could be ruining Eric Romig's life.  I

20   think you had testified to that, right?

21   A.       Yes.

22   Q.       You wanted to have some proof before you

23   made an accusation like this?

24   A.       I wanted the police to look into it.

25   Q.       You knew that if you were making an

Appendix1205

APRIL NACE

1    accusation that might turn out to be false, it could

2    ruin his life?

3    A.        That's correct.  It's a very serious

4    accusation.  It wasn't made lightly.

5    Q.        You also -- you spent time keeping the score

6    book for the team.  Was that the Belles or was

7    that --

8    A.        All of the teams.  I always kept score for

9    the Deep Run teams.  And Eric Romig had asked me to

10   keep score for the Belles, also.

11   Q.        You heard your husband testify about the --

12   at least outward demeanor of Mr. Romig.  Did he

13   always seem respectful when he was dealing with the

14   girls, at least from a public standpoint?

15   A.        Yes.

16   Q.        And you didn't notice any time that you were

17   with him any signs of distrust or uncomfortableness

18   with Mr. Romig's behavior?

19   A.        No.

20   Q.        And as I asked your husband, you're not

21   seeking for yourself to be compensated for any

22   physical manifestations of stress or for -- that

23   you've experienced as a result of this incident,

24   correct?

25   A.        My first answer would be a question and I'm

APRIL NACE

```
 1    not allowed to ask questions.
 2                      MR. GROTH:  The answer to your
 3    question is no, there's nothing in the Complaint.
 4    They're named as guardians of the minor plaintiff in
 5    the case.
 6                      MR. RUSSELL:  No individual
 7    capacity.
 8                      MR. GROTH:  The law doesn't permit
 9    it, anyway.
10                      MR. RUSSELL:  I just wanted to be
11    sure we're clear.
12                      MR. GROTH:  It's clear.
13    BY MR. RUSSELL:
14    Q.       We received a letter and your attorney
15    indicated that -- your client, meaning Liz Nace, was
16    going through struggles right now.  I wanted to show
17    you that to see if we can find out further
18    information on that.
19              (Whereupon, A. Nace Exhibit 2, Letter dated
20    10/1/15, was marked for identification.)
21    BY MR. RUSSELL:
22    Q.       If you could take a moment to read that
23    quietly to yourself and then let me know when you're
24    finished.
25    A.       (Witness complies.)
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1              MR. GROTH:  Do you want her to read

2     the attached letters, also?

3              MR. RUSSELL:  To the extent it was

4     made reference in your letter.  I just wanted her to

5     have the full.

6              MR. GROTH:  Okay.

7     BY MR. RUSSELL:

8     Q.        In this letter, on the first page, the

9     fourth paragraph down, it states, you know that my

10    client is going through the same type of struggles

11    right now, only two years removed from her sexual

12    abuse at the hands of your brother, Eric Romig.

13             In reading the attached letter that was

14    mentioned in there from -- we have the pastor of the

15    Royersford Bible Fellowship Church.  It talked that

16    he had extensive pastoral counseling with Kelly over

17    three years.

18             Is Elizabeth going through these same

19    type of struggles right now, to your knowledge?

20             MR. GROTH:  Object to the form of

21    the question.

22             You can answer.

23             Same type of struggles as who, as Kelly

24    Haines?

25             MR. RUSSELL:  As Kelly Haines,

APRIL NACE

1    correct.

2                    MR. GROTH:  The letter says Kelly

3    Haines hasn't had any pastor counseling for the past

4    three years.  I think it says from 2009 to 2012.

5                    MR. RUSSELL:  I guess to the extent

6    that you state, you know my client is going through

7    the same type of struggles right now, only two years

8    removed from her sexual abuse at the hands of your

9    brother.

10   BY MR. RUSSELL:

11   Q.      I'm just wondering.  Is there something I'm

12   missing?  Are you aware of any types of struggles

13   that your daughter is going through that are similar

14   to what's described in the attached pages that Kelly

15   Haines was going through?

16                   MR. GROTH:  Object to the form of

17   the question only insofar as it relates to or

18   encompasses expert testimony by a medical

19   professional.  To the extent that she can relate her

20   own observations as a lay person understanding, she's

21   welcome to do that.

22   A.      As I said before, Liz is a very strong

23   person.  She doesn't let you know or let you see

24   what's going on.  Liz's sanctuary and her safe place

25   is the mound when she's playing.  She doesn't let

APRIL NACE

1   outside forces influence her or -- she basically

2   builds a wall and goes to a private -- locks herself

3   off from all outside.

4   Q.      Has she told you that she's struggling with

5   anything since she's gone to college, anything

6   emotionally?

7   A.      Since she's gone to college?

8   Q.      Yes.

9   A.      I haven't talked a lot with her since she's

10   gone to college.

11   Q.      Has she told you that she's struggling with

12   anything?

13   A.      She's told me that it's hard.

14   Q.      And what's hard?

15   A.      Just dealing with all of the stress, living

16   with what she did and everything else and what

17   happened.  She finds it, you know -- she finds it

18   difficult.  But she is -- she wants to go on and she

19   doesn't want it to affect and she doesn't want anyone

20   to see that it affects her because that's -- that's

21   not who she is.

22   Q.      With regard to the difficulty, does she live

23   in a co-ed dorm at Lycoming?

24   A.      I believe it is, yes.

25   Q.      Is it co-ed on the same floor or are the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1    floors separated?

2    A.        I believe the floors are separate.  I'm not

3    positive.

4    Q.        You mentioned that she's having some

5    difficulty with her roommate.  What's the difficulty

6    that she's having with her roommate?

7    A.        Her roommate is different from her.

8    Q.        How so?

9    A.        She likes to go out and party.  Comes in

10   late.  Doesn't pick up after herself.  It's creating

11   a problem for her to study or to --

12   Q.        And that difficulty doesn't have anything to

13   do with Eric Romig, correct?

14   A.        In itself, no.

15   Q.        Could she request to be in a dorm that's

16   just female students, do you know, at Lycoming?

17   A.        I'm not sure.

18   Q.        And Josh, the boyfriend that she has at

19   present, that's somebody she met on the mission trip?

20   A.        Correct.

21   Q.        You met him once.  You were on the same

22   mission trip?

23   A.        I was on the same mission trip.  So I met

24   him there.  And he's been to our house once.

25   Q.        Before I let go of this -- what we've marked

APRIL NACE

1    as A. Nace 2, the second page, and this would be if

2    you come up in the third paragraph from the bottom,

3    which begins finally, and you come up, say, five

4    lines where it says, of your own sexual abuse while

5    attending FCA.  Do you see that?

6               Then it continues where it says, my

7    client likewise did not want to discuss her sexual

8    abuse from only two years ago with five attorneys

9    from FCA and Pennridge School District.

10              Is it your understanding that the only

11   reason she had to discuss that was that you filed a

12   lawsuit, correct?

13   A.        Not necessarily.  But as to it pertains

14   here, yes.

15   Q.        If she didn't file the lawsuit, she wouldn't

16   have to discuss her sexual abuse with five attorneys,

17   right?

18   A.        Yes.

19   Q.        Under -- trying to understand, again, who

20   was sued and who was chosen not to be sued in this

21   case.  I'm just trying to figure that out.

22              My understanding is that you sued Faith

23   Christian Academy because you believe that there were

24   other victims.  You stated that you were told by the

25   police that she wasn't special, there were other

APRIL NACE

1    people that Mr. Romig had had this type of

2    relationship with.  Would that be accurate?

3    A.        Correct.

4    Q.        As you sit here today, do you know that Mr.

5    Romig -- there's  -- do you still believe that now?

6                    MR. GROTH:  Not taking into

7    consideration any discussions that you and I had

8    about any facts or testimony or issues in this case,

9    which means independent of anything we discussed.

10   A.        No.  Suspicions.

11   Q.        Suspicions?

12   A.        Knowledge, no.

13   Q.        You had suspicions, but no knowledge?

14   A.        After all of this came out and the police

15   did their investigation, he made references to other

16   girls that were special to him from previous teams.

17   He would say that he knew, at a previous school,

18   where a coach had been let go for improper texting

19   with a player.

20   Q.        But no mention of sexual intercourse?

21   A.        No.

22   Q.        No mention of any touching?

23   A.        No.

24   Q.        No mention of any sexting?  Do you know what

25   I mean by that?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES Appendix1213

APRIL NACE

```
 1    A.        No.

 2    Q.        Sending images of one another.

 3    A.        No.

 4    Q.        Do you have any knowledge other than what

 5    you've learned from your attorney, that -- with

 6    regard to Emily Mayer and the texting that is alleged

 7    to have occurred between Emily Mayer and Eric Romig,

 8    there was never any content that was able to be seen

 9    or observed or --

10    A.        No, I do not.

11    Q.        Have you ever spoken to Emily Mayer?

12    A.        No.

13    Q.        Have you ever spoken to Kevin Smith, her

14    stepfather?

15    A.        No.

16    Q.        Did you know before today that Kevin Smith

17    was a former Montgomery County detective?

18    A.        No.

19    Q.        Do you have any knowledge as to why they

20    didn't report the texting issue if they felt it was

21    inappropriate to the police or the child protective

22    services?

23    A.        No.

24    Q.        Your Complaint mentions Kristen Kennedy.

25    Have you ever spoken with Kristen Kennedy?
```

APRIL NACE

```
 1    A.       No.

 2    Q.       You're aware that her deposition has been

 3    taken?  Or not?

 4                      MR. GROTH:  Again --

 5    A.       No.

 6                      MR. GROTH:  Don't answer that

 7    question.

 8    Q.       Apart from your attorney.

 9                      MR. GROTH:  Except from talking to

10    me, would you have any knowledge about what

11    depositions were taken in the case?

12                      THE WITNESS:  No.

13    BY MR. RUSSELL:

14    Q.       What part -- part of the whole process is

15    the search for the truth in this case.  And I just

16    want to see what truth you're aware of.

17                      With regard to Lauren Fretz, have you

18    ever spoken to Lauren Fretz?

19    A.       No.

20    Q.       Did you know that Emily Mayer's parents

21    continue to pay for tuition for her to attend Faith

22    Christian Academy even after the texting issue was

23    discovered?

24    A.       No.

25    Q.       The silver -- Sellersville Belles, do you
```

APRIL NACE

1    have any knowledge, apart from your attorney, as to

2    why they were not named in this lawsuit?

3    A.        No, I don't.

4    Q.        Do you know anybody on the Sellersville

5    Belles that you wouldn't want to have sued them in

6    some capacity?

7              MR. GROTH:  Again, I'll object to

8    the question insofar as it asks for legal expertise

9    as to whether or not there was even any legal claim

10   against Sellersville Belles.  Your question seems to

11   imply that or assume that.

12             But again, you can answer.

13   A.        No.

14   Q.        According to Elizabeth, she had sex several

15   times while Mr. Romig was coaching the Belles, is why

16   I was asking the question.  Is that your

17   understanding, as well?

18   A.        Correct.

19   Q.        And that was after her team had -- she

20   was -- the season had ended at Pennridge, correct?

21   A.        Yes.

22   Q.        And I thought I saw somewhere that you had

23   mentioned that she had been with the Sellersville

24   Belles before that season, but I think if I'm getting

25   clarified now, that the first time she was with the

APRIL NACE

1   Sellersville Belles was the summer between her

2   sophomore and junior years?

3   A.        It would have been fall.

4   Q.        Did it begin August until --

5   A.        Yeah, August.

6   Q.        August into September or she started in

7   August?

8   A.        They would start practicing in August.

9   Q.        And I'm going -- I know your husband has

10  already answered.  You never reached a settlement in

11  any way with the Sellersville Belles, correct?

12  A.        No.

13  Q.        And again, I'm not meaning any disrespect,

14  but I'm trying to figure out, you're looking to Faith

15  Christian Academy for positing some blame on them as

16  to what they did or should have done.  And so I just

17  want to ask you some questions about what you may

18  have done or may not have done.

19              It's my understanding, as your husband

20  indicated, that the cell phone was either yours or

21  your husband's or both of yours, correct?

22                  MR. GROTH:  Daughter's cell phone.

23  Q.        Your daughter's cell phone.

24  A.        The payment, as it listed, because she was a

25  minor, it has his name and it was paid for by us, but

Appendix1217

APRIL NACE

1    it was always her phone.  It was not ours.

2    Q.        To the extent, though, that you said it was

3    password protected, you couldn't go on and see the

4    texts and you respected your daughter's privacy in

5    that regard?

6    A.        Correct.

7    Q.        But you were able to go on and see the

8    hundreds of pages of texts, I think you said --

9    A.        On the bill.

10   Q.        On the bill, right.  I'm just wondering, was

11   there anything that prevented you from looking at

12   that before you did so at the end of September?

13   A.        There was nothing, no.

14   Q.        So if you had suspicions that your daughter

15   was being secretive about her cell phone, you could

16   have gone on back in April and looked at the cell

17   phone bill itself just to see who she was texting or

18   what was going on or who she was calling or who was

19   calling her.  Is that accurate?

20   A.        Yes.

21   Q.        Is there any reason why you did not?

22   A.        I was not so distrustful at that point.

23   Q.        But you understand there's an allegation

24   against Faith Christian Academy that they should have

25   done something about the number of texts that were

APRIL NACE

1    being exchanged between Emily Mayer and Eric Romig

2    and you had access to that information between your

3    daughter and Eric Romig back in April, right?

4                         MR. GROTH:  Did you say she had

5    access to it?

6                         MR. RUSSELL:  Access to it.

7                         MR. GROTH:  Okay.

8    A.       I disagree with --

9    Q.       Let me withdraw the question.  Let me ask it

10   differently.

11              Do you think that if you had looked back

12   in April at the number of texts that occurred between

13   your daughter and Eric Romig, that you could have

14   prevented your daughter from having a sexual

15   relationship with Eric Romig?

16                         MR. GROTH:  Object to the form.

17   Calls for complete speculation.

18              You can answer.

19   A.       In hindsight, I would hope that I could have

20   done something differently.  If I knew whose number

21   it was.  At that time I didn't have that information,

22   so I wouldn't have been able to.

23   Q.       Was Eric Romig not texting -- or sending

24   text messages to you as the parents, the coach?  You

25   said that's how you figured it out eventually, right?

APRIL NACE

1    A.       By the number.  He sent e-mails and he

2    didn't send us his -- an e-mail with his phone number

3    until September.  So I didn't have knowledge.

4    Q.       But if you saw the phone number, you could

5    have inquired further about that back in April?  If

6    you saw a phone number that was repetitive, rather.

7    A.       Yes.

8    Q.       The other thing, you said that Liz only

9    stayed overnight at two people's homes.  And one was

10   a relative, right?  Who was that?

11   A.       Her name is Christine Gaymen.

12   Q.       Did you -- after this all came out, did you

13   ever contact Christine to find out if Liz was saying

14   she was trying to stay overnight over there when she

15   was really with Eric Romig?

16   A.       No, I did not.

17   Q.       And why not?

18   A.       I didn't discuss it with anybody.

19   Q.       So she -- the relative doesn't know any of

20   the situation with Eric Romig?

21   A.       I don't know if they do or not.  I never

22   discussed it with them.

23   Q.       And how about with Ally, did you know Ally's

24   mom or father?

25   A.       No.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1   Q.       Did you -- when somebody sleeps over -- when

2   your daughter would sleep over at somebody's house,

3   would you take it upon yourself to kind of do an

4   investigation about the house to make sure it's okay

5   or appropriate for her to sleep over there?

6   A.       Not really.

7   Q.       And you never -- even though you had some

8   suspicions about something, like a boyfriend or being

9   out late or something like that, did you ever call

10   Ally's mom to say, hey, is my daughter sleeping over

11   there tonight?

12   A.       No, I did not.

13   Q.       Why not?

14   A.       I didn't distrust her at that point to

15   question it.

16   Q.       When you saw that your daughter was getting

17   picked up not from your home, but down the block, you

18   thought that was odd, right?

19   A.       Correct.

20   Q.       What did you do to look into that further?

21   A.       Just tried to watch out the window.

22   Q.       Did you actually go outside and try to --

23   A.       No.   That would have alerted her that I was

24   watching.

25   Q.       Did you tell your husband to maybe go in the

APRIL NACE

```
 1    back yard or try to look and see who was picking her

 2    up?

 3    A.        No.

 4    Q.        And why not?

 5    A.        We had brought up the subject once, I

 6    believe, and they thought -- I believe my husband

 7    thought at that time maybe I was reading too much in

 8    to my suspicions or, you know, that I wasn't quite --

 9    Q.        Did Liz ever tell you why she was getting

10    picked up down at the corner or did she give some

11    explanation?

12    A.        So we wouldn't know.

13    Q.        I mean, at the time --

14    A.        Oh, no.

15    Q.        Those of us that have children would think

16    it's something curious about not being picked up at

17    your home.  Why would you go and wait for somebody

18    like a bus to come and pick you up, why wouldn't the

19    person come to your house so they can stay inside

20    until they come to your home?  I'm just curious.  Did

21    she give any explanation at the time as to why she

22    was doing that?

23    A.        No.

24    Q.        Did you inquire of her?

25    A.        I'm not sure.
```

Appendix1222

APRIL NACE

1    Q.      Is there any reason why you would not have

2    inquired of her?

3    A.      I really didn't want her to know.  If there

4    was something that she was doing that wasn't right, I

5    wanted to find out what it was or -- I didn't want to

6    put her on guard to hide things more.

7    Q.      But you wanted -- if you had suspicions that

8    something wasn't right, you want to find that out,

9    right?

10   A.      Correct.

11   Q.      But you never asked her about that?

12   A.      No.

13   Q.      Then the other thing -- and I talked to your

14   husband about this and it's just something that

15   doesn't click to me as to making sense, but I think

16   you may have something that may add to it.  Your

17   first report to the police, you go on the evening of

18   the 26th.  Why do you allow your daughter to go

19   unaccompanied to the Belles practice on the 26th if

20   you have suspicions that there was something

21   inappropriate because you knew at that time that it

22   was Eric Romig that this could be an inappropriate

23   relationship with, correct?

24   A.      Yes.

25   Q.      So you let her go unaccompanied to this

APRIL NACE

1   practice that's run by Eric Romig with that

2   knowledge.  Why did you do that?

3   A.      Because I felt that was the safest place for

4   her.  He never did anything at practice.  There were

5   always others around.  She was never alone with him.

6   Anything that happened was always after practice,

7   after school, overnight, whatever.  It was not

8   anything --

9   Q.      Just say, for example, as the coach, he can

10  say, all right, practice is over, everybody go home,

11  except for Kelly doesn't have a ride now -- not

12  Kelly, I apologize -- I mean, Liz doesn't have a

13  ride, she's there, you had no way of knowing whether

14  he could dismiss the practice and just want to spend

15  time with Liz, right?

16  A.      It didn't occur to me until now.

17  Q.      And then she -- you confront her that

18  evening on the 26th?

19  A.      Yes.

20  Q.      And she acknowledges the full scope of the

21  sexual relationship or at least a large part of the

22  sexual relationship, correct?

23  A.      Yes.

24  Q.      And then you still permit her to go to

25  practice on the 28th and that's -- and why was that

APRIL NACE

1    again?

2    A.        We didn't want him to have any suspicions.

3    We knew she had told him that we knew and that we

4    were aware of the relationship.

5    Q.        Let me stop you there.  Wouldn't that be

6    suspicion enough for him?  He already has knowledge

7    of it.  What additional information is he going to

8    glean by her not showing up at practice?

9    A.        That we were doing something about it.

10   Q.        Like not letting her practice with somebody

11   who was having a sexual relationship with her?

12   A.        No.  That we were setting up to have him

13   arrested.

14   Q.        How would he know that you were meeting with

15   the police by not allowing her to go to practice on

16   the 28th?

17   A.        Seemed like an obvious conclusion.

18   Q.        And I think Liz indicated that she was able

19   to talk privately to Eric at that practice, that's

20   where they talked about the cell phone, the third

21   cell phone.  So did you observe that private

22   communication between --

23   A.        I did not.

24   Q.        Let me just finish my question.  Private

25   communication between Eric Romig and Liz at the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1    practice that you were there on the 28th?

2    A.        I did not.

3    Q.        Is there any reason why you didn't observe

4    that?  Were you distracted in some way?  Did you go

5    in your car or some place else?

6    A.        I could see that they were talking.  I

7    assume it was relating to softball.

8    Q.        But at that time you knew that she had

9    already told him that she told the parents, right?

10   A.        Yes.

11   Q.        And did he say anything to you at that

12   practice?

13   A.        No, he did not.

14   Q.        What do you know about the necklace, the

15   pendant that Liz was wearing that was given to her by

16   Eric?

17   A.        I wasn't aware of it.

18   Q.        Did you eventually become aware that she was

19   continuing to wear it?

20   A.        The police took it as evidence.

21   Q.        When did you first learn that it was given

22   to her by Eric Romig?

23   A.        When she told the police and they took it.

24   Q.        Do you know when that was?

25   A.        The 30th.  The day before he was arrested.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES