APRIL NACE

1    Q.        And you two knew Eric Romig for how many

2    years before this incident came to light?

3    A.        Two.

4    Q.        And you trusted him?

5    A.        Yes.

6    Q.        By all appearance, you had no reason not to

7    trust him, right?

8    A.        Correct.

9    Q.        You thought that he was a good guy?

10   A.        Yes.

11   Q.        Did you think he was a good coach?

12   A.        Yes, I did.

13   Q.        And you thought he was respectful with the

14   girls when you saw him interact with them?

15   A.        Yes.

16   Q.        And you also indicated that when you first

17   learned this information, you wanted to give him the

18   benefit of the doubt?

19   A.        Correct.

20   Q.        Do you believe there was anything that you

21   could have done differently that would have prevented

22   this from happening?

23   A.        I'd like to think so, yes.

24   Q.        What would that have been?

25   A.        Paying closer attention sooner.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1              MR. RUSSELL:  I have no further

2    questions.  Thank you.

3                     * * *

4                  EXAMINATION

5    BY MS. CONNOR:

6    Q.       Mrs. Nace, I just have a few questions for

7    you.  I believe that your daughter testified that she

8    had issues with her weight before the Romig

9    relationship and then again after.  Is that your

10   understanding?

11   A.       Yes.

12   Q.       But I think she testified that she never

13   sought medical treatment for the weight issues,

14   either before or after the Romig situation.  Is that

15   your understanding, as well?

16   A.       She didn't seek any.  It was a subject that

17   was brought up when she would have her yearly

18   physicals because she was always under weight.  So it

19   was something that was always brought up, you know.

20   Q.       At her well visits?

21   A.       Just in general.  But never as a specific,

22   we know you're doing this or we know you have this

23   problem.  It was just, these things occur.

24   Q.       Right.  Did she ever undergo any treatment

25   as a result of that?

APRIL NACE

1    A.        No.

2    Q.        Okay.  And it's my understanding that she

3    had some skin conditions before the Romig

4    relationship.  Is that correct?

5    A.        Normal acne, yes.

6    Q.        Teenager acne?

7    A.        Yes.

8    Q.        And she also had that after the relationship

9    with Romig?

10   A.        It would get worse.

11   Q.        It was worse after the relationship?

12   A.        Yes.

13   Q.        Did she seek treatment for that after the

14   relationship?

15   A.        Her pediatrician -- she didn't seek it, but

16   again at the physicals that I took her to, they made

17   note of it.  They gave me a prescription.  I didn't

18   fill it because I felt it was very -- from what I

19   knew of the drug, I thought the side effects were

20   worse than what would happen not taking the drug.

21   Q.        Okay.  Did it eventually clear up?

22   A.        I think so.

23   Q.        You mentioned Josh, that she's dating Josh

24   at the present time.  When did she meet him?

25   A.        July of this year.

APRIL NACE

1    Q.       So July of 2015?

2    A.       Yes.

3    Q.       And they're still dating?

4    A.       Yes.

5    Q.       Do you know if Liz has mentioned to Josh her

6    relationship with Eric Romig?

7    A.       I do not know.

8    Q.       What about Brooks, how did she meet Brooks?

9    A.       He was a friend of her best friend's

10   boyfriend.

11   Q.       And for how long a period of time did they

12   date?

13   A.       Early this year, like February until early

14   July, late June.

15   Q.       Did she ever mention to you whether she had

16   told him about her relationship with Eric Romig?

17   A.       She did not.

18                    MS. CONNOR:  I don't have any other

19   questions.  Thank you.

20                    MR. SANTARONE:  I don't have any

21   questions.

22                         * * *

23                    EXAMINATION

24   BY MR. COX:

25   Q.       Mrs. Nace, my name is Rob Cox, as I

APRIL NACE

1   mentioned earlier to your husband.  I just have a few

2   questions for you.

3           To start, I'd like to have you look at

4   five documents.

5               MR. COX:  David, let me hand you

6   Liz Nace's deposition transcript with the exhibits.

7   Q.      Mrs. Nace, if you would, just take a look at

8   the document that's been -- that's open there in

9   front of you and it's been marked Nace 1.  And I'll

10  represent to you that these are five documents that I

11  showed your daughter back in July or whenever it was

12  that we deposed her.

13              MR. GROTH:  Do you need to look at

14  them?  I have my copy.

15              MR. COX:  Thank you.

16  BY MR. COX:

17  Q.      Mrs. Nace, looking at Nace 1, this is a

18  document that your daughter identified as her grades

19  and courses for her high school career at Pennridge.

20  In other words, her transcript.

21  A.      Yes.

22  Q.      Does that appear to be what that is to you?

23  Do you recognize it?

24  A.      Could they make it any smaller?

25  Q.      Do you recognize it as her transcript from

APRIL NACE

88

1    Pennridge, ma'am?

2    A.        It looks to be.

3    Q.        Okay.  And is it your recollection that her

4    weighted grade point average was above a 4.0?

5    A.        I believe so, yes.

6    Q.        The next document has been marked as Nace 2.

7    And I'll represent to you that this is your

8    daughter's attendance record for her high school

9    career.  Starting on the first page, references Grade

10   12.  Does this document look to you to be accurate --

11   an accurate record of her attendance her senior year?

12   A.        I believe she was absent -- this is her

13   senior?

14                  MR. GROTH:  Yes.

15   Q.        This is the '14, '15 year.

16                  MR. GROTH:  Senior year.

17   A.        I thought she had an absence in September.

18   Q.        Of '14?

19   A.        Yes.

20   Q.        So you think there's an absence that you

21   don't see here?

22   A.        I thought there was, but I don't see it on

23   here.

24   Q.        Okay.  You're not referring to September of

25   2013, are you, ma'am?

APRIL NACE

1    A.        Oh, yes, I was.  Sorry.

2    Q.        That's the next page.  So, '14, '15, the

3    first page looks right?

4    A.        Yes.

5    Q.        So the next page of Nace 2 is the '13, '14

6    school year.  And it lists, looks like three absences

7    in September, 12th, the 27th and the 30th?

8    A.        Yes.

9    Q.        And then on October 7th?

10   A.        1st.

11   Q.        Yes.  October 1st.  Do you know what --

12   okay.  So the 12th, 27th and the 1st.  Do you know

13   what the bottom column refers to where it says other

14   absences, zero, EDCM?  Do you know that means?

15   A.        Early dismissal.

16   Q.        And so does this look accurate to you?  In

17   other words, the absences on the 27th and the 1st,

18   those are right around the time of her conversation

19   with you on the 26th and then the report to the

20   police, right?

21   A.        Yes.

22   Q.        Does this page look accurate to you?

23   A.        Yes.

24   Q.        All right.  And then the third and fourth

25   pages are for grades -- for the '11 -- I am sorry,

APRIL NACE

1    the '12, '13 school year and then the '11, '12 school

2    year.  Do those look right to you, as well?

3                    MR. GROTH:  The next few pages I

4    have, they all say Grade 12.

5                    MR. COX:  Right.  But they were

6    printed the senior year.

7    A.       Yes.

8    Q.       All right.  And then Nace 3, I'll represent

9    to you is a record of her disciplinary history, Liz's

10   disciplinary history at Pennridge.  And it reflects

11   that she didn't have any.  Is that your understanding

12   of her Pennridge career, ma'am?

13   A.       Yes.

14   Q.       The next document that I showed your

15   daughter is marked Nace 4.  And it's a copy of the

16   student handbook which was distributed to students in

17   the 2012, 2013 school year.  And that would have been

18   Liz's second year in high school, 10th grade.  Is

19   that right?

20   A.       Yes.

21   Q.       And when -- when Liz testified, she

22   confirmed that that was her signature at the bottom

23   of that cover page dated September 4th, 2012.  She

24   also believed that that was your signature at the

25   bottom.  Is that your signature?

APRIL NACE

1    A.        Yes, it is.

2    Q.        All right.  Do you remember receiving this

3    document?

4    A.        Yes.

5    Q.        On Page 5 of the student handbook, there's a

6    section that's titled, unlawful harassment.  Do you

7    see that?

8    A.        I see it.

9    Q.        Did you ever have, when you received a copy

10   of this document, a conversation with Liz about the

11   handbook, about that section, about relationships

12   with teachers or coaches or anything like that?

13   A.        No, I did not.

14   Q.        Did you ever have a conversation at all with

15   Liz, you know, while she was a kid growing up in your

16   home about inappropriate relationships with adults or

17   teachers or coaches or anything like that?

18   A.        Not directly.  I am a chaperone for the

19   church, for my church.  And we have had discussions

20   with some of the girls.  Not over coaches, but

21   inappropriate relationships, yes.

22   Q.        And when you say the girls, you mean Liz, as

23   well?

24   A.        Liz was present when -- when it was

25   discussed, yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

1    Q.        What was the nature of those conversations

2    and what was the context of it?

3    A.        It was mostly internet dangers, what you

4    shouldn't do on the internet when you don't know who

5    the other party might be, so that you wouldn't hook

6    up with the wrong person, get in to trouble meeting

7    someone inappropriately.

8    Q.        And what kind of -- were there examples

9    during that discussion of inappropriate relationships

10   or --

11   A.        No.

12   Q.        Where and when was this?  If you remember.

13   A.        It would have been one to two years before

14   this, on a church retreat.

15   Q.        Did you ever have that kind of conversation

16   just with Liz?

17   A.        No.

18   Q.        The next document that you have there is

19   marked Nace 5.  And it is -- it's the same document

20   that I just showed you, but for Liz's Grade 11, which

21   would have been the '13, '14 school year.  Is that

22   your signature at the bottom down there?

23   A.        Yes.

24   Q.        Do you have any reason to believe that

25   anyone at Pennridge knew of your daughter's

APRIL NACE

1    relationship with Eric Romig prior to his arrest on

2    October 1st?

3    A.        No.

4    Q.        Do you know Tom Creeden?

5    A.        I know he's -- was the principal before he

6    retired.  And I met with him.

7    Q.        When did you meet with him?

8    A.        Early October 2013, after --

9    Q.        What was the context of that meeting?  Was

10   it after Mr. Romig's arrest?

11   A.        Yes, it was.

12   Q.        Why did you meet with him?

13   A.        He asked me to come in.  And Mr. Babb was

14   there.  So I'm not sure if it was you that was there.

15   There was a representative from the HR department, I

16   believe it was.  I don't believe it was you.  Forgive

17   me if I'm wrong.

18   Q.        When you say you, are you referring to me?

19   A.        Yourself.

20   Q.        Okay.  I was not there.

21   A.        Okay.  And the superintendent, the lady

22   superintendent, whose name I had forgotten, was

23   there.

24   Q.        You're referring, I think, to Jacqueline

25   Rattigan?

APRIL NACE

```
 1    A.        Yes.

 2    Q.        And the human resources director at that

 3    time would have been Ray Scarpantino.  Does that name

 4    ring a bell at all?

 5    A.        I'm not sure.

 6    Q.        What did you discuss at that meeting with

 7    those individuals?

 8    A.        They wanted to offer their concern of how

 9    Liz was doing and make sure, or so they told me, that

10    she was doing okay.  They did not have her guidance

11    counselor there, so I felt it was not -- the meeting

12    wasn't set up to be what they led me to believe it to

13    be and wasn't necessarily all after Liz's concern

14    because they didn't bring her guidance counselor and

15    didn't really -- you know, say how she was helping,

16    you know.

17    Q.        Well, what was discussed at the meeting?

18    A.        They asked if there was anything they could

19    do.  At that time we were having problems because

20    some of Liz's teachers were demanding that she turn

21    in homework electronically -- and I don't remember

22    the name.  There was a specific name.  It had to be

23    sent over.  And that was the only way that was

24    allowed to turn in this homework.  We had no computer

25    because they had taken everything from us and myself
```

Appendix1238

APRIL NACE

1    and my husband don't have smart phones.  So she had

2    no way of being able to do her homework as the

3    teacher demanded.  So I asked for a laptop for her

4    from the school district.

5              And they also asked if there was anything

6    that they could have done differently.

7    Q.      And what was your response to that?

8    A.      I said, yes, I felt there was.  I've done

9    some hiring for my own company that I work for and

10   when an employee comes in and gives you references,

11   lists previous job experience, I felt -- and I didn't

12   know how Pennridge handles theirs, but I felt that it

13   should always be -- references with past jobs should

14   always be done and not by electronic means, but at

15   least by telephone, if not in person, with the --

16   maybe they aren't close enough for you to go see the

17   person, but at least talk to them so that you could

18   get a feel if there was something --

19   Q.      And do you remember when this meeting

20   occurred?

21   A.      Early October.

22   Q.      All right.

23   A.      I believe.

24   Q.      Other than your taking issue with the hiring

25   process, as you just described it, did you have any

APRIL NACE

96

1    problem with how Pennridge handled this situation

2    after Mr. Romig's arrest?

3    A.       No.

4    Q.       What made you cross reference Eric Romig's

5    phone number when you first saw the text messages on

6    the bill?

7    A.       When I saw the phone number, all I know was

8    it was familiar, that I had just seen it somewhere.

9    And when I was looking back and reading e-mails and

10   checking his e-mail -- it would have started, you

11   know, hello, my name is coach so and so, and you

12   know, practices will be on such and such a day and

13   from this time and lay out expectations, I discovered

14   that it was the same phone number.

15   Q.       In the Complaint there's reference to -- I

16   believe it was Mr. Romig's sentencing hearing -- and

17   a desire among your daughter's teammates to attend

18   that hearing?

19   A.       Correct.

20   Q.       Did you have any problem with the way

21   Pennridge School District handled that?

22   A.       In the end, no.  I had been approached by a

23   mom, one of the girls who told me that her

24   daughter -- I'm not sure if she had gone to the

25   principal, if she had gone to guidance, I don't know

Appendix1240

APRIL NACE

```
 1    who she told at the school, I believe it to be
 2    guidance, but I'm not positive; to state that she was
 3    going to go to the hearing and that several of the
 4    girls were going.  And they were told that they
 5    weren't wanted there.  And the mom immediately texted
 6    to ask me if this was true.  And I said it didn't
 7    come from me, so I didn't know what she was talking
 8    about.  And she said her daughter had been told by
 9    the school that I had said that I didn't want them to
10    be there.  And I said, no, that was not true.
11    Q.      Who is this person that you were --
12    A.      The girl or the mom?
13    Q.      Yes, the mom.
14    A.      Lisa Bolton.
15    Q.      And her daughter was a teammate of Liz's?
16    A.      Yes.
17    Q.      Did you speak to Mr. Creeden or Mr. Babb or
18    anyone else at the district about that?
19    A.      I did not.  Miss Bolton immediately after
20    her daughter texted her did speak with him.  And I
21    believe she told him in no uncertain terms that it
22    was -- she would be going and her daughter would
23    also.  And it was later determined, I believe, the
24    detectives possibly made a call on behalf and said
25    that if the team wanted to go, it was okay and they
```

APRIL NACE

1    should be allowed to go.

2    Q.        Had you requested that members of the

3    Pennridge staff keep the matter confidential?

4    A.        Yes.  I did want it to be as confidential as

5    possible.

6    Q.        And did you understand at any time that that

7    was the basis for Mr. Creeden's concern about

8    teammates attending the hearing?

9    A.        This was, I believe, the sentencing hearing.

10   It was at the end.  And by that time several of the

11   teammates had been to at least two other hearings.

12   So, it may have been his intention, but it was common

13   knowledge by that time.

14   Q.        Do you have any independent knowledge of a

15   conversation -- and again not anything that you've

16   learned from your attorneys -- between Mr. Babb and

17   Mr. Russell Hollenbach --

18   A.        No.

19   Q.        -- regarding Eric Romig?

20   A.        No.

21   Q.        Did you have the same issue with playing

22   time as your husband had in Liz's junior and senior

23   year?

24   A.        Yes.

25   Q.        Did you have -- what was your interaction

APRIL NACE

1    like with Paul Koehler?

2    A.       He asked me to keep score for him for the

3    Pennridge team.  I had told him that I had all of my

4    clearances and made it clear to him that if he needed

5    someone, I was available and would help.

6              He asked for references and score keeping

7    styles, examples, before he took me on.  And agreed

8    to do so.  And then partly through the season, he

9    decided that he no longer wanted me to keep score for

10   him and sent me an e-mail telling me so, which I said

11   fine, thank you for the opportunity, to him and

12   stepped aside.

13   Q.       Did you have any reason to believe that the

14   decrease in playing time that you -- that you allege

15   related to the Eric Romig situation?

16   A.       I do not know.

17   Q.       Do you know whether there was a -- what was

18   your interaction with Eric Romig like in Liz's first

19   and -- 9th and 10th grade years playing for him?

20   A.       It was good.

21   Q.       Where -- where and in what context did you

22   interact with him?

23   A.       At softball games, practices when I'd be

24   picking her up or afterwards.

25   Q.       Did you at any point suspect that the person

Appendix1243

APRIL NACE

1    picking your daughter up down the block was him?

2    A.        No.

3    Q.        After Liz's 9th grade season, was there a

4    softball banquet?

5    A.        Yes.

6    Q.        Did you attend that?

7    A.        Yes.

8    Q.        Did you interact with Eric Romig that

9    evening?

10   A.        Yes.

11   Q.        Did you notice anything unusual about the

12   way he and your daughter interacted at that time?

13   A.        No.

14   Q.        All right.  Same questions for after her

15   sophomore year.  Was there a banquet?

16   A.        Yes, there was.

17   Q.        And did you attend that?

18   A.        Yes, I did.

19   Q.        And was Mr. Romig there?

20   A.        Yes, he was.

21   Q.        And when was this?

22   A.        Would have been June.

23   Q.        Of 2013?

24   A.        '13.

25   Q.        And so at this point, do you know -- do you

APRIL NACE

1    know when in June the banquet occurred?

2    A.       It would have been the first to second week.

3    Q.       Was it before or after Liz's 16th birthday,

4    do you remember that?

5    A.       It would have been after.  Her birthday is

6    in May.

7    Q.       And so at least as far as the Complaint

8    alleges, at this point Mr. Romig was sending Liz

9    inappropriate texts.  Is that correct?

10   A.       I'm sorry.  Would you repeat that?

11   Q.       Sure.  As far as I can tell from your

12   Complaint, in this time period after Liz's 16th

13   birthday in June, Romig is sending her inappropriate

14   texts, correct?

15   A.       Yes.

16   Q.       Did you notice anything unusual about their

17   relationship on the night of the banquet?

18   A.       No.

19   Q.       Did you feel as though, in general, the

20   Pennridge School District was supportive of your

21   daughter --

22   A.       Yes.

23   Q.        -- after the arrest?

24   A.       Yes.

25   Q.       Would you -- is it your belief -- is it your

APRIL NACE

1    opinion that she had -- other than the Eric Romig

2    situation, a good experience at Pennridge?

3    A.       Yes.

4    Q.       Do you have any knowledge that she was ever

5    bullied or harassed by any of her peers or other

6    students or teammates?

7    A.       No, I do not.

8    Q.       Do you have any knowledge that she was ever

9    harassed or treated improperly by any member of the

10   staff or the teaching staff or support staff at

11   Pennridge other than Mr. Romig?

12   A.       No.

13                   MR. COX:  Thank you.  That's all I

14   have.

15                   MR. KEMETHER:  Nothing further.

16                   MS. CONNOR:  I just have one more

17   question.

18                        *  *  *

19                   EXAMINATION

20   BY MS. CONNOR:

21   Q.       Mrs. Nace, did you have any suspicion before

22   September 25th of 2013 that your daughter was having

23   a relationship with Mr. Romig?

24   A.       No.

25   Q.       So before you looked at those bills, you had

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES Appendix1246

APRIL NACE

1    no suspicion?

2    A.       Correct.

3    Q.       So then why you did go to the e-mail that

4    Romig had sent --

5    A.       I didn't go to it specifically.  I'm sorry.

6    I was talking at the same time.

7    Q.       That's okay.

8    A.       I was just reading the e-mails and when I

9    saw the number, it clicked that that's what number I

10   had seen.

11   Q.       So were you upset after you saw the number

12   on the phone bill so many times?

13   A.       I thought it was a friend until I discovered

14   whose phone number it was.

15   Q.       And it was that same day that you discovered

16   it was Eric Romig's number?

17   A.       Yes.

18                  MR. GROTH:  I just have one or two

19   questions.

20                        * * *

21                        EXAMINATION

22   BY MR. GROTH:

23   Q.       On the 26th -- I'm sorry, on the 25th when

24   you saw the phone bill and you saw all those numbers

25   or whatever, you told your husband that day or the

APRIL NACE

1    next day?

2    A.        Next day.

3    Q.        The next day.  The next day when you told

4    your husband, as of that point you had not had any

5    discussion with Liz, correct?

6    A.        Yes, correct.

7    Q.        You had not seen the content of a single

8    text from that number that you later identified to be

9    Mr. Romig's number and there were hundreds of pages

10   of billing with that phone number sending texts to

11   your daughter, correct?

12   A.        Correct.

13   Q.        And on the day that you first discussed that

14   with your husband on the 26th, you jointly decided

15   with him, having no conversation with your daughter

16   and having not seen the content of a single text from

17   Mr. Romig to your daughter, you both decided on that

18   day to go immediately to the police.

19   A.        Yes.

20   Q.        Is that correct?

21   A.        Yes.

22   Q.        And even that next day when you confronted

23   your daughter -- I'm sorry, that same night when you

24   confronted your daughter, if my understanding is

25   correct -- you tell me if it's not -- you didn't tell

APRIL NACE

1    Liz on that day that you had already gone to the

2    police and reported these texts, these excessive

3    number of texts to the police department.  Is that

4    correct?

5    A.        That's correct.

6    Q.        So when she told you that she had been

7    seeing him and they had a sexual relationship and

8    whatever, she still didn't know that you had gone to

9    the police.  Is that correct?

10   A.        Correct.

11   Q.        How did she find out or when did she find

12   out that you and your husband had actually already

13   gone to the police with this?

14   A.        She doesn't really -- we never really told

15   her when or that we had gone before we talked to her.

16   She knew that we told her we were going to go, but

17   we've never -- we never told her.

18   Q.        But at some point she found out that you had

19   already gone to the police, correct?

20   A.        I'm assuming she put two and two together.

21   But --

22   Q.        You don't recall having a conversation with

23   her saying, by the way, we've already taken this

24   hundreds of pages or whatever pages you took of

25   billing for her phone to the police and asked them to

APRIL NACE

1    investigate this?

2    A.      I believe we did, but I don't know what time

3    frame.

4    Q.      Okay.  And you testified earlier that she

5    told you that she thought she was in love with him.

6    Is that correct?

7    A.      Yes.

8    Q.      And that she didn't want -- strike that.

9            Did she give you the impression from your

10   conversations, your initial conversation with her,

11   that she did not want anything bad to happen to Eric

12   Romig at that time?

13   A.      That's correct.

14   Q.      Would that be true that she expressed to you

15   that she didn't want anything bad to happen to Eric

16   Romig until the detectives told her that there were

17   other girls that he had done excessive texting with

18   and may have had some type of relationship, physical

19   or otherwise, with some other girls before he had a

20   relationship with her at Pennridge?

21   A.      Yes.

22   Q.      And did her viewpoint regarding Mr. Romig

23   and whether or not she wanted to continue a

24   relationship with him or whether or not he should go

25   to jail or anything bad happen to him, did her

APRIL NACE

1    opinion of that change when she was given that

2    information by the detectives?

3    A.        It started it.  It didn't fully at first,

4    but, yes, it started it.  And she eventually came to

5    understand that this wasn't normal and right.

6    Q.        Do you believe that there are things that

7    went on between your daughter and Mr. Romig that she

8    still hasn't told you?

9    A.        Yes.

10   Q.        Was she forthcoming after Mr. Romig's

11   arrest, was she forthcoming in details about when,

12   where, how this all began and happened?

13   A.        Not to us.  Only to the police when they

14   would ask her, or the DA.  Again, I wasn't in the

15   room, so I was not -- I would find out when I went to

16   court sitting in on the hearings.

17   Q.        So the detectives interviewed your daughter

18   and she had to talk to them, correct?

19   A.        Correct.

20   Q.        She had to tell them the truth, correct?

21   A.        Correct.

22   Q.        But you weren't there, so you don't know

23   what details she told the detectives, correct?

24   A.        No.

25   Q.        You heard some of them when you went to

APRIL NACE

1    hearings, arraignment hearings, bail hearings, that

2    type of things, where the district attorney's office

3    or the detectives would actually testify as to what

4    your daughter had told them, correct?

5    A.       Correct.

6    Q.       But up to that point, had she told you any

7    of those details?

8    A.       No.

9    Q.       Did she discuss any of those details with

10   you after you heard them in court?

11   A.       No.

12   Q.       Is it your impression that your daughter is

13   specifically trying not to discuss the details of her

14   relationship with Mr. Romig with either you or your

15   husband?

16   A.       Yes.  I think she's trying to spare us any

17   more emotional distress or discomfort.

18               MR. GROTH:  I have no other

19   questions.  Thank you.

20               * * *

21               EXAMINATION

22   BY MR. KEMETHER:

23   Q.       Have you attempted to speak with your

24   daughter about the details of her relationship with

25   Eric Romig since his arrest?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

APRIL NACE

109

```
 1   A.        No.

 2                      MR. KEMETHER:  That's all I have.

 3                              * * *

 4                          EXAMINATION

 5   BY MR. RUSSELL:

 6   Q.        Just a couple of follow ups.  If it's -- if

 7   she doesn't -- if Liz does not want to talk about the

 8   details of her relationship with Eric Romig again, do

 9   you know why she wanted to file this civil lawsuit?

10   Has she told you why she wants to file it?

11   A.        She didn't fully explain, no.

12   Q.        Because I think in her deposition, if you

13   read that, she's concerned for you and your husband,

14   that this lawsuit is stressful on you.  So I'm just

15   wondering why.  But you don't know?

16   A.        No.

17   Q.        The other thing, when you went to the

18   police, in addition to the number of text messages,

19   you also told the police that you had other

20   suspicions, right?  Such as -- she was secretive, you

21   told them that she was secretive about her cell phone

22   usage?

23   A.        Yes.

24   Q.        So in addition to the number of messages,

25   you coupled that with her secretiveness about her
```

APRIL NACE

```
 1    cell phone usage, correct, when you told the police?

 2    A.        Just her secretiveness in general.

 3    Q.        In addition to secretiveness about the cell

 4    phone, you said she was secretive about going out,

 5    she would, like, go out and not tell you where she

 6    was going?

 7    A.        Correct.

 8    Q.        You told that to the police, as well, right?

 9    A.        I believe that we did.

10    Q.        And in addition to the number of text

11    messages, being secretive about her cell phone, going

12    away out of the house and not telling you where she

13    was going, you also told them that she was being

14    picked up down the street on the corner, somebody who

15    was connecting with her was not picking her up in the

16    driveway.  Did you tell them that, as well?

17    A.        I'm not sure.

18    Q.        And in addition to all these things, you

19    also told them that there was a number of video or

20    pictures that you could tell had been exchanged

21    between your daughter and this number that you

22    believe was Eric Romig, correct?

23    A.        I had that on the cell phone billing that I

24    showed them.

25    Q.        So that was all the information that you
```

Appendix1254

APRIL NACE

1    reported to the police, it wasn't just the volume of

2    texts, it was all these things, correct?

3    A.       I believe so.

4                    MR. RUSSELL:  I have no further

5    questions.

6                    MR. COX:  I have one more.

7                         *  *  *

8                    EXAMINATION

9    BY MR. COX:

10   Q.       Ma'am, you testified that you learned a

11   great detail of -- about the case from testimony that

12   you heard at hearings.  Did you ever hear testimony

13   about a -- I asked about this before, but I want to

14   ask you more directly -- did you ever in those

15   hearings or in testimony that you heard, hear about a

16   conversation between Mr. Hollenbach and Mr. Babb?

17   A.       No, I don't believe so.

18                    MR. COX:  That's all I have.  Thank

19   you.

20                 (Concluded at 5:07 p.m.)

21

22

23

24

25

1
2
3                                    OCT 22 2015
4                         _____, 2015
5
6
7            I hereby certify that the evidence
8     and proceedings are contained fully and accurately in
9     the notes taken by me of the testimony of the within
10    witness who was duly sworn by me, and that this is a
11    correct transcript of the same.
12
13
14                    _Stacy D Serba_ (signature)
15            _____
              Stacy D. Serba
16            Notary Public
17
18
      The foregoing certification does not apply to any
19    reproduction of the same by any means unless under
      the direct control and/or supervision of the
20    certifying reporter.
21
22
23
24
25

Your Honorable Judge,

    When I first found out the name of whose phone number was texting my daughter, I was astonished. I spent 2 days agonizing over what could be happening & what I should do. My first thoughts were – if I'm wrong, I could be ruining his life. Do I have the right to do this just so I know what's going on? After counting the 1000's of texts ( sometimes 400 a day ) & how many months it had been happening, I knew I had no choice in this matter. Knowing what to do & still finding the courage to approach my husband with my findings was even more difficult. I was extremely apprehensive over what he would say or do when learning of this. He agreed with me to go to the police & turn everything over to them. After I picked up our daughter from softball practice, we confronted her with our questions. At first we got denial & anger, followed quickly by tears & concern. All the while she was texting him to tell him we knew about them. At this point we took away her phone for good.

    I have never been so afraid in my life. Some of my worst fears became real. I had no idea if she would be despondent enough to commit suicide. Or if she would try to run away with him & we would never see her again.

    After hours of crying ( the first time we ever saw her cry ) & sobbing, she did not want to be alone so we held each other. We eventually laid in our king size bed, all 3 of us, holding on to each other for the rest of the night. None of us got any sleep, but we dozed on & off as she continued to cry. I was afraid to let her out



of my sight. She needed our support & love if she was going to come through this. This went on for the first week or two, even after going back to school.

The first few days, I felt so numb & sick to my stomach. I didn't eat but once a day when I forced down a sandwich or a bowl of oatmeal. I had severe headaches & pains all over, likely from the not eating & all the stress. I soon realized that my husband & daughter were in worse shape than me. They needed me so I pushed myself to go on. I missed more time from work than I ever have in 35 years with the company. I took time off for my husband & daughter to care for them. I took my daughter to the doctor because she was sick & had stopped eating also. I took her to NOVA & another doctor for a gyn exam, & another site for pregnancy & HIV tests. ( A month later I found out they were negative – WOW what a relief. )

After 3 days ( Fri – Sun ), my husband was still traumatized, so I took him to the doctor. His doctor put him on medical leave from work for 2 weeks. He was put on medication to help him sleep & cope. He is still on the medication to this day, but not as high a dose. He told his doctor but no one else. He went back to work after 2 weeks. We found out later his medical leave & pay were denied by his insurance company. He then applied for family leave through FMLA but was turned down for that also. His doctor supplied more statements but the appeal was again denied. At this point we turned to his HR director at work & informed her of the circumstances & also informed his insurance company. Our final appeal was granted & the denial was overturned. His sick pay for

those 2 weeks was approved. One small victory & one less worry for me.

While my husband was home & on the medication ( 3 times a day ), he was a zombie. There were few times when he was coherent. He never left the house except for a doctor appt. or took calls from anyone. He pulled the shades & kept the tv muted.

My husband has had other medical problems with his heart. He takes medicine daily for heart condition, high blood pressure, high cholesterol, etc. for many years now. I worry because he doesn't want anyone to know about this, nor will he talk about it. I do not have a problem talking about it. I feel the more that know , the better & the safer our daughter will be in case anything should happen. I feel like they will watch over her if I can't be there for some reason.

My husband was always extremely active with our daughter & softball. He will still act as her catcher during pitching lessons, but that is all. He no longer wants to come watch any of her games ( travel or school ), while before he rarely missed any if at all.

My husband & I had a date night every Fri. night for the last year or more. When this happened, those stopped. Four months later, I finally got him to go back out with me again. New rules – we couldn't go to our "normal" date place, or anywhere else we might know someone. This stopped again after the hearing in Jan. A few weeks ago he agreed to start going out again & we have gone out the last 2 weeks, yeah! But still not to our usual place or anywhere else we've been to twice. Small step forward though.

I feel like we are getting some of our life back to normal, but I am afraid of what will happen to us after sentencing. I am waiting for the other shoe to drop & more bad things to happen.

I have gone to every court hearing no matter how small or if I needed to. I want to be able to hear & see & try to understand what is happening. I do not trust others to tell me anything. I don't trust him not to try to pull something if I am not there. I know I need to be strong for my husband & daughter & I won't let them down. I feel like my life is on hold, like I'm running in quicksand ( getting no where but sinking fast ). I can't let that happen. My brain feels like it has stopped functioning. Before, I could multi - task with ease. Now simple things take longer to get done ( reading email, bills, making decisions ). I find it difficult to concentrate on one thing or even finish my thoughts. ( Don't even ask how long this took to write. )  I cannot focus on one thing for very long. I have to stop & regroup to be able to finish. I was always known to friends, family, & coworkers, as the problem solver. Give me a problem & I'll think outside the box until I fix or solve it. Now everything is a problem to me & it takes too much effort to think things through. I cannot even think about taking on new tasks, it's too hard. Is my brain injured? Why can't I think & cope? I hate being like this, I want my old brain back. I want to function normally again. I don't think I will be able to do that until well after sentencing. I hope the sentence is long enough to give our family time to heal & move on with our lives. I want my daughter to be able to go to college & play softball. I don't want to worry about him getting out of jail & seeing her or contacting her.

I find myself not trusting anyone, whether it's a friend, coworker, people from church, or even those involved with this case. I have the need to find things out myself ( hard since I'm not a detective or have their resources ) so that I know what is going on. His violation of my trust has blown me away. I spent time with him keeping the scorebook for the team. I feel so stupid for never noticing anything. I am very disturbed at how easily he duped my daughter & all of the other girls & the families. It is very hard to live my life without trust. I am distrustful of how "cooperative" he has been & what exactly his reasons are. I feel like he is trying to manipulate everyone around him to make this appear to be less awful.

The first month or two, I had chest pains often. Finally I discovered that they weren't a heart or health problem, but intense heartache of watching my daughter struggle. Her heart was broken & all that she knew ripped to pieces. It was like seeing an addict go through withdrawal. She had been so brainwashed by everything he had told her for so long. She appears to be handling things better now. But I worry about her view of things. I have seen signs of distrust & uncomfortableness with adult males since this has happened. She prefers not to talk about it & would like if people didn't know. She is aware that some do, but it is not brought up. She has confided in one or two of her closest friends I do know.

In the beginning, the school called almost daily to let me know if something was going on. They told me the girls were supportive. A few days in, the mood changed. The school then said they were concerned for her safety & wanted to pull her out of school. I had to weigh whether she was in actual danger vs leaving