Pennsylvania Access To Criminal History - Record Check Certification                    Page 1 of 2

🖨 Print  Cl...

# Pennsylvania State Police

1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110

## Response for Criminal Record Check

**ERIC NELSON ROMIG**
**1247 FIELDSTONE COURT**                          TELEPHONE (215) 804-0280

**QUAKERTOWN  PA  18951**

TO WHOM IT MAY CONCERN:

THE PENNSYLVANIA STATE POLICE DOES HEREBY CERTIFY THAT:

Name: Romig, Eric Nelson
Date of Birth: 05/24/1977
Social Security #: 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
Sex:
Race: White
Date of Request: 02/15/2012 05:46 AM
Purpose of Request: Education

Maiden Name and/or Alias (1)                                (2)
(3)                                (4)

*** HAS NO CRIMINAL RECORD IN PENNSYLVANIA BASED ON A CHECK BASED ON THE
ABOVE IDENTIFIERS - REFER TO CONTROL #R8710393 ***

THE RESPONSE IS BASED ON A COMPARISON OF DATA PROVIDED BY THE REQUESTER AGAINST
INFORMATION CONTAINED IN THE FILES OF THE PENNSYLVANIA STATE POLICE CENTRAL
REPOSITORY ONLY. PLEASE CONFIRM IDENTIFIERS PROVIDED. POSITIVE IDENTIFICATION
CANNOT BE MADE WITHOUT FINGERPRINTS. THE PENNSYLVANIA STATE POLICE RESPONSE DOES
NOT PRECLUDE THE EXISTENCE OF CRIMINAL RECORDS WHICH MIGHT BE CONTAINED IN THE
REPOSITORIES OF OTHER LOCAL, STATE OR FEDERAL CRIMINAL JUSTICE AGENCIES.
THE INFORMATION ON THIS CERTIFICATION FORM CAN BE VALIDATED BY ACCESSING THE
PENNSYLVANIA ACCESS TO CRIMINAL HISTORY (PATCH) RECORD CHECK STATUS SCREEN
https://epatch.state.pa.us/RCStatusSearch.jsp, AND SUBMITTING A STATUS CHECK REQUEST
THAT CONTAINS THE FOLLOWING - SUBJECT'S NAME (EXACTLY AS INITIALLY ENTERED),
CONTROL NUMBER AND DATE OF REQUEST. PATCH WILL FIND AND DISPLAY THE
CORRESPONDING RECORD CHECK REQUEST. DETAILS ON THE REQUEST CAN BE VIEWED BY
CLICKING ON THE CONTROL NUMBER. YOU WILL BE ABLE TO VERIFY IF THIS REQUEST WAS SENT
OUT AS A NO RECORD OR RECORD RESPONSE BY THE PENNSYLVANIA STATE POLICE.
QUESTIONS CONCERNING THIS CRIMINAL RECORD CHECK SHOULD BE DIRECTED TO THE PATCH
HELP LINE TOLL FREE AT 1-888-QUERY-PA (1-888-783-7972).

Certified by:

DISSEMINATED BY: SYSTEM
02/13/2012

**Lieutenant Kevin J. Deskiewicz, Director**
Criminal Records and Identification Division

https://epatch.state.pa.us/RecordCheckCert.jsp?reqName=*0H0JbIR93AWBR5CRpFPkW...    2/13/2012

Appendix1524



# PENNSYLVANIA CHILD ABUSE
# HISTORY CLEARANCE

ERIC N ROMIG
1247 FIELDSTONE COURT
QUAKERTOWN PA 18951

VERIFICATION DATE:   02/23/2012

SOCIAL SECURITY #:   XXX-XX-0391

The above named person has applied for a Pennsylvania Child Abuse History Clearance pursuant to Chapter 63 of 23 Pa. Consolidated Statutes Annotated relating to the Child Protective Services Law.   NO RECORD EXISTS in the Pennsylvania Department of Public Welfare's statewide Central Registry listing the applicant as a perpetrator of an Indicated or Founded report of child abuse or an Indicated or Founded report for school employees.

Applicants are required to show the Administrator the original document. Administrators are required to keep a copy of this child abuse history clearance on file. Any person altering the contents of this document may be subject to civil, criminal or administrative action.



ISSUED BY: Commonwealth of Pennsylvania
Department of Public Welfare
CHILDLINE AND ABUSE REGISTRY
ChildLine Verification Unit
P.O. Box 8170
Harrisburg, PA 17105-8170
(717) 783-6211

ANY ALTERATION OR ERASURE VOIDS THIS DOCUMENT

046390                                                                        DY6930 - 6/00

# PENNRIDGE SCHOOL DISTRICT
*Perkasie, Pennsylvania 18944-2295*

### Temporary FBI/Criminal/Child Abuse History Affidavit

Pennsylvania State Laws (Act 34, 1985; Act 151, 1994; Act 114, 2006) have placed the following mandates and restrictions on Public School employees who work with children. If you do not have a current PA Criminal History Record, a PA Child Abuse History Clearance and a Federal Criminal History Record from the FBI, you must complete, have notarized and return this affidavit to the Human Resources Office.

This is to swear and affirm that I have not been convicted within the last five (5) years of any of the following criminal offenses relating to:

| | |
|---|---|
| 1. Criminal homicide | 10 Concealing death of a child. |
| 2. Aggravated assault | 11. Endangering the welfare of children |
| 3. Harassment and stalking | 12. Dealing in infant children |
| 4. Kidnapping | 13. Prostitution |
| 5. Unlawful restraint | 14. Corruption of minors |
| 6. Rape or statutory sexual assault | 15. Sexual abuse of children |
| 7. Involuntary deviate sexual intercourse | 16. A felony under "The Controlled Sub-stance, Drug, Device and Cosmetic Act" |
| 8. Indecent assault and/or sexual assault and/or incest | 17. An out-of-state or federal offense similar to any of the above |
| 9. Indecent exposure | |

It is also sworn and affirmed that the Pennsylvania Department of Welfare has not named me "...as a perpetrator in a founded report of child abuse committed within the past five (5) years ..."

I have forwarded my request for Criminal Record Check (SP4-164) to the Pennsylvania State Police Repository or submitted this request on-line on this date: WE HAVE

I have forwarded my Child Abuse History Clearance to the Pennsylvania Department of Public Welfare on this date: 2 / 10 / 12.

I was fingerprinted at the Cogent Systems fingerprint site on this date: WE HAVE

Eric Romig
Printed Name of Applicant

Signature of Applicant

2 / 23 / 12
Date

Sworn and subscribed
before me, this 23rd day of
of February, 2012

Notary

COMMONWEALTH OF PENNSYLVANIA
"NOTARIAL SEAL"
DiAnne E. Brownlow, Notary Public
Perkasie Boro, Bucks County
My Commission Expires Feb. 19, 2014

Please note: This affidavit is valid for a period of time not to exceed thirty (30) days or the receipt of all required clearances as noted above, whichever comes first. This affidavit allows ninety (90) days for receipt of the FBI clearance

Rap Sheet

$\xi\beta$ 2/24/12

## Rap Sheet

| Registration ID: | PAE122H343351865 | Applicant Name (L, F M): | ROMIG, ERIC NELSON |
|---|---|---|---|
| Address: | 1247 FIELDSTONE CT, QUAKERTOWN, PA 18951 | | |
| TCN: | PDE0627722 | Type: | SRE |
| FBI Response Date: | 02/17/2012 | FBI Response Content: | N |

Rapsheet:

```
CIVIL APPLICANT RESPONSE
ICN E201204800000007S472 CIDN OCA
ROMIG,ERIC NELSON W 600 1977/05/24
MNU SOC XXX XX 0391 SEX M
FPC
HENRY CLASS API

CAC0G009Z COGENT SYSTEMS INC DATE FP
PASADENA CA 2012/02/17
A SEARCH OF THE FINGERPRINTS ON THE ABOVE
INDIVIDUAL HAS REVEALED NO PRIOR ARREST
DATA. CJIS DIVISION
2012/02/17 FEDERAL BUREAU OF INVESTIGATION




CAC0G009Z
COGENT SYSTEMS INC
639 N ROSEMEAD BLVD 1
PASADENA,CA 91107-2147
```

Error Message:

Appendix1527

## ARREST/CONVICTION REPORT AND CERTIFICATION FORM
### (under Act 24 of 2011)

**Section 1.  Personal Information**

Full Legal Name: _Eric Nelson Romig_          Date of Birth: _5_ , _24_, _1977_

Any former names
by which you have
been identified: _____

**Section 2.  Report of Arrest or Conviction**

☐

By checking this box, I report that I have been arrested for or convicted of an offense or offenses enumerated under 24 P.S. §1-111(e) ("Reportable Offense(s)"). See Instructions on Page 2 of this Form for a list of Reportable Offenses. If you have none to report, proceed to Section 3 of this form.

**Details of Arrests or Convictions**

For any arrest or conviction of any Reportable Offense, specify in the space below (or on additional attachments if necessary) the crime for which you have been arrested or convicted, the date and location of arrest and/or conviction, and the applicable court.

_____

_____

_____

_____

_____

**Section 3.  No Arrest or Conviction**

☑

By checking this box, I state that I have never been arrested for or convicted of any Reportable Offense.

**Section 4.  Certification**

By signing this form, I certify under penalty of law that the statements made in this form are true, correct and complete. I understand that false statements herein, including, without limitation, any failure to accurately report any arrest or conviction for a Reportable Offense, shall subject me to criminal prosecution under 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.

_____                    _2/7/12_
Signature                                    Date

PDE-6004 (9/1/2011)

## INSTRUCTIONS

This standardized form has been developed by the Pennsylvania Department of Education, pursuant to 24 P.S. §1-111(j), to be used by current and prospective employees of public and private schools, intermediate units and area vocational-technical schools for the written reporting by current and prospective employees of any arrest or conviction for an offense enumerated under 24 P.S. §1-111(e).

As required by subsection (j)(2) of 24 P.S. §1-111, this form shall be completed and submitted by all current employees of a public or private school, intermediate unit or area vocational-technical school by December 27, 2011. In addition, as required by subsection (j)(4) of 24 P.S. §1-111, this form shall be utilized by employees to provide written notice within seventy-two (72) hours after an arrest or conviction for an offense enumerated under 24 P.S. §1-111(e) and occurring after September 28, 2011. In accordance with 24 P.S. §1-111, employees completing this form are required to submit the form to the administrator or other person responsible for employment decisions in a school entity. If you have questions regarding to whom the form should be sent, please contact your supervisor or the school entity administration office.

**PROVIDE ALL INFORMATION REQUIRED BY THIS FORM LEGIBLY IN INK.**

### LIST OF REPORTABLE OFFENSES

An offense enumerated under 24 P.S. §1-111(e) (a "Reportable Offense") consists of any of the following:

(1)  An offense under one or more of the following provisions of Title 18 of the Pennsylvania Consolidated Statutes:

* Chapter 25 (relating to criminal homicide)
* Section 2702 (relating to aggravated assault)
* Section 2709.1 (relating to stalking)
* Section 2901 (relating to kidnapping)
* Section 2902 (relating to unlawful restraint)
* Section 2910 (relating to luring a child into a motor vehicle or structure)
* Section 3121 (relating to rape)
* Section 3122.1 (relating to statutory sexual assault)
* Section 3123 (relating to involuntary deviate sexual intercourse)
* Section 3124.1 (relating to sexual assault)
* Section 3124.2 (relating to institutional sexual assault)
* Section 3125 (relating to aggravated indecent assault)
* Section 3126 (relating to indecent assault)
* Section 3127 (relating to indecent exposure)
* Section 3129 (relating to sexual intercourse with animal)
* Section 4302 (relating to incest)
* Section 4303 (relating to concealing death of child)

* Section 4304 (relating to endangering welfare of children)
* Section 4305 (relating to dealing in infant children)
* A felony offense under section 5902(b) (relating to prostitution and related offenses)
* Section 5903(c) or (d) (relating to obscene and other sexual materials and performances)
* Section 6301(a)(1) (relating to corruption of minors)
* Section 6312 (relating to sexual abuse of children)
* Section 6318 (relating to unlawful contact with minor)
* Section 6319 (relating to solicitation of minors to traffic drugs)
* Section 6320 (relating to sexual exploitation of children)

(2)  An offense designated as a felony under the act of April 14, 1972 (P.L. 233, No. 64), known as "The Controlled Substance, Drug, Device and Cosmetic Act."

(3)  An offense SIMILAR IN NATURE to those crimes listed above in clauses (1) and (2) under the laws or former laws of:
* the United States; or
* one of its territories or possessions; or
* another state; or
* the District of Columbia; or
* the Commonwealth of Puerto Rico; or
* a foreign nation; or
* under a former law of this Commonwealth.

PDE-6004 (9/1/2011)

# ASSISTANT COACH EVALUATION FORM

Pennridge High School
**Athletic Department**
1228 North Fifth Street
Perkasie, PA 18944

Thomas J. Creeden
Principal

Coach's Evaluation

Coach: ERIC ROMIG
Title of Position: Junior Varsity Coach
Date of Evaluation: 6/6/12

Rating Code: S-Satisfactory    NI-Needs Improvement    U-Unsatisfactory    NA-Not Applicable
Commendations/Recommendations where applicable will be written in each category.

| Rating | I. Administration |
|---|---|
| S | a. Adheres to the athletic department/school philosophy and extracurricular code. |
| S | b. Adheres to the equipment policy for issuing/collecting equipment |
| NA | c. Collection/records of the student activity fee |
| NA | d. Organization of coaching staff |
| S | e. Rapport with coaching staff |
| NA | f. Preseason planning |
| S | g. Organization of practice sessions |
| S | h. Organization of facilities (equipment, weight room) |
| S | i. Supervision of student-athletes |
| S | j. Follows Suburban One League and P.I.A.A. rules |
| S | k. Keeps up to date on academic eligibility of student-athletes |
| S | l. Promotion of program |
| S | m. Public Relations (parents, media, booster club, public functions) |

50

| S | n. Attends meetings called by the Athletic Director |
| S | o. Record keeping (eligibility, emergency cards, participation forms, physical cards, medical history forms) |
| NA | p. Understands the N.C.A.A. Clearinghouse and counsels students in recruitment and future goals. |
| S | q. Adheres to district/school policies regarding use of school facilities. |

Commendations: *Eric, this year the JV team was run better than it has been in the last 5 years. You did a terrific job of preparing JV players to move*

Recommendations: *to Varsity. You were an integral part of our success.*

Comments:

| Rating | II. Skills |
| S | a. Caliber and quality of instruction |
| S | b. Demonstrates knowledge of the sport |
| S | c. Demonstrates knowledge and presentation of fundamental skills and sportsmanship |
| S | d. Demonstrates knowledge of conditioning programs related to the sport. |
| S | e. Understands the importance of strength training and incorporates it into the program |
| S | f. Provides individual, group, and team instruction |
| S | g. Prevention and care of injuries |
| S | h. Creates a safe environment for student-athletes during practice and competitions |
| S | i. Promotes integrity and mutual respect from himself and his/her student-athletes. |

Commendations: *Your passion for the game is second to none. Your level of instruction and standards of performance lead our players to*

Recommendations: *play at a higher level. You did give them a taste of what they will need to play varsity*

Comments: *softball.*

| Rating | III. Relationships |
| S | a. Cooperates with the Athletic Director |
| S | b. Communicates with the Athletic Director |
| S | c. Relationship with assistant coaches |
| S | d. Relationship with student-athletes |

51

Appendix1531

| | |
|---|---|
| *NH* | e.  Relationship with the media |
| *S* | f.  Relationship with officials |
| *S* | g.  Relationship with opponents |
| *S* | h.  Relationship with school staff/faculty |
| *S* | i.  Concern for total school program/academics |
| *S* | j.  Supportive to fellow coaches |
| *S* | k.  Concern for total athletic program |
| *S* | l.  Communication with student-athletes |
| *S* | m. Communication with parents |
| *S* | n.  Communication with athletic trainer |

Commendations: *Again, a very good job. The picnic night with the parents was very nice.*

Recommendations:

Comments:

| Rating | IV.  Performance |
|---|---|
| S | a.  Coach's appearance |
| S | b.  Devotion of time and effort to coaching duties |
| S | c.  Conduct during games |
| S | d.  Bench demeanor/control |
| S | e.  Development and communication of team goals and rules |
| S | f.  Ability to motivate players towards goals |
| S | g.  Instills enthusiasm in student-athletes |
| S | h.  Helps other coaches become better coaches |
| S | i.  Exhibits strong moral character |

Commendations:

Recommendations:

Comments:

| Rating | V.  Professional Development |
|---|---|
| S | a.  Attends league coaches meetings and clinics |
| S | b.  Attends educational coaching clinics |
| S | c.  Maintains membership to coaching associations |
| S | d.  Keeps updated by reading current literature/rule changes/supplemental material |

Appendix1532

| | |
|---|---|
| S | e.  Develops goals and objectives for the program |
| S | f.  Continuously evaluates staff and program and employs necessary changes when needed |

Commendations: *It was good how you coached JV players to want to beome Varsity players,*

Recommendations:

Comments:

## VIII.  Final summarization

In your judgement, does this coach demonstrate an adequate expertise to enable him/her to make a high quality contribution to the position he/she holds?  YES

Does he/she demonstrate that he/she understands the purposes of his/her activity in relation to the total program of Pennridge High School?  YES

Does he/she demonstrate a spirit of cooperation with colleagues, supervisors, and students?  YES

Would you recommend him/her for this position next year?  YES

IX.  Coach's Reaction (below)

VIII.  Signatures

Signature of Assistant Coach _____  Date

6/7/12

Signature of Head Coach _____  Date

Signature of Athletic Director _____  Date

7/1/12

Signatures indicate that a conference has taken place and a copy of the observation report has been received.

Attachments included          Yes_____          No _____

53

Appendix1533



# PENNRIDGE SCHOOL DISTRICT

JACQUELINE A. RATTIGAN (Ed.D.)
*CEO*

Pennridge District Administration Office
1200 North Fifth Street
Perkasie, PA  18944
215-453-2710
215-257-4594 - Fax

October 1, 2013

Mr. Eric Romig
1247 Fieldstone Court
Quakertown, PA  18951

RE:  Girls' Softball

Dear Mr. Romig:

We were surprised and shocked to learn from the Bucks' County District Attorney's Office that charges would be forthcoming against you for improper contact with one of your minor softball players.

Please be advised that you are hereby immediately suspended from any duties in connection with your position as girls' junior varsity softball coach. You are hereby directed to have no contact with any players on or off school property. You are further directed to refrain from entering onto school property for any reason.

This suspension will remain in effect until the completion of the school's investigation.

If you have any questions, you may contact Mr. Ray Scarpantonio, Director of Human Resources at 215-453-2368.

Very truly yours,

Jacqueline A. Rattigan, Ed.D.
CEO

cc:    Mr. Ray Scarpantonio, Asst. to the Superintendent for Human Resources
       Mr. David Babb, Athletic Director
       John E. Freund, Solicitor

*Mission Statement*
*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
www.pennridge.org

SD -022926-
Appendix1534

Dear parents and guardians of the Pennridge softball team,

The purpose of this message is to inform you of a situation involving our JV Softball coach, Mr. Eric Romig.

Mr. Romig has been taken into custody based on allegations that he has been improperly involved with one of our softball players. This information will most likely be made public.

Tomorrow our counselors will be available to speak with any members of the team who want to talk or who need assistance. If you or your daughter need assistance during off school hours, please feel free to contact any of the organizations listed below.

If you or your daughter have any information related to this case, please contact the Bucks County District Attorney's Office at 215-348-6344.

Please realize that the safety of all of the Pennridge students is our top priority. Mr. Romig has been suspended from coaching indefinitely pending the outcome of this investigation.

If you need further assistance, please contact Dr. Tom Creeden, our high school principal at 215-453-6944.

Sincerely,

Jacqueline A. Rattigan, Ed.D.
CEO
Pennridge School District

Resources for parents and students:

Penn Foundation – 215-257-1183
Network of Victim Assistance (NOVA) – 1-800-675-6900
Bucks County Children's Crisis – 1-877-435-7709
Children and Youth – 215-348-6900
Grandview Crisis – 215-453-4674
Suicide Hotline – 1-800-273-TALK



Right Reason Technologies

**Certificate of Completion**

*Presented To*

**CHRIS SEIDER**

*Upon Successful Completion of*

**Sexual Harassment Prevention**

*On*

**February 13, 2009**

Pennridge School District

# Pennridge School District
## Staff Computing and
## Information Systems User Agreement

### Staff Member

Name: _Chris Seider_

Position: _Health / PE_

Building(s): _Upper House_

As an employee of the Pennridge School District, I recognize and understand that, by providing access to the District's computing and networked information systems, the District requires all employees to use such systems in accordance with the Acceptable Use Policy and the Guidelines promulgated thereunder.

I acknowledge that I have received, read and understood the District's Acceptable Use Policy and the Guidelines promulgated thereunder.

Signature: _Chris Seide_      Date: _6/20/99_

1/31/98



# PENNRIDGE SCHOOL DISTRICT
*Perkasie, Pennsylvania  18944-2295*

ROBERT S. KISH (Ed.D.)
District Superintendent

KAREN B. GOKAY, Esq.
Director of Human Resources
& Legal Counsel



October 20, 1999


Mr. Christopher J. Seider
2710 Harvard Drive
Warrington, PA 18976

Dear Ms. Seider:

At its regular meeting on September 20, 1999, the Pennridge Board of School Directors approved your employment as a part-time (.8) Health and Physical Education Teacher assigned to the High School, effective August 30, 1999, subject to the completion, submission and verification of all required certification(s), personnel forms and clearances. . For the 1999-2000 school year, you will be placed on Step 2 of the Bachelor's column and, thus, compensated at an annual salary of   $24,800 [$31,000 x 80%] in accordance with the applicable Collective Bargaining Agreement.   Subsequent to this Board Meeting, your contract has been increased to full-time, and your 1999-2000 salary will now be $31,000.

Congratulations and welcome to the Pennridge School District!

Sincerely,

Karen B. Gokay
Director of Human Resources

KBG:bc

**Pennridge District Education Center**   • 1506 North Fifth Street • Perkasie, PA  18944-2295
Telephone 215-453-2715 • Fax 215-453-8699 •  www.BCIU.K12.PA.US\PENNRIDGE\PSD\PSD.HTM
*Mission Statement*
*The Pennridge School District, in partnership with family and community, will provide the opportunity for all students to become productive citizens with the necessary skills for life-long learning.*

Appendix1538



# PENNRIDGE SCHOOL DISTRICT
*Perkasie, Pennsylvania  18944-2295*

Ray Scarpantonio
Director of Human resources

March 12, 2012

Mr. Christopher Seider
36 Paige Trail
Perkasie, PA  18944

Dear Mr. Seider,

This correspondence relates to a recent finding of probable cause of unlawful harassment against you.  The complaint alleges that you verbally and physically harassed the complaintant through inappropriate comments and touching.

On Thursday, January 26, 2012 the District was informed of a harassment complaint by a female student against you.  An investigation was initiated.

At the initial explanation of charge meeting held on Friday, January 27, 2012 the allegations were reviewed with you.  After review, it was requested that you provide a written response to these allegations and names of witnesses you would like interviewed.  At that time, this investigator was informed that you declined to send a written response to these allegations or supply names of witnesses that you would like interviewed.  At a February 29, 2012 meeting attended by David Laboski, Kim DeStefano, you and me, the names of student witness to be interviewed were provided by you.

After a thorough review of the information presented by the complaintant and you, interviews of identified witnesses including professional staff and other documenting evidence, it was concluded that the charges of unlawful harassment are substantiated, and that you have violated Board Policy 248.

As a consequence of this finding of unlawful behavior the District has determined this incident will result in:

1.  <u>Termination of Coaching Duties:</u>  Effective as of Monday, March 19, 2012 you will no longer be employed as the woman's Assistant Varsity Track Coach at the High School or in any other Extra Duty position for the remainder of the 2011-2012 school year.  If you wish consideration for the following years you are welcome to express interest in the position.

2.  <u>PDE 5501 Point Deduction:</u>  You will receive point rating deductions on your end of 2011-2012 school year PDE 5501 Temporary Professional Employee / Professional Employee rating form in Category I:  Personality:  Exercises (prudent) judgment.  Please know this finding is a gross deficiency and could possibly

Appendix1539

warrant a total overall rating of unsatisfactory.  Please be aware that should this happen, a second consecutive overall unsatisfactory rating will result in a recommendation for dismissal.

3.  <u>Workplace Training:</u>  You will enroll in a workplace sensitivity program through Beacon (Health Advocate) prior to the conclusion of the 2011-2012 school year with the goal of receiving assistance in maintaining professional and appropriate student-teacher interaction and relationships.

If you are dissatisfied with the decision rendered you have the right to appeal to the Superintendent of Schools or file a grievance through your local Association (PEA).

If you decide to appeal the decision rendered, such appeal must be made within ten (10) days of receipt of said written decision.

In closing, please note that retaliation by anyone against any individual, who has reported improper conduct, including harassment, is strictly forbidden.

Sincerely,

Mr. Ray Scarpantonio
Director of Human Resources

Cc:    Mr. Thomas Creeden, Principal
       Dr. Bruce Bovard, Assistant Superintendent
       Dr. Robert Kish, Superintendent
       Mrs. Kim DeStefano, President PEA
       Personnel File

*Mission Statement*
*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
*www.pennridge.org*

Page 2 of 2

Appendix1540

<u>UNLAWFUL HARASSMENT INVESTIGATION</u>

<u>TIMELINE</u>

On Thursday, January 26, 2012 Mr. Laboski received an email at 11:37am from Mrs. Davy (see attached email) who was approached by Lauren Meyer, 11th, student. Lauren was visibly shaken. Lauren was asking for advice on what to do if a male teacher made her feel uncomfortable.

Mrs. Davy encouraged her to see Mrs. D'Angelo and/or Mr. Laboski. Lauren did not want to because she did not want to miss the tech bus and subsequently her hours.

Mr. Laboski then received a phone call from Ms. Meyer at 11:51am on voice mail. Mr. Laboski returned her call at 1:40pm and asked Ms. Meyer that she pick Lauren up from tech school and come to PHS for an interview.

Ms. Meyer and Lauren arrived at PHS at approximately 2:30pm. Mrs. D'Angelo also was present. Mr. Laboski asked Lauren the following questions:

1.  Who? Mr. Seider

2.  When? During the school day.

3.  How long has this been going on?

    Approximately since November when the badminton unit began.

4.  Where?

    WGYM, 2nd floor hallway outside room 228, and in the foyer area adjacent to room 228.

5.  What did (does) he do?

    Close up in my face ("almost touching noses"), "Always has to touch me (grab arm/hitting each other), "He stares at me" "Other students tell me he stares at my butt all the time.", "hitting my butt with (badminton and ping pong paddle more than once), Says to me, "wanna fight" jokingly so he has an excuse to touch me.

6.   What does he say?

"He brings up random things." Such as, "I will beat you up." "Recently asked me to join the track team." "Always flirting."

7.   Your reaction?

"pissed" "angry" "feel unsafe" "He is kinda weird" "confused" "I choke up that I am not sure what to say."

8.   How have you been affected by this?

"Anxiety has increased" Lauren states that she does not want to attend PHS anymore. "Makes my day so much worse." "Makes me cry."

9.   Witnessess?

Ginny Leahy, Tim Morton, Mrs. Davy, Lindsay Waters, Sadie Petitt

10.   Other victims?

None that she is aware of. Students generally talk amongst themselves and know that Mr. Seider is much too close and flirty with certain girls.

11.   Can you identify anyone else believed to have information related to these allegations?

No, but possible other sources would be students in gym class.

Lauren wrote a 5-page statement describing the events with her mother present in Mr. Laboski's office until 4:50pm. Mr. Laboski explained the steps that will be taken including interviewing the witnesses she provided. Mr. Laboski stressed to her the importance of keeping this confidential.

Mr. Laboski will provide this report and statements to Mr. Creeden.

Written by: David Laboski, Assistant Principal on Thursday, January 26, 2012.

On Friday, January 27, 2012 at 7:30am Mr. Laboski interviewed two students, Sadie Petitt and Ginny Leahy, names given to me via Lauren's report. Students provided written statements.

On Friday, January 27, 2012 Mr. Laboski contacted Ray Scarpantonio at 8:00am to make him aware of this allegation. Mr. Laboski provided Ray with a copy of Lauren's statement.

Mr. Laboski and Mr. Ott both contacted Chris Seider at 9:05am and spoke to him privately in a classroom. We explained that a female student brought a complaint against him for harassment. He asked who it was and we provided him with the name. We instructed him to contact a union rep and arrange a meeting with us.

At 10:10 Mr. Laboski, Mr. Ott, Mr. Seider, and Mrs. Destefano met in the first floor office. Mr. Laboski asked a series of questions and instructed Mr. Seider to provide his written statement by Monday. Mr. Seider was instructed to not have any contact with Lauren or Mrs. Davy or have conversation with other students about this allegation.

At 11:26 Mr. Laboski received a fax from Mrs. Meyer of a signed "Notice to Individuals Complaining of Unlawful Harassment" along with a filled out "Complaint Form" per Board Policy.

At 12:15 Mr. Laboski spoke with Mrs. Davy and told her that I would need to meet with her today since Lauren stated that she was a witness. Mrs. Davy proceeded to volunteer information that Ms. Simmons told her that she witnessed Mr. Seider and Lauren "holding hands" in the hallway near room 228.

At 1:30pm Mr. Laboski, Mr. Ott, Mrs. Davy, and Mrs. Destefano met in the first floor office. Mr. Laboski asked Mrs. Davy a series of questions. Mrs. Davy will provide a written report on Monday.

At 2:00pm Mr. Laboski and Mr. Ott phoned Mr. Creeden to provide an update.


**Up-dated on Friday, January 27, 2012 by: David Laboski**


On Monday, January 30, 2012 Mr. Laboski received Mrs. Davy's written report.

On Monday, January 30, 2012 Mr. Laboski interviewed Tim Morton and Lindsay Waters. Both provided written statements. In addition, Mr. Laboski interviewed Tyana Sterling (who was reported by Ginny Leahy as a witness).

On Monday, January 30, 2012 Mr. Laboski interviewed Ms. Roberta Simmons along with Kim Destefano and Ray Ott. See attached written statement that Ms. Simmons provided.

On Wednesday, February 01, 2012 Mr. Laboski interviewed Felicia Ulrich, 11th, whose name was provided by Ginny Leahy in her statement. See attached statement from Felicia.

Mr. Laboski ended the investigation on Wednesday, February 01, 2012.

# Pennridge School District
## Staff and Information Systems User Agreement

**Staff Member**

Name: _Jared Jutras_

Position: _substitutie custodian_

Building(s): _upper_

As an employee of the Pennridge School District, I recognize and understand that, by providing access to the District's computing and networked information systems, the District requires all employees to use such systems in accordance with the Acceptable Use Policy and the Guidelines promulgated thereunder.

I acknowledge that I have received, read and understood the District's Acceptable Use Policy and the Guidelines promulgated thereunder.

Signature: _Jared Jutras_          Date: _8/3/05_



# PENNRIDGE HIGH SCHOOL
1228 N. Fifth Street • Perkasie, PA 18944 • 215-453-6944

*Principal*
Thomas J. Creeden

*Assistant Principals*
Stephen W. Gabryluk
Keith H. Godshall
Ray Ott
Nicholas J. Schoonover, III

# MEMORANDUM

To:     Jared Jutras
From:   Mr. Creeden
Re:     Contacting Female Students via Internet
Date:   September 16, 2008

It was brought to my attention by two female sixteen year old Pennridge High School students that you have been engaging in inappropriate conversations (see attachment) with them via the Internet. As per our meeting today you have been informed to cease any contact with these students or any other students via the Internet or in person. As an employee of the district, any adult engaging in inappropriate conversation electronically or in person with a minor can cause not only termination of employment, but also legal implications.

You have also been informed to not be in the area when these students are preparing for cross country or track practice. To assist you with this process your supervisors will reschedule your hours into the evening to avoid any personal contact with students. You should also not be using any school district computers or electronic equipment.

It is very important that you understand that any further contact with these students or any other students electronically or personally will lead to termination of employment and possible referral to legal authorities. If you have any questions about this reprimand, please contact me to set up a meeting.

Attachment

c:  Mr. Tony Secreto – Custodial Supervisor
    Mr. Jeff Loeffler – Director of Operations
    Mr. Lance Strawser – PESPA Representative
    Personnel File



RECEIVED
SEP 17 2008
HUMAN RESOURCES
PENNRIDGE SD

File



# PENNRIDGE SCHOOL DISTRICT MEMO

**RAY SCARPANTONIO**
Director of Human Resources

Date:        January 26, 2009

To:          Jared Jutras

From:        Ray Scarpantonio 

Re:          Contacting Pennridge Students via the Internet

A meeting was held on January 21, 2009 at 12:00 noon to discuss concerns that you had contact with Pennridge High School students via the internet using facebook. Those present at this meeting included Mr. Secreto, Custodial Supervisor, Mr. Creeden, Pennridge High School Principal, Mr. Strawser, PESPA Representative, you and myself.

At this meeting it was shared that a student had reported to her teacher, who, as expected, reported to Mr. Creeden that you had attempted to make contact via Facebook. This is your second incident of this nature to be addressed with you. You denied these present allegations. As a result you were informed that the District would continue with its investigation of this concern.

After interviewing various individuals on one occasion it appears that your entry to a Facebook friend's list was denied and on a second you were accepted on another's Facebook friends list under the assumption that you were a student at Pennridge High School. At this time there appears to be no concrete evidence of any inappropriate comments or conduct by you. Please know that if any additional evidence becomes available the District reserves the right to re-open this investigation and proceed accordingly.

To assist in resolving this issue your job responsibilities will be relocated to different areas of the High School.

As noted in a memo to you dated September 16, 2008 it is very important you understand that adult employees of the District should not make social contact with minor students either electronically or personally. Doing these could result in repercussions up to and including termination.


RS:kk
CC:     Tony Secreto, Custodial Supervisor
        Tom Creeden, HS Principal
        Mr. Strawser, PESPA Representative



# PENNRIDGE SCHOOL DISTRICT

**ROBERT S. KISH (Ed.D.)**
*District Superintendent*

Pennridge District Education Center
1506 North Fifth Street
Perkasie, PA  18944
215-453-2710
215-257-4594 - Fax

January 11, 2005

Mr. David Heath
5 Woodbridge Drive
Doylestown, PA  18901

Dear Mr. Heath:

Enclosed is a copy of the DEBE (PDE-5501) which reflects an overall rating of unsatisfactory. This unsatisfactory rating is supported by the finding reflected in the Harassment Investigation Report that you violated Board Policies 248 and 448. This report was sent to you last week. In addition, the violation of these two policies and the facts supporting this finding constitute immorality under the School Code and further justify the rating and the recommendation of the administration that your employment with the Pennridge School District be terminated. The administration will recommend to the Board of Education termination of your employment at its regularly scheduled meeting on February 14, 2005. Your suspension without pay will remain in effect through that date.

Please be advised that you have a right to a Board hearing under 24 P.S. Sections 1108. Unless I hear from you to the contrary, the hearing before the Board of School Directors will be held on February 8, 2005 at 9:00 a.m. at the Administration Center. You may be represented by counsel and should be prepared to offer a defense to the evidence that will be presented by the administration. The meeting will be held in closed session unless you request otherwise. At the hearing, you will have the right to cross-examine the witnesses against you. The evidence at the hearing will be the testimony of the administrators and others detailing the reason for the issuance of the unsatisfactory rating and justifying the conclusion that you engaged in immoral conduct.

Please notify me by the end of the work day on January 17, 2005 if you will be attending the hearing. If you have any question regarding this letter or your rights, please do not hesitate to contact me directly.

Sincerely,

Robert S. Kish

c:      Ms. Shellie Feola, Director of Human Resources
        Mr. Tom Creeden, Principal
        Dr. Bruce Bovard, Asst. Superintendent for Instruction
        File

## INVESTIGATION REPORT

1.     COMPLAINANT:        Sarah Webster

2.     ACCUSED:        David Heath
                                                   5 Woodbridge Drive
                                                   Doylestown, PA  18901

3.     LOCATION OF INCIDENT:        Pennridge High School property

4.     DATES OF INCIDENT:        September – November 2004

5.     INVESTIGATORS:        Shellie Feola, Director of Human Resources
                                                   Thomas Creeden, Principal, Pennridge High School
                                                   Dr. Robert S. Kish, Superintendent

6.     COUNSEL:    For Employee:        Mark Neff, Esquire
                                                     1401 Walnut Street, Suite 300
                                                   Philadelphia, PA  19102

7.     DATE INCIDENT REPORTED:        November 17, 2004

8.     PROCEDURAL HISTORY

On Wednesday, November 17, 2004, Mr. Thomas Creeden, Principal of Pennridge High
School, received a phone call from Mr. & Mrs. Greg Webster, parents of Sarah Webster,
a 16 year old junior at Pennridge High School, stating that they believed that an
inappropriate relationship existed between their daughter and Mr. David Heath, Physical
Education teacher and Athletic Trainer at the High School. Earlier that day, Mrs.
Webster had discovered letters from Mr. Heath to Sarah referring to her as his "wife" and
expressing his affection. When Mrs. Webster confronted Sarah about the letters, Sarah
confirmed that the letters were from Mr. Heath and that she was engaged in a personal
relationship with him. Sarah is a student trainer who often worked closely with Mr.

Investigation Report – D. Heath                                                       Page 1

Appendix1549

Heath. Mrs. Webster also advised that she had reviewed her daughter's cell phone records and discovered that there were numerous calls she believed originated from Mr. Heath's Pennridge School District cell phone to her daughter. Some of these were calls in the evening and early morning; at times that could not reasonably be connected with school district events. Mrs. Webster provided Mr. Creeden with a copy of the letters she found.

Mr. Creeden informed Dr. Kish of the issue on the evening of November 17, 2004. Dr. Kish and Mr. Creeden met with Ms. Feola, Director of Human Resources, on the morning of November 18, 2004. The District's policy against harassment was reviewed and an investigation into the allegations was commenced.

Both Mr. Heath and Ms. Sarah Webster were interviewed on November 18, 2004. Mr. Heath's employment was suspended with pay on November 18, 2004. The District Attorney's office, Children and Youth and the Pennridge Regional Police were contacted on November 19, 2004 pursuant to the District's responsibilities under the Child Protective Services Act. Additional individuals were interviewed and documentation was reviewed.

Mr. Heath refused to participate in another interview on the advice of his attorney. After reviewing the information gathered during the course of the investigation, Mr. Heath was suspended without pay effective Monday, December 13, 2004

Appendix1550

## 9. SUMMARY OF THE INVESTIGATION

### A. Interview of David Heath

A meeting was held at 11:00 a.m. on November 18, 2004 with Mr. Heath and his union representative, Mr. Phillip Vanderstine. The allegations made by Sarah Webster were summarized by the District representatives, and Mr. Heath was informed of the procedure that would be followed for investigation of the allegations.

Mr. Heath was asked about the letters found by Mrs. Webster. Mr. Heath denied ever having written anything more than a short note to Sarah Webster. When he was shown a copy of the letter found by Mrs. Webster, he advised that they had been written to his wife on the eve of their wedding in October, 2004 and not to Sarah. Mr. Heath stated that he might have left the letter on his desk and that it must have been taken from his desk by Sarah. Mr. Heath further explained that he had looked for the letter before his wedding and when he could not locate it, he re-wrote the letter and gave the re-written one to his wife. Mr. Heath was asked to whom the initials "SLH" referred at the end of the letter and he stated that these were his wife's initials not Sarah's initials. He stated that his wife's full name is Sherrie Lillian (Palko) Heath. Mr. Heath suggested that Sarah might have taken the letter off of Mr. Heath's desk because she (and other female students) were jealous of his wife. Mr. Heath was unable to explain why Sarah Webster would tell her parents that she was engaged in a relationship with Mr. Heath but continued to maintain that Sarah might be jealous of Mr. Heath's wife.

Mr. Heath also explained that the reference to "P2" in the letter was a reference to his wife's maiden name (Palko).

Mr. Heath stated that he has a "history" with Sarah because she talks to him about her relationship with her parents. It was Mr. Heath's opinion that Sarah was intimidated by her parents.

When asked to explain the circumstances under which Mr. Heath would call Sarah and the other trainers at their homes, Mr. Heath stated that he used the Pennridge cell phone assigned to him to contact all of the trainers on various occasions because the walkie talkies don't always work and that student trainers also had access to his cell phone.

Mr. Heath also stated that he had received three missed calls from Sarah Webster's cell phone the night before (November 17, 2004) between 10:14 and 11:00 p.m. There were no messages left. However, Mr. Heath also confirmed that Sarah left practice earlier that afternoon after receiving a call from her parents and had advised him that there was something wrong at home. Diane Webster, Sarah's mother, in a subsequent interview on November 18th, informed the District administration that she had called the number three times on November 17th attempting to identify the source.

Appendix1552

Mr. Heath explained that the phrase "now hide this" contained in the letter was a suggestion to his wife because her mother was "nosy" and the letter was written before they were married.

After the interview with Mr. Heath, his representative, Mr. Putiri informed the District investigators that the document Mr. Heath identified as a letter to his wife written the night before his wedding was, in fact, two separate letters.

B. Interview of Sarah Webster

On the afternoon of November 18, 2004, Mr. Creeden, Dr. Kish, and Ms. Feola met with Mr. & Mrs. Webster and Sarah to gather more information and interview Sarah. The District's procedure for conducting the investigation was explained to Sarah and her parents.

Sarah stated that she began her duties as a student trainer at the end of her sophomore year. There was no inappropriate contact between Sarah and Mr. Heath during Sarah's sophomore year. Sarah stated that beginning in September 2004, she and Mr. Heath engaged in a sexual relationship. Sarah admitted that she and Mr. Heath were able to discuss many matters in their personal lives and that she felt comfortable with Mr. Heath. Their relationship changed in September, 2004 when Mr. Heath kissed Sarah in the training room. The relationship progressed to mutual masturbation. This occurred while the two of them were alone in the Pennridge-owned van after sporting events when Mr.

Appendix1553

Heath was returning the van to the school parking lot to retrieve his car. The sexual contact occurred on at least three occasions between September and November 2004, both before and after Mr. Heath got married.

Sarah stated that Mr. Heath had written her numerous letters but that she had thrown most of them out. When asked why she did not throw out the two letters in question, Sarah stated that in these letters, Mr. Heath was referring to her as his "wife" and she believed that although he was married, there was a future for her in his life. Sarah was asked about the contents of the letters found by her mother. She stated that the "P2" referred to Heath's characterization of the two of them being "two peas in a pod" as stated in the letter. She stated that Mr. Heath referred to her as P2. Sarah also stated that her middle initial is "L". She stated that the "SLH" was a reference to what her initials would be when she and Mr. Heath were married in the future. Sarah stated that although she knew that Mr. Heath was only recently married, the two of them discussed being together as husband and wife one day.

Sarah stated that she did not tell anyone about her relationship with Mr. Heath. Sarah was asked if she would prepare a written statement describing the physical contact. She stated that she would prepare a statement. The statement was prepared at her home and provided to the District on or around the end of November 2004. No one from the district was involved in the preparation of the hand-written statement of the student. The statement is attached to this

investigation report.  Generally, the written statement chronicles the relationship between Sarah and Mr. Heath and describes the physical relationship between the two of them.

Mr. and Mrs. Webster also provided the District with a copy of one month of Sarah's personal cell phone records.   Between September 20, 2004 and October 16, 2004, there were thirty-two (32) calls placed from Mr. Heath's Pennridge-issued cell phone to Sarah Webster.  On at least two occasions during that period of time, calls were placed after midnight to Sarah's cell phone from Heath's cell phone.  On September 24th, a call was placed at 12:15 a.m. which lasted 17 minutes.  On October 16th, the day of Mr. Heath's marriage, another 17 minute call was placed at 3:45 a.m. from Heath's Pennridge-issued cell phone.

Sarah was re-interviewed on November 22, 2004.  Ms. Webster reiterated that the sexual contact between Mr. Heath and her was limited to mutual masturbation and did not extend to sexual intercourse.

C. Additional Interviews and Investigation

On Monday, November 22, Ms. Feola and Mr. Creeden interviewed a number of people regarding their knowledge of a relationship involving Mr. Heath and a student.  Among those interviewed were Mr. Chris Seider, physical education teacher at the high school.  Mr. Seider stated that another teacher had come to

Appendix1555

inform him that Mr. Heath had been observed alone in his car with student trainers. Mr. Seider reminded Mr. Heath that he should avoid being alone with student trainers, all of whom presently are female. The three other student trainers were also interviewed: Laura White, Becky Brown, and Ashley Rex. Ashley stated that: "Sarah sometimes goes with Mr. Heath to return the van." All three girls also stated that the student trainers were not permitted to and did not use Mr. Heath's cell phone to make telephone calls.

On November 23, Ms. Feola and Mr. Creeden interviewed Nancy Godshall, Emergency Medical Technician who also works as a trainer at the high school. Mrs. Godshall indicated that she had witnessed Mr. Heath laying face down on the training table with Sarah on top and straddling him while rubbing his back. She also was aware of a note that Sarah left Mr. Heath stating, "I love you". Mrs. Godshall said she also told Mr. Heath to be careful regarding this relationship.

On November 23, Carol Miller, another EMT was interviewed. Ms. Miller stated that it appeared to her that Sarah was in love with Mr. Heath. She did not observe any inappropriate contact.

On December 2, 2004 Mr. Godshall, high school assistant principal, and Ms. Feola met with Kelly Dorner, a former student trainer. She stated that she observed Mr. Heath giving Sarah a back massage and also stated that Sarah was often late to her tenth period class because of Sarah's relationship with Mr. Heath. Ms. Dorner witnessed Sarah talking to Mr. Heath prior to class and Ms. Dorner's

Appendix1556

classmate also indicated that Sarah would often come in late to class. When the administration asked the teacher (Mrs. Destefano) if this were true, it was confirmed that Sarah was often late and when she came in she would explain that she had stopped in the trainer's room. Mrs. Destafano stated that Sarah was late almost every day.

It was confirmed by Athletic Director Joseph Thompson that on October 27, Sarah was late for the soccer game in which she was to sing the National Anthem. Mr. Thompson was forced to play a pre-recorded audiotape. Mr. Thompson witnessed Mr. Heath and Sarah arriving late together to the soccer game. Mr. Heath explained to Mr. Thompson that the reason that they were late is because they got tied up and then went to get something to eat. (During an interview with Sarah, Sarah confirmed that she was late for this soccer game because she was with Mr. Heath and that the two of them had engaged in sexual contact durng this period.)

On November 23, two month's worth of the cell phone records for Mr. Heath's Pennridge-issued cell phone were retrieved and reviewed. From September 2004 to the end of October 2004, 52 calls were made to Sarah; some of which were late in the evening or in the early morning hours after midnight. In total only 12 calls were made to the three other student trainers and none of the calls were made at an unusual hour.

Appendix1557

Mr. Heath's personnel record was reviewed. On an application to add his wife as a beneficiary on the medical insurance policy, Mr. Heath's wife's name was listed as Sheri Amanda Heath. Her initials are not "SLH". Sarah Webster's middle initial is "L". On December 8th, Dr. Kish, Mr. Creeden, and Ms. Feola attempted a second interview with Mr. Heath in an effort to obtain additional information. The district was informed by Mr. Neff, Heath's attorney that since a criminal investigation was under way, Mr. Heath would not be permitted to answer any questions.

## 10. CONCLUSIONS

A. Mr. Heath was not truthful during the course of the investigation.

  1. Mr. Heath provided inaccurate information about his wife's initials in an effort to mislead the investigators regarding the identity of the individual to whom he refers in the letters. He stated that his wife's middle name was Lillian. Her middle name is Amanda.

  2. Mr. Heath claimed that all of the student trainers had access to his cell phone. This statement was not corroborated by any other individual interviewed. Further, given the dates and times of the calls and the sheer volume of calls, Mr. Heath's explanation is not credible. The call that was made at 3:45 a.m. on the morning of his wedding, October 16th, was especially shocking.

Appendix1558

3.   Mr. Heath denied ever being alone in the van with Sarah. This assertion was refuted not only by Sarah Webster but by at least one other student trainer.

4.   Adult EMT's witnessed contact between Heath and Ms. Webster that both considered inappropriate. Heath was advised that his conduct was of concern.

5.   The letters admittedly written by Heath contain several references which would have been out of context had they been written to his future wife who is two years his senior. For example his statement in the letter, "I went through the same crap at basically the same time you are". This statement obviously relates to someone who is younger in age.

6.   At least one other teacher cautioned Mr. Heath regarding being alone with students, while another EMT cautioned him regarding his relationship specifically with Sarah.

7.   Heath's explanation of how Sarah Webster may have obtained the letters in question was not credible. On the other hand, Ms. Webster had attempted to hide the letter from her parents.

8.   The contents of the letter do not make sense if written, as contended by Mr. Heath, to his future wife on the eve of their wedding. For example, "I am bitter because you aren't mine", "It's the fact that I can't hold you in public or be affectionate with you in any way". These statements would certainly be

Appendix1559

inapplicable to an affianced couple. Mr. Heath also did not
produce nor offer to produce a copy of the letter he allegedly
substituted to his wife when he was unable to locate the original.
Mr. Heath did not offer to make his wife available for an
interview either to substantiate his story. Mrs. Heath did not
contact the administration for an interview either.

B.  An inappropriate relationship existed between Mr. Heath and Sarah Webster in
violation of the Pennsylvania Crimes Code and District policy. Mr. Heath
engaged in inappropriate conduct, immoral conduct, and violated the laws of the
Commonwealth of Pennsylvania.

C.  Procedures as outlined in district policy 248 and 448, entitled Unlawful
Harassment, have been followed.

All signed statements from students and staff interviewed in the process of this
investigation are attached to this report.

D.  It is recommended that a rating of "unsatisfactory" be issued to Mr. Heath, and
that Mr. Heath be advised that the Administration will be recommending
termination of his employment.

Appendix1560

CPY



# PENNRIDGE SCHOOL DISTRICT

*Perkasie, Pennsylvania 18944-2295*

ROBERT S. KISH (Ed.D.)

District Superintendent

January 4, 2005

Mr. David Heath
5 Woodbridge Drive
Doylestown, PA  18901

Dear Mr. Heath,

We have concluded the investigation of harassment pursuant to our board policy 248 and 448 entitled "Unlawful Harassment" (attached).   The Director of Human Resources, the building Principal, and I conducted the investigation.

The policy states that a written report be generated by the individual conducting the investigation and upon completion of the investigation said report be provided to the complainant, the accused, and others directly involved as appropriate.

The policy also states that if the complainant or accused is not satisfied with the decision rendered by the investigator, they may file a written appeal within ten (10) working days to the Superintendent of Schools.  Since I was involved in the investigation, any appeal should be directed to the Assistant Superintendent for Instruction, Dr. Bruce Bovard, who will conduct a review and/or investigation and generate the required report.

Please be aware that a substantiated charge against a District staff member shall subject such staff member to disciplinary action which may include, but not be limited to, discharge, consistent with the Public School Code of 1949, as amended, and any applicable employment agreements.

Sincerely,

Robert Kish, Ed.D.
Superintendent of Schools

Copy: Ms. Shellie A. Feola, Director of Human Resources ✓
      Mr. Tom Creeden, Building Principal
      Mr. Mark Neff, Esquire
      Dr. Bruce Bovard, Asst. Superintendent for Instruction
      File

**Pennridge District Education Center** • 1506 North Fifth Street • Perkasie, PA 18944-2295
Telephone 215-257-5011 • Fax 215-453-8699 http://www.bucksiu.org/pennridge/psd/psd.htm
*Mission Statement*
*The Pennridge School District, in partnership with family and community, will provide all students with numerous
opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped fo.*

Appendix1561



# PENNRIDGE SCHOOL DISTRICT

ROBERT S. KISH (Ed.D.)
*District Superintendent*

Pennridge District Education Center
1506 North Fifth Street
Perkasie, PA 18944
215-453-2710
215-257-4594 - Fax

November 18, 2004

Mr. David Heath
5 Woodbridge Drive
Doylestown, PA 18901

Dear Mr. Heath:

This is to inform you that effective immediately, you are suspended with pay pending an investigation of the incident that was discussed with you this morning, November 18, 2004. You will be contacted in the future regarding the continuation of the investigation. In the interim, you are to have no contact with the involved student.

Please contact me immediately if you have any questions regarding this letter.

Sincerely,

Robert S. Kish

c:     Derek Reid, Esq.
Phil Vanderstine
Tom Creeden
Personnel File ✓

*Mission Statement*

*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
www.bucksiu.org\pennridge\psd\psd.htm

Appendix1562



**COMMONWEALTH OF PENNSYLVANIA**
**GOVERNOR'S OFFICE OF GENERAL COUNSEL**

December 2, 2010

Secretary, Board of School Directors
Penn Ridge School District
1200 N. 5th Street
Perkasie, PA 18944-2207

      Re:    Mark A. Hart-Educator Misconduct Complaint
                 Surrender in lieu of Discipline

Dear Board Secretary:

Please be advised that effective November 18, 2010, Mark A. Hart surrendered his Pennsylvania teaching certification in lieu of discipline. Please be aware that such "surrender in lieu of discipline" constitutes professional discipline as defined by the Professional Educator Discipline Act. See 24 P.S. §2070.1b. As such, this matter is now resolved.

Should you have any questions, please do not hesitate to contact me. Thank you for your cooperation in this matter.

                         Sincerely,

                         Shane F. Crosby
                         Assistant Counsel

cc:    Dr. Robert Kish, Superintendent

Appendix1563



# PENNRIDGE SCHOOL DISTRICT

Robert S. Kish, Ed.D.
District Superintendent

**Office of the Assistant Superintendent**
Pennridge District Education Center
1200 North Fifth St.
Perkasie, PA 18944
215-453-2717
215-453-8699 - Fax

May 3, 2010

RECEIVED
HUMAN RESOURCES

MAY – 4 2010

PENNRIDGE SD

Mr. Steven Turner/Professional Conduct Investigator II
Office of Chief Counsel
Professional Discipline Division
PA Department of Education
333 Market St. – 9th Floor
Harrisburg, PA 17126-0333

Dear Mr. Turner,

This letter is written regarding the Pennridge School District's ongoing investigation into the allegations regarding Mr. Mark Hart, a teacher at Pennridge High School in the Pennridge School District. Mr. Hart's resignation was presented to the Board of Directors and accepted at the regular April 26, 2010 School Board meeting. Enclosed are a copy of the resignation letter and the notification of Board acceptance of this resignation. As per our communication last week, the Pennridge School District received a letter from your assistant, Miss Samantha S. Snyder, requesting copies of all documentation. You will recall that information had been previously sent to your office as I received it. I am copying Miss Snyder on this letter so that she will see that the information should be located in your office. One further point of information, the district extended its investigation of this incident to other colleagues of Mr. Hart to ascertain their knowledge of the incident. It was concluded that neither Mr. Hart nor the involved student shared any information with anyone else in the school district. The district has concluded its investigation and will continue to provide whatever information your office needs to complete your investigation process. Please let me know if I can provide any further help.

Sincerely yours,

Bruce Boyard, Ph.D.

cc:     Dr. Robert Kish, Superintendent
        Mr. Ray Scarpantonio, HR Director
        Mr. Robert Cox, District Solicitor
        Miss Samantha S. Snyder, Assistant Counsel

*Mission Statement*
*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
www.pennridge.org

Appendix1564



# PENNRIDGE SCHOOL DISTRICT

**ROBERT S. KISH (Ed.D.)**
*District Superintendent*

Pennridge District Education Center
1200 North Fifth Street
Perkasie, PA 18944
215-453-2710
215-257-4594 - Fax

February 23, 2010

Mr. Mark Hart
3101 Thompson Rd.
Telford, PA 18969

Dear Mr. Hart:

As a result of allegations that you have been involved in an inappropriate relationship with a former female student prior to her graduation, you are hereby suspended with pay pending the outcome of the district's investigation regarding these allegations. You are not to attempt any contact with the student nor are you permitted to come on to school property without specific permission of Mr. Creeden, the high school principal. Feel free to contact myself or Mr. Creeden should you require any further clarification regarding this decision.

Sincerely,

Robert S. Kish

c:     Mr. Creeden
        File

**Mission Statement**
*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
www.pennridge.org

# Certificate of Completion

*Presented To*

## MARK HART

*Upon Successful Completion of*

## Sexual Harassment Prevention

*On*

## February 13, 2009

Pennridge School District



Right Reason Technologies



# PENNRIDGE SCHOOL DISTRICT

Robert S. Kish, Ed.D.
District Superintendent

*File Copy*

**Office of the Assistant Superintendent**
Pennridge District Education Center
1200 North Fifth St.
Perkasie, PA  18944
215-453-2717
215-453-8699 - Fax

March 1, 2010

Children and Youth Services
4259 W. Swamp Road, Suite 200
Doylestown, PA  18901

To Whom It May Concern:

      The Pennridge School District wishes to advise the Children and Youth Agency that the district has learned of allegations of an inappropriate relationship between Mark Hart, a teacher at Pennridge High School and a former student while she was enrolled at Pennridge High School.  It is the district's understanding that the Pennridge Regional Police authorities have already reported this allegation to Children and Youth and, further that the district is undertaking its own investigation.  If you need more information, please contact me at your earliest convenience.

Sincerely yours,

*B. Bovard*

Bruce Bovard, Ph.D.

cc:    Dr. Robert Kish, Superintendent
       Mr. Tom Creeden, Principal

***Mission Statement***
*The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning.*
**www.pennridge.org**

Appendix1567

# Pennridge School District
## Staff Computing and
## Information Systems User Agreement

### Staff Member

Name: _Mark Hart_

Position: _Social Studies Teacher_

Building(s): _Upper_

As an employee of the Pennridge School District, I recognize and understand that, by providing access to the District's computing and networked information systems, the District requires all employees to use such systems in accordance with the Acceptable Use Policy and the Guidelines promulgated thereunder.

I acknowledge that I have received, read and understood the District's Acceptable Use Policy and the Guidelines promulgated thereunder.

Signature: _____   Date: _7-26-01_

1/31/98

Appendix1568

No. 440

SECTION: PROFESSIONAL EMPLOYEES
TITLE: RESPONSIBILITY OF STAFF FOR STUDENT WELFARE
ADOPTED: December 6, 2004

REVISED:

# Pennridge School District

| | | |
|---|---|---|
| | **440.  RESPONSIBILITY OF STAFF FOR STUDENT WELFARE** | 1 2 3 |
| 1. Purpose | The purpose of this policy is to establish guidelines for the maintenance of high professional and ethical standards of the District's professional staff. | 4 5 6 7 |
| 2. Guideline | The Board concurs with the principles on the Code of Ethics of the Education Profession adopted by the NEA Representative Assembly, 1975, and included in the NEA Strategic Plan for 2002-2004, on staff commitment to students. | 8 9 10 11 12 |
| | The educator strives to help each student realize his or her potential as a worthy and effective member of society.  The educator therefore works to stimulate the spirit of inquiry, the acquisition of knowledge and understanding, and the thoughtful formulation of worthy goals. | 13 14 15 16 17 18 |
| 42 U.S.C. Section 1983; 20 U.S.C. Section 1400 et seq., 29 U.S.C. Section 794 et seq.; 42 U.S.C. Section 2000 (e) et seq.; 22 Pa. Code Section 14.1 et seq.; 43 Pa. S.C. Section 960 et seq. | In fulfillment of the obligation to the student, the educator - | 19 20 |
| | 1.  Shall not unreasonably restrain the student from independent action in the pursuit of learning. | 21 22 23 |
| | 2.  Shall not unreasonably deny the student access to varying points of view. | 24 25 26 |
| | 3.  Shall not deliberately suppress or distort subject matter relevant to the student's progress. | 27 28 29 |
| | 4.  Shall make reasonable effort to protect the student from conditions harmful to learning or to health and safety. | 30 31 32 33 34 35 |
| | Page 1 of 2 | 36 37 38 |

| Pennridge School District | 440.  RESPONSIBILITY OF STAFF FOR STUDENT WELFARE |
|---|---|

5.  Shall not intentionally expose the student to embarrassment or disparagement.

6.  Shall not on the basis of race, color, creed, sex, national origin, marital status, political or religious beliefs, family, social or cultural background, or sexual orientation, unfairly

   a.  Exclude any student from participation in any program
   b.  Deny benefits to any student
   c.  Grant any advantage to any student

7.  Shall not use professional relationships with students for private advantage.

8.  Shall not disclose information about students obtained in the course of professional service unless disclosure serves a compelling professional purpose or is required by law.

Page 2 of 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
2
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
4
44
45

No. 448

| | |
|---|---|
| SECTION: | PROFESSIONAL EMPLOYEES |
| TITLE: | UNLAWFUL HARASSMENT |
| ADOPTED: | August 20, 1990 |
| REVISED: | March 15, 1999; June 21, 2004 |

# *Pennridge School District*

## 448. UNLAWFUL HARASSMENT

**Purpose:**

The Board strives to provide a safe, positive working environment for all employees. Therefore, it shall be the policy of the District to maintain an employment environment in which discrimination and harassment in any form are not tolerated.

Harassment on the basis of race, color, religion, ancestry, gender, national origin, age or handicap/disability is a violation of both federal and state law as it is a form of discrimination.

**Authority:**
U.S. Civil Rights Act of 1964; Section 703 of Title VII of the Civil Rights Act of 1964; Section 5(a) PHRC Act of 1955; Title IX of the 1972 Education Amendments; Americans With Disabilities Act; Age Discrimination In Employment Act

The Board prohibits all forms of unlawful harassment, including harassment because of sexual orientation and gender identity of employees by all District students and staff members, contracted individuals and vendors, and volunteers in the schools. It shall also be a violation of this policy for District employees to harass students, contracted individuals and vendors, and volunteers.

The District shall inform students, staff, parents, independent contractors and volunteers that unlawful harassment of and by employees will not be tolerated via the annual distribution of this policy and the posting of notices/signs in all District-owned buildings or leased sites. The aforementioned individuals also shall be notified that the unlawful harassment of and by employees will not be tolerated through the publication of a notice outlining the same in the school calendar.

The District also shall provide in-service training for employees concerning all aspects of unlawful harassment.

The Board directs that complaints of harassment be investigated promptly, thoroughly and impartially and that corrective action be taken immediately when allegations are verified. Confidentiality shall be maintained consistent with the District's legal and investigative obligations. No reprisals or retaliation shall occur as the result of good faith charges of harassment.

Page 1 of 3

Appendix1571

No. 448

| Pennridge School District | 448. – Page 2 of 3 |
|---|---|
| | A substantiated charge against a District staff member shall subject such staff member to disciplinary action which may include, but not be limited to, discharge, consistent with the Public School Code of 1949, as amended, and any applicable employment agreements.

If it is concluded that an employee has made false accusations, such employee shall be subject to disciplinary action which may include, but not be limited to, discharge, consistent with the Public School Code of 1949, as amended, and any applicable employment agreements.

The term "harassment" includes, but is not limited to, slurs, jokes, or other verbal, graphic or physical conduct relating to an individual's race, color, religion, ancestry, gender, gender identity, sexual orientation, national origin, age or handicap/disability.

"Ethnic harassment" includes the use of any derogatory word, phrase or action characterizing a given racial or ethnic group that creates an offensive educational environment.

"Sexual harassment" shall consist of unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal or physical conduct of a sexual nature when:

1. Acceptance of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature is a term or condition of an individual's employment.

2. Submission to or rejection of such advances/conduct is the basis for employment decisions affecting the individual.

3. Such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment.

Examples of sexual harassment include, but are not limited to, sexual flirtations, advances, touching or propositions; verbal abuse of a sexual nature; graphic or suggestive comments about an individual's dress or body; sexually degrading words to describe an individual; sexual jokes, pin-ups, calendars, objects, graffiti, vulgar statements; abusive language; sexual innuendoes; references to sexual activities; overt sexual conduct, or any such conduct that has the effect of unreasonably interfering with an employee's ability to work or which creates an intimidating, hostile or offensive learning or working environment. |

Definitions: OCR Guidelines on Sexual Harassment, Fed. Reg. Vol. 62, #49; PHRC Guidelines; PA Bulletin Vol. II, #5; Policy Memo, Office of Civil Rights USDE, March 1997

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
44
45

Appendix1572

No. 448

| Pennridge School District | 448. -- Page 3 of 3 |
|---|---|

In determining whether alleged conduct constitutes harassment, the totality of the circumstances, the nature of the conduct and the context in which the alleged conduct occurred shall be investigated. 1 2 3

Each employee shall be responsible for respecting the rights of students, their co-workers, and outside contractors and vendors and for ensuring and maintaining an atmosphere free from all forms of unlawful harassment. 4 5 6 7 8

**Responsibility:** The Superintendent of Schools and/or his/her designee shall be responsible for developing a written procedure by which complaints of harassment shall be reported and investigated. Such procedure shall provide for the following: 9 10 11 12 13

1. Specifics as to how complaints should be filed and with whom. 14 15

2. That a complainant immediately be informed of his/her rights under this policy and the law and of the complaint process in general. 16 17 18

3. That a written report be generated by the individual conducting the investigation; said report to be provided to the complainant, the accused, the Superintendent of Schools and others directly involved as appropriate. 19 20 21 22 23

4. An appeal process to be utilized if the complainant or accused is not satisfied with the decision rendered by the individual responsible for the investigation. 24 25 26 27

It is the expectation of the Board that all employees who have been harassed will report promptly such incidents in accordance with the procedure to be developed by the Superintendent of Schools and/or his/her designee. 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45

No. 248

SECTION:   PUPILS

TITLE:   UNLAWFUL HARASSMENT

**Pennridge School District**

ADOPTED:   August 20, 1990

REVISED:   December 21,1999; June 21, 2004

| | |
|---|---|
| | 248. UNLAWFUL HARASSMENT |
| Purpose: | The Board strives to provide a safe, positive environment for all students and staff members.  Therefore, it shall be the policy of the District to maintain a learning and working environment in which discrimination and harassment in any form are not tolerated. |
| Authority:<br>U.S. Civil Rights Act of 1964; Section 703 of Title VII of the Civil Rights Act of 1964;<br>Section 5(a) PHRC Act of 1955; Title IX of the 1972 Education Amendments; Americans With Disabilities Act; Age Discrimination In Employment Act | Harassment on the basis of race, color, religion, ancestry, gender, national origin, age or handicap/disability is a violation of both federal and state law as it is a form of discrimination.<br><br>The Board prohibits all forms of unlawful harassment, including harassment because of sexual orientation and gender identity of students by all District employees, other students, contracted individuals and vendors, and volunteers in the schools.  It shall also be a violation of this policy for students to harass District employees, contracted individuals and vendors, and volunteers.<br><br>The District shall inform students, staff, parents, independent contractors and volunteers that unlawful harassment of and by students will not be tolerated via the annual distribution of this policy and the posting of notices/signs in all District-owned buildings or leased sites.  The aforementioned individuals also shall be notified that the unlawful harassment of and by students will not be tolerated through the publication of a notice outlining the same in the school calendar.<br><br>The Board directs that complaints of harassment be investigated promptly, thoroughly and impartially and that corrective action be taken immediately when allegations are verified.  Confidentiality shall be maintained consistent with the District's legal and investigative obligations.  No reprisals or retaliation shall occur as the result of good faith charges of harassment. |

Page 1 of 3

No. 248

| Pennridge School District | 248. – Page 2 of 3 |
|---|---|
| | A substantiated charge against a District student shall subject such student to disciplinary action which may include, but not be limited to, expulsion, consistent with the Student Discipline Code and may include, but not be limited to, educational activities and/or counseling services related to the unlawful harassment. |
| | If it is concluded that a student has made false accusations, such student shall be subject to disciplinary action which may include, but not be limited to, expulsion, consistent with the Student Discipline Code and may include, but not be limited to, educational activities and/or counseling services related to the unlawful harassment. |
| Definitions: OCR Guidelines on Sexual Harassment, Fed. Reg. Vol. 62, #49; PHRC Guidelines; PA Bulletin Vol. II, #5; Policy Memo, Office of Civil Rights USDE, March 1997 | The term "harassment" includes, but is not limited to, slurs, jokes, or other verbal, graphic or physical conduct relating to an individual's race, color, religion, ancestry, gender, gender identity, sexual orientation, national origin, age or handicap/disability.

"Ethnic harassment" includes the use of any derogatory word, phrase or action characterizing a given racial or ethnic group that creates an offensive educational environment.

"Sexual harassment" shall consist of unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal or physical conduct of a sexual nature.

Examples of sexual harassment include, but are not limited to, sexual flirtations, advances, touching or propositions; verbal abuse of a sexual nature; graphic or suggestive comments about an individual's dress or body; sexually degrading words to describe an individual; sexual jokes, pin-ups, calendars, objects, graffiti, vulgar statements; abusive language; sexual innuendoes; references to sexual activities; overt sexual conduct, or any such conduct that has the effect of unreasonably interfering with a student's ability to learn or which creates an intimidating, hostile or offensive learning environment.

In determining whether alleged conduct constitutes harassment, the totality of the circumstances, the nature of the conduct and the context in which the alleged conduct occurred shall be investigated. |
| Responsibility: | Each student shall be responsible for respecting the rights of their fellow students and of staff, outside contractors and vendors and for ensuring and maintaining an atmosphere free from all forms of unlawful harassment. |

| Pennridge School District | 248. – Page 3 of 3 |
|---|---|
| | The Superintendent of Schools and/or his/her designee shall be responsible for developing a written procedure by which complaints of harassment shall be reported and investigated.  Such procedure shall provide for the following:<br><br>1.  Specifics as to how complaints should be filed and with whom.<br><br>2.  That a complainant immediately be informed of his/her rights under this policy and the law and of the complaint process in general.<br><br>3.  That a written report be generated by the individual conducting the investigation; said report to be provided to the complainant, the accused, the Superintendent of Schools and others directly involved as appropriate.<br><br>1.  An appeal process to be utilized if the complainant or accused is not satisfied with the decision rendered by the individual responsible for the investigation.<br><br>It is the expectation of the Board that all students who have been harassed will report promptly such incidents in accordance with the procedure to be developed by the Superintendent of Schools and/or his/her designee. |

SD -010579-
Appendix1577

# K-12 PROFESSIONAL HANDBOOK

## Table of Contents

Description of the Pennridge School District ................................................................1
District Map ................................................................................................................2
Philosophy ..................................................................................................................3
Organization of Staff ..................................................................................................4
    Foreword ..............................................................................................................4
    The School Board ..................................................................................................4
    Superintendent of Schools ....................................................................................4
    Assistant Superintendent for Instruction ..............................................................4
    Assistant Superintendent for Program ..................................................................5
    K-8 Subject Area Supervisors ..............................................................................5
    High School Subject Area Supervisors ..................................................................5
    Director of Guidance ............................................................................................5
    Curriculum Committee ..........................................................................................5
    K-12 Subject Committees ......................................................................................6
    K-12 Special Subject Committees ..........................................................................6
    K-12 Pupil Services Committee ............................................................................7
    Elementary Curriculum ........................................................................................7
    Secondary Building-Subject Departments ..............................................................7
    Secondary Subject Departments (7-12) ..................................................................8
    Secondary Curriculum Coordinating Committee ....................................................8
    Secondary Principals ............................................................................................8
    Elementary Grade Level Committees/
        Elementary Subject Area and Special Subject Committees ..............................8
    Elementary School Staffs ......................................................................................9
Organizational Chart ..................................................................................................10
General Procedures, Practices, and Regulations ..........................................................10
    Advertising in the Schools ....................................................................................10
    Bomb Threats ......................................................................................................10
    Cafeteria Meals for Visitors ..................................................................................10
    Closing of Schools ................................................................................................10
    Distribution of Printed Materials ..........................................................................10
    Fire Drills ............................................................................................................11
    Prevention of Exposure to Bloodborne Diseases ....................................................11
    Lunchroom & Recess Policies ..............................................................................12
    Opening Exercises ................................................................................................12
    Reporting to Parents/Student Progress ..................................................................12
    Interim Reports ....................................................................................................13
    School Day and Term ..........................................................................................13
    Smoking on School Premises ................................................................................14
    Time Allocations for Subjects ..............................................................................14
    Visitation of Salespersons, Parents, et.al. ..............................................................15
    Responsibilities of Special and Classroom Teachers in the Fields for
        Art, Music, and Physical Education ..............................................................15
Instructional Program
    Acceptable Use Policy ..........................................................................................17
    Guidelines for Using Personal/Home Computers and
        Peripheral Devices Within the District ..........................................................18
    Avoidance of Conflicts on Wednesday Evenings ....................................................19
    Admission of Students ..........................................................................................19
    Field Trips ............................................................................................................20

Homebound Instruction..................................................................................21
General Requirements for Lesson Plans .........................................................21
Limited English Proficiency Program.............................................................22
Nondiscrimination in Employment/Contract Practices ...................................23
Planning Time ................................................................................................25
Promotion and Retention................................................................................25
Student Trips ..................................................................................................29
Textbook Approval Process ............................................................................32
Personnel Policies ...................................................................................................34
Attendance at Educational Conventions and Meetings ...................................34
Cash in School Buildings ...............................................................................34
Certification ...................................................................................................34
Child Abuse....................................................................................................36
Complaints and Grievances not Pertaining to Agreement
      Between PEA and The Board ...................................................................36
Conflict of Interest..........................................................................................36
Contracts ........................................................................................................36
Corporal Punishment ......................................................................................37
Data Collection for Graduate Study................................................................37
Drug and Alcohol Policy ................................................................................37
Employees – Professional and Substitutes ......................................................38
Equipment......................................................................................................38
Evaluation Procedures ....................................................................................38
Evaluation of Professional Personnel..............................................................40
Extra-Curricular Activities .............................................................................41
Extra Duty ......................................................................................................42
Grievance Procedure Pursuant to Title IX and Section 504 ............................42
Health Examinations.......................................................................................42
HIV Confidentiality Policy .............................................................................42
Communicable Diseases .................................................................................45
Involvement in Decision-making.....................................................................45
Jury Duty/Subpoenaed Witness.......................................................................45
Nepotism.........................................................................................................46
Non-School Employment................................................................................47
Participation in Community Activities ............................................................47
Personnel Records ..........................................................................................47
Playground Supervision ..................................................................................48
Positions – Vacancies After The First Day of School .....................................48
Professional Development Opportunities.........................................................48
Alternative Staff Development Program ..........................................................48
Flex Inservice Days ........................................................................................49
Act 48 Compliance .........................................................................................50
Resignation.....................................................................................................50
Retirement ......................................................................................................51
Royalties .........................................................................................................51
Unlawful Harassment......................................................................................51
Administrative Guidelines for Unlawful Harassment ......................................53
Solicitations of the Staff..................................................................................55
Staff Conduct .................................................................................................55
Staff Protection...............................................................................................55
Student Gifts to Staff Members ......................................................................56
Student Records ..............................................................................................57
Student-Staff Relations ...................................................................................58
Supervision of Students ..................................................................................58
Tenure ............................................................................................................59
Travel Expenses..............................................................................................59

Student Policies.................................................................................................................60
    Rights and Responsibilities ...........................................................................................60
    Absences of Students....................................................................................................60
    Accidents and Injury of Students..................................................................................62
    Dress and Grooming.....................................................................................................63
    Drug and Alcohol Awareness.......................................................................................63
    Prohibition of Anabolic Steroids..................................................................................71
    Free or Reduced-Price School Lunches .......................................................................71
    Non-Resident Student...................................................................................................71
    Pregnancy.....................................................................................................................72
    Sexual Harassment – Pupils .........................................................................................74
    Special Education .........................................................................................................75
    Student Government .....................................................................................................76
    Use of Kitchen.............................................................................................................76
    Use of School Buildings ..............................................................................................77
    Waiting for Buses in Morning ......................................................................................77
Services ...............................................................................................................................78
    Media Services .............................................................................................................78
    Medical Services ..........................................................................................................78
    Dental Services.............................................................................................................78
    Physical Examinations .................................................................................................78
    Medicines.....................................................................................................................78
    Exceptional Students....................................................................................................79

Appendix1580

## DESCRIPTION OF THE PENNRIDGE SCHOOL DISTRICT

The Pennridge School District encompasses an area of approximately ninety-five square miles, which includes eight municipalities. There are seven elementary schools, two middle schools, and a high school which is composed of three adjacent buildings. These are as follows:

| School | Grades | Location |
|---|---|---|
| Bedminster Elementary | K-6 | Bedminster Twp. |
| Deibler Elementary | K-6 | E. Rockhill Twp. |
| Grasse Elementary | K-6 | Hilltown Twp. |
| Guth Elementary | K-6 | Perkasie Boro. |
| Sellersville Elementary | K-6 | Sellersville Boro. |
| Seylar Elementary | K-6 | Hilltown Twp. |
| West Rockhill Elementary | K-6 | W. Rockhill Twp. |
| Central Middle School | 7-8 | Silverdale Boro. |
| South Middle School | 7-8 | Perkasie/Sellersville |
| High School | 9-12 | E. Rockhill Twp. |

The schools are administered by the Superintendent of Schools. The responsibility for the supervision of the instructional program has been delegated to the Assistant Superintendent, the employment of professional employees has been delegated to the Director of Human Resources, and the responsibility for the business functions of the district has been delegated to the Business Manager. They are responsible to the Superintendent of Schools. The Principals, to whom various responsibilities are delegated, are responsible to the Assistant to the Superintendent for Instruction and Superintendent. District coordination of curriculum and technology has been placed under the responsibility umbrella of the Assistant to the Superintendent for Programs. Special programs for students in need of instructional support (IST) or special education services are placed under the responsibility of the Director of Pupil Services.

The Pennridge School Board governs the instructional program. The programs and policies of each school are referred to the School Board by the Superintendent and the Assistant Superintendents.

Appendix1581



PENNRIDGE SCHOOL DISTRICT

1. John M. Grasse Elementary School
2. Penn Central Middle School
3. M.M. Seylar Elementary School
4. Sellersville Elementary School
5. West Rockhill Elementary School
6. Penn South Middle School
7. Patricia A. Guth Elementary School
8. Pennridge High School Upper House
9. Pennridge High School Lower House
10. Pennridge High School Freshman Center
11. Robert B. Deibler Elementary School
12. Bedminster Elementary School
13. Upper Bucks County Technical School
⊚ District Education Center

BEDMINSTER

Dublin

EAST ROCKHILL

Perkasie

Silverdale

WEST ROCKHILL

Sellersville

Telford

HILLTOWN

2

Appendix1582

# PHILOSOPHY

All students in our school program, regardless of their aptitude and home environment, must be prepared for their role in society. It is the function of the school staff to provide an educational program that will enable them to develop an understanding of this role.

All staff members must guide students through experiences and learning activities that will provide a sound foundation of knowledge and problem solving strategies.

By channeling their creative energies and equipping students with principles that foster individual development, we will be preparing them for a life of change -- intellectually, physically, culturally, and morally -- that stimulates, sustains, and nourishes the lifeblood of American society.

The character of any community is a reflection of the attitudes, values, and objectives that it projects. The function of the school system is to recognize this projection and to provide an interrelationship between community and school which will satisfy and provide for the needs of both.

Living in a democratic society permits all of us, both staff and students, ample opportunity to achieve those objectives or goals that lead to "quality" education, "purposeful" living, and "physical and mental" well being.

## MISSION STATEMENT

The Pennridge School District, in partnership with family and community, will provide all students with numerous and varied opportunities to gain the knowledge and skill necessary to grow into healthy, productive citizens equipped for life-long learning. (Strategic Plan 2002-2008)

Appendix1583

# ORGANIZATION OF STAFF

## FOREWORD

It is vitally important that a school district be properly organized for curriculum development, revision, and staff improvement. It is not possible to maintain a status quo in education. An educational system which is stagnant is retrogressing. In order to progress, careful, flexible planning is required and a well-defined organization is necessary to implement the inherent procedures.

The following is the organization plan for the Pennridge School District. It encompasses grades kindergarten through twelve. The organizational plan must be flexible to enable it to serve the needs of all staff members in all subject areas, as well as to enable smooth coordination and articulation among them.

## THE SCHOOL BOARD

The School Board is the official policy-making body of the school district. The members of the School Board should approve the organizational structure for development, formulate the policies necessary for the implementation of curriculum development and staff improvement, and allocate the necessary funds. The members of the School Board should have the opportunity to approve or disapprove curriculum changes at the various stages of the curriculum-building process.

## SUPERINTENDENT OF SCHOOLS

The Superintendent, as the chief school administrator of the school district, guides and coordinates the work of the administrative assistants who are responsible for program revision and staff improvement at their respective levels. The Superintendent should approve, or disapprove, all program development activities. He should present matters concerning program improvement or revision to the members of the School Board for their consideration.

## ASSISTANT TO THE SUPERINTENDENT FOR INSTRUCTION

The Office of the Assistant to the Superintendent for Instruction is responsible for the quality of personnel and the effectiveness of instruction throughout the District. The office is also responsible for the professional growth of all instructional and administrative staff. The Pennridge School District Strategic Planning process is directed and monitored to ensure that the Plan is effectively implemented. Another function is to facilitate the effective operations of the Pennridge School District's Act 48 Professional Staff Development Plan, working through a committee of staff, Board and community members to develop staff development activities to support the Strategic Plan, curriculum initiatives and the effectiveness of the delivery of instruction in the classrooms. Other staff development programs include the New Teacher Induction Program and the development and execution of the administrative training program, which supports the improvement of leadership skills for district administrators and supervisor.

Federal grants, as assigned by the superintendent, are supervised for aspects of development, application and implementation in order to provide additional funds for Pennridge School District programs. The facilitation of the placement of student teachers from various local colleges and universities into the District's schools are a part of the responsibility of this office.

The Assistant to the Superintendent for Instruction serves as the administrative liaison to the Activities Committee of the Board of School Directors and the Policy Review Committee of the Board of School Directors.

4

## ASSISTANT TO THE SUPERINTENDENT FOR PROGRAM

The Assistant to the Superintendent for Program is responsible for curriculum development, assessment, and revision to meet the needs of the students of the Pennridge School District and to be in compliance with Chapter 4 mandates from the Pennsylvania Department of Education.

The Assistant to the Superintendent for Program meets with administrators, department coordinators, K-8 and high school curriculum supervisors on a regular basis to set goals, monitor program implementation, identify needs, and plan revision of curriculum.  The Assistant to the Superintendent for Program also supervises the Technology Coordinator.

The Assistant to the Superintendent for Program also sets agenda items with the School Board's chairperson for Curriculum Committee meetings, which are held on a monthly basis.  The Assistant to the Superintendent for Program works closely with the Assistant Superintendent for Instruction to plan staff development activities that support proper implementation of district curriculum initiatives.

## K-8 SUBJECT AREA SUPERVISORS

In August of 1995, the Pennridge School District appointed subject area supervisors for Language Arts, Social Studies, Math, and Science.  These supervisors are responsible for curriculum articulation from grades K-8 in their specific subject areas.  They are responsible for conducting committee meetings for these subject areas on a regular basis so that staff participation is insured.  They report to the Assistant Superintendent and work closely with the Director of Curriculum.  Supervisors will observe and evaluate classroom performance as members of the "supervisory support team."

## HIGH SCHOOL SUBJECT AREA SUPERVISORS

In the summer of 1996, the Pennridge School Board appointed subject area supervisors for grades 9-12 in English, Math, Science, and Social Studies.  These supervisors are responsible for teaching 3 classes per day in their subject areas and supervising other members of their department to provide support, guidance and assessment to insure quality of curriculum content and instructional delivery.  They report to the High School Principal.

## DIRECTOR OF GUIDANCE

The Director of Guidance is responsible for program development, monitoring implementation and supervision of staff to insure that the guidance program meets the needs of students in the Pennridge School District.  This position reports to the High School Principal.

## CURRICULUM COMMITTEE

The Curriculum Committee will consist of members of the Pennridge Board of Education, the Superintendent, and the Assistant to the Superintendent for Program.  Based on the specific agenda topics for each meeting, they will be joined by Subject Area Supervisors, Department Coordinators, Program Directors, Building Principals and staff members, as appropriate.

The members of the Curriculum Committee shall not be responsible to administer or supervise the educational program unless their position descriptions designate these responsibilities.  The committee will discuss program-related topics and make recommendations to the full Board concerning:

1.  Continuous re-evaluation of the district's philosophy in terms of the needs of the learners and society, including the development of Board policies, as needed;

5

Appendix1585

2.  The status of individual programs and the articulation and coordination of the curriculum in general;

3.  Proposals for program improvement and development, including the sources of funding to support them.

The committee will meet approximately once each month. A designated Board Member and the Assistant to the Superintendent for Program will serve as co-chairmen of the Curriculum Committee. The Superintendent will serve as an ex officio member of the Committee.

## K-12 SUBJECT COMMITTEES

K-12 Subject Committees shall be organized for all subject areas. The membership shall include the appropriate Elementary Subject Committee, the Secondary Subject Departments, Curriculum Supervisors, Subject Coordinators, and/or Program Directors.

The members of the K-12 Subject Committees shall not be responsible to administer or supervise the educational program unless their position descriptions designate these responsibilities. The major responsibilities of the K-12 Subject Committees will be to make recommendations to the Assistant to the Superintendent for Program.

1.  Articulation and coordination of the specific elementary and secondary subject areas.

2.  New and revised content in the specific subject.

3.  New and revised methodology and teaching techniques.

Secondary (middle and high school) subject area departments will meet once each month from October to June. Elementary Subject Committees will meet at least twice each year. K-12 articulation meetings involving both elementary and secondary committee members will occur at least twice each year. When the committee has a priority responsibility for a curriculum project, more frequent meetings will be necessary.

Designated administrators or coordinators will assume the responsibilities as chairpersons of these committees including scheduling meetings, notifying staff, and setting agendas. A member will serve as the secretary of each committee. A written record of each meeting will be submitted to the Assistant to the Superintendent for Program and the Assistant to the Superintendent for Instruction.

## K-12 SPECIAL SUBJECT COMMITTEES

K-12 Special Subject Committees will be organized for the following subject areas: Music, Art, Health/Physical Education, Reading, Library Services, IST, ESL, Guidance and Special Education.

The membership will include any staff members who are teaching or have program assignments in any of the areas. The members of the K-12 Special Subject Committees shall not be responsible to administer or supervise the educational program unless their position descriptions designate these responsibilities. The major responsibilities of the K-12 Special Subject Committees will be to make the following recommendations to the Assistant to the Superintendent for Instruction and Assistant to the Superintendent for Program:

1.  Articulation and coordination of the specific elementary and secondary special subject areas.

6

2.     New and revised content in the specific subjects.

3.     New and revised methodology and teaching techniques.

The K-12 Special Subject Committees will meet at least twice each school term. When a committee has a priority responsibility for a curriculum project, more frequent meetings will be necessary. Designated administrators or coordinators will assume the responsibilities as the chairmen or co-chairmen of these committees. A member will serve as the secretary of each committee. A written record of each meeting will be submitted to the Assistant to the Superintendent for Instruction and the Assistant to the Superintendent for Program. The Superintendent, the Assistant to the Superintendent for Instruction, and the Assistant to the Superintendent for Program will serve as ex officio members of these committees.

## K-12 PUPIL SERVICES COMMITTEE

The K-12 Pupil Services Committee will consist of all staff members working in the following areas: Guidance Counselors, School Nurses, and Psychologists. It will be directed by the Director of Pupil Services.

The major responsibilities of the Pupil Services Committee will be to make recommendations to the Director of Pupil Services concerning:

1.     New and revised programs in the respective areas.

2.     Coordination and articulation of the services offered.

The committee will meet at least twice each school year. When the committee or a specific sub-committee has a priority responsibility or a curricular project, more frequent meetings will be necessary.
Designated administrators or staff members will serve as chairmen or co-chairmen of this committee or its sub-committees. A member will serve as secretary of the committee or sub-committee. The Superintendent and Assistant Superintendent will serve as ex officio members of these committees.

## ELEMENTARY CURRICULUM

The Assistant to the Superintendent for Programs, K-8 Subject Area Supervisors, and the Principals are responsible to guide the curriculum development and staff improvement in the elementary schools. They will serve as chairmen, consultants, and members of assigned committees. They will be responsible to inform staff members of all curriculum changes and to assist in their implementation. The elementary principals are directly responsible for implementation and administration of the curriculum within each respective school. The elementary principals and assistant superintendent meet once a month to review program implementation and instructional effectiveness.

## SECONDARY BUILDING-SUBJECT DEPARTMENTS

Each secondary building shall have a department for the following subject areas: English, Social Studies, Math, Science. Each of the four previously mentioned departments shall be composed of all teachers who teach one or more classes in that subject field. These Building Subject Departments shall be coordinated by a Building Subject Leader in each building.

Appendix1587

## SECONDARY SUBJECT DEPARTMENTS (7-12)

Some subject areas in the secondary schools are better organized grades 7 through 12 rather than on a building level. This is true because of the fewer number of teachers involved. These subject areas are: Foreign Language, Business Education, Home Economics, Industrial Arts, Music, Health/Physical Education, Library Science, Guidance, Art, Special Education, and Reading.

Each of the previously mentioned departments shall be composed of the teachers who teach one or more classes in that subject field. Each of these departments shall have a department coordinator who will have the responsibility for that particular subject in grades 7 through 12.

## SECONDARY CURRICULUM COORDINATING COMMITTEE

This committee shall consist of the High School Subject Area Supervisors, Secondary Subject Department Coordinators and the Secondary Building Principals. The Assistant to the Superintendent for Programs will serve as chairperson of this committee.

The membership of the Secondary Curriculum Coordinating Committee shall not be responsible to administer or supervise the educational program, unless their position descriptions designate these responsibilities. The committee will be responsible to make recommendations to the Board's Curriculum Committee concerning:

1. Continuous re-evaluation of the secondary school's philosophy in terms of the needs of the learner.

2. Articulation and coordination of the curriculum of the secondary schools.

3. Priorities for curriculum revision and the work of the curriculum committee.

4. Planning the summer curriculum development program.

The members shall be responsible for coordination and communication among members of various curriculum committees, teachers of specific grade levels or subject areas, and staff members within and among buildings.

## SECONDARY PRINCIPALS

In the Pennridge School District, the building principals are important key personnel in the curriculum development process. They are in charge of each building, and they analyze the overall curriculum problems in a different perspective than the classroom teacher and the Department Leader/Coordinator. Each principal is responsible for the implementation and administration of the curriculum within his/her building. Department Leaders/Coordinators and curriculum personnel must work through the building principal. The secondary building principals meet once a month with the Assistant to the Superintendent for Instruction to discuss program development and secondary schools general administration of the

## ELEMENTARY GRADE LEVEL COMMITTEES
### and
## ELEMENTARY SUBJECT AREA AND SPECIAL SUBJECT COMMITTEES

The teachers of the elementary schools will meet in grade level meetings for purposes of discussing curriculum matters at least twice each school term. A principal, supervisor or a designated teacher will serve as the chairman of the meeting. One member will serve as the secretary. A written record of each

Appendix1588

meeting will be submitted to the Assistant to the Superintendent for Program and the Assistant to the Superintendent for Instruction.

Elementary staff who are not assigned to a specific grade level will join a grade level or a second special subject committee. A request for an alternative meeting schedule may be submitted prior to the end of September by a designated committee of staff members, subject to review and approval by the Assistant to the Superintendent for Program.

In addition to grade level responsibilities, each elementary teacher will be assigned to serve on one of the following Elementary Subject Area or Special Subject Committees:

| | | |
|---|---|---|
| Language Arts | Art | Remedial Reading |
| Social Studies | Music | Special Education |
| Science | Health (4-6) | Guidance |
| Mathematics | Library Services | Nurses |
| Act 48 | Technology | Educate America |

There shall be membership representing each building on each of the committees. The committee will meet at least twice each school term. A curriculum supervisor, subject coordinator, principal, or teacher will be designated as the chairman of each committee. One member will serve as the secretary of the committee. A written record of each meeting will be submitted to the Assistant to the Superintendent for Program and the Assistant to the Superintendent for Instruction.

## ELEMENTARY SCHOOL STAFFS

The staff of each elementary school shall meet at least monthly for the purpose of discussing programs and instruction. The principal will serve as the chairman for the meetings. One member will serve as the secretary. These meetings are usually held on the first Wednesday of each month.

Appendix1589



7/12/2004

BOARD OF EDUCATION

SUPERINTENDENT
Dr. Robert S. Kish

Director of Pupil Services
Mr. Rob Scoboria

Asst. Director for
Special Education
Dr. Peter Kurtzer

Supervisor of Gifted
Education
Dr. Bruce Fischman

Middle School Principals
Dr. Marge Kantes (South)
Dr. Thomas Rutter (Central)

Assistant Principals
James Shultz (South)
Glenn Donaldson (Central)

Business Administrator
Mr. Robert W. Reinhart

Food
Service
Jane
Natali

Asst. Business
Manager
Frank
Sheaffer

Psychologists
John Davidson
Tim Lyons
Frank Scafaro
Kathleen Cannon

Transp.
Rob
Fisher

Tax Office/Tax
Collectors

Director of Human
Resources
Ms. Shellie Feola

Maintenance
Jim Krynski

Admin. Tech
Coordinator
Donna Eckenrode

High School Principal
Mr. Thomas Creeden

Subject Area
Coord. &
Supervisors

Guidance
Supervisor
Judy Higgins

Asst. to Superintendent
for Program
Dr. Arlene Zielinski

Technology
Coordinator
Mr. Chris Chamuris

K-8 Supervisors
Mr. Van Jurin (Soc. St.)
Dr. Fran Kruzits (Lang. Arts)
Dr. Darlene Jones (Science)
Mr. Wayne Watson (Math)

Assistant Principals
Keith Godshall
Steve Gabryluk
Raymond Ott
Nick Schoonover

Asst. to Superintendent
for Instruction
Dr. Bruce Bovard

Public Information
Officer
Brenda Oelschlager

Director of Athletics
Joseph Thompson

Elementary Principals
Sharon Montgomery – Bedminster
Dave Wagner – Deibler
Christine Koegler – Grasse
Melody Nichols – Guth
Donald Muenker – Sellersville
Pricilla Ponist – Seylar
Susan Mowrer-Benda – West Rockhill

Appendix1590

## GENERAL PROCEDURES, PRACTICES, AND REGULATIONS

### ADVERTISING IN THE SCHOOLS

Advertising by local or area businesses in the Pennridge Schools must be approved in strict accordance with policy set by the Pennridge School Board.

Such items as calendars, book covers, and other free materials may contain national advertising providing it is in good taste and of a useful nature. For example, it would be permissible to use a calendar from Metropolitan Life Insurance Company in a classroom.

### BOMB THREATS

In the event of a bomb scare, it shall be the policy of the Pennridge School Board to take every reasonable precaution necessary for the safety and welfare of the student population and professional and nonprofessional employees of the school district. The district's safety committee has developed a quick reference guidebook for emergency situations. This resource will be distributed to all staff.

The Pennridge School Board will prosecute, to the fullest extent of the law, any person apprehended for furnishing false information concerning bombs, or causing by telephone, letter, or other means, an intentional false alarm reporting a bomb or threat of a bomb to cause damage and/or injury to a school building(s), student(s), and/or other employee(s) under the jurisdiction of the Pennridge School District.

### CAFETERIA MEALS FOR VISITORS

Information from Federal Government sources indicates that it is not permissible to serve free meals to anyone with the exception of building cafeteria workers. If we have guests either we shall have to pay for them, or they shall have to pay for themselves.

### CLOSING OF SCHOOLS

The Pennridge School District has outlined a policy for early school closings should severe weather conditions develop during the course of the school day. Parents are asked to review with their children alternate arrangements in case adults will not be at home should school be dismissed early. It should be emphasized however, the decision to close early will only be made when faced with extreme weather conditions. Parent phone chains will be utilized to whatever extent possible.

If conditions warrant once school has begun, the superintendent will make a decision by 10:30 A.M. whether or not to close schools. If that decision is made, Pennridge High School will close at 11:30 A.M., Pennridge Central and Pennridge South Middle Schools will close at 12:15 P.M., and the elementary schools at 1:00 P.M. The staggered schedule is necessary so that school buses can make their runs.

School Closing Number: (KYW News Radio 1060) – 757

Pennridge Web Site:
**http://www.bucksiu.org/pennridge/psd/psd.htm**   Click on "Cancellations"

### DISTRIBUTION OF PRINTED MATERIALS

Only those pamphlets, memorandums, bulletins, flyers, or other printed materials which are associated with the curricular or extra-curricular activities of the Pennridge schools and are approved by the appropriate building principal and/or the Superintendent of Schools, may be distributed in or on the premises or the

Appendix1591

property of the Pennridge School District, including the school buses operated by the Pennridge School District.

No student or other person shall distribute in any school building, or on the grounds of school, or in any school bus, printed materials prepared by any outside person, group, or organization, unless special permission is granted by the appropriate building principal and/or the Superintendent of Schools.

The time and place of such distribution shall be determined by the principal of the building, and may be restricted to prevent any congestion of normal student traffic flow either within the school or at exterior doors. All printed matter and/or petitions distributed on school property shall bear the name of the sponsoring organization and the name of at least one individual belonging to the organization.

## FIRE DRILLS

Fire drills are to be conducted twice a month during September, October, and November and at least once a month for the remainder of the term.

General procedures and practices which are to be followed are:

1. When the bell sounds, dismiss the pupils promptly.

2. Close all windows and doors in the classroom.

3. Students must walk silently and move as directed.

4. Students should go from the building to designated areas and are to be accompanied by their homeroom and special subject teachers.

5. The teacher shall be the last to leave the room and must account for all the students.

Strict discipline and adherence to all safety rules are expected during these drills.

## PREVENTION OF EXPOSURE TO BLOODBORNE DISEASES

Universal precautions require you to treat **all** human blood and body fluids as if they were potentially infected with a bloodborne pathogen. To assure your safety in the school environment:

1. Avoid direct contact with the blood or body fluids of **all** students and staff.

2. Send them directly to the health office.

3. If you must assist someone who is bleeding, create a **barrier** between yourself and any blood or body fluid by putting on the gloves provided to you by the nurse.

4. After use, place used gloves in a plastic bag and return them to the health office for proper disposal.

5. Wash your hands thoroughly with non-abrasive soap and running water for at least 15 seconds, being sure to wash in between fingers and under fingernails.

6. Notify custodial services for proper cleanup and disposal.

7. Notify the nurse of the incident.

Appendix1592

8. Keep these instructions with your gloves.

## LUNCHROOM & RECESS POLICIES

It is the policy of the Pennridge School Board that all students eat lunch at school.

The lunchroom period and recess activities are under the supervision of the professional staff. Volunteer and/or paid paraprofessionals may be utilized to assist in supervisory responsibilities. Each principal is responsible for the formulation of a detailed lunch schedule to insure that adequate supervision is maintained in the cafeteria.

Pupils are to eat with desirable table manners and all conversation should be in soft-spoken tones.

Each classroom teacher is responsible for the pupils who remain in the classroom during lunch recess and must have appropriate activities planned in advance.

## OPENING EXERCISES

The administrator in charge of each school is responsible for opening exercises which are to be conducted daily. The opening exercises shall begin with the recitation of the "Pledge of Allegiance to the Flag of the United States of America," followed by thirty seconds of silent meditation.

Following the period of silent meditation, each homeroom or building is urged to devote a small amount of time daily, or several days a week, as they may prefer, to the presentation of inspirational music, art, or literature. These presentations should accent our heritage, aspirations, great moments in our history, the lives of national heroes, beauty in all its forms, and ethical and moral values.

## REPORTING TO PARENTS/STUDENT PROGRESS

The Pennridge Board of School Directors believes that the cooperation of school and home is a vital ingredient in the growth and education of each student. The Board acknowledges its responsibility to keep parents informed of student academic progress in school. It also recognizes its responsibilities with respect to State Board and federal regulations governing school records.

The Board directs the Superintendent or his/her designee to establish a system of reporting student progress. All appropriate staff members are expected to comply with such a system as part of their teaching responsibilities. Such a system shall include written academic progress reports/report cards as well as parent conferences or other forms of communication with parents and/or guardians.

The Superintendent or his/her designee, in conjunction with appropriate staff members, shall develop procedures for reporting student progress to parents and guardians. These reporting procedures may include a variety of methods of reporting that are appropriate to the grade level and curriculum content. The student progress reporting system shall include information regarding student attainment of state and district academic standards and, as appropriate, district graduation requirements.

The reporting system shall include provisions for timely advance notice of unsatisfactory progress and/or a pending grade that would adversely affect the student's status, including but not limited to those that may result in loss of credit or retention.

Appendix1593

## INTERIM REPORTS

An important part of any educational program is informing parents/guardians of the progress made by their children. This is accomplished through a systematic method of reporting pupil progress. Both Parent-Teacher Conferences and Report Cards are used.

Conferences will be scheduled at the end of the first marking period. Conferences may be scheduled by either parents/guardians or teachers. At the elementary level, conferences are scheduled for each student at the close of the first marking period. Twenty-minute schedules are arranged to have parents/guardians meet with teachers in their classrooms for conferences. The discussion concerns the child's progress, work habits, and procedures which may be helpful to him/her. Conferences will be scheduled at the secondary level at the direction of the building principal. Each teacher is expected to plan a "full" schedule of parent conferences during the time provided on the District calendar.

Conference worksheets are used for conferences. A copy of this is given to the parent/guardian and a copy is filed in the student's cumulative folder.

Report cards evaluate the individual child's work in relationship to his/her ability and then compare his/her progress with that of his/her class. The marking scale used in each grade level is designated on the report card.

Grades pertaining to art, music, and physical education will be completed by each special teacher and submitted to the classroom teachers for inclusion with the student's report cards.

## SCHOOL DAY AND TERM

The Public School Code, as amended, provides in Section 1501 that "All public elementary and secondary schools shall be kept open each year for at least one hundred eighty (180) days." The Department of Public Instruction interprets 180 days to mean 180 days of instruction for pupils and no days on which schools are closed shall be counted as days taught. The Pennridge school calendar for 2004-2005 has scheduled 184 instructional days.

Although the Department recommends a six-hour day, it will not recognize for State reimbursement purposes, exclusive of kindergarten, any school year which averages less than five hours of instruction time per day for the entire term of a minimum 900 pupil hours of instruction per school year at the elementary level and 990 at the secondary level.

The following activities are among those which are not interpreted as instruction time: early dismissals, celebrations, picnics, dismissal for teacher meetings, proprietary activities.

Individual daily sessions may be shortened due to inclement weather or for other valid causes which are beyond the control of school officials.

The policy with respect to half-day sessions is covered in Section 1504 of the School Laws.

Appendix1594

## SMOKING ON SCHOOL PREMISES

### Employees/Visitors

The Board of School Directors recognizes its responsibility to ensure a safe and healthful environment for all employees and students of the District.  Because of the health hazards documented by the Surgeon General of the United States and the safety hazards indicted in the local fire regulations, the Pennridge School District has set the following policy regarding smoking on District premises by employees and visitors.

Smoking is defined as possessing a lighted cigarette, cigar, pipe, or the use of any other tobacco product.

**Smoking Prohibition**

- Smoking is not permitted in school buildings or on school grounds.

- Smoking is not permitted on school buses or any other school vehicle.

- Smoking is not permitted at any school functions, including home and away athletic contests.

Any individual who violates this policy will be subject to disciplinary action, which may include, but not be limited to, a fine, suspension, or dismissal.

No portion of this policy shall be construed to violate any laws of the Commonwealth or Federal governments or the Collective Bargaining Agreements between the Pennridge School Board and the district employees.

## TIME ALLOCATIONS FOR SUBJECTS

The following time allocations are a general guideline to aid teachers in planning daily and weekly instruction in the various subject areas.  They represent an approximate daily average over the course of the school year.  It is recognized that assemblies, delayed openings and special programs of any sort will require a corresponding adjustment of the schedule.  Interdisciplinary integration (instruction which addresses curriculum goals and objectives in two or more subjects) can be counted toward the time allocations in all subjects addressed.

| Subject Area | Grades K-2 | Grades 3-6 |
|---|---|---|
| Integrated Reading/Language Arts; (includes reading in the content areas, literature, grammar, spelling, handwriting, and writing | 110-120 minutes | 80-90 minutes |
| Mathematics | 45-60 minutes | 45-60 minutes |
| Social Studies | 25-35 minutes | 35-45 minutes |
| Science | 25-35 minutes | 35-45 minutes |

The following subjects are also the responsibility of the elementary classroom teacher, but should be scheduled on a WEEKLY rather than a daily basis.  Please note change in grade level grouping.

Appendix1595

| Subject Area | Grades K-2 | Grades 3-6 |
|---|---|---|
| Health | No K program; Grades 1-3 taught by H/PE specialist (30-35 minutes per week) | 30 minutes/week (includes units taught by nurses) |
| Computer Education | 30 minutes/week **OR** 4-5 hours/marking period (curriculum-related infusion activities, as appropriate) | 30-40 minutes per week for formal computer education curriculum (additional curriculum-related activities, as appropriate) |

## VISITATION OF SALESPERSONS, PARENTS, et.al.

The resolution adopted by the Pennridge School Board for the posting of the following notice is in the lobby of each school building:

Only authorized personnel are permitted in this building
All other persons must report to the office

The following are regulations pertaining to these visitations:

1. Salespersons will not be permitted to interrupt teachers at any time or a discussion of personal business.

2. Parents of children in our schools and other interested citizens are always welcome to visit us. All such visitors should register in the office of the Building Principal and will be required to secure and display a "visitor" identification card. Permission must be secured from the Principal if the purpose is to observe a classroom session. The best procedure is to arrange such a visitation with the Principal by telephone in advance, since there are days when the giving of examinations may make the observation of a normal classroom day inappropriate. If the visitor has not followed this procedure, he/she should be referred to the Building Principal by the teacher. The Building Principal shall have the authority to refuse permission to observe a certain class if he/she believes such a visitation would be detrimental to the program of the school.

3. All Pennridge employees are expected to display their employee identification badges at all times.

4. Conferences for the purpose of discussing a school problem should be held before or after the school day. Classes should not be interrupted for this purpose. Parents wishing to discuss a problem with a teacher should call, in advance, either the teacher or the school, and arrange a time that will be mutually agreeable.

5. Parents are urged not to bring young children when visiting schools.

## RESPONSIBILITIES OF SPECIAL AND CLASSROOM TEACHERS IN THE FIELDS FOR ART, MUSIC, AND PHYSICAL EDUCATION

Special teachers in art, vocal music, and physical education are responsible for teaching their special subjects. These periods will be used by classroom teachers for team meetings and planning periods.

Appendix1596

The special teachers will inform classroom teachers of their general plans at the beginning of each month. The classroom teacher must assume the responsibility to inform the special teachers of units of study taught at specific times in order that the special teacher might plan correlated activities. The classroom teacher should also request types of activities which he/she feels would be of value. These special requests should be made at least two weeks in advance.

Teachers of special subjects of art, music, and physical education will plan and present culminating programs for students and parents during the school term. One month prior to any presentation involving students, the teacher sponsor should inform all parents of possible participants of the nature of the presentation in order to enable them to indicate in writing if the pupil is to participate.

Art exhibits should be representative of all grades and all media. Included in the display should be at least one project completed by each student.

Several musical programs are presented each year under the direction of the music teachers. The classroom teachers and vocal music teachers decide upon the types of vocal programs which are to be presented. Participation by grade levels is determined by the music teacher and Principal. Classes of students are to present these performances, as well as special groups of musicians who have performed and been organized for the entire school term. The instrumental music teacher also presents various concerts throughout the school term.

The physical education teachers are responsible to conduct an adaptive physical education program for all students in need. Intramural programs for students in grades four, five, and six should be implemented with the approval of the Building Principal.

The physical education teachers are also required to direct a physical education program in which students demonstrate activities for parents/guardians. The Annual "Field Day" or "Play Day" activities are under the direction of the physical education teachers and are held at each school in the Spring. All students of the grades included participate in the activities. Events such as relays, races, and team games are scheduled. If students are physically unable to participate, they should be allowed to be spectators, if they wish. However, students who do not desire to participate remain in a classroom and will be assigned materials to be completed under teacher supervision.

Appendix1597

# INSTRUCTIONAL PROGRAM

## ACCEPTABLE USE POLICY

The Board of School Directors recognizes the important role that computers and other forms of technology play in a student's education and in the pursuit of the District's educational goals. The Board, therefore, has authorized the Superintendent or his/her designee to make available computing and networked information resources such as the Internet which may be used by District students, faculty, and staff. These resources, however, are intended to be used solely for educational purposes and to carry out the legitimate business of the District.

The use of networked facilities shall be consistent with the curriculum, adopted by the District as well as the varied instructional needs, learning styles, abilities and developmental levels of students.

The use of these resources by students, faculty and staff is considered a privilege which may be denied for inappropriate and/or illegal use as set forth in this and related policies. Furthermore, violations of the guidelines set forth by the District or other improper use of these resources may result in disciplinary action in accordance with established disciplinary procedures for students, faculty and staff.

The Board expects all students, faculty and staff to be law-abiding citizens, to respect the rights of others, and to refrain from behavior which tends to impair the District's purpose or its reputation within the community. The framework of responsible, considerate and ethical behavior expected by the District, as set forth in policy and guidelines, covers the use of District microcomputers, workstations, computing laboratory facilities, general access timesharing systems, and network and networked resources.

The electronic information available to and prepared by students, faculty and staff does not imply endorsement of the content by the District nor does the District guarantee the accuracy of information received on the Internet.

The District reserves the right to log network use and to monitor fileserver space utilization by all District users. Accordingly, system users possess no privacy expectation in the contents of their personal files on the District system. Specifically, routine maintenance and monitoring of the system may lead to discovery that the user has or is violating this or other policies of the District and/or the law of the United States of America or the Commonwealth of Pennsylvania. Moreover, an individual search will be conducted if there is reasonable suspicion that a user has violated the law or the District's policies. Finally, District employees should be aware that their personal files may be discoverable under state public records law.

Use of these resources as well as any information obtained via the Internet is at the user's own risk. The District makes no warranties of any kind, either expressed or implied, that the functions or the services provided by or through the District system will be error-free or without defect. Specifically, the District will not be responsible for any damage users may suffer, including, but not limited to, loss of data or interruptions of services. The District also will not be responsible for the accuracy or quality of information obtained through or stored on the system. Finally, the District will not be responsible for any financial obligations arising from the unauthorized use of the system.

The District shall make every effort to ensure that this educational resource is used responsibly by students, faculty and staff, including, but not limited to, taking every reasonable step to control access to material inappropriate to the educational mission of the District.

The Superintendent or his/her designee will have the responsibility of developing administrative guidelines and forms governing use of the District network to include, but not be limited to, (i) the establishment of "User Contracts" and/or individual accounts; (ii) procedures by which parents will be notified of the particulars of the District network and the policies governing its use; (iii) procedures by which parents, in

17

accordance with Chapter 5 of the Pennsylvania Code of Regulations, may have their child(ren) excused from specific instruction which conflicts with their religious beliefs; (iv) procedures/policies designed to attempt to insure personal safety while using the Internet; and (v) prohibitions against use of the network for such activities as fund-raising and/or personal, commercial or financial gain, political campaigning/lobbying, unlawful purposes, or for any other purpose inconsistent with the educational mission of the District.

Administrators, teachers and staff have a professional responsibility to work together to help students develop the intellectual skills necessary to discriminate among information sources, to identify information appropriate to their age and developmental levels, and to evaluate and use the information to meet their educational goals.

Students, faculty and staff have the responsibility to respect and protect the rights of every other user in the District and on the Internet.  Students and staff are expected to act in a responsible, ethical and legal manner in accordance with District policy, accepted rules of network etiquette, and Federal and state laws.

The consequences for inappropriate use, including those consequences set forth by contract or District policy, are as follows:

1.  The user shall be financially responsible for all costs associated with damage to hardware, systems and software resulting from deliberate or willful acts.
2.  The use will be reported to the appropriate legal authorities for possible prosecution for vandalism to the hardware, systems and software; illegal use of the network; intentional deletion or damage to files of data belonging to the District or others; copyright infringement; theft of services; etc.
3.  Access privileges may be suspended for a specified period of time, including permanently, as determined by the Superintendent or his/her designee.

## GUIDELINES FOR USING PERSONAL/HOME COMPUTERS AND PERIPHERAL DEVICES WITHIN THE DISTRICT

The Pennridge School District is responsible for all computer systems and peripheral devices located in each of its buildings.  This responsibility includes ensuring that all district computers meet hardware and software standards, and that all installed software is properly licensed.

In an effort to maintain these standards, the following guidelines have been developed for using computers and/or peripheral devices that are purchased with personal funds for use at work within the district. Computers that are purchased with personal funds and used within the district shall be known as "personal/home computers" throughout this document.

1.  All personal/home computers and peripherals used for professional and/or instructional purposes within the district must be registered with the District Technology Office.  Staff members may request an application form from the Instructional Technology Coordinator or from the Curriculum Office.  Copies of all software licenses must be submitted with the application for registration.   Staff members must receive notification that their personal/home computer registration has been authorized prior to using the personal/home computer within the district.
2.  All software installed on personal/home computers must have valid licensing.  A copy of a valid software license for each program installed on the personal/home computer, including the operating system (such as Windows '98) must be on file with the Pennridge School District Instructional Technology Coordinator.  Software licenses for any program installed after the initial registration must be submitted to the Instructional Technology Coordinator prior to its installation. The district reserves the right to remove any software title it deems to be installed without a valid license.
3.  District-purchased software may not be installed on personal/home computers.

18

4. No attempt to connect a personal/home computer to the district's Local Area Networks is permitted. Personal/home computers that are donated to the district will be considered for connection to the network upon submission of a proper work order to the school principal.

5. Personal/home computers or peripheral devices, e.g., printers, will not be maintained or repaired by the district.

6. Printer ink/toner will not be supplied to personal printers used within the district.

7. Ten-month staff members are expected to remove all personal/home computers and peripherals from school premises for the duration of the summer each year.

8. The district assumes no responsibility for damage to or loss of any personal/home computer or peripheral used within the district.

9. All provisions, limitations, and restrictions of the district's User Agreement Guidelines apply to all personal/home computers used for professional and/or instructional purposes within the district.

10. Consequences for actions that do not comply with these guidelines or with the provisions of the User Agreement may include the requirement that the staff member remove his/her personal/home computer or peripheral from school premises.

## AVOIDANCE OF CONFLICTS ON WEDNESDAY EVENINGS

The administration and local ministerial association have agreed upon the following:

1. Whenever possible, the scheduling of school events or activities on Wednesday evenings will be avoided in order that churches might be able to count on the evening for catechism classes or midweek church services, youth fellowship meetings, etc.

2. The scheduling of examinations or lengthy tests for Thursday, which would require considerable studying on Wednesday evening, will also be avoided. By lengthy test or examinations we mean tests one would give at the end of a unit of work or covering an entire quarter's work. It is not meant that short check-up tests or quizzes will not be given on Thursdays if that seems to be the logical day to give such a quiz or test. Neither is it to be construed that no homework shall be given on Wednesday evenings.

3. There are two exceptions to the "no exams on Thursday" agreement. It is felt that when (1) midterm examinations and (2) final examinations are being given, teachers shall have to use every day in the week in order to complete these examinations within the testing period.

## ADMISSION OF STUDENTS

The Board shall establish age requirements for the admission of beginning students that are consistent with statute and sound educational practice and ensure the equitable treatment of all eligible children.

**First Grade**

Beginners are students entering the lowest grade of the primary school above the kindergarten level. A beginner is eligible for admission to the lowest grade of the primary school above the kindergarten level if s/he has attained the age of six (6) years before September 1.

In order to provide the best opportunity for academic success and positive adjustment, students will be admitted to first grade only during the first two (2) weeks of the annual school term. Students who "move-in," or transfer from another school district or system's first grade will be admitted at the time of transfer provided all appropriate registration requirements have been met and the administration is satisfied that the district's admission policy has not been intentionally circumvented.

Resident children, who may be between the ages of 6 and 8, will only be admitted as beginners after the first two weeks of the school year upon review of specific circumstances and approval of the Superintendent of Schools. Any child 8 years of age will be admitted any time during the school year.

A student who has successfully completed a full year kindergarten program at a public school kindergarten will be admitted to first grade provided the sending kindergarten recommends a first grade placement.

### Kindergarten

A child is eligible for admission to kindergarten if s/he has attained the age of five (5) years before September 1.

The Superintendent shall require that each student who registers for entrance to school exhibit his/her birth certificate or similar documentation as proof of age and birth date, along with proof of required immunizations.

### FIELD TRIPS

The Board recognizes that field trips — when used as a device for teaching and learning integral to the curriculum — are an educationally sound and important ingredient in the instructional program of the schools.

Educational trips may be planned by staff members with the advice and consent of the principal. Every educational trip is to be an extension of the classroom instructional activity and, therefore, should make an educational contribution worthy of the expenditure of time, energy, and funds. Teachers and students are representatives of the district. They should conduct themselves properly and be dressed accordingly. The classroom teacher is the supervisor of the activity and is responsible to secure the necessary assistance for the trip.

Educational trips must be authorized by the principal of each respective school or his/her designated representative. All trips that will require a financial burden on the student must exhibit evidence of sensitivity to student financial needs and provide reasonable alternatives for funding so that no student is deprived of attendance due to financial limitations.

The term "field trip" shall designate educational trips to destinations outside the ten (10) mile radius of the district. Trips to sites within a ten (10) mile radius of the district shall be designated as local trips. The transportation of students between schools in the district and to nearby museums and nature centers shall be designated as local trips.

Field trips and local trips shall be authorized by the building principal. Local trips will be funded by the district. Field trips will be budgeted by the sponsoring school or funded by the parent organization.

Transportation by school buses shall be required for each school sponsored trip unless permission to utilize a commercial carrier or private cars is granted by the building administrator. District school buses must be used for local trips. Transportation on district school buses will be provided for field trips if available. The transportation coordinator must be notified of proposed field or local trips at least two (2) weeks in advance of the date of the trips. Failure to apply two (2) weeks in advance may mean that the trip will not be scheduled until two (2) weeks following the receipt of the three (3) copies of the "Request for Field Trips and Bus Transportation."

Appendix1601

When possible, buses should not be scheduled to leave the Pennridge area prior to 9:00 a.m. and must return to the school by 2:00 p.m. The transportation resources available definitely limit the number of field trips that can be scheduled.

It is frequently desirable for teachers to request the use of chaperones for field trips. The Principal, in collaboration with the sponsoring teacher, shall determine the number of chaperones needed to provide adequate supervision for the student scheduled to participate in the field trip or local trip experience.

The teacher in charge of a field trip or local trip must obtain from the office "Parent Permission Slips" which must be signed by parents of students. These must be collected and filed. Only the students who have obtained permission from their parents or guardians may be taken on a field trip or local trip. Students who do not accompany the group must remain in school under the supervision of another teacher.

The Board also recognizes that there may be external influences that may affect the scope and range of field trips, such as local or national emergencies. The Superintendent will be responsible for issuing Administrative Guidelines that may further restrict the use of field trips as an extension of classroom instruction. Those guidelines will be recommended by the Superintendent and reviewed by the Board of School Directors whenever appropriate.

## HOMEBOUND INSTRUCTION

The Board shall provide, pursuant to rules of the State Board of Education, homebound instruction to students confined to home or hospital for physical disability, illness or injury; or when such confinement is recommended for psychological or psychiatric reasons.

Application for homebound instruction shall certify the nature of the illness of disability, state the probable duration of the confinement and must be approved by the Superintendent or his/her designee who may grant such recommended requests for individual instruction and report each to the Board at its next regular meeting.

The program of homebound instruction given each student shall be in accordance with the standards established by the Secretary of Education.

The Board reserves the right to withhold instruction when:

1. The instructor's presence in the place of a student's confinement presents a hazard to the health of the teacher.
2. A parent or other adult in authority is not at home with the student during the hours of instruction.
3. The condition of the student is such as to preclude his/her benefit from such instruction.

## GENERAL REQUIREMENTS FOR LESSON PLANS

All instructional staff are expected to prepare daily and unit lesson plans and to submit them for administrative review on a periodic basis. Generally, teachers prepare these plans one to two weeks in advance and the principal or department supervisor may review them prior to implementation. Specific schedules for lesson preparation and review will be provided by building administrators. Elementary nurses and media specialists who teach on a periodic or intermittent basis are also expected to prepare lesson plans.

Teachers will be provided with a plan book in which to record the essential components of their lesson and unit plans. Teachers will also prepare more detailed plans, question guides, supplemental materials, and/or emergency plans in addition to the plans recorded in the plan book. The standards for such preparation will meet district expectations, but their format will be determined at the building level.

Appendix1602

Lesson plans should be directly related to curriculum goals and objectives, as described in board-adopted curriculum guides.  Content outlines, timelines, and skills arrays should also be used as a basis for planning.  Textbooks and other instructional materials are resources that can be used to teach the curriculum; most curriculum guides contain goals and objectives that extend beyond the scope of any individual textbook.

As a minimum, all lesson plans must contain the following:

      a.   A statement of the objective(s) of the lesson expressed in terms of student behavior of performance.
      b.   A description of the techniques and procedures to be used to achieve the objective(s).
      c.   A description of how the achievement of the objective(s) will be evaluated.
      d.   A description of the materials or equipment needed to implement the lesson.
      e.   Where appropriate, supplemental information on long-range plans and/or emergency plans for substitutes.

Building Principals may collect written lesson plans on a periodic basis.

## LIMITED ENGLISH PROFICIENCY PROGRAM

The Pennridge Board of School Directors recognizes the importance of providing an appropriate instructional program for identified students whose dominant language is not English.  The focus of the program shall be to increase the English language proficiency of eligible students so that they can benefit from instruction designed to help them attain local and State academic standards and achieve academic success.

The Board authorizes the Superintendent or his/her designee to establish a framework of instructional programs, curriculum, and/or services that respond to the needs and abilities of students eligible for English as a Second Language instruction.  Components of this framework shall include the Home Language Survey and LEP identification procedures.  The program design shall include assessment procedures for the following purposes:

    ➢  to determine individual English proficiency levels and needs in listening, speaking, reading, and writing;
    ➢  to measure student progress;
    ➢  to validate exit decisions and monitoring procedures;
    ➢  to evaluate program effectiveness.

The Board shall include provisions for the Limited English Proficient program in its Strategic Plan and appropriate training for professional staff in its Professional Education Plan.

The Board further authorizes the Superintendent or his/her designee to develop and disseminate information about the LEP program, including parent notification of program eligibility and periodic reports of student progress.  Students participating in Limited English Proficiency programs shall have access to and be encouraged to participate in the academic and extracurricular activities available in the district.  As needed, the district shall identify community resources that are available to eligible students and their parents, including support agencies and interpreters.

Appendix1603