– FOR PUBLICATION –

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES NACE and APRIL NACE as Guardians of E.N., A MINOR,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | **NO.  15-333** |
| **PENNRIDGE SCHOOL DISTRICT, ERIC ROMIG, THOMAS CREEDEN, DAVID BABB, FAITH CHRISTIAN ACADEMY, RYAN CLYMER and RUSSELL HOLLENBACH,** | |
| **Defendants.** | |

## OPINION

This case concerns the civil liability of a high school softball coach who engaged in an unlawful sexual relationship with a sixteen-year-old player on his team, the school district that employed the coach and was unaware of the relationship, and a private school that had previously forced the coach to resign due to allegations of sexual harassment but never reported those allegations to outside authorities.  Defendant Eric Romig was a softball coach at Pennridge High School when he used text messages to cultivate a relationship with Plaintiff E.N. – a relationship that became physically sexual during the summer between E.N.'s sophomore and junior years.  Two years before he was hired at Pennridge, Romig had been asked to resign from his position as girls' basketball coach at Faith Christian Academy following allegations of sexually inappropriate text messages with a student – communications that Faith Christian did

1

not report to any enforcement authority.  Romig is currently in jail having pled guilty to six criminal charges arising from his conduct with E.N.

E.N. and her parents have sued Romig for violation of E.N.'s constitutional due process rights, pursuant to 42 U.S.C. § 1983; intentional infliction of emotional distress; and assault and battery.  Their claims against Pennridge School District, Pennridge Principal Thomas Creeden, and Pennridge Athletic Director David Babb (collectively, the "Pennridge Defendants") are for a violation of E.N.'s constitutional due process rights, pursuant to 42 U.S.C. § 1983; a Title IX sexual harassment claim, brought pursuant to 20 U.S.C. § 1681; and a state-law claim for willful misconduct.  And, finally, their claims against Faith Christian Academy, Faith Christian Headmaster Ryan Clymer, and Faith Christian Athletic Director Russell Hollenbach (collectively, the "Faith Christian Defendants") are for negligence and negligence *per se* under Pennsylvania law.  The Pennridge Defendants and each of the Faith Christian Defendants have filed motions for summary judgment on all claims against them, respectively, while Plaintiffs have filed a motion for summary judgment on their claims against Romig.[1]  For the reasons described below, all Defendants' motions shall be granted and Plaintiffs' motion shall be granted in part and denied in part.

## I.     BACKGROUND

### A.  Romig's Coaching Career

Defendant Eric Romig ("Romig") served as part-time athletic coach at three southeastern Pennsylvania high schools between 2003 and 2013.  It was never his full time job:  While he was coaching, he held down a position as the manager of a local automobile service station.

---

[1] Defendant Jacqueline Rattigan was dismissed by consent motion at an earlier stage of these proceedings.

### 1. Faith Christian Academy

Romig began his career as a high school coach at Faith Christian Academy ("Faith Christian") first as an assistant for the boys' baseball team from 2003 to 2004, and then as the head coach of the girls' basketball team from 2005 until his resignation on January 5, 2010, for "health reasons."  In fact, although he cited health reasons, his resignation came at the request of Headmaster Ryan Clymer ("Clymer") after Clymer conducted a two-week investigation into reports from a girl on the basketball team that Romig had sent her thousands of personal text messages, some of which were allegedly sexual.  During the investigation, Clymer interviewed the accusing student who provided him with a list of topics that were allegedly included in the text messages, including explicitly sexual content, but not the messages themselves which had already been deleted.  He also interviewed two other female students who were rumored to have engaged in sexual communication or contact with Romig, and consulted with an acquaintance in the law enforcement community as well as Faith Christian's legal counsel.  He kept the results of his investigation close, not informing anyone in the Faith Christian administration of the details.  Even the school's Athletic Director Russell Hollenbach ("Hollenbach") only learned about the sexual nature of the allegations against Romig well after the close of the investigation.  No report of the incident was made to law enforcement or child protection authorities.  Clymer did, however, ask Romig to resign because of his "excessive texting" to the student.

### 2. Quakertown High School

In Spring 2008, while Romig was still coaching girls' basketball at Faith Christian, David Babb ("Babb"), the athletic director of Quakertown High School ("Quakertown") hired Romig to coach the Quakertown girls' softball team.[2]  Romig resigned from Quakertown on January 5,

---

[2] Babb testified that he was unaware that Romig continued to coach at Faith Christian while he was coaching at Quakertown.

2010 (the same day he resigned from Faith Christian), citing health problems as the reason.  In the meantime, Babb had left Quakertown to become the athletic director at Pennridge.

### 3.   Pennridge High School

#### a.   Initial Hiring as Assistant Softball Coach

In early 2012, when Babb needed to fill an open assistant softball coaching position at Pennridge, he and Pennridge's head softball coach Paul Koehler ("Koehler") encouraged Romig to apply.  In filling out an application, Romig did not mention his prior coaching positions at Quakertown or Faith Christian.  Nevertheless, Babb contacted the person who had replaced him as athletic director at Quakertown to ask why Romig left Quakertown and was told that Romig had resigned for heart-related health reasons.  He then conducted the required criminal history and sexual abuse background checks on Romig which revealed no history of criminal activity or child abuse.  That done, in early 2012 he offered Romig a position as "Softball Assistant Varsity (JV) Coach" for the "2011-2012 school year only," a contract which Romig accepted.

#### b.   Application Coach Girls' Basketball

Shortly after Romig started coaching softball at Pennridge, the school's head girls' basketball coaching position for the 2012-2013 season opened up and he applied for the job.  This time, Romig's application did list his work at Faith Christian – the first formal disclosure to Pennridge that he had coached there.  There is some dispute as to what happened next.  Babb testified that, with this new information available to him, he approached Hollenbach (who was still the athletic director at Faith Christian), at a meeting and asked about Romig's basketball coaching qualifications.  Hollenbach, says Babb, replied that Romig was an excellent basketball coach, but had "some texting issues" and that Romig had left Faith Christian due to a "difference in opinion."  Hollenbach, however, does not recall this conversation at all, and testified that he

last spoke with Babb years before.  Babb claims that he reported the information he learned from Hollenbach to Pennridge Principal Thomas Creeden ("Creeden")  and that Creeden responded by proposing a "let's-keep-an-eye-on-it-strategy."  Creeden, however, does not recall any of this. He testified that he first learned of Romig's "texting issue" after Romig's arrest in October 2013.

In any event, Romig did not get the basketball coaching job.

### c.    Retained as Assistant Softball Coach for 2012-2013

He was, however, offered a contract to return to Pennridge as a softball coach for the "2012-2013 school year only," which he accepted in January 2013.  That contract was not renewed for the 2013-2014 school year, but the record is unclear as to when Romig's employment at Pennridge ended.  Both Babb and Romig contend that it ended no later than when he received his final paycheck at the end of the season, but two letters sent by Pennridge to Romig after the season was over suggest that his job continued beyond the end of the 2012-2013 school year and into the 2013-2014 school year.  More specifically, on October 1, 2013, Pennridge's  superintendent sent Romig a letter informing him that he was "suspended from any duties in connection with your position as girls' junior varsity softball coach" in light of his arrest.  And, after he pled guilty in January 2014, Pennridge sent him a letter terminating him from his position.

### B.   Romig's Abuse of E.N.

Romig coached E.N. during both the 2012 and 2013 seasons while she was a member of the Pennridge girls' softball team.  During the 2012 season, they had little communication outside of softball activities.  However, during E.N.'s sophomore season, Romig began texting her about non-softball topics.  She described the texts as efforts to "get to know me more," but, in May 2013, a few weeks before her sixteenth birthday, they became flattering and

complimentary and, by June 2013, after the softball season was over, they became sexual. The first time they met outside of softball activities was at the very end of the 2012-2013 school year when Romig took E.N. to a park: they talked for about an hour, then Romig drove E.N. home. After that, they saw each other approximately twice per week during the summer, frequently exchanging several hundred text messages per week. Beginning in July, Romig would pick up E.N. near her home and take her to his house, where they had sex. These sexual encounters, some of which were overnight, occurred between 8 and 12 times throughout July, August, and September 2013. E.N. testified that Romig never asked her to do anything that she did not want to do during their sexual encounters. Things progressed to the point where Romig told E.N. that he hoped to marry her, and E.N., who was initially resistant to this idea, eventually told Romig that she loved and hoped to get married to him.

In late September 2013, E.N.'s parents discovered the text messages from Romig on E.N.'s phone, confronted E.N. about the relationship, and contacted law enforcement. At first, E.N. was upset at her parents' intervention, since, at that point, she still hoped to marry Romig. However, she made no efforts to contact Romig after he was arrested, and she now believes that Romig manipulated her into a relationship. The Pennridge Defendants first learned of the relationship between Romig and E.N. after Romig was arrested on October 1, 2013.

Romig has admitted that his relationship with E.N. was "wrong," and that he knew that it was wrong while it was occurring, but he maintains that he was unaware that his conduct would be harmful or injurious to her. He eventually pled guilty to corruption of a minor; photographing, videotaping, depicting on computer or filming sexual acts with a minor; viewing or possessing child pornography; unlawful contact with a minor; unlawful intercourse/sexual

contact with a student; and criminal use of a communications facility.  In May 2014, he was sentenced to serve 3.5 to 7 years in a Pennsylvania state correctional facility.

### C.  Prior Allegations of Sexual Harassment Against Pennridge Staff

Plaintiffs' claims against the Pennridge Defendants implicate the District's sexual harassment and abuse prevention program, as well as the history of sexual harassment and abuse in the District.

### 1.  Sexual Harassment Training at Pennridge

The sexual harassment training program at Pennridge consisted of two tiers.  At the first level, internal human resources staff provided information on the district's sexual harassment policy each year at a faculty meeting attended by the teaching staff.  Non-teaching staff, including coaches, were not required to attend these meetings, and neither Romig nor Koehler ever received this training.  At the second level, in February 2009, district staff completed a formal sexual harassment prevention training provided by an online corporate training vendor.  This training was not repeated while Romig or Koehler were employed by Pennridge.

The Pennridge School District Coach Handbook, which both Romig and Koehler received, does not contain any provisions concerning sexual harassment or personal communication with students.   The only notice that a non-teacher coach received of Pennridge's sexual harassment policy was through: (1) a clause in their coaching contracts requiring adherence to all district policies, which included an express prohibition on sexual harassment of students by staff; and (2) an agreement concerning the acceptable use of Pennridge's own computing and networked systems.  None of the documents they received concern the use of personal electronic devices by staff to communicate with students.

## 2.  History of Sexual Harassment and Abuse by Pennridge Staff Members

Since 1999, there have been numerous allegations of sexual harassment involving at least

five members of the staff at Pennridge High School:

- In 1999, Pennridge suspended and then terminated a male teacher after three female students complained that he touched them inappropriately in class.  The school reported him to police, but he was acquitted of criminal charges and reinstated as a teacher at Pennridge by a labor arbitrator.  After the teacher completed the mandatory sexual harassment training in 2009, another student made similar allegations against him in 2010.  Although Pennridge reported the allegations to local law enforcement, no charges were filed.  In 2011, a female staff member filed a complaint against the same teacher.  Pennridge then suspended the teacher for 10 days, required him to obtain a mental health evaluation, and required that he attend additional sexual harassment training.

- In 2004, a female student complained of inappropriate touching by an athletic trainer.  The allegations were immediately reported to the police and the trainer was suspended and ultimately resigned.  Pennridge reported the trainer's conduct to the Pennsylvania Department of Education and his teaching certificate was revoked.  He was also convicted in a criminal proceeding.

- In 2008, a member of the Pennridge custodial staff sent unsolicited Facebook messages to two female students.  The students reported the messages to the school, and the custodian was reassigned to evening shifts to avoid personal contact with students at school, instructed not to contact the students, and admonished that any future attempts to contact students outside of school would result in further discipline or termination.

- In 2010, an alumna of Pennridge reported to police that a Pennridge teacher had engaged in a sexual relationship with her during her 12th grade year. The teacher was immediately suspended, and ultimately resigned and voluntarily relinquished his teaching certificate.  Pennridge reported the teacher's conduct to Children and Youth Services.  The teacher had attended the mandatory sexual harassment training in 2009.

- In 2012, a female student reported that a Pennridge physical education teacher had harassed her by talking too close to her face, staring at her repeatedly, and hitting her on the buttocks with a badminton racquet or ping pong paddle during class.  The teacher was removed from his track coaching position, given a gross deficiency rating under the relevant evaluation category on his formal teaching evaluation, and mandated to attend additional workplace sensitivity training conducted by an external provider before the end of the school year.  The teacher had attended mandatory sexual harassment training in 2009.

## II.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'"  *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at

322-26).  In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

## III.   DISCUSSION

### A.   Pennridge Defendants' Motion for Summary Judgment

The Pennridge Defendants have moved for summary judgment on all of Plaintiffs' claims against them: Section 1983, Title IX, and willful misconduct.

#### 1.   Section 1983 (42 U.S.C. § 1983)

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must show that "a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States."  *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2014).  The conduct of which Plaintiff complains is the "verbal and physical sexual abuse and harassment" by Romig which, she asserts, were violations of her Fourteenth Amendment due process right to bodily integrity.  It is well-established that physical sexual abuse at the hands of school staff violates a student's due process rights, *see Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989), but there is no precedent in the Third Circuit to support a constitutional due process claim based on verbal sexual harassment or abuse, and the only authority cited by Plaintiffs in support of such a claim is from a district court in another circuit. *See Doe v. Darien Bd. of Educ.*, No. 3:11-cv-1581, 2015 WL 7458498, at *4 (D. Conn. Nov. 24, 2015).  In *Stoneking*, the Third Circuit relied on an analogy to physical abuse to conclude that "[a] teacher's sexual molestation of a student is an intrusion of the schoolchild's bodily integrity not substantively different for constitutional purposes from corporal punishment by teachers." *Id.*  Given that the constitutional right recognized in *Stoneking* was framed in terms of physical

10

abuse and bodily integrity, the Court concludes that the Third Circuit did not intend to extend its holding to verbal harassment or abuse. *See Abeyta v. Chama Valley Indep. Sch. Dist., No.19*, 77 F.3d 1253, 1255-56 (10th Cir. 1996) (holding that a verbal sexual harassment does not support a section 1983 claim) (citing *Stoneking*, 882 F.3d at 727). Therefore, the potential constitutional violation underlying this case consists only of Romig's physical sexual contact with E.N., which he has admitted by virtue of his guilty plea.

Plaintiffs acknowledge that a state entity, such as the Pennridge School District, cannot be held vicariously liable for an alleged violation of constitutional rights committed by its employee. *See Monell v. Dep't of Social Servs.* 436 U.S. 658, 694 (1978). Rather, "a plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell*, 436 U.S. at 691). This standard may be met by showing that a policy is either unconstitutional itself, or that it "is the 'moving force' behind the constitutional tort of one [of] its employees." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 454 U.S. at 694))). In an attempt to meet the *Monell* causal standard, Plaintiffs have set forth two theories of section 1983 liability: failure to train and state-created danger. Plaintiffs' failure-to-train theory alleges that Romig's lack of sexual harassment training at Pennridge was the moving force behind his alleged violation of E.N.'s constitutional rights. Their state-created danger theory alleges that assigning Romig to coach the softball team created a danger that ultimately led to the deprivation of E.N.'s constitutional rights.[3]

---

[3] The Pennridge Defendants argue that they cannot be held liable under a Section 1983 rubric for Romig's acts because Romig was not employed by Pennridge School District at the time of his sexual relationship with E.N. This argument must be rejected at this juncture, however, because there is a genuine dispute over whether Romig was an employee of the district during the relevant time period – his contract was for the "2012-2013 school year" and he

### a.  Failure to Train

Plaintiff's failure-to-train section 1983 theory relies on the fact that Romig did not receive any sexual harassment prevention training at Pennridge.  Section 1983 liability can be premised on a failure-to-train theory only where the alleged failure to train employees amounts to "'deliberate indifference' to the rights of persons with whom those employees will come into contact."  *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  In addition, "'the identified deficiency in a city's training program must be closely related to the ultimate injury' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *City of Canton*, 489 U.S. at 391)).

Deliberate indifference is a high bar.  It not enough to show that "an otherwise sound program has occasionally been negligently administered" nor that "an injury or accident could have been avoided if an [employee] had better or more training."  *City of Canton*, 489 U.S. at 391.  Rather, it is necessary to show that the lack of training represented a "conscious" or "deliberate" choice to ignore the risk of constitutional violations that would likely ensue from a lack of training.  *Id.* at 390.

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

---

received his last paycheck at the end of the softball season, but the district sent him a letter purportedly suspending him in October 2013 and another letter terminating him after he plead guilty in 2014.

*Id.* at 390 n.10 (internal citations omitted).  From these principles, the Third Circuit has set forth

a three-part standard for deliberate indifference in failure-to-train cases, requiring a plaintiff to

show that:  "(1) municipal policymakers know that employees will confront a particular

situation; (2) the situation involves a difficult choice or a history of employees mishandling; and

(3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."

*Carter*, 181 F.3d at 357.

Plaintiffs have failed to meet both the first and second elements of this deliberate

indifference test.  With respect to the first element – knowing that employees will confront a

particular situation – Plaintiffs have not identified a particular circumstance faced by coaches

beyond the general fact that they work with students.  A plain reading of this element indicates

that the situation contemplated in this element must be "specific" enough that an employee will

"confront" it during the course of their job.  Here, Plaintiffs have not made any attempt to

specify what aspect of Romig's job as coach led to his alleged violation of E.N.'s constitutional

rights.  Plaintiffs have thus failed to meet the first element of the failure-to-train deliberate

indifference standard.

Turning to the second element, a plaintiff must show either (1) "the failure [to train] has

caused a pattern of violations," or, (2) absent a pattern of violations, evidence that the choice

faced by employees in a particular situation is so difficult that that a violation of constitutional

rights would be a "'highly predictable consequence of a failure to equip [employees] with

specific tools to handle recurring situations.'"  *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d

Cir. 2000) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

Plaintiffs have cited prior incidents of sexual harassment or abuse by five Pennridge staff

members in an attempt to demonstrate a pattern of constitutional violations.  But the incidents

13

they have cited do not match the specific lack of training they described in their argument:  a "well-settled custom and practice of excluding non-faculty coaches from the sexual harassment training that all faculty members and other employees at Pennridge were required to receive." Specifically, three of the five staff members cited by Plaintiffs actually received the annual training offered to teachers and completed the training provided by an outside vendor in 2009. And, of the two staff members who did not receive training, one's acts of harassment consisted of sending unsolicited Facebook messages to students which, while inappropriate, does not rise to the level of a constitutional violation.  Thus, only one of the incidents cited by Plaintiffs consists of an *untrained* staff member committing a constitutional violation.  One incident does not constitute a "pattern of violations," so the most straightforward interpretation of Plaintiffs' argument – that the Pennridge Defendants' failure to offer Romig sexual harassment training demonstrated deliberate indifference in light of a pattern of violations by untrained Pennridge staff members – is not consistent with the factual record in this case.

An alternative interpretation of Plaintiffs' pattern-of-violations argument is that Pennridge's entire program of sexual harassment training was so inadequate that failing to do even more to prevent sexual harassment shows deliberate indifference to the constitutional rights of students.  Even if Plaintiffs had explicitly made this argument, it would be unavailing.  In *City of Canton*, the Supreme Court emphasized that a training program that turns out to be insufficient or which occasionally fails to prevent a constitutional violation does not support a finding of deliberate indifference.  Rather, a plaintiff must show that the training inadequacies are "so obvious . . . [and] so likely to result in the violation of constitutional rights, that policymakers of the [municipal entity] can reasonably be said to have been deliberately indifferent to the need" for more or different training.  *City of Canton*, 489 U.S. at 390.

14

In this case, while it is evident (and worrisome) that Pennridge's training program did not eradicate sexual abuse from the District, without some identified deficiency in the program, it would not be reasonable to conclude that offering two layers of sexual harassment training – and firing or demoting every staff member found to have committed sexual abuse since 1999 – was so obviously inadequate and likely to lead to frequent constitutional violations as to show that district officials were deliberately indifferent to students' rights by failing to add even more training.  It is not enough to show that an incident "could have been avoided if an [employee] had better or more training."  *Id.* at 391.

In the absence of a pattern of violations, a plaintiff must show that a case falls into the narrow category of circumstances where a constitutional violation by an untrained employee would be "*so* predictable that failing to train . . . amounted to *conscious disregard*" of the relevant constitutional right.  *Connick v. Thompson*, 563 U.S. 51, 71 (2011).  Plaintiffs cannot meet this high standard in this case.  As the Third Circuit has noted, refraining from sexual misconduct is so "obvious" that failing to train employees not to abuse students does not generally demonstrate deliberate indifference and generally cannot sustain a single-incident failure-to-train claim.  *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 630 (3d Cir. 2007).  In other words, because school staff should already know that they cannot have sexual relations with students, failing to make this prohibition explicit through training does not make it "highly predictable" that staff will commit sexual abuse.  This is consistent with other circuits, which have held that when the alleged constitutional violation consists of criminal sexual behavior, such a violation is not a predictable result of a lack of training, and thus cannot support the single-incident theory of deliberate indifference.  *See, e.g.*, *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1160 (9th Cir. 2014) ("If the threat of prison time does not sufficiently deter sexual assault,

it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence.").  Since the record in this case does not support either a pattern-of-violations or single-incident theory of deliberate indifference, the fact that Romig was not offered sexual harassment training does not demonstrate deliberate indifference to the risk of constitutional violations.

Even if Plaintiffs could meet the standard for deliberate indifference, they must also show that the failure to train Romig "actually caused" Romig's violation of E.N.'s constitutional rights.  *City of Canton*, 489 U.S. at 391.  In other words, there must be a "plausible nexus or affirmative link between the municipality's custom and the specific constitutional rights at issue."  *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996).  For example, when a municipality entrusts a police officer with the use of force in carrying out his or her duties but fails to adequately train the officer in the proper use of that force, it is plausible to say that the municipality actually caused a subsequent misuse of the force.  But in this case, the only thing Romig was assigned to do was coach softball.  When he chose to engage in unlawful and inappropriate behavior, entirely unrelated to his assigned duties as a coach, it cannot be plausibly said that his actions were caused by Pennridge's failure to adequately train him to avoid unlawful sexual activity.  In sum, Plaintiffs have failed to meet both the deliberate indifference and causation elements of a failure-to-train section 1983 claim.

### b.   State-Created Danger

Plaintiffs' second theory of section 1983 liability is premised on Babb's testimony that he learned of the actual reasons for Romig's departure from Faith Christian during a conversation with Hollenbach at a meeting in April 2012 and that, although he told Creeden about the conversation, Creeden took no action, choosing instead to adopt a "let's-keep-an-eye-on-it-

strategy."  From this, Plaintiffs argue that a reasonable jury could conclude that Babb and

Creeden were aware of a concrete risk to the girls on the softball team should Romig be hired to

coach them, but disregarded this risk by hiring Romig anyway, and failing to offer training or

closely monitor his contact with student athletes.

        To support a state-created danger claim, a plaintiff must show, *inter alia*, that "the harm

ultimately caused was foreseeable and fairly direct," and that "a state actor acted with a degree of

culpability that shocks the conscience."  *Bright v. Westmoreland Cnty*, 443 F.3d 276, 281 (3d

Cir. 2006) (internal quotation marks omitted).  Even resolving all factual disputes in Plaintiffs'

favor does not satisfy either of these elements.  Babb testified that he learned only that Romig

had a "texting issue" at Faith Christian, and that Romig resigned due to a "difference in opinion."

Plaintiffs object that Babb's account of the meeting is self-serving, and that it is implausible that

Babb did not ask any follow-up questions regarding the reasons for Romig's departure from

Faith Christian.  But expressing incredulity at Babb's testimony is not enough to create a genuine

factual dispute.  It is well established that "the non-movant may not rest on speculation and

conjecture in opposing a motion for summary judgment."  *Ramara, Inc. v. Westfield Ins. Co.*,

814 F.3d 660, 666 (3d Cir. 2016); *see also Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333

(3d Cir. 2005) ("'Speculation does not create a *genuine* issue of fact.'") (quoting *Hedberg v. Ind.

Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995)).  To demonstrate a genuine issue of material fact,

Plaintiffs must point to affirmative evidence that Babb actually learned more or that Hollenbach

actually said more.  They have not done so, nor have they articulated specifically what they

believe Babb learned; they have simply argued that Babb must have learned more than he admits

and Creeden should have done other than he did.  Without more, a reasonable fact-finder could

not conclude that the Pennridge Defendants acted with a degree of culpability that shocks the

conscience or that the harm the Plaintiffs allege was foreseeable from the two conversations. Plaintiffs' state-created danger theory thus fails, and the Pennridge Defendants' motion for summary judgment on Plaintiffs' section 1983 claim shall be granted.

### 2.  Title IX Sex Discrimination (20 U.S.C. § 1681)

Plaintiffs argue that the Pennridge School District's hiring and supervision of Romig give rise to liability for sexual harassment under Title IX.  But a sexual harassment claim under Title IX requires proof that an official with authority to institute corrective measures "ha[d] *actual* knowledge of discrimination . . . and fail[ed] adequately to respond."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (emphasis added).  Given that the parties agree that "[t]here is no evidence that any [Pennridge] coach, teacher or administrator had knowledge of the relationship between Defendant Romig and E.N. prior to Romig's arrest," Pennridge Defs.' Statement of Undisputed Facts ¶ 174; Pls.' Response to Pennridge Defs.' Statement of Undisputed Facts ¶ 174 (accepting this fact as undisputed), the District's motion for summary judgment on Plaintiffs' Title IX claim must be granted.

### 3.  Willful Misconduct

Plaintiffs' allege in Count Six of their Complaint that Defendants Creeden and Babb owed a special duty of care to their students to protect E.N. from foreseeable harm and that this duty was breached when they decided not to take any steps to investigate, train, monitor, or fire Romig after learning of his issues at Faith Christian.  Creeden and Babb are protected from this claim by the immunity provision of the Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. § 8541 *et seq.*, which protects school officials from state tort suits unless their acts "constituted a crime, actual fraud, actual malice or willful misconduct."  42 Pa. Cons. Stat. § 8550.  For the purposes of this statute, "'willful misconduct' means 'willful

misconduct aforethought' and is synonymous with 'intentional tort.'"  *R.H.S. v. Allegheny Cnty. Dep't of Hum. Servs., Office of Mental Health*, 936 A.2d 1218, 1230 (Pa. Commw. Ct. 2007).  In other words, willful misconduct requires a finding that "'the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'"  *Bright*, 443 F.3d at 287 (quoting *Robbins v. Cumberland Cnty. Children & Youth Servs.*, 802 A.2d 1239, 1252 (Pa. Commw. Ct. 2002)).

As set forth above, Plaintiffs' speculation about what may have been said in the conversation between Babb and Hollenbach and between Babb and Creeden does not warrant an inference that Babb or Creeden were aware that Romig's conduct at Faith Christian involved sexually inappropriate text messages.  Absent knowledge of Romig's past propensity, no reasonable fact-finder could infer that Babb and Creeden intended or were aware that it was substantially certain E.N. would be harmed.  Accordingly, summary judgment shall be granted on Plaintiff's willful misconduct claim against Creeden and Babb.

In sum, resolving all disputed material facts in Plaintiffs' favor, none of their claims against the Pennridge Defendants can survive summary judgment, and the Pennridge Defendants' motion for summary judgment shall be granted in all respects.[4]

### B.  Faith Christian Defendants' Motion for Summary Judgment

Plaintiffs' claims against the Faith Christian Defendants are premised on their failure to report the allegations they received concerning Romig's improper communication with a student in 2009.  The contention is that such omission constitutes negligence and negligence *per se*, without which Romig would not have been able to obtain his coaching position at Pennridge. Certainly the manner in which the Faith Christian Defendants, Clymer in particular, handled the

---

[4] Since there are no remaining grounds for liability against the Pennridge Defendants, Plaintiffs' claim against Babb and Creeden for punitive damages are mooted.

allegations against Romig raises questions.  Rather than report the serious allegations to law enforcement, Clymer allowed Romig to resign for "health reasons."  This concealment of Romig's conduct avoided external scrutiny of the allegations, which scrutiny may have prevented Romig's retention for another coaching job.  The issue before the Court, however, is not the standards of the Faith Christian Defendants' normative behavior, it is whether their conduct exposes them to civil liability for (1) common-law negligence, or (2) negligence *per se* arising from an alleged violation of Pennsylvania's mandatory child abuse reporting statute.[5]

### 1.  Negligence

In support of their motion for summary judgment, the Faith Christian Defendants rely heavily on *J.E.J. v. Tri-County Big Brothers/Big Sisters, Inc.*, which provides that the viability of a negligence claim under Pennsylvania law depends on proof of "a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss."  692 A.2d 582, 584 (Pa. Super. Ct. 1997).  In *J.E.J.*, the defendant, a private mentoring organization, was sued for negligence based on its failure to report suspected abuse by a mentor when that mentor later abused a child who was not involved in the mentoring program.  *Id.* at 583-84.  Faced with the question of whether the organization owed a duty to youth who were not participants in its programs, the court held that "[n]o relationship existed between the parties at the time of the abuse" and that the organization's

> general duty of care does not encompass [the abused child] or his family members.  We will not extend the scope of such a duty to require [the mentoring organization] to warn or protect all parents and children from persons like [the mentor]. . . . [T]he law simply does not allow liability to be stretched as far as [the plaintiffs] suggest.

---

[5] Clymer and Hollenbach filed for summary judgment separately from Faith Christian to address the issue of punitive damages, but adopted Faith Christian's argument with respect to liability.  Plaintiffs' response to Clymer and Hollenbach's motion likewise adopted Plaintiffs' response to Faith Christian's motion on issues of liability.  Since the liability issues presented by these motions are identical, they shall be analyzed together.

*Id.* at 585.[6]

Faith Christian's role in this case parallels the role of Big Brothers/Big Sisters in *J.E.J.* Faith Christian is an entity that placed adults in close contact with children, Faith Christian was informed that an adult – Romig – was engaged in inappropriate sexual communication with a student, Faith Christian did not report these allegations to authorities, and Romig later sexually abused another student who was not associated with Faith Christian.  Under these set of facts, Pennsylvania law, as articulated in *J.E.J.*, does not allow negligence liability to extend to Faith Christian for Romig's subsequent abuse of a minor who has no connection to Faith Christian. The Faith Christian Defendants' motion for summary judgment on Plaintiffs' negligence claim must therefore be granted.

### 2. Negligence *Per Se*

The same result pertains to the Plaintiffs' negligence *per se* claim, which is premised on the allegation that the Faith Christian Defendants had a duty to comply with the mandatory child abuse reporting provisions of Pennsylvania's Child Protective Services Law ("CPSL"), 23 Pa. Cons. Stat. § 6301, *et seq.*, and breached that duty by failing to report Romig's interactions with the Faith Christian student.  A violation of a statute may serve as the basis for negligence *per se*, but only when "the intent of the statute was, at least in part, to protect the interest of the plaintiff individually, as opposed to the public."  *Cecile Indus., Inc. v. United States*, 793 F.2d 97, 100 (3d Cir. 1986) (citing *Ennis v. Atkin*, 47 A.2d 217, 219 (Pa. 1946)).  In general, a violation of the CPSL could serve as the predicate for a negligence *per se* claim.  *See K.H. ex rel. H.S. v. Kumar*,

---

[6] While rulings of the Pennsylvania Superior Court are not binding interpretations of Pennsylvania law, "decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise."  *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391 (3d Cir. 2012) (internal quotation marks omitted).  The parties have not cited and the Court has not independently found any authority from Pennsylvania's Supreme Court which could suggest that Pennsylvania's Supreme Court would disagree with the *J.E.J.* decision.

122 A.3d 1080, 1087-90 (Pa. Super. Ct. 2015), *pet. app. denied*, No. 907 MAL 2015 (Pa. Mar.

24, 2016).  But here, where the facts of this case are materially indistinguishable from *J.E.J.*, the

Court concludes that E.N., who was not enrolled as a student at Faith Christian and had no

connection to the school, at least in this matter, falls "outside of the group of individuals that the

statute at issue is designed to protect."  *J.E.J.*, 692 A.2d at 586 (noting that while the CPSL was

undoubtedly enacted to protect children, the specific class of children protected by the statute

"must be in some way connected" to the entity bearing the mandatory reporting obligations).

Accordingly, even if a violation of the CPSL occurred, the Faith Christian Defendants' motion

for summary judgment on Plaintiffs' negligence *per se* claim must be granted.[7]

### C.   Plaintiffs' Motion for Partial Summary Judgment Against Romig

Plaintiffs seek summary judgment on the liability aspect of their three claims against

Romig: Section 1983, intentional infliction of emotional distress, and assault and battery.  In

addition to the facts set forth above, analysis of the claims against Romig requires consideration

of Romig's guilty plea to the charge of Institutional Sexual Assault (Schools), a third-degree

felony which occurs when "a person who is a volunteer or an employee of a school or any other

person who has direct contact with a student at a school . . . engages in sexual intercourse,

deviate sexual intercourse or indecent contact with a student of the school."  18 Pa. Cons. Stat.

§ 3124.2(a.2)(1).  In pleading guilty to this charge, Romig necessarily admitted to being either a

volunteer or an employee of Pennridge when he engaged in sexual contact with E.N.

### 1.   Section 1983 (42 U.S.C. § 1983)

Plaintiffs' section 1983 claim against Romig is that his harassment and abuse of E.N.

violated her constitutional due process rights.  As a preliminary matter, as discussed above in the

---

[7] Since the substantive claims against the Faith Christian Defendants cannot survive summary judgment, Clymer and Hollenbach's motion for summary judgment concerning punitive damages are moot.

22

context of the section 1983 claim against the Pennridge Defendants, it is only Romig's physical sexual abuse – not his verbal or electronic harassment – that could give rise to a constitutional due process violation.  With that in mind, a necessary predicate to grant summary judgment in Plaintiffs' favor would be that Romig was undisputedly acting under color of state law when he engaged in the sexual contact with E.N.  It is not enough to show that Romig was employed by Pennridge; Plaintiffs must show that he "abused a power or position granted by the state" in perpetrating the alleged violation.  *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997); *see Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995) ("[A]n otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state").

The record shows a genuine issue of material fact as to whether Romig was acting under color of state law.  While Plaintiffs contend that he was – given his contract with the school as well as the suspension and termination letters – there are many facts that could reasonably point to a conclusion that he was not.   His contract with Pennridge was for the 2012-2013 school year "only," and Romig, Babb, and Creeden all testified that Romig's coaching duties ended when the JV softball season ended.  Thus, even if Romig remained nominally employed by Pennridge during the summer of 2013, a factfinder could reasonably conclude that he was no longer serving as a Pennridge coach after the season concluded.  Furthermore, even if he was still a Pennridge coach over the summer, there is evidence that his contact with E.N. took place outside his coaching role.  For each sexual encounter, Romig picked E.N. up near her home and took her to his own residence, and there is no evidence that Romig invoked his position as coach to compel E.N. to meet with him or to have sex with him.  Given these facts, it would not be unreasonable to conclude that Romig's sexual contact with E.N. occurred in a private capacity, entirely outside

23

the scope of his duties as a public school employee.  Thus, the question of whether Romig was

acting under color of state law when he engaged in sexual contact with E.N. is in dispute and

precludes summary judgment on Plaintiffs' section 1983 claim.

### 2.  Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress (IIED) requires showing that the

offender "by extreme and outrageous conduct intentionally or recklessly cause[d] severe

emotional distress to another."  *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (quoting

Restatement (Second) of Torts § 46(1) (1965)).[8]  It is not enough "'that the defendant has acted

with intent which is tortious or even criminal, or that he has intended to inflict emotional distress,

or even that his conduct has been characterized by malice, or a degree of aggravation that would

entitle the plaintiff to punitive damages for another tort.'"  *Id.* at 754 (quoting Restatement

(Second) of Torts § 46 cmt. d (1965)).  Rather, IIED liability is reserved "for only the most

clearly desperate and ultra extreme conduct."  *Id.*  Specifically, "the conduct must be so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Id.*

(internal quotation marks omitted).

Romig's conduct was undoubtedly inappropriate and illegal, but a jury could reasonably

conclude that it falls short of the "most clearly desperate and ultra extreme conduct" that must be

---

[8] The Supreme Court of Pennsylvania has never expressly affirmed that IIED is a viable cause of action in
Pennsylvania.  *See Hoy*, 720 A.2d at 753 n.10 ("[T]his court has not expressly adopted section 46 of the
Restatement. . . . Because . . . the issue of whether section 46 should be adopted in our Commonwealth as not raised,
briefed, or argued by the parties, we too leave to another day the issue of whether section 46 of the Restatement
should be the law of Pennsylvania.").  However, because the court, in *Hoy* and elsewhere, "has acknowledged
[IIED's] existence and analyzed its elements in various respects," the Court shall assume that IIED is a viable cause
of action in Pennsylvania and is defined by section 46 of the Restatement (Second) of Torts.  *Weiley v. Albert
Einstein Med. Ctr.*, 51 A.3d 202, 216 n.12 (Pa. Super. Ct. 2012); *see also Taylor v. Albert Einstein Med. Ctr.*, 754
A.2d 650, 652 (Pa. 2000) (dismissing an IIED claim because it failed to meet the "minimum elements necessary to
sustain such a cause of action" as set forth in section 46, but declining to address whether such a claim would be
recognized in Pennsylvania if it met the standards of section 46).

demonstrated to support an IIED claim.  As an initial matter, an IIED claim requires showing that a defendant intended to cause emotional harm.  While the record shows that Romig knew his sexual contact with E.N. was wrong, there is nothing in the record that would allow a factfinder to reasonably conclude that his conduct reached the level of depravity required to meet the standard for IIED.  That is not to say that his behavior was justified.  The finding is only that, as described in the record before the Court, it does not exhibit the extreme conduct required to sustain an IIED claim.  Plaintiffs' motion for summary judgment on that claim must therefore be denied.

### 3.  Assault and Battery

Under Pennsylvania law, battery is defined as an intentional "harmful or offensive contact with the person of another."  *C.C.H. v. Phila. Phillies, Inc.*, 940 A.2d 336, 340 n.4 (Pa. 2008) (internal quotation marks omitted).  The fact that contact occurs without consent is sufficient to establish that it is "offensive," and "[n]o intent to harm the [plaintiff] need be established."  *Cooper ex rel. Cooper v. Lankenau Hosp.*, 51 A.3d 183, 191 (Pa. 2012).  An assault is "*an act* intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery."  *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960); *see Regan v. Upper Darby Twp.*, 363 F. App'x 917, 921 (3d Cir. 2010) (citing *Cucinotti*, 159 A.2d at 217).  In other words, battery is offensive touching without consent, and assault is an action that makes a victim believe that a battery is about to occur.

Given that lack of consent renders contact "offensive," and that it is not necessary to show that Romig intended harm – harm but only that he intended the contact to occur – Plaintiffs' claims for assault and battery turn on whether E.N. consented to the sexual contact. Romig asserts that E.N. did, in fact, consent, but Plaintiffs contend that Romig's conviction for

Institutional Sexual Assault makes such consent legally impossible.  In general, consent as a defense to criminal charges is a distinct standard from consent to tortious conduct.  However, the Supreme Court of Pennsylvania has held that when the acts giving rise to a civil claim also constitute a sex crime for which consent is not a defense, then consent is also foreclosed as a defense in the civil context.  *See C.C.H.*, 940 A.2d at 347.  Although *C.C.H.* concerned a different statutory sex offense – the prohibition on sex with minors under the age of 13 – the core reasoning in *C.C.H.* applies with equal force to the institutional sexual assault statute violated by Romig, which likewise evinces the legislature's rejection of case-by-case analysis of consent in favor of a bright-line rule prohibiting sexual contact.  *See id.* at 349.  Given this parallel, the Court predicts that the Supreme Court of Pennsylvania would hold that an individual convicted of or pleading guilty to Institutional Sexual Assault cannot assert the student-victim's purported consent as a defense to a subsequent civil assault or battery claim arising from the unlawful sexual contact.[9]

Since Romig cannot assert consent as a defense to the assault and battery claims against him, his guilty plea ends the inquiry with respect to Plaintiffs' battery claim.  With consent legally impossible, the sexual contact that was admitted in the guilty plea was necessarily offensive for tort purposes and a battery occurred each time he had sexual contact with E.N.  With respect to the assault claim, the guilty plea is not dispositive, since the crimes to which Romig pled guilty do not include creating an apprehension of physical contact (*i.e.*, sexual contact with no warning could give rise to the same crimes, but would not be a common law

---

[9] One year before *C.C.H.* was decided, another court in this district concluded that "a high school student who is assigned to a teacher's class does not have the capacity to welcome that teacher's physical sexual conduct," after a thorough consideration of Pennsylvania's corruption of minors and institutional sexual assault statutes.  *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 708 (E.D. Pa. 2007).  Although *Chancellor* does not provide binding precedent concerning Pennsylvania law, it provides additional support for the conclusion that the age and authority dynamics implicated in a player-coach relationship preclude the legal recognition of a student's purported consent to sexual advances by a school staff member.

assault).  However, there is no dispute that Romig's actions made E.N. aware that the sexual

contact would occur, so the elements of assault have been satisfied based on the factual record.

Accordingly, Plaintiffs' motion for summary judgment will be granted with respect to their

claims for assault and battery.

An appropriate order follows.

Dated:  May 6, 2016

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**